# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF TENNESSEE

```
------------------------------------------------------- x
                                               :
SNMP RESEARCH, INC. and SNMP                   :      Case No. 3:20-cv-00451-CEA-DCP
RESEARCH INTERNATIONAL, INC.,                  :
                                               :      U.S. District Judge Charles E. Atchley, Jr.
                    Plaintiffs,                :
                                               :
            v.                                 :
                                               :
BROADCOM INC.; BROCADE                         :
COMMUNICATIONS SYSTEMS LLC; and                :
EXTREME NETWORKS, INC.,                        :
                                               :
                    Defendants.                :
------------------------------------------------------- X
```

**EXTREME NETWORKS, INC.'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO COMPEL THE PRODUCTION OF LICENSE AGREEMENTS
<u>FROM SNMP RESEARCH, INC. AND SNMP RESEARCH  INTERNATIONAL, INC.</u>**

## TABLE OF CONTENTS

Page(s)

I.     INTRODUCTION .................................................................................................1

II.    BACKGROUND .................................................................................................2

III.   ARGUMENT ......................................................................................................6

       A.     SNMPR's Licensing History is a Crucial Component of Damages Proof ..............7

       B.     SNMPR's Licensing History is Relevant to Defendants' Claim that the
              Copyright Registrations Are Invalid .........................................................8

       C.     SNMPR's Arguments for Withholding Its Licensing History Are
              Insufficient ...............................................................................................10

       D.     SNMPR's Counter-Proposals Are Insufficient .......................................14

IV.    SNMPR SHOULD BE ORDERED TO RESPOND AND PRODUCE
       DOCUMENTS WITHIN TWENTY-ONE DAYS...........................................17

V.     CONCLUSION.................................................................................................17

i

# TABLE OF AUTHORITIES

Page(s)

## CASES

*ASUS Computer International v. Round Rock Research, LLC*,
No. 12-cv-02099 JST (NC), 2013 WL 6113253 (N.D. Cal. Nov. 20, 2013)..............12, 13

*Brittney Gobble Photography, LLC v. Wenn Ltd.*,
No. 3:16-CV-306-HSM-DCP, 2019 WL 2446997 (E.D. Tenn. Feb. 19, 2019)
(Poplin, Mag.), *report and recommendation adopted sub nom.*, *Brittney Gobble
Photography, LLC v. USA Entertainment News, Inc.*, 2019 WL 1125644 (E.D.
Tenn. Mar. 12, 2019) ........................................................................................................7

*Cooley v. Target Corp.*,
20-cv-2152 (DWF/DTS), 2021 WL 6882660 (D. Minn. Sept. 17, 2021) ........................13

*DaimlerChrysler Services v. Summit National*,
No. 02-71871, 2006 WL 208787 (E.D. Mich. Jan. 26, 2006) ...........................................15

*Dash v. Mayweather*,
731 F.3d 303 (4th Cir. 2013) ....................................................................................15, 16

*ECIMOS, LLC v. Carrier Corporation*,
No. 2:15-cv-2726-JPM-cgc, 2019 WL 13014635 (W.D. Tenn. Apr. 18, 2019).................7

*Gaylord v. United States*,
777 F.3d 1363 (Fed. Cir. 2015).....................................................................................7, 8

*Gold Value International Textile, Inc. v. Sanctuary Clothing, LLC*,
925 F.3d 1140 (9th Cir. 2019) ...........................................................................................9

*Groupwell International (HK) Ltd. v. Gourmet Express, LLC*,
277 F.R.D. 348 (W.D. Ky. Nov. 9, 2011)..................................................................11, 12

*McLaren v. Chico's FAS, Inc.*,
No. 10 Civ. 2481(JSR), 2010 WL 46157722 (S.D.N.Y. Nov. 9, 2010) ............................9

*Mitchell v. Universal Music Group*,
No. 3:15-CV-174-JHM, 2018 WL 1573233 (W.D. Ky. Mar. 30, 2018), *overruled
in part on other grounds sub nom.*, *Mitchell v. Capitol Recs., LLC*, 2018 WL
2011934 (W.D. Ky. Apr. 30, 2018) ..................................................................................13

*Neale v. Coloplast Corp.*,
No. 1:18-cv-00274, 2020 WL 6948361 (E.D. Tenn. Nov. 2, 2020)............................6, 11

ii

*On Davis v. Gap, Inc.*,
    246 F.3d 1525 (2d Cir. 2001).........................................................................................15

*Oracle Corp. v. SAP AG*,
    765 F.3d 1081 (9th Cir. 2014) .........................................................................................7

