IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § § § | Case No. 3:20-cv-00451 |
| Plaintiffs, | | |
| v. | § § | **Jury Demand** |
| BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; AND EXTREME NETWORKS, INC. | § § § § § § | |
| Defendants. | § § | |

**PLAINTIFFS SNMP RESEARCH, INC.'S AND SNMP RESEARCH INTERNATIONAL, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO EXTREME NETWORKS, INC.'S MOTION TO COMPEL DISCOVERY RESPONSES**

Plaintiffs SNMP Research, Inc. and SNMP Research International, Inc. ("SNMP Research" or "Plaintiffs") respectfully submit this Memorandum of Law in Opposition to Extreme Networks, Inc.'s ("Extreme") Motion to Compel Discovery Responses ("Motion" or "Mot.") from Plaintiffs.

**I.     INTRODUCTION**

Extreme's Motion presents an issue that should be resolvable via a reasonable compromise. Extreme's request for all licenses related to networking appear to seek every license that SNMP has ever granted to any customer for SNMP's entire existence, an existence spanning more than three decades. Despite the breadth of that request, and the fact that it encompasses information on the fringes of even the lenient standard for discovery relevance, Plaintiffs' counsel spent a significant amount of time searching for and reviewing licenses in order to determine, among other things, which ones contained contractual confidentiality prohibitions on disclosure. For the 393 licenses Plaintiffs located that had no such confidentiality prohibitions (which entailed review of more than 1,613 separate agreements, amendments, and side letters) (Declaration of John L. Wood (hereafter Wood Decl. ¶ 4)),

Plaintiffs produced them.

Plaintiffs then asked Extreme to review the hundreds of licenses that Plaintiffs had already produced to see if Extreme truly needed more licenses because the rest had confidentiality restrictions that would be cumbersome to address. Six days later, Extreme demanded that it needed all licenses throughout all time without limitation.

Plaintiffs still tried to work out a resolution, proposing multiple potential compromises. Ex. B to Wood Decl. (3/16/22 email from O. Weber to A. Plessman and L. Demers). Plaintiffs' final proposal was to send a letter to each licensee whose license contains restrictions on disclosure requesting that licensee's consent to disclosure, followed by a phone call if necessary. As an inducement to help procure licensee consent, the proposed letter would offer the licensee the option to have its name and any other identifying information redacted from the license agreement and would also note the parties' agreement not to seek disclosure of the licensee's identity in discovery. Consistent with Federal Rule of Civil Procedure 26(c)(1)(B), Plaintiffs also asked Defendants to share in the cost of this effort to secure licensee consent, particularly given that the parties had divergent views on the potential utility of the information to this case. Extreme rejected the proposed compromise and offered no compromise of its own. Plaintiffs submit that their proposal is a fair and balanced compromise, and, for the reasons set forth below, it should be ordered.

## II. FACTS AND RELEVANT PROCEDURAL POSTURE

Extreme has sought production of all of SNMP's customer licenses ever entered into by Plaintiffs for their entire existence. Plaintiffs first asked Extreme to agree on a more narrow set of licenses (e.g. limited by time or some other metric). Ex. C to Wood Decl. (9/22/21 email from O. Weber to L. Demers). Extreme would not agree.

Plaintiffs then began searching for and reviewing licenses and realized that many contained

confidentiality restrictions limiting disclosure.[1]  Wood Decl. ¶ 3.  Plaintiffs estimate that it took 67 hours just to do this work.  *Id.* at ¶ 4.  Plaintiffs' counsel reviewed almost 1,000 license agreements, of which it determined 393 contained no confidentiality provision, and the remaining 565 contain confidentiality restrictions.  *Id.* at ¶¶ 3, 4.  Plaintiffs produced the 393 license agreements containing no confidentiality restrictions, which consisted of 1,613 separate files.  *Id.* at ¶ 4.

Plaintiffs also went to the effort of attempting to secure consent from seventeen licensees with confidentiality restrictions in their licenses.  *Id.* at ¶ 5.  All but three of those licensees did not even respond to Plaintiffs' request, and one attempted to impose onerous conditions and restrictions on things that Plaintiffs cannot control.  *Id.* at ¶ 5.

Plaintiffs asked Extreme to review the hundreds of licenses already produced to see if Extreme really needed more.  Six days later, Extreme again stated it needed all the licenses.  Ex. D to Wood Decl. (12/23/21 email from L. Demers to O. Weber).

