IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE, TENNESSEE

3 _____ )
SNMP RESEARCH, INC. and SNMP )
4 RESEARCH INTERNATIONAL, INC., )
)
5              Plaintiffs, )
)
6 vs. ) Case No. 3:20-cv-451
)
7 BROADCOM, INC., BROCADE )
COMMUNICATIONS SYSTEMS, LLC, )
8 and EXTREME NETWORKS, )
)
9              Defendants. )
_____ )

10

**TELEPHONIC ELECTRONICALLY-RECORDED MOTION PROCEEDINGS**
11      **BEFORE THE HONORABLE DEBRA C. POPLIN**

12          **Wednesday, May 11, 2022**
         **2:00 p.m. to 2:40 p.m.**
13

**APPEARANCES:**
14

       **ON BEHALF OF THE PLAINTIFF:**
15

       ALVIN MATTHEW ASHLEY, ESQ.
16        OLIVIA WEBER, ESQ.
       IRELL & MANELLA, LLP
17        1800 Avenue of the Stars
       Suite 900
18        Los Angeles, CA 90067

19        JOHN L. WOOD, ESQ.
       CHERYL G. RICE, ESQ.
20        EGERTON, MC AFEE, ARMISTEAD & DAVIS, PC
       P.O. Box 2047
21        Knoxville, TN 37901-2047

22

**TRANSCRIBED BY:**
23

Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
Knoxville, Tennessee 37901
25 (865) 244-0454

1    **APPEARANCES:** (Continued)

2            **ON BEHALF OF THE DEFENDANTS:**

3            JOHN NEUKOM, ESQ.
             DEBEVOISE & PLIMPTON, LLP
4            650 California Street
             San Francisco, CA 94108
5                           and
             LESLIE A. DEMERS, ESQ.
6            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
             One Manhattan West
7            New York, NY 10001-8602
             Defendant:  Extreme Networks, Inc.

8                      * * * * * * * *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Beginning of audio recording.)

2         THE COURT:  Please go ahead and state the

3    basis.

4         MR. WOOD:  Okay.  So, Your Honor, we have two

5    issues which you saw in our letter.  One is:  Extreme

6    did not provide computers compliant with the protective

7    order for source code review and they haven't provided

8    manifests.

9         I do -- we think we have a solution to the

10   source code computer issue, but we do still need the

11   Court's help on setting a date for that solution.

12   And --

13        THE COURT:  What was the proposed solution for

14   that?  I saw that plaintiffs had recommended a

15   particular computer and Extreme had responded that it

16   would need some time because it's custom built.  Is

17   that -- is that the proposal?

18        MR. WOOD:  So, I believe Extreme has ordered a

19   different -- Extreme informed us yesterday that they

20   ordered a computer that will be here this week which

21   will have the required amount of ram and two -- each

22   computer will have two eight-terabyte hard drives, which

23   should be plenty of space for what we need to do.

24        THE COURT:  Okay.

25        MR. WOOD:  And they also represented to us that

```
 1   it would take about a week, they thought, to load the
 2   tools and source code onto those computers.
 3          And so we -- which the end of -- if we went to
 4   the next Monday, that would put us at May 23rd.
 5          THE COURT:  Okay.
 6          MR. WOOD:  And so we've asked the defendants to
 7   commit to May 21st because that's over a month after the
 8   original deadline of when those computers should have
 9   been available.
10          THE COURT:  Right.  So, can I just pause for a
11   moment and ask Mr. Neukom what the problem would be with
12   May 23rd?
13          MR. NEUKOM:  Good afternoon, Your Honor.  For
14   today's hearing, I've asked my colleague, Leslie Demers,
15   to take the lead.  She is a talented associate at
16   Skadden, Arps, and I was hoping she could get some
17   podium time.
18          THE COURT:  Okay.  And there will be some back
19   and forth because I want to ask questions.  I have a
20   3:00 o'clock hearing, so I need to try to, you know, get
21   this wrapped up as soon as possible.
22          So, Ms. Demers, what would be the issue with
23   May 23rd?
24          MS. DEMERS:  Yes.  Thank you, Your Honor.  And
25   I'll just directly respond to that question that you
```

1    raised.

