# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF TENNESSEE

---

SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC.,

    Plaintiffs,

v.

BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; and EXTREME NETWORKS, INC.,

    Defendants.

---

Case No. 3:20-cv-00451-CEA-DCP

U.S. District Judge Charles E. Atchley, Jr.
U.S. Magistrate Judge Debra C. Poplin

**EXTREME NETWORKS, INC.'S REPLY IN SUPPORT
OF ITS MOTION TO COMPEL THE PRODUCTION OF LICENSE AGREEMENTS**

## TABLE OF CONTENTS

Page(s)

I. INTRODUCTION ..............................................................................................................1

II. ARGUMENT.....................................................................................................................3

    A. Extreme's Requests Are Relevant and Not Unduly Burdensome, Particularly in Light of the Heavy Discovery Burdens in this Case ........................3

        1. Extreme's Requests Are Undeniably Relevant ............................................4

        2. The "Ledger" Offer Only Makes Matters Worse.........................................8

        3. Extreme's Requests Are Not Unduly Burdensome or Disproportionate ...................................................................................10

        4. The Compromise SNMPR Proposes Is Insufficient .................................12

    B. The New Facts SNMPR Reveals in Its Brief Show that Even More Documents Are Being Withheld Than Extreme Originally Thought....................15

III. CONCLUSION................................................................................................................16

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Brittney Gobble Photography, LLC v. Wenn Ltd.*,
   No. 3:16-CV-206-HSM-DCP, 2019 WL 2446997 (E.D. Tenn. Feb. 19, 2019),
   *report and recommendation adopted sub nom.*, *Brittney Gobble Photography,
   LLC v. USA Entertainment News, Inc.*, 2019 WL 1125644 (E.D. Tenn. Mar. 12,
   2019) ............................................................................................................................. 8

*Dash v. Mayweather*,
   731 F.3d 303 (4th Cir. 2013) ................................................................................. 7, 9

*Delozier v. First National Bank of Gatlinburg*,
   109 F.R.D. 161 (E.D. Tenn. 1986) ....................................................................13, 14

*Disney Enterprises, Inc. v. Farmer*,
   427 F. Supp. 2d 807 (E.D. Tenn. 2006) ..................................................................... 8

*Gaylord v. United States*,
   777 F.3d 1363 (Fed. Cir. 2015) ................................................................................ 8

*Groupwell International (HK) Ltd. v. Gourmet Express, LLC*,
   277 F.R.D. 348 (W.D. Ky. 2011) ........................................................................... 13

*Joe Hand Promotions, Inc. v. Griffith*,
   No. 3:20-cv-382, 2021 WL 4899466 (E.D. Tenn. Oct. 20, 2021) ............................. 5

*Neale v. Coloplast Corp.*,
   No. 1:18-cv-00274-TRM, 2020 WL 6948361 (E.D. Tenn. Nov. 2, 2020) ................ 4

*On Davis v. The Gap, Inc.*,
   246 F.3d 152 (2d Cir. 2001) ..................................................................................... 6

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
   142 S. Ct. 941 (2022) ............................................................................................4, 5

**STATUTES**

17 U.S.C. § 504(b) ............................................................................................................ 6

Extreme Networks, Inc. ("Extreme") respectfully submits this reply in support of its Motion to Compel the Production of License Agreements ("Motion"; ECF No. 136), and in response to Plaintiffs' ("SNMPR") Opposition thereto ("Opposition" or "Opp."; ECF No. 143).

## I. INTRODUCTION

The license agreements sought by Extreme are critical. Even SNMPR cannot dispute their relevance—particularly in view of the broad relevancy standard it urged in its multiple prior motions to compel. Instead, SNMPR claims only that the agreements are "on the fringe." But the whole point of SNMPR's lawsuit against Extreme—by SNMPR's own allegations—is to collect a licensing fee from Extreme. Given the plain import of SNMPR's case against Extreme, it is not credible to argue that the financial terms under which SNMPR licensed the ***exact*** works being asserted in this case, to the rest of market, are "on the fringe" of relevance. SNMPR's own license agreements are plainly, undeniably, centrally relevant to this case.

