**Exhibit I to the Declaration of Olivia Weber**

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF TENNESSEE
 2                    AT KNOXVILLE, TENNESSEE

 3   _____)
                                     )
     SNMP RESEARCH, INC. and SNMP    )
 4   RESEARCH INTERNATIONAL, INC.,   )
                                     )
 5              Plaintiffs,          )
                                     )
 6   vs.                             ) Case No. 3:20-cv-451
                                     )
 7   BROADCOM, INC., BROCADE         )
     COMMUNICATIONS SYSTEMS, LLC,    )
 8   and EXTREME NETWORKS,           )
                                     )
 9              Defendants.          )
     _____)

10
                     MOTION PROCEEDINGS
11          BEFORE THE HONORABLE DEBRA C. POPLIN

12                Friday, March 25, 2022
                  10:07 a.m. to 3:17 p.m.
13
     APPEARANCES:
14
                 ON BEHALF OF THE PLAINTIFF:
15
                 ALVIN MATTHEW ASHLEY, ESQ.
16               OLIVIA WEBER, ESQ.
                 IRELL & MANELLA, LLP
17               1800 Avenue of the Stars
                 Suite 900
18               Los Angeles, CA 90067

19               JOHN L. WOOD, ESQ.
                 CHERYL G. RICE, ESQ.
20               EGERTON, MC AFEE, ARMISTEAD & DAVIS, PC
                 P.O. Box 2047
21               Knoxville, TN 37901-2047

22
     REPORTED BY:
23
     Teresa S. Grandchamp, RMR, CRR
24   P.O. Box 1362
     Knoxville, Tennessee 37901
25   (865) 244-0454
```

1    **APPEARANCES:** (Continued)

2             <u>ON BEHALF OF THE DEFENDANTS:</u>

3             ALISON PLESSMAN, ESQ.
             SALVATORE UMBERTO BONACCORSO, ESQ.
4             (appeared telephonically)
             HUESTON HENNIGAN, LLP
5             523 West 6th Street
             Suite 400
6             Los Angeles, CA 90014
             Defendants:  Broadcom, Inc. and Brocade
7             Communications Systems, LLC

8             JOHN NEUKOM, ESQ.
             DEBEVOISE & PLIMPTON, LLP
9             650 California Street
             San Francisco, CA 94108
10                           and
             LESLIE A. DEMERS, ESQ.
11            SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
             One Manhattan West
12            New York, NY 10001-8602
             Defendant:  Extreme Networks, Inc.

13   **ALSO PRESENT:**

14            DR. JEFFREY CASE, SNMP Research;

15            PHILLIP BLUM, ESQ., Corporate Counsel
16            for Broadcom, Inc.

17                    * * * * * * * *

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All rise.

2          The United States District Court for the

3   Eastern District of Tennessee is now open pursuant to

4   adjournment with the Honorable Debra C. Poplin, United

5   States Magistrate Judge, presiding.

6          Please come to order and be seated.

7          We are here for a motion hearing in Case

8   3:20-cv-451.

9          Here on behalf of the plaintiffs are Alvin

10  Matthew Ashley, Olivia Weber, John Wood, and Cheryl

11  Rice.

12          Are the plaintiffs ready to proceed?

13          MS. RICE:  Yes, Your Honor.

14          THE COURTROOM DEPUTY:  And here on behalf of

15  the defendants are John Neukom, Leslie -- is it Demers?

16          MS. DEMERS:  Yes.

17          THE COURTROOM DEPUTY:  -- Alison Plessman,

18  Phillip Blum, and on the telephone is Salvatore

19  Bonaccorso.

20          Are the defendants ready to proceed?

21          MR. NEUKOM:  Yes, Your Honor.

22          THE COURT:  All right.  Let me ask --

23          Ms. Rice.  It's fine.  Take the podium.

24          Will there be primary counsel for argument, or

25  is it going to be handled in some other fashion?

1          MS. RICE:  Well, Your Honor, good morning.  May

2    it please the Court, happy to be here today on behalf of

3    the plaintiffs.

4          Yes, Mr. Matt Ashley will be taking the

5    leadoff.  However, we probably will be sharing the

6    arguments --

7          THE COURT:  All right.

8          MS. RICE:  -- as we move along.

9          So I would like to take the opportunity, very

10   briefly, Your Honor, to introduce Matt Ashley and Olivia

11   Weber, both members of the California Bar who have been

12   admitted pro hac vice in this matter.  This is their

13   first appearance before the Court.

14         THE COURT:  Welcome to the district.

15         MS. RICE:  And then, of course, Dr. Jeffrey

16   Case, who is the founder and chief officer of the

17   plaintiffs, SNMP Research and SNMP Research

18   International.

19         THE COURT:  Okay.

20         MS. RICE:  I'm going to turn it over to

21   Mr. Ashley.

22         THE COURT:  Okay.

23         MR. ASHLEY:  Thank you.

24         Good morning, Your Honor.  I thought that the

25   way, ultimately, we might handle this is:  Instead of --

```
 1  because of the volume of requests and the volume of

 2  objections and how they tend to repeat themselves, we

 3  could maybe handle it like we did in the briefing, like

 4  the parties did in the briefing, which is take it by --

 5  issue by issue.

 6          But before we dive into the issues -- and some

 7  are more pressing than others because of the time that

 8  we have left in this case.  Particularly, in about

 9  four-and-a-half months, our opening expert --

10  plaintiffs' opening expert reports are due.

11          But before we get into those issues, I thought

12  it might help you if I could give you a little bit of

13  background about the case.  It's in the briefing, too,

14  to some extent.

15          THE COURT:  And I have reviewed --

16          MR. ASHLEY:  Yeah.

17          THE COURT:  -- the Complaint and all of the

18  briefings on the motion.

19          MR. ASHLEY:  So, the plaintiffs, SNMP Research

20  International and SNMP Research, Inc., they're Tennessee

21  corporations.  Their principal place of business is here

22  in Knox County, and they are -- they were founded by

23  Dr. Case and his wife, his late wife, and he is the

24  owner and operator of them today; although, they do have

25  employees.
```

 1         SNMP takes its name from the protocol, Simple

 2    Network Management Protocol.  And just at a very high

 3    level, a protocol is a way of communicating.  So it's a

 4    language.  And SNMP's protocol is directed at

 5    communicating with respect to the management of a

 6    network.

 7         And maybe it would help you to have a little

 8    explanation of the products that are at issue in this

 9    case.  You know, I'm going to be very generalized here,

10    probably over-generalized, because it's not like we're

11    doing a tech tutorial.

12         But the products at issue in this case are, by

13    and large, what are called switches.  And all a switch

14    really is is:  It's a product that allows you to plug in

15    a whole bunch of electronic devices and then for there

16    to be communications passed to and from and received and

17    sent by these devices.

18         So, for, like, the Brocade products, the

19    storage area network products, you could think of it as

20    a way to interconnect a bunch of storage devices.  Like,

21    you might have hard drives and then allow multiple

22    computers to be able to access those simultaneously.

23         And for Extreme, it's Ethernet switches.  So

24    it's a switch where you can have a bunch of computers

25    hooked up and they can communicate with each other.

1    And what SNMP does, at, again, a very high

2 level -- and this is not trying to be all-inclusive.

3 But it really helps the network administrator set up

4 that switch and monitor what's going on with that

5 switch.  So it's pretty critical.

6    Now, it's been around a long time.  Dr. Case

7 was instrumental in the development of the protocol,

8 and, of course, then he developed his software which is

9 an implementation of that protocol.  It's in all sorts

10 of products.

11    All sorts of companies, large and small, use

12 Dr. Case's software, and a lot of the governmental

13 entities do, too, and it's because it's very good, very

14 proven, very reliable, and been around a long time.

15    And I'm going to talk about 20 years ago and

16 get into the license at issue in this case, and that was

17 in 2001, and Brocade obtained license rights to

18 Dr. Case's software.

19    Now, those licenses, Dr. Case's licenses, have

20 very restricted, detailed restrictions, on them.  You

21 can use them with certain platforms, certain processors.

22 There is all sorts of limitations that I won't go into.

23    One of the key limitations, though, is that you

24 can't transfer it.  You can't assign it.  Not without

25 SNMP's express permission.  And that includes -- an

1  assignment includes a merger.  That's number one.

2       Number two, you cannot -- the Brocade license,

3  you cannot disclose his source code to third parties.

4       So that contract was amended several times.

5  Again, I'm not going to get into one versus three versus

6  five.  Just understand it's been around a long, long

7  time.

8       And now let's fast forward six years, 2017, and

9  that's -- that's where this all starts.  Kind of late

10  2016, Broadcom and Brocade announce they're going to

11  merge -- and I could have the date a little off.  And

12  then around that same time when this merger is going to

13  occur, they're going to spin off or divest a portion of

14  Brocade's business to Extreme.

15       And the letter that kicks this off -- I think

16  it would be helpful, Your Honor, if you have access to

17  the Weber declarations in support of both motions.  I'm

18  mainly going to be working off of the Extreme one, but

19  I'm going to start with the Broadcom/Brocade Motion to

20  Compel.

21       And this document is under seal, so I'm not

22  going to be verbatim through it, but I did want you to

23  actually lay eyes on the document that sort of kicks

24  this all off.

25       It's actually -- it's Exhibit A to the Weber

1   declaration.  If it helps you, the Docket No. is 118.

2   And I can hand it up if you'd like.  It's part of the

3   record.  But if you have access, I won't.

4           THE COURT:  I can just get this pulled up.

5           MR. ASHLEY:  And other than this one, Your

6   Honor, the other ones I'll be talking about, we can hand

7   out.  We just happen to only have one copy of this one,

8   unfortunately.

9           THE COURT:  Oh, it's fine.  It's just -- my

10   remote connection was not set up.  It's taking just a

11   moment.

12           MR. ASHLEY:  And if you can't find 118, you can

13   look at the public version at 116 dash -- Docket 116-2.

14           THE COURT:  I've got 118.  It's starting to

15   download.

16           All right.  I'm with you.

17           MR. ASHLEY:  You have it?

18           THE COURT:  Uh-huh.

19           MR. ASHLEY:  So it should -- to make sure that

20   we're looking at the same thing, at the top right

21   corner, there is a big Brocade emblem, and it's dated

22   September 13, 2017.

23           THE COURT:  Yes.

24           MR. ASHLEY:  Okay.  So that's really what I

25   wanted to point you to.  I won't go into the detail and

1    the substance, but this was a letter that was sent by

2    Brocade, basically on behalf of Extreme, Brocade and

3    Broadcom, and it's dated September 13th, 2017, and the

4    subject line talks about what it is. And basically, in

5    a nutshell, this was the -- essentially, like, a notice,

6    but it asked Dr. Case's company to agree and accept that

7    there was going to be a transfer.

8            It kind of roughly describes the transaction.

9    I think the transaction later changed a bit, in terms of

10    the way it was done. But this is sort of the beginning

11    of SNMP's notice that they were looking to do this.

12            And if you look to -- for instance, in the

13    first sentence, you see these references to the word

14    "affiliate." So SNMP's being told, hey, us an affiliate

15    and them an affiliate, and there's these affiliates, and

16    we're going to do something with your software.

17            And if you turn to page 3, there is -- it's

18    already been pre-signed by Brocade and Extreme, and

19    they're asking Dr. Case's company to acknowledge and

20    agree to it.

21            And up at the top of the notice, the notice

22    goes to Extreme and they go to Broadcom, Limited.

23    Broadcom, Limited is the predecessor to what is now

24    Broadcom, Inc., which is one of the defendants, which

25    will give you an indication of why Broadcom, Inc. -- one

1   of the reasons why Broadcom, Inc. is in this case and

2   why we're inquiring into Broadcom, Inc. and affiliates.

3           And when Dr. Case received this, his attorney,

4   John Wood -- who is sitting right over there -- wrote

5   back -- this one is not in the record, but we can

6   provide it; I don't think any of this is in dispute --

7   within a few weeks of this, wrote back to all of

8   Brocade, Extreme, and Broadcom and said, "No, we don't

9   consent.  Not that we would never consent, but you can't

10  just send us a letter like this.  We need to know more

11  about this transaction, what's going to happen with our

12  software," etcetera.

13          So, as it turns out, though, they just

14  proceeded anyway with the transfer of SNMP's software to

15  Extreme, and that included the source code.

16          What happened after that was:  Six months

17  later, Extreme -- after this transfer has already

18  occurred, despite the lack of consent, Extreme reaches

19  out to SNMP again.  They don't write to John Wood.

20          If you -- the rest of these are not under seal.

21  If you can pull up the Weber declaration in support of

22  the Motion to Compel as to Extreme, I'm only going to

23  look at a couple of these exhibits, but I did want to

24  point out some key language to you.

25          Exhibit A is the second reach-out from Extreme

 1  to SNMP.  And I'll direct you -- this is an e-mail.  So

 2  I'm going to start in the back, or approximately the

 3  back.  If you look at page 9 of 11 -- if you're looking

 4  at the Docket 96-3, it would be 9 of 11.  If you're

 5  looking at the Bates stamp, it would be SNMP 4570.

 6  That's where we'll start.

 7            Are you there?

 8            THE COURT:  Yes.

 9            MR. ASHLEY:  So, if you look, there is an

10  e-mail dated Monday, the 16th of April 2016, from

11  someone named Jennifer Sipes at Extreme to Steve

12  Blizzard, who is an officer at SNMP, and they -- and

13  they say -- and I'm just going to jump to the pertinent

14  paragraph.  It's the third paragraph.

15            "In connection with and prior to the

16  acquisition, you were forwarded the attached assignment

17  notice in September 2017."  That's what we just looked

18  at.  "Unfortunately we have not heard back from you to

19  date."  That is not true.  "In order for Extreme to be

20  assured of your understanding of the current

21  arrangement, would you please take a moment and sign the

22  attached."  It goes on.

23            And if you flip backward a page, you see the

24  response that they get.  It's from John Wood.  And John

25  writes near the bottom, "Jennifer, I am counsel for SNMP

Research, and I did respond to your assignment notice

shortly after you sent it in September. I have attached

that correspondence. The license between Brocade and

SNMP Research is not assignable without SNMP's consent,

and SNMP Research has not provided that consent. If

Extreme is using or distributing SNMP Research software

it obtained from Brocade, then it is doing so out of

license."

And he said, "I'd be glad to have a call and

you give me more information about how it's being done

and we can talk about an assignment."

Then she responds about a week later. And,

again, I'm going to jump to the main point. Second

sentence, "As discussed, below is a Brocade product list

with SNMP Research software." And she lists VDX 8770

Series. These are a series of products. It's a product

line. No trouble finding that out.

And these discussions progressed. Mr. Wood

kept trying to find out more and more. You know, after

he gets the names, he wants to know things like

quantities.

So, for instance, if you go to Exhibit B -- or

in addition, Your Honor, another key issue he was

looking into was there a transfer of the Brocade product

line that was in the data center business to Extreme.

     1    And so they just -- they're still selling those.

     2          But we also come to learn that they created

     3    their own products with that software.  And what that

     4    means is:  The reason why you give source code to a

     5    company like a Brocade or an Extreme is they're not just

     6    receiving, like, the working program like you would

     7    in -- you know, imbedded in a computer; they're getting

     8    the source code so they can work it in with their code

     9    and put it into their product to have a working product.

    10    So we come to find that Extreme has new products.

    11          And if you look at Exhibit B -- I'm just going

    12    to take you to the first page.  The very bottom,

    13    Mr. Wood writes, "Can you let me know the Extreme

    14    products that are using SNMP software without a

    15    license."

    16          So you hear sometimes in this case, "We just

    17    don't know" -- because, for instance, Brocade has a

    18    different license with SNMP, one, maybe two, that are

    19    not at issue in this case, and Extreme had one a long

    20    time ago and products basically ran out.

    21          But we asked, "Which ones are you using without

    22    a license?"  They responded.

    23          Now, Exhibit C is under seal, but you can flip

    24    to it.  And I won't go into the detail, but you can just

    25    kind of look at this and you'll see what John Wood is

1  trying to do is:  "Tell me how much.  What shipped when?

2  Tell me for 2017.  Tell me for 2018.  Tell me for 2019."

3  And they did, down to SKU numbers.  "You're using our

4  software without a license.  Which ones?"

5          Now, Extreme knows this.  So there is no doubt

6  that Brocade knows it.  Extreme got the stuff from

7  Brocade.

8          But when you -- as we're finding this out, we

9  send a notice of breach to Brocade.  John Wood sends

10  that, but says, "You can try and cure it."

11          I should note one more thing:  During these

12  discussions with Extreme, it became clear that what had

13  happened, it was not a transfer.  It wasn't like Brocade

14  just transferred the rights to Extreme and then just

15  washed their hands of it.  They transferred the source

16  code, which Extreme is using and making new products

17  with.  But Brocade is still doing it, too.  So they're

18  both using it now.  So they're in breach.  Brocade is in

19  breach and Extreme is selling without a license.

20          And I realize these are all allegations.  I

21  haven't proven any of this.  I'm just walking you

22  through what our allegations are so you have the scope

23  of the case, so you know what's relevant and what's not

24  relevant.

25          So John Wood sends a notice of breach.  They

1    don't respond and say, "No, we didn't breach."  He gives

2    them an opportunity to cure and they don't.  So he

3    terminates not the -- not the agreement itself, but

4    their use and distribution rights, redistribution

5    rights, Brocade's, under the contract.

6           They were in breach long before that, but now

7    it's like you don't -- now, just to make it really

8    clear, your use and distribution rights are gone.

9           And after that Brocade is trying to get a

10   license.  And I won't go through the same type of

11   rigmarole, but they have the same sort of conversation.

12   And then Brocade is asked, "What are you using?  Because

13   to know what" -- "to know what we should do, we need to

14   know what you did."

15          And they also provide a list of the products

16   that Brocade is using SNMP software without a license,

17   and that is the Weber declaration, Exhibit B.  It's

18   under seal, but if you look at page 26, it's 166-3 at

19   26.  You can look.  Here they are.

20          So, with that background in mind -- and before

21   I get into the issues, let me just tell you what we want

22   generally.  What all this discovery is directed at --

23   because it looks like a lot, but it's -- actually, if

24   you just -- if you understand what you have to prove in

25   a case like this, it becomes readily apparent that what

1    we're asking for is relevant.

2         The question becomes:  Is it burdensome?  Is

3    there privilege issues here?  Is it burdensome?  And

4    have they met their burden to show it's burdensome?

5    Very sophisticated in that they can do searches and

6    things like that.

7         So, with all that in mind, with respect to

8    liability -- and I'm going to focus -- I'm going to put

9    aside the breach of contract claim for now.  I'm not

10   going to -- I'm just going to talk about copyright

11   infringement.

12        With respect to the liability portion of the

13   case, we have to show copying.  And not identical

14   copying, copying.  We're going to have to show code and

15   say that didn't happen by accident.  And it's got to be

16   substantially similar.  And we have to show they had

17   access.  The access is not going to be difficult in this

18   case.

19        Yeah, their admissions are great.  The preceded

20   admissions are great.  That's why we essentially used --

21   that's what we used in the Complaint for the actual

22   products that we called accused products in the

23   Complaint.

24        But make no mistake, the allegation is

25   copyright infringement.  You're infringing our

