# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

|  |  |  |
|---|---|---|
| SNMP RESEARCH INC. & SNMP RESEARCH INTERNATIONAL INC., | ) ) | Case No. 3:20-cv-451 |
|  | ) |  |
| *Plaintiffs*, | ) | Judge Atchley |
|  | ) |  |
| v. | ) | Magistrate Judge Poplin |
|  | ) |  |
| BROADCOM INC., BROCADE COMMUNICATIONS SYSTEMS LLC, & EXTREME NETWORKS INC., | ) ) ) | ***REDACTED*** |
|  | ) |  |
| *Defendants*. | ) |  |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court are (i) the Joint Motion to Dismiss Plaintiffs' Complaint or, Alternatively, Transfer Venue [Doc. 40] filed by Broadcom, Inc., and Brocade Communication Systems, LLC; (ii) the Motion to Dismiss or, in the Alternative, To Transfer to the Northern District of California [Doc. 38] filed by Extreme Networks, Inc.; and (iii) Extreme's Motion to Compel Mediation [Doc. 164]. Plaintiffs SNMP Research, Inc., and SNMP Research International, Inc., oppose the motions to dismiss and, in the alternative, request fact discovery on the issue of personal jurisdiction as to Broadcom. [Doc. 48]. They also oppose the motion to compel mediation. [Doc. 195].

The Court finds that oral argument on these motions is not necessary. For reasons that follow, the Joint Motion to Dismiss Plaintiffs' Complaint or, Alternatively, Transfer Venue [Doc. 40] and the Motion to Dismiss or, in the Alternative, To Transfer to the Northern District of California [Doc. 38] will be **DENIED IN PART** and **DENIED WITHOUT PREJUDICE IN PART** to refiling. Extreme's Motion to Compel Mediation [Doc. 164] will be **GRANTED**, and <u>all parties</u> will be ordered to private mediation.

# I.  FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs SNMP Research, Inc., and SNMP Research International, Inc., assert that Broadcom, Inc., Brocade Communications Systems, LLC, and Extreme Networks, Inc., copied, reproduced, prepared derivative works based on, and publicly distributed Plaintiffs' copyrighted software without authorization. [Doc. 1 at ¶¶ 77, 87]. Plaintiffs allege that Dr. Jeffrey Case was instrumental in creating the Simple Network Management Protocol ("SNMP"), a way for connected devices to communicate by sending and responding to messages. [*Id.* at ¶ 2]. Plaintiffs' technology is an implementation of SNMP that is used in network equipment, network-connected computers and servers, telephone systems, electronic gaming, and by the United States military, among other uses and users. [*Id.* at ¶ 4]. Plaintiff SNMP Research is primarily a research and development company that creates, licenses, and supports products based on SNMP. [*Id.* at ¶ 30]. SNMP International is primarily responsible for sales, marketing, and sublicensing software under license from SNMP Research. [*Id.* at ¶ 31]. Dr. Case owns and runs both Plaintiff companies. [*Id.* at ¶ 32]. Plaintiff SNMP Research holds registered copyrights for the software at issue in this case. [*Id.* at ¶ 33]. The copyright registration dates are all between January 2011 and July 2011. [*Id.*].

On March 10, 2001, Plaintiffs licensed some of their software to Brocade pursuant to a License Agreement. [*Id.* at ¶ 7]. The License Agreement sets out which software was licensed, how it could be used by Brocade, and how it could be reproduced or transferred externally. [*Id.* at ¶ 8]. The Agreement also includes express limitations on the use of human-readable "source code" that makes up the licensed software. [*Id.*]. The License Agreement forbids Brocade from transferring or disclosing "Source" materials, defined to include source code and related matter. [*Id.*]. The Agreement provides, for example, that redistribution of sources is prohibited and "[a]ccess to the Software, Source, data, and databases is limited to only Licensee's employees,

consultants, and Contractors who are bound by an agreement including confidentiality terms at least as protective as those in the Agreement and who have a need to access the Software, Source, data, and databases." [Doc. 3-1 at pg. 9]. The License Agreement provides that Brocade's license rights thereunder, as well as the agreement itself, are non-transferable. [*Id.* at ¶ 38].

The License Agreement was amended several times. Amendment 3 to License Agreement [Doc. 91 at 26 *et seq.*], dated April 20, 2010, includes choice of law and forum selection clauses:



**For actions arising out of or related to the subject matter of this Agreement, as amended, the parties hereby agree to be subject to sole and exclusive jurisdiction and venue lying in the State and Federal Courts in Knox County, Tennessee, U.S.A. and hereby agree to service of process in accordance with the rules of such courts.**

[Doc. 91 at 31; Doc. 3-1 at ¶ 25][1] (emphasis added).

Plaintiffs allege that the software licensed under the License Agreement was incorporated into at least two of Brocade's product lines. [Doc. 3-1 at ¶ 41]. Broadcom allegedly acquired one of these product lines / businesses in 2017 and the other was divested. [*Id.*]. Plaintiffs allege that in connection with the Broadcom / Brocade transaction, Extreme acquired Brocade's data center switching, routing, and analytics business for $55 million and additional potential performance-based payments to Broadcom. [*Id.* at ¶ 43].

Brocade and Extreme allegedly sought SNMP International's consent to an assignment of the rights under the License Agreement from Brocade to Extreme. [*Id.* at 44]. SNMP International declined and sought more information. [*Id.* at ¶ 45]. Plaintiffs allege that Brocade nonetheless disclosed to Extreme Plaintiffs' source code provided under the License Agreement and

---

[1] While the License Agreement and amendments thereto are filed under seal, portions of the agreement are quoted in the unsealed Complaint. [*See* Doc. 89].

"transferred to Extreme at least a portion of Brocade's business unit utilizing, licensing and/or offering to license, providing services and/or offering to provide services, and publicly distributing/selling products containing Plaintiffs' copyrighted software in binary form." [*Id.* at ¶ 46]. According to the Complaint, Extreme then began reproducing and publicly distributing products containing Plaintiffs' copyrighted software and derivative works. [*Id.* at 47].

On June 4, 2019, SNMP International sent written notice to Brocade advising that it was in breach of the License Agreement. [*Id.* at 51]. After Brocade did not cure the alleged breach, on July 25, 2019, Plaintiffs sent Brocade a Notice of Termination. [*Id.* at ¶ 58]. The Notice of Termination advised Brocade that any distribution or use of the formerly licensed software would constitute copyright infringement. [*Id.* at ¶ 60]. Plaintiffs allege that Brocade continues to reproduce, prepare derivative works based on, and publicly distribute Plaintiffs' copyrighted software, including by creating new Brocade products. [*Id.* at 13].

Plaintiffs filed this action on October 26, 2020, asserting (1) breach of contract against Brocade; (2) copyright infringement against Brocade and Broadcom; (3) copyright infringement against Extreme; and (4) contributory copyright infringement against Brocade and Broadcom. [Doc. 3-1 at pgs. 14-18]. Specifically, Plaintiffs allege that Brocade improperly transferred and disclosed Plaintiffs' software and source code to Extreme, who they allege is engaging in unauthorized reproduction and public distribution of products containing Plaintiffs' copyrighted software.

Plaintiffs allege that Broadcom is Brocade's ultimate parent and has shared in the profits derived from Brocade's copyright infringement. [*Id.* at ¶ 15]. The Complaint alleges that Broadcom is Brocade's "practical partner" because, *inter alia*, Broadcom worked with Brocade to effectuate the disclosure of Plaintiffs' source code and the eventual transfer, reproduction, or

distribution of products containing the copyrighted software to Extreme and profited from that disclosure. [*Id.* at ¶ 65]. As Brocade's practical partner, Plaintiffs contend that Broadcom is jointly and severally liable with Brocade for the profits derived from infringement. [*Id.*].

On December 22, 2020, Extreme filed its Motion to Dismiss, or in the Alternative, to Transfer to the Northern District of California. [Doc. 38]. Extreme moves to dismiss under Federal Rule of Civil Procedure 12(b)(3) due to improper venue and for dismissal under Rule 12(b)(6) for failure to state a claim. [*Id.*]. Extreme presents no argument or legal authority for this requested relief, purporting instead to rely on the subsequently-filed Joint Motion of Broadcom and Brocade. In the alternative, Extreme moves for transfer of venue pursuant to 28 U.S.C. §§ 1404(a) or 1406. [*Id.*].

Broadcom and Brocade likewise filed a Joint Motion to Dismiss Plaintiffs' Complaint or, Alternatively, to Transfer Venue. [Doc. 40]. Broadcom and Brocade move to dismiss for improper venue pursuant to Rule 12(b)(3) and 28 U.S.C. §§ 1400(a) and 1406. They move to dismiss for lack of personal jurisdiction over Broadcom pursuant to Rule 12(b)(2), and for failure to state a claim pursuant to Rule 12(b)(6). [*Id.*]. In the alternative, Broadcom and Brocade move to transfer this action under either 28 U.S.C. §§ 1404 or 1406 to the United States District Court for the Northern District of California. [*Id.*]. Defendants request oral argument on their motions, but not an evidentiary hearing.

## II.    PERSONAL JURISDICTION

Both Plaintiffs are Tennessee corporations with their principal places of business in Knoxville, Tennessee. [*Id.* at ¶¶ 18-19]. Plaintiffs allege that Brocade, Broadcom, and Extreme are all Delaware entities that have their principal places of business in San Jose, California. [*Id.* at ¶¶ 20-22]. Plaintiffs assert subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338, and

supplemental jurisdiction over Plaintiffs' state law breach of contract claim pursuant to § 1367. [*Id.* at ¶ 24].

Personal jurisdiction is not disputed as to Brocade or Extreme. Plaintiffs allege Brocade expressly submitted to jurisdiction in Knoxville, Tennessee, pursuant to the License Agreement. [*Id.* at ¶ 25]. As to Extreme, Plaintiffs allege that Extreme has a history of dealings with Plaintiffs, including at least one agreement with SNMP International in which it submitted to the jurisdiction of the federal courts in Knox County, Tennessee. [*Id.* at ¶ 27]. Further, Extreme allegedly engaged in extensive negotiations with Plaintiffs concerning the copyrighted software at issue in this action. [*Id.*]. Extreme also executed a Consent to Assignment Letter in September 2017, in which it purported to assume all rights, duties, and obligations under the License Agreement. [*Id.*].

