# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § | Case No. 3:20-cv-00451 |
| Plaintiffs, | § § | |
| v. | § § | <u>Jury Demand</u> |
| BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; AND EXTREME NETWORKS, INC. | § § § § | |
| Defendants. | § § § | |

**PLAINTIFF SNMP RESEARCH, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO ENFORCE ORDER COMPELLING DISCOVERY, COMPEL DISCOVERY, DETERMINE THE SUFFICIENCY OF REQUESTS FOR ADMISSION RESPONSES, AND FOR SANCTIONS AS TO DEFENDANT EXTREME NETWORKS, INC.**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ........................................................................................................... 1

II.    FACTS ........................................................................................................................... 1

    A.     Extreme's Defiance Of The Order Directing Extreme To Identify All
         Of Its Products That Contain Plaintiffs' Software ................................................ 1

         1.     Extreme's Pre-Suit Representations About Its Product Sales
                Under A License With SNMP Research International ............................ 2

         2.     Extreme's Defiance Of The Order And Invocation Of Purported
                "License" Rights That Flatly Contradict Its Pre-Suit
                Representations ..................................................................................... 3

    B.     Extreme's Additional Violations Of The Order .................................................... 7

III.   ARGUMENT ................................................................................................................. 8

    A.     Extreme's Refusal To Identify All Of Its Products Containing SNMP
         Research Software Violates The Order And Should Be Met With
         Sanctions ............................................................................................................. 8

    B.     Extreme Refuses To Produce All Requested Financials Even For The
         Products Already Identified In The Complaint .................................................. 12

    C.     Extreme Still Refuses To Identify The Broadcom Entities Involved In
         The Data Center Transaction ............................................................................. 16

    D.     Extreme Should Be Ordered To Immediately Produce All Responsive
         Emails From Paul Segalini As Well As Information Related To
         Extreme's Document Preservation .................................................................... 17

    E.     Extreme Continues To Improperly Qualify Its RFA Responses And
         They Should Therefore Be Deemed Admitted .................................................. 19

         1.     RFAs 1-20, 21-23, 34-37 (failure to respond in full) ............................ 19

         2.     RFAs 21-23 (continued improper objection to plain terms) .................. 21

    F.     Extreme Should Be Ordered To Respond To Discovery Requests
         Concerning Additional Product-Related Information And Extreme's
         Licensing Defense ............................................................................................. 22

IV.    CONCLUSION ............................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aprile Horse Transp., Inc. v. Prestige Delivery Sys., Inc.*,
No. 5:13-CV-15-GNS-LLK, 2015 WL 4068457 (W.D. Ky. July 2, 2015)............................20

*Asea, Inc. v. S. Pac. Transp. Co.*,
669 F.2d 1242 (9th Cir. 1981) ...............................................................................20

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,
585 F.3d 267 (6th Cir. 2009) ...................................................................................9

*Bridgestone Americas, Inc. v. Int'l Bus. Machines Corp.*,
No. 3:13-CV-1196, 2016 WL 11786195 (M.D. Tenn. Oct. 31, 2016), *aff'd*,
No. 3:13-CV-1196, 2017 WL 1021291 (M.D. Tenn. Mar. 16, 2017) ....................................12

*Brown v. Tellermate Holdings Ltd.*,
No. 2:11-CV-1122, 2014 WL 2987051 (S.D. Ohio July 1, 2014), *adopted as
modified*, No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015) ......................18

*Brown v. Tellermate Holdings Ltd.*,
No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015) ....................................12

*Carpenter v. City of Flint*,
723 F.3d 700 (6th Cir. 2013) .................................................................................12

*Design Basics LLC v. Best Built Inc.*,
No. 14-CV-597, 2016 WL 1060253 (E.D. Wis. Mar. 15, 2016) ..............................................9

*In re Grand Jury Proc.-Gordon*,
722 F.2d 303 (6th Cir. 1983) .................................................................................10

*In re Meggitt*,
No. 17-30029, 2018 WL 1121585 (Bankr. N.D. Ohio Feb. 27, 2018)...................................20

*Neale v. Coloplast Corp.*,
No. 1:18-cv-00274, 2020 WL 6948361 (E.D. Tenn. Nov. 2, 2020)......................................11

*In re Norris*,
No. 11-61150, 2012 WL 1565602 (Bankr. N.D. Ohio May 2, 2012)....................................22

*Taylor v. Medtronics, Inc.*,
861 F.2d 980 (6th Cir. 1988) .................................................................................12

*Vanderbilt Univ. v. Scholastic, Inc.*,
No. 3:18-CV-00046, 2019 WL 9904449 (M.D. Tenn. Nov. 27, 2019)...................................15

*Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*,
    774 F.3d 1065 (6th Cir. 2014) ...................................................................................21

**Statutes**

17 U.S.C. ¶ 504(b) .................................................................................................12

**Rules**

Fed. R. Civ. P. 26(f) ..............................................................................................11

Fed. R. Civ. P. 33(d) ..............................................................................................16

Fed. R. Civ. P. 36 ........................................................................................20, 22, 23

Fed. R. Civ. P. 37 ........................................................................................12, 20, 22

Plaintiff SNMP Research, Inc. ("Plaintiff" or "SNMP Research") respectfully submits this Memorandum of Law in support of its Motion to Enforce the Court's Order Compelling Discovery, Compel Discovery, Determine The Sufficiency of Requests For Admission Responses, and For Sanctions ("Motion" or "Mot.") as to Defendant Extreme Networks, Inc. ("Defendant" or "Extreme").

## I.    INTRODUCTION

On April 22, 2022, the Court ordered Extreme to "fully and substantively respond" to Plaintiff's discovery requests by May 13, 2022. Dkt. 131 (herein, "Order"). Among other things, Extreme was ordered to identify <u>all</u> Extreme products containing Plaintiffs' software, and to provide revenue/cost and other information critical to determining the full scope of infringement.[1] Extreme has failed to comply with this and other central aspects of the Order which necessitated this Motion.

For the convenience of the Court, Plaintiff's accompanying Motion contains a chart identifying each category of discovery failure and the relief sought for each. Plaintiff has attempted in good faith to meet and confer with Extreme on the issues raised in this Motion.

## II.    FACTS

### A.    Extreme's Defiance Of The Order Directing Extreme To Identify <u>All</u> Of Its Products That Contain Plaintiffs' Software

As explained in more detail below, despite this Court's Order that Extreme identify all of its products that contain Plaintiffs' software and produce financial and other information for those products, Extreme has failed to do so. Instead, Extreme claims it can withhold the identity of products that contain Plaintiffs' software because Extreme contends it has a "license" to use that software. Extreme's position is in direct defiance of the Order, which has no exception for products that Extreme claims it has a license right to.

