# **EXHIBIT 2**

# Redline PDF of the Amended Complaint against the Original Complaint

# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TENNESSEE

SNMP RESEARCH, INC. and SNMP     §     **Case No. 3:20-cv-00451**
RESEARCH INTERNATIONAL, INC.,     §
        §
        **Plaintiffs,**     §
        §
    **v.**     §
        §
        §     **Jury Demand**
        §
**Broadcom Inc.**     §
        §
**Brocade Communications Systems LLC**     §
        §
**Extreme Networks, Inc.**     §


        **Defendants.**

---

## AMENDED COMPLAINT FOR BREACH OF CONTRACT ~~AND~~, COPYRIGHT INFRINGEMENT, AND FRAUD

---

Plaintiffs SNMP Research, Inc. and SNMP Research International, Inc. (collectively, "Plaintiffs") bring this action to address breaches of contract and willful acts of copyright infringement that have damaged Plaintiffs and netted Defendants massive returns believed to be in the hundreds of millions of dollars.

## I.
## INTRODUCTION

1.     In 1988, University of Tennessee administrator and computer science professor Dr. Jeffrey Case and one of his graduate students, Ken Key, started a company that was Plaintiffs' forerunner. Based in Knoxville, Dr. Case was instrumental in developing technology that manages devices used in computer networks such as the Internet. Dr. Case and Mr. Key began the development of a software-based management system that grew to become today's market leader.

2.     One of the foundational technologies of modern computer networks is the Simple

Network Management Protocol (herein, "SNMP") from which Plaintiffs take their names. Dr. Case was instrumental in creating this protocol, which is a way for connected devices to communicate by sending and responding to messages. For example, a network-connected laser printer can communicate with a network-connected computer using SNMP to pass messages regarding the printer's status (*e.g.*, needs paper, paper jam).

3. Since the protocol's creation in the early 1990s with the help of Dr. Case, SNMP has become ubiquitous, and the vast majority of managed network computing devices in the world use SNMP.

4. Plaintiffs' technology is an implementation of SNMP. It is used in network equipment, network-connected computers and servers, telephone systems, electronic gaming, and by the United States military, among many other uses and users.

5. Although there are other companies who offer SNMP software, Plaintiffs' SNMP software is in heavy demand by many companies and government agencies and has been a market leader for many years.

6. Like many technology companies, Plaintiffs' primary asset is their intellectual property embedded in their software, including copyright protection.

7. On or about March 10, 2001, Plaintiffs licensed some of their copyrighted software to Defendant Brocade Communications Systems LLC ("Brocade"), formerly known as Brocade Communications Systems, Inc. A copy of the license agreement (herein, "License Agreement"), as amended, is attached as Exhibit A (filed under seal).

8. The License Agreement set clear mandates on, among other things, which software was licensed, how it could be used internally by Brocade, and how it could be reproduced or transferred externally. It contained express limitations with respect to use of the human-readable "source code" that makes up the licensed software. Among other things, the License Agreement

expressly forbade Brocade from transferring or disclosing "Source" materials, which were defined to include source code and related matter.

9.      Brocade breached the License Agreement by, among other things, disclosing Plaintiffs' source code to Extreme Networks, Inc. ("Extreme").

10.     Brocade's breaches rendered the License Agreement subject to Plaintiffs' express right to terminate Brocade's rights under the License Agreement.

11.     Plaintiffs notified Brocade of its breach and gave Brocade an opportunity to cure, but Brocade just stonewalled Plaintiffs.

12.     In response, Plaintiffs terminated Brocade's rights under the License Agreement.

13.     Brocade never disputed that it had in fact breached the License Agreement nor that Plaintiffs had the right to terminate Brocade's rights under it.  Yet, Brocade has continued to reproduce, prepare derivative works based upon, and publicly distribute Plaintiffs' copyrighted software as if Brocade still had license rights.  This includes but is not limited to the creation of new Brocade products.

14.     Brocade's unauthorized disclosure of the source code, as well as Brocade's continued use, reproduction, preparation of derivative works based upon, and public distribution of products containing Plaintiffs' copyrighted software constitute a breach of the License Agreement.  It also constitutes copyright infringement and material contribution to or inducement of infringement by Brocade's partners, resellers, and/or customers.

15.     Broadcom Inc. ("Broadcom"), which is now Brocade's ultimate parent, has shared (and is sharing) in the profits derived from Brocade's copyright infringement, which renders Broadcom a "practical partner" of Brocade.  Broadcom is jointly and severally liable for the profits derived from Brocade's infringing conduct.

16.     In addition, the entity to whom Brocade improperly transferred and disclosed

Plaintiffs' software and source code, Extreme, is also engaging in unauthorized reproduction and public distribution of products containing Plaintiffs' copyrighted software, including but not limited to the creation of new Extreme products. Extreme is thus liable for copyright infringement as a direct infringer, and Brocade is liable as a contributory infringer.

17.     Defendants knew their acts constituted a breach of the Brocade License Agreement and an infringement of Plaintiffs' copyrighted works. Yet Defendants proceeded anyway and continue to this day. They should now be held to account for the damage they have caused Plaintiffs and the amounts that Defendants have received from their unauthorized use, transfer, reproduction, preparation of derivative works based upon, and public distribution of Plaintiffs' software.

## II.
## PARTIES

18.     Plaintiff SNMP Research, Inc. ("SNMP Research") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee.

19.     Plaintiff SNMP Research International, Inc. ("SNMP International") is a Tennessee corporation with its principal place of business in Knoxville, Tennessee.

20.     Defendant Broadcom holds itself out as a Delaware corporation with a principal place of business in San Jose, California.

21.     Defendant Brocade holds itself out as a Delaware limited liability company with a principle place of business in San Jose, California.

22.     Defendant Extreme holds itself out as a Delaware corporation with a principal place of business in San Jose, California.

## III.
## JURISDICTION AND VENUE

23.     The acts in dispute in this case violate Plaintiffs' exclusive rights under the

Copyright Act, 17 U.S.C. § 101 et. seq.

24.     This Court has subject matter jurisdiction over the copyright cause of action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338.  This Court has supplemental jurisdiction over Plaintiffs' state law claim under 28 U.S.C. § 1367.

25.     Personal jurisdiction exists over Brocade because it entered into the License Agreement pursuant to which Brocade expressly submitted to jurisdiction in Knoxville, Tennessee.  Specifically, Brocade agreed that "[f]or actions arising out of or related to the subject matter of this Agreement," it would be "subject to sole and exclusive jurisdiction and venue lying in the State and Federal courts in Knox County Tennessee, U.S.A.," and further "agree[d] to service of process in accordance with the rules of such courts."  *See* Exhibit A.  Brocade is also registered to do business in this State.

