**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

---------------------------------------------------------- x

SNMP RESEARCH, INC. and SNMP
RESEARCH INTERNATIONAL, INC.,

               Plaintiffs,

             v.

BROADCOM INC.; BROCADE
COMMUNICATIONS SYSTEMS LLC; and
EXTREME NETWORKS, INC.,

              Defendants.

---------------------------------------------------------- x

Case No. 3:20-cv-00451-CEA-DCP

U.S. District Judge Charles E. Atchley

## DEFENDANT EXTREME NETWORKS, INC.'S
## MEMORANDUM IN SUPPORT OF ITS MOTION TO REFER
## QUESTIONS TO THE REGISTER OF COPYRIGHTS

# TABLE OF CONTENTS

Page

I. INTRODUCTION ................................................................................................. 1

II. LEGAL STANDARD .......................................................................................... 2

    A. The Section 411(b)(1) Conditions for Invalidity ..................................... 2

    B. The Copyright Act Requires Courts to Refer the Materiality Question to the Register ............................................................................................. 4

III. BACKGROUND ................................................................................................. 5

    A. SNMPR Registered Eight Copyrights as Unpublished ........................... 5

    B. Defendants Moved to Dismiss SNMPR's Copyright Infringement Claim, Arguing that the Registrations Are Invalid .............................................. 6

    C. SNMPR's Software Had Been Distributed ███████████████████ ██████████████████████ ............................................................. 7

IV. SINCE SECTION 411(B)(1) REQUIREMENTS ARE MET, THE COURT MUST REFER THE MATERIALITY QUESTION TO THE COPYRIGHT OFFICE .............................................................................................................. 9

    A. SNMPR Inaccurately Registered the Eight Asserted Copyright Works as Unpublished in 2011 .............................................................................. 10

        1. The Copyright Act is Clear that Distribution and "Offering to Distribute" Constitutes Publication ............................................ 10

        2. SNMPR's Software Was Not Subject to "Limited Distribution" .............. 12

    B. SNMPR Was at Least Willfully Blind as to the Inaccuracy in Its Registrations ........................................................................................... 16

        1. Classifying the Works as Unpublished Was a Significant Error .............. 16

        2. The Law Regarding Publication Was Clear ................................. 16

    C. The Court Should Refer Extreme's Question to the Copyright Office At This Time ................................................................................................ 20

V. CONCLUSION ................................................................................................. 21

# TABLE OF AUTHORITIES

## CASES

*Antony v. Buena Vista Books, Inc.,*
No. 18-205, 2020 WL 5995590 (E.D. Ky. Oct 1, 2020) ....................................................16

*Bruhn NewTech, Inc. v. United States,*
144 Fed. Cl. 755 (2019) ..................................................................................................11

*Bueno v. Benhamou,*
No. 2:21-cv-04595, 2022 WL 1592593 (C.D. Cal. dismissed July 29, 2022)...............3, 10

*D.C.I. Computer Systems, Inc. v. Pardini,*
978 F.2d 1265, 1992 WL 323325 (Table) (9th Cir. 1992) ...............................................15

*Daimler-Chrysler Services North America, LLC v. Summit National, Inc.,*
289 F. App'x 916  (6th Cir. 2008) .................................................................1, 10, 12, 19

*Data General Corp. v. Grumman Systems Support Corp.,*
803 F. Supp. 487 (D. Mass. 1992) ...................................................................................6

*DBT Group, Inc. v. FMC Corp.,*
No. 01 C 2769, 2001 WL 1105077 (N.D. Ill. Sept. 19, 2001)...........................................14

*Determined Productions, Inc. v. Koster,*
Nos. C 92-1697, 2475, 1993 WL 120463, (N.D. Cal. Apr. 13, 1993)................................4

*HealtheState, LLC v. United States,*
160 Fed. Cl. 91 (2022) .................................................................................3, 4, 5, 20, 21

*Hubco Data Products Corp. v. Management Assistance Inc.,*
No. 81-1295, 1983 WL 1130, (D. Idaho Feb. 3, 1983) ...............................................11, 15

*Jeon v. Anderson,*
No. 17-cv-01709, 2019 WL 2949033 (C.D. Cal. June 14, 2019)....................................4, 5

*King-Devick Test Inc. v. NYU Langone Hospitals,*
No. 17-CV-9307, 2019 WL 3071935 (S.D.N.Y. July 15, 2019)......................................20

*LADS Network Solutions, Inc. v. Agilis Systems, LLC,*
No. 19-cv-00011, 2022 WL 4534738 (E.D. Mo. Sept. 28, 2022) .......................................3

*Lieb v. Korangy Publishing, Inc.,*
No. CV 15-0040, 2022 WL 1124850 (E.D.N.Y. Apr. 14, 2022) ............................3, 16, 17

ii

*McLaren v. Chico's FAS, Inc.*,
    No. 10 Civ. 2481, 2010 WL 4615772 (S.D.N.Y. Nov. 9, 2010) ..................................10, 19

*Metropolitan Regional Information Systems, Inc. v. American Home Realty Network*,
    948 F. Supp. 2d 538 (D. Md. 2013) ...................................................................................14

*Midway Manufacturing Co. v. Strohon*,
    564 F. Supp. 741 (N.D. Ill. 1983) .....................................................................................11

*Neman Brothers & Associates, Inc. v. Interfocus, Inc.*,
    No. 20-cv-11181, 2023 WL 115558 (C.D. Cal. Jan. 4, 2023) ............................................5

