# Exhibit B

## 2008 Annual Report of the Register of Copyrights from the United States Copyright Office

# Annual Report of the Register of Copyrights

FISCAL YEAR ENDING SEPTEMBER 30, 2008

Copyright
United States Copyright Office

4 Filed 04/03/23 Page 2 of 80 PageID #:
4





# Organization of the U.S. Copyright Office
SEPTEMBER 30, 2008

**REGISTER OF COPYRIGHTS**
Marybeth Peters

**ASSOCIATE REGISTER FOR REGISTRATION & RECORDATION**
Nanette Petruzzelli

**ASSOCIATE REGISTER FOR POLICY & INTERNATIONAL AFFAIRS**
David O. Carson

**CHIEF OPERATING OFFICER**
Elizabeth R. Scheffler

**GENERAL COUNSEL**
Tanya M. Sandros

**ASSOCIATE CHIEF OPERATING OFFICER**
David Christopher

**DEPUTY GENERAL COUNSEL**
Maria A. Pallante

**SR. ADMINISTRATIVE OFFICER, ADMINISTRATIVE SERVICES OFFICE**
Bruce J. McCubbin

**ACTING CHIEF, COPYRIGHT TECHNOLOGY OFFICE**
Doug Ament

**LITERARY DIVISION**
Susan H. Todd, *Acting Chief*

**PERFORMING ARTS DIVISION**
Linda L. Gill, *Chief*
Laura Lee Fischer, *Asst. Chief*

**VISUAL ARTS & RECORDATION DIVISION**
John H. Ashley, *Chief*
William R. Briganti, *Asst. Chief*

**INFORMATION & RECORDS DIVISION**
James P. Cole, *Chief*
George Thuronyi, *Asst. Chief*

**RECEIPT ANALYSIS & CONTROL DIVISION**
Melissa Dadant, *Chief*
Victor A. Holmes, *Asst Chief*

**LICENSING DIVISION**
James B. Enzinna, *Chief*
Mark L. DiNapoli, *Asst. Chief*

**COPYRIGHT ACQUISITIONS DIVISION**
Jewel A. Player, *Chief*

Teams (7)

Teams (6)

Teams (4)

Information Section

Accounts Section

Examining Section

Acquisitions Section

Records Research & Certification Section

In-Processing Section

Fiscal Section

Technical Processing Team

Records Management Section

Out-Processing Section

Licensing Information Section

Publications Section

Case 3:20-cv-00451-CEA-DCP   Document

TITLE PAGE PHOTO:
The dome of Library of Congress's
Thomas Jefferson Bulding

Organization of the U.S. Copyright Office   INSIDE ►

# Annual Report of the Register of Copyrights

FISCAL YEAR ENDING SEPTEMBER 30, 2008



United States Copyright Office

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 5 of 80    PageID #: 12937

# Contents

1  Message from the Register
*Facts at a Glance* · 3
*Executive Summary* · 4

10  Service to the Government
*Hearings, Legislation, and Studies* · 11
   *Orphan Works* · 11
   *Other Legislation* · 12
   *Studies* · 16
*International Activities* · 19
*Litigation* · 22
*Legal Opinions* · 28
*Copyright Office Regulations* · 29

38  Public Services
*Reengineering Implementation* · 39
*Information Technology* · 39
*Training and Performance* · 41
*Processing Time* · 41
*Registration* · 42
*Recordation* · 44
*Online Service Providers* · 44
*Statutory Licenses and Obligations* · 45
*Budget* · 47

48  Acquisition of Copyrighted Works
*Contributions to Library* · 49
*Mandatory Deposit* · 50
*Electronic Deposits* · 50

52  Public Information and Education
*Copyright Office Website* · 54
*Summer Intern Program* · 55
*Public Information* · 55
*Freedom of Information Act* · 56

58  Appendices and Tables
*Testimony to Congress* · 59
*Federal Register Documents Issued* · 59
*Tables* · 61

# A message from the Register



*Register of Copyrights*
*Marybeth Peters*

Fiscal 2008 was a year that no one in the Copyright Office is likely to forget. We faced many challenges and made many strides in reengineering implementation.

For more than eight years, the Office has concentrated on making electronic registration a reality. In July 2008, it released for public use the electronic Copyright Office (eCO) system, the eService component of which is delivering the promise of reengineering. The most dramatic evidence of this change has been in the mix of claims received in the Office. By the final week of fiscal 2008, the percentage of eService claims received each week had grown to around 50 percent. We also began accepting claims filed on Form CO, with its 2D barcode technology, intended to provide easy data entry into the eCO system. There has been a decline in the number of traditional paper claims received, and the trend should continue as the volume of eService and Form CO claims grows. This reduction in the number of claims requiring the labor-intensive processes of data entry, verification, and quality control is most welcome news.

Large front-end processing workloads that were prominent during the early months of fiscal 2008—hampers full of unprocessed mail, unprocessed check batches, and ingested paper claims awaiting migration of data from scanned applications—were reduced to a manageable workload.

We still have a major workload in the registration area, the primary bottleneck being paper claims. We expect that growth in the in-process workload of unregistered claims will stabilize in fiscal 2009 because of various improvements, after which we will make a concerted effort to reduce the number of claims in process to a reasonable level.

We spent a significant amount of time in fiscal 2008 on the issue of orphan works and other legislation. Orphan works are works that are still within their copyright term

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 8 of 80   PageID #: 12940

but for which a user cannot identify or locate a legitimate copyright owner. I testified on orphan works for the House Subcommittee on Courts, the Internet, and Intellectual Property. We also assisted Congress with the Shawn Bentley Orphan Works Act of 2008, introduced in both houses in April 2008, but passed only in the Senate before the session ended.

I look forward to reporting back to you at the close of fiscal 2009, at which time I expect that the difficulties and growing pains of reengineering implementation will have begun to recede and that a tremendous sense of accomplishment will be felt throughout the Office. Forward movement would not be possible without the commitment and dedication of Copyright Office staff. The record for 2008 bears witness to their perseverance.

*Marybeth Peters*

Marybeth Peters
Register of Copyrights

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 9 of 80   PageID #: 12941

# Facts at a Glance

*In fiscal 2008 the Copyright Office*

- Addressed the challenges of reengineering implementation to remove processing bottlenecks and improve workflow, continued to train staff to use the electronic Copyright Office (eCO) system, and further improved eCO usability and functionality.

- Opened eService, the online copyright registration system, achieving an overall average of nearly 50 percent electronic submissions during the final month of the fiscal year.

- Registered 232,907 claims to copyright, 207 claims in mask works, and 34 claims in vessel hull designs; recorded 11,341 documents covering more than 330,000 titles of works; transferred 526,508 items to the Library valued at $23.8 million; collected licensing royalties totaling close to $250 million and distributed royalties totaling nearly $205 million; and answered 323,469 requests for direct reference services.

- Provided ongoing assistance to Congress, including congressional testimony on orphan works—works still within their copyright term but for which a user cannot identify or locate the copyright owner.

- Participated in proceedings of international intellectual property and trade organizations resulting in increased international protections for U.S. copyrighted works.

- Assisted the Department of Justice in copyright-related litigation regarding the constitutionality of certain provisions of the copyright law and the Librarian's appointment of Copyright Royalty Judges and the Register of Copyrights. Also assisted with litigation related to the Register's refusal to register works having no copyrightable authorship and monitored other important copyright cases moving through lower courts.

- Issued legal opinions on a Copyright Royalty Board referral regarding the division of authority between the Copyright Royalty Judges and the Register of Copyrights under the section 115 statutory license and issued a legal review of the judges' final order setting rates for the public performance of digital transmissions of sound recordings under the sections 112 and 114 statutory licenses.

- Recorded a 9 percent increase in the number of visitors to the Copyright Office website.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 10 of 80   PageID #: 12942

# Executive summary



*Jefferson Building,
Library of Congress*

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 11 of 80   PageID #: 12943

The Office expected fiscal 2008 to be a time of tremendous challenge as reengineered processes and information technology systems, so long in planning, were implemented. That expectation was exceeded as the Office wrestled with startup adjustments, a slowdown in processing time, a growing number of claims in process, delayed public release of eService, decreased revenues, and delays in hiring new staff. Participants in the Library's Leadership Development Program assisted with tackling and largely eliminating a backlog of materials in the mail sort and distribution and accounts operations. The extensive retraining needed for staff in the new registration specialist position, and a corresponding staffing loss of over 10 percent in the registration area, contributed to slower processing times and a much higher number of claims in process.

## eService and Form CO

The most significant development that occurred in fiscal 2008 was the release of eService—the online filing component of the electronic Copyright Office (eCO)—to the public on July 1, 2008, following a yearlong beta test. A principal objective of reengineering was to enable faster processing by reducing the amount of paper handling and manual transactions. eService permits anyone with an Internet connection to submit an application, pay fees, and upload digital copies or print out a shipping slip for mailing hard copies of works being registered. By September, electronic submissions were approaching 50 percent of claims received each week.

Also in July, the Office introduced Form CO with two-dimensional (2D) barcode technology, which enables quick processing of copyright applications with little or no manual keying of data. The printed form's barcodes capture data entered by the filer. When the barcodes are scanned, the encoded data are imported into eCO.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 12 of 80   PageID #: 12944

# Legislative

Office staff addressed several substantive legislative issues in fiscal 2008.

## Orphan Works

Orphan works are works that are still within their copyright term but for which a user cannot identify or locate a legitimate copyright owner. The inability to find an owner frustrates possible productive and creative uses of these works.

In March, the Register testified before Congress about this problem, and legislation based on a study the Office completed in fiscal 2006 was thereafter introduced. The orphan works bills proposed a new section in the copyright law, providing legal ways for a good-faith user to use an orphan work after first diligently searching for the copyright owner and meeting other threshold preconditions. The Senate passed the bill, but the House version did not reach the floor before adjournment.

## 115 License

The Copyright Office initiated a rulemaking seeking to clarify the scope and application of the section 115 compulsory license for making and distributing phonorecords of musical works by means of digital phonorecord deliveries. Specifically, the proposed rule was drafted to include, among other things, all reproductions made to facilitate the making and distributing of digital phonorecord deliveries.

## Section 109 Report

The Office forwarded to Congress on June 30, 2008, its report on the statutory licenses concerning terrestrial broadcasting: the cable compulsory license, the satellite carrier distant-signal compulsory license, and the satellite carrier local-television compulsory license. Congress asked the Office to compare the three licenses and make recommendations for congressional consideration during 2009. This comprehensive report will be the starting point for legislative action in the House and Senate in 2009. The Register recommended abolishing the licenses by 2015 and, for the period of 2010

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 13 of 80   PageID #: 12945

through 2015, establishing a single five-year license for both cable and satellite services that is easy to administer and addresses current problems.

### Section 108 Study Group Report

The Section 108 Study Group issued its report to the Librarian and the Register of Copyrights. The Librarian assigned to the Register the follow-up to this report, including the group's recommendations for legislative change. The Office plans to meet with interested parties in 2009 to discuss the recommendations and possible legislative amendments.

## Litigation

The Office assisted the Department of Justice in drafting briefs for a number of legal proceedings. Three cases challenged the constitutionality of certain copyright law provisions, others involved interpretation of various legal provisions, and some were in defense of the Office's refusal to register a claim in a particular work.

## Legal Review and Opinions

The Register issued to the Copyright Royalty Judges a legal opinion on the division of authority between the judges and the Register of Copyrights under the section 115 statutory license, which states that issues related to the scope of the license belong to the Register, while the terms and rates of the licenses belong to the judges.

The Register also performed a legal review of the judges' final order on rates and terms of the sections 112 and 114 statutory licenses. The Register found that the judges' inclusion of the rate for the section 112 license within the rates and terms for the section 114 license constituted a failure to establish a discernible rate for the section 112 license and was, therefore, a legal error. This error has serious ramifications, because the beneficiaries of the section 112 license are different from the section 114 beneficiaries.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 14 of 80   PageID #: 12946

## Outreach

The Copyright Office participated in or sponsored numerous programs about its services and the law. The popular "Copyright Office Comes to . . ." meetings sponsored by the Office and the California Bar Association (Los Angeles and San Francisco), the New York State Bar Association (New York) and the First Amendment Center at Vanderbilt University (Nashville) drew large crowds.

The Register of Copyrights made other presentations in the United States as well as Brazil, Canada, China, and the United Kingdom. She was the keynote speaker at various symposia and spoke at numerous law schools and annual meetings.

## International

The Register and her staff represented the United States at the World Intellectual Property Organization (WIPO) Meeting of Member States in September and attended WIPO copyright meetings. They also participated in copyright programs such as the WIPO Pilot on Cultural Documentation and, with the Library's American Folklife Center and Duke University's Center for Documentary Studies, the Archiving and Intellectual Property Management for Indigenous and Local Communities project. In addition, staff traveled to China to meet with government officials, spoke to many foreign delegations, and participated in interviews with foreign reporters.

