# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

-------------------------------------------------------- x

                            :

SNMP RESEARCH, INC. and SNMP
RESEARCH INTERNATIONAL, INC.,       :

                            :

                 Plaintiffs,          :

                            :

                 v.                  :

                            :

BROADCOM INC.; BROCADE
COMMUNICATIONS SYSTEMS LLC; and   :
EXTREME NETWORKS, INC.,

                            :

                Defendants.        :

-------------------------------------------------------- x

Case No. 3:20-cv-00451-CEA-DCP

U.S. District Judge Charles E. Atchley

 

**DEFENDANT EXTREME NETWORKS, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND ..........................................................................................................................2

I.      SNMPR'S ORIGINAL COMPLAINT ...............................................................................2

II.     SNMPR'S AMENDED COMPLAINT ...............................................................................3

LEGAL STANDARD....................................................................................................................5

ARGUMENT ................................................................................................................................5

I.      THE COURT SHOULD DISMISS SNMPR'S COPYRIGHT INFRINGEMENT
        CLAIMS BASED ON ACTS MORE THAN THREE YEARS BEFORE THIS
        SUIT...............................................................................................................................5

        A.      The Supreme Court Has Found That a Copyright Plaintiff Can Gain
                Retrospective Relief Only Three Years Back From the Time of Suit ....................6

        B.      Other Courts Have Held That a Copyright Plaintiff Can Gain
                Retrospective Relief Only Three Years Back From the Time of Suit ....................7

II.     SNMPR DOES NOT ALLEGE A BREACH OF THE LEGACY AGREEMENT
        THAT WOULD ENTITLE IT TO "ANY AMOUNT RECEIVED" BY
        EXTREME........................................................................................................................10

        A.      Section 16 Requires Breach of Source Confidentiality Provisions .......................11

        B.      The FAC Fails to Allege Breach of Source Confidentiality Provisions ...............12

III.    THE COURT SHOULD DISMISS ANY CLAIMS BASED ON THE LEGACY
        AGREEMENT'S ▮ MONTHLY PENALTY AS USURIOUS AND
        UNENFORCEABLE AS AGAINST PUBLIC POLICY ...................................................15

        A.      The ▮ Monthly Rate Is Usurious.....................................................................15

        B.      The ▮ Monthly Rate Is a Penalty Unenforceable as Against Public
                Policy ...........................................................................................................17

IV.     SNMPR'S FRAUD CLAIM SHOULD BE DISMISSED UNDER THE
        ECONOMIC LOSS DOCTRINE .....................................................................................20

        A.      SNMPR's Fraud Claims and Purported Losses Mirror Its Contract Claims ........21

B.     Courts Have Dismissed Similar Claims Under the Economic Loss Doctrine.................................................................................................22

CONCLUSION........................................................................................................24

ii

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Alshaibani v. Litton Loan Servicing, LP*,
    528 F. App'x 462 (6th Cir. 2013) ..................................................................14

*Alvarado Orthopedic Research, L.P. v. Linvatec Corp.*,
    No. 11-CV-246, 2011 WL 3703192 (S.D. Cal. Aug. 23, 2011) .......................22

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).....................................................................................5, 14

*Bachour v. Mason*,
    No. 2012-00092-COA-R3-CV, 2013 WL 2395027 (Tenn. Ct. App. May 30, 2013)........19

*Bailey Farms, Inc. v. NOR-AM Chemical Co.*,
    27 F.3d 188 (6th Cir. 1994) ...........................................................................20

*Barbosa v. American Osteopathic Board of Surgery*,
    No. 07-cv-0338, 2008 WL 2468483 (S.D. Ohio May 23, 2008).......................9

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................5

*Best v. Time Warner Inc.*,
    No. 11-cv-00104, 2013 WL 66265 (W.D.N.C. Jan. 4, 2013)....................21, 22

*BP Products North America Inc. v. Premier Oil Co.*,
    No. 11-cv-2162, 2013 WL 1908061 (W.D. Tenn. May 7, 2013) .....................16

*Commercial Painting Co. v. Weitz Co.*,
    No. W2019-02089-COA-R3-CV, 2022 WL 737468 (Tenn. App. Ct. Mar. 11, 2022) ..............................................................................................................20

*Davis v. Lincoln National Life Insurance Co.*,
    1988 WL 22824 (Tenn. Ct. App. Mar. 10, 1988) ............................................16

*Design Basics, L.L.C. v. Carhart Lumber Co.*,
    No. 13CV125, 2016 WL 424974 (D. Neb. Feb. 3, 2016)..................................7

*DoDots Licensing Solutions LLC v. Lenovo Holding Co.*,
    C.A. No. 18-098 (MN), 2019 WL 3069773 (D. Del. July 12, 2019) ...............10

iii

*Engler v. Arnold,*
    862 F.3d 571 (6th Cir. 2017) ............................................................................5

*Everly v. Everly,*
    958 F.3d 442 (6th Cir. 2020) ............................................................................7

*Gregg v. Lawson,*
    732 F. Supp. 849 (E.D. Tenn. 1989)................................................................9

*Guesthouse International Franchise Systems, Inc. v. British American Properties*
    *MacArthur Inn, LLC,*
    No. 07-0814, 2009 WL 278214 (M.D. Tenn. Feb. 5, 2009)......................17, 18

*Guiliano v. Cleo, Inc.,*
    995 S.W.2d 88 (Tenn. 1999)............................................................................17

*Havens Steel Co. v. Randolph Engineering Co.,*
    813 F.2d 186 (8th Cir. 1987) ..........................................................................16

*League of United Latin American Citizens v. Bredesen,*
    500 F.3d 523 (6th Cir. 2007) ............................................................................5

*LF Centennial Ltd. v. Z-Line Designs, Inc.,*
    No. 16cv929, 2019 WL 13136765 (S.D. Cal. Jan. 8, 2019) ...............................23

*Life Care Centers of America, Inc. v. Charles Town Associates Ltd. Partnership,*
    79 F.3d 496 (6th Cir. 1996) ............................................................................10

*LMNO Cable Group, Inc. v. Discovery Communications, LLC,*
    No. LA CV16-04543, 2020 WL 10759618 (C.D. Cal. May 15, 2020) ............................23

*McKee Foods Corp. v. Pitney Bowes, Inc.,*
    No. 06-CV-80, 2007 WL 896153 (E.D. Tenn. Mar. 22, 2007) ........................13

*Mhoon v. U.S. Bank Home Mortgage,*
    No. 12-cv-03053, 2013 WL 6858680 (W.D. Tenn. Dec. 30, 2013) ..................14

*Milan Supply Chain Solutions, Inc. v. Navistar, Inc.,*
    627 S.W.3d 125 (Tenn. 2021)..........................................................................20

*Mitchell v. Capitol Records, LLC,*
    287 F. Supp. 3d 673 (W.D. Ky. 2017)..............................................................8

*N.H. ex rel. Hernandez v. Sequoyah Council, Inc.,*
    No. 11-CV-171, 2012 WL 2126863 (E.D. Tenn. Apr. 30, 2012)..................9, 19

