# EXHIBIT 11

TODD M. LANDER (BAR NO. 173031)
todd.lander@ffslaw.com
JEFFREY M. JENSEN (BAR NO. 262710)
jeffrey.jensen@ffslaw.com
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
Telephone: (310) 255-6100
Facsimile: (310) 255-6200

Attorneys for Defendants POOF APPAREL CORP., BOSCOV'S, INC., ARDENE INTERNATIONAL, INC. and ARDENE USA, INC.

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

FASHION AVENUE SWEATER KNITS, LLC, a New York limited liability company,

Plaintiff,

vs.

POOF APPAREL CORP., a New York corporation, ARDENE INTERNATIONAL, INC., a Canadian corporation; ARDENE USA, INC., a Delaware corporation; BOSCOV'S INC., a Pennsylvania corporation; and DOES 1 through 10,

Defendants.

Case No. 2:19-cv-06302-CJC-JEM

Hon. Cormac J. Carney

**DECLARATION OF JEFFREY M. JENSEN SUBMITTING REBUTTAL EXPERT REPORT OF DAVID NIMMER IN FURTHER SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Date: October 26, 2020
Time: 1:30 p.m.
Ctrm: 9B

Motion Cutoff: October 27, 2020
Pre-Trial Conf.: November 30, 2020
Trial Date: December 8. 2020

FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

4690111.1
DECLARATION OF JEFFREY M. JENSEN SUBMITTING REBUTTAL EXPERT REPORT OF DAVID NIMMER IN FURTHER SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FREEMAN, FREEMAN & SMILEY, LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**DECLARATION OF JEFFREY M. JENSEN**

I, Jeffrey M. Jensen, declare that:

1. I am an attorney duly licensed to practice before all of the courts in the State of California. I am a senior counsel with Freeman, Freeman & Smiley, LLP, counsel of record for Defendants POOF APPAREL CORP. ("Poof"), BOSCOV'S, INC., ARDENE INTERNATIONAL, INC. and ARDENE USA, INC. (together, Ardene) (collectively, "Defendants") in this action. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would competently testify to such facts under oath.

2. I submit this Declaration in further support of Defendants' Opposition to Plaintiff's Motion for Summary Judgment.

3. Attached hereto as **Exhibit A** is a true and correct copy of the rebuttal Expert Report of David Nimmer, dated as of October 8, 2020, as provided to my firm by Mr. Nimmer

4. In the Report, Mr. Nimmer expresses the opinion that this Court should refer to the Registrar of Copyright the question of whether the 735 Registration is valid. *See* Report ¶ 16 ("For the reasons set forth below, it is my opinion that this Court should request the Register of Copyrights to address the complex questions arising under the rubric of publication as they unfold in this case.").

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 8th day of October 2020, at Los Angeles, California.

*/ s / Jeffrey M. Jensen*
Jeffrey M. Jensen

# EXHIBIT A

# EXPERT REPORT OF DAVID NIMMER

I, David Nimmer, hereby declare,

1. I am an attorney licensed to practice law in the State of California. I serve as a Professor from Practice at the UCLA School of law, and Of Counsel to the law firm of Irell & Manella LLP in Los Angeles, California.

2. Since 1985, I have served as the current author of NIMMER ON COPYRIGHT, the standard treatise on United States copyright law, which is routinely cited as authority in decisions by courts across the United States and in other nations. I also write extensively on copyright law and related subjects in scholarly journals. A copy of my curriculum vitae is attached as Exhibit A.

3. I have been retained by counsel for defendants Poof Apparel Corp., Ardene International Inc., Ardene USA Inc., and Boscov's, Inc. (collectively, "Defendants") to serve as a rebuttal expert witness in the above-titled action, *Fashion Avenue Sweater Knits LLC vs. Poof Apparel Corp.*, et al., No. 2:19-cv-06302 (C.D. Cal.).

## I. DOCUMENTS EXAMINED

4. In preparing this report, I have reviewed the following primary documents relating to this case:

a. Complaint filed July 22, 2019, in Central District of California by plaintiff Fashion Avenue Sweater Knits, LLC.

b. U.S. Copyright Registration Certificate No. VAu 1-307-735, effectiveJuly 26, 2017.

c. Deposit material in connection with U.S. Copyright Registration Certificate No. VAu 1-307-735, containing 376 images.

    d. U.S. Copyright Registration Certificate No. VA 2-150-695, effective May 2, 2019.

e. U.S. Copyright Registration Certificate No. VA 2-158-592, effective July 15, 2019.

f. Expert Report of Ralph Oman, dated September 9, 2020.

g. Declaration of Ronald Hollandsworth, dated September 14. 2020.

h. Rough transcript of Zoom deposition of Ronald Hollandsworth.

i. Rough transcript of Zoom deposition of Perri McCammon.

j. Rough transcript of Zoom deposition of Thomas McKown.

