# EXHIBIT 12

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FASHION AVENUE SWEATER KNITS, LLC,<br><br>  Plaintiff,<br><br>  vs.<br><br>POOF APPAREL CORP., ET AL.,<br><br>  Defendants. | CASE NO.: 2:19-cv-06302-CJC-JEM<br><br>RESPONSE OF THE REGISTER OF COPYRIGHTS TO REQUEST PURSUANT TO 17 U.S.C. § 411(b)(2) |

On January 8, 2021, pursuant to 17 U.S.C. § 411(b)(2), the Court requested advice from the Register of Copyrights (the "Register") on the following question (the "Order"):[1]

> [W]hether [the Register] would have rejected Plaintiff's Registration No. VAu 1-307-735 for 2-dimensional

---

[1] Request at 1 (January 8, 2021). On October 28, 2020, the Request was submitted to the Office via U.S. mail. This resulted in a delay in the Office receiving the Request due to the COVID-19 pandemic closure of the building in which the Office is housed. Following this closure, the Office amended its rules to accept requests by email. *See* 37 C.F.R. § 205.14; *see also* Email Rule for Statutory Litigation Notices, 85 Fed. Reg. 10,603 (Feb. 25, 2020) (announcing final rule effective May 26, 2020). The Register thanks the Court for resubmitting the Request via email on January 8, 2021.

> artwork in its entirety if, at the time of the application, it had known that although Plaintiff had characterized the works as an unpublished collection, five of those works had been the subject of offers and sustained negotiations with buyers and numerous exemplars had been manufactured and were awaiting shipment.

The Register hereby submits her response.

# BACKGROUND

## I. Examination History

A review of the records of the U.S. Copyright Office ("Copyright Office" or "Office") shows the following:

On July 26, 2017, the Copyright Office received an application to register a two-dimensional artwork collection titled "Christmas 2017." The collection contained 359 images, including Subject Design No. 1, Subject Design No. 2, Subject Design No. 3, Subject Design No. 4, and Subject Design No. 5 (the "Subject Designs"). The application identified Fashion Avenue Knits[2] as the work made for hire author of and copyright claimant for the collection. The application stated that the collection was created in 2017, and that it was unpublished. Based on the representation that the two-dimensional artwork contained in the Christmas 2017 collection was unpublished, the Office registered the works as an "unpublished collection" on March 1, 2018 with an effective date of registration

---

[2] On August 26, 2020, Fashion Avenue Sweater Knits, LLC submitted an application for supplementary registration to correct the name listed as the work made for hire author for and claimant of "Christmas 2017." The application replaced "Fashion Avenue Knits" with Plaintiff's official entity name "Fashion Avenue Sweater Knits, LLC" in the relevant author and claimant fields. On August 27, 2020, the Office approved the supplementary registration application and assigned registration number VAu001404278. *See* 17 U.S.C. § 408(d) (noting that an application for supplementary registration may be used "to correct an error in a copyright registration or to amplify the information given in a registration").

("EDR")[3] of July 26, 2017, and assigned registration number VAu001307735. The Office had no reason to question the representations in the application and accepted them as true and accurate.

## II. The Court's Request

In the Order accompanying the Request, the Court noted that the "parties dispute when the [Subject Designs] were first published."[4] Fashion Avenue Sweater Knits, LLC ("Plaintiff") contends that the designs were published after they were submitted for registration, while Defendants present evidence that Plaintiff "was actively negotiating details of the sales of these designs and that a significant number of copies had to have been produced for distribution prior to the July 26 registration date."[5] Thus, the Court requested that the Register consider whether the Office would have refused to register the claim if it had known that the Subject Designs "had been the subject of offers and sustained negotiations with buyers and numerous exemplars had been manufactured and were awaiting shipment."[6]

---

[3] The EDR is the date that the Office received a completed application, the correct deposit copy, and the proper filing fee.

[4] Am. Order Granting in part Pl.'s Mot. Summ. J. and Referring the Validity Issue of the 735 Registration to the Register of Copyrights 7, ECF No. 128.

[5] *Id.*

[6] *Id.* at 18–19.

