# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

------------------------------------------------------------ x

SNMP RESEARCH, INC. and SNMP
RESEARCH INTERNATIONAL, INC.,

            Plaintiffs,

            v.

BROADCOM INC.; BROCADE
COMMUNICATIONS SYSTEMS LLC; and
EXTREME NETWORKS, INC.,

            Defendants.

------------------------------------------------------------ x

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No. 3:20-cv-00451-CEA-DCP

U.S. District Judge Charles E. Atchley

**DEFENDANT EXTREME NETWORKS, INC.'S**
**REPLY IN SUPPORT OF ITS MOTION TO REFER**
**QUESTIONS TO THE REGISTER OF COPYRIGHTS**

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................1

II.   THERE IS NO REAL DISPUTE THAT SECTION 411(B)(1)'S
      REQUIREMENTS ARE MET ....................................................................2

      A.   Extreme Need Only Put Forth an Evidentiary Basis to Support Referral...............2

           1.   Extreme Need Not Prove the Elements of Section 411(b). .........................3

           2.   Extreme Has Put Forth a Sufficient Evidentiary Basis to Refer.................5

           3.   The Court Need Not Delay Referral Until After Fact Discovery
                Closes.............................................................................................5

      B.   A Willful Blindness Showing Satisfies Section 411(b)(1)(A)................................7

      C.   The Record is Replete with Evidence That SNMPR Was At Least
           Willfully Blind as to Publication Status....................................................9

           1.   Dr. Case's Self-Serving Declaration Is Irrelevant. ...................................11

           2.   SNMPR's Licenses Were Not Restrictive. ................................................14

           3.   The Law Regarding Publication via Licensing Was Also Clear. ..............16

                (a)   SNMPR cannot distinguish Extreme's cases................................17

                (b)   Publication was not a nuanced legal issue. ...................................18

III.  CONCLUSION.........................................................................................21

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Advisers, Inc. v. Wiesen-Hart, Inc.*,
　238 F.2d 706 (6th Cir. 1956) ................................................................7

*Archie MD, Inc. v. Elsevier, Inc.*,
　261 F. Supp. 3d 512 (S.D.N.Y. 2017) ................................................19

*Brunson v. Cook*,
　No. 20-cv-01056, 2023 WL 2668498 (M.D. Tenn. Mar. 28, 2023) ................................2, 8

*D.C.I. Computer Systems, Inc. v. Pardini*,
　978 F.2d 1265 (9th Cir. 1992) ............................................................17

*Daimler-Chrysler Services North America, LLC v. Summit National, Inc.*,
　289 F. App'x 916 (6th Cir. 2008) ...................................................17, 18

*DBT Group, Inc. v. FMC Corp.*,
　No. 01 C 2769, 2001 WL 1105077 (N.D. Ill. Sept. 19, 2001) ....................................15

*DeliverMed Holdings, LLC v. Schaltenbrand*,
　734 F.3d 616 (7th Cir. 2013) ..............................................................3

*Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P.*,
　948 F.3d 261 (5th Cir. 2020) ..............................................................3

*Fashion Avenue Sweater Knits, LLC v. Poof Apparel Corp.*,
　No. 19-cv-06302, 2020 WL 7862132 (C.D. Cal. Oct. 28, 2020) ...............................20, 21

*Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*,
　No. 17-cv-42, 2019 WL 4647305 (S.D. Ohio Sept. 24, 2019) ....................................5

*Furnituredealer.net, Inc. v. Amazon.com, Inc.*,
　No. 18-232, 2022 WL 891473 (D. Minn. Mar. 25, 2022) ................................19

*HealtheState, LLC v. United States*,
　160 Fed. Cl. 91 (2022) ................................................2, 3, 5, 6, 11

*Hubco Data Products Corp. v. Management Assistance Inc.*,
　No. 81-1295, 1983 WL 1130 (D. Idaho Feb. 3, 1983) ...............................15, 18

*King-Devick Test Inc. v. NYU Langone Hospitals*,
　No. 17-CV-9307, 2019 WL 3071935 (S.D.N.Y. July 15, 2019) ....................................5, 6

ii

*LADS Network Solutions, Inc. v. Agilis Systems, LLC*,
No. 19-cv-00011, 2022 WL 4534738 (E.D. Mo. Sept. 28, 2022),
*appeal dismissed*, No. 22-3077, 2022 WL 19348883 (8th Cir. Dec. 14, 2022) ...............11

*Lieb v. Korangy Publishing, Inc.*,
No. CV 15-0040, 2022 WL 1124850 (E.D.N.Y. Apr. 14, 2022) ............................6, 13, 20

*McLaren v. Chico's FAS, Inc.*,
No. 10 Civ. 2481, 2010 WL 4615772 (S.D.N.Y. Nov. 9, 2010) .......................................17

*Metropolitan Regional Information Systems, Inc. v. American Home Realty Network,
Inc.*,
948 F. Supp. 2d 538 (D. Md. 2013) ...............................................................................15

*Nason Homes, LLC v. Singletary Construction, LLC*,
No. 14-cv-1656, 2016 WL 6952257 (M.D. Tenn. Jan. 29, 2016) ......................................7

*Neman Brothers & Assoc., Inc. v. Interfocus, Inc.*,
No. 20-cv-11181, 2023 WL 115558 (C.D. Cal. Jan. 4, 2023)....................................12, 18

*Oliver v. Meow Wolf, Inc.*,
No. 20-237, 2022 WL 3682936 (D.N.M. Aug. 25, 2022) ..........................................13, 20

*Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*,
684 F.2d 821 (11th Cir. 1982) .........................................................................................7

*PRC Realty Systems, Inc. v. National Ass'n of Realtors, Inc.*,
766 F. Supp. 453 (E.D. Va. 1991),
*aff'd in part, rev'd in part*, 972 F.2d 341 (4th Cir. 1992).................................................15

*ReportHost LLC v. Spectora Inc.*,
No. 22-cv-00457, 2023 WL 2782285 (D. Colo. Mar. 29, 2023) .......................................19

*Roberts v. Gordy*,
877 F.3d 1024 (11th Cir. 2017) .......................................................................................7

