IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § | Case No. 3:20-cv-00451-CEA-DCP |
| Plaintiffs, | § § | |
| v. | § § | |
| BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; AND EXTREME NETWORKS, INC., | § § § § | |
| Defendants. | § § | |

**EXTREME'S BRIEF RE COMMON INTEREST COMMUNICATIONS[1] AND SNMPR'S ISSUE NOS. 2 AND 3**

---

[1] SNMPR's motion relates to thirteen privilege log entries numbered 507 (EXTREME-00697320), 508 (EXTREME-00697371), 509 (EXTREME-00697422), 510 (EXTREME-00697473), 511 (EXTREME-000697524), 512 (EXTREME-00697575), 530 (EXTREME-00698298), 689 (EXTREME-00704911), 696 (EXTREME-00704952), 777 (EXTREME-00706892), 819 (EXTREME-00708020), 820 (EXTREME-00708025), and 839 (EXTREME-00709302). The underlying documents are available for *in camera* inspection. These log entries are attached as Exhibit A. An exemplar of the redacted at-issue communications is attached as Exhibit B.

## Issue No. 1: Common Interest Communications

Extreme asserts privilege over portions of an email chain containing attorney-client privileged communications within Brocade ("Brocade Communications") and Brocade's subsequent sharing of those privileged communications with Extreme ("Extreme Communications") (collectively, "Disputed Communications"). SNMPR's arguments—that Brocade waived privilege over Brocade Communications by failing to log them and that Extreme lacks standing to assert privilege—are legally and factually wrong. Thus, the brunt of the parties' dispute is whether Brocade waived privilege by forwarding the communications to Extreme under a common interest agreement. It did not. The common interest doctrine prevents waiver because (a) the communications occurred after Extreme agreed to acquire Brocade's data center business ("Brocade Business"), and (b) Brocade shared the communications—which relate to the interpretation of Brocade's 2001 license agreement with SNMPR ("2001 License")—with Extreme in furtherance of the parties' common legal interest in ensuring that Extreme had the necessary licenses to the Brocade Business.

### I. FACTUAL BACKGROUND

In February 2017, leading up to Extreme's acquisition of the Brocade Business, Extreme and Brocade executed a confidentiality agreement, whereby they agreed (a) to maintain confidential information exchanged between them and (b) that they had "a commonality of interest." (*See* Ex. Cat ¶¶ 2, 6.) In March 2017, they entered into an Asset Purchase Agreement ("APA") whereby they agreed that Extreme would acquire the Brocade Business along with "a valid license to use" the business, and that both parties would "use reasonable best efforts to [] take . . . all appropriate actions and do . . . all things necessary[] [and] proper . . . to consummate . . . the transactions contemplated by [the APA]." (Ex. D at 1, §§ 3.5(a), 5.3(a).) In October 2017, the parties signed another APA with similar terms. (Ex. E. at §§ 3.5(a), 5.3(a).)

Because the 2001 License related to the Brocade Business (ECF No. 3 ¶¶ 41-43), consistent with the APA, the parties jointly asked SNMPR to assign the agreement to Extreme (see Ex. B at 4). On September 22, 2017, SNMPR's counsel (John Wood) sent an email to Extreme's in-house attorney (Associate General Counsel, Jennifer Sipes) and Brocade's in-house attorney (Senior Director of Legal, Larry Fitterer) stating that (a) he believed the 2001 License was "not assignable," (b) he needed more information about the Brocade-Extreme transaction, and (c) without that information, SNMPR did not "consent to [their] request to assign the [License] from Brocade to Extreme." (*Id*. at 5.) That same day, Extreme's in-house counsel (Contract Attorney, Linda Chain) asked Mr. Fitterer to help respond to Mr. Wood's questions. (*Id*. at 4.) Extreme has not withheld any of these communications.

**Brocade Communications**. On September 26, 2017, Mr. Fitterer sought legal advice from Brocade's in-house intellectual property counsel (Vice President of Intellectual Property, Jim Parsons) relating to SNMPR's interpretation of the 2001 License. Mr. Parsons provided Mr. Fitterer and another Brocade employee (Director of Procurement, Maggie Mingione) legal advice on those issues. (*Id.* at 2-3.) These communications reflect internal Brocade discussions seeking and providing legal advice; the parties do not appear to dispute that they were privileged.

