# EXHIBIT A

IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 9, 2022 Session

FILED
09/28/2023
Clerk of the
Appellate Courts

# COMMERCIAL PAINTING COMPANY INC. v. THE WEITZ COMPANY LLC ET AL.

Appeal by Permission from the Court of Appeals
Chancery Court for Shelby County
No. CH-06-1573     JoeDae L. Jenkins, Chancellor
_____

No. W2019-02089-SC-R11-CV
_____

The economic loss doctrine generally precludes a contracting party who suffers only economic losses from recovering damages in tort. In Tennessee, the application of this doctrine is limited to products liability cases. In this appeal, we consider whether the economic loss doctrine should be expanded to apply outside the products liability context. A jury awarded compensatory and punitive damages to a drywall subcontractor in a suit against a general contractor under theories of breach of contract and tort. The Court of Appeals applied the economic loss doctrine to preclude the recovery of damages in tort in a suit between sophisticated commercial entities. The intermediate court, in part, affirmed the award of compensatory damages for breach of contract, dismissed the tort claim, and reversed the award for punitive damages. We hold the economic loss doctrine only applies in products liability cases and should not be extended to other claims.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Reversed; Judgment of the Trial Court Affirmed in Part; Remanded to the Court of Appeals**

SHARON G. LEE, J., delivered the opinion of the Court, in which ROGER A. PAGE, C.J., and HOLLY KIRBY, J., joined. SARAH K. CAMPBELL, J., filed a dissenting opinion, in which JEFFREY S. BIVINS, J., joined.

Scott A. Frick, Memphis, Tennessee, for the appellant, Commercial Painting Company, Inc.

Philip E. Beck, Atlanta, Georgia, John A. Templer, Jr., Des Moines, Iowa, and Jeffrey C. Smith, Germantown, Tennessee, for the appellees, The Weitz Company, LLC, Federal Insurance Company, and St. Paul Fire & Marine Insurance Company.

Gregory L. Cashion, Nashville, Tennessee, and Leah Pilconis, Arlington, Virginia, for the Amici Curiae Associated General Contractors of America and Associated General Contractors of Tennessee, Inc.

# OPINION

## I.

This case stems from a contract dispute between a general contractor, The Weitz Company, LLC, and its drywall subcontractor, Commercial Painting Company, Inc. Weitz was the general contractor on a multi-building retirement community in Shelby County. In December 2004, the parties entered into a contract for Commercial Painting to perform drywall work on the project.[1] The contract included a schedule detailing the phases and timing of construction. Weitz agreed to pay Commercial Painting $3,222,400 for its work. Change orders later increased the amount to $3,315,189. The parties had various disputes as the project progressed.

By the end of the contract, Weitz had paid Commercial Painting twelve of its seventeen pay applications. Weitz refused to pay the remaining five applications, claiming they were submitted untimely and contained improper change order requests.

In August 2006, Commercial Painting sued Weitz[2] and its sureties, Federal Insurance Company and St. Paul Fire & Marine Insurance Company, and The Village at Germantown in the Shelby County Chancery Court seeking $1,929,428.74 in damages for breach of contract, including attorney's fees.[3] Commercial Painting alleged that Weitz

---

[1] The work included installation of exterior ceiling insulation; exterior wall metal framing; exterior wall insulation; light gauge metal partitions; gypsum board walls, ceilings, and soffits; and suspended ceilings. The contract, with an effective date of September 28, 2004, was signed by the president of Commercial Painting on November 1, 2004, and by Weitz's representative on December 7, 2004.

[2] The defendant named in the complaint's caption was The Weitz Company, Inc., but the first paragraph of the complaint referenced the defendant as The Weitz Company-National. These entities are referred to herein collectively as "Weitz."

[3] Section 12.1 of the contract provides:

> In the event it shall become necessary for either party to institute legal proceedings against the other party for recovery of any amounts due and owing under the Agreement, it is expressly agreed that the prevailing party in any such action shall be entitled to recover from the non-prevailing party all costs, including reasonable attorney's fees, of pre-suit collection attempts, suit, and post judgment or settlement collection including those incurred on appeal.

failed to properly sequence, coordinate, monitor, and inspect the work of the various subcontractors on the project, which caused Commercial Painting extra work and forced it to work in a more inefficient and costly manner. The complaint also included claims for payment under the performance bond issued by Weitz's sureties, interest on retainage under section 66-11-144 of the Tennessee Code,[4] unjust enrichment, enforcement of Commercial Painting's mechanic's and materialman's lien, and interest and attorney's fees under the Prompt Pay Act of 1991.[5]

Weitz answered and counterclaimed against Commercial Painting and its surety for "no event less than" $500,000 in damages for costs allegedly incurred on the project due to Commercial Painting's delay and defective workmanship.

In a later amendment to its complaint, Commercial Painting asserted additional claims for fraud, intentional and negligent misrepresentation, rescission/reformation of the contract, and $10,000,000 in punitive damages. Commercial Painting alleged Weitz negotiated a six-month extension with the project owner before executing the contract with Commercial Painting, but the construction schedule attached to the contract did not reflect the extension. Commercial Painting also claimed Weitz signed the contract knowing the schedule was outdated by about eight months and that the actual length of the delay was eight to twelve months. Commercial Painting alleged that Weitz knew when it executed the contract that to make up for the delay, it would have to compress the construction schedule and hire extra workers to supplement the work of various subcontractors, including Commercial Painting's drywall work. Commercial Painting also asserted that after negotiating the six-month extension with the project owner, Weitz issued an amended construction schedule that was "fraudulent and unrealistic" in order to earn an early completion bonus.[6] According to Commercial Painting, Weitz continued to issue construction schedules that were unrealistic, and required the subcontractors to adhere to those schedules, never revealing the actual length of the extension until near the end of the project when it became clear that Weitz could not complete construction in time to earn the early completion bonus. Commercial Painting contended that Weitz improperly supplemented Commercial Painting's work by falsely claiming Commercial Painting was not completing its work according to a schedule that Weitz knew contained false

---

[4] Transferred to section 66-34-104 of the Tennessee Code by 2008 Public Acts, chapter 804, section 2, effective July 1, 2008.

