```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TENNESSEE
 2                   AT KNOXVILLE, TENNESSEE
   _____
 3                                  )
   SNMP RESEARCH, INC. and SNMP     )
 4 RESEARCH INTERNATIONAL, INC.,    )
                                    )
 5              Plaintiffs,         )
                                    )
 6 vs.                              ) Case No. 3:20-cv-451
                                    )
 7 EXTREME NETWORKS,                )
                                    )
 8              Defendant.          )
   _____)
 9
           ELECTRONICALLY-RECORDED DISCOVERY CONFERENCE
10           BEFORE THE HONORABLE DEBRA C. POPLIN

11                 Wednesday, November 1, 2023
                    1:30 p.m. to 4:05 p.m.
12
   APPEARANCES:
13
              ON BEHALF OF THE PLAINTIFFS:
14
              OLIVIA WEBER, ESQ.
15            IRELL & MANELLA, LLP
              1800 Avenue of the Stars
16            Suite 900
              Los Angeles, CA 90067
17
              JOHN L. WOOD, ESQ.
18            EGERTON, MC AFEE, ARMISTEAD & DAVIS, PC
              P.O. Box 2047
19            Knoxville, TN 37901-2047

20

21

22
   TRANSCRIBED BY:
23
   Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
   Knoxville, Tennessee 37901
25 (865) 244-0454
```

1    <u>**APPEARANCES**</u>: (Continued)

2            <u>ON BEHALF OF THE DEFENDANTS:</u>

3            JOHN NEUKOM, ESQ.
             SAURABH PRABHAKAR, ESQ.
4            DEBEVOISE & PLIMPTON, LLP
             650 California Street
5            San Francisco, CA 94108
                      and
6            CHARLES B. LEE, ESQ.
             MILLER & MARTIN, PLLC (Chattanooga)
7            832 Georgia Avenue
             1200 Volunteer Building
8            Chattanooga, TN 37402
             Defendant:  Extreme Networks, Inc.;
9
             ALISON PLESSMAN, ESQ.
10           HUESTON HENNIGAN, LLP
             523 West 6th Street, Suite 400
11           Los Angeles, CA 90014
             Terminated Defendants:  Broadcom, Inc.,
12           and Brocade Communications Systems, LLC

13                     * * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1              THE COURTROOM DEPUTY:  All rise.

2              This court is again in session with the

3    Honorable Debra C. Poplin, United States Magistrate

4    Judge, presiding.

5              Please come to order and be seated.

6              We are here for a discovery conference in Case

7    3:20-cv-451, SNMP Research, Incorporated versus Extreme

8    Networks, Incorporated.

9              Here on behalf of the plaintiffs are John Wood

10   and Olivia Weber.

11             Is the plaintiff ready to proceed?

12             MR. WOOD:  Yes.

13             THE COURTROOM DEPUTY:  And here on behalf of

14   the defendants are John Neukom, Saurabh Prabhakar,

15   Charles Lee, and Alison Plessman.

16             Are the defendants ready to proceed?

17             MR. NEUKOM:  We are, except Ms. Plessman is not

18   counsel for Extreme; she is counsel for Brocade --

19             THE COURT:  Okay.  Yes.

20             MR. NEUKOM:  -- a non-party.

21             THE COURT:  Yes.  I remember Ms. Plessman.

22   Thank you.

23             All right.  Good afternoon to you all.

24             So, I have reviewed your position statements.

25   The first one I believe you all are calling the document

1   production, and, Mr. Wood, you're going to take the

2   argument on that on behalf of plaintiffs; correct?

3        MR. WOOD:  Yes, Your Honor.

4        THE COURT:  Okay.  And then responding to that

5   issue -- can you pronounce your last name for me,

6   please.

7        MR. PRABHAKAR:  Your Honor, Saurabh Prabhakar.

8        THE COURT:  Prabhakar.  Thank you very much.

9   So, I see that you're going to take the lead for that

10  argument as well.

11       MR. PRABHAKAR:  Yes, Your Honor.  You're

12  referring to the discovery issues?

13       THE COURT:  Yes.

14       MR. PRABHAKAR:  Sorry.  I couldn't hear the

15  first of what you said.

16       THE COURT:  So, that's what we will take up

17  first.  And, Mr. Wood, even though this is your request,

18  I do want to ask that we start out by having Extreme

19  give the Court a purely factual timeline of what

20  happened, starting with when you received the request,

21  and I want you to follow that timeline all the way

22  through to the claw-back request.  So, can you do that

23  for me, and, again, just keep it a factual timeline.

24       MR. PRABHAKAR:  Your Honor, may I ask for a

25  quick qualification?

```
 1                THE COURT:  Yes.

 2                MR. PRABHAKAR:  The claw-back issue is tied

 3    with the common-interest issue, but did you want --

 4                THE COURT:  It's tied a little bit --

 5                MR. PRABHAKAR:  Yes.

 6                THE COURT:  -- but I would just like a full

 7    factual timeline.  Sorry.  We're getting a little

 8    feedback.  So, I don't know if Mr. Neukom needs to

 9    address --

10                MR. PRABHAKAR:  I'm happy to --

11                THE COURT:  -- some of that.

12                MR. PRABHAKAR:  -- cover that, Your Honor.

13                THE COURT:  Okay.

14                MR. PRABHAKAR:  And I may ask Mr. Neukom for

15    his help if I need it.

16                MR. NEUKOM:  Good afternoon, Your Honor.

17                THE COURT:  Good afternoon.

18                MR. NEUKOM:  It's nice to be back in your

19    courtroom after 20 months.

20                THE COURT:  Are you enjoying the fall leaves?

21                MR. NEUKOM:  Exactly.  I am planning to cover

22    the privilege issue, but I think for the timeline of the

23    claw back and the discovery, the Court will find

24    Mr. Prabhakar far more useful than me.

25                THE COURT:  Okay.
```

1          MR. NEUKOM:  So, I'm happy to yield the podium

2     to him on that.

3          MR. PRABHAKAR:  Thank you, Mr. Neukom.

4          Your Honor, so, I can start with the --

5          (A discussion was had off the record amongst

6           the Courtroom Deputy and the Court.)

7          THE COURT:  Yes.  We're recording, and, so,

8     it's a little bit -- you can stay there, but I can hear

9     a little bit better if you come to the podium.

10         MR. PRABHAKAR:  Yes.  Of course, Your Honor.

11         So, Your Honor, the discovery issues that are

12    before you and the documents that were clawed back all

13    relate to document requests from plaintiffs which were

14    responded to by Extreme sometime -- I think on the 23rd

15    of March of this year.  And in response to that and as

16    you may remember previously, several new products from

17    Extreme dating back to 2001 were added to the case, and,

18    therefore, the productions related to the prior

19    doc- -- products that were in the case was already

20    covered.

21         So, in March 23rd, 2023, we produced over 30-,

22    40,000 documents related to the EXOS line of products

23    and the EOS line of products.  Some of those requests

24    that we responded to related to the marketing documents

25    that are at issue.  There were also the install images

which were covered in a previous discovery issue that
was before the Court.  I joined this case sometime in
June, and I add that because I may be missing some
context and I may have to go back to Mr. Neukom to
confirm that.

So, in June, we started meeting and conferring
on several of these issues.  Then, as part of another
production, we produced recently -- I'm sorry.  I just
need some water.

THE COURT:  Oh, it's fine.  Actually, I'm going
to ask if we can maybe get the temperature turned down
in here, if you don't mind.

MR. PRABHAKAR:  Okay.  Sorry about that, Your
Honor.

So, in March 2023, Extreme made a large
production of documents that related to the EXOS line of
products that were added to the case earlier this year.

Starting June, the parties meeting -- started
meeting and conferring on various issues related to the
documents that were produced then.  The marketing
documents were part of that dispute.  The install images
were indirectly now in dispute because the previous time
this issue was raised with the Court, only the SLX and
MediaX line of products were at issue.

The other side identified several deficiencies,

1    many of which were, in fact, not deficiencies.  Many of

2    these deficiencies were not identified with sufficient

3    particularity so that we could properly investigate what

4    is actually missing.

5              On the install images, we worked with the

6    defendants -- or, sorry -- the plaintiffs to impress

7    upon them that we have produced over a thousand copies

8    of source code for various Extreme products and,

9    therefore, the install images are irrelevant.

10             We kept meeting and conferring, and every time

11   we met and conferred, new issues came up in the case.

12   And I mention that because it's kind of a running

13   hopper.  We go back, ask Extreme for certain updates.

14   Defendant -- or plaintiffs come back, ask for more

15   information.  We go back to the -- to our client, and,

16   therefore, things kind of get wrapped up because there

17   are a lot of feral threads.

18             In the middle of all of this there was an old

19   thread from March of this year that related to privilege

20   logs and, more specifically, we had responded to the

21   privilege log issue in May of 2023, explaining why

22   certain privilege issues weren't raised or why certain

23   privilege entries were made.

24             We didn't hear from this -- on this issue from

25   plaintiffs until July, and that's the first privilege

1    issue that came up, which is the common-interest
2    privilege issue between -- communications between
3    Extreme, Brocade and Broadcom.
4         While all this was going on, we kept addressing
5    plaintiffs' deficiencies on various different topics.
6    While all of this was going on, the deficiencies in
7    marketing documents came up.  The first time the
8    deficiencies in the marketing documents were raised,
9    there were no specific requests that were identified to
10   which our responses were deficient.  The issue came up
11   sometime in July.  We kept talking about various other
12   issues, and then the Brocade/Broadcom/Extreme
13   common-interest issue came to a head.
14        When briefing was being done on this issue,
15   first time in plaintiffs' opening brief, they
16   reflected -- they identified certain documents that they
17   claim that we had produced which were not privileged,
18   and that's what led us to investigate that these
19   documents should not have been produced in the first
20   instance because they seemed privileged.  We went back
21   after we saw that brief, we investigated, and we did a
22   first claw-back notice.  That was done sometime in
23   August.
24        Then as part of that claw back, we had also
25   recently produced a consolidated privilege log which

rolled up all our previous privilege logs, and we had
produced that on August 18th or 19th.

In the preparation of that privilege log, since
the common-interest issue and inadvertent production of
privilege documents was at issue, we went back and did a
comprehensive search; are there other potential
privileged documents that would have been produced
inadvertently.

And the -- as I mentioned, Your Honor, that
the -- that the main production was substantial in size,
we found that there were certain communications related
to another acquisition that Extreme had made, Avaya
Communications data center networking business.  There
were essentially four e-mails, but because they were not
threaded to be one conversation, there were about 100
copies of those e-mails that were inadvertently
produced.  But essentially there are just four unique
e-mails in response to which various communications
happened.  But the genesis of the privilege claim was
basically four e-mails, and those four e-mails
essentially relate to two unique topics, and that's the
second claw back which numerically we admit seems pretty
large.  It's about 100 e-mails, but it relates to four
different communications.

During this time we were also investigating the

1    issue of marketing documents that plaintiffs had raised,

2    and during the meet and confer process, for the first

3    time, plaintiffs identified which specific marketing

4    requests were at issue.  And part of the confusion was

5    that for Extreme, which is a technology company,

6    marketing means different things.  Some of it is

7    internal technical marketing and some of it is the more

8    business-style marketing where we advocate for our

9    products or sell them out in the market.

10            So there was some confusion about what

11   marketing documents are being talked about because we

12   had already produced marketing documents, e-mails from

13   custodians who were related to marketing.  But we

14   understood what -- once we better understood what

15   plaintiffs were asking, we went back to Extreme, looked

16   at what was collected previously, and one of the

17   specific issues that plaintiffs had raised was that are

18   there shared repositories of documents that Extreme

19   maintains in the ordinary course of business.

20            And Extreme, Your Honor, is a company that has

21   come together, an amalgamation of different companies

22   over the years.  So, things are not -- it's not a

23   monolithic company like Apple which has existed as a

24   single company for 30, 40 years.  We've made multiple

25   acquisitions, some of which are Brocade or Avaya which

1    are in front of you.

