**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

--------------------------------------------------------- x
                                              :
SNMP RESEARCH, INC. and SNMP                  :          Case No. 3:20-cv-00451-CEA-DCP
RESEARCH INTERNATIONAL, INC.,                 :
                                              :
                   Plaintiffs,                :
                                              :
              v.                              :
                                              :
BROADCOM INC., BROCADE                        :
COMMUNICATIONS SYSTEMS LLC, and               :
EXTREME NETWORKS, INC.,                       :
                                              :
                   Defendants.                :
--------------------------------------------------------- x

## DEFENDANT EXTREME NETWORKS, INC.'S
## SUPPLEMENTAL BRIEF IN SUPPORT OF ITS PRIVILEGE ASSERTIONS

# TABLE OF CONTENTS

Page

I.    PROCEDURAL BACKGROUND ...................................................................2

II.   EXTREME'S IDENTIFICATION OF THREE PRIVILEGED DOCUMENTS IN AN INTERROGATORY RESPONSE DOES NOT CONSTITUTE A WAIVER OF PRIVILEGE ..........................................................................................................3

      A.    Factual Background ..........................................................................................4

      B.    Extreme's Identification of the Three Documents in Its Interrogatory Response Was Not An Intentional Disclosure of Privileged Information ..............6

      C.    Extreme's Citing of the Documents In an Interrogatory Response Was Not An Intentional Disclosure Of Privileged Communications ....................................6

      D.    If Extreme's Identification of the Three Documents Was A Disclosure of Privilege, The Disclosure Was Inadvertent ...........................................................8

      E.    Extreme's Listing of the Three Documents In The Interrogatory Does Not Result in a Privilege Waiver Because the Parties' Claw Back Agreement Prevents Waiver in These Circumstances ..............................................................11

III.  WHEN EXTREME ACQUIRED AVAYA'S NETWORKING BUSINESS, IT ALSO ACQUIRED THE AUTHORITY TO ASSERT PRIVILEGE OVER THE BUSINESS' COMMUNICATIONS. .................................................................................14

      A.    Avaya's Bankruptcy and Extreme's Acquisition of Avaya's Networking Business .................................................................................................................14

      B.    Extreme Acquired Avaya's Attorney-Client Privilege for the Networking Business When Extreme Acquired That Business in July 2017 ...........................16

IV.  THE POST-ACQUISITION AVAYA-RELATED EMPLOYEE COMMUNICATIONS ARE ALSO PROTECTED BY EXTREME'S ATTORNEY CLIENT PRIVILEGE ..............................................................................21

# **TABLE OF AUTHORITIES**

**Cases**     **Page(s)**

*Adkisson v. Jacobs Eng'g Grp., Inc.*, 2021 WL 149841 (E.D. Tenn. Jan. 15, 2021) .............21, 23

*American International Specialty Lines Insurance Co. v. NWI-I, Inc.*, 240 F.R.D.
    401 (N.D. Ill. 2007) ...............................................................................17, 19, 20, 21

*American Municipal Power, Inc. v. Voith Hydro, Inc.*, 2020 WL 5014914 (S.D.
    Ohio Aug. 25, 2020) .............................................................................................24

*Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 19 F.3d
    1432, 1994 WL 58999 (6th Cir. 1994) .................................................................25

*Cooey v. Strickland,* 269 F.R.D. 643 (S.D. Ohio 2010) ...................................................24

*First Tech. Capital, Inc. v. JP Morgan Chase Bank, N.A.*, 2013 U.S. Dist. LEXIS
    185763 (E.D. Ky. Dec. 10, 2013) ...........................................................................3

*GATX Corp. v. Appalachian Fuels, LLC*, 2010 WL 5067688 (E.D. Ky. Dec. 7,
    2010) .....................................................................................................................10

*Haines v. Liggett Group, Inc.*, 2000 U.S. Dist. LEXIS 22491 (D.N.J. Sept. 11,
    2000) .......................................................................................................................7

*Hopson v. City of Baltimore*, 232 F.R.D. 228 (D. Md. 2005) ...........................................6

*Hosea Project Movers, LLC v. Waterfront Assocs., Inc.*, 2017 WL 4682384 (S.D.
    Ohio Oct. 18, 2017) .............................................................................................24

*In re. Windstream Commc'ns., LLC*, 2018 U.S. App. LEXIS 21997 (6th. Cir. Aug.
    7, 2018) ................................................................................................................11

*irth Sols., LLC v. Windstream Commc'ns LLC*, 2017 U.S. Dist. LEXIS 121241
    (S.D. Ohio Aug. 2, 2017) ..............................................................................6, 9, 13

*Luraco Health & Beauty, LLC v. Vu Tran*, 2020 WL 2747233 (E.D. Tex. May 27,
    2020) .....................................................................................................................17

*Lynx Services Ltd. v. Horstman*, 2016 WL 4565895 (N.D. Ohio Sept. 1, 2016)..............16, 17, 18

*Oro BRC4, LLC v. Silvertree Apartments, Inc.*, 2023 WL 2785743 (S.D. Ohio
    Feb. 10, 2023) ...........................................................................................21, 22, 23, 24

*Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995 (N.D. Ill.
    2008) .............................................................................................................16, 17, 19, 20

*Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760 (E.D. Tex. 2004)..............16, 17, 19, 21

*Synopsys, Inc. v. Siemens Indus. Software Inc.*, 2023 U.S. Dist. LEXIS 169557 (N.D. Cal. Sept. 22, 2023) ...........................................................................6, 7

*United States v. Adams*, 2018 WL 1255003 (D. Minn. Mar. 12, 2018) ...........................16, 18, 19

*United States v. Wells Fargo Bank, N.A.*, 2015 WL 5051679 (S.D.N.Y. Aug. 26, 2015) ...........................................................................................................................14

*USI Ins. Servs., LLC v. Ryan*, 2014 WL 3054278 (N.D. Ind. July 7, 2014) ..................................16

*UTStarcom, Inc. v. Starent Networks, Corp*, 2009 WL 4908579 (N.D. Ill. Feb. 20, 2009) ...........................................................................................................................16

*Wolpert v. Branch Banking Trust & Co.*, 2023 U.S. Dist. LEXIS 190768 (E. D. Tenn., Oct. 24, 2023) .........................................................................................10

*Wolpert v. Branch Banking Trust & Co.*, 2023 U.S. Dist. LEXIS 55179 (E.D. Ten. Mar. 30, 2023) ...............................................................................3, 6, 8, 9, 10, 11

*Yosemite Inv., Inc. v. Floyd Bell, Inc.*, 943 F. Supp. 882 (S.D. Ohio 1996) ..................................17

