# Exhibit 16

Avaya Inc. & Avaya International Sales Limited



To:

Luxoft Global Operations GmbH
GUBELSTRASSE 24
Zug 6300
Switzerland

June 14, 2017

Dear Sirs and Madams:

<u>Notice of Duplication of Agreement and Consent to Assignment</u>

We are pleased to give you notice that the United States Bankruptcy Court for the Southern District of New York has issued an order (the "**Sale Order**") approving the sale of Avaya Inc.'s Networking Business to Extreme Networks, Inc., a public company listed on Nasdaq (EXTR) ("**Extreme**"), pursuant to a purchase agreement (the "**Purchase Agreement**") entered into by Avaya Inc. ("**Avaya**") and Extreme on March 7, 2017. The closing of the sale is expected to occur on July 1, 2017 (the "**Closing**"). A copy of the Sale Order is available at https://cases.primeclerk.com/avaya/Home-DocketInfo.

This letter will serve as notice that in connection with the sale, Avaya will be duplicating each agreement between Avaya and you in its entirety and assigning each duplicated contract with you that is applicable to the Networking Business, as referred to in the attached Agreement Schedule to this notice (each, a "**Contract**"), to Extreme (or an affiliate of Extreme, which Extreme may designate at its discretion). The agreement(s) shall otherwise remain in full force and effect with Avaya with respect to any rights and obligations of the parties relating to products and services other than those relating to the Networking Business. The assignment of each Contract will be effective as of the Closing.

Pursuant to the Purchase Agreement, Extreme has agreed to assume, among other things, with effect from Closing, liabilities arising from or in connection with the performance of each Contract after Closing (other than liabilities relating to pre-Closing matters) including payment obligations for products and services delivered after Closing (collectively, the "**Assumed Liabilities**"). Accordingly, Extreme will not assume any liability arising from or in connection with the Networking Business other than the Assumed Liabilities, while Avaya will no longer be liable for the Assumed Liabilities.

Your continued performance under each Contract, or acceptance by you or by any of your affiliates of Extreme's or its affiliate's purchase order will constitute consent to the duplication and assignment to Extreme of each Contract and assumption by Extreme of Avaya's rights and obligations under each Contract, as set forth herein and in the Purchase Agreement, and we and Extreme shall rely upon such consent and acceptance. That said, in the interest of time, we would appreciate you countersigning and returning this letter at your earliest convenience.

Extreme will provide you with further written notice of Closing after the date of Closing or as soon as reasonably practicable thereafter. If applicable, such notice shall identify Extreme's designated affiliate.

Please be advised that for a certain amount of time after Closing, Avaya and its affiliates will continue to issue and process purchase orders and invoices under the Contract(s) in its own name but on behalf of Extreme. Extreme has agreed to assume all obligations and liabilities arising from or in connection with such purchase orders in accordance with the Purchase Agreement.

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383711

If you have any questions or concerns at any point during this process, please do not hesitate to contact Avaya at avayasourcing@avaya.com.

Best Regards,

Avaya Inc.

<u>On copy notice</u>:

We hereby acknowledge receipt of the above Notice of Duplication of Agreement and Consent to Assignment and consent, conditional on Closing, to the assumption by Extreme of and the release of Avaya from the rights and obligations of Avaya under each Contract, as set forth herein, and the Assumed Liabilities.

We hereby waive any restrictions under any Contract on the assignment of any Contract and the assumption by Extreme (or its designated affiliate) of the rights and obligations of Avaya under the Contract, as set forth herein.

**Signed** for and on behalf of Luxoft Global Operations GmbH

*Luxoft Global Operations GmbH*
Company Name

By: _____
Authorized Signatory

*Elena Gougunova*
Name

*Managing Director*
Title

*28.06.2017*
Date

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383712

# Agreement Schedule

| Avaya Entity | Counterparty | Contract Description |
|---|---|---|
| Avaya Inc. & Avaya International Sales Limited | Luxoft Global Operations GmbH | Master Services Agreement, dated as of January 1st, 2014 as amended and the related Amended and Restated Addendum to Master Services Agreement, dated September 1st, 2014. |

OUTSIDE COUNSEL EYES ONLY                                                                                    EXTREME-01383713

***CUST Avaya 1650 SRF 16662 SVC: SD MMLID: 3513892 TRACK ID: SUPP_0023
Luxoft Global Operations GmbH
GUBELSTRASSE 24
Zug  6300
Switzerland

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383714



## MASTER SERVICES AGREEMENT

This Master Services Agreement ("Agreement"), dated 1 January, 2014 (the "Effective Date") is entered into by and between Avaya Inc., a Delaware, U.S. corporation, with its principal place of business at 4655 Great America Parkway, Santa Clara, CA 95054-1233, and Avaya International Sales Limited, an Irish corporation, having its principal offices at The Atrium, Block A Blackthorn Road, Sandyford Industrial Park, Sandyford, Dublin 18, Ireland ("AISL"), and Luxoft Global Operations GmbH, a company incorporated under the laws of the Swiss Confederation, having its principal place of business at Bundesstrasse 5, 6300 Zug, Switzerland. ("Luxoft" or the "Supplier"). References to "Avaya" or "Company" herein or in an SOW shall refer to Avaya Inc. for services to be delivered in North America and "Company" shall refer to AISL for services to be delivered in all other geographic locations.

These framework terms shall govern only those SOWs that reference them. The terms of this Agreement are not operative without being incorporated into an SOW. Each such SOW incorporating the terms and conditions of this Agreement shall constitute a separate contract between its respective parties. Company hereby engages Supplier to provide the Services described in the applicable Statement(s) of Work which are attached hereto and incorporated herein by this reference (the "Services"); and Supplier accepts such appointment. Company and Supplier are each a "Party" to the Agreement and together are referred to as the "Parties".

That certain Master Business Agreement effective as of 3rd November 2005, (including all subsequent amendments, appendices and addendums, the "Prior Master Agreement") shall continue in full force and effect with respect to all documents that expressly reference its terms. The parties hereto intend that this Agreement supersede or replace the Prior Master Agreement only with respect to SOWs or such other documents that expressly reference this Agreement's terms.

Now therefore, in consideration of the promises and covenants contained herein, the Parties agree as follows:

### 1. Definitions

"Acceptance" means the point in time at which Company has accepted or is deemed to have accepted a Deliverable, product or service pursuant to the relevant Statement of Work.

"Affiliate" means, with respect to any party, any person or entity that is under common control with, controls, or is controlled by, that party. For purposes of this definition, "control" means beneficial ownership (direct or indirect) of more than 50% of the shares of the subject entity entitled to vote in the election of directors (or, in the case of an entity that is not a corporation, for the election of the corresponding managing authority).

"Attachment" means the attachments listed below and attached herewith, the terms of which Supplier agrees to abide by. The Attachments as they may be updated from time to time can also be found at http://www.avaya.com/usa/about-avaya/doing-business/supplier-information/. As of the Effective Date, the Attachments are as follows:

- Statement of Work (attached)
- Travel Policy
- Vendor Privacy Standards
- Security Guidelines for Consultants
- Supplier Code of Ethics

"Deliverable" means any work product created or developed by Supplier pursuant to this Agreement, including but not limited to creative materials, reports, written material, plans and ideas, strategies, text, graphics, still images, video images and sounds as well as products, devices, software, computer programs, techniques, know-how, algorithms, specifications, source code, data procedures and modifications thereto.

