# Exhibit 3

ASSET PURCHASE AGREEMENT

BETWEEN

AVAYA INC.

and

EXTREME NETWORKS, INC.

Dated as of March 7, 2017

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383274

# TABLE OF CONTENTS

Page

Article I Purchase and Sale ........................................................................................... 1

Section 1.01    Purchase and Sale ...................................................................... 1
Section 1.02    Deposit ....................................................................................... 1
Section 1.03    Transferred Assets and Excluded Assets ................................... 2
Section 1.04    Consents to Certain Assignments ............................................... 5
Section 1.05    Assumption of Liabilities; Retained Liabilities ......................... 6
Section 1.06    Assumption and Assignment of Contracts ............................... 10
Section 1.07    Additional and Eliminated Transferred Contracts ................... 10

Article II Closing ........................................................................................................ 11

Section 2.01    Closing ...................................................................................... 11
Section 2.02    Transactions To Be Effected at the Closing ............................ 11
Section 2.03    Post-Closing Adjustment .......................................................... 12
Section 2.04    Deferred Closing ....................................................................... 14
Section 2.05    Withholding .............................................................................. 15

Article III Representations and Warranties of AVAYA ............................................... 16

Section 3.01    Organization and Standing ........................................................ 16
Section 3.02    Authority; Execution and Delivery; Enforceability ................. 16
Section 3.03    Non-Contravention and Approvals ........................................... 16
Section 3.04    Financial Statements ................................................................. 17
Section 3.05    Absence of Certain Changes ..................................................... 18
Section 3.06    Title to Assets; Condition of Assets ......................................... 19
Section 3.07    Real Property ............................................................................ 20
Section 3.08    Intellectual Property ................................................................. 20
Section 3.09    Contracts ................................................................................... 24
Section 3.10    Permits ...................................................................................... 26
Section 3.11    Taxes ......................................................................................... 26
Section 3.12    Legal Proceedings .................................................................... 27
Section 3.13    Employee Benefit Plans; Labor ................................................ 27
Section 3.14    Compliance with Laws ............................................................. 28
Section 3.15    Sufficiency of Assets ................................................................ 29
Section 3.16    Certain Business Relationships with Affiliates ........................ 29
Section 3.17    Environmental Matters .............................................................. 29
Section 3.18    Brokers and Finders .................................................................. 30
Section 3.19    Insurance ................................................................................... 30
Section 3.20    Top Customers and Top Suppliers ............................................ 30
Section 3.21    Government Contracts ............................................................... 30
Section 3.22    Solvency .................................................................................... 31
Section 3.23    No Other Agreements ................................................................ 31
Section 3.24    Purchaser's Representations ..................................................... 31

Case 3:20-cv-00451-CEA-DCP    Document 334-29    Filed 11/15/23    Page 3 of 43    PageID #: 14861

OUTSIDE COUNSEL EYES ONLY                                                    EXTREME-01383275

Article IV REPRESENTATIONS AND WARRANTIES OF PURCHASER ............................ 32

Section 4.01  Organization ................................................................................. 32
Section 4.02  Authority; Execution and Delivery; Enforceability ..................... 32
Section 4.03  Non-Contravention and Approvals ............................................... 32
Section 4.04  Legal Proceedings ........................................................................ 33
Section 4.05  Availability of Funds .................................................................... 33
Section 4.06  Solvency ....................................................................................... 33
Section 4.07  Brokers and Finders ..................................................................... 33
Section 4.08  Avaya's Representations ............................................................... 34

Article V Covenants .................................................................................................... 34

Section 5.01  Conduct of Business ..................................................................... 34
Section 5.02  Access to Information ................................................................... 35
Section 5.03  Confidentiality .............................................................................. 37
Section 5.04  Regulatory and Other Authorizations; Notices and Consents ..... 38
Section 5.05  Non-Compete; Non-Solicit .......................................................... 39
Section 5.06  Publicity ........................................................................................ 40
Section 5.07  Use of Retained Names and Marks .............................................. 41
Section 5.08  Avaya Guarantees ......................................................................... 43
Section 5.09  Financing Cooperation ................................................................. 43
Section 5.10  Necessary Efforts; Further Action; Wrong Pockets; Mail Handling ........ 44
Section 5.11  Financial Statements ..................................................................... 45
Section 5.12  Separation of Mixed-Use Contracts ............................................. 46
Section 5.13  Submission for Bankruptcy Court Approval ................................ 46
Section 5.14  Overbid Procedures; Adequate Assurance ................................... 48
Section 5.15  Termination Fee ............................................................................ 48
Section 5.16  Expense Reimbursement ............................................................... 49
Section 5.17  Cure Payments; Cure of Defaults ................................................ 50
Section 5.18  Competing Bids ............................................................................ 50
Section 5.19  CPOD Agreement ......................................................................... 51
Section 5.20  Disclosure and Delivery of Intellectual Property ........................ 51
Section 5.21  TSA Matters .................................................................................. 51
Section 5.22  Certain Consent Matters ............................................................... 52

Article VI Employment Matters .................................................................................. 52

Section 6.01  Non-ARD Employees ................................................................... 52
Section 6.02  Terms of Employment .................................................................. 53
Section 6.03  Defined Benefit Plan .................................................................... 54
Section 6.04  401(k) Plan ................................................................................... 54
Section 6.05  Health and Welfare Benefit Plans ................................................ 55
Section 6.06  Credit for Service with Seller ...................................................... 55
Section 6.07  COBRA and HIPAA ..................................................................... 56
Section 6.08  Workers' Compensation ............................................................... 56
Section 6.09  Liabilities ...................................................................................... 56

iii

OUTSIDE COUNSEL EYES ONLY                                                    EXTREME-01383276

Section 6.10  Severance Liability ................................................................................ 56
Section 6.11  Accrued Vacation ................................................................................... 57
Section 6.12  Administration, Employee Communications, Cooperation ..................... 57
Section 6.13  Labor Consultations ............................................................................... 57
Section 6.14  WARN Act ............................................................................................. 58
Section 6.15  Flexible Spending Accounts ................................................................... 58
Section 6.16  Retention Plans ...................................................................................... 58
Section 6.17  Non-US Employees ................................................................................ 58
Section 6.18  ARD Employees ..................................................................................... 58
Section 6.19  No Third Party Employee Rights ............................................................ 60

Article VII Conditions to Closing ...................................................................................... 60

Section 7.01  Conditions to Each Party's Obligation ................................................... 60
Section 7.02  Conditions to Obligation of Purchaser .................................................. 61
Section 7.03  Conditions to Obligation of Avaya ........................................................ 62
Section 7.04  Frustration of Closing Conditions .......................................................... 62

Article VIII Termination ..................................................................................................... 63

Section 8.01  Termination ............................................................................................ 63
Section 8.02  Effect of Termination ............................................................................. 65

Article IX INDEMNIFICATION; SURVIVAL .................................................................. 65

Section 9.01  Indemnification by Avaya ...................................................................... 65
Section 9.02  Indemnification by Purchaser ................................................................ 66
Section 9.03  Indemnification Procedures ................................................................... 66
Section 9.04  Limitations on Indemnification .............................................................. 69
Section 9.05  Calculation of Indemnity Payments ...................................................... 71
Section 9.06  Exclusivity ............................................................................................. 71
Section 9.07  Tax Treatment of Indemnification ......................................................... 72
Section 9.08  Survival ................................................................................................. 72

Article X Tax Matters ......................................................................................................... 72

Section 10.01  Tax Covenants ..................................................................................... 72
Section 10.02  Cooperation; Tax Returns and Tax Claims .......................................... 74
Section 10.03  FIRPTA Certificates ............................................................................ 74

Article XI Miscellaneous .................................................................................................... 74

Section 11.01  Assignment .......................................................................................... 74
Section 11.02  No Third-Party Beneficiaries ............................................................... 74
Section 11.03  Expenses .............................................................................................. 75
Section 11.04  Notices ................................................................................................. 75
Section 11.05  Interpretation; Certain Definitions ...................................................... 76
Section 11.06  Non-Recourse ...................................................................................... 89

iv

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383277

| Section 11.07 | Counterparts | 90 |
| Section 11.08 | Entire Agreement | 90 |
| Section 11.09 | Severability | 90 |
| Section 11.10 | Governing Law | 90 |
| Section 11.11 | Jurisdiction | 91 |
| Section 11.12 | Service of Process | 91 |
| Section 11.13 | Waiver of Jury Trial | 91 |
| Section 11.14 | Amendments and Waivers | 91 |
| Section 11.15 | Specific Performance | 92 |
| Section 11.16 | Joint Drafting | 92 |
| Section 11.17 | Currency | 92 |

EXHIBITS

A       Form of Bill of Sale
B       Form of Assignment and Assumption Agreement
C       Form of Patent Assignment
D       Form of Trademark Assignment
E       Form of Sublease
F       Form of Domain Name Assignment
G       Form of Transition Services Agreement
H       Form of Intellectual Property License Agreement
I       Escrow Agreement
J       [Reserved]
K       Bidding Procedures Order
L       Sale Order
M       Bidding Procedures and Sale Motion
N       Form of Reseller Agreement
O       CPOD Agreement Term Sheet

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383278

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of March 7, 2017 (this "**Agreement**"), and is by and between AVAYA INC., a Delaware corporation ("**Avaya**"), and Extreme Networks, Inc., a Delaware corporation ("**Purchaser**").

WHEREAS, Avaya and certain of its subsidiaries are engaged in the Business and own all of the Transferred Assets;

WHEREAS, on January 19, 2017 (the "**Petition Date**"), Avaya, together with certain of its subsidiaries (Avaya and such subsidiaries, collectively, the "**Debtors**") and its parent, commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York;

WHEREAS, on the terms and subject to the conditions set forth herein, Sellers desire to sell to Purchaser, and Purchaser desires to purchase from Sellers all of their right, title and interest in and to all of the Transferred Assets, and Sellers desire Purchaser to assume, and Purchaser desires to assume from Sellers, all of the Assumed Liabilities;

WHEREAS, Avaya and Purchaser desire to make certain representations, warranties, covenants and other agreements in connection with the transactions contemplated by this Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth in this Agreement and intending to be legally bound, the parties hereby agree as follows.

## ARTICLE I

## PURCHASE AND SALE

Section 1.01  <u>Purchase and Sale</u>.  Upon the terms and subject to the conditions of this Agreement, at the Closing, Avaya shall, and shall cause its subsidiaries (as applicable) to, sell, transfer, assign and deliver to Purchaser, and Purchaser will purchase, and shall cause it subsidiaries (as applicable) to, acquire and accept from Avaya and its subsidiaries, all of their right, title and interest in, to and under the Transferred Assets, (in the case of the Debtors, to the extent set forth in the Sale Order) free and clear of all Liens (other than Permitted Liens), as of the Closing, for (A) the Purchase Price, payable as set forth in <u>Section 2.02(b)</u> and subject to adjustment as set forth in <u>Section 2.03(c)</u>, and (B) the assumption by Purchaser of the Assumed Liabilities.  The purchase and sale of the Transferred Assets and the assumption of the Assumed Liabilities are collectively referred to in this Agreement as the "**Acquisition**".

Section 1.02  <u>Deposit</u>. Contemporaneously with the execution of this Agreement, and in any event on the date hereof, Purchaser shall deposit with The Bank of New York Mellon Trust Company, N.A. (the "**Escrow Agent**"), a deposit in the amount of $10,000,000 (the "**Deposit**"), by wire transfer of immediately available funds for deposit into a separate escrow account (the "**Deposit Escrow Account**"), established pursuant to the escrow agreement, dated as of the date hereof, by and among Avaya, Purchaser and the Escrow Agent, substantially in the form attached

1

OUTSIDE COUNSEL EYES ONLY                                                    EXTREME-01383282

hereto as <u>Exhibit I</u> (the "**Escrow Agreement**"). If Closing occurs, Avaya and Purchaser shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by Avaya to the Escrow Agent, and the Deposit shall be credited against the amount required to be paid by Purchaser to Avaya at Closing in accordance with <u>Section 2.02(b)(i)</u>. If this Agreement is validly terminated by Avaya in accordance with the terms of this Agreement prior to Closing pursuant to <u>Section 8.01(d)</u> or <u>Section 8.01(e)</u>, then Avaya and Purchaser shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release from the Deposit Escrow Account the entire Deposit, by wire transfer of immediately available funds to an account designated by Avaya to the Escrow Agent, to be retained by Avaya as liquidated damages (and not a penalty). In all other circumstances (including, for the avoidance of doubt, termination by Purchaser pursuant to <u>Section 8.01(f)</u> or <u>Section 8.01(g)</u>), if this Agreement is validly terminated in accordance with the terms of this Agreement prior to Closing, then within two (2) Business Days of such termination, Avaya and Purchaser shall deliver a joint written instruction to the Escrow Agent authorizing the Escrow Agent to release all funds held in the Deposit Escrow Account, including any interest or earnings thereon, by wire transfer of immediately available funds to an account designated by Purchaser to the Escrow Agent.

Section 1.03 <u>Transferred Assets and Excluded Assets</u>.

