# IN THE UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § | Case No. 3:20-cv-00451-CEA-DCP |
| Plaintiffs, | § § | |
| v. | § § | **Jury Demand** |
| BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; AND EXTREME NETWORKS, INC., | § § § § | |
| Defendants. | § § | |

**PLAINTIFFS SNMP RESEARCH, INC.'S AND SNMP RESEARCH INTERNATIONAL, INC.'S OPPOSITION TO EXTREME NETWORKS, INC.'S SUPPLEMENTAL BRIEF REGARDING PRIVILEGE ASSERTIONS**

11280858

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................................1

II.   EXTREME HAS SELECTIVELY DISCLOSED .........................................................4

      A.    Facts Showing Selective Disclosure .......................................................4

      B.    Extreme Has Failed To Carry Its Burden To Prove That It Did Not Waive
            Attorney Client Privilege Through Intentional, Selective Disclosure ............................6

            1.    Rule 502(a)(1):  Extreme's Waiver Was Intentional .........................................7

            2.    Rule 502(a)(2):  Extreme's Disclosed And Undisclosed
                  Communications Concern The Same Subject Matter Regarding
                  Whether Extreme Had A Right To Use SNMP Research
                  Software In Its Products ..................................................................11

            3.    Rule 502(a)(3):  Fairness Requires that Extreme's Disclosed
                  And Undisclosed Communications Regarding The Same
                  Subject Matter Be Considered Together ............................................16

      C.    The Parties' Protective Order Does Not Preclude A Finding Of Intentional
            Waiver ......................................................................................19

III.  EXTREME HAS NOT CARRIED ITS BURDEN TO SHOW THAT AVAYA
      INC.'S ATTORNEY CLIENT PRIVILEGE TRANSFERRED TO EXTREME
      WHEN EXTREME PURCHASED A DIVISION OF AVAYA INC. ..................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.,*
    240 F.R.D. 401 (N.D. Ill. 2007) ................................................................23

*Doe v. Hamilton Bd. of Educ.,*
    No. 1:16-CV-373 .........................................................................................24

*Graff v. Haverhill N. Coke Co.,*
    No. 1:09-CV-670, 2012 WL 5495514 (S.D. Ohio Nov. 13, 2012) .............12, 16, 18

*Oro BRC4, LLC v. Silvertree Apartments, Inc.,*
    No. 2:19-CV-04907, 2023 WL 2785743 (S.D. Ohio Feb. 10, 2023) ......................24

*Owners Ins. Co. v. Reynolds Concrete Pumping, LLC,*
    2023 WL 3166179 (W.D. Ky. Apr. 27, 2023) ...........................................19

*Synopsys, Inc. v. Siemens Indus. Software Inc.,*
    2023 U.S. Dist. LEXIS 169557 (N.D. Cal. Sept. 22, 2023) .......................8

*Wolpert v. Branch Banking Tr. & Co.,*
    No. 3:19-CV-138-TRM-DCP, 2023 WL 2731083 (E.D. Tenn. Mar. 30, 2023)
    (*Wolpert I*) ...........................................................................................7, 9, 17

*Wolpert v. Branch Banking Tr. & Co.,*
    No. 3:19-CV-138-TRM-DCP, 2023 WL 7003683 (E.D. Tenn. Oct. 24, 2023)
    (*Wolpert II*) .......................................................................................7, 8, 9, 17

*XY, LLC v. Trans Ova Genetics, LC,*
    2018 WL 11000694 (D. Colo. May 14, 2018) ...........................................20

**Other Authorities**

Fed. R. Civ. P. 26(b)(1) ....................................................................................11

Fed. R. Civ. P. 33(d) .........................................................................................2

Fed. R. Evid. 502(a) .............................................................................. *passim*

Fed. R. Evid. 502(b) .....................................................................................7, 19

Pursuant to the Court's November 1, 2023 Order, Dkt. 331, Plaintiffs SNMP Research, Inc. ("SNMP Research") and SNMP Research International, Inc. ("SNMP International") (collectively, "Plaintiffs") hereby submit this Opposition to Defendant Extreme Networks, Inc.'s ("Extreme") Supplemental Brief in Support of Extreme's Privilege Assertions ("Extreme Supp. Br."). *See* Dkt. 334.

## I. INTRODUCTION

The Court requested additional briefing on three privilege issues: (1) whether Extreme has intentionally waived privilege with respect to communications between Extreme and Brocade that Extreme identified as non-privileged in response to Interrogatory 8; (2) whether attorney-client privilege transferred from a third party, Avaya, to Extreme after Extreme purchased a division of Avaya; and (3) whether Avaya's and Extreme's inter-company communications (post-Avaya sale) were privileged. For the reasons set forth below, Extreme's invocations of privilege fail.

***Issue 1: Brocade-Extreme Communications***. The first issue concerns Extreme's intentional disclosure of Extreme-Brocade communications that Extreme cited in a sworn response to SNMP Research Inc.'s Interrogatory 8, which requests identification of communications concerning whether Extreme had a right to use SNMP Research Software in its products and Extreme's payment obligations for such use. Extreme has claimed for more than two years (during which time the Court ordered Extreme to "fully respond" to Interrogatory 8) that it was not aware of **any** responsive non-privileged communications to Interrogatory 8. After months of conferring about whether there were in fact non-privileged communications that were responsive to this request (Plaintiffs believed that there plainly were and provided an example from Extreme's own production), Extreme finally agreed to supplement its response to identify non-privileged communications. Extreme then identified, under oath, 33 non-privileged documents by express Bates number.

Then, ***after*** Plaintiffs argued to the Court that Extreme had engaged in selective disclosure of its communications (which it had identified in response to Interrogatory 8), Extreme clawed back three

11280858

- 1 -

emails between Extreme and Brocade that Extreme had identified in its sworn response. This was no accident: Extreme intended to identify the documents, then saw the potential ramifications of its selective disclosure after Plaintiffs made the argument, and only then tried to claw them back. That is an intentional disclosure by any sense of the word.

