# EXHIBIT CC

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § | Case No. 3:20-cv-00451-CEA-DCP |
| Plaintiffs, | § § § | |
| v. | § § | **Jury Demand** |
| BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; AND EXTREME NETWORKS, INC., | § § § § | |
| Defendants. | § § § | |

**PLAINTIFFS' POSITION STATEMENT
RE ISSUES RAISED IN AUGUST 24, 2023 EMAIL**

## I. DISPUTE REGARDING PRIVILEGE CLAIM

Pursuant to Dkt. 218, Plaintiffs move to compel production in unredacted form of 13 email chains that are highly relevant and undeniably responsive to numerous discovery requests issued to Extreme and former party Broadcom/Brocade (collectively, "Brocade"). Extreme has redacted numerous of these emails claiming they contain "common interest privileged" information, and Brocade has (for the first time, two weeks ago) asserted the attorney-client privilege over an email embedded in 11 of the emails. These privilege assertions fail, and the redacted communications should be ordered produced.

### A. BACKGROUND

Plaintiffs served the requests for production ("RFP") that encompass the redacted documents in December 2020.[1] After months of meet and confers and multiple motions, on April 22, 2022, Extreme and Brocade were ordered to "fully respond" to the discovery by May 13, 2022. Dkt. 131 at 7, 11, 13.

On May 13, 2022, Brocade represented that it would provide a "substantially complete privilege log by July 15, 2022." Brocade later unilaterally changed that date to September 15, 2022, and ultimately served its log on September 16, 2022. Brocade did not include any of the 13 documents at issue on its log, nor did Brocade assert any "common interest privilege" with Extreme at all. Brocade and Plaintiffs settled this action as between them in March 2023.

On May 13, 2022, Extreme represented that it would provide a privilege log within 30 days but failed to do so. Extreme provided its first privilege/redaction log on July 8, 2022, which it amended twice (the latest being July 28, 2023). With respect to the 13 documents at issue, Extreme initially asserted "legal advice of counsel regarding contract negotiations." App. B. On March 22, 2023, Plaintiffs challenged the redactions, noting that:

> Extreme has redacted portions of communications between employees of Brocade and Extreme under the claim of attorney-client privilege. Communications exchanged between Brocade and Extreme are not protected by the attorney-client privilege . . . [and] Extreme has no standing to assert the attorney-client privilege on behalf of Brocade, and to the extent the communications may have been privileged . . . any privilege was waived when the communications were shared with Extreme.

Plaintiffs and Extreme then engaged in a several months-long written and oral meet and confer effort, during which time Extreme changed its position on which "privilege" supposedly applied multiple times. *See* App. B. Plaintiffs and Extreme were ultimately unable to resolve this issue.

On August 16, 2023, the day Plaintiffs told Extreme they intended to move to compel after months of conferring, counsel for Brocade sent an email to Plaintiffs' counsel claiming privilege over a key email chain (dated September 26, 2017) that is part of 11 of the 13 email chains at issue. During a meet and confer call, Plaintiffs asked Brocade why, if this email was privileged, it was not on Brocade's privilege log. Brocade's counsel responded that "we do not have" the document, and that the document "may" have been deleted by its custodian, Larry Fitterer, because he ultimately left Brocade. Plaintiffs then asked Brocade's counsel whether: (i) Brocade has (and at the time of privilege logging, had) access

---

[1] Plaintiffs have submitted concurrently herewith an: (i) **Appendix A** ("App. A") of quotations of the applicable RFPs; (ii) **Appendix B** ("App. B") with excerpts of Extreme's privilege log and two amendments with the disputed log entries highlighted yellow; and (iii) **Appendix C** with redacted versions of the documents in dispute by privilege log entry number. Plaintiffs can provide any other cited material(s) upon request.

to the document even if Mr. Fitterer is no longer with the company (e.g. in databases other than Mr. Fitterer's email account, such as in company-wide and/or backup databases); and (ii) Brocade itself permanently deleted the email pursuant to a document deletion policy or otherwise. Brocade's counsel said she did not know the answer to these questions and also stated that, because Brocade was no longer in the case, Brocade was not willing to investigate these issues.