*RJ Control Consultants, Inc. v. Multiject, LLC*,
    981 F.3d 446 (6th Cir. 2020) ............................................................................................8

*Thoroughbred Software International, Inc. v. Dice Corp.*,
    488 F.3d 352 (6th Cir. 2007) ............................................................................................7

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
    142 S. Ct. 941 (2022)...................................................................................................6, 9

*Virtual Studios, Inc. v. Stanton Carpet Corp.*,
    No. 4:15-CV-0070-HLM, 2016 WL 5334473 (N.D. Ga. Jan. 12, 2016) ...................12, 14

## STATUTES

17 U.S.C. § 411(b)(1) ................................................................................................................8

## OTHER AUTHORITIES

U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 612.2 (3d ed.
    2021) .................................................................................................................................9

iii

Defendant Extreme Networks, Inc. ("Extreme") respectfully submits this memorandum of law in support of its motion to compel the production of license agreements from SNMP Research, Inc. and SNMP Research International, Inc.'s (together, "SNMPR" or "Plaintiffs").

## I. <u>INTRODUCTION</u>

It is not seriously disputed that SNMPR's licensing history is central to the issues in this litigation. For example (1): SNMPR's claims are alleged to arise from one such license agreement between SNMPR and Brocade Communications Systems LLC ("Brocade"). (*See* ECF No. 3-1 at ¶¶ 7-9, 16.) For example (2): SNMPR's licensing history is a core component of Extreme's case as a defendant. Extreme is asserting as a defense that SNMPR's licenses invalidate its own copyright registrations because the registrations claim that certain source code was unpublished when in fact SNMPR had published the same code through licenses for years prior to registration. For example (3): SNMPR's licenses show that SNMPR's supposed damages are wildly overstated, or in any event will be undeniably and directly relevant to setting the correct amount of damages owed in this case by Extreme (if Extreme is found to owe any damages at all). For its part, SNMPR has told this Court that this case "involves ill-gotten profits believed to be in the hundreds of millions of dollars." (ECF No. 101 at 13.) And yet, as far as Extreme can tell, SNMPR's <u>entire business</u> revolves around the licensing of its source code to various companies, and SNMPR regularly licenses the very same code at issue in this litigation to others for sums in the ▮▮▮▮ ▮▮.

Given the undisputed import of SNMPR's licensing history, Extreme sought copies of SNMPR's license agreements through two of the six total requests for production that Extreme

propounded on SNMPR. (*See* Demers Decl.[1] Ex. 1.) Extreme served those requests nearly one year ago, and yet still does not have a complete production of SNMPR's license agreements. Instead, SNMPR has produced what it describes as a fraction of its full licensing history. Troublingly, SNMPR's characterization of the produced agreements suggests that the agreements it produced are not even representative of the "hundreds" of agreements that SNMPR has unjustifiably withheld from production.

While Extreme has attempted to handle this matter outside of court, the parties' negotiations have reached an impasse. Accordingly, Extreme moves to compel the production of SNMPR's license agreements relating to the works it contends have been infringed by Extreme and any other licenses to which SNMPR has been a party that concern network technology software.

## II.    **BACKGROUND**

Over the course of this litigation, SNMPR has brought five motions to compel against Brocade, Broadcom Inc. ("Broadcom", together with Brocade, "Brocade/Broadcom"), and/or Extreme (together with Brocade/Broadcom, the "Defendants"). (*See* ECF Nos. 60, 69, 70, 88, 96, 115.) In contrast, Extreme has repeatedly sought to resolve discovery disputes without the help of this Court. This time is no different. But after months of back and forth with SNMPR, Extreme is now forced to make its first motion to compel in this matter.

The Extreme Requests for Production ("RFPs") were served on August 9, 2021. (Demers Decl. Ex. 1 at 8-9.) Extreme RFP No. 1 asks SNMPR to produce "[a]ll Licenses relating to copyrighted works that You contend are infringed in this Lawsuit." (*Id.* at 7.) Extreme RFP No. 2 asks SNMPR to produce, "[t]o the extent not otherwise requested, all Licenses to which You are

---

[1]    "Demers Decl." refers to the Declaration of Leslie A. Demers filed in support of Extreme's motion to compel.

2

a party, and which relate to any software regarding networking technology." (*Id*.) On September 8, 2021, SNMPR served its objections and responses. (Demers Decl. Ex. 2 at 7.) Through its responses, SNMPR did not agree to produce a single agreement, simply stating as follows:

> **RESPONSE TO REQUEST FOR PRODUCTION NO. 1**:
>
> Plaintiffs object on the grounds that this request is overbroad, is unduly burdensome because it would involve, among other things, having to give notice to and secure the agreement of many third-party licensees, and is not limited as to time or relevance. Plaintiffs are withholding documents based on these objections, and are willing to meet and confer to determine an appropriate scope of production of third party license agreements.