After multiple subsequent calls failed to yield a compromise,[2] Plaintiffs then proposed the following approach to Extreme:

> SNMP will inform licensees that their names and other identifying information can be redacted from the produced agreements and that Defendants will not pursue the redacted information either in this litigation or otherwise.
>
> To reduce burdens and cost, SNMP will send a letter to each licensee

---

[1] Prior to SNMP Research International Inc.'s incorporation in 1994, licenses were entered into with SNMP Research, Inc.  Those licenses have either been transferred to SNMP Research International, Inc. or are no longer active.  Therefore, those older licenses were not reviewed.  *See* Wood Decl ¶ 7.  Plaintiff also has not reviewed or produced evaluation licenses with customers which would take hundreds of hours and are not relevant to damages claims since the evaluation licenses have no cost, do not allow customers to redistribute the SNMP Research software, and are provided for the limited purpose of evaluating the SNMP Research software.  *Id.*  Finally, Plaintiffs have not reviewed or produced licenses to Plaintiffs.

[2] In the Motion, Extreme references a proposal from Brocade's and Broadcom's counsel whereby Plaintiffs would provide representations about royalty amounts and the number of license agreements.  *See* Mot. at 5.  Both Extreme and Plaintiffs agree that this proposal will not work.  From Plaintiffs' perspective, this proposal is unworkable because (i) Plaintiffs do not want to be in the position where they are essentially required to interpret the contracts for Defendants; and (ii) Plaintiffs do not want to undertake such an interpretation that would require enormous effort, given how many times the various agreements were amended and restated.

> and, if SNMP does not hear from the licensee within one week, SNMP
> will issue one follow-up call or letter to that licensee. Should that
> licensee fail to respond to SNMP's second attempt to contact the
> licensee, SNMP would be under no further obligation to seek the
> consent of that licensee to produce.

Ex. B to Wood Decl. (4/15/22 email from O. Weber to L. Demers). In the same proposal, Plaintiffs also asked: "Are Defendants willing to split the cost of this effort with Plaintiffs?" *Id.* Three weeks later, Extreme responded and rejected Plaintiffs' proposal.

In short, Plaintiffs have proposed a variety of ways to try to narrow Extreme's request for production of all of SNMP's customer licenses ever entered into by Plaintiffs for their entire existence, but Extreme rejected each of those proposals.

### III. ARGUMENT

Because Extreme's request seeks information of only marginal relevance, and because procuring third party consent would be a significant burden (*see* Wood Decl. ¶ 6), this Court should deny Extreme's motion and order the compromise solution that Plaintiffs have offered to Extreme.

#### A. Extreme's Request Encompasses Information On The Fringes Of Discovery Relevancy

Extreme admits that Plaintiffs have already produced hundreds of license agreements to Extreme. Extreme argues that there are three reasons why it needs to see all remaining licenses over Plaintiffs' entire three-decade history:

> (1) SNMPR's claims are alleged to arise from one such license agreement between
> SNMPR and Brocade Communications Systems, LLC ('Brocade'); . . . (2) SNMPR's
> license history is a core component of Extreme's case as a defendant. . . . [and]
> (3) SNMPR's licenses show that SNMPR's supposed damages are wildly overstated,
> or in any event will be undeniably and directly relevant to setting the correct amount of
> damages owed in this case by Extreme[.]

Mot. at 1. As to item (1), Extreme never explains why the fact that SNMPR's claims "are alleged to arise" from a single license to Brocade (which has been produced) somehow render hundreds of other licenses over Plaintiffs' entire existence relevant, much less important, to this case.

As to item (2), the "defense" Extreme is referring to is its contention in this case that: (a) the act of licensing allegedly equates to "publication" under copyright law; (b) which, it contends, means that SNMP Research, Inc. should have checked the box "published" rather than the box "unpublished" on its registration application; and (c) that SNMP Research, Inc.'s failure to do so means SNMP Research, Inc. made a "knowingly false" statement on its registration application and that its copyright registration is therefore invalid. *See* Dkt. 40-1 (Mem. of Facts and Law in support of Defendants' Motion to Dismiss Plaintiffs' Complaint and/or Transfer Venue (herein, "Defendants' Motion to Dismiss")) at 16-22. Plaintiffs disagree. *See, e.g.,* Dkt. 48 (Plaintiffs' Opp. to Defendants' Motion to Dismiss) at 12-22; Dkt. 61 (Plaintiffs' Supp. Brief attaching Report of the Register of Copyrights rejecting Defendants' position); Dkt. 122 (Plaintiffs' Supp. Brief updating the Court with a newly-issued United States Supreme Court opinion reversing case authority relied on by Defendants in their Motion to Dismiss). Yet even if it were true that licensing equates to publication for purposes of the registration process, Extreme never explains why it needs to see all licenses Plaintiffs have ever entered into for their entire existence in order to make that assertion. Indeed, Extreme has claimed to this Court that just one license will do to prove its "publication" defense. *See* Dkt. 40-1 (Defendants' mem. in support of motion to dismiss) at 17 (arguing that the license to Brocade alone purportedly establishes "publication" as a matter of law).[3]