2           So the issue for us is that we're in a

3    situation that is outside of our control.  You know,

4    we've provided computers to SNMP Research on -- that

5    they're able to use, they're able to generate, you know,

6    700 files in two days of review, and yet they asked for

7    custom-built computers.

8           They identified in recent days a company that

9    they said would provide these custom-built computers,

10   and so we've placed that order on their representation

11   that they can moot the issue.

12          We then heard last night they want us to commit

13   to the May 23rd deadline.  Our concern with committing

14   to that deadline -- there is a couple of issues with

15   that, Your Honor.  Number one is:  We're having to take

16   it on face.  This vendor that SNMP Research had

17   identified, this quote that the vendor had provided of

18   hoping to have the computers available to us by the end

19   of this -- by the end of this week, by Friday, this is a

20   third party.  We're not actually building these

21   computers ourselves, someone else is.  So we're just

22   having to take it on face.

23          The second issue is --

24          THE COURT:  Let me -- let me stop you right

25   there because I want to set this out for the parties'

```
 1   consideration.  What if you, when you receive the
 2   computers, you immediately notify the plaintiffs that
 3   they have been received.  And then if you have -- I
 4   guess you've estimated a week to upload the tools and
 5   source codes.  Then it's a week from that date.  And
 6   hopefully it will be within, you know, days of the
 7   anticipated date.
 8           They have given us this Friday, but
 9   understanding this is a third party and there are
10   certain delays outside of everyone's control, I guess
11   I'm asking Mr. Wood:  Would there be any problem with
12   that?  I mean, I can understand some -- the issue with
13   committing to a particular date if they don't receive
14   the computers on Friday.
15           MR. WOOD:  Your Honor, we don't have a problem
16   with that proposal.  We aren't the ones who ordered the
17   computers.  So we assume they're going to show up on
18   Friday.
19           I'll also add:  We -- when we found out from
20   defendants -- they said they couldn't get a computer in
21   time.  We also ordered computers, and we have those
22   computers.  They're brand-new computers with brand-new
23   hard drives.  They're ready to go.  And we've offered to
24   ship those to defendants, and they have turned down our
25   offer and said they want to purchase their own.
```

1        So, yes, I would say if they do not get the

2   computers, they would then have to take us up on our

3   offer to use our computers.  They're brand new.  And I

4   can show when we ordered them.  And they can -- they

5   have plenty of space.  They have the required amount of

6   ram.

7        So we have multiple solutions here.  There is,

8   I don't think, a reason to continue to delay

9   indefinitely.

10        THE COURT:  And we're not going to delay

11   indefinitely, but we're sitting here today and the

12   request is being made for the laptops that were called

13   for in the protective order.  For multiple reasons, that

14   was not done.  So I want to address the issue as we sit

15   here today and move you all forward.

16        So, my first proposal is:  Instead of requiring

17   them to commit exactly to the 23rd, because they're not

18   sure exactly when they will receive them, there is --

19   hopefully they will receive them this Friday, but I

20   would propose for Ms. Demers to notify the parties

21   immediately upon receipt, and then there be a week from

22   that date for them to load the tools and the source

23   code.

24        If, say -- we're looking about the -- that will

25   be the 13th is when they are anticipated.  If we get to

```
 1   the 17th and they're still not received, then we'll need
 2   to take up the issue of, you know, why that -- why they
 3   haven't been delivered and we can look at other
 4   alternatives.
 5           But they have -- I don't -- I don't see the
 6   point in insisting that they use computers you've bought
 7   when they have already placed the order and they're
 8   expected this Friday.  We're dealing with some things
 9   that are just uncertain.
10           The order has been made; correct, Ms. Demers?
11           MS. DEMERS:  Yes, that's correct.
12           THE COURT:  With an anticipated date of this
13   Friday the 13th; is that correct?
14           MS. DEMERS:  That's also correct, Your Honor.
15           THE COURT:  All right.  So I propose that we
16   see if -- can you track the delivery?
17           MS. DEMERS:  We'll be picking them up in
18   person.  So it's not going to be an actual shipment.
19           But the time period between now and Friday,
20   they're actually building -- you know, it's a custom
21   computer.  So they're having to put it together and get
22   the parts, etcetera.
23           THE COURT:  Will they be finished Friday for
24   pickup?
25           MS. DEMERS:  Yes, that was the -- I apologize,
```

1    Your Honor.  That was the information provided to us.

2            THE COURT:  Okay.  So you'll pick them up on

3    Friday and then start loading the tools and source codes

4    on the 16th?