While begrudgingly acknowledging the relevance of the licenses, SNMPR nonetheless refuses to turn over the evidence. Without a hint of irony, SNMPR argues that it is burdensome for it to produce its own license agreements covering the very works it is asserting here because counsel representing SNMPR in this case has spent 67 hours reviewing agreements. (Opp. at 6.) But SNMPR's supposed burden cannot shield this evidence from discovery, especially considering that:

- SNMPR has already stated that it is seeking to recover "'ill-gotten profits believed to be in the hundreds of millions of dollars.'" (*Id.* at 5 (quoting ECF No. 101 at 13).)

- SNMPR itself has relied on this unrealistic view of the case value in justifying its exceedingly broad requests. (*See, e.g.*, ECF No. 101 at 12-13.)

- SNMPR's own discovery requests called for Extreme to produce over 694,000 pages, and counting, and that does not include the terabytes of source code that Extreme produced. (*See* Demers Reply Decl. at ¶ 3.)[1]
    - To be clear: SNMPR's document production so far is ***less than 3%*** the size of Extreme's. (*See id.* at ¶ 2.)
- While SNMPR complains that its counsel spent 67 hours reviewing license agreements (the majority of which SNMPR admits it has not produced) (Opp. at 6), Extreme's representatives have already spent ***thousands of hours*** reviewing documents to produce in response to SNMPR's document requests. (Demers Reply Decl. at ¶ 3.)
- SNMPR's request for the production of source code required Extreme's outside counsel, in-house counsel, employees (including engineers), and contractors to work around the clock, devoting ***hundreds of hours*** to collecting source code for SNMPR to review. (*See, e.g.*, ECF No. 136-8 at ¶¶ 18-20.)

Instead of providing fulsome discovery responses, SNMPR offers a self-serving proposal that would make discovery incomplete, misleading, unreliable, and on top of that a one-way street. As explained below, SNMPR's proposal in its Opposition to shortcut its discovery obligations would deprive Extreme (and the fact-finder in this case) from obviously relevant information, such as the factual circumstances of SNMPR's licensing history.

Moreover, the information SNMPR now provides in its Opposition only raises the stakes and makes it further clear that Extreme must see the full set of SNMPR's license agreements. SNMPR now reveals that the license agreements it has produced so far constitute a much smaller

---

[1] "Demers Reply Decl." refers to the Declaration of Leslie A. Demers filed in support of Extreme's reply to its Motion.

subset of license agreements in SNMPR's possession than Extreme had originally understood. Specifically, while SNMPR has admittedly reviewed some license agreements for purposes of this case, it has produced only a minority of those reviewed agreements, **_withholding 565 license agreements from production_**. (*See* Opp. at 3.) SNMPR also identifies two **_new_** sets of agreements for the first time—(1) "older" license agreements entered into by SNMP Research, Inc. and (2) "evaluation licenses"—that SNMPR has apparently not even reviewed. (*Id.* at 3 n.1.) Extreme has no idea how much or in what respects the subset of agreements that SNMPR has produced differ from (1) the remaining 565 known-but-withheld license agreements, nor (2) the "older" license agreements (in a quantity that has not been disclosed), nor (3) the evaluation agreements (in a quantity that has not been disclosed) that SNMPR is withholding. Indeed, SNMPR is seemingly not willing to make representations related to the quantity or contents of the withheld agreements. (*See id*. at 3 n.2.) For all of the reasons that follow, withholding these agreements is unacceptable.

## II.   ARGUMENT

### A.   Extreme's Requests Are Relevant and Not Unduly Burdensome, Particularly in Light of the Heavy Discovery Burdens in this Case

SNMPR objects to Extreme's requests on the grounds that they have limited relevancy and would be unduly burdensome and disproportionate. (*See* Opp. at 4-9.) These objections, however, disregard the exacting discovery demands that SNMPR has served on Extreme and insisted should be met, no matter the price—including through seriatim motions to compel. (*See, e.g.*, ECF No. 101 at 9, 13; ECF No. 70-1 at 7-8.) It is clear, however, that Extreme's requests are relevant and do not impose an undue or disproportional burden on SNMPR.