```
1   copyrights.  And you don't have to know all the
2   products.  You're supposed to look and tell us the
3   products under oath which ones.  You know how to do it.
4   You did it before the case; you can do it again.
5             And you don't get to direct how we define our
6   terms.  They can -- they can serve discovery on us with
7   their defined terms, as long as our terms are
8   understandable and reasonable.
9             And one of our concerns is that when
10  you -- aside from their admissions, the way you
11  generally prove copying in a software copyright
12  infringement case is comparing source code.  That's not
13  a -- that happens in all copyright cases involving
14  source code.  I mean, on software, you compare source
15  code.
16            And that's why before we even served a single
17  request, the very beginning of this case, the parties
18  filed a 26(F) report.  Everybody had a different take on
19  everything, the defendants' portion, plaintiffs'
20  portion, but there was one thing that everybody was
21  universal on.  We said to the judge, "This is going to
22  involve source code review, thousands of lines.  Tedious
23  reviews of source code.  So we have to have more time
24  than normal."  That's at Docket 46, page 4, paragraph 6.
25  I know you've seen it in the briefing, so I won't quote
```

it, unless you want me to.  But it's basically the

parties know that we're going to need experts to review

this stuff.

        And you should know, Your Honor -- I mean, I

think the impression is being given that somehow we just

want to have a bunch of irrelevant code to review.

There is nothing more mind numbing, hardly, than

reviewing source code and comparing it.  We don't

benefit from being dumped a bunch of irrelevant source

code.

        Here is the problem:  With source code,

particularly like SNMP's, you don't just, like, have it

in one place.  It's kind of embedded.  Like I told you,

when they build their product, they take our code and

they do what they will with it.  And they might change a

little bit here and there; okay?

        And they keep focusing on the version numbers.

None of that matters at the end of the day.  At the end

of the day, we have copyrighted work; they have

products.  Experts will compare, and they will say how

substantially similar are they and there was no

accident.

        And we have to have the source code for the

full product because we can't let the other side, who is

accused of infringing and copying, be the arbiter of

1    what portion of the code they say is -- is -- they deem

2    appropriate for us to look at and compare.  It's a

3    copying case.  So we need to get on that very soon.

4            THE COURT:  And as I understand, there was a

5    proposal that that would be done simultaneously.

6            MR. ASHLEY:  That's what we proposed.

7            So what happened was:  You might remember they

8    filed a Motion to Stay Discovery.  In that Motion to

9    Stay Discovery, they hinted that, "Oh, we can't answer

10   these requests because we have to see their source code

11   first."

12           This is -- this is, like, literally right after

13   we served our requests.  We said, "Okay.  Let's

14   exchange.  You want our source code, it's fine.  But

15   we've asked you for source code.  Let's exchange."

16           We can't hide the ball or anything.  You know,

17   what's on deposit with the Copyright Office, that's what

18   it is.  It's not a trade secret case.

19           And we said, "Let's just simultaneously

20   exchange it."  They said no.  That was offered, I think,

21   in the end of 2020, or the beginning of 2021, like

22   within a few weeks of our first requests which we're

23   still fighting about.

24           What they want to do, Your Honor -- I'm kind of

25   jumping ahead here to the issue, but what they want to

do is:  They want us to produce our code on deposit at the Copyright Office.  They want to go look at it, and they want to produce potentially subsets, if anything, subsets of their codes and products, the parts that they want to produce.  And we think that doesn't work.  And I'm going to go into that a little bit more.

THE COURT:  Okay.

MR. ASHLEY:  So that's the liability portion.

The damages -- and I'm not talking about the breach of contract claim.  The damages portion in a copyright case, there is multiple components of damage. There is the component you probably think of, which is sort of the compensatory component, you know, out of pocket and whatnot.  I'm not saying -- I'm not trying to delineate which damages we can get, but there is that damages component.

But most people putting in the word "damage" in a copyright case, also a component you're entitled to, which is disgorgement of profits.  And these are very profitable, massively-expensive products.  These are not the router that you buy at Best Buy.  These are hundreds of thousands of dollars, and -- I mean, per product.

I'm not saying -- I don't know that for sure because I don't have all the figures, but these are big-deal products.  And SNMP is a big deal in these

1   products.  It's a reason why they didn't take it out

2   right away.

3          And our only obligation as the plaintiff under

4   the Copyright Act for disgorgement of profits in a case

5   like this where the software -- we're going to show the

6   software that's in the product, the infringing software,

7   our obligation is to state, What are your gross revenues

8   on these products?  And it is their obligation --

9          (A discussion was had off the record amongst

10          co-counsel for the plaintiffs.)

11         MR. ASHLEY:  Oh, yeah, yeah.  I should -- I

12   should -- I should clarify one thing.  I'm jumping ahead

13   because I said they are -- they are offering to produce

14   code that's in their product.  They haven't even agreed

15   to do that yet.

16         Their offer is -- in their offer for a

17   simultaneous exchange, theirs is, "You give us all yours

18   on deposit with the Copyright Office," and Brocade says,

19   "We'll give you back the code you sent us if we have

20   it."  You know, they don't tell us if we have it.  That

21   doesn't tell us what's in the product.

22         I'll get to the competing compromises in a

23   moment, but I misspoke.

24         THE COURT:  Okay.

25         MR. ASHLEY:  So -- but what happens is:

1    Defendants have an advantage right now on the damages
2    case.  It's kind of reversed, in terms of who has the
3    asymmetry of information.  They have all the
4    information.  They're fine to sit here and do nothing
5    for as long as they can because they know they're going
6    to have to produce the gross revenues.  But then what
7    happens is, there is a fight.  The defendants have to
8    prove costs that are properly deductible under copyright
9    law so they can show that they -- they can reduce those
10   costs, in terms of how much they have to disgorge.

11           They also have to show if they're going to try,
12   oh, the bottom-line profit, it shouldn't be apportioned
13   a hundred percent to the infringing use; it should be --
14   that there is other features that matter.

15           So things that talk about what's important to
16   the product, our software or something else, will be
17   important, and they control it all right now.

18           So they're very to happy say, "What are you
19   talking about?  I don't understand what you mean by
20   related to the financials," or, "We'll produce documents
21   sufficient to show."  I don't want documents sufficient
22   to show.  They will just give me a big cost.  I want to
23   understand the costs.  They say, "Well, you don't need
24   to know anything from the day before the breach."  Of
25   course, we do.  I want to know if what they're saying

1  now about their margins is consistent with what they

2  said before the margins.

3      They talk about these products internally.  How

4  profitable are they?  Are we making money?  How much

5  money are we making?

6      And we haven't gone far back at all.  The

7  breach was in 2017.  We're going to January 1st, 2017.

8  You've probably seen cases where when there is a breach

9  in 2017, you go back two or three years, four years,

10  five years to get a complete picture.

11      I think we even cited a case, maybe, that you

12  decided where that was the case.  So we're not being

13  pigs here about how far back we go.  In fact, as it

14  turns out, they picked the exact same time period,

15  January 1st, 2017 until today, or they have none at all,

16  where ours are pretty much all January 1st, 2017 up

17  through.  And, actually, they don't even say up to

18  today.  They want to stop all -- not all, but

19  significant, important productions on the date of the

20  Complaint.  Like damages, as if they're selling

21  something after the date of the Complaint, it doesn't

22  somehow become relevant.

23      So you could probably see now why we have some

24  breadth to our -- our damages discovery.  And what

25  normally happens there is:  There is a dialogue with the

 1   other side.  They say, "Well, this would encompass this.

 2   It would encompass that.  We have this and we have

 3   that."  And then you decide, "Well, okay.  That sounds

 4   like it's marginally relevant and too burdensome, so we

 5   won't do it.  We will agree not to."  But they don't do

 6   that.  So, that's damages.

 7          And then there is wilfulness.  So this is not

 8   like some -- and you have patent cases, for instance,

 9   where somebody is going along on their merry way selling

10   products, and then all of a sudden, bam, eight years

11   later, somebody says, "You're infringing my patent.  I

12   want damages back as far as the statute or latches

13   allows."

14          This is a willful infringement case, or that's

15   what we intend to prove.  2017, can we do it?  No.  Then

16   from 2018 to '20, trying to hunt them down on what

17   they're doing with our software, all the while they're

18   infringing; they're selling.

19          So we've propounded a lot of the discovery

20   saying, "What did you say to get" -- but after John Wood

21   writes this e-mail, what happens?  There has got to be

22   discussions.  This is a big deal.

23          What about the discussions internally?  And

24   today, as of today, after a year of discovery, we don't

25   have a single e-mail between them.  We don't have a

1  single e-mail.  We don't have a single line of source

2  code.  They tout that they have produced these

3  documents.  The document production is always correct.

4  We file a motion, or whatever applies to you after you

5  set a hearing and things start to roll in.  But most of

6  them are like SEC filings, public documents of that

7  sort.

8        We don't have any documents yet.  And it's so

9  easy for them to produce saying, "Here is our product

10 that you've accused.  Here is the revenues.  Here is the

11 costs."  They keep that.  They can get that.  That's

12 something that any plaintiff who can delineate the

13 accused products in the Complaint should get.  We

14 shouldn't have to prove our case for that.

15       By the way, I just showed you we have more than

16 you almost ever get in a copyright case.  You get

17 admissions saying, "What are you using without a

18 license?"  And they give it to you.  And now they say,

19 "Huh?  What?  Why do I have to produce this

20 information?"  Actually, they don't even say that.  They

21 say -- I don't think they want to say, "We're not going

22 to produce it."  They exclude it that it isn't relevant.

23 They say, "We will."  But when?  Why are we still doing

24 this?  We've got expert reports in four months.

25       Well, I'll tell you why.  It's the asymmetry of

1    information.  They have our source code.  Make no

2    mistake about it, they have our source code.  We

3    licensed it to them.  They can be looking at it right

4    now.  We don't have their source code.

5        They claim they need our source code on deposit

6    with the Copyright Office.  And that's what I'm going to

7    get into right now is the source code because it is a

8    critical issue.  It is so time sensitive.  They say,

9    "Well, we can't give you our code because we don't

10   understand the case.  We don't know where this software

11   is in this because you've sued us for copyright

12   infringement."  You know, "The stuff before the case,

13   that was" -- "We just wanted to give you money for free.

14   It wasn't copyright infringement."  Of course, they

15   always knew it was copyrighted.

16       Now they're saying they haven't seen a deposit

17   copy, but what does that matter right now?  What does

18   that matter for them to go back and say, "Here is the

19   product in" -- I mean, "the source code in our product."

20   We can't change what's with the Copyright Office.  And

21   we said we'll do it simultaneous.

22       Who's hiding the ball?  We don't have -- we

23   don't have nothing to hide.  This is not like a -- they

24   cite these trade secret cases where a Court is really

25   disturbed because somebody comes in, like, usually a

competitor, like, this is their Puerto Rico case, and
somebody comes in and says, "I'm suing you for" -- "my
competitor, for trade secrets they have.  Let me see
your trade secret.  Let me see your source code."  And
the Court says, "No, you have to show your trade secrets
first so that you can't adjust what your trade secrets
are by what you see."  So you make them come in so they
can't hide the ball.

It's -- it's the defendants that are trying to
do that.  It's the exact opposite.  They want to see
code, come up with arguments, and then what they want to
do is be the arbiters of what is produced.  It's real
simple what should be produced.  What's in the product?

They haven't put in any affidavit of -- that
it's burdensome.  Almost every case they cite -- and I'm
happy to go into them.  Almost every case they cite,
there is a detailed affidavit where somebody says, "This
is going to be really hard."

It's not going to be hard for a company like
Broadcom or Extreme.  They keep it in a source code
file.  But the way they're kept, it's just like a -- you
probably have Word files and Outlook files, and you have
a folder and you have subfolders.  Every time you do
something, you put it in a new folder.  And you have
programs within them.  And they can copy them.  It's

1  harder to try to go back and figure out, well, which

2  lines of code should I show SNMP.

3  And by the way, do you think we're going to

4  agree on that?  We can't agree on the most basic stuff.

5  We will be in here every week trying to argue that

6  they're not producing enough.  That even happens in some

7  of their cases.

8  So they haven't done what the -- the cases that

9  they cite litigants did.  And, moreover, in this

10  district, it is crystal clear.  We don't have to prove

11  our case to get discovery.  If they want to claim our

12  software is not registered, sobeit.  They will get

13  all -- we will do a simultaneous exchange.  They can

14  spend time on that.  That defense will go away very

15  quickly, I can tell you, when this thing they're trying

16  to -- this trick they're trying to employ where we have

17  to produce ours and they can, like, decide what

18  percentage of the code to produce.

19  If you rule against that, I think this whole

20  argument about registration is going to be gone.  And

21  I'll show you why.  If you have the Complaint, I

22  can -- I think I can explain what they're doing, but

23  they're really cagey about it.  So I may get it

24  partially wrong.  But I think I got the gist of it.

25  And if you turn to the Complaint, page 7 --

1   just let me know when you're there.

2         THE COURT:  I'm there.

3         MR. ASHLEY:  So, paragraph 33 -- and, by the

4   way, it's the Complaint's allegations that govern, not

5   their defenses.

6         But they claim that there was an admission by

7   us that our software is not registered, the software

8   that's at issue in this case.  There was not.

9   They're -- they're -- and they never quote it, by the

10   way.  And you might -- you might notice that we asked

11   that the meet-and-confer calls be transcribed.  In one

12   of the exhibits, there is dialogue between Ms. Weber and

13   people over there saying, "We want it transcribed.  We

14   keep having these misunderstandings."  They said, "No,

15   we won't do it."  That was in July.  That's when the

16   admissions supposedly occurred.  And they don't quote it

17   as an admission.

18         But what matters is paragraph 33, "SNMP

19   Research has registered the copyrights for the software

20   at issue in this case collectively," and then it sets

21   forth.

22         I'm not going to spend an inordinate amount of

23   time on this, but it does bear looking at this product

24   list.  You see this product?  This is the software.  And

25   you'll see it says Version, like Version 15.  15.2,

1   15.3, 15.4, 16, and so on.

2          So the way it works is:  The 15 and the 16,

3   those whole digits, those are effectively -- and people

4   use different terminology, but they're releases.  It's

5   like a product -- I mean, you know, it's a release

6   and/or you can call it a version.  It's a major release.

7   16, 15.

8          Then you have a dot and you have another one.

9   This is -- and this is SNMP's designation.  Not

10  everybody does it like that.  I don't want to convey

11  that.  But SNMP's designation throughout its existence

12  has been that that first number is the major release;

13  next one is the minor release.

14         But there is other ones, too.  So you can get

15  up to four.  So, but, like, you'd have -- and I'm making

16  this up.  I don't know if there is one of these

17  versions, but you can have a 13.2.1.6.

18         And I may have this wrong, but I know the major

19  is the first, the minor release is the second, and the

20  other ones are, like, patches and bug fixes and

21  revisions.  They're minor.

22         And so what happens is -- the way it happens

23  from a copyright registration perspective is:  You know,

24  16.2 will encompass all the stuff before it because

25  you're just putting in more files.  That's all you're

1    doing is putting in more files.  And if you have a

2    16.2.0, you have a bug fix one, maybe three bug fixes,

3    three.  You might even do them in a week.  You don't

4    register each of those separately.  Nobody does, hardly.

5           What Jeff does is:  He just -- or Dr. Case does

6    is:  He -- if it's not -- if it's -- if it's 16.2 and

7    then it's, like, 16.2.0.1, some of the stuff that wasn't

8    in 16.2 will just get wrapped into 16.3.  Or if there

9    isn't a 16.3, it will go to 17.  That's what happens.

10          We'll show that if they want us to.  John would

11   have told them that.  So when they say, like, in

12   their -- I think one lawyer says it in a declaration,

13   but I think the other one says it in a brief.  They say

14   something like, "Oh, there is an admission that..."

15   They leave out all this.

16          What they want to do, I think, and I'm not

17   sure -- what they want to do is:  They want to say one

18   of the versions that we sent was 16.2.0.9.  Major 16,

19   minor release 2, 0 revisions, bug 9.  And Dr. Case is

20   probably cringing as I'm probably getting this wrong.

21   I'm just getting you the point of it, the gist of it.

22          They got and have said they were using that.

23   Now, they may have been using others as well.  We're not

24   going to take their word for what they're using.  And I

25   think what they want to do is say -- they keep asking

1    you, "Oh, you should just make them define SNMP software
2    as to what's on Table 1."

3            Well, then, they can take it back and go, "Hmm,
4    we have no responsive documents."  Table 1 doesn't say
5    16.2.0.9.  Or they want to say, "Okay.  It's what's
6    registered."  They take it back, get into the conference
7    room, "What does registration mean according to us?  We
8    believe that's not registered, despite what Mr. Ashley
9    just said.  We will produce nothing or we produce what
10   we want."

11           They can make all these arguments after we do
12   our simultaneous production.  They can make them all.
13   But none of them should mean they don't have to produce
14   the source code in the products that we actually allege
15   in the Complaint.  All of it.  They should have to
16   produce all of that.

17           I'm going to get, in a moment, to what they
18   should be doing to find other products, including stuff
19   after the Complaint.  But at least the stuff in the
20   Complaint, there should be no issue.  That's why we
21   offered this compromise.  Let's start with that.  Then
22   we could have been reviewing source code for the past,
23   you know, ten months and fighting about what other
24   products they have to identify.

25           You know, when you're taking depositions and

```
 1   finding out whether or not things that are being
 2   represented are accurate, there is going to be
 3   additional stuff that has to be produced, most likely.
 4         So that the argument on that it's not
 5   registered is -- that's a merits-based argument, and
 6   they should have no problem doing a simultaneous
 7   exchange if that's their concern.
 8         But they have other roadblocks, too.  They say
 9   they can't tell us which source codes and which products
10   have the source code.  Well, we've told them.  We've
11   alleged them.  So they should have to produce them.
12   It's not burdensome for them to do so.  If they have
13   nothing to hide, it shouldn't be a problem.
14         Also, they had no problem finding it in the
15   pre-suit discussions, and they say, "Oh, well, you
16   shouldn't really consider that because," you know, "no
17   lawsuit had been filed yet."  That's exactly why you
18   should consider it.
19         Just like when you're trying to see -- when the
20   parties are fighting about what do the -- what does this
21   term of the contract mean to us; right?  What does that
22   mean?  Do you pay more attention to what they're saying
23   when outside counsel is arguing in litigation or what
24   they said before?
25         So they can find it.  There is tools.  There is
```

1  commercial tools that you run to find searches -- I

2  mean, to search for similar code.

3         And just so you know, our code is supposed to

4  have in it copyright SNMP.  It's embedded in this, in

5  the source code.  They're supposed to keep it in there.

6         Now, the reason why we're not saying just

7  search for that is:  They might not have it.  And that

8  wouldn't be an excuse not to produce; right?  You can't

9  take out the copyright designation and then not produce

10  the code itself if it's not exactly identical.

11         So I think what they're trying to do is split a

12  bunch of hairs.  I think they know exactly what we're

13  asking for.  They knew it before and they know it now,

14  and what they're trying to do is create ambiguity so

15  they simply don't have to produce the source code in the

16  products we have accused based on their admissions so

17  that we can't do a comparison and show copying, which

18  I'm sure we will.

19         And I think if you ordered the production of

20  the source code in the products accused in the

21  Complaint -- and we'll talk about the rest later -- some

22  of this will go away very quickly because we will be

23  able to look at it.  And they can look at our copyright

24  registrations and make any arguments they want.  That's

25  their right.

1      So, not deterred.  They also say they're too

2 secret.  The source code is too secret.  We told the

3 Court this is going to involve a lot of source code

4 review.  It's not too secret.

5      I don't know if you've seen the protective

6 order in this case.  It's Docket 93.  The key pages for

7 source code are pages 9 through 10 and 18 through 24.

8 It is a very robust protection.

9      Just to give you an example, the computers are

10 set up in their attorneys' offices.  They can't be

11 connected to the network.  They can actually monitor the

12 in-person review.  There is very few people that can

13 view it.  Like, if it's an expert, you have to disclose

14 the expert in advance.  They get to see if it's a

15 competitor.

16      And Dr. Jeff is not -- Dr. Case is not selling

17 switches.  I'm not trying to compete with Broadcom.

18 He's certainly not trying to find out their secrets.

19 He's certainly not trying to find out any secrets on his

20 own code.  And he -- and he couldn't review anything

21 unless he actually authored it, or the company, you

22 know, SNMP authored it, and we, of course, should be

23 able to see our own code.

24      But there is extremely robust protections.  And

25 you know what?  They haven't put in a single affidavit

1    or even argued in a brief what's missing.

2          We negotiated that protective order for seven

3    months.  You might remember, in your prior order, you

4    were talking about the protective order.  It was

5    not -- it wasn't entered until six months later, and you

6    know we aren't going slow.  Every accusation is that

7    we're trying to move this fast, trying to be careful but

8    move it fast.  So we know who slowed it down.  But it

9    was a very extensive negotiation.  And you should know

10   we gave a lot.  We just wanted the source code.  So we

11   gave and gave and gave on these negotiations, and now we

12   hear, "Oh, source code?  That's too secret."

13         And, by the way, once again, the cases they

14   cite, there is declarations talking about why it's

15   literally the lynchpin of their entire company, that

16   this particular code -- one of them involved, like, the

17   Google search engine.  They didn't put in any

18   declarations.

19         I've already told you that the cases they cite

20   are largely -- are, I think, universally irrelevant.

21   There is one case that's very relevant that we cited,

22   and that's Brocade, when it was suing for copyright

23   infringement over software, its software, and it sued

24   A10 in its home district, Northern District of

25   California, Brocade's, and it was before Judge Lucy Koh

 1   at the Northern District and on her way up to the Ninth
 2   Circuit.
 3            And I don't know if this was one that we had to
 4   cite a docket in that case, but it's a decision you
 5   should definitely reread.  It's Docket 86.  And the key
 6   pages -- yeah, we can hand it up to you, but -- can I
 7   enter the well?
 8            THE COURT:  You may.
 9            MR. ASHLEY:  It's very thick.  Most of it is
10   not that relevant.
11            I'm not going to quote it for you, but you can
12   flip, if you want, to page 51.  Basically there is a
13   dialogue occurring where -- there was also a trade
14   secret involved in that case, Your Honor, and so they
15   had a trade secret claim, a patent claim, and a
16   copyright infringement claim.
17            And reading on, Judge Koh said if something is
18   only with respect to the trade secret claim, that
19   doesn't have to be produced right now, right away,
20   source code, because first you have to delineate the
21   trade secrets.  And then you don't want the plaintiff to
22   be able to look at the code to make the trade secrets.
23   But she said, for the copyright claim, produce now.
24            And the defendant in that case was trying to do
25   just what they're trying to do now.  "I don't" -- "I

1  can't produce the whole" -- "I'm not going to produce

2  all the code for the product.  That would be

3  burdensome."  And Judge Koh said, "Patent."  And they

4  didn't have any answer, any affidavit.  And, of course,

5  it's not true.  And then they wanted to pick and choose,

6  but, "Okay.  If you're not going to produce it for the

7  product, then what are you going to do?"  "Oh, we'll" --

8  "They're claiming that we're infringing their copyright

9  code.  I'll look at their code and I'll look at the

10 stuff that might look like it and I'll give it to them.

11 But," you know, "I'll deny infringement."

12         And then Judge Koh said -- this is at page 51,

13 4 through 10, "I've never heard that the defendant gets

14 to pick and choose what files of the source code they

15 want to produce because based on their own opinion, they

16 feel like these particular files are the only ones that

17 are relevant to the plaintiff's patent case or copyright

18 case."  Remember, the answer is different for trade

19 secrets.

20         Mr. Marino, who is Brocade's counsel, "I don't

21 think I can take their word for it."  The Court

22 overruled -- overrules the objection.

23         And we can't take their word for it and the

24 Court shouldn't take their word for it.  And we're not

25 asking them to take our word for what's on deposit for

1    the Copyright Office.  We're saying simultaneous

2    exchange.

3         And I think later in this when Judge Koh

4    realizes that the trade secret's in the actual source

5    code, they do a simultaneous exchange.  That's what

6    Brocade suggests.  "Okay.  Then, fine, we'll do a

7    simultaneous exchange."  Exactly what we're suggesting

8    about.

9         Let's remember again where you begin with in a

10   discovery dispute is:  Is there a privilege?  Is there a

11   work product?  In any of the broad view of relevance,

12   it's clearly relevant.  It's relevant, but the "it,"

13   it's kind of -- it might encompass a few other things.

14   Well, fine.  Then we're going to have a much harder

15   source code review.  But it's relevant.

16        And then on burdensome, you're supposed to put

17   in -- it's crystal clear.  They know this rule.  They

18   keep talking about how many times we've moved.  They

19   know the law.  It is the party claiming burdensome,

20   undue burden, or disproportionality has the obligation

21   to put in evidence or affidavits, make a showing.  You

22   can't just say it.  And they haven't done that.  And so

23   that should end the issue.

24        So I now want to talk about the compromises.

25   So our compromise from the beginning on all this was,

1    "You produce the code at the very least to start with in

2    the products we've identified in the Complaint as

3    at-issue products.  We'll produce everything" -- you

4    want our code?  Tell us what code you want.  Do you want

5    the code?  Tell us everything.  We'll do it

6    simultaneous."

7              So let's talk about their compromise.  Their

8    compromise, which I alluded to earlier was, no, we have

9    to give them all of our code.  So that's what they have

10   requested; right?

11             Oh, I should also note we've requested the code

12   of the very first instance.  Like, literally, probably

13   on the first week you could actually propound the

14   request, we asked for it because we needed to start

15   reviewing it.

16             Their requests came, I think, nine months, a

17   year later.  Now, part of that can be explained, Your

18   Honor, for instance, by them saying, "Well, we had told

19   them it will not be" -- "We will not claim it's a waiver

20   of" -- "of jurisdictional arguments or venue arguments."

21   So that's not the excuse.  But they might have been

22   waiting on your ruling.  So -- to propound the official

23   requests; right?  We had already offered it.  You don't

24   even have to request it.  We'll do it.

25             But you issued your ruling in June.  There is

1  no immediate request from Extreme.  It comes, like, a

2  month, month-and-a-half later.

3        Broadcom doesn't ask for our code for, like,

4  four or five months after -- they were saying the whole

5  time, "We can't do it because, gosh, it's so unfair that

6  plaintiff wants to proceed with discovery, but we

7  can't" -- the offer was always on the table.  But then

8  you had asked for it.  But they're saying in their

9  compromise, they go first.  We have to give them our

10 code.  That's what they're requesting because -- in

11 front of us, and then we don't get what we want.

12        What they say we get -- Brocade says, "We'll

13 give you back the code that you sent us as part of the

14 license if we have it."  "If we have it."  Why do they

15 say "if we have it"?  Do you have it or not?

16        And Extreme says something along the lines of,

17 "Uh, us, too."  You know, "Whatever we got from Brocade,

18 we'll give you."

19        But we don't want -- we know what code we gave

20 them.  We want the code that's in the products.  And you

21 can bet come trial time, they're not going to say that's

22 sufficient if we prove that they have what we gave them.

23 What we prove is that they used or substantially

24 copied -- you know, they copied -- it doesn't have to be

25 identical.  They copied our code.  And I don't care

1    which version it is.  If it's copyrighted, it's

2    copyright infringement.

3            So their compromise is not a compromise at all.

4    They want to offer the words because we said the words.

5    So I don't think you should be duped into that being a

6    true compromise.  It truly is not.

7            And they really should not have anything to

8    hide here if there was no copying.  They will be able

9    to -- they will be able to prove us wrong or we won't

10   make our burden.

11           And I'm just going to touch on a related issue.

12   You probably saw references to build environment and

13   install images.  And I think their first argument is,

14   "We don't even know what those are."  It is absurd that

15   Broadcom or Extreme would say, "We don't know what a

16   build environment or an install image is."  In fact,

17   they end up citing cases later saying, "Oh, yeah.  We're

18   not going to allow a build environment because in that

19   case, it wasn't worth the cost."  And sometimes it's

20   not.  I'll give you an example based by cases.

21           There are patent cases, and sometimes in a

22   patent case, there is source code that's at issue.  But

23   in a patent case, you're not -- you're not comparing for

24   copying; you're accusing instrumentalities.  And

25   sometimes what the plaintiff wants is:  It'll make my

1    life easier in proving what it does by doing the build

2    environment.

3          And so the Court says, no, it's not that

4    important.  And in their cases they cite, there is a

5    technical expert that comes in and says -- from the

6    defendants -- says, "This is an undue burden and there

7    is no payoff because..."

8          But, here, they haven't put any evidence of an

9    undue burden.  And so I'll tell you what the build

10   environment is.  Why is the source code not enough for

11   the product?  Because what can happen is:  You can have

12   a source code tree that -- that beads multiple products;

13   okay?

14         So when they produce us -- if you ordered them

15   to produce the source code for all the products that are

16   accused in the Complaint and they did, and then we went

17   back with our experts and we proved, oh, there is

18   copying; here is the substantially-similar parts, you

19   know, from over here and there and there in this folder

20   and that folder.  We lay it out.  You could see Brocade

21   or Broadcom or Extreme saying, "You didn't prove it's in

22   the product.  That could have gone in other products or

23   not accused products that have not been used.  We just

24   gave you the full source code tree.  You want the full

25   source code tree?  You got it."

1          So the build environment basically is -- I'm

2     probably going to get this a little wrong.  It's

3     basically a set of instructions, essentially software,

4     and they're followed to take the human readable source

5     code and turn it into the actual software program that

6     runs on the finished product.  So when you have it, it's

7     a big part of the complete picture of what portion of

8     that code is in the product and how.

9          And the install image is sort of created from

10    the build environment.  Almost -- I don't know if you

11    want to call it, like, the release, or some sort of

12    a -- basically what it does is:  It's the actual object

13    code, the binary code.  It's a depiction of it.  It's a

14    depiction of it saying this is what's in that product

15    and it goes out with every product.  It's for the

16    install.

17         And when I say it goes out, I mean, it's

18    probably, like, downloaded, or, you know, in a link or

19    something, but -- or already included.  But the point

20    is:  They have the install image for every single

21    product.  It's not burdensome for them to produce it.

22    It's not super sensitive.  It goes to the customers.

23    And those two pieces help us determine, like, complete

24    the puzzle where we have, okay, give us the source code

25    for the product.  We can compare that source code with

1    our source code.  They can do the same.  Everybody gets

2    to do it.  We'll show copying.  We have the build

3    environment and we have the install image.  Now we can

4    prove it's in the product.

5          Oh, by the way, I'm not just claiming the

6    admissions we have, but we want to do the work, all the

7    work, to make the case.

8          And they never really -- I mean, the fact that

9    they're saying, "I don't know what this means," or, "We

10   can't explain it," I mean, we are -- we were shocked.

11   Really?  That's Broadcom?  This is your -- I mean, a

12   highly-technical company, and you don't know what an

13   install image or a build environment is?  You're citing

14   cases using those terms.

15         And we always feel like if we try to define it,

16   it's going to be twisted against us.  We asked the

17   question.  They have to answer it under oath,

18   eventually, I hope, and I think once you order it, maybe

19   some of the game playing will stop.

20         Once again, though, we offered a compromise.

21   We said, "It's not our goal to create more work for us.

22   Dr. Case is not looking to outspend Broadcom and

23   Extreme.  If you will tell us when you produce the

24   code" -- I mean, "when you produce the source code tree,

25   if you'll tell us" -- okay? -- "and the Court that's the

complete code for the product and all that went in it,
then we don't need the build environment."

They should still have to produce the install
images because those just go out with the products.  But
we don't need the build environment if you'll do that
because then they just can't say later we didn't make
our burden of taking the code, the software, and doing
the comparison but somehow not prove that that copied
portion was in the product.

But -- and they don't have to agree to what we
suggested.  But if they don't, then they would have to
show it's burdensome to do -- unduly burdensome to do
what we're asking, and they haven't.  And it's
undeniably relevant, and they know what we're talking
about, and I hope you understand it now.

Now, up until now, I've been focusing on
the product.  To me, what I call the low-hanging fruit.
This is the easy ones.  It's what they admitted before
the Complaint.  You don't even get that in a copyright
case, usually.

But on top of that, you know, we have it in
writing, and we can allege it under Rule 11 and then
some, and those are easy.  Like, they should have to
produce all that.  So I think that's the bare minimum of
what we're requesting from you today is:  Produce that,

1    and we'll simultaneously produce our code and we can get

2    to work; all the parties can get to work.

3           We're still going to have to decide this issue

4    of, well, why do we have to rely solely on what they

5    said pre-suit?  Like, what if they give us the wrong

6    letter in one of their e-mails on the product, or there

7    is another one.  They know what's in their line.  Their

8    engineers know exactly where they get their software.

9    And so we asked the question under oath, "Are there any?

10   List them all."  And they say, "We just" -- "It's too

11   confusing because" -- this is the key rogs,

12   Interrogatories 1 and 2 for all the defendants.  And

13   Rog -- I'm just paraphrasing.  Rog 1 is basically saying

14   tell us all of your products that have SNMP software and

15   then give us all the information, the release and

16   version number and whatnot.

17          And one of my colleagues will be talking about

18   the details of that.  But at a high level, it tells us

19   what you're using.  I mean, which products are using our

20   software under oath.  And then tell us which people

21   helped you answer that question so we can depose them.

22          Rog 1 is -- and then Rog 2 talks about partner

23   products because the way some of these companies work

24   is:  They might sell a product themselves, but they

25   might also have it sold through an OEM, you know,

another entity that -- like, it could be a Hitachi or
somebody.  It's the same product.  We re-branded it.  We
want to know who has got our software out there and how
much was sold.

They say they can't answer it because they're
very confused and it's overbroad and unduly burdensome,
the definition of SNMP software.  You saw it all through
there.  And it literally pervades almost the entirety of
discovery.

And you could imagine, it's not easy to get
perfect agreement between parties on something like
this.  And I think the concern of defendants is, "Oh,
well, then we're admitting that we did something."
Well, that's kind of what we want.  And you have to --
you have to admit what's true if it's true.  And
sometimes you don't want to, but we're allowed to frame
our requests the way we want to, as long as they're --
as long as they're reasonable and they're
understandable.

And this is not about lack of understanding.
I'll read you -- I took you through all those e-mails at
the beginning of this.  And here is the definition:
SNM- -- and I'm not putting all the other caveats.  But
SNMP software means any of the following:  One, software
provided by SNMP Research to Brocade; two, software