Plaintiffs allege that personal jurisdiction exists as to Broadcom because it has a history of dealings with the Plaintiffs, including at least one agreement with SNMP International in which it consented to the jurisdiction of the federal courts in Knox County, Tennessee. [*Id.* at ¶ 26]. Broadcom also allegedly engaged in extensive negotiations with Plaintiffs in which Broadcom representatives spoke on behalf of Brocade and represented an ability to obtain a license agreement on behalf of Brocade. [*Id.*]. Plaintiffs allege it was reasonably foreseeable to Broadcom that it would become involved in the instant dispute given its close relationship and dealings with Brocade, who is bound by exclusive jurisdiction and venue clauses in the License Agreement. [*Id.*]. Finally, Plaintiffs allege that upon information and belief, Broadcom is "actively marketing, selling, offering to sell, licensing, and/or offering to license hardware, software, and/or services directly or indirectly through its distribution channels to business consumers in this District, including, without limitation, products containing the software at issue in this case." [*Id.*].

Broadcom and Brocade argue that the Court lacks personal jurisdiction over Broadcom, rendering venue improper as to all Defendants. [Doc. 40-1 at 5]. Broadcom and Brocade move the Court to dismiss the action without prejudice to refiling or transfer the case to the Northern District of California where personal jurisdiction exists and venue is proper as to all Defendants. [*Id.*]. Plaintiffs argue that if personal jurisdiction over Broadcom is lacking, the claims against Broadcom alone should be dismissed without prejudice to refiling. In the alternative, Plaintiffs request leave to amend the complaint following fact discovery as to personal jurisdiction. [Doc. 48 at 19]. All parties appear to oppose severance of the claims against Broadcom. [*See* Doc. 40-1 at 14]. Plaintiffs do not argue that the Court has general jurisdiction over Broadcom, so the Court's inquiry is restricted to specific jurisdiction.

Plaintiffs argue first that though a non-signatory, Broadcom is bound to the mandatory forum-selection clause in the License Agreement because it is closely connected to Brocade and the events giving rise to this dispute, making it reasonably foreseeable that Broadcom would become a party to a dispute between Plaintiffs and Brocade. Second, Plaintiffs argue that personal jurisdiction exists because Broadcom partnered with Brocade to implement the challenged disclosure of copyrighted software, actively marketed products containing the subject software in this District, and took action to form a long-term relationship with Tennessee. [Doc. 48 at 14-16].

## A. Personal Jurisdiction – Standard of Review

Plaintiffs bear the burden of demonstrating personal jurisdiction over Broadcom. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). Faced with a properly-supported motion for dismissal, a plaintiff may not stand on its pleadings, "but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991).

A district court has discretion in how it chooses to resolve a Rule 12(b)(2) motion. *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020). If the motion can be ruled on before trial, the court may (1) determine the motion based on affidavits alone; (2) permit discovery in aid of the motion; or (3) conduct an evidentiary hearing on the merits of the motion. *Id.* If the court decides the motion "solely on written submissions and affidavits . . . the burden on the plaintiff is relatively slight, and the plaintiff must make only a prima facie showing . . . in order to defeat dismissal." *Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007). In that context, the court reviews the pleadings and other documentary evidence in the light most favorable to the plaintiff, without considering the defendant's controverting assertions. *Bridgeport Music, Inc. v. Still N The Water Publishing*, 327 F.3d 472, 478 (6th Cir. 2003). If the defendant submits affirmative evidence showing that the court lacks jurisdiction, the plaintiff must respond by showing, through affidavits or otherwise, specific facts that establish jurisdiction. *Parker v. Winwood*, 938 F.3d 833, 839 (6th Cir. 2019).

"Dismissal in this procedural posture is proper only if all the specific facts which the plaintiff . . . alleges collectively fail to state a prima facie case for jurisdiction." *Theunissen*, 935 F.2d at 1458. This rule prevents a defendant from defeating personal jurisdiction by simply filing an affidavit contradicting the jurisdictional allegations of the complaint. A defendant may, however, invoke the court's discretion to order a pretrial evidentiary hearing, just as a plaintiff may move for jurisdictional discovery. *See Malone*, 965 F.3d at 505-6 (district court erred by crediting defendant's controverting affidavit without first allowing any form of discovery).

Though Defendant requested oral argument, neither party has requested an evidentiary hearing on the motions. In its response briefs, Plaintiffs requested leave to amend to add jurisdictional allegations after Defendants' substantive responses to discovery. [Doc. 48 at 19].

8

After review of the record and applicable law, the Court ordered Broadcom, Brocade, and Plaintiffs to file limited evidentiary supplements, consisting of a statement of facts the parties contend are relevant to the following:

> Broadcom's marketing, selling, offering to sell, licensing, and/or offering to license hardware, software, and/or services directly or indirectly through its distribution channels to business consumers in Tennessee, including the products containing the software at issue in this case.

[Doc. 147]. The Court advised the parties to confine their supplemental materials to this narrow evidentiary issue. [*Id.*]. It prohibited the parties from including any arguments previously raised or any evidence or argument that is beyond the scope of the Order. [*Id.*]. While the Order permitted the parties to attach evidence not previously filed, it advised them to "narrowly tailor any new evidence submitted to avoid unnecessary expansion of the record." [*Id.*]. Broadcom and Brocade and Plaintiffs each filed a supplement, attaching hundreds of pages of exhibits and declarations.

Because the Court did not conduct an evidentiary hearing, ordinarily Plaintiffs would have the burden of making only a *prima facie* showing that personal jurisdiction exists and the Court would not credit any controverting evidence submitted by Defendants. *Malone*, 965 F.3d at 505. However, the Court solicited evidentiary supplements regarding whether Broadcom purposefully availed itself of the privilege of doing business in Tennessee. Accordingly, as to the matters identified in the supplement – specifically, whether Broadcom's direct or indirect activities in Tennessee demonstrate purposeful availment – the Court has reached its determinations based on a preponderance of the evidence standard.

### B. Personal Jurisdiction - Forum Selection Clause

Plaintiffs contend that Broadcom is bound by the forum-selection clause in the License Agreement because Broadcom is so closely related to the dispute that it was foreseeable that it would be bound. Plaintiffs allege that Broadcom "worked substantially and continuously with

9

Brocade to implement the disclosure . . . of products containing the copyrighted software to Extreme." [Doc. 1 at ¶ 65]. Plaintiffs allege that Broadcom wholly owns and controls Brocade and shares in Brocade's profits from infringement, making it Brocade's "practical partner" for the purposes of infringement liability. [*Id.* at ¶ 66]. According to Plaintiffs, Broadcom also took part in "extensive negotiations with Plaintiffs in which . . . Broadcom representatives spoke on behalf of Brocade and represented the ability to obtain a license agreement on behalf of Brocade." [*Id.* at ¶ 26]. The efforts to obtain a new license agreement apparently included communications between Plaintiffs and Broadcom. [Doc. 48 at 13; Doc. 48-1 at ¶¶ 27-28; Docs. 48-7 & 48-8]. Finally, Plaintiffs note that Broadcom and Brocade are represented by the same counsel in this action, further demonstrating they share a common interest. [*Id.* at 13].

"The use of a forum selection clause is one way in which contracting parties may agree in advance to submit to the jurisdiction of a particular Court." *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006). There is currently "no definitive rule in the Sixth Circuit on when a party to a contract can seek to bind a non-party to a forum selection clause," *Amwear USA, Inc. v. Galls, LLC*, No. 5:20-cv-354, 2021 WL 1994228, *6 (E.D. KY. May 18, 2021), and the parties emphasize different considerations. Plaintiffs contend that where a non-signatory is so closely related to a dispute that it becomes foreseeable that it will be bound, a contract's forum selection clause may be enforced against that party. [Doc. 48 at 12]. Defendants contend that there is no basis to subject Broadcom to the forum selection clause because Broadcom is a separate corporate and legal entity from Brocade and there is no allegation that the License Agreement was assigned to Broadcom. [Doc. 56 at 19].

The Sixth Circuit has not expressly adopted a test for evaluating when a non-signatory to a contract may nonetheless be bound by a forum selection clause. It has, however, cited with

approval the Seventh Circuit's holding that to "bind a non-party to a forum selection clause, the party must be 'closely related' to the dispute such that it becomes 'foreseeable' that it will be bound." *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1106 (6th Cir. 1997) (*citing Hugel v. Corp. of Lloyd's*, 999 F.2d 206, 209 (7th Cir. 1993)). Based on this reasoning, the district court in *Baker* had held that the non-signatory defendants could not enforce the forum selection clause, and the Sixth Circuit affirmed. *Id.*

Similarly, in *Wilson v. 5 Choices, LLC*, 776 F. App'x 320 (6th Cir. 2019), the Sixth Circuit allowed non-signatory defendants to enforce a forum selection clause that required the plaintiffs to file suit against privity defendants in a different forum. *Id.* at 329 (quoting *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514 n.5 (9th Cir. 1988) ("[O]ther courts have noted that 'a wide range of transaction participants, parties, and non-parties should benefit from and be subject to forum selection clauses' where 'the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants.'").