---

[1] As used herein, the term "Plaintiffs" refers to SNMP Research and its co-Plaintiff, SNMP Research International, Inc.

### 1. Extreme's Pre-Suit Representations About Its Product Sales Under A License With SNMP Research International

As the Court is aware, in 2017 Broadcom acquired a portion of Brocade's business and divested another portion of that business, the Data Center business, to Extreme. Dkt. 3-1 (herein, "Cmplt."). In turn, Brocade disclosed Plaintiffs' source code to Extreme without permission. Cmplt. ¶¶ 44-64. After gaining Plaintiffs' source code from Brocade, Extreme then used Plaintiffs' software in numerous Extreme products without consent and sold those products to Extreme's customers (which constitutes copyright infringement). *Id.* ¶¶ 47-50, 85-93.

Prior to filing this suit, Plaintiffs and Extreme engaged in licensing discussions wherein Plaintiffs sought to understand exactly how Extreme was using Plaintiffs' software and whether that use was authorized. That is because, when Plaintiffs license their software, they only do so on strict terms governing the scope of use of the software, including (but not limited to) imposing limitations on which products are covered by any given license. On February 27, 2020, Extreme stated to Plaintiffs that "[a]s a bit of background, Extreme had an annual license for a version of [Plaintiffs'] software," Declaration of Olivia Weber ("Weber Decl.") & Ex. A at 6.[2] The "annual license" that Extreme referenced was a December 8, 1999 license agreement entered into between Plaintiff SNMP Research International, Inc. (herein, "SNMP Research International") and a company called Enterasys Networks, Inc. that Extreme had previously acquired (herein, the "Enterasys License").[3] *See* Dkt. 51-3 (Enterasys License). (After Extreme acquired Enterasys, Extreme and SNMP Research International entered into an amendment substituting Extreme in place of Enterasys with respect to the Enterasys License. *See Id.* at Amendment 9.)

During the discussions preceding this lawsuit, Plaintiffs noted to Extreme that Extreme had not

---

[2] All exhibits are to the Weber Decl. filed concurrently with this memorandum.

[3] This agreement concerned a limited license for specific uses of particular portions of the copyrighted software alleged in Table 1 of the Complaint.

reported and paid any royalties under the Enterasys License for many years. Plaintiffs requested

Extreme to confirm that it was not shipping <u>any</u> products under the Enterasys License. Ex. A at 4. On

June 11, 2020, Extreme's contracts manager, Paul Segalini, represented to Plaintiffs that "[w]e can

confirm that the legacy Enter[a]sys products went End of Sale in July 2006 and then End of Support in

July 2011," and he provided a list of seven products that Extreme reportedly stopped selling on July 1,

2006. Ex. A at 2. In an attachment to that same email, Extreme separately identified several dozen

products that it had obtained from Brocade—which contained Plaintiffs' software—and that it was

continuing to sell without a license. *Id.* In other words, Extreme admitted that it was selling products it

had obtained from Brocade without a license, and denied that it was still selling any products under the

Enterasys License (which covered a product different from the products that Extreme had obtained

from Brocade).

### 2. Extreme's Defiance Of The Order And Invocation Of Purported "License" Rights That Flatly Contradict Its Pre-Suit Representations

In an effort to discover which Extreme products truly contained its copyrighted software,

Plaintiff's discovery requests to Extreme sought identification of <u>all</u> Extreme products containing

"SNMP Research Software," along with associated information about those products such as sales

numbers and product guides.[4] For example, Interrogatory 1 requests Extreme to "Identify all Extreme

Products that contain, use or are otherwise associated with SNMP Research Software either as

manufactured or as a result of a software or firmware installation or update . . . whether in current

distribution or not . . . ." Ex. F at 3. Relatedly, RFP 31 requests Extreme to produce "[a]ll Documents

---

[4] Plaintiff's copyrighted software is referred to as "SNMP Research Software" in the discovery requests, which is defined as follows: "The term 'SNMP Research Software' means any of the following: (i) software provided by SNMP Research to Brocade, (ii) software licensed by SNMP Research to Brocade, or (iii) any software created by SNMP Research which is or was in the possession of Extreme. The foregoing categories include Source Code, compiled code, binary code, configuration files and data, associated documentation, and Derivative Works thereof." Plaintiff's First Set of Interrogatories to Extreme at 2. The Court overruled Extreme's and the other Defendants' objections to this definition. Order at 8-9.

2248531.10

concerning any analysis, discussion, or Communication about whether SNMP Research Software may be contained or used in any Extreme Product under the License Agreement or otherwise." Ex. E at 50. As another example, Interrogatory 6 states that "[w]ith respect to each Product Identified in response to Interrogatory numbers 1 and 2, please Identify the number of Products shipped, revenue and costs Related to each and every such Product, by quarter, from October 1, 2017 to the present, including, but not limited to: (1) any internal bookkeeping or financial analysis of any kind in which Extreme keeps track of the profitability of each Product, and (2) the number of units produced of each such Product." Ex. F at 17. This requested information bears directly upon the scope of Extreme's infringement as well as Plaintiffs' damages.

On April 22, 2022, the Court ordered complete and substantive responses to virtually all of Plaintiff's requests, including its requests seeking identification of all Extreme products containing SNMP Research Software and the revenues/costs and associated product information for those products. The Court also expressly overruled Extreme's objections that Plaintiff was attempting to seek discovery concerning software "outside" the Complaint. Order at 9. The Court held that "Plaintiff's discovery requests relat[ing] to Extreme's products—whether or not they are specifically identified in the Complaint" go to "the heart of Plaintiff's copyright infringement claim." Order at 9; *see also id.* at 7, 11, 13 (ordering Extreme to "fully respond" to, *inter alia*, Interrogatory 1).

Despite the Order requiring Extreme to identify <u>all</u> of its products containing SNMP Research Software in response to Interrogatory 1 and other related requests, Extreme refused to do so. Instead, Extreme limited its supplemental discovery responses to just those products identified in the Complaint (and a few other Brocade-related products). *See, e.g.*, Ex. F ("Extreme's Third Supp. Resp. to Interrogatories") at 2 ("Extreme understands that these discovery requests do not pertain to any separate license agreement between Extreme and SNMP Research International unrelated to Extreme's acquisition of the data center from Brocade and unrelated to the allegations in this case. Extreme's

responses reflect this understanding.").  Thus, while Extreme admitted that there were additional Extreme products that contained SNMP Research Software that Extreme had not identified in its discovery responses as had been ordered, Extreme justified its failure to identify them because it claimed to have a "license" to sell them.  Ex. L at 3.