26.     Personal jurisdiction exists over Broadcom because Broadcom has a history of dealings with Plaintiffs including at least one agreement executed with SNMP International—in which Broadcom consented to the jurisdiction of the Federal courts in Knox County, Tennessee, U.S.A.—plus extensive negotiations with Plaintiffs in which, among other things, Broadcom representatives spoke on behalf of Brocade and represented the ability to obtain a license agreement on behalf of Brocade.  All of the foregoing demonstrate Broadcom's intent to form a long-term relationship with Tennessee through an ongoing business relationship with Plaintiffs.  It was also reasonably foreseeable to Broadcom that it would become involved in the present dispute in this District given its close relationship to and dealings with Brocade concerning Plaintiffs' copyrighted software, and given that Brocade is bound by the exclusive jurisdiction and venue clause set forth in the License Agreement that is central to this dispute.  Upon information and belief, Broadcom is also actively marketing, selling, offering to sell, licensing, and/or offering to license hardware, software, and/or services directly or indirectly through its distribution channels

to business consumers in this District, including, without limitation, products containing the software at issue in this case.

27.     Personal jurisdiction exists over Extreme because Extreme has a history of dealings with Plaintiffs including at least one agreement executed with SNMP International—in which Extreme submitted to the jurisdiction of the Federal courts in Knox County, Tennessee—and also extensive negotiations with Plaintiffs concerning the copyrighted software underlying the present dispute, all of which demonstrate Extreme's intent to form a long-term relationship with Tennessee through an ongoing business relationship with Plaintiffs.  It was also reasonably foreseeable to Extreme that it would become involved in the present dispute in this District given its September 13, 2017 Consent to Assignment letter whereby Extreme purported to "assume all of the rights, duties and obligations required under" the License Agreement that is central to this dispute, and which contains the exclusive jurisdiction and venue clause described in paragraph 25. Furthermore, Extreme is registered to do business in this State.  On information and belief, Extreme is also actively marketing, selling, offering to sell, licensing, and/or offering to license hardware, software, and/or services directly or indirectly through its distribution channels to business consumers in this District, including, without limitation, products containing the software at issue in this case.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants are subject to personal jurisdiction in this District.

**IV.**
**FACTUAL BACKGROUND**

A.     <u>**Plaintiffs And The Copyrighted Software At Issue In This Case**</u>

29.     Plaintiffs have expended substantial creativity, time, labor, and money to develop, author, market, and license the software which Defendants are wrongfully exploiting.

30.     SNMP Research is primarily a research and development company that creates,

licenses, and supports products based on SNMP.

31.     SNMP International is primarily responsible for sales, marketing and sublicensing software under license from SNMP Research. At all times relevant to this Complaint, SNMP International operated under a license by SNMP Research for SNMP International to license the software and intellectual property at issue in this case.

32.     Dr. Case owns and runs both SNMP Research and SNMP International.

33.     SNMP Research has registered the copyrights for the software at issue in this case (collectively, "Copyrights") set forth in Table 1. The registration certificates are attached as collective Exhibit B.

**Table 1 Copyright Registration Certificates**

| Company | Product | Registration Date | Registration Number |
|---|---|---|---|
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15 | January 25, 2011 | TXu 1-706-718 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.2 | July 20, 2011 | TXu 1-772-248[1] |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.3 | July 20, 2011 | TXu 1-772-250 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 15.4 | February 3, 2011 | TXu 1-738-956 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 16 | February 3, 2011 | TXu 1-707-158 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 16.2 | February 3, 2011 | TXu 1-738-954 |

---

[1] The first page of this registration certificate provides that the registration number is "TXu 1-722-248," but subsequent pages provide that the registration number is "TXu 1-772-248." *See* Exhibit B.

| Company | Product | Registration Date | Registration Number |
|---------|---------|-------------------|---------------------|
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 17 | February 3, 2011 | TXu 1-707-157 |
| SNMP Research, Inc. | NETMON, Associated Applications, and Libraries Version 17.2 | February 3, 2011 | TXu 1-738-958 |

**B.**     **The License Agreement**

34.     On March 10, 2001, SNMP International entered into the License Agreement with Brocade.  The License Agreement was modified via Amendment 1 dated December 8, 2004, Amendment 2 dated October 10, 2006, Amendment 3 dated April 30, 2010, Amendment 4 dated June 29, 2015, and Amendment 5 dated June 30, 2015.  *See* Exhibit A.

35.     The License Agreement defined "Source" to include "source code and any and all associated developer documentation in human-readable or machine-readable media which are components of versions of NETMON, associated applications, and libraries."  Exhibit A, § 1.

36.     The License Agreement granted limited licenses to Brocade with respect to particular portions of Plaintiffs' software **(herein, the "Software")**.  Among other things, the License Agreement gave Brocade (i) "Internal Use Rights" and (ii) "Binary Redistribution Rights."  Exhibit A, §§ 2, 3.

37.     Under the License Agreement, rights licensed by SNMP International are limited with respect to use.  Therefore, if a licensee, such as Brocade, wants to use the licensed software in a new way outside the scope of the existing license, a new license or written modification is required.

38.     The License Agreement expressly provides that Brocade's license rights thereunder, as well as the agreement itself, are to be "non-transferable."  Exhibit A, §§ 2, 3; *see*

*also* Exhibit A, at Amendment 3, § 7.

39. Brocade recognized in the License Agreement that the licensed software was developed "at great expenditures of time, resources, and money" (Exhibit A, § 8), and the License Agreement expressly forbade, in multiple provisions, the disclosure of Source material including source code:

### Table 2 Select License Agreement Prohibitions On Disclosure

| |
|---|
| "Licensee agrees that software licenses will include a provision that will prevent its customers from reverse engineering or decompiling the software. No rights are granted for the distribution of the Licensed Modules and Derivative Works thereof in Source form to any third party." Exhibit A, § 3. |
| "Licensee shall keep the Program Source received from SNMP, and the Sources of any Derivate Works, whether designated confidential or not, in the strictest confidence and will exercise the highest degree of care to safeguard the confidentiality of the Program Source and the Sources of any Derivative Works." Exhibit A, § 8. |
| "Licensee agrees that it will take appropriate action with its employees and consultants, by agreement or otherwise, to satisfy its obligations under this License Agreement with respect to use, copying, transference, protection, and security of the Program Source, and any other materials provided to the Licensee by SNMP as a result of this License Agreement." Exhibit A, § 8. |
| "The redistribution of sources is prohibited under the terms of this License Agreement . . . ." Exhibit A, § 24(d). |
| "Licensee does not have the right to redistribute the Amendment 3 Licensed Modules in Source form." Exhibit A, at Amendment 3, § 4. |
| "Software, Source, and any data or databases contained therein shall be maintained in strict confidence and will not be disclosed to any third party without the express written consent of SNMP." Exhibit A, at Amendment 3, § 6. |
| "Access to the Software, Source, data, and databases will be limited to only Licensee's employees, consultants, and Contractors who are bound by an agreement including confidentiality terms at least as protective as those in the Agreement and who have a need to have access to the Software, Source, data, and databases." Exhibit A, at Amendment 3, § 6. |
| "The Software, Source, data, and databases will be uninstalled and fully removed from any computers, disk drives, printouts, or any form of media before it becomes no longer under Licensee's control, whether by sale, gift, liquidation, or otherwise. It is expressly understood and agreed that the strictures of confidentiality imposed by this Agreement shall survive the termination of this Agreement or any part thereof." Exhibit A, at Amendment 3, § 6. |

40. The License Agreement also delineates certain types of breaches that constitute

2261441

defaults. Specifically, the relevant portion of its "Default" provision reads in full as follows:

> (a) If Licensee breaches any confidentiality, proprietary, or intellectual rights provisions of this License Agreement and does not correct such conditions within five days after receiving notice thereof from SNMP, SNMP shall have the right to exercise any one or more of the following remedies:
>
> i. To terminate the Internal Use and Redistribution Rights . . .;
>
> ii. In the event of unauthorized use or distribution of the Licensed Modules or Derivative Works, SNMP shall have the right in addition to its other remedies, to recover from Licensee an amount not less than the sum that SNMP would have charged the person or persons obtaining the benefit of such unauthorized use of the Licensed Modules or Derivative Works plus any amount received by Licensee on account of such unauthorized use;
>
> iii. To seek to have any threatened or actual breach by Licensee enjoined;
>
> iv. To pursue any other remedy at law or in equity.