*PRC Realty Systems, Inc. v. National Association of Realtors, Inc.*,
    766 F. Supp. 453 (E.D. Va. 1991), *aff'd in part, rev'd in part on other grounds*,
    972 F.2d 341 (4th Cir. 1992) .............................................................................................15

*Reed Elsevier, Inc. v. Muchnick*,
    559 U.S. 154 (2010)..............................................................................................................1

*SellPoolSuppliesOnline.com LLC v. Ugly Pools Arizona Inc.*,
    No. CV-15-01856, 2018 WL 4565900 (D. Ariz. Sept. 24, 2018) .......................................5

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
    142 S. Ct. 941 (2022)...............................................................................................3, 7, 16

*Unix System Laboratories, Inc. v. Berkeley Software Design, Inc.*,
    No. 92-1667, 1993 WL 414724 (D.N.J. Mar. 3, 1993) ....................................................15

## STATUTES

17 U.S.C. § 101...........................................................................................................10, 14, 18

17 U.S.C. § 410....................................................................................................................16

17 U.S.C. § 411.......................................................................................................1, 2, 3, 4, 20

17 U.S.C. § 412 ....................................................................................................................16

Case 3:20-cv-00451-CEA-DCP   Document 263-1   Filed 03/20/23   Page 4 of 26   PageID #: 12704

## I.   INTRODUCTION

In this case, SNMP Research, Inc. and SNMP Research International, Inc. (collectively, "SNMPR") are asserting eight copyrights against Extreme Networks, Inc. ("Extreme"). SNMPR may not do so unless its copyright registrations were validly registered, and have been valid at all stages of this case. "The Copyright Act . . . requires copyright holders to register their works before suing for copyright infringement." *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 157 (2010); 17 U.S.C. § 411(a).

Such registrations are not validly registered if SNMPR procured them from the Copyright Office improperly, such as by providing the Copyright Office with incorrect information. As relevant to this case, the Register of Copyrights (the "Register") has consistently stated that it would refuse registration based on inaccuracies regarding ***publication***, and courts routinely invalidate registrations on such grounds.

In this case, SNMPR registered its eight copyrights in 2011, and when it did so SNMPR explicitly told the Copyright Office that each of the copyrighted works was "unpublished." That is a problem given that all parties now know that the following had all occurred prior to 2011: (i) SNMPR had licensed its eight works ▇▇▇▇▇ of licensees, including the ▇▇▇▇▇ ▇▇▇▇▇▇▇, while collecting ▇▇▇▇ for such licenses; (ii) SNMPR had distributed the works to those ▇▇▇▇ of licensees; and (iii) SNMPR's licensees had distributed ▇▇▇▇ of copies of the software to their customers. Thus, under the law, there can be no sincere debate about whether SNMPR had "published" its eight works prior to telling the Copyright Office it had not. *See, e.g.*, *Daimler-Chrysler Services North Am., LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916 (6th Cir. 2008).

At this stage, Extreme is not asking this Court to invalidate SNMPR's copyright registrations. Instead, Extreme asks that the Court confirm that Extreme has sufficiently alleged that SNMPR's registrations contained "inaccurate information" as described in Section 411(b)(1) of the Copyright Act. *See* 17 U.S.C. § 411(b)(2). It has. Given that, the Copyright Act requires the Court to request the Register to advise whether it would have refused registration of SNMPR's registrations as "unpublished" had it known that the works were widely distributed prior to each registration. *See id*. A confirmation by the Register that it would have refused registration would then, in turn, allow Extreme to seek a finding of invalidity from this Court.

Accordingly, Extreme respectfully asks the Court to refer the following question to the Register pursuant to Section 411(b)(2):

> Would the Register of Copyrights have rejected SNMPR's following copyright registrations if it had known that the claimed software had been published prior to SNMPR seeking to register its works as unpublished: Registration No. TXu 1-706-718, registered on January 25, 2011; Registration No. TXu 1-772-248[1], on July 20, 2011; Registration No. TXu 1-772-250, on July 20, 2011; Registration No. TXu 1-738-956, on February 3, 2011; Registration No. TXu 1-707-158, on February 3, 2011; Registration No. TXu 1-738-954, on February 3, 2011; Registration No. TXu 1-707-157, on February 3, 2011; and Registration No. TXu 1-738-958, on February 3, 2011 (collectively, the "Registrations")?

## II. LEGAL STANDARD

### A. The Section 411(b)(1) Conditions for Invalidity

A certificate of registration is valid "regardless of whether the certificate contains inaccurate information" ***unless*** two conditions are met:

> (A) the inaccurate information was included in the application for copyright registration with knowledge that it was inaccurate; and
>
> (B) the inaccuracy of information, if known, would have caused the Register of Copyrights to refuse registration.

---

[1] The first page of the registration certificate provided by SNMPR with its Amended Complaint (ECF No. 244, "FAC") shows the registration number as "TXu 1-722-248," but subsequent pages show the registration number as "TXu 1-772-248." (ECF No. 244-2 at 6-9.)