The Office also assisted Executive Branch agencies on international matters and was deeply involved in all trade agreements.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 15 of 80   PageID #: 12947

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 16 of 80   PageID #: 12948

# Service
## to the
# government



*Testifying at orphan
works hearing*

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 17 of 80    PageID #:
12949

The Copyright Office offers timely quality service to Congress, the executive branch, and the courts to address current and emerging issues involving copyright policy and law.

## Hearings, Legislation, and Studies

The Copyright Office provides advice and testimony to Congress on copyright matters and proposed copyright legislation and undertakes studies leading to authoritative reports on current issues affecting copyright.

### Hearings

The Register of Copyrights testified in two congressional hearings during fiscal 2008. At the first hearing, she testified in conjunction with the Librarian of Congress to present the fiscal 2009 appropriations request. The second hearing took place on March 13, 2008, before the Subcommittee on Courts, the Internet, and Intellectual Property of the House Committee on the Judiciary on the topic "The Orphan Works Problem and Proposed Legislation," covered in detail below.

### Orphan Works

Orphan works include photographs, writings, sound recordings, and other materials that are still within their copyright term but for which a user cannot identify or locate a legitimate copyright owner. Potential users of orphan works include commercial publishers and producers who wish to salvage and transform the works into new, valuable formats at their own cost, as well as museums, libraries, and archives that collect and want to publish or otherwise make available thousands of culturally important materials in accordance with their noncommercial, educational missions.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 18 of 80   PageID #: 12950

Before the introduction of legislation, the House Subcommittee on Courts, the Internet, and Intellectual Property invited the Register of Copyrights to testify. The Register spoke to the subcommittee about the convergence of issues that had contributed to the existence of orphan works, including the relaxation over the past 30 years of formalities involved in establishing a valid copyright, such as registration with the Copyright Office and posting of a copyright notice. She noted that orphan works are a problem for "almost everyone who comes into contact with the United States copyright system."

In April 2008, the Shawn Bentley Orphan Works Act of 2008 was introduced in the Senate (S. 2913), and the Orphan Works Act of 2008 was introduced in the House (H.R. 5889). The proposed legislation, derived from the Copyright Office's 2006 *Report on Orphan Works*, would create a new section 514 in the copyright law. It provides a statutory framework under which a good-faith user can proceed to use an orphan work after first diligently searching for the copyright owner and meeting other threshold preconditions. Copyright owners who later emerge and claim authorship to the relevant works would be assured reasonable compensation from the user (except in limited circumstances where certain noncommercial users elected to expeditiously cease use of the relevant content) and would also be entitled to limited injunctive relief in select instances.

The proposed legislation balanced four primary issues: (1) the proprietary interests of copyright owners; (2) the valuable contributions of nonprofit organizations, publishers, and other users in making orphan works accessible; (3) the prospective benefit to the public and public discourse; and (4) the international treaty obligations of the United States. The Senate passed its bill September 26, 2008, by unanimous consent, but H.R. 5889 did not make it to the House floor before the House adjourned on October 3, 2008.

## Other Legislation

Congress addressed other copyright-related legislation in 2008 as well.

### Prioritizing Resources and Organization for Intellectual Property Act

The Prioritizing Resources and Organization for Intellectual Property Act (Pub. L. No. 110-403), also known as the PRO-IP Act, strengthens the intellectual property

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 19 of 80   PageID #: 12951

laws of the United States in several respects. For example, it amends section 411 of the copyright law to codify the doctrine of fraud on the Copyright Office in the registration process. The law also clarifies that registration is not a prerequisite for a criminal copyright prosecution and makes it unlawful (civilly and criminally) to export unauthorized copies or phonorecords of protected works from the United States. In addition, the law amends section 506 of the law to provide for the forfeiture to the U.S. government of any property used to commit or facilitate the commission of a criminal offense involving copyrighted works.

The act creates a new enforcement paradigm for the federal government's efforts to combat counterfeiting and piracy. For example, it establishes an intellectual property enforcement coordinator within the Executive Office of the President. The coordinator, along with an intellectual property enforcement advisory committee that includes the Register of Copyrights, would be primarily responsible for developing and implementing a strategic plan against counterfeiting and piracy and would serve as a principal advisor to the president on domestic and international intellectual property enforcement policy. The act also provides for improved investigative and forensic resources for enforcement of laws related to intellectual property crimes and allocates additional funding for resources to investigate and prosecute intellectual property crimes and other criminal activity involving computers.

An earlier draft of the PRO-IP bill included a provision (section 104) that would have increased the amount of statutory damages available to plaintiffs in copyright infringement suits. Specifically, the provision would have amended section 504(c)(1) of the copyright law so that statutory damages would be calculated based on each work within a compilation. Such a provision would have increased the range for statutory damages for a counterfeit CD containing 10 songs, for instance, from $7,500 to $1.5 million, rather than the current $750 to $150,000. Some stakeholders objected to this provision. The Copyright Office convened a roundtable on January 25, 2008, focusing on the proposed amendment. At the roundtable, attendees discussed the proposed provision, its legislative history, the interpretation of the law by the courts, its practical effect, whether the law has worked as intended, and whether it should be amended. Subsequently, the provision was removed while the bill was still in subcommittee.

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 20 of 80    PageID #: 12952

The Webcasters Settlement Act of 2008 (Pub. L. No. 110-435) is intended to allow Internet music services (webcasters) and the sound recording royalty collective, SoundExchange, time to negotiate a settlement to replace rates previously set by the Copyright Royalty Judges. Private negotiations began after March 2007, when the Copyright Royalty Judges set rates for webcasters under sections 112 and 114 of the copyright law. The judges adopted a per-performance, per-listener escalating royalty rate for all stations that exceed a monthly aggregate-tuning-hours threshold, rather than a fee based upon a percentage of revenue as had been the case for small webcasters under the previous agreement negotiated with SoundExchange pursuant to the Small Webcasters Settlement Act of 2002 (Pub. L. 107–321). The judges also imposed a $500 per-channel fee on all commercial webcasters.

Generally, the act allows SoundExchange to enter into agreements with webcasters that establish royalty terms for the performance of sound recordings over the Internet. It also provides the following:

- Revises section 114 of the copyright law to allow all music services an opportunity to negotiate an alternative agreement with SoundExchange, rather than limiting this option to "small" webcasters.

- Provides that negotiated agreements, which may be effective for a period of up to 11 years following January 1, 2005, are to be binding on all copyright owners of sound recordings and other persons entitled to payment, in lieu of any determination of statutory license rates set by the Copyright Royalty Judges.

- Terminates the authority to negotiate settlement agreements under the act on February 15, 2009.

- Declares that nothing in the act (or any agreement entered into under the act) shall be taken into account by the U.S. Court of Appeals for the District of Columbia Circuit in its review of the May 1, 2007, determination of royalty rates by the Copyright Royalty Judges.

The Webcasters Settlement Act was deemed necessary to grant SoundExchange statutory authority to engage in negotiations while Congress is in recess.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 21 of 80   PageID #: 12953

## Vessel Hull Design Protection Amendments

The Vessel Hull Design Protection Amendments of 2008 (Pub. L. No. 110-434) clarifies the design protections available under the Vessel Hull Design Protection Act. Specifically, they amend the definitions for "hull" and "deck" in chapter 13 of the copyright law and clarify that protection is available for a deck design or a hull design, separately, or for a design that is a combination of a deck and a hull. The new law also exempts the U.S. Department of Defense from chapter 13. In this case, the Defense Department is subject to either its contractual agreements or title 10 of the *United States Code*, which in section 2320 regulates intellectual property rights in procurement matters.

## Performance Rights Act

The transmission of sound recordings to the public by over-the-air radio stations implicates the public performance right under section 106 of the copyright law. However, radio stations that play music need only compensate songwriters for the performance of their musical compositions and do not have to compensate the holders of the copyrights in the sound recordings of those musical compositions. Yet if music is publicly performed by means of a digital audio transmission, such as by Internet radio stations or satellite radio, both the songwriter and the recording artist (and sound recording copyright owner) are entitled by law to receive royalty payments for the public performance of their respective works from the transmitting entity.

The Performance Rights Act of 2007 (H.R. 4789 and S. 2500) would amend the copyright law to expand the public performance right of sound recording copyright owners to include analog audio transmissions. This change would, for the first time, require over-the-air radio stations to make royalty payments to record companies and recording artists. In reaction to these bills, resolutions, strongly supported by the broadcast industry, have been introduced in the House and the Senate (Supporting the Local Radio Freedom Act, H.Con.Res. 244 and S.Con.Res. 82), that would essentially bar the imposition of any new performance fees, royalties, or other charges for over-the-air broadcasts of sound recordings by local radio stations. At a July 2007 hearing, before the legislation was introduced, the Register of Copyrights testified in support of such legislation. The legislation was not enacted by the 110th Congress, but the matter is likely to be revisited in the 111th Congress.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 22 of 80   PageID #: 12954

## Studies

The Copyright Office researched and prepared two authoritative studies for Congress in fiscal 2008.

### Section 109 Report to Congress

There are three statutory licenses in the copyright law governing the retransmission of distant and local broadcast station signals. One statutory license is applicable to cable television systems, and two licenses apply to satellite carriers. The cable statutory license, codified in section 111 of the law, permits a cable operator to retransmit both local and distant over-the-air radio and television signals to subscribers who pay a fee for cable service. The satellite carrier statutory license, codified in section 119, permits a satellite carrier to retransmit out-of-market, over-the-air network station and superstation signals (but not radio signals) to subscribers for private home viewing and to commercial establishments. The section 122 statutory license permits satellite carriers to retransmit local television signals (but not radio signals) into the stations' local market on a royalty-free basis. This license is contingent upon the satellite carrier complying with rules, regulations, and authorizations established by the Federal Communications Commission (FCC) governing the carriage of television broadcast signals.

Section 109 of the Satellite Home Viewer Extension and Reauthorization Act of 2004 (SHVERA) required the Copyright Office to examine and compare the copyright law's statutory licensing systems for the cable and satellite television industries and recommend any necessary legislative changes in a report due to Congress no later that June 30, 2008. Among other matters, the Copyright Office was required to analyze the differences among the three licenses and consider whether they should be eliminated, changed, or maintained with the goal of harmonizing their operation.

Under section 109, Congress indicated that the report should include, but not be limited to, the following:

- A comparison of the royalties paid by licensees under sections 111, 119, and 122, including historical rates of increases in these royalties, a comparison between the royalties under each such section, and the prices paid in the marketplace for comparable programming;

- An analysis of the differences in the terms and conditions of the licenses under such sections; an analysis of whether these differences are required or justified by

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 23 of 80   PageID #: 12955

historical, technological, or regulatory differences that affect the satellite and cable industries; and an analysis of whether the cable or satellite industry is placed at a competitive disadvantage due to these terms and conditions;

- An analysis of whether the licenses under such sections are still justified by the bases upon which they were originally created;

- An analysis of the correlation, if any, between the royalties, or lack thereof, under such sections and the fees charged to cable and satellite subscribers, addressing whether cable and satellite companies have passed to subscribers any savings realized as a result of the royalty structure and amounts under such sections; and

- An analysis of issues that may arise with respect to the application of the licenses under such sections to the secondary transmissions of the primary transmissions of network stations and superstations that originate as digital signals, including issues that relate to the application of the unserved household limitations under section 119 and to the determination of royalties of cable systems and satellite carriers.

In April 2007, the Office published a notice of inquiry to collect information on the issues raised by Congress in section 109 of SHVERA and subsequently held three days of hearings in July 2007 on matters raised in the notice to further supplement the record.

After several months of careful study, the Office made the following recommendations to Congress on the statutory licenses in its *Section 109 Report*. The Copyright Office's principal recommendation is for Congress to move toward abolishing sections 111 and 119 of the copyright law. The report notes that the cable and satellite industries are no longer considered nascent entities in need of government subsidies through a statutory licensing system. The Copyright Office found that the industries have substantial market power and are able to negotiate private agreements with copyright owners for programming carried on distant broadcast signals. The Office also found that the Internet video marketplace is robust and is functioning well without a statutory license. The Office nevertheless recommends the retention of a royalty-free local-into-local license, because such a license is still necessary and promotes the general welfare of users, broadcasters, and the public.

Despite the Copyright Office's determination that the ultimate solution should be elimination of the existing distant-signal licenses, it recognizes that the digital television transition in 2009 is likely to generate unanticipated signal-reception

problems for millions of American households. The Copyright Office found it important for Congress to provide a lifeline distant-signal service for subscribers during the posttransition period. The Copyright Office therefore recommends the establishment of a new statutory licensing system to cover the retransmission of distant broadcast signals beginning on January 1, 2010, and ending on December 31, 2014. The Office believes that this measure will permit users of the license to serve the needs of subscribers who may experience viewing disruptions. An equally important rationale for a transitional license is that it will take time for voluntary licensing arrangements to take shape and become widely available. The Copyright Office concludes that marketplace solutions will work but that parties need to be given time to adapt to changes in the regulatory regime.