*In re National Century Financial Enterprises, Inc., Investment Litigation,*
    No. 03-MD-1565, 2006 WL 2849784 (S.D. Ohio Oct. 3, 2006)......................11

iv

*National Fitness Center, Inc. v. Atlanta Fitness, Inc.,*
 902 F. Supp. 2d 1098 (E.D. Tenn. 2012) ...................................................................18

*Navarro v. Procter & Gamble Co.,*
 515 F. Supp. 3d 718 (S.D. Ohio 2021) ...................................................................8, 9

*Nealy v. Warner Chappell Music, Inc.,*
 60 F.4th 1325 (11th Cir. 2023) ...................................................................................8

*Park v. Skidmore, Owings & Merrill LLP,*
 No. 17-cv-4473, slip op. (S.D.N.Y. Sept. 30, 2019) ...................................................7

*Perry v. United Parcel Service,*
 90 F. App'x 860 (6th Cir. 2004) .................................................................................5

*Petrella v. Metro-Goldwyn-Mayer, Inc.,*
 572 U.S. 663 (2014) ...........................................................................................5, 6, 9

*Rattagan v. Uber Technologies, Inc.,*
 No. 19-cv-01988, 2020 WL 4818612 (N.D. Cal. Aug. 19, 2020) ...............................20

*Red Equipment Pte Ltd. v. BSE Tech, LLC,*
 No. 2:13-CV-1003, 2014 WL 2557129 (D. Ariz. June 6, 2014) .................................20

*In re River City Resort, Inc.,*
 No. 14-bk-10745, Adv. No. 18-ap-01044, 2022 WL 2445422 (Bankr. E.D. Tenn.
 July 5, 2022) ..............................................................................................................16

*Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,*
 477 F.3d 383 (6th Cir. 2007) ......................................................................................7

*SFDG LLC v. Cincinnati Insurance Co.,*
 558 F. Supp. 3d 590 (E.D. Tenn. 2021) ....................................................................22

*Software Research, Inc. v. Dynatrace LLC,*
 316 F. Supp. 3d 1112 (N.D. Cal. 2018) .....................................................................10

*Sohm v. Scholastic Inc.,*
 959 F.3d 39 (2d Cir. 2020) ..........................................................................................7

*Starz Entertainment, LLC v. MGM Domestic Television Distribution, LLC,*
 39 F.4th 1236 (9th Cir. 2022) ......................................................................................8

*Stewart v. IHT Insurance Agency Group, LLC,*
 990 F.3d 455 (6th Cir. 2021) .....................................................................................24

*Stuart C. Irby Co. v. Thompson Brown, Inc.,*
 No. 17-1071, 2018 WL 11437816 (M.D. Tenn. Oct. 15, 2018) .................................18

v

*Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc.*,
    939 F. Supp. 365 (E.D. Pa. 1996) ......................................................20

*Sunless, Inc. v. Selby Holdings, LLC*,
    No. 20-cv-00930, 2021 WL 3513871 (M.D. Tenn. Aug. 10, 2021) .................10

*Ultimate Smoke, LLC v. City of Kingsport, Tennessee*,
    No. 12-CV-13, 2013 WL 6713513 (E.D. Tenn. Dec. 19, 2013) .........................9

## STATUTES

17 U.S.C. § 507(b) ................................................................................6

Tenn. Code Ann. § 47-14-110 ...........................................................15, 16

Tenn. Code Ann. § 47-14-102(3) .............................................................16

Tenn. Code Ann. § 47-14-103(2) .............................................................15

vi

## PRELIMINARY STATEMENT

Extreme Networks, Inc. ("Extreme") moves to dismiss SNMP Research, Inc.'s and SNMP International, Inc.'s (collectively, "SNMPR") first Amended Complaint (ECF No. 244) ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) on four discrete issues, each of which would significantly streamline this case, including by dismissing certain of SNMPR's claims for relief that are not permitted by law.

SNMPR claims to own a portion of source code, which is one of many implementations of the Simple Network Management Protocol, an internet standard protocol, used to monitor and manage network devices. (*See* FAC ¶¶ 2-5.) According to the FAC, Extreme chose to use SNMPR's particular implementation in its network switching products, which it sells at "thousands of dollars per product." (*Id.* at ¶ 91.) In 2001, the parties entered into a license (the "Legacy Agreement") that contemplated that SNMPR would receive a maximum of ▮ per unit that Extreme sold, or ▮ for a fully paid-up perpetual license. (ECF No. 246-2 at Attachment C.) SNMPR alleges that Extreme failed to make all the payments due under that agreement and/or included SNMPR's code in products not covered by the Legacy Agreement. (FAC ¶¶ 72-76, 140.)

Now, SNMPR seeks ***hundreds of millions of dollars*** in damages (ECF No. 101 at p. 13) including (1) copyright infringement damages going back over two decades; (2) all revenues that Extreme received over the course of over two decades for sales of its switching products, also going back over two decades; (3) a ▮ penalty on all late payments, compounded ***monthly***; and (4) punitive damages. (*See* FAC ¶¶ 79, 96, 123, 141, 155; *id.* at p. 33, ¶ 7.)

With this motion, Extreme seeks to dismiss SNMPR's four most aggressive overreaches to limit its claims to those permitted by law. First, Extreme moves to dismiss SNMPR's copyright claims to the extent they seek remedies before October 2017, based on Supreme Court precedent that bars SNMPR from obtaining damages for infringement more than three years before the

October 2020 commencement of this suit. Second, Extreme moves to dismiss SNMPR's claim for all of Extreme's revenue because SNMPR has not alleged—and admits it cannot allege—a breach of "Source confidentiality provisions" as required by the Legacy Agreement for that remedy. Third, Extreme moves to dismiss claims that apply the ███ penalty, compounded monthly, because that calculation grossly exceeds the maximum permitted by Tennessee statute, and furthermore is unenforceable as against public policy since it serves only to penalize Extreme for an alleged breach of contract. Fourth, Extreme moves to dismiss SNMPR's fraud claim (upon which SNMPR relies to seek punitive damages) because the claim is barred by the economic loss doctrine since it is premised on Extreme's alleged breaches of contract.

**BACKGROUND**

## I.    SNMPR'S ORIGINAL COMPLAINT

SNMPR's original complaint focused on alleged copyright infringement related to its 2001 license with Brocade Communications Systems LLC ("Brocade") (the "Brocade Agreement"). (ECF No. 3-1 ¶ 7.) SNMPR asserted that Brocade had incorporated SNMPR's software into products for its data center business pursuant to the license. (*Id.* at ¶¶ 41-43.) In 2017, Extreme acquired the data center business from Brocade and allegedly began selling products that incorporated the software provided by SNMPR to Brocade. (*Id.* at ¶¶ 43, 47-49.) SNMPR alleges that, while "Brocade and Extreme sought SNMP International's consent to permit an 'assignment' from Brocade to Extreme" of the Brocade Agreement in 2017, SNMPR "declined to provide its consent." (*Id.* at ¶¶ 42, 44-45.)

SNMPR brought suit years later, on October 26, 2020, asserting various claims against Brocade and its parent, Broadcom, Inc. ("Broadcom") (ECF No. 3-1 ¶¶ 68-84, 94-104); and a claim for copyright infringement against Extreme, predicated on sales of products following its acquisition from Brocade in 2017 (*id.* at ¶¶ 85-93).