## II. FACTUAL BACKGROUND

5. For current purposes, I accept the following propositions set forth in the Expert Report of Ralph Oman:

a. "Subject Designs 1 through 5 were registered as 'unpublished' works."

b. "[A]fter the designs at issue were created, but before they were registered with the U.S. Copyright Office, the owner of those works, Plaintiff, displayed sample garments, each bearing one of those designs, to prospective retailer buyers (i.e., retailer employees) during private in-person scheduled meetings in the Plaintiff's private office located in New York City."

c. "[I]n doing so, for each design at issue, the Plaintiff only displayed the original design to the prospective buyers, as applied to an actual finished garment, and . . . the Plaintiff did not copy or otherwise reproduce the design, or distribute copies of the design, to the prospective buyers, in any printed or electronic form."

d. "Plaintiff did not create 'look books', catalogues, brochures, or Internet website pages showing images of the Subject Designs, it did not send images of the Subject

Designs to its prospective retailer buyers, and it did not otherwise provide copies of the designs or permit the prospective retailer buyers to make copies of the designs or take copies of the designs with them from the private in-person meetings."

6.  The above recitation focuses on the date when scheduled meetings occurred in Plaintiff's private offices with prospective purchasers, which I understood took place beginning in March 2017.  Inasmuch as registration was not effectuated for the works in question until over four additional months had elapsed, it is necessary to focus as well on that timeframe.

7.  For that purpose, I rely on deposition excerpts as supplemented by information supplied by defense counsel, who informs me that discovery requests are outstanding and that the defense has not yet been able to ascertain all the appurtenant facts. Because this expert report is now due, counsel has asked me to draw pertinent assumptions as follows as to the material it expects to develop.

8.  The in-person meetings with various customers entailed displays of over three hundred sample garments.  Approximately seventeen customers expressed interest in purchasing five different garments in bulk, corresponding to Subject Designs 1 through 5.

9.  Those customers did not complete the transaction on the date of meeting; rather, over the course of succeeding weeks, each of them communicated with Plaintiff to consummate a separate deal for a set number of each design at an agreed price, to be delivered at a later date in time for the Christmas season.

10.  Over the course of succeeding months, those customers continued to communicate with Plaintiff, at times adjusting the size of an order or otherwise altering its contours; for instance, customer X could hypothetically increase its March 25 order of 300 units of a given design to expand it on July 1 to 350 units of that same design.

11. Once Plaintiff received orders for given designs from its customers, it started the production process of those units by commissioning manufacturing facilities located in China to produce them according to Plaintiff's specifications, in order to assure shipment of the requisite number of ordered garments in time for the forthcoming Christmas season. That manufacturing continued continuously through succeeding months.

12. Starting in September 2017, Plaintiff shipped finished products to its customers, in the following amounts:

| Item | Units Delivered (Rounded) |
| --- | --- |
| Design 1 | 1,300 |
| Design 2 | 2,200 |
| Design 3 | 11,000 |
| Design 4 | 5,000 |
| Design 5 | 28,000 |

## III. PROCEDURAL POSTURE

13. A question has arisen in this case:

a. The lower case "u" in Copyright Registration Certificate No. VAu 1-307-735 signifies that the 376 items included therein were all claimed to be "unpublished" as of its effective date of July 26, 2017.

b. Defendants claim that one or more of those constituent works were, as of that date, in fact published—with the consequence that Certificate No. VAu 1-307-735 cannot support this cause of action.

c. More particularly, Defendants allege that Certificate No. VAu 1-307-735 contains inaccurate information that was included "with knowledge that it was inaccurate,"

17 U.S.C. § 411(b)(1)(A), and that "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration," 17 U.S.C. § 411(b)(1)(A).

        d.   Plaintiff denies the above.  Supported by Prof. Oman, it contests that publication of any of those works had occurred as of that date.