# ANALYSIS

## I. Relevant Statute, Regulation, and Agency Practice

An application for copyright registration must comply with the requirements of the Copyright Act set forth in 17 U.S.C. §§ 408(a), 409, and 410. Regulations governing applications for registration are codified at 37 C.F.R. §§ 202.1 to 202.24. Further, principles that govern how the Office examines registration applications are set out in the *Compendium of U.S. Copyright Office Practices*, an administrative manual that instructs agency staff regarding their statutory and regulatory duties and provides expert guidance to copyright applicants, practitioners, scholars, courts, and members of the general public regarding Office practices and related principles of law. The Office publishes regular revisions of the *Compendium of U.S. Copyright Office Practices* to reflect changes in the law and/or Office practices, which are provided for public comment prior to finalization. Here, Plaintiff applied to register the Christmas 2017 unpublished collection on July 26, 2017. The governing principles the Office would have applied at that time are set forth in the version of the *Compendium of U.S. Copyright Office Practices, Third Edition* ("COMPENDIUM (THIRD)") that was first released in December 2014.[7]

### a. Publication

In pertinent part, the statutory requirements for copyright registration dictate that, "if the work has been published," an application for registration shall include

---

[7] The Copyright Office released a new version of the COMPENDIUM (THIRD) in September of 2017 and has just released the newest version in January 2021, but the 2014 version is the applicable version here as it was in effect at the time the application was submitted.

"the date and nation of its first publication."[8] The Copyright Act defines "publication" as

> [T]he distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication.[9]

As the COMPENDIUM (THIRD) explains, under the first sentence of this definition (the "distribution" prong), "publication occurs when one or more copies or phonorecords are distributed to a member of the public who is not subject to any express or implied restrictions concerning the disclosure of the content of that work."[10] For example, "distributing copies of a motion picture through a retail service constitutes publication of that work."[11] The Copyright Act defines "copies" as material objects "in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."[12]

The second sentence of the statutory definition of "publication" (the "offering to distribute" prong) provides a somewhat limited exception to the

---

[8] 17 U.S.C. § 409(8).

[9] *Id.* § 101 (definition of "publication").

[10] U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 1905.1 (3d ed. 2014) ("COMPENDIUM (THIRD)"); *see also* H.R. REP. NO. 94-1476, at 138 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5754.

[11] COMPENDIUM (THIRD) § 1905.1.

[12] 17 U.S.C. § 101 (definition of "copies").

general rule requiring actual distribution of the work. Under this sentence, the mere "offering" of copies of a work to "a group of persons" for "further distribution, public performance, or public display" constitutes publication; distribution itself is not required.[13] For example, COMPENDIUM (THIRD) advises that "[p]ublication occurs when fabric, carpet, or wallpaper samples are offered to sales representatives for the purpose of selling those works to wholesalers and retailers."[14]

The offering of a work to a *single person* for the enumerated purposes under the "offering to distribute" prong does not qualify as publication. And offering a copy of a work to a group of persons is not enough: the offer must also be made with the purpose of further distributing that work, publicly performing that work, or publicly displaying that work.[15] The work being offered must also be ready for further distribution at the time of the offer.[16] In other words, "[o]ffering to distribute copies or phonorecords before they exist or before they are ready for further distribution, public performance, or public display does not constitute publication."[17] For example, "[o]ffering a new line of toys to a group of retailers

---

[13] The actual distribution of (in addition to the mere "offering to distribute") copies or phonorecords to a group of persons for the enumerated purposes also constitutes publication under the statute. *See* 3 Paul Goldstein, *Goldstein on Copyright* § 3.3.2 (2021).

[14] COMPENDIUM (THIRD) § 1906.1.

[15] *See NBC Subsidiary (KCNC-TV), Inc. v. Broad. Info. Servs., Inc.*, 717 F. Supp. 1449, 1452 (D. Colo 1988) ("The offering . . . must be made to 'a group of persons *for the purposes of further distribution, public performance, or public display* []' . . . . Congress would have shortened the definition . . . had it not intended to qualify the definition by requiring that the offering be made for one or more of the specific purposes provided.") (internal citation omitted).

[16] COMPENDIUM (THIRD) § 1906.3.