*Schenck v. Orosz*,
105 F. Supp. 3d 812 (M.D. Tenn. 2015)....................................................................*passim*

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.* (*Unicolors I*),
142 S. Ct. 941 (2022).....................................................................................1, 7, 8, 10, 11

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.* (*Unicolors II*),
52 F.4th 1054 (9th Cir. 2022) .......................................................................................4, 8

*Unix System Laboratories, Inc. v. Berkeley Software Design, Inc.*,
No. 92-1667, 1993 WL 414724 (D.N.J. Mar. 3, 1993) ..............................................17, 18

iii

## STATUTES

17 U.S.C. § 101 .................................................................................................1, 10

17 U.S.C. § 409 ....................................................................................................12

U.S.C. § 411(b)(2) ..................................................................................................2

## OTHER AUTHORITIES

1 *Nimmer on Copyright* § 4.13 ............................................................................ 16

Case 3:20-cv-00451-CEA-DCP   Document 286-1   Filed 04/10/23   Page 6 of 28   PageID #: 13503

## I.    INTRODUCTION[1]

SNMPR does not dispute the following:

- Prior to 2011, SNMPR licensed and distributed its source code and binary code to at least *675 companies*, including the dominant players in the switching and routing market like ███████████████████ (*see* Br. at 7-9);

- Prior to 2011, SNMPR's licensees redistributed *thousands if not millions* of copies of SNMPR's binary code to their customers (*see id.* at 9, 11);

- SNMPR's software was published before SNMPR registered it (*see id.* at 10-12); and

- SNMPR's registrations contain inaccurate information, *i.e.*, they falsely state that SNMPR's software was "unpublished" (*see id.* at 10-15).

These undisputed facts are sufficient to satisfy Section 411(b)(1)(A)'s "inaccurate information" requirement.  Thus, the Court is required by statute to refer Extreme's question to the Register of Copyrights (the "Register") at this time.

SNMPR also does not dispute that the Register has repeatedly found that inaccurately registering a work as "unpublished" is a material misstatement that would have caused it to refuse registration.  (Br. at 2-4, 16.)  This is sufficient to meet Section 411(b)(1)(B)'s materiality requirement.   SNMPR also does not dispute that:

- The Supreme Court recently made clear that Section 411(b)(1)(A)'s "knowledge" requirement can be met by "willful blindness," *see Unicolors, Inc. v. H&M Hennes & Mauritz, L.P. (Unicolors I)*, 142 S. Ct. 941, 947-48 (2022); (Br. at 3; Opp.[2] at 7);

- SNMPR knew the relevant facts, *i.e.*, that its software had been widely distributed as of 2011 (Br. at 17); and

- The law was clear in 2011 that "'[p]ublication' is the *distribution* of copies . . . by rental, lease, or lending" and the "offering to distribute copies," 17 U.S.C. § 101 (emphasis added); (*see* Br. at 16-20).

---

[1] On April 6, 2023, the Court ordered Extreme to refile its opening papers by April 14, 2023 with modified redactions.  (ECF No. 180.)  In the meantime, in this brief, Extreme cites to the original docket numbers for its opening brief and supporting exhibits.  (ECF No. 265.)

[2] "Opp." refers to SNMPR's opposition to Extreme's Motion, filed at ECF No. 272.

These undisputed facts are sufficient to meet Section 411(b)(1)(A)'s knowledge requirement, and require referral. *See* 17 U.S.C. § 411(b)(2).

SNMPR disputes only three issues, none of which change this conclusion. First, SNMPR argues that "prior to referring an issue to the Register of Copyrights under Section 411(b)(2), a court can and should first require the party challenging validity to **prove** a knowingly false statement in the copyright application." (Opp. at 10 (emphasis added).) And yet SNMPR elsewhere concedes that referral is required if "'there is an evidentiary basis' for each element under Section 411(b)" (*id.* at 11)—which there is here. Second, SNMPR argues that "Section 411 requires a showing of **fraud** on the Copyright Office." (*Id.* at 6 (emphasis added).) But the Supreme Court has made clear—and SNMPR elsewhere concedes—that willful blindness meets the knowledge standard. (*See* Br. at 3; Opp. at 7.) Third, SNMPR argues that Extreme has not sufficiently shown willful blindness because "the question of whether **licensing** of computer software constituted publication was unclear at the time of SNMP Research's registration." (Opp. at 14 (emphasis added).) But SNMPR does not dispute that it was clear that distributing software—as SNMPR did—constituted publication. In any event, the law was indeed clear that licensing also constituted publication.

## II. THERE IS NO REAL DISPUTE THAT SECTION 411(B)(1)'S REQUIREMENTS ARE MET

### A. Extreme Need Only Put Forth an Evidentiary Basis to Support Referral.

SNMPR ultimately concedes that referral is necessary if "'there is an evidentiary basis' for each element under Section 411(b)." (Opp. at 11; *see HealtheState, LLC v. United States*, 160 Fed. Cl. 91, 95-96 (2022) (movant need only provide "some basis for its allegation"); *Brunson v. Cook*, No. 20-cv-01056, 2023 WL 2668498, at *4 n.8 (M.D. Tenn. Mar. 28, 2023) ("[I]f the record reflects some basis to find each required element under § 411, then there is sufficient evidence to

support a request to the [R]egister"). Thus, "the Court need not resolve . . . factual disputes [regarding whether SNMPR knew of inaccuracies] at this juncture because [Extreme] is not required to *prove* knowing inaccuracies in order to show that referral to the Register is required under § 411(b)(2)." *HealtheState*, 160 Fed. Cl. at 96 (emphasis in original).

        1.        **Extreme Need Not Prove the Elements of Section 411(b).**

Before conceding that an "evidentiary basis" is sufficient for referral, SNMP argues that "[e]very United States Circuit Court of Appeal to have addressed the issue has held that, prior to referring an issue to the Register of Copyrights under Section 411(b)(2), a court can and should first require the party challenging validity to *prove* a knowingly false statement in the copyright application." (Opp. at 10 (emphasis added).) But none of the cases SNMPR cites holds that "proof" is required. Rather, they stand for the proposition—which Extreme does not dispute—that a bare *allegation* is insufficient.