**Extreme Communications**. On October 11, 2017, Mr. Fitterer shared Mr. Parsons' advice with Extreme (*i.e.*, Ms. Sipes), and Brocade and Extreme in-house counsel discussed Mr. Parsons' legal advice (*id.* at 1-2).

1

## II. Extreme Properly Withheld the Disputed Communications as Privileged

SNMPR has argued that (1) Brocade waived privilege over the Brocade Communications because they were not on Brocade's privilege log; (2) Extreme cannot assert privilege on behalf of Brocade; and (3) Brocade and Extreme waived privilege over the Disputed Communications by sharing them with each other.[2] SNMPR is wrong on all counts.

*First*, Brocade did not waive the privilege by failing to log the Brocade Communications since Brocade did not have possession, custody, or control of those emails during the litigation and therefore could not have logged them. (Decl. of P. Blum at ¶ 6.) Thus, there should be no dispute that Brocade's failure to log cannot constitute a waiver.

*Second*, SNMPR is wrong that only Brocade can assert privilege over the Brocade Communications. "[A]ny member of a common-interest arrangement may invoke the privilege against third persons, even if the communication was not originally made by or addressed to the objecting member." *ContiTech USA, Inc. v. McLaughlin Freight Servs., Inc.*, 2021 WL 6618846, at *3 (S.D. Iowa, Nov. 24, 2021) (citations omitted).

*Third*, Brocade did not waive the privilege by sharing its emails with Extreme because the common interest doctrine applies. The parties shared the communications in furtherance of their common legal interest in the interpretation and assignment of the 2001 License as a part of Extreme's acquisition of the Brocade Business. Further, under federal law, which governs here, SNMPR is wrong that the disclosures must be made in anticipation of litigation for the common interest doctrine to apply.

**Federal common law governs, not state law**. Federal common law governs this dispute because SNMPR's copyright infringement claims arise under federal law. *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998) ("Questions of privilege are to be determined by federal common law in federal question cases.").[3]

**The common interest doctrine protects communications between clients who share a common legal interest**. "The common interest privilege is not an independent basis for privilege, but an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party." *Elvis Presley Enters., Inc. v. City of Memphis*, 2020 WL 4015476, at *7 (W.D. Tenn. July 16, 2020). It may be claimed in three instances: "(1) when a single attorney represents multiple clients (i.e., joint client privilege); (2) when parties share a common defense, typically in the criminal context (i.e., joint defense privilege); or (3) when two or more clients share a common legal or commercial interest and share legal advice with respect to that common interest (i.e., common interest arrangement)." *Id.* To establish a common interest arrangement, the asserting party must show: "(1) the

---

[2] SNMPR does not challenge the privilege over subsequent communications among Extreme's in-house counsel—except for two emails involving Mary Chay because she had a Brocade email address. (Priv. Log. Entry Nos. 689, 696.) But she worked for Extreme at the time, and all internal Extreme emails involved attorneys discussing legal advice. (Decl. of P. Lam ¶¶ 7, 10-12.)

[3] SNMPR has no state law claims related to the Brocade Business. Even if it did, "where pendent state claims are raised the federal common law of privileges should govern all claims of privilege." *Hancock v. Dodson*, 958 F.2d 1367, 1373 (6th Cir. 1992) (citations omitted).

2

communications were made by separate parties in the course of a matter of common interest; (2) the communications were designed to further that effort; and (3) the underlying privilege exists and has not been waived." *Id.* at *8. "[T]he purpose of the doctrine is to permit persons with similar legal interests, but represented by different counsel, to enjoy the same ability to communicate confidentially about their common interests with multiple attorneys that each client enjoys separately." *Fresenius Med. Care Holdings, Inc. v. Roxane Lab'ys, Inc.*, 2007 WL 895059, at *2 (S.D. Ohio Mar. 21, 2007).