[5] Tenn. Code Ann. §§ 66-34-101 to -704.

[6] The extension agreement negotiated by Weitz and the project owner included a bonus to Weitz of $8,597 for each day, up to forty-five days, that the project was completed early.

- 3 -

information about the project completion date and that Weitz fraudulently charged Commercial Painting for the cost of the supplemental drywall work. Weitz generally denied the allegations in the amended complaint and reiterated the allegations in its counterclaim that Commercial Painting was in breach of the subcontract and did not perform its contractual duties in a timely and workmanlike manner.

The trial court granted partial summary judgment in favor of Weitz on Commercial Painting's claims for intentional/negligent misrepresentation and fraud, rescission/reformation of the contract, and punitive damages. After a bench trial, the trial court awarded Commercial Painting $450,464.26 for breach of contract, finding that Commercial Painting was entitled to $600,464.26 less a $150,000 offset to Weitz for having to supplement Commercial Painting's work.

The Court of Appeals vacated the trial court's award of partial summary judgment to Weitz, concluding that Commercial Painting established a genuine issue of material fact regarding the intentional and negligent misrepresentation claims. *Com. Painting Co. v. Weitz Co., LLC*, No. W2013-01989-COA-R3-CV, 2016 WL 3519015, at *2 (Tenn. Ct. App. June 20, 2016).

After remand from the Court of Appeals, Commercial Painting filed a second amended complaint including additional alleged facts. The second amended complaint sought compensatory damages of $1,929,428.74, less a payment of $456,170 made by Weitz in June 2013, and increased the punitive damages claim to $200,000,000.

In September and October 2018, a jury heard the case. Commercial Painting presented evidence that Weitz misled it from the outset of the relationship by misrepresenting how far behind schedule the project was, bids submitted by other subcontractors, and the existence of the agreement for extension of time to complete the project. The jury also considered evidence that Weitz tried to compress the work schedule by improperly supplementing Commercial Painting's drywall work, and wrongfully refused to pay for extra work done by Commercial Painting's employees.

The jury awarded Commercial Painting $1,729,122.46 in compensatory damages on each of the claims—breach of contract, unjust enrichment, and intentional misrepresentation, as well as its claim under Weitz's payment bond.[7] The jury also awarded Commercial Painting $3,900,000 in punitive damages. The trial court reduced the

---

[7] The jury verdict form showed awards to Commercial Painting of $1,729,122.46 on its intentional misrepresentation claim; $1,729,122.46 on its breach of contract claim; and $1,729.122.46 on its unjust enrichment claim.

compensatory damages by $456,170, the amount of Weitz's earlier payment. The trial court also awarded Commercial Painting $2,083.362.16 in pre-judgment interest and $1,103,549.27 for litigation costs and attorney's fees. The total judgment was $8,359,863.83.[8]

Weitz appealed, and the Court of Appeals held that the economic loss doctrine applied outside the products liability context when the contract was negotiated between sophisticated commercial entities. The intermediate appellate court affirmed the trial court's judgment for compensatory damages for breach of contract; dismissed the tort claim for intentional misrepresentation and reversed the punitive damages award based on the economic loss doctrine; reversed the trial court's award of pre- and post-judgment interest after finding that interest was not an available remedy under the parties' contract; and vacated the trial court's award of attorney's fees in part after determining that Commercial Painting was entitled only to attorney's fees incurred in obtaining the compensatory damages award. *Com. Painting Co. v. Weitz Co., LLC*, No. W2019-02089-COA-R3-CV, 2022 WL 737468, at *1 (Tenn. Ct. App. Mar. 11, 2022). The Court of Appeals analyzed and attempted to apply the principles stated in *Milan Supply Chain Sols., Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), concluding that "the reasoning employed by" *Milan* "hews most closely to the reasoning of those jurisdictions that have extended the economic loss rule beyond its origination." *Com. Painting*, 2022 WL 737468, at *21.

We granted Commercial Painting's Rule 11 application for permission to appeal to consider two issues:

    1. Whether the Court of Appeals erred in applying this Court's holding in *Milan Supply Chain Solutions, Inc. v. Navistar, Inc.*, 627 S.W.3d 125 (Tenn. 2021), and expanding the application of the economic loss doctrine to the circumstances of this case.

    2. Whether the Court of Appeals erred in vacating the trial court's award of attorney's fees and in limiting the scope of recoverable fees on

---

[8] The judgment for compensatory damages and pre-judgment interest in the amount of $3,356,314.62 was entered against The Weitz Company, LLC, Federal Insurance Company, and St. Paul Fire & Marine Insurance Company, jointly and severally. Punitive damages were awarded solely against Weitz. There was no verdict against The Village at Germantown, Inc. The trial court dismissed Commercial Painting's claims against The Village at Germantown and The Weitz Company, Inc. with prejudice, and these entities are not parties to this appeal. The trial court also dismissed with prejudice Weitz's counterclaims against Commercial Painting and its surety. Commercial Painting withdrew its claim for rescission/reformation before trial.

remand, and whether the Court of Appeals erred in denying Commercial Painting Company an award of costs and fees on appeal.