2              So, the documents have been reorganized as

3    acquisitions have happened or as different people have

4    joined or the company structure has changed.

5              We went back.  We looked.  We identified a

6    shared repository.  And this is what was happening

7    around the time that briefing was going on.  So, one of

8    the persons who was actually responsible for that

9    repository, who had reorganized the documents, was on

10   leave.  She came back.  We quickly talked to her.  She

11   identified the repositories.  We went there, checked,

12   found the documents that were going to be responsive to

13   plaintiffs' request, and I think within a matter of

14   fortnight, we produced over 5,000 different marketing

15   documents that were previously not produced.  And this

16   is within a month of plaintiffs raising this issue.  We

17   made a full production of 5,000 documents on the

18   marketing side.

19             We also during this time produced the install

20   images that plaintiffs were asking for.  We noted in our

21   brief that these are not helpful for plaintiffs.  In

22   fact, Your Honor's previous order, Docket 131, had noted

23   that the production of source code would moot a lot of

24   these issues, and it was our belief that the install

25   images issue was moot because of that.

1          And I'll try not to get into argument, but I
2    just wanted to note that we produced over 400 different
3    install images from different Extreme products.  Some of
4    those products date as far back as 2007 or 2006.  So,
5    over 16 years of install images that we could find in
6    our archive, we produced that.

7          There was also an issue raised about a request
8    for network monitoring solutions.  It was our belief and
9    we responded that in our discovery responses that,
10   number one, the monitoring solutions, which plaintiffs
11   admit are not an accused product in the case, are
12   irrelevant, so, we should not be required to produce
13   them.  We also said that there are free monitoring
14   solutions that plaintiffs can download from the internet
15   and use it for their purpose.

16         Plaintiffs did not agree.  They insisted that
17   we provide one.  We did not want to come here, Your
18   Honor, today and take up your time arguing about whether
19   a certain solution works, not works.  So, we agreed to
20   produce one monitoring solution.  And we offered the
21   plaintiffs that; why don't we enter a stipulation which
22   reduces our burden of producing these monitoring
23   solutions and we can -- we can settle this dispute.

24         We have been trading drafts now for a couple of
25   months and unfortunately we have not been able to reach

1    an agreement.  Plaintiff has its position; we have our

2    position.  But ultimately we decided that this is not

3    where we want to spend the Court's time.  So, this

4    morning, after consulting with our client, we have

5    agreed to produce whatever monitoring solutions we have.

6    We don't have to go back and forth on the -- on the

7    stipulation anymore.  We'll get the software over to

8    plaintiffs in fairly short time.  So that takes care

9    of -- from our side, at least, that takes care of one of

10   the other discovery disputes.

11             THE COURT:  Okay.

12             MR. PRABHAKAR:  There was another dispute about

13   production of source code printouts.  As of today, there

14   are no pending requests for source code printouts.  All

15   the source code that the defendant -- the plaintiffs

16   have requested, which is over 20-, 30,000 files in one

17   iteration, Extreme has produced that.  We have produced

18   that in compliance with the protective order that was

19   entered by the Court.

20             Plaintiffs want us to not follow the protective

21   order.  They have their reasons.  Some of the reasons we

22   understand and we are willing to work with them on that,

23   but, so far, we're not -- we have not been able to reach

24   an agreement on that.

25             So, I can address that in the argument section

1   where the disputes are.  You can also ask us to go back

2   and meet and confer just outside the courtroom.  I'm

3   happy to do with that with Mr. Wood and see if we can

4   come to a resolution on that dispute.  But, from our

5   perspective, Your Honor, this is where we stand.

6           There was also an issue about reforming our

7   interrogatory responses.  We have committed that we will

8   do it.  We regret that we haven't been able to do it at

9   the time frame that we had originally provided to

10  plaintiffs, but we have been investigating a lot of

11  discovery issues that plaintiffs are raising which

12  shouldn't have been issues in the first place.  But

13  without getting into argument, that's the reason that

14  the interrogatory response rollup is delayed.  But we

15  have provided -- now that we have better certainty and

16  we have put many of the discovery issues behind us, we

17  have provided a date certain.  We didn't want to eat

18  into our associates' Thanksgiving break, so we have

19  offered to do a rollup of our interrogatory responses by

20  December 5th.  We're fairly confident of meeting that

21  date.

22          There are -- as we were supplementing some of

23  our interrogatory responses, we have already done that

24  for three of them, and we're fairly confident that we'll

25  be able to do that for the rest of the interrogatory

1   responses.

2           So, that's where we are, Your Honor, in terms

3   of status.  And if you are -- if you have any questions

4   or something was not clear, I'm happy to answer that.

5           THE COURT:  Okay.  Thank you.

6           MR. PRABHAKAR:  Thank you, Your Honor.

7           MR. WOOD:  Good afternoon, Your Honor.

8           THE COURT:  Good afternoon, Mr. Wood.

9           MR. WOOD:  Your Honor, would you like me to

10  comment on the timeline of discovery as well, or just

11  talk about the discovery issues?

12          THE COURT:  If you feel there are corrections

13  to be made to the timeline, if you could briefly address

14  that because I want to make sure I have an accurate

15  picture.

16          MR. WOOD:  Okay.

17          THE COURT:  But we do need to spend time

18  letting you present on the legal issues, but I do want

19  to make sure that factually I have things straight.

20          MR. WOOD:  Okay.  Yes, Your Honor.

21          So, we first issued discovery in December of

22  2020, and that discovery contained a request for

23  marketing documents, RFP 37.  The parties -- nothing

24  happened on discovery, really, for the first year.  If

25  you remember, there were multiple motions to compel

1    filed.  We weren't making any progress.  We finally, I
2    think -- I think we ended up having a hearing in the
3    spring of 2022.  So, it took all of 2021.  And then we
4    had a hearing in the spring of 2022, and Extreme was
5    ordered to fully respond by May 13th, 2022.

6         In that production, there were very few
7    marketing documents.  We noted that, and then just so
8    there would be no confusion that the issue wasn't with
9    our requests, on June 6, 2022, we issued new RFPs, 71
10   through 78.  So, it was really clear exactly what kind
11   of marketing documents we were requesting because we
12   wanted to make sure we got them all.

13        Extreme told us on July 6th that it would be
14   substantially complete by July 29th.  We still didn't
15   have a lot of marketing documents.  And in the -- in the
16   next couple of months is when we discovered that not
17   only was Extreme using the products, that SNMP software
18   in the SLX, VDX products, they were also using it in
19   their EXOS line and EOS line, which constituted 40-plus
20   additional products that we hadn't known about before.

21        And if you remember, Your Honor, we had a
22   hearing -- we had a hearing in December of last year
23   based on what the scope of our requests -- did it
24   encompass the EXOS or not, and I believe -- I believe
25   the ruling was that it did.

1            And we -- in advance of that, we issued an

2    additional set of duplicate RFPs just to make sure there

3    was no confusion that our RFPs indeed did cover EXOS.

4    So, we were trying to -- we had a hearing about it, and

5    we issued additional RFPs just to be doubly sure.

6            Again, Extreme still didn't produce the

7    marketing documents we were -- we were talking about.

8    We then had a pause where we mediated in January, and

9    when the mediation failed at the end of January for

10   Extreme, it was actually successful for Broadcom and

11   Brocade, we then renewed our requests, and Extreme said

12   they would be substantially complete May of this year.

13           And at the end of May, they said they needed

14   six more weeks.  We asked for an assurance in June that

15   the marketing documents would be produced by July 15th,

16   and they responded they had already produced 16, and

17   those were all by a custodian, Robert Reason was his

18   name, an employee of Extreme.

19           So, Extreme finally produced additional

20   documents in July.  We still didn't see the marketing

21   documents.  We had additional meet and confers on that,

22   and some of those were listed in our paper.  But Extreme

23   identified Robert Reason at that time.  And we said,

24   well, we only have 16 documents.  There are well over 40

25   products that are at issue here; surely there are more

1  than this many standalone doc- -- you know, marketing

2  documents.

3          So, we then raised the issue with the Court.

4  Extreme promised to produce by September 15th.  They

5  then -- as counsel represented, they produced 4- to

6  5,000 marketing documents on September 15th.  And

7  Mr. Reason was the custodian for 2,000 of those

8  documents.

9          I noted that counsel said there was a "she"

10 that they had to talk to -- this is the first I've heard

11 that it was a lady -- that identified the repository.

12 We don't have a female custodian that -- for the

13 marketing documents.  We have Extreme in general and we

14 have Robert Reason.  That's it.  So -- but we can take

15 that -- I can take that up with counsel later if we're

16 actually missing a custodian and there was a lady in

17 there.

18         So, we've been working on getting the documents

19 we need for quite some time, which is why we raise this,

20 and we appreciate Your Honor taking it up.

21         Since we've had this hearing scheduled, we have

22 made substantial progress.  They have produced a lot of

23 marketing documents, I think, in response to us raising

24 the issue with the Court.

25         And if Your Honor doesn't have any questions

about the schedule, I'd be happy to run through the ten

issues that we mentioned to the Court in our filing on

September 1st, and that is Exhibit -- Exhibit 3 to our

September 1st filing has the e-mail that lists those,

and it has our requests and Extreme's response to that

request.

So, we've already talked about the marketing

documents.  Extreme is now representing that that is

complete.  And it's hard for us -- with the substantial

number that they have provided, I mean, we don't have

any reason to challenge that.

Issue No. 2 is the production of install

images.  Extreme has produced 380 install images.  They

have represented that that -- those are all the install

images that they can find after a reasonably diligent

search.  I think there are many more source code trees

than that that they produced, and there should be one

install image for each source code tree, but if

that -- that is all they can find and produce, then I

think they have satisfied that request.

Issue No. 3 is the production of their

monitoring solution.  And counsel discussed that, and as

of a little over an hour ago, they have represented that

they will -- they will produce all relevant monitoring

solutions.  For the last two months, we've been

1  discussing they only wanted to produce one.  Today

2  they're now producing all of them, which we're fine

3  with.  We would like a date certain for that production.

4  We think two weeks.  And we would like to know which

5  ones they plan to produce.  That would be our -- our

6  request, and then I think that would --

7          THE COURT:  Well, let's pause --

8          MR. WOOD:  Yes.

9          THE COURT:  -- right here.  So, what would be

10 your position on that if he's requesting a date certain

11 and some identification?

12         MR. PRABHAKAR:  So, Your Honor, for the

13 monitoring solution --

14         THE COURT:  Yes.

15         MR. PRABHAKAR:  -- we have the software

16 identified, and we feel comfortable that -- we have one

17 that is ready for production now, and the other

18 solutions, we should be in a position to produce them

19 within two weeks.

20         THE COURT:  Okay.

21         MR. PRABHAKAR:  And I mention two weeks because

22 I have commitments, like, hearings coming up in a

23 different case.  But if you want it sooner, Your Honor,

24 just let us know and we'll get to work and get it done.

25         THE COURT:  I think the two weeks will be

1  sufficient.  You said two weeks would be acceptable --

2          MR. WOOD:  Yes.

3          THE COURT:  -- and they have identified it.

4  And you said you already have one ready?

5          MR. PRABHAKAR:  Yes, Your Honor.

6          THE COURT:  And, so, then the second one in two

7  weeks.

8          MR. WOOD:  If they could --

9          THE COURT:  So, that should take care of that

10  issue.

11          MR. WOOD:  If they could tell us what they are,

12  that would be helpful.  They were previously promising

13  to produce the latest product.  I would assume they're

14  doing that now if -- producing something else, we may

15  have some questions for them.  But if we knew what

16  solutions they're now planning to produce, that would be

17  helpful in verifying the request.

18          THE COURT:  Is that something you feel like you

19  could do?  You said you have one ready.  And can you

20  make any -- do you have any specific information as to

21  the second one?