**Other Authorities**

Fed. R. C. P. 33 ............................................................................................................5, 6

Fed. R. Evid. 502 ...................................................................................... *passim*

Plaintiffs ("SNMPR") served an interrogatory that—as written by SNMPR—required Defendant Extreme Networks, Inc. ("Extreme") to "identify" all documents regarding Extreme's right to use SNMPR software. Extreme obliged; used keyword searching to identify documents fitting that SNMPR-designed subject matter; and then listed 106 documents in a written interrogatory response. Among them, Extreme listed (simply by Bates number, with no further description) three privileged communications with Brocade Communications Systems LLC ("Brocade"). When Extreme listed those three documents in its interrogatory response, no information was provided except Bates numbers. A month later, when Extreme clawed back those three privileged documents (pursuant to the Stipulated Protective Order ("PO")), Extreme deleted the three documents from its interrogatory response. Extreme's identified the documents in the same way as one would list privileged communications on a privilege log (i.e. by subject matter). Just as listing a document on a privilege log does not disclose privileged information, identifying the three documents by Bates number did not independently disclose the underlying privileged communications, let alone intentionally, let alone for strategic advantage. But even if Extreme did disclose privileged communications by listing the documents' Bates numbers, the disclosure was inadvertent and cannot result in waiver because the claw back provision that the parties agreed to in the PO, and that this Court entered, prevents waiver of privilege in these circumstances. The Court should not find that Extreme waived privilege over the three documents (or a broader subject matter).

The Court should also find that Extreme's acquisition of Avaya, Inc.'s ("Avaya") networking business during Avaya's bankruptcy was not simply an asset sale but instead a transfer of control of the business from Avaya to Extreme such that Avaya's attorney-client privilege for the networking business transferred to Extreme. As a result, Extreme rightfully held attorney-client

privilege over the pre-acquisition communications between Avaya employees who were gathering information for Avaya's in-house counsel to render legal advice related to Avaya's litigation and settlement with SNMPR. Further, when the same information gathering continued post-acquisition with the assistance of Extreme's agents, Extreme's privilege remained intact because communications involving a client's agent are protected by the client's attorney-client privilege. The Court should find Extreme's communications with its agents for gathering information on behalf of in-house counsel were protected by Extreme's attorney-client privilege.

## I.     Procedural Background

On September 1 and 7, 2023, the parties submitted briefs under the Court's informal discovery process concerning, *inter alia*, Extreme's communications with Brocade that Extreme asserted were attorney-client privileged documents subject to the common-interest doctrine. On September 7, Extreme clawed back eight similar documents that included additional privileged communications with Brocade that Extreme previously, had inadvertently produced. Extreme had identified three of those clawed back documents by Bates number only, with no additional context, in its August 8, 2023 supplemental response to SNMPR's Interrogatory No. 8.

Separately: On September 11 and 20, Extreme clawed back four email chains[1] comprising privileged communications related to Avaya's networking business, which Extreme had acquired—along with Avaya's attorney-client privilege—in March 2017. Declaration of Saurabh Prabhakar ("Prabhakar Decl.") Ex. 1, Extreme Claw Back Notice Emails at 3. These communications involved (1) pre-acquisition internal communications within Avaya's networking business for the purpose of gathering information requested by Avaya's in-house counsel to render

---

[1] The four email chains (three of which originated from the same initial email) constituted 100 documents.

and implement legal advice (related to Avaya's litigation and settlement with SNMPR) and (2) post-acquisition communications between Extreme and its agents for gathering the same information requested pre-acquisition by in-house counsel

The Court ordered the parties to submit two-page informal briefs on these privilege issues, which the parties submitted on October 5 and 12. On November 1, the Court heard oral arguments from the parties on these issues and ordered the parties to submit supplemental briefing addressing three questions:

(1)     Whether Extreme's interrogatory identification by Bates number of three subsequently clawed back documents containing privileged communications with Brocade operated as an intentional waiver of the privilege under Federal Rule of Evidence ("FRE") 502(a) (*see* Prabhakar Decl. Ex. 7, Nov. 1, 2023 Disc. Hr'g Tr. at 84:17-20);

(2)     Whether Avaya's privilege transferred to Extreme after Extreme acquired Avaya's networking business (*see id.* at 84:21-22); and

(3)     Whether the clawed back communications between Avaya employees were protected under attorney-client privilege because the communications were made at the direction of counsel (*see id.* at 84:23:24, 86:18-87:1, 87:8-10).

## II.     Extreme's Identification of Three Privileged Documents in An Interrogatory Response Does Not Constitute A Waiver of Privilege

FRE 502 applies "to disclosure of a communication or information covered by the attorney-client privilege." Fed. R. Evid. 502; *Wolpert v. Branch Banking Trust & Co*., 2023 U.S. Dist. LEXIS 55179, *10 (E.D. Ten. Mar. 30, 2023) (federal law govern waiver). "Under the Rule's structure, a disclosure is inadvertent or it is intentional." *First Tech. Capital, Inc. v. JP Morgan Chase Bank, N.A.*, 2013 U.S. Dist. LEXIS 185763, at *6 (E.D. Ky. Dec. 10, 2013). Whether a

3

disclosure of privileged information is inadvertent or intentional affects the waiver determination: if disclosure is intentional, waiver is presumed; but if disclosure is inadvertent, then FRE 502(b) applies to determine if there is waiver. *Id.*

### A. Factual Background

The three privileged documents at issue were among around 37,000 documents comprising around 700,000 pages that Extreme produced in May 2022. Neither party relied on them in any submission or filing with the Court—or even discussed their substance—until September 7, 2023, when SNMPR argued for the first time in a reply brief that Extreme had waived privilege over all Brocade communications by selectively relying on such communications in Extreme's response to interrogatories a month before. Prabhakar Decl. Ex. 2, Plaintiffs' Sept. 7, 2023 Reply re Issues Raised in Aug. 24, 2023 Email.

SNMPR was referring to its Interrogatory No. 8. That interrogatory required Extreme to identify its internal communications related to the use of SNMPR's software in Extreme products:

> Identify all internal Communications in which there was any discussion or Communication whatsoever concerning: (1) whether Extreme had a right to use SNMP Research Software in Extreme Products, including but not limited to any particular Extreme Product; and (2) payment obligations of Extreme for the use of SNMP Research Software.

Prabhakar Decl. Ex. 3, Extreme's 8th Supp. Resps. & Objs. to SNMPR's 1st ROGs at 31-32. Extreme originally objected that the interrogatory sought attorney-client privileged communications and was unduly burdensome because it asked for "all" communications on the subject matter. Prabhakar Decl. Ex. 4, Extreme's 7th Supp. Resps. & Objs. to SNMPR's 1st ROGs at 29-32.