1.1. "Intellectual Property" or "Intellectual Property Rights" means any and all present or future, tangible and intangible: ownership rights, including worldwide copyrights, moral rights, and maskworks, trademarks and

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 6 of 21   PageID #: 14760

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881685

trade name rights and similar rights, trade secrets, patents, algorithms, designs and other industrial property rights, inventions, patents and mask work rights, moral rights, contract rights and other proprietary rights, and all types of registrations, applications, renewals, extensions and reissues of the foregoing, and all other intellectual property rights, industrial property rights and other similar proprietary rights recognized in any relevant jurisdiction worldwide, whether or not patentable, copyrightable, or otherwise protectable.

"Supplier Intellectual Property" means all products, devices, software, computer programs, techniques, know-how, algorithms, specifications, source code, data procedures and modifications thereto, whether patentable or copyrightable, whether tangible or intangible, and all right, title and interest in and to the intellectual property derived from such works, that have been or will be created, developed or otherwise acquired by Supplier prior to execution of this Agreement or that have general utility to Supplier outside the scope of this Agreement.

"Specifications" means the requirements for functionality, performance, and other specified attributes applicable to Services described in a particular Statement of Work or Order.

## 2.    Statement of Work, Delivery and Acceptance

A. During the term of this Agreement Supplier shall perform the Services as set forth in the applicable Statement(s) of Work and provide the Deliverables specified therein. Supplier shall be responsible for the performance of all its obligations under this Agreement, including those that it performs through its subcontractors.

B. All Services provided under this Agreement are subject to Acceptance by Company. Acceptance criteria will be set forth in the applicable Statement of Work or, if no acceptance criteria are provided in the applicable Statement of Work, Acceptance shall occur on Supplier's receipt of Company's written notice of acceptance. . Services that Company reasonably determines do not conform to the Specifications or Acceptance criteria set forth in the Statement of Work, will be re-performed or re-delivered, as the case may be, by Supplier at no additional cost to Company. Use of the Services, including any Deliverables, by Company shall not be deemed Acceptance under this Agreement. Company shall have the right to accept all or any portion of the Services.

## 3.    Term

This Agreement is effective on the Effective Date and shall continue in effect unless terminated as allowed herein. Each Statement of Work shall expire upon completion of the Services specified therein.

## 4.    Payment

A. The total amount payable by Company for the Services shall be set forth in the relevant Statement of Work. Supplier shall not increase the rate of compensation during the term of this Agreement unless agreed to by both Parties in writing.

B. All invoices provided to Company related to the purchase of products and/or Services will be accumulated for a period from the 1st day of a calendar month to the last day of the calendar month ("Accumulation Period"). Company Accounts Payable will initiate payment for conforming invoices, collected during the Accumulation Period, in the first payment cycle (typically the 1st through the 10th of the month) of the month following to sixty (60) days after the end of the Accumulation Period. Company will not be deemed to be in breach of this Agreement for withholding payment of amounts subject to a *bona fide* dispute. Payment shall not constitute acceptance or approval of Services or a waiver by Company of any right.

Supplier is required to render all invoices, including expenses, within 30 days of Acceptance of a Deliverable or the incurrence of expense. Except as mutually agreed Company will not be liable for invoices presented 90 days after Acceptance of Deliverable or expense incurrence.   Subject to the preceding sentence, any valid invoice properly addressed shall be deemed to have been accepted if Company does not present a written objection within 30 days from the date of receipt of invoice.  However, Company will use reasonable efforts to notify Supplier of a disputed invoice as soon as it determines that an invoice is in dispute.  If such objection is made, the Parties shall make every reasonable effort to settle promptly the dispute concerning the invoice in question.

Avaya Proprietary and Confidential

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 7 of 21   PageID #: 14761

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881686

C. Unless a different payment model is otherwise agreed Company shall pay Supplier's fees for Deliverables and Services as listed in the Statement of Work. In no event shall Company be liable to pay any Services fees in excess of the prices agreed upon in the Statement of Work.

Supplier acknowledges that the fixed prices agreed to by the Parties in the Statement of Work are intended to cover all expenses that Supplier expects to incur in providing Deliverables and Services to Company. Consequently, Company shall not be required to reimburse Supplier for any expenses incurred by Supplier in providing Deliverables and Services under this Agreement, unless such expenses are specified in the applicable Statement of Work and as authorized by Company's Global Sourcing Organization.

5.    Confidentiality

A. "Confidential Information" means any tangible, intangible, visual, electronic, present or future information of a party that is not accessible or known to the general public, including, without limitation: i) trade secrets, unpatented inventions, and confidential intellectual property; ii) information retrieved from the other party's internal data repository (such as, without limitation, source code, documentation, website content used for project knowledge sharing); iii) financial information, including pricing, forecasting and sales data; iv) technical information, including software, Deliverables, research, development, procedures, algorithms, data, designs, and prototype; v) business information, including operations, planning, procurement needs, marketing, services and products; vi) information acquired during any location visit, (vii) the terms (excluding pricing) but not the existence, of this Agreement, and (viii) any information provided by one party to the other that is marked "Confidential" or "Proprietary". Any intangible information or information disclosed verbally will qualify as Confidential Information, provided that the disclosing party: (a) informs the receiving party of its confidential or proprietary nature at the time of disclosure and summarizes the confidential or proprietary information in writing to the receiving party within 30 days of disclosure; or (b) a reasonable person would know based on the circumstances surrounding disclosure and the nature of the information that the information should be treated as confidential.
B.  B.  Excluded Information. Confidential Information does not include materials or information that: (i) is generally known by third parties as a result of no act or omission of the receiving party; (ii) was already known by the receiving party at the time of disclosure, as evidenced by documentation in the receiving party's possession, and was not received from a third party in breach of that third party's obligations of confidentiality; (iii) was independently developed by the receiving party which the disclosing party agrees in writing is free of such restrictions; or (iv) is required to be disclosed by court order or other lawful government action, but only to the extent so ordered, and provided that the receiving party promptly notifies the disclosing party of the pending disclosure in writing so that the disclosing party may, at its sole cost and expense, attempt to obtain a protective order or other remedy. In the event of a potential disclosure in the case of subsection (v) above, the receiving party will provide reasonable assistance to the disclosing party where the disclosing party attempts to obtain a protective order.