(a) The term "**Transferred Assets**" means all rights, title and interest of Avaya and its subsidiaries in, to and under all assets, properties and rights of Avaya or any subsidiary of Avaya, wherever located, whether tangible or intangible, real, personal or mixed, that are Related to the Business, including (in each case, to the extent Related to the Business but specifically excluding, in all cases, the Excluded Assets):

(i) rights under the Transferred Contracts;

(ii) the Transferred Intellectual Property;

(iii) lists of, and currently available contact information for, customers, vendors and suppliers (whether current, former or prospective), in each case Related to the Business;

(iv) sales, marketing and promotional information, literature and manuals, in each case Related to the Business;

(v) all books, records, customer and other reports, files and papers, correspondence and other documents, invoices, whether in hard copy or computer or other electronic format, including manuals and data (collectively, "**Books and Records**"), in each case that are Related to the Business, in each case other than (A) any books, records or other materials originals of which Sellers are required by Law to retain (in which case copies of which, to the extent permitted by Law, will be made available to Purchaser at Purchaser's reasonable request) and (B) personnel, medical and employment records for employees and former employees of the Business other than Transferred Employee Records; <u>provided</u> that the parties shall use commercially reasonable efforts and cooperate in good faith with each other to provide such

2

OUTSIDE COUNSEL EYES ONLY                                                                 EXTREME-01383283

Books and Records without causing violation or loss of attorney-client work product and other legal privileges of Avaya and its subsidiaries;

     (vi)    all Transferred Employee Records;

     (vii)    (A) the leases and subleases set forth on Section 1.03(a)(vii) of the Disclosure Schedule (the "**Assumed Leases**") and (B) all structures, improvements and fixtures located on any Assumed Lease Real Property that are owned by any Seller, regardless of whether title to such buildings, structures, improvements or fixtures are subject to reversion to the landlord or other third party upon the expiration or termination of the Assumed Lease for such Assumed Lease Real Property;

     (viii)    all Furniture and Equipment located at the Assumed Lease Real Property or otherwise set forth on Section 1.03(a)(viii) of the Disclosure Schedule and all Transferred IT Systems;

     (ix)    all Permits (including applications therefor) related solely to the Business, to the extent such Permits may be transferred to Purchaser under applicable Law;

     (x)    all goodwill Related to the Business;

     (xi)    all accounts, notes and other receivables Related to the Business;

     (xii)    all Inventory;

     (xiii)    all prepaid expenses Related to the Business;

     (xiv)    all other current assets Related to the Business;

     (xv)    all causes of action, claims, demands, deposits, warranties, guarantees, refunds, rights of recovery, rights of set off and other rights and privileges against third parties whether liquidated or unliquidated, fixed or contingent, choate or inchoate that are Related to the Business, in each case, including only Avoidance Actions that are related exclusively to the Business but excluding Retained Claims; and

     (xvi)    the assets, properties and rights set forth on Section 1.03(a)(xvi) of the Disclosure Schedule.

     (b)    The term "**Excluded Assets**" means any right, title and interest in, to or under any of the following assets, properties and rights of Avaya or any of its subsidiaries (including those that are Related to the Business) wherever located, whether tangible or intangible, real, personal or mixed:

     (i)    cash and cash equivalents, if any;

     (ii)    all Furniture and Equipment not located at the Assumed Lease Real Property and all IT Systems other than the Transferred IT Systems;

OUTSIDE COUNSEL EYES ONLY           EXTREME-01383284

(iii)     any information that would otherwise constitute an Excluded Asset that is stored on any Transferred IT Systems included in the Transferred Assets; provided that to the extent Purchaser is otherwise permitted to make copies of such information, Purchaser shall be entitled to retain electronic copies of such information on such Transferred IT Systems;

(iv)     all Permits (including applications therefor and any trade or import/export Permits) that (A) are not related solely to the Business or (B) are not transferable to Purchaser under applicable Law;

(v)     assets in respect of any Employee Benefit Plan;

(vi)     all personnel, employment and medical records relating to the Transferred Employees that are not Transferred Employee Records;

(vii)     Excluded Contracts;

(viii)     all right, title and interest in, to and under the Retained Intellectual Property;

(ix)     all rights under and claims to any coverage or recovery under any Insurance Policy, in each case, that are not Related to the Business or that relate to events or circumstances that occur or arise following the Closing;

(x)     all minute books, organizational documents, stock registers and such other books and records of any Seller as pertaining to ownership, organization or existence of such Seller;

(xi)     all Tax Returns of Avaya and its subsidiaries (and all Tax books and records, including workpapers) related thereto;

(xii)     any Tax refund, Tax credit or other Tax asset of any of Avaya or any of its affiliates (except as provided in Section 10.01(c));

(xiii)     any equity interest in any subsidiaries of Avaya;

(xiv)     all Seller Credit Support Obligations, other than as described in clause (iii) of the definition of Transferred Contracts;

(xv)     the Purchase Price and all other rights of Avaya and its subsidiaries under or pursuant to this Agreement and the Schedules attached hereto and any other agreements entered into by Avaya or any of its affiliates pursuant to this Agreement; and

(xvi)     Retained Claims and those assets set forth on Section 1.03(b)(xvi) of the Disclosure Schedule.

(c)     Notwithstanding anything to the contrary contained in this Agreement, Purchaser acknowledges and agrees that all of the following shall remain the property of Sellers, and neither Purchaser nor any of its affiliates shall have any interest therein: (i) all reports,

4

OUTSIDE COUNSEL EYES ONLY     EXTREME-01383285

summaries, updates or other similar materials prepared by any of their Representatives on behalf of or received by the board of directors (or equivalent governing body) or senior management of the Sellers or any of their respective affiliates in connection with the sale process for the Business, including all analyses relating to the business of Purchaser or its affiliates (but excluding any materials made available to Purchaser or its Representatives and any financial information relating to the Business that would be reasonably required for the financial planning or reporting obligations or any other reasonable business purpose of Purchaser) or any other potential purchaser or its affiliates and its proposals and (ii) all confidentiality agreements with prospective purchasers of the Business or any portion thereof (except that Sellers shall, to the extent permitted by the terms thereof without consent of the counterparty thereto, assign to Purchaser at the Closing all of Sellers' rights under such agreements to confidential treatment or restrictions on use of information relating to the Business and the Transferred Assets and with respect to solicitation and hiring of Transferred Employees), and all bids and expressions of interest received from third parties with respect thereto. In addition, Sellers shall have the right to retain copies of the Books and Records included in the Transferred Assets (to the extent not solely related to the Business) prior to the Closing Date, subject to their compliance with Section 5.03(b).

(d)     Notwithstanding anything to the contrary in this Agreement, (i) Avaya and its subsidiaries will retain such rights as are reasonably necessary under applicable Law under the Transferred Contracts for the sole purpose of enabling Avaya to provide the administrative services under the Transition Services Agreement as Purchaser's agent, including Avaya's ability to ship Purchaser-owned product, invoice and collect cash and pay costs on Purchaser's behalf; (ii) Avaya will transfer all its right, title and interest to the Inventory as a Transferred Asset; provided that the Inventory will remain where located as of the Closing for purposes of Avaya performing delivering services as an agent under the Transition Services Agreement; and (iii) Purchaser agrees that, notwithstanding the services to be performed as noted in clause (i), all other rights will transfer and as such, under the Transition Services Agreement, Purchaser is the primary obligor of the Transferred Contracts and maintains all of the risks and rewards of ownership of the Transferred Contracts on the Closing Date. Promptly following the completion of such services performed by Avaya under the Transition Services Agreement, any rights retained by Avaya and its subsidiaries under the Transferred Contracts pursuant to the immediately preceding sentence shall be transferred to Purchaser.

Section 1.04     Consents to Certain Assignments.

(a)     Notwithstanding anything to the contrary contained in this Agreement, this Agreement shall not constitute an agreement to sell, transfer, assign, or deliver, directly or indirectly, any Transferred Asset, or any benefit arising thereunder, if an attempted direct or indirect sale, transfer, assignment or delivery thereof, without the Consent of or notice to a third party (including a Governmental Entity), after giving effect to the Sale Order and the Bankruptcy Code, would constitute a breach, default, violation or other contravention of the rights of such third party, would be ineffective with respect to any party to a Contract concerning such Transferred Asset or would in any way adversely affect the rights of Sellers or any of their respective affiliates or, upon transfer, Purchaser with respect to such Transferred Asset; provided, however, that nothing in this Section 1.04 is intended to modify any representation, warranty or covenant of Avaya under this Agreement.

5

OUTSIDE COUNSEL EYES ONLY
EXTREME-01383286

(b)     If any such Consent is not obtained or notice is not given prior to the Closing, the Closing shall nonetheless take place subject to the terms and conditions set forth herein and, thereafter, through the earlier of such time as such Consent is obtained or notice is given and twelve (12) months following the Closing (or, if the Transferred Asset is a Contract, the remaining term of the Contract, if shorter), Purchaser shall use its commercially reasonable efforts to secure such Consent or give such notice as promptly as practicable after the Closing and Avaya shall provide or cause to be provided all necessary assistance to Purchaser (not including the giving of any consideration) reasonably requested by Purchaser to secure such Consent or give such notice, or cooperate in good faith with Purchaser (with each party being responsible for its own out of pocket expenses, but without requiring the payment of any amounts by any Seller to any party in order to obtain such party's Consent and without any further consideration paid by Purchaser to any Seller, and it being understood that following the Closing, Purchaser will own any other Transferred Assets used with respect to such Transferred Asset (*e.g.*, with respect to performance, if such Transferred Asset is a Contract)) in any lawful and commercially reasonable arrangement reasonably proposed by Purchaser under which (i) Purchaser shall obtain (without infringing upon the legal rights of such third party or violating any Law) the economic rights and benefits (net of the amount of any related Tax costs imposed on Sellers or their respective affiliates) under the Transferred Asset with respect to which the Consent has not been obtained and (ii) Purchaser shall assume any related economic burden (including the amount of any related Tax benefit obtained by Sellers or their respective affiliates) and obligation with respect to such Transferred Asset, including subcontracting, licensing, sublicensing, leasing or subleasing to Purchaser any or all of a Seller's rights and obligations with respect to any such Transferred Asset.  Upon satisfying any requisite Consent or notice requirement applicable to such Transferred Asset after the Closing, such Transferred Asset shall promptly be transferred and assigned to Purchaser in accordance with the terms of this Agreement.  In connection with and without limiting the foregoing, for so long as a Business Contract of the type of clause (i)(A) of the definition thereof is not transferred to Purchaser, each party will use commercially reasonable efforts and cooperate in good faith with the other party to allow Purchaser to perform the services thereunder on Avaya's behalf, in all cases, without infringing upon the legal rights of any third party or violating any Law and subject to the other terms of this Section 1.04, such that Sellers may provide delivery with respect to customer commitments thereunder and Purchaser shall obtain the economic rights and benefits under such Business Contract.

Section 1.05     Assumption of Liabilities; Retained Liabilities.

(a)     Upon the terms and subject to the conditions of this Agreement, Purchaser shall assume, effective as of the Closing, and shall pay, perform and discharge when due, only the following Liabilities of each Seller and their respective subsidiaries (collectively, the "**Assumed Liabilities**"):

(i)     all accounts payable Related to the Business that are not past due as of the Closing;

(ii)     all Liabilities Related to the Business arising out of or relating to warranty, return, exchange, rebate and credit obligations in respect of services provided or products sold (whether current or non-current);

6

OUTSIDE COUNSEL EYES ONLY                                                                    EXTREME-01383287

(iii)    all Liabilities Related to the Business (other than accounts payable and Liabilities arising out of or relating to warranty, return, exchange, rebate and credit obligations, which are the subject of Section 1.05(a)(i) and Section 1.05(a)(ii), respectively) that are (x) reflected as specific current liabilities on the latest balance sheet included in the Current Financial Statements or (y) of the same type and nature as the Liabilities reflected as specific current liabilities on the latest balance sheet included in the Current Financial Statements and incurred in the ordinary course of business since October 1, 2016, in each case other than Liabilities arising out of, related to or with respect to (A) the employment or termination of or the compensation and benefits provided to any Employee (which is the subject of Section 1.05(a)(vii)), (B) any violation of Law or any Proceeding by or before any Governmental Entity, (C) any Taxes (which is the subject of Section 1.05(a)(ix)) or (D) any breach of this Agreement;

(iv)    all Liabilities under the Transferred Contracts (A) arising after the Closing, (B) relating to customer or purchase orders and product or service delivery obligations outstanding as of the Closing for purchase orders received by Sellers prior to the Closing (including implementation projects that are in the process of being implemented as of the Closing) or (C) relating to deferred revenue of the Business; provided, however, that Purchaser shall not assume or agree to pay, discharge or perform any Liabilities of Avaya or any of its subsidiaries under or with respect to any Transferred Contracts arising out of any breach, misfeasance or under any other similar theory, to the extent relating to the conduct of Avaya or any of its subsidiaries prior to the Closing; provided further that Liabilities arising out of warranty, return, exchange, rebate and credit obligations shall be governed by Section 1.05(a)(ii);

(v)    all Liabilities arising after the Closing under the Assumed Leases; provided, however, that Purchaser shall not assume or agree to pay, discharge or perform any Liabilities of Avaya or any of its subsidiaries under or with respect to any Transferred Contracts, including Liabilities arising out of any breach, misfeasance or under any other theory, to the extent relating to the conduct of Avaya or any of its subsidiaries prior to the Closing;

(vi)    all Liabilities to the extent resulting from the conduct of the Business by Purchaser after the Closing;

(vii)    all Liabilities assumed by Purchaser pursuant to Article VI (collectively, the "**Assumed Benefits Obligations**") (provided that Purchaser shall not assume any Liabilities with respect to any Employee who is not a Transferred Employee);

(viii)    all Liabilities in respect of deferred revenue of the Business included in the Deferred Revenue Amount (whether current or non-current); and

(ix)    Transfer Taxes and Apportioned Obligations allocable to Purchaser in accordance with Section 10.01(b).