And Extreme's selective waiver goes even further. Extreme has produced and put at issue many other communications in response to Interrogatory 8, all of which Extreme admits concern the same subject matter. *See,* Section II.B.2, *infra.* Fairness requires that Extreme cannot disclose some communications in response to Interrogatory 8 but withhold others. Any email that goes to the subject matter of Interrogatory 8 is fair game, given that Extreme has selectively disclosed some emails that go to that subject matter. The three emails that Extreme cited pursuant to Rule 33(d) in response to Interrogatory 8—but clawed back a month later—bear directly upon this contested issue. So do all of the other redacted documents that Extreme identified in response to Interrogatory 8, as well as two emails from 2014 that also evince (on their face) a discussion of the very same subject matter.

***Relief Requested Regarding Brocade-Extreme Communications.*** Plaintiffs request an order requiring production of unredacted copies of the three Extreme-Brocade emails corresponding to Extreme's privilege log entries 1324, 1328, and 1329 (*i.e.*, the three Bates-numbered documents that Extreme identified in Interrogatory 8 and later clawed back). Furthermore, because Extreme has engaged in selective disclosure of communications regarding the subject matter of Interrogatory 8, Plaintiffs request production of unredacted copies of the privilege log entries that Extreme claims "relate" to Interrogatory 8 and thus also bear directly upon the same subject matter (*id.* at 490-491, 497, 507, 508-512, 517, 522-523, 528, 551-553, 561-562, 566, 569-570, 573-574, 582, 658, 663-667, 681, 701-704, 731-732, 734-736, 739-741, 743-745, 747-749, 751-753, 755-757, 774, 776-787, 819-820, 838-839, 983-984, 998, 1022-1025, 1029, 1033-1034, 1043). *See* Ex. Q (Extreme's 2023-09-08

Privilege Log) (highlighted entries). Lastly, Plaintiffs request the production of unredacted copies of two other discussions from 2014, which evince selective disclosure on their face because they are plainly responsive to Interrogatory 8: Ex. B (EXTREME-01082028) and Ex. C (EXTREME-01082022).[1]

Alternatively, if the Court is not yet inclined to order unredacted production of the aforementioned documents, then Plaintiffs respectfully submit that *in camera* review of a small subset of these documents is warranted so that the Court can compare a subset of the already disclosed communications—the three clawed back Brocade-Extreme emails in log entries 1324, 1328, and 1329, plus an Extreme email thread in Ex. D (EXTREME-00699416 at -9419) that contains an investigation done at the request of Extreme's attorney, Jennifer Sipes, and evinces selective disclosure on its face— with a single one of the withheld communications, a September 26, 2017 email exchange between Mr. Fitterer and Mr. Parsons, Ex. AA (EXTREME-00708020 at -8021-8022) (see red brackets). Plaintiffs submit that this will demonstrate that Extreme has produced and withheld documents under the guise of privilege that both go to the same subject matter.

*Issues 2-3: Avaya-Extreme Communications.* As to the second and third issues involving Extreme's clawed-back communications with a third party, Avaya Inc., Extreme has not met its burden to show that privileged correspondence between Avaya Inc. and its counsel, Richard Hamilton III, "transferred" to Extreme when Extreme bought a networking business division from Avaya Inc. in 2017. Extreme does not show the clawed-back communications at issue here were the privileged communications of the networking division that was ultimately sold to Extreme, as opposed to the privileged communications of the parent company (Avaya Inc.) selling the division. Nor can it. As Extreme's own brief makes clear, all of the clawed-back communications ultimately concern Mr.

---

[1] All Exhibits are attached to the Declaration of Olivia Weber filed herewith.

Hamilton's efforts to render legal advice related to a settlement between Avaya Inc. and Plaintiffs. In turn, the sale agreement governing Extreme's purchase of the networking division from Avaya Inc. expressly *excluded* from the sale the settlement agreement between Avaya Inc. and Plaintiffs. Any "privilege" with respect to Mr. Hamilton's rendering of legal advice would necessarily have been held by Avaya Inc., not Avaya's networking division, and such privilege did not transfer to Extreme when it purchased the networking division. In turn, Avaya Inc.'s disclosure of its "privileged" communications to a third party (here, Extreme and Luxoft) waived the privilege, and any follow-on correspondence between Avaya and Extreme employees was not privileged either.

Even if the record did not show that Avaya Inc. held the privilege to the at-issue communications, case law cautions against judicial "splitting" of the attorney client privilege, and the Court should not do so here. Nor has Extreme carried its burden to show that post-sale communications between non-legal employees at Extreme and Avaya were somehow privileged.

***Relief Requested Re Avaya-Extreme Communications.*** Plaintiffs request the Court to order re-production of unredacted copies of all of the documents that Extreme clawed back on September 11 and 20, 2023, listed in Ex. G.

## II. EXTREME HAS SELECTIVELY DISCLOSED

### A. Facts Showing Selective Disclosure

Interrogatory 8 asks Extreme to "Identify all internal Communications in which there was any discussion or Communication whatsoever concerning: (1) whether Extreme had a right to use SNMP Research Software in Extreme Products, including but not limited to any particular Extreme Product; and (2) payment obligations of Extreme for the use of SNMP Research Software." In Extreme's supplemental response to Interrogatory 8 served on August 27, 2021, Extreme answered that "Extreme is not aware of non-privileged information for this Interrogatory at this time." *See* Ex. H (2021-08-27 Extreme's 2nd Supp. Resp. to Interrogatory No. 8). After the Court ordered Extreme to "fully respond"

11280858

- 4 -

to virtually all outstanding discovery requests—including Interrogatory 8, *see* Dkt. 131 at 7—Extreme supplemented for a third time on May 13, 2022, stating that "Extreme reiterates that it is not aware of non-privileged information for this Interrogatory at this time." *See* Ex. I (2022-05-13 Extreme's 3rd Supp. Resp. to Interrogatory No. 8). Extreme supplemented yet again almost a year later, stating again that "Extreme is not aware of any non-privileged information for this Interrogatory at this time." *See* Ex. J (2023-04-28 Extreme's 7th Supp. Resp. to Interrogatory No. 8).