### B. THERE IS NO UNDERLYING ATTORNEY-CLIENT PRIVILEGE

The "common interest privilege" is not actually a privilege, it is a doctrine that permits sharing of attorney-client privileged material in certain circumstances. *Adkisson v. Jacobs Eng'g*, No. 3:15-CV-505-TAV, 2021 WL 149841, *9 (E.D. Tenn. Jan. 15, 2021). The burden of establishing the existence and non-waiver of the underlying privilege is on the party resisting discovery, and the privilege is "narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit." *Doe v. Hamilton Bd. of Educ.*, No. 1:16-CV-373 (lead); 1:16-CV-497, 2018 WL 542971, at *2 (E.D. Tenn. Jan. 24, 2018) (quoting *U.S. v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)). Here, Extreme's and Brocade's privilege assertions fail both at the underlying privilege level as well as the alleged "common interest" level.

#### 1. There Is No Valid And Unwaived Underlying Privilege In The Emails At Issue

As noted above, in 11 of the 13 email chains at issue, the core underlying email is a September 26, 2017 email chain between two Brocade employees (Larry Fitterer and Jim Parsons). Brocade did not include it on its privilege log, so any privilege that might have existed is waived. *Graff v. Haverhill*, 2012 WL 5495514, at *7 (S.D. Ohio Nov. 13, 2012); *see also First Horizon v. Houston Cas.*, 2016 WL 5867268, at *8 (W.D. Tenn. Oct. 5, 2016) ("As a general rule, when a party fails to assert a privilege on its privilege log, the privilege is waived."). This is particularly true here where Brocade did not even serve a privilege log until over a year-and-a-half past the deadline to respond to the discovery requests, and four months past this Court's ordered deadline for Brocade to "fully respond" to the discovery requests. *See Burlington N. v. U.S. Dist. Ct.*, 408 F.3d 1142, 1149 (9th Cir. 2005) ("sophisticated corporate litigant's" five month delay in providing privilege log alone justified a finding of waiver of the privilege); *Ritacca v. Abbott Labs.*, 203 F.R.D. 332, 335 (N.D. Ill. 2001) ("evidence of foot-dragging or a cavalier attitude towards following court orders and the discovery rules supports finding waiver"); *Brown v. Tax Ease Lien Servicing*, 2017 WL 6939338, at *14 (W.D. Ky. Feb. 16, 2017) (relying upon *Burlington* and *Ritacca* in its privilege waiver analysis).

Brocade claims it "does not have" the document and that its former employee, Larry Fitter, "may" have deleted his emails because he left Brocade. However, that purported explanation does not help Brocade. First, Extreme produced the September 26, 2017 email in redacted form on July 8, 2022, so Brocade knew of its existence, and Brocade could and should have logged it if Brocade wanted to assert that the email was protected by the attorney-client privilege. Second, Brocade has produced numerous documents in which Larry Fitterer is the custodian, dated both before and after September 26, 2017, so Brocade's claim to "not have the document" because Mr. Fitterer ended his employment with Brocade makes no sense. Finally, Brocade has claimed work product as far back as June 15, 2017 (which requires "anticipation of litigation") for documents relating to its transaction with Extreme. Thus, at the time of Mr. Fitterer's email, Brocade's position is that it was already anticipating litigation with respect to its transaction with Extreme (the same subject matter as Mr. Fitterer's email). *See, e.g., Lendingtree v. Zillow,* 2014 WL 1309305, at *10 (W.D.N.C. March 31, 2014) ("LendingTree's duty to preserve evidence arose no later than its assertion of the attorney work product privilege."); *Siani v. State Univ.*, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010) ("If it was reasonably foreseeable for work product

purposes, Siani argues, it was reasonably foreseeable for duty to preserve purposes. The court agrees."). Brocade cannot justify its failure to log a document that Brocade chose to permanently delete despite its duty to preserve the document. *See Siani,* 2010 WL 3170664, at *56 (duty to preserve arises "when a defendant first anticipates litigation").