> **RESPONSE TO REQUEST FOR PRODUCTION NO. 2**:
>
> Plaintiffs object on the ground that this request is vague as to what constitutes "other software regarding networking technology," and Plaintiffs further object on the grounds that this request is overbroad, is unduly burdensome because it would involve, among other things, having to give notice to and secure the agreement of many third-party licensees, and is not limited in time or relevance. Plaintiffs are withholding documents based on these objections, and are willing to meet and confer to determine to an appropriate scope of production of third party license agreements.

(Demers Decl. Ex. 2 at 3.)

Two days after receiving SNMPR's blanket refusal to produce licenses, Extreme reiterated its need for these documents, given that the licenses are "vitally important to Extreme's defense." (Demers Decl. Ex. 3 at 5.) After discussion between the parties, on October 7, 2021, SNMPR agreed to produce "licenses [SNMPR is] able to locate after a reasonable search," and stated that it would do so (or at least would produce a vast majority) by December 8, 2021. (*Id*. at 1.) SNMPR made no mention of refusing to procure sign-off from the licensees. (*See id*.) What is more, on October 25, 2021, SNMPR represented to this Court that it had "agreed to produce all licenses

3

yielded after a reasonable search," and would do so by December 8, 2021. (ECF No. 111 at 10 n. 6.) Again, SNMPR made no mention of refusing to procure sign-off from the licensees. (*See id.*) At this point, Extreme believed the issue had been resolved and that SNMPR would produce all licenses, regardless of any confidentiality provisions in those agreements.

On November 30, 2021, SNMPR made what Extreme understood to be one in a series of rolling productions of license agreements. This production contained approximately 1,600 documents, a few hundred of which were license agreements, and also included amendments to license agreements and side letters. Yet again, at no point did SNMPR indicate that this was the last production it intended to make or that it was refusing to procure sign-off from other licensees. And at no point did SNMPR indicate that it was leaving out any license agreements, let alone hundreds of them.

But SNMPR changed its tune on December 17, 2021. In an email on that date to Extreme, SNMPR explained that it was planning on withholding "hundreds of licenses that require consent of the licensee to produce." (Demers. Decl. Ex. 4 at 3.) The only reason cited for this abrupt departure was the need to "negotiate[e] the required consents (assuming that can be done) . . . ." (*Id.*) As noted in Extreme's response sent December 23, 2021, SNMPR's email did not specify how many agreements it was withholding, nor did it state whether any effort had been made to provide requisite notice or obtain supposedly required consent for the agreements it had decided not to produce. (*Id.* at 2.) In fact, there is nothing to suggest that SNMPR has ever attempted to give notice and secure the agreement from the licensees. (*See id.* at 1-3; Demers Decl. Ex. 5 at 3 (noting SNMPR's repeated failure to answer whether it has undertaken any effort to seek approval from the third-party licensees led Extreme to conclude that SNMPR has not made any effort yet to get approval).)

4

During a meet and confer held in March 2022, the parties discussed a possibility of accepting representations from SNMPR on the following subjects: (i) "[a] representation about the highest royalty that SNMP[R] has received from licensing its software, and/or the categories of royalty amounts"; and (ii) "[a] representation about the number of SNMP[R] license agreements and how many licenses SNMP[R] executed in the years prior to 2011." (Demers Decl. Ex. 5 at 5.) As Extreme explained in subsequent communications, this arrangement is unacceptable for a number of reasons: (i) "representations about the highest dollar value or the number of license agreements executed is not enough from Extreme's perspective for valuation of the asserted copyrights[,]" (ii) "information beyond just the dollar value is needed to contextualize the agreements[,]" and (iii) Extreme "ha[s] concerns that the agreements produced to date are not representative of the agreements that SNMP[R] withheld from production." (*Id*. at 3.) With regard to the last point, SNMPR represented that the agreements it produced do not include confidentiality provisions requiring licensee sign-off before production, but the agreements that SNMPR refuses to produce do. (Demers Decl. Ex. 4 at 3.) On April 13, 2022—after continued discussion with no mutually acceptable resolution—Extreme again asked SNMPR for its position on whether it would produce its own licensing history and informed SNMPR that it would be moving forward with filing a motion to compel. (Demers Decl. Ex. 5 at 2.)