As to item (3), Extreme argues that: "For its part, SNMPR has told this Court that this case "involves ill-gotten profits believed to be in the hundreds of millions of dollars." ECF No. 101 at 13. Mot. at 1. But then Extreme ignores the fact that ***Extreme's profits*** are derived from Extreme's revenues from selling its infringing products, not Plaintiffs' license agreements with non-parties to this

---

[3] Extreme claims that having numerous licenses shows Plaintiffs' knowledge that licensing equals publication (Mot. at 9-10), but Extreme never explains why that is the case. If licensing truly did equate to publication, and Plaintiffs didn't know that at the time of registration, it wouldn't matter if Plaintiffs had previously licensed once or hundreds of times.

case. 17 U.S.C. § 504(b) ("The copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expense and the elements of profit attributable to factors other than the copyrighted work."). And, in any case, Plaintiffs have been requested to produce, and expect to produce, a ledger showing license payments Plaintiffs have received from third parties.[4] Thus, although Plaintiffs do not concede the relevance of Plaintiff's license payments to its damages in this matter, Extreme will be able to ascertain those license payments through that material, without the burden associated with production of the remaining license agreements. Consequently, Extreme's professed need for every license that Plaintiffs have ever issued throughout Plaintiffs' entire existence is, at best, on the fringes of even the broad discovery relevance standard, and Plaintiffs have already produced all of the responsive licenses reasonably accessible to it other than those with confidentiality provisions prohibiting disclosure.

### B. Extreme's Request Is Unduly Burdensome And Disproportionate

Concurrently with this opposition, SNMP has submitted the declaration of John L. Wood, who was personally involved in collecting and reviewing (and supervising others' collection and review of) the hundreds of licenses produced thus far, as well as in reaching out to several licensees whose license agreements with Plaintiffs contain confidentiality provisions. As set forth in that declaration, Plaintiffs already incurred approximately 67 hours of attorney time just to determine which licenses, over almost 30 years of Plaintiffs' existence, contain confidentiality provisions which limit or preclude disclosure. Wood Decl. ¶ 4. Many of the agreements have multiple amendments and side letter agreements, and

---

[4] Brocade Communications Systems LLC's Request for Production No. 77 in Brocade Communications Systems LLC's First Set of Requests for Production to SNMP Research Inc. calls for Plaintiffs to produce a ledger showing revenues and/or profits actually or expected to be received from licensing. Plaintiffs can produce license payments back to 1997.

must be reviewed in full to determine whether confidentiality restrictions exist. *Id.* at ¶¶ 2, 3. Any licenses that did not contain a restriction on disclosure have already been produced. *Id.* at ¶ 4.

In addition, while Extreme claims Plaintiffs never attempted to reach out to any licensees with confidentiality restrictions to try to secure their consent, that is incorrect. Wood Decl. ¶ 5. In fact, Plaintiffs reached out to seventeen such licensees. *Id.* All but three did not even respond to Plaintiffs' request. *Id.* And one of the respondents demanded numerous "conditions" that Plaintiffs could not, even if they wanted, enforce in this case. An excerpt of that licensee's demands is quoted immediately below:

- SNMP agrees that the Parties will not use or disclose the License Agreement to jury or trial consultants, including mock jurors.

- SNMP must notify [the licensee] in writing if any of the License Agreement is designated as a trial exhibit or is to be used in open court. To the extent any of the License Agreement will be disclosed in the courtroom at trial or any hearing, SNMP agrees that it will move to have the courtroom sealed before any such disclosure.

- SNMP confirms that no Party may remove, or cause to be removed, any portion of the License Agreement from the territorial boundaries of the United States of America.

- To the extent the produced materials will be disclosed to an expert, that expert must be properly disclosed to [the licensee] under the terms of the Protective Order, and [the licensee] must be given 10 business days to object to that expert receiving [the licensee's] confidential information.

- SNMP shall be responsible for securing any necessary permission from third parties whose confidential information may also be included in the License Agreement. [The licensee] cannot and does not grant permission to produce such third parties' information on their behalf.

Ex. A to Wood Decl.