5            MS. DEMERS:  Yes.  We're hoping to be able to

6    start loading on the 13th, but that will depend on the

7    actual time that we pick it up.  But, yeah, that general

8    timing is correct.

9            THE COURT:  And you do estimate one week.  So

10   if all goes as planned, would it be ready by Monday the

11   23rd?

12           MS. DEMERS:  If all goes as planned, the answer

13   is, yes, Your Honor.  We're dealing with a third party.

14   We're also dealing with a large amount of code.  Our

15   best guess is that it will be able to be loaded within a

16   week, but we will certainly be willing to immediately

17   notify counsel for the plaintiffs if that estimate is

18   inaccurate.

19           THE COURT:  Okay.  So, Mr. Wood, if things go

20   as planned and the source code and tools are all loaded

21   and ready to go hopefully around the 23rd, when would

22   you be planning to make the trip?  Can you schedule it

23   for around the 25th so that gives us two buffer days?

24           MR. WOOD:  Yes, we can do that, Your Honor.

25           THE COURT:  Ms. Demers, does that sound

1  acceptable if everything goes as planned?  Hopefully

2  you'll be ready by the 23rd, and then it would be ready

3  for plaintiffs by the 25th.

4          MS. DEMERS:  Yes, Your Honor.  Thank you.

5          THE COURT:  All right.  And, Ms. Demers, I ask

6  that if on the 13th, since you are planning to

7  personally pick up the computers, if there is some issue

8  and they're not ready, you immediately notify plaintiffs

9  and also not only explain why they weren't ready, but

10  the anticipated date of when they will be, and hopefully

11  that would be no later than Monday if there is some

12  issue.  If it goes beyond the seven -- goes into the

13  17th, I will want you to contact chambers on the 17th

14  because I will want to have further discussion as to

15  what is causing the delay.

16          MS. DEMERS:  Absolutely, Your Honor.

17          THE COURT:  All right.  So, as of now, the

18  source code review will occur on Wednesday the 25th.

19  Does that take care of the source code review for -- in

20  dealing with the computers and the exact date for now?

21  Do we need to discuss that before we move to the

22  manifests?

23          MR. WOOD:  I think that -- that resolves the

24  issue for plaintiffs, Your Honor.

25          THE COURT:  All right.

1          MR. WOOD:  Thank you.

2          THE COURT:  On the manifests, after reviewing

3    the letters, my question is:  Is there not something

4    that can generate this information?  Even if it is not

5    kept in that -- it's just not kept is what I hear

6    Extreme saying in the normal course of business.  Why

7    can that not be -- why cannot a generator be used for

8    that?

9          MS. DEMERS:  Yes.  Thank you, Your Honor.

10         So we had detailed our position on this in the

11   attached declaration as well from an engineer at

12   Extreme, but we hope that everyone, including

13   plaintiffs, appreciate that this is not counsels'

14   estimate.  This is information from the engineers at

15   Extreme who are handling this data and work with the

16   technology.

17         So, our understanding, Your Honor -- you're

18   correct; our client does not keep these documents in the

19   ordinary course of business.

20         In terms of generating the documents, that can

21   be done.  It would require the generation of

22   approximately 75 million files, and according to our

23   engineers, it will take -- it will take months.  It will

24   take multiple months to complete.

25         MR. WOOD:  Your Honor, can I respond?

```
 1              THE COURT:  Yes, because I want to fully
 2   understand.  I mean, I -- it is my impression that a
 3   generator tool could be used on these particular
 4   computers that are being set up for the source code and
 5   that it could automatically generate the files.  So if
 6   that's -- I need some clarification if that is not
 7   correct.
 8              MR. WOOD:  Yeah, that -- that is correct, Your
 9   Honor, and it's really not -- it's not generating a
10   file, it's just generating a number.
11              THE COURT:  Right.
12              MR. WOOD:  It's a unique number for that file.
13              THE COURT:  Right.
14              MR. WOOD:  And Extreme has actually done this
15   with the discovery they provided to us.  So they have
16   given us one file of metadata for their discovery.  So
17   every time they give us a set of discovery, they give us
18   a list of the files and the MD5 checksum for every file
19   in their discovery.
20              Brocade -- so they're not generating additional
21   files.  It's just -- it's just an identifier for the
22   file they're generating.
23              THE COURT:  Right.  I -- if I could ask
24   Ms. Demers.  That's what I found confusing about the
25   engineer's statement because it doesn't -- the way I
```

1  understand it, it wouldn't be something he's creating.