3

Case 3:20-cv-00451-CEA-DCP   Document 146   Filed 06/01/22   Page 6 of 20   PageID #: 5560

### 1. **Extreme's Requests Are Undeniably Relevant**

Both SNMPR and this Court have recognized that the relevancy threshold is low. (*See* ECF No. 101 at 9 ("Relevance has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matters that could bear on, any issue that is or may be in the case." (quoting *Neale v. Coloplast Corp.*, No. 1:18-cv-000274-TRM, 2020 WL 6948361, at *2 (E.D. Tenn. Nov. 2, 2020)); ECF No. 131.) Any argument from SNMPR that its license agreements do not meet this threshold, much less greatly exceed the threshold, ignores the realities of this litigation.

As Extreme explained in its Opening Brief (ECF No. 135), SNMPR's license agreements are relevant to two principal issues: (1) Extreme's invalidity arguments, and (2) Extreme's damages case. (*See* Opening Brief at 6.) These core elements of Extreme's defense are a far cry from "[i]nformation [o]n [t]he [f]ringes [o]f [d]iscovery [r]elevancy", as SNMPR claims. (*See* Opp. at 4-6.) When confronted with requests that go to the "core aspects" of the discovering party's claim, this Court has ordered the objecting party to respond in full. (*See* ECF No. 131 at 6-7.) That includes a request for "All Documents Relating to" "products that contain, use, or are otherwise associated with Plaintiff's software." *Id*. at 7. The requests here are much narrower, and seek only licenses relating to the asserted copyrighted works and other comparable technology.

***Relevance to Copyright Validity:*** To support its argument that SNMPR's copyrights are invalid, Extreme must have the full picture of SNMPR's licensing history. This can primarily be used to show the extent to which SNMPR published its software (such as through licensing agreements to make it available to numerous licensees) prior to registering the copyright, which in turn constitutes evidence of the significance of SNMPR's legal error in listing its works as "unpublished" on its copyright registrations. *Cf. Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941, 948 (2022). The more significant the legal error, the more likely it is that SNMPR

4

was willfully blind to its inclusion of legally inaccurate information on the registration. *See id.* Failing to acknowledge this logic laid out in Extreme's Opening Brief, SNMPR states that because Defendants have previously argued that just one license constitutes publication, the rest are irrelevant to proving invalidity. (*See* Opp. at 5.) But SNMPR misses the point: while executing a single license may constitute publication, the higher the quantity of licenses executed prior to registration would support a finding of willful blindness, and therefore overcome any claim that SNMPR unknowingly included inaccurate information on its registrations. *See Unicolors*, 142 S. Ct. at 948 (recognizing that a significant legal error supports a finding of willful blindness as to that error, which in turn leads to the conclusion that a registrant had actual knowledge). This is quite literally a scenario in which the contents of, and quantity of, and licensee identities for, ***all*** of SNMPR's history matters. If SNMPR executed 5 versus 50 versus 500 versus 1,000 on-point license agreements—that would be highly probative for Extreme's invalidity defense. In any event, this defense is the subject of Defendants' pending motion to dismiss (and if the motion to dismiss were denied, would be the subject of a defense beyond the pleadings stage), and so documents relating to it are plainly relevant.

In addition, the licenses may have other terms that bear on the validity of SNMPR's claim of copyrightability—for instance: assignment provisions, representations on copyrights obtained, and descriptions of the supposed copyrighted works, to name a few. For example, if just one agreement included a provision affecting ownership rights under the copyrighted works, SNMPR's case could be defunct. *See, e.g.*, *Joe Hand Promotions, Inc. v. Griffith*, No. 3:20-cv-382, 2021 WL 4899466, at *5 (E.D. Tenn. Oct. 20, 2021) (holding that the plaintiff "cannot maintain this action for [copyright] infringement" where there is "no evidence that [the plaintiff] owned an

exclusive right at the time of the infringement").  SNMPR's full licensing history is necessary to assess these issues as well.

***Relevance to Copyright Damages (Profits Theory)***: Extreme's Opening Brief also sets forth its reasons for needing to see SNMPR's full licensing history in order to support its damages case.  In response, SNMPR suggests that because it is seeking Extreme's profits, its prior license agreements are irrelevant.  (*See* Opp. at 5-6.)  But even if SNMPR proceeds with just a profits theory of damages, under the law, SNMPR could recover only those profits that are attributable to the alleged infringement, and not attributable to other aspects of the accused products.  *See* 17 U.S.C. § 504(b).