```
 1   licensed by SNMP Research to Brocade; or, three, any
 2   software created by SNMP Research which is or was in the
 3   possession of whoever.
 4         That way if they try to claim, "I don't know
 5   what was licensed," or, "Was it truly licensed," if they
 6   have it, then identify it.
 7         And that's not just if they have the exact
 8   replica of the Version 16.2.0.9.  It is -- they know if
 9   they're using parts of our software.  And if they want
10   to deny it, they should do it under oath.
11         But this is a reasonable definition.  Now, they
12   say, "Oh, gosh, we have to search 150 entities."  They
13   put in a one-sentence declaration, one -- I think it was
14   Mr. Blum, one sentence that says words to the effect,
15   "We have 150 subsidiaries."  Not, "We don't know which
16   ones are doing what."  In fact, you'll see repeatedly
17   throughout their brief, they say, "Virtually none of
18   which had anything to do with this case."  So, fine.  Do
19   the ones that do have something to do with this case.
20   Search.  You're the ultimate parent.
21         Remember that very first letter I showed you
22   where when they were asking for a license, they were so
23   cagey on our affiliates?  They used defined terms.  So
24   we don't want to be tricked.  We want to know the full
25   scope.
```

1        And, you know, we tried -- like, for instance,

2  with Brocade, we said, "Oh, we know there is a prior

3  license or a current license," so we excluded that.  If

4  you read the definition of SNMP's software, we said, "We

5  don't want that.  That's the last thing we want is stuff

6  about" -- and if they have another contract they want to

7  exclude, that's how you work these out.  You say, "Oh,

8  this is going to encompass other stuff."

9        But the notion that Broadcom has to go back and

10  go, "Wow, let's go through all 150 entities and figure

11  out what they're selling.  I have no clue where our

12  product line is that we mentioned prior to this suit,"

13  is not -- it's just not plausible.  They know.  They're

14  dodging.  That's why they're doing it.

15        And when they say, "Oh, we want to tie it to a

16  table or a copyright," that's the way they want to do it

17  so they can do some internal machinations and then not

18  produce.

19        So Broadcom is a little more complicated

20  because we're going beyond -- right? -- the products in

21  the Complaint.  They certainly should -- if you look at

22  the answer, we had a -- we had a -- we tried to work out

23  a deal where we said, "Okay."  You know, "You can't find

24  them.  So at least for the universe in the Complaint

25  that are identified, let us know."  And all they did

1    was, they rewrote what was in the Complaint and said,

2    "We don't have anything," which is not really what we

3    wanted.  But their claim is, "Well, because we don't

4    know if it's registered."  Well, so, fine.  This is what

5    we told them a year ago.  Then we'll give you what's on

6    register two simultaneously with your production of the

7    code for the products that are already in the Complaint

8    because we're not going to take their word on anything

9    for that.  That's -- those are in this case to stay

10   until they win on the merits.

11           But for the other stuff, if you -- if you think

12   you need our code, then sobeit.  Why wouldn't they have

13   taken us up on that?  They say, "Oh, well, we have to

14   know and understand."  They don't have to know or

15   understand anything.  They'll have that defense.  We

16   can't change it.  It is or it isn't registered.

17           So, I don't want to say I don't want you to

18   order Rog 1, I do.  I want you to order Rogs 1 and 2,

19   for them to answer it as crafted with our definition of

20   SNMP software.  But if you want to give them additional

21   time so they can do their analysis after -- if you

22   order, you know, a simultaneous exchange, that's fine

23   with us.  It's just that we're running out of time, you

24   know, to have these iterations and back and forth.

25           If they really wanted to do that, they

 1    shouldn't have done what they did in the delay.  And I

 2    understand that we're not adding most of the stuff prior

 3    to your ruling, but a lot of this stuff could have -- we

 4    could have worked out a protective order.  We said we

 5    wouldn't assert jurisdictional issues on source code.  A

 6    lot of this could and should have been worked out.

 7          So whenever they're proposing something, just

 8    remember, it usually takes a long time and the clock is

 9    running and there is this asymmetry of information.

10          Now, I talked mostly about source code and

11    product identification, and -- and I'm going to talk

12    very briefly, but my colleagues are going to go into

13    more detail on it, what they're doing with these

14    boilerplate and general objections.  We briefed this is

15    couple times because we had one -- one motion to compel

16    that you -- they keep saying that you denied it.  I

17    think you denied it without -- with leave if we couldn't

18    work it out in a meet and confer.

19          THE COURT:  That is correct.

20          MR. ASHLEY:  They somehow think they have won.

21    They knew this law.  I can't even -- they know the law

22    within the district courts in the Sixth Circuit that

23    says you don't do this.  You don't just have a long list

24    of general objections and then say, "I hereby

25    incorporate them all by reference."

1      And if you do, you back off of that during the

2   meet and confer.  But they don't.  And they're very

3   sophisticated lawyers, and there is a reason why they

4   don't is because they don't really want to resolve

5   things.  They want to have this -- why they don't want

6   to respond to Ms. Weber's e-mails when she tries to

7   state, "Here is what we've done and agreed to."  They

8   say, "We can't do that because we just can't bother

9   with" -- "it's too adversarial."

10      But it just means they can always go back to

11  another objection no matter what we do.  We can't close

12  the loop.  And that's why when they say, "We're still

13  meeting and conferring.  We're still thinking about this

14  a lot.  Boy, they should have told us we had a motion,"

15  they just want to run out the clock.  And it's a perfect

16  way to do it and it's in direct defiance of the law.

17      And I'll tell you a really laughable -- I don't

18  know if they figured this out, but in Brocade and

19  Broadcom's latest ones, they incorporate by reference

20  the objections in the prior one.

21      Now, Broadcom takes out the one that Your Honor

22  took care of in your ruling, but they still do leave in

23  all the others.  So, like, right now, as we sit here,

24  the taxpayer privilege, which they take out of their

25  current responses, gets embedded back in by

incorporating by reference all of the objections in the
prior superceded responses. That's how laughable it is.
You can't ever tie them down because of that. And it's
directly in violation of the rules, and it's also in
vi- -- they keep trying to justify this, but if you
assert an objection, you're supposed to have a
reasonable basis for it.

And, like, for instance, undue burden, and you
should be able to say, "I am withholding documents based
on that objection." They say, "Oh, we've told you what
we're doing." No, they haven't. And the rule is clear.
If you assert an objection, you can't just say without
waiving. You have to say are you or are you not
withholding documents. That lets us streamline the
issues and know what we're fighting instead of a
phantom. And it's part of the reason why we're here on
all this stuff.

Believe me, we want to resolve these issues so
we can get to work and get documents that we need and
get source code that we need. And I think that should
speak volumes because they don't want to reach that
resolution. They are struggling not to reach a
resolution.

And I will tell you, also, I believe that a
case like this where there is no privilege asserted,

there is no work product protection asserted, nothing is
hinging on that, what you're really looking at when
somebody says it's irrelevant is, is it burdensome?
Like, if you end up producing a few things that are
irrelevant or many things that are irrelevant, it makes
our life harder, but is it unduly burdensome for you to
do it, to run the search, to have the extra custodian
look; right?  That's really what it comes down to, and
they have completely failed that.  They have utterly
failed on meeting their burden of putting in an
affidavit or explaining in detail why.  How many
custodians is it?  How many of those 150 entities do you
have to search?  Do you not know?  Nobody comes in --
nobody comes in and says, "I don't know the answer.  We
can't tell."

              And with that, I think that this -- this should
be relatively easy, almost across the board.  Other than
the definitional terms, which I want you to understand
that we're trying to work it out, but we're also trying
not to get gamed where we don't get what we need.

              So those are the issues I had planned on
covering, and I'm happy -- if you'd like, I can tell you
which -- which issues they pertain to by number in the
two motions, if you'd like, or we could do that at the
end, or maybe this is all you need.  I just didn't want

```
 1  to --
 2          THE COURT:  Maybe let's do that at the end.
 3          MR. ASHLEY:  At the end?  Okay.
 4          So, unless you have questions, I was planning
 5  on turning this over to my colleagues on some of the
 6  more discreet issues, but also still tracking what was
 7  in the motion papers.
 8          THE COURT:  You can turn it over to your
 9  colleagues at this time.  Thank you.
10          MR. ASHLEY:  Thank you, Your Honor.
11          (A discussion was had off the record amongst
12           Mr. Neukom and Mr. Ashley.)
13          MR. NEUKOM:  Good morning.  I am --
14          THE COURT:  Good morning.
15          MR. NEUKOM:  Well, I am a colleague in the Bar
16  with Mr. Ashley, but I'm not his colleague on this case.
17  I had just one administrative question for the Court.
18          THE COURT:  Yes, sir.
19          MR. NEUKOM:  I confess that I thought this
20  hearing was not going to go the duration, and now it
21  appears it's going to go, and Ms. Demers and I have
22  return flights.  We have both signed a letter.  We're
23  aware of the rules around the use of phones in the
24  courtroom.  If it's okay with the Court, Ms. Demers may
25  send a short e-mail on quiet mode just to make sure that
```