Both *Baker* and *Wilson* involved non-signatory defendants seeking to enforce a forum selection clause against a signatory plaintiff, so they did not present personal jurisdiction issues. The parties cite a number of cases that have limited applicability for the same reason.[2] Cases in which a signatory defendant seeks to enforce a forum selection clause against a non-signatory

---

[2] *See Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287 (3d Cir. 1996) (non-signatory defendant could not enforce forum selection clause in contract between its subsidiary and plaintiff); *Winston v. Zaehringer*, No. 1:19-cv-216, 2020 WL 3259531 (E.D. Tenn. June 16, 2020) (denying motion of non-signatory defendants to dismiss based on forum selection clause between plaintiffs and third party); *Wireless Properties v. Crown Castle Int'l*, No. 1:10-cv-269, 2011 WL 3420734 (E.D. Tenn. Aug. 4, 2011) (non-signatory defendant could enforce forum selection clause because they were "sufficiently intertwined" with the signatory defendant); *ThorWorks Indus. v. E.I. DuPont De Nemours & Co.*, 606 F. Supp. 2d 691, 697 (N.D. Ohio 2008) (defendant who was not a third-party beneficiary of agreement and was not closely related to signatories could not enforce forum selection clause).

plaintiff are similarly inapposite.[3] Finally, several cases cited by the parties simply did not involve personal jurisdiction challenges.[4]

District courts do not agree on whether the so-called "closely-related party doctrine" can be used to enforce a forum selection clause against non-signatory defendants in the absence of assignment or other legal relationship. Courts have held, however, that the closely-related party doctrine is not limited to third party plaintiffs. *See, e.g., Medtronic*, 530 F. Supp. 2d 1054, 1057 ("[W]hen deciding whether the doctrine applies, a court must answer only the following question: should the third party reasonably foresee being bound by the forum-selection clause because of its relationships to the cause of action and the signatory to the forum-selection clause?"). This Court has previously suggested that when a plaintiff invokes the closely-related party doctrine, the same facts may be relevant, but the analysis shifts to personal jurisdiction: "If Plaintiff filed suit in [the contractual forum] . . . and Defendants raised the defense of personal jurisdiction, . . . [t]he same facts and circumstances upon which the Court relied to find that Defendants can enforce the clause would apply equally well as a challenge to any personal jurisdiction defense." *Wireless Properties*, 2011 WL 3420734 at *7.

At least one court has expressed serious doubt that the closely-related party doctrine can be used to enforce forum selection clauses against non-signatory defendants who challenge personal jurisdiction. *See Arcadia Biosciences, Inc. v. Vilmorin & Cie*, 356 F. Supp.3d 379 (S.D.N.Y. 2019). In *Arcadia*, the court acknowledged several circuit court cases in which a forum

---

[3] *See Shaffer v. Interbank FX*, No. 3:12-cv-231, 2013 WL 53979 (E.D. Tenn. Jan. 3, 2013) (granting defendant's motion to transfer based on forum selection clause despite opposition of non-signatory plaintiff); *Regions Bank v. Wyndham Hotel Mgmt., Inc.*, No. 3:09-1054, 2010 WL 908753, *16-17 (M.D. Tenn. Mar. 12, 2010) (permitting signatory defendant to enforce forum selection clause against non-signatory plaintiff and dismissing without prejudice).

[4] *See Wiedo v. Securian Life Ins.*, 2020 WL 5219536 (E.D. Ky. Sept. 1, 2020) (plaintiff sought to enforce a forum selection clause against a non-signatory defendant to transfer the case, but no personal jurisdiction dispute); *Medtronic, Inc. v. Endologix, Inc.*, 530 F. Supp. 2d 1054 (D. Minn. 2008) (no personal jurisdiction analysis).

12

selection clause was enforced against a non-signatory. *Id.* at 393-94. The court distinguished those cases because enforcement was against successors in interest and third party beneficiaries to a contract. *Id.* at 394. These holdings, the court reasoned, were "consistent with the general 'law of contracts.'" *Id.* (quoting *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 203 (3d. Cir. 1983)). Similarly, the court acknowledged that enforcement may be justified against a "closely related" non-signatory plaintiff whose interests are completely derivative of those of the signatory plaintiffs. *Id.* The court declined to join other lower courts who have extended these rulings to allow plaintiffs to enforce forum selection clauses against "closely related" non-signatory defendants who object to the exercise of personal jurisdiction. *Id.* The court explained that "constitutional requirements caution against a liberal application of forum selection clauses to non-signatory defendants." *Id.* at 395.

Other district courts that have applied the closely-related party doctrine to defendants who challenge personal jurisdiction also appear to focus on contract principles. *See Highway Com. Servs., Inc. v. Zitis*, No. 2:07-cv-1252, 2008 WL 1809117 (S.D. Ohio April 21, 2008) (dismissing for lack of personal jurisdiction where defendant was an entirely separate legal entity, was not owned or operated by either signatory, and was not a third-party beneficiary of the agreement); *Hitachi Med. Sys. Am., Inc. v. St. Louis Gynecology & Oncology, LLC*, No. 5:09-cv-2613, Case No. 2011 WL 711568, *8 (N.D. Ohio Feb. 22, 2011) (dismissing non-signatory defendant who was not a successor entity to signatory or third party beneficiary). And many of the cases in which a non-signatory is bound to a forum selection clause involve contractual "hooks," such as assumption or successor liability.[5] As the court reasoned in *Arcadia*, these outcomes are "consistent with the general 'law of contracts.'" *Arcadia*, 356 F. Supp. at 394 (citation omitted).

---

[5] *See, e.g., H.H. Franchising Systems, Inc. v. Brooker-Gardner*, Case No. 1:14-cv-651, 2015 WL 4464774 (S.D. Ohio July 21, 2015) (non-signatory company bound by forum selection clause where it had a history of dealings with the

After careful review of the caselaw, the Court finds that Broadcom is not so closely related to Brocade or the License Agreement that it was foreseeable that it would be bound by the forum selection clause in the License Agreement. Personal jurisdiction arises out of the due process clause, which "constrains a State's authority to bind a nonresident defendant to a judgment of its courts." *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Parties may waive personal jurisdiction or agree in advance to submit to the jurisdiction of a particular court by contract. *Preferred Capital, Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006). It stands to reason that the law of contracts would determine whether a party is bound by such a waiver. In the absence of a contractual mechanism for enforcement, the closely-related doctrine cannot supplant the minimum contacts that are constitutionally required to establish specific personal jurisdiction.

Moreover, the factors that other courts have considered when binding a non-signatory to a forum selection clause are largely not present here. "In determining whether a non-signatory is closely related to a contract, courts consider the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *Carlyle Inv. Mgmt. LLC*, 779 F.3d at 219. Here, Broadcom did not own Brocade at the time the contract was executed and had no involvement in the negotiation of the License Agreement or amendments thereto, which were in place for years before Broadcom acquired Brocade. [Doc. 3-1 at ¶¶ 34, 42]. Assuming the closely-related party doctrine even applies where personal jurisdiction is at issue, the facts alleged are simply not enough to bind Broadcom to a forum selection clause in a contract it did not sign. *See*

---

signatory and signed a related agreement, while second company owned by signatory principal was not bound); *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp.2d 147 (E.D.N.Y. 2012) (non-signatory defendant bound by forum selection clause by assumption of contract and under closely related doctrine); *Regions Bank*, 2010 WL 908753 at *16 (where management agreement contained forum selection clause, party that signed a separate agreement incorporating the management agreement by reference was bound); *Amwear*, 2021 WL 1994228 at *6 (where company signed supply agreement that was incorporated into purchase agreement, company's principal signed purchase agreement, and transaction was "integrated," non-signatory plaintiff bound by forum selection clause).

*Dayhoff v. H.J. Heinz co.*, 86 F.3d 1287, 1297 (3d Cir. 1996) ("[Non-signatories to a contract] should not by reason of their corporate relationship with [a signatory] be able to invoke the arbitration and forum selection clauses, for there is no more reason to disregard the corporate structure with respect to such claims as there would be to disregard it with respect to other legal matters.").

### C. Personal Jurisdiction – Minimum Contacts Analysis

"Specific jurisdiction turns on the 'affiliation between the forum and the underlying controversy.'" *Parker*, 938 F.3d at 839 (*quoting Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011)). Three criteria are evaluated in determining whether personal jurisdiction exists:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Inds., Inc.*, 401 F.2d 374 (6th Cir. 1968). When a federal court's subject matter jurisdiction stems from a federal question, "personal jurisdiction over a defendant exists if the defendant is amenable to service of process under the forum state's long-arm statute and if the exercise of personal jurisdiction would not deny the defendant due process." *Bridgeport*, 327 F.3d at 477 (quoting *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002)) (cleaned up). Because Tennessee's long-arm statute is coterminous with the limits on personal jurisdiction imposed by the due process clause, the Court need only consider whether exercising personal jurisdiction over Broadcom comports with federal due process. *See id.* (applying federal due process framework to copyright infringement action filed in Tennessee).

"[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Int'l Tech. Consultants, Inc. v. Euroglas, S.A.*, 107 F.3d 386, 395-96 (6th Cir. 1997) (*quoting Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "Thus where the defendant 'deliberately' has engaged in significant activities within a State . . . or has created 'continuing obligations' between himself and residents of the forum . . . he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by 'the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Burger King*, 471 U.S. at 475–76.

### 1. Purposeful Availment

Plaintiffs argue that the purposeful availment factor is met because (i) Broadcom directed tortious conduct into Tennessee; (ii) Broadcom intended to form a long-term relationship with Tennessee through its ongoing business relationship with Plaintiffs; and (iii) Broadcom is actively marketing, selling, or licensing software or services to consumers in this District, including products containing the subject software. Plaintiffs also note that Broadcom representatives spoke on behalf of Brocade regarding a replacement license for the Agreement.

#### a. *Tortious Conduct Directed at Tennessee*

First, Plaintiffs argue that purposeful availment may be found when a defendant directs tortious conduct into the forum state of the injured plaintiff. [Doc. 48 at 14]. Under the "effects test" articulated in *Calder v. Jones*, 465 U.S. 783, 104 (1984), when a defendant intentionally aims tortious conduct at a forum and the brunt of the harm is felt in that forum, jurisdiction may be proper based on the effects of the defendant's conduct in the forum state. But the Sixth Circuit has narrowed the application of the effects test "such that the mere allegation of intentional tortious

conduct which has injured a forum resident does not, by itself, always satisfy the purposeful availment prong." *Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) (defendant's contacts with Michigan where "enhanced" by its conduct directed to causing harm to Michigan resident). The court explained that while the effects test has been limited, "the existence of intentional tortious conduct nonetheless 'enhances' a party's other contacts with the forum state for purposes of the purposeful availment analysis." *Id.* at 552-53; *see also Mor-Dall Enters. v. Dark Horse Distillery*, 16 F. Supp. 3d 874, 881-82 (W.D. Mich. 2014) ("The *Calder* effects test allows a plaintiff to 'enhance' the contacts a defendant has with a forum by demonstrating that the defendant intentionally directed its tortious conduct toward plaintiffs in the forum.").