Plaintiff told Extreme that the Order did not permit Extreme to avoid identifying all products that contain SNMP Research Software just because Extreme unilaterally asserted a "license" defense (or any other defense for that matter).  Plaintiff informed Extreme that if it did not comply with the Order by identifying all Extreme products that contain SNMP Research Software, Plaintiff would involve the Court and seek all appropriate relief, including sanctions.  Ex. M at 3; Ex. O at 4.  But Extreme still has not fully responded to Interrogatory 1, much less provided the other information about the products that this Court ordered be produced by May 13, 2022 (*e.g.*, financial information as to sales/costs/etc.).

Meanwhile, Extreme's vague assertion of a supposed "license" defense kept changing. Extreme first invoked the Enterasys License.  Weber Decl. ¶¶ 10, 12; Ex. L at 3; Ex. N at 3-4.  This assertion bewildered Plaintiff given the very limited scope of the Enterasys License coupled with Extreme's pre-suit representation (discussed above) that it had stopped selling the products subject to the Enterasys License back in July 2006.  *See* Ex. A at 2.  After the parties met and conferred on August 12 and Extreme still had not identified all products that contained SNMP Research Software by the end of August (as promised), SNMP Research International sent a notice of breach of the Enterasys License to Extreme.  Ex. P at 2-3.

The notice of breach referenced two top-selling Extreme product families that Extreme had refused to identify in its discovery responses as containing SNMP Research Software, despite being ordered by the Court to do so.  Given all of the suspicious circumstances, including but not limited to Extreme's suspicious refusal to identify all of its products containing SNMP Research Software despite

the Order directing Extreme to do so, Plaintiff purchased a few Extreme products to investigate. In doing so, for every product for which Plaintiff has fully investigated, Plaintiff learned that those products use SNMP Research Software.[5]

After receiving the notice of breach, Extreme changed its story. It now contended that the Enterasys License was the "wrong" license, even though Extreme invoked that license as its license "defense" in the first place. Ex. P at 4. Extreme now invoked a different license, namely one that Extreme and SNMP Research International had entered into on October 22, 2001 (the "2001 License").[6] *See* Ex. C. In other words, after receiving a notice of breach, Extreme switched its purported "license" defense from the Enterasys License to the 2001 License. *See* Ex. P at 4-5.

However, once again, Extreme's position had no basis in fact. The 2001 License only applied to a single product (something called the "BlackDiamond" 10808 10-Slot Chassis). The top-selling Extreme products that Plaintiffs had recently discovered contained SNMP Research Software are not the BlackDiamond product licensed under the 2001 License. Moreover, Extreme's new story flatly contradicted a 2015 representation that Extreme had made to SNMP Research International that the only product licensed under the 2001 License (namely the BlackDiamond 10808 10 Slot Chassis) had gone "end of sale" in 2011, after which time Extreme never paid a single additional royalty under the license. Ex. D at 1 Consequently, Extreme's new position that it is currently selling products based on the 2001 License flatly contradicts not only the terms of the license itself but also Extreme's own express pre-suit representations. And given that Extreme has paid no royalties under the 2001 License since 2011, Extreme's admission that it was selling product based on source code it had received under

---

[5] To be clear, these products are in addition to the Brocade-related products identified in the Complaint, which also contain particular portions of SNMP Research Software, including Plaintiffs' copyright registration notice.

[6] This license, like the Enterasys License and the SNMP Research International's limited license with Brocade, also concerns specific uses of particular portions of the copyrighted software alleged in Table 1 of the Complaint.

the 2001 License was at the very least an admission of breach because Extreme had not paid royalties under the license since July 2011 and had also exceeded its single-product scope. As a result, on September 19, SNMP Research International served a notice of Breach of the 2001 License. Ex. P at 6-8.

On October 19, Extreme sent a letter regarding the Enterasys License and 2001 License notices of breach. Ex. P at 12-15. In response to SNMP Research International's identification of two top-selling Extreme product families in its notice of breach correspondence, Extreme simply stated that the two product families that were identified run an operating system called EXOS, and then Extreme identified dozens of other so-called "product classes" that run this operating system as well. Notably, Extreme still did not say whether these products contain SNMP Research Software. And even if it had, Extreme still did not confirm whether the list of "product classes" that it provided was a complete list of all products containing SNMP Research Software.

Given Extreme's refusal to fully respond to Interrogatory 1 and identify all products containing SNMP Research Software as the Court ordered, Plaintiffs have had to engage in additional expense by ordering and investigating additional Extreme products. Every Extreme product that Plaintiffs have fully investigated contains SNMP Research Software.

B. **Extreme's Additional Violations Of The Order**

As discussed further below, Extreme (i) continues to assert "vague and ambiguous" objections that the Court already expressly overruled; (ii) refuses to identify the Broadcom entities involved in the sale of SNMP Research Software to Extreme, (iii) improperly qualifies and fails to respond in full to RFAs, (iv) provides incomplete and inconsistent financial information, and (v) refuses to produce information bearing upon the scope of infringement and damages in this case.

## III.    ARGUMENT

### A.    Extreme's Refusal To Identify All Of Its Products Containing SNMP Research Software Violates The Order And Should Be Met With Sanctions

As demonstrated above, the Court ordered Extreme to identify all products containing SNMP Research Software and to answer discovery expressly tethered to the products (Interrogatories 1-3), including but not limited to product information (such as product manuals and guides, RFP 15), and agreements (*i.e.*, Extreme's agreements with third parties concerning the sale of products containing SNMP Research Software, Interrogatory 12). *See* Order at 7, 9, 11, 13 (compelling responses to product-related discovery requests including Interrogatories 3-4, 7-8, 10-12 and RFPs 1, 12, 15, 21, 31, 37-38, 41-42, 68-69). In its supplemental responses, Extreme failed to provide this information for products not identified in the Complaint (other than a few additional Brocade-related products). Extreme has proffered two arguments in support of its position: (1) that the products it is withholding are not "identified" in the Complaint and were not the result of Brocade's breach of its license agreement with SNMP Research International; and (2) that Extreme supposedly has a "license" to sell these products. Both arguments fail.