Exhibit A, § 16.

## C. Brocade's Breach Of The License Agreement And Defendants' Acts Of Infringement

41. The software licensed under the License Agreement was incorporated into at least two of Brocade's product lines: the Brocade Fibre Channel SAN Switching products and the Brocade IP Networking business (a/k/a Data Center) products.

42. According to Broadcom and Brocade, in or about 2017, Broadcom acquired Brocade's Fibre Channel SAN Switching business and Brocade's IP Networking business was divested.

43. Either as part of or proximate to the Broadcom-Brocade transaction, Extreme acquired Brocade's data center switching, routing, and analytics business for $55 million in cash and additional potential performance-based payments to Broadcom.

44. Brocade and Extreme sought SNMP International's consent to permit an "assignment" from Brocade to Extreme.

45.     SNMP International declined to provide its consent and asked for additional details on the assignment to Extreme and intended subsequent uses being proposed.

46.     Despite the lack of consent, Brocade nonetheless disclosed Plaintiffs' source code provided under the License Agreement to Extreme and transferred to Extreme at least a portion of Brocade's business unit utilizing, licensing and/or offering to license, providing services and/or offering to provide services, and publicly distributing/selling products containing Plaintiffs' copyrighted software in binary form.

47.     After its transaction with Brocade/Broadcom, Extreme began reproducing and publicly distributing products that contained Plaintiffs' copyrighted software and derivative works.  Extreme did so even though it admitted it had no license from Plaintiffs.  Extreme also admitted that it used the software the same way Brocade used it for its Data Center business and that Extreme needed to license Plaintiffs' software to cover the same license that Brocade had with SNMP International.

48.     Extreme's reproduction and public distribution infringes SNMP Research's Copyrights.

49.     Extreme's infringing products include products within the following product families:  SLX 9140 Family; SLX 9240 Family; SLX 9540 Family; SLX 9850 Family; SLX 9030 Family; SLX 9640 Family; SLX 9150 Family; SLX 9250 Family; VDX 6740 Family; VDX 6940 Family; and VDX 8770 Family.  Additional infringing products may be uncovered during discovery.

50.     Extreme's unauthorized reproduction, preparation of derivative works based upon, and public distribution of products containing Plaintiffs' copyrighted software has induced, caused, and/or materially contributed to Extreme's partners', resellers', and/or customers' infringement of Plaintiffs' copyrighted software.

51.     On June 4, 2019, SNMP International sent Brocade a written letter informing Brocade that it was in breach of the License Agreement ("Notice of Breach").

52.     Because Brocade's breaches were of "confidentiality, proprietary, or intellectual rights provisions" of the License Agreement, Brocade had five days to cure the breach.  *See* Exhibit A, § 16(a).

53.     The Notice of Breach informed Brocade of the five-day cure period and asked Brocade to contact Plaintiffs' legal counsel "immediately so we can remedy the situation."

54.     Brocade stonewalled Plaintiffs for weeks, despite Plaintiffs' repeated requests for Brocade to issue a substantive response.

55.     Plaintiffs repeatedly wrote to Brocade expressly stating that Brocade had breached the License Agreement by transferring and/or disclosing the software to Extreme without the right to do so.

56.     Brocade did not contend that it was not in fact in breach.

57.     Instead, Brocade continued to delay.

58.     After waiting 55 days for a cure that would never occur, on July 25, 2019, Plaintiffs sent Brocade a written letter terminating Brocade's internal use and redistribution rights set forth in the License Agreement (the "Notice of Termination").

59.     The Notice of Termination reminded Brocade of its post-termination obligations, including that "Brocade immediately return all copies of the Licensed Modules and Derivative Works, as those terms are defined in the March 2001 License Agreement."

60.     The Notice of Termination also stated that any distribution or use of the formerly licensed software would constitute copyright infringement.

61.     Brocade did not contend that the termination was improper.

62.     Yet Brocade still did not return (and to this day has not returned) all copies of the

SNMP-EX-0
2261441

Licensed Modules and Derivative Works (as defined in the License Agreement).

63.     Instead, Brocade has simply ignored the fact that its license rights have been terminated and has just kept right on reproducing and publicly distributing the copyrighted software and derivative works (and/or licenses thereto) with no license to do so, thereby infringing SNMP Research's Copyrights.

64.     Brocade's infringing products include products within the following product families: X6 Director Family; 6520 Family; 6543 Family; 6558 Family; 6559 Family; 7840 Family; 6510 Family; 6505 Family; 6547 Family; G610 Family; G620 Family; G630 Family; MXG610s Family; 310 Family; 320 Family; 340 Family; 360 Family; 5430 Family; 5460 Family; 5470 Family; 6542 Family; M6505 Family; 7810 Family; G648 Family; G649 Family; G720 Family; and X7 Director Family. Additional infringing products may be uncovered during discovery.

**D.     Broadcom Is Brocade's Practical Partner**

65.     A Broadcom press release announcing the Brocade acquisition states "Broadcom, with the support of Brocade, plans to divest Brocade's IP Networking business, consisting of wireless and campus networking, data center switching and routing, and software networking solutions." *See* https://www.broadcom.com/company/news/product-releases/2218429. Upon information and belief, Broadcom profited from Brocade's disclosure of Plaintiffs' source code and eventual transfer, reproduction and/or public distribution of products containing the copyrighted software to Extreme, and worked substantially and continuously with Brocade to implement the disclosure, transfer, reproduction, and/or public distribution of products containing the copyrighted software to Extreme.

66.     Broadcom shared and continues to share in the profits with Brocade, a wholly-owned subsidiary limited liability company, attributable to the reproduction and public

SNMP-BRCD-
2261441

distribution of products containing Plaintiffs' copyrighted software and derivative works to Extreme and to Brocade's and Broadcom's customers, resellers, and partners.

67. Based on the foregoing, Broadcom is a practical partner of Brocade and is therefore liable for all of Brocade's profits attributable to Brocade's infringing acts.