2

17 U.S.C. § 411(b)(1).

With respect to Section 411(b)(1)(A), the Supreme Court recently clarified that the word "knowledge" in the phrase "with knowledge that it was inaccurate" means "actual, subjective awareness of both the facts and the law." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941, 947 (2022). The Court explained, however, that "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Id.* at 948. Instead, "willful blindness may support a finding of actual knowledge." *Id.*

Thus, post-*Unicolors*, courts have found that willful blindness can satisfy the knowledge requirement of Section 411(b)(1)(A). *See Lieb v. Korangy Publ'g, Inc.*, No. CV 15-0040, 2022 WL 1124850, at *12 (E.D.N.Y. Apr. 14, 2022) (holding plaintiff had requisite knowledge where Copyright Office "provided the clearest of directions and the registrant knowingly ignored them"); *HealtheState, LLC v. United States*, 160 Fed. Cl. 91, 96 (2022) ("Actual knowledge can also be proven through a finding of willful blindness or based on circumstantial evidence that the applicant was actually aware of the inaccuracy of the information."); *cf. LADS Network Sols., Inc. v. Agilis Sys., LLC*, No. 19-cv-00011, 2022 WL 4534738, at *7 (E.D. Mo. Sept. 28, 2022) ("finding of knowledge does not require a smoking gun").

With respect to Section 411(b)(1)(B), which is often referred to as the "materiality question," the Register has repeatedly found that inaccurately registering a work as "unpublished" is a material misstatement that would have caused it to refuse registration. *See, e.g.*, Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 2, *Bueno v. Benhamou*, No. 2:21-cv-04595 (C.D. Cal. Mar. 16, 2022), ECF No. 74-1 [hereinafter *Bueno* Register Response] ("Had the Office known that the Blue-Lit Walkway photograph was published prior to the submission of the May 21, 2021 registration application, the Office would have refused to register

3

that work as a part of group registration for unpublished photographs."); Response of the Acting Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 8, *Jeon v. Anderson*, No. 17-cv-01709, 2019 WL 2949033 (C.D. Cal. June 14, 2019), ECF No. 52-1 [hereinafter *Jeon* Register Response] ("[H]ad the Office been aware that the Works had been published prior to the date Plaintiff submitted its applications, the Office would have refused to register these works as part of an unpublished collection."); Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 15, *HealtheState*, 160 Fed. Cl. 91 (No. 18-cv-34C), ECF No. 187 [hereinafter *HealtheState* Register Response] ("If, as alleged, the deposit copies provided for the . . . [r]egistrations were not first published or completed on the dates indicated on their respective applications, then the Office would not have granted the registrations based on the applications that were submitted."); *see also Determined Prods., Inc. v. Koster*, Nos. C 92-1697, 2475, 1993 WL 120463, at *1 (N.D. Cal. Apr. 13, 1993) ("Wrongly identifying a number of published individual works as an unpublished collection is a fundamental registration error, which deprives this court of jurisdiction over the copyright claim.").

### B. The Copyright Act Requires Courts to Refer the Materiality Question to the Register

The Copyright Act provides that courts must refer the materiality question to the Register if a defendant alleges that both conditions of Section 411(b)(1) are met:

> In any case in which inaccurate information described under paragraph (1) is **alleged**, the court **shall** request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(2) (emphasis added). Notably, the statute requires a defendant to "allege"—rather than prove—both conditions of Section 411(b)(1) to trigger the mandatory referral obligation. *See id.* Thus, courts "review the movant's request to determine whether it has provided

4

some basis for its allegation and presented a proper question for referral to the Register." *HealtheState*, 160 Fed. Cl. at 96.

Courts have routinely referred questions about inaccuracies regarding publication to the Register. *See, e.g., SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz. Inc.*, No. CV-15-01856, 2018 WL 4565900, at *5 (D. Ariz. Sept. 24, 2018). As noted above, the Register has routinely responded that it would have refused registration if it had known about such inaccuracies. A confirmation by the Register that it would have refused registration in this case would open the door for the Court to make a merits decision on whether SNMPR had the requisite knowledge. *See Neman Bros. & Assocs., Inc. v. Interfocus, Inc.*, No. 20-cv-11181, 2023 WL 115558, at *13 (C.D. Cal. Jan. 4, 2023) (granting summary judgment on copyright infringement claims after the Register responded to an inquiry with regard to materiality of inaccuracy); *Jeon v. Anderson*, 2019 WL 2949033, at *6 (same).

## III. BACKGROUND

### A. SNMPR Registered Eight Copyrights as Unpublished

In 2011, SNMPR applied for and received the eight Registrations for the "text, compilation, editing, computer program, artwork" for the software at issue in this case as "unpublished." (FAC ¶ 33, Table 1 (listing eight Registrations); ECF No. 244-2 ("TXu" prefix used in all registration numbers); *see* Demers Decl.[2] Ex. 1 (U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* §§ 1802.8(A)(2), 2306.4 (3d ed. 2021)) [hereinafter Compendium III] (TXu indicates unpublished works).) While software can be stored in either "source code" or "object code" form,[3]

---

[2] "Demers Decl." refers to the Declaration of Leslie A. Demers filed in support of this motion.

[3] "Computer programs are initially written in a 'source code,' which is a symbolic language, often using English words and common mathematical symbols, that humans can read. The source code is then translated, through a mechanical process known as compilation or assembly, into 'object

*(cont'd)*

5

"[f]or registration purposes, the claim is in the ***computer program*** rather than in any particular representation of the program." *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 803 F. Supp. 487, 490 (D. Mass. 1992) (bold emphasis added) (quoting the U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 321.03 (2d ed. 1984) [hereinafter Compendium II (available at Demers Decl. Ex. 2)]).