The Copyright Office understands that repeal of the existing statutory licenses, and enactment of a new statutory license, may not be possible or feasible in 2009. The Office therefore made several recommendations to amend sections 111 and 119. For the cable statutory license, the most significant recommendation is to replace the existing gross-receipts formula for determining royalty payments with a flat per-subscriber, per-month regime. For the satellite statutory license, the most significant recommendation is to replace the unserved household provision for determining eligibility to receive distant broadcast signals with a carriage paradigm that includes retransmission consent and nonduplication requirements, like those now in place for cable operators.

The Copyright Office will continue to work with Congress on the issues raised in the *Section 109 Report* in 2009.

### Section 108 Study Group

As reported in the Copyright Office's 2006 annual report, the Library of Congress National Digital Information and Infrastructure and Preservation Program, in cooperation with the Copyright Office, convened the Section 108 Study Group in April 2005 to reexamine the copyright exemption and limitations applicable to libraries and archives in light of the widespread use of digital technologies. The group was also charged with identifying relevant areas of the law in need of updating and formulating recommendations for legislative change. The group held a public roundtable in Chicago on January 31, 2007, focusing on access to copies, specifically to the provisions

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 25 of 80   PageID #: 12957

in section 108 that deal with copies for users, including copies made under interlibrary loan arrangements.

*The Section 108 Study Group Report* was published in March 2008. It includes recommendations for legislative change addressing issues for which the study group agreed that a legislative solution is appropriate. Many of these recommendations are subject to the resolution of related outstanding issues, discussed in detail in the body of the report. There are also conclusions on other issues on which the study group had substantive discussions and agreed that a legislative solution might be appropriate, but on which it had no specific recommendations.

## International Activities

The Copyright Office's international activities advance national prosperity by promoting adherence to and enforcement of treaties and foreign copyright laws that ensure appropriate levels of protection and compensation for U.S. creators and copyright owners, thereby encouraging the creation and dissemination of works to a global audience.

The Copyright Office participates in U.S. delegations to international institutions that administer copyright treaties or otherwise address copyright issues, participates in U.S. delegations that meet with foreign governments relating to copyright issues, and advises Congress and other U.S. government agencies on international copyright matters.

Around the world, copyright protection depends primarily on the national laws of each country in which protection is sought. However, most countries are parties to international copyright treaties and conventions that impose certain minimum requirements upon national laws.

The Copyright Office continued to work in tandem with executive branch agencies on international matters, particularly with the United States Trade Representative (USTR), the Patent and Trademark Office, and the Departments of State and Commerce.

In fiscal 2008, the Office was a key participant in the U.S. delegation to the March 2008 meeting of the World Intellectual Property Organization (WIPO) Standing Committee on Copyright and Related Rights and in the delegation to the WIPO

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 26 of 80   PageID #: 12958

General Assemblies meeting, where among other things, a new director general of WIPO was elected.

The Office also participated in other copyright-related projects with WIPO, such as the WIPO Pilot Training Program on Cultural Documentation and, with the American Folklife Center of the Library of Congress and the Center for Documentary Studies of Duke University, the Archiving and Intellectual Property Management for Indigenous and Local Communities project focusing on Kenya's Massai Tribe. In addition, the Copyright Office helped to formulate U.S. positions on WIPO's development agenda, considering how WIPO should address issues related to the role of intellectual property in developing countries.

The Copyright Office also participated in numerous multilateral, regional, and bilateral negotiations in fiscal 2008. Office staff was instrumental in drafting and negotiating the intellectual property provisions of ongoing consultations on a prospective free trade agreement with Malaysia. In addition, staff provided technical assistance to the USTR and the countries involved in implementing copyright-related obligations in free trade and trade promotion agreements with Bahrain, Chile, Costa Rica, Honduras, Jordan, Oman, and Peru,

Throughout the year, the Office actively participated in numerous additional bilateral negotiations and consultations with countries around the world, including Canada, China, Egypt, Israel, Japan, Kazakhstan, Kuwait, Malaysia, Nigeria, Russia, Saudi Arabia, Singapore, Thailand, and Ukraine on issues ranging from enforcement of copyright laws to copyright law revision. For the USTR, the Office also assisted nations including Cape Verde and Russia in connection with their World Trade Organization (WTO) accession processes, and it participated in WTO trade policy reviews relating to countries including Ghana, Iraq, Montenegro, and Serbia.

The Office continued to assist the USTR in a WTO dispute-settlement proceeding against China relating to intellectual property protection and enforcement in China, participating in discussions with the Chinese government in connection with the proceeding. Staff also participated in U.S. government consideration of documents of the Organisation for Economic Co-Operation and Development (OECD) on the future of the Internet economy in discussions leading up to an OECD ministerial meeting held in South Korea in June 2008.

The Copyright Office also participated on the USTR's interagency Special 301 Committee, which evaluates the adequacy and effectiveness of intellectual property

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 27 of 80   PageID #: 12959

protection and enforcement throughout the world. This annual process, established under U.S. trade law, is one of the tools used by the U.S. government to improve global protection for U.S. authors, inventors, and other holders of intellectual property rights. In addition to the regularly scheduled Special 301 process, the Office assisted in out-of-cycle reviews of Israel and Taiwan.

In addition, the Office assisted the USTR in connection with preparing and negotiating an Anti-Counterfeiting Trade Agreement (ACTA) under discussion with Australia, Canada, the European Union, Japan, Korea, Mexico, Morocco, New Zealand, Singapore, and Switzerland.

The Office also advised the Departments of State and Commerce on intellectual property matters and on the intellectual property implications of the *Draft Legislative Guide on Secured Transactions* of the United Nations Commission on International Trade Law.

Engaging in public discussion about copyright and educating the public about copyright law are primary responsibilities of the Copyright Office. To this end, the Office hosted visitors from other countries during the year, and staff participated in international conferences on copyright.

The Register of Copyrights attended WIPO meetings in Geneva and Beijing. While in Switzerland, the Register served as a member of the U.S. delegation at the 45th Series of Meetings of the Assemblies of Member States. Issues addressed by this group include protection of audiovisual performances and protection of the rights of broadcasting organizations. While in China, the Register gave a presentation on copyright and economic development titled "IP Strategy and Contributions of the Copyright Industry to a National Economy." The Register also witnessed and signed a memorandum of understanding between the Copyright Office, the General Administration of Press and Publication of China, and the U.S. Patent and Trademark Office.

Copyright Office staff participated in other symposia and conferences outside the United States. The Associate Register for Policy and International Affairs presented "United States Copyright Law: Should Europeans Care?" at the British Literary and Artistic Copyright Association; "Protection of Intellectual Property Rights in the New Digital Environment" and "Liability of Intermediate Service Providers" at the International Conference on Intellectual Property Rights in the Digital Environment of the Spanish Ministry of Industry, Tourism, and Commerce; and "U.S. Copyright Laws—Changes, Developments, and Trends" at IBC Legal's Seventh Annual

International Copyright Law Conference in London. Staff also participated in or spoke at conferences in Canada, Japan, and Nigeria.

## Litigation

The Copyright Office is not an enforcement agency for the provisions of the copyright law. The Office may, however, be involved in copyright infringement litigation by (a) choosing to intervene under section 411(a) in a copyright infringement case where registration has been refused; (b) being sued under the Administrative Procedure Act; (c) being asked to assist in the preparation of an amicus curiae brief in support of a particular position; (d) assisting the Department of Justice in defending or prosecuting a particular action; or (e) asking the Department of Justice to bring a suit under section 407 to compel the deposit of copies of the best edition of a copyrighted work published in the U.S.

### Golan v. Gonzales

The plaintiffs brought an action against the federal government challenging the legality of the Copyright Term Extension Act (CTEA) and the Uruguay Round Agreements Act (URAA), claiming that these laws unconstitutionally removed literary and artistic works from the public domain or stanched the flow of such works into the public domain. The U.S. District Court for the District of Colorado, in two separate rulings in 2004 and 2005, decided that the CTEA provision extending term of copyright to life of an author plus 70 years did not create perpetual copyright in violation of the Copyright and Patent Clause of the U.S. Constitution. The court also dismissed the challenge to the URAA's provision restoring copyrights for foreign works that had fallen into the public domain because of the failure to observe now-abandoned formalities or because of the national origin of the works. The court rejected a First Amendment challenge because "private censorship via copyright enforcement does not implicate First Amendment concerns," and it rejected a due process challenge because the provision is rationally related to a legitimate government purpose.

The plaintiffs appealed the decisions to the U.S. Court of Appeals for the 10th Circuit. The 10th Circuit reversed in part, holding that section 514 of the URAA

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 29 of 80   PageID #: 12961

altered the traditional contours of copyright by restoring copyright in a manner that implicates the plaintiffs' right to free expression. The court of appeals remanded the case to the district court for further consideration of the First Amendment claims at issue, instructing the district court to assess whether section 512 of the URAA is content based or content neutral. If the provision is content based, the district court needs to consider whether the government's interest in promulgating the legislation is compelling and whether the government might achieve the same ends through alternative means that have less of an effect on protected speech. If the provision is content neutral, the district court must assess whether the legislation is narrowly tailored to serve an important governmental interest. The district court proceeding will begin at the end of 2008 or in early 2009.

The Office assisted the Department of Justice in the defense of the constitutionality of the CTEA and the URAA throughout the course of the litigation.

### Kahle v. Gonzales

Plaintiffs challenged the constitutionality of four copyright statutes: (1) the 1976 Copyright Act, (2) the Berne Convention Implementation Act, (3) the Copyright Renewal Act of 1992, and (4) the Sonny Bono Copyright Term Extension Act. The plaintiffs argued that the legislative removal of various formalities, such as copyright notice and renewal, violated the First Amendment and the Copyright Clause of the Constitution. On November 19, 2004, the District Court granted the government's motion to dismiss for failure to state a claim upon which relief may be granted, rejecting all the plaintiffs' constitutional challenges.

The plaintiffs appealed this decision to the U.S. Court of Appeals for the Ninth Circuit. In affirming the decision of the district court, the Ninth Circuit held that the plaintiffs' claims were essentially the same as the claims presented to the Supreme Court and rejected by the Court in *Eldred v. Ashcroft*. In August 2007, the plaintiffs filed a petition for certiorari to the Supreme Court. The petitioners' principal argument was that numerous amendments to the copyright law have changed copyright from an "opt -in" to an "opt-out" system. The petitioners therefore argued that Congress has altered the traditional contours of copyright protection in a manner that warrants First Amendment scrutiny. Relying on the *Eldred* decision, the government argued that the

free speech safeguards within copyright law—the idea-expression dichotomy and the fair-use doctrine—vitiated any First Amendment concerns.

After the petition for certiorari was submitted to the Court, the 10th Circuit's decision in *Golan v. Gonzales* was published. The petitioners in *Kahle* cited the 10th Circuit's *Golan* decision in their petition to the Supreme Court. The government requested an en banc rehearing of the 10th Circuit decision, but on January 4, 2008, the Court of Appeals for the 10th Circuit refused en banc review of the panel decision. On January 7, 2008, the Supreme Court declined review of the Ninth Circuit's decision in *Kahle*. The Office assisted the Department of Justice in defending the constitutionality of the challenged provisions of the copyright law at all stages of the *Kahle* litigation.

### *Darden v. Peters*

Plaintiff William Darden brought suit against the Register of Copyrights in the U.S. District Court for the Eastern District of North Carolina for refusing to register Darden's copyright claims in two works, one consisting of maps and the other of pages from a website that included the maps. The district court ruled in favor of the Register, holding that the denial of copyright registration was not an abuse of agency discretion. It specifically found that the shading, coloring, and font modifications that the plaintiff made to preexisting census maps were insufficient to make them "original."

The plaintiff then appealed the district court's decision to the U.S. Court of Appeals for the Fourth Circuit. Challenging the district court's deference to the agency, the plaintiff argued that the issue of copyrightability for purposes of registration is a question of law subject to de novo review by the court. He also maintained that, contrary to the Register's decision, the works are copyrightable. The Copyright Office argued that the Register's decisions are supported by the record and that the correct standard of review is the abuse of discretion standard set forth in section 706(2)(A) of the Administrative Procedures Act. Rejecting Darden's arguments in support of a de novo standard of review, the Fourth Circuit ruled that the Register's refusals to register the plaintiff's works were not an abuse of discretion. On July 23, 2007, the circuit court rejected Darden's petition for rehearing. On February 25, 2008, the Supreme Court denied the plaintiff's certiorari petition. At each stage of this case, the Office worked

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 31 of 80   PageID #: 12963

closely with the Department of Justice and assisted in drafting the briefs and court filings and in preparing for the oral arguments.

## Capitol Records v. Thomas

Several recording industry participants recently brought action against Jammie Thomas for copyright infringement of 24 sound recordings in the U.S. District Court for the District of Minnesota. The plaintiffs asserted that Thomas had placed the sound recordings on her computer's hard drive, which was also loaded with peer-to-peer software. They claimed that Thomas made these sound recordings available for downloading by other peer-to-peer software users in violation of copyright law.