2

On December 22, 2020, Brocade and Broadcom filed a motion to dismiss or in the alternative to transfer, arguing that (1) the Court lacked personal jurisdiction over Broadcom, and (2) SNMPR failed to state a claim for copyright infringement as its copyright registrations are invalid. (ECF No. 42 at 6-12, 15-22.) Extreme joined that motion. (*See* ECF No. 39 at 2.) On September 26, 2022, this Court denied the motion to dismiss the copyright claim without prejudice and invited the defendants to re-file a motion to dismiss following mediation. (*See* ECF No. 205 at 42-43.)

## II.    SNMPR'S AMENDED COMPLAINT

On December 2, 2022, SNMPR filed a motion for leave to amend its complaint, seeking to expand the suit to assert copyright infringement, breach of contract, and fraud claims against Extreme relating to products sold since the 2001 Legacy Agreement. (*See, e.g.*, ECF No. 22; FAC ¶¶ 96, 117-125, 137-155.)

As alleged, the Legacy Agreement granted Extreme rights to use SNMPR source code and incorporate SNMPR software into certain Extreme products. (*See* FAC ¶ 68.) The agreement contemplated that SNMPR would receive between ■ per unit (if Extreme sold over 10,000 units) and ■ per unit (if Extreme sold up to 2,000 units). (ECF No. 246-2 at Attachment C.) Alternatively, Extreme could obtain a license in perpetuity for an unlimited number of units for a single payment of ■■■■■. (*Id.*) The agreement purported to set "a monthly penalty of ■ ■■■ of the amount due, compounded monthly, or the maximum allowed by law, whichever is less" for "payments received later than 30 days after the invoice date." (ECF No. 246-2 § 24.)

The gravamen of SNMPR's FAC is that Extreme allegedly incorporated SNMPR's software into products beyond those permitted by the Legacy Agreement and/or failed to make all the payments required under the agreement. As a result, SNMPR asserts three sets of claims.

3

First, SNMPR claims that Extreme's sales of certain products containing its purportedly copyrighted software constitute copyright infringement. (FAC ¶ 76.) SNMPR apparently seeks copyright damages for sales going back to 2001.[1]

Second, SNMPR alleges that Extreme breached the Legacy Agreement by:

a) failing to report and pay royalties;
b) using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the [Legacy Agreement];
c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the [Legacy Agreement];
d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the [Legacy Agreement];
e) failing to provide information that Extreme was required to provide under the [Legacy Agreement];
f) failing to maintain SNMP Research's copyright notice in the software;
g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP Research International; and
h) failing to return or provide certification of the destruction of Program Source provided under the [Legacy Agreement].

(FAC ¶ 140.) Among other requests for relief, SNMPR claims it is entitled to recover "any amount received by [Extreme] on account of such unauthorized use" pursuant to Section 16 of the Legacy Agreement. (*Id.* at ¶ 79.) That Section applies only if the "Licensee fails to observe, keep, or perform any Source confidentiality provisions." (ECF No. 246-2 § 16.) Notably, SNMPR does not allege that Extreme failed to keep any SNMPR source code confidential. SNMPR further claims it is entitled to "any interest as required under the terms of . . . the [Legacy Agreement]." (FAC at p. 33, ¶ 7.)

Third, SNMPR asserts a claim for fraud premised on the parties' contractual relationship. In particular, SNMPR alleges that Extreme inaccurately reported its sales of products including

---

[1] While SNMPR does not identify any particular allegedly infringing sale, SNMPR attaches nearly 200 pages of royalty reports labeled Q4 2001 to Q2 2018 (*see* ECF No. 246-3) and asserts that the "vast majority of these royalty reports" reflect allegedly unlicensed sales. (FAC ¶ 87.)

4

SNMPR's software under the Legacy Agreement. (FAC ¶¶ 147-150.) SNMPR further claims that Extreme received software updates for products on which it had not paid royalties. (*Id.* at ¶¶ 72-74, 87, 151.) Among other requests for relief, SNMPR seeks punitive damages.

## LEGAL STANDARD

Dismissal under Rule 12(b)(6) is appropriate where a plaintiff "fail[s] to state a claim upon which relief can be granted." A motion to dismiss pursuant to Rule 12(b)(6) tests "whether the plaintiff has pleaded a cognizable claim." *Perry v. United Parcel Service*, 90 F. App'x 860, 861 (6th Cir. 2004). "The [plaintiff's] factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show *entitlement* to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). "Mere labels and conclusions are not enough; the allegations must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Engler v. Arnold*, 862 F.3d 571, 575 (6th Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). Further, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id* at 679.

## ARGUMENT

### I. THE COURT SHOULD DISMISS SNMPR'S COPYRIGHT INFRINGEMENT CLAIMS BASED ON ACTS MORE THAN THREE YEARS BEFORE THIS SUIT

SNMPR seeks copyright infringement damages for sales dating back to 2001. But the Supreme Court has held that copyright plaintiffs are limited to "retrospective relief only three years back from the time of suit." *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 664 (2014).

Because SNMPR filed suit on October 26, 2020, this court should dismiss SNMPR's pre-October 26, 2017 copyright damages claims, eliminating sixteen years' worth of untimely claims.

## A. The Supreme Court Has Found That a Copyright Plaintiff Can Gain Retrospective Relief Only Three Years Back From the Time of Suit

The Copyright Act of 1976 provides that "[n]o civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). In *Petrella*, the Supreme Court analyzed this statute of limitations as a predicate to holding that a copyright infringement defendant cannot invoke a laches defense to bar relief on a claim brought within the three-year limitations period. 572 U.S. at 667. The Court concluded that the statute of limitations "itself takes account of delay" in filing for infringement because "a successful plaintiff can gain retrospective relief only three years back from the time of suit." *Id.* at 677. The Supreme Court then repeated this core principle regarding limits on retrospective relief no fewer than six times throughout its opinion:

- "Congress . . . prescribed a three-year look-back limitations period for all civil claims arising under the Copyright Act." *Id.* at 670.

- "Under the Act's three-year provision, an infringement is actionable within three years, ***and only three years***, of its occurrence. And the infringer is insulated from liability for earlier infringements of the same work." *Id.* at 671 (emphasis added).

- "Congress provided two controlling time prescriptions: the copyright term . . . and § 507(b)'s limitations period, which allows plaintiffs during that lengthy term to gain retrospective relief running only three years back from the date the complaint was filed." *Id.* at 672.

- Plaintiffs can "gain retrospective relief running only three years back from the date the complaint was filed." *Id.*

- "[A] successful plaintiff can gain retrospective relief only three years back from the time of suit." *Id.* at 677.

- "Congress' time provisions secured to authors a copyright term of long duration, and a right to sue for infringement occurring no more than three years back from the time of suit." *Id.* at 685.