        14.     Governing law provides the methodology that is to be followed when a dispute arises, as above, under paragraph (1) of 17 U.S.C. § 411(b):

> In any case in which inaccurate information described under paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(2)

## IV.    QUESTION PRESENTED

        15.     I have been asked to address only one question in this expert report:  Should this Court (a) investigate the validity of Certificate No. VAu 1-307-73 by reaching its own independent determination as to the publication status of the 376 constituents included for registration thereunder, or (b) pursuant to the provision just quoted, should "the court . . . request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration"?

        16.     For the reasons set forth below, it is my opinion that this Court should request the Register of Copyrights to address the complex questions arising under the rubric of publication as they unfold in this case.

## V.    ANALYSIS

        17.     To appreciate the context in which this case arises, a brief historical retrospective is helpful, following which the circumstances of this case can be slotted into their appropriate framework.

**A. Perils of Publication**

18. It has been over a half-century since Judge Frank called attention, in a famous copyright case, to the chameleon term *publication* and the wide range of meanings to which it is subject. *See American Visuals Corp. v. Holland*, 239 F.2d 740, 743 (2d Cir. 1956). The problem is that, for more than a hundred years, the term "publication" as used in the law of copyright has been the subject of endless glosses, exceptions, and contradictory holdings—such that canvassing the case law interpreting "publication" now consumes over a hundred pages. *See* 1 NIMMER ON COPYRIGHT Chap. 4.

19. Congress has labored mightily during that period to bring order to this troubled field. Starting in 1955, it convened studies and hearings that culminated, ten years later, with a recommended change to the statutory language based on the observation

> that the use of the words "publication" or "published," in hundreds of common law and statutory cases, dissertations, and otherwise, has made the terms archaic today in the light of our recent technological progress. Reference to such materials where the word derived its meaning from conditions existing in the 18th, 19th, and early part of the 20th century, will only lead to confusion.

*Copyright Law Revision, Part 3: Preliminary Draft for Revised U.S. Copyright Law and Discussions and Comments on the Draft* (H. Comm. on the Judiciary Print) (1964). *See* 2 NIMMER ON COPYRIGHT § 8.11[B][1] (placing that quotation in context reaching back to 1955).

**B. PRO-IP Act**

20. Even those salutary efforts left certain pockets within the law of copyright giving rise to endless disputes over the meaning of "publication." One of those aspects concerns challenges to copyright registrations based on alleged misrepresentations over the purported *publication* status of the material in question, as illustrated by this case.

21.     To redress that arena, Congress passed the Prioritizing Resources and Organization for Intellectual Property Act of 2008, Pub. L. 110-403, 122 Stat. 4256 (Oct. 13, 2008).  That PRO-IP amendment added to the Copyright Act the provision quoted above, 17 U.S.C. § 411(b), which mandates referral to the Register of Copyrights when questions arise regarding publication status insofar as they affect the viability of group registrations.

22.     The Ninth Circuit recently quoted this statutory provision to hold that, "once a defendant alleges" the necessary elements, "a district court is then required to submit a request to the Register of Copyrights 'to advise the court whether the inaccurate information, if known, would have caused [it] to refuse registration.'"  *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 959 F.3d 1194, 1197 (9th Cir. 2020) ("In other words, courts may not consider in the first instance whether the Register of Copyrights would have refused registration due to the inclusion of known inaccuracies in a registration application.").  In that case about whether the plaintiff complied with applicable requirements to register a collection of garment designs as a "unit publication," the Ninth Circuit reversed the decision below on the precise basis that "the district court did not make the statutorily required request" to the Register of Copyrights.  *Id*. at 1200.

23.     Applying the statutory provision, courts routinely defer to Copyright Office determinations.  Illustrative is a case in which the plaintiff alleged "that it owns the copyright in a two-dimensional textile design entitled 1461-43 ('1461 Design')," and that it "registered the 1461 Design under Copyright Registration No. VAu 1-151-509 ('509 Registration'), as part of its 'Grp. 029-Spring/Summer 2014' collection."  *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC,* 925 F.3d 1140, 1142 (9th Cir. 2019).  After the parties contested this issue, the District Court submitted the matter to the Register of Copyrights for guidance.  The Copyright Office responded to the Court with the statement

"that 'had the Office been aware that the 1461 Design had been previously published, the Office would have refused registration of that work using the unpublished collections option because the work was registered as unpublished when in fact it had been published.'" *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 2017 U.S. Dist. LEXIS 222099, *4. The Ninth Circuit affirmed: "In light of the Register's response, we agree that § 411(b)(1)(B) is satisfied and that the inaccuracy in the '509 registration renders it invalid as to the 1461 Design." 925 F.3d at 1148.