[17] *Id.*

constitutes publication, provided that the toys are available for distribution when the offer is made."[18]

### b. Registration requirements for the "unpublished collection" option

At the time that Plaintiff submitted its December 2017 collection for registration, the Office permitted applicants to register numerous unpublished works with one application and filing fee.[19] This registration accommodation was known as an unpublished collection.[20] The unpublished collection option could not be used to register published works.[21]

## II. Other Copyright Office Regulations and Practices

The Copyright Office's regulations require applicants to make a "declaration . . . that the information provided within the application is correct to the best of [the applicant's] knowledge."[22] Generally, the Office "accepts the facts stated in the

---

[18] *Id.* § 1906.1.

[19] *Id.* §1106.1. On February 13, 2019, the Office replaced the accommodation for "unpublished collections" with a group registration option for a limited number of unpublished works. *See* Group Registration of Unpublished Works, 84 Fed. Reg. 3693 (Feb. 13, 2019). Because the unpublished collection accommodation is no longer available, the 2021 version of COMPENDIUM (THIRD) has deleted most references to it. The 2014 and 2017 versions of COMPENDIUM (THIRD) include section 1106.1 referenced in this response. *See Prior Editions of the Compendium of U.S. Copyright Office Practices*, COPYRIGHT.GOV, https://copyright.gov/comp3/prior-editions.html (last visited Feb. 1, 2021).

[20] COMPENDIUM (THIRD) §§ 1106, 1106.1.

[21] *Id.* § 1106.1 ("All of the copyrightable elements that are otherwise recognizable as self-contained works must be unpublished . . . Works that do not satisfy these requirements cannot be registered as an unpublished collection. In particular, an applicant cannot use this option to register a number of published and unpublished works. If any of the works have been published, the applicant should not include those works in the claim.").

[22] 37 C.F.R. § 202.3(c)(3)(iii) (2019).

registration materials, unless they are contradicted by information provided elsewhere in the registration materials or in the Office's records."[23] The COMPENDIUM (THIRD) states that "[t]he applicant—not the U.S. Copyright Office—must determine whether a work is published or unpublished."[24] Such determination "should be based on U.S. copyright law under Title 17, and it should be based on the facts that exist at the time the application is filed with the Office."[25] Therefore, the Office does not inquire about a work's publication without an apparent omission, inconsistency, or contradiction.

When the Office determines that all of the "legal and formal requirements" of title 17 have been met, it will register the copyright claim and issue a certificate of registration under its seal.[26] There may be instances during the application process, however, where communication between the applicant and the Office is required. For example, it is not unusual for a registration specialist to correspond with an applicant about factual assertions if the assertions appear to conflict with other information provided in the application materials.[27]

Accordingly, if the Office becomes aware of an error at the time of application, such as one relating to whether the work was published, or has questions about facts asserted in the application, it provides the applicant an opportunity to correct the error or verify the facts within a specified period of time.

---

[23] COMPENDIUM (THIRD) § 602.4(D).

[24] *Id.* § 1904.1.

[25] *Id.*

[26] 17 U.S.C. § 410(a); COMPENDIUM (THIRD) § 602.

[27] COMPENDIUM (THIRD) § 602.4(C).

If the applicant responds in a timely fashion to the satisfaction of the Office, the Office can proceed with the registration. In this case, no error was identified and no corrective action appeared to be necessary based on the information set forth in the application and deposit.

In responding to the Court's question, the Register applies the foregoing governing statutory and regulatory standards and examining principles.

## REGISTER'S RESPONSE TO THE COURT

Defendants urged the Court to seek the Register's advice regarding whether the Subject Designs had been published at the time the copyright application was filed.[28] Defendants' expert, David Nimmer, opined that Congress intended one rule regarding publication to prevail nationwide, so "the question is no longer how judges are inclined to rule in individual cases. Instead, the key is to consult the Copyright Office in all instances, so that uniform standards can apply across the country."[29]

The Register's view is that the function of section 411(b)(2) is to establish a process to advise courts specifically regarding copyright registration procedures of the Office. Prior to 2008, courts attempted to determine whether the inaccuracy of information on a certificate would have caused the Register to refuse registration and sometimes reached erroneous conclusions. For example, in *Raquel v. Education Management Corporation*, the Third Circuit held that a copyright registration was invalid because the claimants described the "nature of this work"

---

[28] Jensen Decl. Ex. A Expert Report of David Nimmer 12, ECF No. 111.