For example, the Fifth Circuit found that it was not sufficient that the defendant had "*alleged* inaccurate information." *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 278 (5th Cir. 2020) (emphasis added).[3] Similarly, the Seventh Circuit in *DeliverMed Holdings, LLC v. Schaltenbrand* made clear—in the portion of its holding SNMPR excludes—that allegations alone are insufficient:

> Although the statute appears to mandate that the Register get involved "[i]n any case in which inaccurate information [in an application for copyright registration] is alleged," 17 U.S.C. § 411(b)(2), input need not be sought immediately *after a party makes such a claim*.

---

[3] The court in *Energy Intelligence Group* held that courts "may, in their discretion, determine inaccuracy before making a referral to the Register." 948 F.3d at 278. Here there is no dispute that SNMPR's registrations were inaccurate.

3

734 F.3d 616, 625 (7th Cir. 2013) (emphasis added). The court, unsurprisingly, held that "courts can demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality." *Id.* at 625. But the court did not articulate a standard for "establishing" those preconditions, or even require that courts make a determination. Rather, the court noted that a "court should *feel free* to determine whether there is in fact a misstatement of fact." *Id.* (emphasis added) (citing Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. § 411(b)(2) at 12, *Olem Shoe Corp. v. Wash. Shoe Co.*, No. 09-cv-23494, ECF No. 209 (submitted herewith as Reply Demers Decl.[4] Ex. 10) [hereinafter *Olem Shoe* Register Response]). Finally, the Ninth Circuit held that "a court must first establish whether the registrant had the proper 'knowledge' of the inaccuracy under § 411(b)(1)(A)" but did not address the requisite showing. *See Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.* (*Unicolors II*), 52 F.4th 1054, 1064 (9th Cir. 2022). As SNMPR concedes, that showing in the Sixth Circuit is merely "an evidentiary basis." (Opp. at 11.)

The only Tennessee case SNMPR cites—*Schenck v. Orosz*, 105 F. Supp. 3d 812 (M.D. Tenn. 2015)—confirms that "proof" is *not* necessary. (*See* Opp. at 8, 11, 15, 16.) In *Schenck*, the court acknowledged that it was obligated to refer legitimate questions of validity to the Register provided that "there is an *evidentiary basis*" for allegations that registrations include inaccurate information and that the Register might have refused to register to copyright. 105 F. Supp. 3d at 823 (emphasis added). The court further explained that the question was whether defendant's

---

[4] "Reply Demers Decl." refers to the Reply Declaration of Leslie A. Demers filed concurrently with this memorandum of law.

allegations had any "factual support." *Id.* at 819.[5] In any event, this case is nothing like *Schenck.* There, defendants' allegations were akin to "throw[ing] mud against the wall and see[ing] what sticks." *Id.* at 823. The defendants failed to even identify what was "inaccurate" about the applications at issue. *Id.* at 819-21.[6]

**2. Extreme Has Put Forth a Sufficient Evidentiary Basis to Refer.**

As in *HealtheState* and *King-Devick*, Extreme has made a sufficient evidentiary showing to trigger a referral: it is undisputed that SNMPR's registrations contain inaccurate information (*see* Br. at 10-15); its software had been distributed to thousands of entities at the time of registration (*see id.* at 9, 11); SNMPR knew the relevant facts (*see id.* at 17); and the law was clear that distribution constituted publication (*see id.* at 16–20). This is more than sufficient. *See HealtheState*, 160 Fed. Cl. at 96 (referring to Registrar where it was undisputed that applications "contain some inaccuracies" and each party presented evidence regarding whether applicant knew of the inaccuracies); *King-Devick Test Inc. v. NYU Langone Hospitals*, No. 17-CV-9307, 2019 WL 3071935, at *10 (S.D.N.Y. Jul. 15, 2019) (evidence that work had been published via a license agreement was "[sufficient] factual record" to make referral "fruitful") (citation omitted).

**3. The Court Need Not Delay Referral Until After Fact Discovery Closes.**

SNMPR attempts to dismiss *HealtheState* and *King-Devick* in a footnote on the grounds that the referral motions in those cases were made after fact discovery closed. (*See* Opp. at 11 n.4.)

---

[5] In *Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, the court denied a request to refer because the Copyright Office had already found that the withheld information was immaterial—an issue not in dispute here. No. 17-cv-42, 2019 WL 4647305, at *9-10 (S.D. Ohio Sept. 24, 2019).

[6] SNMPR argues that "even if a court has already found that a knowingly false statement was made on an application, the court still cannot invalidate the copyright registration unless the court first asks the Register of Copyrights if the misstatement was material to the registration decision." (Opp. at 5.) That referral is exactly what Extreme is asking the Court to do.

5

But those courts relied not on the fact that discovery had closed, but on the fact that defendants had "put forward meaningful 'factual support' for their theories." *King*-Devick, 2019 WL 3071935, at *9 (citation omitted); *see also HealtheState*, 160 Fed. Cl. at 96. In fact, SNMPR's own counsel submitted an expert opinion in another case arguing in favor of referring publication questions while fact discovery was ongoing. (*See* Reply Demers Decl. Ex. 11 ([Rebuttal] Expert Report of David Nimmer) ¶ 7, *Fashion Avenue Sweater Knits, LLC v. Poof Apparel Corp.*, No. 19-cv-06302, ECF No. 111 [hereinafter Nimmer Report] (informed by counsel that "discovery requests are outstanding and that the defense has not yet been able to ascertain all the appurtenant facts"); *id.* at ¶ 38 ("reference to the [Copyright] Office is appropriate at this juncture").) Thus, there is no requirement that the Court wait until fact discovery closes to make the referral; "courts are free to decide when a sufficient factual record exists such that referral would be fruitful." *Lieb v. Korangy Publ'g, Inc.*, No. CV 15-0040, 2022 WL 1124850, at *12 (E.D.N.Y. Apr. 14, 2022).

From a practical standpoint, referring now would be more efficient than waiting until later in the litigation. Indeed, discovery will remain open until June 11, 2024, but summary judgment motions are due July 9, 2024 and trial is set to begin on October 22, 2024. (*See* ECF No. 242 at 2-3.) If the Court were to wait until the close of discovery to refer to the Register, there would be only three months within which to rule on the referral motion, await a Register response, and rule on invalidity before trial. This approach risks more inefficiencies and delay than proceeding with referral now.