**Brocade and Extreme shared legal advice pursuant to a common legal interest**. This case is similar to others where courts have held that the common interest doctrine protected communications between parties to a transaction. For example, in *FM Generator, Inc. v. MTU Onsite Energy Corp.*, 2016 WL 8902603 (D. Mass. Aug. 25, 2016) during MTU's acquisition of Katolight, Katolight's counsel provided opinions "evaluating Katolight's existing contractual obligations," which Katolight then shared with MTU. *Id.* at *6 n.4 (applying Massachusetts law but parties agreed there was "no practical difference in the application of state and federal law to the facts of this case"). The common interest protected the communications since "counsel for MTU and Katolight cooperated in a joint effort to complete the acquisition"; the communications were "made for the purpose of obtaining or rendering legal advice regarding the sale and acquisition"; and the parties shared a common legal interest since their work was done "for the purpose of assisting MTU with its due diligence as they finalized the acquisition." *Id.* at *7. Similarly, in *Fresenius*, where a seller shared its patent counsel's advice regarding the prosecution of patent applications with a purchaser, the court found that the parties had a common legal interest "in obtaining a strong and enforceable patent." 2007 WL 895059, at *3.[4]

Here, like in the cases above, the seller (Brocade) shared with the purchaser (Extreme) privileged communications with Brocade's intellectual property counsel regarding the interpretation and assignability of the 2001 Agreement as a part of the parties' joint effort to finalize the Brocade Business acquisition. The parties had agreed to keep communications confidential (Ex. C; Decl. of D. Dulac at ¶ 3), and they shared a common legal interest: common interest in understanding and protecting the legal interests of the Brocade Business. The Disputed Communications were made in furtherance of that interest—in response to SNMPR counsel's statement that the 2001 License could not be assigned to Extreme. Given the parties' shared legal interests and the privileged nature of the underlying communications, the common interest doctrine protects the disputed communications. *See Elvis*, 2020 WL 4015476, at *8.

**Anticipation of Litigation Is Not Required**. SNMPR has relied on *Adkisson v. Jacobs Engineering Group, Inc.*, 2021 WL 149841 (E.D. Tenn. Jan. 15, 2021), to argue that the common

---

[4] *See also MPT, Inc. v. Marathon Labels, Inc.*, 2006 WL 314435, at *7 (N.D. Ohio Feb. 9, 2006) (former patent owner and assignee shared interest in "enforcement and validity" of patents); *William F. Shea, LLC v. Bonutti Rsch., Inc.*, 2013 WL 1386005, at *2 (S.D. Ohio Apr. 4, 2013) (parties in negotiation over patent-related assets shared common interest in strength and scope of the patents); *Dura Glob., Techs., Inc. v. Magna Donnelly Corp.*, 2008 WL 2217682, at *3 (E.D. Mich. May 27, 2008), objections overruled, 2008 WL 2695668 (E.D. Mich. July 2, 2008) (where seller shared with buyer opinion letters prepared by its patent counsel, parties shared interest in avoiding patent infringement liability).

3

interest doctrine can apply only when privileged information is disclosed "due to actual or anticipated litigation." *Id.* at *9-10. But *Adkisson* is inapposite.

*Adkisson* applied Tennessee state law, *see id.* at *2, rather than the federal common law applicable in this federal copyright case. In cases where federal common law controls, "[t]he weight of authority holds that litigation need not be actual or imminent for communications to be within the common interest doctrine." *Dura Glob., Techs*, 2008 WL 2217682, at *3. District courts across the Sixth Circuit agree. *See Elvis Presley Enters.*, 2020 WL 4015476, at *7 ("[i]t is not necessary that a [common interest arrangement] be derived from legal action"); *Cooey v. Strickland*, 269 F.R.D. 643, 652 (S.D. Ohio 2010) (same); *Fresenius*, 2007 WL 895059, at *3 ("community of interest doctrine is not limited to litigation situations"); *William F. Shea, LLC v. Bonutti Rsch., Inc.*, 2013 WL 1386005, at *3 (S.D. Ohio Apr. 4, 2013) (same); *MPT, Inc. v. Marathon Labels, Inc.*, 2006 WL 314435, at *7 (N.D. Ohio Feb. 9, 2006) ("parties can have common legal interests outside of the litigation context altogether"). Other circuits agree. *See In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 363 (3d Cir. 2007) ("community-of-interest privilege . . . applies . . . in purely transactional contexts"); *United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 n.6 (7th Cir. 2007) ("communications need not be made in anticipation of litigation"); *In re Regents of the Univ. of Cal.*, 101 F.3d 1386, 1390–91 (Fed. Cir. 1996) (doctrine not limited to "advice obtained in the shadow of litigation").