## II.

The question of whether the economic loss doctrine applies in this case is a matter of law which we review de novo. *Milan,* 627 S.W.3d at 141 (citing *Lincoln Gen. Ins. Co. v. Detroit Diesel Corp.*, 293 S.W.3d 487, 488 (Tenn. 2009)).

### *Economic Loss Doctrine*

The economic loss doctrine is a judicially-created rule that "operates generally to preclude contracting parties from pursuing tort recovery for purely economic or commercial losses associated with the contract relationship." *Milan*, 627 S.W.3d at 142 (quoting *Plourde Sand & Gravel v. JGI E., Inc.*, 917 A.2d 1250, 1253 (N.H. 2007)). The purpose of the rule is to "preserve[] the important distinction between contract and tort law" and to "prevent the 'tortification' of contract law." Jeffrey L. Goodman, Daniel R. Peacock & Kevin J. Rutan, *A Guide to Understanding the Economic Loss Doctrine*, 67 Drake L. Rev. 1, 3–4 (2019).

In 2009, the economic loss doctrine was adopted when this Court answered the certified question of whether "Tennessee law recognize[s] an exception to the economic loss doctrine under which recovery in tort is possible for damage to the defective product itself when the defect renders the product unreasonably dangerous and causes the damage by means of a sudden, calamitous event." *Lincoln Gen.*, 293 S.W.3d at 488.

The Court in *Lincoln General* noted that the "economic loss doctrine is implicated in products liability cases when a defective product damages itself without causing personal injury or damage to other property." *Id.* at 489. *Lincoln General* for the first time examined "the proper application of the economic loss doctrine when only the defective product is damaged." *Id.* Relying on the United States Supreme Court's opinion in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858 (1986), the Court concluded that "the owner of a defective product that creates a risk of injury and was damaged during a fire, a crash, or other similar occurrence is in the same position as the owner of a defective product that malfunctions and simply does not work." *Lincoln Gen.*, 293 S.W.3d at 491. Thus, "the remedies available to these similarly situated product owners should derive from the parties' agreements, not from the law of torts." *Id.*

This Court most recently examined the economic loss doctrine in *Milan*, a products liability case where the manufacturer and seller of allegedly defective trucks asserted the

doctrine as a defense to a fraud claim brought by a commercial trucking company. *Milan*, 627 S.W.3d at 129, 140–41. The Court examined three different approaches of other states in applying the economic loss doctrine to fraud claims: (1) a strict approach in which "the economic loss doctrine bars all fraud claims," *id.* at 146; (2) a broad exception under which "fraudulent inducement claims seeking economic losses are excepted because the duty not to commit fraud exists independent of any contract," *id.* at 147; and (3) a narrow exception in which fraud claims are barred in certain situations involving contracts between sophisticated business entities. *Id.* at 148–51. We adopted the narrow exception to bar a purely economic loss claim in cases where "the alleged fraud concerns pre-contractual misrepresentations and nondisclosures about the quality, reliability, and character of *the goods that are the subject of a contract between sophisticated business entities*." *Id.* at 154 (emphasis added).

The *Milan* Court "expressly stop[ped] short of resolving the broad question of whether there may ever be a fraudulent inducement exception to the economic loss rule in Tennessee." *Id.* at 155 (internal quotation marks omitted). Importantly, *Milan* did not contemplate the application of the economic loss doctrine outside of the products liability context. In fact, this Court stated in *Milan* that the economic loss doctrine "has been aptly described as 'one of the most confusing doctrines in tort law,'" and "[t]he confusion is compounded because most states have not limited the doctrine to the products liability context, in which it originated." *Id.* at 144–45 (quoting R. Joseph Barton, Note, *Drowning in a Sea of Contract: Application of the Economic Loss Rule to Fraud and Negligent Misrepresentation Claims*, 41 Wm. & Mary L. Rev. 1789, 1789 (2000)).

Legal scholars generally agree that the inconsistent application of the economic loss doctrine and the wide array of exceptions applied by different states have resulted in a "confusing morass." Goodman et al., *supra*, at 56. This is in part because the results of the cases "vary depending on the fact pattern of the particular case and the variation of the doctrine utilized by the jurisdiction." *Id.* Consequently, "application of the doctrine now involves applying copious exceptions, numerous tests, and exhaustive mental gymnastics." *Id.* at 8. As one law professor put it, "[s]ome courts have suggested, in effect, that the 'economic loss rule' means there is no recovery in tort for pure economic loss, except when there is." Ward Farnsworth, *The Economic Loss Rule*, 50 Val. U. L. Rev. 545, 571 (2016).

The widespread confusion and lack of clarity resulting from the unwarranted expansion of the economic loss doctrine is far from the only concern raised by such a decision. As further discussed below, applying the economic loss doctrine in cases beyond product liability actions would threaten contracting parties for services, who are not covered by the significant protections afforded by the Uniform Commercial Code. This is particularly true for less sophisticated individuals who enter into more informal, often

unwritten, agreements for a variety of services. As numerous expert commentators have observed, the expansion of the doctrine also threatens to extinguish tort claims, long recognized as legitimate and viable, for people entering into such commonplace informal contracts for services.