22          MR. PRABHAKAR:  I do, Your Honor.

23          THE COURT:  Okay.

24          MR. PRABHAKAR:  So, we are planning on

25  producing three monitoring solutions that Extreme has

offered.  The first one we already had agreement on.
It's a product called ExtremeCloud IQ Site Engine.

THE COURT:  Okay.

MR. PRABHAKAR:  That's the one that's ready to
go.  That's the stipulation that we have been
negotiating for the last several months because -- and
the stipulation issues are actually not related to the
software itself, but certain other conditions that
plaintiffs had because they said we're not producing the
monitoring solutions that they want.  So, it had nothing
to do with the production part but ancillary terms
related to production of one monitoring solution.

The second monitoring solution, which Extreme
has available but is no longer sold or offered to
clients, is called Extreme Management Center.

THE COURT:  And that you are no longer offering
to clients; is that what you said?

MR. PRABHAKAR:  And we haven't -- yes, Your
Honor.  And we haven't offered that for several years
now.

XIQ Site Engine, the product we offered to
produce, is the one that's currently on the market and
used by a few of our customers.  It's not a very popular
product.

The third product is called NetSight, and that

1   is a product that has been deprecated even longer than

2   Extreme Management Center.  I believe 2013 or 2014 was

3   the last time that product would have been offered.

4           So, these are the three that we have available,

5   Your Honor, and we're willing to produce.  But if Your

6   Honor might allow me a brief moment, the reason we were

7   always negotiating on Site Engine was because there was

8   a different request that plaintiffs had which asked

9   Extreme to produce samples of its hardware.  And as part

10  of that, we agreed to produce six switches, and Extreme

11  IQ's Site Engine would have supported all those

12  switches.  So, therefore, the additional software, we

13  were only producing it because we did not want to bring

14  this dispute before the Court.

15          But, otherwise, it is still our position that

16  there are free software available on the market that a

17  vast majority of people use that plaintiff could have

18  used months ago to get going with whatever they were

19  trying to do.

20          So, we're producing it, but we want to note

21  that just XIQ Site Engine would do the job.  It would be

22  rare for an actual customer to use more than one

23  monitoring solution.

24          The last thing I would note, and this is

25  something that plaintiffs have admitted to with us

1  during meet and confers, that the monitoring solution

2  itself is not an accused product.  So, this isn't a

3  product that's going to be at issue in this case in

4  terms of the claims that the plaintiffs have.

5        And I only mention this, Your Honor, because we

6  are doing all we can to not have to come in front of you

7  arguing about versions of software.  But we're producing

8  more than ordinarily we would offer to produce simply to

9  keep disputes outside of this court.

10        THE COURT:  Okay.  Thank you.  So, he's

11  identified Cloud IQ that's ready, and then the other two

12  have been identified, Extreme Management Center and

13  NetSight --

14        MR. WOOD:  Yes.  I think that --

15        THE COURT:  -- within --

16        MR. WOOD:  I think that --

17        THE COURT:  -- two weeks.

18        MR. WOOD:  -- resolves it.  I did -- my

19  co-counsel had a question if there was another version

20  of Cloud IQ that's relevant other than Site Engine.

21        MS. WEBER:  The prior version of the Site

22  Engine, Cloud IQ.

23        MR. PRABHAKAR:  Sorry, I -- I was consulting

24  with counsel.  Can you say that again?  I apologize.

25        MR. WOOD:  Yeah, if there was another version

1    of Cloud IQ Site Engine or Cloud IQ that is relevant and
2    was offered prior to Site Engine.

3           THE COURT:  So, is there a second Cloud IQ
4    version?

5           MR. PRABHAKAR:  There would be older versions
6    of Site Engine, Your Honor, that Extreme would have
7    offered in the past.  But, as Mr. Wood, who is a pretty
8    trained software engineer knows, bugs get fixed in the
9    older version.  Something new would get added; something
10   would get taken out.

11          So, we are offering to produce whatever is in
12   the field today that we send to our customers because
13   that's been one of their requirements; that we don't
14   somehow build a software that's not sold to our
15   customers.

16          So, we are offering to produce the latest
17   version.  I don't think the prior versions have
18   relevance to the extent that the monitoring solution has
19   any relevance to this case.  We would -- we would be --
20   we would like the Court to order us to produce if the
21   Court orders us to produce the latest version only.

22          THE COURT:  Okay.  Well, let's start with that.
23   And then if you feel the older versions are relevant,
24   you all can meet and confer on that because I can't make
25   that call today.  I have additional argument on that.

1    So --

2              MR. WOOD:  Right.

3              THE COURT:  -- let's just plan on what has been

4    set forth.  So, it would be the current version of the

5    Cloud IQ that's ready to go, and then the other two in

6    two weeks.

7              MR. WOOD:  If it -- okay.  So, the current

8    version now and the other two in two weeks; is that --

9              THE COURT:  Yes.  And then if you feel the

10   older versions of Cloud IQ may be relevant, please have

11   a meet and confer and see if you can resolve it without

12   having to bring that back --

13             MR. WOOD:  Okay.

14             THE COURT:  -- in front of the Court.

15             MR. WOOD:  Yes, Your Honor.  That's great.

16             Okay.  Issue No. 4 was the production of

17   devices in response to a request for inspection one.  We

18   have received all those devices from Extreme.  At this

19   point, we are still in the process of setting them up

20   and verifying that they work.  But right now we

21   have -- we have no issue with No. 4.

22             No. 5 was the identification of shipment

23   numbers in response to Interrogatories 5 and 6.  We did

24   receive an update that does that.  We have identified,

25   we think, an issue with the numbers, and Extreme is

1    investigating that, and, so, our request would be that

2    we could get a supplement by November 17th.

3         THE COURT:  If you're investigating that, do

4    you feel that you could get a supplement by November

5    17th?

6         MR. PRABHAKAR:  Yes, Your Honor, November 17th,

7    we should be able to do a supplement.

8         THE COURT:  Okay.

9         MR. PRABHAKAR:  But I do want -- we're still

10   investigating this, but I want to alert the Court to the

11   possibility that the issues that plaintiffs have

12   identified may not require a supplement because the

13   products that they have identified that they believe are

14   not covered in the response may actually have been

15   excluded for justifiable reasons.

16        So, to the extent that there is a supplement

17   required, we assure Your Honor that it will be done by

18   November 17th.  But if there is no supplement required,

19   we'll just explain to plaintiffs why no supplement is

20   required also by November 17th.

21        THE COURT:  Okay.

22        MR. WOOD:  Okay.

23        THE COURT:  That sounds like that will resolve

24   that.

25        MR. WOOD:  Yes.  Thank you.

1    No. 6 was the production of all the customer

2  download information for EXOS and EOS. Extreme has

3  provided that and represented that it is complete.

4    THE COURT: Okay.

5    MR. WOOD: That's done.

6    No. -- issue No. 7 is -- that issue is still

7  open, unfortunately. That's the production of source

8  code printouts identified by SNMP's experts.

9    So, we agreed in the protective order with

10  Extreme and Broadcom/Brocade that if we found source

11  code that is actually owned by SNMP, they would produce

12  that without any limit. And Broadcom/Brocade and

13  Extreme did that on our prior code reviews.

14    The -- we negotiated with them because the

15  production was so -- we found so much source code that

16  was actually SNMP's that needed to be produced,

17  according to our agreement, we both agreed all those

18  files would be produced as natives so our expert can

19  more easily evaluate them; they can more easily produce

20  them. And Extreme has actually produced, by my count,

21  395,552 source code files natively.

22    Then, for reasons unknown to us, when our

23  expert went -- started reviewing the EXOS code and

24  requested a production in July, Extreme refused to

25  produce it at first and then would only produce it in

1    PDF.

2         The protective order does call for production

3    in PDF.  They said the parties had agreed to do a native

4    production.  So, we started discussing this with

5    Extreme.  We never received an explanation on why they

6    changed positions; why -- we had an agreement.  This was

7    working just fine, and for some reason in July, they

8    just said, we're not going to do it anymore; we don't

9    think this is the right way to do it and we don't have

10   to under the protective order.

11        Reminded them that it had been done before.

12   This is -- it's harder for them; it's harder for us.

13   They insisted on producing PDFs.  Since PDFs are not

14   formatted correctly, in many instances, they are hard

15   for our expert to work with.  They're hard to search.

16        So, we've requested that they produce native

17   files, and their response was, we will do it, but only

18   if we amend the protective order to say we can produce

19   as natives.  We said that's fine.  So, we started that

20   process, I think, on August 3rd, and we are still -- we

21   are still going.  So --

22        THE COURT:  And this is just on whether you add

23   that they can be produced in a native --

24        MR. WOOD:  Right.  So, we -- our understanding

25   was we were -- we were just going to amend the

protective order to say you could produce a native.
What we have gotten is a set of limitations on how we
can use those files and what we have to do with them
that would have further restricted our expert.  And, so,
we weren't able to agree to that.  We've been going back
and forth.  The entire negotiation has been on producing
all of those files in native -- as natives.

Two days ago we got another version that
removed the restrictions but only agreed to produce
certain of the files as natives.  So, after two months,
the paradigm completely switched.  Still haven't gotten
an explanation on that.

We -- the parties produced native files all the
time in this litigation.  So, any time a file is not
easily viewed in PDF format, we produce it as natives.
Excel files are produced as natives.  Any other file
that's not easily converted to PDF is produced as a
native file so the parties can easily view it.  That
hasn't been an issue.

And, like I said, we -- Brocade was happy to
produce as natives.  Extreme was happy to do it.  And
suddenly in July --

THE COURT:  Something changed.

MR. WOOD:  -- everything changed.

THE COURT:  So, let me pause you right there

1   and see if I can get Mr. Prabhakar's input on --

2            MR. WOOD:  Yes, okay.

3            THE COURT:  -- that --

4            MR. WOOD:  Yes.

5            THE COURT:  -- and why that's changed.

6            MR. WOOD:  Okay.

7            MR. NEUKOM:  Just one second.  May we indulge

8   the Court for just a 60-second consult --

9            THE COURT:  Oh, certainly.

10           MR. NEUKOM:  -- before we respond to the

11  Court's question?

12           THE COURT:  Certainly.  We'll pause for just a

13  moment.

14           (A brief recess was taken.)

15           MR. NEUKOM:  Sorry.  Let me -- if the Court

16  will forgive us -- musical chairs -- I wanted to address

17  this one with the possibility of a practical solution.

18           THE COURT:  Okay.

19           MR. NEUKOM:  There is a fair number of things

20  that my friend, Mr. Wood, said that we disagree with

21  factually, but rather than get into a he said/she said

22  or he said/he said, here is my practical proposal for

23  how to resolve this:  The current protective order as

24  drafted and proposed to us by the other side of the

25  caption doesn't allow some of the production protocol

that's -- that was later honored by voluntary agreement
and now is in dispute.

I think what we're talking about right now most
practically is:  There is agreement that there should be
an amendment to the protective order so that Extreme is
not in a position of violating the protective order, and
there is some disagreement about a handful of
limitations about what that change to the protective
order should look like.

From our side, for what it's worth, there is no
interest in being obstructionist.  The interest is in
how do we accommodate SNMP's request while still
producing documents in a way that can be used, in a way
that can be used and pincited by the parties for easy
cross-reference and they can be used at trial.