In early June 2023, SNMPR demanded that Extreme supplement its response to identify both non-privileged and privileged communications. Despite the burden of SNMPR's request, to avoid a dispute, Extreme agreed in mid-July to supplement its response to identify (i)

4

communications that Extreme had produced by Bates Number and (ii) privileged communications by reference to the corresponding privilege log entries.

Identifying "all internal Communications" sought by the interrogatory by individually reviewing every produced communication was not feasible: by mid-July 2023, Extreme had (to comply with SNMPR's discovery demands) produced around 85,000 documents comprising 1.28 million pages. Thus, Extreme used search terms to identify responsive communications and ultimately identified 106 communications in its supplemental response: 33 produced documents by Bates Number and 73 documents on Extreme's privilege log by entry number. Prabhakar Decl. Ex. 5, Extreme's 9th Supp. Resps. & Objs. to SNMPR's 1st ROGs at 2-3. Extreme did not argue that the identified documents were helpful to its defenses in this case. Extreme did not characterize the documents in any way. Rather, Extreme listed the documents by Bates number pursuant to Federal Rule of Civil Procedure 33(d). Simply put, the interrogatory asked for all communications about a subject matter and Extreme's response ***only identified the communications about that subject matter and nothing more***.

Extreme did not realize that it had cited to three privileged documents until SNMPR accused Extreme of selective waiver in its September 1, 2023 brief.[2] Extreme immediately investigated the issue and promptly clawed back the three documents on September 7, 2023. Prabhakar Decl. Ex. 1 at 1. The next day, Extreme updated its response to Interrogatory No. 8 and deleted reference to the three documents. Prabhakar Decl. Ex. 6, Extreme's 10th Supp. Resps. & Objs. to SNMPR's 1st ROGs at 4-6.

---

[2] SNMPR did not specifically identify any communications in its brief; it made only a vague reference to selective waiver. Extreme then uncovered the inadvertent disclosure through its own search.

## B. Extreme's Identification of the Three Documents in Its Interrogatory Response Was Not An Intentional Disclosure of Privileged Information

SNMPR does not seriously dispute that Extreme's initial production of the three documents identified in Interrogatory No. 8 was inadvertent. Extreme produced the three documents with a voluminous production of around 37,000 other documents. *See, e.g.*, *Hopson v. City of Baltimore*, 232 F.R.D. 228, 244 (D. Md. 2005) (finding a record-by-record pre-production privilege review, on pain of subject matter waiver, is unreasonable). Inadvertent disclosure means any "mistaken, or unintentional, production of privileged material." *Wolpert*, 2023 U.S. Dist. LEXIS 55179, at *14 (citing *irth Sols., LLC*, 2018 U.S. Dist. LEXIS 12724 (S.D. Ohio Jan. 26, 2018) ("Court's across the country have held that any action that was not intended, not planned, or a mistake, qualifies as 'inadvertent'—regardless of how negligent a party's actions were.")). A negligent disclosure of privileged information is still considered inadvertent. *irth Sols.*, LLC, 2017 U.S. Dist. LEXIS 121241, at *20. "Inadvertence is a given in most cases." *irth Sols., LLC v. Windstream Commc'ns. LLC*, 2017 U.S. Dist. LEXIS 121241, at *20 (S.D. Ohio Aug. 2, 2017). Here, SNMPR effectively concedes that Extreme produced the three Brocade communications by mistake by stating that it is "not making an inadvertent disclosure argument." Prabhakar Decl. Ex. 7, at 54:13-16.

## C. Extreme's Citing of the Documents In an Interrogatory Response Was Not An Intentional Disclosure Of Privileged Communications

SNMPR is wrong that Extreme "selectively waived . . . based on [its] intentional citation of three [documents] pursuant to Rule 33(d)" in its response to Interrogatory No. 8. (Prabhakar Decl. Ex. 7 at 54:13-17.)

As an initial matter, "referencing [a document by] the Bates number is not an independent disclosure of the actual document" that waives privilege. *See Synopsys, Inc. v. Siemens Indus. Software Inc.*, 2023 U.S. Dist. LEXIS 169557, *4 (N.D. Cal. Sept. 22, 2023). In *Synopsys*, the

6

defendant served an interrogatory seeking identification of plaintiff's communications related to the patents at issue. *Id.* at *1-2. The plaintiff responded to the interrogatory by producing documents and identifying them by Bates number in its interrogatory response. *Id.* at *2. The plaintiff's response referenced a previously produced document by Bates number that the plaintiff clawed back six days after production. *Id.* at *3. The court found that the plaintiff did not waive privilege because, *inter alia*, referencing a Bates number was not an independent disclosure of the document and the error was promptly rectified. *Id.* at *4.

*Synopsys* is on all fours. Like *Synopsys*, Extreme responded to an interrogatory by identifying the three Brocade communications by Bates numbers. Like *Synopsys*, Extreme's error was promptly rectified by (i) clawing back the privileged documents within a week of being alerted to their mistaken production and (ii) deleting references to those documents in its interrogatory response. Like *Synopsys*, by initially identifying the documents by Bates number in an interrogatory response, Extreme did not independently disclose any privileged information. Accordingly, Extreme did not waive privilege.

Substantively, Extreme's supplemental response to Interrogatory No. 8 was no different than the information that would be disclosed in a privilege log. See *Haines v. Liggett Group, Inc.*, 2000 U.S. Dist. LEXIS 22491, *39 (D.N.J. Sept. 11, 2000) ("The [Press] Release, while disclosing the most general description of the subject matter of the communications, does not delve into their substance. As such, it is hardly more descriptive than a privilege log, which [defendant] would be required to submit in claiming the privilege."). Like a privilege log, which identifies privileged communications but does not disclose the underlying privileged contents, Extreme's interrogatory response identified the communications without disclosing their contents.

To the extent SNMPR argues that identifying a document by Bates number is a disclosure of the document, that argument taken to its logical conclusion would result in an absurd outcome. Extreme's response to Interrogatory No. 8 identified 73 privileged communications by privilege log entry numbers, which are identifying numbers just like a Bates number. So, if identifying a communication by Bates numbers discloses the underlying communication, as SNMPR argues, then identifying a communication by privilege log entry number also discloses the underlying privileged communications. To put a finer point on it, under SNMPR's argument, Extreme disclosed 73 properly withheld privileged communications by identifying them in its interrogatory response. That is an absurd result but one that follows from SNMPR's argument.