C. Protection of Confidential Information. Each party will protect all Confidential Information received from the other party with the same degree of care as it uses to protect its own Confidential Information, but in no event with less than a reasonable degree of care. Neither party may disclose the other party's Confidential Information to any third party, except that each party will have the right to disclose the other party's Confidential Information to its Affiliates, employees, subcontractors or authorized representatives working on behalf of the receiving party who have a need to know the Confidential Information in connection with the purpose of this Agreement or Customers with a need to know with respect to operation of the Supplier Software as well as the Parties' auditors and legal advisors ("Additional Recipients"), provided: (i) such Additional Recipients have signed confidentiality agreements or are otherwise bound by confidentiality obligations at least as restrictive as those contained herein; and (ii) each party remains liable to the other party for any breaches of its respective Additional Recipients' unauthorized disclosure of the other party's Confidential Information.  Each party will use the other party's Confidential Information only for the purpose of this Agreement. The confidentiality obligations of each party under this Agreement will survive any expiration or termination of this Agreement for a period of 5 years or as required by applicable law, except in the case where Confidential Information is reasonably necessary for one party to provide surviving obligations to the other party, in which case, the confidentiality obligation will expire 5 years from the date the party reasonably ceases lawfully using the Confidential Information or as required by applicable law. Notwithstanding the foregoing, any trade secrets disclosed under this Agreement shall be held in confidence by the receiving party for: (i) as long as the Confidential Information remains the disclosing party's trade secret under

Case 3:20-cv-00451-CEA-DCP    Document 334-17    Filed 11/15/23    Page 8 of 21    PageID #: 14762

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881687

applicable law; or (ii) until the Confidential Information falls under one of the exceptions to the confidentiality obligations specified in Section 5B above.

D. Upon termination of this Agreement written request of the disclosing party or the receiving party's determination that it no longer has a need for such Confidential Information, the receiving party, shall return all Confidential Information and copies thereof or certify in writing that it has destroyed all Confidential Information and copies. Notwithstanding the foregoing, the receiving party may retain copies of the disclosing party's Confidential Information: (i) as part of the receiving party's archival records (including backup systems) that receiving party keeps in the ordinary course of its business, but only as required by the receiving party's records retention policies, (ii) as may be required by law, (iii) if and only to the extent they are relevant to a dispute between the parties, or (iv) may be reasonably necessary to carry out any surviving obligations under this Agreement.

E. Third Party Information. Each party represents and warrants that it will not disclose any third party Confidential Information to the other under the terms of this Agreement unless it has the legal and contractual right to do so.

**6. Publicity**

Neither Company nor Supplier is permitted to use the other Party's name or use any trademark, service mark or trade name of the other in any media release, public announcement, promotional or marketing materials, customer lists, referral lists or business presentations without the prior written consent from the other Party for each such use or release. Consent may be given or withheld in that Party's sole discretion.

**7. Indemnity**

A. Intellectual Property Indemnification. Supplier will indemnify, defend and hold harmless Company, and its officers, directors, employees, subsidiaries, parents, resellers, and end users (collectively, "Indemnified Parties") from all claims, damages, assessments, costs, losses and other expenses, including but not limited to reasonable attorneys' fees and costs (collectively, "Costs") arising out of or resulting from any claim, demand, suit, action or other proceeding (collectively, "Claims") that arise out of or relate to any claim of infringement, wrongful use or misappropriation of any intellectual property right by: (a) the Supplier Intellectual Property, (b) the Services and Deliverables furnished under this Agreement; or (c) the use thereof by Company, a Company reseller, or an end user.

B. General Indemnification. Supplier shall defend, indemnify and hold harmless the Indemnified Parties from and against all Costs arising out of or resulting from any Claims arising out of or related to (i) the breach of any covenant or warranty made by Supplier or a material breach by Supplier of this Agreement; or (ii) the performance of the services by Supplier; provided, however, that Supplier shall not be required under this Section to defend, indemnify or hold harmless any Indemnified Party for loss or liability resulting from any willful misconduct or gross negligence of Company.

C. Procedure. Supplier's obligation to indemnify is subject to the conditions that it is given prompt notice of any such Claims and is given primary control of and all reasonably requested assistance (at Supplier's cost) for the defense of such Claims, provided that Indemnified Parties shall under no circumstances be required to admit liability, and provided further that any delay in notification shall not relieve Supplier of its obligations hereunder except to the extent that the delay materially impairs its ability to indemnify. Without limiting the foregoing, the Indemnified Parties may participate in the defense at its or their own expense and with their own counsel. Supplier shall not enter into or acquiesce to any settlement containing any admission of or stipulation to any guilt, fault, liability or wrongdoing on the part of an Indemnified Party or which would otherwise adversely affect the Indemnified Party without the Indemnified Party's prior written consent (which shall not be unreasonably withheld). Supplier shall keep the Indemnified Parties advised of the status of the Claims and the defense thereof and shall consider in good faith recommendations made by the Indemnified Parties with respect thereto. The foregoing indemnity shall be in addition to any other indemnity obligations of Supplier set forth in this Agreement.

D. Remedial Measures. Without limiting the foregoing obligations, if a Service, Deliverable or use of any of the foregoing becomes, or Supplier reasonably believes any of the foregoing may become the subject of an

Case 3:20-cv-00451-CEA-DCP    Document 334-17    Filed 11/15/23    Page 9 of 21    PageID #: 14763

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881688

infringement, wrongful use or misappropriation claim, Supplier shall, at its own expense and option: (i) procure for the Indemnified Party the right to continue to use the affected Service(s) or Deliverable(s) in the manner contemplated by this Agreement; (ii) re-perform the Service; (iii) modify the Service or Deliverables (without material loss of functionality) so that it no longer infringes, wrongfully uses or misappropriates any third-party intellectual property right; (iv) replace or modify the applicable Deliverables and/or work product resulting therefrom with a replacement or version that is non-infringing and non-misappropriating, provided that the replacement or modified version is substantially equivalent and reasonably satisfactory to the Indemnified Party; or if none of the foregoing are commercially practicable to implement, (v) refund to the Indemnified Party two the fees received for the affected Service or Deliverable, in which case the Indemnified Party shall cease offering or using the affected, Service or Deliverable (as the case may be).

E.  Exceptions.  Supplier will have no defense or indemnity obligation for any infringement claim to the extent the claim is caused by (i) combination of a Deliverable with a product furnished by a party other than Supplier, where in the absence of such combination the applicable product or Deliverable would not have been infringing (provided, however, that the use with equipment, data, devices or software as contemplated by the Documentation shall not merit this exception), (ii) Supplier's compliance in strict conformance with a customized design supplied by Company and that Company required Supplier to specifically adhere to such design, provided that this exception will not include any infringement or claim of infringement based upon: (a) Deliverables which Supplier makes commercially available to its customers; (b) Deliverables of Supplier's design or selection (for which Supplier did have substantial freedom of design), or (c) Deliverables provided by Supplier in conformance with the Specifications and for which Company did not provide a design, whether or not such Specifications are unique to Company; (iii) products furnished by a party other than Supplier.

F.  SOLE AND EXCLUSIVE LIABILITY. EXCEPT TO THE EXTENT APPLICABLE LAW PROHIBITS THE PARTIES FROM DISCLAIMING LIABILITY, THIS SECTION SETS FORTH EACH PARTY'S SOLE AND EXCLUSIVE LIABILITY FOR CLAIMS DESCRIBED HEREIN.