(b)    The term "**Retained Liabilities**" means all other Liabilities of Avaya or any of its affiliates, including the following:

7

OUTSIDE COUNSEL EYES ONLY                                                                 EXTREME-01383288

(i)        all Liabilities of Avaya and its subsidiaries under this Agreement, the Schedules attached hereto and any other agreements entered into by Avaya and its subsidiaries in connection with the transactions contemplated by this Agreement;

(ii)        all Liabilities of Avaya and its affiliates arising out of facts or circumstances in existence prior to the Closing Date and from or related to any breach, default, failure to perform, torts related to performance, violations of Law or Judgment, infringements or indemnities, guaranties and overcharges, underpayments or penalties, in each case, on the part of Avaya or any of its affiliates, whether arising under (A) any Contract, agreement, arrangement or understanding of any kind to which Avaya or any of its subsidiaries is a party prior to the Closing Date or (B) or any other theory of liability whatsoever, including any claims or penalties owing to, assessed by, or that may be owed to or assessed by, any Governmental Entity or other Person, against Avaya or any of its affiliates, including any Successor Liability Claims;

(iii)        all Liabilities of Avaya and its subsidiaries arising from or related to (A) the operation or condition of the Transferred Assets prior to the Closing or (B) facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing, in each case of (A) and (B), other than those Liabilities set forth in <u>Section 1.05(a)</u>;

(iv)        all Liabilities of Avaya and any of its affiliates or any member of any consolidated, affiliated, combined or unitary group of which any of them is or has been a member for Taxes for any Tax period (including, for the avoidance of doubt, any such Taxes attributable to the transactions contemplated hereunder and any such Taxes asserted against Purchaser as a withholding Tax other than any such Taxes that are withholding Taxes arising by reason of Purchaser's willful misconduct), and any Taxes attributable to the ownership of the Transferred Assets or the operation of the Business for any Pre-Closing Tax Period, including any Taxes which are not due or assessed until after the Closing Date but which are attributable to the Pre-Closing Tax Period; <u>provided</u>, <u>however</u>, that Transfer Taxes and Apportioned Obligations shall be apportioned in the manner set forth in <u>Section 10.01(b)</u>;

(v)        all Liabilities of Avaya or any of its affiliates relating to legal services, accounting services, financial advisory services, investment banking services or any other professional services performed in connection with this Agreement and any of the transactions contemplated hereby or otherwise on behalf of Avaya or its affiliates, and any pre-Petition or post-Petition Claims for such services, including any brokerage fees, commissions, finders or similar fees incurred by Avaya or any of its affiliates in connection with the transactions contemplated by this Agreement;

(vi)        all Liabilities of Avaya or any of its affiliates related to Excluded Assets;

(vii)        all accounts payable and other amounts payable of Avaya or any of its affiliates, other than those Liabilities set forth in <u>Section 1.05(a)</u>;

(viii)        all Liabilities expressly retained by Sellers pursuant to <u>Article VI</u>;

(ix)        all Liabilities of Avaya and its subsidiaries for accounts payable to trade creditors, other than those Liabilities set forth in <u>Section 1.05(a)</u>;

8

OUTSIDE COUNSEL EYES ONLY                                                                 EXTREME-01383289

(x)     all Liabilities arising out of, related to or in connection with the employment or service with or termination of employment or service of any Employee, consultant or other service provider of Avaya or any of its affiliates arising on or prior to the Closing, other than those Liabilities set forth in <u>Section 1.05(a)</u> and the Assumed Benefit Obligations;

(xi)     all Liabilities of Avaya and its subsidiaries arising from or related to the operation of the Business or the Business' products or services prior to the Closing Date, including any Liability relating to design or manufacturing defects and any warranty, product liability, safety and other Liability relating to any product sold or manufactured or services rendered by Avaya or any of its affiliates prior to the Closing, other than those Liabilities set forth in <u>Section 1.05(a)</u>;

(xii)     all Liabilities of Avaya or any of its affiliates arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Avaya or any of its affiliates, whether or not used in the Business, including any Liabilities for noncompliance with Environmental Laws or the release of Hazardous Materials on or prior to the Closing, whether known or unknown as of the Closing;

(xiii)     all Liabilities arising from or related to any Claim, action, arbitration, audit, hearing, investigation, suit, litigation or other Proceeding (whether civil, criminal, administrative, investigative, or informal and whether pending or threatened or having any other status) against Avaya or any of its affiliates, or related to the Transferred Assets or the Assumed Liabilities, pending or threatened or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Closing Date, including any Successor Liability Claims but excluding any Claims for which Purchaser may be responsible pursuant to <u>Article VI</u>;

(xiv)     all Liabilities for fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of Avaya or any of its subsidiaries, or any of their respective directors, officers, or employees;

(xv)     all Liabilities of Avaya or its subsidiaries to any equity holder, director, or officer of Avaya or its affiliates, including Claims for indemnity and similar rights;

(xvi)     all Liabilities of Avaya or its subsidiaries arising from state or bankruptcy Law theories of recovery, including fraudulent transfer;

(xvii)     all Liabilities relating to any breach by Avaya or its subsidiaries of this Agreement or the Ancillary Agreements;

(xviii)     all Liabilities arising out of or under any of the Retention Agreements;

(xix)     all Liabilities in respect of Indebtedness; and

(xx)     other than the Assumed Benefits Obligations, all Liabilities in respect of pension and other employment, equity, severance, retention, bonus, benefit or any similar plan, arrangement or agreements of Avaya and its subsidiaries;

9

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383290

provided that in the event of any conflict between the terms of Section 1.05(a) and this Section 1.05(b), the terms of Section 1.05(a) will control.

Section 1.06    Assumption and Assignment of Contracts.

(a)    As soon as reasonably practicable, but in any event within twenty (20) Business Days, from the date hereof, Avaya shall deliver Section 1.06(a) of the Disclosure Schedule to Purchaser, which shall contain with respect to each Transferred Contract and Assumed Lease as of the date hereof, Avaya's good-faith estimate of the amount of Cure Payments with respect to each such Contract determined as of a date between the date hereof and the date of delivery of such schedule.  Prior to the Sale Hearing, Avaya shall commence appropriate Proceedings before the Bankruptcy Court and otherwise take all reasonably necessary actions in order to determine Cure Payments with respect to any Transferred Contract or Assumed Lease entered into prior to the Petition Date.  Notwithstanding the foregoing, at any time and from time to time prior to the Bid Deadline, Purchaser may identify any Transferred Contract as one that Purchaser no longer desires to have assigned to it in accordance with Section 1.07.

(b)    At the Closing, Avaya and its subsidiaries shall assign to Purchaser the Transferred Contracts and Assumed Leases, in each case (unless such subsidiary is not a Debtor in the Bankruptcy Cases) pursuant to Section 365 of the Bankruptcy Code and the Sale Order, subject to provision by Purchaser of adequate assurance as may be required under Section 365 of the Bankruptcy Code and payment by Purchaser of the Cure Payments in respect of Transferred Contracts and Assumed Leases pursuant to and in accordance with Section 365 of the Bankruptcy Code and the Sale Order.

Section 1.07    Additional and Eliminated Transferred Contracts.  Notwithstanding anything in this Agreement to the contrary, Purchaser may, from time to time and in its sole and absolute discretion, upon written notice to Avaya, amend or revise Section 11.05(b)(xii) of the Disclosure Schedule in order to eliminate any Contract from Section 11.05(b)(xii) (other than Contracts underlying Liabilities to be assumed pursuant to Section 1.05(a)(viii) and any Business Contracts) of the Disclosure Schedule or to add any Contract (other than any Lease, Mixed-Use Contract or Retained Mixed-Use Contract) that is Related to the Business to which Avaya or any of its subsidiaries is a party up to the Bid Deadline.  Automatically upon the addition of any Contract to Section 11.05(b)(xii) of the Disclosure Schedule by Purchaser in accordance with the previous sentence, it shall be a Transferred Contract for all purposes of this Agreement.  Automatically upon the deletion of any Contract from Section 11.05(b)(xii) of the Disclosure Schedule by Purchaser in accordance with the first sentence of this Section 1.07 (any such deleted Contract, an "**Eliminated Agreement**"), it shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Purchaser or any of its affiliates or be the obligation, Liability or responsibility of Purchaser or any of its affiliates, in each case, until and unless such time, if any, as Purchaser restores such Eliminated Agreement to Section 11.05(b)(xii) of the Disclosure Schedule in accordance with the first sentence of Section 1.07.  If any Contract is added to the list of Transferred Contracts, then Avaya shall, and shall cause its affiliates to, take such steps as are reasonably necessary, to cause such Contract to be assumed and assigned to Purchaser as promptly as possible at or following the Closing, including payment of all Cure Payments, and Purchaser shall, and shall

10

OUTSIDE COUNSEL EYES ONLY                                                                      EXTREME-01383291

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF AVAYA

Except as set forth in the disclosure schedules (the "**Disclosure Schedule**") (each of which have been arranged in separately titled sections corresponding to the Sections of this Article III but subject in each case to Section 11.05(a)), Avaya hereby represents and warrants to Purchaser as follows.

Section 3.01    Organization and Standing.  Each Seller is a legal entity duly organized, validly existing and, where applicable, in good standing under the Laws of the jurisdiction of its organization or incorporation.  Each Seller has the requisite corporate (or similar organizational) power and authority to enable it to own, operate, lease or otherwise hold the Transferred Assets owned, leased or otherwise held by it, and to conduct the Business as currently conducted by it.  Each Seller is qualified to do business in each jurisdiction in which the ownership of the Transferred Assets or the operation of the Business by such Seller as now being conducted makes such qualification necessary, except to the extent the failure to be so qualified would not have a Material Adverse Effect.

Section 3.02    Authority; Execution and Delivery; Enforceability.  Subject to Bankruptcy Court approval and entry of the Bidding Procedures and Sale Orders, each of Avaya and its applicable subsidiaries has the requisite corporate (or similar organizational) power and authority to execute and deliver this Agreement and the other agreements and instruments to be executed and delivered by it in connection with this Agreement (the "**Ancillary Agreements**") to which it will be a party and to consummate the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements.  Subject to Bankruptcy Court approval and entry of the Bidding Procedures and Sale Orders, each of Avaya and its applicable subsidiaries has taken all corporate (or similar organizational) action and no other corporate (or similar organizational) proceedings on the part of Avaya or any of its subsidiaries are required to authorize the execution and delivery of this Agreement and the Ancillary Agreements to which it will be a party and to authorize the consummation of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements.  Each of Avaya and its applicable subsidiaries has duly executed and delivered this Agreement and, at or prior to Closing, will have duly executed and delivered each Ancillary Agreement to which it will be a party, and (assuming the due authorization, execution and delivery by Purchaser and subject to Bankruptcy Court approval and entry of the Bidding Procedures and the Sale Order) this Agreement constitutes, and each Ancillary Agreement to which it will be a party will, after the Closing (assuming the due authorization, execution and delivery by the other parties thereto and subject to Bankruptcy Court approval and entry of the Bidding Procedures and the Sale Order), constitute, its legal, valid and binding obligation, enforceable against it in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, moratorium, reorganization, fraudulent conveyance or similar Laws affecting the enforcement of creditors' rights generally and to general equitable principles (whether considered in a proceeding in equity or at law) (the "**Enforceability Exceptions**").

Section 3.03    Non-Contravention and Approvals.

16

OUTSIDE COUNSEL EYES ONLY                                                                EXTREME-01383297

(a)     Subject to Bankruptcy Court approval and entry of the Bidding Procedures and the Sale Order, the execution, delivery and performance by Avaya of this Agreement does not, and neither the execution, delivery and performance by each of Avaya and its applicable subsidiaries of each Ancillary Agreement to which it will be a party nor the consummation by each Seller of the transactions contemplated to be consummated by it by this Agreement and such Ancillary Agreements will, (i) conflict with or violate its certificate of incorporation or bylaws (or similar organizational documents), (ii) result in any breach of or constitute a default under any Material Contract, (iii) conflict with or violate any judgment, order or decree ("**Judgment**") or federal, national, supranational, state, provincial or local or administrative statute, law, ordinance, rule, code or regulation ("**Law**") applicable to such Person (including any Data Protection Laws), any of the Transferred Assets or the Business or (iv) result in the creation of any Lien (other than Permitted Liens) upon any of the Transferred Assets, except as set forth on Section 3.03(a) of the Disclosure Schedule and except, in the case of clauses (ii), (iii) and (iv), any such items that would not reasonably be expected to (X) be material, individually or in the aggregate, to the Business, (Y) result in Liability to the Purchaser or (Z) to prevent or materially delay the ability of the Sellers to consummate the transactions contemplated hereby.

(b)     Subject to Bankruptcy Court approval and entry of the Bidding Procedures and Sale Orders, no consent, approval, waiver, Permit, license or authorization ("**Consent**") of, or registration, declaration or filing with, any federal, national, supranational, state, provincial, local or foreign court of competent jurisdiction, governmental or quasi-governmental agency, authority, instrumentality or regulatory body (a "**Governmental Entity**") is required to be obtained or made by Avaya or any of its subsidiaries in connection with the execution, delivery and performance of this Agreement and the Ancillary Agreements to which they will be a party or the consummation of the Acquisition, other than (i) compliance with and filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (the "**HSR Act**"), (ii) compliance with and filings, notifications and approvals under any applicable foreign antitrust, competition, or trade regulation Law ("**Foreign Merger Control Laws**"), (iii) those that may be required solely by reason of Purchaser's (as opposed to any other third party's) participation in the Acquisition and the other transactions contemplated by this Agreement and by the Ancillary Agreements, (iv) those set forth in Section 3.03(b) of the Disclosure Schedule and (v) those the failure of which to obtain or make would not reasonably be expected to be material, individually or in the aggregate, to the Business or prevent or materially impede, interfere with or hinder the consummation of the Acquisition.

Section 3.04    Financial Statements.