In light of Extreme's continued assertion of privilege over communications related to Interrogatory 8—and in the face of many instances where Extreme had produced unredacted communications that were plainly responsive to the same subject matter—on June 8, 2023, Plaintiffs sent Extreme a letter asking to discuss Extreme's invocation of privilege in response to Interrogatory 8. Plaintiffs noted that they would like to discuss why Extreme believed that all emails concerning Interrogatory 8 (such as emails regarding royalties owed) would be privileged, particularly where Extreme had already produced communications on the same subject matter (in unredacted form), but had not identified them in response to Interrogatory 8. *See* Ex. K (2023-06-08 email from O. Weber to L. Demers).

The parties met and conferred in June and July, and Extreme finally agreed to "update its interrogatory response to SNMP Research Interrogatory No. 8 to identify, by Bates number, responsive, ___*non-privileged*___ communications," and that it would do so within a week of substantial completion of its entire document production in mid-July. *See* Ex. L (2023-07-11 email from O. Weber to S. Prabhakar (emphasis added)); Ex. M (2023-07-17 letter from S. Prabhakar to O. Weber (confirming that Extreme agreed with Plaintiffs' "list of resolved issues")). On August 8, 2023, Extreme supplemented its response to Interrogatory 8 and, after more than two years of claiming that there were no non-privileged responsive communications (and more than a year after Extreme was

ordered to "fully respond" to Interrogatory 8, Dkt. 131 at 7), Extreme reversed course and identified 33

Bates-numbered, non-privileged documents in a sworn response to Interrogatory 8, and also identified

privilege log entries "relating" to this interrogatory as well. Ex. R (2023-08-08 Extreme's 9th Supp.

Resp. to Interrogatory No. 8).

Around the same time, Plaintiffs sought relief from the Court regarding Extreme's improper

invocation of privilege over its communications with former defendants Brocade Communications

Systems LLC and Broadcom, Inc. (collectively, "Brocade"). The Court ordered the parties to

simultaneously brief whether Extreme had improperly asserted the common-interest doctrine over its

communications with Brocade. In Plaintiffs' opening brief, Plaintiffs argued that Extreme and Brocade

had selectively disclosed communications between them discussing the assignability of a license with

SNMP International from Brocade to Extreme. Ex. CC (2023-09-01 Plaintiffs' Opening Brief. at 4).

After that (and the day that Plaintiffs' response to Extreme's opening brief was due), Extreme clawed

back three Extreme-Brocade communications that it had identified in its sworn response to

Interrogatory No. 8 as non-privileged. *See* Ex. N (2023-09-07 email from S. Prabhakar to O. Weber).

### B. Extreme Has Failed To Carry Its Burden To Prove That It Did Not Waive Attorney Client Privilege Through Intentional, Selective Disclosure

Extreme has intentionally, selectively disclosed communications that relate to Interrogatory 8,

and the Court should order production of the remaining undisclosed communications regarding the

same subject matter that Extreme has withheld. Rule 502(a) provides:

> When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and

(3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).[2]  It is Extreme's burden to show that it has not waived privilege.  *Wolpert v. Branch Banking Tr. & Co.*, No. 3:19-CV-138-TRM-DCP, 2023 WL 7003683, at *5 (E.D. Tenn. Oct. 24, 2023) (*Wolpert II*).

### 1.   Rule 502(a)(1):  Extreme's Waiver Was Intentional

As set forth above, after three "supplemental" responses to Interrogatory 8, a Court order requiring Extreme to provide a complete and accurate response, and after meeting and conferring for months, Extreme agreed to again supplement its response to Interrogatory 8 to identify ***non-privileged*** communications that discussed whether it had a right to use SNMP Research Software.  Extreme then admittedly had attorneys review its documents for content (Dkt. 334-1 ¶ 4) and selectively and intentionally identified dozens of communications as non-privileged, and Extreme's Vice President and Deputy General Counsel then verified that response under oath.  It was only after Plaintiffs subsequently argued that Extreme has been engaging in selective disclosure that Extreme then clawed back three Extreme-Brocade emails it had expressly identified as non-privileged, under the guise of "inadvertence."  That is not inadvertence.  Extreme's commitment to identify non-privileged communications and then its ensuing review, selection, and identification of these emails in a sworn interrogatory response is every bit as intentional as the defendant's conduct in *Wolpert*, where the Court ruled that the defendant intentionally disclosed email strings it "voluntarily produced . . . to Plaintiff as part of discovery," which the plaintiffs later cited in briefing over a privilege dispute.  *Wolpert v.*

---

[2] Extreme devotes considerable space to addressing inadvertent disclosure under Rule 502(b), Extreme Supp. Br. at 3-4, 6, 8-14, but the Court ordered the parties to address whether Extreme intentionally waived privilege for purposes of Rule 502(a).  Dkt. 333 at 84:17-21.  As ordered, Plaintiffs' brief focuses on Extreme's intentional waiver.

*Branch Banking Tr. & Co.*, No. 3:19-CV-138-TRM-DCP, 2023 WL 2731083, at *6 (E.D. Tenn. Mar. 30, 2023) (*Wolpert I*).

   While Extreme asserts that it "did not argue that the identified [and subsequently clawed-back] documents were helpful to its defenses in this case," Extreme Supp. Br. at 5, and that its supplemental response to Interrogatory 8 was "no different than the information that would be disclosed in a privilege log," *id.* at 7, Extreme's assertions ignore the fact that it took a litigation position when it identified some (but not all) of its communications that were responsive to the subject matter of Interrogatory 8. Moreover, not only has Extreme taken a litigation position by identifying non-privileged discussions in response to Interrogatory 8, Extreme has also indicated that it will be relying on a license defense in this case. *See* Ex. A (2023-07-21 Extreme 5th Supp. Resp. to SNMPR RFA No. 44). Extreme also ignores that it took the position it did in response to Interrogatory 8 after meeting and conferring with Plaintiffs and agreeing to identify responsive, non-privileged documents—a reversal of course after claiming for years that it was aware of "no" responsive non-privileged documents.