In short, Brocade waived any privilege that it might have had over the September 26, 2017 email. Moreover, given that the common interest privilege requires a valid, unwaived, underlying privilege, even if there were a "common interest" here (and as explained below there is not), it cannot apply to the email chains between Extreme and Brocade that spawn from the September 26 email. Consequently, every email in Appendix C (except the few that are highlighted green) should be ordered unredacted.

## 2. The Common Interest Privilege Does Not Apply

There is also no common interest privilege between Extreme and Brocade, which is an independent basis for holding that all of the Brocade-Extreme communications in the 13 email chains at issue must be disclosed, including the September 26, 2017 email (regardless of whether Brocade waived by failing to log it).

As this District has held in an opinion Extreme itself relies upon,[2] the party asserting "common interest" privilege must not only prove an underlying, unwaived privilege, it must also prove "that the otherwise privileged information was disclosed due to actual or anticipated litigation [and] was made for the purpose of furthering a common interest in the actual or anticipated litigation." *Adkisson*, 2021 WL 149841, *9. Although this holding was in connection with a diversity case (and the present action involves both federal copyright and state law claims), it is also consistent with other district court authority within the Sixth Circuit involving federal question cases, as well as Tennessee law:

> [C]ommunications shared during a business undertaking lose their privileged status, even though such sharing helped address or ameliorate bona fide concerns about the legal implications of some aspect of the business venture. . . [T]he common interest doctrine does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation. . . . [A] concern about litigation does not transform [the parties'] common interest and enterprise into a legal as opposed to a commercial matter.

*Libbey Glass v. Oneida*, 197 F.R.D. 342, 348 (N.D. Ohio March 16, 1999) (internal citations omitted and emphasis added); *see also N. Am. Rescue v. Bound Tree*, 2010 WL 1873291, *4-5 (S.D. Ohio May 10, 2010) (rejecting common interest because "the parties must have a common legal, as opposed to commercial, interest"); *Boyd v. Comdata Network*, 88 S.W. 3d 203, 213 (Tenn. Ct. App. 2002) ("[T]he proponent must demonstrate . . . that the otherwise privileged information was disclosed due to actual or anticipated litigation [and] . . . was made for the purpose of furthering a common interest in the actual or anticipated litigation."); *Gammons*, 2023 WL 2531479, at *2 (questioning a party's assertion of the common interest doctrine where it was "unclear how communications were due to anticipated litigation" and where there was a lack evidence of a common interest agreement).

When Plaintiffs asked Extreme to identify the "common interest" agreement, Extreme referenced a February 14, 2017 confidentiality agreement and a 140-page Asset Purchase Agreement (herein "APA"), noting that "[w]e rely on that confidentiality agreement and the Asset Purchase Agreement in

---

[2] Extreme wrote in its meet and confer correspondence: '[C]ourts now routinely apply the common interest privilege to potential defendants . . . and others who have a community of interest in the subject matter of the communications.' [citing *Adkisson*]."

its entirety because it describes the common enterprise between Extreme and Brocade. But to focus our discussion we identify at least the following provisions of the Asset Purchase Agreement: Transferred Contracts, ¶ 2.8, ¶ 5.3, ¶¶ 6.1-6.3." Plaintiffs have submitted both contracts as **Exhibits 1** and **2**. Neither involves anything other than common *business* interests. They discuss no common legal issue that the contracting parties were going to jointly analyze, much less one associated with actual or anticipated litigation. For instance, the confidentiality agreement (Exhibit 1) just provides generic boilerplate language that points to no joint legal analysis or effort at all. *See* Ex. 1, at ¶ 6. The APA says nothing about any common interest either, and the paragraphs that Extreme points to are all about business interests, not any joint legal analysis or effort, much less one associated with a threat of litigation.