SNMPR responded with yet another insufficient proposal. First, SNMPR stated that it would inform licensees that their name and other identifying information could be redacted from the produced agreements, and thus would remain unknown to Extreme and its expert witnesses who will be assessing damages. (*Id*. at 1.) Second, SNMPR stated that it would send one letter to each licensee, and if after one week there was no response, it would follow up with one phone call or a letter. (*Id.*) If SNMPR were to receive no response from the follow up attempt, "there would

5

be no production of that license(s) in this case." (*Id.*) SNMPR also asked the parties to cover its fees for fulfilling its obligations under the Federal Rules of Civil Procedure to produce this information. (*Id.*)

But Extreme cannot allow shortcuts on this critical discovery. Thus, Extreme now makes this motion requesting that this Court compel SNMPR to produce the entire set of license agreements responsive to its discovery requests. As described above, Extreme met and conferred with SNMPR in good faith prior to filing this Motion.

## III.    ARGUMENT

As this Court emphasized in its recent Order on SNMPR's motions to compel (ECF No. 131) ("Order on SNMPR's Motions to Compel"), Federal Rule of Civil Procedure 26(b)'s relevance requirement governing discoverable information "'is extremely broad'" and "'has been construed to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" (ECF No. 131 at 3 (quoting *Neale v. Coloplast Corp.*, No. 1:18-cv-00274, 2020 WL 6948361, at *1 (E.D. Tenn. Nov. 2, 2020)); *see also id.* at 6 (referencing the Federal Rules' "broad relevancy standard"); *id.* at 22 (same)).

There is no doubt that SNMPR's own licensing history bears directly on issues in this case. In particular, SNMPR's licensing history is relevant to at least two specific aspects of Extreme's defense. First, the license agreements are fundamental to ascertaining a proper damages calculation to be applied. Second, the license agreements are a necessary component in Defendants' argument that SNMPR's copyright registrations are invalid.[2] While SNMPR has

---

[2]   This issue of copyright invalidity is currently pending before this Court as part of Defendants' Motion to Dismiss Plaintiffs' Complaint and/or to Transfer Venue (*see* ECF No. 42 at 15-22). In light of the Supreme Court's recent ruling in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941 (2022), the parties submitted supplemental briefing on this issue in March, 2022. (*See* ECF Nos. 121, 122.)

6

argued that it would be too burdensome to produce the full set of responsive documents, its concerns do not justify withholding the documents from production.

A.    <u>**SNMPR's Licensing History is a Crucial Component of Damages Proof**</u>

Extreme is seeking to compel production of SNMPR's license agreements in part because they are a fundamental component to making its actual damages calculation. Actual damages in copyright cases can include "the reasonable license fee on which a willing buyer and willing seller would have agreed for the use taken by the infringer." *Brittney Gobble Photography, LLC v. Wenn Ltd.*, No. 3:16-CV-306-HSM-DCP, 2019 WL 2446997, at *6 (E.D. Tenn. Feb. 19, 2019) (Poplin, Mag.) (quoting *Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 359 (6th Cir. 2007)), *report and recommendation adopted sub nom.*, *Brittney Gobble Photography, LLC v. USA Ent. News, Inc.*, 2019 WL 1125644 (E.D. Tenn. Mar. 12, 2019).

Damages experts, courts, and juries ***<u>routinely</u>*** consider comparable licenses in determining a reasonable license fee. *See, e.g.*, *id.* at *7; *ECIMOS, LLC v. Carrier Corporation*, No. 2:15-cv-2726-JPM-cgc, 2019 WL 13014635, at *10 (W.D. Tenn. Apr. 18, 2019) ("The proposals and purchase orders submitted as exhibits make clear that the money [plaintiff] would have earned for its software package would have been a recurring license $50 per unit per month and a one-time software migration fee . . . ." (internal quotation marks and citation omitted)). That is because the reasonable license fee "must be tied to the particular work at issue and its marketplace value" and "past arms-length licensing practices by the copyright owner or the infringer for similar uses and 'benchmark' licenses by others in the industry may be useful" in making this determination. *Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015). Indeed, it would be difficult to establish the amount of hypothetical-license damages without undue speculation in the absence of these agreements. *See Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1093 (9th Cir. 2014).

7

Thus, the agreements sought by Extreme RFP Nos. 1 and 2 are directly relevant to Extreme's damages calculation in the event it is found liable for infringement. Further, Extreme's requests are tailored to the information that would be relevant to this inquiry. Specifically, by requesting licenses relating to (i) the very same copyrighted works SNMPR contends are infringed in this lawsuit, and (ii) software regarding networking technology (the very subject matter of the copyrighted works that SNMPR is asserting in this case), Extreme seeks to obtain information about SNMPR's "past arms-length licensing practices . . . for similar uses" and other agreements with industry players. *See Gaylord*, 777 F.3d at 1368.