For Plaintiffs to negotiate with the remaining licensees protected by confidentiality restrictions would take Plaintiffs hundreds of hours (Wood Decl. ¶ 6), would likely require multiple letters/emails/calls per licensee (even assuming the licensee would agree to speak with Plaintiffs), and even then, Plaintiffs do not have the ability to force acquiescence. Extreme mischaracterizes this as Plaintiffs purportedly "refusing to procure sign-off from the licensees" or failing to "secure the agreement from the licensees," Mot. at 3, 4, but Plaintiffs do not control the licensees and, as is shown by the response received from one licensee excerpted above, to the licensees it may not be a simple "sign-off." Moreover, because Extreme's request goes back to Plaintiffs' inception, many of the licensees are no longer customers or have undergone name changes or are otherwise difficult to ascertain current contact information for. Wood Decl. ¶ 5. In addition, Plaintiffs anticipate that negotiating consent with some of the licensees would be exceedingly difficult and could risk jeopardizing Plaintiffs' relationships with those licensees. It is because of all of these difficulties as well as Plaintiffs' lack of control over licensee consent that Plaintiffs proposed a compromise to Extreme. Namely, that: (i) SNMP would send a letter that would go to all remaining licensees with confidentiality clauses seeking their consent to disclosure/production; (ii) the letter would include an offer that the licensee's name could be redacted from the copy of the license produced and that Defendants would not pursue the redacted information either in this litigation or otherwise; (iii) the required follow-up from the letter would be limited to one phone call or letter to the licensee; and (iv) that the parties would split the cost of all of this work.

As noted above, three weeks thereafter, Extreme rejected this proposal. Extreme did not suggest any other potential compromise or share any of the reasons why this compromise supposedly would not work that it now proffers in its Motion. Extreme also would not accept any element of the proposed compromise (e.g. redaction), even if it were rejecting the other elements (e.g. cost sharing).

Plaintiffs' proposed compromise is fair and consistent with Rule 26(c)(1)(B), which permits the

Court to "specify[] terms, including time and place or the allocation of expenses for the disclosure or discovery." "It is well settled that a district court may order that a party seeking discovery pay a portion of the expense incurred in obtaining discoverable materials." *Delozier v. First Nat. Bank of Gatlinburg*, 109 F.R.D. 161, 164 (E.D. Tenn. 1986). As demonstrated above, the scope of license production that Extreme seeks is on the fringes of relevance, has already caused Plaintiffs to incur significant time and expense, has yielded a production of hundreds of licenses already, and would require much more time and expense to secure the consent of the remaining licensees with confidentiality provisions precluding disclosure/production. Plaintiffs have offered a balanced and fair compromise that takes these factors into account, and Extreme's own cited authority demonstrates that its dismissive attitude toward any compromise at all is inappropriate. Indeed, immediately after a passage that Extreme selectively quotes, *Groupwell Int'l v. Gourmet Express, LLC* directs that:

> [W]here a party claims burdensomeness, it must explain why that is so. It should also propose alternatives, if such things might be possible, that could enable some degree of production. Where a party explains the difficulties that compliance would create, the requesting party must be heedful, and not simply knee-jerk dismissive of those explanations.

277 F.R.D. 348, 360 (W.D. Ky. Nov. 9, 2011).[5]

### IV. CONCLUSION

For all of the aforementioned reasons, Plaintiffs respectfully submit that Extreme's motion should be denied, and that the Court should order the compromise solution that Plaintiffs offered to Extreme.

---

[5] Extreme is correct that Plaintiffs are not claiming, and have never claimed, that this Court is bound by confidentiality clauses in contracts with third parties. Plaintiffs have just tried to work out a solution that balances the interests of the third parties and hopefully increases (e.g. through the offer of redactions) the likelihood of securing voluntary consent to disclosure, production, and use in this case.

Respectfully submitted,

Dated: May 25th, 2022    By: /s/ *John L. Wood*
 John L. Wood, Esq. (BPR #027642)
 Cheryl G. Rice, Esq. (BPR #021145)
 Rameen J. Nasrollahi, Esq. (BPR #033458)
 EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
 900 S. Gay Street, Suite 1400
 P.O. Box 2047
 Knoxville, TN 37902
 (865) 546-0500 (phone)
 (865) 525-5293 (facsimile)
 jwood@emlaw.com
 crice@emlaw.com
 rnasrollahi@emlaw.com

Dated: May 25th, 2022    By: /s/ *A. Matthew Ashley*
 A. Matthew Ashley (CA Bar. No. 198235)
 Morgan Chu (CA Bar. No. 70446)
 David Nimmer (CA Bar. No. 97170)
 Olivia Weber (CA Bar. No. 319918)
 IRELL & MANELLA LLP
 1800 Avenue of the Stars, Suite 900
 Los Angeles, California 90067-4276
 (310) 277-1010 (phone)
 (310) 203-7199 (facsimile)
 mchu@irell.com
 dnimmer@irell.com
 mashley@irell.com

 *Attorneys for Plaintiffs*
 *SNMP Research International, Inc.*
 *SNMP Research, Inc.*