2  This is already something that -- it just has to be

3  generated from the file.  It's not creating something

4  new.  So --

5       MS. DEMERS:  Yes, Your Honor.  And I hope I'm

6  not doing the engineers a disservice, you know, in

7  repeating what they had explained to me, but at least

8  based on their explanation to me of having to create

9  these MD5 cache checks and values for the source code

10  files, I understand that it actually -- you know, it

11  would create -- it would require them to create

12  something new and that that process would take a

13  long -- a very long period of time.

14       I'm not sure entirely what's driving the amount

15  of time that it takes to generate this information, but

16  I would expect it to be the fact that the source code

17  files and the source code hairballs, as they call them,

18  have so many files that they contain with 300 files with

19  each release.  And, again, that's totaling to about 75

20  million files.  So --

21       MR. WOOD:  And, Your Honor --

22       THE COURT:  Yes.

23       MR. WOOD:  Yeah.  I just might help.  So we

24  have also initiated a source code review with Brocade.

25       THE COURT:  Yes.

1    MR. WOOD:  They have -- and I don't know if you

2  remember, but Brocade is a party who provided the code

3  to Extreme and there is a similar code base there.

4  Brocade has 199 source code releases, which they were

5  provided to us on April 22nd.  They also provided one

6  file per release that had a list of every file name in

7  the release and the MD5 checksum for that file.  They

8  didn't have to -- they didn't create a separate file for

9  every single source code file.  They put it all in one

10  file.

11    And we did the same thing and delivered those

12  mani- -- for our source code and delivered those

13  manifests to Extreme and Brocade.  So -- and, as I said,

14  all the parties have been doing this for regular

15  discovery; e-mails and documents and other things.  It's

16  just -- it's simply not -- it's a generated number, as

17  you said.  It's not a separate file that has to be

18  created.

19    MR. NEUKOM:  Your Honor --

20    THE COURT:  I'm sorry.

21    MR. NEUKOM:  I'm so sorry for the interruption.

22  This is Jay Neukom.  I -- may I try to assist very

23  briefly?

24    THE COURT:  Yes.

25    MR. NEUKOM:  Okay.  So I think -- look, I am

1  also not an engineer, but, God help me, I litigate a lot

2  of these cases.

3          Here is my understanding:  It's absolutely true

4  that for most files, it's really easy to generate an MD5

5  hash value.  Every e-mail has an MD5 hash value, a Word

6  document does, a PDF does, and there are absolutely

7  products and services available on the market that can

8  scan and generate an MD5 hash value for various sorts

9  and files.  That's not the issue here; right?

10          So, let's say, just hypothetically, we had

11  produced a bunch of documents to them, you know,

12  e-mails, spreadsheets, what have you, and they wanted an

13  MD5 hash value.  In that case, we really wouldn't have a

14  timing or a burdened issue to bring to you.  It might

15  be, at most, what I would call a hassle issue that we

16  would have to run the software.

17          The issue here, as I understand it from

18  Extreme's engineers, is:  We're not talking about a Word

19  file or a PDF file; we're talking about a massive,

20  massive directory structure of files.  And Your Honor's

21  heard us talk about the size of these files; right?  But

22  across the 250-some-odd source code master files, we're

23  talking about 12 terabytes of data.

24          Our understanding from the Extreme engineers is

25  that:  Number one, they have not created in the past MD5

hash values for these files.  So they don't have them today.  And, number two, if they were asked to move as quickly as possible, whether it's for the use of an outside service or writing their own custom script, to then generate an MD5 hash value for these kinds of files with their volume and numerosity, that's the issue.

And I just wanted to make sure that the Court did not hear Ms. Demers and I to be saying that MD5 hash values are always a pain in the rear end.  That would be wrong, and a simple Google search would indicate that.  The issue we're having is because of the nature of these massive directory file structures, they're not prone to that easy MD5 hash value.