In this case, the Extreme products that SNMPR alleges infringe its copyrights are network switching products—including expensive hardware (none of which is related to SNMPR's alleged copyrights) and complete operating systems (comprised of massive source code files, only a miniscule percentage of which are allegedly SNMPR code).  (*See* ECF No. 3-1 at ¶¶ 41-43 (describing the "data center switching, routing, and analytics business" Extreme acquired from Brocade); *see also id.* at ¶ 4 (characterizing Plaintiffs' technology as software used by network equipment, electronic gaming, and unstated items by the US military).)  Thus, if SNMPR proceeds only with a "profits" damages theory, the parties will dispute what portion of Extreme's profits for its networking switching products is attributable to (i) the hardware, versus (ii) the vast majority of the source code for the operating system ***not*** claimed as copyrighted by SNMPR, versus (iii) the relatively miniscule portion of source code within the operating system that SNMPR alleges to own.  *See, e.g.*, *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001) (noting, for a copyrighted poem in an anthology, that a damages analysis may consider the "extent to which . . . profits from the sale of the anthology were attributable to factors other than the infringing poem,

6

including particularly the other poems contained in the volume"); *see also Dash v. Mayweather*, 731 F.3d 303, 332-33 (4th Cir. 2013) (affirming summary judgment for the defendant on profit damages where copyright owner failed to provide sufficient evidence, holding that "when, as here, the infringing content forms only a small, incidental portion of the products that generated the claimed revenue streams, further evidence is necessary to link the claimed revenues to the infringement"). In undertaking that inquiry—what is the value of, or profits attributable to, SNMPR's allegedly copyrighted code in comparison to all other aspects of Extreme's accused products—it will be unquestionably probative to know what market value SNMPR has assigned to the very same code when selling or licensing it to others, such as other companies selling networking switching products. *See id.*

To put some specifics on this: Suppose that Extreme is selling the accused products for $3,000/unit.[2] Further suppose that Extreme's profit on such a sale is $1,500/unit. Further suppose that SNMPR will claim that 30% of such profits (or $450/unit) is attributable to the existence of SNMPR copyrighted source code inside the broader operating system for the network switching product at issue. Extreme would (and will) vehemently oppose the suggestion that 30% of its profits are attributable to relatively miniscule portions of its source code allegedly coming from SNMPR. But in presenting that defense, it would be highly relevant for Extreme to be able to show that (for example) SNMPR has a history of licensing the very same code to comparable companies selling comparable switching products for a fee of $5/unit (not $450/unit). Put another way, SNMPR's own licensing history arguably shows the value (or profit attribution) that SNMPR and others in the market have already assigned to SNMPR's allegedly copyrighted code. And Extreme cannot defend this case on damages without having an opportunity to make that showing.

---

[2] The figures used herein are for illustration purposes only.

7

***Relevance to Copyright Damages (Actual Damages + Statutory Damages)***: Although SNMPR's Opposition suggests that only "profits" damages are at issue, SNMPR's pleadings say otherwise. SNMPR is also seeking actual damages, or in the alternative, statutory damages. (*See* ECF No. 3-1 at 18.) Given that, SNMPR's own licensing history is a ***fundamental component*** to Extreme's actual damages case. (*See* Opening Brief at 7-8; *see also Brittney Gobble Photography, LLC v. Wenn Ltd.*, No. 3:16-CV-206-HSM-DCP, 2019 WL 2446997, at *6 (E.D. Tenn. Feb. 19, 2019) ("[C]ourts have explained that a copyright owner's actual damages may include in appropriate cases the reasonable license fee on which a willing buyer and willing seller would have agreed for the use taken by the infringer." (internal quotation marks and citations omitted)), *report and recommendation adopted sub nom.*, *Brittney Gobble Photography, LLC v. USA Ent. News, Inc.*, 2019 WL 1125644 (E.D. Tenn. Mar. 12, 2019); *Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) (describing utility of copyright owner's past arms-length licensing practices for determining damages).) It is also pertinent to SNMPR's statutory damages claim, as courts can consider lost revenues (such as lost licensing fees) when determining a statutory damages amount. *See Disney Enters., Inc. v. Farmer*, 427 F. Supp. 2d 807, 816 (E.D. Tenn. 2006) (stating that factors to consider in awarding statutory damages include the revenues lost by plaintiffs as a result of the defendants' infringing conduct).