```
 1    we reschedule our flights.
 2              THE COURT:  Yes.
 3              MR. NEUKOM:  Thank you.  If we have an extra
 4    night in Knoxville, we've suffered worse fates than
 5    that, but thank you.
 6              THE COURT:  Thank you.
 7              MR. WOOD:  Good morning, Your Honor.
 8              THE COURT:  Good morning.
 9              MR. WOOD:  John Wood.
10              So I wanted to cover a couple of issues.
11    Mr. Ashley mentioned Interrogatories Nos. 1 and 2, which
12    are really pretty core to this case.  And if you look at
13    Brocade's response to the interrogatories, which is -- I
14    believe it's 116-13 in there.
15              And so this -- this, in some ways, is the
16    foundational question, and it should be pretty simple,
17    but it's -- and has Your Honor found that?  I don't want
18    to start until you have it.
19              THE COURT:  You gave me the docket number of
20    116-13?
21              MR. WOOD:  Yes.  Is that right?
22              That should be their response -- their
23    supplemental response to the first set of
24    interrogatories.
25              MS. WEBER:  Yes, it's Exhibit L to the --
```

1          MR. WOOD:  Yes, it's Exhibit L to the Weber --

2          MS. WEBER:  It's under seal, so I'll get the

3  exhibit number.

4          MR. WOOD:  I think the unsealed version is

5  117 -- is it --

6          MS. WEBER:  118-3.

7          MR. WOOD:  118-3.  Sorry about that.

8          THE COURT:  I'm there.

9          MR. WOOD:  Okay.  So, this, as I said, was

10  foundational.  We're simply asking them to identify all

11  products that contain or use SNMP Research software.

12  And this is the same question we asked them pre-lawsuit.

13  We need to know what products are using the software so

14  we know what you need a license for, and then we'll

15  figure out the terms of that license and how much it

16  costs.

17          And they had no problem answering that question

18  pre-lawsuit.  And now, as Mr. Ashley said, what they

19  have done in their answer -- if you turn over to page

20  13.  Starting on page 13, they have given us a table.

21  Well, this is the same table that we gave them, which is

22  in the Complaint, which is the table they gave us

23  pre-lawsuit.  So they have simply given it back to us.

24          But then they say in their response -- let me

25  find that -- that they're not going to say any of these

1    products actually have SNMP Research software.  And

2    that's the whole point.  We need to know if these are

3    the products and if they have SNMP Research software.

4           So, as Mr. Ashley said, we proposed, "Why don't

5    you just start with the ones you already know and we'll

6    get started with that."  They took that the wrong way,

7    and they said, "You agreed we could just put this list,

8    but we don't have to say they have SNMP Research

9    software."

10          Well, that's not what we said at all.  We still

11   want to know which products have SNMP Research software.

12   They should have to answer this question and they have

13   avoided it.

14          And on page 13 above the charts, they say that

15   they are -- it's kind of in the middle, "Brocade is

16   limiting its response to the products identified in

17   paragraph 64 of the Complaint."  As I said, they're just

18   giving us back the list we gave them.  "And we'll

19   provide specific identifying information.  In so doing,

20   Brocade does not concede that these products contain any

21   SNMP Research software."

22          Well, they haven't answered the question.  They

23   either need to -- if they're really denying that -- and

24   the reason they're denying it is, "Your definition is so

25   confusing, we can't figure out what SNMP Research

1   software means."  And that's at the core of a lot of
2   their objections is this problem with SNMP Research
3   software.

4          And what they want us to do is to define it as
5   something very narrow so they can have a way to say,
6   "Well, these products don't contain it."  So we've just
7   said, "It's any software you got from us.  You know what
8   that is."  And we've even offered -- Broadcom has
9   another license that has SNMP Research software, and in
10  our defin- -- and we're aware of that, and the products
11  that use that, it's a completely different entity, we
12  believe.

13         The products -- the products that use that,
14  they're properly licensed; so we excluded those.  We
15  said, "We're not talking about any of those products."
16  And we offered them -- we said, "If you know of any
17  other licenses where you're properly using SNMP Research
18  software, we'll be glad to exclude those."

19         "What is the" -- "What is your problem?"  They
20  keep saying the problem is the definition.  And we're
21  just talking past each other because we know they know
22  which products have SNMP Research software.  They just
23  keep saying our definition.  "You have to narrow your
24  definition."  They say, "Narrow it to 16-2-09."  Well,
25  then if they put 16-3 in a product, they wouldn't have

 1    to produce those products.

 2            So it's sort of a -- a lot of their discovery

 3    is like a shell game.  They want us to identify the very

 4    specific -- something very specific, and then say, "Ha,

 5    it's under a different one.  You identified the wrong

 6    number," or, "You didn't identify it quite right."

 7            And so that's why we've said, "If you have our

 8    software, tell us about it.  If there is some burden

 9    with that, tell us what it is.  If you have another

10    license and we agree it's properly licensed, we'll

11    exclude that."  And we already did that with one.  So we

12    think they should have to answer this question.

13            And if you go to Interrogatory No. 2, I think

14    it's very telling.  Interrogatory No. 2 is asking

15    for -- we call -- we call them partner products.  And

16    partner products are simply -- it's the same product you

17    identified in Interrogatory No. 1, but it has a

18    different label.

19            So, for example, IBM, we believe, ships some of

20    these products, but they have a different number and

21    they're called the IBM something.  It's the same

22    product.  We believe it has our software.  And so those

23    are at issue in this case, too, because you've created

24    the product; you're just selling it under another name.

25            So we don't want this to be a game of got-you

1  where we didn't identify the correct name, so,

2  therefore, you don't tell us what's going on.

3          So if you look at their response to

4  Interrogatory No. 2, which is on page 19, they

5  don't -- they don't respond.  They just say, "Brocade

6  identified the products listed in paragraph 64 in its

7  response to Interrogatory No. 1."

8          And it's -- and above that, they say the reason

9  they're doing that is they're limiting its response to

10  the products identified in paragraph 64, the list we

11  gave them, in this action and we'll provide identifying

12  information pursuant to our agreement.

13          So, it's exactly what they're doing to say,

14  "Aha, we got you.  We got you to agree to a certain set

15  of products, so now we don't have to identify the ones

16  that are labeled differently."

17          Well, this is -- this is the reason we had to

18  ask the question broadly.  They're going to come up here

19  and say, "They need to limit their definitions."  This

20  is exactly why we can't limit our definitions because

21  they haven't denied that they're shipping products under

22  different labels.  They're just saying, "You agreed that

23  the list you gave us is the only list at issue in this

24  case," which is not what we agreed.  We just said,

25  "Start with that."  We weren't trying to limit

1    Interrogatory No. 2, but they're saying, "We got you.

2    You agreed to this limit, so now there isn't anything to

3    answer on Interrogatory No. 2 because it's outside of

4    the limit."

5         So that's the problem.  That's the problem

6    we've been facing.  And so then we go round and round.

7    They say, "Well, you agreed."  And we're like, "That's

8    not what we agreed."  And then they say, "You're going

9    back on your agreement."  We said, "No, that was just a

10   start."  We just wanted -- we couldn't even get off the

11   ground.  But then once we agreed to something, it gets

12   used against us.

13        And I can show you that.  The other big way

14   they do this is with their entities, and Mr. Ashley hit

15   on this, where they say, "Well, you need to identify the

16   very specific entity that has the product."  Well, how

17   do we know those -- that's the entity that's actually

18   using it?  They switch product names -- I mean, they

19   switch entity names.  They say they have all these

20   entities.

21        Our position is:  You know exactly which entity

22   are using these products and which ones are using SNMP

23   Research software.  You should have to tell us.  This

24   isn't a shell game where if we don't guess the right

25   shell, we lose.

1          If there is no burden, you should have to tell

2     us what the entity is.  And if you look at Broadcom rog

3     response 85, which -- let me find that one.  It is --

4          Can I see the Broadcom folder there?  Which

5     number is that?  I'm sorry.  I meant the RFP, RFP 85,

6     which is -- let me find that.  It should be 116-14.

7          So we also said -- so we had such a dispute

8     over these entities, we said, "Why don't you try

9     answering some of these questions based on" -- and they

10    suggested this -- "based on the entities actually named

11    in the Complaint instead of also the affiliates?"  And

12    we agreed to that as a start; right?  Let's get some

13    answers here.

14          But then once we agreed to that, again, it

15    became -- you can see requests for production No. 85.

16    We said, "We'd like all the documents constituting the

17    Brocade merger transaction identified at page 17 of

18    Broadcom's 2017 Form 10-K."

19          So there is no question what we're talking

20    about here.  This is -- this is the merger that created

21    this whole problem.  Documents are clearly relevant.

22    They haven't shown any burden.

23          Their response is -- if you turn over to the

24    next -- the next page, "Broadcom construes the term

25    'Broadcom' to refer to the specific entity named as a

1    defendant in this action, Broadcom, Inc.  No responsive

2    non-privileged documents exist as there is no 2017 Form

3    10-K for Broadcom, Inc."  So they're like, "Oh, we've

4    got you again.  You picked the wrong shell.  You

5    shouldn't have said" -- "You shouldn't have agreed to

6    Broadcom, Inc. because what we're actually talking about

7    here, it was a different entity at that time.  We've

8    changed entity names."  So the entity in the merger was

9    a different entity than the entity that exists now as

10   the parent.  And so since we named the wrong -- you

11   don't get any documents.  They're clearly relevant.

12   It's the transaction that started all this.  We want the

13   documents.

14            So that's what's going on here when they're

15   trying to get us to narrow the definitions.  That's why

16   we have the -- we're asking for Broadcom and all their

17   affiliates because they know what it is.  If there is a

18   burden, they should have told us.  They should have put

19   it in an affidavit.  Same thing with the definition of

20   SNMP Research software.  And if we can agree on those, I

21   think that clears up a lot of these discovery issues.

22            I would say the other -- the other really big

23   issue -- Mr. Ashley hit on this as well -- is they have

24   actually agreed to answer a lot of these questions, and

25   we've listed that in our papers.  We have a category

that says they have actually agreed to answer these.

Now, especially for Brocade and Broadcom, they precede each one of those with about two pages of objections that also incorporate all of the general objections and also incorporate all of the objections from previous filings, and they say, "Subject to the objections, we're going to produce."

And so we ask them and say, "That's great, you're going to produce these documents. Are you withholding any documents based on your objections?" They won't tell us. So how do we -- and then they don't actually produce the documents.

Mr. Ashley said, "We don't have any e-mails. We don't have any financials. We don't have any source code. So are you actually withholding something based on this?" And they won't tell us if they are or aren't.

We don't know -- so we could argue about all these little terms that they object to. We could argue about the tax privilege that they say they can withhold on. We have no idea how that can apply. They won't take any of them out. They won't say they're not withholding based on these objections. We think they have to tell us either I'm producing everything you asked for or I'm withholding based on a specific objection. Then we can have a conversation with them.

1      But right now, we don't -- they just say,
2 "Yeah, we've agreed to produce, but we're not telling
3 you if we're withholding anything and we're not going to
4 tell you when we're going to produce it."
5      So Extreme, for example, their last production
6 was October 18th, over five months ago.  So they're
7 on -- they're doing a rolling production that's not
8 rolling.  It's just -- it's stuck.  So we're not getting
9 documents.  We can't judge it that way.  They won't tell
10 us what's coming, and we think by the law that they have
11 to.
12      So we could go through a lot of these specific
13 objections on the specific terms.  I guess our view in
14 some way is that ship has sailed.  We're running out of
15 time.  And if they wanted to withhold documents based on
16 those objections, they needed to tell us so we could
17 have already had that discussion, and that's why we
18 think they shouldn't be able to withhold based on those
19 objections anymore because it's too late.  They need to
20 produce what we asked for with our definitions.
21      So I had one other issue I think I had to
22 cover, which is the identification of the people
23 Mr. Ashley hit on.
24      If you go back to Brocade Interrogatory No. 7,
25 so we've asked them to identify all of the people who

1   are involved in any searches for the code because we

2   want -- we want to know what they did.

3          So when they finally do answer the question and

4   say, "These are the products that have SNMP Research

5   software," we want to know who did the search.  We want

6   to know who did the search before when they gave us the

7   list.  We've asked that question of both Brocade and

8   Extreme.

9          And so their response, again, if you look at

10  the bottom at the end of Interrogatory No. 7, it's the

11  second to the last sentence, they say, "Given the

12  parties' stipulation" -- and this is that we can just

13  cite back to you the products you listed in your

14  Complaint; we don't have to actually do a search -- "no

15  search for products was necessary to respond to these

16  interrogatories."

17         And we've met and conferred on this.  We said,

18  "Well, what about the search beforehand?"  And their

19  response was, "Well, are you" -- "are you going to limit

20  this request to that search?"  "No, we want to know all

21  searches you did, the ones we know about and the ones we

22  don't because of this" -- we under -- we're seeing a

23  pattern.  Let's get you to limit as to something you

24  already know.  We'll tell you about that, and then we

25  don't have to tell you all this other stuff and we

1  can -- we can move on.

2          So this just seems very straightforward.  They

3  did a search before.  They told us the products.  They

4  need to tell us who the people are.  We really don't

5  understand why that's an issue.

6          And I think Extreme's objection -- we don't

7  have to turn there -- theirs was based on priv- -- they

8  said, "We don't know of any non-privileged information."

9  Well, identification of a person is not privileged.

10 We're not asking for communications.  We're just asking

11 them to identify the people.  If they want to assert

12 privilege when we depose them, that's their prerogative,

13 but we should be able to get the list of people that did

14 the search, and then we can ask them whatever questions

15 we want.

16          So I'm going to turn it over to the next

17 person.

18          THE COURT:  Okay.

19          MR. WOOD:  Thank you.

20          MS. RICE:  Good morning, Your Honor.  What I

21 have is a very small part of all this.  I think a lot of

22 it has been covered in general by Mr. Ashley and

23 Mr. Wood, but my piece of this is to cover generally the

24 plain terms that are objected to.

25          There are numerous, numerous plain terms,

1    meaning the terms that haven't been defined in our

2    discovery requests that we initiated to the defendants,

3    that have been objected to and that are leading to

4    objections stating that the questions, whether it be a

5    document request, an admission request, or an

6    interrogatory, are vague and confusing and can't be

7    responded to.

8            For Brocade and Broadcom, there are over 170

9    plain terms that have been objected to; everything

10   from -- golly -- oh, "acquisition" to "agent" to "source

11   code" to "version" of a software.  There just -- there

12   is a plethora.  They're all quoted in their response.

13           We've tried to work through those with the

14   defendants, and there is a similar list, probably not as

15   extensive for Extreme, but it's -- as my co-counsel have

16   alluded to, when we don't have any indication of

17   what -- whether documents or information are being

18   withheld on the basis of an objection and we don't have

19   responses -- although, they're promised on a rolling

20   basis -- that allow us to make any discernment of that,

21   we're really at a loss.  We could really be here for

22   hours trying to go through definitions of very common

23   terms we've used.

24           The case law in this district and beyond, Your

25   Honor, is that discovery is not a game of semantics;

that the parties should use common sense and reason and
apply ordinary meaning to terms.

We've suggested that in our meet and confers.
In that process, we were told we would receive
supplemental responses.  And we suggested use of the
dictionary definition, or if you don't understand a term
like "build environment," ask your engineers, and if you
have a question, come back to us before you answer and
we'll be happy to work through it with you further.  We
didn't get any follow-back that said, "We've looked at
this term further," you know, "we've asked our
engineers, let's talk about these terms further."  We
just got renewed responses with the same objections.

We did get, of course, promise to make some
rolling productions and we've received a few documents,
but, again, we're in that same kind of dilemma where we
really don't know whether any of these terms are at
issue and how to go through the process at this point of
negotiating every simple, common word that may be
objected to by either of the defendants.

We've spent hours on the phone.  We've had
multiple meet-and-confer calls since Your Honor's ruling
last June, and at this point, as Mr. Wood said, in our
perspective, the ship has, perhaps, sailed.  We don't
really have time to continue this back and forth that

that the parties should use common sense and reason and
apply ordinary meaning to terms.

We've suggested that in our meet and confers.
In that process, we were told we would receive
supplemental responses.  And we suggested use of the
dictionary definition, or if you don't understand a term
like "build environment," ask your engineers, and if you
have a question, come back to us before you answer and
we'll be happy to work through it with you further.  We
didn't get any follow-back that said, "We've looked at
this term further," you know, "we've asked our
engineers, let's talk about these terms further."  We
just got renewed responses with the same objections.

We did get, of course, promise to make some
rolling productions and we've received a few documents,
but, again, we're in that same kind of dilemma where we
really don't know whether any of these terms are at
issue and how to go through the process at this point of
negotiating every simple, common word that may be
objected to by either of the defendants.

We've spent hours on the phone.  We've had
multiple meet-and-confer calls since Your Honor's ruling
last June, and at this point, as Mr. Wood said, in our
perspective, the ship has, perhaps, sailed.  We don't
really have time to continue this back and forth that

 1    takes several weeks to schedule a call, hours to

 2    complete a call.

 3            And, of course, in our calls, you know, we're

 4    all discussing things, but we can't -- we can't be on

 5    the phone long enough to discuss 170 plain terms, Your

 6    Honor.  It's just not a workable situation.  So we would

 7    ask that you strike those objections and order that

 8    discovery be produced.

 9            The other issue that I'd like to just briefly

10    defer to -- or refer to is Extreme's -- the majority of

11    Extreme's responses have been to reiterate their

12    objections and say, "But we're still willing to meet and

13    confer with you."  Again, it's the cyclical process that

14    Mr. Ashley has referred to.  It's not workable.

15            We've spent many, many months trying to work

16    through it without a lot of success; really, without

17    much success at all, and we're running out of time.  So

18    we need the Court's intervention.

19            You know, I'm happy to get into the weeds on

20    these individual terms, but, in a nutshell, Your Honor,

21    that is part of our request.

22            THE COURT:  Thank you.

23            MS. WEBER:  Good afternoon, Your Honor.

24            THE COURT:  Good afternoon.

25            MS. WEBER:  I'd like to make -- I'll make a few

points as quickly as I can.  I thank you all for your
time.

Following up on just a note, given the recent
productions from Brocade in the month-and-a-half leading
up to this hearing, I'd like to say that Brocade so far
has produced 292 documents.  Broadcom has produced zero,
and Extreme has produced 177 total documents.

One of the topics that I'll be addressing is
identification of entities and the requests going to
those.

Plaintiff seeks discovery into which Broadcom
entities were involved in the 2017 transfer of SNMP
source code to Extreme.

That same year, as Mr. Ashley said, only about
a month before the transfer of SNMP source code to
Extreme, Brocade requested consent from SNMP to assign
the Brocade license.  You know all that.

So identification of the Broadcom entities
involved in this transfer to Extreme is relevant to
numerous issues, including the scope of breach and
infringement and Broadcom's participation in it.

And Broadcom's involvement also concerns this
Court's personal jurisdiction over it, which is an issue
currently pending before Judge Atchley.

Six months ago in a September meet-and-confer

call, when I asked which Broadcom entities were involved
in the transfer of the data center division, Extreme
stated that it was not a simple Jack versus Jane
situation and that it involved a complex corporate
family and so the entities could not be identified on
the call.

Well, defendants in this case should by now
well be able to describe which Broadcom entities were
involved in the transfer of SNMP source code to Extreme.

And I'll just give you a few quick examples.
If you go to Extreme Interrogatory 11 -- and I could
just paraphrase it so we can make this go quicker,
Identify all products responsive to Interrogatory 1 that
were sold or transferred to Extreme. For each product,
identify the entity from whom you obtained the product.

And Extreme objected that this request seeks
information that may be held by Broadcom or Brocade.
But which precise products were transferred to Extreme
and from who is information that it should know.

It never claims it doesn't possess this
information. Extreme could and should provide it, and
it is, in fact, required to provide a full answer under
Rule 33 under oath.

Then we have Extreme Interrogatory 14 which
asks Extreme to describe Broadcom's involvement in the

transfer of SNMP Research's software that was or is in

the possession of Brocade or Broadcom to Extreme,

including the duration of Broadcom's involvement and the

identity of persons involved and their roles.  And,

again, Extreme does not answer the question.  It

objected and said that seeks information that should be

sought from Broadcom and that Extreme is not in a

position to accurately or fully describe the levels,

scope, or nature of the involvement of another party,

including the duration of its involvement.

        But as plaintiff has explained repeatedly

during meet and confers, we only seek Extreme's own

knowledge.

        I'll walk you through one more.  Interrogatory

No. 15 asks Extreme to identify each individual who

answered or contributed to any of the answers furnished

to these interrogatories and to designate the number of

each rog for which such person furnished information.

        So I just went over Interrogatory Nos. 11 and

14 for which Extreme says it doesn't have the

information and we should ask Broadcom.

        Well, in their response to No. 15, you see they

identify seven different people who furnished facts and

information for Interrogatories 2 through 4.  11 and 14

are not even listed on there.  Apparently, my read of

1   that is that they did not even attempt to get an answer

2   about the identity of Broadcom's involvement and the

3   nature, who was involved.

4           We also asked identical interrogatories of

5   Broadcom and Brocade.  Describe Broadcom's involvement

6   in the transfer.  Broadcom played a -- well, I shouldn't

7   say "played."  Broadcom answered in a way that my

8   colleague spoke about.  They construed the term

9   "Broadcom" to mean only the named entity, the parent

10  company, Broadcom, Inc., and said that the interrogatory

11  was nonsensical because Broadcom, Inc. acquired Brocade

12  after the transfer of plaintiffs' software to Extreme.

13          But that still doesn't answer the question

14  about Broadcom's predecessor's involvement in the

15  transfer, if any, and whether and to what degree other

16  Broadcom entities were involved.  Brocade did not answer

17  the question either.  So neither defendant has answered

18  the question despite having the ability to do so.

19          I would point Your Honor to page 7 of Brocade

20  and Broadcom's opposition brief.  There they claim that

21  discovery requests about specific predecessor's

22  involvement in the conduct alleged could be proper.

23          But Interrogatory No. 15, which I just

24  referenced, is not meaningfully different.  It asked

25  them to involve Broadcom's involvement in that transfer.

 1  Broadcom and Brocade know what entities were involved
 2  and they should be required to provide that information.
 3          Moreover, as Mr. Ashley mentioned on page 4 of
 4  the opposition brief, Brocade and Broadcom argued that
 5  of the 150 Broadcom, Inc. subsidiaries, virtually none
 6  have any relevance to do -- any relevance to this case.
 7  And so despite making that statement, they are still
 8  unable to describe Broadcom's involvement in the
 9  transfer, and that does not make sense.  They have
10  avoided taking a position on it, and they have a duty to
11  do so and to supplement their response under Rule
12  26(e)(1).
13          I'll go to the next issue, which is time frame,
14  and I'll try to be brief about this.  We -- plaintiff
15  served discovery requests, and the -- we served them in
16  2020.  The time frame is January 1st, 2017, the year of
17  the breach, to the present.
18          2017 is a critical year.  I won't repeat what
19  others have said.  It's the year of breach and it's when
20  the transfer of Extreme's -- of plaintiffs' software to
21  Extreme occurred.  It's also the date of the merger.
22          So SNMP seeks discovery after January 1st,
23  2017, and two issues, such as the scope of breach,
24  wilfulness, copyright infringement, personal
25  jurisdiction, and damages.

1              It also attempts to account for potential

2     defenses that defendants will assert, who will almost

3     certainly seek to diminish the profits attributable to

4     infringement.  So we're entitled to a full, accurate

5     accounting of the financial information related to

6     profit margins, cost allocations, prior to the date of

7     termination of the license agreement and after.

8              After the date of termination, they would have

9     had every incentive to adjust how costs were allocated

10    or how the profits looked because they knew at that

11    point that they were still using plaintiffs' software

12    but they no longer had a license to do so.

13             Brocade and Broadcom objected to the

14    January 2017 time frame as overbroad, unduly burdensome,

15    irrelevant, and not proportional to the needs of the

16    case.

17             They would limit the time period, as Mr. Ashley

18    said, to the date of the license termination, which is

19    July 25th, 2019, to the date this lawsuit was filed.

20    And they provided no explanation as to why discovery

21    should be restricted to the date this lawsuit was filed

22    and they do not persuasively explain why discovery

23    dating back to 2017, the year of the breach, falls

24    outside the extremely broad scope of discovery.

25             I'll just give a few examples.  Brocade RFP 44

requests all materials concerning or discussing the use
of our client's software and Brocade products.  And that
is undeniably relevant to damages and defendants'
defense concerning what profits are attributable to
infringement.

They, Brocade, objected to plain terms in that
request, and then they unilaterally limited their
production to after July 25th, 2019.

But pre-July 25th, 2019 discussions about the
use of plaintiffs' software and Brocade's products is
every bit as relevant to defendants' defense concerning
profits attributable to infringement as discussions are
after that date.

No matter when the discussions took place, they
bear upon how defendants' products use SNMP, which will
be relevant to their profits defense.  And so Brocade
should not be able to arbitrarily limit the date that it
provides discovery to this request.

They also argue Brocade and Broadcom in their
opposition that plaintiffs' source code requests -- and
I can state them later, the specific numbers.  But they
say that they're overbroad because there is, quote, "no
question" -- that's the opposition at 17, footnote 20 --
"that Brocade's products incorporated plaintiffs'
software prior to July 25th, 2019."

1    So that response, to me, just further
2 demonstrates why plaintiffs are entitled to
3 pre-July 25th, 2019 discovery of source code.

4    If there is no question that plaintiffs' source
5 code was in these products prior to July 25th, then
6 plaintiffs are entitled to compare that source code that
7 they just admitted contained the products to post
8 July -- or that product contains the source code,
9 they're entitled to compare the code after July 25th to
10 see the types of changes, if any, that were made.  And
11 this reinforces why plaintiffs need a full picture
12 starting the year of Brocade's 2017 breach.

13    I also note that defendants' own time -- well,
14 Brocade's own time frame in the discovery request they
15 served on us is either no limit; so dating back 30 years
16 to the inception of SNMP, or they have sought things
17 that -- and I'm paraphrasing -- involve all
18 communications concerning development, which would
19 literally involve every single document that our company
20 has, or January 1st, 2017 to present, which is our time
21 frame.

22    I can go over a few more, but the -- in the
23 interest of time, I guess I'll underscore, Broadcom and
24 Brocade protests are requests seeking the identities of
25 customers pre-July 25th, 2019 and the number of sales of

1    products of those customers.

2         Brocade Rog 5 and RFP 49 requests Brocade to

3    identify their customers and the client of each product

4    from January 21st, 2017 to present.

5         First, Brocade objects that the identities of

6    its customers is private.  But we have a protective

7    order, and they have not explained why the protective

8    order is insufficient to protect those identities.

9         They also protest that the identities of the

10   customers who sell Brocade's products containing

11   plaintiffs' software product prior to the date of the

12   license termination is irrelevant to the breach of

13   contract or copyright claims because Brocade had a

14   license to use plaintiffs' software prior to that time.

15        Again, Brocade is just trying to artificially

16   obstruct the scope of discovery.  And one example is

17   that -- of why we need this information is that Brocade

18   has persistently said it will provide certain

19   information if it exists.  And if you do a search for

20   that, you'll see it throughout the discovery responses.

21        For example, for this particular request, I

22   believe it says it will provide business records to show

23   the number of products sold after July 25th, 2019, "if

24   any exist," and that is a quote from the Brocade

25   opposition at 16.

1        It has also made other reservations repeatedly
2   about what other discovery it may or may not produce,
3   including the source code that we've sent them.
4        So, in part, because of these repeated
5   reservations about what evidence is even still in
6   existence, we need information from the customers to be
7   able to cross-check what -- has Brocade made a full
8   production; is it accurate.
9        Plaintiffs, I think, in large part, aside from
10  that reservations issue, they deserve a
11  historically-accurate picture of Brocade's revenues,
12  allocations, and profit margins.
13       As I mentioned -- well, for one, we're also
14  entitled to subpoena these customers to confirm whatever
15  information and business records Brocade does actually
16  produce, and what -- because I mentioned earlier, as you
17  know, there is discussions and license negotiations in
18  2018, 2019, and 2019, our client terminates Brocade's
19  license and use rights.  Brocade knew this was coming.
20  So it did have every incentive to change the way it
21  allocated costs and reported profit margins after that
22  because it knew it was risking a copyright infringement
23  suit.
24       So we are entitled to only a year-and-a-half of
25  discovery prior to that time the license rights were

```
 1   terminated so we can compare, do the financial
 2   calculations correspond to one another; are they
 3   consistent.
 4          And Brocade has not provided any declaration
 5   presenting affidavit -- or presenting evidence showing
 6   that producing this information would be a burden.
 7          I have two more that I'd like to get through
 8   quickly.  One request -- or -- sorry -- one category of
 9   requests implicates third-party confidentiality.
10   Brocade objects to almost all of the requests on
11   third-party confidentiality grounds.  And Broadcom
12   similarly raises third-party confidentiality objections
13   to all requests except one.
14          And one example of the language it uses is,
15   "Broadcom objects to this request as it requires the
16   disclosure of confidential and proprietary information,
17   documents, and tangible things of Broadcom and third
18   parties."  That's the definition of a meaningless and
19   boilerplate request objection.
20          One example where this objection occurs is
21   Interrogatory No. 12 in the Brocade interrogatories, and
22   this requests identification of all contracts between
23   Brocade and all third parties to which Brocade has
24   provided the products containing plaintiffs' software or
25   provided the software itself.  That's highly relevant.
```

 1          Brocade asserted burden, relevance, privacy,

 2     and confidentiality obligations to providing these

 3     underlying agreements.  Again, it did not provide any

 4     sort of burden, proof of burden, or declaration

 5     supporting that.

 6          And moreover, the information is highly

 7     relevant for the reasons I just articulated.  It's

 8     relevant to damages particularly because Brocade has

 9     indicated that it may not have existing admissible

10     business records for certain requested information, and

11     getting the contracts from third parties would

12     enable -- or pertaining to third parties would enable

13     plaintiffs to glean product pricing and the number of

14     units sold and the timing and duration of these

15     contracts so that it could then compare this information

16     with Brocade's produced business records on the topic,

17     if any.

18          Brocade Interrogatory No. 9 asks Brocade to

19     identify revenues and costs of any other products or

20     services sold with or as a result of the purchase of

21     products identified in response to Interrogatory No. 1.

22          And we have explained on several

23     meet-and-confer calls that this would encompass add-ons

24     to products.  Like, if you wanted to buy additional

25     memory to go with the switch, that's a -- or that's an

additional product sold with the infringing products
that we will want to include in our damages calculation.
We're entitled to that information.

    But Brocade objected to providing this, in
part, because of third-party confidentiality grounds.
And I'd just say that, again, SNMP is entitled to a full
historical picture of the revenues and costs for the
profits sold of the infringing products, which is
relevant to the damages and the profits attributable to
infringement.

    I'd note that in corollary requests in the
Extreme discovery requests, Extreme does not object on
third-party confidentiality grounds.  We asked for all
distribution documents that can show the number of
products identified in response to Rogs 1 and 2,
distributed, transferred, or disclosed to third parties,
including the name of the third party to whom the
product was disclosed.  And Extreme has indicated that
it will provide that.  Broadcom/Brocade can and should
do the same.

    And last, the topic I'll discuss is personal
jurisdiction over Broadcom, Inc.  It is the only party
that is challenging personal jurisdiction.  As I
mentioned, Judge Atchley is presiding over that issue,
the motion is still pending, and plaintiffs served