Plaintiffs assert that Broadcom "substantially and continuously [worked] with Brocade to implement the disclosure, transfer, reproduction, and/or public distribution of products containing the copyrighted software to Extreme," knowing that their actions constituted a breach of the License Agreement and infringement of Plaintiffs' copyrighted works. [Doc. 3-1 at ¶¶ 17, 65]; [Doc. 48 at 14]. Plaintiffs also argue that Broadcom acted as Brocade's "practical partner," supporting joint liability and a finding of purposeful availment. [Doc. 3-1 at ¶¶ 65-67]. According to Plaintiffs, Broadcom willfully engaged in copyright infringement, injuring Plaintiffs in Tennessee. [Doc. 48 at 14]. That harm will presumably be felt in Tennessee, where Plaintiffs reside. [*Id.*]. These allegations are analogous to those in *Safetech International*, where the defendants owed a judgment debt to a Michigan-based plaintiff and fraudulently transferred assets with intent to defraud plaintiff. *Safetech*, 503 F.3d at 553. The *Safetech* court found that the defendants "undoubtedly knew" that the focal point of their actions and the brunt of the harm would be felt by plaintiffs in Michigan. *Id.* The court held that defendants' other contacts with

Michigan were enhanced by conduct which "was intentionally directed to cause harm to a Michigan resident." *Id.* Based on the Sixth Circuit's guidance in *Safetech International*, Plaintiffs' allegation that Broadcom's intentionally tortious conduct was directed at Tennessee can enhance Broadcom's other contacts with Tennessee.[6]

### b. Intent to Form a Long-Term Relationship with Tennessee

Plaintiffs also contend that Broadcom intended to form a long-term relationship with Tennessee through its ongoing business relationship with Plaintiffs. In support of this contention, Plaintiffs allege the following: (1) Broadcom subsidiaries entered into contracts with SNMP International that contain forum selection clauses; (2) Broadcom executed at least one agreement with Plaintiffs that had a forum selection clause; and (3) Broadcom representatives spoke on behalf of Brocade in attempting to obtain a replacement license for the Agreement. [Doc. 48 at 16-17]. Though they make related arguments, Plaintiffs did not allege an alter ego relationship between Broadcom and Brocade or any subsidiaries.[7] The actions of Broadcom's subsidiaries thus do little to demonstrate that Broadcom purposefully availed itself of the privilege of acting in Tennessee. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014 ("[T]he relationship must arise out of contacts that the defendant *himself* creates with the forum State.") (cleaned up, emphasis original). So, the Court will focus on whether Broadcom itself intended to form a long-term relationship with Tennessee.

First, Plaintiffs show Broadcom entered into an agreement with SNMP International in which the parties agreed that State and Federal Courts in Knox County, Tennessee, would have

---

[6] To the extent *Big Guy's Pinball, LLC v. Lipham*, No. 14-cv-14185, 2015 WL 4209042 (E.D. Mich. July 10, 2015) holds otherwise, it is not controlling.

[7] In their Supplement [Doc. 154], Plaintiffs argue for the first time that an alter ego relationship is not required to impute Brocade's contacts to Broadcom for the purposes of personal jurisdiction. [*Id.* at 6, n. 7]. They contend that even if alter ego is the proper test, the burden is "relatively slight" for personal jurisdiction purposes as compared to liability. [*Id.*].

exclusive jurisdiction over actions arising out of the agreement. [Doc. 3-1 at ¶ 26; Doc. 51-5].[8] Among other things, the agreement permits Broadcom to "conduct business transactions with SNMPRI, such as issuing purchase orders, reporting royalties, and renewing software service agreements on behalf" of the subsidiary. [Doc. 51-5 at 30]. The Sixth Circuit has held that entering a contract, without more, is not enough to establish minimum contacts. *See CompuServe*, 89 F.3d at 1265. But the court has also found that where a party "deliberately set in motion an ongoing marketing relationship" with plaintiff, "he should have reasonably foreseen that doing so would have consequences." *Id.* (finding minimum contacts where defendant both entered a contract with a forum-state plaintiff and placed a product into the stream of commerce in the forum state).

Next, Plaintiffs point to Broadcom's involvement in negotiating an assignment of the License Agreement as indicating its intent to form an ongoing relationship with Tennessee through Plaintiffs. Contrary to Broadcom's suggestion, it does not appear that these were mere settlement negotiations. Rather, they contemplate a new agreement regarding the rights under the License Agreement. This would presumably result in a continued relationship between, at minimum, Extreme and Plaintiffs. [Doc. 3-1 at ¶¶ 47; Doc. 48-7; Doc. 48-8]. The record indicates that Broadcom was involved in negotiations surrounding a replacement or assignment of the License Agreement ███████████████████████████████████████████ [Doc. 154-90 at ¶ 4]. It is not clear whether Broadcom sought to be a party to any resulting agreement. While this primarily relates to Brocade and Broadcom's other subsidiaries, it is some evidence of Broadcom's contacts with Tennessee.

---

[8] Both of these documents were ordered unsealed by Judge Poplin. [Doc. 89 at 2].

Plaintiffs next argue and allege that "upon information and belief," Broadcom is "actively marketing, selling, offering to sell, licensing, and/or offering to license hardware, software, and/or services directly or indirectly through its distribution channels to business consumers in this District, including, without limitation, products containing the software at issue in this case." [Doc. 3-1 at ¶ 26]. A party can, "on knowledge, information, and belief," assert specifically that the existence of a necessary distribution relationship will "likely have evidentiary support after a reasonable opportunity for discovery." *Palnik v. Westlake Entertainment, Inc.*, 344 F. App'x 249, 252 (6th Cir. 2009) (quoting Fed. R. Civ. P. 11(b)). Broadcom argues that to show personal availment, the defendant's interaction with the forum must be intentional and specific.[9] Mark Brazeal, Chief Legal Officer at Broadcom, Inc., avers that "Broadcom, being the parent holding company and not a sales operating entity, does not sell or engage in any product development containing the software at issue in this case anywhere in the United States." [Doc. 40-2 at ¶ 5].

After a careful review of the record, the Court found that the allegations of the Complaint were ambiguous, preventing the Court from determining the nature and extent of Broadcom's activities in Tennessee. The Court ordered the parties to file limited evidentiary supplements on the isolated issue of Broadcom's direct and indirect marketing, sale, or licensing of the allegedly infringing products. [Doc. 147]. The Court ordered the parties to file a statement of facts and attach any necessary evidentiary support for those statements. Accordingly, the Court has relied only on those portions of the evidentiary filings that were specifically brought to the Court's attention. *See*

---

[9] Broadcom also contends that even if it directed distribution to Tennessee, Plaintiffs cannot satisfy the "arising from" factor, because marketing and licensing unidentified products containing the software at issue is not enough to establish personal jurisdiction. [Doc. 56 at 12 n.4]. Rather, Plaintiffs must allege that the marketing/licensing of products in this District forms the basis of their claims. [*Id.*]. As discussed below, Plaintiffs' supplemental evidence satisfies this deficiency.

*Shorts v. Bartholomew*, 255 F. App'x 46, 50 (6th Cir. 2007) (the court is not obligated to "scour the record" to find support for the parties' arguments); *Layne Christensen Co. v. City of Franklin*, 449 F. Supp. 3d 748, 755 (M.D. Tenn. 2020) (on summary judgment, court is entitled to "rely only upon those portions" of the record "specifically called to its attention by the parties").

In their supplement, Plaintiffs argue that Broadcom directly markets, sells, and licenses the infringing products/software in Tennessee through (i) its highly interactive website, (ii) the direct actions of Broadcom personnel, and (iii) Broadcom's role in attempting to secure licenses from Plaintiffs. [Doc. 154 at 2]. Plaintiffs contend that Broadcom also indirectly markets, sells, and licenses the infringing products/software in Tennessee through Brocade. [*Id.* at 6]. In its supplement, Broadcom reiterates that it is a parent holding company ███████████████████ ████████████████, and that it does not market, sell, or distribute products containing the software at issue in this case. [Doc. 156 at 5]. It does not have employees or products or engage in the day-to-day business operations of its subsidiaries. [*Id.*].

First, Broadcom's website. "A defendant purposefully avails itself of the privilege of acting in a state through its website if the website is interactive to a degree that reveals specifically intended interaction with residents of the state." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 890 (6th Cir. 2002); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997) (explaining the "sliding scale" of website interactivity in relation to personal jurisdiction principles). In *Neogen*, the website of defendant NGS was primarily passively posted information, advertising NGS's services and providing contact information. *Id.* at 890. It also had interactive elements:

- When Michigan residents purchased NGS's services, the website provided them with passwords to access their test results on the website from Michigan;

- The passwords were part of a contract for NGS's services;

- The website advertised that it would conduct genetic screening for "any parent in any state";

- The website enabled Michigan residents to print out a testing form to send with payment.

*Id.* at 886-87. Further, NGS tested 14 samples from customers in Michigan in one year and anticipated the same number for the next. *Id.* The court clarified that "[t]he proper test for personal jurisdiction is not based on a 'percentage of business' analysis . . . but rather on whether the absolute amount of business conducted [in the forum state] represents something more than 'random, fortuitous, or attenuated contacts' with the state." *Id.* at 891-92 (quoting *Burger King*, 471 U.S. at 475).