This Court already rejected Extreme's contention that Plaintiff's discovery is limited to the products identified in the Complaint. Order at 9 ("The Court disagrees that ["SNMP Research Software"] is an overbroad term, as Plaintiff's discovery requests relate to Extreme's products— whether or not they are specifically identified in the Complaint—that Plaintiff alleges are improperly incorporating its software. This goes to the heart of Plaintiff's copyright infringement claim.").

The products expressly identified in the Complaint do not limit Plaintiff's infringement claims to only those products. In fact, the Complaint expressly contemplated that discovery could lead to additional infringing products. Cmplt. ¶ 49. Nor does it matter that the products expressly named in the Complaint 'were tied to the products transferred to Extreme from Brocade. Plaintiff's claim against Extreme is for infringement of the copyrights identified in the Complaint. It does not matter whether

Extreme's copyright infringement is born from misconduct associated with Brocade or with misconduct associated with some other license: all that matters is that Extreme is engaged in copyright infringement. *See, e.g.*, *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 274 (6th Cir. 2009) ("There are two essential questions at the heart of any copyright infringement action: whether the plaintiff owned the copyrighted work and whether the defendant copied it."). As one court has aptly put it, Plaintiff is entitled to ascertain "how deep the rot runs." *Design Basics LLC v. Best Built Inc.*, No. 14-CV-597, 2016 WL 1060253, at *2 (E.D. Wis. Mar. 15, 2016) (compelling production of "a complete set of all house plans" from 2000 to 2016 where defendant had produced only the designs "specifically identified in the complaint" as plaintiff was entitled to explore "how deep the rot runs").

As for Extreme's purported (and ever-morphing) license defense, it has nothing to do with Extreme's obligation to comply with this Court's Order that requires Extreme to identify all of its products that contain SNMP Research Software. Order at 11, 13 (compelling a full response to Interrogatory 1). All means all; it does not exclude some products just because Extreme unilaterally asserts they are subject to a supposed "license" defense. Extreme is free to proffer any defense it wants, but it cannot use its proffered defenses to defy this Court's Order.

Plaintiffs' opening expert reports are due on March 8, 2023. Identification of all of Extreme's products containing SNMP Research Software and associated discovery responses and documents (including the scope of sales of those products) were ordered to be provided by May 13, 2022.[7] The information that Extreme has failed to produce in defiance of the Court's Order is critical to determining the full scope of Extreme's infringement and is thus prejudicing Plaintiffs' ability to prosecute their case. Extreme should therefore be ordered, again, to immediately identify all products containing SNMP Research Software. Moreover, Extreme should be ordered, again, to immediately

---

[7] The Court ordered complete responses by May 13, 2022. Extreme produced documents on that date, and also committed in writing to a substantial completion date by June 12, 2022. *See* Ex. E ("Extreme's Third Supp. Response to Plaintiff's RFPs") at 4.

provide all associated information ordered as to those products—including but not limited to all product and associated service revenues—**from the date of first sale of each product**.[8]

This includes identification of all agreements between Extreme and third parties to which Extreme sold or transferred products containing SNMP Research Software (or sold SNMP Research Software itself) (Interrogatory 12), which Extreme promised to identify by June 13 but still has not identified in its interrogatory responses. *See* Order at 7, 11, 13 (compelling response to Interrogatory 12); Ex. F at 29; Ex. O at 2 . It also includes identification of employees with whom Extreme consulted regarding Extreme's discussions about whether it had a right to use SNMP Research Software, and Extreme's accompanying payment obligations. *See* Order at 7 (compelling response to Interrogatory 15).[9] Extreme vaguely invoked privilege and work product to avoid identifying those individuals and directed Plaintiff to a privilege log. But Extreme's privilege log does not shed light on the identities of these individuals, nor does Extreme's bare invocation of privilege properly shield their identities. *See In re Grand Jury Proc.-Gordon*, 722 F.2d 303, 308 (6th Cir. 1983) (request for "the identity of the representatives of the corporations with whom [a] law firm communicated regarding 'legal matters' involving the corporations" did not seek attorney-client privileged communications and there was "no basis for refusing to respond.").

With respect to source code, the Court did not order Extreme to produce its source code for

---

[8] Plaintiff's discovery for the most part sought information from January 1, 2017 to present because, at the time the discovery was propounded, Extreme had not yet admitted that it has sold products that contain Plaintiff's software beyond the products identified in the Complaint, which were transferred to Extreme in 2017. Now, Extreme has admitted that it has been selling products purportedly under a license dated October 22, 2001, despite the fact that it has not paid royalties for those products and they are beyond the scope of the license (which was limited to a single product). Plaintiffs will be moving to amend the complaint to add a claim for breach of that contract, but regardless of that, Plaintiffs at the very least have a right to know the scope of potential infringement for all such sales and for any other product that contains SNMP Research Software since the date of first sale of any such product.

[9] Interrogatory 15 asks Extreme to identify the persons with whom it consulted to answer the interrogatories on a request-by-request basis. Interrogatory 8 requests Extreme to identify its communications concerning any discussion about whether Extreme had a right to use SNMP Research Software, and its payment obligations for use of that software. This Court ordered full and complete responses to these interrogatories. Order at 7.

products beyond those identified in the Complaint. However, the Court expressly stated that "the parties are directed to meet and confer to discuss any additional source code exchange that must occur. This includes Plaintiff's request for the source code of Extreme's products that contain Plaintiff's software but are not specified in the Complaint." Order at 8. Moreover, as demonstrated above, the Court did order Extreme to identify all products that contain SNMP Research Software and associated financial and other information as to those products. Extreme defied the Order, and in doing so, has held up <u>for months</u> any meaningful ability to meet and confer over the source code issue.

The source code for all Extreme products containing SNMP Research Software is undeniably relevant to the "copying" aspect of Plaintiff's copyright infringement claims against Extreme (*see* Order at 3 (citing *Neale v. Coloplast Corp.*, No. 1:18-cv-00274, 2020 WL 6948361, at *1 (E.D. Tenn. Nov. 2, 2020)). As the parties recognized nearly two years ago in their Rule 26(f) report, source code review is a "time consuming and tedious task of evaluating thousands of lines of computer source code." Dkt. 46 at 4. Plaintiffs need timely access to the full source code for all Extreme products containing SNMP Research Software so that they can prepare opening expert reports by the March 8, 2023 deadline. Consequently, Extreme should be ordered to immediately load all source code for <u>all</u> products that contain (or at any time have contained) SNMP Research Software onto the source code computers so that Plaintiff may begin reviewing that source code.