**E.     The October 22, 2001 License Agreement**

**1.     Extreme's Breach Of The October 22, 2001 License Agreement**

**68.     SNMP International and Extreme are parties to an October 22, 2001 License Agreement (herein, "2001 Extreme License").  *See* Exhibit C.  Similar to the License Agreement with Brocade alleged above, the 2001 Extreme License granted a limited license to Extreme with respect to particular portions of Plaintiffs' software.  As discussed in more detail below, Extreme has breached the 2001 Extreme License in multiple ways, including but not limited to:  a) failing to report and pay royalties; b) using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 Extreme License; c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 Extreme License; d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source[2] provided to Extreme under the 2001 Extreme License; e) failing to provide information that Extreme was required to provide under the 2001 Extreme License; f) failing to maintain SNMP Research's copyright notice in the software; g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP International; and h) failing to return or provide certification of the destruction of Program**

---

**[2] Under the 2001 Extreme License:  "'Source' refers to both the source code and any and all associated developer documentation in human-readable or machine-readable media which are components of versions of NETMON, associated applications, and libraries."  Under the 2001 Extreme License: "Program" refers to "versions of NETMON, associated applications, and libraries which are implementations based on the Simple Network Management Protocol . . . ."  Exhibit C, at p. 1.**

Source provided under the 2001 Extreme License. The following paragraphs of this subsection outline some relevant terms of the 2001 Extreme License, Extreme's breaches, SNMP International's notice of breach, and Extreme's failure to cure. Subsection E.2 then discusses Extreme's multiple misrepresentations and Plaintiffs' discovery of Extreme's breach and fraud, which discovery occurred during the pendency of this lawsuit.

69. The 2001 Extreme License granted a limited license to Extreme with respect to particular portions of Plaintiffs' software. Among other things, the 2001 Extreme License gave Extreme expressly limited (i) "Internal Use Rights" and (ii) "Binary Redistribution Rights," and with these rights came the obligation not to exceed the contractual limitations on them. Exhibit C, §§ 2-3.

70. Extreme's internal use and binary redistribution rights were limited to the "Licensee's Network Switch project," which was defined as "a single product developed at several coordinated development sites using a single particular combination of target processor, operating system, and development tools platform." Exhibit C, at Attachment A (emphasis added). The authorized combination of target processor, operating system, and development tools platform were a MIPS processor and a Red Hat Linux operating system and development tools. *See id.*

71. Consistent with the "single product" limitation, for eleven years Extreme reported royalties under the 2001 Extreme License on a single product, namely, the BlackDiamond 10808 10-Slot Chassis product. Extreme never reported or paid royalties on any other product under the 2001 Extreme License.

72. As discussed in more detail in subsection E.2, *infra*, after this case was filed, Extreme admitted that it used and redistributed—and, for some products and product classes, is apparently still using and redistributing—Plaintiffs' software licensed under the

SBE-000X-XV
2261441

2001 Extreme License in the following "product classes" (Extreme's term): ExtremeSwitching 5320; ExtremeSwitching 5420; ExtremeSwitching 5520; ExtremeSwitching 5720, 7520, 7720; ExtremeSwitching X695; Summit X670; BD 10K; BD 12K; BD 20K; BD 8800; BD X; Bundle BD X8; E4G-200; E4G-400; Ericsson (OEM family); ExtremeSwitching X435; ExtremeSwitching X465; Summit X460-G2; Ericsson (Summit family); ExtremeSwitching X590; ExtremeSwitching X695; Summit X150; Summit X250; Summit X350; Summit X430; Summit X440; Summit X440-G2; Summit X450; Summit X450-G2; Summit X460; Summit X460-G2; Summit X480; Summit X620; Summit X650; Summit X670; Summit X670-G2; Summit X690; Summit X770; and Summit X870.[3] Upon information and belief, the above list is not complete or exhaustive. Additional infringing products may be uncovered during discovery.

73. Extreme never reported or paid any royalties on any of these "product classes," or any of the products within them other than one product, namely, the BlackDiamond 10808 10-Slot Chassis product.

74. Extreme's failure to report and pay royalties on these products constitutes breach of the 2001 Extreme License.

75. Moreover, for multiple independent reasons, including those set forth below, Extreme's use and redistribution of Plaintiffs' software in the above product classes (and all products within them other than the BlackDiamond 10808 10-Slot Chassis product) exceed Extreme's use and redistribution rights under the 2001 Extreme License.

A. The 2001 Extreme License only allowed use and redistribution as to a single product, but Extreme has used and redistributed Plaintiffs'

_____

[3] On information and belief, a "product class" can contain multiple separate products within that class. Thus, the number of product classes identified above understates the number of separate products that Extreme has sold without a right to do so.

software in scores of products.

B.  Extreme used and copied the Program Source for products that do not conform with the authorized combination of target processor, operating system, and development tools platform allowed under the 2001 Extreme License; for instance, at least some of the products within the above product classes do not operate on the Red Hat Linux operating system.

C.  The 2001 Extreme License provides that:  "If the license fee and royalties are not paid in a timely fashion as provided herein, the internal use and redistribution rights granted the Licensee under this License Agreement shall be terminated."  Exhibit C, § 24.  Consequently, even if Extreme's use and redistribution of Plaintiffs' software were not beyond Extreme's rights for the reasons set forth in paragraphs (A) or (B) above (and they are), its rights were terminated by Extreme's admitted failure to timely pay royalties.

76.     As with Plaintiffs' software under the Brocade License Agreement, Plaintiffs' software licensed to Extreme under the 2001 Extreme License is subject to the copyright registrations set forth in paragraph 33, *supra*.[4]  Consequently, in addition to breaching the 2001 Extreme License, Extreme's unauthorized use and redistribution of products containing Plaintiffs' copyrighted software constitutes copyright infringement.

77.     The 2001 Extreme License also requires Extreme, as part of its "Confidentiality and Non-Disclosure" obligations, to "take appropriate action with its

---

[4] The portion of Plaintiffs' software that was licensed to Extreme under the 2001 Extreme License is not the same as the portion of Plaintiffs' software that was licensed to Brocade under the Brocade License Agreement; however, all of Plaintiffs' software referenced in this Amended Complaint is subject to the copyright registrations set forth in paragraph 33, *supra*.

2261441

17

employees and consultants, by agreement or otherwise, to satisfy its obligations under this License Agreement with respect to use, copying, transference, protection, and security of the Program Source, and any other materials provided to the Licensee by SNMP as a result of this License Agreement." Exhibit C, § 8.

78.  Extreme breached its Confidentiality and Non-Disclosure obligations by, among other things, using (which includes distributing internally within Extreme and to Extreme's contractors) and copying the Program Source outside the authorized use and copying permitted by the 2001 Extreme License, which was limited to "a single product" and a specific combination of target processor, operating system, and development tools.

79.  The 2001 Extreme License further provides that "[i]n the event of unauthorized use or distribution of the Program Source, SNMP Research shall have the right in addition to its other remedies, to recover from Licensee an amount not less than the sum that Licensor would have charged the person or persons obtaining the benefit of such unauthorized use of the Program Source, plus any amount received by Licensee on account of such unauthorized use." Exhibit C, § 16. This remedy is expressly in addition to SNMP International's right to "pursue any other remedy at law or in equity[,]" *id.*, which includes but is not limited to copyright infringement.

80.  Upon discovering Extreme's breaches (the details of Plaintiffs' discovery are discussed in subsection E.2, *infra*), SNMP International sent Extreme a notice of breach of the 2001 Extreme License on September 19, 2022. In this notice of breach, SNMP International also invoked Section 10 of the 2001 Extreme License, which provides that: "Nothing shall prevent Licensee from independently producing, selling, and distributing similar products without obligation to SNMP. In the event that Licensee produces similar products, Licensee shall provide information to SNMP to authenticate that it was

independently produced."  SNMP International asked Extreme to "provide a list of each [Extreme] product that uses SNMP and sufficient information to [SNMP International] so that [SNMP International] can authenticate that the SNMP implementation was independently produced."