## B. Defendants Moved to Dismiss SNMPR's Copyright Infringement Claim, Arguing that the Registrations Are Invalid

On October 26, 2020, SNMPR filed its initial complaint, including claims for copyright infringement against (a) Brocade Communications Systems LLC ("Brocade") and its parent, Broadcom, Inc. ("Broadcom"), who had licensed SNMPR's software pursuant to a 2001 agreement (the "Brocade Agreement") and (b) Extreme, who had acquired Brocade's data center business and allegedly began selling products that incorporated the software provided by SNMPR to Brocade. (ECF No. 3-1 ¶¶ 7, 8, 43, 47-50, 75-104.)

On December 22, 2020, Brocade and Broadcom, joined by Extreme, filed a motion to dismiss arguing that SNMPR failed to state a claim for copyright infringement as its copyright registrations are invalid pursuant to 17 U.S.C. § 411. (ECF No. 42 at 15-22; *see* ECF No. 39 at 2-3.) In particular, Brocade, Broadcom, and Extreme (collectively, "Defendants") noted that SNMPR registered the eight copyright registrations at issue in this case as unpublished. (ECF No. 42 at 15-17.) Relying on the facts alleged in SNMPR's original complaint alone, Defendants argued that "Plaintiffs' software products are registered as unpublished works" even though

---

code,' which is a concatenation of 1s and 0s readable by computer. Although a skilled programmer can read and understand small sections of object code, it is virtually impossible to develop a working understanding of a program by examining only its object code. As a result, most commercial programs are sold only in object code form, and can be run only 'as is' by the ordinary user." 4 Nimmer on Copyright § 13.03, n. 271 (2022).

"Plaintiffs admit in their Complaint that they licensed their software to Brocade in 2001," and "issuing a 'license' constitutes 'distribution' and thus publication." (*Id.* at 15-16.) Defendants further argued that "Plaintiffs knowingly submitted their applications for copyright registration with inaccurate information." (*Id.* at 18.)

On January 26, 2021, SNMPR conceded that it had registered its works as unpublished. (*See, e.g.*, ECF No. 51 at 19 (admitting "SNMP Research[] regist[ered] . . . its software as unpublished").) But SNMPR argued the Brocade Agreement did not constitute "publication" because the "Agreement contains numerous 'express restrictions' on disclosure, so SNMP Research's registration of its software as unpublished is consistent with ¶ 1905.1 [of Compendium III]." (*Id.* at 2, 20.) SNMPR further argued that binding Sixth Circuit precedent required that Defendants show SNMPR had "defrauded the Copyright Office." (*Id.* at 2.)

On February 24, 2022, the Supreme Court clarified the scope of the phrase "with knowledge that it was inaccurate[,]" ruling that Section 411(b) did not include "a scienter requirement other than actual knowledge" and that "willful blindness" can meet that requirement. *Unicolors*, 142 S. Ct. at 942.

On September 26, 2022, this Court ordered the parties to mediate their claims; denied the motion to dismiss without prejudice; and invited Defendants to re-file that motion if mediation failed. (*See* ECF No. 205 at 43, 45-46.) On March 17, 2023, Brocade and Broadcom re-filed a motion to dismiss based in part on the invalidity of SNMPR's registrations. (*See* ECF No. 261.)

C.    **SNMPR's Software Had Been Distributed** ███████████████

During discovery, SNMPR revealed that, before registering its copyrights, ███████████
████████████████████████████████████████████████████████████
████████████████████████████████. In particular, SNMPR had

7

entered into agreements to distribute its software with at ██████████████████████

████, before it registered the first work at issue in this case. (*See* Demers Decl. ¶ 12.)[4]

The licenses granted various rights to SNMPR's source code and binary/object code. With regard to source code, the licenses generally granted each ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. (ECF No. 246-2 § 3.) Through these agreements, SNMPR had actually distributed its source code ████████████████████

████████████████████████████. (*See, e.g.*, Demers Decl. Ex. 3 at SNMP-0024564

(████████████████████████).) In fact, ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████. (*See* Demers Decl. Ex. 4 at EXTREME-00725184-85; Demers Decl. ¶ 13.) SNMPR also provided updates of its software to its licensees. (FAC ¶ 151 (describing SNMPR's "software service agreement," which "allows the customer to receive updates of Plaintiffs' software"); ECF No. 260-1 at § 2 (████████████████████████

████████████████████).)

The licenses typically granted each ████████████████████████

████████████████████████████████████████████████████████████

████████████████████. (ECF No. 246-2 § 3 (emphasis added); *see* Demers Decl. Ex. 5.) SNMPR generally structured its agreements ████████████████████████

---

[4] SNMPR has entered into over 950 license agreements, plus amendments, from 1990 to today. (*See* ECF No. 229 at 2.) SNMPR's productions to date have not included all agreements entered into prior to 1994, and SNMPR has so far declined to produce these agreements. (*See* ECF No. 229 at 2.)

8

███████████████████████████████████████. (*See, e.g.*, ECF Nos. 246-1, 246-2.)

SNMPR received ████████████████████████████████████

███████████████████████████████████████

█████████████████████████. (*See* Demers Decl. Ex. 3 at SNMP-0024564).)[5]  According

to SNMPR, these licensees use its software in "network equipment, network-connected computers

and servers, telephone systems, electronic gaming, and by the United States military, among many

other uses and users."  (FAC ¶ 4.)

To be clear, these undisputable facts—about SNMPR's own licensing history, based on

SNMPR's own documents—show that when SNMPR told the Copyright Office that its works

were "unpublished," in fact those works were (and had been for a decade or more) present in the

global market for routers and switches, including ███████████████████████████████

███████████████████████████.  SNMPR of course knew this was the case;

SNMPR was █████████████████████████████████.

SNMPR has asserted that its alleged copyrighted works were not published (*see* ECF No.