The jury concluded that Thomas had engaged in copyright infringement by distributing the sound recordings at issue. She was ordered to pay to the plaintiffs $222,000 in damages. Of particular interest was the district court judge's jury instruction on infringement of the distribution right. The parties disputed whether simply "making available," or offering to distribute a work, infringed the distribution right without proof that a copy of the work actually changed hands. The court was persuaded by the record companies' argument that proof that a work was offered for distribution is sufficient to support infringement of the copyright owners' exclusive right of distribution.

Subsequently, the court ordered a briefing on the question whether the jury instruction was a "manifest error of law." The court decided that the instruction had been erroneous and that the verdict could not stand and ordered a new trial. Because of the importance of the copyright issues contested in these cases, including an ancillary issue concerning the assessment of statutory damages, the Office, together with the Department of Justice, has been monitoring this and similar cases as they work their way through the lower courts.

## Intercollegiate Broadcasting System et al. v. Copyright Royalty Board

On May 1, 2007, the Copyright Royalty Judges announced their final determination of the rates and terms for two statutory licenses for the period January 1, 2006, to December 31, 2010, permitting certain digital performances of sound recordings and

the making of ephemeral recordings. Six parties filed appeals with the U.S. District Court for the District of Columbia Circuit contesting the rates adopted by the judges.

On May 13, 2008, Royalty Logic Inc., one of the six parties to appeal, filed a motion for leave to file a supplemental brief challenging the appointment of the Copyright Royalty Judges by the Librarian of Congress as a violation of the Appointments Clause of the U.S. Constitution. The court granted the motion. The Office assisted the Department of Justice in drafting the government's response brief. The Office has a particular interest in the resolution of this issue because the Register of Copyrights, who is an inferior officer of the United States, is also appointed by the Librarian of Congress under the provisions of the Appointments Clause. Oral argument has not yet been scheduled.

### Sound Exchange v. Library of Congress

On January 24, 2008, the Copyright Royalty Judges published their determination setting rates and terms for the use of the sections 112 and 114 statutory licenses created by the Digital Millennium Copyright Act for the transmission of sound recordings and the making of ephemeral copies by preexisting satellite digital audio radio services, such as XM Radio and Sirius. Such determinations are subject to review for legal error by the Register of Copyrights. In this case, the Register had concluded that it was legal error for the Copyright Royalty Judges to incorporate the rate for making ephemeral copies of the sound recording into the rates for the public performances of these works under a different license without specifying what percentage, if any, is attributable to the section 112 license. The Register's opinion also concluded that it was legal error not to adhere to the statutory requirement to set a minimum fee for the making of the ephemeral copies. In the event that a party to a proceeding appeals a decision of the Copyright Royalty Judges, the Register of Copyrights has a right to intervene as a matter of law to defend her legal conclusions.

SoundExchange, representing the interests of the copyright owners of the sound recordings, filed an appeal in the U.S. Court of Appeals for the District of Columbia Circuit on March 31, 2008, challenging the rates established by the Copyright Royalty Judges. The Copyright Office has assisted the Department of Justice, which represented the judges in the appeal, especially with respect to its conclusions that the law requires the judges to set a separate rate for the making of ephemeral copies of sound

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 33 of 80   PageID #: 12965

recordings under section 112 and the establishment of a minimum fee for use of this statutory license. The government's briefs are scheduled to be filed with the court in December 2008.

## Mullen et al. v. Society of Stage Directors and Choreographers

The plaintiffs, producers of theatrical entertainment, filed a copyright infringement suit in the U.S. District Court for the Northern District of Illinois, Eastern Division, regarding the production of the play, *Urinetown!* The plaintiffs sued after the producers of the original production publicly accused them of infringing the original production, including lighting and staging elements. One of the central questions in this lawsuit was whether stage directions in a theatrical production are copyrightable. In 2006, the Copyright Office refused to register a copyright claim for the stage direction in *Urinetown!* on the grounds that the expressions of stage direction are not fixed and do not rise to a level of originality that is sufficient to achieve copyright protection. The Office asked the Department of Justice to enter the case under section 411(a) to defend the Register's decision not to register the stage directions and worked with the department in developing the legal arguments in support of the Register's action. The parties eventually settled out of court early in the fiscal year, obviating the need to address the Register's decision to reject the application for registration of the stage directions.

## Judicial Enforcement Regarding Africa World Press

Under section 407 of the copyright law, the owner of copyright or of the exclusive right of publication of a work published under copyright protection in the United States is required to deposit in the Copyright Office two complete copies of the best edition of the work for the use of or disposition by the Library of Congress. Failure to comply subjects the copyright owner to penalties prescribed by the copyright law, including a fine of up to $250 for each work and payment to the Library of the total retail price of the copies claimed.

After Africa World Press disregarded a demand and three follow-up letters for deposit of 65 books, the Copyright Office requested that the Department of Justice proceed with judicial enforcement of the statute. After several communications

between the publisher and the Department of Justice, all the titles that remained in print were deposited.

## Legal Opinions

During fiscal 2008, the Register of Copyrights reviewed two decisions of the Copyright Royalty Board, acting pursuant to statute.

### Division of Authority under the Section 115 License

On July 25, 2008, the Copyright Royalty Judges referred material questions of substantive law to the Register of Copyrights concerning the division of authority between the Register of Copyrights and the Copyright Royalty Judges under the section 115 statutory license. Specifically, the judges requested a decision by the Register regarding whether the judges' authority to adopt terms under the section 115 license is limited solely to late payment, notice of use, and recordkeeping regulations, and, if the answer is in the negative, what other categories or types of terms the judges can prescribe by regulation. The Register responded to the material questions of law in a memorandum opinion dated August 8, 2008. To provide the public with notice of the Register's decision, the opinion was published in the Federal Register on August 19, 2008.

The memorandum opinion determined that under the split authority for administration of section 115, the Copyright Royalty Judges can issue regulations that supplant currently applicable regulations, including those heretofore issued by the Librarian of Congress, solely in the area of notice and recordkeeping. However, the Register noted that the scope of the judges' authority in the area of notice and recordkeeping for the section 115 license must be construed in light of Congress's more specific delegation of responsibility to the Register of Copyrights, which includes the authority to issue regulations regarding notice of intention to obtain the section 115 license as well as those regarding monthly payment and monthly and annual statements of account. Moreover, accepted principles of statutory construction dictate that the authority of the Copyright Royalty Judges to set "terms" must be construed in light of the more specific delegations of authority to the Register.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 35 of 80   PageID #: 12967

## Digital Transmissions of Sound Recordings

The Copyright Royalty Judges have issued three final determinations setting rates and terms for the public performance of a sound recording by means of a digital transmission and for the making of ephemeral recordings necessary to facilitate those transmissions under the sections 112 and 114 statutory licenses. On December 19, 2007, the judges announced the rates and terms applicable to preexisting satellite services; on December 20, 2007, they announced the rates and terms applicable to new subscription services; on January 24, 2008, they announced the rates and terms applicable to satellite digital audio radio services.

The Office reviewed the judges' determinations pursuant to section 802 (f)(1)(D) of the Copyright Act, which allows the Register of Copyrights to review for legal error any resolution by the Copyright Royalty Judges of a material question of substantive law under the Copyright Act that underlies or is contained in a final determination of the judges. The Register concluded that the judges' resolution to include the rate for the section 112 license within the rates and terms for the section 114 license constituted a failure to establish a discernable rate for the section 112 license and was therefore a legal error. Moreover, the Register noted that because the beneficiaries of the section 114 license fees are not identical to the beneficiaries of the section 112 license fees, the legal error carried serious ramifications. In addition, the Register concluded that the judges' failure to set a minimum fee within the section 112 license rates for satellite digital audio radio services was a legal error. Pursuant to the requirements established in section 802(f)(1)(D), the decision was published in the *Federal Register* on February 19, 2008.

## COPYRIGHT OFFICE REGULATIONS

The Register of Copyrights is authorized to establish regulations for the administration of the copyright law. In addition to the regulatory activities discussed elsewhere in this report, regulations issued during fiscal 2008 included the following.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 36 of 80   PageID #: 12968

## Section 115 License

The Copyright Office published a notice of proposed rulemaking seeking to amend its regulations to clarify the scope and application of the section 115 compulsory license to make and distribute phonorecords of a musical work by means of digital phonorecord deliveries. The notice proposed to amend the definition of "digital phonorecord delivery" to clarify that a digital phonorecord delivery under the compulsory license includes the following: (a) permanent digital downloads of phonorecords; (b) limited downloads, which use technology that causes the downloaded file to be available for listening only during a limited time (for example, a time certain or a time tied to ongoing subscription payments) or for a limited number of performances; and (c) all buffer copies delivered to a transmission recipient. The notice also proposed that the section 115 license include coverage for all reproductions made to facilitate the making and distributing of digital phonorecord deliveries.

In response to requests by several interested parties, and in light of the intervening August 4, 2008, decision of the U.S. Court of Appeals for the Second Circuit in The *Cartoon Network LP v. CSC Holdings, Inc.*, the Copyright Office extended the comment period and announced a hearing on the issues addressed in the notice. The hearing, which took place on September 19, 2008, garnered input from several interested parties on questions concerning the scope of the section 115 license. Testimony presented at the hearing, as well as comments and reply comments received in response to the notice, will serve as the foundation for interim rules to be published in the next fiscal year.

## Notices of Termination

The Copyright Office has recently re-examined its regulations governing the copyright law's termination provisions in sections 304(c) and (d) and 203 of the Copyright Act. Section 304(c) governs any work in which the copyright was subsisting in its first or renewal term as of January 1, 1978, and provides for termination of a grant at any time during a period of five years beginning at the end of 56 years from the date copyright was originally secured. Section 304(d) provides a termination right for a subset of works for which the termination right expired on or before October 27, 1998, the effective date of the Sonny Bono Copyright Term Extension Act, which extended the copyright term by 20 years. This provision allows an author, or certain heirs and

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 37 of 80   PageID #: 12969

successors, to terminate the grant of a transfer or license of the renewal copyright, or any right under it, at any time during a five-year period beginning at the end of 75 years from the date copyright was originally secured. Section 203 governs works created on or after January 1, 1978. The author, or certain heirs and successors, can terminate any grant made on or after this date at any time during a period of five years beginning at the end of 35 years from the date of publication of the work under the grant or at the end of 40 years from the date of execution of the grant, whichever term ends earlier. In contrast to the provisions of section 304, termination under section 203 is possible only if the author executed the grant.

The termination provisions are not self-executing. Rather, they are formalistic and include several conditions. For example, the provisions require that the author (or, if the author is deceased, the author's widow, widower, children, or other heirs specified by statute) serve the notice of termination in writing on a grantee or the grantee's successor in title prior to the effective date of termination. Moreover, the notice must state the effective date of the termination and must be served not less than two or more than 10 years before the effective date. And, as a condition of the termination taking effect, a copy of the notice of termination must be recorded with the Copyright Office prior to the effective date of termination.

The process and other formal requirements for submitting a copy of the notice to the Copyright Office for recordation are prescribed by regulation. In short, the regulations require the recording party to submit a complete and exact duplicate of the notice that he or she served on the grantee or grantee's successor-in-title. The copy must include (a) either actual signatures or reproductions of signatures; (b) a statement setting forth the date the notice was served; (c) an indication of the manner of service; and (d) submission of the appropriate filing fee. The Copyright Office checks for each of the above-referenced elements and may refuse recordation if any one element is missing.

Under the law, the failure to file a notice of termination in a timely manner is a fatal mistake that cannot be construed as an immaterial, harmless error. Thus, before recording a notice, the Copyright Office looks for confirmation that the relevant statutory deadlines have been met. If in the judgment of the Office the document is untimely, the Office will take one of two actions. If the notice is premature, the Office will return it with an explanation so that it can be resubmitted within the proper statutory window. If the document is late, the Office will offer only to record and

index the document as a "document pertaining to copyright." It will not accept the document as a notice of termination, meaning that it will not be specially indexed as such. Whether such general recordation by the Copyright Office will be sufficient in any particular instance to effect termination as a matter of law is an issue that only the courts can resolve.

The Copyright Office has commenced a rulemaking proceeding to address several different aspects of the notice-of-termination process. The three key issues covered in a pending notice of proposed rulemaking include (a) recordation as distinguished from legal sufficiency; (b) legibility of notices of termination and other documents pertaining to copyright; and (c) fee requirements for notices of termination. Other matters, such as mailing addresses for notices of termination, were also addressed in the notice of proposed rulemaking. Final rules on these matters will be forthcoming in the next few months.

## Group Registration of Copyright Claims

When Congress enacted the 1976 Copyright Act, it provided for a single registration regarding a group of related works but also permitted the Register to create registration options in which a group of related works might be registered together.