6

**B.** **Other Courts Have Held That a Copyright Plaintiff Can Gain Retrospective Relief Only Three Years Back From the Time of Suit**

Bound by *Petrella*, other courts have held that the Copyright Act limits damages to three years before the filing of the lawsuit *regardless* of whether a court follows the "occurrence" rule or the "discovery" rule.[2]  For example, the Second Circuit agreed that "independent of whether the injury or discovery rule applies, '[u]nder the [Copyright] Act's three-year provision, an infringement is actionable within three years, *and only three years*, of its occurrence,' and that 'the infringer is insulated from liability for earlier infringements of the same work.'"  *Sohm v. Scholastic Inc.*, 959 F.3d 39, 51 (2d Cir. 2020); *see also Park v. Skidmore, Owings & Merrill LLP*, No. 17-cv-4473, slip op. at 5 (S.D.N.Y. Sept. 30, 2019) (copyright plaintiff "cannot recover damages for infringements occurring more than three years before filing"); *Design Basics, L.L.C. v. Carhart Lumber Co.*, No. 13CV125, 2016 WL 424974, at *2 (D. Neb. Feb. 3, 2016) (copyright holder "may 'gain retrospective relief running only three years back from the date the complaint was filed'" (citation omitted)).  The *Sohm* court found that the "*Petrella* Court partially based its determination that laches was inapplicable to actions under the Copyright Act on the conclusion that the statute 'itself takes account of delay' by limiting damages to the three years prior to when suit is filed."  959 F.3d at 52 (citation omitted).  The court thus concluded that "the three-year limitation on damages was necessary to the result in *Petrella* and . . . binding precedent."  *Id.*

---

[2] There are generally two options for rules governing when a claim accrues for purposes of limitations calculations: (1) the discovery rule, which starts the limitations period on the date when the plaintiff discovered or should have discovered that cause of action; and (2) the occurrence rule, where the limitations period begins on the date when a violation of the plaintiff's legal rights has occurred.  *See Everly v. Everly*, 958 F.3d 442, 460 (6th Cir. 2020) (Murphy, J., concurring).  The Sixth Circuit has traditionally applied the discovery rule.  *See Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 390 (6th Cir. 2007).

Case 3:20-cv-00451-CEA-DCP   Document 276-1   Filed 04/04/23   Page 15 of 33   PageID #: 13222

Similarly, a court within the Sixth Circuit held that "the language of *Petrella*, including language that motivated the ultimate holding in that case . . . expressly limits damages to those that arose in the three years before filing suit." *Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 762 (S.D. Ohio 2021). The *Navarro* court reasoned that "[t]he Supreme Court has explained . . . that the statute of limitations may also run backwards, at least in terms of the 'retrospective relief' that a cause of action provides." *Id.* at 760 (citation omitted). Like the Second Circuit, the *Navarro* court found that *Petrella's* "references to this limited look-back period for damages [could not] be dismissed as dicta because the existence of this limited look-back period was integral to *Petrella*'s broader holding about laches": "it was precisely that aspect of copyright damages—that a plaintiff loses the right to recover damages that occurred more than three years before suit—that led the Court to conclude there was no need to incorporate laches as an incentive for plaintiff to sue promptly." *Id.*

The *Navarro* court acknowledged that some other courts have refused to bar recovery for damages that occurred more than three years before suit where, as in the Sixth Circuit, the discovery rule applies. *Id.* at 762 (citing *Mitchell v. Capitol Records, LLC*, 287 F. Supp. 3d 673, 677 (W.D. Ky. 2017)); *see also Nealy v. Warner Chappell Music, Inc.*, 60 F.4th 1325 (11th Cir. 2023) (holding that, when a copyright plaintiff has a timely claim under the discovery rule for infringement that occurred more than three years before the lawsuit was filed, the plaintiff may recover damages for that infringement); *Starz Ent., LLC v. MGM Domestic Television Distrib., LLC*, 39 F.4th 1236, 1242-44 (9th Cir. 2022) (same). But the *Navarro* court explicitly rejected the reasoning of these cases, holding that "the language of *Petrella*, including language that motivated the ultimate holding in that case . . . ***expressly limits damages to those that arose in the three years before filing suit.***" 515 F. Supp. 3d at 762 (emphasis added). The court further noted that

8

"waiting . . . comes with a price, as the copyright owner will 'miss out on the damages for periods prior to the three-year look-back.'" *Id.* at 760 (citation omitted). What is more, *Petrella* was on appeal from the Ninth Circuit, which itself applies the discovery rule. Yet, the Supreme Court in *Petrella* did not hold that the three-year damages bar applies only in occurrence rule jurisdictions. *See* 572 U.S. at 670 n.4 (expressly not passing on whether the occurrence rule or discovery rule should apply to claims under the Copyright Act). The *Navarro* court thus dismissed claims for any damages that occurred prior to that date "[g]iven *Petrella*'s express language." *Id.* at 762.

Here, SNMPR's claims for copyright infringement damages for acts that occurred more than three years before its October 26, 2020 complaint must be dismissed—regardless of when SNMPR discovered or should have discovered the alleged infringement.[3] *See, e.g.*, *id.* (dismissing any claims for damages that occurred prior to the date of filing suit).

Dismissing requested relief that is not available as a matter of law is not only supported by precedent in the copyright infringement context, but is also commonplace in other contexts at the pleadings stage. *See, e.g.*, *N.H. ex rel. Hernandez v. Sequoyah Council, Inc.*, No. 11-CV-171, 2012 WL 2126863, at *2 (E.D. Tenn. Apr. 30, 2012) (granting motion to dismiss demand for punitive damages and noting that, "to survive a motion to dismiss, a claim for punitive damages must be plausible as defined by Tennessee law"); *Gregg v. Lawson*, 732 F. Supp. 849, 852 (E.D. Tenn. 1989) (granting motion to dismiss claim for monetary damages as barred by Eleventh Amendment); *Ultimate Smoke, LLC v. City of Kingsport, Tenn.*, No. 12-CV-13, 2013 WL 6713513, at *2 (E.D. Tenn. Dec. 19, 2013) (granting motion to dismiss claim for injunctive relief as moot and separately considering claim for damages); *Barbosa v. Am. Osteopathic Bd. of Surgery*, No.

---

[3] Extreme is confident that it will be able to prove that SNMPR discovered, or should have discovered, the facts on which its claims are premised *many* years before 2017. Extreme will raise these facts at the appropriate juncture.

9

07-cv-0338, 2008 WL 2468483, at *4 (S.D. Ohio May 23, 2008) (dismissing monetary damages demand under Rule 12(c) where relevant statute "provides private parties with injunctive relief, not monetary damages"); *Sunless, Inc. v. Selby Holdings, LLC*, No. 20-cv-00930, 2021 WL 3513871, at *5 (M.D. Tenn. Aug. 10, 2021) (granting motion to dismiss claims for pre-filing damages in the patent infringement context); *DoDots Licensing Sols. LLC v. Lenovo Holding Co.*, C.A. No. 18-098, 2019 WL 3069773, at *4 (D. Del. July 12, 2019) (same); *Software Rsch., Inc. v. Dynatrace LLC*, 316 F. Supp. 3d 1112, 1138 (N.D. Cal. 2018) (dismissing indirect "infringement claims to the extent based on pre-filing conduct" but allowing indirect infringement "claims to the extent based on post-filing conduct"). Dismissal should be with prejudice since no amendment can change the fact that SNMPR is entitled at most to copyright damages going back to October 26, 2017, as a matter of law.