24. Complementary, an earlier Ninth Circuit ruled that, because the Copyright Office rejected what the defendant claimed was a purported error—"the inclusion of two previously published designs in a work registered as an unpublished collection"—the courts would follow the Office's lead, allowing the action to continuing notwithstanding the challenged registration. *See L.A. Printex Indus., Inc. v. Aeropostale, Inc.*, 676 F.3d 841, 854 (9th Cir. 2012).

**C. Issues outside the Scope**

25. Before passage of the PRO IP Act, each court had to wade through the morass of case law to determine whether a given compilation, purportedly composed of unpublished parts, complied with the hyper-technical standards of *publication* dictated by governing law. In that world, one cognizable interpretation would be the one reached by Prof. Oman here, that Designs 1 through 5 were unpublished as of March 2017. Oman Report ¶ 27.

26. On the other hand, the opposite conclusion would be equally cognizable. It is hoary doctrine that sale of "a single copy" may constitute publication. *Bobbs-Merrill Co. v. Straus*, 147 F. 15, 19 (2d Cir. 1906), *aff'd*, 210 U.S. 339 (1908). Sales from the premises of a private office in no way derogates from a conclusion of *publication*, and a mere *offer* to

sell has been held sufficient to constitute "publication." As the Ninth Circuit commented earlier this year, "publication includes when copies of a work are 'made available to the general public …even if a sale or other disposition does not in fact occur.'" *Unicolors,* 959 F.3d at 1198, quoting NIMMER ON COPYRIGHT; see cases currently collected in 1 NIMMER ON COPYRIGHT § 4.03[A] n.10. Skillful lawyers can argue either side of these cases, and courts can thus reach disparate results.

27. But Congress intended one rule to prevail nation-wide. For that reason, since passage of the PRO IP Act, the question is no longer how judges are inclined to rule in individual cases. Instead, the key is to consult the Copyright Office in all instances, so that uniform standards can apply across the country.

**D. Applied to Instant Facts**

28. The Copyright Office has articulated the standard that it applies here:

> **The Copies or Phonorecords Must Be in Existence.** The statutory definition indicates that offering to distribute copies or phonorecords constitutes publication, provided that the copies or phonorecords exist when the offer is made. Offering to distribute copies or phonorecords before they exist or before they are ready for further distribution, public performance, or public display does not constitute publication.

U.S. Copyright Office, *Compendium of U.S. Copyright Office Practices* § 1906.3 (3d ed. 2017).

29. The Office adduces examples on both sides of the ledger. On the negative side, it specifies: "Offering to distribute a motion picture that is currently in production does not constitute publication." *Id*. Also, "Offering to distribute a sound recording that has not been fixed in its final form does not constitute publication." *Id*. In both of those instances, the work in question has not yet been fixed in a tangible medium of expression. Those facts stand in contrast to the instant Plaintiff's activities in March 2017, by which time each garment had been reduced to its final form in at least one exemplar.

30. On the positive side, the Office specifies: "Offering a new line of toys to a group of retailers constitutes publication, provided that the toys are available for distribution when the offer is made." *Id*. That language must be applied to the facts at bar.

31. The evidence regarding activities that preceded the registration date of July 26, 2017, indicates the possibility (on which the Copyright Office must pronounce) that at least some of the items in question had already been published. Given that Plaintiff began production of Design 5 starting in March 2017, and ultimately delivered 28,000 garments bearing that design by September of that year, it seems overwhelmingly likely that, as of July 26, thousands of garments embodying that design had been produced and were ready for sale. It is highly unlikely that the first order placed in March 2017 was for the full 28,000 exemplars ultimately produced. Given that customers called Plaintiff on a regular basis after placing their order in March for the purpose of adjusting those orders, it also seems overwhelmingly likely that conversations took place between Plaintiff and its customer altering the amount of units ordered, the eventual delivery date, the purchase price, and other pertinent terms. To the extent that one of those conversations resulted in a meeting of the minds on or before July 26, then it follows that Plaintiff made an offer (which was accepted) to deliver goods that were already in existence. Using the standard that the Office applies—"that the [garments] are available for distribution when the offer is made"—the Office may interpret its policies to conclude that Design 5 had been published prior to registration.

32. It remains possible, concomitantly, that the Office may interpret its policies to the contrary, based on all the circumstances. The point is that we cannot know the answer, absent reference of the matter to the Register of Copyrights, as 17 U.S.C. § 411(b)(2) commands.