[29] *Id.*

on their application as "Audiovisual work" when their claimed copyrighted work was a musical composition.  The Third Circuit rejected the claimants' argument that the audiovisual work referred to the deposit they had submitted with the application, which was a videotape of a television commercial in which their musical composition was performed.[30]  Following the decision, the Office clarified in a statement of policy that Copyright Office practices allow applicants to describe the physical nature of the deposit in the "nature of this work" space on Form PA and that this description would not invalidate a claim for copyright in a musical composition.[31]  The Supreme Court vacated and remanded the case after reviewing the Solicitor General's brief and the Copyright Office's statement of policy.[32]

      Subsequently, Congress amended the Copyright Act as part of the Prioritizing Resources and Organization for Intellectual Property Act of 2008[33] to add sections 411(b)(1), (2), and (3).  Section 411(b)(1) provides that a certificate of registration satisfies the requirements of section 411(a) and section 412 even if it contains inaccurate information, unless "the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate;" and "the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration."[34]  Section 411(b)(2) requires a

---

[30] *Raquel v. Educ. Mgmt. Corp.*, 196 F.3d 171, 177 (3d Cir. 1999).

[31] *See* 65 Fed. Reg. 41,508 (July 5, 2000).

[32] *Raquel v. Educ. Mgmt. Corp.*, 531 U.S. 952 (2000).

[33] Pub. L. No. 110-403. 122 Stat. 4256 (2008).

[34] 17 U.S.C. § 411(b)(1).  In full, section 411(b)(1) provides:

court to request that the Register advise as to "whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration" when a party has alleged that inaccurate information is included on a copyright registration certificate.[35]

In connection with section 411(b), then, the Register's role is to clarify the registration procedures of the Copyright Office. The Court, or potentially a jury, determines, either prior to or following the Register's response, whether the applicant in fact provided inaccurate information to the Copyright Office with knowledge that it was inaccurate.

The short answer to the 411(b) inquiry is that if the Office had known that the Subject Works had been the subject of offers and negotiations with prospective buyers and that exemplars had been manufactured, for the reasons detailed below, it would not have been able to determine based on those facts alone whether the Subject Works had been published. In the absence of additional clear evidence of publication, the Office would have allowed Plaintiff to make the determination of whether the works had been published. If Plaintiff had indicated that all of the works were unpublished, the Office would have registered all of the works as an

---

(b)(1) A certificate of registration satisfies the requirements of this section and section 412, regardless of whether the certificate contains any inaccurate information, unless—
    (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
    (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

In accordance with section 411(b)(2), the Register is to advise the Court regarding the second requirement, section 411(b)(1)(B)

[35] *Id.* § 411(b)(2).

unpublished collection. If Plaintiff had indicated that the Subject Works were published, the Office would not have registered the Subject Works as part of an unpublished collection and would have advised Plaintiff to file additional applications to register the Subject Works.

The Order and the parties' filings suggest that it would be helpful for the Register to provide her views on whether the Subject Designs were published prior to Plaintiff's application. In addition to advising courts regarding copyright registration procedures pursuant to section 411(b)(2), the Register regularly advises courts on issues related to copyright law more generally pursuant to section 701(b)(2).[36] The Register therefore provides her view on several issues related to the publication question below.

### 1. Showing Sample Garments to Retailers

The first issue the parties have raised is whether the showing of the designs to retailers in Plaintiff's New York showroom constituted publication. The parties agree that Plaintiff showed sample garments bearing each of the Subject Designs to retailer buyers during private, in-person meetings beginning in March 2017, but did not include the designs in any catalogs, brochures, look-books, or website pages.[37] Defendants argue that the Subject Designs were published when Plaintiff

---

[36] *See id.* § 701(b)(2), which provides:

> (b) In addition to the functions and duties set out elsewhere in this chapter, the Register of Copyrights shall perform the following functions:
>
> . . . .
> (2) Provide information and assistance to . . . the Judiciary on . . . issues relating to copyright, other matters arising under this title, and related matters.