**B.     A Willful Blindness Showing Satisfies Section 411(b)(1)(A).**

There is no dispute that Section 411(b)(A)'s knowledge requirement (i) includes knowledge of the facts and the law[7] and (ii) can be satisfied by a showing of willful blindness. *Unicolors I*, 142 S. Ct. at 948; (*see* Opp. at 6-9).  While SNMPR maintains that the Copyright Act requires showing "fraud" (*see, e.g.*, Opp. at 6, 10), it fails to explain whether, or how, that showing is distinct from willful blindness.[8]

SNMPR argues that the Sixth Circuit, in *Advisers, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706 (6th Cir. 1956) (*per curiam*), articulated a "fraud on the Copyright Office" standard that remains "binding precedent." (Opp. at 7, 9.) But that court held that "an ***innocent misstatement, or clerical error,*** in the . . . certificate of registration, unaccompanied by fraud or intent to extend the statutory period of copyright protection, does not invalidate the copyright." *Advisers*, 238 F.2d at 708 (emphasis added); *see also Schenck*, 105 F. Supp. 3d at 819 (same).  As SNMPR itself explains, this doctrine merely meant that "inadvertent mistakes on registration certificates [did] not invalidate a copyright . . . ." (Opp. at 7.) Thus, "*Advis[e]rs, Inc.* was limited to instances in which there was an 'innocent mistake, or a clerical error' in the registration materials." *Nason Homes, LLC v. Singletary Constr., LLC*, No. 14-cv-1656, 2016 WL 6952257, at *6 (M.D. Tenn. Jan. 29, 2016) (citation omitted). *Advisers* is inapposite here because Extreme alleges SNMPR was at least willfully blind as to whether its widespread software distribution constituted publication under the

---

[7] SNMPR's complaint that "Broadcom/Brocade argued in their prior motion to dismiss that actual knowledge did not include knowledge of the law" (Opp. at 6) is irrelevant.  While Extreme joined in that motion, there is no dispute that, after Broadcom/Brocade had filed their motion, *Unicolors I* clarified that knowledge of the law is required.

[8] SNMPR cites two cases that suggest "intentional or purposeful concealment of relevant information" is required.  (Opp. at 8 n.3 (citing *Roberts v. Gordy*, 877 F.3d 1024, 1030 (11th Cir. 2017) and *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 828 (11th Cir. 1982)).)  But those cases pre-date *Unicolors I*'s holding that willful blindness is sufficient.

7

law—given that SNMPR had already licensed its software to the better part of a thousand companies by the time it told the Copyright Office it was somehow "unpublished."

SNMPR also latches onto statements by the Ninth Circuit that Section 411 "'was intended to codify the fraud on the Copyright Office Doctrine.'" (Opp. at 8 (quoting *Unicolors II*, 52 F.4th at 1066-67.) But the Ninth Circuit also held that "***willful blindness may support a finding of actual knowledge***." *Id*. at 1066, 1069 (citing *Unicolors I*, 142 S. Ct. at 948) (emphasis added). Combined, these statements make clear that the "fraud on the Copyright Office" doctrine protects a plaintiff who has made an innocent mistake or clerical error, with no actual knowledge (including "willful blindness") of the legal and factual inaccuracies. The Ninth Circuit's use of the word "fraud" does not change the relevant standard. *Cf. Brunson*, 2023 WL 2668498, at *16 ("intent to defraud" not required). In fact, the Ninth Circuit repeatedly confirmed that the "fraud" requirement is met through "knowledge" (which includes "willful blindness") of the relevant facts and law:

- It held that "the registrant perpetrate[s] fraud on the Copyright Office by ***knowingly*** misrepresenting material facts." *Unicolors II*, 52 F.4th at 1067 (emphasis added).

- It found that "fraud is properly defined as '[a] ***knowing*** misrepresentation . . . of a material fact.'" *Id*. at 1065 (emphasis added).

- It found that "there is no daylight between a court's determination that a party had ***knowledge*** of the legal and factual inaccuracies and a finding that the party committed fraud on the Copyright Office." *Id*. at 1066 (emphasis added).

- It equated a showing that "(1) the registrant submitted a registration application containing inaccuracies, (2) the registrant ***knew*** that the application failed to comply with the requisite legal requirements, and (3) the inaccuracies in question were material to the registration decision by the Register of Copyrights"—exactly what Extreme alleges here—with a showing of "fraud." *Id*. at 1067 (emphasis added).

Thus, even under SNMPR's cited precedent, Extreme need only show that SNMPR knew of (*e.g.*, was willfully blind to) the legal and factual inaccuracies at the time of registration.

8

This conclusion would not penalize Dr. Case for making an innocent "mistake" as SNMPR suggests. (*See* Opp. at 2, 11-14.) Rather, it would hold him accountable for being willfully blind to the law. Nor would it "allow infringers to sidestep the consequences of their infringement based on a technicality" (Opp. at 4). SNMPR does not dispute that improperly classifying a work as unpublished is a significant error, nor that the Register has repeatedly found that inaccurately registering a work as "unpublished" is a material misstatement that would have caused it to refuse registration. (*See* Br. at 2-4, 16.) Holding that Extreme need only show that SNMPR was willfully blind to the law would (i) not only be consistent with the Supreme Court's holding in *Unicolors I*, but also (ii) ensure that plaintiffs cannot—as SNMPR has done—collect ███████████ for licensing and public redistribution of their works; represent to the Copyright Office that those works are unpublished when the law is clear that they are published; and continue to bring infringement claims based on registrations that contain false information.

### C. The Record is Replete with Evidence That SNMPR Was <u>At Least</u> Willfully Blind as to Publication Status.

SNMPR does not dispute that, by 2011, it knew that it had distributed its software to *hundreds* of its licensees who had in turn distributed the software to *thousands* of customers pursuant to the following (or equivalent) provision in SNMPR's license agreements:

> 3. Binary Redistribution Rights
>
> SNMP grants Licensee an irrevocable (except as provided herein), non-exclusive, non-transferable, royalty-bearing, and worldwide license to use, execute, reproduce, display, perform, prepare Derivative Works based upon, and distribute internally and externally, copies of the Licensed Modules and Derivative Works thereof in Software form, for Licensee's Network Switch project using the Red Hat Linux operating system and the MIPS hardware platform.