Further, *Adkisson* relied on *Boyd v. Comdata Network, Inc.,* 88 S.W.3d 203, 214 (Tenn. Ct. App. 2002), *see* 2021 WL 149841, at *10, which is a state law case and addresses one of the other instances of common interest discussed above: the ***joint defense*** privilege, 88 S.W.3d at 214 n13.[5] But "***[u]nlike the joint defense privilege, the common interest does not require or imply that an actual suit is or ever will be pending***." *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 219 (W.D. Ky. 2006) (emphasis added); *Elvis Presley Enters.*, 2020 WL 4015476, at *7 (distinguishing between "joint defense privilege" and "common interest arrangement": former requires "actual or threatened litigation" while latter does not). Thus, no anticipation of litigation is required here, and the Disputed Communications are protected by the common interest doctrine—despite Brocade sharing them with Extreme—given the parties' common legal interest regarding an accurate interpretation of the 2001 License.

---

[5] *Boyd* relied on *Medcom Holding Co. v. Baxter Travenol Lab'ys, Inc.*, 689 F. Supp. 841, 844 (N.D. Ill. 1988). *See* 88 S.W.3d at n16. *Medcom* in turn found that, in the criminal context, "[t]he privilege arises out of the need for a ***common defense***"—which is not required if there is no possibility of litigation. 689 F. Supp. at 844 (emphasis added). The other two cases *Boyd* cites say nothing about litigation being required. The first says states that "[s]ome form of ***joint strategy*** is necessary to establish a JDA." *United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999) (emphasis added). The second case did not find that anticipation of litigation was relevant; rather parties claiming protection "must show that they had a common legal, as opposed to commercial, interest, and that they cooperated in formulating a ***common legal strategy***." *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y. 1996) (emphasis added).

4

### Issue No. 2 (Dates Certain For Production For "Several Items") and
### No. 3 (Production of Marketing Documents)

SNMPR has served approximately 275 discovery requests (document requests, inspection requests, interrogatories, and requests for admissions) to date and in the past two months raised at least 18 purported issues relating to a small fraction of those requests—all new issues since the Court's last order on a motion to compel. Extreme has been diligently working to address those issues and respond to SNMPR's 41 emails sent between June 2 and August 22. Extreme has even agreed—to avoid a dispute and not burden the Court—to produce documents and information for which SNMPR has failed to articulate any real relevance (e.g. install images for hundreds of files, a network monitoring product that SNMPR admits does not contain their code). Yet SNMPR has continued to angle to raise *some* discovery issue with the Court. Since June 2, it has threatened to raise 6 different issues, when the parties had not completed their meet and confer—and in some instances where it had not even explained to Extreme what the "dispute" was. For example, SNMPR threatened to move to demand production of product download information even though it had not served a discovery request for that information and Extreme had already agreed to produce the information. After SNMPR recognized that it could not raise any of those 6 issues with the Court because Extreme had already addressed (or agreed to address) them, SNMPR identified two new issues, which are now before the Court.