*Application of Economic Loss Doctrine Beyond Products Liability Cases*

Here, we are not presented with claims of defective products or buildings. Instead, a provider of construction services on a project sued the general contractor, asserting various claims, including intentional misrepresentation. Although the cost of materials was a significant portion of the price to be paid to Commercial Painting under the contract, the description of the scope of Commercial Painting's work on the project clearly shows it is a contract for services.[9] The description of Commercial Painting's work makes it clear that, regardless of the price of materials, the contract was not for the sale of goods. The question thus presented is whether Tennessee should expand the application of the economic loss doctrine to contractual relationships outside the products liability context.

Courts in some jurisdictions have applied the economic loss doctrine to services contracts but have carved out numerous and varying exceptions. These exceptions include claims arising out of contracts with providers of professional services, such as attorneys, accountants, and doctors, among others. *See, e.g., Flagstaff Affordable Hous. Ltd. P'ship v. Design All., Inc.*, 223 P.3d 664, 673 (Ariz. 2010) (holding the economic loss doctrine applied to construction contracts, but noting an exception for attorneys and fiduciaries); *Town of Alma v. AZCO Constr., Inc.*, 10 P.3d 1256, 1263 (Colo. 2000) (expressly adopting the economic loss doctrine and applying it to a services contract, but recognizing exceptions for "special relationships" such as attorney-client, doctor-patient, or insurer-insured and situations where a duty *independent* of any contractual obligations exists, such as fraud or negligent misrepresentation); *Taylor v. Taylor*, 422 P.3d 1116, 1125 (Idaho 2018) (stating that economic loss doctrine applies in all negligence cases, including actions based on a services contract, unless there is a special relationship between the parties or "unique circumstances require a reallocation of the risk"); *Congregation of the Passion v. Touche Ross & Co.*, 636 N.E.2d 503, 514–15 (Ill. 1994) (holding that the economic loss doctrine does not apply to a contract that results in something intangible, such as the services of an accountant or an attorney, because "[w]hether the professional produces a legal brief or a financial statement, the value of the services rendered lies in the

---

[9] Section 1.1 of Exhibit D to the contract, under the heading "Subcontractor's Work," states as follows: "Subcontractor's Work includes all labor; supervision; materials; equipment; services; supplies; tools; facilities; transportation; storage; receiving; licenses; inspections; certifications; overhead; profit; insurance; and other items required or reasonably inferable from the Subcontract Documents to properly and timely perform and complete the Subcontractor's Work."

- 8 -

ideas behind the documents, not in the documents themselves," and noting the doctrine does not apply to a breach of duty that exists outside of the contract); *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 742 (Ind. 2010) (holding that the economic loss doctrine generally applied to a contract for design and inspection services on a construction project, but stating that the rule "is a *general* rule that admits of exceptions for contracts for services in appropriate circumstances" such as, possibly, legal malpractice, breach of fiduciary duty, breach of an insurer's duty to settle a claim, or negligent misstatement); *David v. Hett*, 270 P.3d 1102, 1114 (Kan. 2011) (holding economic loss doctrine does not bar claims for economic damages "against a service contractor in the residential construction context"); *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 87, 90 (Nev. 2009) (holding that the economic loss doctrine applies to contracts for architectural and engineering services, but noting exceptions to the doctrine for "certain categories of cases, such as negligent misrepresentation and professional negligence actions against attorneys, accountants, real estate professionals, and insurance brokers"); *Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 49 (S.C. 2009) (recognizing a "narrow exception to the economic loss rule to apply solely in the residential home context" because a home is usually the largest investment a person will make, it is different than any other manufactured good a person will buy, and the business transaction between a home builder and a home buyer "involves inherently unequal bargaining power"); *LAN/STV v. Martin K. Eby Constr. Co.,* 435 S.W.3d 234, 243–46 (Tex. 2014) (noting that professional malpractice claims are not barred by the economic loss doctrine, regardless of the existence of a contract, and stating that "the application of the rule depends on an analysis of its rationales in a particular situation").[10]

As these cases show, applying the economic loss doctrine outside the products liability context to services contracts necessitates finding and justifying "very numerous and confusing" exceptions. Farnsworth, *supra*, at 571. Consequently, "judges, lawyers, and legal scholars struggle to track the doctrine's meaning, application, and scope within their jurisdiction." Goodman et al., *supra*, at 1; *see also* Andrew Gray, Note, *Drowning in a Sea of Confusion: Applying the Economic Loss Doctrine to Component Parts, Service Contracts, and Fraud*, 84 Wash. U. L. Rev. 1513, 1513 (2006) (noting the "vast confusion over this area of the law" resulting in part from "the doctrine's wide-ranging impact");

---

[10] Many of these cases are cited and relied upon by Weitz in support of its various arguments in favor of affirming the Court of Appeals' decision. Weitz has also cited other cases, including *New London Tobacco Market, Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393 (6th Cir. 2022); *Hamon Contractors, Inc. v. Carter & Burgess, Inc.*, 229 P.3d 282 (Colo. Ct. App. 2009); *United Textile Workers of America, AFL-CIO, CLC v. Lear Siegler Seating Corp.*, 825 S.W.2d 83 (Tenn. Ct. App. 1992); *Mechanical, Inc. v. Venture Electrical Contractors, Inc.*, 944 N.W.2d 1 (Wis. Ct. App. 2020). We have considered these and other cases cited by Weitz and the amici and find them inapplicable, distinguishable, or unpersuasive.