If that just put the Court to sleep, that
wasn't my intention.  Here is my practical proposal:
The specific limitations and debates about the
protective order modification have not been briefed to
the Court.  What I suggest is, on this issue, the
parties, within five court days or less, make a joint
proposal to you with either, A, an agreed-upon,
modified, stipulated protective order, and hopefully
Mr. Wood and Mr. Prabhakar can come to some sort of
agreement on some of these, what I would call conditions

1   issues, or, B, if they can't, the way that I've usually
2   done this in the past, which I think is efficient for
3   the Court is -- right? -- 99 percent of that amended new
4   protective order is going to be agreed upon.  There
5   might be one section where SNMP says we want this and
6   where we say we want this.  And then each side can imbed
7   within it a paragraph or two explanation, I think with a
8   directive from the Court that a paragraph or two is
9   better than a page or two, of why they would like these
10  limitations to be present or not present in the amended
11  protective order.
12          In my experience, Your Honor, what that does
13  for the Court is:  It gives you one filing which you
14  could look through with succinct argument and you can
15  sort of check a box and say, I'm going to allow this
16  limitation or not.
17          Alternatively, I can turn the podium back to
18  Mr. Prabhakar and we can start to debate what the
19  limitations are or the reasonableness thereof.  But I
20  think if we do that, we're going to be getting into some
21  pretty wonky source code debates for the first time in
22  this case, and I think we can do that more efficiently
23  for the Court.
24          THE COURT:  And the main reason for being here
25  today is:  We're supposed to get to these e-mails.  And,

1   so, a lot of this, of what I'm hearing up until this

2   point, certainly could have been dealt with and let me

3   know it's been resolved and we wouldn't have had to have

4   spent a whole hour now on it.

5          MR. NEUKOM:  Yes.

6          THE COURT:  So, I'm inclined to go with that

7   proposal, just to let you all have five more days to see

8   if you can work through any amendments to the protective

9   order.  If you can't, all I want is a joint document,

10  and with the -- if there is disagreement on the

11  paragraph as you set forth, that's perfectly fine, but I

12  want the positions all stated within that one document.

13  And I don't want there to be anything outside the agreed

14  protective order to review either, just the comments

15  within the protective order itself.

16         MR. WOOD:  Okay.  Yes, Your Honor.

17         MR. NEUKOM:  E-mailed to chambers, Your Honor?

18         THE COURT:  Yes, sir.  Thank you.

19         MR. WOOD:  And the rest are very -- very quick.

20         Extreme has supplemented their financials as we

21  asked.  They have provided a privilege log for

22  production No. 20, and counsel has already addressed,

23  said that they will do their consolidated rog responses

24  by December 5th, and we are fine with that date.

25         THE COURT:  Okay.

1          MR. WOOD:  So, thank you, Your Honor.  This has

2     been very helpful in resolving some of these issues.

3     So, thank you.

4          THE COURT:  Okay.  Thank you.

5          Just one moment.  Let me take -- let me take a

6     brief recess and see if there is -- and then we'll come

7     back.  We'll take a five-minute recess.

8          THE COURTROOM DEPUTY:  All rise.  This

9     honorable court stands in recess.

10          (A brief recess was taken.)

11          THE COURTROOM DEPUTY:  All rise.  This court is

12     again in session.  Please come to order and be seated.

13          THE COURT:  Now we'll get to the issue of the

14     e-mails.  So, as I understand, Mr. Wood, you can go

15     ahead and come to the podium to present your position or

16     answer questions.

17          MS. WEBER:  It would be me, today, Your Honor.

18          THE COURT:  Sorry, Ms. Weber.

19          MS. WEBER:  That's okay.

20          THE COURT:  So, we have the 13 e-mail chains at

21     issue with what I understand the core e-mail is one

22     dated September the 26th of 2017, which were about two

23     Brocade employees.

24          MS. WEBER:  Yes.

25          THE COURT:  So, let me start this as we sort

through the legal issues.  It doesn't appear that there
is any dispute that these would be attorney/client
privilege.  But you're going to be arguing for reasons
that that was waived; is that correct?

MS. WEBER:  That's correct.  Waived by Brocade.
And, then, also, that there is no common-interest
privilege.

THE COURT:  Okay.

MS. WEBER:  And one clarifying point:  There
were 13 e-mails, and then there were an additional nine
documents that were clawed back later.  So, now it's 22
e-mails total or Bates-numbered documents.

May I begin, Your Honor, or did you have a
question?

THE COURT:  Yes, you may begin.  Thank you.

MS. WEBER:  Good afternoon.  May it please the
Court.

I'm going to discuss the two issues today
related to the e-mails.  First, I'll be discussing why
the 22 e-mails between Brocade and Extreme should be
produced to plaintiffs in unredacted form.  And the
second overarching issue that I'll discuss is Extreme's
improper asserted -- assertion of privilege over roughly
100 Bates-numbered documents with a third party called
Avaya and another third party called Lexoft.

1            As to the Brocade and Extreme privilege issue,

2    Extreme has taken a sweeping approach in purporting to

3    assert attorney/client privilege over communications

4    with third parties, and that's become apparent now that

5    there are three separate third parties that Extreme is

6    trying to shield with the -- with attorney/client

7    privilege.  And our view is that this approach

8    improperly broadens the scope of attorney/client

9    privilege when the law is clear that it should be

10   construed narrowly.

11            It is defendant's burden to justify the

12   assertion of privilege.  That's *Doe v. Hamilton.*  And

13   defendants haven't remotely begun to carry their burden.

14            There is two independent reasons why the

15   Brocade and Extreme e-mail communications listed in

16   Extreme's privilege log should be produced to plaintiffs

17   in an unredacted form, and the first reason is that

18   Brocade has waived any claim of privilege it may have

19   had over the, as you mentioned, September 26, 2017,

20   e-mails between two Brocade employees, Mr. Fitterer and

21   Mr. Parsons.  Those are in 11, anchored in the bottom of

22   11 of the 22 chains.

23            Of the 11 redacted documents containing this

24   communication, Brocade did not include any of them on

25   the privilege log that it served to us over a year ago

in September of 2022.  And Brocade did not include them
on this log; although, two months just prior to that,
Extreme had produced many documents, Bates-numbered
documents, containing this exact correspondence between
Mr. Fitterer and Mr. Parson -- Parsons.

We met and conferred with Brocade over this
issue in August, and its counsel at the time claimed
that they did not have the correspondence because it was
missing and Mr. Fitterer may have deleted the e-mails.

In its briefing, Brocade has continued to make
that claim.  It's our position that that doesn't help
Brocade.  The general rule is that if you do not log
communication on a privilege log, the privilege over
that is waived.

And we have a case that Extreme actually cites
for the assertion that Brocade had no duty to log this
e-mail.  It's a Southern District of New York case,
*Weber v. Paduano*.  It's where a tenant sought to recover
damages from an apartment fire below her from another
tenant.  In that case, the Court observed that the
defendant tenant who had started the apartment fire did
not have to log documents that were not ever in their
control.  Those were third-party documents from fire
investigators that the tenant had never had.

But Brocade's own internal e-mail was at one

1  point in its own control, and it became available to it

2  again when the documents were produced in July of 2022

3  by Brocade.

4          That same court in the *Weber v. Paduano* case

5  also approvingly observed that the defendant tenant did

6  actually log third-party documents for a third party who

7  was involved in the defense of the action, and that was

8  defendant's insurance company.  And, similarly, here,

9  Brocade's own co-defendant did produce this internal

10  e-mail between the two Brocade employees.

11          And, so, our position is that even under

12  Extreme's own authority, Brocade did have the duty to

13  log it once it became available to it again, and it did

14  not do so, and, so, it waived the privilege, and that

15  comports with the general rule that failure to log

16  waives the privilege.  And that's the first independent

17  reason for ordering production of the 22 Brocade and

18  Extreme communications in our Appendix C.

19          The second independent reason is that Extreme

20  has not carried its burden to demonstrate that a

21  common-interest privilege exists.  As the party

22  asserting the common-interest privilege, Extreme has to

23  not only prove an underlying, unwaived privilege, it has

24  to also prove that the otherwise privileged information

25  was disclosed due to actual or potential litigation and

1    was made for purpose of furthering that actual or

2    potential litigation.  And we cited three cases in

3    support of that; *Adkisson*, *Gammons* and *Boyd*.

4         *Adkisson* is a case that Extreme actually

5    originally cited.  It does use -- it's a diversity

6    action.  It cites Tennessee law, as Extreme pointed out

7    in response, but it also notes that -- the parties had

8    briefed the issue, and it appeared that federal common

9    law is in accordance with the Tennessee privilege law on

10   this common-interest issue, and it did require actual or

11   potential litigation.

12        You're familiar with your decision, obviously,

13   in *Gammons*.  There you observed -- it was unclear how

14   communications would have been disclosed due to

15   anticipated litigation against the litigant.

16        And *Boyd* stands for the same proposition.  It

17   is a Tennessee state court case, but it cited all

18   federal cases in support of this actual or potential

19   litigation requirement.

20        And several -- as we noted in the briefing -- I

21   won't repeat it, but several of Extreme's own cited

22   cases also involved actual or potential litigation.

23        But, regardless, we believe the Court need not

24   actually even decide whether actual or intended or

25   potential litigation is necessary because it's clear

1    that a mere commercial interest is insufficient to give

2    rise to the common-interest privilege.  Common interest,

3    under the *Libbey* case and others, requires a common

4    legal as opposed to commercial interest.

5            In its response brief, Extreme argued that

6    *Libbey* is inapposite -- that's a trade dress case -- and

7    they said that the defendant, Oneida, is the only one

8    that involved an attorney; that it took no steps to

9    ensure that its documents with a third party about

10   potential supplier relationship and infringement would

11   remain confidential, they took no steps to do that, and

12   that Oneida shared the privileged communications with

13   the third party simply for commercial gain and not legal

14   advantage.

15           But if you look at the decision at 349, the

16   Court ruled that even if the parties had taken steps to

17   preserve the confidentiality of those documents shared

18   with third parties, like Brocade and Extreme did in this

19   case, the Court ruled the correspondence was still,

20   quote, "ancillary to the principal activity in which

21   Oneida and the third parties were engaged."

22           And I quote, "The negotiation of an agreement

23   for third party to make and for Oneida to buy and

24   distribute glassware, all parties apprehended that their

25   venture involved some legal risk, but that apprehension

1  was merely a part of their larger endeavor."

2          And we think that's on point with what happened

3  here with the sale between Brocade of its data center to

4  Extreme, and that any percolating legal interests were

5  just one part of the larger endeavor of getting the sale

6  over the finish line.

7          So, Extreme is trying to broaden its invocation

8  of privilege, invoke a business interest, its purchase

9  of Brocade's assets, and then try to ground common

10 interest in that.  But it hasn't identified an agreement

11 to jointly analyze a common legal interest between the

12 parties.

13         I'll run through this briefly, but we asked

14 Extreme to identify that agreement.  It identified a

15 confidentiality agreement with boilerplate language that

16 actually does even reference a potential joint defense

17 agreement, but it says nothing about a common-interest

18 agreement.

19         It also identified an asset purchase agreement,

20 but also just goes through what types of information the

21 parties are going to exchange to, I guess, get the deal

22 over the finish line and the steps they're going to take

23 to get there.  But neither one of the agreements

24 reflects anything other than that common business

25 interest of getting the asset sale finished.  There is

1    no discussion of a common legal issue that the parties

2    were going to jointly analyze, let alone a discussion of

3    a common legal issue that's associated with actual or

4    anticipated litigation.

5         Extreme argued in its response brief that

6    Extreme and Brocade had, quote, "related and relatively

7    narrow set of common legal interests, including a mutual

8    understanding of the licensing rights that were

9    associated with the business assets that were being

10   purchased and transferred to Extreme."

11        But those assertions are nothing more than

12   attorney argument, and it ignores that the only

13   agreement that Extreme has ever cited or invoked is a

14   confidentiality agreement with boilerplate language and

15   the asset confidentiality with boilerplate language and

16   the asset purchase agreement.

17        Brocade and Broadcom are sophisticated

18   entities, have big law firms representing

19   it -- representing them.  If they wanted to ink a

20   common-interest agreement to reflect joint legal

21   analysis of the common legal purpose, they could have

22   done so and they didn't.

23        THE COURT:  Is that your position; that they

24   would have had to have had a written agreement?