### D. If Extreme's Identification of the Three Documents Was A Disclosure of Privilege, The Disclosure Was Inadvertent

To the extent that SNMPR argues that referencing a document by Bates number in an interrogatory is evidence of intent to waive privilege, SNMPR is wrong again. Extreme included the three documents in its supplemental interrogatory response by operation of search terms used to reduce Extreme's burden in identifying responsive communications. Prabhakar Decl. at ¶5. While Extreme reviewed the documents identified in its response, it reviewed privileged and non-privileged communications that hit on the search terms together and focused its review solely on determining whether the communications were responsive to the interrogatory. Extreme was not re-screening the documents for privilege. Prabhakar Decl. at ¶4. It had no reason to do so since SNMPR had not put it on notice of any inadvertently produced privileged material at the time. Once the substantive review for responsive documents was complete, the relevant Bates number and privilege log entry numbers were added to the interrogatory response in a different workflow.

*Wolpert* is instructive. 2023 U.S. Dist. LEXIS 55179, at *13-16. There, the defendant produced a letter after redacting some, but not all, attorney-client privileged information. *Id.* at *4.

After the plaintiffs prompted the defendant to log the redacted portions of the letter in a privilege log, the defendant discovered that it failed to redact other privileged portions of the letter and clawed it back. *Id*. The court found the letters' disclosure was inadvertent because—while the defendant clearly had reviewed the contents of the letter when applying the initial set of redactions—"failing to redact other portions [did] not necessarily mean [d]efendant's actions . . . were intentional." *Id*. at *16. In contrast, the court found the defendant's disclosure of certain email strings was intentional because the defendant took multiple affirmative actions showing a voluntary disclosure, including: arguing that the email strings contained content that was different from the privileged content in the letter, and filing the email strings on the docket, where they remained publicly available for approximately two months. *Id*. at *13-15.

Here, there is no evidence that Extreme's disclosure was intentional. Extreme never (1) argued that the three documents were not privileged; (2) filed them on the docket; (3) described the contents of the communications; (4) contended the documents were different from other privileged content Extreme had withheld; or (5) contended that they were substantively helpful to Extreme's case. *Compare with* Wolpert, * 13-15. Extreme did not use the three documents in any way like the email strings in *Wolpert* had been used. Rather, like the letter in *Wolpert*, once Extreme became generally aware of a claim of selective disclosure—via SNMPR's September 1, 2023 brief—Extreme promptly clawed back the inadvertently produced documents. Notably, even if Extreme was negligent in failing to catch its inadvertent disclosure as it identified documents in response to SNMPR's interrogatory, negligence is still considered an inadvertent disclosure. *See irth Sols., LLC*, 2017 U.S. Dist. LEXIS 121241, at *20.

9

SNMPR's claims that Extreme selectively disclosed privileged information are based entirely on Extreme's identification of the three documents in its interrogatory response. [3] Prabhakar Decl. Ex. 7 at 54:15-17. But Extreme neither sought nor gained any tactical advantage by listing three documents in the non-privileged rather than the privileged bucket in response to Interrogatory No. 8. *See, e.g.*, *GATX Corp. v. Appalachian Fuels, LLC*, 2010 WL 5067688, at *6 (E.D. Ky. Dec. 7, 2010). Extreme has not relied on the three documents in a selective, misleading, or unfair manner. *See Wolpert v. Branch Banking Trust & Co.*, 2023 U.S. Dist. LEXIS 190768, *18 (E. D. Tenn., Oct. 24, 2023). And Extreme cannot rely on these documents now anyway because the documents have been clawed back. Additionally—relevant to a question the Court posed during oral argument—Extreme has not produced the documents to use in a defense it was going to assert in this case. Prabhakar Decl. Ex. 7 at 71:23-72:1; *see Wolpert*, 2023 US. Dist. LEXIS 190768, at *18. (no selective disclosure when defendant represented it had not relied on the email strings to prove a defense or negate any claims). Finally, SNMPR has not shown what tactical advantage Extreme gained by listing the three documents in its interrogatory response.[4] Prabhakar Decl. Ex. 7 at 53:12-25. All these facts confirm that Extreme's listing of the three

---

[3] In its informal reply brief submitted on September 7, SNMPR provided an August 2019 email between Broadcom's counsel and Extreme's counsel as a lone example of an intentionally disclosed privileged communication. *See* Ex. 4 from that brief. But that email was never a privileged communication. By August 2019, the two-year term of the parties' February 2017 Confidentiality Agreement had already expired. Prabhakar Decl. Ex. 8, February 14, 2017 Confidentiality Agreement at EXTREME-00008097. And by August 2019, Extreme and Broadcom no longer had a common interest in Brocade's datacenter networking business— Extreme had closed the acquisition of that business nearly two years ago. SNMPR's example, therefore, does not show intentional disclosure of privileged communications because the communication was not privileged in the first place.

[4] SNMPR conceded during the hearing that it had not briefed whether subject matter waiver is warranted. Prabhakar Decl. Ex. 7 at 55:1-2. The Court should allow Extreme to respond to any subject matter waiver SNMPR might argue for the first time in a responsive brief, if it does so.

documents was an unintended mistake that occurred because of their inadvertent production in the first place.

### E. Extreme's Listing of the Three Documents In The Interrogatory Does Not Result in a Privilege Waiver Because the Parties' Claw Back Agreement Prevents Waiver in These Circumstances

The Court ordered Extreme to address intentional waiver under FRE 502(a), which Extreme has done above. But since Extreme's disclosure of the three documents was unintentional, the Court should separately find that Extreme did not waive privilege over the three documents listed in Extreme's interrogatory response because Extreme complied with the Court's protective order, which the parties agreed upon when submitting it to the Court.

Ordinarily, when a party inadvertently discloses privileged information, the Court assesses whether waiver has occurred under FRE 502(b)(2)-(3). *See Wolpert*, 2023 U.S. Dist. LEXIS 55179, at *10 (finding FRE 502(b) governs waiver of attorney-client privilege by an inadvertent disclosure). But FRE 502(e) states that "an agreement on the effect of disclosure in a federal proceeding is binding [] on the parties to the agreement." Such agreements may obviate the need for assessing waiver under FRE 502(b). Fed. R. Evid. 502(e), advisory comment to subsection (e) ("Subdivision (e) codifies the well-established proposition that parties can enter an agreement to limit the effect of waiver by disclosure between or among them.")