## 8.    Limitation of Liability

EXCEPT FOR CLAIMS OF WILLFUL MISCONDUCT, PERSONAL INJURY, CONFIDENTIALITY OBLIGATIONS, SUPPLIER'S WARRANTY OBLIGATIONS UNDER SECTION 9 ("THIRD PARTY LICENSED SOFTWARE"), BREACHES OF THE LICENSE TERMS UNDER SECTION 13, AND CONTRACTUAL INDEMNIFICATION OBLIGATIONS, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES OF ANY KIND OR NATURE ARISING OUT OF THIS AGREEMENT OR THE SALE OF PRODUCTS, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING THE POSSIBILITY OF NEGLIGENCE OR STRICT LIABILITY), OR OTHERWISE, EVEN IF THE PARTY HAS BEEN WARNED OF THE POSSIBILITY OF ANY SUCH LOSS OR DAMAGE, AND EVEN IF ANY OF THE LIMITED REMEDIES IN THIS AGREEMENT FAIL OF THEIR ESSENTIAL PURPOSE., IN NO EVENT WILL EITHER PARTY'S AGGREGATE LIABILITY TO THE OTHER UNDER THIS AGREEMENT EXCEED FOR ANY YEAR THE GREATER OF: (A) TWO TIMES FEES PAID OR PAYABLE UNDER THE AGREEMENT IN THE TWELVE (12) MONTHS IMMEDIATELY PRECEDING THE EVENT WHICH GAVE RISE TO SUCH DAMAGES OR (B) $ 3,000,000 DURING THAT YEAR, WHERE A YEAR IS MEASURED FROM THE EFFECTIVE DATE (OR AN ANNIVERSARY THEREOF) TO THE NEXT ANNIVERSARY OF THE EFFECTIVE DATE. THE LIMITATIONS OF LIABILITY IN THIS SECTION ALSO WILL APPLY TO ANY LIABILITY OF DIRECTORS, OFFICERS, EMPLOYEES, AGENTS AND SUPPLIERS. THE LIMITATIONS OF AGGREGATE LIABILITY WILL NOT APPLY TO CLAIMS OF WILLFUL MISCONDUCT, PERSONAL INJURY, CONFIDENTIALITY OBLIGATIONS, SUPPLIER'S WARRANTY OBLIGATIONS UNDER SECTION 10 ("THIRD PARTY LICENSED SOFTWARE"), BREACHES OF THE LICENSE TERMS UNDER SECTION 13, AND CONTRACTUAL INDEMNIFICATION OBLIGATIONS.

## 9.    Warranty

Supplier warrants that it shall perform the Services in a professional and workmanlike manner, in accordance with the Specifications and the applicable Statement of Work.

Supplier shall re-perform any faulty Services or correct its work within a time frame acceptable to Company at no additional cost.  If Supplier and Company so agree, Company will re-perform such Services, but at Supplier's cost and risk.

Avaya Proprietary and Confidential

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881689

**10. Third Party Licensed Software**

A. "Commercial Third Party Licensed Software" is software developed by a business with the purpose of making money from the use of that licensed software. "Freeware Licensed Software" is software which is made available for use, free of charge and for an unlimited time, but is not Open Source Licensed Software. "Open Source Licensed Software" is software licensed under an Open Source Initiative ("OSI") approved license as set forth at the following site: http://www.opensource.org/licenses/index.html or such other location as the OSI may otherwise designate. These are collectively referred to herein as "Third Party Licensed Software."

B. Supplier represents and warrants that Supplier, including employee, contractor, subcontractor, consultant, agent engaged by Supplier, is in compliance and will continue to comply with all Third Party Licensed Software obligations used in the Supplier Deliverable including providing to Company all information required by such licenses so Company can pass through information to Company customers and resellers as may be necessary. SUPPLIER REPRESENTS AND WARRANTS THAT THE OPEN SOURCE LICENSED SOFTWARE PROVIDED UNDER THIS AGREEMENT DOES NOT INCLUDE ANY OPEN SOURCE LICENSED SOFTWARE CONTAINING TERMS REQUIRING ANY INTELLECTUAL PROPERTY OWNED OR LICENSED BY COMPANY TO BE (I) DISCLOSED OR DISTRIBUTED IN SOURCE CODE OR OBJECT CODE FORM; (II) LICENSED FOR THE PURPOSE OF MAKING DERIVATIVE WORKS; OR (III) REDISTRIBUTABLE ON TERMS AND CONDITIONS NOT AGREED UPON BY COMPANY. Supplier's representation and warranty extends to all code chosen by Supplier and delivered to Company under this Agreement, but does not extend to code previously provided by Company to Supplier, enhancements and modifications made to Supplier Deliverable or the Open Source Licensed Software by anyone other than Supplier, or to the use of the Supplier Software in a manner inconsistent with documentation for Supplier Deliverable supplied by Supplier to Company.

C. Supplier will respond to requests that Company has received from customers or resellers or others relating to Third Party Licensed Software associated with Supplier's selection and use of Third Party Licensed Software in the Supplier Deliverable. Supplier will cooperate in good faith by furnishing the relevant information to Company and the requester within 2 weeks from the time that Company provided the request to Supplier.

D. Supplier will provide written notice and seek authorization from Company for selection and use of Open Source Licensed Software under the GNU General Public License, GNU Lesser General Public License, GNU Affero General Public License, Sleepy Cat license, Oracle Berkeley DB license, and Berkeley DB license. In the written notice, Supplier will provide information regarding the interaction of the Open Source Licensed Software between Supplier Deliverable and Company proprietary code or any other third party code sufficient to allow Company to make an informed decision whether to authorize the use of the Open Source Licensed Software.

E. To the extent that a third party license imposes a limit or restriction on Company's right to use the Commercial Third Party Licensed Software chosen by Supplier as intended in this Agreement and such limit or restriction has not been identified in this Agreement, Supplier shall take all necessary action and pay all sums required to provide Company with all the rights to use such Commercial Third Party Licensed Software afforded by this Agreement. Company shall receive such rights for such Commercial Third Party Licensed Software as required for use of Supplier Deliverable in accordance with all of the terms of this Agreement. Unless specifically provided otherwise herein, Company shall have no obligation to pay any third party any fees, royalties, or other payments for Company's use of any Commercial Third Party Licensed Software in accordance with the terms of this Agreement.

F. Remedies. Supplier must immediately (i) if commercially feasible, obtain a commercial license for the open source licensed code so that the Supplier is no longer in breach of this warranty, and deliver the source code of the applicable Open Source Licensed Software to Company; or: (ii) at Company's option repair or replace, at Supplier's expense, the affected Deliverable so that Supplier is no longer in breach of this warranty, and reimburse Company, Company Affiliates, and/or Company resellers the cost of distributing the repaired or replaced Integrated Product to end users and any other remedies available to Company, Company Affiliates, and/or Company resellers under this Agreement, at law, and/or in equity.

**11. Insurance**

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 11 of 21   PageID #: 14765

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881690

Supplier, and any permitted subcontractors used by Supplier under this Agreement, will maintain the following minimum insurance limits and coverage during the term of the Agreement and for a period not less than two years after the expiration or termination of this Agreement:

- All insurance and bonds required by any applicable law.
- Worker's Compensation and Employer's Liability insurance, covering each employee of the Supplier engaged in the performance of work under this Agreement, as follows:
  - Workers' Compensation – Statutory Limits
  - Employers Liability – Each Accident, $1,000,000; Disease – each employee, $1,000,000; and Disease – $1,000,000 Policy Limit.
- Commercial General Liability insurance, including coverage for contractual liability, products and completed operations, personal injury, bodily injury and broad form property damage with liability limits not less than $1,000,000 per occurrence and $2,000,000 annual aggregate.
- Automobile Liability insurance covering all owned and non-owned and hired vehicles used in connection with the performance of work under the Agreement, with a combined single limit of liability for bodily injury and property damage of not less than $1,000,000 per occurrence.
- Professional Liability insurance with limits not less than $2,000,000 per claim and annual aggregate covering the errors and omissions of the Supplier.
- Fidelity coverage for theft/computer fraud with a limit of $2,000,000 that shall include employee dishonesty and fidelity coverage for all Supplier employees, officers and agents.