(a)     Attached to Section 3.04 of the Disclosure Schedule are the unaudited balance sheet of the Business and statement of income for the fiscal years ended September 30, 2016 and September 30, 2015 (the "**Current Financial Statements**").  The Current Financial Statements, and when delivered in accordance with Section 5.11, the Audited Financial Statements shall, present fairly in all material respects the financial position and results of operations of the Business as of the times and for periods referred to therein.  The Current Financial Statements, and when delivered in accordance with Section 5.11, the Audited Financial Statements shall, have been derived from the books and records of Avaya used in the preparation of the audited consolidated financial statements of Avaya, using the same accounting methods, historical policies, practices, principles and procedures with consistent classifications and estimation

17

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383298

methodologies, except for the accounting of certain revenue, assets, liabilities and expenses of the Business that has been prepared using the Allocation Principles. Notwithstanding the foregoing sentence, the Current Financial Statements, and when delivered in accordance with Section 5.11, the Audited Financial Statements shall, (i) include allocations of certain revenue, assets, liabilities and expenses of Avaya and its subsidiaries attributable to the Business in accordance with the Allocation Principles (as reasonably determined by Avaya) and thus the Audited Financial Statements and the Current Financial Statements may not necessarily reflect what the financial position and results of operation of the Business would have been had the Business operated independently of Avaya as of the dates or for the periods presented, (ii) in the case of the Current Financial Statements, not include year-end audit adjustments and the notes thereto (which will not be, individually or in the aggregate, material) and not include the impact of accounting for income Taxes and (iii) include the GSMB business unit, the Avaya Private Cloud Services managed service offering business and the networking business in the Excluded Jurisdictions, none of which are included in the Business.

(b) Since January 1, 2014, the books of account and other financial records of Avaya and its affiliates relating to the Business have been kept accurately in the ordinary course of business consistent with past practice and applicable Laws, the transactions entered therein represent bona fide transactions, and the revenues, expenses, assets and liabilities of the Business have been properly recorded in accordance with the Accounting Principles and the Allocation Principles, in each case, in all material respects. Avaya has established and maintain a system of internal accounting controls with respect to the Business sufficient to provide reasonable assurances that (i) transactions, receipts and expenditures of the Business are being executed and recorded timely, (ii) transactions are recorded as necessary (A) to permit preparation of financial statements in conformity with GAAP and (B) to maintain accountability for assets, (iii) the amount recorded for assets on the books and records of Avaya and its subsidiaries are compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences and (iv) accounts, notes and other receivables and inventory are not recorded materially inaccurately, and proper and adequate procedures are implemented to effect the collection thereof on a current and timely basis. Since September 30, 2016, there has been no material change in any accounting controls, policies, principles, methods or practices, including any material change with respect to reserves (whether for bad debts, contingent liabilities or otherwise), of Avaya and its subsidiaries with respect to the Business, except to the extent required by the Accounting Principles as a result of the Bankruptcy Cases.

(c) Subject to the Allocation Principles, all of the accounts receivable, whether billed or unbilled, of the Business reflected in the latest balance sheet in the Current Financial Statements represent bona fide and valid obligations arising from sales actually made or services actually performed in the ordinary course of business, and are carried at values determined in accordance with the Accounting Principles. Other than in the ordinary course of business, there is no contest or claim under any Contract with any obligor of any receivable related to the amount or validity of such receivable.

Section 3.05 <u>Absence of Certain Changes</u>. From September 30, 2016 until the date hereof, (a) there has not been any event, occurrence or development that has had a Material Adverse Effect and (b) except for the solicitation of, discussions and negotiations with, presentations and provision of other diligence to and similar engagement with other potential bidders for the

18

OUTSIDE COUNSEL EYES ONLY                                                                 EXTREME-01383299

Business, the negotiation and execution of this Agreement, the preparation and commencement of the Bankruptcy Cases and Debtors' debtor-in-possession financing in the Bankruptcy Cases or as otherwise set forth in <u>Section 3.05</u> of the Disclosure Schedule, neither Avaya nor any of its subsidiaries has taken any action that, if taken after the date of this Agreement, would constitute a breach of any of the covenants set forth in <u>Section 5.01</u>.

Section 3.06    <u>Title to Assets; Condition of Assets</u>.

(a)    Subject to Bankruptcy Court approval, entry of the Bidding Procedures and Sale Orders and assumption by Avaya or its applicable subsidiary of the Transferred Contracts and Assumed Leases in accordance with applicable Law (including satisfaction of any applicable Cure Payments), Avaya and its subsidiaries, taken together, have, and as of the Closing will have, good and valid title to, or a valid leasehold interest in, all Transferred Assets, including those assets reflected on the latest balance sheet included in the Current Financial Statements (other than Inventory sold in the ordinary course of business), in each case free and clear of all Liens, except for (i) such Liens as are set forth in <u>Section 3.06(a)(i)</u> of the Disclosure Schedule, (ii) mechanics', carriers', workmen's, repairmen's or other like Liens arising or incurred in the ordinary course of business for amounts which are not delinquent, (iii) Liens arising under original purchase price conditional sales Contracts and equipment leases with third parties entered into in the ordinary course of business, (iv) Liens for Taxes or other amounts due to Governmental Entities that are not due and payable or being contested in good faith and set forth in <u>Section 3.06(a)(iv)</u> of the Disclosure Schedule, (v) recorded or unrecorded easements, covenants, restrictions, rights-of-way, zoning, building restrictions and other similar matters, (vi) non-exclusive licenses of Intellectual Property, (vii) other imperfections of title, licenses or Liens, if any, which do not materially detract from the value of any of the property, rights or assets included in the Transferred Assets or materially impair or interfere with the continued use and operation of any such assets and (viii) Liens that will be released by the Sale Order (the Liens described in clauses (ii) through (viii) above are referred to herein, collectively, as "**Permitted Liens**").

(b)    All of the tangible Transferred Assets (including the Furniture and Equipment located at the Assumed Lease Real Property) are in operating condition and repair (normal wear and tear excepted) in all material respects sufficient for the purposes for which they are currently used.

(c)    Except as set forth on <u>Section 3.06(c)</u> of the Disclosure Schedule, the Inventory: (i) are in good, merchantable and useable condition; (ii) have not been consigned to any third party; (iii) are at facilities either owned or leased by Avaya or its subsidiaries or are located at a facility of a third party provider or a manufacturer engaged by Avaya or its subsidiaries under a Transferred Contract or a Mixed-Use Contract (other than in the case of Delta Networks, Inc. (see <u>Section 3.09(b)</u> of the Disclosure Schedule)) or in transit to (A) a facility either owned or leased by Avaya or its subsidiaries or by such third party or manufacturer or (B) a customer (including resellers, distributers and channel partners); and (iv) are, in the case o f finished goods, of a quality and quantity saleable or useable in the ordinary course of business and, in the case of all other inventories, of a quality and quantity useable in the ordinary course of business.

19

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383300

Section 3.07   Real Property.  Avaya and its subsidiaries do not own in fee any real property that is used primarily in the operation or conduct of the Business.  Section 3.07 of the Disclosure Schedule sets forth all real property and interests in real property leased by Avaya or any of its subsidiaries and Related to the Business or that is otherwise governed by an Assumed Lease (each, a "**Leased Property**"), together with a complete list, as of the date of this Agreement, of all Contracts, in each case as amended, modified and supplemented to date (each, a "**Lease**"), pursuant to which Avaya or any of its subsidiaries leases, subleases, licenses or otherwise uses or occupies (whether as landlord, tenant, subtenant or pursuant to any other occupancy arrangement) any Leased Property.  Subject to Bankruptcy Court approval, entry of the Bidding Procedures and Sale Orders and assumption by the applicable Seller of the applicable Lease in accordance with applicable Law (including satisfaction of any applicable Cure Payments), Sellers or their respective subsidiaries, collectively, have valid leasehold estates or, as the case may be, valid leasehold interests, in all Leased Property.  There are no licenses, subleases, occupancy or similar agreements to which Avaya or any of its subsidiaries is a party as sublandlord or licensor, relating to or affecting the Leased Property. (i) There are no physical conditions or defects on any part of the Leased Property which would materially impair or would be reasonably expected to materially impair the continued operation of the Business as presently conducted at each such property and (ii) the Leased Properties are in condition suitable for the Business as currently conducted, and the Business's current use of any such Leased Property does not violate any local zoning or similar land use Laws or governmental regulations which violation, individually or in the aggregate, has had or could reasonably be expected to adversely affect in any material respect the operations of the Business.  Neither Avaya nor any of its subsidiaries is in violation of or in noncompliance with any covenant, condition, restriction, order or easement affecting any such Leased Property except where such violation or noncompliance, individually or in the aggregate, has not had or would not reasonably be expected to have an adverse effect in any material respect on the occupancy of such Leased Property or the operations of the Business. Avaya has not received written notice of any pending, nor, to the Knowledge of Sellers, is there any threatened, condemnation or similar Proceeding affecting any Leased Property that has had or could reasonably be expected to adversely affect in any material respect the occupancy of such Leased Property or the operations of the Business.

Section 3.08   Intellectual Property.

(a)     Section 3.08(a) of the Disclosure Schedule sets forth, as of the date hereof, all unexpired patents, all unexpired trademark registrations, all unexpired copyright registrations, all unexpired domain name registrations, and all pending applications for issuance or registration of any of the foregoing, in each case, that are included in the Transferred Assets (the "**Transferred Registered Intellectual Property**"), including for each such item (i) the record owner of such item, (ii) the jurisdiction in which such item is issued, registered or pending and (iii) the issuance, registration or application date and number of such item.  The Transferred Registered Intellectual Property is subsisting, in effect and has not expired or been abandoned, and, to the Knowledge of Seller, is valid, and maintenance and prosecution fees relating thereto that are or were due as of or prior to the date hereof have been paid.  A Seller or one of its subsidiaries, as applicable, is the sole and exclusive owner of (or owns jointly with another Seller or one of its subsidiaries) all right, title and interest in and to the Transferred Registered Intellectual Property and the Transferred Intellectual Property, free and clear of all Liens, other than Permitted Liens.

20

OUTSIDE COUNSEL EYES ONLY                                                              EXTREME-01383301

(b)      Except (i) as set forth in Section 3.08(b) of the Disclosure Schedule or (ii) as would not, individually or in the aggregate, reasonably be expected to result in any material Liability to the Business or Purchaser, (A) none of (1) any Technology in the Transferred Intellectual Property, (2) Business Products nor (3) the operation and conduct of the Business by each Seller and its subsidiaries (x) infringes, misappropriates, dilutes or otherwise violates, and have not infringed, misappropriated, diluted or otherwise violated, any Intellectual Property (other than Patents) of any third party or (y) to the Knowledge of Seller, infringes, and has not infringed, any Patents of any third party and (B) no Proceedings are pending or, to the Knowledge of Sellers, threatened against any Seller or any of its subsidiaries by any third party and Sellers have not, since January 1, 2014, received any written notice from a third party (1) claiming infringement, misappropriation, dilution or other violation of Intellectual Property owned by such third party in connection with the conduct of the Business as currently conducted or as previously conducted, (2) asserting the invalidity or unenforceability of, or challenging any Seller's or any of its subsidiaries' ownership or use of, any Transferred Intellectual Property or Sellers Licensed Intellectual Property or (3) inviting any Seller or any of its subsidiaries to take a license under any Intellectual Property of a third party or consider the applicability of any Intellectual Property of a third party to the conduct of the Business.  To the Knowledge of Sellers, no third party is infringing, misappropriating, diluting or otherwise violating any Transferred Intellectual Property.

(c)      The Sellers and their subsidiaries have taken commercially reasonable steps to protect the confidentiality of any confidential and proprietary information, including trade secrets, included in the Transferred Intellectual Property.  Each employee and contractor of each Seller and each of its subsidiaries that has created, developed or improved any Transferred Intellectual Property that is material to the Business has entered into a written non-disclosure and invention assignment agreement whereby such employee and contractor assign all of their right, title and interest in and to such Transferred Intellectual Property to such Seller or the applicable subsidiary of such Seller.

(d)      Except as set forth in Section 3.08(d) of the Disclosure Schedule, no Person who has licensed to any Seller or any of its subsidiaries any Intellectual Property or Technology, in each case that is material to the Business, has ownership rights, or has the right to grant third parties licenses, to any derivative works or improvements of such Intellectual Property or Technology made by or on behalf of such Seller or any of its subsidiaries.

(e)      No funding of any Governmental Entity was used, directly or indirectly, to develop or create, in whole or in part, any Transferred Intellectual Property that is material to the Business.

(f)      Except as set forth in Section 3.08(f) of the Disclosure Schedule, no Seller nor any subsidiary of any Seller is or was a member or promoter of, or a contributor to, any industry standards body or similar organization that could compel Avaya or any of its subsidiaries to grant or offer to any third party any license or right to any Transferred Intellectual Property that is material to the Business.

(g)      A Seller or one of its subsidiaries owns or possesses sufficient rights in or to the Sellers Licensed Intellectual Property to grant Purchaser the rights set forth in the Intellectual

21

OUTSIDE COUNSEL EYES ONLY                                                    EXTREME-01383302

Property License Agreement. Avaya has all necessary right and license from its subsidiaries to grant licenses on behalf of each such subsidiary as set forth in the Intellectual Property License Agreement.

(h)     To the Knowledge of Sellers, none of the Business Products (other than the Legacy Business Products) (i) contains any bug, defect, or error that materially and adversely affects the use, functionality, or performance of such Business Product when used in accordance with its specifications and applicable documentation or (ii) fails to comply with any applicable warranty or other contractual commitment relating to the use, functionality, or performance of such Business Product except as would not, individually or in the aggregate, reasonably be expected to result in any material Liability to the Business or Purchaser.

(i)     Section 3.08(i) of the Disclosure Schedule contains an accurate and complete list and description of all Sellers Proprietary Software that is incorporated into any Business Product (other than Legacy Business Products).