   In an attempt to bolster its argument that its identification of specific communications in response to Interrogatory 8 does not show intentional waiver, Extreme relies on an out of district case with no reasoning and that applies the wrong standard. *See* Extreme Supp. Br. at 6-7 (citing *Synopsys, Inc. v. Siemens Indus. Software Inc.*, 2023 U.S. Dist. LEXIS 169557, *4 (N.D. Cal. Sept. 22, 2023)). In particular, the court in *Synopsis* required the party claiming wavier had the burden of proof. *Id.* at *4. But the opposite rule is applied in this Circuit. *See Wolpert II*, No. 3:19-CV-138-TRM-DCP, 2023 WL 7003683, at *5 ("The party claiming attorney-client privilege has the burden to show that it has not waived the privilege"). In addition, the sum total of the *Synopsys* court's analysis about whether citing documents in an

interrogatory response amounts to disclosure is as follows: "Synopsys's privilege was not waived because referencing the bates number is not an independent disclosure of the actual document, the error was promptly rectified, and in any case Siemens did not carry its burden." *Id.* The *Synopsis* court's conclusions should not govern here, particularly where Extreme made the tactical choice to identify particular responsive documents after months of meeting and conferring with Plaintiffs—while under Court order to respond fully and correctly—and after expressly agreeing to identify non-privileged, responsive communications to Interrogatory 8.

Extreme also asserts that this Court's decision in *Wolpert I* is instructive because the defendant's disclosure of a letter in that case was "inadvertent" where the plaintiff prompted the defendant to re-review its production to update its privilege log, and as part of that process, the defendant clawed back certain portions of that letter. Extreme Supp. Br. at 9. But *Wolpert I* underscores why Extreme's conduct here was intentional. In the course of updating its privilege log, the *Wolpert I* defendant realized that it had failed to apply all necessary redactions, *Wolpert I*, No. 3:19-CV-138-TRM-DCP, 2023 WL 2731083, at *2, while here, Extreme was not simply updating its log—it was updating (as it had expressly agreed to do) a ***sworn interrogatory response*** about a single subject matter to identify ***non-privileged*** responsive documents, after attorneys reviewed the documents for content, and after years of asserting that no non-privileged communications existed. Extreme ultimately identified 33 responsive, non-privileged communications. Only after Extreme saw that Plaintiffs argued selective waiver did Extreme try to claw back a handful of Extreme-Brocade communications it had affirmatively identified; but that is not unintentional or inadvertent behavior, it is a tactical switch of positions (even while Extreme is still engaging in further selective disclosure as to the same subject matter, as discussed below). Plaintiffs may not have cited the three

clawed-back communications in a brief (as in *Wolpert I*), but that is of no moment, because *Extreme* had already intentionally cited them in its sworn interrogatory response about whether Extreme had a right to use SNMP Research Software.  Nor is there any requirement that Plaintiffs have cited the document in a motion for there to be selective, intentional waiver.  *See* Fed. R. Evid. 502(a).

Extreme also claims that Plaintiffs' approach to selective waiver results in an "absurd outcome" because Extreme identified many privileged communications in response to Interrogatory 8 (by referencing the privilege log entries that "relate" to the subject matter), and under Plaintiffs' approach, "Extreme disclosed 73 properly withheld privileged communications by identifying them in its interrogatory response."  Extreme Supp. Br. at 8. But this argument misses the point.  It is not the fact that Extreme identified certain responsive privilege log entries that yields waiver; it is the fact that Extreme *selectively disclosed* some communications *but also withheld others* about a single subject matter.

Lastly, Extreme claims it "inadvertently" (rather than intentionally) cited three purportedly privileged documents because Interrogatory 8's request to identify "all internal Communications" was burdensome and so Extreme was forced to use "search terms" to reduce its burden, and thereafter it did not "re-screen[] the documents for privilege."  Extreme Supp. Br. at 8 (citing Prabhakar Decl. ¶ 4).  But the Court already expressly overruled all of Extreme's objections to Interrogatory 8 in the April 22, 2022 Order, including as to burden. Dkt. 131 at 6-7.  Plaintiffs had moved the Court to "[o]rder that Extreme's general objections, relevancy objections (Category 1 in the table below), and its unsupported burden, overbreadth, and proportionality objections (Category 1) are waived for every request."  Dkt. 101 at 2 (*see* Category 1).  The Category 1 requests included Interrogatory 8, and the Court granted

Plaintiffs' requested relief, observing that the Category 1 requests sought (among other things) "communications related to SNMP Research Software," ruling that "Extreme has failed to include with any objection as to relevancy a specific explanation describing why the request lacks relevance and/or why the requested discovery is disproportionate in light of the factors enumerated in Federal Rule of Civil Procedure 26(b)(1). Dkt. 131 at 6-7. The Court therefore "agree[d] with Plaintiff and overrule[d] Extreme's objections" and ordered Extreme to "fully respond to Plaintiff's Category 1 requests." *Id.* at 7.[3]

### 2. Rule 502(a)(2): Extreme's Disclosed And Undisclosed Communications Concern The Same Subject Matter Regarding Whether Extreme Had A Right To Use SNMP Research Software In Its Products

For purposes of this motion Plaintiffs will accept Extreme's admission that Interrogatory 8 defines the scope of the subject matter. *See* Extreme's Supp. Br. at 5 (Interrogatory 8 "asked for all communications about a subject matter and Extreme's response only identified the communications about that subject matter and nothing more.") (emphasis omitted). Again, Interrogatory 8 seeks identification of "all internal Communications in which there was any discussion or Communication whatsoever concerning: (1) whether Extreme had a right to use SNMP Research Software in Extreme Products, including but not limited to any particular Extreme Product; and (2) payment obligations of Extreme for the use of SNMP

---

[3] Furthermore, Extreme's claim that it did not "re-screen[] the documents for privilege" rings particularly hollow because the whole reason Extreme agreed to supplement its response to Interrogatory 8 was to identify ***non-privileged*** responsive documents. *See* Ex. L (2023-07-11 email from O. Weber to S. Prabhakar ("Lastly, the parties reached the following agreements . . . Within a week of its July 15 production, Extreme will update its interrogatory response to SNMP Research Interrogatory No. 8 to identify, by bates number, responsive, non-privileged communications;")); Ex. M (2023-07-17 letter from S. Prabhakar to O. Weber ("We confirm the list of resolved issues and appreciate SNMPR's willingness to work with us.")). Given these circumstances, it is inexplicable why Extreme's supplementation of Interrogatory 8 would have not included a privilege review, especially given that Extreme expressly distinguished between privileged and non-privilege documents in its response.