During the meet and confer, Extreme never contended that it and Broadcom had agreed to share common legal strategy, including over actual or anticipated litigation. Instead, Extreme's sole argument was that litigation need not be actual or anticipated for the common interest privilege to apply, citing two cases, *Dura Global v. Magna Donnelly*, 2008 WL 2217682 (E.D. Mich. May 27, 2008) and *U.S. v. BDO Seidman*, 492 F.3d 806 (2007). Neither case overrides the authority cited above, including from this District (*Adkisson*) that Extreme itself relied upon during the meet and confer. And *Dura* was careful to note that the communications at issue there "were made in connection with a common legal strategy rather than joint commercial venture." *Dura*, 2008 WL 2217682, at *3. The opposite is true here. And to the extent these cases are interpreted to stand for the proposition that merely having a common "business" interest suffices, it would sweep in virtually any business transaction, which is contrary to the Sixth Circuit and District rule that "[t]he privilege is narrowly construed." *U.S. v. Collis*, 128 F.3d at 320

In short, Extreme has not met its burden of proving that there is a common interest agreement that precludes discovery of the emails at issue here, *which is likely why Extreme's purported counter-party to the "common interest agreement"—Brocade—never asserted such an agreement with Extreme once in Brocade's ninety-page privilege log for this action.* Moreover, as noted above, the discovery requests at issue were served in December 2020, over a year-and-a-half before Extreme served its first privilege log, and that log did not identify "common interest privilege" as to any of the documents at issue. That invocation of the "common interest privilege" did not occur until almost another year passed (which was a year after this Court ordered "full and complete" responses to the discovery at issue). This delay alone justifies a finding of waiver of any "common interest privilege" – assuming there ever was one. *See Burlington*, 408 F.3d at 1149.

Finally, Extreme and Broadcom have selectively disclosed numerous communications between them, including their counsel. *In re Columbia/HCA Healthcare Corp. Billing Practices Litig.*, 293 F.3d 289, 302–03 (6th Cir.2002) (rejecting "any form of selective waiver") (citation omitted). Plaintiffs cannot compare these selectively-disclosed communications with the redacted ones due to the redactions. However, the Court need not analyze the propriety of the selective disclosure (which would require an in-camera review) given all of the other deficiencies herein. To the extent the Court finds that, based on the current record, there has been no waiver and there is both an unwaived attorney-client privilege and an unwaived common interest privilege, Plaintiffs respectfully request the opportunity to submit other Broadcom-Extreme communications that have been selectively disclosed so that the Court can compare them to the ones that Extreme has redacted.

## II. PRODUCTION OF ITEMS EXTREME HAS AGREED TO PRODUCE

After multiple meet and confers, Extreme agreed to produce responsive material with respect to ten long-outstanding discovery items.[3] However, Extreme would not provide dates certain for its production. After the Court agreed to the submission of position papers, Extreme finally provided dates certain for six of the ten items. See Email from Saurabh Prabhakar to John L. Wood dated August 30, 2023, *See* **Exhibit 3** (item numbers 4, 5, 6, 8, 9, and 10). Therefore, Plaintiffs only require the Court's assistance for the four items discussed below.

Discovery has been ongoing in this case since December 2020. Delays in discovery have already been the subject of a detailed Court Order on April 22, 2022 (Dkt. 131), followed by another Court order re-ordering Extreme to provide pivotal information about its products that contain SNMP's software (Dkt. 229). Expert reports are due on April 2, 2024, Dkt. 242, and extensive depositions need to take place before those expert reports, and the material Extreme has promised to produce will be pivotal to both the expert reports and percipient depositions that need to also take place before the expert reports. Discovery has been ongoing for nearly three years, and it is well past the time that Extreme should have produced the information below. Plaintiffs therefore request that the Court order Extreme to produce the information below (that Extreme has already agreed to provide) within 14 days.

### A. RFPS 135, 141 – 148. MARKETING DOCUMENTS.

Background: In December 2020, Plaintiffs served discovery that encompassed marketing documents for products containing SNMP's software. *See,* e.g., App. D, RFP 37. This Court ordered Extreme to fully respond by May 13, 2022. Dkt. 131. However, Extreme produced very few marketing documents. On June 6, 2022, so that there would be no confusion, Plaintiffs served RFPs 71 – 78 to more specifically describe the types of marketing materials sought. Extreme responded on July 6, 2022 and stated that it would produce responsive documents and be substantially complete by July 29, 2022.