**B.     SNMPR's Licensing History is Relevant to Defendants' Claim that the Copyright Registrations Are Invalid**

The licensing history also speaks to whether SNMPR's copyright registrations are invalid. A full discussion of Defendants' arguments with respect to invalidity is set forth in their Memorandum of Facts and Law in Support of Defendants' Motion to Dismiss Plaintiffs' Complaint and/or to Transfer Venue (ECF No. 42 at 15-22) and Defendants' Response to Plaintiffs' Supplemental Brief in Opposition to Defendants' Joint Motion to Dismiss the Complaint or, Alternatively, to Transfer Venue (ECF No. 122). For the purpose of this motion, Extreme provides an abbreviated recitation of the law and the shortcomings of SNMPR's copyright registrations, and refers the Court to the briefing identified herein for a more fulsome discussion.

In order to bring a claim for copyright infringement, the plaintiff must own a valid copyright. *RJ Control Consultants, Inc. v. Multiject, LLC*, 981 F.3d 446, 454 (6th Cir. 2020). Plaintiffs cannot satisfy this requirement if "(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(1). Courts have found that if a work is knowingly registered as unpublished

8

when in fact it has been published, this constitutes grounds to invalidate the registration. *See Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1148 (9th Cir. 2019). Courts consider software that has been licensed to be published under the Copyright Act. *See, e.g.*, *McLaren v. Chico's FAS, Inc.,* No. 10 Civ. 2481(JSR), 2010 WL 4615772, at *2 (S.D.N.Y. Nov. 9, 2010) ("By licensing the . . . illustration . . . [plaintiff] 'published' the drawing within the meaning of the Copyright Act."); *see also* U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 612.2 (3d ed. 2021) ("Software is distributed when copies are distributed by purchase or license, whether in CD-ROM format or online . . . ."). Thus, this invalidity defense is predicated on the fact that, at the time the works were registered in 2011, they had been published by virtue of SNMPR's longstanding licensing practices.

Additionally, the Supreme Court recently sought to define the scope of the phrase "with knowledge that it was inaccurate" in *Unicolors, Inc.*, 142 S. Ct. at 945-48. In noting that a good faith misunderstanding of the law may not invalidate a registration containing inaccurate information, the Court explained that "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Id.* at 948. Indeed, "[c]ircumstantial evidence, including the significance of the legal error . . . may also lead a court to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information." *Id.*

The volume of agreements SNMPR executed in which it licensed the software at issue speaks to the significance of legal error. For example, if SNMPR executed thousands of agreements in which it licensed the software at issue, it seems that only willful blindness or fraud could explain SNMPR's reasoning for registering its works as unpublished. Here, too, a representation by SNMPR as to the number of license agreements and licenses it executed prior to

2011 is insufficient. While the number would provide necessary evidence in support of willful blindness, other information contained within the agreements is important, such as the particular code licensed, how long SNMPR has engaged in its licensing practices for the works at issue, the industries across which SNMPR is operating, and the expansiveness of rights granted.

### C. SNMPR's Arguments for Withholding Its Licensing History Are Insufficient

SNMPR objects to producing its full licensing history on the grounds that the requests are overbroad and unduly burdensome. More specifically, SNMPR's responses to Extreme RFP Nos. 1 and 2 state that the requests are overbroad and "unduly burdensome because [they] would involve, among other things, having to give notice to and secure the agreement of many third-party licenses, and [are] not limited as to time or relevance." (Demers Decl. Ex. 2 at 3.) SNMPR's response to Extreme RFP No. 2 also asserts that it is "vague as to what constitutes 'other software regarding networking technology.'" (*Id.*) These objections are insufficient to justify withholding relevant documents. Not only do these responses lack a proper basis for objection, case law shows that courts often reject these arguments in favor of ordering the production of a party's relevant licensing history.

### 1. SNMPR Has Failed to Show That Production Would be Overly Burdensome

As an initial matter, Extreme takes issue with the idea that SNMPR—the plaintiff in this case—should be heard to complain about the burden of responding to discovery requests. As this Court knows, SNMPR recently succeeded in compelling Extreme to produce over twelve terabytes of source code, a process which entailed Extreme engineers on two continents working "around the clock" (Demers Decl. Ex. 6 at ¶ 20), the purchase of multiple new computers, (Demers Decl. at ¶ 9), and the preparation of dedicated review rooms, (*id.*). Also, to be clear, Extreme had to provide contractual notices to various third parties (whose source code was contained in various

10

of Extreme's source code files) before producing its source code files in this case. (*Id.*) But Extreme did not rely on those third-party confidentiality contract provisions to avoid making a production. Nor did Extreme withhold documents on that basis. Instead, Extreme complied with its contractual confidentiality duties to third parties, and then made a production—exactly what SNMPR appears to be refusing to do here.