And then finally, I will just add, and then I will put the cotton back in my mouth rather than in my ears, if there is, you know, any awareness of a way to generate these MD5 hash values quickly with any specificity, we've not heard it from the plaintiffs.  What Ms. Demers and I have been hearing is on one hand Mr. Wood saying, "We want these MD5 hash values, generate them quickly and that should be doable quickly," and on the other hand, these overworked engineers who, I think the discussion was work through the night telling us that's not doable without an obscene amount of work.

1    And I thank you for allowing me to interrupt.

2 I'll give the podium back to Ms. Demers.

3    THE COURT:  Well, for either of you, Mr. Neukom

4 or Ms. Demers, what I also want to point out is that I'm

5 hearing that Broadcom has produced these and its source

6 code as well, and it sounds like you're telling me you

7 can't do it because their source code files -- or that

8 there is going to have to be more effort put into it.

9 But Broadcom has already produced it, so that's what I

10 don't understand.  And --

11    MR. NEUKOM:  My best --

12    THE COURT:  And you agreed to provide it.  You

13 signed the Agreed Protective Order and you agreed to

14 provide it.

15    MR. NEUKOM:  So two thoughts there.  Look, it's

16 hard for me to speak for Broadcom and Brocade because I

17 don't represent them, but I do know that some companies

18 do create and maintain MD5 hash values in the ordinary

19 course of business for their source code directory.  So

20 some do and some don't.  I have not spoken with

21 Ms. Plessman about this.  I'd have to think that her

22 client already has that data.

23    Number two, as to the protective order issue, I

24 think that's a very fair point.  My answer to that is

25 entirely genuine, which is:  When we signed that

1    protective order, we had not -- as I don't think anybody

2    had -- begun the process of diving into this ocean of

3    source code.  And whatever any court order calls for, if

4    we have it, we will produce it.

5         And in this particular instance, because of how

6    our client currently manages its source code repository,

7    we simply don't have it.  So we are then interpreting

8    that as, you know, what you have, you have to give to

9    honor the order, but -- but we just literally don't have

10   this.

11        And then, you know, finally, look, if the end

12   of this discussion is that the Court wants us to go

13   generate MD5 hash values, we will respectfully disagree

14   with that, but, of course, honor that.

15        But I do want to be clear that every indication

16   that Ms. Demers and I have, other than e-mails from

17   Mr. Wood saying in a specific fashion that this can be

18   done quickly, is that this will be a multi- --

19   multi-month process.

20        If we lose this fight, if we're forced to go

21   create new evidence, I would ask for some understanding

22   from the Court on the timing because I don't think that

23   the Court has a full record before it about the

24   technical complexity and the resources, human and

25   computing, that would be required to do that.

1             MR. WOOD:  Your Honor, this is John Wood.

2             THE COURT:  So, Mr. Wood, let me ask you this

3    question:  I know it's provided in the protective order,

4    but what does this add to the case to have this

5    information?

6             MR. WOOD:  Well, Your Honor, two things,

7    mainly.  One, it's standardly done because it shows the

8    accuracy and the integrity of the files.  So we avoid

9    any type of disagreement or fights that that's not the

10   file we produced to you; you're -- you changed the file.

11   All of that.  So that's why everything we're producing

12   has an MD5 associated with it.

13            The other thing it does for us is:  It allows

14   us to easily find duplicates.  So they've -- they're

15   producing about 250 source code releases, and a lot of

16   the code is the same, and if the MD5 checksum is the

17   same between the releases, we don't even need to look at

18   it.  We know that file is exactly the same because the

19   MD5 checksum is the same.  So there are some pretty good

20   reasons --

21            THE COURT:  Right.

22            MR. WOOD:  -- for putting it in the protective

23   order.

24            And I would offer that -- I think it's

25   extremely unlikely that Brocade had these MD5 checksums

1  sitting around.  I know SNMP Research did not and they

2  generated all of them, and it was not that difficult.

3  And my understanding would be that Brocade did, too.

4  And what I heard from Mr. Neukom, he has no knowledge

5  otherwise.

6       And I -- you know, I think one reason it's so

7  hard for them is because they think they have to

8  generate a new file for every MD5 checksum.  Well, if

9  you do that, it's going to take a long time, but the

10  only reason you do that is to make it more difficult.