### 2. The "Ledger" Offer Only Makes Matters Worse

As a consolation, SNMPR claims that it "expect[s]" to produce a ledger showing license payments received from third parties, and that this ledger (if ever produced) will allow Extreme to ascertain the information it needs. (*See* Opp. at 6.) As an initial matter, Extreme still has not received any such ledger, despite that SNMPR indicated that it "can produce license payments back to 1997." (*Id.*) Regardless, a ledger is an insufficient replacement for the full set of license

8

agreements because, as Extreme explained in its Opening Brief, "information beyond the dollar value is needed to contextualize the agreements."  (*See* Opening Brief at 15.)

As one example of pertinent information beyond the dollar value, Extreme needs to be able to see not only the financial terms agreed-to in each license, but also the identity of the licensee, which would enable an analysis of which licenses and licensed conduct could be "comparable" to Extreme's alleged conduct in this case.  Suppose that SNMPR licensed its allegedly copyrighted works to 20 specific companies comparable to Extreme (in size, product offerings, etc.).  Further suppose that SNMPR licensed the same works to 20 other companies that are not even arguably comparable (because they are much larger or smaller, in a different market, or offer non-comparable products).  Extreme must be able to discern the details of all license agreements to understand the relevance of each—and the fact-finder in this case will need the same.  Otherwise—lacking a responsible "benchmark" analysis of SNMPR's licensing history—Extreme risks setting forth damages figures that are "overly speculative."  *See, e.g.*, *Dash*, 731 F.3d at 319 ("Evidence of an infringer's entrance into licensing agreements with other copyright holders is not overly speculative when the benchmark licenses contemplate comparable uses of comparable works . . . . But, if the benchmarks relied on are inapposite, they may, without more, be too speculative to support a copyright holder's claim for actual damages." (internal quotation marks and citations omitted)).

As additional examples, Extreme needs to be able to assess what rights were granted in the license (*e.g.*, distribution rights, rights to create derivative works), what source code was licensed, what alleged copyrights were implicated, etc.  There is no indication that SNMPR's promised ledger will include that information.  Indeed, SNMPR suggests the opposite by claiming that the ledger simply includes "license payments."  (Opp. at 6.)

9

***An Important Note on Completeness***: SNMPR's unclear promise of a "ledger" is one in a series of attempts by SNMPR to try to produce "some but not all" of its licensing history. But any attempt by SNMPR to avoid making a ***complete*** production of its licensing history for the allegedly copyrighted works at issue in this case, and their subject matter, is not only inappropriate, it also defeats the purpose of any such information being produced. Whether for validity purposes, "profits" damages, or "actual" or statutory damages, Extreme needs to be able to study the entirety of SNMPR's licensing history. Otherwise—*e.g.*, if the licensee names were omitted, if the contractual language that specifies the scope of the license subject matter were omitted, if the contractual language that specifies pass-along rights were omitted, or if some number of licenses were omitted altogether—neither Extreme nor a fact-finder in this case could conduct a responsible analysis of how SNMPR's licensing history affects the merits of this case. To use a real estate analogy, Extreme and the fact-finder here would be attempting to conduct a "comparable sales" analysis for a home valuation while certain categories of relevant information (square footage, or location, or lot size) were omitted and/or while some unspecified number of home sales were omitted altogether from the data set.

### 3. Extreme's Requests Are Not Unduly Burdensome or Disproportionate

SNMPR has not shown that it would be ***unduly*** burdened by Extreme's requests, which are particularly reasonable in light of SNMPR's own discovery demands. In addition to its broad approach to relevancy, SNMPR has forced Extreme to jump through nearly-impossible hoops just to meet its broad requests. For instance, in order to produce the terabytes of source code sought by SNMPR, Extreme employees and contractors from at least two continents worked around the clock, devoting ***hundreds*** of hours to the project. (*See* ECF No. 136-8 at ¶¶ 18-20.) Separate from the source code production, Extreme's representatives have spent ***thousands*** of hours responding to SNMPR's remaining requests and produced almost 700,000 pages of documents—a figure that

10

stands in stark contrast to the 20,000 or so total pages produced by SNMPR. (*See* Demers Reply Decl. at ¶ 2.)