```
 1  requests last January -- sorry --
 2  January -- December 2020 concerning personal
 3  jurisdiction because only a week prior, defendants had
 4  moved to dismiss or transfer the case on that basis.
 5          In that motion, plaintiff cited authority
 6  showing that this Court has personal jurisdiction over
 7  Broadcom because Broadcom's own actions made it
 8  reasonably foreseeable that it would become involved in
 9  a dispute.
10          I think you're aware of it.  The case is Baker
11  v. LeBoeuf.  It's a Sixth Circuit case, and it
12  contemplates non-signatories being bound by an agreement
13  that has an exclusive form flexion clause, which the
14  Brocade license agreement has here, and it provides for
15  exclusive venue and jurisdiction in Knox County.
16          Your Honor's June 25th order denying
17  defendants' request to discovery states -- it
18  specifically found that their participation in
19  discovery, while the motions to dismiss are pending,
20  will not be construed as a waiver of personal
21  jurisdiction.
22          Accordingly, the defendants should have no
23  problem responding to plaintiffs' request concerning
24  personal jurisdiction to Broadcom.
25          And the requests that I went over previously
```

1  involving identification of entities and specifically

2  Broadcom's involvement is one set of requests that's

3  relevant to personal jurisdiction.

4       I'll mention a few more.  Broadcom RFP 72,

5  which requests all documents relating to Broadcom,

6  Inc.'s review, awareness, or acknowledgment of the

7  license agreement, which tracks the standard I just

8  quoted to you or mentioned to you from *Baker v. LeBoeuf*,

9  105 F.3d 1102, Sixth Circuit.

10      Broadcom responded with objections to plain

11  terms, awareness and what acknowledgment means, and

12  defined terms, and in a July 2021 phone call, we had

13  asked Brocade if it was ready to substantively respond

14  to the personal jurisdiction requests or whether we

15  needed to discuss any of the definition -- or any of the

16  objections to plain terms, and they said they're ready

17  to respond, but that they would keep an open line of

18  communication with us if there was any confusion.  We

19  never got any calls, but all the same objections are

20  still in the supplemental responses.

21      The request is undeniably relevant to personal

22  jurisdiction over Broadcom and whether its actions would

23  have made it reasonably foreseeable that it would become

24  involved in a dispute over a license agreement.

25      Broadcom RFP 71 requests all documents relating

to Broadcom, Inc.'s involvement, direct or indirect, with Brocade's development or sale of derivative works with respect to our client's software.

Broadcom again responded with objections to plain and defined terms.  But this request, whether Broadcom, who did not have a license for this software, the request about whether they helped Brocade create durable works is plainly relevant to the issue of copyright infringement and Brocade's breach if it provided the source code to Broadcom.

I'm trying to wrap this up, but my last example will be Broadcom RFP 18 and Interrogatory 17 where we ask for all documents relating to whether Broadcom has ever acted as an agent for Brocade and where that occurred, which is, again, relevant to that standard that I quoted you previously from *Baker v. LeBoeuf*.

Broadcom objects on numerous grounds, including -- I think it's a prior objection, but it still explicitly incorporates it -- including because the Court has supposedly not ordered that plaintiffs are entitled to jurisdictional discovery and because the term "agent" is vague and undefined.

But that does not answer the question.  Agent is a plainly understood term, meaning acting on behalf of, and defendants even use it in their own discovery

1  requests.  They use it in the definition of the

2  entities.  And they can use their own understanding to

3  respond to this one.

4         We served this request because Broadcom's

5  agency and where it occurred, as I mentioned, informs

6  the foreseeability of it being bound by the form

7  selection clause in the license agreement.

8         And I note that in 2019, Broadcom, Inc. is the

9  one that sent a letter to Extreme Networks and SNMP

10  taking the position that the license was a type of

11  contract that was material to the operation of the data

12  center business sold to Extreme and that SNMP did not

13  consent to a partial assignment of that license to

14  Extreme.

15         Broadcom, Inc. sent that letter, it appears, on

16  behalf of Brocade.  In 2019 as well, a representative

17  from Broadcom, Inc. was involved in negotiations with

18  Dr. Case over a new license agreement.

19         It seems like both of those would potentially

20  be responsive to this interrogatory and document

21  request, but they were not listed.

22         Unless Your Honor has any other specific

23  questions, I'll wrap it up.

24         THE COURT:  I don't.  Thank you.

25         MS. WEBER:  Thank you.

 1              THE COURT:  Mr. Neukom and Ms. Demers, were you

 2    able to reschedule your flight?

 3              I want to talk about scheduling a little bit.

 4    We need to take a break.  The court reporter needs a

 5    break.  I've got some things I have to do.  So I need to

 6    know what the afternoon is going to look like.

 7              And I want to let you know, we're going to come

 8    up with a definition for the SNMP software before we

 9    leave today.  So however long you all feel like that's

10    going to take, we're going to do that.

11              MR. NEUKOM:  We are all for that, Your Honor.

12    And thank you for asking about the accommodations.

13              We were -- I'm the troublemaker.  By the way,

14    I'm the reason we're here a week or two later because I

15    e-mailed with, I think, your clerk.  Thank you for the

16    reschedule.  It allowed my wife and I to take our three

17    kids to Disneyland, which was our first vacation in the

18    COVID era.  So I'm sorry to be the scheduling guy at

19    every term.

20              We've been rebooked.  The rebooked flight has

21    me getting home at about midnight and would allow us to

22    stay until --

23              THE COURT:  What time do you need to leave the

24    courthouse?

25              MR. NEUKOM:  That would have us leaving about

1  2:00.  I would ask if it's possible, we're willing to --

2  I think our side of the presentation from the Extreme

3  side is going to be much, much shorter than what you've

4  heard so far.

5          If it would be possible for us to skedaddle by

6  1:00 or 1:15, I think we might be able to --

7          THE COURT:  If you all can work out that

8  definition.  If not, we're going to stay here a while.

9          MR. NEUKOM:  Okay.  Well, we've got both

10  flights booked.  So if we could get out by 1:00 or 1:15,

11  we can make our original flights, and if not, we'll just

12  do the later ones.

13          THE COURT:  Okay.  We're going to talk about

14  this offer or discussions that you all have had

15  concerning at least the simultaneous exchange.  We need

16  to address that.  So those are going to be the two

17  primary things on the table.

18          I mean, I'll tell you right now, in looking at

19  the responses, wilfully inadequate under the rule.

20  Willfully.

21          So I'm going to listen, but I have -- what I

22  have before me, I have no support for any -- to evaluate

23  any arguments concerning why this would be burdensome.

24          So I've heard the relevance.  So now it will be

25  on you all to talk to me about the proportionality.  But

```
 1   we're sitting here today without anything to support
 2   that, really.  So we need to get discovery going.
 3        MR. NEUKOM:  Happy to address that.  And I'm
 4   happy -- well, I was planning to let -- I represent the
 5   smallest defendant.
 6        THE COURT:  We need to take a break.  The court
 7   reporter needs a break.
 8        MR. NEUKOM:  Okay.
 9        THE COURT:  And so we're going to have to take
10   some time.  So you all tell me.  Knowing you need to
11   think about the definition, we have to get that done.
12        So do you want to take an hour?  Do you want to
13   take 30 minutes?  Or do you all want -- I would like for
14   the parties to be able to do this.  But I'm happy to sit
15   here and work through the terms with you.
16        Do you want to go try to get a bite of lunch
17   for 30 minutes and then meet back for 30 minutes and see
18   what you can work out?  So there is a full hour.  That
19   will put us back at 1:00.
20        MR. NEUKOM:  That would.  I would ask for
21   30 minutes, if that doesn't -- I don't want to keep
22   everybody too tight.
23        But I also -- I have just one idea that I just
24   want to put in the back of the Court's mind over lunch.
25        THE COURT:  Okay.
```

1          MR. NEUKOM:  We are also -- just to be clear,

2     Ms. Demers and I represent Extreme Networks, the

3     smallest defendant.

4          THE COURT:  Yes.

5          MR. NEUKOM:  We're the ones accused of

6     having --

7          THE COURT:  Let me ask you, Ms. Plessman, do

8     you have time restrictions?

9          MS. PLESSMAN:  Yes, Your Honor.  My flight is

10    at 3:00.  But I'm happy to reschedule it.  I want to

11    give you as much time as you need.

12         THE COURT:  Well, I know scheduling flights is

13    not an easy task these days either.  So --

14         MS. PLESSMAN:  I don't know what's available

15    later, but on a break, I'll check and see what I can

16    find.

17         MR. NEUKOM:  So here was the idea I had:  And

18    this is by no means a joint proposal.  This was my

19    private jotting.

20         For Extreme, not only are we the smallest

21    defendant, but there also -- there is only copyright

22    claims against Extreme.  So I think we all need to

23    confer about this.

24         Because there are only copyright claims against

25    Extreme, it is why Ms. Demers and I have been -- one

1  might say fetishistically focused on getting a copy of

2  the actual registered asserted copyrighted works.

3         We've got a real chicken and egg situation

4  where each side wants to show -- see the other's source

5  code first or even simultaneous.

6         My proposal for all of us today and going

7  forward would be as follows:  Number one, we would ask

8  for production of the eight registered copyrighted

9  works, attorneys' eyes only, outside counsel only, so

10 that Ms. Demers and my colleagues and I can review it.

11        Number two, we will commit to this Court that

12 within 20 days of receiving that, we will come back to

13 the defendant -- pardon me -- the plaintiff with an

14 expected production.

15        Number three, I humbly submit, and I have not

16 conferred with any of my colleagues in the Bar on this,

17 we've got 482 discovery requests from the plaintiff, 64

18 rogs, 255 RFPs, 164 RFAs, five motions to compel, and

19 we're now two-plus hours into a motion to compel

20 hearing.

21        I respectfully suggest that the parties retain

22 a discovery master of the Court's choosing.  The parties

23 can work out between themselves how to pay for that

24 master, and that master could do a couple of things.

25 Number one, set the timing for these calls.  Number two,

1   set the duration, and, number three, it would be the

2   discovery master who would certify what is ripe for

3   taking this Court's resources on a motion to compel.

4        I respectfully think that is a win-win for

5   everybody; although, we have to pay the master fees.

6   And when I say a win-win for everybody, it's for the

7   Court as well so that we don't have multi multi-hour

8   motion to compel hearings.

9        THE COURT:  It's not that I haven't worked

10   through cases like this before.  I think we can work

11   through this.  But if you all want to have those

12   discussions.

13        But given that we're running short on time, if

14   you all want to talk about that, fine.  Take 30 minutes.

15   We're going to take the full hour.  We'll be -- well,

16   it's now short of that.  It's 50 minutes.  We'll be back

17   here at 1:00 o'clock.  Use the time how you wish.

18        Please work towards getting a definition and

19   have further consultation about the source code because

20   we need to work through that to get your discovery

21   moving.

22        MR. NEUKOM:  Thank you.

23        THE COURT:  And then if you want to think about

24   the responses, let me know.  I think I can actually go

25   ahead and rule on those.  I will listen.  I certainly

1    will.  But just based on the rules, they are wilfully

2    inadequate.

3              MR. NEUKOM:  Thank you.

4              THE COURT:  Okay.  We'll take a recess until

5    1:00.

6              THE COURTROOM DEPUTY:  All rise.  This

7    honorable court stands in recess.

8              (A luncheon recess was taken at 12:11 p.m.)

9                        **AFTERNOON SESSION**

10                           (P.M.)

11             THE COURTROOM DEPUTY:  All rise.

12             This court is again in session.  Please come to

13   order and be seated.

14             THE COURT:  All right.  Mr. Neukom.  So my

15   computer has gone to sleep during the break, so just one

16   moment.

17             MR. NEUKOM:  Thank you, Your Honor.

18             May it please the Court, John Neukom.  With me

19   is my colleague, Leslie Demers, for Defendant Extreme

20   Networks.

21             We had some prepared thoughts and remarks,

22   relatively short, but I thought I would try to

23   streamline this a little bit in light of the guidance

24   from the Court that we received before the lunch hour.

25             So, by our light, it's important to distinguish

1   what claims are being asserted against which parties.

2   Extreme is, as I said, the smallest of the defendants.

3   The only claims being asserted against us are copyright

4   infringement.  That is in reference to eight

5   specifically-identified, allegedly-registered works and

6   with respect to a handful of products, or I think

7   product families, 11 of them.

8           I am going to --

9           THE COURT:  The ones set out in paragraph 49 of

10  the Complaint, those product families?

11          MR. NEUKOM:  That's right.  That's right.

12          Well, to be perfectly frank with Your Honor, I

13  don't remember if it was paragraph 49.  I'm trusting

14  that the Court got that right.

15          So I'm going to shift in just a moment to the

16  Court's suggested guidance of "let's get a definition of

17  SNMP Research software," because I think once we get --

18  at least from our position, if we were to get an

19  agreed-upon definition of that, that would, in a

20  flow-down way, resolve almost all disputes before this

21  Court with respect to Extreme.

22          THE COURT:  So are we going to focus on that?

23          MR. NEUKOM:  Yeah, I think so.  But before I do

24  that, very briefly --

25          THE COURT:  Oh, certainly.

1          MR. NEUKOM:  -- I wanted to -- I wanted to try

2   to help explain to the Court why this issue has mattered

3   and why what Extreme has been doing has not been

4   stonewalling in any gamesmanship way.

5          Ms. Demers and I are IP litigators.  These are

6   the kinds of cases that we handle.  Although, this is my

7   first time in Knoxville.  By the way, it's a gorgeous

8   courthouse.  I invite you all to the Northern District

9   of California.

10          THE COURT:  We welcome you all to the Eastern

11   District of Tennessee as well.

12          MR. NEUKOM:  If you come to the federal

13   courthouse in San Francisco, you'll see how jealous I

14   am.

15          We have struggled because -- well, you've heard

16   some comments about the history of the dealings of the

17   parties over time.

18          As outside counsel for Extreme -- right? --

19   it's our responsibility to evaluate a discovery request

20   and figure out if it's fair, if it's proportional, if

21   it's relevant, and what we should be producing or not.

22          So that's the job that, as officers of the

23   Court, Ms. Demers and I have.  It's 18 months after this

24   case has been filed.  Again, against our client, the

25   only claim asserted is copyright infringement, and as of

1  today, I still do not have my eyes on the asserted

2  copyrighted works.

3  I've struggled with that.  This is like

4  asserting a copyright claim over a book but refusing to

5  give the book to the defendant, or a picture, but giving

6  a snippet or a piece of the picture and that's it.

7  Or I don't know if this Court has been burdened

8  with patent litigation as much as we are in California,

9  but this would be like asserting a patent claim but then

10  refusing to show somebody what the patent is.

11  Every discovery request that comes in, opposing

12  counsel can all accuse each other of gamesmanship and

13  obstructing and what have you, but one good-faith

14  endeavor is undertaken by the responding party to any

15  discovery requests, which I'm going to look at the

16  discovery request, I'm going to map it to the scope of

17  the claims, possible defenses, and I'm going to make a

18  judgment call about whether this is fair.

19  As I stand here today, that has been an

20  undoable task at our law firm on behalf of Extreme.

21  I think what we know is the case today --

22  although, I can't yet prove it -- is that whatever

23  version of code my client bought from Broadcom/Brocade

24  is not one of the eight asserted copyright

25  registrations.  I could be wrong about that.  If I am,

         1    as I'm standing before you, I'll be the first to admit

         2    it.

         3              So we're going to have some litigation about

         4    that, whether this is enough of a modification or a

         5    derivation that it's covered by the registrations.

         6              And we'll all have that fight.  I'm sure it

         7    will be a long one and a fair one when the time comes.

         8              What I am trying to do right now is with a

         9    high-technology client that makes switches, which, as

        10    you just heard, are not as cheap to buy as a microwave,

        11    and with massive, massive libraries of source code,

        12    including which is iterative, changing over time, thanks

        13    to these engineers, what is appropriate to be produced

        14    or not.

        15              And opposing counsel may not be happy with how

        16    we have engaged them on this dispute, but it's a pretty

        17    darn fair one from our perspective.  From outside

        18    counsel, if you want me to produce a document, you want

        19    me to produce source code from a product that you allege

        20    has your copyrighted code, can I see it?  Because that's

        21    how I'm going to look for it.  And we don't have that

        22    today.

        23              THE COURT:  Let me ask you this:  They say that

        24    the copyright is embedded.  Can you not do a search?

        25    They said there is commercial software available to

1    search for this.

2         I mean, I don't -- because there is nothing

3    before me, in terms of sworn declarations and affidavits

4    and such, I don't know what the problem is.

5         MR. NEUKOM:  Well, that -- so that actually

6    goes to my proposed definition of SNMP Research

7    software.  And you may hear -- I think you're going to

8    hear three different proposals.  We really did try.

9         My proposal from Extreme's perspective is as

10   follows:  We define SNMP Research software sequentially.

11   And if I just put the Court to sleep, bear with me.

12   Step one would be as follows:  Extreme will produce

13   source code for products which contain a source code

14   that we purchased and received from Brocade.  You just

15   heard the transactional history about two hours ago.  We

16   will produce that.

17        At the same time, if the plaintiff will produce

18   to us for the first time ever the complete body of the

19   asserted registered copyrighted works, we can run a

20   search, and if we have any products that have any of

21   those registered copyright versions, we will produce

22   that as well.  I believe there are going to be none of

23   those.  That would be step one.

24        Step two, when I said this would be a

25   sequential definition is:  Once we actually have a copy

1    of the copyrights that have been being asserted against
2    us, and once they have the source code for the products
3    that we got from Broadcom/Brocade -- this is going to
4    make everybody moan -- there will need to be a meet and
5    confer, and we're going to have to negotiate on what the
6    search terms or what the search protocols are for
7    additional products.

8            And I'm not saying that to be cagey.  I'm
9    saying that for the exact opposite reason.  The way the
10   source code evolves over time -- right? -- all -- at
11   least on the defendants' side, there are armies of
12   engineers.  And this source code is iterative.  It
13   changes.  There are modifications.  There are updates.
14   There are complicated numbering schemes and
15   up-versioning all the time.

16           Now, I could stand here and tell you that I
17   will not produce anything unless it has the exact source
18   code from one of the copyrighted registrations.  I love
19   that position.  I actually think it's correct on the
20   law.  I also understand I'm going to get a lot of
21   screaming from that because this stuff gets modified
22   over time.

23           THE COURT:  Now, even if it -- let me ask this:
24   Even if it's modified, does that embedded copyright not
25   stay with it?

1          MR. NEUKOM:  It depends on how it's modified.

2  I actually have one factual disagreement with a comment

3  that I heard from Mr. Ashley this morning, my friend at

4  opposing counsel table.

5          I don't think it's accurate to say that various

6  of these bodies of code when they're versioned up, that

7  it's nothing but indicia.

8          My understanding for some of the subject matter

9  of this case and just more generally for source code

10  revisions is that is not right.  There may, in fact, be

11  deletions and things may be changed in order.

12          THE COURT:  Including an embedded copyright?

13          MR. NEUKOM:  Could be.  That's right.  Could be

14  deleted.  I mean, various portions of this could change

15  over time.

16          THE COURT:  Oh.

17          MR. NEUKOM:  I -- God bless me, I am not a

18  source code engineer at Extreme Networks, so I don't do

19  this, but in litigating these cases, that's my

20  understanding.

21          So if I were to take the position that I am

22  such a generous man, I will agree to produce everything

23  that has one of the eight copyright registered exact

24  versions -- I'm going to get a lot of heat for that, but

25  if they give us their registrations and I give them the

1    source code for the products that we bought, which is

2    how we got dragged into this lawsuit, then here is

3    what's going to happen:  They're going to show up at the

4    meet and confer, and they're going to say, "I want you

5    to search for everything that has the words" -- I bet

6    the Court has seen this when we're negotiating over

7    search terms for e-mails; right?  They will say, "I want

8    any e-mail with the word 'and'."  And I'll say, "I

9    disagree.  I'd like a boolean term with AT connectors

10   with everything within 20 words."  They're going to

11   design the search term which will come up with

12   everything.  The defendant will propose a search term

13   that comes up with nothing.

14          What I think needs to happen here is:  After we

15   actually get their copyrighted works, which Ms. Demers

16   and I would really like to see, they get some of

17   our -- the source code for the products that they accuse

18   that we bought and thereby started copyright

19   infringement.  Let's exchange that.  Counsel will look

20   at it and retained experts will look at the source code

21   as well.

22          Then we're going to have a negotiation about

23   what the appropriate search term would be.  So that they

24   have accused of us of copyright infringement and they

25   would like to see things which are modifications, slight

1    variations on code that they assert they own.  Whether

2    it's on unregistered work that was given to us by

3    Brocade or whether it's one of the asserted works in

4    this case, we'll have that discussion.

5         The meeting and conferring in this case has

6    been frustrating on all sides.  You have just heard two

7    hours of frustration from the plaintiffs' side.  I can

8    assure you it's been in good faith and with quite a bit

9    of frustration on the defense side as well.

10        I don't impugn everything for that.  That's the

11   adversarial process.  But if we can do that, once we're

12   all looking at the same code, I think either we can

13   agree to a reasonable search or not.  And if we don't,

14   we can bring it to this Court or -- my read on the room

15   was my discovery master suggestion didn't go over very

16   well.  So I'm happy to drop that.  But that would at

17   least be a narrow dispute.

18        Now, I think what you're going to hear from my

19   other friends on the other side of the podium is that's

20   not right.  Instead, we should just have to go look for

21   SNMP code because we should be able to find it and

22   identify it.

23        The problem for me is as follows:  I started by

24   talking -- and I don't think I've ever done this --

25   about the fact that Ms. Demers and I have a special role

 1   here as outside counsel.  We're not source code
 2   engineers.  We're not inhouse counsel of the company.
 3   In order for us to be signing our name to pleadings or
 4   to discovery answers and to be making representations
 5   about what we have or haven't found, and to be doing
 6   that in an imprecise definition of, it came from
 7   Dr. Case, it came from this wonderful company in
 8   Tennessee, that puts us in a pretty rotten position
 9   because I don't know how I can make that representation
10   in any reliable way.
11          Instead, after each side exchanges, we're all
12   looking at the same source code.  We then negotiate.
13   Not whether something is actionable because it hasn't
14   been modified enough or -- or isn't actionable because
15   it has.  Let's treat it as -- let's treat it as source
16   code, as it were, like it's an e-mail repository, and
17   negotiate search terms.  And then they will know exactly
18   what they are and are not getting because it either hit
19   on the search term or it didn't.
20          I will be able to make a representation that
21   I'm not going to get accused of later on that we ran the
22   terms through the appropriate repositories with the
23   agreed-upon terms and that's what came up.
24          So I know that's not a silver bullet for a
25   definition, but it seems workable to me.  And just to

1  summarize, before I sit down, because I did promise the
2  Court I'd be the fastest one today, number one, we will
3  give them the source code for the products that we
4  inherited, or purchased, rather, from Broadcom/Brocade,
5  and if that same source code persisted over numerous
6  versions of the product, they will get that as well.

7          They will not get, as an initial matter,
8  modifications.  And the reason I don't think they get
9  modifications is for two things:  Number one, it's a
10 slippery slope for us.  Number two, it puts me back in
11 that untenable position of looking through source code
12 and try to predict what SNMP would or wouldn't call its
13 own.  Number two -- or 1-B, if you will, because I think
14 it should happen at the same time, they finally show us
15 the copyrighted works that they have sued us on.  Number
16 three, we then have maybe a disagreeable, but at least a
17 transparent, or apparent, as the case may be, discussion
18 about what the further searching steps would be for what
19 would or wouldn't come in.

20         To be clear, I bet that process is going to
21 have me producing more source code for more products
22 than we will later at summary judgment or a trial be
23 anywhere close to admitting are covered by the claims
24 against us, but that's -- if done with proportionality
25 and with an eye towards burden, that's fine.  That's