Based on the website and these interactions with Michigan residents, the Sixth Circuit found that NGS intentionally chose to conduct business in Michigan. The court focused on the fact that while customers contacted NGS and not the other way around, NGS could not mail test results to and accept payment from customers with Michigan addresses without intentionally choosing to conduct business in Michigan. *Id.* at 892. Viewing the facts in the light most favorable to the plaintiff, the court found that the purposeful availment requirement was met and reversed the district court's dismissal for lack of personal jurisdiction. *Id.* In *Neogen*, the court also found the "arising from" requirement of *Mohasco* met. *Id.* at 892. The plaintiff alleged that NGS's use of the tradename on its website and its business contacts in Michigan might have caused economic harms in Michigan. *Id.* Because it was "possible" that NGS's activities in Michigan caused economic injury to Neogen, there was a sufficient causal connection to satisfy the "arising from" requirement. *Id.*

22

In contrast, courts have found that websites that merely permit readers to post comments and information, but do not offer goods or services, are insufficiently interactive to support personal jurisdiction. *See Wargo v. Lavendeira*, No. 1:08-cv-02035, 2008 WL 4533673 (N.D. Ohio Oct. 3, 2008) (distinguishing cases in which the defendant's website offered information and forms to purchase goods and services from the defendants, allowed users to place orders, provided users with passwords, and allowed users to apply for and track mortgage applications). In *Premium Balloon Accessories, Inc. v. Control Plastics*, 113 F. App'x 50, 51 (6th Cir. 2004) for example, the Sixth Circuit affirmed dismissal for lack of personal jurisdiction where a California company made only a fraction of its worldwide sales to Ohio in the relevant time period and the website in question was not fully interactive. While the website provided information about the company's products and permitted a user to download an order form, it did not allow users to make purchases directly online. *Id.*

Here, Plaintiffs argue Broadcom's website is highly interactive "to a degree that reveals specifically intended interaction with residents of the state." *Neogen*, 282 F.3d at 890; [Doc. 154]. Plaintiffs show:

- Typing www.brocade.com takes the user to www.broadcom.com. [Doc. 157 at ¶5].[10]

- The webpage www.broadcom.com indicates that the term "Broadcom" refers to Broadcom. Inc. and/or its subsidiaries. [Doc. 154-4 at 3].

---

[10] A motion to seal the Weber declaration and certain exhibits is pending before Magistrate Judge Poplin. [Doc. 155]. The Court makes no determination as to the merits of this motion, and has redacted portions of this Memorandum Opinion that quote or paraphrase certain contents of Ms. Weber's declaration. Nonetheless, the declaration addresses certain publicly available information (such as the webpage of Broadcom, Inc.). Plaintiffs' supplement likewise discusses Weber's declaration at length, with only limited redactions. [Doc. 154]. The Court has redacted only that information that (i) is either under seal or subject to a pending motion to seal and (ii) is not contained elsewhere in the record of this case or otherwise publicly available.

23

- On the website, "Broadcom, Inc.," specifically, holds itself out as a "global technology leader that **designs, develops, and supplies** a broad range of semiconductor and infrastructure software solutions," including "data center networking and storage." [*Id.*] (emphasis added).

- The webpage includes links for "Products" and "How to Buy." Featured in a column of the homepage are "Latest Products." [*Id.*].

- The security certificate for the website indicates it is owned by Broadcom Inc. [Doc. 154-5 at 2].

- The "Terms of Use" on the website state that "Broadcom Inc., including its corporate affiliates and subsidiaries, ('Broadcom') authorizes you to view and download the materials at this Web site" with certain conditions. [Doc. 154-6 at 2].

Through the Declaration of Olivia Weber and the exhibits attached to her declaration, Plaintiffs show that a potential purchaser can select "How to Buy" from the Broadcom homepage and click through a series of links to "Contact Sales." [Doc. 157 at ¶ 10; Doc. 154-10]. Eventually, the user can reach a Contact Form to receive "additional information on a [sic] **Broadcom products**." [Doc. 154-13 at 2] (emphasis added). The form includes a pull-down menu for the potential purchaser's state of residence, including Tennessee. [*Id.*]. Plaintiffs show that the form allows the user to select "Brocade SAN Products," ████████████████████████████

████████████ [Doc. 154-13; Doc. 157 at ¶ 12]. The user submits the form through the website; it is not printed or downloaded. [Doc. 154-13 at 2]. To submit the form, the user must check a box to indicate they understand and agree to Broadcom's Terms of Use and Privacy Statement. [*Id.*].

████████████████████████████████████████

24

███████████████████████████████████████ [Doc. 157-1 at 6-8].[11] Ms. Weber avers that she navigated from the Broadcom homepage to pages for allegedly infringing products. [Doc. 154 at ¶¶ 13-14; Doc. 154 at 3]. For each product, the webpage banner includes the "How to Buy" option, that takes the user to the "Contact Sales" form to inquire about purchasing a product. [*Id.*; Doc. 154-16 at 2]. Navigating to one of the allegedly infringing products also gives the user the option to "Find a Partner" or "Request Info." [Doc. 154-19 at 2]. User guides and other documents pertaining to allegedly infringing products are also accessible on Broadcom's website. [Doc. 157 at ¶ 19; Doc. 154-21]. ███████████████████████████████████████ ███████████████████████████████████████ [Doc. 154 at ¶ 27].

Plaintiffs also show that release notes for certain Brocade products instruct that for non-urgent technical support, the customer should login to the "myBroadcom" Customer Support Portal, which requires registration, issues the user a password, and provides users with a virtual agent via chat for support areas that include "Brocade." [Doc. 157 at ¶¶ 20-23; Doc. 154-24]. The security certificate for the support portal page indicates that Broadcom Inc. is the owner of the certificate. [Doc. 157 at ¶ 24; Doc. 154-26; Doc. 154-27]. Through the Customer Support Portal, users are able to download firmware and documentation files. [*Id.* at ¶ 19; Doc. 154-21].

Finally, Plaintiffs show that numerous Tennessee companies and governmental entities did in fact download infringing software in 2019 and 2020 from the Broadcom Customer Support Portal. [Doc. 157 at ¶ 34; Doc. 154 at 3]. Multiple Tennessee companies and entities, ████████ ███████████████████████████████████████

appear to have downloaded infringing software from Broadcom's customer service portal ███████
███████████ [*Id.* at ¶ 34].

Thus, in addition to being highly interactive generally, the record suggests that the website is "interactive . . . with the people in the forum state." *Cadle Co. v. Schlichtmann*, 123 F. App'x 675, 677-78 (6th Cir. 2005); *see Northbrook v. Vendio*, 625 F. Supp. 2d 728, 751-52 (D. Minn. 20085) ("[W]here users in the forum state download and use software published by the defendant, there is sufficient proof that the defendant purposefully directed its activities into the forum state."). In *Cadle*, for example, the Sixth Circuit agreed with the district court that a website that provided contact information and arguably solicited support for the site's purpose likely fell between interactive and passive. *Id.* With a "semi-interactive" website, "the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs." *Id.* (quoting *Zippo*, 952 F. Supp. at 1124). Because the plaintiff did not allege that any interaction or exchange of information occurred between the defendant and forum state residents via the website, personal jurisdiction did not exist over the defendant based on the website. *Id.* Unlike the situation in *Cadle*, Plaintiffs here have shown that Tennessee residents more likely than not have engaged with the website, by, *inter alia*, downloading infringing software. The record reflects that Broadcom has "something more than 'random, fortuitous, or attenuated contacts" with Tennessee. *See Neogen*, 282 F.3d at 892 (citation omitted). The website is also more interactive than that in *Cadle* and commercial in nature, even if products cannot be purchased directly on the website.

Courts gauge the interactivity of a website based on a "sliding scale," with passive websites that merely post information on one side, and interactive websites where the defendant establishes repeated online contacts with residents of the forum state on the other. *Cadle*, 123 F. App'x at 677-

78 (citing *Zippo*, 952 F. Supp. at 1124). Based on the evidence presented, Broadcom's website appears to be highly interactive. While it passively advertises allegedly infringing products, it also allows potential purchasers to contact sales about products and services, allows potential purchasers to "find a partner" or request information for specific products, including allegedly infringing products, and generates an electronic contact form that contemplates inquiries from Tennessee residents via the website. The website certificates for the homepage and the Customer Service Portal reflect that they are registered to Broadcom, Inc., and Broadcom, Inc., holds itself out as being a "global technology leader" that "designs, develops and supplies a broad range of semiconductor and infrastructure software solutions." [Doc. 154-4 at 3] (emphasis added). Through the website, Broadcom, Inc. purports to actively supply products and features new products. The website offers user guides, installation guides, and technical documents pertaining to allegedly infringing products. [Doc. 154-18 at ¶ 17; Doc. 157 at ¶ 17]. ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████ [Doc. 157 at ¶ 19]. On the Customer Support Portal, users can create an account and receive tech support, including for Brocade products, chat with a virtual agent, and download software. [Doc. 154-21; Doc. 154-24; Doc. 154-36].

The United States District Court for the Eastern District of Texas reached a similar conclusion regarding the website of Broadcom Ltd., Broadcom's predecessor company. [*See* Doc. 156 at 4]; *Godo Kaisha IP Bridge 1 v. Broadcom Limited*, Case No. 2:16-cv-0134, 2017 WL 970383 (E.D. Tex. Mach 1, 2017). The court looked at substantially similar language on the website, indicating that Broadcom Ltd. was a "global semiconductor leader" that "deliver[s] . . .

27

products" to "its customers." *Id.* at *5. The Broadcom Ltd. website had an interactive map that allowed customers to find out where to buy Broadcom products and a client support portal with information about accused products. *Id.* at *6. That Broadcom Ltd. held the copyright for the website's content showed that Broadcom Ltd. participated in the dissemination of information through the website. *Id.* On balance, the court found that Broadcom Ltd. supported a highly interactive website and thus "effectively maintained a web presence in a manner in which there is no meaningful way for a customer to determine if Defendants are truly separate and apart from their domestic subsidiaries (partly because they identified and advertised themselves interchangeably or as related entities on their websites) thereby making the exercise of specific personal jurisdiction over them fair and reasonable." *Godo Kaisha*, 2017 WL 970383 at *7.

These considerations support personal jurisdiction here. As in *Godo Kaisha*, regardless of whether Broadcom directly sells or licenses the infringing products, through its website, it directly and actively participates in the dissemination of information about the allegedly infringing products, provides virtual support for Brocade products, and allows a potential purchaser to contact Broadcom Sales – America about buying allegedly infringing products. And unlike the website in *Premium Balloon Accessories*, the Broadcom website does not merely allow users to view products and download an order form, but to submit it. Whatever entity ultimately consummates the sales, Plaintiffs identify "overt actions connecting the defendant with the forum state." *Bridgeport Music*, 327 F.3d at 478-79.