Finally, to the extent that Extreme's delay—including during the pendency of this Motion—causes further prejudice to Plaintiff, Plaintiff seeks: (i) an extension of Plaintiffs' deadlines under the Scheduling Order sufficient to alleviate the prejudice; and (ii) preclusion of any counter-evidence and counter-argument by Extreme as to its infringement, its purported "costs" associated with its sales, and any apportionment of profits.[10] *See* Fed. R. Civ. Proc. 37(b)(2)(A) (failure to obey an order authorizes

---

[10] Under the copyright remedy statute, in order to disgorge Extreme's profits, Plaintiff's only burden is to prove gross revenues. Extreme then has the burden to prove proper costs and to apportion its profits to factors other than the infringing work. 17 U.S.C. ¶ 504(b).

a court to, *inter alia*, "prohibit[] the disobedient party from supporting or opposing designated claims or defenses"); *Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2015 WL 4742686, at *6-*8 (S.D. Ohio Aug. 11, 2015) (Rule 37(b)(2) sanctions are appropriate where "Defendant [] and its counsel fail[ed] to obey an order to provide or permit discovery," and "in the context of Rule 37, a litigant is prejudiced by an opposing party's 'dilatory conduct if the [litigant] is required to waste time, money, and effort in pursuit of cooperation which [the opposing party] was legally obligated to provide.'") (quoting *Carpenter v. City of Flint*, 723 F.3d 700, 707 (6th Cir. 2013)); *see also Taylor v. Medtronics, Inc.*, 861 F.2d 980, 983 (6th Cir. 1988) (affirming sanctions imposed under Rule 37(b)(2) where the court had explicitly threatened sanctions yet the sanctioned party failed to abide by court-ordered deadline); *Bridgestone Americas, Inc. v. Int'l Bus. Machines Corp.*, No. 3:13-CV-1196, 2016 WL 11786195, at *11-*12 (M.D. Tenn. Oct. 31, 2016) (preclusion sanctions warranted where the sanctioned party did not meet an ordered 45-day compliance deadline), *aff'd*, No. 3:13-CV-1196, 2017 WL 1021291 (M.D. Tenn. Mar. 16, 2017).

### B. Extreme Refuses To Produce All Requested Financials Even For The Products Already Identified In The Complaint

Even for the products listed in the Complaint, Extreme's discovery responses as to financial information requests are deficient.

**Missing Service Revenues.** Interrogatory 9 requests Extreme to identify the revenues of "any other Products or services (including but not limited to installation or other services) that were sold with or as a result of the purchase of the Products Identified in response to Interrogatory numbers 1 and 2," and to delineate these revenues by product or service name. Extreme limited its third supplemental interrogatory response by asserting that it "understands, through meet and confers and representations in [Plaintiff's] briefing" that this interrogatory actually **excludes** services and was limited to "products sold alongside the [alleged] infringing products identified in the Complaint (an example could be a power supply sold as part of a router that contains the infringing software)." Extreme's Third Supp.

Response to Interrogatory 9 (quoting Plaintiff's prior motion to compel, Dkt. 96-1 at 20). Plaintiff did not agree to any such narrowing; Extreme's interrogatory response only quotes part of Plaintiff's prior motion to compel brief, which expressly stated that "Extreme also did not identify which products **or services** might have been sold alongside the infringing products[.]" Dkt. 96-1 (emphasis added).

Interrogatory 9 also very clearly seeks products **and** service revenues sold with or as a result of the purchase of the products identified in response to Interrogatory 1. The Court Ordered a full response to this interrogatory, yet Extreme still has not identified the service revenues associated with its products (delineated by service name) despite the Court's order that Extreme do so.[11]

**Missing And Conflicting Infringing Product Revenues.** Extreme's product revenues during fiscal years 2019-2020 vary from spreadsheet to spreadsheet. As one example, EXTREME-00531084 identifies revenues of approximately ███ for a product named "BR-SLX9850-MM," but for the very same time period and the very same product, EXTREME-00527792 identifies no revenues at all. As another example, for fiscal years 2019-2020, spreadsheet EXTREME-00503993 reports that a product named BR-SLX-9140-48V-AC-F had approximately ███ in revenue. But for the same fiscal years and the same product, EXTREME-00717280—which was belatedly produced to Plaintiffs on August 19—reports approximately ███ in revenue. Similarly, spreadsheet EXTREME-00503993 reports that products named BR-SLX-9540-2C-POD-P and BR-SLX-9540-ADV-LIC-P had approximately ███ in net revenues, but these products are missing entirely from recently-produced EXTREME-00717280.[12] Compounding these problems, which are just examples, and despite the Court's Order, Extreme has not identified contemporaneous revenue reporting—such as

---

[11] Extreme's filings with the Securities Exchange Commission indicate that a substantial portion of the company's revenues are from services (e.g. 31.5%) associated with its products sales. *See, e.g.*, Extreme Networks, Inc., Form 10-K (Aug. 29, 2022), at 33, https://investor.extremenetworks.com/sec-filings/sec-filing/10-k/0001564590-22-030248.

[12] Plaintiff can provide copies of these spreadsheets to the Court upon request.

profit and loss presentations—that would enable Plaintiffs to cross-check and verify the numbers excerpted in the produced spreadsheets. *See, e.g.*, Interrogatory 6 (requesting internal financial analysis tracking the profitability of each product).

Plaintiff provided Extreme with concrete examples of these deficiencies and proposed ways to remedy them. For example, Plaintiff invited Extreme to produce extracts directly from its general ledger of all revenue and cost data on a product-by-product basis, and to produce and identify contemporaneous presentations or reports identifying the full revenues and costs of those same products—which Extreme should have already identified in response to Interrogatory 6. *See* Ex. K at 3-5. Extreme responded that it expected to provide much of the requested information within "two to three weeks," Ex. L at 5-6, but now—over four months later—Extreme still has not identified the information.

**Missing Cost Information**. Notwithstanding the Order to "respond" to the financial requests seeking cost information for each product containing SNMP Research Software (Interrogatories 6 and 9), Extreme's May 13 interrogatory responses did not identify any product-level cost data concerning the products containing SNMP Research Software. Instead, Extreme just provided a summary analysis from a 2021 mediation spreadsheet that provided no source for its cost analysis and no details that would allow Plaintiffs to determine which products were implicated by Extreme's mediation summary. Extreme also identified three other documents in response to Interrogatories 6 and 9, but these documents did not contain any cost information at all, much less costs tethered to the products at issue.