81.     The 2001 Extreme License has a five-day cure period for a failure "to observe, keep, or perform any Source confidentiality provisions of this License Agreement required to be observed, kept or performed by Licensee[.]"  Exhibit C, § 16.  The license has a thirty-day cure period for other breaches.  *Id.*

82.     Extreme did not cure within either the five-day or the thirty-day period.  It also did not provide the information that SNMP International requested pursuant to Section 10 of the 2001 Extreme License.

83.     Instead, on Friday, September 23, 2022, Extreme asked for a meeting of senior management under Section 16 of the 2001 Extreme License.  On Tuesday, September 27, SNMP International agreed to the requested meeting and stated that it was available immediately and was also willing to host the meeting.  Extreme responded that its first availability was not until November 1, 2022, and then it was only available via Zoom and in a few intermittent half-hour and hour time slots.  This November 1, 2022 date was after the five- and thirty-day cure periods were both set to expire.  SNMP International agreed to the proposed November 1, 2022 date because it was the first date Extreme claimed it was available.  However, SNMP International reiterated that it was available immediately and without date restriction for any day (weekday or weekend) before November 1, 2022, and SNMP International also made clear that Extreme's delay of the senior management meeting that Extreme itself had requested would not toll, revive or otherwise alter any deadlines under the 2001 Extreme License, including the cure periods.

84.    On October 20, 2022, after both the five- and thirty-day cure periods under the 2001 Extreme License had passed without cure, SNMP International terminated Extreme's internal use and redistribution rights under the 2001 Extreme License to the extent they were not already terminated for non-payment of royalties under Section 24 of the 2001 Extreme License.  SNMP International also demanded, pursuant to Section 16 of the 2001 Extreme License, that Extreme return or provide written certification of the destruction of all copies of the Program Source provided by SNMP International to Extreme and all copies thereof and all Derivative Works[5] of the Program Source in all forms.

85.    On November 1, 2022, SNMP International (through Dr. Jeffrey Case and his counsel) and Extreme (through its Chief Financial Officer, Remi Thomas, Senior Director of Intellectual Property, Peter Lam, Chief Administrative Officer and Sustainability Officer, Katy Motiey, and Extreme's counsel) had the senior management meeting that Extreme had requested back on September 23, 2022.  SNMP International participated in good faith in that meeting in a sincere attempt to resolve the dispute, but no resolution was reached.

86.    In addition to all of the breaches discussed above, Extreme has not complied with its obligation under Section 16 of the 2001 Extreme License to return or provide written certification of the destruction of all copies of the Program Source provided by SNMP International to Extreme and all copies thereof and all Derivative Works of the Program Source in all forms.

2.    Extreme's Material Misrepresentations And Plaintiffs' Discovery Of Them And Of Extreme's Breaches Of The 2001 Extreme License

87.    As discussed in more detail in Count 6 (for fraud) below, the 2001 Extreme

---

[5] Under the 2001 Extreme License, "Derivative Work" means "any program or documentation in Source form or Software form which (i) is developed by Licensee through use of the Program, or (ii) includes any features, provisions, algorithms, or other portions of the Program."  Exhibit C, at p. 1.

EDTX 3:20-cv-
2261441

20

License required Extreme to prepare and submit quarterly royalty reports to SNMP International showing the product quantities that Extreme sold each fiscal quarter, as royalties owed were tied to quantities. *See* Exhibit C, § 25. Extreme did so from 2001-2018, reporting royalties solely on the one product licensed under the 2001 Extreme License (the BlackDiamond 10808 10-Slot Chassis). The vast majority of these royalty reports (*i.e.*, all of the ones that showed only sales of the BlackDiamond 10808 10-Slot Chassis at a time when Extreme was in fact selling other products that contained Plaintiffs' software licensed under the 2001 Extreme License) were false because they represented that units of just one product had been sold when in fact Extreme had sold, and is still selling, scores of other products that contain Plaintiffs' software provided to Extreme under the 2001 Extreme License. As further discussed in Count 6, below, Extreme also confirmed in written emails that its royalty reports included all units of product sold under the license.

88. It was not until after this case was filed that Plaintiffs learned that Extreme had breached the 2001 Extreme License and that its royalty reports and emails confirming the accuracy of those reports were false.

89. During discovery in this case, on April 22, 2022, Magistrate Judge Poplin ordered Extreme to identify all products containing Plaintiffs' software[6] and to produce

---

[6] The April 22, 2022 Order (and the written discovery in dispute that it addressed) used the term "SNMP Research Software," which was defined in the written discovery to Extreme to mean "any of the following: (i) software provided by SNMP Research to Brocade, (ii) software licensed by SNMP Research to Brocade, or (iii) any software created by SNMP Research which is or was in the possession of Extreme. The foregoing categories include Source Code, compiled code, binary code, configuration files and data, associated documentation, and Derivative Works thereof." Extreme had objected that the term "SNMP Research Software" was supposedly overbroad and ambiguous because "it appears to seek discovery concerning software outside the alleged, asserted copyrighted works listed in the Complaint" and because it "potentially implicate[s] a great number of products." April 22, 2022 Order at 9. However, Magistrate Judge Poplin overruled these objections, and held: "The Court disagrees that [SNMP Research Software] is an overbroad term, as Plaintiff's discovery requests relate to Extreme's products—whether or not they are specifically identified in the Complaint—that Plaintiff alleges are improperly incorporating its software. This goes to the heart of Plaintiff's copyright infringement claim." *Id.*

SR-Extreme
2261441

21

financial and other information regarding those products.  Dkt. 131 (herein, "April 22, 2022 Order") at pp. 6-7, 9.

90.     When Extreme served its supplemental written discovery responses on May 13, 2022, Extreme included a cryptic reference in them, stating that it was not identifying products that contained Plaintiffs' software and for which Extreme claimed it had a "separate license agreement" from Plaintiffs.  However, Extreme had previously represented to Plaintiffs, on multiple occasions—including in the November 20, 2015 email discussed in paragraph 94, *infra*—that its use under other licenses with Plaintiffs had ended many years ago.  Nor had Extreme paid any royalties under those other licenses (including the 2001 Extreme License) for many years.  Consequently, Extreme's vague reference to its inclusion of Plaintiffs' software in products pursuant to "a separate license agreement" aroused Plaintiffs' suspicion.

91.     At that point, Plaintiffs began their own independent investigation.  They began by purchasing in mid-2022 some of Extreme's products (which are separate from the Brocade-based lines, discussed in paragraphs 49 and 64, above) and analyzed the code in those products.  These purchases were not small expenditures; they often amounted to thousands of dollars per product.  After receiving the products, Plaintiffs located their software in Extreme's products, including on multiple occasions Plaintiffs' own copyright notice embedded in the products' code.  For some products Plaintiffs found indicia that Plaintiffs' software was in the Extreme products, but the copyright notice which is required to be present appears to have been removed.  This investigation represents the first time Plaintiffs learned that Extreme is currently selling, and apparently has been selling for many years, products with Plaintiffs' copyrighted software other than those that Extreme had obtained from Brocade in 2017 or those that were derivative works of the products

Extreme had obtained from Brocade.