51 at 19) despite ████████████████████████████████

██████████████████████████████████████

████████████████.

## IV.  SINCE SECTION 411(B)(1) REQUIREMENTS ARE MET, THE COURT MUST REFER THE MATERIALITY QUESTION TO THE COPYRIGHT OFFICE

While Extreme need only allege that both requirements of Section 411(b)(1)(A) are met

for Section 411(b)(2)'s referral obligation to apply, the documents SNMPR has produced to date

confirm that those requirements are met: SNMPR's copyright registrations contain the inaccurate

---

[5] SNMPR collected ███████████████████████████████████████
██████████████. (*See* Demers Decl. Ex. 3 at SNMP-0024564.)

9

statement that the works were not published, and SNMPR had the requisite knowledge of these inaccuracies when it registered its software in 2011. Therefore, pursuant to Section 411(b)(2), the Court must request the Register to advise the Court whether the inaccurate information, if known, would have caused the Register to refuse registration.

### A. SNMPR Inaccurately Registered the Eight Asserted Copyright Works as Unpublished in 2011

SNMPR's Registrations inaccurately state that its software was unpublished in 2011—when SNMPR's software had already been widely distributed.

#### 1. The Copyright Act is Clear that Distribution and "Offering to Distribute" Constitutes Publication

The Copyright Act defines "publication" to mean "the distribution of copies . . . of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending . . ." or "offering to distribute copies . . . to a group of persons for purposes of further distribution . . . ." 17 U.S.C. § 101. SNMPR's software was published in three separate ways.

First, the Copyright Act makes clear that "[t]he *offering* to distribute copies . . . to a group of persons for the purpose of further distribution . . . constitutes publication." 17 U.S.C. § 101 (emphasis added); (*see* Demers Decl. Ex. 1 (Compendium III at § 612.2) ("offering to distribute copies . . . constitutes publication").) Courts have similarly confirmed that "[l]icensing a work constitutes 'publication' under the Copyright Act." *Bueno*, 2022 WL 1592593, at *5 (citation omitted); *McLaren v. Chico's FAS, Inc.*, No. 10 Civ. 2481, 2010 WL 4615772, at *2 (S.D.N.Y. Nov. 9, 2010) (holding that by licensing the work to an entity so that entity could produce and sell products based on the work, the plaintiff "published" the work within the meaning of the Copyright Act). For example, in *Daimler-Chrysler*, the Sixth Circuit held that software had been "published" under the Copyright Act because it had been licensed to a variety of customers. 289 F. App'x at 922-23. Thus, the law is also clear that SNMPR offered to distribute its software—and thus

10

published—via its ████ of license agreements, which ████████████,
before 2011.

Second, even if licensing itself did not constitute an offer to distribute (which it does),
SNMPR's software was in fact distributed—and thus published—████████████
████████. *(See, e.g.,* ECF No. 246-2 § 3; Demers Decl. Ex. 1 (Compendium III at § 612.2)
(software published "when copies are distributed by purchase or *license*") (emphasis added))); *see
also Bruhn NewTech, Inc. v. United State*s, 144 Fed. Cl. 755, 815 (2019) (software first published
when "delivered to the United States government . . . pursuant to [a c]ontract").

Finally, SNMPR's software was distributed—and thus published—████████
████████████. "A program is considered published
even if the copies contained object code rather than source code and even if the source code has
not been disclosed to the public." (Demers Decl. Ex. 1 (Compendium III at § 721.9(E))); *see also
Midway Mfg. Co. v. Strohon*, 564 F. Supp. 741, 751 (N.D. Ill. 1983) ("the object code is nothing
other than a direct transformation of a computer program, composed . . . in source code"); *Hubco
Data Prods. Corp. v. Mgmt. Assistance Inc.*, No. 81-1295, 1983 WL 1130, at *6 (D. Idaho Feb. 3,
1983) (assuming that distribution of operating object code form can constitute publication).
SNMPR even concedes that distribution of its software in object form constitutes public
distribution no fewer than 16 times in the FAC, including:

- "After its transaction with Brocade/Broadcom, Extreme began reproducing and *publicly
distributing* products that contained Plaintiffs' copyrighted software and derivative works."
(FAC ¶ 47 (emphasis added).)

- "Yet, Brocade has continued to reproduce, prepare derivative works based upon, and
*publicly distribute* Plaintiffs' copyrighted software as if Brocade *still* had license rights."
(*Id.* at ¶ 13 (emphases added).)

- Brocade "transferred to Extreme at least a portion of Brocade's business unit utilizing,
licensing and/or offering to license, providing services and/or offering to provide services,

11

and ***publicly distributing/selling products containing Plaintiffs' copyrighted software in binary form***." (*Id.* at ¶ 46 (emphasis added).)

(*See also* FAC ¶¶ 14, 16-17, 48-50, 63, 65-66, 109, 119, 128.) Thus, SNMPR's software was published—by being widely licensed and distributed, in both source and object code form—well before SNMPR submitted applications to the Copyright Office untruthfully claiming that the software was unpublished.

### 2. SNMPR's Software Was Not Subject to "Limited Distribution"

In its opposition to Defendants' prior-filed motion to dismiss, SNMPR argued that its software was not published because it was subject to "a more limited distribution." (ECF No. 51 at 19.) Not so. SNMPR distributed its software widely throughout the industry, and its license agreements did not have sufficiently restrictive terms to render its software "unpublished."