In response to the statutory mandate, the Register has issued regulations throughout the years offering a group registration option in which related works of authorship can be aggregated and registered for one fee on one application form with one group of required deposit copies. The group registration option can be used to register (a) a group of serial issues first published on or after January 7, 1991, at intervals of a week or longer within a three-month period during the same calendar year; (b) a group of newspapers published within the same month; (c) a group of newsletter issues first published on or after July 1, 1999, with a claim including two or more issues within a single calendar month within the same calendar year; (d) a group of contributions to a periodical, including a newspaper, by the same individual author; (e) a group of published photographs by the same photographer, whether the author is an individual or an employer for hire, first published in the same calendar year; and (f) a group of updates or revisions to a database, added over a period of time, whether or not they are published.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 39 of 80   PageID #: 12971

In July 2008, the Copyright Office began offering an online electronic registration option, but it did not offer this option for group registration. The immediate goal of the Copyright Office is to expand its online registration system to accommodate applications for group registrations. Online registration will increase the Copyright Office's efficiency in examining these larger group registration claims and allow the Copyright Office to decrease the time it takes to process these applications.

In light of this goal, the Office published a notice of proposed rulemaking in the *Federal Register* proposing to amend the current regulations to require any applicant wishing to take advantage of group registration options to file a group claim electronically within the new online registration system. The notice seeks comment on this proposal, among others, which is to be implemented after completion of beta testing for these registrations. Group registration would then be available only through online submission for the following (currently permitted) groups of works: (a) published serials; (b) published daily newspapers; (c) published newsletters; (d) updates to databases; (e) groups of published photographs; and (f) groups of contributions to periodicals. Final rules will be forthcoming in the next fiscal year.

## Phantom Signals

In implementing the cable statutory license provisions of the copyright law, the Copyright Office adopted a definition of the term "cable system" that replicated the statutory definition found in section 111(f). However, the Office separated the text of the provision into two parts to clarify that a cable system can be defined in two ways for the purpose of calculating royalty fees. Thus the regulatory definition provides that "two or more facilities are considered as one individual cable system if the facilities are either (a) in contiguous communities under common ownership or control or (b) operating from one headend." The Copyright Office stated that its interpretation of the statutory "cable system" definition was consistent with Congress's goal of avoiding the "artificial fragmentation" of systems (a large system purposefully broken up into smaller systems) and the consequent reduction in royalty payments to copyright owners.

Since the implementation of section 111 in 1978, the cable industry has expressed dissatisfaction with the "cable system" definition and has petitioned the Copyright Office on a number of occasions to revise its regulatory definition of the term. In 2005,

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 40 of 80   PageID #: 12972

the National Cable and Telecommunications Association (NCTA) once again asked the Copyright Office to commence a rulemaking proceeding to address cable copyright royalty anomalies arising from our implementation of the "cable system" definition.

The NCTA stated that where two independently built and operated systems subsequently come under common ownership because of a corporate acquisition or merger, the Office's rules require that the two systems be reported as one. Similarly, where a system builds a line extension into an area contiguous to another commonly owned system, the line extension can serve as a "link" in a chain that combines several commonly owned systems into one entity for copyright purposes. The NCTA asserted that, in either of these cases, dramatically increased royalties can result. NCTA stated that royalty obligations may increase as a result of the Copyright Office's policy of attributing carriage of a signal to all parts of a cable system, whether or not the station is actually carried throughout the system. In the NCTA's view, a "phantom signal" event arises when a cable system pays royalties based on the retransmission of the signals of distant broadcast stations after a cable system merger, even if those signals are not, and in some instances cannot, be delivered to all subscribers in the communities served by the cable system. The NCTA asked the Copyright Office to change its definition of "cable system" to fix the phantom signal problem.

Early in fiscal 2008, the Office commenced a new proceeding seeking comment on the phantom signal problem generally and the NCTA's concerns in particular. After reviewing comments on issues associated with changing the definition of the term "cable system" under the copyright law, the Office found that it lacked the statutory authority to adopt the rule amendments sought by the cable industry because the proposed changes were inconsistent with the statute. Therefore, the Office terminated the proceeding and stated that it would no longer engage in any rulemaking involving phantom signals. The Office, however, clarified regulatory policy regarding the application of the 3.75 percent fee to phantom signals.

## Digital Television Signals

Congress initially set February 17, 2009, as the date by which U.S. television stations must transition to a digital broadcasting format. Digital technology allows broadcasters to provide more programming choices to over-the-air viewers as well as to cable and satellite subscribers. Digital television stations provide a mix of

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 41 of 80   PageID #: 12973

high-definition and standard-definition broadcast signals and may possibly offer interactive television services in the future. More important, such stations are able to "multicast" by splitting their digital signals into smaller streams, each of which may be independently programmed.

The Office sought comment on several issues associated with the secondary transmission of digital television signals by cable operators under section 111. The Office initiated a notice of inquiry to address matters raised in a petition for rulemaking filed jointly by several copyright owner groups, including the Motion Picture Association of America and sports rights holders; subsequently, the Office published a notice of proposed rulemaking in the *Federal Register*. The notice sought comment on specific proposals and policy recommendations on issues related to the retransmission of digital television signals under the cable statutory license. Some of the tentative conclusions outlined in the notice are as follows:

- If the programming carried on the primary digital signal is duplicative of the programming carried on the analog signal, double payment of royalties for the retransmission of both by cable operators should not be required.

- If there is any original, nonduplicative programming on a multicast stream, then royalties should be paid according to the distant-signal equivalent value that would be assigned to that stream based upon its classification as a network, independent, or noncommercial station.

- A cable operator should include in its gross receipts calculation all sales of services or tiers that must be purchased for subscribers to access any type of digital broadcast signal, whether it is a duplicative digital broadcast signal or a unique multicast signal.

- A cable operator's digital set top box revenues and monies generated by the sale or rental of cable cards used to access digital broadcast signals should be included in gross receipts, and royalties must be paid based upon the inclusion of these items.

The Copyright Office received five comments and four reply comments in response to the publication of the notice of proposed rulemaking. The Copyright Office will issue its final rule in fiscal 2009.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 42 of 80   PageID #: 12974

## Specialty Stations under the Section 111 License

The Copyright Office has published a request for information to compile a new specialty-station list identifying commercial television broadcast stations that, according to their owners, qualify as specialty stations for purposes of the Federal Communication Commission's (FCC) former distant-signal carriage rules and the section 111 cable statutory license. The Copyright Office requested that all interested owners of television broadcast stations that qualify as specialty stations, including those that previously filed affidavits, submit sworn affidavits to the Office stating that the programming of their stations meets the requirements specified under the FCC regulations in effect on June 24, 1981.

On June 15, 2007, the Copyright Office published a notice listing the 61 broadcast stations for which the owner or licensee of the station had filed the requested affidavit. In the notice, the Copyright Office also requested that parties objecting to claims to specialty-station status submit comments stating their objections. No comments or objections were filed. However, the Copyright Office received one additional affidavit attesting to the specialty-station status of the identified station. Because this station was not listed in the earlier published list, the station was identified with an asterisk (*) in the final list. The specialty-stations list became effective January 1, 2008, for the first accounting period of 2008 and thereafter. Copyright Office licensing examiners now refer to the final annotated list in examining a statement of account in which a cable system operator claims specialty-station status for a particular station.

## Section 119 Rate Adjustments

The Copyright Office published a notice in the *Federal Register* announcing that it would be adjusting satellite carrier royalty rates for the secondary transmission of the analog and digital transmissions of network stations and superstations to reflect changes in the Consumer Price Index for all urban consumers from January 2007 to January 2008. The Copyright Office announced those changes on March 17, 2008. Specifically, the change in the cost of living as determined by the Consumer Price Index (all consumers, all items) for the relevant period was 4.3 percent (the January 2007 figure was 202.4; the figure for January 2008 is 211.080, based on 1982-1984 = 100 as a reference base). Rounding off to the nearest cent, the Copyright Office established the new rate schedule as follows:

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 43 of 80   PageID #: 12975

- For private home viewing of analog stations: 24 cents per subscriber per month for distant superstations and 24 cents per subscriber per month for distant network stations. For viewing in commercial establishments: 48 cents per subscriber per month for distant superstations.

- For private home viewing of digital stations: 24 cents per subscriber per month for distant superstations and 24 cents per subscriber per month for distant network stations. For viewing in commercial establishments: 48 cents per subscriber per month for distant superstations.

As directed by section 119 and the Copyright Office's rules, the rates will have to be readjusted again in 2009.

A full listing of *Federal Register* documents with their citations can be found in the appendix.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 44 of 80   PageID #: 12976

# Public
## services



*Jefferson Building,
Library of Congress*

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 45 of 80   PageID #: 12977

The Copyright Office administers the provisions of the copyright law for the benefit of owners and users of copyrighted works, mask works, and vessel hull designs. It promotes the appropriate protection and use of these works by providing timely easy-to-use public services. Copyright Office regulations governing copyright law administration are in chapter 37 of the *Code of Federal Regulations*.

## Reengineering Implementation

The challenge to provide the right services to the public in a timely way led the Copyright Office to carry out a multiyear effort to reengineer its business processes and the delivery of its principal public services. In fiscal 2008—the first fiscal year completed entirely after implementation of reengineering—the focus on retraining staff, realigning workflows, and addressing information technology issues resulted in a slowdown in registration processing time and an increase in the number of claims in process. (See Copyright Office annual reports for fiscal 2000 through 2007 for additional background on reengineering.)

**Reengineering Objectives**

- *Improve the efficiency and timeliness of Copyright Office public services*

- *Provide more services online*

- *Ensure the prompt availability of new copyright records*

- *Provide better tracking of individual items in the workflow*

- *Increase the acquisition of digital works for Library of Congress collections*

## Information Technology

The electronic Copyright Office (eCO) system has two components: eCO Service provides online registration (eService) and support for processing both electronic and hard-copy registrations; eCO Search makes more than 20 million indexed and searchable copyright records available online.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 46 of 80   PageID #: 12978

Late in fiscal 2008, the Office began an effort to optimize the eCO system's performance. The first round of eCO performance enhancements went into production in September 2008, and a 50 percent performance improvement resulted. Additional eCO performance enhancements are planned for early fiscal 2009.

As currently configured, the eCO system accepts basic claims to copyright in literary works; works of the performing arts, including sound recordings and motion pictures; works of the visual arts; and serial publications. Additional registration types and copyright services, including those related to group registrations, mask works, vessel hull designs, document recordation, renewals, and licensing, will be offered through eCO in the future. In addition, the Office will explore reengineering the Licensing Division's processes.

### Electronic Submissions

On July 1, 2008, the Office publicly released eService, an online application system, for the submission of basic claims to copyright. Users can now submit copyright registrations and certain types of copyright deposits over the Internet. Prior to July, the eService system operated under a limited-access beta test. Between its July 2008 opening and the end of the fiscal year, the Office created 46,118 eService user accounts and processed 59,850 eService claims. By the end of fiscal 2008, almost 50 percent of all claims received each week were filed through eCO. Approximately 43,000 users charged copyright application fees to credit cards or bank accounts, and the rest charged fees to Copyright Office deposit accounts. Users submitted approximately 35,000 electronic deposit copies; the remaining claims were submitted with hard-copy deposits sent by regular mail. By the end of fiscal 2008, approximately 72,500 individuals and organizations were registered users of the eCO eService system.

### Form CO with 2D Barcode

On July 1, 2008, the Office released the new Form CO that incorporates 2D barcode technology. Form CO, which can be completed online, is intended for applicants who prefer not to transact business over the Internet. When correctly printed, each form has scannable 2D barcodes that encode all the data entered in the form. When

the Office scans the barcode, all fields of the eCO record are populated automatically, eliminating the need for manual data entry.

## Training and Performance

During the year, the Office continued a major program to train registration specialists to use eCO and the new registration process that combines the formerly separate functions of copyright examination and creation of registration records. Because of the large number of staff requiring training, groups of employees began training in four phases from October 2007 through February 2008. The program included four months of refresher classroom training in substantive examination rules and practices; the introduction of new examination-related subject matter; and ongoing one-on-one training provided by more senior registration specialists during which actual registrations were processed. Targeted training for individual employees was also developed and provided as needed. By early 2009, all registration specialists will have completed at least one full year of training and processing work in the eCO system.

When reengineering was initially implemented in August 2007, management announced a one-year suspension of performance requirements to allow employees to focus on training and gaining familiarity and experience with the new processes and the eCO system. The following August, the Office reached an agreement with Local 2910 of the American Federation of State, County, and Municipal Employees that, effective October 2008, written individual performance requirements would be implemented for all registration specialists.

## Processing Time

Timely service is a goal of the Copyright Office. The Office expected that it would experience a learning curve as reengineered processes and new information technology systems were implemented. Predictably, the average processing time for all claims had grown by the end of the fiscal year to 163 days. However, the disparity in processing time between claims filed online compared with claims filed on paper forms provided a glimpse of significantly decreased processing times in the future as

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 48 of 80   PageID #: 12980



**Average Registration Processing Time**
*(in days)*

| 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|
| 80 | 82 | 87 | 81 | 163 |

the volume of electronic filings increases at the expense of paper filings. While 90 percent of claims filed on traditional paper forms were being completed within 14 months at the end of the fiscal year, 90 percent of claims filed through eCO were being completed within four months. In fiscal 2009, the Office will continue to refine and improve operations and related technology infrastructure to decrease processing times, and it will continue efforts to attract filers to eCO in support of that effort.

## Registration

The Copyright Office registers copyright claims and claims for protection of mask works and vessel hull designs.