## II. SNMPR DOES NOT ALLEGE A BREACH OF THE LEGACY AGREEMENT THAT WOULD ENTITLE IT TO "ANY AMOUNT RECEIVED" BY EXTREME

SNMPR does not plausibly allege a breach sufficient to recover ***all revenues***—which it estimates total "hundreds of millions of dollars"—that Extreme received over the course of over twenty years for sales of its network switching products. (*See* FAC at 1.) SNMPR claims the Legacy Agreement entitles it to do so as a remedy for Extreme's alleged unauthorized inclusion of portions of SNMPR source code in those products. (*See id.* at ¶¶ 17, 79.) But, as detailed below, the Legacy Agreement does not contemplate this harsh remedy absent a breach of "Source confidentiality provisions." (ECF No. 246-2 § 16.) Because SNMPR has alleged no such breach, its claims for breach of Section 16 of the Legacy Agreement and the remedy of "any amount received by [Extreme]" (*see, e.g.,* FAC ¶ 79) should be dismissed. *See Life Care Ctrs. of Am., Inc.*

*v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996) (*prima facie* case for breach of contract requires plausible breach allegation).[4]

### A.    Section 16 Requires Breach of Source Confidentiality Provisions

Paragraph one of Section 16 of the Legacy Agreement—reproduced in relevant part below—allows recovery of "any amount received by Licensee on account of such unauthorized use" only if two conditions are met (and the Licensee does not cure in five days): (1) the "Licensee fails to observe, keep, or perform any Source confidentiality provisions of this License Agreement," and (2) there is "unauthorized use or distribution of the Program Source."

> 16. Default
>
> If Licensee ***fails to observe, keep, or perform any Source confidentiality provisions*** of this License Agreement required to be observed, kept, or performed by Licensee and does not correct such conditions within five days after receiving written notice thereof from SNMP Research, SNMP Research shall have the right to exercise any one or more of the following remedies: . . .
>
> > (b) in the event of ***unauthorized use or distribution of the Program Source***, SNMP Research shall have the right in addition to its other remedies, to recover from Licensee an amount not less than the sum that Licensor would have charged the person or persons obtaining the benefit of such unauthorized use of the Program Source, plus ***any amount received*** by Licensee on account of such unauthorized use; . . .

(ECF No. 246-2 § 16 (emphases added).) Section 8, entitled "Confidentiality and Non-Disclosure," lays out Source confidentiality provisions along with other obligations. (*Id.* at § 8.) With respect to Source confidentiality, Section 8 states that "Licensee shall keep the Program Source received from SNMP, and the Sources of any Derivative Works, whether designated confidential or not, in

---

[4] Extreme is seeking to dismiss only this subset of the breach of contract claim. To the extent SNMPR argues that dismissal of fewer than all of the alleged breaches is not proper, that is incorrect. *See, e.g.*, *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, No. 03-MD-1565, 2006 WL 2849784 (S.D. Ohio Oct. 3, 2006) (dismissing claims for breaches of certain sections of agreement but not others).

11

the strictest confidence and will exercise the highest degree of care to safeguard the confidentiality of the Program Source and the Sources of any Derivative Works." (*Id.*)[5]

**B.     The FAC Fails to Allege Breach of Source Confidentiality Provisions**

The FAC alleges eight breaches of the Legacy Agreement, including two relating to Section 16's second condition, *i.e.*, unauthorized use. (*See, e.g.*, FAC ¶¶ 68(b, c), 140(b, c); *see also id.* at ¶ 75.) But the FAC does not allege that the first condition is met, *i.e.*, that Extreme failed to "keep the Program Source received from SNMP, and the Sources of any Derivative Works . . . in the strictest confidence." (ECF No. 246-2 § 8.) Nor can it be amended to do so: SNMPR alleges Extreme distributes products "containing Plaintiffs' copyrighted *software*" (FAC ¶ 50 (emphasis added))—not the source code itself. This is in stark contrast to SNMPR's prior allegations against Brocade that it breached the Brocade Agreement "by, among other things, disclosing Plaintiffs' *source code* to Extreme." (FAC ¶ 9 (emphasis added), *see also id.* at ¶¶ 8, 46, 103.)

Instead, SNMPR suggests that Extreme breached the Source confidentiality provisions in two ways—neither of which can constitute a breach of the provisions as a matter of law.[6] First, SNMPR alleges that "Extreme breached its Confidentiality and Non-Disclosure obligations by . . .

_____

[5] While "Program Source" itself is not defined in the Legacy Agreement, "Program" and "Source" are defined separately. "Program" is defined in the preamble of the Legacy Agreement as "the program materials and documentation" licensed to Extreme, "which comprise versions of NETMON, associated applications, and libraries which are implementations based on the Simple Network Management Protocol . . . ." (ECF No. 246-2 at p. 1.) "Source" is defined in Section 1 of the Legacy Agreement as "both the source code and any and all associated developer documentation in human-readable or machine-readable media which are components of versions of NETMON, associated applications, and libraries." (*Id.* at § 1.) Taking these together, "Program Source" refers to the source code and associated developer documentation for the implementation of the Simple Network Management Protocol licensed to Extreme under the Legacy Agreement.

[6] The remaining breach allegations have nothing to do with confidentiality. (*See* FAC ¶¶ 68(a, e, f, g, h), 140(a, e, f, g, h).)

12

using . . . and copying the Program Source outside the authorized use and copying permitted by the [Legacy Agreement]." (FAC ¶ 78.)[7] But "unauthorized use or distribution" is the **second** condition required for Section 16(b) remedies. To the extent SNMPR contends that unauthorized use itself constitutes breach of the confidentiality provision and meets the **first** condition, that reading would render superfluous the first paragraph of Section 16. It would also render superfluous the second paragraph of Section 16, which provides different remedies in situations "other than breach of Source confidentiality," including "intellectual, payment, or other financial provisions of [the Legacy Agreement]." (ECF No. 246-2 § 16.) If use of SNMPR's software in products beyond the scope of the license or failure to make payments under the license—as SNMPR alleges here—satisfied Section 16, paragraph one, there would be no need to provide different remedies for those activities under Section 16, paragraph two. The language of the contract is clear and unambiguous that "unauthorized use or distribution" and breach of "Source confidentiality provisions" are two separate conditions. The Court should, therefore, reject as a matter of law SNMPR's apparent attempt to equate unauthorized use of the software and failure to keep the underlying source code confidential. *See McKee Foods Corp. v. Pitney Bowes, Inc.*, No. 06-CV-80, 2007 WL 896153, at *3 (E.D. Tenn. Mar. 22, 2007) ("[w]here the language of the contract is clear and unambiguous . . . contractual interpretation is a matter of law and may be addressed on a motion under Rule 12" (citation omitted)).

---

[7] SNMPR misleadingly states that the Legacy Agreement "provides that '[i]n the event of unauthorized use or distribution of the Program Source, SNMP Research shall have the right in addition to its other remedies, to recover from Licensee . . . any amount received by Licensee on account of such unauthorized use.'" (FAC ¶ 79 (citing Section 16).) This ignores the first paragraph of Section 16 that requires a breach of Source confidentiality provisions. (ECF No. 246-2 § 16.)