### E.     *Olem Shoe*

33.     What circumstances would warrant the contrary conclusion, namely that the matter *should not* be referred to the Register of Copyrights?  As with all issues in civil litigation, the failure to raise a cognizable point supported by evidence means that courts can dispose of the issue as a matter of law.  Accordingly, if given defendants in copyright infringement cases simply claim that misrepresentations had occurred in a given registration certificate, but are unable to adduce any evidence to that effect, the matter would not warrant reference to the Copyright Office.

34.     In this case, Defendants have amply reached the requisite threshold.  As set forth above in Part D, the operative facts raise an issue that rises to the level of warranting input from the Register of Copyrights.

35.     As the Copyright Office itself indicates, "if the issue depends *even in part on interpretation or understanding of the Copyright Office's registration practices,* the more prudent practice—and the practice anticipated in § 411(b)—would be to refer the question to the Register."  *Schenck v. Orosz*, 105 F. Supp. 3d 812, 819 (M.D. Tenn. 2015), quoting Register's pleading in the unpublished case of *Olem Shoe Corp. v. Washington Shoe Corp*. at 12 n.5.  See Oman Report Ex. D.

36.     In the instant case, the question is whether the Copyright Office's registration practices would accept as unpublished a particular design that, for instance, had previously been the subject of an offer to distribute at a time when thousands of exemplars of that work had been created and were ready to distribute.  Those circumstances create a live issue on which the Office must pronounce.

37.     The question whether the Office would have rejected Plaintiff's application had it been apprised of all the pertinent circumstances becomes particularly pointed in light

of Plaintiff's own subsequent conduct and representations.  In two regards, those

considerations raise questions as to Plaintiff's previous representation as of July 26, 2017,

that all 376 components included within Certificate No. VAu 1-307-735 were then

unpublished:

      a.   On May 2, 2019, Plaintiff filed with the Office its Registration Certificate

No. VA 2-150-695, claiming a first publication of Penguins Style 16832 as of March 15,

2017.  My understanding is that Penguins Style 16832 was shown to prospective clients

along with the 300+ other garments of the same collection in March 2017, but that Plaintiff

inadvertently neglected to include a picture of Penguins Style 16832 amidst the deposit

material for Certificate No. VAu 1-307-735.  See McCammon Depo. at 47-48.  If, indeed,

the showing of Penguins Style 16832 to customers on that date worked a publication of that

work, as Plaintiff conceded when it registered that work on May 2, 2019, then all 376 other

garments that Plaintiff showed to customers on that same day were equally published,

meaning that Certificate No. VAu 1-307-735 would be quintuply flawed.

      b.   On July 22, 2019, Plaintiff filed its complaint in this case.  That pleading

states that "Subject Design Nos, 1, 2, 3, 4 and 5 . . . were registered with U.S. Copyright

Office within three months of their first publication."  Complaint ¶ 47.  One of Plaintiff's

witnesses subsequently affirmed the same proposition.  *See* Hollandsworth Depo. at 31-35.

Taken at face value, that proposition concedes that first publication of those five items

unfolded prior to July 26, 2017—again with the result that Certificate No. VAu 1-307-735

would be quintuply flawed.

      c.   When the Office conducts its investigation into whether Plaintiff made

knowing misrepresentations, it must be given the opportunity to consider those two

representations from Plaintiff contrary to the substance of Plaintiff's representations made in
Certificate No. VAu 1-307-735.

38.     In sum, the question for the Register to answer is whether the Office permits
group registration of 376 works as unpublished at a time when five of those works have
been the subject of offers and sustained negotiation, when thousands of exemplars of them
have already been manufactured and are awaiting shipment, and when Plaintiff well knows
all the operative facts.  Given that there is no way to be certain what the answer to that
question will be, reference to the Office is appropriate at this juncture.

## VI.   QUALIFICATIONS AND PUBLICATIONS

39.     Exhibit A to this Report sets forth my curriculum vitae, which contains a list
of my publications.

## VII.   OTHER EXPERT TESTIMONY WITHIN THE LAST FOUR YEARS

40.     When preparing expert reports in the past, I have habitually attached as
Exhibit B a list of cases in which, within the last four years, I have offered expert testimony
at trial or in deposition.  I have ascertained that there are no such instances within the period
of October 8, 2016, to the present—and therefore am not attaching any such exhibit to this
report.