[37] Kobulnick Decl. Ex. 2 Expert Report of Ralph Oman 6, ECF No. 112-1; Jensen Decl. Ex. A Expert Report of David Nimmer 5, ECF No. 111.

showed the designs to retailers because Plaintiff was offering to distribute the garments to them and each of the garments had been "reduced to its final form in at least one exemplar."[38]

As discussed above, the Copyright Act provides that offering to distribute copies to a group of persons for purposes of further distribution, public performance or public display constitutes publication.[39] The Office has previously opined that the work being offered must exist and be ready for further distribution at the time of the offer in order for it to constitute publication.[40]

The Office notes that the statutory definition of "copies" is limited to material objects "in which a work is fixed by any method now known or later developed." In other words, a copy of a work does not exist until the work has been fixed in a tangible medium of expression. While an offer to distribute copies does not require an actual distribution in order to be considered publication, the COMPENDIUM (THIRD) takes the position that the group of persons must have the actual ability to accept the offer when it is made, not merely the ability to accept the offer at some point in the future when the works have been produced. It further states that "offering a work directly to the public does not constitute publication where distribution of copies or phonorecords requires additional action by the offeror."[41]

---

[38] Defs.' Opp'n to Mot. Summ. J. 14, ECF No. 108; Jensen Decl. Ex. A Expert Report of David Nimmer 12, ECF No. 111.

[39] 17 U.S.C. § 101 (definition of "publication").

[40] COMPENDIUM (THIRD) § 1906.3.

[41] Id. § 1906.1.

To illustrate this distinction, COMPENDIUM (THIRD) provides an example that offering a line of toys is considered publication if the actual toys that will be distributed are available when the offer is made.[42] Similarly, offering prints of a motion picture to a group of theater owners constitutes publication, so long as "the prints are available for public performance when the offer is made."[43]

The example of fabric, carpet, or wallpaper samples being considered published when they are offered to sales representatives further supports this principle.[44] Fabric, carpet, and wallpaper manufacturers produce sample books containing swatches of their works, and the sample books themselves are often publicly displayed by retailers. When the offer is made to retailers, the sample books that will actually be distributed are available for distribution, and so the Office has taken the view that the designs included in the books are considered published.[45]

Thus, following the Office's administrative practices, the offering of a new line of garments to a group of retailers will only be considered publication if the actual garments to be distributed are available for distribution when the offer is made. Here, Plaintiff contends that it had only one physical copy of each design at

---

[42] Id.

[43] Id.

[44] Id.

[45] The offer by a retailer to distribute a completed carpet or roll of wallpaper to an end-user customer would potentially be an additional publication of the design, in which case one could consider whether the finished carpet or wallpaper roll had been manufactured at the time of that offer. But if the design had previously been included in a sample book, the offer of that sample book to the retailer, not the offer of the finished product to the end-user customer, should be the first step in determining whether the design was published.

the time of the meetings with retailers.[46]  Plaintiff showed the sample copy of each design to the retailers to encourage them to order copies that would be manufactured later and sold in stores.  There is no indication in the Court's Order or the expert reports that the sample garments were suitable for further distribution or that the sample garments would actually be included in the batches that were ultimately shipped to retailers.  If the garments that Plaintiff would distribute had not yet been manufactured when the offer was made, the guidance of COMPENDIUM (THIRD) is that there was no "offer to distribute copies" and the Subject Designs were not published.

**2. Manufacturing Copies for Distribution**

The second issue Defendants have raised is whether the Subject Designs were published by July 26, 2017, the date on which Plaintiff submitted the copyright application, based on evidence suggesting that the finished garments had been manufactured by that date.[47]  Defendants' expert, Mr. Nimmer, states that Plaintiff began meeting with prospective customers regarding the garment designs in March 2017 and shipped finished garments to retailers beginning in September 2017.[48]  Between September and December 2017, Plaintiff shipped to retailers approximately 1,300 products bearing Design 1; 2,200 products bearing Design 2; 11,000 products bearing Design 3; 5,000 products bearing Design 4; and 28,000 products bearing Design 5.[49]  Based on that timeline, Mr. Nimmer is skeptical that

---

[46] Kobulnick Decl. Ex. 2 Expert Report of Ralph Oman 6, ECF No. 112-1 ("[F]or each design at issue, the Plaintiff only displayed the original design to the prospective buyers, as applied to an actual finished garment.").