(ECF No. 246-2 § 3 (emphasis added); *see* Br. at 19.) SNMPR knew the relevant facts.

SNMPR argues that it was not clear in 2011 that licensing software constituted a form of publication. (*Cf.* Opp. at 14-22 (arguing "question of whether *licensing* of computer software

9

constituted publication was unclear") (emphasis added); *see also id.* at 15-18 (discussing Compendium II's[9] guidance regarding "licensing of software"); *id.* at 21 (arguing that issue of publication "in the context of licensing and computer software" is nuanced).) Among other problems, that argument misses a more salient point: the law was clear in 2011 that ***distributing*** software constituted a form of publication. Indeed, SNMPR admits that the Copyright Act and Copyright Office resources have clearly defined "[p]ublication" to include the "***distribution*** of copies [or phonorecords of a work to the public] . . . by rental, lease, or lending" for decades. (Br. at 18 (quoting 17 U.S.C. § 101) (emphasis added); *see also* Opp. at 20-21.)

The clarity of the law on distribution—combined with SNMPR's knowledge that its software was widely distributed—is sufficient to establish that SNMPR had the requisite knowledge (*i.e.*, willful blindness) to justify referral. *See Unicolors I*, 142 S. Ct. at 948 ("Circumstantial evidence, including . . . the complexity of the relevant rule, . . . and other such matters, may also lead a court to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information.").

SNMPR attempts to escape this conclusion by (i) submitting a declaration of SNMPR's principal, Dr. Jeffrey Case, stating he "believes in the accuracy of what he wrote" (Opp. at 12); (ii) arguing that SNMPR's hundreds of licenses contained restrictions that rendered its software unpublished (*see id.* at 16-18); and (iii) arguing that "the question of whether ***licensing*** of computer software constituted publication was unclear at the time of SNMP Research's registration" (*id.* at 14 (emphasis added)). As detailed below, the first point here is irrelevant. The second is wrong. And the third is both irrelevant—given that the law regarding ***distribution*** of software was clear at the time of registration and alone is sufficient to justify referral to the Register—and wrong.

---

[9] "Compendium II" has the same meaning herein as in Extreme's Opening Brief.

### 1. Dr. Case's Self-Serving Declaration Is Irrelevant.

The Supreme Court has held that "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Unicolors I*, 142 S. Ct. at 948. Indeed, the Court was careful not to make it "too easy for copyright holders, by claiming lack of knowledge, to avoid the consequences of an inaccurate application." *Id.* Rather, courts can look to circumstantial evidence "to find that an applicant was actually aware of, or willfully blind to, legally inaccurate information." *Id.*; *see also HealtheState*, 160 Fed. Cl. at 96 (evidence of knowledge was sufficient even where plaintiff's CEO submitted a declaration that he "prepared and completed the registration with the most accurate information available to him at the time" (citation omitted)); *LADS Network Sols., Inc. v. Agilis Sys., LLC*, No. 19-cv-00011, 2022 WL 4534738, at *7 (E.D. Mo. Sept. 28, 2022), *appeal dismissed*, No. 22-3077, 2022 WL 19348883 (8th Cir. Dec. 14, 2022) ("finding of knowledge does not require a smoking gun"). Thus, the Court need not accept Dr. Case's testimony that he did not have the requisite knowledge; the circumstantial evidence—detailed in Section IV.B of Extreme's Opening Brief and Section II.C.2 below—shows that SNMPR was at least willfully blind to the law.

SNMPR suggests that Extreme confirmed Dr. Case's understanding of the law by failing—at the time it signed its license in 2001—to "contend[] or even hint[] that there was any inconsistency between SNMP International licensing its software to Extreme . . . yet the software still being unpublished." (Opp. at 13.) Extreme's silence has no relevance. First, SNMPR admits that Extreme signed its license "ten years before registration of the software." (*Id.*) SNMPR had not even submitted its registrations when Extreme signed its license: there was no inconsistency for Extreme to identify at that time. Second, even if Extreme had learned about SNMPR's registrations in 2011 (which it did not), SNMPR did not inform Extreme until this litigation that it had entered into hundreds of other licenses between 2001 and 2011. Finally, it was not Extreme's

11

job to police the accuracy of SNMPR's registration. The "Copyright Act imposes an obligation on registrants submitting applications to accurately" provide certain information, including information related to publication. *Neman Bros. & Assoc., Inc. v. Interfocus, Inc.*, No. 20-cv-11181, 2023 WL 115558, at *11 (C.D. Cal. Jan. 4, 2023) (citing 17 U.S.C. § 409).

SNMPR also suggests that the Copyright Office confirmed Dr. Case's understanding of the law by failing—at the time of SNMPR's applications in 2011—to "suggest there was any inconsistency between the prior licensing (plainly disclosed repeatedly throughout the source code sent to the Copyright Office with the application materials) and selecting 'unpublished' on SNMP Research's copyright applications." (Opp. at 12; *see id.* at 2.) Again, the Copyright Office's silence has no relevance. First, at the time SNMPR registered its works, the Copyright Office was clear that it "will not attempt to make factual investigations to determine whether or not publication has occurred" (Reply Demers Decl. Ex. 13 (Compendium II) § 904); the Copyright Office will generally rely on the position taken by the applicant unless the facts available to it "clearly show that publication has occurred" (*id.*).

Second, while SNMPR emphasizes that it repeated that its software is an "unpublished work" "nearly two-dozen time[s]" in its source code deposits (Opp. at 12), "[t]he fact that copies bear a statement indicating that their distribution has been restricted or limited in some way will generally not constitute a sufficient basis for questioning whether or not publication occurred" (Reply Demers Decl. Ex. 13 (Compendium II) § 905.02). This paragraph appears on the ***same Compendium page*** that SNMPR purports to show that SNMPR's software was unpublished.