In particular, on August 24, SNMPR asked the Court to compel Extreme to provide "dates certain for production of certain items" (Issue No. 2) and produce marketing documents (Issue No. 3). At that time, SNMPR had not told Extreme which "specific items" it wanted dates certain for and Extreme had already agreed to produce any responsive marketing documents. A week before SNMPR approached the Court (and again on August 21), Extreme had asked for a prioritized list of items SNMPR wanted a date certain for and told SNMPR that the parties should be able to resolve both issues without court intervention. Extreme stated in the notice to the Court on August 24 that Issue Nos. 2 and 3 were not ready for the Court's assistance, as the parties had not finished the meet and confer required by the Court's order. *See* ECF No. 218 at 3. It was not until two days *after* SNMPR approached the Court (on a Saturday) that SNMPR identified a "non-exhaustive list (in no particular order)" of ten discovery items for which SNMPR sought a date certain. Within three days, Extreme provided a date certain for *all* ten topics.[6] SNMPR agreed that half of its topics do not need the Court's assistance, but SNMPR insists on raising the remaining five topics. For reasons below, the remaining five items also do not require the Court's assistance (at least at this time):

**1. Date certain for Extreme's response to Plaintiffs' RFPs related to marketing documents (RFP Nos. 135, 141-148) and Issue No. 3**:[7] Extreme has agreed to exactly what SNMPR asked for: the production of additional marketing documents arguably responsive to RFP Nos. 135 and 141-148 by September 15. But SNMPR insisted on bringing this issue before the Court.

On July 28, SNMPR asked Extreme "to point us to marketing documents" in Extreme's most recent production of nearly 37,000 documents. Around the time SNMPR asked this question,

---

[6] On nine out of ten topics, Extreme has provided date certain that falls within two weeks of receiving SNMPR's list of topics.

[7] SNMPR's Issue No. 3 (production of marketing documents) appears to be a "date certain" issue since Extreme has already agreed to produce any responsive documents; the only outstanding question is when. Thus, Extreme addresses all issues relating to marketing documents here.

5

Extreme was investigating numerous other discovery issues that SNMPR had asked Extreme to investigate. Those issues came ahead of this request in both timing of the request by SNMPR and import of the issue.

SNMPR met and conferred with Extreme about various other topics on *four* occasions between July 28 and August 16 and never raised the issue of marketing documents with Extreme. Then, on August 16, SNMPR claimed Extreme's production of marketing documents was deficient. Extreme assured SNMPR that it would investigate SNMPR's concerns, that it was not withholding any marketing documents, and that it would go back and investigate the issue to determine if additional marketing documents existed and needed to be produced. Twenty hours later, SNMPR demanded additional information. Extreme told SNMPR that it was setting up interviews with Extreme's marketing team with urgency, in order to see if additional marketing documents existed. Extreme also shared information about its prior search for marketing documents and identified the custodians whose documents were previously collected. Two business days later, on August 21, SNMPR again demanded answers about Extreme's investigation and threatened to move the Court. On August 22, Extreme assured SNMPR that it was investigating the issue and would respond to its questions. Two days later, SNMPR asked the Court's assistance on this issue without waiting for Extreme's investigation—launched only six business days before—to complete.

On August 30, Extreme finished its investigation.[8] Extreme informed SNMPR that it had located additional marketing documents and expected to produce them by September 15. Extreme asked SNMPR to confirm that this issue no longer needed the Court's assistance so that the parties do not waste the Court's time with issues that have been resolved. On August 31, SNMPR refused and raised a half dozen new questions. Extreme is willing to provide this information to SNMPR.

The Court should deny SNMPR's request on this issue (both the date certain and whatever else SNMPR seeks under Issue No. 3) because Extreme has already agreed to produce additional marketing documents and provided a date certain for the same.

**2. Date certain for production of install images**: SNMPR asks that Extreme produce install images for every Extreme software version for which it has already produced all available source code (i.e. approximately 1200 install images). These install images are machine-generated, non-human readable binary code created from source code that can only execute on Extreme's hardware. In its April 22, 2022 order, the Court recognized that a category of requests, which covered install images, "will at least be partially mooted by . . . initial exchange of source code." ECF No. 131 at 7-8 (addressing Category 2). The images have virtually no relevance to this case and SNMPR's only stated relevance of the install images is that can locate SNMPR's functions in the binary file despite having access to Extreme's source code with those functions. But to avoid a dispute on this issue, Extreme said it will produce "all install images that are on [Extreme's support] website or elsewhere" by September 8. The install images provided to customers are archived on the support website. Now SNMPR has demanded Extreme explain the burden of conducting a search for install images that are not on Extreme's website. Like the previous topic of marketing documents, Extreme can provide a more fulsome explanation in a meet and confer, not a discovery letter brief.