- 9 -

*Milan*, 627 S.W.3d at 144–45 (discussing concerns of confusion and lack of clarity caused by doctrine's expansion).

The federal district court decisions attempting to apply Tennessee law to this issue are not in complete agreement. Weitz cites *Ladd Landing, LLC v. Tennessee Valley Authority*, 874 F. Supp. 2d 727, 729 (E.D. Tenn. 2012) for its rejection of the plaintiffs' argument "that the economic loss rule is inapplicable to their claims because under Tennessee law, that rule is limited to claims for products liability or claims involving the sale of goods." However, at least eight federal district court opinions have reached the contrary conclusion, holding, based in part on rulings of this Court and the Tennessee Court of Appeals, that the economic loss doctrine does not extend to services contracts. *See SPO Go Holdings, Inc. v. W & O Constr. Co.*, 187 F. Supp. 3d 887, 892–93 (M.D. Tenn. 2016) (noting that "many federal courts have concluded that the doctrine should not be extended beyond cases involving the sale of goods," and following cases "predicting Tennessee law [that] have held that the economic loss doctrine does not extend to contracts for the provision of services"); *Lick Branch Unit, LLC v. Reed*, No. 3:13-cv-203, 2014 WL 546696, at *16 (E.D. Tenn. Feb. 10, 2014) (same; stating that economic loss doctrine "typically applies in the products liability context"); *Tan v. Wilbur Smith Assoc., Inc.*, No. 2:09-cv-25, 2011 WL 3421320, at *7 (E.D. Tenn. Aug. 4, 2011) (footnote omitted) ("[a]fter reviewing the *Ham* case and its companion cases and noting the lack of extensive Tennessee case law on this issue, the Court agrees that the economic loss rule is applicable to the sale of goods, but does not extend equally to contracts for the provision of services"); *Ham v. Swift Transp. Co.*, 694 F. Supp. 2d 915, 922–23 (W.D. Tenn. 2010); *Lott v. Swift Transp. Co.*, 694 F. Supp. 2d 923, 930–31 (W.D. Tenn. 2010); *Pascarella v. Swift Transp. Co.*, 694 F. Supp. 2d 933, 945–46 (W.D. Tenn. 2010); *Broadnax v. Swift Transp. Co.*, 694 F. Supp. 2d 947, 953–54 (W.D. Tenn. 2010); *Corso Enters., Inc. v. Shop at Home Network, Inc.*, No. 3:04-0260, 2005 WL 2346986, at *7 (M.D. Tenn. Sept. 26, 2005) (holding an agreement was for services, "not a contract for the sale of goods governed by the UCC" and thus the economic loss doctrine did not bar the plaintiffs' tort-based claims).

In the *Ham, Lott, Pascarella,* and *Broadnax* related quartet of cases, the court carefully analyzed then-existing Tennessee caselaw on the issue of the potential application of the economic loss doctrine outside of cases involving the sale of goods and stated:

> Application of the economic loss doctrine to cases involving defective products is not surprising . . . because the Uniform Commercial Code ("UCC") sets forth the full series of rights and remedies available to an aggrieved purchaser who suffers only economic losses. . . . If the existence of UCC remedies provides the justification for not allowing the plaintiff to sue in tort, the absence of UCC remedies should counsel in favor of allowing

- 10 -

tort recovery. Thus, the Court believes that, like the Wisconsin Supreme Court, the Tennessee Supreme Court would rely on the fact that the economic loss doctrine has its origins in the UCC to preclude application of the doctrine to suits not involving UCC remedies, specifically those concerning the provision of services.

*E.g., Ham*, 694 F. Supp. 2d at 922–23 (citing *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 688 N.W.2d 462, 467–68 (Wis. 2004)).

The Supreme Courts of Wisconsin, Florida, and Minnesota, and the Michigan Court of Appeals, have all held that the economic loss doctrine does not apply to services contracts.

In *Insurance Co. of North America v. Cease Electric Inc.*, 688 N.W.2d 462 (Wis. 2004), the Wisconsin Supreme Court held that the economic loss doctrine did not bar a tort claim brought by a barn owner arising out of losses incurred due to the failure of a ventilation system in the barn. *Id.* at 464. After determining that the contract for installation of the ventilation system was for services and not for a product, the court examined the applicability of the economic loss doctrine. *Id.* at 466–67. The *Cease* court rejected the defendant's argument that "contract law is better suited than tort law for dealing with purely economic loss in the context of service agreements" because "the built-in warranty provisions that the U.C.C. may provide in a contract for the sale of products or goods would not apply to a contract for services." *Id.* at 469. The court reasoned that, under the UCC, when a product does not operate as it should, the purchaser has the option of filing a claim for breach of warranty or revoking acceptance and suing for breach of contract. *Id.* at 468. The manufacturer is also protected by its ability to disclaim warranties or limit remedies in its contract with the purchaser. *Id.* But the UCC does not apply to services contracts, and therefore the *Cease* court determined that the economic loss doctrine did not apply. *Id.* at 469.

The Minnesota Supreme Court employed similar reasoning in *McCarthy Well Co. v. St. Peter Creamery, Inc.*, 410 N.W.2d 312 (Minn. 1987). There, the court held that because the UCC does not apply to a services contract, the economic loss doctrine did not bar the plaintiff from recovering purely economic losses under a negligence theory. *Id.* at 315.