25        MS. WEBER:  No, I don't think that they would

have had to have had a written agreement.  I think that
takes it a bit too far.  But I think the fact that they
did have a written agreement and there is nothing about
it in there speaks volumes.

          And I think Extreme's -- what Extreme is
inviting the Court to do would sweep in almost any
correspondence that arises in a complicated transaction
such as theirs.  There is -- those type of transactions,
I think, invariably give rise to all types of legal
issues about the scope of what's being sold, and I don't
think it's the goal of the law to protect all of those
communications under the guise of an asset sale.

          And, lastly, I'll just note to remember that
Brocade did not want to assert a common-interest
privilege with Extreme a single time in its 90-page
privilege log that it and Broadcom jointly produced, and
Extreme did not want to assert the common-interest
privilege with Brocade until after we met and conferred
with them for months and we told them we are going to
move the Court.

          Does Your Honor have any questions on this
issue?

          THE COURT:  I do question whether -- I didn't
hear you reference this, but in your position statement,
another argument you were making that they had waived

1    was for the untimely production of the privilege log.

2    Are you still standing on that as well?

3         MS. WEBER:  Yes.  Well, Brocade in particular,

4    I think that's just one factor to analyze in whether it

5    waived the privilege.  And it did take -- I guess it

6    produced it in September of 2022.  It was ordered to

7    fully respond to the discovery request by May 15th.  So,

8    I think that that's one factor to consider and lean

9    towards -- leans towards a finding that they did waive

10    the privilege by failing to log it and the delay they

11    took in finally getting that log to us.

12         THE COURT:  Okay.

13         MS. WEBER:  All right.  I'd like to turn to the

14    second major issue, which is the Avaya and Extreme

15    documents.  Extreme has claimed privilege over more

16    third-party communications.  This time it's with -- two

17    third parties named Avaya and Luxoft.  I have two cases

18    that I'm going to reference today.  They're in reply to

19    some arguments that Extreme made in a response which was

20    submitted a week after our opening, and I have copies

21    for Extreme and the Court when I raise them.

22         So, just after the briefing on this first

23    motion was completed, there were two successive claw

24    backs and that's where the additional Brocade/Extreme

25    e-mails were clawed back.  But then there were also this

1  new category of Extreme communications with the third

2  party, Avaya.

3        We wanted the Court to ideally hear all of

4  these same common interest issues at the same time.

5  During the meet and confer process, Extreme did claim

6  that its communications with Avaya were protected under

7  the common-interest privilege.  And when we asked

8  Extreme to confirm what agreement was anchoring that

9  claim of privilege, it said it would look for it and get

10 that to us in the upcoming days.

11       And after we raised this issue with the Court,

12 we learned Extreme's new position was that the transfer

13 of privilege had actually occurred from Avaya to

14 Extreme.  And it also asserted that other communications

15 between Avaya and Extreme employees, non-attorneys, were

16 privileged because Avaya was acting as Extreme's agent.

17 So, I will address those two issues.  And I'll address

18 the claimed transfer of privilege first.

19       In 2017, Avaya was going through a bankruptcy

20 and it sold some of its assets to Extreme.  It

21 was -- I'll be clear -- an asset sale of one part of

22 Avaya to Extreme and sub- -- under these, I guess,

23 roughly 100 Bates-numbered documents, there is only one

24 attorney/client communication in all of them, and that's

25 a communication between Avaya and its in-house counsel,

1    Richard Hamilton, III.

2              We cited authority, which was the *Linx* case,

3    and it holds that disclosure of an attorney/client

4    privilege communication from a seller to a buyer in an

5    asset sale is a waiver of that privilege.  And, so, we

6    agree with that.  Avaya's disclosure of its attorney's

7    internal analysis relating to a sale and Avaya's

8    disclosure of that to Extreme was a waiver.  That

9    follows *Linx*.

10             Extreme, I think, has also acknowledged that

11   this sale of assets is not enough to transfer a

12   privilege from the selling corporation to the receiving

13   corporation, and it argues in its brief that the

14   transfer of control of the company does warrant the

15   transfer of privilege.

16             So, I have a couple of responses to that.

17   First, it's Extreme's burden to document that -- I

18   guess, to prove privilege, and, again, it's construed

19   narrowly so that the fact-finding process is not

20   frustrated.  And Extreme here has not remotely shown

21   that the transfer of Avaya as a corporation transferred

22   to Extreme.

23             Avaya in 2017 to 2023 is a public company.  It

24   still exists.  The transfer of control did not happen,

25   and Extreme has not proven that it has happened.

Extreme purchased a division of Avaya assets. It did not purchase the entire company.

And the case that I have, I think it's a pretty basic assertion, but I do have copies for Extreme if they want them. It's *Commodity Futures Trading Co. v. Weintraub*.

Would you like a copy, Your Honor?

THE COURT: Yes.

MS. WEBER: I could approach the bench if you need it.

And this is -- let's see -- 417 U.S. 343, and it just stands for the basic proposition that the right to assert or to waive a corporation's attorney/client privilege is an incident of control of the corporation. So, if control changes hands, then the right to transfer privilege also changes hands. I think that is the anchor behind the cases it cites, anyway.

So, Avaya still exists today. Its attorney, Richard Hamilton, III, stayed with Avaya. He didn't go to Extreme. And Avaya simply sold off one of its business divisions.

So, our position is that Extreme has not carried its burden to show that the transfer or -- sorry -- the privilege transferred to Avaya to Extreme.

1          Second, and just as important, there is another

2    case that I think that the principle it stands for is

3    commonsensical.  *American International Specialty Lines*,

4    240 F.R.D. 401.  It's a Northern District of Illinois

5    case.

6          May I approach the bench?

7          THE COURT:  Yes, you may.

8          MS. WEBER:  So, this case shows that courts are

9    loathed to split the privilege amongst multiple

10   entities.  In this *American Specialty Lines* case, the

11   Court rejected an invitation to divide up the

12   attorney/client privilege based on assets received from

13   a bankruptcy sale, and it held that absent control of

14   the corporation itself, the Court found that the

15   attorney/client privilege would not pass to a successor

16   entity, even with respect to the assets that transferred

17   to that successor.

18         So, it does come down to control, which I don't

19   think Extreme has proven, or has even come close to

20   showing.  Again, we have a division of assets.

21         In addition, the *Linx* case that we cited holds

22   that the privilege can only be asserted by Avaya and not

23   Extreme.  Avaya is not here today.  I think, noticeably,

24   Extreme invited Brocade to participate; did not invite

25   Avaya to participate.  It's still a company that exists.

1    It hasn't made a statement about this.  And I think that

2    all goes to Extreme's burden and failure to carry it.

3    So that goes all to one e-mail between Avaya and its

4    attorney.

5            The rest of the e-mails that Extreme is

6    withholding, all of them are between Extreme employees

7    and Avaya and Luxoft employees.  None of them are

8    lawyers.  And, so, to keep these out of evidence, the

9    argument is that the Avaya employees were acting as

10   Extreme's agent and, at bottom, the agency argument

11   isn't applicable.  It only applies if there is

12   attorney/client privilege on that underlying e-mail

13   which we believe there is no privilege.  It was waived

14   when Avaya disclosed it.

15           But, also, we believe that Extreme is wrong as

16   a legal matter; that Avaya was somehow acting as an

17   agent in connection with the privilege or work product

18   communications.

19           The privilege -- we cited the *Hosea Project*

20   *Movers* case that says the privilege only extends to

21   agents of a lawyer who are employed to provide legal

22   advice.  I think one of Extreme's cases backs that up.

23   This is the *Cooey v. Strickland* case out of the Southern

24   District of Ohio.  There it observed that privilege

25   includes all the persons who act as the attorney's

1   agents, like secretaries, file clerks, telephone

2   operators, messengers, etcetera, and I think that fits

3   perfectly with the idea in *Hosea* that privilege only

4   extends to agents of lawyers who are employed to provide

5   legal advice. And I don't think there is any reasonable

6   argument that Avaya was employed to provide legal advice

7   on behalf of a lawyer for Extreme.

8        So, Extreme's agency argument not only fails to

9   track the case law, but I think it also fails to track

10   how the agreements that they've pointed to define

11   Avaya's agency role.

12        So, the only agency agreements that Extreme

13   invokes set forth a, quote, "limited agency," end quote.

14   And this expressly carved out the sharing of information

15   that would result in the disclosure of privilege.

16   That's Exhibits 12 and Exhibit 13.

17        In these limited agency agreements, the work

18   was also defined only to include things like processing

19   orders, invoicing, delivering product. And, so,

20   it's -- I think it's clear just from looking at the

21   papers that Avaya's contemplated agent role was just

22   helping smooth over the transition of the sale of one

23   part of Avaya to Extreme.

24        Extreme also invoked the asset purchase

25   agreement, but if you take a look at that, it makes

1    clear in Section 5.02(c) that this particular sale did

2    not obligate either party to waive privilege.  I think

3    that's a common -- common term.  And it also made clear

4    that each party had to use commercially-reasonable

5    efforts, including by entering into a joint defense or

6    common-interest agreement to permit the disclosure of

7    privileged information.  And Extreme and Avaya have not,

8    to our knowledge, ever entered into any such agreement

9    and Extreme did not identify one to us.

10            So, the disclosure of the internal Avaya e-mail

11   between Avaya and its attorney, Richard Hamilton, III,

12   constituted a waiver of the attorney/client privilege.

13   And Extreme has articulated no reason, we believe, why

14   any of the other non-attorney communications between

15   Extreme and two third parties would be subject to any

16   claim of privilege or work product.

17            That's all I have on those two issues.  But I

18   can answer any question on this second one that you

19   have.

20            THE COURT:  Okay.

21            MS. WEBER:  Okay.  Thank you, Your Honor.

22            THE COURT:  Before you sit down, Ms. Weber, so,

23   I want to go back to, I guess, the three documents you

24   said Extreme for the first time had argued that it had

25   inadvertently produced documents ending in 693, 891 and

1   860.  And then they had pointed out that they had

2   referenced those in a sworn interrogatory response.

3   Then 30 days later, those were subject, I guess, to the

4   claw back.

5           So, I guess my question with regard to that, as

6   brought up, whether 502(a) comes into play if there has

7   been an intentional disclosure.  If there has, then do

8   we need to look at whether there is the same subject

9   matter; do we need to look at the fairness argument?

10  And, so, I just wanted to raise that question while I

11  had you all here today.

12          MS. WEBER:  I appreciate it, Your Honor.

13          I think that -- well, I know we're not making

14  an inadvertent disclosure argument.  We -- we've noted

15  that it appears that they have selectivity waived, and

16  based on their intentional citation of three documents

17  pursuant to Rule 33(d) and their disclosure of a letter

18  between -- I think it was Brocade and Broadcom to

19  Extreme stating that the SNMP Research license was not

20  assignable, that's also legal analysis pertaining to

21  SNMP Research that has now been disclosed.  And it

22  sounds like that type of contract analysis is also the

23  type of analysis underlying other clawed-back

24  communications based on Extreme's description in the

25  briefing.

1    We'd certainly be happy to brief for Your Honor
2 further whether subject matter waiver is warranted, but
3 I think, at least to the license -- or, sorry; excuse
4 me -- legal analysis regarding the scope of the SNMP
5 license and whether it's assignable, we would -- we do
6 believe that that's been selectively disclosed and the
7 rest should be produced.
8    THE COURT:  Okay.
9    MS. WEBER:  Thank you.
10    MR. NEUKOM:  Good afternoon, Your Honor.
11    THE COURT:  Good afternoon.
12    MR. NEUKOM:  I do have a few remarks to share
13 before I -- and I can open myself up to questions at the
14 beginning or at the end.  Does the Court have a
15 preference?
16    THE COURT:  I have my questions, but if you
17 want to go ahead and state your position, that's fine as
18 well.
19    MR. NEUKOM:  Okay.  I'll try to be brief.
20    As an initial matter, I'd like to provide the
21 Court just a little bit of factual background on this
22 issue, including the claw-back issue, and, more broadly,
23 the disputes that the Court has heard about today.
24    This Court has dealt with an awful lot of
25 discovery dealings in this case going back a couple of

years.  There are a couple of different reasons that

could be the case.  One is a recalcitrant or an

obstructionist defendant or, in any event, a party who

is not producing materials.  Another could be an

overeager propounding party that is increasing the

burden.