Extreme has not found any controlling Sixth Circuit authority on the interplay between claw back agreements under FRE 502(e) and analysis of waiver under FRE 502(b). *See In re. Windstream Commc'ns., LLC*, 2018 U.S. App. LEXIS 21997, at *2 (6th. Cir. Aug. 7, 2018) (acknowledging lack of controlling authority). The Sixth Circuit has recognized that courts have addressed the interplay between claw back agreements and FRE 502(b) in three lines of cases, which hold : (1) the claw back agreement always trumps FRE 502(b); (2) no waiver when there is a claw back agreement unless the production of documents was completely reckless; and (3) when

a claw back agreement does not provide concrete directives about disclosures, FRE 502(b) will be used as a gap filler. *Id.*

Here, the parties entered into a Stipulated Protective Order, which was then entered by the Court, that contains a FRE 502(e) claw back agreement:

> The production or disclosure of any information (including documents) in this action that a Designating Party later claims should not have been produced due to a privilege or protection from discovery, including but not limited to any attorney-client privilege . . . *shall not be deemed to waive any such privilege or protection*, nor shall it prejudice any claim that the disclosed or related information is privileged or protected from discovery. . . . No one shall use the fact or circumstances of production of the information in this action to argue that any privilege or protection has been waived. (emphasis added).

ECF No. 93, at ¶ 51. The third line of cases is inapplicable because the PO here provides concrete directives about discovery disclosures. Regardless of which of the other two lines of cases this Court finds most persuasive, the PO in this case precludes a finding that Extreme waived privilege by identifying the three documents by Bates numbers in the interrogatory response.

Under the first line of cases, the outcome is straightforward: Extreme's listing of the three Bates numbers in response to Interrogatory No. 8 cannot result in waiver because the parties agreed in the PO that there would never be a waiver by disclosing information in discovery. No further inquiry under FRE 502(b)(2) and (3) is necessary because the claw back agreement provides blanket protection against waiver of privilege by disclosure in an interrogatory response, which is undisputedly discovery.

In this case, the Court should adopt the first line of authority for two reasons. First, the parties were represented by competent counsel when they agreed to the claw back provision of the PO. Each side understood the broad scope of non-waiver they were agreeing to in this case. Second, the claw back agreement in the PO was drafted by SNMPR. Prabhakar Decl. at ¶6. SNMPR voluntarily gave up its right to assert waiver based on the fact or circumstance of any disclosure

of privileged information in connection with discovery.[5] The Court should not allow SNMPR to undo the consequences of its tactical choices.

Even if the Court is inclined to consider the second line of authority, Extreme's listing of the three Bates numbers in its interrogatory response should not result in waiver because Extreme did not act completely recklessly in preparing its interrogatory response. "For production to be classified as 'completely reckless,' the producing party must have shown no regard for preserving the confidentiality of the privileged documents." *irth Sols., LLC*, 2017 U.S. Dist. LEXIS 121241, at \*28. "In analyzing what constitutes complete recklessness, courts have considered the amount of privileged documents inadvertently produced, the amount of documents ultimately reviewed, and the type of review process engaged in by the producing party." *Id.* at \*37. When the privileged documents represent more than 10% of the documents produced, courts have found that the production is completely reckless. *Id.* at \*40.

Extreme's claw back does not even come close to the level of complete recklessness. The three documents at issue are a tiny fraction (0.001 %) of the 35,000 documents Extreme produced in May 2022. They are also a small fraction (3.1 %) of the 106 documents identified in Extreme's interrogatory response. Extreme's use of search terms to prepare its response to Interrogatory No. 8 was not reckless given the volume of documents (around 85,000) that had to be reviewed. Extreme had also consistently maintained that the at-issue communications were privileged because the same email chain conversations between Brocade and Extreme have always been designated as privileged by Extreme, meaning those the three clawed-back documents were inadvertently missed. *See, e.g.*, Ex. 9, Extreme's Sept. 8, 2023 Privilege Log at Entry Nos. 774,

---

[5] SNMPR gained the same protections against assertion of waiver against its disclosure of privileged information in discovery.

776. Finally, within a week of SNMPR vaguely claiming selective disclosure, Extreme clawed back the documents and deleted them from its interrogatory response. None of these facts warrants a finding of recklessness, let alone *complete* recklessness. *See, e.g.*, *United States v. Wells Fargo Bank, N.A.*, 2015 WL 5051679, *2 (S.D.N.Y. Aug. 26, 2015) (finding party's behavior not "unreasonable, let alone completely reckless," although party clawed back documents six weeks after learning about their disclosure).

In sum, the Parties agreed to specific claw back procedures in their PO, and Extreme clawed back the at-issue documents pursuant to the PO. Extreme's identification of the three documents in its interrogatory response cannot result in waiver of privilege over the documents under any applicable line of authority recognized in the Sixth Circuit.

### III. When Extreme Acquired Avaya's Networking Business, It Also Acquired the Authority to Assert Privilege over the Business' Communications.

Extreme holds the privilege over attorney-client communications within Avaya networking business made prior to Extreme's March 2017 acquisition of that business. When Extreme acquired Avaya's networking business during Avaya's bankruptcy, Extreme gained control over the entirety of Avaya's networking business. SNMPR's claim to the contrary misunderstands both well-established law and the facts of this case.

#### A. Avaya's Bankruptcy and Extreme's Acquisition of Avaya's Networking Business

To better understand how Extreme acquired Avaya's privilege over attorney-client communications within Avaya's networking business, Extreme provides a brief overview of Avaya's plans to sell its business segments leading up to its bankruptcy in January 2017, Extreme's acquisition of Avaya's networking business in March 2017, and the new Avaya that emerged from bankruptcy in December 2017.

14

On January 19, 2017, Avaya and its affiliates filed for Chapter 11 bankruptcy protection in federal court. *See, e.g.*, Avaya Inc., Dkt. No. 1:17-bk-10089 (Bankr. S.D.N.Y. Jan. 19, 2017). Leading up to its bankruptcy filing, Avaya was composed of three distinct business segments: Unified Communications, Contact Center and Private Cloud Solutions, and Networking. Prabhakar Decl. Ex. 10, Avaya Inc. 2017-01-19 Form 8-K at pp. 12. Avaya had planned to split the company by selling the Networking business and the Contact Center and Private Cloud Solutions businesses separately, and creating a new Avaya from its remaining Unified Communications business. *Id*. at 76-77; *see also id.* at 60 (illustrating the split).

In July 2016, Avaya's creditors pitched the sale of Avaya's entire networking business to Extreme. Decl. of Daren Dulac ("Dulac Decl.") at ¶3.. As part of the pitch, Extreme received an Avaya slide deck that identified the networking business as a distinct business and characterized it as a "separable business" from rest of Avaya. Dulac Decl. Ex. 1, Avaya Networking July 2016, at 4("distinct businesses");16 ("separable business). For its part, Extreme wanted to purchase Avaya's networking business. Dulac Decl Ex. 2, Arrowhead – Nov 2016 at 8. Extreme planned to have a target agreement in place by mid-January 2017 and to close the acquisition in March 2017. *Id*. With few months of delay, in March 2017, Extreme entered into an agreement to purchase the entirety of Avaya's networking business, and in July 2017, Extreme closed the acquisition. Dulac Decl. Ex. 3, March 7, 2017 Agreement.