All insurance above, with the exception of the Workers Compensation and Employers Liability Policies, will designate Avaya Inc., its Affiliates, and its directors, officers and employees as Additional Insureds.

All such insurance must be primary and non-contributory and require insurer to respond and pay prior to any other insurance or self-insurance available. Any other coverage available to Company will apply on an excess basis. Supplier agrees that Supplier and Supplier' insurer(s) will have no claim, right of action or right of subrogation against Company and its customers based on any loss or liability insured against under the foregoing insurance.

Supplier and Supplier' subcontractors will furnish prior to the start of work a Certificate of Insurance to evidence the insurance requirements. Company will be notified in writing at least thirty (30) days prior to cancellation of or any material change in the Policies. Insurance companies providing coverage under this Agreement must be rated by A-M Best with at least an A- rating.

12. **Ownership**

A. **Work Made for Hire.** Unless otherwise agreed in an SOW or Addendum hereto, Supplier Deliverables and all work product created by Supplier under this Agreement is considered "work made for hire," and any and all copyrights, trademarks, patents and legal protections in such materials shall vest in and be the exclusive property of Company. Unless otherwise agreed in an SOW or Addendum hereto, to the extent the Deliverable is deemed not to be "work made for hire" Supplier hereby assigns all right, title and interest in and to the Deliverable to Company. Supplier will and, where applicable, will have Supplier's employees, consultants, subcontractors, representatives or agents (referred to hereinafter as Supplier's "Associates"), disclose and furnish promptly to Company all Intellectual Property developed under this Agreement. Supplier hereby assigns all rights, title, and interest in the Deliverable, the Intellectual Property developed under this Agreement and any derivative works thereof to Company and, where applicable, shall cause its Associates to do the same. Supplier will execute and deliver, both in its own name and from its Associates, all assignments and other instruments necessary to perfect such assignment of such rights, title and interest. Supplier covenants, warrants and represents that it is the owner of or has a valid license to any pre-existing Intellectual Property embodied in the Deliverable and that it is authorized to transfer the rights and licenses granted to Company herein. The Deliverable and Intellectual Property developed under this Agreement are Confidential Information and will be kept in confidence by Supplier and Supplier's associates in accordance with the requirements of Section 5 ("Confidentiality"), and may not be used for any purpose except upon such terms as may be agreed upon between the parties in writing. Deliverable shall not include commercially available

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 12 of 21   PageID #: 14766

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881691

software and third party intellectual property required for the development, maintenance or implementation of the Deliverable or third-party materials it supplies.

B. Supplier Intellectual Property. All Supplier Intellectual Property is and will remain the exclusive property of Supplier. Company is granted a perpetual, non-exclusive, royalty-free license to use, modify, and distribute Supplier Intellectual Property in connection with Supplier Deliverables and/or Services provided herein.

**13. License Grant and Restrictions**

A. Company grants Supplier a limited, non-sublicensable, non-exclusive, non-transferable license to use Company documentation, software, and other intellectual property provided under the Agreement (collectively referred to as "Company Intellectual Property") solely as reasonably required to provide the Services pursuant to the applicable Statement of Work. Company reserves all rights, title and interest in and to the Company Intellectual Property and any modifications to it. This license will expire upon expiration or upon termination of the applicable Statement of Work. All right, title and interest in and to Company Intellectual Property shall remain with and vest in Company and the Company Intellectual Property is the proprietary and confidential information of Company.

B. Supplier will not, directly or indirectly, except as permitted under this Agreement: (1) reverse engineer, decompile, disassemble or otherwise attempt to discover the source code or underlying ideas, mechanics or algorithms of Company Intellectual Property; (2) modify, translate, or create derivative works based on Company Intellectual Property; or (3) rent, lease, sublicense, distribute, sell, resell, assign or otherwise transfer any rights in or to Company Intellectual Property. In addition, Supplier will not directly or indirectly cause or seek to cause any disabling or circumvention of any security or authentication device, process or procedure that Company may provide or otherwise establish with respect to any Company Intellectual Property.

**14. Notices**

To be effective, any notice or demand under this Agreement is required to be in writing and given by priority mail, confirmed email or in-person delivery to the representative named below.

Notice to a party at the address stated above or at a different address of which such party has provided notice from time to time shall be effective (1) two days following the date mailed for priority mail when sent by signed for delivery, (2) when confirmed by "read receipt" email when acknowledged by a non-automated email or (3) if in-person delivery, when delivered as evidenced by a signed receipt acknowledging delivery. For Company, notice shall be addressed Attn: Global Sourcing Director; for Supplier, notice shall be addressed to Delivery Center Director.

**15. Termination**

A. Termination for Convenience by Company. Company reserves the right to terminate the Agreement or any associated Statement of Work in whole or in part at any time with or without cause with prior written notice of at least sixty (60) days to Supplier. Upon termination, Company's payment obligations shall be limited to the amounts specified in the associated Statement of Work(s). Company shall be reimbursed within sixty (60) days for any payments made to Supplier for unperformed future Services beyond the termination date. Termination of an SOW does not terminate this Agreement. Termination of this Agreement does not terminate any SOW. The terms herein shall apply as necessary to any SOW that survives termination of this Agreement.

B. Termination for Material Breach. In the event of any material breach of the Agreement or a Statement of Work, the non-breaching Party shall give the breaching Party written notice describing such breach. If the breaching Party fails to cure the breach within thirty (30) days following receipt of written notice, the non-breaching Party may terminate the Agreement. Company is not required to pay any amount to Supplier that is related to the specific agreement or Statement of Work that is in breach, after Company has provided Supplier with notice of a material breach and until such breach is cured. The foregoing does not alter Company's obligation to make payments for Services performed prior to with the date of notice of material breach; provided, however, that Company shall not be required to make any payment with respect to the specific deficient Service giving rise to the material breach.

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 13 of 21   PageID #: 14767

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881692

C. **Effect of Termination.** Upon the termination of the Agreement, all of the rights and obligations of each Party shall terminate and be of no further force and effect, except as otherwise provided in Section 26 ("Miscellaneous") of this Agreement.

16. **Supplier Personnel**

A. Supplier shall employ for the Services only persons known to it to be experienced and fully qualified to perform the tasks assigned to them. Supplier shall be responsible for all associated salaries, taxes and insurance. At Company's request, the credentials of any of Supplier's employees assigned to perform the Services shall be submitted to Company in advance of such assignment.

B. All persons performing Services on Company's site must comply with the attached Security Guidelines for Consultants and any other applicable requirements. Company may reject or have Supplier immediately remove any employee who in Company's opinion does not meet Company's expectations, whereupon Supplier shall, at its expense and risk, reject or remove and within a reasonable time replace such employee at no increase in price.