(j)     Except as would not, individually or in the aggregate, reasonably be expected to result in any material Liability to the Business or Purchaser, no Sellers Proprietary Software contains any "back door," "drop dead device," "time bomb," "Trojan horse," "virus," "worm," "spyware" or "adware" (as such terms are commonly understood in the software industry) or any other malicious code designed or intended to have, or capable of performing or facilitating, any of the following functions: (i) disrupting, disabling, harming, or otherwise impeding in any manner the operation of, or providing unauthorized access to, a computer system or network or other device on which such code is stored or installed, or (ii) compromising the privacy or data security of a user or damaging or destroying any data or file without the user's consent (collectively, "**Malicious Code**"). Each Seller and each of its subsidiaries responsible for product development or electronic distribution implement industry standard measures designed to prevent the introduction of Malicious Code into Sellers Proprietary Software, including firewall protections and regular virus scans.

(k)     Except as set forth on Section 3.08(k) of the Disclosure Schedule, no Seller nor any of its subsidiaries has delivered, licensed, or made available to any escrow agent or other Person who was not, as of the date of disclosure, an employee, contractor, or consultant of Seller or a subsidiary of Seller any source code for any Sellers Proprietary Software included in the Transferred Intellectual Property. Except as set forth on Section 3.08(k) of the Disclosure Schedule, no Seller nor any subsidiaries of any Seller have any duty or obligation (whether present, contingent, or otherwise) to deliver, license, or make available the source code for any Sellers Proprietary Software included in the Transferred Intellectual Property to any escrow agent or other Person who is not an employee, contractor or consultant of any Seller or any of its subsidiaries. Except as set forth on Section 3.08(k) of the Disclosure Schedule, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will, or could reasonably be expected to, result in the delivery, license, or disclosure of any source code of any Sellers Proprietary Software included in the Transferred Intellectual Property to any other Person who is not an employee, contractor or consultant of any Seller or any of its subsidiaries.

22

OUTSIDE COUNSEL EYES ONLY                                        EXTREME-01383303

(l)     Section 3.08(l) of the Disclosure Schedule sets forth an accurate and complete list of all Open Source Software that is or has been included, incorporated or embedded in, linked to, combined with or otherwise used in the provision of any Sellers Proprietary Software that is incorporated into any Business Product (other than Legacy Business Products), which list specifies (i) the Contract under which each such item of Open Source Software has been licensed to any Seller or its subsidiaries, (ii) whether such item of Open Source Software has been modified by any Seller or its subsidiaries and (iii) whether such item of Open Source Software is or was distributed by any Seller or its subsidiaries.  Except as specified in Section 3.08(l) of the Disclosure Schedule, no such Sellers Proprietary Software has used or been distributed with any "open source" software licensed under an open source license (such as the GNU Public License, Lesser GNU Public License, or Mozilla Public License) in such a manner as to trigger any provision of any such license that would require, or would condition the use or distribution of such Sellers Proprietary Software or portion thereof on, (i) the disclosure, licensing, or distribution of any source code for any portion of such Sellers Proprietary Software, (ii) the granting to licensees of the right to reverse engineer or make derivative works or other modifications to such Sellers Proprietary Software or portions thereof, (iii) licensing or otherwise distributing or making available such Sellers Proprietary Software or any portion thereof for a nominal or otherwise limited fee or charge, or (iv) granting any patent rights to any licensee or other third party.

(m)     Each Seller and its subsidiaries have taken steps reasonable in accordance with customary industry standards and practices for entities operating businesses similar to the Business to protect from Malicious Code the information technology systems Related to the Business, including any such systems that are used to provide products or services to customers in the conduct of the Business as it is currently conducted (the "**IT Systems**"). Each Seller and its subsidiaries have in place commercially reasonable disaster recovery plans and procedures for the IT Systems and have taken commercially reasonable steps to safeguard the security of the IT Systems.  To the Knowledge of Sellers, there have been no unauthorized intrusions or breaches of security with respect to the IT Systems.

(n)     Each Seller's and each of its applicable subsidiaries' privacy practices conform and, since January 1, 2014, have conformed, in each case in all material respects, to all publicly posted privacy statements or policies made available on any website owned or operated by such Seller or any of its subsidiaries (the "**Privacy Policies**"), and its own internal privacy policies, terms of use and guidelines related to information privacy and security, in each case related to the Business, including with respect to the collection, use, disposal, disclosure, maintenance and transmission, in each case in connection with the conduct of the Business, of Personal Information at the time such policies, terms of use or guidelines were in effect.  Each Seller and each of its applicable subsidiaries take commercially reasonable measures to ensure that Personal Information collected, stored or used by such Seller or such subsidiary in connection with the conduct of the Business is protected against unauthorized access, loss, damage use, sharing, modification, or other misuse other than as expressly described in the Privacy Policies, and, to the Knowledge of Sellers, there has been no unauthorized access, loss, damage, use, sharing, modification, or other misuse of any such Personal Information by any Seller or any of its subsidiaries.  No Seller or any subsidiaries of any Seller have received any written inquiry or written complaint from a regulatory authority in any jurisdiction from which it has processed

23

OUTSIDE COUNSEL EYES ONLY                                                EXTREME-01383304

Personal Information, or inquiry or complaint giving rise to legal proceedings, regarding its collection, use, storage, or sharing of Personal Information.

Section 3.09    Contracts.

(a)    Section 3.09(a) of the Disclosure Schedule sets forth, as of the date hereof, each of the following Contracts that are Related to the Business or are Mixed-Use Contracts (which Mixed-Use Contracts are identified with "*") in all cases other than purchase orders or similar instruments:

(i)    a collective bargaining agreement or other Contract with any labor organization, trade union, works council or similar bargaining representative;

(ii)    a Contract, including customer contracts and Government Contracts, for the sale of any product or service by the Business involving aggregate revenue of more than $750,000 in the twelve-month period ended September 30, 2016;

(iii)    a Contract for the purchase by the Business of materials, supplies, equipment or services (excluding Data and Related Agreements), including capital commitments or expenditures, involving aggregate payments of more than $750,000 in the twelve-month period ended September 30, 2016;

(iv)    a Contract pertaining to any Indebtedness or to any Lien (excluding any non-exclusive licenses of Intellectual Property) on any of the Transferred Assets;

(v)    a Contract concerning the establishment, control, maintenance or operation of a partnership, joint venture, profit sharing or other similar agreement or arrangement;

(vi)    each Lease;

(vii)    a Contract containing a "most favored nation" provision;

(viii)    a Government Contract involving aggregate revenue of more than $750,000 in the twelve-month period ended September 30, 2016;

(ix)    a Contract that restricts or prohibits the Business from freely engaging in business or competing with any Person or in any geographic area or during any period of time or that includes any exclusive dealing or similar exclusivity provision;

(x)    a Contract that includes a covenant not to sue, covenant not to assert or a settlement agreement with respect to any Proceeding, which Contract has ongoing obligations;

(xi)    a Contract with a Top Customer or Top Supplier;

(xii)    any Contract (other than non-exclusive licenses granted to resellers, distributors, service providers, suppliers, end-users or customers pursuant to (1) Avaya's applicable form agreement for each such type of agreement (a copy of which has been Made

24

OUTSIDE COUNSEL EYES ONLY                                                                EXTREME-01383305

Available to Purchaser) or pursuant to an agreement that does not materially and adversely differ from such form agreement, in each case in the ordinary course of business or (2) any Contract listed under Section 3.09(a)(xviii) of the Disclosure Schedule or not required to be listed thereon due to the threshold in Section 3.09(a)(xviii)), pursuant to which any Seller or any of its subsidiaries has granted any person any right or license to any Transferred Intellectual Property or to make, have made, manufacture, use, sell, offer to sell, import, export, or otherwise distribute any Business Product;

(xiii)  any Contract (other than Data and Related Agreements) with any third party pursuant to which such Seller or any subsidiary thereof, as the case may be, has been granted a license to Intellectual Property that (i) is owned by a third party and (ii) is used in and material to the conduct of the Business as currently conducted;

(xiv)  any Contract providing for the development of any Intellectual Property for the benefit of the Business other than Contracts entered into between Avaya or any of its subsidiaries and an employee of Avaya or the applicable subsidiary regarding the development of Technology or Intellectual Property by such employee that is entered into pursuant to a Seller's form employee agreement (a copy of which has been Made Available to Purchaser) or pursuant to an agreement that does not materially and adversely differ from Sellers' form employee agreement; or

(xv)  a Contract that contains "take or pay" provisions;

(xvi)  a Contract that relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of assets or otherwise) pursuant to which there are any ongoing rights or obligations;

(xvii)  a Contract pursuant to which Avaya or its subsidiaries has any material outstanding indemnification obligation (excluding indemnities contained in Contracts for the purchase, sale or license of products or services in the ordinary course of business);

(xviii)  a Contract (A) pursuant to which a third party distributor (including any reseller, Tier 2 reseller, channel partner or direct or Tier 1 partner) (other than any affiliate of any Seller) has the right to distribute or resell products of the Business in a particular market and (B) involving aggregate payments in excess of $750,000 in the twelve-month period ended September 30, 2016; and

(xix)  any other Contract not otherwise required to be set forth in any Section or subsection of the Disclosure Schedule that has an aggregate remaining obligations to any Person (other than any Seller) in excess of $1,000,000 or that is otherwise material to the Business.

(b)  Subject to Bankruptcy Court approval, entry of the Bidding Procedures and Sale Orders and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Payments) and except as a result of the commencement of the Bankruptcy Cases, all Contracts required to be set forth in Section 3.09 of the Disclosure Schedule (such Contracts, the "**Material Contracts**") are valid, binding and in full force and effect, subject, as to enforcement, to the Enforceability Exceptions.

25

OUTSIDE COUNSEL EYES ONLY   EXTREME-01383306

Avaya has Made Available to Purchaser a true and correct copy of all Material Contracts, together with all amendments, waivers or other changes thereto. No Seller is in breach or default under the Material Contracts, and, to the Knowledge of Sellers, no other party to any Material Contract, is in breach or default thereunder, except as a result of commencement of the Bankruptcy Cases or as would not reasonably be expected to be material to the Business. To the Knowledge of Sellers, no event has occurred, and no circumstance or condition exists, that (with or without notice or lapse of time) will or would reasonably be expected to, (i) result in a material violation or material breach of any of the provisions of any Material Contract, (ii) give any Person the right to accelerate the maturity or performance of any Material Contract, or (iii) give any Person the right to terminate any Material Contracts, other than pursuant to termination for convenience or similar clauses that permit such Person to terminate based on time or notice (or neither), in each case of (i), (ii) and (iii), except as a result of commencement of the Bankruptcy Cases or for the matters addressed by Cure Payments. Since January 1, 2016, neither Avaya nor any of its subsidiaries has received any written notice or, to the Knowledge of Sellers, other communication from any Person that such Person intends to terminate the terms of any Material Contract, excluding any filings (including Cure objections) made by such Persons in the Bankruptcy Cases.

Section 3.10    Permits.  (a) Avaya and its subsidiaries have, and since January 1, 2014, have had, all material Permits necessary to conduct the Business as presently conducted, (b) all such Permits are in full force and effect, (c) no Proceeding is pending or, to the Knowledge of Sellers, threatened in writing that would be reasonably expected to result in the revocation, cancellation or suspension of any such Permit the loss of which would reasonably be expected to be material, individually or in the aggregate to the Business and (d) since January 1, 2014, neither Avaya nor any of its subsidiaries has received any written notice regarding any actual or alleged material violation of or material failure to comply with any term or requirement of any such Permit or any actual or threatened revocation, withdrawal, suspension, cancellation, termination or modification of any such Permit.  Section 3.10 of the Disclosure Schedule sets forth an accurate and complete list, as of the date of this Agreement, of all Permits Related to the Business.

Section 3.11    Taxes.

(a)    (i) All material Tax Returns required to be filed pursuant to the Code or applicable state, provincial, local or foreign tax Laws by or on behalf of the Sellers have been timely filed and such Tax Returns are complete and accurate in all material respects, (ii) all material Taxes payable by or with respect to the Sellers (whether or not shown to be due on such Tax Returns) have been paid in full by the due date thereof, (iii) as of the date of this Agreement, no material claims have been asserted in writing with respect to any such Taxes and (iv) as of the date of this Agreement, no material Liens for Taxes (other than any Lien for Taxes that is a Permitted Lien) with respect to the assets of the Sellers have been filed or proposed in writing

(b)    (i) Sellers have timely paid all Taxes which have been required to be paid on or prior to the date hereof, the non-payment of which would result in a Lien for Taxes (other than a statutory lien for current Taxes not yet due and payable or a Lien set forth in Section 3.06(a)(iv) of the Disclosure Schedule) on any Transferred Asset, and (ii) Sellers have established, in accordance with GAAP applied on a basis consistent with that of preceding periods, adequate reserves for the payment of, and will timely pay, all Taxes which arise from or with respect to

26

OUTSIDE COUNSEL EYES ONLY                                                                    EXTREME-01383307

the Transferred Assets and are incurred or attributable to the Pre-Closing Tax Period, the non-payment of which would result in a Lien for Taxes (other than a Lien for Taxes that is a Permitted Lien) on any Transferred Asset.

Section 3.12    Legal Proceedings.    Section 3.12 of the Disclosure Schedule sets forth each Proceeding pending or, to the Knowledge of Sellers, currently threatened against Avaya or any of its subsidiaries Related to the Business or involving the Business or the Transferred Assets and that, in each case, would reasonably be expected to be material, individually or in the aggregate, to the Business or would reasonably be expected to prevent or materially interfere with or delay the consummation of the Acquisition, other than the Bankruptcy Cases.  Neither Avaya nor any of its subsidiaries is party or subject to or in default under any unsatisfied Judgment that is applicable to the conduct of the Business.

Section 3.13    Employee Benefit Plans; Labor.