11280858

- 11 -

Research Software." As set forth below, Extreme has undeniably engaged in selective disclosure of purportedly privileged emails concerning this subject matter. This constitutes selective disclosure, and it means all communications on the same subject matter are waived. *Graff v. Haverhill N. Coke Co.*, No. 1:09-CV-670, 2012 WL 5495514, at *16 (S.D. Ohio Nov. 13, 2012); *see also* Fed. R. Evid. 502(a).

For example, Extreme has identified in response to Interrogatory 8 an email chain where its in-house attorney, Jennifer Sipes, asked Extreme employees: "Who has info re this software?" *See* Ex. O (EXTREME-00604074 at -4074). Extreme has produced the employee-to-employee information gathering that occurred in response to that question from its counsel, including the following exchange between Extreme and Brocade employees about Extreme's rights:

- "[Q] I didn't see a term for the license in the amendment. Is it perpetual or term and if term, how long?

- [A] It is a perpetual license."

*Id.* This is a convenient disclosure for Extreme, given that one of its apparent defenses is one of the licenses with SNMP International is "perpetual." Dkt. 277 at 1. Moreover, this chain also underscores that, when it benefits Extreme to disclose employee information gathering that was initiated by Extreme's counsel, Extreme has no problem doing so.

In another produced email an Extreme employee responds to Extreme's in-house counsel's question (which was also identified as "relating" to Interrogatory 8) with: "We would need SNMP research license for SNMP on VDX and SLX. Gwen took care of the renewal last year[.]" Ex. D (EXTREME-00699416 at -9419). Thus, Extreme apparently does not mind sharing this attorney-client communication relating to the Interrogatory 8 subject matter (the VDX and SLX line of products are the ones that Extreme obtained from Brocade and are one

set of infringing products in this case). And while multiple portions of this email are disclosed, the seventh email amongst the employees is redacted. And thereafter the employee emails were forwarded to attorneys and all of the emails amongst those attorneys are redacted. *Id.* Extreme does not show or even argue that these redacted emails are not of the same subject matter as the disclosed ones (which in turn is the same subject matter of all of the clawed back emails identified in Extreme's interrogatory 8 response and the rest of the disclosed emails discussed in this section).

Another selective disclosure example identified in response to Interrogatory 8 is Exhibit E (identified in response to Interrogatory 8 as log entry 552). In it, Extreme engineering personnel asked "What is the third-party SW code that we are using (SNMP??)" Ex. E (EXTREME-00698724 at -8726). The response was partially redacted to exclude certain information apparently obtained from the "Extreme Legal team," but the response was left unredacted as to the ultimate answer to the question posed, which was that the SNMP code was "purchased in a buy out from Windriver during the Avaya years." *Id.* (EXTREME-00698724 at -8725). But Extreme should not be permitted to disclose some information to/from its counsel, and hide other information bearing on the same subject matter.

Plaintiffs also previously showed the Court a 2019 letter between Brocade and Extreme that went directly to the issue of whether a license with SNMP International ever transferred to Extreme. Ex. DD (2023-09-07 Plaintiffs' Resp. Br., Ex. 4). Extreme does not contend this 2019 letter is of a different subject matter than the other emails with Brocade that Extreme is seeking to keep secret. Instead, Extreme's *only* response is that 2019 is after the two-year term had expired for one of three "agreements" (the Confidentiality Agreement) Extreme has invoked for its purported "common interest privilege" with Brocade (and so as Extreme's

- 13 -

theory goes, this 2019 letter was not privileged in the first place). Extreme Supp. Br. at 10 n.3. But Extreme conspicuously says nothing about a two year time limitation for the *other* agreements Extreme has invoked as the basis of its purported common interest agreement with Brocade (two asset purchase agreements). Moreover, Extreme apparently forgets that in response to Interrogatory 8 it also identified 2018 communications (that are within two years of the Confidentiality Agreement) which say essentially the same thing as the 2019 letter. *See* Ex. F (EXTREME-00698702 at -8702) (Brocade asking Extreme to "request that the assignment be modified to a partial assignment, such that Brocade's (or any other assignee's) rights are not affected"); *id.* (revealing legal analysis that, although Brocade divested certain assets to Extreme, Brocade was still using SNMP Research's software in "all" of its products). Extreme's "two year" excuse for its selective disclosure thus rings hollow.

Similarly, Extreme has produced a 2014 email thread between its employees and attorneys that were prompted by an external inquiry from SNMP International inquiring as to why Extreme's royalty reports had gone down to zero. *See* Ex. B (EXTREME-01082028). In the produced document, Extreme withholds five initial emails between these employees and attorneys discussing whether Extreme had a right to use SNMP Research Software in a certain product, but then conveniently discloses a portion of the following exchange between employees in the very same thread (with yet another redaction applied mid-email):

- QUESTION: "I assume Extreme has opted for the Royalty-Free option and paid the $115k? Is there a yearly support-fee that we pay? Meenakumar indicated that a payment was made about a month ago?"

- ANSWER: "The payment we make is 5k USD a year, which is the yearly support fee. (we paid it a couple of weeks ago.). I will transfer it to you, for the next year. [REDACTED] We should also look at potential Royalties with the new rebranding for Aviat."

*Id.* Notably, and again conveniently, one of Extreme's asserted defenses in this case is that it

can somehow, years after the fact (and in contravention of the plain language of the license), buy its way out of this case by paying $115,000. Ex. P (2022-09-11 letter from J. Neukom to J. Wood ("Extreme has two royalty options: either a per-unit royalty, or a paid-up royalty option of $115,000. Extreme is prepared to move forward with the paid-up royalty option.").

Extreme also produced another email thread arising from an external inquiry from SNMP International, Ex. C (EXTREME-01082022), where Extreme cherry-picks the portions it likes, and withholds the exchanges it does not like, even though it is all of the same subject matter:

- "[Q] Is this SNMP Research code embedded in EXOS? If so, what are the license terms."

- "[A] I heard from my team that we pay and use the emanate SNMP code."

- "[Q] Do you know when we are due for next ?"

- "[A] The license for Emanate was renewed earlier this month and is automatically renewed each year."