On November 16, 2022, shortly after Plaintiffs learned that Extreme has been using SNMP's software in scores of products for over two decades that Extreme had never previously identified, Plaintiffs reissued RFPs 37 and 71-78 as RFPs 135 and 141-148, with no date limitation, to make it clear that SNMP sought marketing materials for all products containing SNMP's software for as far back as those products were sold. Extreme responded on December 16, 2022, stating that these RFPs were the same as RFPs 37, and 71 – 78 except for an expanded time frame, and represented that it "is not presently aware of any particular responsive, non-privileged document that has not already been produced."

When very few marketing documents were produced, Plaintiffs raised the issue with Extreme. Extreme promised that its production would be substantially complete by the end of May 2023. At the end of May, Extreme said it needed an additional six weeks to be substantially complete. On June 6, 2023, Plaintiffs asked for an assurance that the marketing documents would be produced by July 15, 2023. Extreme responded that it had already produced EXTREME-00913971 – EXTREME-00914136 (16 documents for which Robert Reason is custodian) and that "Extreme anticipates that there will be additional marketing documents in its upcoming productions."

Extreme produced additional documents July 15, 2023, but Plaintiffs notified Extreme in writing on July 28, 2023 that they still could not find the promised marketing documents. Extreme never responded to Plaintffs' letter, so they requested a meet and confer on August 7, 2023. The parties met and conferred on August 17, 2023, and Extreme represented that its production of marketing documents

---

[3] **Appendix D** contains SNMP's discovery requests at issue in Section II of this position paper.

was already "substantially complete." Extreme identified two custodians (Robert Reason and Senthil Sankrappan) that it searched for marketing documents. Mr. Reason is the custodian for 16 documents and those documents only cover a few of the scores of products that are at issue in this litigation. Mr. Sankrappan is only the custodian for emails. Extreme had no answer for the clearly missing marketing documents, but still insisted that its production was "substantially complete." Extreme finally agreed to investigate whether it had failed to produce responsive marketing documents but would not provide a date certain for the conclusion of its investigation, much less a date certain for completion of production. Therefore, Plaintiffs were left with no alternative but to seek the assistance of the Court.

After the Court granted SNMP's request for a submission, Extreme offered to resolve the issue as follows: "Extreme's investigation is nearly complete. Our investigation took time because a necessary Extreme employee was on leave until August 28. We have identified additional relevant marketing documents. We are in the middle of collecting those and expect to produce them by 9/15." Plaintiffs responded that Extreme was still not providing a date certain for production of all responsive marketing documents. Moreover, Plaintiffs noted that Extreme needed to disclose exactly what new marketing documents it had found and why those documents were not previously produced and commit to a date certain for substantial completion of all marketing documents. Extreme did not respond.

Relief Sought: The Court should order Extreme to fully produce all documents responsive to RFPs 135, and 141 – 148 within 14 days with a corporate representative's certification of completeness.

### B.  RFP 18.  PRODUCTION OF INSTALL IMAGES.

Background: An install image is a binary file that contains the software installed on Extreme's products. Plaintiffs requested Extreme's install images by RFP 18 which was issued on December 26, 2020, and on April 22, 2022, the Court ordered the install images produced (Dkt. 131, at I.B.1 and I.B.5). Extreme has represented that there are 200 install images readily available to its customers which it will produce by September 8, 2023. Extreme has also promised to provide a list of the other install images that it claims are too burdensome to produce with an explanation of why that is so, but Extreme will not provide a date certain for when it will provide this list and explanation.

Relief Sought: The Court should order Extreme to provide a list of all install images for products containing SNMP's software that Extreme claims are too burdensome to produce with a detailed explanation of the asserted burden within 14 days.