In any event, as SNMPR knows full well, "[a] responding party must show specifically how each discovery request is burdensome and oppressive by submitting affidavits or offering evidence revealing the nature of the burden" and that "[g]ood cause for refusing discovery is not established solely by showing that discovery may involve inconvenience and expense." *Groupwell Int'l (HK) Ltd. v. Gourmet Express, LLC*, 277 F.R.D. 348, 360 (W.D. Ky. Nov. 9, 2011) (internal quotation marks and citation omitted). Indeed, SNMPR asserted this same argument against Extreme in its own motion to compel. (*See* ECF No. 74 at 2-3.) More recently, the Court echoed this sentiment in its Order on SNMPR's Motions to Compel (*See* ECF No. 131 at 9, 17, 21-22.) The Court's Order on SNMPR's Motions to Compel also makes it clear that boilerplate objections to discovery requests are unacceptable. (*See id.* at 4 ("The court strongly condemns the practice of asserting boilerplate objections to every discovery request." (quoting *Neale*, 2020 WL 6948361, at *2)); *see also id.* at 23 (explaining that the Sixth Circuit has found boilerplate objections to be insufficient)).

SNMPR's conclusory and speculative objections fly in the face of this Court's Order on SNMPR's Motions to Compel. The speculative nature is especially clear when taking into account the fact that SNMPR has not yet actually attempted to give notice and secure the agreement of ***any*** third-party licensees. Nor has SNMPR given a reason why its objections on the basis of time and relevance are valid. And SNMPR's subsequent communications with Extreme lack any further

11

Case 3:20-cv-00451-CEA-DCP   Document 136-1   Filed 05/11/22   Page 15 of 22   PageID #: 5401

evidence (much less an affidavit) concerning this issue. Rather, SNMPR has merely claimed that producing the remaining license agreements would impose a "significant burden" on Plaintiffs based on "estimates that it will take significant attorney time to negotiate consent to produce the remaining licenses." (Demers Decl. Ex. 5 at 1.) Again, how exactly SNMPR is making this "estimate" is unclear. Regardless, these vague statements do not justify withholding the licensing history. *See Groupwell Int'l (HK) Ltd.*, 277 F.R.D. at 361 (ordering the plaintiff to make a good faith effort to produce all of the contracts requested due to the plaintiff's "bare assertion[s]" as to the number of documents covered by the requests and thus "a great deal of uncertainty surrounding the true nature and burden associated with the production of documents").

Forming the basis of SNMPR's argument that production would be burdensome is the fact that, unlike the agreements already produced, the remaining agreements apparently have provisions requiring SNMPR to obtain the licensees' consent before handing them over. (*See* Demers Decl. Ex. 4 at 3.) But confidentiality concerns are simply not enough to justify claims that the production of agreements with third parties would be burdensome, particularly where a protective order is in place. *See Virtual Studios, Inc. v. Stanton Carpet Corp.*, No. 4:15-CV-0070-HLM, 2016 WL 5334473, at *14 (N.D. Ga. Jan. 12, 2016); *ASUS Comput. Int'l v. Round Rock Rsch., LLC*, No. 12-cv-02099 JST (NC), 2013 WL 6113253, at *2 (N.D. Cal. Nov. 20, 2013). Indeed, this Court rejected this argument in its recent Order on SNMPR's Motions to Compel, stating that Broadcom/Brocade did "not identify how many responsive contracts contain confidentiality provisions, explain how the Protective Order [Doc. 93] would not serve to alleviate their concerns, or elaborate on their alleged 'undue burden.'" (ECF No. 131 at 21.) Likewise, SNMPR has not satisfied any of these conditions—it has merely claimed that "hundreds" of documents are being withheld due to consent requirements while refusing to elaborate on the

12

reasons underlying its supposed burden.  Therefore, to borrow a phrase from SNMPR's own motion to compel, these objections simply "fail to hold water."  (*See* ECF No. 74 at 2.)