11       You should be putting the file name and the MD5

12  checksum all -- just writing it out to a file.  You're

13  not creating 75 million new files.  So if you do it as

14  their engineer proposed to do it, it's -- it probably

15  will take longer and will be harder.  But that's not the

16  way anyone does it and that's not the way Extreme has

17  done it for other parts of this case.

18       THE COURT:  Okay.  Let me suggest this because

19  there are certainly good reasons to have this and it is

20  called for in the protective order:  So I would ask that

21  you all have some further discussion and have

22  Ms. Plessman on the line as well so there can be an

23  understanding of what -- how -- maybe that would help

24  and an explanation of how they did it, and that you all

25  can decide what would be the best way to produce this

information in the most expedient fashion and that that
will be in compliance with the protective order to give
you the assurance of the information you need to check
the files.  And I'm going to ask that you do that before
Tuesday.  And so if there are any issues with the
computers, we can address that on Tuesday.  And if you
have not been able to resolve how to produce this MD5
hash information, I'll take that back up on Tuesday
afternoon.

It sounds like you all need to talk some more,
and I'm not going to be doing anything more and holding
you here longer than just listening.  And I really feel
like you all need to be talking to each other so that
you're on the same page as to what the expectations are.

So, Mr. Neukom and Ms. Demers, you will need to
supply this information, but I want to give you the
opportunity to have further discussions with Broadcom so
you can find out how they were able to produce it to the
satisfaction and compliance with the order and further
conversations with plaintiffs so that you are all on the
same page.  And if need be, I'll schedule a time to talk
with you again on Tuesday.

MS. DEMERS:  Thank you, Your Honor.

THE COURT:  Let me go ahead and -- I'm just
going to block time in the event we need to take this

1   back up.

2          So I would be able to talk with you all at

3   4:30.  Is there -- do any of you have a conflict with

4   that time should we need to gather?

5          MR. WOOD:  No, no conflicts for us, Your

6   Honor --

7          THE COURT:  Right.

8          MR. WOOD:  -- for plaintiffs.

9          THE COURT:  Ms. Demers?

10         MS. DEMERS:  No conflicts for me, Your Honor.

11         THE COURT:  All right.  So I will go ahead and

12  put a hold on the calendar for 4:30 on Tuesday the 17th,

13  and if you're able to resolve everything, just notify

14  Ms. Nease that that can be taken off the calendar by

15  Tuesday morning, if you don't mind.

16         All right.  I think that addresses the two

17  issues.  Is there anything else we need to take up?

18         MR. NEUKOM:  This is Jay Neukom, Your Honor.

19  One -- one small note, which is -- if you'll go with

20  me -- related to what we talked about today, and the

21  Court may be happy to know it's not a point of

22  contention.

23         From Extreme's perspective, we would

24  respectfully ask the Court to order the parties to

25  attend a paid third-party mediation, or at least we'd

1  like the Court to have that -- to be thinking about it
2  in the back of the Court's mind.
3          From our perspective, you've heard me at the
4  podium say that we're sort of -- we're the smallest
5  party here and we feel a little bit like the little
6  sibling in the backseat being taken for a ride.
7          The -- without divulging protective
8  order-governed materials, we've now seen some but not
9  all of the plaintiffs' life history for this code, and
10  we have an understanding of what the market value is of
11  a license to this stuff.  And I'm not trying to persuade
12  you that I'm right on that, but I can tell you that the
13  amount of fees and burden that Extreme Networks, as the
14  company that unknowingly bought this software from
15  Broadcom and Brocade, if it allegedly has SNMP code in
16  it, the amount of resources and money that we've been
17  putting into this just to comply with the source code
18  issue is already dwarfing what appears to us, to
19  Ms. Demers and I, to be the market value of a license
20  for this stuff.
21          So, again, I'm not trying to convince you that
22  this case is worth a lot or a little, but from our
23  perspective, I don't think -- the Court may have
24  inferred how well or not counsel is communicating based
25  on the last few hearings.

1          So I would ask the Court to use its inherent

2   authority to force at least Extreme and SNMP to hire and

3   use a respected, paid third-party mediator to force

4   these folks to get into a room for 12 hours and to not

5   leave until they have signed a deal or at least

6   exhausted all possibility.

7          And I don't know if this is a motion or a case

8   management, but I just wanted the Court to be aware of

9   that for the benefit of its case management.