SNMPR's Opposition Brief conveniently ignores this reality. Instead, it rests on the estimated 67 hours it took counsel for SNMPR to review their client's license agreements, and the time it speculates will take to "negotiate with the remaining licensees protected by confidentiality restrictions." (Opp. at 8; *see id*. at 3, 6.) But even if it would take SNMPR the "hundreds" of hours it estimates is required to procure consent from the licensees, SNMPR overlooks the fact that it is a plaintiff in a federal court litigation in a matter (1) ***it claims*** is worth hundreds of millions of dollars (ECF No. 101 at 13) and (2) that has already resulted in Extreme as a defendant spending multiple thousands of hours reviewing documents to respond to SNMPR's demands. (Demers Reply Decl. at ¶ 3.)

Additionally, for the first time, SNMPR highlights that it has reached out to 17 licensees whose agreements are subject to some sorts of confidentiality restrictions (*See* Opp. at 7.) But it appears as though SNMPR only recently began its outreach efforts. Indeed, the only document submitted by SNMPR showing that it attempted to obtain consent from certain licensees is dated May 2, 2022. (*See* ECF No. 143-2.) This is after Extreme indicated that it would move forward with a motion to compel (*see* ECF No. 136-7 at 2) and almost ***nine months*** after Extreme served its Requests for Productions (*see* ECF No. 136-4).

Nevertheless, having already provided notice and not receiving any response from all but three licensees, SNMPR has not explained why it is unable to produce these agreements immediately. (*See* Opp. at 7.) While SNMPR claims to be concerned about the "demands" identified by one of the licensees (*id.*), there is an Agreed Upon Protective Order ("PO"; ECF No. 93) in place, and Extreme would not object to SNMPR's designation of the remaining agreements

11

as "Outside Counsel Eyes Only." Those licensee demands cannot trump the Federal Rules of Civil Procedure or an order from this Court. And, to be clear, this Court has the authority to order SNMPR to produce all of its license agreements in its possession, custody or control—regardless of whether unnamed third parties have "consented" to such a production. SNMPR agrees on this point in a footnote, acknowledging that the Court has the authority to grant relief but instead providing business reasons for why it would prefer to spend the time to receive voluntary consent from third parties instead. (Opp. at 9 & n.5.)

Finally, SNMPR's Opposition Brief fails to acknowledge that it was ordered to produce hundreds of licenses in a previous litigation against Avaya Inc ("*Avaya*"). As Extreme explained in its Opening Brief, SNMPR's attempts to avoid producing the license agreements in that case also failed. (*See* Opening Brief at 16.) So far, SNMPR has refused to answer whether there is any overlap in the agreements it has produced or withheld in this case versus the *Avaya* case, despite the answer having potential ramifications with respect to the supposed burden of this request.[3] (*See id.*)

### 4. The Compromise SNMPR Proposes Is Insufficient

SNMPR has offered a compromise in which it would (i) send a letter to all remaining licensees seeking their consent to disclosure/production and offering to redact the licensee's name from the agreement, (ii) follow-up with one single letter or phone call, and (iii) require the parties

---

[3] Seven years (and presumably hundreds of license agreements) ago, SNMPR was ordered to produce 394 license agreements in the *Avaya* litigation. *See Avaya Inc. v. SNMP Rsch., Inc.*, No. 1:12-cv-00191-RGA-MPT, Hearing Transcript Excerpt at 40:1-8 (D. Del. June 11, 2015), ECF No. 276-3. Coincidentally, SNMPR has produced 393 license agreements in this litigation. (*See* Opp. at 3.) It is conceivable that (i) many of the agreements produced in the Avaya litigation overlap with those produced here, or (ii) they constitute a number of the agreements being withheld. In either situation, SNMPR's overall burden with respect to these requests would likely be greatly reduced, as much of the work needed to prepare these agreements would have already been completed for the previous litigation.

12

to split the cost.  (*See* Opp. at 8.)  This is unacceptable.  As SNMPR explained in its brief, only three of the 17 licensees it contacted actually responded.  (*Id.* at 7.)