```
1    part of the discovery process.  But it at least gets us
2    transparency.
3             I have about 52 other comments that I'm itching
4    to make to the Court, but I'm going to pass the podium
5    over to Ms. Plessman, who represents Broadcom/Brocade,
6    and I'm happy to address any questions from the Court
7    about what I hope is a practical solution.
8             THE COURT:  Okay.  Thank you.
9             MR. NEUKOM:  Thank you.
10            MS. PLESSMAN:  Good afternoon, Your Honor.
11            THE COURT:  Good afternoon.
12            MS. PLESSMAN:  As he said, my name is Allison
13   Plessman, and I represent defendants Broadcom, Inc. and
14   Brocade in this case.
15            I think there is a lot to unpack here, and I'm
16   not going to be able to refute every point.  And this
17   isn't an argument on the merits; although, suffice it to
18   say, there are some things I agree with from
19   defendant -- or from plaintiffs and there are some
20   things that we disagree with, and I'm not going to be
21   able do that unless I spend the next five hours.  So I'm
22   not going to do that.
23            But I do think it's important to put a few
24   things, a few background points into context so you know
25   where we are coming from.
```

1       First of all, as defendants have explained to

2  plaintiffs many times, Defendant Broadcom, Inc. is a

3  parent holding company.  It's not an operating company.

4  It doesn't have employees and it doesn't have products.

5  So a lot of our responses to the requests are based on

6  that because that's just a fact.  And they seem

7  unwilling to accept that, but unfortunately that's just

8  the case.  Its subsidiaries and affiliates, though,

9  include approximately 150 separate entities around the

10 world; one of which is Brocade.

11      And the SEC filings and publicly-available

12 documents, which plaintiffs have equally available to

13 them, show that Broadcom, Inc. did not acquire Brocade

14 until after Brocade's divestiture in October 2017.

15 Broadcom acquired Brocade in November.  So that's also a

16 source of contention, but it's publicly available.  They

17 know that to be the case, and yet they still ask for

18 things like all documents relating to the merger, the

19 acquisition of Broadcom of Brocade.

20      That can't be relevant.  And the problem with

21 talking about this at a high level, you know, these

22 categories, yes, could some documents relating to

23 Broadcom's acquisition of Brocade be relevant?  Yes.

24 Could some documents relating to the divestiture of

25 Extreme be relevant to the extent it pertains to SNMP?

1   Of course.

2           But their request asked for all documents

3   relating to these very broad topics, and that's when you

4   really start to break it down.  And then on top of it in

5   each of these requests -- now, I can see if you're not

6   Broadcom and Brocade where we're fixed on this

7   definitional issue.  You start to get -- as you look

8   through the response, you just see Brocade and Broadcom

9   and it looks like it's targeted to those defendants.

10  Behind -- and the same with SNMP Research.  You

11  assume -- Research software.  You assume it must just be

12  the software in the Complaint.

13          But when you keep going back to the defined

14  entities and the defined software, you realize that

15  every single request is sucking in 150 entities as if

16  they're parties to the litigation.  And that is the

17  problem.  So not only are they overbroad seeking all

18  documents relating to these broad categories, but

19  they're applying those requests to 150 entities.

20          So I think that those threshold issues, if we

21  can get to those definitional issues and just focus on

22  the software that's at issue in the Complaint, the

23  entities that are actual defendants, we will move so

24  much faster.

25          THE COURT:  And I think an appropriate response

 1    in that sort of situation would -- instead of just an
 2    objection that it's overbroad would be state what you
 3    have.  These are the ones relevant to SNMP.  We have
 4    other documents, but they are outside the scope of those
 5    dealing with this particular issue because we have 150.
 6    Go about it in the reverse.
 7              MS. PLESSMAN:  So let's -- let's talk about the
 8    withholding issue because it kind of touches on that.
 9              THE COURT:  Because the rule does require that.
10    If they're withheld, you have to state that there are
11    documents being withheld.  So I would like to --
12              MS. PLESSMAN:  Yeah, and I understand that.
13    And this is the way that -- and, actually, if you look
14    at plaintiffs' reply brief, they actually point to
15    language in the advisory committee that we believe
16    applies and makes sense.
17              And I think if you -- if we use an example from
18    how plaintiffs themselves did it -- I know we haven't
19    filed a motion to compel first, but I think just for
20    illustration purposes, it shows that our response
21    actually is more helpful.
22              So the way that we interpret that, there is an
23    advisory committee note that says that if you provide
24    the limits of the boundaries of what you're producing,
25    then that qualifies as to what you're withholding.

```
 1              So what we do is:  We say, "Here is our

 2     objections, but we will produce non-privileged

 3     documents."  So we're not producing the ones that are

 4     subject to the privilege objections, you know, from this

 5     date to this date.  So that brings in the time frame.

 6     For Brocade, Inc.  We're construing it to apply only to

 7     Brocade, Inc.

 8              So, in our response, we are providing the

 9     limits.  That's how we construe that rule.  Now, I defer

10     to Your Honor exactly how to do it, but we weren't doing

11     it in bad faith.

12              So let me -- let me just compare what

13     plaintiffs have done.  First of all, they don't say

14     they're withholding documents on an

15     objection-by-objection basis.  What they do is:  They

16     list -- they have a laundry list of objections, and at

17     the end, they say, "But we're withholding documents."

18     And then they say, "But we're also producing them."

19              And so in meet and confers, I said, "Well, what

20     objections are you withholding?  What are you

21     producing?"  And they say, "Well, we don't actually know

22     what we're withholding.  We haven't done the search yet.

23     We don't know the categories of documents.  Like you

24     said, we" -- you know, "This is a huge case.  We're

25     doing all this review.  We don't know exactly what could
```

1  possibly be withheld."

2  So it's meaningless that way.  Whereas, the way

3  that we're doing, we're trying to provide the boundaries

4  of exactly what we're willing to produce so that we can

5  have a meaningful meet and confer.

6  So that's why we thought that the way that we

7  were doing it was actually the spirit of the rule.  That

8  was the purpose, to help somebody understand, "Okay.

9  You have these objections, but what are you agreeing to

10  produce?"

11  So that's the way that we approached it.  And,

12  again, you know, if you have a --

13  THE COURT:  I'm still at a loss as to why there

14  have been, I guess since last summer, four meet and

15  confers and we're still here and nothing has been -- I

16  don't -- I don't understand.

17  MS. PLESSMAN:  Yeah, let me talk about that.

18  So, I think it is important to go through kind

19  of the chronology.  And I'm not going to belabor every

20  point.  And I agree.  I don't -- I don't want to impugn

21  anybody.  You know, but I do think it's -- you've got to

22  do a little finger pointing.

23  THE COURT:  I don't -- I don't want to impugn.

24  I want to understand so we can get to the core problem

25  and get you all moving.

1          MS. PLESSMAN:  So let me explain a little bit.

2     So, Your Honor issued the ruling in June 2019, basically

3     saying, meet and confer on these requests, you know, and

4     there had been a period of time where we were in a

5     standstill.  So we did.  We immediately tried to meet

6     and confer.  But we were focused on the issue of that

7     Interrogatory No. 1.  And we barely met and conferred

8     about any of the others, and there are several requests

9     that we didn't even meet and confer about.

10          But once we reach an agreement that we were

11    going to limit our response to the items in paragraph

12    64, they wanted us to respond to that as soon as

13    possible to get the ball rolling.

14          So we said, "Okay.  We're going to try to do

15    that in a month."  It was a lot of information to

16    compile.  So we got to the end of the month and they

17    said -- and, again, we didn't confer about a lot of

18    responses that you said that we should.  The plan, in my

19    mind, was that we would, but we were trying to get that

20    initial response that all of the other requests are tied

21    to.

22          So we say -- you know, we get to the end of the

23    month and we say, "We need a little bit more time."

24    Instead of waiting or asking or talking and -- they just

25    filed a motion which they later withdrew.  So that whole

1    month we are then responding to the motion and trying to
2    supplement our response.

3         And so we supplemented our responses, as the
4    parties agreed, and later they didn't like that
5    agreement, and, fine, I'll get to that.  But we were
6    spending both our time responding to the motion, trying
7    to supplement, and then we said in a number of responses
8    that you have before you, you know, we'll agree to meet
9    and confer, referring back to Your Honor's order because
10   we had not yet met and conferred about them.

11        So, I understand from your perspective, it
12   might look like -- you know, if we were just looking at
13   it for the first time and there wasn't that history,
14   we're just saying we'll meet and confer.  But the reason
15   for that is because we hadn't yet done it in response to
16   your order.  There were several topics that just didn't
17   come up at all.

18        So we get to the supplemental response.  We
19   thought we did it exactly as agreed.  They don't like,
20   for example, that we agreed to limit it to the
21   paragraphs in 64.  But Broadcom didn't respond to those
22   paragraphs -- or for those products.

23        Well, the reason Broadcom didn't respond for
24   those products is because it doesn't sell products.  It
25   doesn't sell the products in 64.

```
 1            THE COURT:  Was that discussed at the meet and
 2    confer?
 3            MS. PLESSMAN:  Oh, yes, yes, yes.  Yes, they
 4    know that.  We've gone over that many, many times.
 5            And that's true for a lot of the Broadcom
 6    responses.  We repeat over and over again, well, they're
 7    not selling products in Tennessee.  They're not selling
 8    products here.  They're not -- they're not involved in
 9    the marketing and advertising of products.  They don't
10    have employees.  So I don't really know how much more we
11    can provide on that topic.
12            And the problem with the meet and confer since
13    then, and even before then, the way that they went, it
14    was very much in the vein of, "We don't have to
15    compromise at all because we think just on these broad
16    topics, they're relevant; so we're not going to
17    compromise at all."  And I was approaching it, and I
18    think Extreme was approaching it as, this is the
19    starting point.  There is some requests that were just
20    facially overbroad.  Look at these definitions applying
21    to 150 companies.
22            We can get to a point where we agree, but when
23    you're trying to negotiate with somebody that is just
24    saying, "This is it.  This is the way it's going to be,"
25    it's very difficult.
```

1          So we did reach some agreement, and as I said,

2    we agreed to produce documents responsive to dozens of

3    requests.  And to this point, we have -- I think we have

4    collected from 34 custodians that we think are most

5    relevant or likely to be relevant to this case.  It's

6    over 5 million documents already just with those.  But

7    it has nothing to do with the 150 companies that have

8    nothing to do with this litigation.

9          It takes time.  Most of those documents are

10   going to be irrelevant.  This is actually a pretty

11   straightforward case.  But in order to do, like, a

12   reasonably diligent search, we cast a wide net.  We're

13   not trying to delay or hide documents, or, you know, get

14   around our discovery obligations.  We know we're going

15   to have to produce documents relating to the contract

16   with Brocade and communications about it and that sort

17   of thing.

18         But what we don't want to do is take this -- it

19   can't be a fishing expedition.  And just as an example,

20   when we were talking about how to limit the SNMP

21   Research software definitions, I think that is the

22   easiest issue from my perspective.

23         From my perspective, it should just be the

24   software that's listed in Table 1 and the software that

25   Brocade received under the license agreement.  And what

```
 1   I added, and when we were conferring over the lunch
 2   break, was that if they're concerned that we may have
 3   made modifications, we can add that into the definition,
 4   any modifications that Brocade might have made.
 5           And I explained that the problem with expanding
 6   it beyond that is, for one, if it wasn't registered,
 7   then it's not going to be the subject of a copyright
 8   infringement claim anyway.  So what else is there?  And
 9   if it wasn't provided to Brocade under the license
10   agreement, then it's not relevant to the breach of
11   contract claim.
12           So it seems like why -- why can't we just agree
13   that that's the relevant software?  And then they're
14   saying, well -- and then the additional point is:  We
15   don't know whether your predecessor or subsidiaries or
16   employees created some software, what the name of it is,
17   whether there is a subsidiary in Venezuela who, you
18   know, might have had some agreement, and how would we
19   even find that?  And why is that relevant at all because
20   it might have been a perfectly legal agreement that has
21   nothing to do with the case?  Or, at the very least, if
22   you think there is software, like, that aren't -- that
23   isn't in that -- you know, the copyright
24   registered -- the registration listed in the Complaint
25   or the software provided under the license agreement,
```

 1    list it for us.  Tell us the names of the software.

 2    It's their software.  Tell us what you want us to look

 3    for.

 4            But, instead, you know, they want to just have

 5    this undefined third category of software that they have

 6    created that they won't tell us what it is, what it's

 7    named.  You know, it's like a catchall that's

 8    unnecessary because it necessarily wouldn't have

 9    anything to do with the allegations in the Complaint.

10    We're focused on the copyrighted works and the license

11    agreement software.

12            So I really just don't understand why that's an

13    issue.  We've talked about it.  I've tried to explain

14    that issue over and over and over again in the meet and

15    confers and it just has gone nowhere.

16            And what's most troubling is what I heard over

17    the lunch break because we said, "We don't have any

18    reason to believe" -- "There are a couple entities that

19    have license agreements with SNMP that, you know, are

20    not at issue," and they said, "They will be excluded."

21    And we said, "We don't have any reason to believe that

22    anybody, any of the other 150 entities have it."

23            But for us, when you're responding to

24    discovery, when you actually make them part of the

25    definition, it makes them, in effect, parties to the

litigation. "In order for us to verify, what do you

want us to do?" And Mr. Ashley suggested that we would

have to search the source code of all products of all

150 entities to prove a negative. And that is exactly

the problem; right? If we could just represent -- you

know, we can informally represent and say, "Hey, we're

not aware of anything. Do you have any reason to

believe this?"

But when you're putting it in a discovery

response, what are you having to do? Are you having to

review all these products, the source code of

everything? Are you collecting documents from 150

entities and then applying, you know, how many search

terms against millions and millions of documents?

It just doesn't make sense because the claims

in this case are not related to Brocade disclosing the

software to their affiliates. And if they really wanted

to just know that, even though I would say it's

irrelevant, but at this point, we would be willing to

answer it, they could have served a discovery request

saying, "To which affiliates did Brocade," you know,

"disclose the software that it received under the

license agreement?" And we would say none because it's

focused on Brocade. It's not just asking about all 150

entities and what they're doing and putting them on the

```
1   spot and making Brocade answer on behalf of those 150
2   entities.
3           And they're doing that throughout.  You know,
4   even to the extent for the -- there are requests, for
5   example, asking for all financial documents for a
6   certain period of time from all 150 entities.
7   That's -- I have never seen anything like that.
8           And so when you -- when you read their
9   requests, you really have to make sure that you -- when
10  you see Broadcom and Brocade and you see SNMP Research
11  software, that you refer back to the defined terms, and
12  then it becomes very, very clear how facially overbroad
13  it is.  It's difficult to even -- there has been a lot
14  of talk about burden and showing, you know,
15  what -- showing undue burden.  But the 150 entities is
16  the initial threshold burden because in order to even
17  get to those more exact burden calculations, you would
18  have to -- you would have to do this crazy search of 150
19  entities.
20          So what I think makes sense, you just -- the
21  entities should be the defendants, Broadcom, Inc.,
22  Brocade, and then if you want to add in predecessors
23  because there is this issue with Broadcom, Limited,
24  fine.  But there is no reason to add all the entities.
25          And then they think you can have reasonable
```

1　discussions about burden and whether or not it makes

2　sense and how to limit the requests because then you're

3　actually talking on a reasonable scale.  It's easy to --

4　it's easier to assess the burden in the first place;

5　right?  We can go to our 34 custodians, which I think is

6　a lot of custodians for a case like this.  We were being

7　very generous in applying, you know, what is and what is

8　not potentially relevant.

9　　　　　Then you can say, "Okay.  Well, if you're

10　asking for" -- whatever -- "all documents relating to

11　the merger, we can start running search terms to see how

12　many numbers come up against those documents."

13　　　　　But to do that against 150 entities as a

14　starting point, that's just -- we've got to get past

15　that as the threshold point, so that then we can have

16　the meaningful meet and confers.

17　　　　　And this is an issue that we've talked about so

18　much in the meet and confers, and then we've spent very

19　little time at all on the actual substance of the

20　request.

21　　　　　And, frankly, we were surprised when they filed

22　the latest motion to discover because there is still a

23　lot of issues to work out, and I feel like the parties

24　could meaningfully compromise if there was any desire to

25　compromise, or any belief that they need to, and they're

1  coming at it from a place where they don't need to move

2  at all because they're the plaintiffs and there is this

3  very broad concept of relevance, which I don't dispute,

4  but it is not without bounds.  And what we're dealing

5  with right now is a fishing expedition.

6          So when we have these meet and confers, I will

7  tell you that what we've heard today is the most

8  detailed explanation I've ever heard through any of

9  these hours on the meet-and-confer calls.

10         When I've asked, "Well, what's the reason why

11 you need this," or X, Y, I've gotten, "There are

12 reasons.  We might have other claims.  They" -- you

13 know, "One of these entities may have received it

14 for" -- "software from someone."  Those aren't -- those

15 aren't reasons.  And it's very difficult to meet and

16 confer when you're hearing those sorts of --

17         THE COURT:  You did not have an in-person

18 meeting.  This is not the first time, first case I've

19 heard these sorts of matters.  It's very helpful when

20 you get in the same room and you do hear each other.

21         MS. PLESSMAN:  Yeah.  You know what?  And I'm

22 fine with that, and I do feel like this is -- I do feel

23 like if we can get through this defined term issue, and

24 I just feel very strongly that this is not complicated.

25 It should just be the parties to the case and it should

 1    be software that's at issue in the Complaint.  I don't
 2    even know why that's a dispute.  I really don't.  The
 3    only reason that they possibly want to expand it is
 4    because they might have other claims, and that's just
 5    not good enough.
 6          What I think makes more sense is:  First you
 7    limit it to the parties in the case and the software in
 8    the case, and then as we produce these documents, if
 9    there is something in the discovery they receive that
10    triggers something, they're, like, "Ooh, this is a
11    problem," or, "Oh, now we need more about this," well,
12    then you have that discussion.  Then you issue more
13    discovery responses.  Then you expand it; you have that
14    talk.  But you don't start with 150 entities.
15          I've just never seen anything like that.  So
16    that's -- I mean, I think that there is a lot to go
17    through.  And I can explain a lot more, but I do believe
18    that -- and I don't want to leave anything -- what I
19    don't want is to leave and then not have addressed a
20    specific request and then have to, you know, have some
21    really burdensome or a bunch of -- produce a bunch of
22    irrelevant documents because I didn't address it today,
23    but my firm belief is that if we can come -- if we can
24    start with the parties to the case and the software at
25    issue in the Complaint, we can produce documents much

1   more quickly.  We can get to that next stage if there is

2   additional documents, if we need to expand it.  And if

3   there is really, like, an entity that they are really

4   concerned about, we would consider adding that, but not

5   150.  And then I think -- and then we're moving.  And

6   then we can come back on -- you know, on targeted

7   requests, saying this one is a problem even with the --

8   you know, even with the terms narrowed, or, you know, we

9   haven't been able to reach consensus on this; that kind

10  of thing.

11          And I don't -- I don't have a problem with that

12  sort of phased approach, necessarily.  What I do have a

13  problem with, though, is that when the parties reach an

14  agreement, and even if it's preliminary, and we follow

15  that agreement and then being told, "Well, they're

16  playing" -- "It's shell games.  They're being

17  disingenuous," because we just did what we agreed to.

18  We -- nobody ever said that's the only, that's all we'll

19  ever produce.

20          Like, for Interrogatory 1, we never said that

21  we wouldn't provide additional information or that we

22  would only limit it to paragraph 64.  What we said is,

23  like, "Well, why don't we just limit it to Brocade, just

24  the one entity and just the software at issue and then

25  just frame the interrogatory that way?"

 1          And, again, I may be -- maybe I'm seeing it the

 2   wrong way, but, to me, that just seems very reasonable,

 3   at least as a starting point, and then, you know, if

 4   other things come out of discovery -- and they have got

 5   a lot of requests, so if there is another problem,

 6   they're going to see it.  They're very good lawyers.

 7   They are going to identify it.  They can give a targeted

 8   request.  But I just -- I think you've got to have a

 9   starting point that's more reasonable.  Otherwise, it's

10   just too much.  We're already at 5 million documents.

11          THE COURT:  Okay.

12          MS. PLESSMAN:  Do you have any questions that

13   you want me to address on the other topics?  I know

14   there were several.

15          THE COURT:  No, I want to try to get to some

16   productive conversations on where we go from today

17   before you all need to leave.

18          So it seems like it would be a very reasonable

19   starting point to start the production with the parties

20   and with the products listed in the Complaint.  That

21   sounds very reasonable.  And then it seems that could be

22   done -- it should be done quickly.  This has been

23   pending for quite a while.

24          Then you could look -- and I'm just talking out

25   loud at the moment.  I'll hear your comments about it

 1    and what issues may arise.  But that does sound very

 2    reasonable.

 3           And then as you do look through things, it's

 4    not saying that that's the end of it.  I understand that

 5    there may be -- there may be more claims.  You're

 6    entitled to the discovery to pursue that.  But, at this

 7    point -- and I would like to hear your comments on the

 8    150 entities.  I'm not sure at this point, based on what

 9    I know today, where that will go, but it does make -- it

10    does make sense that, go ahead and start with what we

11    have with Broadcom and then see what you get.

12           Mr. Wood.

13           MR. WOOD:  Your Honor, can we have three

14    minutes to caucus among ourselves before we move on?

15           THE COURT:  Yes.

16           MR. NEUKOM:  While we do that, may I make one

17    request for clarification before my friends caucus?

18           THE COURT:  If you all would pause for just a

19    minute and see if his request may impact your

20    discussions.

21           MR. WOOD:  Okay.

22           MR. NEUKOM:  This is somebody's paper.

23           I wrote down what you said.  It makes sense to

24    me.  I just wanted to make one beating-of-a-dead-horse

25    request that we add to that the production from the

```
 1    plaintiff of the source code for the copyright
 2    registration.
 3          THE COURT:  And I do want you all to talk about
 4    that because I've heard your request, which is -- it
 5    seems to me you're intertwining the definition of what
 6    we're looking at along with this copyright, and --
 7          MR. NEUKOM:  Well, okay.  I think I am.  Sorry,
 8    I didn't mean to talk over the Court.
 9          THE COURT:  No, go ahead.
10          MR. NEUKOM:  I only represent Extreme.  Against
11    Extreme, there is no breach of contract or license
12    claim.
13          I think the issue gets -- I think Ms. Plessman
14    could advocate on the implications of that better than I
15    ever could.
16          But from Extreme's perspective, given that the
17    only claim is copyright infringement, Your Honor heard
18    how boring Ms. Demers and my law practice is.  We really
19    need to see that code to understand the scope of the
20    case.
21          So I don't intend to be asking for anything
22    controversial.  With the products listed in the
23    Complaint for the parties who are named to the suit, I
24    just wanted to respectfully ask if we could add to that,
25    also.  Could we please get those --
```

```
 1                  THE COURT:  The code.