The Court need not determine whether Broadcom's website is independently sufficient to support specific personal jurisdiction, because multiple other factors also weigh in favor of jurisdiction. First, there is some evidence that Broadcom intended to form a long-term relationship with Tennessee through its ongoing business relationship with Plaintiffs. As touched on earlier, in

28

a September 13, 2017, letter to Plaintiffs, Brocade and Extreme requested an assignment of rights under the License Agreement. [Doc. 154 at 5]. In that letter, Broadcom's predecessor was identified as one party to whom notices should be sent. ███████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████ [*Id.*].[12] While attempting to settle potential litigation may be insufficient to establish personal jurisdiction, this effort was more than that – it contemplated a new or assigned contractual relationship. [*See id.*].

This involvement is significant because Broadcom reached out to Tennessee residents, namely Plaintiffs, in the course of negotiations and the result would have been a contract between, at minimum, Broadcom subsidiaries and Plaintiffs. ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Dr. Case avers that during his communications regarding the potential assignment, "people on the other side repeatedly referred to themselves as being with Broadcom generally or Broadcom, Inc., specifically, and always acted as if they had the ability to negotiate on behalf of and bind Brocade." [Doc. 48-1 at ¶ 27. As an example, Dr. Case provides an email from Martin Skagen with a signature line that reads "Martin Skagen, VP Architecture & Technology, BSN, Broadcom Inc." [Doc. 48-9 at 2]. ████████████████████

---

[12] While not relevant to this analysis, Broadcom's involvement in the transaction between Extreme and Brocade seriously undercuts the significance of Broadcom's refrain that it acquired Brocade only after its divestiture to Extreme. [*See* Doc. 160 at 4].

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ [Doc. 154-90 at ¶ 5]. While entering a contract

is not enough, standing alone, to establish minimum contacts, a party that deliberately sets in

motion an ongoing relationship with residents of the forum state "should have reasonably foreseen

that doing so would have consequences." *See CompuServe*, 89 F.3d at 1265.

Similarly, Broadcom's ownership of Brocade and involvement in Brocade's affairs weighs

in favor of finding personal jurisdiction, albeit slightly. While Plaintiffs did not make alter ego

arguments in their response to the motions to dismiss, they have consistently urged that Broadcom

is more than an uninvolved parent company of Brocade. Broadcom disputes this characterization,

showing that Brocade operates as a separate entity from Broadcom. [Doc. 156 at 4]. This may be

so, but Plaintiffs also show that when Broadcom acquired Brocade, it dismissed Brocade's senior

officers and directors and replaced them with Broadcom, Inc.'s senior officers. [Doc. 154 at 7]. In

addition to Broadcom's role in the negotiations between Extreme, Brocade, and Plaintiffs,

Plaintiffs allege that Broadcom traded Brocade's rights under its sales contract with Extreme in

favor of rights for other Broadcom subsidiaries. [Doc. 154 at 8]. Plaintiffs also show that at least

in some contexts, Broadcom refers to Brocade as a "division" of Broadcom. [Doc. 154-35]

(instructing users to "click Brocade products to access the Brocade Business Division Support

Portal" and explaining that Broadcom has a unified landing page to access support "across its

multiple business divisions").

In *Third National v. WEDGE Grp.*, 882 F.2d 1087 (6th Cir. 1989), defendant WEDGE was

the 100% owner of TRC, a company that conducted business in Tennessee. *Id.* at 1090. WEDGE's

officers served as TRC's directors, who held meetings in Tennessee. *Id.* In combination with other factors,[13] the Sixth Circuit considered this relationship in finding that WEDGE purposefully availed itself of acting and causing consequences in Tennessee. *Id.* Standing alone, Brocade's contacts with Tennessee are not enough to support specific personal jurisdiction over its parent company. Yet "ownership of a subsidiary that conducts business in the forum state is one factor which weighs in favor of sufficient minimum contacts." *Niemi v. NHK Spring Co.*, 276 F. Supp. 2d 717, 721 (E.D. Mich. 2003). Because Plaintiff did not raise an alter ego argument in its initial response to the motion to dismiss, the Court declines to make a finding on that issue. Nonetheless, Brocade's contacts with Tennessee, Broadcom's involvement in those same contacts, and Broadcom's 100% ownership of Brocade provide additional support for a finding of specific personal jurisdiction.

Finally, as the Court previously explained, Broadcom's allegedly tortious conduct was directed at Tennessee residents and would undoubtedly be felt by Plaintiffs in Tennessee. These allegations enhance Broadcom's other contacts with Tennessee. *See Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552 (6th Cir. 2007) ("[T]he existence of intentional tortious conduct nonetheless 'enhances' a party's other contacts with the forum state for purposes of the purposeful availment analysis."). Accordingly, the Court finds by a preponderance of the evidence that Broadcom purposefully availed itself of the privilege of acting or causing a consequence in Tennessee.

### 2. "Arising From" Requirement

To satisfy the "arising from" prong of the *Mohasco* test, "the plaintiff must demonstrate a

---

[13] Specifically, the Court noted that WEDGE was party to a tax sharing agreement with TRC and its subsidiaries, that WEDGE officers participated in negotiations between TRC and plaintiff and deposited funds related to that agreement, and entered into another agreement between plaintiff and TRC that was executed in Tennessee. *Third National*, 882 F.2d at 1090.

causal nexus between the defendant's contacts with the forum state and the plaintiff's alleged cause of action." *Beydoun v. Wataniya Restaurants Holding, Q.S.C.*, 768 F.3d 499 (6th Cir. 2014). "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]." *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723-24 (6th Cir. 2000) (quoting *Mohasco*, 401 F.2d at 384, n.29). This factor "does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, it requires only 'that the cause of action, of whatever type, have a substantial connection with the defendant's in-state activities.'" *Bird v. Parsons*, 289 F.3d 865, 875 (6th Cir. 2002) (quoting *Third Nat'l Bank in Nashville v. WEDGE Grp., Inc.*, 882 F.2d 1087, 1091 (6th Cir. 1989)).

Broadcom argues that Plaintiffs' allegations are insufficient to establish personal jurisdiction because Broadcom's alleged sale, marketing, or licensing of products containing the copyrighted software is not the basis of Plaintiffs' claims. It also points out that certain of its contacts with Tennessee are not related to the instant dispute, *e.g.*, the other contract it allegedly entered into with Plaintiffs.

The Court agrees that Broadcom's other contract with Plaintiffs provides little, if any, support for a finding of personal jurisdiction. However, Plaintiffs' causes of action against Broadcom arise out its other contacts with Tennessee. Plaintiffs claim that after termination of its rights, Brocade continued to reproduce, prepare derivative works based upon, and publicly distribute Plaintiffs' copyrighted software as if Brocade had license rights. [Doc. 3-1 at ¶ 13]. They allege Broadcom profits from that reproduction and distribution and acts as Brocade's practical partner. [*Id.* at ¶¶ 15, 65, 79]. These contentions are substantially connected to Broadcom's

Case 3:20-cv-00451-CEA-DCP   Document 204   Filed 09/26/22   Page 32 of 46   PageID #: 10875

contacts with Tennessee residents through its highly interactive website, which features allegedly infringing products.

Plaintiffs also allege that Broadcom worked with Brocade to effectuate the unauthorized reproduction and distribution of Plaintiffs' copyrighted software to Extreme. [*Id.* at ¶ 41]. While Broadcom repeatedly argues that it acquired Brocade only after Brocade's divestiture to Extreme, Plaintiffs allege these transactions were "part of or proximate" to one another. [*Id.* at ¶ 43]. They allege that Extreme acquired Brocade's data center switching, routing, and analytics business for $55 million in cash and additional performance-based payments to Broadcom. [*Id.*]. Broadcom was also involved in negotiations regarding the License Agreement, █████████████

████████████████████████████████████████████████████

███████████ [Doc. 154-90 at ¶ 4]. Broadcom (or those representing themselves as Broadcom employees) negotiated with Tennessee residents regarding this new contractual relationship, ██████

████████████████████████████████████████████████████████

████ [Doc. 157-29]. Broadcom's actions suggest an intent to form a new and/or ongoing relationship with Tennessee residents, at minimum on behalf of its subsidiaries. This dispute is at the heart of this litigation.

Finally, Broadcom allegedly directed tortious conduct into Tennessee and this action arises out of that alleged conduct. The Court finds that Plaintiffs' claims against Broadcom arise from Broadcom's contacts with Tennessee.

### 3. Fair and Reasonable Assertion of Personal Jurisdiction

The third criterion for determining specific personal jurisdiction is whether the acts of the defendant or consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable. *Mohasco*, 401 F.2d

33

at 381. If the first two requirements for specific personal jurisdiction are met, an inference arises that this third factor is also present. *Bird*, 289 F.2d at 875. Factors to consider include the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies. *Id.* The subject software was developed in Tennessee, the copyright registrations at issue are held by Tennessee companies, and the harm from alleged infringement will be felt by these companies. Tennessee has a legitimate interest in protecting the business interests of its citizens, even where the claims are asserted under federal law. *Bird*, 289 F.3d at 875. Although Broadcom might face a burden defending this suit in Tennessee, its contacts with Tennessee make this result foreseeable. The first two criteria for specific personal jurisdiction are met, and the record does not reflect any circumstances to overcome the inference that assertion of jurisdiction is fair and reasonable.

Plaintiffs have shown that Broadcom purposefully availed itself of the privilege of acting in Tennessee or causing a in consequence Tennessee, that the causes of action asserted in the Complaint arise out of Broadcom's activities in Tennessee, and that Broadcom's actions and the consequences it allegedly caused have a substantial enough connection with Tennessee to make the exercise of jurisdiction over Broadcom reasonable. Accordingly, the motions to dismiss for lack of jurisdiction under Rule 12(b)(2) are **DENIED**.