Plaintiff raised these deficiencies in a letter to Extreme. Ex. K at 3-5. In response, Extreme initially represented that its cost data could be found in 23 Bates-numbered documents, however these turned out to be SEC filings containing company-wide cost information—not the product-level cost information that Plaintiff's discovery requested and that the Court ordered. Order at 6-7; Ex. L at 6. When Plaintiff responded that it would seek to preclude late-provided information—including as to

Extreme's purported costs that Extreme might attempt to use to reduce Plaintiffs' right to profits disgorgement, Ex. M at 3—Extreme claimed that there was still a year left to go in discovery (Ex. N at 6), conveniently ignoring the fact that the Court had already ordered Extreme to "fully respond" by May 13, 2022, and that Plaintiffs need time to investigate their damages case and draft expert reports by March 8, 2023, which is only a little over four months away. Extreme belatedly produced some additional cost information in August, but that information also failed to tie costs to products or even families of products.

In light of Extreme's defiance of the Order, Plaintiff requests that the Court order Extreme to immediately produce and identify (1) complete and unedited excerpts from Extreme's general ledger detailing all revenue information for each and every Extreme product containing SNMP Research Software **from the date of first sale to the present**,[13] along with any dictionary or legend required to interpret those excerpts, and (2) contemporaneous financial presentations or reports—such as profit and loss presentations—that delineate Extreme's revenues at a product-level, so that Plaintiffs can cross check the general ledger excerpts with contemporaneously-made internal documents. In addition, Extreme should immediately identify (3) **all** products or services that were sold with or as a result of the purchase of the products containing SNMP Research Software, and delineate these products and services by name. And because Extreme has relied on Rule 33(d) to respond to Interrogatories 5, 6, and 9, Extreme should be ordered to identify all responsive documents by Bates numbers in its

---

[13] As noted *supra*, n.6, the time period in the requests was largely from January 1, 2017 to present in light of Extreme's pre-suit correspondence where Extreme stated that it was using former Brocade products containing SNMP Research Software, which Extreme received sometime in 2017. But now, it is readily apparent that Extreme has been selling products containing Plaintiff's software outside the scope of a license since long before January 1, 2017, so the Court should make clear that all product information (financial and otherwise) should be produced from the date of first sale of each product containing Plaintiff's software, all the way up to the present as Extreme is continuing to infringe and breach. *See, e.g.*, *Vanderbilt Univ. v. Scholastic, Inc.*, No. 3:18-CV-00046, 2019 WL 9904449, at *13 (M.D. Tenn. Nov. 27, 2019) (rejecting time period and burden objections to request for twenty years of documents regarding revenues for alleged products because these documents "would be relevant to [the] breach of contract claim and damages calculation").

responses. All of the above-requested information is responsive to Interrogatories 5, 6, and 9 and should have been identified months ago. Finally, to the extent that Extreme's delay (including during the pendency of this Motion) causes further prejudice, Plaintiff seeks: (i) an extension of Plaintiffs' deadlines under the Scheduling Order sufficient to alleviate the prejudice; and (ii) preclusion of any counter-evidence and counter-argument by Extreme as to its purported "costs" associated with its sales as well as any apportionment Extreme might attempt to offer to reduce Plaintiffs' right to profits disgorgement.

## C. Extreme Still Refuses To Identify The Broadcom Entities Involved In The Data Center Transaction

The Order required Extreme to fully respond to Interrogatory 14, which seeks a description of the Broadcom entities'[14] involvement in the transfer of SNMP Research Software from Brocade/Broadcom to Extreme, including the persons involved and their roles. Order at 10. The Court noted that "Extreme has had ample time to respond, and the fact that Broadcom may hold information related to these requests does not hinder Extreme's ability to respond from its own perspective or remove its obligation to do so." *Id.*

Nevertheless, Extreme's May 13 supplemental response stated that Extreme had no knowledge of any involvement "by Broadcom" in the Data Center sale, including any transfer of SNMP Research Software to Extreme. Extreme's Third Supp. Resp. to Interrogatory 14. When Plaintiff asked how this could possibly be the case (unless Extreme was taking an unduly restrictive view of the entities encompassed by the defined term "Broadcom"), Extreme claimed that "Extreme employees cannot be expected to recall the names of third party internal corporate entities involved in a deal that took place five years ago." Ex. N at 3. But Extreme should be expected to recall (or at least ascertain) the names

---

[14] Plaintiff's discovery requests defined "Broadcom" to include its predecessors and subsidiaries. While the Court temporarily restricted the definition of "Broadcom" and "Brocade" in its Order addressing Broadcom's and Brocade's responses (which it did to "stimulate discovery"), Order at 17, the Court made no such temporary restriction in its Order addressing Extreme's responses.

of the entities with whom it does business. Extreme knows or can readily ascertain which Broadcom entities it dealt with in a multi-million dollar transaction that took place just five years ago. For instance, Extreme's own SEC filings show that multiple Broadcom entities (*i.e.*, Broadcom Corporation and LSI Corporation) were involved in the Data Center sale from the outset. *See* Extreme Networks, Inc., Form 8-K (March 30, 2017), https://investor.extremenetworks.com/sec-filings/sec-filing/8-k/0001193125-17-102344.

During further meet and confers on the issue, Extreme stated that it would "endeavor" to provide by August 19, 2022, a list of Bates numbers showing the role of Broadcom-related entities in the transfer to Extreme, and that it would supplement further, to the extent documents existed, before Labor Day. Ex. O at 2. But Extreme never provided the list nor supplemented its response to Interrogatory 14. The Court should order Extreme (again) to immediately and fully supplement its response to Interrogatory 14.

### D. Extreme Should Be Ordered To Immediately Produce All Responsive Emails From Paul Segalini As Well As Information Related To Extreme's Document Preservation

It has been five months since the May 13, 2022 deadline by which Extreme was ordered to fully respond to Plaintiff's request for all communications concerning the use of SNMP Research Software in Extreme's products. *See* Order at 6-7 (compelling production of "communications related to SNMP Research Software"). Despite Plaintiff's request, there is a dearth of emails concerning the use of SNMP Research Software in Extreme's products.