92.    Meanwhile, around this same time, Plaintiffs asked Extreme to identify the "license" that Extreme nebulously referenced in its supplemental discovery responses. Extreme first claimed, in a June 17, 2022 letter to Plaintiffs, that the license was one entered into between SNMP International and a company called Enterasys Networks, Inc. ("Enterasys"). Enterasys is a company that Extreme had acquired and stepped into the shoes of for purposes of Enterasys' license with SNMP International (herein, "Enterasys License"). But this assertion by Extreme flatly contradicted a prior representation from Extreme, made in writing on June 11, 2020. In that email from Paul Segalini, of Extreme, to John Wood (counsel for Plaintiffs), Mr. Segalini represented in writing that: "We can confirm that the legacy Entersys [sic] products went End of Sale in July 2006 and then End of Support in July 2011."[7]

93.    When Plaintiffs confronted Extreme with this fact, Extreme then changed its story. Extreme next claimed that the "license" it had referred to in its supplemental discovery responses was not the Enterasys License (as Extreme previously represented), but instead was the 2001 Extreme License. In the process, Extreme admitted that it had sold scores of product classes containing Plaintiffs' software provided to Extreme under the 2001 Extreme License, including the product classes identified in paragraph 72, *supra*.

94.    However, this new "license" assertion (like Extreme's prior and now abandoned assertion about the Enterasys License) flatly contradicted Extreme's prior representations, including (i) Extreme's 2001 Extreme License royalty reports, which only reported and paid royalties on a single product, the BlackDiamond 10808 10-Slot Chassis product, and (ii) a November 20, 2015 email from Fiona Nolan, of Extreme, to Patti Sams

---

[7] Tara Flanagan, Extreme's in-house counsel, was also copied on this email chain.

and Mary Gibson, of SNMP International, which expressly stated that the single product licensed under the 2001 Extreme License went "end of sale" in 2011 and reported no other product sales.

95.     In its communication claiming that it had a supposed right under the 2001 Extreme License to use and redistribute Plaintiffs' software for the "product classes" identified in paragraph 72, *supra*, Extreme did not dispute, and has never disputed, that it failed to report or pay any royalties for any of these "product classes" other than the single product intended under the 2001 Extreme License—the BlackDiamond 10808 10-Slot Chassis product.  Also, in its communication claiming that it had a supposed right under the 2001 Extreme License, Extreme admitted that it has known of its failure to report and pay royalties, and thus the falsity of its repeated misrepresentations to Plaintiffs, for many years (though Extreme has not yet specified for precisely how many years).

96.     In other words, in claiming its purported "license" right under the 2001 Extreme License for scores of "product classes" that it never reported or paid royalties on, Extreme has effectively admitted:  (i) to years of breach and infringement which are ongoing, and (ii) that Extreme's written representations to SNMP International in Extreme's royalty reports under the 2001 Extreme License, as well as its November 20, 2015 email, were knowingly false.

97.     Prior to the events discussed in paragraphs 90-96, *supra*, Plaintiffs did not know, nor should they have known, that Extreme had breached the 2001 Extreme License and had engaged in copyright infringement by exceeding the scope of use and redistribution rights under the 2001 Extreme License.

98.     Prior to the events discussed in paragraphs 90-96, *supra*, Plaintiffs did not know, nor should they have known, that Extreme had made misrepresentations on its

2261441

royalty reports, which identified and paid royalties on a single product (namely, the BlackDiamond 10808 10-Slot Chassis product) even though Extreme now admits that it used and redistributed Plaintiffs' software it received pursuant to the 2001 Extreme License on scores of additional products. Copies of Extreme's royalty reports are attached as collective Exhibit D.

99. Prior to the events discussed in paragraphs 90-96, *supra*, Plaintiffs did not know, nor should they have known, that Extreme's representations in the November 20, 2015 email from Fiona Nolan, of Extreme, to Patti Sams and Mary Gibson, of SNMP International were false.

## FIRST CAUSE OF ACTION

### (Breach of Contract – License Agreement)

### (Against Brocade)

**100.** ~~68.~~ Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph ~~67~~**99.**

**101.** ~~69.~~ SNMP International and Brocade had a valid and binding written contract, the License Agreement. *See* Exhibit A.

**102.** ~~70.~~ SNMP International adequately performed its obligations under the License Agreement.

**103.** ~~71.~~ Brocade breached the License Agreement by improperly disclosing confidential and Source material to Extreme and failing to comply with its post-termination obligations. The breached sections of the contract include, without limitation, Sections 2, 3, **88,** 16, 28, and Amendment 3 Section 4, all as discussed in more detail in Sections IV.B and C, above.

**104.** ~~72.~~ Brocade's breaches are material and are the legal cause of substantial damage to SNMP International for which SNMP International seeks monetary damages in an amount to be

determined at the time of trial.

**105.** ~~73.~~ Section 16 of the License Agreement expressly provides that SNMP International is entitled to seek an injunction against any unauthorized use or distribution of the licensed software post-termination. SNMP International also seeks, consistent with Section 16 of the License Agreement, an order enjoining Brocade from continuing to use or distribute the copyrighted software, as well as an order directing Brocade to comply with its post-termination obligations under Section 16 of the License Agreement.

**106.** ~~74.~~ SNMP International also seeks its expenses, including attorneys' fees, pursuant to Section 17 of the License Agreement.

## SECOND CAUSE OF ACTION

### (Copyright Infringement – 17 U.S.C. § 501)

### (Against Brocade and Broadcom)

**107.** ~~75.~~ Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph ~~74.~~**106.**

**108.** ~~76.~~ Plaintiff SNMP Research is the registered owner of the valid Copyrights listed in Table 1.

**109.** ~~77.~~ As set forth in Sections IV.B and C above, Brocade, without authorization, copied, reproduced, prepared derivative works based upon, and publicly distributed Plaintiffs' copyrighted software.

**110.** ~~78.~~ Brocade's unauthorized acts constitute copyright infringement.

**111.** ~~79.~~ Brocade's copyright infringement has been and continues to be willful and with full knowledge of SNMP Research's Copyrights.

**112.** ~~80.~~ As a direct and proximate result of Brocade's conduct, SNMP Research has suffered and will continue to suffer irreparable harm, for which it has no adequate remedy at law.

2261441

**113.** ~~81.~~ As a direct and proximate result of the infringement by Brocade set forth herein, SNMP Research is entitled to actual damages and Brocade's profits attributable to its infringement.

**114.** ~~82.~~ Alternatively, SNMP Research is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), and such other amounts as may be proper under 17 U.S.C. § 504(c).

**115.** ~~83.~~ Brocade and Broadcom are jointly and severally liable for any recovery of actual damages, profits, or statutory damages.