### (a) SNMPR's Software Was Widely Distributed

While it is true that that a work need not be registered as "published" if it was only in "limited publication," that occurs only when it is "provided to a definite, very selective group." *See Daimler-Chrysler*, 289 F. App'x at 923. In *Daimler-Chrysler*, the Sixth Circuit concluded that the plaintiff's software was not in limited publication—and its works had been publicly distributed—since its "customers included a variety of banks, financial institutions, utilities, and other corporations willing to pay for it." *Id.*

Similarly, here, SNMPR marketed and licensed its software to ███████████ for use in "network equipment, network-connected computers and servers, telephone systems, electronic gaming, and by the United States military." (FAC ¶¶ 4, 31.) Those licensees, in turn, generally ██████████████████████████████████████████████. (ECF No. 246-2 § 3.) Thus, SNMPR cannot argue that its software was distributed to a "definite, very selective group."

12

(b)     <u>SNMPR's Licenses Did Not Contain Sufficiently Restrictive Terms</u>

In previous briefing, SNMPR pointed to Sections 2 and 3 of the Brocade Agreement as the purported "restrictions" that demonstrate lack of publication. (ECF No. 51 at 19-21.) SNMPR argued that Section 3 "prohibit[s] disclosure of source code" by its licensees to third parties. (*Id.* at 19-20; *see also* ECF No. 246-1 § 3.) As an initial matter, the licensing and distribution of the source code to ███████ of licensees alone constituted publication. Further, that SNMPR's licensees could only redistribute SNMPR's software in object code form (but not the underlying source code) changes nothing: As noted above, "a program is considered published even if the copies contained object code rather than source code and even if the source code has not been disclosed to the public." (Demers Decl. Ex. 1 (Compendium III at § 721.9(E)).) Thus, limits on the redistribution of SNMPR's ***source code*** are irrelevant to whether SNMPR's ***program*** was published.

SNMPR further argued that Sections 2 and 3 limit "internal use rights" and object code "redistribution rights" to a particular platform of the licensee. (ECF No. 51 at 19-20; *see also* ECF No. 246-1 §§ 2, 3 (████████████████████████████████████████ ██████████████████████████████████████).) That argument is almost frivolous. Regardless of what platform restrictions SNMPR's licenses contained, SNMPR had distributed its software to ███████████████████████████████ by the time it sought to register its software as unpublished. (*See* Demers Decl. Ex. 4 at EXTREME-00725184-85; Demers Decl. ¶ 13.) And, consistent with the purported restrictions in Sections 2 and 3, SNMPR's licensees ████████████████████████████████████████████████. (*See, e.g.*, Demers Decl. Ex. 3 at SNMP-0024564.) Under SNMPR's logic, software that is widely distributed in the relevant market would only be considered "published" if the licenses contained no restrictions on the use of the software at all. But the reality is that SNMPR's software was

13

"published" at least by "the distribution of copies . . . of a work to the public." *See* 17 U.S.C. § 101.

The cases on which SNMPR relied to argue that its software was in more "limited distribution" involved licenses with significantly more "restrictive terms" than those here. For example, in *Metropolitan Regional Information Systems, Inc. v. American Home Realty Network*, 948 F. Supp. 2d 538 (D. Md. 2013), the court found that a database had not been published because it was "only made available to subscribers under restrictive licensing terms." *Id.* at 559. Those terms included prohibiting the subscriber from transferring or duplicating the software except for (i) the subscriber's own internal or personal use and (ii) preparing a reasonable number of backup copies. (*See* Memorandum in Support of Motion to Dismiss or, in the Alternative, Summarily Adjudicate Amended Counterclaims at 12, *Metropolitan Regional Information Systems*, 948 F. Supp. 2d 538 (No. 12–cv–00954), ECF No. 76-1 (citing ECF No. 29-1 at 5).) Here, SNMPR's license agreements typically provide for ████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ (ECF No. 246-2 § 3 (emphasis added)), █████████████ ██████████████████████ (*id.* § 1).

In *DBT Group, Inc. v. FMC Corp.*, No. 01 C 2769, 2001 WL 1105077 (N.D. Ill. Sept. 19, 2001), the court found that the software had not been published in light of "terms of the license agreement and the fact that [licensee] sought and received consent to distribute the software," which "refute the inference that [licensor] allowed distribution." *Id.* at *4. Here, SNMPR's licensees are ████████████████████████████████████████████████████ ████████████████████████████████. (*See* ECF No. 246-2 § 3.)

14

In *PRC Realty Systems, Inc. v. National Ass'n of Realtors, Inc.*, 766 F. Supp. 453 (E.D. Va. 1991), *aff'd in part, rev'd in part on other grounds*, 972 F.2d 341 (4th Cir. 1992), the court found no evidence of publication because the works were made available under "tightly restricted terms," including "restrictions on sublicensure to a competitor." *Id.* at 461. Here, SNMPR specifically granted licensees ███████████████████████████████████████████████████ ███████████. (ECF No. 246-2 § 3.)

Finally, in *Hubco*, the court's decision that there was no general publication of the operating system at issue turned on the fact that the operating system was offered by the copyright owner simply as a component to the larger computer sold by the copyright owner. 1983 WL 1130, at *6. Here, the product SNMPR is licensing is the alleged copyrighted work itself. *See Unix Sys. Lab'ys, Inc. v. Berkeley Software Design, Inc.*, No. 92-1667, 1993 WL 414724, at *14 (D.N.J. Mar. 3, 1993) (distinguishing *Hubco* on the basis that the software was the licensed product, instead of an ancillary program that was loaded onto the computer being sold).