### Copyrighted Works

The Office examines claims to copyright to determine that the deposited work contains copyrightable content and that the claimant has complied with U.S. copyright law and Office regulations. During fiscal 2008, the Copyright Office received and processed into its systems 561,428 copyright claims, covering well over a million works, and it registered 232,907 claims. The significant decrease in registrations was not unexpected given the operational impact associated with a relatively rapid transition from a paper-based processing environment to



**Copyright Claims** *(in thousands)*

| | 2004 | 2005 | 2006 | 2007 | 2008 |
|---|------|------|------|------|------|
| Claims Entered into System | 614 | 601 | 594 | 541 | 561 |
| Claims Registered | 661 | 532 | 521 | 526 | 233 |

☐ Claims Entered into System  ■ Claims Registered

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 49 of 80   PageID #: 12981

an online processing environment. As the Office receives and processes more claims electronically (nearly 50 percent of claims were filed electronically in the final month of the fiscal year), it expects to return to normal performance levels.

## Reconsiderations of Denials of Registration

Under the copyright law, the Register of Copyrights can determine that a claim is not registrable because the material submitted does not constitute copyrightable subject matter or for other legal or procedural reasons. When such a determination is made, the Register refuses registration and notifies the applicant in writing of the reason(s) for such refusal. Applicants whose claims for registration are rejected can seek reconsideration of such decisions in a two-stage process. The claimant first requests reconsideration by the appropriate division in the Registration and Recordation Program. If the division upholds the refusal, the claimant can make a second request to the Copyright Office Review Board. The board consists of the Register of Copyrights, the general counsel, and the Associate Register for Registration and Recordation or their respective designees.

In fiscal 2008, the Copyright office received 201 first requests for reconsideration covering 411 works. Of the initial refusals to register claims, 62 refusals were reversed on first request.

The Copyright Office Review Board met seven times to consider second requests for reconsideration involving 81 works. The board issued eight decisional letters involving 14 works. The board affirmed the refusal to register 78 works. The Office is continuing a practice, with respect to works of the visual arts, of including images of the works whenever possible in the decision letters to help those who request reconsideration to understand the board's rulings.

## Mask Works

The Semiconductor Chip Protection Act of 1984 created a new type of intellectual property protection for mask works, a series of related three-dimensional images or patterns formed on or in the layers of metallic, insulating, or semiconductor material and fixed in a semiconductor chip product, that is, the "topography" of the "chip." In fiscal 2008, the Office received applications for 370 mask works and registered 284.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 50 of 80   PageID #: 12982

### Vessel Hull Designs

The copyright law grants the owner of an original vessel hull design certain exclusive rights, provided that application for registration of the design is made in the Copyright Office within two years of the design being made public. The Office received 36 applications for registration of vessel hull designs this fiscal year and registered 26.



**Documents Recorded** *(in thousands)*

| 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|
| 14.9 | 11.8 | 13.0 | 11.5 | 11.3 |



**Average Document Recordation Processing Time** *(in days)*

| 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|
| 33 | 59 | 33 | 58 | 116 |

*Note: The fiscal 2007 annual report indicated an average processing time of 42 days for fiscal 2007. This table is updated to reflect the correct processing time.*

## Recordation

The Copyright Office records documents relating to a copyrighted work, a mask work, or a vessel hull design. Documents may include, for example, transfers of rights from one copyright owner to another, recordation of security interests, contracts between authors and publishers, and notices of termination of grants of rights. These documents frequently reflect popular and economically valuable intellectual property.

During fiscal 2008, the Office recorded 11,341 documents covering more than 330,000 titles of works. At the end of the fiscal year, average processing time for documents had increased to 116 days.

## Online Service Providers

Congress amended the copyright law in 1998 to limit potential liability of service providers for monetary and injunctive relief for copyright infringement for certain activities carried out on their systems or networks. To take advantage of this limitation

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 51 of 80   PageID #: 12983

on liability, certain kinds of service providers must file a designation of agent statement identifying the agent to receive notification of claims of infringement. The service provider must also post such information on its publicly accessible website. The Office processes these online service provider designations of agents and makes them available to the public through a directory of agents on its website, one of the website's most-visited areas. During the year, the Office posted an additional 1,623 designations of agents to the website. The total available at the end of the fiscal year was 9,244.

# Statutory Licenses and Obligations

The Copyright Office receives royalty fee payments related to licenses that deal with secondary transmissions of radio and television programs by cable television systems; secondary transmissions of superstations and network stations by satellite carriers; and the importation, manufacture, and distribution of digital audio recording devices and media. In addition, the Office receives filing fees related to these and other licenses, such as the making of ephemeral recordings; the noninteractive digital transmission of performances of sound recordings; the making and distributing of phonorecords of nondramatic musical works, which includes digital phonorecord deliveries; and the use of published nondramatic musical, pictorial, graphic, and sculptural works and nondramatic literary works in connection with noncommercial broadcasting.

*The Copyright Office oversees the statutory licenses and obligations in the copyright law. Congress created statutory copyright licenses to remove the burden of negotiating individual licenses from certain users and owners of copyrighted works.*

## Statutory Licenses

Some statutory licenses require the users of protected works to deposit royalty funds with the Copyright Office. Statutory licenses were included in the Copyright Act of 1976 and later laws amending it. The Licensing Division dates from 1978, when the Copyright Act of 1976 became effective.

The Licensing Division is responsible for collecting royalty fees from cable operators, satellite carriers, and importers and manufacturers of digital audio recording devices and media (DART); investing the royalty fees, minus operating costs,

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 52 of 80   PageID #: 12984

in interest-bearing securities with the U.S. Treasury for later distribution to copyright owners; recording voluntary licensing agreements between copyright owners and specified users of their works; and examining licensing documents submitted for these statutory licenses to determine whether they meet the requirements of the law and the Office's regulations.

Since 1978, royalty rates, terms, and conditions of statutory licenses as well as distribution determinations have been made by three different bodies that Congress created: from 1978 to 1993 by the Copyright Royalty Tribunal, an independent agency outside the Library of Congress; from 1993 to 2005 by Copyright Arbitration Royalty Panels, administered through the Copyright Office under the aegis of the Librarian of Congress; and, beginning in 2005, by the Copyright Royalty Board, an independent and separate unit of the Library also under the aegis of the Librarian of Congress.

The Licensing Division collected close to $250 million in royalty payments during the fiscal year.



**Royalty Receipts and Distributions** *(in millions)*

| | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|
| Receipts | 205 | 214 | 227 | 235 |
| Distributions | 72 | 40 | 191 | 275 |

□ Receipts  ■ Distributions

### Royalty Fee Distributions

The Copyright Office distributes royalties collected under sections 111 and 119 and chapter 10 of the copyright law, as determined by agreements among claimants or by proceedings of the Copyright Royalty Board.

In fiscal 2008, the Office distributed royalties totaling nearly $205 million in the following distributions:

- On December 13, 2007, a supplemental distribution totaling $90,772.05 of the 2002, 2003, and 2004 DART Sound Recordings Fund

- On February 14, 2008, a partial distribution totaling $57,401,182.34 of the 2003 cable royalty fund

- On February 28, 2008, a final distribution totaling $131,335.38 of the 2003 cable royalty fund to National Public Radio

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 53 of 80   PageID #: 12985

- On April 24, 2008, a partial distribution totaling $146,996,899.74 of the 2004 and 2005 cable royalty funds

- On August 14, 2008, final distribution totaling $43,523.14 of the DART 2007 Nonfeatured Musicians and Nonfeatured Vocalists Subfunds

The Office compiles and audits financial statements for royalty fees on a calendar-year basis as required by law. The total royalty receipts and distributions shown in calendar-year statements are therefore not the same as the fiscal year total. Calendar-year 2007 financial statements are included in the appendices to this report. Calendar-year 2008 financial statement figures will appear in the fiscal 2009 report.

Regulations related to statutory licenses are reported under "Copyright Office Regulations" on page 29 of this report.

## Budget

The Copyright Office annually receives two appropriations from Congress: a basic and a licensing appropriation. Total fiscal 2008 Copyright Office budget authority was $48,077,000, with a full-time-equivalent staff ceiling of 469. The basic appropriation derives its funding from two revenue sources: net appropriations from the U.S. Treasury ($4,351,000 in fiscal 2008) and authority to spend user fees and prior-year reserves ($39,726,000). Licensing budget activities ($4,000,000) were fully funded from user fees withdrawn from royalty pools.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 54 of 80   PageID #: 12986

# Acquisition of copyrighted works



*Mandatory deposits*

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 55 of 80   PageID #: 12987

The Copyright Office supports Library of Congress service to Congress and the American people by providing timely acquisition of copyrighted works required by the Library.

## Contributions to Library

Copies of works submitted for registration or to fulfill the mandatory deposit provision of the law are available for the Library of Congress to select for its collections. Copyright deposits form the core of the Library's "Americana" collections and serve as the primary record of American creativity.



**Estimated Value of Items Transferred to the Library of Congress** *(in millions)*

| | | | | |
|---|---|---|---|---|
| $37 | $39 | $41 | $45 | $24 |
| 2004 | 2005 | 2006 | 2007 | 2008 |

During the fiscal year, the Office transferred 526,508 copies of registered and nonregistered works valued at close to $24 million to the Library of Congress for its collections. The volume of works transferred was less than in previous years because of the increase in the number of claims in process and a longer processing time, leading to significant numbers of deposit copies being in process but not yet sent to the Library. As these in-process deposit copies are forwarded to the Library for its collections, their value will be included in the report for the fiscal year during which they were transferred.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 56 of 80   PageID #: 12988

## Mandatory Deposit

The mandatory deposit provision in section 407 of the copyright law requires, with certain exceptions, that the owners of copyrighted works or of the exclusive rights of publication deposit two copies of works published in the United States within three months of publication. The Library may add these works to its collection, or it may use them in its exchange programs with other libraries.

The Copyright Acquisitions Division (CAD) encourages copyright owners to deposit or register works regularly and voluntarily immediately after publication; however, the copyright law authorizes the Register to issue demands for the required copies any time after publication.

The Office made demands for 4,630 titles based on congressional requests and recommendations by librarians and Library recommending officers. CAD received 4,103 titles from publishers in response to these demands. CAD also completed 18 reviews of publishers for compliance with the mandatory deposit provision of the law. Two publishers the Office had referred to the Department of Justice for possible legal action complied with the law's requirements. The Office also conducted specific outreach to four other publishers.



**Deposit Copies Received** (in thousands)

| 2004 | 2005 | 2006 | 2007 | 2008 |
|------|------|------|------|------|
| 538 | 563 | 656 | 553 | 527 |

More than two-thirds of the copies of works the Office transferred to the Library of Congress for its use arrived under the mandatory deposit provisions of the copyright law (362,004 out of 526,508 copies). The value of these mandatory deposit copies was $9.4 million or more than 40 percent of the estimated $24 million value of all materials transferred to the Library.

## Electronic Deposits

A small publisher of scholarly science and technology journals requested special relief from the mandatory deposit requirements by replacing printed publications with online access and regular submissions of digital archival files for each publication. Although all journals are considered open access and are freely available on the

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 57 of 80   PageID #: 12989

publisher's website, expensive subscriptions to the printed versions are available when requested. Since the Library is moving toward the acceptance of electronic copyright deposits for published works, the availability of these electronic files was especially attractive. All the publications are open access, and links for all titles within scope of the collection are available through the Library's Online Public Access Catalog.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 58 of 80   PageID #: 12990

# Public information and education



*Assisting a registrant in the
Public Information Office*

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 59 of 80   PageID #:
12991

The Copyright Office, as the administering agency for the copyright law, is experienced in disseminating information on the copyright law and copyright services, providing copyright education to the public, and responding to information requests.

In fiscal 2008, the Register and her staff spoke at domestic symposia, conferences, and workshops on various aspects of copyright law and the intellectual property world's current challenges. (See "International Activities" on page 19 for details about international appearances.) These included three successful programs titled "The Copyright Office Comes to California" (Los Angeles and San Francisco), "The Copyright Office Comes to New York," and "The Copyright Office Comes to Music City" (Nashville). The Register also spoke in New York at the Fordham University Intellectual Property Law and Policy Conference on digital licensing issues and on copyright law exceptions and limitations; in Boston at the Impact of Copyright on Digital Licensing of Music Conference on the copyright law's effectiveness in today's music business; at annual meetings of the Copyright Society of the USA and the American Library Association; and at several other symposia.

Other Office staff presented a videoconference on copyright basics for the Dallas Public Library; participated in "Private Rights and Public Broadcasting," a conference of public broadcast service WGBH in Boston; conducted Office tours; made presentations to visiting groups; joined in discussions about intellectual property at the Annual Legal Issues in Museum Administration Conference in Scottsdale, Arizona; and represented the Office at the American Library Association Midwinter Conference and during Copyright Awareness Week activities.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 60 of 80   PageID #: 12992

# Copyright Office Website

The Copyright Office website is the primary public face of the Copyright Office. It plays a key role in fulfilling the Library of Congress's strategy to "create and deliver timely content, products, services, and experiences" and the Copyright Office's goal to "improve public understanding of copyright law." The website, *www.copyright.gov*, is a vital communication source that makes available information circulars, announcements, regulations, the copyright law, application forms, and historical information on copyright. The website also allows users to submit eService claims through the eCO portal and search records of copyright registrations and recorded documents from 1978 to the present. Portions of the website and popular circulars are available in Spanish.