13

Second, SNMPR alleges that Extreme "fail[ed] to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the [Legacy Agreement]." (FAC ¶¶ 68, 140(d).) It is true that Section 8, titled "Confidentiality and Non-Disclosure," required Extreme to "take appropriate action with its employees and consultants, by agreement or otherwise, to satisfy its obligations under this License Agreement with respect to use, copying, transference, protection, and security of the Program Source, and any other materials provided to the Licensee by SNMP as a result of this License Agreement." (ECF No. 246-2 § 8.) But that obligation does not address Source confidentiality and thus cannot support a breach under Section 16. *See Mhoon v. U.S. Bank Home Mortg.*, No. 12-cv-03053, 2013 WL 6858680, at *4 (W.D. Tenn. Dec. 30, 2013) (dismissing breach claim where complaint "fail[ed] to state how any . . . lack of notice amounts to a breach"). Even if it did, this lone conclusory allegation—unsupported by any facts—cannot support SNMPR's claim to recover hundreds of millions of dollars that Extreme received over the course of over twenty years. *See Iqbal*, 556 U.S. at 678; *Alshaibani v. Litton Loan Servicing, LP*, 528 F. App'x 462, 465 (6th Cir. 2013) (dismissing plaintiffs' "naked" breach of contract allegation, which was "simply a legal conclusion couched as a factual allegation").

Put plainly, if SNMPR had any basis to allege that Extreme has mistreated its allegedly highly sensitive, human-readable source code, SNMPR would have done so. And yet SNMPR has not. Instead, SNMPR has alleged that Extreme included SNMPR software (after being compiled into binary, non-human readable, form) into Extreme products, and thus shipped products that infringe SNMPR's copyrights. (*See* FAC ¶¶ 68(b), 75-76, 140(b).) That may be (*arguendo*) a breach of contract or copyright infringement, but it does not constitute a breach of Source confidentiality provisions.

## III. THE COURT SHOULD DISMISS ANY CLAIMS BASED ON THE LEGACY AGREEMENT'S ███ MONTHLY PENALTY AS USURIOUS AND UNENFORCEABLE AS AGAINST PUBLIC POLICY

SNMPR seeks "interest as required under the terms of the . . . [Legacy Agreement]" (FAC at 33, ¶ 7), which sets "a monthly penalty of ███ of the amount due, compounded monthly" for "payments received later than 30 days after the invoice date" (ECF No. 246-2 at § 24). Applying the ███ rate, compounded monthly, would mean that a hypothetical claim for ███ in royalties that allegedly came due in December 2001 would increase—by operation of the contract rate alone—to nearly ███ dollars (greater than ███ the amount of the principal) by December 2022.[8] Under the maximum applicable rate that the Tennessee statute allowed at the time of the Legacy Agreement (*i.e.*, 9.93% per year), that same ███ would increase to only ███ as of December 2022. Because the ███ monthly rate is usurious and constitutes a penalty unenforceable as against public policy, this Court should dismiss any claims for relief based on such rate.

### A. The ███ Monthly Rate Is Usurious

Because SNMPR seeks to recoup a ███ compounding monthly rate—far more than the maximum 9.93% annual rate permitted by Tennessee statute—Extreme "may avoid the excess over lawful interest by pleading usury." Tenn. Code Ann. § 47-14-110.

Tennessee Code provides that "the maximum effective rate[] of interest . . . [f]or all written contracts . . . signed by the party to be charged" is "the applicable formula rate." Tenn. Code Ann. § 47-14-103(2). The "applicable formula rate" is defined by the statute as "the greater of: (A) the

---

[8] That is the result of calculating an annual effective rate (███ compounded twelve times each year) of around ███, multiplying ███ by that rate, and then continuing that process for each year through 2022 (resulting in ███ in 2002; ███ in 2003; and so on, through almost ███ dollars in 2022).

'formula rate' in effect at such time; or (B) the 'formula rate' last published in the Tennessee Administrative Register prior to such time, pursuant to § 47-14-105." § 47-14-102(3). "[F]or fixed rate contracts, the 'maximum effective note' and synonymously the 'highest lawful rate' is the formula rate at the time the rate is executed." *Davis v. Lincoln Nat'l Life Ins. Co.*, 1988 WL 22824, at *2 (Tenn. Ct. App. Mar. 10, 1988). Tennessee courts have limited interest rates on delinquent payments to the applicable formula rate. *See In re River City Resort, Inc.*, No. 14-bk-10745, Adv. No. 18-ap-01044, 2022 WL 2445422, at *10 (Bankr. E.D. Tenn. July 5, 2022) (reducing 18% interest charged on legal bills); *BP Prods. North Am. Inc. v. Premier Oil Co.*, No. 11-cv-2162, 2013 WL 1908061, at *9 (W.D. Tenn. May 7, 2013) (limiting prejudgment interest award on delinquent incentive fund payments to an amount calculated using the applicable formula rate).

Here, the maximum rate the Legacy Agreement could impose was 9.93% per year. That is because the Legacy Agreement was executed on October 22, 2001, and the Tennessee Department of Financial Institutions published a prevailing formula rate of 9.93% per year on October 16, 2001 (the last published rate before execution of the Legacy Agreement).[9] By contrast, the ██ monthly rate contemplated by the Legacy Agreement would result in an effective rate of around ██—nearly double the applicable formula rate for the first year alone. Thus, the Court should dismiss any of SNMPR's claims seeking recovery based on the ██ monthly rate set by the Legacy Agreement as usurious. *See* Tenn. Code Ann. § 47-14-110.

---

[9] *See* Declaration of Leslie A. Demers in Support of Extreme's Motion to Dismiss the FAC ("Demers Decl.") Ex. 1. An official listing of formula rates set by a Tennessee governmental agency is a proper subject for judicial notice. *See, e.g., Havens Steel Co. v. Randolph Eng'g Co.*, 813 F.2d 186, 189 (8th Cir. 1987) (noting that "[a] prevailing rate of interest" as set by the Board of Governors of the Federal Reserve "is a proper subject for judicial notice").

16

**B.**     <u>The ███ Monthly Rate Is a Penalty Unenforceable as Against Public Policy</u>

Alternatively, the Court should dismiss any claims that apply the "monthly penalty of ███ ███ of the amount due, compounded monthly" imposed by the final paragraph of Section 24 of the Legacy Agreement (ECF No. 246-2 § 24) because that provision serves only to penalize Extreme for an alleged breach of contract, and is thus unenforceable as it contradicts public policy.

While Tennessee law generally respects the rights of parties to freely enter into contracts with terms of their choosing, Tennessee courts will invalidate liquidated damages provisions where the terms "violate public policy." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 100 (Tenn. 1999). "If the parties agree in the contract on the amount of damages to be recovered for compensation, upon the occurrence of a particular defaulting event, then the damages are liquidated unless the contract states otherwise." *Id.* at 97. Courts will enforce such provisions where "the liquidated sum is a reasonable prediction of potential damages and the damages are indeterminable or difficult to ascertain at the time of contract formation." *Id.* at 99. Conversely, when "the provision and circumstances indicate that the parties intended merely to penalize for a breach of contract," then the provision "is unenforceable as against public policy." *Id.* at 101. Where there is any doubt as to whether a sum imposes a penalty or a reasonable amount of liquidated damages, courts typically hold that the provision is unenforceable. *See Guesthouse Int'l Franchise Sys., Inc. v. Brit. Am. Props. MacArthur Inn, LLC*, No. 07-0814, 2009 WL 278214, at *10 (M.D. Tenn. Feb. 5, 2009).