## VIII.   COMPENSATION

41.     Irell & Manella LLP charges $1,610 per hour for my services.

October 8, 2020

David Nimmer

# EXHIBIT A

**DAVID NIMMER**
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, California 90067
(310) 277-1010 or (310) 203-7079
E-Mail: dnimmer@irell.com

# PUBLICATIONS

**NIMMER ON COPYRIGHT** releases 19 through 111 (1985 - 2020)

**COPYRIGHT ILLUMINATED: REFOCUSING THE DIFFUSE U.S. STATUTE** (2008)

**COPYRIGHT: SACRED TEXT, TECHNOLOGY, AND THE DMCA** (2003)

**COPYRIGHT'S MILLENNIAL TURN** (1999)

**IMPOSSIBLE REALITIES** (1995)

**COPYRIGHT'S TRADE STATUS: GATT AND NAFTA** (1994)

**HOME AUDIO TAPING OF MUSIC: DIGITAL TECHNOLOGY AND THE NEW COPYRIGHT AMENDMENTS** (1993)

**THE BERNE CONVENTION IMPLEMENTATION ACT OF 1988** (1989)

"Fair Use and Fair Dealing: Two Approaches to Limitations and Exceptions in Copyright Law" (with Shyam Balganesh) in **INDIA AS A PIONEER OF INNOVATION** (Harbir Singh *et al*., eds. 2017)

Contributor to **FROM MAIMONIDES TO MICROSOFT** by Neil Weinstock Netanel (2016)

"INacCSSibility," in **AN UNHURRIED VIEW OF COPYRIGHT, REPUBLISHED (AND WITH CONTRIBUTIONS FROM FRIENDS)** (2005)

"The Worldwide Legacy of Mayer Gabay" in **ADV. MAYER GABAY—A BOOK IN HIS MEMORY** (Aharon Barak & Michal Navoth, eds. 2015)

"Software Copyright in the Cloud" in **REGULATING THE CLOUD: POLICY FOR COMPUTING INTRASTRUCTURE** (Christopher S. Yoo & Jean-François Blanchette, eds. 2015)

"Assaying Qimron's Originality" in **ARTEFACTS AND INTELLECTUAL PROPERTY** (Timothy H. Lim, Hector L. MacQueen, Calum M. Carmichael, eds.) (2001).

"United States," in Nimmer & Geller, eds., **INTERNATIONAL COPYRIGHT LAW AND PRACTICE** (1988) (and annual updates 1989 - 1998)

"Copyright Law of the USA," in **COPINGER AND SKONE JAMES ON COPYRIGHT** (1991) (and 1994 Supplement)

Fourth Edition (and 1989 Supplement to Third Edition) of **CASES AND MATERIALS ON COPYRIGHT AND OTHER ASPECTS OF ENTERTAINMENT LITIGATION** (1991) (with Paul Marcus and David Myers)

Contributor to **ON MULTIMEDIA: TECHNOLOGIES FOR THE 21ST CENTURY** (M. Greenberger, ed. 1990)

"Le Droit D'Auteur en Droit American" in **DROIT DES AFFAIRES** (1989) (Eric Laporte, trans.)

* * *

"Idle Chatter or Vital Chat? A Janus-Faced Talmudic Dictum," 28 **Hakirah** 187 (2020)

"World-Weariness," **NULR of Note,** http://blog.northwesternlaw.review/?p=1114 (Feb. 17, 2020)

"Volition in Violation of Copyright," 43 **Colum. J.L. & Arts** 1 (2019)

"Investigating the Hypothetical 'Reasonable Royalty' for Copyright Infringement," 99 **B.U. L. Rev.** 1 (2019)

"Miriam's Oasis," 34 **Touro L. Rev**. 983 (2018)

"Remarques peu orthodoxes sur la protection du droit d'auteur en France et aux Etats-Unis," **Entertainment**, Issue No. 8 (2018) (Mickaël Le Borloch, trans.)