[47] Defs.' Opp'n to Mot. Summ. J. 14–15, ECF No. 108.

[48] Jensen Decl. Ex. A Expert Report of David Nimmer 6, ECF No. 111.

[49] *Id.*

all of the products were manufactured after July 26, 2017. He opines, for example, that given Plaintiff's delivery of 28,000 garments bearing Design 5 by September 2017 "it seems overwhelmingly likely that, as of July 26, thousands of garments embodying that design had been produced and were ready for sale."[50] In contrast, Plaintiff and its expert, Mr. Oman, maintain that Plaintiff manufactured and distributed the finished garments after Plaintiff submitted the copyright application on July 26, 2017.[51]

As discussed in detail above, offering to distribute goods to retailers for further distribution constitutes publication when the goods are in existence at the time the offer is made.[52] The parties agree that Plaintiff offered to deliver garments to retailers for further distribution, but they disagree as to whether those garments had actually been manufactured when the copyright application was filed on July 26, 2017. If the garments had been manufactured by that date, then there was an offer and the goods existed, so that the designs were published and could not have been registered properly as part of a collection of unpublished works. This is a purely factual dispute regarding the dates of manufacture, upon which the Register offers no opinion.

### 3. Plaintiff's Knowledge of Any Inaccuracy

In addition to determining if Plaintiff included inaccurate information in its application for a copyright registration, section 411(b)(1)(A) requires the Court to

---

[50] *Id.* at 13.

[51] Pl.'s Reply in Supp. of Mot. Summ. J. 19, ECF No. 112; Kobulnick Decl. Ex. 2 Expert Report of Ralph Oman 6, ECF No. 112-1.

[52] COMPENDIUM (THIRD) § 1906.3.

determine whether the applicant provided any such inaccurate information "with knowledge that it was inaccurate."[53] As the Office recognized in a recent Notification of Inquiry focusing on online publication issues, determining whether a work has been published can raise complex legal questions for which there are not always straightforward answers.[54] Various individuals and groups have expressed frustration to the Office regarding difficulties in determining whether a work has been published when completing copyright application forms.

Even if the Court determines that the Subject Designs were published prior to the filing of the application, the question is whether Plaintiff made any misrepresentations knowingly. The Ninth Circuit pointed to the existence of an unsettled legal question as an example of a claimant making a "good faith or inadvertent mistake," as opposed to a knowing inaccuracy.[55] A number of courts have determined that ambiguity in the definition of the term "publication" prevented a finding that an applicant provided inaccurate information with knowledge that it was inaccurate when it mischaracterized the publication status of a work.[56] Particularly when there is no question of whether the applicant was a

---

[53] *See* 17 U.S.C. § 411(b).

[54] 84 Fed. Reg. 66,328 (Dec. 4, 2019) (quoting commenter who described the distinction between published and unpublished works as ''so complex and divergent from an intuitive and colloquial understanding of the terms that it serves as a barrier to registration. . . .'').

[55] *Gold Value Int'l Textile, Inc. v. Sanctuary Clothing, LLC*, 925 F.3d 1140, 1147 (9th Cir. 2019).

[56] *See, e.g., Palmer/Kane LLC v. Gareth Stevens Publ'g*, No. 1:15-cv-7404-GHW, 2017 WL 3973957 at *12–13 (S.D.N.Y. Sept. 7, 2017) (denying summary judgment due to uncertainty regarding whether designation of work as unpublished was inaccurate and whether any inaccurate information was provided with knowledge of the inaccuracy); *Archie M.D., Inc. v. Elsevier, Inc.*, 261F. Supp. 3d 512, 520 (S.D.N.Y. 2017) (holding that the characterization of works as

proper claimant or that the work is protectable by copyright, a copyright registration should not be invalidated – and the copyright owner's ability to enforce the copyright compromised – when the application was submitted in good faith based on a reasonable interpretation of the law.

Dated: February 5, 2021                /s/ Shira Perlmutter_____

Shira Perlmutter
Register of Copyrights and Director
of the U.S. Copyright Office

---

unpublished was not made with knowledge that it was inaccurate where company knew the animations had been licensed but question of whether the work had been published by virtue of its licensing was an unsettled legal question at the time the application was filed).