Finally, SNMPR never informed the Copyright Office that its software had been licensed and distributed in source code form to over 675 licensees, and in object code form to thousands of customers around the world. If anything, the language in SNMPR's deposit implies that the

software was subject to a ***singular*** "license" including a "confidentiality agreement." (Opp. at 2, 12.) And the language claiming that the software was "unpublished" only reiterates the fact that SNMPR misled the Copyright Office into believing that the software had not been widely distributed. To get meaningful guidance from the Copyright Office, SNMPR would have had to inform it that SNMPR's software had been widely distributed. Thus, this case is analogous to *Lieb*, in which the court held that "Lieb cannot claim that the Copyright Office could have or should have corrected his improper registration" because "the information that would allow for such a correction [*i.e.* the existence of a previously published work] was never made available to any specialist." 2022 WL 1124850, at \*14.[10] The court noted that "Lieb could have done any number of things—he did not, but instead puts the onus on the Copyright Office, or the Court, to excuse his errors." *Id.* The court concluded that "Lieb cannot claim that his lack of legal knowledge excuses the failure to provide accurate information": "there is no question but that the applicant was 'willfully blind' to providing accurate information." *Id.* (citation omitted). [11]

Here, Dr. Case could have hired an attorney to ensure that he filled out his copyright applications properly (given that by 2011 he had collected ███████████ in royalties in exchange for publishing his works). Instead, he "personally filled out SNMP Research's applications for its copyright registrations," apparently without consulting an attorney. (Opp. at 2.) He also chose not to inform the Copyright Office that his software had been distributed

---

[10] This case is unlike *Oliver v. Meow Wolf, Inc.*, where the plaintiff "clearly conveyed [to the Copyright Office] that these works had already been distributed to others for sale or display." No. 20-237, 2022 WL 3682936, at \*7 (D.N.M. Aug. 25, 2022).

[11] SNMPR attempts to distinguish *Lieb* on the basis that Copyright resources gave more direction on the issue at hand, while those resources "simply regurgitated the statutory definition of 'publication.'" (Opp. at 20.) But that definition made clear that distribution—as occurred here—constitutes publication.

13

thousands of times, nor to ask the Office whether it would consider the works published. He should not be permitted to put the onus on the Copyright Office, or the Court, to excuse his errors.[12]

## 2. SNMPR's Licenses Were Not Restrictive.

The crux of SNMPR's argument is that—notwithstanding the fact that its software had been distributed to thousands of customers, including the key players in the networking industry—restrictions in its license agreements rendered its software unpublished. (*See* Opp. at 16-18.) But the law in 2011 was clear that the purported restrictions in SNMPR's licenses were not enough to render the software unpublished.

SNMPR argues that the license agreements "contain numerous 'express restriction[s] with respect to disclosure of the work's contents.'" (Opp. at 17 (quoting Compendium II § 905.02).) But the only disclosure restrictions it identifies relates to its source code. (*See id.* (citing ECF No. 246-1 ("Brocade Agreement") § 3 (prohibiting disclosure of source code); ECF No. 246-2 ("2001 Extreme License") § 3 (same)).) SNMPR does not dispute that restrictions on the disclosure of "SNMPR's *source code* are irrelevant to whether SNMPR's *program* [*i.e.*, the binary code] was published." (Br. at 13.)

SNMPR identifies **no restrictions at all** on the disclosure of its binary code, which licensees were permitted to "distribute internally and externally" "worldwide." (Brocade Agreement § 3; 2001 Extreme License § 3.) Rather, SNMPR argues that its licenses "limit[ed] the 'target processor, operating system, and development tools platform' on which [SNMPR's software] can be used." (Opp. at 17 (citation omitted).) But SNMPR's argument is the equivalent

---

[12] SNMPR also states—inaccurately—that Extreme "suggests that SNMP Research's co-plaintiff, SNMP International, had previously registered *other* works as 'published.'" (Opp. at 13.) Extreme said only that SNMP International "had co-authored six works, all of which were registered as published" (Br. at 19-20), a fact SNMPR does not dispute.

14

of saying that SNMPR did not collect ███████████ in royalties because it only collected ███████████ from each licensee. The fact that each individual license restricted the use of SNMPR's software to a specific processor, operating system, and/or platform is irrelevant. SNMPR licensed to *675 companies*, including the dominant players in the switching and routing market. (*See* Br. at 7-8.) These licenses—combined—licensed software to be used on virtually every processor, operating system, and platform in the switching and routing market.

SNMPR argues that *Hubco*, *PRC Realty*, *Metropolitan Realty*, and *DBT* support the conclusion that its licenses were sufficiently restrictive to avoid publication. (*See* Opp. at 16-18.) As detailed in Extreme's Opening Brief, those cases involved agreements with vastly more restrictive terms than those at issue here. (*See* Br. at 14-15.) While SNMPR classifies these distinctions as "hair splitting" (Opp. at 17), the restrictions that the courts relied upon in SNMPR's cases simply do not exist in SNMPR's licenses. For example, in *Hubco Data Products. v. Management Assistance Inc.*, the software was "only offered to owners of MAI computers." No. 81-1295, 1983 WL 1130, at *6 (D. Idaho Feb. 3, 1983). Here, SNMPR's licenses combined allowed software to be used on virtually every relevant processor, system, and platform on the market for switching and routing—across almost 700 licensees selling products to the entire world. Further, in *PRC Realty Systems v. National Ass'n of Realtors.*, the single license at issue had "confidentiality and restrictions on sublicensure to a competitor." 766 F. Supp. 453, 461 (E.D. Va. 1991), *aff'd in part, rev'd in part*, 972 F.2d 341 (4th Cir. 1992); *see also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network*, 948 F. Supp. 2d 538 (D. Md. 2013) (license precluded redistribution); *DBT Grp., Inc. v. FMC Corp.*, No. 01 C 2769, 2001 WL 1105077 (N.D. Ill. Sept. 19, 2001) (license required consent to redistribute). Here, not only did SNMPR have *hundreds* of

15

licenses, those licenses included effectively no confidentiality, redistribution, or sublicensing restrictions on its binary code.