---

[8] Extreme's investigation took longer because a key marketing employee was on vacation until August 28.

6

**3. Date certain for Extreme's production on RFI Set 2**: SNMPR had insisted that Extreme produce its network monitoring solution, which SNMPR admits does not contain its software, and despite that a free version of another monitoring solution from the Internet would work for SNMPR's stated use. To avoid a dispute, Extreme agreed to produce a single monitoring solution with no obligation to provide customer support to SNMPR for operating it. After SNMPR moved the Court it appears to have reneged on that agreement that the parties negotiated over several meet and confers in July. Now, Extreme will have to meet and confer with SNMPR to arrive at new terms for production.

**4. Date certain of production of source code printouts**: SNMPR wants Extreme to produce source code in a manner that is non-compliant with the Protective Order's ("PO") requirements for source code printouts that SNMPR itself had proposed and Extreme had accepted. Extreme has offered to produce printouts for over 11,000 source code files in a manner that complies the PO's requirements. SNMPR does not want that. Nevertheless, in the spirit of cooperation, Extreme has offered to send its revisions to the PO by September 1.

**5. Date certain for reforming Extreme's interrogatory responses**: For the purposes of this request, SNMPR does not contend that Extreme's interrogatory responses are deficient. Rather, SNMPR has demanded that Extreme reformat its responses in a way that SNMPR prefers. Extreme agreed to do so as a professional courtesy. The parties disagree on the date Extreme will complete those revisions. After SNMPR provided its list of "items" to Extreme (after seeking the Court's intervention), Extreme proposed October 6. SNMPR responded that it wants September 22 imposed as a deadline—even though the close of discovery is not until June 11, 2024 and no deposition notices have been served. On this topic too, the parties can meet and confer and arrive at a mutually agreeable date.

*   *   *

There are ten months of discovery left in this case. Extreme is committed to making sure that SNMPR has documents and information it needs ahead of depositions—let alone the close of fact discovery.

Extreme has been diligently working through SNMPR's myriad requests. But sending daily emails demanding and redemanding information that Extreme has already agreed to provide is counterproductive; it forces Extreme to focus its attention on responding to multiple lengthy daily emails instead of on actually providing the requested information. Had it not been for SNMPR's barrage of meet and confer emails, the above items might already have been addressed.

Extreme respectfully requests that the Court order SNMPR to give Extreme a reasonable amount of time to investigate issues and respond in a thoughtful and fulsome manner before approaching the Court with future discovery issues.

DATED: September 1, 2023

                                                      Respectfully Submitted,

                                                      */s/ John M. Neukom*

| | |
|---|---|
| J. Chadwick Hatmaker, BPR# 018693 | John M. Neukom (*admitted pro hac vice*) |
| Kaitlyn E. Hutcherson, BPR# 035188 | Abraham A. Tabaie (*admitted pro hac vice*) |
| WOOLFE, MCLANE, BRIGHT, | Barbara N. Barath (*admitted pro hac vice*) |
|   ALLEN & CARPENTER, PLLC | Saurabh Prabhakar (*admitted pro hac vice*) |
| Post Office Box 900 | Alicia J. Ginsberg (*admitted pro hac vice*) |
| Knoxville, Tennessee 37901-0900 | DEBEVOISE & PLIMPTON LLP |
| Tel: (865) 215-1000 | 650 California Street |
| Fax: (865) 215-1001 | San Francisco, California 94108 |
| chatmaker@wmbac.com | jneukom@debevoise.com |
| khutcherson@wmbac.com | atabaie@debevoise.com |
| | bnbarath@debevoise.com |
| | sprabhakar@debevoise.com |
| | ajginsberg@debevoise.com |
| | (415) 738-5700 |

Leslie A. Demers (*admitted pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
leslie.demers@skadden.com
(212) 735-3000

*Attorneys for Extreme Networks, Inc.*