The Michigan Court of Appeals in 2002 noted that Michigan courts had only applied the economic loss doctrine in cases involving a transaction for goods and had "declined to apply the economic loss doctrine where the claim emanates from a contract for services." *Quest Diagnostics, Inc. v. MCI WorldCom, Inc.*, 656 N.W.2d 858, 862–63 (Mich. Ct. App.

2002). *See also White Acres, LLC v. Shur-Green Farms, LLC*, No. 354175, 2022 WL 4283105, at *4 (Mich. Ct. App. Sept. 15, 2022), *perm. app. denied*, 984 N.W.2d 196 (Mich. Jan. 31, 2023) (quoting *Quest Diagnostics*, 656 N.W.2d at 863) (reiterating that "the economic loss doctrine does not apply when 'the claim emanates from a contract for services'" but applying the doctrine because the contract involved the sale of goods rather than services).

The evolution of the Florida Supreme Court's jurisprudence on this issue is particularly instructive. That court eventually recognized that its "unprincipled expansion" of the economic loss doctrine outside the realm of products liability had resulted in confusion. *Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 110 So.3d 399, 407 (Fla. 2013). The court ruled that in Florida, the application of the economic loss doctrine should return to the rule's origin and original purpose and be limited to products liability cases. *Id.*

Nine years earlier, the Florida Supreme Court "recognized the danger in an 'unprincipled extension of the [economic loss] rule'" in *Indemnity Insurance Co. of North America v. American Aviation, Inc.*, 891 So.2d 532, 542 (Fla. 2004) (citing *Moransais v. Heathman*, 744 So.2d 973, 981 (Fla. 1999)). The court in *American Aviation* "expressly limited" the economic loss rule to "cases involving either privity of contract or products liability." *Id.* at 542–43. The court stated that the "other exceptions" to the rule—professional malpractice, fraudulent inducement, negligent misrepresentation, and freestanding statutory causes of action—would still apply. *Id.* at 543. The court also noted that "[i]ntentional tort claims such as fraud, conversion, intentional interference, civil theft, abuse of process, and other torts requiring proof of intent" remained viable claims even in the context of products liability or privity of contract. *Id.* at 543, n.3. The express limitation on the economic loss rule in *American Aviation* was necessary because, as the concurring justice stated, "[t]he economic loss rule ha[d] become a confusing morass." *Id.* at 544 (Cantero, J., concurring). Concurring Justice Cantero summarized the holding as follows: "[T]he economic loss rule does not apply in the services context unless a contract exists and none of the established exceptions to the rule apply." *Id.*

In *Tiara Condominium Association*, the Florida Supreme Court again lamented the "unprincipled expansion" of the economic loss doctrine beyond products liability, "recede[d] from [its] prior rulings to the extent that they have applied the economic loss rule to cases other than products liability," and "return[ed] the economic loss rule to its origin in products liability." *Tiara Condo. Ass'n*, 110 So.3d at 407. The court concluded: "Our experience with the economic loss rule over time, which led to the creation of the exceptions to the rule, now demonstrates that expansion of the rule beyond its origins was unwise and unworkable in practice." *Id.*

- 12 -

Professor Farnsworth summed up the problem recognized and addressed by the Florida high court as follows:

> Stating a broad rule against recovery for pure economic loss in tort has an additional worrisome consequence beyond the confusion it has caused. It creates a presumption against liability in cases that don't fit into one of the well-defined exceptions. This can cause legitimate claims to be snuffed out inadvertently by the sweep of the rule in the background. Trouble predictably results when a rule is recited and extended without attention to its rationale; sure enough, some states have found themselves in difficult and embarrassing positions when they stated aggressive versions of the economic loss rule and then discovered that the "rule" they had stated had implications they did not intend or came to regret.

Farnsworth, *supra*, at 550 (citing *Tiara Condo. Ass'n,* 110 So.3d at 404).

We conclude that it would be unwise for this Court to travel down the same path the Florida Supreme Court ultimately found to be an untenable "confusing morass." *See American Aviation,* 891 So.2d at 544 (Cantero, J., concurring). As expressly stated in *Milan*, the widely recognized confusion about the economic loss doctrine has been compounded "because most states have not limited the doctrine to the products liability context, in which it originated." *Milan*, 627 S.W.3d at 145. In sum, there is no compelling reason to extend the economic loss doctrine to services contracts.

Weitz argues that the Court of Appeals' application of *Milan* to the facts in this case does not constitute a modification of or deviation from *Milan*. But it does. *Milan* was a products liability case. We indicated no interest in expanding the economic loss doctrine beyond the products liability context. The application of the doctrine to a contract for construction services is a modification by expansion of *Milan*. The amici curiae contend that reversing the Court of Appeals' decision "will materially change Tennessee law." But just the opposite is true. Our decision today does not change the current state of Tennessee law regarding the application of the economic loss rule. Weitz and the amici are seeking a material change in Tennessee law by extending the economic loss doctrine to services contracts.

Weitz asserts that this Court has never held the economic loss doctrine is limited to products liability cases, pointing out that *Milan* adopted the reasoning of *Healthbanc Int'l, LLC v. Synergy Worldwide, Inc.*, 435 P.3d 193 (Utah 2018), which was not a products liability action. *See Milan*, 627 S.W.3d at 153 (citing *Healthbanc*, 435 P.3d at 194). However, in *Milan*, we followed the reasoning of *Healthbanc* in addressing fraud claims

in products liability cases. We concluded that in cases "involving a contract between sophisticated commercial business entities and a fraudulent inducement claim seeking recovery of economic losses only, the economic loss doctrine applies if 'the only misrepresentation[s] by the dishonest party concern[ ] the quality or character of the *goods sold*'" because "[u]nder such circumstances, 'the other party is still free to negotiate warranty and other terms to account for possible defects *in the goods*.'" *Id.* at 153–54 (emphasis added).