I'm not going to try to convince you that one

party or another here is being a good actor or a bad

actor, but I do want to give the Court some background

about what's happening beyond the Court's gaze.

At this point, by my count, SNM- -- pardon

me -- Extreme has received and responded to about 200

requests for production of documents.  We have produced

1.4 -- I'm using round numbers -- 1.4 million pages of

documents.  That's not counting the over 500,000

additional pages of source code printouts which have

been demanded of us over source code for over 100

different versions which cannot even be measured in a

page count.  We've seen eight motions to compel from the

plaintiff, and by our informal internal survey, we have

had 37 or more meet and confers in this case.

We are happy to argue to the heavens and take

our wins and losses on discovery disputes, but I just

want to be sure that this Court understands that what we

have here is not a situation of difficulty or

recalcitrance.  What we have here is an unusually,
unusually high burden of discovery requests.  And the
report card will show what it does, but we are trying
our darndest.

A final footnote on that relating to the
monitoring solution issues, I heard from Mr. Wood a few
times that we've agreed to produce all relevant versions
of the monitoring solutions.  That's not quite right.
We are agreeing to produce those three monitoring
solutions that my colleague mentioned today.

That is without a concession -- not that I'm
trying to preserve the point, but I just want to be
straight with this Court about what matters and doesn't
in this case -- that is without conceding that there is
any relevance to those monitoring solutions.

In fact, we are concerned that the older
monitoring solutions are not even going to work; that
for opening them up would be like opening up a
15-year-old Excel file which has call links to web pages
that no longer exist.

THE COURT:  That's something you all are going
to meet and confer on; correct?

MR. NEUKOM:  I assure you that we --

THE COURT:  I really want to get --

MR. NEUKOM:  -- will be asked to.

```
 1            THE COURT:  -- to the issues we're here about
 2   today because it's 3 o'clock and we need to end at 4:00
 3   and I'm afraid I'm not going to be able to hear
 4   everything.  So --
 5            MR. NEUKOM:  Fair enough.  I'll move on.
 6            THE COURT:  -- we'll have to come back.
 7            MR. NEUKOM:  Thank you, Your Honor.
 8            THE COURT:  So, we'll start with what would
 9   be -- what's your position on plaintiffs' point that
10   Brocade did not waive the privilege by not logging it?
11            MR. NEUKOM:  So, on the Brocade waiver, I think
12   the facts here matter.  Number one, for these -- call
13   them 13 e-mails at issue, as far as we understand,
14   Brocade didn't have them in their files, and you can't
15   produce what you don't have.  We did have them.
16            THE COURT:  Well, let me ask you about this,
17   and I know you represent Extreme, but -- so, plaintiffs
18   have said they received e-mails -- I guess
19   Mr. Fritterer, if I'm pronouncing his name correctly --
20   that those predated and postdated the date of this court
21   e-mail.  So, I'm trying to understand why it would not
22   have been available to log.
23            MR. NEUKOM:  Look, I would have to defer to
24   Ms. Plessman on that issue.  Although, I haven't -- I've
25   heard suspicions, but I've heard no accusation of any
```

1  spoliation or any untoward conduct by Brocade and

2  Broadcom.  As Your Honor noted, I don't represent them.

3  I do take them at their word that they simply didn't

4  have these documents.

5      If SNMP wants to make an accusation and seek

6  relief under the theory that Broadcom/Brocade, in fact,

7  contrary to what their counsel of record and a member of

8  this gild has said, did have those documents and, yeah,

9  withheld them, I would leave that to SNMPR to pursue in

10 some different procedural format other than today.

11     From my perspective as counsel for Extreme,

12 when I hear that Broadcom/Brocade says they didn't have

13 those documents, I take that to be -- I take that

14 representation as truthful.

15     THE COURT:  Okay.  So, Extreme noted the

16 communications, and that was in, I believe, July --

17     MR. NEUKOM:  So, we did have --

18     THE COURT:  -- is that correct?

19     MR. NEUKOM:  I'm so sorry.  I didn't mean to

20 talk over you.

21     THE COURT:  No.  So, I'm just getting to the --

22 I'm trying to -- I'm going to have to -- I'm trying to

23 address all of the points that they're making of waiver

24 and I want to get your position on those.

25     So, first was not logging it.  You don't

1  specifically have a position on that.  It sounds like

2  you're taking them at their word that they would not

3  have had it and that's the reason that they didn't log

4  it.  But I'm having to look at the legal issue of would

5  that be a waiver.  So, you can either state your

6  position on that, if you have one, or --

7        MR. NEUKOM:  Sure.  My position would be as

8  follows:  If we -- if we accept the representations that

9  Broadcom did not have these documents to produce, then

10  the fact of what happened here is as follows:  We did

11  have them; we produced them in redacted form because

12  there were certainly some dealings between these parties

13  which were not privileged and others that were, and I

14  think that's important to understand by way of

15  background.

16        But we produced redacted versions.

17  Broadcom/Brocade, by my lights, and I believe under the

18  law, was under no obligation to provide a privilege log

19  for something which was produced by another party.

20        We produced it.  We redacted it.  We then noted

21  these items on our privilege log.  I think there is a

22  dispute about whether we should have not only logged

23  them, but furthermore in the log noted this is also

24  covered by a common-interest agreement.  The law says

25  that is not required by any stretch.  We've got the *DC*

1  *Comics* case, the *Zurich* case, the *Kamatani* case.

2          So, look, we -- I may seem less confident at

3  the podium when we talk about Avaya and the claw back,

4  but as to the Broadcom/Brocade 13 e-mails, in the first

5  instance when they were produced, they were redacted.

6  We privilege logged them when we produced our privilege

7  log.  There is now later a dispute about should we have

8  additionally tagged it as common interest or should a

9  different party, non-party now, have additionally logged

10 it.

11         I am aware of no authority under the law which

12 imposes on Broadcom/Brocade a logging obligation for a

13 document produced by another.

14         Now, I can imagine a different scenario.  If we

15 had produced a Broadcom/Brocade privileged, common

16 interest or otherwise, document and it hadn't been

17 redacted and at that point we got into sort of a

18 snapback scenario, look, whether they had a duty to or

19 not, I could certainly imagine that Broadcom and Brocade

20 would want to raise their hand.

21         But, in this instance, if I -- if I'm being

22 asked to put myself in Ms. Plessman's shoes, I can't

23 imagine what the duty or what the practical need would

24 be to say anything because the privilege materials at

25 issue had been redacted and weren't being produced.

1        THE COURT:  Okay.

2        MR. NEUKOM:  I said a moment ago -- let me -- I

3   know the Court wants to get to the very specific issues,

4   but I just want to set the table in a way which I hope

5   is useful.

6        In February 2017, my client and Brocade

7   executed an agreement which included confidentiality

8   clauses and which commemorated contractually the

9   commonality of interest between the two.  Thereafter,

10  the parties negotiated and worked on and ended up

11  executing a purchase and sale agreement for a division.

12       The 13 e-mails at issue arose here in a very

13  specific circumstance.  By the time this happened, and

14  this goes to a distinction from the *Libbey* case and a

15  few others, by September of 2017, Extreme and Brocade

16  had agreed upon all terms of this transaction.  Unlike

17  *Libbey*, unlike an awkward position that we're all used

18  to seeing when you have a commonality of interest

19  between two parties who are negotiating a deal, are they

20  commonality of interest because they both want the deal

21  to get done, or are they adversaries because each one

22  wants a respectively better term?

23       That was not the scenario here.  By September

24  of 2017, there is an e-mail correspondence between, on

25  one hand, Mr. Wood, longtime outside counsel to SNMPR,

1    and on the other hand, two attorneys, one for Extreme,

2    one for Brocade.

3            That e-mail is not privileged, and it's been

4    provided to the Court as one of the exhibits.  The gist

5    of that e-mail was, hey, SNMP, will you agree to

6    transfer the license agreement which previously went to

7    Brocade over to Extreme?  SNMPR said, in effect, no.

8    Or, in any event, what came out of that e-mail

9    communication was there was not an agreed-upon transfer

10   of the license.

11           Those two attorneys representing two companies

12   who at that point are contractually agreed upon the

13   terms of a transfer of the business, what spins out from

14   that is some e-mail traffic and some discussions between

15   attorneys and between attorneys and their clients, which

16   communications all happen while governed by -- it's not

17   disputed -- confidentiality obligations.

18           The reason that I say that that background

19   matters is:  To me, it goes to one of the points that we

20   just heard at the podium which was, here we have a

21   commonality of business interest but we don't have a

22   commonality of legal interests.

23           To me, that's a hard argument to countenance

24   when you understand what the subject matter was of the

25   correspondence in particular; namely, you were talking

 1     about IP rights, licensee rights, contract rights in

 2     which Brocade and Extreme, attorneys for the same

 3     explicitly on the e-mail chain, are wanting one result.

 4     Mr. Wood for SNMP on the other hand doesn't yield, and

 5     then there is legal analysis and legal subject matter

 6     communication that follows, on which subject matter

 7     these two companies, being bound by the fully

 8     agreed-upon terms of a contract, had a commonality of

 9     legal interest.

10          Next point, and I'm going to cover this very,

11     very briefly.  We heard the argument again that there

12     needs to be an actual or potential anticipation of

13     litigation.  Humbly, I think that's a relatively easy

14     question to decide.  There is no dispute between the

15     parties that federal common law governs this issue.

16          If we look to the federal case law on this

17     issue, *Dura Global*, *Elvis Presley*, *Fresenius*, *William F.*

18     *Shea*, *MPT*, *BDO Seidman*, *Regents of California*, I believe

19     I have just bored the Court with about half of the case

20     law citations that we've provided for you showing that

21     the great weight of authority is that there -- under

22     federal law as opposed to Tennessee law, there is no

23     need for an anticipation of litigation.

24          And if that proposition is wrong, then the

25     Federal Circuit Court of Appeals is wrong, the Seventh

Circuit Court of Appeals is wrong, and a heavy handful
of District Court Article III judges in this
district -- pardon me -- in this circuit are also wrong.

On the commonality of legal interests, I've
already mentioned to you the distinction from *Libbey*
where you have an active negotiation versus the
situation here. And I've also mentioned to you the Wood
e-mail. I would also invite the Court to look at the
*Fresenius* and the *FM Generator* decisions which are both
decisions in which the commonality of legal interest in
comparable situations is acknowledged.

I'm prepared to move on to the Avaya situation.
However, I want to pause there. If there are any
questions from the Court about the lucky 13 e-mails, I
want to make sure I address those.

THE COURT: Do you have any position on their
position that it was waived because of the delayed
production of the privilege log of Brocade?

MR. NEUKOM: I do. The -- there was
no -- look, if there was a Court-ordered deadline that
we missed, I haven't heard that. The production of
privilege logs, remember in the context in which I
represent a party which -- whereas, they have produced
54,000 pages of documents so far; we've produced two
million.

1          We produced the privilege log as quickly as we

2     could.  When we priv logged it, we noted all of these

3     redacted items.  I think the primary dispute on waiver

4     there is whether we should not have only logged it as

5     privileged, but we should have additionally given it a

6     tag for common interest, which -- which we've given you,

7     I think, three different decisions that say that's not

8     required.

9          THE COURT:  Okay.  Thank you.

10         MR. NEUKOM:  My pleasure.

11         On Avaya, I am going to try -- I am going to

12    try to streamline this for you.  By my read, the entire

13    Avaya decision or dispute comes down to this:  Did we --

14    by "we," I mean my client.  Did Extreme purchase enough

15    of the business or the division from Avaya such that

16    they became the transferee or the inheritor or the

17    acquirer of the attorney/client privilege.