In December 2017, Avaya emerged from bankruptcy as Avaya Holdings Corp. ("New Avaya") that owned the old Avaya, Inc. entirely. Prabhakar Decl. Ex. 11, 2018-12-21 10K Avaya Holdings Corp. Form 10-K at i, 19. New Avaya's Security and Exchange Commission ("SEC") filing reflected the sale of Avaya's entire networking segment business to Extreme, including all related customers, personnel, software and technology assets, and maintenance and professional

services. *Id.* at 86. The SEC filing stated that prior to the sale of the networking business, Avaya had three separate operating segments and now it had only two segments. *Id.* at 138.

### B. Extreme Acquired Avaya's Attorney-Client Privilege for the Networking Business When Extreme Acquired That Business in July 2017

Courts in the Sixth Circuit and across the country—including all of those cited by Plaintiffs in their October 5 submission—agree that (i) a company that merely purchases some of the assets of another may not inherit the other company's privilege over protected communications, and conversely (ii) a "merger or acquisition" which "involves the transfer of control or management" generally also transfers the privilege. *Lynx Services Ltd. v. Horstman*, 2016 WL 4565895, at *2 (N.D. Ohio Sept. 1, 2016); *see also, e.g.*, *United States v. Adams*, 2018 WL 1255003, at *3 (D. Minn. Mar. 12, 2018) (finding that an acquisition "pass[es] privilege to the acquiring corporation . . . where (1) the sale also transferred control of the business; and (2) the acquiring corporation's management continues the selling corporation's business"); *Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1002–03 (N.D. Ill. 2008) (finding that "the analytical focus [in determining whether privilege transfers] is on whether control of the predecessor organization passed to the successor organization"); *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004) (finding that privilege transferred following an acquisition in which the acquiror "not only acquired certain assets but also []continued to operate the [acquired] business"); *USI Ins. Servs., LLC v. Ryan*, 2014 WL 3054278, at *5 (N.D. Ind. July 7, 2014) (finding a transfer of privilege with the plaintiff's purchase of an insurance division of Wells Fargo because the plaintiff post-acquisition proceeded to conduct the same business, from the same location, employing most of the same employees, and serving the same clients); *UTStarcom, Inc. v. Starent Networks, Corp*, 2009 WL 4908579, *5 (N.D. Ill. Feb. 20, 2009) (finding transfer of privilege following plaintiff's purchase of a division of 3Com because plaintiff bought a business unit and

16

continued its operations). In determining whether a particular transaction involved a transfer of control, courts look to its "practical consequences rather than the formalities." *Soverain*, 340 F. Supp. 2d at 763 (cleaned up); *see also Parus Holdings*, 585 F. Supp. 2d at 1002 ("The cases generally turn on the particular facts and circumstances of the transfers and relationships between the predecessor and successor organization."). "If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well." *Id.*[6]

SNMPR does not appear to dispute these basic legal principles. Rather, in its submission on this issue and at the hearing on November 1, SNMPR argued (wrongly) that the transaction between Extreme and Avaya was a mere asset purchase. SNMPR's argument is based on the title of Extreme and Avaya's agreement: "Asset Purchase Agreement." *See* Prabhakar Decl. Ex. 12, Pls.' Oct. 5, 2023 Position Statement at 2.

"When analyzing an agreement to determine what rights it confers, labels and titles do not control, but rather 'one must examine the substance of what was granted.'" *Luraco Health & Beauty, LLC v. Vu Tran*, 2020 WL 2747233 at *5 (E.D. Tex. May 27, 2020) (finding that plaintiff did not receive an exclusive license to the patents although the agreement with the patent owner was named "Exclusive Licensing Agreement").

The practical consequence of the bankruptcy transaction was that the entirety of Avaya's networking business left Avaya's hands and transferred to Extreme. Put another way, the

---

[6] The cases SNMPR cited in its opening position statement are not to the contrary: though both ultimately involved mere asset sales, both courts recognized that attorney-client privilege does transfer in *acquisitions*. *See Yosemite Inv., Inc. v. Floyd Bell, Inc.*, 943 F. Supp. 882, 883 (S.D. Ohio 1996); *Lynx*, 2016 WL 4565895, at *2. *American International Specialty Lines Insurance Co. v. NWI-I, Inc.*, 240 F.R.D. 401 (N.D. Ill. 2007), which SNMPR cited at the November 1 hearing before this court, also recognizes this "well-established principle." *Id.* at 406.

17

transaction was an acquisition, not a mere asset transfer. The terms of the agreement the parties entered into make this clear. In the agreement, the two companies agree to transfer, not just the assets of Avaya's networking business, but also (1) Avaya's existing customers and customer records, Dulac Decl. Ex. 3 at ¶1.03; (2) Avaya's leases, equipment, and intellectual property, *id.* at ¶¶1.03, 3.06, 3.07, 3.08; (3) Avaya's existing permits, goodwill, and business accounts, *id.* at ¶¶ 1.03, 1.05, 3.10; (4) Avaya's existing and ongoing contracts, *id.* at ¶¶ 1.06, 3.09; and (5) the majority of Avaya's employees, who were guaranteed "continuity of employment," *id.* at VI; *see also* Prabhakar Decl. Ex. 13, June 14, 2017 Agreement at EXTREME-01383707 ("Pursuant to the Purchase Agreement, Extreme has agreed to assume . . . liabilities arising from or in connection with the performance of each Contract after Closing . . . including payment obligations for products and services delivered after closing."). In other words, Avaya transferred to Extreme its entire networking business, including its existing employees, records, equipment, contracts, and permits, which Extreme then assumed control of. Extreme's acquisition of the entire networking business from Avaya stands in stark contrast to the "pure asset sale" in *Lynx*, a case SNMPR relies on, where the buyer received the "selling companies' corporate records, computers, and servers" only. *Lynx*, 2016 WL 465895, at *1.

Even post-bankruptcy Avaya's SEC filings confirm that Avaya no longer maintained control over its networking business—Extreme did. *See Adams,* 2018 WL 1255003, at *4-5 (relying on SEC filings to assess whether control of Apollo transferred over to Scio). As explained above in Section III.A *supra*, the sale of Avaya's networking business meant Avaya lost an entire business segment. Prabhakar Decl. Ex. 11 at 138. New Avaya's financial statements in the SEC also reflect the losses and gains from the sale of an entire business: Avaya's revenues in the U.S and overseas (Europe, Middle East and Africa, and Asia Pacific) fell, *id*); Avaya lost $48 million

18

in gross profit from the networking business, *id.* at 49; Avaya reduced its research and development expenses by $15 million, *id.* at 50; and Avaya's goodwill was impaired by $52 million from the sale of the networking business, *id.* Collectively, these facts show that Avaya lost control of its entire networking business to Extreme, not just some assets.