C. Supplier shall insure that background checks are conducted on Supplier employees and contractors who come on Company premises in the performance of their duties under this Agreement.. The scope, type and nature of background checks will be subject to and limited by local laws and regulations. . Supplier shall exclude from any direct participation in the performance of the Services any dishonest, dangerous or otherwise unqualified persons.

In the event of a suspected breach of this Section, Supplier agrees to make available to Company copies of records to verify background checks were conducted.

D. The Supplier shall ensure that the resources provided have the necessary skills and experience to carry out the work in a professional manner and may at their discretion provide additional training as required.

For Time and Materials based projects: -
- Company may specify desired experience levels for the Supplier's team for specific Statements of Work. Company will detail this specific requirement in the relevant Statement of Work and will engage with the Supplier to discuss requirements and mutually agree upon the same.

- Supplier will provide the company monthly reports, or as mutually agreed upon, in the format of timesheet of the resources involved in any project.

- Supplier shall take active measures, such as a creating a Buffer, to ensure project deliverables are unaffected by attrition. A Buffer is defined as people trained, assigned to and actively working on the project who are not billed to Company.

17. **Employment, Non Hire, Non Solicitation, and Visitor Status**

A. Both parties agree that for the term of this Agreement and for a period of one year thereafter, neither party will intentionally, directly or indirectly:

- Recruit, or attempt to recruit, any person who was a Supplier employee, was involved in the performance of any Statement of Work under this Agreement.

- Solicit any person who is or has been an employee, or agent of the other party at any time during the term of this Agreement and has been involved in the performance of any Statement of Work under this Agreement to terminate his or her relationship with the other party or any related company or to knowingly introduce such person to any potential employer.

18. **Tools and Equipment**

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 14 of 21   PageID #: 14768

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881693

A. Unless otherwise specifically provided in this Agreement or Statement of Work, Supplier shall only provide basic tools and equipment ("the Tools") for performance of this Agreement restricted to personal computer and office software. Company shall provide all specialist tools and equipment ("the Specialist Tools").

## 19. Governing Law and Dispute Resolution

B. Choice of Law. This Agreement and any disputes between the Parties and their affiliates arising out of or relating to the Agreement ("Disputes") will be governed by the Laws of the State of New York for SOWs where Avaya Inc. is the contracting Avaya entity, and the laws of the UK, where AISL is the contracting Avaya entity, regardless of: (i) that jurisdiction's conflict of law principles; (ii) the applicability of the United Nations Convention on Contracts for the International Sale of Goods; or (iii) the Uniform Computer Information Transactions Act ("UCITA"). Supplier agrees to submit to the jurisdiction of any court wherein an action is commenced against Company based on a Claim for which Supplier has agreed to indemnify Company under this Agreement.

C. Arbitration and Injunctive Relief. Any Disputes, including without limitation the formation, interpretation, breach or termination of this Agreement, or any issue regarding whether a Dispute is subject to arbitration hereunder, that cannot be settled by good faith negotiation between the parties within a reasonable period of time, will be conclusively determined by a final and binding arbitration proceeding to take place in New York City, New York. Such proceeding will be conducted in English and administered by JAMS pursuant to the JAMS Comprehensive Arbitration Rules and Procedures then in effect, or in the event one or more of the parties is located outside of the United States, pursuant to the JAMS International Arbitration Rules then in effect, before a panel of one arbitrator chosen in accordance with such rules. The arbitrator will not award punitive or exemplary damages, and will not have the authority to limit, expand or otherwise modify the terms of this Agreement. The ruling by the arbitrator may be entered in any court having jurisdiction over the parties or any of their assets. The parties will evenly split the cost of the arbitrator's fees, but each party will bear its own attorneys' fees and other costs associated with the arbitration. The parties agree that this arbitration provision may be enforced by injunction or other equitable order, and no bond or security of any kind will be required with respect to any such injunction or order. In addition and notwithstanding the foregoing, either party shall be entitled to take any necessary legal action, including without limitation seeking immediate injunctive relief from a court of competent jurisdiction, in order to protect its intellectual property and its confidential or proprietary information (including but not limited to trade secrets).

D. The Parties will continue to perform their obligations under this Agreement while any dispute is being resolved, except to the extent the issue in dispute precludes performance. Disputes over payment do not preclude performance.

E. Disputes must be brought to arbitration within 2 years after the cause of action arises or they are waived.

## 20. Laws, Regulations and Permits

Supplier, its employees and representatives are required at all times to comply with all applicable federal, state and local laws, ordinances, statutes, rules and regulations, including those relating to wages, taxes, hours, environmental conditions, fair employment practices, equal opportunity, anti-discrimination, safety, fire prevention and working conditions. Supplier is required, at its own expense, to obtain all permits, inspections and licenses from governmental authorities which may be required in connection with its performance of the Services. Supplier is responsible for any costs, fines, penalties, awards, damages or other liabilities incurred by either Party resulting from any violations of this Section by Supplier.

A. Both Parties agree to provide any assistance reasonably requested by the other Party to enable such Party to comply with the Sarbanes-Oxley Act of 2002, the rules of the Public Accounting Oversight Board and rules of the Securities and Exchange Commission relating to disclosure controls and procedures (the "Control Rules") as such act or rules may be amended from time to time .

B. Both Parties agree to comply with all relevant anti-bribery/anti-corruption laws and regulations that apply to their businesses. These laws and regulations include, but are not limited to, the UK Bribery Act and the U.S. Foreign Corrupt Practices Act. Both Parties shall not engage other Party's employees in any behaviors prohibited

Avaya Proprietary and Confidential

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 15 of 21   PageID #: 14769

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881694

by anti-bribery/anti-corruption laws and regulations, including any payments or other activity barred by these laws and regulations .

C. Import/Export Compliance and C-TPAT.

Each Party, will comply with applicable import and export control laws and regulations, including those of the United States that prohibit or limit export to certain countries, for certain uses, or to certain end-users. The Party conducting the export or import shall obtain, all necessary export or import authorizations required for such Party to execute its obligations under this agreement. Each Party shall reasonably cooperate and exercise reasonable efforts to support the other Party in obtaining any necessary licenses or authorizations required to perform its obligations under this agreement or in connection with associated reporting or recordkeeping obligations. Reasonable cooperation shall include providing such Party (or its designated agent or representative) reasonably necessary information (i.e. product descriptions, classifications of products and/or components (HTS, ECCN), country of origin, etc.) and documentation (i.e. import, end-user, retransfer certificates, declarations/certificates to support duty free, special tariff programs or free trade agreements, etc.). Each Party further agrees to promptly notify the other Party of any changes in facts relating to previously provided information (e.g., country of origin) or that affect previously issued documentation (e.g., declarations or certificates).

Any Supplier expenses related to meeting these requirements will be covered in the appropriate Statement of Work(s)

Supplier certifies that they are not on the U.S. Department of Commerce's Denied Parties List or affiliated lists, the U.S. Department of Treasury's Specially Designated Nationals List or on any other export exclusion list of any other U.S. or non U.S. governmental entity or agency. Supplier further certifies that neither the U.S. Bureau of Industry and Security nor any other U.S. or non- U.S. governmental entity or agency has issued sanctions against Supplier or otherwise suspended, revoked or denied Supplier's import or export privileges. To obtain additional information relevant to Avaya's compliance with applicable export and import laws and regulations, contact Avaya Global Trade Compliance at globaltrade@avaya.com.