(a)      There are no individuals who are service providers who primarily provide services to the Business other than the Employees.  Section 3.13 of the Disclosure Schedule contains a true and complete list of each retirement, pension, deferred compensation, medical, dental, disability, life, severance, vacation, change in control, retention, commission, incentive bonus, equity-based compensation, and stock purchase plan, program, agreement or arrangement in each case sponsored or maintained or contributed to or required to be contributed to by Sellers or their respective subsidiaries for the benefit of any Employee (whether or not an "employee benefit plan" within the meaning of Section 3(3) of ERISA) (each an "**Employee Benefit Plan**").  Prior to the date of this Agreement, true and complete copies and/or summaries of the Employee Benefit Plans have been Made Available to Purchaser.

(b)      Each Employee Benefit Plan has been established and administered in all material respects in compliance with its terms and applicable Law.  Each Employee Benefit Plan that is intended to be tax qualified under Section 401(a) of the Code has received a favorable determination or opinion letter from the Internal Revenue Service.  No Employee Benefit Plan that is a pension plan (within the meaning of Section 3(2) of ERISA) constitutes a "multiemployer plan" (within the meaning of Section 3(37) of ERISA).

(c)      Except as set forth on Section 3.13(c) of the Disclosure Schedule, to the Knowledge of Sellers, (i) no labor organization, trade union, works council or similar bargaining representative has been certified as representing any of the Employees, (ii) no labor organization, trade union, works council or similar bargaining representative has been recognized by Sellers as representing any of the Employees and (iii) there are no ongoing or threatened union organizing activities involving Employees.  Within the past year there have been no strikes, work stoppages, formal petitions for representation filed with the National Labor Relations Board, pickets, work slow-downs due to labor disagreements or other material labor disputes involving the Business. With respect to the Employees, there is no unfair labor practice, charge or complaint pending, unresolved or, to the Knowledge of Sellers, threatened before any Governmental Entity.

(d)      With respect to the Employees, Sellers are in compliance in all material respects with all Laws governing the employment and labor.

27

OUTSIDE COUNSEL EYES ONLY                                    EXTREME-01383308

(e)　　With respect to each Employee Benefit Plan maintained pursuant to the Laws of a country other than the United States: (i) such Employee Benefit Plan has been administered and maintained in all material respects in accordance with all applicable requirements (including applicable Law) and (ii) any Employee Benefit Plan that is intended to qualify for special Tax treatment meets all material requirements for such treatment.

Section 3.14　　Compliance with Laws.　Except as set forth on Section 3.14 of the Disclosure Schedule:

(a)　　With respect to the operation of the Business, Avaya and each of its subsidiaries is and has been since January 1, 2014 in compliance in all material respects with all applicable Laws.  Since January 1, 2014, neither Avaya nor any of its subsidiaries has received any written or, to the Knowledge of Sellers, other notice to the effect that a Governmental Entity claimed or alleged that Avaya or any of its subsidiaries was not in compliance in all material respects with all Laws or Judgments applicable to the Business or the Transferred Assets, and to the Knowledge of Sellers, neither Avaya nor any of its subsidiaries is, and at no time since January 1, 2014 has been, under investigation by a Governmental Entity with respect to a material violation of any applicable Law in connection with the Business.

(b)　　Since January 1, 2014, neither Avaya, nor any of its subsidiaries nor, to the Knowledge of Sellers, any director, officer, employee or other Person acting for or on behalf of Avaya has, in connection with the operation of the Business, violated in any material respect the Foreign Corrupt Practices Act of 1977 (the "**FCPA**") or similar non-U.S. Laws, including by making use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay or authorization of the payment of any money, or other property, gift, promise to give, or authorization of the giving of anything of value to any "foreign official" (as such term is defined in the FCPA) or any foreign political party or official thereof or any candidate for foreign political office, in contravention of the FCPA or similar non - U.S. Law.

(c)　　Since January 1, 2014, the Business has not made any sales to, or engaged in business activities with or for the benefit of, any Persons or countries that are subject to any sanction administered by the Office of Foreign Assets Control of the United States Treasury Department, including any "Specially Designated Nationals and Blocked Persons", in each case in a manner that violates any applicable Law.

(d)　　With respect to the operation of the Business:

(i)　　neither Avaya nor any of its subsidiaries nor any of their respective Representatives has, in the past three (3) years, directly or, to the Knowledge of Sellers, indirectly through its Representatives or any Person authorized to act on its behalf (including any distributor, agent, sales intermediary or other third party), has taken any action in violation of International Trade Laws;

(ii)　　all Export Approvals have been obtained, and no additional Export Approvals are required by International Trade Laws for continued export, reexport or import of

28

OUTSIDE COUNSEL EYES ONLY　　　　　　　　　　　　　　　　　　　　　　　　　　　　　EXTREME-01383309

the Business' products, services, software and technology in accordance with the current practice for conducting such activities; and

(iii)    during the last three (3) years, Avaya and its subsidiaries have not been convicted of violating any International Trade Law or has been the target of any investigation by a Governmental Entity for potential violation of any applicable International Trade Laws.

(e)    Section 3.14(e) of the Disclosure Schedule sets forth a true and complete list, as of the date of this Agreement, of each material export Permit applicable to the Business.

Section 3.15    Sufficiency of Assets.    Subject to Bankruptcy Court approval, entry of the Bidding Procedures and Sale Orders and assumption by the applicable Seller of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Payments):

(a)    except (i) for the exclusion of the Excluded Assets and assets, properties and rights identified in Section 3.15(a) of the Disclosure Schedule, (ii) for the enterprise-wide services and benefits provided to the Business by Avaya and its subsidiaries which are not being provided under the Transition Services Agreement and are described in Section 3.15(a) of the Disclosure Schedule, (iii) the assets, properties and rights used to perform the services, and the services, that are the subject of the Transition Services Agreement and (iv) the Seller Licensed Intellectual Property, the Transferred Assets constitute all of the material assets, properties and rights owned, leased or licensed by Avaya or their subsidiaries that are used or held for use in the conduct of the Business as it is currently being conducted or otherwise Related to the Business; and

(b)    except (i) for the Excluded Assets and assets, properties and rights identified in Section 3.15(b) of the Disclosure Schedule, (ii) for the enterprise-wide services and benefits provided to the Business by Avaya and its subsidiaries which are not being provided under the Transition Services Agreement and are described in Section 3.15(b) of the Disclosure Schedule, (iii) the assets, properties and rights used to perform the services that are the subject of the Transition Services Agreement, the Transferred Assets, together with the services that are the subject of the Transition Services Agreement and the Seller Licensed Intellectual Property, are sufficient to operate the Business immediately after the Closing in all material respects as the Business is currently conducted.

Section 3.16    Certain Business Relationships with Affiliates.  Except (a) for the exclusion of the Excluded Assets, (b) for the corporate-level services provided to the Business by Avaya and its affiliates, (c) as set forth in Section 3.16 of the Disclosure Schedule and (d) arrangements on an arms-length basis, no affiliate of any Seller (other than any of the Sellers themselves) (i) owns any property or right, tangible or intangible, that is Related to the Business or (ii) owes any money to, or is owed any money by, the Business.

Section 3.17    Environmental Matters.  Except as would not, individually or in the aggregate, reasonably be expected to result in any material Liability to the Business or Purchaser, (a)  Avaya and its subsidiaries are not, and since January 1, 2014 have not been, in violation of applicable Environmental Laws or any Permits issued under Environmental Laws with respect to its

29

OUTSIDE COUNSEL EYES ONLY                                                                                    EXTREME-01383310

conduct of the Business or any Leased Property, (b) there are no Proceedings pursuant to Environmental Law pending or, to the Knowledge of Sellers, threatened against Avaya or any of its subsidiaries which relates to the Business or any Leased Property and (c) there has been no release (or threatened release) of any Hazardous Materials on or at any Leased Property in violation of, or which would reasonably be expected to create any Liability under, any applicable Environmental Laws.

Section 3.18   Brokers and Finders.   There is no investment banker, broker, finder, financial advisor, restructuring advisor or other intermediary that has been retained by or is authorized to act on behalf of Avaya or any affiliate thereof that might be entitled to any fee or commission in connection with the Acquisition other than Goldman, Sachs & Co., whose fees and expenses will be paid by Avaya.

Section 3.19   Insurance.   All policies or binders of fire, liability, product liability, umbrella Liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance issued to Avaya or any affiliate of Avaya for which the policy period has not yet ended, only to the extent such policies provide coverage for the Business, the Transferred Assets or the Assumed Liabilities, including any self-funded insurance policies or arrangements and any policies or arrangements which provide coverage on a "claims made" basis (collectively the "**Insurance Policies**"), are in full force and effect, all premiums thereon have been timely paid or, if not yet due, accrued, and no written notice of cancellation, termination or non-renewal has been received by Avaya or any of its affiliates with respect to any such Insurance Policy.   Section 3.19 of the Disclosure Schedule sets forth, as of the date hereof, a list of all claims currently pending under any such Insurance Policies which are Related to the Business, the Transferred Assets or the Assumed Liabilities.

Section 3.20   Top Customers and Top Suppliers.   Section 3.20 of the Disclosure Schedule sets forth (a) the top 20 customers of the Business by net revenue, during Avaya's fiscal year ended as of September 30, 2016 (collectively, the "**Top Customers**") and (b) the top 20 suppliers of the Business by expenditures during Avaya's fiscal year ended as of September 30, 2016 (the "**Top Suppliers**").   Except as set forth on Section 3.20 of the Disclosure Schedule, none of the Top Customers or the Top Suppliers has canceled or otherwise terminated its relationship with the Business, and Avaya and its subsidiaries have not received written notice or, to the Knowledge of Sellers, any other overt communication that any such Top Customer or Top Supplier, as the case may be, intends to terminate or otherwise (x) materially modify its relationship with the Business or (y) materially change its purchases from or sales to the Business.

Section 3.21   Government Contracts.   With regard to each Government Contract included among the Transferred Contracts, except as would not reasonably be expected to be material to the Business:

(a)   Avaya (and its subsidiaries) have complied with all terms and conditions of each such Government Contract, including all clauses, provisions and requirements incorporated expressly, by reference or by operation of law therein;

(b)   Avaya (and its subsidiaries) have complied with all requirements of applicable Laws pertaining to each such Government Contract;

OUTSIDE COUNSEL EYES ONLY                                                    EXTREME-01383311

(c)     the cost accounting and procurement systems and practices of Avaya and its subsidiaries are, and for the past three (3) years have been, in compliance with all applicable U.S. Government Laws (including all applicable cost accounting standards);

(d)     no Governmental Entity, prime contractor, subcontractor or other Person has provided written notification to Avaya or any of its subsidiaries, that Avaya or any of its subsidiaries have breached or violated any applicable Law, or any certification, representation, clause, provision or requirement pertaining to any such Government Contract;

(e)     no termination for convenience, termination for default, cure notice, notice of noncompliance, or show cause notice is in effect as of the date hereof pertaining to any such Government Contract; and

(f)     neither Avaya nor any of its subsidiaries, nor their respective directors, officers, agents or employees or, to the Knowledge of Sellers is (or during the last three (3) years has been) under administrative, civil or criminal investigation, or indictment or audit by any Governmental Entity with respect to any alleged irregularity, misstatement or omission arising under or relating to any such Government Contract.

Section 3.22    Solvency.    Immediately after giving effect to the transactions contemplated hereby but without taking into consideration any Liabilities owing to Avaya or any other subsidiary of Avaya, each subsidiary of Avaya (other than any Debtor) that will be transferring any Transferred Assets pursuant to this Agreement to Purchaser or any of its subsidiaries shall be solvent, as such term or concept is defined and/or interpreted under the applicable Laws of the jurisdiction in which such subsidiary is organized.

Section 3.23    No Other Agreements.    As of the date hereof, neither Avaya nor any of its affiliates has any legal obligation, absolute or contingent, to any other Person to sell all or a material portion of the Transferred Assets taken as a whole (other than a sale of Inventory in the ordinary course of business) or the Assumed Liabilities or any material portion thereof taken as a whole, or to sell any material portion of the Business or to effect any merger, consolidation or other reorganization relating to the Transferred Assets or the Business or to enter into any agreement with respect thereto, except pursuant to this Agreement.

Section 3.24    Purchaser's Representations.    Avaya acknowledges and agrees that, other than the representations and warranties of Purchaser specifically contained in Article IV, there are no representations or warranties of Purchaser or any other Person either expressed or implied with respect to the Business, the Transferred Assets, the Assumed Liabilities, or the transactions contemplated hereby.  Avaya, together with and on behalf of its affiliates and Representatives, specifically disclaims that it or they are relying upon or have relied upon any such other representations or warranties (including any estimates, projections, forecasts, plans or budgets or other statements regarding future performance, any management presentation or any confidential information memoranda) that may have been made or provided by any Person.

31

OUTSIDE COUNSEL EYES ONLY                                                 EXTREME-01383312

(c)     In each case of <u>Section 5.21(a)(ii)</u> and <u>Section 5.21(b)(ii)</u>, (i) the "Duration" specified by Purchaser shall be a firm date or period, and not a range of dates or optional dates or periods and (ii) in no event will the amount set forth under the heading "Monthly Cost" in <u>Exhibit A</u> and <u>Exhibit B</u> of the Transition Services Agreement be changed, without the consent of both parties.

(d)     Following the 15th day following the date hereof or the 45th day following the date hereof, as applicable, (i) except as set forth in the Transition Services Agreement, neither Avaya nor Purchaser will be obligated to provide or cause to be provided any services not set forth on the applicable Sections of <u>Exhibit A</u> and <u>Exhibit B</u> of the Transition Services Agreement as of such date, (ii) Avaya will be obligated to provide or cause to be provided the services that are set forth on the applicable Sections of <u>Exhibit A</u> of the Transition Services Agreement as of such date, (iii) Purchaser will not be obligated to pay Avaya for any services not set forth on the applicable Sections of <u>Exhibit A</u> of the Transition Services Agreement as of such date and (iv) Purchaser will be obligated to pay Avaya for the services that are set forth on the applicable Sections of <u>Exhibit A</u> of the Transition Services Agreement for the respective "Duration" of such services set forth on <u>Exhibit A</u> of the Transition Services Agreement as of such date.