- "[A] It is pay-and-use every year and it is automatically renewed. Looks like, its renewed earlier this month."

*Id.* Extreme has thus withheld correspondence involving attorneys and engineers about the same subject matter discussed above, but opportunistically disclosed what it believes are helpful quips from its engineers on the very same chain.

In summary, the above communications show selective disclosure on the face of the documents because Extreme is apparently redacting some but not all discussions about the same subject matter. Indeed, **all** of the correspondence identified in response to Interrogatory 8 reflects the same subject matter as the three disclosed (and subsequently clawed-back) Extreme-Brocade emails. Extreme already acknowledges that Interrogatory 8 asks for "all communications about a subject matter." Extreme Supp. Br. at 5.

**3.** **Rule 502(a)(3): Fairness Requires that Extreme's Disclosed And Undisclosed Communications Regarding The Same Subject Matter Be Considered Together**

The final factor under Rule 502(a)—fairness—dictates that Extreme's disclosed and undisclosed communications about the same subject matter of Interrogatory 8 be considered together.

As has also been demonstrated, Extreme has disclosed and produced dozens of documents between its attorneys and employees, and between Extreme and Brocade, which concern the subject matter of Interrogatory 8. Many of these disclosed communications include attorneys on the email chain, or evince investigations done at the behest of Extreme attorneys. At the same time, Extreme has also withheld dozens of the very same types of communications on privilege grounds. It is of no moment that Extreme has not (yet) cited these communications in any filings given the procedural stage of this case, wherein Extreme has not even had to answer the complaint. ***The salient point is that Extreme has disclosed attorney-client (and Extreme-Brocade) communications on the same subject matter as those it is withholding***.

Plaintiffs should not be forced to wait until Extreme actually chooses which of the selectively disclosed documents it wants to use with a particular witness at deposition or at trial, or in connection with a dispositive motion or an expert report. By that point, Plaintiffs will have little or no remedy, including getting the full picture by being able to themselves inquire into the undisclosed communications. It is more than enough that Extreme has intentionally, and selectively chosen to disclose communications between its attorneys and employees, and its attorneys and Brocade, on the same subject matter for which it is withholding such communications. *See, e.g.*, *Graff v. Haverhill N. Coke Co.*, 2012 WL 5495514, at *17 (S.D. Ohio Nov. 13, 2012) ("The undersigned finds that it would be unfair to permit defendants to produce the final version of the ERM audit which concludes that HNCC was compliant with regulatory requirements, yet withhold the draft versions of the audit and other communications that may undermine or help explain the factual basis for this conclusion.").

11280858

- 16 -

7420886.2

*Wolpert* is again instructive. In *Wolpert I*, the Court found "that the attorney-client privilege is waived with respect to the March 5 Letter given that Defendant intentionally disclosed the Email Strings, which discusses the same subject matter." *Wolpert I*, 2023 WL 2731083, at *9.

And *Wolpert II* does not support Extreme. There, the plaintiff tried to invoke the Court's ruling to obtain subject matter waiver as to 142 other documents set forth in a privilege log that the plaintiff believed concerned the same subject matter as the intentionally-waived email strings. *Wolpert II*, 2023 WL 7003683, at *5-7. The Court denied plaintiff's motion for two reasons, neither of which apply here. First, the Court did not have sufficient information to determine whether the intentionally-waived email strings were the same subject matter as the 142 logged documents. *Id.* at *5. Here, as explained above, the Court does have sufficient information to determine whether the subject matter is the same. It can accept at face value Extreme's representation that Interrogatory 8 "asked for all communications about a subject matter and Extreme's response ***only identified the communications about that subject matter and nothing more***." Extreme Supp. Br. at 5 (emphasis in original). As to the only two communications at issue that Extreme did not identify in response to Interrogatory 8 but for which Plaintiffs seek full, unredacted production, as set forth above, the two 2014 Extreme emails plainly discuss the same subject matter as all the other communications disclosed in response to Interrogatory 8. *See* Ex. B (EXTREME-01082028); Ex. C (EXTREME-01082022).

The second reason the Court denied the plaintiff's follow-on motion in *Wolpert II* was because fairness did not warrant disclosure as applied to those facts. The Court looked to the Advisory Committee notes, which explain that subject matter waiver is reserved for situations where fairness requires further disclosure "to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." *Id.* at *6. The Court reasoned that the defendant in *Wolpert II* had not relied on the intentionally disclosed email strings to prove its defense or to negate any of plaintiffs'

claims. *Id.* Here, by contrast, Extreme has selectively disclosed emails chains and snippets of correspondence from larger discussions about the subject matter of Interrogatory 8 to warp (in Extreme's favor) Extreme's own evidence regarding that subject matter. What Extreme has done here reflects the type of situation contemplated by the Advisory Committee, where subject matter waiver is warranted to prevent a selective and misleading presentation of evidence. *See, e.g., Graff*, 2012 WL 5495514, at *16 (considering Advisory Committee notes and ordering production of communications to provide a complete picture).

Even if the Court determines that it does not currently have enough evidence on the present record to decide whether fairness requires a ruling of subject matter waiver, Plaintiffs have presented more than enough evidence to at least justify this Court performing a limited *in camera* review to determine whether or not the following withheld emails are of the same subject matter as the ones discussed, *supra,* at pp. 11-15. Therefore, Plaintiffs alternatively request that the Court review *in camera* a small subset of the **already disclosed** communications: (i) the three clawed back Brocade-Extreme emails in log entries 1324, 1328, and 1329 (which no longer have corresponding Bates numbers because Extreme clawed them back entirely); and (ii) the Extreme email thread in Ex. D (EXTREME-00699416 at -9419), which contains an investigation done at the request of Extreme's attorney, Jennifer Sipes, and evinces selective disclosure on its face. These four documents have already been intentionally disclosed, as discussed above. Plaintiffs then request that the Court compare these four disclosed documents with the withheld, September 26, 2017 email exchange between Mr. Fitterer and Mr. Parsons, Ex. AA (EXTREME-00708020 at -8021-8022, at the red bracketed portion), so that the Court can confirm whether (at the very least) this subset of disclosed and undisclosed emails do in fact concern the same subject matter. (To be clear, Extreme has already identified **all** of this subject of documents as relating to Interrogatory 8, and so under Extreme's own logic, these documents

should already concern the same subject matter.)  Extreme. Supp. Br. at 5.