### C.  REQUEST FOR INSPECITON 5: PRODUCTION OF CLOUDIQ

Background: RFI 5, which Plaintiffs served on May 5, 2023, seeks "… a copy of all versions of ExtremeCloud IQ that Extreme provided or has provided in the past to monitor [products identified in response to Interrogatories 1 and 2]." On July 25, 2023, Extreme offered to produce a copy of its ExtremeCloud IQ Site Engine if Plaintiffs would agree to enter into a stipulation that does not require production of further monitoring solutions. Plaintiffs said that it could not agree to stipulate to that until they have the opportunity to analyze the particular ExtremeCloud IQ Site Engine Extreme was offering to produce (otherwise Plaintiffs would be agreeing it was representative of other programs without having even inspected it). On July 28, 2023, Extreme stated that it would circulate a proposed stipulation the following week, but it never did so despite Plaintiffs' repeated requests. After Plaintiffs made their August 24, 2023 request to the Court, Extreme finally promised to provide a proposed stipulation by September 11, 2023. However, given the delay (as well as the fact that Plaintiffs need to inspect the program before stipulating that it is representative of other programs), Extreme's production of ExtremeCloud IQ should not be conditioned on a stipulation or delayed any further.

Relief Sought: The Court should order Extreme to produce ExtremeCloud IQ Site Engine within 14 days. (The parties can continue to try to reach a stipulation but that should not delay production.)

### D. PRODUCTION OF SOURCE CODE PRINTOUTS

Background: The Protective Order for this case requires Extreme to produce source code that Plaintiffs' expert identifies in the Extreme source code production which contains the SNMP Research copyright notice. (Dkt. 93, p. 34). The source code files are required to be produced within seven days of Plaintiffs' request. Plaintiffs have requested and Extreme has produced at least 395,552 such source code files to date. While the Protective Order states that the "printouts shall be in the form of encrypted PDF files," (*id.*), due to the large number of files and the difficulty in converting the files to pdf format, the parties previously agreed to produce the files as natives with the Bates number indicated in the file name, and had been doing so since May of 2022. This conforms to the ESI Stipulation that allows for the production of native files. (Dkt. 52, p. A.8)

On July 19, 2023, Plaintiffs requested that Extreme produce additional source code files that Plaintiffs' expert identified as containing the SNMP Research copyright notice. Extreme refused to produce the source code files unless SNMP's expert converted all of the source code files to pdf. Plaintiffs explained the difficulty and burden in converting a large number of source code files to pdfs and explained how the parties (including Extreme) resolved this issue previously by producing the native files. Extreme would not explain why it was suddenly changing its position and insisted on changes to the Protective Order before it would proceed as it had previously. In order to resolve the dispute, Plaintiffs agreed to consider Extreme's proposed Protective Order changes. Plaintiffs sent Extreme a redline of the Protective Order on August 14, 2023 and still have not received any agreement (or counter) from Extreme. Plaintiffs do not agree that any changes to the Protective Order are needed for Extreme to proceed with the production requested, which is evidenced by the fact that all parties (including Extreme and former parties Broadcom and Brocade) have produced such source code in native form upon request numerous times in the past.

Relief Requested: That the Court order Extreme to produce the source code files in native format within 14 days, and to produce them in native format when requested in the future.

**RESPECTFULLY SUBMITTED** this 1st day of September, 2023,

By: /s/ *John L. Wood*
    John L. Wood, Esq. (BPR #027642)
    Cheryl G. Rice, Esq. (BPR #021145)
    Rameen J. Nasrollahi, Esq. (BPR #033458)
    EGERTON, McAFEE, ARMISTEAD & DAVIS, P.C.
    900 S. Gay Street, Suite 1400
    P.O. Box 2047
    Knoxville, TN 37902
    (865) 546-0500 (phone)
    (865) 525-5293 (facsimile)
    jwood@emlaw.com
    crice@emlaw.com
    rnasrollahi@emlaw.com


By: */s/ A. Matthew Ashley*
    A. Matthew Ashley (CA Bar. No. 198235)
    Morgan Chu (CA Bar. No. 70446)
    David Nimmer (CA Bar. No. 97170)
    Olivia L. Weber (CA Bar. No. 319918)
    IRELL & MANELLA LLP
    1800 Avenue of the Stars, Suite 900
    Los Angeles, California 90067-4276
    (310) 277-1010 (phone)
    (310) 203-7199 (facsimile)
    mchu@irell.com
    dnimmer@irell.com
    mashley@irell.com
    oweber@irell.com

    *Attorneys for Plaintiffs*
    *SNMP Research International, Inc. and*
    *SNMP Research, Inc.*