### 2.    Courts Routinely Order Parties to Produce Their Licensing History

It is not unusual for a court to order the full production of a party's licensing history.  For example, in *Cooley v. Target Corp.*, the court ordered the defendant to produce all licensing agreements it had with any artist or designer whose work it used in its children's clothing lines, which were relevant as a measure of damages for copyright infringement.  No. 20-cv-2152 (DWF/DTS), 2021 WL 6882660, at *3-4 (D. Minn. Sept. 17, 2021).  At issue in the case was a design used in one of the defendant's children's clothing lines. *Id.* at *1.  Notably, the court's order was not limited to license agreements concerning the specific line at issue, but also included those having to do with all of the defendant's children's clothing lines. *Id.* at *4.  Here, too, Extreme is requesting license agreements associated with (i) the specific works SNMPR contends were infringed as well as (ii) those associated with the subject matter of the technology at issue.  As the court determined in *Cooley*, all agreements that fall within these buckets are relevant to the question of copyright infringement damages and therefore must be produced. *Id.*; *see also Mitchell v. Universal Music Grp.*, No. 3:15-CV-174-JHM, 2018 WL 1573233, at *8-9 (W.D. Ky. Mar. 30, 2018) (ordering party to respond to request for production seeking all documents related to licensing agreements), *overruled in part on other grounds sub nom.*, *Mitchell v. Capitol Recs., LLC*, 2018 WL 2011934 (W.D. Ky. Apr. 30, 2018); *ASUS Comput.*, 2013 WL 6113253, at *2 (ordering the plaintiff to identify and produce all license agreements concerning the products at issue in the patent context in order to support the defendant's damages case).

Moreover, it is not uncommon for courts to order the production of agreements that implicate confidentiality concerns.  For example, in *Virtual Studios*, the court ordered production of all licenses or agreements between the plaintiff and third parties, despite claims that they were

13

covered by confidentiality orders, because "the documents sought are relevant, and any concerns as to confidentiality can be alleviated by the Court ordering production and noting that the documents are subject to the terms of the protective order in this case." 2016 WL 5334473, at *14. Thus, the protections currently in place via the Protective Order alleviate potential confidentiality concerns.

### 3. The Phrase "Other Software Regarding Networking Technology" Is Not Vague

SNMPR feigns ignorance at the meaning of "other software regarding networking technology." It is not credible that a company that claims to "specialize[] in solutions for Internet and network security applications" and "focus on network security first" does not know the meaning of "networking technology." *See About SNMP Research*, SNMP RESEARCH INTERNATIONAL, INC., https://snmp.com/company/snmpcompanies.shtml (last visited May 6, 2022). It is furthermore not credible that a company whose founder was formerly the "network manager" for a university does not know the meaning of "networking technology." *See, e.g.*, *High Tech Goes Low Key*, SNMP RESEARCH INTERNATIONAL, INC. (Dec. 31, 1998), https://snmp.com/company/history.shtml. Indeed, SNMPR's company name appears to be cribbed from an Internet Standard Protocol called "SNMP," or, "Simple Network Management Protocol."

### D. <u>SNMPR's Counter-Proposals Are Insufficient</u>

Through a series of ever-changing proposals in recent weeks and months, SNMPR has repeatedly tried to avoid producing its own licensing history by offering alternatives. Those alternatives will not work.

Select representations about certain (but not all material) facts about the undisclosed agreements are insufficient. First, any representation by SNMPR of the highest royalty it has received from licensing its software is both self-serving and incomplete. It should be no surprise

14

that SNMPR—wanting to claim large damages against Extreme—is willing to share its "highest" royalty fees. But that ignores that any reasonable and responsible review of SNMPR's licensing history should include its highest fees, its lowest fees—all of the fees it received, and from whom, and under what circumstances. The reasonable licensing fee calculation must take into account "the amount a *willing* buyer would have been *reasonably* required to pay." *DaimlerChrysler Servs. v. Summit Nat'l¸* No. 02-71871, 2006 WL 208787, at *2 (E.D. Mich. Jan. 26, 2006) (internal quotation marks and citation omitted). Therefore, the highest license fee available will not be a reasonable objective payment. *See On Davis v. Gap, Inc.*, 246 F.3d 152, 166 n.5 (2d Cir. 2001) ("[T]he fair market value to be determined is not of the highest use for which plaintiff might license but the use the infringer made.").