10          THE COURT:  Well, as a magistrate judge, I

11   handle the pretrial case management.  Any order to

12   mediation would be up to, again, the district judge.

13   I'm happy to relay your point to that.

14          I would ask, Mr. Wood, what your response would

15   be to that.

16          MR. WOOD:  Well, Your Honor, Mr. Neukom has

17   blind-sided us with this.  So he didn't bring it up

18   beforehand.  So we have not had an opportunity to talk

19   amongst ourselves.

20          THE COURT:  Well, perhaps you can include that,

21   think about it and include that in your discussions you

22   need to have before Tuesday.

23          MR. WOOD:  Right.  I will offer this

24   observation, though:  His conclusion on the value of the

25   case seems to preclude any successful mediation.  He

```
1   thinks if the case isn't worth anything, we're not going
2   to be able to mediate successfully, and that's the
3   problem we've had, I think, since the beginning.
4          And they -- they didn't receive the source code
5   unknowingly.  They knew.  They asked for it.  They asked
6   for permission.  They didn't get it.  They took it
7   anyway and they began to use it.
8          So there is multiple misrepresentations in what
9   Mr. Neukom was saying, which I don't -- we'll have to
10  talk about it, and we'll be glad to talk about it.
11         THE COURT:  Well, I'm sure we will all be
12  meeting again.
13         MR. WOOD:  Yes.
14         THE COURT:  We hope you can get these issues
15  worked out, but, if not, I'll talk to you again on
16  Tuesday.
17         But since Mr. Neukom has put that on the table,
18  if you would just see if you can have some discussion on
19  that, and if there is a desire to go that route, that
20  information can then be passed along for the district
21  judge's consideration.
22         MR. ASHLEY:  Your Honor, this is Matt Ashley.
23  That makes sense.
24         I wanted to mention one thing that I think is
25  in your wheelhouse, and you may have already seen it
```

1   come across the line, but the parties have agreed on one
2   thing, and they have made a joint motion to extend a few
3   discovery deadlines under --
4               THE COURT:  I did --
5               MR. ASHLEY:  -- the scheduling order.
6               THE COURT:  I did see that joint motion, yes.
7               MR. ASHLEY:  Yeah.  So we finally reached an
8   agreement on something.  And I don't know whether -- you
9   know, we're trying to do what we can as the plaintiff to
10  keep the trial date, but, you know, to get ahead of some
11  of these issues because of the delays.  So, this is, you
12  know, our first attempt at trying to do that, to address
13  these delays.  And so we've asked to move the expert
14  disclosure deadlines out about 30 days each, and that,
15  you know, necessitates the change to the final witness
16  list deadline and the close of discovery.
17              For all this, we're talking about a few weeks
18  to a month.  It doesn't change any of the other dates,
19  like the deadline for dispositive motions or Daubert or
20  trial or pretrial conference or pretrial filing dates.
21              So I just wanted to supply it for you.  It
22  would help our planning purposes.  If it's something
23  you're going to rule on, you know, to have an answer
24  sooner rather than later, but I realize it was just
25  filed this week.  I just wanted to supply it for you.

1          THE COURT:  Yes, I also noted that in

2    preparation for this all, and as long as it's not

3    affecting the dispositive motion deadline, it should be

4    fine.  But I will be ruling on that rather quickly.

5          MR. ASHLEY:  Thank you, Your Honor.

6          THE COURT:  All right.  Thank you.  You all

7    have a nice afternoon.

8          MR. WOOD:  Thank you.  You as well.

9          MR. NEUKOM:  Thank you, Your Honor.

10          (Which were all the digitally-recorded

11           telephonic proceedings had and

12           herein transcribed.)

13                    * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

```
1                       C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4              I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported the digitally-recorded audio

6    proceedings to machine shorthand to the best of my

7    ability and hearing; that the foregoing pages were

8    transcribed under my personal supervision and constitute

9    a true and accurate record of the digitally-recorded

10   audio proceedings.

11             I further certify that I am not an attorney or

12   counsel of any of the parties, nor an employee or

13   relative of any attorney or counsel connected with the

14   action, nor financially interested in the action.

15             Transcript completed and signed on Wednesday,

16   May 25, 2022.

17

18

19

20


22             _____
               TERESA S. GRANDCHAMP, RMR, CRR
23             Official Court Reporter

24

25
```