First, SNMPR has not shown that the notice it provided those parties already is insufficient under the agreements.  But even if more is required,[4] it is clear that SNMPR's current outreach methods are insufficient, and it is unlikely that the compromise it offers would bring about much more success.  As the court explained in the passage from *Groupwell International (HK) Ltd. v. Gourmet Express, LLC*, 277 F.R.D. 348, 360 (W.D. Ky. 2011), cited by SNMPR, any proposed alternatives must "enable some degree of production."[5]  But there is no indication that this arrangement would yield an appreciable number of results given the amount of agreements SNMPR has revealed it is withholding and its success rate thus far.

Second, Extreme should not have to pay for any costs SNMPR incurs while working to satisfy its own discovery obligations.  SNMPR cites *Delozier v. First National Bank of Gatlinburg*, 109 F.R.D. 161 (E.D. Tenn. 1986) for the proposition that "a district court may order a party to pay a portion of the expenses incurred in obtaining discoverable materials."  (Opp. at 9 (quoting *Delozier*, 109 F.R.D. at 164).)  But even the court in *Delozier* stated that the burden of discovery will not be shifted onto the discovering party where the costliness involved is entirely due to the objecting party's own business practices over which the discovering party has no control.  *See*

---

[4] Because Extreme has not seen any agreements that contain the confidentiality provision SNMPR hides behind, it cannot take a position on whether more is actually required.  Indeed, it bears noting that SNMPR failed to even provide excerpts of the confidentiality provisions at issue here.

[5] SNMPR cites to *Groupwell International* in an attempt to highlight what it calls Extreme's "dismissive attitude toward any compromise."  (Opp. at 9.)  This characterization could not be further from the truth.  Throughout this litigation, Extreme has sought to resolve disputes with compromises outside of court.  Indeed, Extreme corresponded with SNMPR ***for months*** on this issue prior to filing this Motion (which was filed about nine months after Extreme served its RFPs), but SNMPR was unable to offer a workable solution.  (*See* ECF Nos. 136-4–136-7.)

13

*Delozier*, 109 F.R.D. at 164. Extreme obviously has no control over the fact that certain of SNMPR's agreements purportedly contain confidentiality provisions that supposedly provide no workable mechanism for obtaining consent or allow for exceptions in light of litigation demands. Ultimately, SNMPR brought this lawsuit and chose to put its own licensing history directly at issue. The agreements are a core element of Extreme's defenses. Thus, SNMPR must produce these documents at its own expense.[6]

Third, this proposal by SNMPR runs straight into the "completeness" issue addressed above. (*See **An Important Note on Completeness***, above.) If SNMPR were permitted to produce license agreements with the names of the licensees redacted (an "offer" that SNMPR proposes it should be allowed to make to its licensees), then it would be impossible for Extreme or a fact-finder to determine whether the license agreement is comparable or not, or to what degree, to the alleged scenario in which Extreme is including portions of SNMPR source code inside the broader operating system it installs on network switching hardware products it offers for sale. Further, if SNMPR were permitted to produce some but not all of its on-point licensing agreements— apparently depending on which licensees responded or not to a letter from SNMPR counsel—then the data set available to Extreme and a fact-finder in this case will be incomplete and thus inherently unreliable. For both validity and damages purposes, the quantity and details of these licenses are relevant. SNMPR should not be allowed to deprive Extreme of such evidence.

---

[6] Indeed, Extreme has borne all of its discovery costs on its own despite the incredible burden involved in meeting SNMPR's demands. Now that it is SNMPR's turn to comply with Extreme's discovery requests, Extreme sees no reason why SNMPR should receive special treatment in order to fulfill its responsibilities.

14

## B. The New Facts SNMPR Reveals in Its Brief Show that Even More Documents Are Being Withheld Than Extreme Originally Thought

Not only does SNMPR's Opposition Brief convey a surprising position on relevancy and burden, it divulges a number of facts about the withheld agreements that were previously unknown to Extreme. These admissions reveal that the situation is worse than Extreme originally thought. SNMPR's Opposition Brief provides more details about these documents than SNMPR ever disclosed in the many months that Extreme repeatedly sought to resolve this issue.