 2                  MR. NEUKOM:  Not the code source deposits that

 3      went to the Copyright Office, which is just like the

 4      first 25 and last 25 pages; the whole shebang, the

 5      copyrighted work.

 6                  So, to use my analogy before, if we're accused

 7      of ripping off a book, we would sure love a copy of that

 8      book.

 9                  THE COURT:  Well, in your discussions, please

10      take that request into account.  And then we'll take a

11      five-minute recess and come back and see where we are.

12                  MR. NEUKOM:  Thank you.

13                  THE COURTROOM DEPUTY:  All rise.  This

14      honorable court stands in recess.

15                  (A brief recess was taken.)

16                  THE COURTROOM DEPUTY:  All rise.  This court is

17      again in session.  Please come to order and be seated.

18                  THE COURT:  All right.  Mr. Wood.

19                  MR. WOOD:  So I wanted to address with Your

20      Honor about starting the production and then very

21      quickly want to go to the definition of SNMP Research

22      software, see if we can get some resolution on that --

23                  THE COURT:  Okay.

24                  MR. WOOD:  -- hopefully.  So we are -- we

25      completely agree with Your Honor.  We think that's a
```

1    great place to start, with the production, the products

2    that are listed.  That's what we've been trying to get

3    for a while.  That was our initial proposal -- call it a

4    compromise -- that we made with the parties to kind of

5    get things rolling.

6            We just want to be clear that that is all

7    versions of the products.  Not just the ones that

8    existed in 2017 or 2019, but all the versions we've

9    asked for.  And we've asked for a limited period of

10   time, so --

11           THE COURT:  So the products listed in the

12   Complaint and all versions of those specific products?

13           MR. WOOD:  Correct.

14           THE COURT:  So it will be the source code for

15   those specific things?

16           MR. WOOD:  Yes.

17           THE COURT:  Okay.

18           MR. WOOD:  And I just want to -- I think it's

19   helpful.  This is just on that point because my

20   understanding of Mr. Neukom's proposal is that they only

21   provide what was existing in 2017, or -- actually, I

22   think what he said was, "We're only going to give you

23   what we got from Brocade."  Not, "We're going to give

24   you what's in our products," which, as we've explained,

25   is what we really need to see.

1           And I had -- so, Document No. 98, which is an

2   e-mail that -- and it's Exhibit C to the Weber

3   declaration.  So it's an e-mail from Extreme, actually,

4   to me with -- describing what they have.  There is an

5   attachment to that e-mail, and we didn't put it in the

6   record just because we felt like it was a lot of detail

7   and maybe Extreme's confidential information.  But I

8   think it's informative for what we're doing here.

9           If I can, I'd like to pass one up to Your

10  Honor.

11          THE COURT:  Uh-huh.  Yes, you may.

12          MR. WOOD:  So this is the --

13          THE COURT:  I'm sorry, Mr. Wood.  The phone

14  line disconnected.  I guess I'm not -- we're going to

15  see if we can get him back on.

16          (A brief recess was taken.)

17          THE COURT:  Okay.  Sorry, Mr. Wood.  Go ahead.

18          MR. WOOD:  So this is the attachment that

19  Extreme sent us showing all their SKUs that contained

20  SNMP Research and how many shipped by year.  So they

21  determined in 2020, that they had shipments of products

22  with SNMP up through 2020, and it's our belief that that

23  has continued.

24          The other point I would point out, in terms of

25  the second page, if you look at the products at the end,

```
1   you notice that some of those didn't even start

2   distributing until 2020, which means they were putting

3   it in new SKUs.  So the 9150 has some in 2019, and then

4   some of the SKUs didn't even ship until 2020.

5          So they have our software.  They know they have

6   it.  To only give us what was existing in 2017 really

7   doesn't -- is not really even a start because they

8   are -- they already know and they have given us a chart

9   that shows that.

10         And these are the products that are listed in

11  the Complaint, the ones on this -- the ones here

12  (indicating).  So they were able to do it with a lot of

13  detail.

14         And I'd like to show -- while I only have one

15  of these, I think I can show it on the ELMO and then

16  maybe everyone can see it because it actually has source

17  code.

18         So this is another -- this is an e-mail from

19  Extreme, and our request was what -- they had an issue

20  with some source code, and that's the reason this

21  has -- because it actually has SNMP Research source code

22  in it.  So we're trying to keep that confidential.

23         But if you notice, Ms. Sipes from Extreme

24  Networks, she says this is the version and this is the

25  copyright screen out of their source code.
```

 1              So your question to Mr. Neukom was, "Why can't

 2      you just look at the copyright string?"  Well, that's

 3      exactly what they did back in 2018 when this -- when

 4      this first started.  They looked and said, "Hey, this is

 5      what we're using.  It's right here in the source code."

 6              And it's not clear why Mr. Neukom wouldn't know

 7      about this.  This has been -- I mean, it's their e-mail

 8      and/or any other counsel, or why he couldn't have

 9      inquired of their engineers to figure it out.

10              The other thing I wanted to comment on goes to

11      this exact same point.  His analogy that it's like suing

12      someone for a book and you don't have a book.  They have

13      the book.  This is proof that they have the book.

14              What they don't have is the copy of the book

15      that we filed with the Copyright Office.  That's all

16      they're asking for.  They have the book.  They know

17      exactly what the book says.  They can read the book, and

18      they can tell which products have the book in it, you

19      know, have our software in it.

20              So, I mean, to us, it's just not -- it's just

21      not credible that they don't know what's going on

22      because we've got all this information in front of us.

23              THE COURT:  Okay.  At the beginning of your

24      argument, Mr. Ashley said there had been an offer for

25      the simultaneous exchange, and it would be you would

1  give them the source code.  What exactly does that mean?

2          MR. WOOD:  So that's the copy of the source

3  code that was actually registered with the Copyright

4  Office.  So that's what they have.

5          So in order to do an infringement

6  analysis -- so to know you have the software should not

7  be an issue because you have the book.  You can see

8  what's in the book.

9          To do an infringement analysis, you need to see

10  exactly what was registered with the Copyright Office,

11  and you'd get an expert and they will compare what was

12  registered at the Copyright Office to what's in the

13  product.  That's what we need to do to prove our case.

14  That's what they're going to do to try and defend the

15  case.  And we both want to do that at the same time.

16          So we're fine, also, you know, if they will

17  produce -- they're going to produce all the source code

18  for all their products --

19          THE COURT:  Okay.

20          MR. WOOD:  We're fine with it at the same time

21  so our experts can start at the same time and we have

22  all the same information.

23          What we don't want is --

24          THE COURT:  Okay.

25          MR. WOOD:  -- we don't get anything, they do an

1    infringement analysis, and inevitably they come back and
2    say it doesn't exactly match, or there is some defense
3    and we're right back in front of you.  So that's where
4    we think your proposal --
5             THE COURT:  Okay.
6             MR. WOOD:  -- we're completely in --
7             THE COURT:  So you do not have any issue with
8    the copyright Mr. Neukom has requested for the
9    simultaneous exchange?
10            MR. WOOD:  We don't have any issue with that.
11            THE COURT:  All right.
12            MR. WOOD:  So that, I think -- hopefully that
13   resolves that issue.
14            THE COURT:  Well, let me ask this question.
15            MR. WOOD:  Okay.
16            THE COURT:  So I think that would be the most
17   reasonable thing is to schedule the simultaneous
18   exchange.  So we need to have a very specific date by
19   which to do that.
20            So I do not know how long that it would take
21   for you to get your copyright information.  It seems
22   like it wouldn't take very long to get the source code
23   from at least the versions in the Complaint.  It does
24   make sense that it would go for future versions because
25   something has been shown that it still includes the

1    source code.  So all that makes sense.

2            So I need a time estimate to put in the order.

3    Not an estimate, I need a date.  So I need to know what

4    you estimate so I can decide on a date.

5            So let me start by -- so, okay.

6            MS. PLESSMAN:  I'm so sorry.  I think that

7    because Extreme -- what Extreme -- and Broadcom and

8    Brocade might be a little bit different.  Do you mind if

9    I just --

10           THE COURT:  No, come up.  I want to take all

11   that into account because I want one date.

12           MS. PLESSMAN:  Are you finished or --

13           MR. WOOD:  I'm done with that.  I still want to

14   address the SNMP Research software, but I can do that

15   after we address this issue.

16           THE COURT:  Okay.  I'm sorry.

17           MS. PLESSMAN:  Okay.  So, just to give you a

18   little bit of background on the source code and some of

19   the source of confusion about the requests and what

20   exactly has to be provided and when, we agree with

21   Mr. Neukom that the initial phase -- and we proposed

22   this last summer, and as Mr. Ashley said, this could

23   have been done very quickly if they had just agreed, and

24   there is really no dispute that that software that was

25   registered with the Copyright Office has to be provided.

1    So there is no dispute about that, and we think that's

2    the first step.

3           But with respect to the requests for source

4    code and other requests that are sort of related, there

5    is a lot of confusion in the way that they frame the

6    request.  And we've talked about this in meet and

7    confers, but it continues to be a problem.

8           They talk about needing the source code for all

9    versions of all releases of the products, of all

10   products that are listed in this paragraph.

11          But the way that the SNMP -- so just stepping

12   back, and as Mr. Ashley said, there is the SNMP

13   protocol, which it's been around for decades and, as you

14   said, it basically helps devices on a network to

15   communicate with each other.  That is not SNMP Research.

16   Plaintiffs, they don't own that.  That's a protocol.

17   There are several, many, many different implementations.

18   Their implementation is one of them.

19          And, in fact, the -- Brocade has now replaced

20   the SNMP implementation with a free open source

21   implementation available on the internet.

22          So that's what we're talking about.  We're

23   talking about an implementation of an SNMP protocol for

24   which there are many and now they're freely available on

25   the internet.  Just to -- and I think that's important

1 for the proportionality point because what we're talking

2 about here is the code on -- we're really not talking

3 about the products. We're talking about the software

4 that's in the products, and the software is part of an

5 operating system.

6 The SNMP portion, when it was on Brocade's

7 operating system -- and there is no dispute about that

8 because we got it under the license agreement -- it was

9 a tiny fraction of Brocade's overall operating system.

10 So when they asked for new versions of

11 different releases of the products, I think what they're

12 really saying, which we've tried to understand, is that

13 they're talking about versions of the operating system

14 and how it's changed over time and the SNMP portions of

15 that.

16 And so what we have said is that it might make

17 sense -- again, I think there is that initial phase to

18 make sure that the copyrights were actually registered

19 because that's a prerequisite to filing a copyright

20 infringement claim. So the case should never have been

21 brought if the codes don't match.

22 And one of the issues, as you mentioned, was at

23 a meet and confer, they did admit that the version that

24 was provided to us wasn't registered. So there is

25 serious concerns about that.

1    You can't say in a Complaint that it was

2  registered and then have that not be true, and then go

3  through and have the situation where Brocade is giving

4  its entire operating code when the SNMP portion is a

5  tiny fraction -- and those are the crown jewels of

6  Brocade's entire business, the non-SNMP portion -- when

7  we might have a situation where the copyright

8  infringement claim should never have been brought.

9    And that's why we're so concerned about that

10  initial phase, which, again, Mr. Ashley said could

11  happen very quickly.

12    But then with respect to the actual exchange of

13  source code, what -- what we don't want to have is in

14  that initial exchange where they provide that copyright

15  exchange, we're providing our entire operating system.

16    What we want to do is provide the -- you know,

17  the software that we actually received under

18  the -- under the agreement to see if they're the same;

19  to just do an initial comparison to make sure that this

20  is a claim that should have been brought.

21    It's not -- they said it's an entire

22  infringement analysis, but they also said that that

23  could happen very quickly and that there should be no

24  doubt, and, you know, we'll understand very quickly that

25  that was, in fact, registered.

1    But that's what we've been proposing, just to

2  have that check that we aren't -- based on their own

3  representations in the meet and confers and the fact

4  that our version is not listed in the Table 1 of the

5  Complaint, I think that's an entirely reasonable

6  proposal just to make sure that what we're talking about

7  is onboard; right?  That we're not just opening up the

8  entire operating system, which is massive, and has

9  nothing to do with SNMP.

10    And the other issue for us is:  We're not

11  talking about -- there is a lot of talking about copying

12  and that they need to be able to compare lines of code.

13  That's not the case for us.  This isn't a case where,

14  say, an employee was working for a company and they took

15  the source code and then they put it in their new

16  company's software.  Now you have to try to find it

17  somewhere in their software and try to determine whether

18  or not it was copied and stolen.  They know; we all know

19  that we had the software.  We know where it is.

20    They even said, and we've -- we acknowledged

21  it, too, there is -- there are files that are specific

22  to SNMP.  We don't use it anymore, but in the -- when we

23  did, there are SNMP files that can be isolated.  There

24  is no reason to provide the entire code, especially at

25  this first stage when we're still -- we still need to

1    verify that this is a claim that should even be here.

2            So that's our position on that.  Do you have

3    any questions?

4            THE COURT:  Not at the moment.

5            MR. NEUKOM:  Once again, I'll try to be brief.

6    I heard the Court's suggestion.  Look, as an initial

7    point, I hope part of what's been going on for the last

8    year might be coming clear to the Court that it's not

9    necessarily -- it's that negotiating these issues,

10   especially with repositories, is tricky stuff.  And I'm

11   sure it's not the first time this Court has adjudicated

12   a source code fight.

13           For the suggestion that we produce all source

14   code for all products across all time, so long as they

15   track one of the 11 named product families in the

16   Complaint, I intended to say yes to show the Court how

17   reasonable I am, but there is a practical issue there.

18           Look, as an initial matter, the projector

19   showing -- which Mr. Wood showed us, which at least took

20   me back to high-school math, and I enjoyed it, the

21   version talked -- that was mentioned there, 16.2.0.9,

22   isn't one of the copyrighted works, but you've heard

23   that from me before.

24           Secondly, I think that we're doing Tara

25   Flanagan, a lawyer in California, who at the time was

 1  inhouse at Extreme, a little bit of a disservice in this

 2  courtroom.  The Court may hear about this another day,

 3  maybe, further down the road, but my client has been

 4  trying to negotiate a license for this stuff for quite a

 5  while.  And in the context of those pre-suit

 6  negotiations, she had an open line of communication with

 7  counsel for SNMP.

 8          The idea that in a pre-suit, if not even

 9  settlement communication, that a counsel would say,

10  "Here is a big list of product SKUs that trace to our

11  acquisition from the Broadcom business unit, which the

12  lawyers said have SNMP code," that is very, very

13  different than outside counsel in a federal courtroom

14  making representations about whether asserted code is in

15  a product or not.

16          All of that said, my concern is more of a

17  practical one.  If we are talking about us producing

18  source code for that many products across a five-year

19  period of time, I'm actually concerned about the burden

20  for all of us.  That would be -- I want to be very

21  clear.  I'm not making a representation to the Court

22  because I don't know the quantity of source code trees

23  we're talking about.  I believe that would be an obscene

24  quantity of data to be hosting on a secure non-network

25  machine for source code review by parties and their

1    experts.

2          It's for that reason -- and this is the last

3    time I'll make this suggestion, and if it doesn't get

4    traction, I won't raise it again.  My thought would be

5    to start with the initial round of products that the --

6    and they did not misrepresent me.  My thought was:  They

7    give us the copyright registrations.  We give them the

8    source code for the products as we acquired them.

9          Once counsel and experts on both sides are

10   equally equipped with that same set of information, then

11   we have a meet and confer about what kind of searches

12   can be run to see which other source code versions

13   should be fair game for this case.

14         So, on that point -- I mean, to be fair, to be

15   very, very clear, of course, if this Court orders that

16   you want us to produce all source code for all of those

17   products, we will, of course, do that.  If you ask me

18   the date on which to do that, I think it might be -- we

19   might need, like, 40 days because of the quantity of

20   terabits, gigabits at issue.

21         But I intend not to be hiding the ball with my

22   idea that we make that initial, more-limited production.

23   I intend that to be a more practical solution.  We'll

24   get it over to them.  You've heard me riff on this

25   before.  They will ask us to search everything that has

```
1    the word "and."  We'll say, "Only with 92 boolean
2    points."  We will negotiate and come to some agreed-upon
3    search.  I think that is going to be far, far more
4    practical for the parties.
5            Thank you for the Court's time.
6            THE COURT:  So if the future versions are not
7    considered and it's just the ones listed in the
8    Complaint, what would that time estimate be?
9            MR. NEUKOM:  Well, I'm in danger of getting in
10   trouble because my client's not here.  But I can tell
11   you that either Ms. Demers and I would make sure that
12   was produced in 20 days, or, if not, we would offer the
13   Court a good-cause affidavit explaining to you why we
14   couldn't meet the 20-day deadline and asking for the
15   Court's mercy.
16           But I just want to make sure that the client
17   doesn't have a source code repository issue or
18   something.  But I can tell you from our part, that's
19   what we can commit to giving you our best efforts on.
20           THE COURT:  Okay.
21           MR. NEUKOM:  Thank you.
22           THE COURT:  Thank you.
23           MR. WOOD:  Your Honor, if I may.
24           THE COURT:  Yes.
25           MR. WOOD:  So, in the Complaint, we've listed
```

```
 1   the products.  We haven't listed versions.  And then we
 2   asked them to identify everything that has it, which
 3   they haven't done.  So that's why we're asking -- I
 4   mean, we're asking for all versions across the time
 5   period.
 6            I'd like to point out that, you know, this has
 7   been pending -- this request has been pending since, I
 8   think, December of 2020, and --
 9            THE COURT:  This first step should have been
10   done a long time ago.
11            MR. WOOD:  And Extreme has not submitted or
12   Brocade/Broadcom has not submitted anything to explain
13   the burden of doing this.
14            I believe Mr. Neukom prefaced his comment about
15   obscene quantity with he doesn't really know, and he
16   said before, he really doesn't even know what's in the
17   software.  He doesn't -- I mean, it's pure speculation.
18   There is nothing before Your Honor to show that there
19   is -- there is any burden.
20            So, I think with that, we should move forward
21   with Your Honor's proposal, and, you know, we can meet
22   any of those time frames with our production.  Whatever
23   Your Honor thinks is reasonable.  20 days, 40 days.  We
24   can do it quicker than 20 days if we need to.  And I'd
25   be glad to answer any other questions.
```

1      I do feel like I need to respond to one thing

2  Ms. Plessman said, continue or a frame that somehow we

3  represented that it wasn't registered.  That's not what

4  we said.  I think Mr. Ashley addressed that in his

5  opening, but I think I can continue to use Mr. Neukom's

6  book analogy.  It's the equivalent -- when we

7  registered -- when SNMP, when Dr. Case registers Version

8  16, he's registering all the code that he has.  It's all

9  one version.

10      When code is shipped to a particular entity,

11  they get a subset of that code.  And so when we

12  register, we're registering the entire book.  They have

13  chapters 1 through 3.  And what they keep saying is,

14  "Show us where you registered" -- "your registration

15  says chapters 1, 2 and 3."  And we say, "Well, we've

16  registered it in the book."  Then they're like, "Well,

17  then, you didn't register chapters 1, 2 and 3."  It's

18  like, "We did register chapters 1, 2, and 3.  We

19  registered it with the book.  We registered it with all

20  the code.  You have a subset of the code."

21      So we've explained that to them over and over.

22  They won't tell you that part.  They just keep saying,

23  "You said it wasn't registered."  We never said that.

24  It's registered as a part of the whole.

25      So it's definitely registered, as Mr. Ashley

said.  They will see that.  They already have, you know,

the copy that they have.  So I really don't think that's

an issue and we should proceed.

        I don't know if we want to move on to the SNMP

Research software.  I guess we still need to set a date

for the production.

        THE COURT:  Yes.  So, Ms. Plessman, can you

make the -- so this would be my thought:  There would be

20 days for the exchange of the copyright.  So at the

same time, it would be for the source code of the

products listed in the Complaint during that time frame.

And then we'll set a deadline for the subsequent

versions.

        MS. PLESSMAN:  And just so I understand,

because, again, just going back to the -- when we talk

about products, what we are talking about, really, is

the operating system, which would be consistent across

all products.  So the products listed in the Complaint

and in Interrogatory 1 when we're talking about the --

        THE COURT:  So I'm looking at --

        MS. PLESSMAN:  -- operating system.

        THE COURT:  I'm looking at paragraph 64, which

are the -- in the Complaint, which appears to be the

claimed product families.

        MR. WOOD:  Yes.  And I think we can agree with