## III.    VENUE

Broadcom and Brocade also move to dismiss for improper venue pursuant to Rule 12(b)(3) and 28 U.S.C. §§ 1400(a) and 1406, or in the alternative, to transfer under 28 U.S.C. § 1406 or 1404. [Doc. 40]. Extreme moves to dismiss or transfer pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406, and in the alternative, to transfer pursuant to § 1404(a).

**A. § 1406(a) Motion to Dismiss or Transfer**

Section 1400(a) provides that civil actions arising under any Act of Congress relating to copyrights may be brought "in the district in which the defendant or his agent resides or may be found." 28 U.S.C. § 1400(a). This venue provision has been widely read to mean that a defendant is "found" wherever personal jurisdiction can be properly asserted against it. *Bridgeport Music, Inc. v. Agarita Music, Inc.*, 182 F. Supp. 2d 653, 659 (M.D. Tenn. 2002). Section 1406(a) permits the Court to dismiss, or if it be in the interest of justice, transfer a case which is filed in the wrong district to any district in which it could have been brought. 28 U.S.C. § 1406(a); *Martin v. Stokes*, 623 F.2d 469, 471 (6th Cir. 1980). If venue is improper, a district court can transfer an action under 1406(a), even if it lacks personal jurisdiction over the defendant. *Goldlawr v. Heiman*, 369 U.S. 463, 466-67 (1962).

Defendants argue that the Court does not have personal jurisdiction over Broadcom, making venue improper. [Doc. 40-1 at 13]. They urge the Court to dismiss or transfer this action due to improper venue under Rule 12(b)(3) and 28 U.S.C. §§ 1400(a) and 1406(a). Brocade makes this request despite its execution of an agreement containing a mandatory forum selection clause designating the State and Federal courts in Knox County, Tennessee, as the exclusive venue for disputes arising out of the License Agreement. Meanwhile, Extreme makes no arguments and presents no legal authority for dismissal under Rule 12(b)(3) or § 1406, instead purporting to join in Broadcom and Brocade's Joint Motion and "incorporate by reference" their arguments. [Doc. 39 at 3-4].

Brocade and Extreme do not dispute that they are subject to personal jurisdiction in this District. The only reason they claim venue is improper is the alleged lack of personal jurisdiction as to Broadcom. Because the Court has found that personal jurisdiction exists as to Broadcom, the

motions to dismiss or transfer under Rule 12(b)(3) and 28 U.S.C. §§ 1400(a) and 1406 will be **DENIED**.

### B. § 1404(a) Motion to Transfer

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). For a typical § 1404(a) motion, courts "must evaluate both the convenience of the parties and various public-interest considerations." *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Court for the Western Dist. of Tex.*, 571 U.S. 49, 62 (2013). Factors relating to the parties' private interests include the relative ease of access to sources of proof, availability of compulsory process, the cost of obtaining attendance of willing witnesses, and other practical concerns that make trial "easy, expeditious and inexpensive." *Id.* at 62, n.6 (*quoting Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n. 6 (1981)). Public interest factors include "administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; [and] the interest in having the trial of a diversity case in a forum that is at home with the law." *Id*

The party seeking transfer bears the burden of demonstrating that transfer is warranted. *Mayberry v. Nuclear Fuel Servs., Inc.*, No. 3:13-cv-499, 2013 WL 5560318 (E.D. Tenn. Oct. 7, 2013). "[U]nless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Id.* (quoting *Dowling v. Richardson-Merrell, Inc.*, 727 F.2d 608, 612 (6th Cir. 1984)); *see also West American Ins. Co. v. Potts*, 908 F.2d 974 (6th Cir. 1990) (table) ("A motion for change of venue is properly granted when the balance weighs 'strongly in favor of transfer.'") (quoting *Nicol v. Koscinski*, 188 F.2d 537 (6th Cir. 1951)). As the permissive language of the statute suggests, the Sixth Circuit has recognized that "district courts have 'broad discretion' to determine when party 'convenience' or 'the interest of justice' make a transfer appropriate."

36

*Reese v. CNH America, LLC*, 574 F.3d 315, 320 (6th Cir. 2009). All Defendants seek transfer under § 1404(a) as alternative relief. These motions will be denied.

First, the Court will deny Extreme's motion to transfer under § 1404(a). [Doc. 38]. Extreme shows that this action could have been brought in the Northern District of California, where venue is proper as to all Defendants. [Doc. 39 at 5]. Extreme argues that the allegations in the Complaint focus on a business acquisition and other conduct that took place in California, between California companies. [*Id.* at 6]. Extreme has identified several witnesses who live or appear to live in California and "who may have information and/or documents relevant to the litigation." [Doc. 38-1 at ¶ 6]. Extreme suggests it is highly likely that these witnesses, if called to testify, would be inconvenienced by travelling to Tennessee. Three of these people are not employed by Extreme or Brocade, and if they were unwilling to testify, could not be compelled to appear in this Court.

Extreme argues that the interests of justice and efficiency also favor transfer, but the circumstances it identifies really relate to the private interests of the parties. Extreme repeats that all Defendants and some witnesses are located in California, and any documents and evidence they possess are likely there as well. Keeping this action in Tennessee would require all three Defendants to appear in litigation taking place approximately 2,000 miles away. And Extreme argues that Plaintiffs' preference for this venue is outweighed by the fact that the relevant conduct occurred in California. Finally, they claim there can be little prejudice to Plaintiffs litigating in California as they have retained California counsel. Again, these concerns do not speak to "administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law" or similar public interests. *Atlantic Marine*, 571 U.S. at 62 n.6.

37

Plaintiffs respond that the conduct pertinent to their claims did not just occur in California, as the alleged acts of infringement occurred at least in part in this District. [Doc. 49 at 20-21]. Moreover, the intellectual property at issue in this case was developed and the License Agreement was entered into in the State of Tennessee. According to Plaintiffs, any inconvenience Defendants may experience in litigating in this District will simply be shifted to Plaintiffs if they must litigate in the Northern District of California. Plaintiffs note that while Extreme has identified several witnesses who live in California, it has not pointed to any evidence showing they will be severely inconvenienced or refuse to attend. Nor has Extreme demonstrated or suggested that any of the witnesses have information that is truly significant to the case.

Plaintiffs, meanwhile, identify Dr. Case as a "critical witness," and identify two other witnesses who are expected to provide "important" testimony. [Doc. 51-2 at ¶ 16; Doc. 49 at 21, 23]. Dr. Case owns and runs both SNMP Research and SNMP International. [Doc. 49 at 23]. He actively manages the daily affairs of both Plaintiff companies, regularly meets in person with employees, and is the only employee or officer that is authorized to sign checks and contracts on behalf of the businesses. [Doc. 51-2 at ¶¶ 13-15.]. He avers that a three-week trial in California would substantially negatively impact the businesses, a hardship that would be exacerbated if two other potential witnesses also had to attend trial in California for any significant period of time. [*Id.* at ¶¶ 16-18].

Plaintiffs also argue that the declaration provided by Extreme says nothing about the accessibility of evidence. Meanwhile, SNMP's protected works are kept in this District, including numerous documents in hard copy form, as are the materials reflecting Dr. Case's communications with the Copyright Office. Plaintiffs argue that any cost of obtaining witnesses would be just as expensive for Plaintiffs as for Defendants, noting the financial disparity between Plaintiffs and

38

Defendants. Finally, Plaintiffs argue that Defendants have failed to make any showing that public interest factors favor transfer. Plaintiffs contend there is a local interest in the resolution of this dispute in Tennessee, because potentially tortious conduct was directed at a forum resident.

Extreme has not shown that the relevant public and private interest factors weigh strongly in favor of transfer. Both parties identify multiple witnesses that are likely to be inconvenienced by travelling to a distant forum. And "[a] transfer of venue under 28 U.S.C. § 1404(a) must render the litigation more convenient as a whole; it cannot merely shift inconvenience between the parties." *McKee Foods Kingman v. Kellogg Co.*, 474 F. Supp. 2d 934, 936 (E.D. Tenn. 2006); *Van Dusen v. Barrack*, 376 U.S. 612, 645-46 (1964) ("Section 1404(a) provides for transfer to a more convenient forum, not to a forum likely to prove equally convenient or inconvenient."). Extreme also has not alleged or shown that any witnesses would be unwilling to testify, so the availability of compulsory process is less significant. *See Duha v. Agrium, Inc.*, 448 F.3d 867, 877 (6th Cir. 2006) ("[A]lthough the availability of compulsory process is properly considered when witnesses are unwilling, it is less weighty when it has not been alleged or shown that any witness would be unwilling to testify.").

Extreme shows that these witnesses "may have information and/or documents relevant to the litigation of this matter." [Doc. 39-1 at ¶ 6]. That is the extent of Extreme's showing on the location or accessibility of evidence.[14] In its reply brief, Extreme says that "it is clear that far more evidence" is located in California than Tennessee, but offers no evidence to support this claim. [Doc. 55 at 7]. Through the Declaration of Dr. Case, Plaintiffs show that the subject software and

---

[14] Indeed, Extreme's reply brief claims that in "prior submissions" it showed how litigating in this District would be inconvenient for them, "particularly in light of the likely evidence being overwhelmingly located far from this forum." [Doc. 55 at 8]. The Court cannot locate anything in Extreme's citations that addresses the location of evidence. The cited record states, *inter alia*, the location of the Defendants' headquarters and potential witnesses.

all related documents, including some hard copy documents, are located at Plaintiffs' offices in Knox County, Tennessee. [Doc. 51-2 at ¶ 12].

Extreme makes little, if any, showing that public interest factors favor transfer, instead reiterating its arguments about the convenience of the parties and witnesses. Extreme does not argue, for example, that the Northern District of California has a local interest in resolving the dispute or that its courts are less congested. It does point to California as the location of most of the alleged conduct. Relying on *Maberry v. Nuclear Fuel Servs., Inc.*, Extreme argues that since the relevant conduct took place in California, Plaintiffs' choice of forum should be given less deference. No. 3:13-cv-499, 2013 WL 5560318 (E.D. Tenn. Oct. 7, 2013). But in *Maberry*, the Court noted that three factors can make a plaintiff's choice of forum less important: (i) when the case has been removed to federal court, (ii) when the conduct complained of occurred elsewhere, and (iii) when the plaintiff does not reside in the chosen forum. *Id.* at *4. All three of those factors were at play in *Maberry*, while only one is even arguably present here.