For example, as described *supra*, during pre-suit discussions wherein Plaintiffs asked for a full list of all Extreme products containing Plaintiffs' software, a contracts manager at Extreme, Paul Segalini, emailed Plaintiffs' outside counsel on June 11, 2020 with a response. In that email, Mr. Segalini identified certain Extreme products containing SNMP Research Software as well as quantities of those products sold since 2017. *See* Ex. A at 2. When Plaintiff did not see this email (or

Case 3:20-cv-00451-CEA-DCP   Document 215-1   Filed 10/26/22   Page 21 of 28   PageID #: 11034
2248531.10

any emails between Mr. Segalini and the people who provided him with the information he gave to Plaintiff) in Extreme's document production in this case, it raised a red flag. So on June 30, Plaintiff asked Extreme to produce Mr. Segalini's emails without further delay. In response, Extreme produced an email chain that contained the June 11, 2020 email from Mr. Segalini, but did not produce any emails leading up to that date wherein Mr. Segalini was provided with the information that he then forwarded to Plaintiff. Plaintiff therefore asked Extreme to explain its methodology for collecting responsive documents so that Plaintiff could understand why certain emails were not produced. But during the parties' August 12 conference, Extreme was unwilling to disclose anything about its document search and production methodology. *See* Ex. O at 5. The refusal was improper. *See Brown v. Tellermate Holdings Ltd.*, No. 2:11-CV-1122, 2014 WL 2987051, at *21 (S.D. Ohio July 1, 2014), *adopted as modified*, No. 2:11-CV-1122, 2015 WL 4742686 (S.D. Ohio Aug. 11, 2015) (refusal to discuss the parameters of ESI collection "eschew[s] transparency and cooperation in the discovery process."). Nor has Plaintiff been able to discern whether spoliation might be an issue as to communications relating to SNMP Research Software, given that Extreme has asserted privilege with respect to its document retention policy, and refuses to produce documents detailing any such policy. Extreme has cited no authority in support of its contention that its document retention policy is somehow privileged.

More than two months ago, Extreme represented that it was "continuing to run searches to assess [Plaintiff's] position and will revert as soon as possible." Ex. O at 3. To date, Extreme has not reverted back. Plaintiff requests an order compelling Extreme to produce Mr. Segalini's emails immediately. Plaintiff also requests that the Court order Extreme to produce its document retention policy to Plaintiff, or otherwise communicate its policy so that Plaintiff can assess whether spoliation may have occurred.

### E. Extreme Continues To Improperly Qualify Its RFA Responses And They Should Therefore Be Deemed Admitted

Extreme's RFA responses do not comply with the Order. For the reasons discussed below, they should be deemed admitted.

#### 1. RFAs 1-20, 21-23, 34-37 (failure to respond in full)

Extreme's responses to Plaintiff's RFAs 1-23 and 34-47 include minor variations of the following statement:

> In the March 28, 2022 Order, the Court ordered a mutual and simultaneous exchange of source code by all parties. As such, for the first time in this litigation, SNMPR made the source code for its alleged copyrighted works available for counsel to Extreme. As far as Extreme knows, no party has completed its inspection of source code. **Because of the pending status of source code inspections, Extreme is unable at this time to truthfully admit or deny the full scope of the Request as written, despite a reasonable and diligent inquiry into the information currently known or available to it.**

*See* Ex. G ("Extreme's Third Supp. Responses to RFAs") 1-23, 34-37.[15]

Extreme's qualification/hedging language based on the "pending status of its source code review" is improper. Extreme was given full access to Plaintiffs' source code on April 22, 2022, just as the Court ordered (because everyone recognized time was of the essence). Then, Extreme was ordered to fully respond to Plaintiffs' discovery by May 13, 2022. If Extreme felt it needed to review source code to answer the discovery, then Extreme could and should have done the work necessary to meet the Court's deadline. But Extreme did not even start its source code review until June 6, 2022, more than six weeks after it was given access, and nearly four weeks after the due date for a full and complete response to discovery was ordered by this Court. Extreme's written responses claim it engaged in a "reasonable and diligent inquiry." But merely tracking the language of Rule 36 is not enough. *See*

---

[15] Other variations of this language include: "In all other respects, Extreme is unable to truthfully admit or deny, despite having made a reasonable and diligent inquiry into the information currently known or available to Extreme," Extreme's Third Supp. Responses to RFAs 1-12, 21-23, 34-37, 44-45, to which Extreme sometimes adds "Extreme will supplement this response as necessary and appropriate after source code inspection is completed," Extreme's Third Supp. Responses to RFAs 13-20.

*Aprile Horse Transp., Inc. v. Prestige Delivery Sys., Inc.*, No. 5:13-CV-15-GNS-LLK, 2015 WL 4068457, at *3 (W.D. Ky. July 2, 2015) (("[P]ermitting a party to avoid admitting or denying a proper request for admission simply by tracking the language of Rule 36(a) would encourage additional abuse of the discovery process.") (quoting *Asea, Inc. v. S. Pac. Transp. Co.*, 669 F.2d 1242, 1246 (9th Cir. 1981)); *see also* Fed. R. Civ. Proc. 36(a)(4) (The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny.").

What's more, even assuming Extreme had more review to do, Extreme has not even attempted to resume its inspection since its review ended on June 10, 2022. Yet the interrogatory and RFA responses still contain the improper "pending source code review" hedging/qualification language.[16]

Extreme's failure to comply with the Order is alone grounds to deem the RFAs admitted. Fed. R. Civ. Proc. 37(b)(2) (failure to obey a discovery order permits a court to "direct[] that the matters embraced in the order or other designated facts be taken as established for purposes of the action"); *see also* Fed. R. Civ. Proc. 36(a)(6) (once a court has ordered an answer, "[o]n finding that an answer does not comply with [Rule 36]" the court may order the matter admitted). But here, there is an additional and independent ground. Extreme knows full well that its code contains SNMP Research Software; indeed, <u>Plaintiff's copyright notice is embedded in Extreme's source code</u>. The source code that Extreme produced also proves it. Dkt. 154-89 ¶¶ 14-15. Extreme's pre-suit admissions prove it as well. Ex. B at 3. So the answers to the RFAs—for example, "Admit You inserted, added, or otherwise incorporated SNMP Research Software in Your Products—is obvious. *See* RFA No. 3. This is

---

[16] The hedging phrase "in all other respects, Extreme is unable to truthfully admit or deny" is also improper because it does not identify what is supposedly being "denied." *See, e.g., In re Meggitt*, No. 17-30029, 2018 WL 1121585, at *5 (Bankr. N.D. Ohio Feb. 27, 2018) ("[G]ood faith qualification of [a] response requires the responding party to also state specifically what part of the request is true or not true.").

another ground to deem them admitted. *See, e.g.*, *Yoder & Frey Auctioneers, Inc. v. EquipmentFacts, LLC*, 774 F.3d 1065, 1076 (6th Cir. 2014) (affirming order deeming request admitted where "district court looked beyond the language of the response to determine whether [the defendant] actually inquired into" the fact sought to be admitted, and concluded that the defendant "was unable to demonstrate that it had a reasonable ground to believe it could" deny the RFA).

### 2. RFAs 21-23 (continued improper objection to plain terms)

Extreme's responses to RFAs 21-23 continue to assert improper and already-overruled objections to plain terms. The requests state as follows:

> **RFA 21**: Admit that You did not have SNMP Research's permission to receive any SNMP Research Software transferred to You after January 1, 2017.

> **RFA 22**: Admit that You asked for SNMP Research International, Inc. to consent to the transfer of SNMP Research Software to You.

> **RFA 23**: Admit that SNMP Research International, Inc. did not consent to the transfer of SNMP Research Software to You.

The Court ordered Extreme to "fully respond" to these requests and ruled that the terms were not ambiguous. Order at 10-11. Nevertheless, in its supplemental responses, Extreme continued to object to "permission" and "consent" as vague and ambiguous and, on that basis, rewrote the RFAs to seek an admission that "Extreme received a **written license** agreement from SNMPR." *See* Extreme's Third Supp. Responses to RFA Nos. 21-23 (emphasis added). Extreme did not meet and confer with Plaintiffs about any perceived ambiguity before responding in this way.

Plaintiff immediately raised issue with the responses, noting the obvious: "permission" and "consent" mean permission or consent of any kind, not just "a written license agreement from SNMPR." Ex. M at 5. On July 15, Extreme responded that it would "consider" Plaintiff's explanation but that it believed Plaintiff's explanation was "a new interpretation of RFAs 21-23." Ex. N at 8.

Extreme's responses are evasive and improper. This is an additional and independent basis for the Court to deem Extreme's responses to RFAs 21-23 admitted pursuant to Rule 37(b)(2)(A) and Rule

36(a)(6).  *See In re Norris*, No. 11-61150, 2012 WL 1565602, at *3 (Bankr. N.D. Ohio May 2, 2012)

(deeming RFAs admitted under Rule 36(a)(4) because the responses "generally lack[ed] good faith").

### F.  Extreme Should Be Ordered To Respond To Discovery Requests Concerning Additional Product-Related Information And Extreme's Licensing Defense

RFPs 71-78, 83, 88-96, 101-105 seek the following production with respect to Extreme's

products containing SNMP Research Software:  (1) marketing and advertising documents and business

plans (RFPs 71-78); (2) discussions about revisions to the source code implementing the simple

network management protocol and SNMP Research Software (RFPs 83, 90-96); (3) documents

showing Extreme's disclosure of Plaintiffs' source code to other entities (RFPs 88-89); (4) documents

concerning insurance coverage for this lawsuit (RFPs 101-102); and (5) notes, working groups, and

consultant information relevant to the parties' claims and defenses (RFPs 103-105).  *See* Ex. I.  These

categories bear upon the scope of Extreme's infringement, damages/disgorgement, and identification of

key witnesses to depose.  Extreme's objections—*i.e.*, its exclusion of responsive information based on

its purported licensing defense, its continued objection to "SNMP Research Software," and its assertion

that source code review is still ongoing and so it will supplement at some future, undisclosed date—are

meritless, for the reasons discussed above.  Plaintiff therefore requests that the Court order Extreme to

fully respond to RFPs 71-78, 83, 88-96, 101-105 with respect to all Extreme products containing

SNMP Research Software (*i.e.*, all Extreme products responsive to Interrogatory 1).

RFAs 44 and 45 ask Extreme to admit whether it is or is not relying, in whole or in part, on the

March 10, 2001 license agreement between SNMP Research International and Brocade as part of its

defense of this case.  Despite the Court's guidance to confer with Plaintiff to the extent Extreme was

still confused by any "plain terms" (Order at 10-11), Extreme objected to RFAs 44-45 as "vague and

ambiguous" and interpreted them to request an admission about whether "it presently intends to

introduce the License Agreement during the presentation of Extreme's defense at trial."  Extreme's

Third Supp. Responses to RFAs 44-45.  Even then, Extreme added the same blanket statement

discussed above that "In all other respects, Extreme is unable to truthfully admit or deny, despite having made a reasonable and diligent inquiry into the information currently known or available to Extreme." *Id.* Extreme's objections to, and rewriting of, Plaintiff's straightforward requests are improper. RFAs 44-45 plainly seek Extreme's position on whether it is asserting a defense based in whole or in part on the Brocade license. Extreme's refusal to clearly admit or deny these requests contravenes the requirement of Rule 36(a)(4) to "specifically deny" the request or "state in detail why the answering party cannot truthfully admit or deny it." The Court should order Extreme to immediately respond to RFAs 44 and 45 as written.

## IV.    CONCLUSION

For all of the foregoing reasons, the Court should grant Plaintiff's Motion to enforce the prior Order, compel discovery, determine the sufficiency of the requests for admission, and order sanctions, as set forth herein and as summarized in the chart provided in the accompanying Motion.


Respectfully submitted,


Dated:  October 26, 2022              By: /s/ *John L. Wood*
                                         John L. Wood, Esq. (BPR #027642)
                                         Cheryl G. Rice, Esq. (BPR #021145)
                                         Rameen J. Nasrollahi, Esq. (BPR #033458)
                                         EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
                                         900 S. Gay Street, Suite 1400
                                         P.O. Box 2047
                                         Knoxville, TN 37902
                                         (865) 546-0500 (phone)
                                         (865) 525-5293 (facsimile)
                                         jwood@emlaw.com
                                         crice@emlaw.com
                                         rnasrollahi@emlaw.com


Dated:  October 26, 2022              By: /s/ *A. Matthew Ashley*
                                         A. Matthew Ashley (CA Bar. No. 198235)
                                         Morgan Chu (CA Bar. No. 70446)

David Nimmer (CA Bar. No. 97170)
Olivia Weber (CA Bar. No. 319918)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010 (phone)
(310) 203-7199 (facsimile)
mchu@irell.com
dnimmer@irell.com
mashley@irell.com
oweber@irell.com

*Attorneys for Plaintiffs*
*SNMP Research International, Inc.*
*SNMP Research, Inc.*