**116.** ~~84.~~ SNMP Research is further entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## THIRD CAUSE OF ACTION

### (Copyright Infringement – 17 U.S.C § 501)

### (Against Extreme)

**117.** ~~85.~~ Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph ~~84.~~ **116.**

**118.** ~~86.~~ Plaintiff SNMP Research is the registered owner of the valid Copyrights listed in Table 1.

**119.** ~~87.~~ As set forth in Sections IV.B **, C,** and ~~C~~**E** above, Extreme, without authorization, copied, reproduced, prepared derivative works based upon, and publicly distributed Plaintiffs' copyrighted software.

**120.** ~~88.~~ Extreme's unauthorized acts constitute copyright infringement.

**121.** ~~89.~~ Extreme's copyright infringement has been and continues to be willful, and with full knowledge of SNMP Research's Copyrights.

**122.** ~~90.~~ As a direct and proximate result of Extreme's conduct, SNMP Research has

3585784v1/2261441

suffered and will continue to suffer irreparable harm, for which it has no adequate remedy at law.

**123.** ~~91.~~ As a direct and proximate result of the infringement by Extreme set forth herein, SNMP Research is entitled to actual damages and Extreme's profits attributable to its infringement.

**124.** ~~92.~~ Alternatively, SNMP Research is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), and such other amounts as may be proper under 17 U.S.C. § 504(c).

**125.** ~~93.~~ SNMP Research is further entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## FOURTH CAUSE OF ACTION

**(Copyright Infringement – 17 U.S.C. § 501)**

**(Against Brocade and Broadcom)**

**Contributory Copyright Infringement**

**126.** ~~94.~~ Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph ~~93.~~**125.**

**127.** ~~95.~~ Plaintiff SNMP Research is the registered owner of the valid Copyrights listed in Table 1.

**128.** ~~96.~~ As set forth in Sections IV.B and C above, Extreme, without authorization, copied, reproduced, prepared derivative works based upon, and publicly distributed Plaintiffs' copyrighted software.

**129.** ~~97.~~ Extreme's unauthorized acts constitute copyright infringement.

**130.** ~~98.~~ Brocade knew or had reason to know that Extreme's unauthorized acts constituted copyright infringement.

**131.** ~~99.~~ Brocade induced, caused, and/or materially contributed to Extreme's copyright

2261441

28

infringement.

**132.** ~~100.~~ As a direct and proximate result of Brocade's conduct, SNMP Research has suffered and will continue to suffer irreparable harm, for which it has no adequate remedy at law.

**133.** ~~101.~~ As a direct and proximate result of the contributory infringement by Brocade set forth herein, SNMP Research is entitled to actual damages and Brocade's profits attributable to its infringement.

**134.** ~~102.~~ Alternatively, SNMP Research is entitled to maximum statutory damages, pursuant to 17 U.S.C. § 504(c), and such other amounts as may be proper under 17 U.S.C. § 504(c).

**135.** ~~103.~~ Brocade and Broadcom are jointly and severally liable for any recovery of actual damages, profits, or statutory damages.

**136.** ~~104.~~ SNMP Research is further entitled to its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

## FIFTH CAUSE OF ACTION

### (Breach of the 2001 Extreme License)

### (Against Extreme)

**137.** **Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph 136.**

**138.** **SNMP International and Extreme had a valid and binding written contract, the 2001 Extreme License.** *See* **Exhibit C.**

**139.** **SNMP International adequately performed its obligations under the 2001 Extreme License.**

**140.** **Extreme breached the 2001 Extreme License in multiple ways, including but not limited to: a) failing to report and pay royalties; b) using and redistributing Plaintiffs'**

SNMP000
2261441

29

software beyond the scope of the use and redistribution rights granted by the 2001 Extreme License; c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 Extreme License; d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the 2001 Extreme License; e) failing to provide information that Extreme was required to provide under the 2001 Extreme License; f) failing to maintain SNMP Research's copyright notice in the software; g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP International; and h) failing to return or provide certification of the destruction of Program Source provided under the 2001 Extreme License. The breached sections of the contract include, without limitation, Sections 2, 3, 7, 8, 10, 16, 24, and Attachment A, all as discussed in more detail in Section IV.E, above.

141. Extreme's breaches are material and are the legal cause of substantial damage to SNMP International for which SNMP International seeks monetary damages in an amount to be determined at the time of trial.

142. Section 16 of the 2001 Extreme License expressly provides that SNMP International is entitled to pursue any other remedy at law or in equity. SNMP International also seeks, consistent with Section 16 of the 2001 Extreme License, an order enjoining Extreme from continuing to use or distribute the copyrighted software, as well as an order directing Extreme to comply with its post-termination obligations under Section 16 of the 2001 Extreme License.

143. SNMP International also seeks its expenses, including attorneys' fees, pursuant to Section 17 of the 2001 Extreme License.

30

# SIXTH CAUSE OF ACTION

## (Fraud)

## (Against Extreme)

144.   Plaintiffs reallege and incorporate herein the allegations contained within paragraph 1 through paragraph 143.

145.   The 2001 Extreme License granted Extreme the right to use and redistribute Plaintiffs' software in a single product:  its BlackDiamond 10808 10-Slot Chassis product. *See* Exhibit C, §§ 2, 3; *id.*, Attachment A.  The 2001 Extreme License further provided that Extreme would pay SNMP International a license fee, as well as a royalty based on the number of units of that product sold.  *See* Exhibit C, § 24.

146.   The 2001 Extreme License required Extreme to prepare and submit quarterly royalty reports to SNMP International showing the product quantities that Extreme sold each fiscal quarter.  *See* Exhibit C, § 25.

147.   Between 2001 and 2018, Extreme, through its Director of Purchasing, Fiona Nolan and its Senior Buyer, Charles Pitchaimani, as well as other Extreme employees (including Yeeping Zhong, Heidi Bagg, Rita Sierra, Cindy Huang, Sandhya Hebbar, Mark Burke, Diane Applegate, Josh West, and Charles Pitchaimani) sent SNMP International royalty reports reporting sales solely of the BlackDiamond 10808 10-Slot Chassis product. *See* collective Exhibit D.   From 2012 to 2018 Extreme submitted seventeen (17) royalty reports that reported zero (0) sales of product containing Plaintiffs' software.

148.   These royalty reports were false because they represented that units of just one product (the BlackDiamond 10808 10-Slot Chassis) had been sold or that no products had been sold, when in fact Extreme had sold, and is still selling, scores of other products that contain Plaintiffs' software provided to Extreme under the 2001 Extreme License.  *See,*

SNMP-EXT-
2261441

32

*supra*, Section E.

149.   Extreme also made false representations to SNMP International in emails. On November 20, 2015, Extreme (through Ms. Nolan) represented that the only product licensed under the 2001 Extreme License (the BlackDiamond 10808 10-Slot Chassis product) went "End of Sale in 2011" and represented that "no shipments could have been missed."  This e-mail also contained a chart showing that Extreme had made no sales of licensed product since the first quarter of 2012.  *See* Exhibit E.  Also, in another email on November 20, 2015, Ms. Nolan further confirmed that no shipments were missed in the royalty reports by stating:  "We have tracked all shipments by Extreme to End Customers for all locations."  See Exhibit F.  These emails were knowingly false because Extreme had sold (and is still selling) scores of other products that contain Plaintiffs' software provided to Extreme under the 2001 Extreme License.

150.   Extreme knew that the representations in its royalty reports and its emails were false.  SNMP International did not know that the representations in Extreme's royalty reports and emails were false.

151.   In addition, Extreme induced SNMP International to provide software updates (via annual software service agreements)[8] to Extreme, ostensibly to service the single product licensed under the 2001 Extreme License, when in fact and unbeknownst to SNMP International, Extreme was using the software updates it received to incorporate those updates into scores of unlicensed products.

152.   SNMP International reasonably relied on Extreme's material misrepresentations and was damaged in doing so in an amount to be determined at trial.

---

[8] A software service agreement is tied to a particular license agreement and allows the customer to receive updates of Plaintiffs' software and to receive support from Plaintiffs' personnel.

5855-8520-4614
2261441

For example and not by way of limitation, SNMP International received far less than it was entitled to due to Extreme's fraudulent royalty reporting. In addition, SNMP International would not have provided Extreme with software updates had SNMP International known of Extreme's improper use of Plaintiffs' software licensed under the 2001 Extreme License on products that were not licensed and for which Extreme was not reporting or paying royalties. Plaintiffs found these software updates in certain units of the Extreme products Plaintiffs purchased. In addition, had SNMP International known of Extreme's improper use of Plaintiffs' software licensed under the 2001 Extreme License, SNMP International would have, at that time, terminated Extreme's use and redistribution rights (to the extent they were not already terminated under Section 24 for failure to timely pay royalties) and demanded written certification of the destruction of all copies of the Program Source provided by SNMP International and all derivative works of the Program Source in all forms.

153. SNMP International's reliance was reasonable. Among other things, and not by way of limitation, Extreme sent SNMP International emails attesting to the accuracy of its royalty reporting, which only reported sales on a single product. That attestation and the royalty reports themselves were consistent with the 2001 Extreme License, which only provided license rights as to "a single product developed at several coordinated development sites using a single particular combination of target processor, operating system, and development tools platform." Exhibit C, at Attachment A (emphasis added).

154. Extreme acted fraudulently or recklessly in making its misrepresentations.

155. Due to Extreme's malicious, intentional, fraudulent, and reckless behavior, Plaintiffs are entitled to punitive damages pursuant to TENN. CODE ANN. § 29-39-104(a)(1) (2021).

## PRAYER FOR RELIEF

WHEREFORE, **PLAINTIFFS PRAY** FOR THE FOLLOWING RELIEF:

1.     For judgment in favor of SNMP International for all damages sustained as a result of Brocade's breach of contract, in an amount to be proven at trial;

2.     For judgment of copyright infringement on all copyright counts and an order that SNMP Research is entitled to all actual damages it has suffered as well as all of Broadcom's, Brocade's, and Extreme's profits attributable to the copyright infringement, or in the alternative, maximum statutory damages with respect to each of SNMP Research's copyrighted works, plus full costs and attorneys' fees as provided for by 17 U.S.C. § 505;

**3.     For judgment in favor of SNMP International for all damages sustained as a result of Extreme's breach of contract, in an amount to be proven at trial;**

**4.     For judgment in favor of SNMP International for all damages sustained as a result of Extreme's fraud, in an amount to be proven at trial;**

**5.**     ~~3.~~ Equitable relief including enjoining Broadcom, Brocade, and Extreme, their officers, agents, servants, employees, parent and subsidiary companies, assignees and successors in interest, and those persons and/or entities in concert or participation with Defendants from: reproducing, preparing derivative works based upon, and publicly distributing Plaintiffs' copyrighted software or derivative works and from further disclosing and/or distributing source material, and to deliver to the Court for destruction or other reasonable disposition all such materials and means for accomplishing the same in Defendants' possession, custody, or control;

**6.**     ~~4.~~ For an award of reasonable attorneys' fees, costs, and expenses;

**7.**     ~~5.~~ For pre-judgment and post-judgment interest, and any interest as required under the terms of the License Agreement **and the 2001 Extreme License**;

**8.**     ~~6.~~ For such further and other relief that this Court deems just and proper;

**9.** For an accounting of all sales by Extreme of any products or services containing Plaintiffs' software or products or services that were reasonably related to such sales; and

**10.** ~~7.~~ For a trial by jury.

Dated: ~~October 26, 2020~~December 2, 2022          Respectfully submitted,

By:      /s/ John L. Wood

John L. Wood, Esq. (BPR #027642)
Cheryl G. Rice, Esq. (BPR #021145)
Rameen J. Nasrollahi, Esq. (BPR #033458)
EGERTON, McAFEE, ARMISTEAD &
DAVIS, P.C.
900 S. Gay Street, Suite 1400
P.O. Box 2047
Knoxville, TN 37902
(865) 546-0500 (phone)
(865) 525-5293 (facsimile)
jwood@emlaw.com
crice@emlaw.com
rnasrollahi@emlaw.com


Morgan Chu* (CA Bar. No. 70446)
David Nimmer* (CA Bar. No. 97170)
A. Matthew Ashley* (CA Bar. No. 198235)
Olivia L. Weber* (CA Bar. No. 319918)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010 (phone)
(310) 203-7199 (facsimile)
mchu@irell.com
dnimmer@irell.com
mashley@irell.com
oweber@irell.com

*Motion for Admission Pro Hac Vice
Forthcoming

*Attorneys for Plaintiffs*
*SNMP Research International, Inc.*
*SNMP Research, Inc.*

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure Rule 38(b), and otherwise, Plaintiffs respectfully demand a jury trial on all issues raised in this Complaint.

Dated: **December 2, 2022**                    Respectfully submitted,

By:      */s/ John L. Wood*                 

John L. Wood, Esq. (BPR #027642)
Cheryl G. Rice, Esq. (BPR #021145)
Rameen J. Nasrollahi, Esq. (BPR #033458)
EGERTON, McAFEE, ARMISTEAD &
DAVIS, P.C.
900 S. Gay Street, Suite 1400
P.O. Box 2047
Knoxville, TN 37902
(865) 546-0500 (phone)
(865) 525-5293 (facsimile)
jwood@emlaw.com
crice@emlaw.com
rnasrollahi@emlaw.com

Morgan Chu* (CA Bar. No. 70446)
David Nimmer* (CA Bar. No. 97170)
A. Matthew Ashley* (CA Bar. No. 198235)
Olivia L. Weber* (CA Bar. No. 319918)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010 (phone)
(310) 203-7199 (facsimile)
mchu@irell.com
dnimmer@irell.com
mashley@irell.com
oweber@irell.com

~~*Motion for Admission Pro Hac Vice Forthcoming~~

*Attorneys for Plaintiffs*

*SNMP Research International, Inc.*
*SNMP Research, Inc.*

Document comparison by Workshare 9.5 on Friday, December 2, 2022 6:09:14 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://IMANAGEDMS/IMANAGE/10886373/7 |
| Description | #10886373v7<IMANAGE> - SNMP Complaint For Filing (10-26-20) |
| Document 2 ID | interwovenSite://IMANAGEDMS/IMANAGE/11164076/5 |
| Description | #11164076v5<IMANAGE> - SNMP Amended Complaint (2022-12-2) (For Filing) |
| Rendering set | I&M Standard |

| Legend: | |
|---|---|
| **Insertion** | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 206 |
| Deletions | 65 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 271 |