This case is more like *Unix System Laboratories, Inc.*, in which the software at issue had been distributed to "literally thousands of licensees." *See* 1993 WL 414724 at *13. There, the court found that plaintiff could not escape a finding of general publication despite the fact that customers had to confirm that they would "take good care of Plaintiff's intellectual property." *Id.* at *12-14; *see also D.C.I. Comput. Sys., Inc. v. Pardini*, 978 F.2d 1265, 1992 WL 323325 (Table), at *1 (9th Cir. 1992) (publication where the plaintiff licensed its program "to any automobile or recreational vehicle dealership in the country that would agree to enter into a contract"). Similarly, here, SNMPR's software was ████████████████████████████████████████████████ ██████████████████████████████████████████████.

15

**B.** **SNMPR Was at Least Willfully Blind as to the Inaccuracy in Its Registrations**

SNMPR's production to date confirms that SNMPR was at least willfully blind to the fact that the works covered by the Registrations had been published prior to 2011.

When determining whether an applicant was willfully blind, courts consider "[c]ircumstantial evidence, including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters." *Unicolors*, 142 S. Ct. at 948. Here, SNMPR's classification of works as unpublished was a significant error, and the law was clear that distribution of software constituted publication.

**1.** **Classifying the Works as Unpublished Was a Significant Error**

The classification of a work as unpublished when it is in fact published is a significant legal error. That distinction has important implications, including with respect to legal presumptions, damages, and exclusive rights to which the copyright holder is entitled. *See, e.g.*, 17 U.S.C. § 412; *Antony v. Buena Vista Books, Inc.*, No. 18-205, 2020 WL 5995590, at *4 (E.D. Ky. Oct 1, 2020) (distinction between published and unpublished works "has been considered important by the Sixth Circuit"); Demers Decl. Ex. 6 at SNMP-0016689 (Circular 1, *Copyright Basics*) (listing the "several reasons" for why "[p]ublication is an important concept in the copyright law"). For example, only registrations for published works can be used as *prima facie* evidence of validity of the copyright. *See* 17 U.S.C. § 410(c).

**2.** **The Law Regarding Publication Was Clear**

With respect to the complexity of the relevant rule and the applicant's experience with copyright law, courts consider the clarity of the law and the resources available to non-lawyers. For example, in *Lieb*, the plaintiff had provided inaccurate information in its registration, *i.e.*, "the identification of [the work] as an original, unpublished first version that was not based upon an earlier published article." 2022 WL 1124850, at *13. The court found that it "must have been

16

[clear] to Lieb [] that he published [an earlier work] prior to publishing the [work at issue], and thus he knew of the factual error of failing to disclose." *Id.* In assessing whether the plaintiff could "credibly claim that he did not know of the inaccuracy of his registration from a legal point of view," the court noted that "[t]he terms 'prior' and 'published' are not nuanced legal terms – they are plain English." *Id.* The court then analyzed the Copyright Office's forms, "help" page, and manual (*i.e.*, Copyright Compendium),[6] which "give the public clear, basic information as to registering and properly limiting their claims of copyright." *Id.* at *8. The court noted that, in addition to those documents, "[g]uidance is also offered by Copyright Office 'Registration Specialists,'" who "are responsible for examining claims to copyright." *Id.* at *11. The court found that Section 411(b)(1)(A) was met because the "clarity of these resources, coupled with the simplicity of the information that [plaintiff] was asked to provide" made it a case "where only willful blindness to the law can explain the inaccuracy at issue." *Id.* at *13.

Similarly, here, SNMPR does not dispute that it knew the relevant facts, *i.e.*, that it licensed its software ███████████████████████████████████.

Nor can SNMPR credibly claim that it did not know of the inaccuracy of its registration from a legal point of view. First, the information that SNMPR was asked to provide to the Copyright Office was simple. As the court in *Lieb* explained, the word "published" is "not [a] nuanced legal term[]." *Id.* at *13.

---

[6] Per the Copyright Office, the Compendium "is the administrative manual of the Register of Copyrights concerning Title 17 of the United States Code and Chapter 37 of the Code of Federal Regulations." (Demers Decl. Ex. 1 (Compendium III at Introduction p. 1).) It "provides instruction to agency staff regarding their statutory duties and provides expert guidance to copyright applicants, practitioners, scholars, the courts, and members of the general public regarding institutional practices and related principles of law." (*Id.*)

17

Further, the law was clear. The Copyright Act's definition of "publication," resources from the Copyright Office, and case law were all clear in 2011 that SNMPR's license agreements, distribution of its source code to its licensees, and SNMPR's licensees' redistribution of SNMPR's object code to their customers, all constituted publication. Indeed, the Copyright Act's definition of "publication"—which includes "the *distribution* of copies . . . by rental, lease, or lending" and the "offering to distribute copies"—has remained unchanged since 1976. 17 U.S.C. § 101 (emphasis added).

As in *Lieb*, Copyright Office resources also made clear that offering to distribute copies to a group of persons for purposes of further distribution—exactly as SNMPR did here—constitutes publication. For example, SNMPR produced the following screenshot of a Copyright Office tutorial, dated January 12, 2010:



(Demers Decl. Ex. 7 at SNMP-0018355 (annotations added).) The Copyright Office's instructions, revised in 2009 and produced by SNMPR, state the same:

18

> **1F–1H** *Date of publication* · Give the complete date, in mm/dd/yyyy format, on which the work was first published. Do not give a date that is in the future. **NOTE:** Leave this line blank if the work is unpublished. "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display constitutes publication. A public performance or display of a work does not of itself constitute publication. 17 U.S.C. § 101.

(Demers Decl. Ex. 8 at SNMP-0018401 (annotations added).)

In its opposition to Defendants' prior motion to dismiss, SNMPR argued that "the Second Compendium [which was operative in 2011] provided no discussion at all as to whether or when *licensing* of software constituted 'publication' to the general public." (ECF No. 51 at 19 (emphasis added).) As an initial matter, as noted above, there is no dispute that SNMPR actually distributed its software ███████████████████████████████████████████████████████████████ ████████████████████████████████. (ECF No. 246-2 § 3 (emphasis added); *see id.* at Attachment C (███████████████████████████████████████████); Demers Decl. Ex. 3 at SNMP-0024564.)

In any event, courts had also been clear by 2011 that licensing itself constitutes "publication." For example, *Daimler-Chrysler*, discussed above, was decided in 2008. 289 F. App'x at 922-23; *see also McLaren*, 2010 WL 4615772, at *2 ("By licensing the . . . illustration . . . [plaintiff] 'published' the drawing within the meaning of the Copyright Act.").

Against this backdrop, SNMPR either knew exactly what it was doing, or at a bare minimum was willfully blind to the wrongness of what it was doing. After all, SNMPR was not new to copyrighting in 2011. By 2005, SNMP Research International Inc. had co-authored six

19

works, all of which were registered as published.[7]  And if SNMPR had any doubt, it could have consulted Copyright Office Registration Specialists on the issue—especially considering that it already was in contact with the Office during the application process.  (*See, e.g.*, Demers Decl. Ex. 9.)  Instead, SNMPR remained at least willfully blind as to the inaccuracy of its statements that its software (being widely sold in object form by leading networking companies) was "unpublished."

**C.**  **The Court Should Refer Extreme's Question to the Copyright Office At This Time**

Because both conditions of Section 411(b)(1) have been met, the Court **must** refer the Section 411(b)(1)(B) question to the Register.  17 U.S.C. § 411(b)(2).

In its opposition to Defendants' prior motion to dismiss, SNMPR argued that a "bare allegation" that Section 411(b)(1)(A) is met is not sufficient to invoke the Section 411(b)(2) referral mechanism.  (*See* ECF No. 51 at 22.)  But courts have held that the movant need only provide "some basis for its allegation."  *HealtheState*, 160 Fed. Cl. at 96.  For example, in *HealtheState*, the court credited evidence suggesting the work had been published prior to the registration date, despite the work being registered as "unpublished."  *Id.*  While the plaintiff submitted a declaration stating that "no information in the applications was knowingly inaccurate[,]" the court found that it did not need to "mak[e] any final determinations" before submitting the proposed questions to the Register.  *Id.* at 96-97.  In *King-Devick Test Inc. v. NYU Langone Hospitals*, No. 17-CV-9307, 2019 WL 3071935 (S.D.N.Y. July 15, 2019), the court found that defendants, by presenting evidence that, *inter alia*, a work had been published via a license agreement, had developed a "[sufficient] factual record" to make referral "fruitful."  *Id.* at *10 (citation omitted).

---

[7]  Those works are:  TX0006257219;  TX0005682300;  TX0005666512;  TX0005666513; TX0005666514; TX0005666507.

20

Here, Extreme has submitted extensive evidence that SNMPR's software was published decades before registration, and sufficient evidence to show that there is at least some basis for its allegation that SNMPR was willfully blind to the inaccuracies of its representations to the Copyright Office. The Court need not resolve any factual disputes before submitting the proposed questions to the Register. *See HealtheState*, 160 Fed. Cl. at 97. Given the scope of SNMPR's copyright infringement claims and the potential to resolve a threshold issue regarding validity of its registrations, it would promote judicial efficiency to seek the Register's guidance at this juncture.

## V. CONCLUSION

For the foregoing reasons, pursuant to Section 411(b)(2) of the Copyright Act, the Court must refer the materiality question for each of the registrations listed in Section III.A to the Register so that it may advise the Court whether the inaccurate information, if known, would have caused the Register to refuse registration.

DATED:        March 20, 2023
              New York, New York

                                        Respectfully Submitted,

                                        */s/ Leslie A. Demers*

J. Chadwick Hatmaker, BPR# 018693       John M. Neukom (*admitted pro hac vice*)
Kaitlyn E. Hutcherson, BPR# 035188      Barbara N. Barath (*admitted pro hac vice*)
WOOLFE, MCLANE, BRIGHT,                 DEBEVOISE & PLIMPTON LLP
  ALLEN & CARPENTER, PLLC               650 California Street
Post Office Box 900                     San Francisco, California 94108
Knoxville, Tennessee 37901-0900         jneukom@debevoise.com
Tel: (865) 215-1000                     bnbarath@debevoise.com
Fax: (865) 215-1001                     (415) 738-5700
chatmaker@wmbac.com
khutcherson@wmbac.com                   Leslie A. Demers (*admitted pro hac vice*)
                                        Chris J. Coulson (*admitted pro hac vice*)
                                        Anthony P. Biondo (*admitted pro hac vice*)
                                        Ryan P. Bisaillon (*admitted pro hac vice*)

21

SKADDEN, ARPS, SLATE,
 MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
leslie.demers@skadden.com
chris.coulson@skadden.com
anthony.biondo@skadden.com
ryan.bisaillon@skadden.com
(212) 735-3000

*Attorneys for Extreme Networks, Inc.*