This year, the preparations for the July public release of eService and the new Form CO required a carefully coordinated update of many publications and web pages that inform the public about copyright registration procedures. The Office determined which web pages and publications needed updates, prepared the new web pages and documents, and fashioned "redirect" pages for now-obsolete documents. The new website content was posted on July 1.

The Office also joined a Library-wide initiative through GovDelivery, a service that permits users to subscribe to a variety of Library of Congress websites and informational updates sent through email and RSS feeds. The Office converted its existing *NewsNet* subscriptions to the GovDelivery system and created three targeted topic areas to which users can subscribe: "What's New at the Copyright Office?" "Licensing," and "Legislative Developments." *NewsNet* is an electronic news service about Copyright Office services and copyright-related activities.

This year, the copyright website joined the Library's effort to measure website usage using new criteria. Thus the number of "page views" indicates the number of times a web page has been viewed by one visitor, and "visits" indicate one user looking at one or more pages over a short time. Users visited the Copyright website 4,807,821 times (an increase of 9 percent) and viewed 19,404,174 pages (an increase of 14 percent) this year.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 61 of 80   PageID #: 12993

# Summer Intern Program

Works of American creative achievement are richly represented in the Library's vast treasure trove of materials deposited for copyright. For the fourth year, the Library gave college student interns a chance to delve into these collections in search of hidden treasures. The 10-week Junior Fellows Summer Intern Program, made possible through the generosity of the late Mrs. Jefferson Patterson and the Library's Madison Council, furthers the Library's mission to provide access to the universal record of human knowledge and creativity in its collections. The program has been a project of the U.S. Copyright Office, Library Services, the Office of Workforce Diversity, Human Resources Services, and the Office of the Chief Financial Officer.

The 2008 program brought 50 college students from around the country to work with the Library's special copyright and gift collections. They reviewed tens of thousands of registration applications from the year 1899 contained in boxes that were retrieved from off-site storage. More than 5,900 copyright deposit copies, including photographs, prints, maps, manuscripts, musical scores, and other ephemeral materials, were discovered by the interns. The deposits were itemized, inventoried, stabilized in Mylar and acid-free folders, and prepared for transfer to Library custodial units, where they will be made available to researchers. This year's work resulted in discovery of many items related to Admiral George Dewey and a rare first-edition piece of instrumental sheet music for the "Maple Leaf Rag" by Scott Joplin. The interns hosted a special discussion and display of some of their discoveries in August, which resulted in press features on local news programs and affiliates.

# Public Information

In fiscal 2008, the Office responded to a total of 323,469 requests from the public for direct reference services within all areas of the Office. The Office as a whole also assisted approximately 18,000 public visitors.

The Information and Records Division answered 276,794 of these public requests for information, taking in 11,853 registration applications and 5,719 documents for



**Nonfee Reference Services** *(in thousands)*

| | | | | |
|---|---|---|---|---|
| 382 | 362 | 339 | 305 | 323 |
| 2004 | 2005 | 2006 | 2007 | 2008 |

recordation from members of the public. The average wait time for public telephone callers decreased from just over four minutes at the beginning of the year to just over three minutes at the end of the year. In response to public requests, the Office searched 20,312 titles, prepared 455 search reports, fulfilled more than 56,000 requests for forms and publications, and conducted 1,090 transactions to retrieve deposits, perform certifications, and provide additional certificates.

The Office distributed 26 issues of *NewsNet* to over 6,800 subscribers during the fiscal year. The Office also provided support for the electronic publication of 13 issues of the Copyright Royalty Board's *CRB News*.

During the fiscal year, the Office processed 149,083 deposit copies, constituting 2,843 cubic feet, for storage at the Deposit Copies Storage Unit in Landover, Maryland. The unit transferred 5,110 cubic feet of unpublished and published deposit copies to other remote off-site storage facilities.

## Freedom of Information Act

The Office received and responded to 54 requests under the Freedom of Information Act (FOIA) during the fiscal year. The Copyright Office's average turnaround time for FOIA requests is four business days.

Respectfully submitted to the Librarian of Congress by

Marybeth Peters

*Register of Copyrights and*
*Associate Librarian of Congress for Copyright Services*

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 63 of 80   PageID #: 12995

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 64 of 80   PageID #:
12996

# Appendices
# & tables



*Kiosk, Madison Building,*
*Library of Congress*

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 65 of 80    PageID #: 12997

## Testimony to Congress

- Before the Subcommittee on the Legislative Branch of the House Appropriations Committee, Fiscal 2009 Budget Request, March 5, 2008

- Before the Subcommittee on Courts, the Internet, and Intellectual Property of the House Committee on the Judiciary, "The 'Orphan Works' Problem and Proposed Legislation," March 13, 2008

## Federal Register Documents

- Cable Statutory License; Specialty Station List: Notice of Final Specialty Station List (72 FR 60029, October 23, 2007)

- Registration of Claims to Copyright—Renewals: Final Rule (72 FR 61801, November 1, 2007)

- Section 119 and Changes in Consumer Price Index: Notice of Rate Adjustment (72 FR 68198, December 4, 2007)

- Definition of Cable System: Notice of Inquiry (72 FR 70529, December 12, 2007)

- Recordation of Notices of Termination of Transfers and Licenses; Clarifications: Notice of Proposed Rulemaking (73 FR 3898, January 23, 2008)

- Review of Copyright Royalty Judges Determination: Notice (73 FR 9143, February 19, 2008)

- Review of Copyright Royalty Judges Determination: Notice; Correction (73 FR 10290, February 26, 2008)

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 66 of 80    PageID #: 12998

- Section 119 and Changes in Consumer Price Index: Final Rule (73 FR 14183, March 17, 2008)

- Registration of Claims to Copyright, Group Registration Options: Notice of Proposed Rulemaking (73 FR 23990, April 30, 2008)

- Definition of Cable System: Termination of Rulemaking Proceeding (73 FR 25627, May 7, 2008)

- Late-Filed and Underpaid Royalties: Final Rule (73 FR 29071, May 20, 2008)

- Retransmission of Digital Broadcast Signals Pursuant to Cable Statutory License: Notice of Proposed Rulemaking (73 FR 31399, June 2, 2008)

- Copyright Office Makes Nonsubstantive Amendments to Regulation: Final Rule (73 FR 37838, July 2, 2008)

- Retransmission of Digital Broadcast Signals Pursuant to Cable Statutory License: Extension of Time to File Comments and Reply Comments (73 FR 40203, July 14, 2008)

- Copyright Office Announces Receipt of Notices of Intent to Audit: Public Notice (73 FR 40392, July 14, 2008)

- Compulsory License for Making and Distributing Phonorecords, Including Digital Phonorecord Deliveries: Notice of Proposed Rulemaking (73 FR 40802, July 16, 2008)

- Compulsory License for Making and Distributing Phonorecords, Including Digital Phonorecord Deliveries: Extension of Time to File Comments and Reply Comments; Notice of Hearing (73 FR 47113, August 13, 2008)

- Division of Authority Between Copyright Royalty Judges and Register of Copyrights under Section 115 Statutory Licenses: Final Order (73 FR 48396, August 19, 2008)

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 67 of 80   PageID #: 12999

## Registrations, 1790–2008

| Date | Total | Date | Total | Date | Total | Date | Total |
|---|---|---|---|---|---|---|---|
| 1790–1869 | 150,000 [1] | 1904 | 104,431 | 1939 | 175,450 | 1974 | 372,832 |
| 1870 | 5,600 | 1905 | 114,747 | 1940 | 179,467 | 1975 | 401,274 |
| 1871 | 12,688 | 1906 | 118,799 | 1941 | 180,647 | 1976 | 410,969 |
| 1872 | 14,164 | 1907 | 124,814 | 1942 | 182,232 | 1976 | 108,762 |
| 1873 | 15,352 | 1908 | 120,657 | 1943 | 160,789 | 1977 | 452,702 [2] |
| 1874 | 16,283 | 1909 | 121,141 | 1944 | 169,269 | 1978 | 331,942 |
| 1875 | 16,194 | 1910 | 109,309 | 1945 | 178,848 | 1979 | 429,004 |
| 1876 | 15,392 | 1911 | 115,955 | 1946 | 202,144 | 1980 | 464,743 |
| 1877 | 16,082 | 1912 | 121,824 | 1947 | 230,215 | 1981 | 471,178 |
| 1878 | 16,290 | 1913 | 120,413 | 1948 | 238,121 | 1982 | 468,149 |
| 1879 | 18,528 | 1914 | 124,213 | 1949 | 201,190 | 1983 | 488,256 |
| 1880 | 20,993 | 1915 | 116,276 | 1950 | 210,564 | 1984 | 502,628 |
| 1881 | 21,256 | 1916 | 117,202 | 1951 | 200,354 | 1985 | 540,081 [3] |
| 1882 | 23,141 | 1917 | 112,561 | 1952 | 203,705 | 1986 | 561,208 [3] |
| 1883 | 25,892 | 1918 | 107,436 | 1953 | 218,506 | 1987 | 582,239 [3] |
| 1884 | 27,727 | 1919 | 113,771 | 1954 | 222,665 | 1988 | 565,801 |
| 1885 | 28,748 | 1920 | 127,342 | 1955 | 224,732 | 1989 | 619,543 [4] |
| 1886 | 31,638 | 1921 | 136,765 | 1956 | 224,908 | 1990 | 643,602 |
| 1887 | 35,467 | 1922 | 140,734 | 1957 | 225,807 | 1991 | 663,684 |
| 1888 | 38,907 | 1923 | 151,087 | 1958 | 238,935 | 1992 | 606,253 |
| 1889 | 41,297 | 1924 | 164,710 | 1959 | 241,735 | 1993 | 604,894 |
| 1890 | 43,098 | 1925 | 167,863 | 1960 | 243,926 | 1994 | 530,332 |
| 1891 | 49,197 | 1926 | 180,179 | 1961 | 247,014 | 1995 | 609,195 |
| 1892 | 54,741 | 1927 | 186,856 | 1962 | 254,776 | 1996 | 550,422 |
| 1893 | 58,957 | 1928 | 196,715 | 1963 | 264,845 | 1997 | 569,226 |
| 1894 | 62,764 | 1929 | 164,666 | 1964 | 278,987 | 1998 | 558,645 |
| 1895 | 67,578 | 1930 | 175,125 | 1965 | 293,617 | 1999 | 594,501 |
| 1896 | 72,482 | 1931 | 167,107 | 1966 | 286,866 | 2000 | 515,612 |
| 1897 | 75,035 | 1932 | 153,710 | 1967 | 294,406 | 2001 | 601,659 |
| 1898 | 75,634 | 1933 | 139,361 | 1968 | 303,451 | 2002 | 521,041 |
| 1899 | 81,416 | 1934 | 141,217 | 1969 | 301,258 | 2003 | 534,122 |
| 1900 | 95,573 | 1935 | 144,439 | 1970 | 316,466 | 2004 | 661,469 |
| 1901 | 93,299 | 1936 | 159,268 | 1971 | 329,696 | 2005 | 531,720 |
| 1902 | 93,891 | 1937 | 156,930 | 1972 | 344,574 | 2006 | 520,906 |
| 1903 | 99,122 | 1938 | 168,663 | 1973 | 353,648 | 2007 | 526,378 |
| | | | | | | 2008 | 232,907 [5] |
| | | | | | | **Total** | **33,272,404** |

1  Estimated registrations made in the offices of the Clerks of the District Courts (Source: Pamphlet entitled *Records in the Copyright Office Deposited by the United States District Courts Covering the Period 1790–1870*, by Martin A. Roberts, Chief Assistant Librarian, Library of Congress, 1939).

2  Registrations made July 1, 1976, through September 30, 1976, reported separately owing to the statutory change making the fiscal years run from October 1 through September 30 instead of July 1 through June 30.

3  The totals for 1985–87 were corrected as of the fiscal 2004 annual report to include mask works registrations.

4  The total for 1989 was corrected as of the fiscal 2004 annual report to be consistent with the fiscal 1989 table of "Number of Registrations by Subject Matter."

5  Implementation of reengineering resulted in a larger than normal number of claims in process, temporarily reducing the total claims completed and registered.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 68 of 80   PageID #: 13000

## Number of Registrations by Subject Matter, Fiscal 2008

| Category of Material | Published | Unpublished | Total |
|---|---|---|---|
| Nondramatic literary works: | | | |
| *Monographs and computer-related works* | 60,140 | 18,566 | 78,706 |
| *Serials:* | | | |
| Serials (nongroup) | 12,816 | – | 12,816 |
| Group Daily Newspapers | 2,472 | – | 2,472 |
| Group Serials | 6,673 | – | 6,673 |
| **Total literary works** | **82,101** | **18,566** | **100,667** |
| | | | |
| Works of the performing arts, including musical works, dramatic works, choreography and pantomimes, and motion pictures and filmstrips | 30,561 | 34,569 | 65,130 |
| Works of the visual arts, including two-dimensional works of fine and graphic art, sculptural works, technical drawings and models, photographs, cartographic works commercial prints and labels, and works of applied arts | 23,687 | 18,465 | 42,152 |
| Sound recordings | 7,032 | 17,215 | 24,247 |
| **Total basic registrations** | **143,381** | **88,815** | **232,196** |
| | | | |
| Renewals | | | 470 |
| Mask work registrations | | | 207 |
| Vessel hull design registrations | | | 34 |
| | | | |
| **Grand total: *All registrations*** | | | **232,907** |
| **Preregistrations** | | | **914** |
| **Documents Recorded** | | | **11,341** |

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 69 of 80   PageID #: 13001

*Financial information published in this table is unaudited.*

## Fee Receipts and Interest, Fiscal 2008

| Fees | Receipts Recorded[1] |
|---|---|
| Copyright Registration | $ 23,327,638 |
| Mask Works Registration | $ 29,355 |
| Vessel Hull Design Registration | $ 6,525 |
| Renewal Registration | $ 31,570 |
| **Subtotal** | **$ 23,395,088** |
| | |
| Recordation of Documents | $ 2,571,496 |
| Certifications | $ 295,518 |
| Searches | $ 131,016 |
| Special Handling/Expedited Services | $ 2,080,935 |
| Preregistrations | $ 91,400 |
| Other Services | $ 676,157 |
| **Subtotal** | **$ 5,846,522** |
| | |
| **Total Receipts Recorded** | **$ 29,260,571** |
| | |
| Fee Receipts Applied to the Appropriation | $ 29,462,799 |
| Interest Earned on Deposit Accounts | $ 129,285 |
| **Fee Receipts and Interest Applied to the Appropriation[2]** | **$ 29,592,084** |

1   "Receipts Recorded" are fee receipts entered into the Copyright Office's in-process system.

2   "Fee Receipts and Interest Applied to the Appropriation" are income from fees and deposit account interest that were fully cleared for deposit to the Copyright Office appropriation account within the fiscal year. The amount of Fee Receipts Applied to the Appropriation during the fiscal year does not equal the Total Receipts Recorded, because some receipts recorded at the end of the year are applied in the next fiscal year.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 70 of 80   PageID #: 13002

## Estimated Value of Materials Transferred to the Library of Congress, Fiscal 2008

| | Registered works transferred to other Library departments | Non-registered works transferred to other Library departments | Total works transferred to other Library departments | Average Unit Price | Total value of works transferred to other Library departments |
|---|---|---|---|---|---|
| **Books[1]** | **76,148** | **110,069** | **186,217** | | **$7,361,616** |
| Ink Print | 57,232 | 49,138 | 106,370 | $61.01 | $6,489,634 |
| Electronic Works (ProQuest) | 17,774 | 57,922 | 75,696 | $4.31 | $326,250 |
| Microfilm | 1,142 | 0 | 1,142 | $131.47 | $150,139 |
| **Serials[2]** | **46,990** | **248,336** | **295,326** | | **$6,917,428** |
| Periodicals[3] | 40,054 | 231,056 | 271,110 | $40.44 | $6,578,213 |
| Ink Print Newspapers | 4,464 | 17,280 | 21,744 | $1.09 | $14,221 |
| Microfilm Newspapers | 2,472 | 3,009 | 5,481 | $131.47 | $720,587 |
| **Computer-Related Works** | **1,250** | **0** | **1,250** | | **$202,494** |
| Software | 438 | 0 | 438 | $30.23 | $13,241 |
| CD-ROMs | 250 | 0 | 250 | $757.01 | $189,253 |
| Printouts | 563 | 0 | 563 | indeterminate value | |
| **Motion Pictures** | **13,066** | **280** | **13,346** | | **$8,091,711** |
| Videotapes | 12,413 | 280 | 12,693 | $92.89 | $1,179,053 |
| Feature Films | 653 | 0 | 653 | $10,586.00 | $6,912,658 |
| **Music** | **12,668** | **77** | **12,745** | **$50.00** | **$637,250** |
| **Dramatic Works, Choreography and Pantomimes** | **1,300** | **0** | **1,300** | **$61.01** | **$79,313** |
| **Sound Recordings** | **8,742** | **3,100** | **11,842** | **$25.00** | **$296,050** |
| **Maps** | **1,282** | **142** | **1,424** | **$39.20** | **$55,821** |
| **Prints, Pictures, and Works of Art** | **3,058** | **0** | **3,058** | **$31.79** | **$97,214** |
| **Total** | **164,504** | **362,004** | **526,508** | | **$23,738,897** |

1  60 percent of "Books" are selected for the collections; 40 percent are used for the Library's exchange program.
2  60 percent of "Serials" are selected for the collections, except for Microfilm Newspapers (100 percent of which are selected).
3  The figure for nonregistered "Periodicals" includes (1) an estimate based on average loads in hampers delivered to Library processing and custodial divisions and (2) a count of serials issues checked in through the Copyright Acquisitions Division. For the estimated portion, there was an earlier change in physical method of delivery, which decreased the average amount per hamper. This year's figure reflects a reasonable estimate of current receipts per hamper and will be reviewed on a regular basis.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 71 of 80   PageID #: 13003

## Nonfee Information Services to Public, Fiscal 2008

**Information and Records Division Direct Reference Services**

| | |
|---|---:|
| In person | 20,591 |
| By correspondence | 60,243 |
| By email | 60,085 |
| By telephone | 135,875 |
| **Total** | **276,794** |

**Office of the General Counsel Direct Reference Services**

| | |
|---|---:|
| By correspondence | 1,340 |
| By telephone | 1,610 |
| **Total** | **2,950** |

**Receipt Analysis and Control Division Services**

| | |
|---|---:|
| By correspondence | 4,299 |
| By email | 4,017 |
| By telephone | 12,846 |
| **Total** | **17,145** |

**Licensing Division Direct Reference Services[1]**

| | |
|---|---:|
| By correspondence or email | 490 |
| By telephone | 4,855 |
| **Total** | **5,345** |

**eCO Service Help Desk**

| | |
|---|---:|
| By email | 14,109 |
| By telephone | 7,126 |
| **Total** | **21,235** |

| | |
|---|---:|
| **Grand Total Direct Reference Services** | **323,469** |

[1] As of fiscal 2005, the Licensing Division figures do not include correspondence and telephone contacts initiated by licensing examiners.

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 72 of 80    PageID #: 13004

*Financial information published in this table is unaudited.*

## Financial Statement of Royalty Fees for Compulsory Licenses for Secondary Transmission by Cable Systems for Calendar Year 2007

| | |
|---|---:|
| Royalty fees deposited | $145,370,735.28 |
| Interest income | $5,780,580.01 |
| Gain on matured securities | $375,343.43 |
| Transfers in | $6,320.34 |
| **Total** | **$151,532,979.06** |

| | |
|---|---:|
| **Less:** | |
| Licensing operating costs | $3,136,133.97 |
| Refunds issued | $91,920.88 |
| Cost of investments | 144,309,612.79 |
| Cost of initial investments | $2,632,959.37 |
| Copyright Royalty Judges' Operating Costs | $1,128,980.06 |
| Transfers out | $232,965.87 |
| **Total** | **$151,532,572.94** |

| | |
|---|---:|
| Balance as of September 30, 2008 | $406.12 |
| **Plus:** Face amount of securities due | $144,578,049.36 |
| Less: Pending refunds | $102,253.39 |

| | |
|---|---:|
| **Cable royalty fees for calendar year 2007 available for distribution by the Library of Congress** | **$144,476,202.09** |

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 73 of 80   PageID #: 13005

*Financial information published in this table is unaudited.*

## Financial Statement of Royalty Fees for Statutory Obligations for Distribution of Digital Audio Recording Equipment and Media for Calendar Year 2007

| | |
|---|---|
| Royalty fees deposited | $1,679,674.81 |
| Interest income | $24,188.76 |
| Gain on matured securities | $16,311.25 |
| Transfers in | $20,823.35 |
| **Total** | **$1,740,998.17** |

| **Less:** | |
|---|---|
| Licensing operating costs | $83,253.81 |
| Refunds | $1,168.83 |
| Cost of investments | $1,590,379.21 |
| Cost of initial investments | $9,105.22 |
| Copyright Royalty Judges' operating costs | $12,917.16 |
| Distribution of fees | $43,523.14 |
| Transfers out | $640.80 |
| **Total** | **$1,740,988.17** |

| | |
|---|---|
| Balance as of September 30, 2008 | $10.00 |
| **Plus:** Face amount of securities due | $1,590,564.78 |

| | |
|---|---|
| **Audio Home Recording Act royalty fees for calendar year 2007 available for distribution by the Library of Congress** | **$1,590,574.78** |

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 74 of 80    PageID #: 13006

*Financial information published in this table is unaudited.*

## Financial Statement of Royalty Fees for Statutory Licenses for Secondary Transmission by Satellite Carriers for Calendar Year 2007

| | |
|---|---:|
| Royalty fees deposited | $89,942,557.23 |
| Interest income | $4,111,650.00 |
| Gain on matured securities | $191,600.87 |
| **Total** | **$94,245,808.10** |

| | |
|---|---:|
| **Less:** | |
| Licensing operating costs | $59,612.22 |
| Refunds | |
| Cost of investments | $92,731,844.98 |
| Cost of initial investments | $1,454,238.12 |
| Copyright Royalty Judges' operating costs | $102.78 |
| **Total** | **$94,245,798.10** |

| | |
|---|---:|
| Balance as of September 30, 2008 | $10.00 |
| **Plus:** Face amount of securities due | $92,742,665.28 |

| | |
|---|---:|
| **Satellite carrier royalty fees for calendar year 2007 available for distribution by the Library of Congress** | **$92,742,675.28** |

Case 3:20-cv-00451-CEA-DCP    Document 272-4    Filed 04/03/23    Page 75 of 80    PageID #: 13007

# Copyright Office Contact Information

U.S. Copyright Office

Library of Congress

Copyright Office-COPUBS

101 Independence Avenue, SE

Washington, DC 20559-6304

**Website** · *www.copyright.gov*

**Public Information Office** · (202) 707-3000 or 1-877-476-0778

Staff members are on duty to answer questions by phone from 8:30 AM to 5:00 PM, eastern time, Monday through Friday, except federal holidays. Recorded information is also available 24 hours a day.

**Forms and Publications Hotline** · (202) 707-9100

*NewsNet*

Subscribe to the Copyright Office free electronic mailing list on the Copyright Office website at *www.copyright.gov*. Click on *News*.

Case 3:20-cv-00451-CEA-DCP   Document 272-4   Filed 04/03/23   Page 76 of 80   PageID #: 13008

**PHOTOGRAPHY CREDITS**

Cover and Title Page        Cecelia Rogers
Page 1                      Cecelia Rogers
Page 4                      Cecelia Rogers
Page 10                     Cecelia Rogers
Page 22                     Cecelia Rogers
Page 38                     Cecelia Rogers
Page 48                     Charles Gibbons
Page 52                     Cecelia Rogers
Page 58                     Cecelia Rogers

# International Copyright Treaties and Conventions

Protection against unauthorized use of a copyrighted work in a country depends primarily on the national laws of that country. Most countries offer protection to foreign works under the aegis of international copyright treaties and conventions.

## Treaties and Conventions

- *Berne Convention*—the leading international agreement that sets standards for protecting literary and artistic works
- *Bilateral*—a unique agreement on copyright protection between the United States and another country
- *Phonograms Convention*—known as the Geneva Convention, sets standards for protection of sound recordings against piracy
- *Universal Copyright Convention* (*UCC*)—an international agreement that sets standards for protecting literary and artistic works, largely superseded by Berne
- *WIPO Copyright Treaty* (*WCT*)—an international treaty setting standards for protection of works in digital format
- *WIPO Performances and Phonograms Treaty* (*WPPT*)—an international agreement setting standards for protection of sound recordings
- *World Trade Organization* (*WTO*)—the World Trade Organization's obligations regarding Trade-Related Aspects of Intellectual Property Rights, incorporating and expanding on Berne and adding enforcement obligations



# International Copyright Treaties and Conventions

RELATIONS AS OF SEPTEMBER 2008

**Legend:**

- ■ Berne Convention
- ◆ Bilateral
- ◈ Phonograms Convention
- ▲ Universal Copyright Convention (UCC)
- ● Unclear
- ✧ WIPO Copyright Treaty (WCT)
- ✦ WIPO Performances and Phonograms Treaty (WPPT)
- ▼ WTO
- ▶ None

This map does not indicate membership in the UCC or bilateral treaty relations for any country that is either party to the Berne Convention or a member of the WTO.



Library of Congress
United States Copyright Office
101 Independence Avenue SE
Washington, DC 20559-6000

www.copyright.gov