Here, the final paragraph of Section 24 constitutes a liquidated damages provision because it states an amount the parties agreed SNMPR would recover "upon the occurrence of a particular defaulting event" (*i.e.*, failure to make payment within 30 days of the invoice date). *Guiliano*, 995 S.W.2d at 97.

But the ███ monthly rate, compounded monthly, contemplated by Section 24 is unenforceable as against public policy because it results in SNMPR receiving a windfall far

17

exceeding any amount the parties expected SNMPR would receive under the Legacy Agreement, and serves only to penalize Extreme for an alleged breach of contract.

As an initial matter, this is not a situation where, at the time of contracting, damages would have been indeterminable and difficult to prove. The license fees are clearly stated in the contract (*see* ECF No. 246-2 at Attachments A, C), and are calculated on a simple per-unit basis. In *National Fitness Center, Inc. v. Atlanta Fitness, Inc.*, 902 F. Supp. 2d 1098 (E.D. Tenn. 2012), this District held that a similar liquidated damages clause was unenforceable as a matter of law because license fees were clearly set out in the agreement, such that damages would not be "indeterminable or otherwise difficult to prove." *Id.* at 1109 (citation omitted).

Further, the ▮▮ rate, compounded monthly, is not a reasonable prediction of potential damages SNMPR could suffer. The Legacy Agreement suggests SNMPR expected at the time of contracting to receive a maximum of ▮▮▮ in royalties over the life of the agreement; Extreme could purchase a fully paid-up license for that amount. (ECF No. 246-2 at Attachment C.) As discussed above, the ▮▮ rate, compounded monthly, would entitle SNMPR to more than ▮▮ ▮▮ the amount of the principal on a hypothetical royalty payment of ▮▮▮ allegedly missed in December of 2001. In *Guesthouse International*, another Tennessee District Court found unenforceable a provision that would have entitled the non-breaching party to double recovery— much less than the ▮▮▮ in this case—for a specific period. 2009 WL 278214, at *10. And in *Stuart C. Irby Co. v. Thompson Brown, Inc.*, No. 17-1071, 2018 WL 11437816 (M.D. Tenn. Oct. 15, 2018), the court considered a liquidated sum of 1.5% per month—▮▮▮▮ ▮▮—on any past due balances owed for the sale of electrical materials. *Id.* at *2-3. The contract labeled the sum a "service charge . . . for the additional cost of carrying a delinquent account." *Id.* at *3. The Court found that, while a 1.5% monthly service charge may have been reasonable "for

18

the original maximum credit limit of $5,000" provided for in the contract, "the same percentage veers toward unenforceable as against public policy when the delinquent amount totals $103,129.86 and the collection period spans years." *Id.* So too, here, the ███ interest rate, compounded monthly, would be applied to purported delinquent amounts presumably totaling at least thousands of dollars[10] over a collection period spanning more than twenty years (since the 2001 execution of the Legacy Agreement). There is nothing in the contract or the FAC suggesting that monthly compounding penalties of ███ are based on an estimate of any damages that SNMPR might have allegedly suffered as a result of a missed payment.

Finally, the Legacy Agreement expressly refers to the sum as a penalty three times: "[A]ll payments received later than 30 days after the invoice date will be subject to a monthly ***penalty*** of ███████ of the amount due, compounded monthly, or the maximum allowed by law, whichever is less. This ***penalty*** will continue to accrue until the payment plus ***penalty*** is paid in full." (ECF No. 246-2 § 24 (emphasis added)). In *Bachour v. Mason*, No. 2012-00092-COA-R3-CV, 2013 WL 2395027 (Tenn. Ct. App. May 30, 2013), a Tennessee Court of Appeals found unenforceable a similar provision that provided for a sum that was not based on any estimate of potential damages and was considered a penalty. *Id.* at *1, *5. Thus, the final paragraph of Section 24 is unenforceable as against public policy, and the Court should dismiss the claims for relief that apply the ███ monthly rate. *See N.H. ex rel. Hernandez*, 2012 WL 2126863, at *2 (granting motion to dismiss demand for damages that were not available under Tennessee law).

---

[10] SNMPR contends that Extreme made unauthorized sales of "scores of product classes" (FAC ¶ 93), and the Legacy Agreement contemplates a minimum of ██/unit of sales (ECF No. 246-2 at Attachment C). Moreover, as noted *supra*, the Legacy Agreement provided a buyout for royalties totaling ██████. (*Id.*)

19

## IV. SNMPR'S FRAUD CLAIM SHOULD BE DISMISSED UNDER THE ECONOMIC LOSS DOCTRINE

SNMPR's fraud claim should be dismissed pursuant to the economic loss doctrine because SNMPR by its own allegations seeks "recovery for purely economic or commercial losses associated with [its] contract relationship" with Extreme. *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125, 155 (Tenn. 2021) (dismissing fraudulent inducement claim under economic loss doctrine in a products liability case); *see also Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994) (finding that "an action in tort requires a breach of duty separate and distinct from a breach of contract" and holding economic loss doctrine barred plaintiffs' tort claim). The rationale behind the doctrine is that "tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement." *Sun Co., Inc. (R & M) v. Badger Design & Constructors, Inc.*, 939 F. Supp. 365, 371 (E.D. Pa. 1996) (citation omitted). The concerns underlying the doctrine "apply with equal force in the products liability context [in which it originated] as in other commercial transactions between sophisticated parties." *Com. Painting Co. v. Weitz Co.*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *20-21 (Tenn. App. Ct. Mar. 11, 2022) (adopting the economic loss doctrine in the context of a construction contract). "[M]any jurisdictions now apply the economic loss doctrine in a wide array of circumstances beyond the products liability context." *Milan Supply Chain*, 627 S.W.3d at 145.[11] In fact, the Tennessee Supreme Court has expressly declined to "exempt[] all fraud claims from the economic loss rule." *See id.* at 153. Thus, the doctrine precludes a fraud

---

[11] *See, e.g.*, *Rattagan v. Uber Techs., Inc.*, No. 19-cv-01988, 2020 WL 4818612, at *7 (N.D. Cal. Aug. 19, 2020) (applying the economic loss doctrine to bar fraudulent concealment claim and noting that "[t]here is no *per se* rule limiting the economic loss doctrine to products liability or construction defect cases"); *Red Equip. Pte Ltd. v. BSE Tech, LLC*, No. 2:13-CV-1003, 2014 WL 2557129, at *4 (D. Ariz. June 6, 2014) (rejecting argument that economic loss doctrine is limited to products liability cases and applying it to bar a fraud claim of an alleged failure to adequately perform promises under a service contract).

20

claim that "merely states an alleged breach of contractual duties and does not concern representations that are collateral or extraneous to the parties' contract." *Best v. Time Warner Inc.*, No. 11-cv-00104, 2013 WL 66265, at *4 (W.D.N.C. Jan. 4, 2013) (granting summary judgment on fraud claims premised on false royalty reports).

## A. **SNMPR's Fraud Claims and Purported Losses Mirror Its Contract Claims**

Here, the doctrine precludes SNMPR's fraud claim because SNMPR effectively seeks to recover economic losses based on two alleged breaches of Extreme's contractual duties: (1) Extreme's purported failure to identify all Extreme products using SNMPR's software in royalty reports and in a 2015 email chain (FAC ¶¶ 147-150), and (2) Extreme's alleged receipt of software updates for products not licensed under the Legacy Agreement (*id.* at ¶¶ 151-152). SNMPR's breach of contract claims are premised on the same allegations: (1) Extreme had a duty under the Legacy Agreement to "prepare and submit quarterly royalty reports to SNMP[R] showing the product qualities that Extreme sold each fiscal quarter" (*id.* at ¶ 146) but allegedly breached the agreement by "failing to report and pay royalties" (*id.* at ¶ 140), and (2) Extreme allegedly breached the Legacy Agreement by "using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the [Legacy Agreement]" (*id.*).

Should SNMPR argue that software updates are governed by separate agreements and thus are sufficiently distinct to avoid the economic loss doctrine, that argument would not carry water. The FAC concedes that services agreements for software updates are "tied to a particular license agreement" (here, the Legacy Agreement) (*id.* at ¶ 151 & n.8), and Extreme's agreement on software updates itself specifies that software "[u]pdates . . . will be treated as components of the

21

licensed [p]rogram and their use will be governed by the terms and conditions of the License Agreement with the [c]ustomer" (Demers Decl. Ex. 2 at EXTREME-00699004).[12]

Further, the economic losses SNMPR claims it suffered as a result of the purported fraud arise directly from the alleged contract breaches. In particular, SNMPR claims (1) it received "far less than it was entitled to due to Extreme's fraudulent royalty reporting," and (2) it "would not have provided Extreme with software updates had SNMP International known of Extreme's improper use of [SNMPR's] software licensed under the [Legacy Agreement] on products that were not licensed and for which Extreme was not reporting or paying royalties." (FAC ¶ 152.) SNMPR should not be permitted to rely on tort law to recover these purported losses since it suffered them as a result of alleged breaches of duties Extreme assumed only by contract.

## B. Courts Have Dismissed Similar Claims Under the Economic Loss Doctrine

Courts have found that the economic loss doctrine precludes fraud claims in this exact context. For example, in *Alvarado Orthopedic Rsch., L.P. v. Linvatec Corp.*, No. 11-CV-246, 2011 WL 3703192 (S.D. Cal. Aug. 23, 2011), the court applied the economic loss doctrine on a motion to dismiss the plaintiffs' fraud claims premised on the defendant's alleged breach of a license agreement by failing to pay royalties and submitting false reports. *Id.* at *3. Specifically, the court held that "[p]laintiffs' fraud claims are based upon the same factual allegations— regarding both misconduct and damages—as [p]laintiffs' breach of cont[r]act claim: [defendant] failed to provide complete and accurate quarterly reports as required under the agreement, and, as a result, [defendant] did not pay [p]laintiffs the full amount of royalties due under the agreement." *Id.*; *see also Best*, 2013 WL 66265, at *4 ("thrust" of the plaintiff's fraud claim was that

---

[12] The Court may consider the agreement on software services in ruling upon the motion to dismiss because it is incorporated into the complaint by reference and is alleged to be central to the claims. *See, e.g.*, *SFDG LLC v. Cincinnati Ins. Co.*, 558 F. Supp. 3d 590, 593 (E.D. Tenn. 2021).

22

"[d]efendants falsely represented the amount of royalties due [t]o him[; s]uch false representations are not collateral or extraneous to the contract, and the related claims are therefore barred").

Further, courts have rejected arguments that a plaintiff suffers independent damages based on purported misrepresentations relating to license agreements. For example, in *LF Centennial Ltd. v. Z-Line Designs, Inc.*, No. 16cv929, 2019 WL 13136765 (S.D. Cal. Jan. 8, 2019), the court granted the defendant's motion to dismiss plaintiff's fraud claim premised on failure to pay royalties owed and allegedly false royalty statements. *Id.* at *6. In doing so, the court rejected the plaintiff's argument that it suffered independent damages in the form of "costs it incurred in recovering lost royalties and the lost time value of the unpaid royalties," which it attempted to claim were "distinct from its economic losses." *Id.* The court concluded that these economic losses arose "directly from" and were "intertwined with the alleged breach of contract." *Id.* "To accept the notion that delayed payment under a contract and its attendant inconvenience transforms a contract action into a fraud action would allow the exception to swallow the economic loss rule." *Id.* In *LMNO Cable Grp., Inc. v. Discovery Commc'ns, LLC*, No. LA CV16-04543, 2020 WL 10759618 (C.D. Cal. May 15, 2020), the court rejected the plaintiff's argument that suffering damages beyond delayed payments—there, "out-of-pocket damages" from having to investigate the defendants' conduct and "emotional distress damages"—"serve[d] as a basis for an exception to the economic loss rule absent a finding that defendant violated a duty that arose independently of the contract." *Id.* at *13-14. Similarly, here, SNMPR does not—and cannot amend its complaint to—point to duties independent of the Legacy Agreement or damages that arose independent from the alleged breaches of that contract. Any allegations of delayed payments of royalties or over-provision of software updates arise directly from, or are at least intertwined with, SNMPR's breach of contract theories.

23

## CONCLUSION

Because "it is clear . . . that the complaint could not be saved by an amendment," *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 n.1 (6th Cir. 2021), Extreme respectfully requests that this Court significantly narrow the scope of this case by dismissing the following claims with prejudice, pursuant to Rule 12(b)(6): (1) claims for copyright infringement damages based on purported acts more than three years before the filing of this lawsuit; (2) breach of contract claims seeking entitlement to "any amount received" by Extreme; (3) claims based on the ███ monthly rate listed in the Legacy Agreement; and (4) fraud claims that are duplicative of breach of contract claims.

DATED:     March 16, 2023
           New York, New York

                                    Respectfully Submitted,

                                    */s/ Leslie A. Demers*

J. Chadwick Hatmaker, BPR# 018693        John M. Neukom (*admitted pro hac vice*)
Kaitlyn E. Hutcherson, BPR# 035188       Barbara N. Barath (*admitted pro hac vice*)
WOOLFE, MCLANE, BRIGHT,                   DEBEVOISE & PLIMPTON LLP
   ALLEN & CARPENTER, PLLC                650 California Street
Post Office Box 900                       San Francisco, California 94108
Knoxville, Tennessee 37901-0900           jneukom@debevoise.com
Tel: (865) 215-1000                       bnbarath@debevoise.com
Fax: (865) 215-1001                       (415) 738-5700
chatmaker@wmbac.com
khutcherson@wmbac.com                     Leslie A. Demers (*admitted pro hac vice*)
                                          Chris J. Coulson (*admitted pro hac vice*)
                                          Anthony P. Biondo (*admitted pro hac vice*)
                                          Ryan P. Bisaillon (*admitted pro hac vice*)
                                          SKADDEN, ARPS, SLATE,
                                             MEAGHER & FLOM LLP
                                          One Manhattan West
                                          New York, New York 10001
                                          leslie.demers@skadden.com
                                          chris.coulson@skadden.com
                                          anthony.biondo@skadden.com
                                          ryan.bisaillon@skadden.com

24

(212) 735-3000

*Attorneys for Extreme Networks, Inc.*