"Juries and the Development of Fair Use Standards," 31 Harv. J. L. & Tech. 563 (2018)

"Breaking Down the Barrier Separating Copyright from droit d'auteur," **Entertainment**, Issues Nos. 1 and 2 (2017)

"Innocence of Copyright: An Inquiry into the Public Interest," 63 **J. Copyright Soc'y** 367 (2016)

"Software Copyright's *Oracle* from the Cloud." 30 **Berkeley Tech. L.J**. 161 (2015) (with Lothar Determann)

Symposium, "*Aereo*, Disruptive Technology, and Statutory Interpretation, **SCOTUSBLOG**, http://www.scotusblog.com/2014/06/symposium-aereo-disruptive-technology-and-statutoryinterpretation/ (June 26, 2014) (with Peter Menell)

"Copyright and the Fall Line," 31 **Cardozo Arts & Ent. L.J.** 803 (2013)

"Is Copyright Property?—The Debate in Jewish Law," 12 **Theoretical Inquiries in L.** 241 (2011) (with Neil Netanel)

"Queen Anne in the Emperor's Shadow," 47 **Hous. L. Rev.** 919 (2010)

"Pooh-Poohing Copyright Laws 'Inalienable' Termination Rights," 57 **J. Copyright Soc'y** 799 (2010) (with Peter Menell)

"In the Shadow of the Emperor: The Hatam Sofer's Copyright Rulings," 15 **Torah U-Madda J.** 24 (2010)

"Copyright Law and the Restoration of Beauty," 47 **Osgoode Hall L.J.** 553 (2010)

"Rabbi Banet's Charming Snake," 8 **Hakirah** 69 (2009)

"Access Denied," 3 **Utah L. Rev.** 769 (2007)

"Unwinding *Sony*," 95 **Cal. L. Rev.** 941 (2007) (with Peter Menell)

"Legal Realism in Action: Indirect Copyright Liability's Continuing Tort Framework and *Sony*'s De Facto Demise," 55 **UCLA L. Rev.** 143 (2007) (with Peter Menell)

"A Modest Proposal to Streamline Fair Use Determinations," 24 **Cardozo Arts & Ent. L.J.** 11 (2006)

"Copyright's 'Staple Article of Commerce' Doctrine: Patently Misguided," 53 **J. Copyright Soc'y** 365 (2006) (with Peter Menell)

"Promises! Promises!," 119 **Harv. L. Rev. F.** 74 (2006), http://www.harvardlawreview.org/forum/issues/119/jan06/nimmer.pdf

"Repeat Infringers," 52 **J. Copyright Soc'y** 167 (2005)

"On the *Sony* Side of the Street," 34 **Sw. U. L. Rev.** 205 (2004)

"The Moral Imperative Against Academic Plagiarism (Without a Moral Right Against Reverse Passing Off)," 54 **DePaul L. Rev.** 1 (2004)

"Codifying Copyright Comprehensibly," 51 **UCLA L. Rev.** 1233 (2004)

"Preexisting Confusion in Copyright's Work For Hire Doctrine," 50 **J. Copyright Soc'y** 399 (2003) (with Peter Menell & Diane McGimsey)

"'Fairest of them All' and Other Fairy Tales of Fair Use," 66 **Law & Contemp. Probs.** 263 (2003)

"Appreciating Legislative History:  The Sweet and Sour Spots of the DMCA's Commentary," 23 **Cardozo L. Rev.** 909 (2002)

"Sound Recordings, Works for Hire, and the Termination-of-Transfers Time Bomb," 49 **J. Copyright Soc'y** 387 (2001) (with Peter Menell)

"Back From the Future:  A Proleptic Review of the Digital Millennium Copyright Act," 16 **Berkeley Tech. L.J.** 855 (2001)

"Copyright in the Dead Sea Scrolls:  Authorship and Originality," 38 **Hous. L. Rev.** 1 (2001)

"Ignoring the Public, Part I:  On the Absurd Complexity of the Digital Audio Transmission Right," 7 **UCLA Ent. L. Rev.** 189 (2000)

"A Riff on Fair Use in the Digital Millennium Copyright Act," 148 **U. Pa. L. Rev.** 673 (2000)

"Puzzles of the Digital Millennium Copyright Act," 46 **J. Copyright Soc'y** 401 (1999)

"The Metamorphosis of Contract Into Expand," 87 **Cal. L. Rev.** 17 (1999) (with Elliot Brown and Gary Frischling)

"*Aus Der Neuen Welt*," 93 **Nw. U. L. Rev.** 195 (1998)

"Time and Space," 38 **IDEA** 501 (1998)

"Adams and Bits:  Of Jewish Kings and Copyrights," 71 **S. Cal. L. Rev.** 219 (1998)

"An Odyssey Through Copyright's Vicarious Defenses," 73 **N.Y.U. L. Rev.** 162 (1998)

"A Tale of Two Treaties," 22 **Colum.-VLA J.L. & Arts** 1 (1997)

"Forum on Attorney's Fees in Copyright Cases:  Are We Running Through the Jungle Now or Is the Old Man Still Stuck Down the Road?," 39 **Wm. & Mary L. Rev.** 65 (1997)

"Brains and Other Paraphernalia of the Digital Age," 10 **Harv. J.L. & Tech.** 1 (1996) (excerpted in 46 **Rivista di Diritto Industriale** 55)

"*Abend*'s Stepchild," 43 **J. Copyright Soc'y USA** 139 (1996)

"The End of Copyright," 48 **Vand. L. Rev.** 1385 (1995)

"GATT's Entertainment:  Before and NAFTA," 15 **Loy. L.A. Ent. L.J.** 133 (1995)

"*Corcovado*: Renewal's Second Coming or False Messiah?," 1 **UCLA Ent. L. Rev.** 127 (1994)

"Nation, Duration, Violation, Harmonization: An International Copyright Proposal for the United States," 55 **Law & Contemp. Probs.** 211 (1992)

"Refracting the Window's Light: *Stewart v. Abend* in Myth and in Fact," 39 **J. Copyright Soc'y USA** 18 (1991)

"The Impact of Berne on United States Copyright Law," 8 **Cardozo Arts & Enter. L.J.** 27 (1989)

"Copyright Ownership by the Marital Community: Evaluating *Worth*," 36 **UCLA L. Rev.** 383 (1988)

"A Structured Approach to Analyzing the Substantial Similarity of Computer Software in Copyright Infringement Cases," 20 **Ariz. State L.J.** 625 (1988) (with Richard L. Bernacchi and Gary N. Frischling)

"The Double Jeopardy Clause as a Bar to Reintroducing Evidence," **THE CRIMINAL LAW REVIEW OF 1981**; reprinted from 89 **Yale L.J.** 962 (1980)

* * *

"Groundhog 007," 21 **New Matter** No. 3 (Fall 1996)

"Second Wind," **Los Angeles Lawyer** (November 1995)

"Letter from the United States," **Informatierecht/AMI** No. 9 (November 1994); "Lettera dagli Stati Uniti," **Il Diritto Industriale** n. 1/1995 (Claudia Paoletti, trans.)

"Studios vs. Writers: *A Bend* in Analysis," 11 **Entertainment Law Reporter**, No. 4 (September 1989)

"Criminal Copyright and Trademark Law: The Importance of Criminal Sanctions to Civil Practitioners," 9 **Criminal Law News**, No. 1 (Summer 1989); 9 **Entertainment Law Reporter**, No. 1 (June 1987)

"The Berne Convention Implementation Act of 1988: A New Era," **Copyright World**, No. 4 (May 1989)

"Analyzing Substantial Similarity in Computer Software Infringement Cases," 6 **The Computer Lawyer** Nos. 1 & 2 (1989)

"Copyright Works: The Importance of Importation," 13 **New Matter** No. 4 (Winter 1988)

"Fee Simple: Debunking the Increasing Complexity in the Award of Attorney's Fees in Copyright Infringement Cases," 6 **Entertainment and Sports Lawyer (ABA)** No. 4 (Spring 1988)

"Advanced Issues in Copyright Ownership," in **Current Issues in Entertainment Law** (1988)

"Arbitration and No-Contest Clauses in Copyright Contracts:  A Critique of *Saturday Evening Post Co. v.  Rumbleseat Press*," 9 **Entertainment Law Reporter**, No. 9 (February 1988)

"Criminal Copyright and Trademark Law Update," 9 **Entertainment Law Reporter**, No. 4 (September 1987)

"Criminal Copyright and Criminal Contempt," **THE LAW OF GRAY AND COUNTERFEIT GOODS** (P.L.I. Publication 1987)

# MULTIMEDIA

Managing Editor and monthly columnist, **The Multimedia Law Report**

Founding Guest, CompuServe Multimedia Forum

Various In-House Presentations

# OTHER

Congressional Testimony (Washington)

Parliamentary Testimony (Sydney)

Trustee, Los Angeles Copyright Society

Former Assistant United States Attorney, Central District of California, Criminal Division

Former Law Clerk, Honorable Warren Ferguson, Ninth Circuit Court of Appeals

1989-1992, Chair, Committee on Intellectual Properties Litigation, ABA Section of Litigation

# EDUCATION

Yale Law School

Editor, Yale Law Journal

Stanford University

Phi Beta Kappa