Relying exclusively on cases decided before 1984, SNMPR's counsel explained in his treatise that it was "clear that a publication will be general, rather than limited, 'unless the circulation is restricted ***both as to persons and purpose***.'" 1 *Nimmer on Copyright*, § 4.13 (citation omitted). The limitation on purposes "must preclude the recipients of copies from broadcasting, or from reproducing, distributing or selling such copies." *Id.* (footnote omitted). Here, SNMPR did just the opposite: it ***permitted distribution*** of binary code to hundreds of licensees—including the dominant players in the routing and switching industry—as well as their thousands of customers, using effectively every processor, operating system, and platform on the market for switching and routing. SNMPR has identified no restrictions that even arguably render its software in binary code unpublished.

### 3. The Law Regarding Publication via Licensing Was Also Clear.

As detailed in Extreme's Opening Brief, the law was clear by 2011 that licensing software constitutes "publication." (*See* Br. at 19-20.) In response, SNMPR cites *Schenck* to argue that because Compendium II did not explicitly state—like Compendium III[13] does—that "licensing of software . . . constitutes "publication' . . . there was no statute, regulation, or even a Compendium provision setting forth the law, rule, or even the standard on publication of computer software for SNMP Research to 'know' back in 2011" (*id.* at 15-16 (citing *Schenck*, 105 F. Supp. 3d at 820)).[14]

---

[13] "Compendium III" has the same meaning herein as in Extreme's Opening Brief.

[14] SNMPR complains that Extreme cited the Third Compendium, which was not released until 2014. (Opp. at 14-15.) But Extreme did so to establish the inaccuracy of the information in SNMPR's registrations—not its knowledge in 2011. (*See* Br. at 10-13.) SNMPR does not dispute that the information it provided was inaccurate.

And yet, in *Schenck*, the rule at issue ***did not exist*** at the time of registration. Here, the relevant publication rule has not changed for decades. (*See* Br. at 18.)

SNMPR also claims that "there is no rule that [it] was required to scour trial court opinions throughout the country." (Opp. at 18.) In fact, the Sixth Circuit itself held in 2008 that "licensing" software constituted publication within the meaning of the Copyright Act. *Daimler-Chrysler Services N. Am., LLC v. Summit Nat'l, Inc.*, 289 F. App'x 916, 922-23 (6th Cir. 2008); *see also McLaren v. Chico's FAS, Inc.*, No. 10 Civ. 2481, 2010 WL 4615772, at *2 (S.D.N.Y. Nov. 9, 2010) (licensing illustration constituted publication). Further, courts had universally held before 2011 —and SNMPR has not pointed to any case saying otherwise—that licenses permitting wide distribution were not sufficiently restrictive to avoid publication. *See, e.g., Unix Sys. Lab'ys, Inc. v. Berkeley Software Design, Inc.*, No. 92-1667, 1993 WL 414724, at *13 (D.N.J. Mar. 3, 1993) (software distributed to "literally thousands of licensees" was published); *D.C.I. Comput. Sys., Inc. v. Pardini*, 978 F.2d 1265, 1992 WL 323325, at *1 (9th Cir. 1992) (table) (software licensed "to any automobile or recreational vehicle dealership in the country that would agree to enter into a contract" was published). SNMPR's attempt to distinguish these cases fails, and the cases on which it relies to argue that publication was a nuanced legal issue are inapposite.

(a)    SNMPR cannot distinguish Extreme's cases.

SNMPR's attempts to distinguish the clear guidance from the Sixth Circuit fail. First, SNMPR argues that *Daimler-Chrysler* was unpublished. (*See* Opp. at 18-19.) But a case's publication status does not matter in this context.[15] That is because the question is not whether

---

[15] SNMPR's own authority acknowledges that "only a handful of courts have addressed the implementation of § 411(b)(2)" and finds an unpublished case "helpful and instructive." *Schenck*, 105 F. Supp. at 818.

17

other courts would have been bound, but whether guidance existed for determining publication status. It did.

Second, SNMPR argues that the Sixth Circuit noted that the software at issue was "aggressively marketed." (*See* Opp. at 19.) But the court's ultimate conclusion was based on the fact that the software "was not provided to a definite, very selective group." *Daimler-Chrysler*, 289 F. App'x at 923. In any event, SNMPR too spent ███████████ on marketing between 2000 and 2004. (*See* ECF No. 265-2 at SNMP-0024565.)

Finally, SNMPR argues that *Daimler-Chrysler* and *Unix System* "analyz[ed] a 'notice' requirement."[16] (Opp. at 19 & n. 9.) But both courts analyzed whether the software was "widely published" or merely in "limited publication" within the meaning of 17 U.S.C. § 101—the very statute that is relevant here. *Daimler-Chrysler*, 289 F. App'x at 923; *Unix Sys.*, 1993 WL 414724, at *12. Indeed, *Hubco*, which is cited by SNMPR, arose in the same context. *See* 1983 WL 1130, at *5. Thus, SNMPR's attempts to discount this authority fails. And its "failure to consider the relevant instructions" evinces willful blindness. *Neman Bros*, 2023 WL 115558, at *12.

      (b)   <u>Publication was not a nuanced legal issue.</u>

Whether SNMPR's software, which had been distributed to thousands of customers with effectively no restrictions, was published at the time of registration is not a "nuanced legal issue" as SNMPR argues. (Opp. at 21-22.) And the cases SNMPR offers in support do not suggest otherwise.

First, SNMPR describes *Archie MD, Inc. v. Elsevier, Inc.* as a "[m]uch more salient" decision than Extreme's authorities. (Opp. at 19 (citing 261 F. Supp. 3d at 520).) But it

---

[16] That doctrine denied copyright protection to works the "owner 'publishes,' unless the owner has properly affixed a notice of copyright to the published work." *Unix Sys.*, 1993 WL 414724, at *12.

conveniently leaves out the most "salient" fact of *Archie*—that the court there "referred to the Register the question of 'whether the fact that Archie had previously licensed its animations to Elsevier before applying to register them in a collection of unpublished works would have caused the Register to refuse registration.'" 261 F. Supp. 3d at 514–15 (citation omitted). Also "salient" is *Archie*'s holding that the plaintiff's "licensing and delivery of the Work . . . amount[ed] to distribution and therefore publication"—even though the licensee "had not yet undertaken further distribution of the Work." *Id.* at 517. Here, in contrast, SNMPR had not only licensed its works to hundreds of licensees, but those licensees had further distributed the software (with SNMPR's express permission) to thousands of customers.

Second, two other cases SNMPR cites in support of its proposition that it was unclear in 2011 whether "licensing" constitutes publication (Opp. at 20) are distinguishable as they do not concern publication via *software* licensing. In *Furituredealer.net, Inc. v. Amazon.com, Inc.*, the court found it unclear whether the product descriptions written by plaintiff were published because "they appeared on [a third party's] website along with an intentionally placed 'Print this Page' button." No. 18-232, 2022 WL 891473, at *7, *9, *13 (D. Minn. Mar. 25, 2022). And the two copyrights at issue in *ReportHost LLC v. Spectora Inc.* were for "boilerplate language" and "templates" for proprietary home inspection narratives—not software. No. 22-cv-00457, 2023 WL 2782285, at *1 (D. Colo. Mar. 29, 2023).

Third, the Register's response in *Fashion Avenue* (*see* Opp. at 22) dealt with complex rules for registering "an unpublished collection" of 359 images, (Reply Demers Decl. Ex. 12 (Response of the Register of Copyrights to Request Pursuant to 17 U.S.C. §411(b)(2)) at 1-3, *Fashion Avenue*, No. 19-cv-06302, ECF No. 129-1 [hereinafter *Fashion Avenue* Register Response]), *all* of which must be unpublished to register the work as "unpublished." *Oliver*, 2022 WL 3682936, at *6. This

19

is in contrast to "an unpublished collective work or other compilation," which "can be registered as unpublished even if some of its component works have previously been published." *Id. Fashion Avenue* also dealt with thorny issues such as whether showing sample garments to buyers during private, in-person meetings constituted publication. (Reply Demers Decl. Ex. 12 (*Fashion Avenue* Register Response) at 12-15.) In any event, the court in *Fashion Avenue* still referred the questions to the Copyright Office. *See* No. 19-cv-06302, 2020 WL 7862132, at *3, *6 (C.D. Cal. Oct. 28, 2020).

Here, there is even more reason to refer since none of those complex rules or thorny issues comes into play. The question SNMPR faced when registering its works was relatively simple: had its software been published by virtue of the hundreds of license agreements it had entered into prior to 2011, and the fact that its licensees had distributed thousands of copies of its works? The case law and resources available to SNMPR at the time of registration clearly indicated that the answer is "yes." The Copyright Act was unambiguous that "distribution" constitutes "publication." While SNMPR's individual licenses restricted the platform on which each licensee could use its software, SNMPR's almost 700 licenses collectively permitted distribution on virtually any platform and contained no other restriction on the distribution of binary code. Thus, Extreme's approach would not impose a "mistakes of law do not count" requirement, as SNMPR suggests. (Opp. at 14.) Rather, it applies the willful blindness standard as instructed by the Supreme Court and seeks to hold SNMPR accountable for ignoring the law.[17] (*See* Br. at 16-17 (citing *Lieb*, 2022 WL 1124850, at *13).)

---

[17] SNMPR argues that "even if Dr. Case made a mistake by selecting [']unpublished['] on the application, that mistake cannot possibly justify invalidating SNMP Research's copyright registrations, particularly where there is no dispute or challenge that SNMP Research was the proper copyright claimant and that ***SNMP Research's work of authorship is protectable*** by copyright." (Opp. at 2 (emphasis added).) This argument is wrong for at least two reasons. First,
*(cont'd)*

Finally, to the extent the licensing question was indeed unclear as SNMPR contends, its own authorities cautions that if a disputed "issue depends even in part on interpretation or understanding of the Copyright Office's registration practices, the more prudent practice—and the practice anticipated in § 411(b)—would be to refer the question to the Register." (Reply Demers Decl. Ex. 10 (*Olem Shoe* Register Response) at 12 n.5; *see* Reply Demers Decl. Ex. 11 (Nimmer Report) ¶ 35 (quoting same)); *Schenck*, 105 F. Supp. at 819 (quoting same); *Fashion Avenue*, 2020 WL 7862132, at *3 (granting request to refer "[g]iven the parties' conflicting evidence on the issue of whether the designs were published prior to registration"). Thus, this Court need not at this time make a definitive determination on whether the law left enough room for Dr. Case's supposed belief that he did not publish his works. It is sufficient that Extreme has made a showing that there is a basis for finding that SNMPR was at least willfully blind to the inaccuracies in its registrations.

## III. CONCLUSION

Extreme has set forth abundant evidence showing that it has a legitimate basis for its allegations and that it is not seeking to delay the proceedings by making this motion. The Court should refer Extreme's question to the Register at this time.

DATED:       April 10, 2023

Respectfully Submitted,

*/s/ Leslie A. Demers*

J. Chadwick Hatmaker, BPR# 018693
Kaitlyn E. Hutcherson, BPR# 035188
WOOLFE, MCLANE, BRIGHT,
  ALLEN & CARPENTER, PLLC

John M. Neukom (*admitted pro hac vice*)
Barbara N. Barath (*admitted pro hac vice*)
DEBEVOISE & PLIMPTON LLP
650 California Street

---

Extreme most certainly is disputing that SNMPR is a proper copyright claimant; SNMPR appears to be asserting copyrights that it procured by making false statements to the Copyright Office. Second, Extreme will challenge the protectability of SNMPR's source code inserts at the appropriate juncture in this case (presently, the pleadings are not even settled).

21

Post Office Box 900
Knoxville, Tennessee 37901-0900
Tel: (865) 215-1000
Fax: (865) 215-1001
chatmaker@wmbac.com
khutcherson@wmbac.com

San Francisco, California 94108
jneukom@debevoise.com
bnbarath@debevoise.com
(415) 738-5700

Leslie A. Demers (*admitted pro hac vice*)
Chris J. Coulson (*admitted pro hac vice*)
Anthony P. Biondo (*admitted pro hac vice*)
Ryan P. Bisaillon (*admitted pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
leslie.demers@skadden.com
chris.coulson@skadden.com
anthony.biondo@skadden.com
ryan.bisaillon@skadden.com
(212) 735-3000

*Attorneys for Extreme Networks, Inc.*