In *Milan*, this Court expressed no interest in expanding the doctrine to services contracts and noted that such an expansion in other states had caused confusion about the doctrine. *Id.* at 145. On this point, *Milan* is clear and unambiguous: "[T]his Court has never applied the economic loss doctrine outside the products liability context, in which it originated." *Id.* at 153. The sole issue decided in *Milan* was whether to adopt a fraud exception to the economic loss doctrine in a case involving a contract between two sophisticated business entities for the sale of goods. *Id.* at 153–54.

Weitz and the amici express the concern that allowing a contracting party to recover tort damages would "frustrate[ ] the ability of contracting parties to reliably allocate risks and costs during their bargaining and to then build cost considerations into their contracts." This Court explained in *Milan* that courts adopting a broad fraud exception to the economic loss doctrine have stated that "the parties to a contract 'create a mini-universe for themselves, in which each voluntarily chooses his contracting partner, each trusts the other's willingness to keep his word and honor his commitments, and in which they define their respective obligations, rewards and risks.'" *Milan*, 627 S.W.3d at 147 (quoting *Robinson Helicopter Co. v. Dana Corp.*, 102 P.3d 268, 275 (Cal. 1994)). In this scenario, it is the function of contract law "to enforce only such obligations as each party voluntarily assumed, and to give [each party] only such benefits as [that party] expected to receive." *Id.* (quoting *Robinson Helicopter*, 102 P.3d at 275) (alterations in original). But "this universe of expectations does not merit protecting if one party commits fraud to induce the contract because '[a] party to a contract cannot rationally calculate the possibility that the other party will deliberately misrepresent terms critical to the contract.'" *Id.* (quoting *Robinson Helicopter*, 102 P.3d at 275).

One party need not have to consider another party's fraud among the potential risks and costs when negotiating a contract in good faith. Parties to a contract—even sophisticated commercial parties—"cannot, and should not, be expected to anticipate fraud and dishonesty in every transaction." *Id.* (quoting *Robinson Helicopter*, 102 P.3d at 277). To hold otherwise would increase the risk of fostering a legal system tending to place the risk of fraudulent behavior on the defrauded party rather than the perpetrator. Contracting

parties in Tennessee, including those in the construction industry, should not have to factor into their decision to enter a contract the potential for fraud or another party's dishonesty.

Weitz and the amici also urge us to recognize that the economic loss doctrine draws "the line between warranty and contract on the one hand and the torts of strict liability, negligence, fraud, and misrepresentation on the other hand." In support, Weitz cites *Trinity Industries, Inc. v. McKinnon Bridge Co. Inc.*, 77 S.W.3d 159, 171–72 (Tenn. Ct. App. 2001), *abrogated on other grounds by Bowen ex rel. Doe v. Arnold*, 502 S.W.3d 102 (Tenn. 2016). But *Trinity Industries* was a case involving the sale of goods, and the economic loss doctrine applied because a claim based on a contract for the sale of goods is governed by the UCC. *Trinity Indus.*, 77 S.W.3d at 171–73. The amici make the same argument, relying on *Messer Griesheim Industries, Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457 (Tenn. Ct. App. 2003). Like *Trinity Industries*, however, *Messer Griesheim* involved the sale of goods. The economic loss doctrine was inapplicable because the product caused damage to other property. *Messer Griesheim*, 131 S.W.3d at 466.

Moreover, as observed by Professor Johnson,

> The boundary-line function of the economic loss rule is most clearly established in the field of products liability. . . .
>
> The economic loss rule operates sensibly in the products liability field because the commercial nature of the underlying transaction means that a contract-law remedy is not only feasible, but routinely available. The sale that produces the distribution of the defective product allows the parties to determine how economic risks relating to the quality of the product should be allocated and supplies default rules relating to warranties that resolve disputes if the parties do not specify particular terms of recovery. In addition, the ubiquitous adoption of the Uniform Commercial Code (UCC) means that there is a carefully crafted statutory mechanism available for resolving economic loss claims.

Vincent R. Johnson, *The Boundary-Line Function of the Economic Loss Rule*, 66 Wash. & Lee L. Rev. 523, 549, 551 (2009).

The expansion of the economic loss doctrine has raised concerns that "it is traditional tort claims that are struggling to keep their heads above water." Daniel Rapaport, Kurt Olafsen, Sigmund D. Schutz & Jonathan Mermin, *Tort Killer: The Applicability of the Economic Loss Doctrine to Service Contracts*, 20 Me. B.J. 100, 103 (2005). "The extension of the economic loss doctrine to services threatens to engulf longstanding

common law torts for the inadequate or incompetent performance of professional services." *Id.* In *Milan*, we noted this concern by quoting Chief Justice Abrahamson's observation that, like the alien in the classic horror film *The Blob*, "[a]t the current pace, the economic loss doctrine may consume much of tort law if left unchecked." *Milan*, 627 S.W.3d at 145 (quoting *Grams v. Milk Prods., Inc.*, 283 Wis.2d 511, 699 N.W.2d 167, 181 (2005) (Abrahamson, C.J., dissenting)).

Weitz also cites other cases in which courts in Tennessee have held that a tort claim cannot be based on a breach of contract. However, Commercial Painting's claim of intentional misrepresentation was not predicated merely on a breach of the contract; it was predicated on the fact, as found by the jury, that Weitz deliberately made false representations about the timing and amount of work involved in the subcontract "in order to mislead Commercial Painting to obtain an undue advantage over it."[11] And, as stated above, Commercial Painting could not be expected to factor into its decision to enter the contract the possibility that Weitz was making false misrepresentations. *See Milan*, 627 S.W.3d at 147 (quoting *Robinson Helicopter*, 102 P.3d at 275–76).[12]

In sum, the economic loss doctrine should only apply in products liability cases. We decline to extend the doctrine to services contracts. Thus, the economic loss doctrine does not bar Commercial Painting's recovery of compensatory and punitive damages based on its tort claim of intentional misrepresentation against Weitz. The Court of Appeals reversed the punitive damages award based largely on its holding that the economic loss doctrine precluded Commercial Painting's tort claims and pretermitted all remaining issues related to the punitive damages award. *Com. Painting*, 2022 WL 737468, at *28. We granted review on the narrow issue of the applicability of the economic loss doctrine. Thus, we remand to the Court of Appeals to review any pretermitted issues regarding the jury's award of punitive damages consistent with this opinion.

---

[11] The amici assert there is no proof in the record of justifiable reliance on a misrepresentation or damages resulting proximately from such a misrepresentation. We disagree. There is proof in the record from which the jury found both.

[12] Weitz contends that the implied duty of good faith and fair dealing that Tennessee law imposes on parties to a contract provides sufficient protection to justify applying the economic loss doctrine to services contracts, citing *Dick Broadcasting Co. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653 (Tenn. Ct. App. 2013) and *APAC-Atlantic, Inc., Harrison Constr. Div. v. State*, No. E2012-01536-COA-R3-CV, 2013 WL 5883697, at *1 (Tenn. Ct. App. Oct. 31, 2013). Neither of those cases, however, involved tort claims or the economic loss doctrine. They are inapplicable.

*Existing Safeguards against Disproportionate Liability*

We recognize the concerns of potential disproportionate or indeterminate liability for defendants who cause purely economic harm, which in part gave rise to the doctrine in the first place. But the common law of damages, contracts, and torts has developed to adequately equip courts to guard against and reject claims that involve overly speculative, excessive, or unforeseeable losses. As one legal scholar notes,

> general principles of damages and proximate causation already recognize these concepts, and rules are in place to guard against liability for speculative, excessive, or unforeseeable losses or losses outside the scope of risks that made the defendant's conduct negligent. Because that is true, these considerations offer dubious justification for erecting a general economic loss rule. Moreover, while there is a risk that liability for negligent conduct might have a chilling effect on non-negligent conduct, "because the line between negligent and non-negligent conduct is not a clear one," there is no reason to think that that problem is any greater in cases involving purely economic losses than in the great mass of cases in which liability for negligence (including economic loss damages) is routinely imposed.

Johnson, *supra*, at 543–44. It is reasonable to trust that Tennessee courts can apply well-established limiting concepts, such as foreseeability and proximate causation, to provide safeguards against disproportionate liability. As the Court of Appeals earlier observed in this case,

> Commercial Painting is entitled to just one recovery to the extent damages from more than one cause of action overlap, but it should not be precluded from proceeding on multiple theories of liability if it is able to make out a prima facie case under more than one cause of action. . . . "Whether the theory of recovery is breach of contract, intentional misrepresentation, or promissory fraud, if the damages claimed under each theory overlap, the Plaintiff is only entitled to one recovery." Commercial Painting is not required to choose between various causes of action just because the damages available may overlap. *See Concrete Spaces, Inc. v. Sender*, 2 S.W.3d 901, 909 (Tenn. 1999) ("If a defendant has been found liable under more than one theory of recovery, no inequity results from allowing the plaintiff to choose one of the claims upon which to realize its maximum recovery of enhanced damages.").

*Com. Painting*, 2016 WL 3519015, at *12 (quoting *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 238 (Tenn. Ct. App. 1998)). The law thus already precludes double or excessive recovery for the same damages, which ultimately must be adequately proven to the satisfaction of the trier of fact under whichever theory of liability has been validly presented.

The dissent discusses the possibility that the independent duty doctrine might be used to counter some of the deleterious effects of expanding the economic loss rule. But this Court has not adopted the independent duty doctrine, so any future role of the doctrine in Tennessee remains theoretical.

In short, there are adequate existing safeguards to protect against disproportionate liability, and the extension of the economic loss doctrine beyond products liability cases is not needed.

## CONCLUSION

We hold the economic loss doctrine only applies in products liability cases and should not be extended to other claims. Thus, the economic loss doctrine does not bar Commercial Painting's recovery of compensatory and punitive damages based on its tort claim of intentional misrepresentation against Weitz. We reverse the Court of Appeals' ruling as to the applicability of the economic loss doctrine. We remand to the Court of Appeals to review any pretermitted issues regarding the jury's award of punitive damages consistent with this opinion. Because this ruling makes Commercial Painting the only prevailing party, the second issue raised in this appeal about attorney's fees is pretermitted. We reverse the judgment of the Court of Appeals, affirm the judgment in part of the trial court, and remand to the Court of Appeals for review of any pretermitted punitive damage issues consistent with this opinion. The costs of this appeal are taxed to The Weitz Company, LLC, Federal Insurance Company, and St. Paul Fire & Marine Insurance Company, for which execution shall issue if necessary.

_____
SHARON G. LEE, JUSTICE