18         We just heard at the podium we haven't proven

19    that to you enough yet.  I would note for Your Honor

20    that our opportunity to be heard on this issue was a

21    two-page submission.  Within that two-page submission,

22    we cited for you the purchase agreement.

23         According to the purchase agreement, what

24    Extreme did was:  They didn't just buy a patent or they

25    just didn't buy naming rights for a product; we

purchased the assets.  We got the employees from the

networking division.  And I'll talk briefly in a minute

about the --

THE COURT:  So, was it a purchase of a

division?  I mean, that's --

MR. NEUKOM:  Yes.

THE COURT:  -- how I heard Ms. Weber describe

it, as a purchasing of a division.

MR. NEUKOM:  Well, that was, and under the law,

that's allowed.  Even under the Ninth Circuit decision

which I just read for the first time about 20 minutes

ago, that is allowed.

The law does not state that whether you buy the

entirety of a legal entity versus -- or a business

enterprise, even if comprised of multiple legal

entities, the question is not did you buy a division

versus the business; the question is:  Were you buying

control of the business?

THE COURT:  Is that by buying control of a

division?

MR. NEUKOM:  Yes.  And I think it's the *Parmac*

decision, if I may.

Pardon me.  It's not *Parmac*.  We cited for you

the *Parus Holdings versus Banner & Witcoff* decision from

the Northern District of Illinois in 2008, which

1  is -- it talks about the division of a company and

2  privilege moving therewith.

3         But more importantly -- right? -- what's better

4  than a perfectly on-point case law citation looking at

5  the underlying legal analysis?  And what the case law

6  shows is that the focus of the courts is on whether you

7  were buying a thing, a widget, versus whether you were

8  buying the operating business.  And there is no question

9  that that's what we did by my lights.

10        Now, by my lights, versus what the Court will

11 understand were different, given that we have only had a

12 two-page submission.  Within that two-page submission,

13 however, we have cited the purchase agreement to you,

14 and what that agreement shows is that rather than buying

15 a patent or a particular product, we bought the assets.

16 We got the employees.  We got the customers and the

17 customer relationships.  We inherited all the leases.

18 We took their equipment.  We got the IP.  We got their

19 permits, and we became bound by all ongoing and existing

20 contracts of the division, the business, whatever you

21 want to call it.  That scenario -- that's Exhibit C to

22 our most recent two-page submission to you.

23        Now, part of what we heard, and I thought it

24 was a -- it caught my ear -- a good argument was:  How

25 are we doing anything other than dividing the privilege,

1    and the courts don't like that?

2            None of this has been briefed, Your Honor, and

3    I have a solution about how we can work with that at the

4    end.  But if one understands Avaya, which, in my neck of

5    the woods, was a very big entity for a long period of

6    time in Silicon Valley, Avaya had two pieces of the

7    business; they had the phones business and they had the

8    networking business.

9            When they went into bankruptcy -- I think it

10   was 2016, not 2017, by the way.  When they went into

11   bankruptcy, the phones business emerged from bankruptcy

12   reorganization as an ongoing Avaya-branded business.

13   The networking business did not.  The networking piece

14   of the business, the division, if you will, was sold to

15   Extreme.

16           So, the idea that there is today an Avaya

17   entity which -- which goes forward and we are

18   duplicatively or confusingly claiming privilege over

19   something that they would, again, we haven't had the

20   opportunity to brief this to you, but that's not quite

21   square with the facts on the ground about what

22   modern-day Avaya looks like versus what Extreme is

23   doing.  We took the entirety of their networking

24   business.

25           So, here is my -- and then before I -- and I do

1    want to make a brief note on selective disclosure.  I
2    said I would simplify the Avaya issue.  To me, it is as
3    follows:  The Avaya issue came to you relatively late in
4    the game in relatively truncated submissions, even in
5    the form of this informal discovery.

6          I would ask Your Honor after this informal
7    discovery conference, to the extent that you're not
8    convinced, if Your Honor would like additional briefing
9    on the issue, with each side having -- or at least for
10   my side not having just a two-page submission, if we can
11   fully address, if you want more evidence, about whether
12   did we actually take control of the business, in which
13   point we inherit the attorney/client privilege, or were
14   we just lucky sons of guns who bought an asset and
15   nothing more, at which point we don't get the privilege.

16         So far the Court has heard on that only one
17   exhibit and I think one sentence from us and only oral
18   argument comments from the other side, and before
19   we -- before we tear up privilege, so to speak, I would
20   ask to be heard on that, and I think that might be of
21   benefit to the Court.

22         My final point:  The Court asked the question
23   to my friend at opposing counsel table about selective
24   disclosure.  I wasn't planning to cite any cases to Your
25   Honor today that weren't in the briefing, but since that

has been done, we are aware of Your Honor's decision in the Wolpert case from, I think, about a week ago. There is a very helpful discussion of what does and doesn't constitute selective disclosure.

And as I read Your Honor's writing -- I may be on thin ice. As I read Your Honor's writing, there is a discussion of selective disclosure that says, in effect, one is guilty -- those are my words, not the Court's. One is guilty of selective disclosure in a way that you'll be held accountable for, not if you necessarily mention or acknowledge the existence of something, but if you rely upon it for -- and here I am quoting the Court -- "tactical advantage."

The idea that we produced documents because we were asked to or we were forced to, the idea that we cited them in an interrogatory answer, in an interrogatory fashioned by opposing counsel in the subject of ongoing demands for greater content, volume, clarity, nothing about that has secured -- I can assure you, nothing about that has secured my client a tactical advantage in this case, and it's pretty distinguishable from that kind of a scenario.

THE COURT: So, would it be your position that they were not produced in any way that would go to a defense you're going to assert?

```
 1              MR. NEUKOM:  That's right.
 2              THE COURT:  Okay.
 3              MR. NEUKOM:  And, look, just to try to salvage
 4    a teeny bit of credibility, I will say this:  In many
 5    cases that line of questioning from the Court could open
 6    up some sometimes awkward discussions about the timing
 7    of production and the timing of the claw back.
 8              In this case, due to the terms of the
 9    protective order, we don't have that debate.  The
10    parties here have mutually agreed and the Court has
11    ordered that when there is going to be a snapback --
12    right? -- we're not going to get into those other
13    questions.
14              But that doesn't go to the selective disclosure
15    question.  That might go to a diligence or a timeliness
16    question, which thankfully here, due to the protective
17    order, both sides specifically are protected from those
18    kinds of questions.
19              THE COURT:  Okay.  Thank you.
20              MR. NEUKOM:  Thank you, Your Honor.
21              MS. PLESSMAN:  Your Honor.
22              THE COURT:  Yes, Ms. Plessman.
23              MS. PLESSMAN:  There have been a number of
24    questions and oral argument relating to Broadcom or
25    Brocade's waiver.
```

1           THE COURT:  Would you mind coming to the

2     podium?  Thank you.

3           MS. PLESSMAN:  Yes.  I was just going to ask if

4     I could address that.  Thank you.

5           I wasn't necessarily planning to speak, but

6     since a lot of the discussion focuses on those issues, I

7     thought that I would say something.

8           THE COURT:  I appreciate your input.  I know

9     you're in a bit of an awkward position, but --

10          MS. PLESSMAN:  Yes.  Thank you.  Yeah.  And, I

11    mean, just to get right to the point, to be very clear,

12    I'm happy to be back in Knoxville.  We're not happy to

13    be back in this courtroom, necessarily.

14          Plaintiffs had Brocade's privilege log and

15    Extreme's privilege log many, many months before they

16    decided to settle this case.  That settlement agreement,

17    like many settlement agreements, contained very broad

18    releases, known, unknown claims, and the primary purpose

19    of that is to avoid coming to defend and litigate the

20    very case that you've just settled, including discovery

21    disputes about whether or not documents were properly

22    preserved or whether the privilege log is untimely or

23    whether or not something should have been logged on the

24    privilege log.

25          So, our first argument would just be:  It's not

1   Brocade that waived any arguments; it's plaintiffs that
2   waived and released those arguments when they decided to
3   settle this case.  And we should not be brought into
4   this courtroom any time a discovery dispute arises
5   between the parties, and particularly here where it
6   involves a privilege issue that we weren't aware of
7   until August of this year.  And we only were alerted to
8   that by Extreme, not plaintiffs.  It just simply wasn't
9   on our radar at all.
10              And I just want to address some of the -- so,
11  putting aside the waiver issue, the release issue, the
12  settlement issue, more specifically on the timeliness of
13  the production, as Mr. Neukom alluded to, there was not
14  a specific date in the order on which the privilege log
15  would be produced.  And what happened was:  The parties
16  discussed when those privilege logs would be produced,
17  and we produced it right around the same time as Extreme
18  and plaintiffs did.  I don't recall the exact date, but
19  it was the summer of 2022, I believe.
20              In those privilege logs, and, again, plaintiffs
21  have had those privilege logs, it -- we didn't have the
22  documents in question, as you know from our papers.
23  They just weren't in our possession at the time.  The
24  employees in question had left long ago, before the
25  litigation commenced.  Just didn't have them.

 1    Then there is the issue of whether or not we
 2  then had the duty to comb through what was hundreds of
 3  thousands of documents that had been produced in this
 4  case, find redacted documents that were produced by
 5  Extreme and log this privilege, not even a
 6  common-interest privilege, which they're allowed to do
 7  but wouldn't necessarily alert us to an issue, and then
 8  look at the redacted documents and determine whether or
 9  not we then need to add those documents to our privilege
10  log and note that they're -- that they were somehow
11  related to us or our privilege.

12    There is simply no legal duty to do that.  They
13  weren't in our possession, and we hadn't even reviewed
14  all of the documents that had been produced in this
15  case.  And, again, not alerted to this issue until long
16  after settlement.

17    Plaintiffs, on the other hand, if this was
18  their issue, if this is the issue they cared about, they
19  had both privilege logs.  They could have raised it
20  before they settled.  They could have raised it and this
21  could have been an issue that was raised before the
22  Court.  It's too late now.

23    And then finally, I would just say that the --
24  and I think Mr. Neukom already addressed this, but we
25  don't have a duty to log documents that we don't

possess.  And that's simply what happened here.  And,
so, there can't be a waiver of documents because it
wasn't logged on a privilege log where we didn't even
possess the documents in the first place.

I'm happy to address any other questions.  I
think Mr. Neukom, I'm going to defer to him on the
common-interest privilege and those issues.  But I
simply wanted to address this -- this idea that somehow
they can continue raising issues relating to our
discovery, our production of documents, our logging of
privilege issues because, frankly, this could keep
coming up, and we don't want to be dragged back into the
courtroom any time that comes up because we think those
issues were resolved when the parties settled.

THE COURT:  Thank you.

MS. PLESSMAN:  Thank you.

MR. LEE:  Your Honor, could I -- I really want
to talk.

THE COURT:  Mr. Lee.

MR. LEE:  Can I, just from a big-picture
standpoint, for just five minutes?

THE COURT:  Certainly.  And then I'll allow
Ms. Weber to respond.  Then I'll take a brief recess
before we --

MR. LEE:  Okay.  Thank you.

1          THE COURT:  -- conclude.

2          MR. LEE:  On the issue of the common-interest

3    agreement, and I understand it's really not a

4    privilege --

5          THE COURT:  It's a doctrine.

6          MR. LEE:  -- it's attorney/client privilege

7    materials, and then you have a common-interest

8    agreement, and the question is whether you produce

9    materials under that common-interest agreement.  Does

10   that constitute a waiver?  That's kind of what it gets

11   down to on the common-interest issue.

12         And I would suggest to the Court that -- I

13   mean, the Court's decision on this has, obviously,

14   impact on this case, but it has a much broader impact in

15   the business world in that companies are bought or

16   attempted to be bought every day.

17         Corporate lawyers, my colleagues and other

18   people's colleagues, they -- they enter into

19   confidentiality agreements to enter into a due diligence

20   phase to try to buy or look to buy a company.

21         Say it's a restaurant chain and it has 50

22   restaurants and you're trying to gather information as

23   to whether you want to buy this for what price, whether

24   you need to get indemnity for certain threats that are

25   out there, legal and non-legal.

1      So, you enter into a confidentiality or

2  common-interest agreement.  And under that there is a

3  sharing of privileged information.  What do your leases

4  look like?  Do you have any holes in your leases?  You

5  know, and they -- so, you're looking before you leap,

6  before you purchase.

7      What do your vendor contracts look like?  If

8  you're a restaurant that, for example, serves Impossible

9  Burgers, you know, do you have that properly licensed

10 where you can put that name on your menu?  You, as the

11 seller's counsel and the seller, you're looking for that

12 due diligence.

13      And I think the courts and society want there

14 to be full disclosure because you don't want to buy a

15 pig in a poke.  You want to encourage there to be full

16 disclosure between buyer and seller so that the market

17 functions effectively and you know what you're buying.

18      To the extent that producing privileged

19 materials under a common-interest agreement, to the

20 extent the Court rules that's a waiver, that would be at

21 odds with almost all corporate law; Delaware,

22 everywhere.  And there are transactions every day, and I

23 don't think the Court wants to have a chilling effect,

24 because the outcome then is the seller is not going to

25 tell you about this stuff.  We have a problem with our

1   lease but we're not going to tell you about it.  We have
2   a problem with our vendor agreements but we can't tell
3   you about it.  There needs to be this full and frank
4   disclosure as part of this -- whether it's an asset
5   purchase, a letter of intent, or at each step down the
6   road, even after a letter of intent is signed.
7           I think the Court needs the big picture to be
8   encouraging that sort of disclosure within the confines
9   of the confidentiality agreement, and that does not
10  constitute a waiver.
11          That's just my big-picture point of view.
12  Thank you.
13          THE COURT:  Thank you, Mr. Lee.
14          Ms. Weber.
15          MS. WEBER:  Thank you, Your Honor.  I'll make a
16  few brief points.
17          I agree with Mr. Lee that I think a ruling on
18  this common-interest doctrine issue could have a big
19  impact in the business world, and that is our very
20  point.
21          And to the extent that, as Mr. Lee says,
22  parties who are negotiating a transaction are worried
23  about things like legal risk, then they can enter into a
24  common-interest agreement to note their common purpose
25  in jointly analyzing the shared legal risk that the

1  parties might be getting into.

2         That's not what happened here.  There are

3  plenty of protections that Brocade and Extreme as

4  sophisticated parties could have provided for in the

5  confidentiality agreement, in the APA.  They didn't.

6         THE COURT:  But you would agree there did not

7  need to be a separate common-interest agreement.

8         MS. WEBER:  I think that there needed to be a

9  clear indication and evidence provided to meet their

10 burden to show that there was a joint pursuit of a legal

11 analysis.  That's not just something that percolates up

12 from the business interest.

13        THE COURT:  Separate from a

14 confidentiality -- a general confidentiality agreement.

15        MS. WEBER:  Than the one we have here, yes,

16 Your Honor.  I do think that's the case.

17        And my next point, I think -- I've already made

18 this point.  I'll just make it again really quick.  You

19 don't have to get to the waiver issue.  I think the 22

20 Brocade/Extreme e-mails that we're asking for to be

21 produced unredacted can still be produced if you find

22 that Extreme has not met its burden to show that the

23 common-interest doctrine applies here.

24        My third point:  Jay had mentioned that in

25 September 2017, Mr. Wood reached out to -- or, I guess,

1  responded to Brocade, asked for a little bit more

2  information about what they planned to do with the

3  license agreement.  That happened months after the

4  agreements that they are pointing to as the anchoring

5  point of the common-interest doctrine in this case.

6  They still don't point to any agreement.  They point to

7  kind of a reaction.

8         And I'll point out something about the timing.

9  Jay said something to the effect of the one result that

10  the parties wanted, and at this point in late September,

11  early October of 2017, the one result that the parties

12  wanted was to close the deal.  And, in fact, they had to

13  extend it a little bit.  It was supposed to close, I

14  think, in late September, and it ended up closing in

15  late October.  So that is the one result and why they

16  wanted to finally get permission from the last lingering

17  parties who hadn't, for one reason or another, agreed to

18  a contract assignment, and that's what they're trying to

19  make happen so that they could close this deal.

20         I'll point out, my friend Jay mentioned two

21  cases, *Fresenius*, *FM Generator*.  *Fresenius* is a great

22  example of actual litigation being involved.  Nabi in

23  that case communicated with a third party because it was

24  taking over the patent prosecution from that third

25  party.  So, that's the -- I think that just underscores

1    what we're arguing as required under the common-interest

2    doctrine.

3              And then *FM Generator* does point out the

4    requirement for the pursuit of a common legal

5    enterprise.  I don't think we have anything like that in

6    this case.  There were legal issues that percolated up.

7              And there was also a note in that case that

8    there was explicit evaluation of assessing risk

9    corresponding to existing contractual obligations.

10             With respect to Avaya and whether Extreme

11   proved it enough, I'll note -- I think there were, like,

12   five lines at the end of their brief that they left

13   blank.  They did not ask for leave to submit more

14   evidence.  But I don't think submitting more evidence

15   would help here because the point is still the same;

16   they're asking you to split the privilege between the

17   Avaya entity that still exists and now the assets that

18   Extreme owns.

19             We don't think that that would be the correct

20   result, and, in fact, you could argue that the same

21   thing happened with Brocade because Extreme bought a

22   division from Brocade.  They're not making the argument

23   that the transfer of privilege occurred once they bought

24   that division; now they have Brocade's privilege.  They

25   didn't make that argument.

1          My last point:  I think the assertions that we

2     violated the settlement agreement, we obviously don't

3     agree with, and we're happy to submit the settlement

4     agreement for Your Honor to review if Brocade agrees.

5     Just let us know, please.

6          Thank you.

7          THE COURT:  Okay.

8          MS. WEBER:  Unless you have any questions.

9          THE COURT:  Let me -- so, let me just go back

10    to the common-interest --

11         MS. WEBER:  Okay.

12         THE COURT:  -- privilege.  Mr. Neukom had

13    argued that there was no need for the anticipation of

14    litigation, and you had argued that, and I just wondered

15    if there was anything you had to add in response to --

16         MS. WEBER:  I don't think --

17         THE COURT:  -- what he said.

18         MS. WEBER:  Sorry.  I don't think there is any

19    additive.  Just that we would still point to the same

20    three cases, *Adkisson*, I think *Gammons*, and *Boyd*.  We

21    believe it is required.

22         But even if it's not required, we still don't

23    think they have shown the common legal interest that's

24    required under the case law in the first place.

25         So, under either iteration, their view or our

1    view of the law, we think they haven't met their burden

2    to show the common-interest doctrine is extended here.

3            THE COURT:  Okay.

4            MS. WEBER:  Thank you.

5            THE COURT:  All right.  Well, I'm going to take

6    a brief recess to see if there is any other questions I

7    need to ask before we conclude today.  So, we'll stand

8    in a brief recess.

9            THE COURTROOM DEPUTY:  All rise.  This

10   honorable court stands in recess.

11           (A brief recess was taken.)

12           THE COURT:  Okay.  Before we recess for the

13   day, I do want to request supplemental briefing on three

14   topics, and I want all three topics addressed in

15   one -- your one briefing document that for each side is

16   a limit of 25 pages.

17           So, these are the three issues:  First, whether

18   Extreme, in responding to the interrogatory request,

19   whether that operated as an intentional waiver of the

20   privilege, and, of course, if so, go through the 502(a)

21   factors, include that.  Second, whether there was a

22   transfer of privilege from Avaya to Extreme.  And,

23   third, I want you to address the claim of privilege with

24   respect to Avaya's employee communications because I

25   didn't -- I feel like I didn't hear enough about that

1    today.

2           So, given that Extreme has the burden, I want

3    to ask them -- I don't want these simultaneous.  I want

4    Extreme to go first, especially since it sounds like

5    they wanted to provide additional information as to

6    Avaya and that transaction.  So, I would ask that

7    Extreme have its opening brief by November 15th.  Does

8    that work?

9           MR. NEUKOM:  That does.  Thank you, Your Honor.

10          THE COURT:  Okay.  And then for SNMP, I would

11   like to have your responding brief by December the 1st.

12   I'm giving you a couple of days because of the

13   Thanksgiving holiday.  So, it's just a little beyond two

14   weeks.

15          And I'm going to ask that you actually file

16   your briefs on ECF.  While this is an informal discovery

17   dispute, I feel like I'm requesting this additional

18   information.  You may have declarations or such to

19   submit, so I would feel that -- I feel it's more

20   appropriate to have that filed on ECF at this time.

21          So, I'm going to do a short order reflecting

22   that I've asked for additional briefing and the parties

23   are asked to file that on the record.

24          Okay.  So, is there anything else then we need

25   to take up?

1          MR. LEE:  Your Honor, procedurally -- or, go

2     ahead.

3          MR. NEUKOM:  Sorry.  Is this the stuff that we

4     discussed?

5          MR. LEE:  Yes.

6          MR. NEUKOM:  I'm comfortable with that for now.

7          MR. LEE:  Okay.  All right.

8          MR. NEUKOM:  I have one question, which is:  I

9     think I have a very clear understanding of what Your

10    Honor would like us to address with points one and

11    number two.

12         THE COURT:  Yes.

13         MR. NEUKOM:  If you asked me to repeat back

14    what we should address on point number three, I don't

15    think I could do a very good job of it.  So, may I ask

16    the Court just to -- even if it's saying the same thing

17    all over again --

18         THE COURT:  Yes, it's with respect to the

19    employee communications.  As the way I understood from

20    the position statements, I need to consider perhaps

21    whether those communications between the employees were

22    done at the direction of or for information that was

23    going to go back to Mr. Hamilton as legal counsel.  And,

24    so, I need to -- I need to understand more about the

25    communications amongst the employees and why those were

1  taking place.

2          MR. NEUKOM:  Understood.  So, is it scenario

3  one, two employees, non-lawyers, e-mailing about a new

4  product launch that's not privileged?

5          THE COURT:  Right.

6          MR. NEUKOM:  Is it, instead, two employees

7  doing something covered by privilege?

8          THE COURT:  Collecting -- were they directed to

9  collect information that was going back to be used by

10  legal counsel.

11          MR. NEUKOM:  Understood.  Thank you.

12          THE COURT:  Okay.  All right.  Anything further

13  on behalf of SNMP?

14          MR. WOOD:  Nothing from plaintiffs, Your Honor.

15          THE COURT:  Okay.  All right.  Thank you for

16  your presentations today.

17          MR. WOOD:  Thank you.

18          MR. NEUKOM:  Thank you.

19          MR. LEE:  Thank you, Your Honor.

20          THE COURTROOM DEPUTY:  All rise.  This

21  honorable court stands adjourned.

22          (Which were all the digitally-recorded

23           proceedings had and herein transcribed.)

24                    * * * * * * *

25

```
1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4            I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    digitally-recorded proceedings; that the foregoing pages

7    were transcribed, to the best of my ability to hear and

8    understand the recorded file, under my personal

9    supervision, and constitute a true and accurate record

10   of the digitally-recorded proceedings.

11           I further certify that I am not an attorney or

12   counsel of any of the parties, nor an employee or

13   relative of any attorney or counsel connected with the

14   action, nor financially interested in the action.

15           Transcript completed and signed on Tuesday,

16   November 7, 2023.

17

18

19

20

21           _____
             TERESA S. GRANDCHAMP, RMR, CRR
22           Official Court Reporter

23

24

25
```