This is exactly the sort of transfer of control and operations that courts have consistently recognized as an acquisition giving rise to a transfer of privilege. *See, e.g.*, *Soverain*, , 340 F. Supp. 2d at 763 (finding transfer of privilege where the acquiror continued to sell "the Transact product, retain[ed] the patents covering that product, [] service[d] customers with contracts to that product," and took on employees from the acquired company who supported the product); *Adams*, 2018 WL 1255003, at *3 (finding transfer of privilege based on the language of the asset purchase agreements, which indicated that "Scio acquired all of Apollo's intellectual property rights, website, equipment, machinery, and inventory, as well as numerous other tangible and intangible assets"); *Parus*, 585 F. Supp. 2d at 1003 (finding that privilege transferred where the plaintiff "acquired the entire division of Vail responsible for developing and marketing the System," including "taking on employees and managers from the division"). So too here. *See Soverain*, 340 F. Supp. 2d at 763–64 (transfer need not be all of a company's assets if the consequence is "transfer of control of the business").

At the November 1 hearing, SNMPR cited *American International Specialty Lines Insurance Co. v. NWI-I, Inc.*, 240 F.R.D. 401 (N.D. Ill. 2007), to argue that Extreme's position would lead to multiple parties holding privilege over the same communications. This is not the case. The *NWI-I* Court considered whether two of several bankruptcy successors of Old Fruit of the Loom ("Old FTL")—namely, the Fruit of the Loom Successor Liquidation Trust ("SLT") and the Fruit of the Loom Custodial Trust ("CT")—could assert privilege over Old FTL

19

communications from before and during the bankruptcy. After recognizing the "well-established principle" that transfer of control of an enterprise results in the transfer of the right to assert attorney-client privilege, the court found that New Fruit of the Loom ("New FTL") was Old FTL's successor in control of the company since, under the Asset Purchase Agreement, it "purchased substantially all of Old FTL's business operations and continues to operate Old FTL's business." *Id.* at 406–07. Though CT and SLT argued that they obtained *some* of Old FTL's assets and, therefore, rights over some of its privileged communications, the court concluded that because "neither the CT nor the SLT emerged from bankruptcy with control of Old FTL's business," they were not able to assert privilege over Old FTL's communications; only New FTL had that right. Unlike CT and SLT, here, Extreme did not merely acquire some limited *assets* from the Avaya bankruptcy. Where CT emerged from the Old FTL bankruptcy with title over seven properties and SLT acquired stock and certain rights under Old FTL's insurance policy, Extreme emerged from the Avaya bankruptcy with *control over the entirety of Avaya's networking business*. Thus, as it did in the *NWI-I* case to New FTL, the right to assert privilege transferred to Extreme.

SNMPR claims that Extreme, like CT and SLT, is attempting to "divide up the attorney-client privilege based on the assets that multiple successors" acquired out of a bankruptcy. But Extreme does not argue that multiple parties hold privilege over the communications relating to Avaya's networking business. Instead, Extreme alone holds the right to assert privilege because it now controls the business transferred to Extreme. The fact that Avaya continues to operate and hold privilege in relation to its separate communications business does not challenge this conclusion. As multiple courts have recognized, "a transfer of the [attorney-client] relationship can occur in situations involving the sale of less than all the organization's assets," so long as control of the organization's business passed to the successor. *Parus*, 585 F. Supp. 2d at 1002

(citing *NWI-I* and finding that privilege over attorney-client communications about "the System" transferred where the plaintiff "alone acquired *the entire division* of Vail responsible for developing and marketing the System" (emphasis added)); *Soverain*, 340 F. Supp. 2d at 763 (rejecting argument that transfer of privilege requires transfer of "all of [the transferor's] assets" and finding that the plaintiff could assert privilege over communications of "a software business called Transact" after acquiring the business *but not its parent companies* in a bankruptcy). That is what happened in this case. Avaya's bankruptcy resulted in a clean break of Avaya's two well-established and discrete businesses, cleaving the networking business from the phone business, and transferring operation and control of the former to Extreme. Extreme now holds privilege over that business' communications.

## IV. The Post-Acquisition Avaya-Related Employee Communications are also protected by Extreme's Attorney Client Privilege

The attorney-client privileged emails relating to Avaya's networking business—that Extreme clawed back—straddled the closure of Extreme's acquisition of Avaya's networking business on July 17, 2017. The post-acquisition communications continued the pre-acquisition privileged communications that were initiated by Richard Hamilton III, Avaya's in-house counsel.

Extreme maintains the attorney-client privilege over the at-issue post-acquisition communications between Extreme, Avaya, and Luxoft employees based on two well-established, uncontroversial privilege principles. First, communications among non-attorneys can be privileged "if made at the direction of counsel, to gather information to aid counsel in providing legal services." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 2021 WL 149841, at *5 (E.D. Tenn. Jan. 15, 2021). Second, attorney-client privilege applies to agents of the client, if the communications are in connection with legal advice. *Oro BRC4, LLC v. Silvertree Apartments, Inc.*, 2023 WL 2785743, at *5 (S.D. Ohio Feb. 10, 2023).

21

Here, Extreme will attempt to explain the chronology of the communications—without disclosing the underlying privileged communications—to show that its claim of privilege over the post-acquisition communications holds.[7] These attorney-client privilege communications began on July 12, 2017, (before the acquisition closed) when Daniel Regan, an Avaya employee, sought legal advice from Attorney Hamilton. *See* Privilege Log Entry 1334. On July 14, Attorney Hamilton requested Michael Fitzgerald, an Avaya employee at that time, to provide information necessary to render legal advice related to settlement of a litigation between SNMPR and Anaya involving Avaya's networking business. *Id.* Fitzgerald added Avaya employees to the email chain who were necessary to provide Attorney Hamilton the information he needed to provide the legal advice requested by Regan.

On July 17, Extreme closed its acquisition of Avaya's networking business and many employees on the email chain, for example, Fitzgerald, Dale Nash, Michael Goddard, became employees of Extreme. After the acquisition closed, Avaya became an agent of Extreme pursuant to a "Transition Services and Limited Agency" ("TSA") between them. Prabhakar Decl. Ex. 14, TSA at EXTREME-0138508. Under the TSA, Avaya had responsibilities related to Avaya software that was transferred to Extreme. *See, e.g.*, *id.* at EXTREME-01383556 ("Infrastructure Software"), EXTREME-01383565 ("Data Transfer"). On July 18, employees of Luxoft Global Operations GmbH ("Luxoft"), who were involved in development of the Avaya software, also provided information requested by Attorney Hamilton. *See, e.g.*, Prabhakar Decl. Ex. 15, Extreme's Sept. 26, 2023 Supplemental Privilege Log, at Entry No. 1334. By then Luxoft had also become an agent of Extreme by virtue of assignment of Avaya's Master Services Agreement

---

[7] Extreme is willing to produce a subset of the communications in dispute for *in camera* review by the Court if the Court so desires.

22

("MSA") with Luxoft to Extreme. Prabhakar Decl. Ex. 16, MSA at EXTREME-01383711; Prabhakar Decl. Ex. 13 at 1. The Luxoft team "operated as an extension of Extreme's research and development (R&D) organization." Prabhakar Decl. Ex. 17, EXTREME-00881653 at -1654. In each of the clawed back emails related to Avaya's networking business, Extreme, Avaya, and Luxoft employees communicated with each other to provide information requested by Attorney Hamilton to facilitate the rendering of legal advice by him and also to implement any legal advice conveyed to them.

In *Adkisson*, the court found that documents that did not include an attorney were properly withheld as privileged because the "documents either included legal advice or the gathering of necessary information to obtain legal advice." 2021 WL 149841, at *6. Here, Extreme's claim for privilege is even stronger than *Adkisson* because the email chains all (i) included Attorney Hamilton at one point or another, or (ii) specifically identified Attorney Hamilton as the requester of the information at issue.[8]

In *Oro BRC4*, the Court found RDI was an agent of defendant Borror for the purpose of assessing privilege because RDI "hosted the information side of Borror's operation, including Borror's most sensitive records." 2023 WL 2785743, at *4. And the court held that privilege could extend not only to agents of the attorney but also to agents of the client. *Id.* at *5. Here, Avaya and

---

[8] On eleven privilege log entries, Attorney Hamilton is not listed as a sender or recipient of the email chains. *See* Prabhakar Decl. Ex. 9 at Entry Nos. 1331, 1336, 1337, 1339, 1340, 1348, 1382, 1385, 1386, 1388, and 1401. Extreme produced two such emails with non-privileged portions unredacted and redacted portions showing Attorney Hamilton involved in earlier emails in the chain. Prabhakar Decl. Ex. 18, EXTREME-01079442; Prabhakar Decl. Ex. 19, EXTREME-01076335.. For the remaining emails, the log entries state that the email chain originated with the request for legal advice from Attorney Hamilton, reflecting that he was involved in earlier emails in the chain. *See* Prabhakar Decl. Exs. 9, 15 at Entry Nos. 1337, 1339, 1340, 1348, 1382, 1385, 1386, 1388, and 1401. Extreme is willing to produce these communications *in camera* for the Court's review.

23

Luxoft held Avaya's "highly sensitive" software that became Extreme's property through the acquisition. The Luxoft team was acting as Extreme's agent because Luxoft was operating as an extension of Extreme's R&D organization with respect to the Avaya software that was being transferred to Extreme. Therefore, consistent with *Oro BRC4*, Extreme's attorney-client privilege extended to Avaya, and Luxoft, who were acting as Extreme's agents in connection with the at-issue communications.

SNMPR argues that Extreme's communications with Luxoft and Avaya are not protected because they were not agents of Avaya's counsel. But SNMPR is misrepresenting (or misunderstanding) the law. Specifically, SNMPR claims that "privilege applies only 'to agents of a lawyer who are employed in order to provide legal advice.'" Prabhakar Ex. 12 at 2 (citing *Hosea Project Movers, LLC v. Waterfront Assocs., Inc.*, 2017 WL 4682384, at *6 (S.D. Ohio Oct. 18, 2017). But *Hosea* does not so hold. Instead *Hosea* stands for the unremarkable proposition that "attorney-client privilege . . . *can also apply* to agents of a lawyer." 2017 WL 4682384 at *6 (emphasis). *Hosea*, is silent on the question of whether privilege protect communications with a client's agent. Similarly, *Cooey v. Strickland*, a case SNMPR relied on during the November 1 Hearing, holds that privilege is available for agents of an attorney without making any holding (positively or negatively) about whether the same is true for agents of the client. 269 F.R.D. 643 (S.D. Ohio 2010) (finding confidential communications disclosed to an attorney's agents should remain protected but silent on agents of the client); *see* Prabhakar Decl. Ex. 7 at 51:23-52:5. While *Hosea* and *Cooey* are silent on the issue, several courts in the Sixth Circuit have spoken on the issue and found that "privilege can also extend to the agents of the client." *Oro BRC4*, 2023 WL 2785743, at *5; *American Municipal Power, Inc. v. Voith Hydro, Inc.*, 2020 WL 5014914, at *8 (S.D. Ohio Aug. 25, 2020) (communications with a third-party acting as the agent of the client can

24

be considered privileged); *Arkwright Mut. Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 19 F.3d 1432, 1994 WL 58999, at *5 (6th Cir. 1994) (Table) ("[A] communication by *any form of agency* employed or set in motion by the client is within the privilege."). Therefore, SNMPR's objection to Extreme's assertion of privilege over the post-acquisition communications are inconsistent with the prevailing law in the Sixth Circuit.

For the foregoing reasons, Extreme's post-acquisition communications with Avaya and Luxoft employees are protected by Extreme's attorney-client privilege.


DATED:  November 15, 2023

Charles B. Lee, BPR# 011570
Jessica Malloy-Thorpe, BPR# 035234
Jordan B. Scott, BPR# 037795
MILLER & MARTIN, PLLC
832 Georgia Avenue
1200 Volunteer Building
Chattanooga, Tennessee 37402
Tel: (423) 756-6600
Fax: (423) 785-8293
clee@millermartin.com
jessica.malloy-thorpe@millermartin.com
jordan.scott@millermartin.com

Respectfully Submitted,

*/s/ John M. Neukom*

John M. Neukom (*admitted pro hac vice*)
Abraham A. Tabaie (*admitted pro hac vice*)
Barbara N. Barath (*admitted pro hac vice*)
Saurabh Prabhakar (*admitted pro hac vice*)
Alicia J. Ginsberg (*admitted pro hac vice*)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, California 94108
jneukom@debevoise.com
atabaie@debevoise.com
bnbarath@debevoise.com
sprabhakar@debevoise.com
ajginsberg@debevoise.com
(415) 738-5700
Leslie A. Demers (*admitted pro hac vice*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
leslie.demers@skadden.com
(212) 735-3000

*Attorneys for Extreme Networks, Inc.*

25