Avaya may provide Supplier with Avaya owned materials, such as equipment, tooling, molds etc. (collectively "Avaya Provided Materials") in support of this agreement. For the shipment of Avaya Provided Materials out to Supplier, Avaya will be responsible for export customs formalities to exit the Avaya Provided Materials from its country of origin and Supplier will be responsible for the import customs formalities required to enter the Avaya Provided Materials into the country of destination. For the return shipment of Avaya Provided Materials back to Avaya, Supplier will be responsible for export customs formalities and Avaya will be responsible for the import customs formalities.   Avaya Provided Materials may be considered dutiable assists associated with the production of articles that will be imported into the United States. If the Supplier is the importer of record, the values of such assists must be declared to U.S. Customs and Border Protection upon entry, to arrive at the appropriate customs value.

Supplier acknowledges that Avaya participates in the Customs Trade Partnership Against Terrorism (C-TPAT) program administered by the U.S. Customs and Border Protection (CBP). On behalf of itself and its designated agents and representatives, Supplier agrees to take such reasonable measures as are required by Avaya and/or CBP to ensure physical integrity and security of all shipments to Avaya. Avaya reserves the right to audit Supplier's security procedures and to conduct on-site facilities inspections concerning C-TPAT compliance.

Supplier agrees to provide Avaya or Avaya's designated agent or representative with timely, accurate and complete information with respect to all products shipped pursuant to this agreement as required for compliance with all applicable import regulations, including without limitation the Importer Security Filing (10+2) regulation issued by U.S. Customs and Border Protection (CBP).

Supplier agrees to indemnify and hold Avaya harmless from and against all losses or damages that Avaya incurs as a result of Supplier's breach of its obligations under this section, including but not limited to any government assessed fees or penalties, attorneys' fees , added transportation costs,  storage costs, and/or costs associated with the detention or confiscation of goods.

Avaya Proprietary and Confidential

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 16 of 21   PageID #: 14770

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881695

**Section 508 Accessibility Compliance.**

A. "Electronic and information technology" (EIT) either developed or to be delivered in accordance with the terms of this Agreement shall be assessed against the U.S. Government information technology accessibility standards mandated by Section 508 of the Rehabilitation Act (29 U.S.C. §794d), as amended. Additional information about the Section 508 electronic and information technology standards can be found at: http://www.Section508.gov.

B. For each product or service that meets the 508 standard's definition of EIT, to be furnished solely by Supplier in performance of this Agreement, Supplier will provide Avaya with an accurately populated Voluntary Product Assessment Templates (VPATs) (the form for which can be found at http://www.avaya.com/usa/about-avaya/doing-business/supplier-information/). The VPATs for such EIT products or services shall clearly document and demonstrate the current conformance level with Section 508 of the Rehabilitation Act of 1973 (29 U.S.C. §794d), as amended, and the Architectural and Transportation Barriers Compliance Board's Electronic and Information Technology Accessibility Standards (36 C.F.R. 1194). In addition to providing populated VPATs, Supplier will also document and explain any Supplier workarounds or other adaptive technology it would like to propose to increase the level of compliance of such EIT products or services. Such VPAT information, documentation and support for EIT products or services will be provided by Supplier at no additional cost to Avaya. During the term of this Agreement, Supplier will retain and maintain current records of all VPAT information and other documentation required by this provision. Supplier shall indemnify Avaya for any Costs associated with providing false or inaccurate VPAT information.

C. For products or services that both Avaya and the Supplier jointly develop or deliver in accordance with the terms of this Agreement if any, then Avaya shall be solely responsible for completing the assessments. The Supplier will provide reasonable assistance to Avaya in completing the assessments.

D. . Supplier shall indemnify Avaya against all claims, actions, costs, expenses and damages (including reasonable attorney's fees and costs) suffered by Avaya as a result of Supplier's failure to comply with the terms of this Section.

E. This section shall apply to Supplier where Section 508 applies to Avaya with respect to a Deliverable or Service. This section is not intended to broaden the application of the law as to Supplier for items to which it does not apply by its terms.

**21. Taxes**

D. Company is responsible for paying all sales, use, value added and similar taxes, however designated, legally imposed by or payable to any federal, state, local or foreign tax or government authority on the Products and Services provided by Supplier under this Agreement, (individually and collectively, "Taxes"); provided, however, that Company will not be responsible for any Taxes based or due on net income of Supplier.

E. Company will reimburse Supplier for Taxes with respect to transactions under this Agreement unless Company advises Supplier that an exemption applies. Taxes payable by Company will be billed as separate items on Supplier's invoices and will not be included in Supplier's prices. It is agreed that Company will not make payment to Supplier until Tax Attachments 1 and 2 are fully completed by Supplier and returned to Company. Tax Attachment may be found at http://www.avaya.com/usa/about-avaya/doing-business/supplier-information/. If Company is required by law to withhold taxes from any payment based on information provided by Supplier as required in Attachment 1 and Attachment 2, then the amount of the payment due from Company to Supplier shall be equal to: (i) the payment which would have been due if no withholding tax was required less (ii) the required withholding tax. Company is not required to make an increased payment to Supplier due to any withholding tax. If it is subsequently determined that any portion of any amount paid to the Supplier is subject to withholding taxes, Company will remit such withholding taxes and any applicable interest, late payment charges or penalties to the appropriate taxing authority and the Supplier will promptly reimburse Company for (i) the amount of such withholding tax and (ii) any such interest, late payment charges or penalties, if the failure or delay in withholding tax remittance was due, in whole or in part, to Supplier's or its representative's action or inaction. Company is relying on Supplier's representations with regard to U.S. withholding taxes.

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 17 of 21   PageID #: 14771

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881696

F. Company will have the right to request Supplier to contest any such Taxes that Supplier or Company deem improperly levied, at Company's expense. Supplier agrees to cooperate with Company in any such contest.

22. **Audit**

A. With the exception of prices fixed by this Agreement, Supplier shall maintain accurate and complete records of all costs incurred under this Agreement including, without limitation, hours worked that may affect the amounts payable by Company to Supplier hereunder or permit the verification of such amounts. These records shall be maintained in accordance with recognized commercial accounting practices so they may be readily audited.

B. Supplier shall permit Company or Company's representative to examine and audit these records and all supporting records at reasonable times upon seven days notification of the intent to audit. Audits may be made not later than three calendar years after the completion of services rendered or three calendar years after expiration date of this Agreement, whichever comes later.

23. **Contractual Relationships**

The relationship between Company and Supplier is that of the "customer" and "independent contractor". As an independent contractor, Supplier is required determine the means and methods for satisfactorily performing the Services described in the Agreement.

24. **Supplier Diversity**

It is Company's policy that Minority, Women, Veteran, and Disabled Veteran-Owned Business Enterprises (MWDVBEs) as well as small businesses are given the maximum practicable opportunity to participate as suppliers, contractors, and subcontractors of goods and services to Company. Where not inconsistent with local law Supplier agrees to use its good faith efforts to award subcontracts to carry out this policy to the fullest extent consistent with the efficient performance of this Agreement, and agrees to conduct a program which will enable MWDVBEs and small businesses to be considered fairly as subcontractors under this Agreement.

25. **Code of Conduct and Vendor Privacy Standards**

A. Supplier agrees to comply with Company's Code of Ethics and Business Conduct policies, which can be found and downloaded at http://www.avaya.com/usa/about-avaya/doing-business/supplier-information/. Company reserves the right to update such policies from time to time and will notify the Supplier of any changes.

B. Each Party agrees to process personal data of the other Party's employees in accordance with the terms and conditions set forth in Vendor Privacy Standards, and to abide by its terms and conditions.

26. **Force Majeure**

A. Neither party will be held responsible for a delay or failure in performance of any part of this Agreement to the extent such delay or failure is caused by a Force Majeure Event. "Force Majeure Event" means an event beyond the reasonable control of the party affected by it (the "Non-performing Party") which could not have reasonably been anticipated by the Non-performing Party including, but not limited to: fire; flood; earthquake; storm; acts of God; war, riots, civil disorders or acts of terrorism; strikes, lockouts, and labor disputes (but excluding strikes, lockouts and labor disputes involving employees of the Non-performing Party or its Affiliates or subcontractors); or malicious damage (but excluding malicious damage caused by the employees of the Non-performing Party or its Affiliates or subcontractors).

B. Upon its knowledge of a Force Majeure Event, the Non-performing Party will: (i) notify the other party as promptly as reasonably possible of the nature and the anticipated effect of such event upon its ability to meet its obligations; and (ii) promptly implement commercially reasonable efforts to mitigate the adverse effects of the Force Majeure Event.

C. Whenever a Force Majeure Event causes Supplier to allocate limited resources among multiple customers, Company shall be treated no less favorably than any other Supplier customer.

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 18 of 21   PageID #: 14772

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881697

D. Supplier shall not have the right to additional payments or increased charges as a result of any Force Majeure Event.

27. **Travel Policy Addendum**

   A. Travel policy only applies for travel that is billed directly to the Company
   B. Supplier may use an alternate travel agency where the cost is less than or equal to the equivalent Avaya travel agency cost, providing that this is pre-approved by the appropriate Avaya engagement manager
   C. A per-diem living expenses amount may be used in place of daily expenses providing that this is pre-approved by the appropriate Avaya engagement manager

28. **Miscellaneous**

A. <u>Assignment by Supplier</u>. Except as otherwise provided in this Section or agreed elsewhere in writing and signed by the parties, Supplier will not assign any right or interest under this Agreement, any Statement of Work, or any purchase order (excepting monies due or to become due) without the prior written consent of Company. Any attempted assignment in contravention of the above provisions will be void and ineffective. Any assignment of monies will be void and ineffective to the extent that: (a) Supplier will not have given Company at least 30 days prior written notice of the assignment; or (b) such assignment attempts to impose upon Company obligations to the assignee additional to the payment of such monies, or to preclude Company from dealing solely and directly with Supplier in all matters pertaining to this Agreement or an Order including the negotiation of amendments or settlements of charges due.

B. Supplier has a right to transfer, assign, subcontract and/or sublicense this Agreement and/or any of its rights and/or obligations hereunder, in whole or in part, to its Affiliates. Supplier shall remain primarily liable for all Services provided and all other of Supplier's obligations under this Agreement, regardless of whether Supplier or its subcontractor performs the services and obligations hereunder; a breach of this Agreement by the subcontractor shall be deemed a breach of this Agreement by Supplier.

C. Upon Company's prior written consent, Supplier may assign its rights under this Agreement to an entity into which Supplier has merged or which has otherwise succeeded to all or substantially all of its business and assets to which this Agreement pertains, by purchase of stock, assets, merger, reorganization or otherwise, provided the assignee agrees to assume all Supplier obligations under this Agreement, including, but not limited to, those related to Supplier Software availability, maintenance and support and agreed upon pricing. All Company Initial Fees, credits and prepayments shall survive such assumption.

D. <u>Assignment by Company</u>. Company has the right to assign this Agreement to: (a) any third party upon written notice to Supplier, or (b) any present or future Company Affiliate or to any third party into which it has merged or which has otherwise succeeded to all or substantially all of its business and assets to which this Agreement pertains, by purchase of stock, assets, merger, reorganization or otherwise. In each of the above instances, Company will provide Supplier with written evidence of such future assignee's acceptance of the assignment, delegation and assumption of the obligations under this Agreement, including assumption of all accepted purchase orders. Company will be released and discharged, to the extent of the assignment and delegation, from all future duties under this Agreement or purchase orders accepted prior to the time of such assignment. Assignment is subject to Supplier's consent, which shall not be unreasonably withheld.

E. The obligations of the Parties under the Sections entitled <u>Indemnification, Confidentiality, Limitation of Liability, Third Party Licensed Software, Warranty, License Grant and Restrictions, Publicity,</u> and any terms contained in this Agreement which by their nature are intended to survive the termination, cancellation, or expiration of the Agreement, shall survive termination, cancellation or expiration of the Agreement.

F. The Agreement constitutes the entire understanding of the Parties with respect to the subject matter of the Agreement and will supersede all previous and contemporaneous communications, representations or understandings, either oral or written, between the Parties relating to that subject matter and will not be contradicted or supplemented by any prior course of dealing between the Parties. Printed provisions on the reverse side of Company's purchase orders and all provisions on Supplier's forms shall be deemed deleted.

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 19 of 21   PageID #: 14773

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881698

G. If any provision of the Agreement is determined to be unenforceable or invalid by court decision, the Agreement will not be rendered unenforceable or invalid as a whole, and the provision will be changed and interpreted so as to best accomplish the objectives of the original provision within the limits of applicable law.

H. The failure of either Party to assert any of its rights under the Agreement, including, but not limited to, the right to terminate the Agreement in the event of breach or default by the other Party, will not be deemed to constitute a waiver by that Party of its right to enforce each and every provision of the Agreement in accordance with their terms.

I. All notices under the Agreement and any modifications or amendments to the Agreement must be in writing.

J. In the event of a conflict between or among the provisions of this Agreement, a Statement of Work, or a purchase order, priority will be given in the following order: (a) this Agreement, including any amendments or addenda; (b) the Statement of Work; (c) the purchase order. Notwithstanding the above, it is agreed that to the extent expressly provided in a Statement of Work, provisions of this Agreement may be modified for purposes of that specific Statement of Work only.

AGREED TO AND ACCEPTED BY:

Luxoft Global Operations GmbH

By: _____

Printed Name: Roman Yakushkin

Title: Managing Director

Date: 3 September, 2014

Avaya Inc.

By: _Terri M_____

Printed Name: _Terri Vosburgh_

Title: _Sr. Manager, GSO_

Date: _3 September 2014_

Avaya International Sales Limited

By: _MMurray_____

Printed Name: _MICHAEL MURRAY_

Title: _DIRECTOR_____

Date: _Sep 3 2014_____

Avaya Proprietary and Confidential

v.2.0
05/13

Case 3:20-cv-00451-CEA-DCP   Document 334-17   Filed 11/15/23   Page 20 of 21   PageID #: 14774

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881699

OUTSIDE COUNSEL EYES ONLY

EXTREME-00881700