Section 5.22   <u>Certain Consent Matters</u>.   Avaya will use commercially reasonable efforts to obtain Consents necessary to effectual the transfer to Purchaser of (a) the Avaya Xirrus Interest (as defined in the Disclosure Schedules) and any Transferred Contracts with Xirrus, Inc., in each case, to the extent required by and in accordance with the Contracts governing the Avaya Xirrus Interest and such Transferred Contracts and (b) the Assumed Leases; <u>provided</u> that the foregoing will not require Avaya or any of its subsidiaries to expend any money or to incur any Liability to obtain any such Consent; <u>provided further</u> that Purchaser acknowledges that the Avaya Xirrus Interest is subject to a right of first refusal, pursuant to which Avaya may be required to transfer the Avaya Xirrus Interest to a third party and may not be able to transfer the Avaya Xirrus Interest to Purchaser.

ARTICLE VI

EMPLOYMENT MATTERS

Section 6.01   <u>Non-ARD Employees</u>.

(a)     <u>Offer of Employment</u>.  Not later than thirty (30) days prior to the Closing (or if required by applicable Law, such greater period as required by applicable Law and practices), Purchaser or one of its affiliates shall offer employment with Purchaser or one of its affiliates to at least a majority of the Employees (which majority excludes ARD Automatic Transferred Employees), commencing as of the Closing, on the terms set forth in this <u>Article VI</u> (including <u>Section 6.02(a)</u>).  Commencing promptly following the date hereof, the parties will discuss and use their respective reasonable best efforts to determine positions, roles and/or functional areas for Employees that will and will not be offered employment by Purchaser or one of its affiliates (as contemplated by the previous sentence), and to complete such determination, within forty-five (45) days following the date hereof.  The Non-ARD Employees who accept the offer of employment with Purchaser or one of Purchaser's affiliates shall be referred to as "**Non-ARD Transferred Employees**".  Nothing herein shall be construed as a representation or guarantee by

52

OUTSIDE COUNSEL EYES ONLY                                    EXTREME-01383333

any Seller or any of their respective affiliates that any or all of the Non-ARD Employees will accept the offer of employment from Purchaser or one of Purchaser's affiliates or will continue in employment with Purchaser or one of Purchaser's affiliates following the Closing. Purchaser shall carry out all actions necessary under applicable Law to effect the transfer of employment to it of each such Non-ARD Transferred Employee who has accepted that offer. Notwithstanding anything to the contrary herein, where applicable, the parties intend that there shall be continuity of employment with respect to all Non-ARD Transferred Employees immediately prior to the Closing and that the transactions contemplated by this Agreement do not constitute a separation, termination or severance of employment of any Non-ARD Employee or Non-ARD Transferred Employee prior to or upon the Closing. Purchaser shall indemnify Avaya and its subsidiaries against any Liabilities arising out of (i) any failure of Purchaser to carry out all actions necessary under applicable Law to effect the transfer of employment, (ii) any failure of Purchaser to comply with Section 6.02(a) and (iii) any amount payable to or in respect of any Non-ARD Transferred Employee in respect of his or her employment following Closing, except as otherwise set forth in this Article VI. Purchaser must keep Avaya informed in writing of all offers and acceptances referred to above within seven (7) days of all such offers and acceptances.

(b)     Rejected Offers.  If a Non-ARD Employee rejects any offer of, or is not offered, employment from Purchaser or one of its affiliates, Purchaser shall not, and shall cause its subsidiaries not to, knowingly solicit, entice away, employ, offer to employ, or contract with any such Non-ARD Employee for a period of twelve months following the Closing, except where prior written consent has been obtained from Avaya; provided, however, that Purchaser and its subsidiaries shall be free to conduct general, non-directed solicitation advertisements or web postings for employment or utilizing an independent employment search firm, in each case, which does not target employees of Avaya and its subsidiaries.

Section 6.02    Terms of Employment.

(a)     Except to the extent greater benefits are required by applicable Law, during the period that begins as of the Closing Date and continues through the date that is twelve months after the Closing Date (the "**Continuation Period**"), Purchaser or one of Purchaser's affiliates shall provide to each Transferred Employee (i) a position at a grade level and with responsibilities that are no less in the aggregate than the level and responsibilities in effect for such Transferred Employee immediately prior to the Closing Date, and at a work location that is within a "reasonable distance" (or similar term) under applicable Law of such Transferred Employee's primary work location immediately prior to the Closing Date, (ii) a base salary or hourly wage, and bonus, incentive and/or commission opportunity no less than that in effect for such Transferred Employee immediately prior to the Closing Date (or, in the case of a Transferred Employee on disability or other leave of absence immediately prior to the Closing Date, the base salary or hourly wage and bonus, incentive and/or commission opportunity in effect immediately prior to such leave or such higher rate as required under Law), and (iii) employee benefits that are no less favorable in the aggregate (including defined contribution pension, health and welfare, severance, or benefits and nonqualified deferred compensation, and equity compensation) than that in effect for such Transferred Employee immediately prior to the Closing Date, such that, in the cases of (i), (ii) and (iii), such terms and conditions would preclude any claims of actual or constructive dismissal, claims for end of service, gratuity, indemnity or similar payments or similar claims under any Law.

53

OUTSIDE COUNSEL EYES ONLY                                        EXTREME-01383334

(b)     Purchaser and Purchaser's subsidiaries shall be responsible for, and shall indemnify and hold Seller and Seller's subsidiaries harmless from, all Liabilities with respect to employment, employee benefits and related matters with respect to all Transferred Employees that have arisen from such Transferred Employees' employment (i) after the Closing and (ii) prior to or on the Closing, but, in the case of this clause (ii), only to the extent of any Liabilities are to be assumed by Purchaser pursuant to Section 1.05(a), Section 6.10(a) or Section 6.11.  Except as otherwise provided in this Article VI,  Seller and Seller's subsidiaries shall be responsible for all Liabilities and shall indemnify and hold Purchaser and Purchaser's subsidiaries harmless from, all Liabilities with respect to employment, employee benefits and related matters with respect to all Employees that have arisen on or prior to the Closing, including Liabilities in respect of (i) awards of equity or equity based compensation granted to Transferred Employees prior to the Closing, (ii) benefits accrued under the Seller DB Plans prior to the Closing and (iii) compensation and benefits accrued with respect to any period prior to the Closing under any Employee Benefit Plan retained by any Seller or any of their respective affiliates, in all cases, except to the extent otherwise set forth herein, including Section 1.05(a), Section 6.10(a) or Section 6.11.  For the avoidance of doubt, Purchaser, or one of its subsidiaries, shall indemnify Avaya and its subsidiaries against any Liability related to the Transferred Employees which arises out of or in connection with (i) the termination of employment of a Transferred Employee following the Closing or any other act or omission by Purchaser, or one of its subsidiaries, or any other event, matter or circumstance occurring after Closing; and (ii) any employment claims brought by, or related to, the Transferred Employees, arising from facts, acts or circumstances occurring or existing after Closing.

(c)     Purchaser or one of its affiliates shall assume all obligations of Sellers and any of their respective affiliates with respect to the Transferred Employees under each collective bargaining, works council or other similar agreement disclosed in Section 3.13 of the Disclosure Schedule.

Section 6.03     Defined Benefit Plan.

(a)     No assets or liabilities with respect to the Transferred Employees shall be transferred as a result of this Agreement from the Seller DB Plans to any plan or arrangement established by Purchaser or any of Purchaser's affiliates, and, as of the Closing, no Transferred Employees shall accrue additional benefits under the Seller DB Plans (to the extent such accruals have not already ceased).

(b)     Effective as of the Closing, Purchaser or one of its affiliates shall assume the German pension obligations to Transferred Employees set forth on Section 6.03(b) of the Disclosure Schedule in accordance with applicable Law (the "**Assumed Pension Obligations**").

Section 6.04     401(k) Plan.  Effective as of the Closing Date, Purchaser or any of its affiliates shall permit each Non-ARD Transferred Employee, who is located in the United States, to participate or to be eligible to participate in Purchaser's defined contribution plan that includes a qualified cash or deferred arrangement within the meaning of Section 401(k) of the Code (such plan being referred to as the "**Purchaser 401(k) Plan**").  Avaya shall cause, as of the Closing Date, all accrued benefits of all Non-ARD Transferred Employees under the Seller 401(k) Plan to be fully vested.  Under the terms of the Seller 401(k) Plan, each Non-ARD Transferred

54

OUTSIDE COUNSEL EYES ONLY                                                    EXTREME-01383335

Employee who has an account under the Seller 401(k) Plan shall be eligible to receive an immediate distribution from such Seller 401(k) Plan following the Closing. The Purchaser 401(k) Plan shall accept (and shall be amended, prior to the Closing, to the extent necessary to accept) the rollover of any "eligible rollover distribution" (within the meaning of Section 402(c)(4) of the Code) from the Seller 401(k) Plan.

Section 6.05   Health and Welfare Benefit Plans.  Effective as of the Closing, Purchaser or one of Purchaser's affiliates shall maintain or cause to be maintained benefit plans to provide medical care, dental care and vision care for the Transferred Employees (collectively, the "**Purchaser Health Plans**").  No waiting period or exclusion from coverage of any pre-existing medical condition shall apply to the participation of any Transferred Employee (or dependent thereof) in the Purchaser Health Plans, and all payments, charges and expenses of such Transferred Employees (and their eligible dependents) that were applied toward the deductible and out-of-pocket maximums under the comparable Employee Benefit Plans during the plan year in which the Closing occurs shall be credited toward any deductible and out-of-pocket maximum applicable under the Purchaser Health Plans for the plan year in which the Closing occurs.  In addition, to the extent that any Transferred Employee (or dependent thereof) has begun a course of treatment with a physician or other service provider who is considered "in-network" under any Seller Health Plan and such course of treatment is not completed prior to the Closing, Purchaser shall use its reasonable best efforts to arrange for transition care, whereby such Transferred Employee (or dependent thereof) may complete the applicable course of treatment with the pre-Closing physician or other service provider at "in-network" rates.  By way of example, the transition of care described in the preceding sentence shall cover chemotherapy, orthodontia, and pregnancy-related office visits through birth.  Effective as of the Closing, Transferred Employees shall cease to be eligible to participate in the Seller health and welfare plans (collectively, the "**Seller H&W Plans**") and shall be eligible to commence participation in Purchaser Health Plans and other Purchaser welfare benefit plans (collectively, the "**Purchaser H&W Plans**") in accordance with, and subject to, the membership, eligibility and coverage requirements thereof (which shall conform to the requirements of this Article VI).  Following the Closing, Purchaser and Purchaser's affiliates shall be responsible under the Purchaser H&W Plans for all claims by or on behalf of the Transferred Employees for participation in the Purchaser H&W Plans.

Section 6.06   Credit for Service with Seller.  Where applicable, and automatically applicable if required by Law, Purchaser and Purchaser's affiliates shall credit each Transferred Employee's length of service with Sellers and their respective affiliates for all purposes (including eligibility, vesting, benefit accrual and calculating entitlement to vacation days, sick days, gratuity payments, indemnity payments, end-of-service payments and severance payments) to the same extent such service was recognized under the plan, program, policy or arrangement of Sellers or any of their respective affiliates that most closely resembles that to be offered by Purchaser or one of Purchaser's affiliates; provided, however, that such service shall not be recognized or credited (i) for any purpose under any equity, phantom equity or similar compensation plan or defined benefit pension maintained by Purchaser or Purchaser's affiliates or (ii) to the extent that such recognition would result in a duplication of benefits provided to the Transferred Employee or to the extent that such service was not recognized under any similar Employee Benefit Plan, in each case of (i) and (ii), unless required by applicable Law.

OUTSIDE COUNSEL EYES ONLY                                                                    EXTREME-01383336

Section 6.07   <u>COBRA and HIPAA</u>.   Effective as of the Closing, Purchaser and Purchaser's affiliates shall assume all obligations, liabilities and commitments with respect to Non-ARD Transferred Employees and their eligible dependents, in respect of health insurance under the Consolidated Omnibus Budget Reconciliation Act of 1985, the Health Insurance Portability and Accountability Act of 1996, Sections 601 et seq. and Sections 701 et seq. of ERISA, Section 4980B and Sections 9801 et seq. of the Code and applicable state or similar Laws.

Section 6.08   <u>Workers' Compensation</u>.   Effective as of the Closing, Purchaser and Purchaser's affiliates shall be responsible for all workers' compensation benefits payable to or on behalf of the Transferred Employees, except that Sellers and their respective subsidiaries shall be responsible for all workers' compensation benefits payable under the terms and conditions of the workers' compensation programs maintained by Sellers and their respective subsidiaries for claims by or on behalf of Non-ARD Transferred Employees and ARD Non-Automatic Transferred Employees relating to events occurring prior to the Closing Date.

Section 6.09   <u>Liabilities</u>.   From and after the Closing Date, subject to applicable Laws, Purchaser shall be solely responsible for paying, providing and satisfying when due the following: all compensation (including salary, wages, commissions, bonuses, incentive compensation, overtime, premium pay and shift differentials), vacation, personal days, sick pay and other paid time off, benefits and benefit claims, gratuity payments, indemnity payments, end-of-service payments, severance and termination pay (including any employer Taxes or other payments related thereto), notice and benefits under all applicable Laws in each case, accruing, incurred or arising as a result of employment or separation from employment with Purchaser after the Closing Date with respect to Transferred Employees  In the event that Avaya or its subsidiaries is required to retain, honor, pay or provide any of the items contemplated to be assumed, honored, paid or provided by Purchaser pursuant to this <u>Section 6.09</u>, Purchaser will indemnify and hold harmless Avaya and its subsidiaries for any such items so retained, honored, paid or provided by Avaya or its subsidiaries.

Section 6.10   <u>Severance Liability</u>.

(a)     Effective as of the Closing, Purchaser and Purchaser's affiliates shall assume all Liabilities in respect of Claims made by any Transferred Employee (or any other individual with a colorable claim that he or she is a Transferred Employee) for severance or other termination benefits (including claims for wrongful dismissal, notice of termination of employment, pay in lieu of notice or breach of contract) arising out of, relating to or in connection with any failure to offer employment to, or to continue the employment of, any such Transferred Employee (or other individual with a colorable claim that he or she is a Transferred Employee) on terms and conditions that would preclude any claims of actual or constructive dismissal, claims for end of service, gratuity, indemnity or similar payments or similar claims under any Law or other failure to comply with the terms of this Agreement.

(b)     Except for any Employees who were offered employment by Purchaser in accordance with this <u>Article VI</u> and did not accept such offer (which are the subject of <u>Section 6.10(c)</u>) and subject to <u>Section 6.10(a)</u>, Sellers and their subsidiaries shall be solely responsible for the amount of any payments or benefits as required by applicable Law or an applicable Employee Benefit Plan in effect as of the date hereof paid to those certain Employees

56

OUTSIDE COUNSEL EYES ONLY                                                                    EXTREME-01383337

who did not become Transferred Employees in connection with such individuals' termination of employment as of the Closing, including any severance, termination, pay in lieu of notice, gratuity payments required to be made in India pursuant to the Payment of Gratuity Act, 1972, as amended, redundancy and similar payments (and not, for the avoidance of doubt, in connection with such individual's ongoing employment following the Closing).

(c)     Sellers and their subsidiaries shall be solely responsible for the amount of any payments or benefits paid to those certain Employees who did not become Transferred Employees because such individuals were offered and did not accept Purchaser's offer of employment in connection with such individuals' termination of employment as of the Closing, including, any severance, termination, pay in lieu of notice, gratuity payments required to be made in India pursuant to the Payment of Gratuity Act, 1972, as amended, redundancy and similar payments, and such individual's ongoing employment following the Closing; provided that Purchaser's offer(s) of employment complied with the requirements of this Article VI.

Section 6.11    Accrued Vacation.  All accrued but unused vacation, gratuity payments, personal hours or days earned and sick leave of the Transferred Employees under the vacation, gratuity payments, personal hours or days and sick leave policies of Sellers and their subsidiaries, to the extent accrued in the ordinary course of business prior to the Closing with respect to only Transferred Employees, shall be carried over and assumed by Purchaser or one of its affiliates; provided that if such vacation, gratuity payments, personal hours or days earned and/or sick leave of the Transferred Employees is required to be paid out under applicable Law, then Purchaser shall reimburse Sellers for the aggregate amount of the costs to Sellers to effectuate such cash out with respect to only the Transferred Employees (including the amount of any employer taxes related thereto) as soon as practicable, but in no event later than ten (10) Business Days after receiving a schedule setting forth such expenses from Seller.  Sellers or their affiliates shall be solely responsible for all accrued and unpaid hours of vacation, gratuity payments, personal hours or days earned and sick leave applicable to Employees that are not Transferred Employees.

Section 6.12    Administration, Employee Communications, Cooperation.  Following the date of this Agreement, Avaya (and its subsidiaries) shall, and Purchaser (and its affiliates) shall, reasonably cooperate and use good faith efforts in all matters reasonably necessary to effect the transactions contemplated by this Article VI, including Avaya (and its subsidiaries) providing Purchaser information and data relating to workers' compensation, employee benefits and employee benefit plan coverages (except to the extent prohibited by Law) and Avaya and/or Purchaser, as applicable, making any and all required filings and notices, making any and all required communications with Transferred Employees and obtaining any governmental approvals required hereunder.

Section 6.13    Labor Consultations.    Purchaser and Avaya shall, and shall cause their subsidiaries to, cooperate fully in carrying out applicable provisions of information to, or consultations, discussions or negotiations with relevant unions, works councils or other employee representative groups.  Avaya shall complete, or cause to be completed, prior to the Closing, and Purchaser shall assist and cooperate fully with Avaya in causing to be completed, all notifications required by applicable Law, to, and all consultations required by applicable Law with, the employees, employee representatives, work councils, trade unions, labor boards and

57

OUTSIDE COUNSEL EYES ONLY                                                                                    EXTREME-01383338

relevant Governmental Entities concerning the Acquisition with respect to the Non-ARD Transferred Employees.

Section 6.14    <u>WARN Act</u>.  Purchaser and Purchaser's affiliates agree to provide any required notice under the Worker Adjustment and Retraining Notification Act of 1988, as amended (the "**WARN Act**"), and any similar Law, and to otherwise comply with the WARN Act and any such other similar Law with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or group termination or similar event affecting Transferred Employees (including as a result of the consummation of transactions contemplated by this Agreement) and occurring after the Closing.  Avaya shall notify Purchaser of any layoffs of any Employees that occur during the 90-day period prior to the Closing.

Section 6.15    <u>Flexible Spending Accounts</u>.  Prior to Closing, Purchaser or one of Purchaser's affiliates shall allow each Transferred Employee in the United States to participate in or be eligible to participate in a flexible spending account plan ("**Purchaser FSA**").  Each Transferred Employee shall be treated as if his or her participation in Purchaser FSA had been continuous from the beginning of the plan year under the comparable Employee Benefit Plan in which the Closing occurs and each existing salary reduction election shall be taken into account for the remainder of the plan year under Purchaser FSA in which the Closing occurs, as if made under Purchaser FSA.  Purchaser FSA shall provide reimbursement for medical care expenses incurred by Transferred Employees following the Closing (excluding claims incurred before the Closing), up to the amount of such Transferred Employees' elections and reduced by amounts previously reimbursed by Seller FSA.  With respect to Transferred Employees, this <u>Section 6.15</u> shall be interpreted and administered in a manner consistent with Rev. Rul. 2002-32, 2002-1 C.B. 1069 (June 6, 2002).

Section 6.16    <u>Retention Plans</u>.  Avaya or its affiliates entered into change of control or other retention agreements with certain Transferred Employees (the "**Retention Agreements**").  Avaya and its subsidiaries shall be responsible for Liabilities pursuant to the Retention Agreements (subject to any necessary Bankruptcy Court approval) and in no event will Purchaser or any of its subsidiaries assume any Liability under any such Retention Agreement.

Section 6.17    <u>Non-US Employees</u>.   For any Non-ARD Transferred Employees who are principally based outside the United States, the provisions of <u>Section 6.01</u> through <u>Section 6.16</u> shall apply to such employees *mutatis mutandis* to the maximum extent permitted by applicable Law.

Section 6.18    <u>ARD Employees</u>

(a)     In this <u>Section 6.18</u> "**Employment Liability**" and "**Employment Liabilities**" includes any award, compensation, damages, fine, loss, order, penalty or payment made by way of settlement and costs and expenses reasonably incurred in connection with a claim or investigation (including any investigation by any enforcement, regulatory or supervisory body and of implementing any requirements which may arise from any such investigation); legal costs and expenses being assessed on an indemnity basis.

58

OUTSIDE COUNSEL EYES ONLY                                                          EXTREME-01383339

(b)     The Sellers and Purchaser acknowledge and agree that the ARD will have effect in the applicable jurisdictions after Closing. Accordingly, from Closing, Purchaser, or one of its affiliates, shall employ any ARD Employee whose employment transfers automatically by operation of Law, on their existing terms that exist immediately before Closing, unless such individual objects to the transfer in such a way as to prevent the transfer of their employment by operation of Law (if such a right exists under the Laws of the relevant jurisdiction). Each ARD Employee whose employment automatically transfers to Purchaser, or one of its affiliates, on Closing by operation of Law pursuant to the ARD (and who does not object to the transfer) shall be referred to herein as an "**ARD Automatic Transferred Employee**". Avaya, or one of its affiliates, shall indemnify Purchaser against any Employment Liability in accordance with Section 6.10(c) hereof arising out of or in connection with any ARD Employee objecting to the transfer of their employment under the ARD.  If an ARD Employee objects to his or her employment transferring to Purchaser or one of its subsidiaries pursuant to the ARD, Purchaser shall not, and shall cause its affiliates not to, solicit, entice away, employ, offer to employ, or contract with any such ARD Employee for a period of twelve months following the Closing, except where prior written consent has been obtained from Avaya; provided, however, that Purchaser and its subsidiaries shall be free to conduct general, non-directed solicitation advertisements or web postings for employment or utilizing an independent employment search firm, in each case, which does not target employees of Avaya and its subsidiaries.

(c)     Not later than thirty (30) days prior to the Closing, Purchaser, or one of its affiliates, shall offer employment with Purchaser, or one of its affiliates, to each ARD Employee who (i) does not automatically transfer by operation of Law to Purchaser or one of its affiliates or (ii) objects to the automatic transfer of their employment in accordance with Section 6.18(b) above, to take effect on Closing, on the terms set forth in this Article VI (including Section 6.02(a) and Section 6.10(a)).  Subject to Section 6.10(a) and Section 6.10(b), Avaya, or one of its subsidiaries, shall indemnify Purchaser and its subsidiaries for any Employment Liabilities which arise out of termination of any such ARD Employees (including but not limited to all redundancy and termination costs and any costs connected to collective redundancy consultation obligations).  Purchaser, or one of its subsidiaries, shall be solely responsible for any amount payable to or in respect of an ARD Transferred Employee who accepts the offer of employment by Purchaser or one of its subsidiaries in respect of his or her employment following Closing.  Purchaser, or one of its subsidiaries, shall carry out all actions necessary under applicable Law to effect the transfer of employment to it of each ARD Employee who accepts the offer of employment made to them. Purchaser, or one of its affiliates (where applicable), will keep the applicable Seller informed of all offers and acceptances referred to above.  The ARD Employees, who do not automatically transfer to Purchaser, or one of its affiliates, and who accept the offer of employment with Purchaser or one of Purchaser's affiliates shall be referred to as "**ARD Non-Automatic Transferred Employees**".  Nothing herein shall be construed as a representation or guarantee by any Seller or any of their respective affiliates that some or all of the ARD Non-Automatic Transferred Employees will accept the offer of employment from Purchaser or one of Purchaser's affiliates or will continue in employment with Purchaser or one of Purchaser's affiliates following the Closing.  Each Employee who is an (i) ARD Automatic Transferred Employee or (ii) ARD Non-Automatic Transferred Employee shall be referred to herein as an "**ARD Transferred Employee**".

Case 3:20-cv-00451-CEA-DCP   Document 334-29   Filed 11/15/23   Page 40 of 43   PageID #: 14898

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383340

(d)        Purchaser and Avaya shall, and shall cause their subsidiaries to, reasonably cooperate in good faith to timely satisfy the Employment Obligations with relevant trade unions, works councils, staff associations or other employee representative groups in respect of the ARD Transferred Employees.

(e)        Avaya shall assume and be solely responsible for, and shall indemnify and hold harmless Purchaser and its affiliates from and against, all Liabilities related to service providers of Avaya and each of its subsidiaries located in the Excluded Jurisdictions, including any Liabilities resulting from the failure by Avaya to exclude such employees from the Business or Claims by any service provider in any Excluded Jurisdiction that his or her service provider relationship transferred automatically to Purchaser or its affiliates by operation of applicable Law.

Section 6.19    No Third Party Employee Rights.

(a)        To the extent permitted by any applicable Laws and except as required by the terms of this Article VI, nothing in this Agreement shall limit the right of Purchaser, or any affiliate of Purchaser, to terminate or reassign any Transferred Employee after the Closing or to change the terms and conditions of his or her employment in any manner.

(b)        No provision of this Article VI shall create any third party beneficiary or other rights in any Employee or former employee in respect of continued or resumed employment wit h Sellers, or with Purchaser, and no provision of this Article VI shall create any rights in any such persons in respect of any benefits that may be provided under any plan or arrangement which may be established by Purchaser.  Nothing contained herein shall be construed as requiring, and Sellers, Purchaser and their subsidiaries shall take no action that would have the effect of requiring, Sellers, Purchaser or their subsidiaries, to continue any specific Employee Benefit Plan or similar Purchaser benefit plan.  The provisions of this Article VI are for the sole benefit of Sellers and Purchaser and nothing in this Article VI, expressed or implied, is intended or shall be construed to constitute an amendment of any Employee Benefit Plan or any similar plan or arrangement of Purchaser (or an undertaking to amend an y such plan) or other compensation and benefits plan maintained for or provided to Employees, including Transferred Employees, prior to, on or following the Closing.

## ARTICLE VII

## CONDITIONS TO CLOSING

Section 7.01    Conditions to Each Party's Obligation.  The obligations of Purchaser and Avaya to consummate the Closing are subject to the satisfaction (or waiver by Purchaser and Avaya), as applicable, at or prior to the Closing of the following conditions.

(a)        Governmental Approvals.  Any waiting period under the HSR Act or under the Foreign Merger Control Laws set forth in Section 7.01(a) of the Disclosure Schedule ("**Applicable Foreign Merger Control Law**") shall have expired or been terminated and any approvals required under any Applicable Foreign Merger Control Law shall have been obtained.

60

OUTSIDE COUNSEL EYES ONLY                                                                    EXTREME-01383341

IN WITNESS WHEREOF, Avaya and Purchaser have duly executed this Agreement as of the date first written above.

AVAYA INC.

By: _____

Name: Laurent Philonenko
Title: Senior Vice President, Corporate Strategy and Development -- Chief Technology Officer

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383374

EXTREME NETWORKS, INC.

By: _____

Name: Katy Motiey
Title: EVP, Chief Administrative Officer
HR, General Counsel, & Corporate
Secretary

OUTSIDE COUNSEL EYES ONLY

EXTREME-01383375