The court in *Owners Ins. Co. v. Reynolds Concrete Pumping, LLC*, 2023 WL 3166179, at *6 (W.D. Ky. Apr. 27, 2023) recently took a similar approach and concluded that fairness required a finding of subject matter waiver where, after an *in camera* review of the redacted and unredacted material, it appeared that more unfavorable testimony was redacted while favorable testimony was unredacted.  *Id.*  Likewise here, at a minimum, Plaintiffs respectfully request that the Court review and compare copies of the aforementioned documents so that it may make a finding as to whether "it actually appears that [defendant] often redacted instances in which the testimony [] was not as favorable on the [disputed] issue . . . as some of the unredacted testimony."  *Owners Ins. Co.*, 2023 WL 3166179, at *6.

### C.    The Parties' Protective Order Does Not Preclude A Finding Of Intentional Waiver

Lastly, Extreme argues that the Court should apply the Agreed Protective Order (Dkt. 335) to excuse Extreme's "unintentional" identification of three documents in response to Interrogatory 8, arguing that whether unintentional waiver occurred under FRE 502(b) is supplanted by the claw-back agreement in the Agreed Protective Order.  Extreme Supp. Br. at 11-14.  The Court ordered supplemental briefing regarding FRE 502(a)—intentional waiver— and did not order supplemental briefing regarding the interplay between FRE 502(b) (inadvertent waiver) and the claw-back agreement in the Agreed Protective Order in this case. Regardless, the parties' claw-back agreement does not bear upon a finding of intentional waiver under FRE 502(a).  Indeed, various courts have observed that claw-back agreements in court-approved protective orders apply to ***inadvertent*** disclosures but should ***not*** extend to ***intentional*** disclosures.  *See, e.g.*, *XY, LLC v. Trans Ova Genetics, LC*, 2018 WL 11000694, at *6 (D. Colo. May 14, 2018) (ruling that court-approved protective order was "never intended to

generally immunize any and every disclosure of privileged information, particularly intentional waivers.") (citing *Smith v. Best Buy Stores, L.P.*, 2017 WL 3484158, at *3-4 (D. Idaho Aug. 14, 2017) ("The Court also has serious reservations about the enforceability of a clawback order extending to intentional disclosures . . . [a]llowing a party to intentionally and tactically disclose protected materials during litigation, while preserving the ability to assert privilege when such tactics change and against parties privy to the Rule 502(d) Order, would stretch attorney-client privilege and work product protections far beyond their intended purpose")).

## III. EXTREME HAS NOT CARRIED ITS BURDEN TO SHOW THAT AVAYA INC.'S ATTORNEY CLIENT PRIVILEGE TRANSFERRED TO EXTREME WHEN EXTREME PURCHASED A DIVISION OF AVAYA INC.

In September, while the parties were briefing the common interest privilege issue, Extreme clawed back four email chains—three of which originated from the same initial email—all totaling 100 documents reflecting communications between a third party, Avaya Inc., and Extreme. Extreme Supp. Br. at 2. Extreme initially claimed that these were "common interest" privileged. But when Plaintiffs asked Extreme to identify the common interest privilege agreement, Extreme changed its position. Extreme now claims privilege over these emails for two reasons: (1) the chains purportedly involve the request for (or actions taken in response to) legal advice and impressions from Avaya Inc.'s counsel, Richard Hamilton III, related to litigation between Avaya Inc. and Plaintiffs and the settlement thereof;[4] and (2) the attorney-client privilege over those email chains purportedly "transferred" to Extreme when Extreme bought Avaya's networking division. It is Extreme's burden to demonstrate privilege and non-waiver, and it has not carried that burden.

Extreme spends pages recounting the divestiture of Avaya's networking business which it claims was a discrete business division within Avaya Inc. Extreme Supp. Br. at 14-16, 18-19. But

---

[4] *See* Ex. S (2023-09-26 Extreme Supp. Priv. Log); Extreme Supp. Br. at 22.

Extreme fails to show why the clawed-back communications at issue here were the privileged communications of the networking business in the first place, as opposed to the privileged communications of the parent company, Avaya Inc. Nor can it.

Extreme has only ever identified a single attorney involved in the four clawed-back email chains at issue: Richard Hamilton III. Mr. Hamilton was the legal director for *Avaya Inc*. *See* Ex. T (EXTREME-00706791) (signature line for Mr. Hamilton stating "Legal Director – Labor, Employment & Litigation | Avaya Inc."). And the record shows that Mr. Hamilton was rendering legal advice on behalf of Avaya Inc., not some networking business division. As Extreme recounts, Daniel Regan (an Avaya employee) sought legal advice from Mr. Hamilton related to the settlement of a litigation between Plaintiffs and Avaya Inc. Extreme Supp. Br. at 22. But the asset purchase agreement governing Extreme's purchase of Avaya's networking business makes clear that the settlement agreement between Plaintiffs and Avaya Inc. was *excluded* from the sale of the networking business to Extreme. *See* Ex. U (EXTREME-01383274 (APA) § 1.03(b) (defining "Excluded Assets" to include "Excluded Contracts"); § 1.05(b) (defining "Retained Liabilities" to include "All Liabilities of Avaya or any of its affiliates related to Excluded Assets")); Ex. V (EXTREME-01383376 at -3493) (Disclosure Schedule to APA setting forth the "Excluded Contracts," which listed the settlement and license between Avaya Inc. and Plaintiffs). Accordingly, any purported "privilege" with respect to Mr. Hamilton's rendering of legal advice about the litigation/settlement between Avaya Inc. and Plaintiffs would have necessarily been on behalf of Avaya Inc., not Avaya's networking division that was part of the sale to Extreme.

Two of the one hundred clawed-back Avaya emails that Plaintiffs can see (insofar as they contain partial redactions) also support the conclusion that Mr. Hamilton was rendering legal advice on

11280858
7420886.2

behalf of Avaya Inc. rather than on behalf of the networking business that Extreme purchased.[5]  Both email chains begin with a January 5, 2018 email from Dan Regan, an Avaya employee, to Sunil Ramu, an Extreme employee.  *See* Ex. W (Extreme-01078470 at -8473); Ex. X (Extreme-01079442 at -9446).  Mr. Regan sent this email half a year ***after*** Extreme closed its purchase of Avaya's networking division, and he contacted Extreme regarding "Possible SNMPRI content in Bangalore," expressing concern about files that had been flagged for "containing the SNMP Research Copyright."  *Id.*  Again, Avaya Inc.'s settlement and license with Plaintiffs was expressly excluded from the networking business sale to Extreme, and Avaya Inc. retained the liabilities associated with the excluded assets.  Accordingly, Mr. Regan's email underscores that Avaya Inc. contacted Extreme after the networking business sale to address potential issues related to Avaya Inc.'s settlement with Plaintiffs.  Only Avaya Inc. could claim privilege over correspondence such as that.

Given that Mr. Hamilton was rendering legal advice on behalf of Avaya Inc. (not the networking business sold to Extreme), then absent a common interest agreement between Avaya Inc. and Extreme, disclosure of Avaya Inc.'s privileged communications to Extreme waives any such privilege.  Extreme has disclaimed that any common interest agreement applies to its correspondence with Avaya Inc.  *See* Ex. Y (2023-09-26 email from S. Prabhakar to O. Weber ("To clarify, Extreme is not asserting common interest; it is asserting the privilege belonged to Extreme because of the acquisition.")).  Because Extreme has disclaimed reliance on a common interest agreement, the disclosure of privileged communications between Avaya Inc. and Extreme (and third-party Luxoft) renders any such privilege waived.[6]  And, given that Extreme cannot show an underlying, unwaived

---

[5] The other 98 clawed-back emails are all completely redacted and are not viewable in any way to Plaintiffs.

[6] Notably, while Extreme tries to invoke the "Transition Services and Limited Agency" agreement between Avaya and Extreme to support its agency theory, that agreement does not help it either because the confidentiality provision therein expressly states that "For clarity and notwithstanding

privilege that it holds, it also cannot claim "privilege" over the post-acquisition emails between Extreme, Avaya, and Luxoft employees either.

But in any event, even if the evidence somehow showed that Avaya's networking division held the privilege over the hundred communications at issue (it does not), case law cautions against judicial "splitting" of the attorney client privilege, and the Court should not split the privilege here. The decision in *Am. Int'l Specialty Lines Ins. Co. v. NWI-I, Inc.*, 240 F.R.D. 401, 406 (N.D. Ill. 2007) remains instructive. A successor in that case purchased "substantially all" of the bankrupt business' operations and continued to operate the old business, while two other successors obtained some of the other assets of the bankrupt business. *Id.* at 406-07. The court concluded that neither of the two other successors emerged with "control" of the old business, and so it would not split the privilege. Similarly here, Extreme did not buy "substantially all" of the bankrupt entity, Avaya Inc.; it purchased a subset of Avaya Inc.'s business (a networking division). Control of the bankrupt entity (Avaya Inc.) did not pass to Extreme, and while Extreme contends that it "alone holds the right to assert privilege" concerning the hundred communications at issue, noticeably absent is any signed declaration from Avaya Inc. attesting to the same. Extreme's invitation to split the privilege by drawing a vague line as to what communications purportedly concern the "networking business" rather than those of the parent company, Avaya Inc. should be denied, particularly here where the parent company that went into bankruptcy still exists today.

Lastly, as to Extreme's agency theory, Extreme takes an expansive view of the application of attorney client privilege, which is the opposite of how the privilege is meant to be construed: narrowly.

---

anything to the contrary herein, the Confidential Information of Purchaser ***shall not include any Excluded Assets***." Ex. Z (EXTREME-01383508, § 5.1). In other words, the confidentiality provision of the agency agreement did not encompass information from any excluded assets (such as Avaya Inc.'s settlement agreement with Plaintiffs) that had not been transferred to Extreme.

*Doe v. Hamilton Bd. of Educ.*, No. 1:16-CV-373 (lead); 1:16-CV-497, 2018 WL 542971, at *2 (E.D. Tenn. Jan. 24, 2018). Extreme invokes *Oro BRC4, LLC v. Silvertree Apartments, Inc.*, No. 2:19-CV-04907, 2023 WL 2785743, at *4 (S.D. Ohio Feb. 10, 2023), but that case does not help Extreme because the court expressly acknowledged that "communications between an ***attorney*** and a client's agent" are privileged (*id.* at*4) (emphasis added), and indeed, all of the communications the court reviewed involved counsel on both sides (not employees on both sides). *Id.* at *6. Here, Extreme is trying to expand the privilege to protect employee-to-employee communications under the umbrella of privilege. That is an expansive view that runs counter to how privilege is appropriately construed.

Plaintiffs respectfully request the Court to order re-production of unredacted copies of all of the documents that Extreme clawed back on September 11 and 20, 2023, which are listed in Ex. G hereto.

Respectfully submitted,

Dated: December 1, 2023

By: /s/ *John L. Wood*
    John L. Wood, Esq. (BPR #027642)
    Cheryl G. Rice, Esq. (BPR #021145)
    Rameen J. Nasrollahi, Esq. (BPR #033458)
    EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
    900 S. Gay Street, Suite 1400
    P.O. Box 2047
    Knoxville, TN 37902
    (865) 546-0500 (phone)
    (865) 525-5293 (facsimile)
    jwood@emlaw.com
    crice@emlaw.com
    rnasrollahi@emlaw.com

By: /s/ *A. Matthew Ashley*
    A. Matthew Ashley (CA Bar. No. 198235)
    Morgan Chu (CA Bar. No. 70446)
    David Nimmer (CA Bar. No. 97170)
    Olivia L. Weber (CA Bar. No. 319918)
    IRELL & MANELLA LLP
    1800 Avenue of the Stars, Suite 900

Los Angeles, California 90067-4276
(310) 277-1010 (phone)
(310) 203-7199 (facsimile)
mchu@irell.com
dnimmer@irell.com
mashley@irell.com
oweber@irell.com

*Attorneys for Plaintiffs*
*SNMP Research International, Inc. and*
*SNMP Research, Inc.*

7420886.2