Moreover, information beyond the dollar value is needed to contextualize the agreements. For each agreement, it is necessary to consider the specific work(s) licensed, the rights granted (for what duration, with what rate structure, with what pass-along rights if any, etc.), the licensee and its profile (is it a large company specializing in the networking industry, such as Cisco; or is it a small company with only peripheral involvement in the networking industry), and the industry to which the licensee belongs to contextualize any hypothetical license that would have been executed between SNMPR and Extreme. *See Dash v. Mayweather*, 731 F.3d 303, 319 (4th Cir. 2013) (explaining that benchmark licenses are "not overly speculative when [they] contemplate comparable uses of comparable works," but are too speculative to support a copyright holder's claim for actual damages if the licenses are "inapposite" (internal quotation marks and citation omitted)). Without seeing the full picture of the licensing history, there is no way of knowing whether the agreements produced are truly comparable and representative.

15

For the same reasons, SNMPR's most recent offer does not meaningfully resolve the issue. Again, it is necessary that Extreme knows the identity of the licensees in order to assess whether the agreements are comparable. If SNMPR redacts the licensees' names and other identifying information, the parties' damages calculations will be speculative. *See Dash*, 731 F.3d at 319. Moreover, the redactions would be unnecessary, as the Protective Order (ECF No. 93) alleviates confidentiality concerns. Indeed, SNMPR has not asserted that the Protective Order would be insufficient to allow production of the hundreds of withheld agreements in this case.

Nor can Extreme accept SNMPR's proposal that it no longer has an obligation to produce the applicable license(s) in the event it does not hear back from a licensee after two attempted outreaches by mail or telephone. If Extreme were to agree to this, it would soon enough end up in the same position it is in now: with no information on (i) the nature of the agreements withheld, or (ii) whether or not they are comparable to a hypothetical license. Thus, SNMPR's stated proposal is insufficient. What is more, because SNMPR has not attempted any outreach or specified the number of agreements it is withholding, it is impossible to gauge how many agreements would likely end up being withheld under this arrangement. Nor has SNMPR offered any evidence of the burden it would face in obtaining and reviewing the agreements. In fact, Extreme raised to SNMPR that it had been ordered to produce hundreds of agreements in a separate litigation against another party, and SNMPR was unable to confirm that the agreements produced in that litigation could not be (or were not already) produced here. *See Avaya Inc. v. SNMP Research, Inc.*, No. 1:12-cv-00191-RGA-MPT, Hearing Transcript Excerpt at 38:19-40:8 (D. Del. June 11, 2015), ECF No. 276-3 (ordering SNMPR to produce hundreds of licenses it had previously withheld). (*See also* Demers Decl. at ¶ 8.)

16

Finally, of course, this Court has the authority to compel SNMPR to produce its own licensing history ***notwithstanding*** objections by or failures to consent from various third parties. By proposing schemes under which licensing agreements that SNMPR entered into (and pursuant to which SNMPR collected and/or paid license fees) would be produced only with the consent of third parties, SNMPR seems to be suggesting that such consent is necessary before the licenses could be produced. That is not right. This Court can and should compel such licenses (sitting in the possession, custody and control of SNMPR) to be produced. They may then be produced with confidentiality designations applied by SNMPR, and then treated confidentially by outside counsel for Extreme.

## IV. SNMPR SHOULD BE ORDERED TO RESPOND AND PRODUCE DOCUMENTS WITHIN TWENTY-ONE DAYS

SNMPR should be ordered to respond fully in writing and by producing documents within twenty-one (21) days of the Court's order on this motion. In its own motion to compel, SNMPR demanded that Extreme produce documents and answer written discovery for the more than one hundred cited requests at issue in a mere fourteen (14) days. (ECF No. 101 at 24.) SNMPR has had Extreme's targeted set of discovery requests for almost a year. Discovery cannot be a one-way street. Extreme respectfully asks the Court to hold SNMPR to (a more reasonable version of) SNMPR's own standard and order production within twenty-one (21) days. (*See* ECF No. 131 at 23 (ordering production within twenty-one (21) days).)

## V. CONCLUSION

Extreme respectfully requests the Court to compel SNMPR to produce all license agreements related to the works it alleges that Extreme has infringed and all remaining license agreements that otherwise concern software regarding networking technology.

17

DATED:    May 11, 2022          Respectfully Submitted,
          New York, New York

                                */s/ Leslie A. Demers*

                                John M. Neukom (*admitted pro hac vice*)
                                DEBEVOISE & PLIMPTON LLP
                                650 California Street
                                San Francisco, California 94108
                                jneukom@debevoise.com
                                (415) 738-5700

                                Leslie A. Demers (*admitted pro hac vice*)
                                SKADDEN, ARPS, SLATE,
                                  MEAGHER & FLOM LLP
                                One Manhattan West
                                New York, New York 10001
                                leslie.demers@skadden.com
                                (212) 735-3000

                                *Attorneys for Extreme Networks, Inc.*

18