For instance, SNMPR represents it is withholding 565 agreements that contain confidentiality restrictions. (*See* Opp. at 3.) This stands in stark contrast to statements SNMPR initially made to Extreme and this Court that it would produce all licenses yielded after a reasonable search. (*See* ECF No. 136-5 at 1; ECF No. 111 at 10 n.6.) Now, SNMPR is refusing to produce the license agreements, despite the search yielding 565 more than what has been produced thus far. Additionally, not only has SNMPR's counsel searched for and located the remaining agreements, they have also already reviewed them. (*See* Opp. at 3 ("Plaintiff's counsel reviewed almost 1,000 license agreements, of which it determined 393 contained no confidentiality provision, and the remaining 565 contain confidentiality restrictions.").) Thus, SNMPR should be held to its original promise (and obligation) and produce all of SNMPR's own agreements.

Further, Extreme has now learned from SNMPR's Opposition Brief that SNMPR has not reviewed (much less produced) any license agreements entered into prior to 1994, nor any evaluation licenses. (*See* Opp. at 3 n.1.) But SNMPR's stated reasons for failing to even review these agreements make no sense.

First, SNMPR claims that the pre-1994 licenses were not reviewed because they were either transferred to SNMP Research International, Inc. or are no longer active. (*Id.*) But SNMP Research International, Inc. is a ***party to this litigation*** and was subject to the RFPs served by

15

Extreme. (*See* ECF No. 136-3 at 1-2.) Therefore, any license agreements transferred to SNMP Research International, Inc. are plainly responsive to Extreme's requests and are just as relevant as those that have not been transferred. Any suggestion by SNMPR that it can hide behind SNMP Research International, Inc. in order to avoid producing these agreements is nonsensical. Furthermore, the license agreements that are no longer active are relevant to showing SNMPR's historical licensing practices, including pricing, and any assignment rights granted. For the reasons explained above, this is of particular importance to Extreme's invalidity argument.

Next, SNMPR claims that the evaluation licenses are not relevant because they "have no cost, do not allow customers to redistribute the [SNMPR] software, and are provided for the limited purpose of evaluating the [SNMPR] software." (Opp. at 3 n.1.) But they can be relevant for other reasons—for example, the agreements may contain a provision specifying the price floor around which the parties are negotiating, which goes to damages. The evaluation licenses are also relevant to Extreme's invalidity arguments, including the description of SNMPR's supposed copyrighted work, publication of its supposed copyrighted work, etc. At bottom, SNMPR cannot simply characterize documents as it sees fit to avoid producing evidence. SNMPR's unilateral decision to ignore what appears to be a substantial portion of the agreements it has entered into is improper, and Extreme should be allowed to analyze these documents itself.

### III. CONCLUSION

For all of the foregoing reasons, and those stated in Extreme's Opening Brief, Extreme respectfully requests that this Court grant its Motion in its entirety and order SNMPR to produce all of its own license agreements related to the works its alleges that Extreme has infringed, and all remaining license agreements that otherwise concern software regarding networking technology. Extreme reiterates its request from its Opening Brief—to which SNMPR did not respond—that such production should occur within 21 days of the Court's order.

16

Case 3:20-cv-00451-CEA-DCP   Document 146   Filed 06/01/22   Page 19 of 20   PageID #: 5572

| | | |
|---|---|---|
| DATED: | June 1, 2022<br>New York, New York | Respectfully Submitted,<br><br>*/s/ Leslie A. Demers*<br><br>John M. Neukom (*admitted pro hac vice*)<br>DEBEVOISE & PLIMPTON LLP<br>650 California Street<br>San Francisco, California 94108<br>jneukom@debevoise.com<br>(415) 738-5700<br><br>Leslie A. Demers (*admitted pro hac vice*)<br>SKADDEN, ARPS, SLATE,<br> MEAGHER & FLOM LLP<br>One Manhattan West<br>New York, New York 10001<br>leslie.demers@skadden.com<br>(212) 735-3000<br><br>*Attorneys for Extreme Networks, Inc.* |

17

Case 3:20-cv-00451-CEA-DCP   Document 146   Filed 06/01/22   Page 20 of 20   PageID #: 5573