```
 1    Ms. Plessman.  So what they call their -- they call
 2    their software operating system, I think it's really the
 3    software that runs on a Linux operating system, probably
 4    embedded.  And to the extent they use the same software
 5    in every product, they would just need -- I mean, that
 6    would be one production.  They just need to represent
 7    that to us.
 8          So if they say this is the software version and
 9    it runs on all of these products, then we're not
10    expecting them to produce the exact same thing, you
11    know, 15 times.
12          But it's however they do -- if it's different
13    for every product, we want to get the different version
14    for every product.  We don't actually know.  But I think
15    what she is saying, and it may be the same -- and I
16    think it's the same for Extreme.  And if that's the
17    case, it's really not an obscene burden to produce it if
18    it's -- if they're using shared code, which most -- you
19    know, most companies do that.  It's just efficient.
20          THE COURT:  Ms. Plessman, can you do that, just
21    represent if it's on -- if it's the same product on
22    various platforms?
23          MS. PLESSMAN:  Yeah, I think we can make a
24    representation of something like that, and I think that
25    makes a lot of sense so that we don't just have to
```

1  produce a bunch of the same stuff.  But I still have the

2  concern because we're talking about the operating system

3  and the SNMP portion is a -- very easily isolated, what

4  I would propose is that we can extract the SNMP portion

5  relatively quickly.  It's in files.  They know this.

6  It's not -- it's not mixed in with the rest of the code.

7  It's something that we can just pull out of the

8  operating system.  They will know the versions.  They

9  will know the dates.  So I think, certainly, it's a

10  first step, and especially if they want to move things

11  along, that seems like the best way to do it.

12          THE COURT:  What is the issue with that,

13  Mr. Wood?

14          MR. WOOD:  Yeah.  Well, Your Honor, we don't

15  know that.  We don't know -- I mean, we haven't seen

16  their source code.  We don't know how they integrated it

17  into the product.  Maybe they kept a lot of it separate.

18          There are almost always extensive modifications

19  in order to fit it into their product.  So without going

20  into too much detail, every -- one of the reasons you

21  have source code is they have to -- so their product has

22  specific values, like temperature.  Well, that sensor,

23  they have to integrate whatever reads that with the SNMP

24  code so then you can monitor the temperature of the box.

25  Well, there are thousands of those.

1    So there is integration that goes on with SNMP.
2    We don't know what they have done.  And they may have
3    replaced our code with open source code.  We won't know
4    until we see it.  They may have partially replaced our
5    code with open source code.  That's why we want to see
6    all the versions.

7    If they did and there is nothing there, well,
8    then, we won't have any claim for those versions.  But
9    we don't want to take their representation that, "Oh, it
10   no longer exists.  You don't get to see it," because it
11   did exist.  When did they actually take it out?  Did
12   they take all of it out?  Where is it in there?

13   We can't have them picking and choosing what we
14   see and say, "Oh, it's only this little piece," and then
15   we go, "Well, we think you left this out."  "Oh, we
16   didn't use that."  "Well, you had to use that or it
17   didn't work."  "Well, we didn't use it."  And, again, we
18   just need to see the whole thing.

19   And, again, they haven't presented anything
20   that says there is a burden for them to do that.  You
21   don't have anything before you that represents that.
22   Neither Extreme or Brocade has done that.  And if it
23   really was a burden, why didn't they submit that?

24   THE COURT:  Ms. Plessman, can you come up just
25   so we can make sure you're heard?

1        I'm sorry, Ms. Plessman.  I need to consult

2   something to help another judge.  Just a minute.

3        Sorry, Ms. Plessman.  Go ahead.

4        MS. PLESSMAN:  Oh, no problem.  I was going to

5   say, I was a bit surprised by what I just heard from

6   Mr. Wood because he was actually the one that told me

7   when we were originally negotiating source code protocol

8   and we were kind of questioning the difficulties that it

9   should be no problem because the SNMP portion of the

10  operating system is in separate, easily-isolated

11  folders.  So that initially came from Mr. Wood.  So what

12  he's saying now is a little bit surprising to me, and I

13  think he knows that that's just not the case.

14       And what I would say, though, is that we've

15  never said that the -- we will never produce the entire

16  operating code if it becomes apparent that that's

17  necessary.  What we've said is that because we have

18  these serious concerns -- and I know they say they

19  didn't make that admission.  We disagree.  But they've

20  also said that that can be readily determined.  It can

21  be quick.  That very first stage, we think,

22  before -- it's not about burden.  It will be a lot of

23  work, but --

24       THE COURT:  We're just past that --

25       MS. PLESSMAN:  Yeah.

1          THE COURT:  -- because they're going to turn

2     over their copyright information --

3          MS. PLESSMAN:  Right.

4          THE COURT:  -- and they have represented there

5     is no problem with that.  So we need to get past that.

6          MS. PLESSMAN:  So what I'm saying is:  As the

7     first step, while we have that initial comparison, we

8     think it makes sense to just pull the SNMP portions.

9     Again, this is a tiny fraction of the overall operating

10    system because what we're talking about here is

11    Brocade's operating system.

12         THE COURT:  And is that going to track

13    everything that is needed as the -- with the parameters

14    being everything set forth in paragraph 64 of the

15    Complaint?

16         MS. PLESSMAN:  We believe it will show

17    everything that the -- the SNMP code that was included

18    in the operating system is what we are saying we'll

19    provide.

20         THE COURT:  And what might that exclude,

21    Mr. Wood --

22         MR. WOOD:  Well --

23         THE COURT:  -- if she is saying that she is

24    going to supply everything from the SNMP?

25         MR. WOOD:  So we've been hearing arguments for

1   over a year that they don't know what SNMP Research

2   software is; our definitions are confusing; they can't

3   figure it out, and now they're able to identify exactly

4   what it is and they're able to exactly pull it out and

5   it's very easy to do.

6           So we just -- it's exactly -- Brocade argued

7   exactly the opposite in the *A10* case, which is, you

8   can't let the defendants determine what they produce in

9   a copying case.

10          We need to see it and we get to determine if

11  it's our code or not.  We can't have them -- I mean, the

12  problem is they may only give us a small subset.

13          So, like I said, we have not seen their code.

14  We haven't seen how it's integrated.  So if Ms. Plessman

15  knows it's separate, it could be separate.  I don't

16  know.  I know there is an integration work they have to

17  do.  I just don't know -- I just don't know what they

18  have done because we haven't seen it.

19          THE COURT:  All right.

20          MR. WOOD:  And, like I said, they haven't

21  submitted any burden --

22          THE COURT:  Right.

23          MR. WOOD:  -- for producing it.  And I think

24  she was saying it's shared code across multiple products

25  which makes it even less of a burden to produce.

1          MS. PLESSMAN:  I would just point out, the *A10*

2     case is a very different case.  Again, we're talking

3     about copying versus this is an isolated -- they know

4     exactly what their code looks like, and they will know

5     when they see what we produce that that is the code.

6     This is a --

7          THE COURT:  Ms. Plessman, I don't want to get

8     to the point where I say, "Okay.  Produce those files,

9     just SNMP," and then you say, "Oh, there is a problem

10    with the definition," because I don't want to have to

11    sit here another hour or so and we come up with a

12    definition as well.  I don't even think that should be

13    necessary.  Like, you know what you have.  You're

14    telling me.

15         MS. PLESSMAN:  I think that's a very different

16    issue because what we've always said is that for

17    Brocade, we can provide what SNMP provided to us and we

18    know what -- for Brocade what is in the system and has

19    been in -- for SNMP what is in the system.

20         When we're talking about the SNMP Research

21    software definition, we're talking about as it's applied

22    across 150 entities and knowing what they may or may not

23    have and all the different iterations.

24         And so we've just simply said it should be

25    what's provided to us under the license agreement, which

would be what we would be providing in this exchange,
you know, as it's integrated into the operating system
or registered in the Complaint.

So those are two -- those are two different
issues. We wouldn't argue that we can't identify the
SNMP software in the operating system. It's just -- and
I think they know this. It's an isolated file that is
for SNMP.

THE COURT: Okay. Mr. Neukom, did you have
something to add?

MR. NEUKOM: Two brief -- well, I don't know if
they will add, but I'll try. Two brief notes.

Number one, I think there has been a confusion
about what the defendants' messaging here has been. The
point has never been that SNMP Research software was an
unfathomable term. The point was in an adversarial
proceeding, we need specificity, especially when we're
being asked to make a production with representations.

So the idea that on a Brocade/Broadcom side or
on the Extreme side that we are able to isolate a folder
in a file folder that is associated with SNMP is in no
fashion inconsistent with defendants properly saying,
"Your definition of SNMP Research software is unworkably
broad."

You know, I don't know if the Court remembers

this, but -- because it was now two hours ago, but I
think it was Mr. Ashley or maybe Mr. Wood at one point
read for this Court what the discovery instrument
definition of that was.

I hope the Court was paying careful attention
to bucket three, which was -- and I'm paraphrasing --
anything that SNMP ever created.  That goes back to the
boring scenario of me and Ms. Demers working hard and
not understanding how we can make a certification.

My second point is:  Maybe I had misunderstood
this, but I think that we've been talking about,
functionally speaking, the definition of SNMP Research
software the whole time.  I mean, the whole point of the
definition of that term is to try to get us to some sort
of greased-wheels position on discovery.

So if the Court would like to have further
colloquy with all of us about how we want to define that
term, we are, of course, at the pleasure of the Court.

By the way, we've moved back all of our travel.
So we're with you for as long as you'd like us today.

THE COURT:  Okay.

MR. NEUKOM:  But I'm not sure there is much
utility to that, to having, like, a separate -- it would
almost feel to me like a philosophy debate.

If what we agree upon today is -- and I'm not

```
 1   going to try to restate or shade in my favor, but this
 2   simultaneous exchange scenario we've just described, I
 3   respectfully submit for purposes of interpreting SNMP
 4   Research software and for most other discovery disputes,
 5   that is a huge amount of progress and it gets us moving
 6   over the next month.  Thank you.
 7              THE COURT:  Thank you.
 8              MR. ASHLEY:  Your Honor, if I could just say a
 9   couple quick words.  I started this day, and I do think
10   that if we keep our eye on the ball right now, which is
11   the products alleged in the Complaint, their actual
12   accused products in the Complaint, we delineated them.
13   We have a basis for it.  We're asking for the code in
14   those products, all the way up from 2017 to the present
15   day.  They have it.  They should have nothing to hide if
16   they didn't copy.  We've always offered to say, in
17   exchange, we'll do a simultaneous exchange of our code.
18              What you're hearing is, "Well, there might be
19   some extra code that you don't need."  Compare that with
20   the fate we suffer if they control what we get to see.
21              It's not privileged material.  It's not
22   attorney work product.  They're saying it's just
23   extraneous code that we don't need to see.  That's why
24   we have a protective order with very detailed provisions
25   protecting source code.  So that just means we have more
```

1    review to do.  And if they really had a burdensome

2    argument, they would have made it.

3           Mr. Neukom indicated he can do this in 40 days.

4    We could do it in 40 days, too.  We can do a

5    simultaneous exchange.  But you could also order it

6    earlier.  I think they could do that.  But it should be

7    the full code in the products.

8           And if there is extraneous codes that the

9    parties don't need to look at or that's ultimately not

10   used in the case, no harm.  But that contrary, which is

11   if you give them control of what they show us because of

12   what internal folder they look at for the very products

13   they already admitted pre-suit they needed a license

14   for -- I read you the language, but they didn't have

15   one -- you're giving the fox control of the henhouse.

16   And there is no justification for that under the broad

17   definition of relevance and when they haven't put in any

18   affidavit of burden.

19          So I suggest that you do what you originally

20   indicated, which is a simultaneous exchange on a date

21   certain.  We give them the code at the Copyright Office

22   and they give us the code for all of the accused

23   products in the Complaint from January 1st, 2017 to the

24   present.  And then we can define SNMP software for what

25   else they search for.

1      But those -- those allegations in the Complaint

2  on those particular accused products should not be a

3  debate.  They will have their defenses, but we can

4  debate SNMP Research software and how to define it.

5      I would suggest that we keep what we have in

6  the current discovery.  And then what I've suggested to

7  both Broadcom and Brocade and to Extreme is:  You heard

8  complaints that they don't know if SNMP has some

9  subsidiary, you know, in Venezuela.  Well, we don't.

10 And I said we can use the definition to include only the

11 two named plaintiffs when they're searching for our

12 software, and then the exact same litany of ones where

13 they say agents, attorneys, etcetera, that they use to

14 define our client in their own discovery.  So that

15 should take care of that problem.

16     We said we'd carve out any contracts they have.

17 So if they have other legitimate contracts to SNMP

18 software, we'll carve it out, and that should take care

19 of the issues that they're complaining about.

20 Everything else they're complaining about is:  They

21 don't know if the case is that good; they want to do a

22 copyright analysis.  They should not be doing a merits

23 legal analysis to tell us which software of ours is in

24 their products.

25     But that's another day.  I agree with

1    Mr. Neukom.  If we can leave today with this
2    simultaneous exchange of source code on a date certain
3    but for all the products in the Complaint, I think we've
4    gotten a lot done today.

5           Your Honor, I would also -- my colleagues tell
6    me we would also like -- just because of the impending
7    deadlines -- the Court to order a date certain for them
8    to produce whatever else you order ultimately, in terms
9    of all the other objections and all the other requests.

10          THE COURT:  Yes.

11          MR. ASHLEY:  Including the ones that they say
12   they're just working on or they want a further meet and
13   confer.  We think we're so far past that point.

14          THE COURT:  Yes, I'll take it under advisement
15   for the rest of that.  I just want to, today, get things
16   moving in the interim.

17          MR. ASHLEY:  One thing that I didn't -- that we
18   haven't clarified is that we want the build environment
19   as well with the source code.  I mean, it's going to be
20   in the same location.  They have indicated no burden to
21   produce that.

22          THE COURT:  Let me ask this:  I heard that that
23   may -- it sounded to me like it would be unnecessary for
24   the build environment if you had the full source code.

25          MR. ASHLEY:  Yeah.  Well, like I said earlier,

1  when they produce the source code --

2          THE COURT:  Uh-huh.

3          MR. ASHLEY:  -- you heard it could be a single

4  big source code that covers all the products, and when

5  they produce that source code and then we analyze it for

6  copying, they can later allege that we haven't met our

7  burden of proof because we haven't shown that the source

8  code, that particular portion of the source code,

9  actually made it into the product.  In the build

10 environment is how you determine which portion of the

11 source code actually makes it into the final product.

12         THE COURT:  Okay.

13         MS. PLESSMAN:  Your Honor, may I address --

14         MR. ASHLEY:  Okay.  I should have also said you

15 need the build environment and the install images to do

16 that.  Nobody has even contended it would be difficult

17 to produce the install images.  They're literally sent

18 to the customer with the product.

19         THE COURT:  I recall that.  Thank you.

20         MS. PLESSMAN:  Can I just address that?

21         THE COURT:  Please come to the podium.

22         MS. PLESSMAN:  With respect to the build

23 environment and the install images, this is something

24 that has barely been discussed in any of the meet and

25 confers.  We've heard hardly anything about why it's

1    necessary except for today.  I think there is a

2    paragraph in the Motion to Compel.  It actually is a

3    very big deal and it's completely unnecessary.

4            So what I would submit is:  Let's do a source

5    code exchange, and if we need the build environment or

6    the install images, I mean, my understanding is that it

7    is many, many gigabits of data and it's not necessary

8    given the type of product that we're talking about and

9    the SNMP protocol at issue.  It's just not.  It's not

10   necessary, and I think it will really slow things down

11   and it will be very time-consuming.

12           So what I would suggest is that the parties

13   meet and confer about that and what they really need,

14   and if there is a way to narrow that, so if there is a

15   sampling or something, or representations about what was

16   included in the products rather than actually going

17   through the process of producing the build environments,

18   I think, would be a better process.

19           And then one other -- to the extent that you

20   are planning on issuing an order on the -- you know, the

21   other remaining document requests, I would just say,

22   again, we -- the starting point is the definitions.  It

23   doesn't mean that after we settle the definitions and

24   get -- and narrow the request in that way that they're

25   not still problematic.  And I would say one particular

```
 1    area has to do with the financial documents.  And I
 2    think I pointed that out.
 3              But I just don't want to see an order that
 4    would be kind of disastrous and way overbroad.  So I
 5    just wanted to raise that.  You know, that's where
 6    they're seeking all documents related to all financial
 7    documents for a time period that they are not even
 8    saying was infringing, and it's just way overbroad.  And
 9    what we have agreed to provide are documents sufficient
10    to show the revenues, the profits, the costs, but not
11    all documents relating to --
12              THE COURT:  That's what I'm going to find is
13    the problem if you didn't provide a date when you're
14    going to do that.  That's going to be problematic.
15              MS. PLESSMAN:  For the documents sufficient to
16    show?
17              THE COURT:  Uh-huh.
18              MS. PLESSMAN:  I think we can do that within
19    30 days.  I just -- you know, if we're talking about all
20    documents relating to any financial documents, that's a
21    much bigger burden.
22              THE COURT:  I'll go back and see what your
23    written response was.
24              MR. ASHLEY:  Your Honor, on the build
25    environment and the install images, their main briefing
```

1    originally was, "We don't know what it means.  It's

2    vague and ambiguous."  They know what it means.  Every

3    engineer should have a build environment to do their

4    job, and what you're still hearing now is argument from

5    counsel on something they should have submitted an

6    affidavit for or evidence for.

7         We don't have very much time.  All you keep

8    hearing from them is a preliminary step.  They gave

9    egregiously improper responses.  They have -- they have

10   run the clock out as far as they can.  And they're still

11   not giving you evidence that any of this is a burden or

12   they can't do it.

13        This is Broadcom.  And Extreme may be smaller,

14   but they're still a huge company.  And this product

15   line, they're not saying -- for all we know, it could be

16   a download that takes a day.

17        They're not -- they haven't given you any

18   information at all on that, and that was their

19   obligation, and they knew it was their obligation, and

20   now we're four-and-a-half months from when our reports

21   are due and all you keep hearing from them is a

22   preliminary step.  And I think that we've crossed that

23   bridge.  They should be ordered to produce the full

24   source code, build environment, and install images for

25   at least the products at issue in the Complaint on a

1    date certain, and it should be very soon, and then we

2    can talk -- there is still going to be a lot more work

3    to do.

4         And we haven't even gotten to the point where

5    we can look at it and start doing the work.  So I really

6    think their protests about starting off and seeing how

7    it goes and doing some further meet and confers, that we

8    just -- we're past that point.  So we would respectfully

9    urge the Court to order the production of those critical

10   items, hopefully within a date certain very soon, and

11   they get to work today.

12        Because what's going to happen is:  They're

13   going to do the source code, and then 30 days later,

14   we'll be fighting about the build environment.  And

15   there is -- I think if they wanted to do that, they

16   should have responded differently a long time ago to our

17   discovery.

18        THE COURT:  Mr. Neukom, if I could ask you

19   first.  So in talking about the versions, you gave me

20   40 days for all versions, probably 20 days for just

21   those products in the Complaint.  Do we know if it's

22   that -- I mean, if you're looking for all of it, does it

23   not make sense -- would it not be more efficient to do

24   it all at one time?

25        MR. NEUKOM:  So I think the distinction that I

 1   was trying to make was not all products versus those in
 2   the Complaint, but, rather, the versions of the product
 3   that we received from Broadcom/Brocade versus -- within
 4   the 11 product families that they have named in their
 5   Complaint versus truing that up over the ensuing five
 6   years.
 7          We have a desire how the Court rules.  However
 8   you rule, we will, of course, abide by it.  But the
 9   scope -- the scope of work that is to be done for that
10   2017 set versus a five-year going back is quite
11   different.  And I just think it's a matter of volume and
12   time.
13          If I may, on the same topic, I'm actually a
14   little bit surprised that we're hearing argument today
15   about source code production not being burdensome and
16   also about it sort of being not a big deal; that people
17   should just be producing images and build environments
18   and entire versions.  I think if there is one thing
19   that's been clear in IP law in the last 15 years, it's
20   that on the issue when a technology company is asked to
21   make a production of its source code, maybe other than
22   deposing a high-maintenance CEO, it might be the single
23   biggest hot-button topic that arises in these cases.
24          You've heard from Broadcom/Brocade that they
25   want to very sensitive about what source code they're

1 going to produce. Extreme has taken the same position.

2 I will not further tilt at that windmill

3 because I think the Court has heard our thought on that.

4 I do, however, have one other closing point which I hope

5 is a productive one.

6 I've been disappointed a little bit today to

7 hear a fair amount of mud slinging, and I think that all

8 of us on this side of the courtroom or the court are a

9 little better than that.

10 I told you, without telling you what they were,

11 that the frustrations during the meet and confer process

12 have been mutual. I did not go down the rabbit hole.

13 I'm now mixing metaphors to tell you why we have been so

14 frustrated, the inconsistencies, the fools' errands we

15 feel like we've been sent on because I just don't think

16 that's particularly appropriate for officers of the

17 court to be giving to the Court in soap opera.

18 But I will represent to you this: On the

19 Extreme side, I think on all sides, we have been

20 engaging in this process in good faith. It has been

21 iterative. It has been slow. But it does not mean that

22 anybody is -- insert here -- stonewalling, bad defendant

23 playing gamesmanship. It means that sometimes issues

24 like this are tough. Like, how do you defend a source

25 code copyright case when you don't have the source code

1   copyright and the plaintiff won't give it to you?

2         Now, Mr. Ashley or Mr. Wood could give you

3   their own good soundbite to say why they have been so

4   frustrated.  But I hope for future hearings we can have

5   a fair fight about what should be produced or not

6   without the name calling, and, for my part, I will

7   certainly try to do that.  Thank you.

8         THE COURT:  Thank you.

9         All right.  I'm going to take a ten-minute

10   recess.  And so we'll -- that will make it 3:00.  So

11   we'll recess for ten minutes.

12         THE COURTROOM DEPUTY:  All rise.  This

13   honorable court stands in recess.

14         (A brief recess was taken.)

15         THE COURTROOM DEPUTY:  All rise.  This court is

16   again in session.  Please come to order and be seated.

17         THE COURT:  Okay.  After taking everything into

18   consideration, I think the most important takeaway from

19   today is to get the parties started with the discovery.

20         So in consideration of the general time frames

21   that were outlined, I want to set the date for the

22   simultaneous exchange for April the 22nd, and we'll say

23   noon.  That will -- I also want to add, though, that can

24   certainly be before that date if there is mutual

25   agreement, but April the 22nd at noon is the cutoff

1   date. Well, that's the exact simultaneous exchange

2   time, but if you agree to a day or two before at another

3   exact time, let me know beforehand.

4         So this will include the plaintiffs producing

5   the eight registered copyright works. There are eight;

6   correct? That's what I heard in argument. Okay.

7         And then the defendants will produce the source

8   code for all of the alleged infringing products that are

9   set forth in the Complaint. This is going to include

10   2017 to the present for those products because I -- I

11   acknowledge the arguments that that would take more

12   time, and, Ms. Plessman, I have taken into consideration

13   your representation that the information may encompass

14   more than just SNMP, but I do not have anything before

15   me where I can appropriately measure any arguments as to

16   proportionality in that regard. So, at this point, it's

17   going to encompass those products and the versions from

18   2017 to the present.

19         All other issues I'm going to address in an

20   order, and that will include the issue raised regarding

21   the build environment. So I hope just this step with

22   the deadline of April the 22nd at noon can get you

23   started. I hope it will be productive, and we will deal

24   with things as we go along. But I hope with this and

25   the order that I'll get down as soon as possible with

1  regard to the other matters will get you all well on

2  your way into getting your case ready.

3          So, thank you for your extended time here in

4  the Eastern District today, and I wish you all well in

5  getting your case prepared.

6          MR. ASHLEY:  Thank you, Your Honor.

7          MR. NEUKOM:  Thank you, Your Honor.

8          MS. PLESSMAN:  Thank you.

9          MS. RICE:  Thank you, Your Honor.

10         THE COURT:  Anything else we need to address?

11         MS. RICE:  No, Your Honor.  Thank you.

12         THE COURT:  All right.  We'll stand adjourned.

13         THE COURTROOM DEPUTY:  All rise.  This

14  honorable court stands adjourned.

15             (Which were all the proceedings had and

16              herein transcribed.)

17             * * * * * * *

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4             I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    proceedings; that the foregoing pages were transcribed

7    under my personal supervision and constitute a true and

8    accurate record of the proceedings.

9             I further certify that I am not an attorney or

10   counsel of any of the parties, nor an employee or

11   relative of any attorney or counsel connected with the

12   action, nor financially interested in the action.

13            Transcript completed and signed on Monday,

14   April the 11th, 2022.

15

16

17

18

20            _____
                 TERESA S. GRANDCHAMP, RMR, CRR
21               Official Court Reporter

22

23

24

25