Based on Plaintiffs' allegations, the infringing conduct took place at least in part in Tennessee, not solely in California. [Doc. 3-1 at ¶ 27].[15] Moreover, the software at issue was developed in Tennessee by Tennessee companies, and licensed pursuant to agreements executed in Tennessee, which designated Knox County, Tennessee, as the forum for disputes.[16] To the extent Extreme argues that the location of the relevant conduct favors transfer to the Northern District of California, the Court disagrees. Taken together, the factors Extreme identifies do not weigh heavily in favor of transfer, so Plaintiffs' choice of forum will not be disturbed. Having

---

[15] "On information and belief, Extreme is also actively marketing, selling, offering to sell, licensing, and/or offering to license hardware, software, and/or services directly or indirectly through its distribution channels to business consumers in this District, including, without limitation, products containing the software at issue in this case." [Doc. 3-1 at ¶ 27].

[16] This is not to say that Extreme is bound by the License Agreement. Only that the dispute as a whole has a clear connection to Knox County, Tennessee.

failed to carry its burden as the moving party, Extreme's motion for transfer under § 1404(a) will therefore be **DENIED**.

The Court will also deny Broadcom and Brocade's motion to transfer venue [Doc. 40] under § 1404(a). Again, Section 1404(a) allows a court, "for the convenience of parties and witnesses, in the interest of justice," to transfer the action to a more convenient forum. But when parties agree to a forum selection clause, "they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of litigation." *Atlantic Marine*, 571 U.S. at 64. Accordingly, "a district court may consider arguments about public-interest factors only." *Id.*

Broadcom and Brocade scarcely argue for transfer under § 1404(a). They state only that "Broadcom and Brocade both reside in the Northern District of California as do relevant witnesses who are employees and former employees of Brocade," and cite (without discussion) the Declaration of John Rondoni. [Doc. 40-1 at 15]. In their reply brief, Brocade and Broadcom contend they would be "significantly inconvenienced if [their] executives and employees had to participate in a three-week trial 2,000 miles away from their homes and workplaces." [Doc. 56 at 20]. The Joint Motion presents no legal authority or other argument relevant to § 1404(a), purporting instead to "incorporate by reference" Extreme's arguments in support of its motion to transfer. [*Id.*]. But "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

As to Broadcom, Extreme's arguments are largely inapplicable, relating instead to employees and former employees of Extreme and Brocade. [*See* Doc. 39 at 7]. The Declaration of John Rondoni is the only evidence cited to support transfer under § 1404(a) in the Joint Motion

41

and it contains no averments at all regarding Broadcom. The Declaration of Mark Brazeal, Chief Legal Officer at Broadcom, Inc., does not speak to the convenience or location of witnesses or the accessibility of evidence. [Doc. 40-2].

As to Brocade, it has also waived the right to challenge this forum as inconvenient for itself or its witnesses by agreeing to litigate all disputes arising out of the License Agreement in the State and Federal courts of Knox County, Tennessee. Brocade has not challenged the validity or enforceability of this forum selection clause. This means that the Court can only consider public interest factors in evaluating Brocade's motion. *See Atlantic Marine*, 571 U.S. at 64 ("A court must deem the private-interest factors to weigh entirely in favor of the preselected forum."). But Extreme's motion, on which Brocade relies, does not address public interest factors, focusing on the convenience of the parties, the location of witnesses and evidence, and the availability of compulsory process. To the extent there is a local interest in resolving this dispute, that factor weighs at least slightly towards this forum.

Even if the Court could consider the convenience of the parties and witnesses, Brocade's supporting declaration is inadequate. The Declaration of John Rondoni only recites the location of Brocade and identifies three employees with "relevant" information. [Doc. 40-4 at ¶¶ 2-3]. Rondoni avers it would be "far more convenient for Brocade" to litigate in California. [*Id.* at ¶ 3]. But this is not the test and does not come close to showing that relevant factors weigh heavily towards transfer. Having waived the right to challenge this forum as inconvenient for itself or witnesses and raising no other argument in support of transfer, Brocade has not met its burden of demonstrating that the relevant factors weigh strongly towards transfer. Accordingly, Broadcom and Brocade's motion for transfer under § 1404(a) will be **DENIED**.

42

## IV.    RULE 12(B)(6) MOTION TO DISMISS

Having resolved the preliminary issues in this case – whether Broadcom is subject to personal jurisdiction in this District and where this action will proceed – the Court will order the parties to mediation, as explained below. The Joint Motion to Dismiss [Doc. 40] for failure to state a claim filed by Broadcom and Brocade and Extreme's Motion to Dismiss [Doc. 38] for failure to state a claim will be **DENIED WITHOUT PREJUDICE** to refiling following the completion of mediation.

## V.    MOTION TO COMPEL MEDIATION

On July 27, 2022, Extreme filed a Motion to Compel Mediation [Doc. 164], contemplating mediation between itself and Plaintiffs. Plaintiffs oppose mediation. [Doc. 195]. For reasons that follow, the Court will not only **GRANT** Extreme's Motion to Compel Mediation [Doc. 164], but also **ORDER** all parties to private mediation.

Following the reassignment of this case to the undersigned District Judge, the Court undertook an extensive review of the record, the parties' briefing, and relevant legal authority. Based on the allegations of the Complaint, the Court was initially unable to determine whether personal jurisdiction existed as to Broadcom and ordered the parties to file limited evidentiary supplements.

In its Order [Doc. 147], the Court required (i) Plaintiffs and (ii) Broadcom and Brocade to file a single evidentiary supplement, consisting of a statement of facts relevant to the isolated issue of Broadcom's marketing, selling, and licensing activities in Tennessee. The Court specifically advised the parties to "confine their supplemental materials to the narrow evidentiary issue identified in this Order" and "strongly encouraged" the parties to narrowly tailor any new evidence submitted to avoid unnecessary expansion of the record. [*Id.*]. The Order further put the parties on

43

notice that any submission that did not comply with the Order was subject to being stricken and disregarded. [*Id.*].

On July 22, 2022, Plaintiff filed a Supplement [Doc. 154] and approximately 221 exhibits. The electronically-filed exhibits alone total over 1,500 pages, in addition to the manual filing. [*See* Doc. 159]. Broadcom and Brocade filed approximately 27 documents, totaling over 600 pages. [Doc. 170]. Though the Court's Order required the supplement to "consist of a statement of facts" that the parties contend are relevant to specific issues, Broadcom and Brocade used the supplement to discuss discovery disputes at some length. [Doc. 156 at 5-7]. Broadcom and Brocade likewise submit a declaration of counsel that relates entirely to discovery, opining that Plaintiffs' requests have been "extremely burdensome" and that Plaintiffs have, by comparison, produced very few documents "and very little of substance." [Doc. 156 at 1]. This is wholly beyond the scope of the Court's Order.

Moreover, despite certifying that they have met and conferred regarding every discovery dispute, the parties have collectively filed eight motions to compel [Docs. 60, 69, 70, 88, 96, 115, 136 & 151], necessitating multiple hearings before Magistrate Judge Poplin. On at least one occasion, Judge Poplin has admonished Broadcom and Brocade for disregarding the Federal Rules of Civil Procedure. [Doc. 131 at 24]. The parties' briefing on the discovery-related motions reflects many *ad hominem* attacks and efforts to paint the opposing party/parties in an unflattering light. Now, despite the Court's clear instruction to file "limited evidentiary supplements," Broadcom, Brocade, and Plaintiffs have each ignored the spirit and letter of the Order by addressing irrelevant issues and/or massively expanding the record on the motions to dismiss.[17]

---

[17] Extreme, of course, was not ordered to file a supplement and is not included in this observation. It has actively sought mediation, however.

The Federal Rules of Civil Procedure require the court (and the parties) to employ those Rules "to secure the just, speedy, and **inexpensive** determination of every action and proceeding." Fed. R. Civ. P. 1. (emphasis added). And "trial courts have inherent power to control their dockets." *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 516 (6th Cir. 2003).[18] The parties' voluminous filings, laxity regarding orders of the Court, and seeming inability to resolve disputes cooperatively have unnecessarily taxed the finite resources of the Court. While zealous representation of one's client is the duty of every litigator, the record suggests that the parties are unable or unwilling to work cooperatively to reach a resolution of even routine issues in this case without the intervention of the Court. Moreover, Extreme has moved for mediation. The Court finds that a neutral, third-party mediator will provide the parties with an opportunity to meaningfully negotiate their disputes in a more cooperatively-focused forum, without the specter of additional motion practice. By separate order, the parties will be required to promptly submit their dispute to private mediation.

## VI. CONCLUSION

Accordingly, the Joint Motion to Dismiss Plaintiffs' Complaint or, Alternatively, Transfer Venue [Doc. 40] filed by Broadcom, Inc., and Brocade Communication Systems, LLC, is **DENIED**, excepting the motion to dismiss for failure to state a claim under Rule 12(b)(6), which is **DENIED WITHOUT PREJUDICE**.

Likewise, the Motion to Dismiss or, in the Alternative, To Transfer to the Northern District of California [Doc. 38] filed by Extreme Networks, Inc., is **DENIED**, excepting the motion to

---

[18] As the Supreme Court has recognized, "[e]very paper filed with the Clerk of this Court, no matter how repetitious or frivolous, requires some portion of the institution's limited resources. A part of the Court's responsibility is to see that these resources are allocated in a way that promotes the interests of justice." *In re McDonald*, 489 U.S. 180, 184 (1989).

45

dismiss for failure to state a claim under Rule 12(b)(6), which is **DENIED WITHOUT PREJUDICE**.

Extreme's Motion to Compel Mediation [Doc. 164] is **GRANTED** and all parties to this dispute are **ORDERED** to mediation. A separate order detailing mediation requirements will follow.

**SO ORDERED**.

*/s/ Charles E. Atchley, Jr.*
CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE