# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH INC. & SNMP RESEARCH INTERNATIONAL INC., | ) ) ) | Case No. 3:20-cv-451 |
| *Plaintiffs*, | ) ) | Judge Atchley |
| v. | ) ) | Magistrate Judge Poplin |
| EXTREME NETWORKS INC., | ) ) | |
| *Defendants*. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Dismiss the Amended Complaint [Doc. 275] filed by Extreme Networks, Inc. ("Extreme") and the Motion to Strike [Doc. 305] filed by Plaintiffs SNMP Research, Inc. ("SNMP Research"), and SNMP Research International, Inc. ("SNMP International"). For reasons that follow, Extreme's Motion to Dismiss [Doc. 275] will be **DENIED** and Plaintiffs' Motion to Strike [Doc. 305] will be **DENIED AS MOOT**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The following facts are taken from the Amended Complaint [Doc. 244], which the Court accepts as true for the purposes of a motion to dismiss. Plaintiffs allege that Dr. Jeffrey Case was instrumental in creating the Simple Network Management Protocol, a way for connected devices to communicate by sending and responding to messages. [Doc. 244 at ¶ 2].[1] Plaintiffs' technology is an implementation of the Simple Network Management Protocol. [*Id.* at ¶ 4]. SNMP Research is primarily a research and development company that creates, licenses, and supports products based on the Simple Network Management Protocol. [*Id.* at ¶ 30]. SNMP International is primarily

---

[1] For clarity, citation is made to the CM/ECF-stamped document and page number, rather than any internal pagination of the document. Where possible, the Court has included more specific references, such as to the numbered paragraphs of the Complaint.

responsible for sales, marketing, and sublicensing software under license from SNMP Research. [*Id.* at ¶ 31]. SNMP Research has registered copyrights for the software at issue in this case, all registered in 2011. [*Id.* at ¶ 33].

On or about March 10, 2001, Plaintiffs licensed some of their copyrighted software to Brocade [*Id.* at ¶ 34]. Plaintiffs allege that in or about 2017, Extreme acquired Brocade's data center switching, routing, and analytics business. [*Id.* at ¶ 42-43]. Brocade and Extreme then sought SNMP International's consent to permit an assignment of the license agreement from Brocade to Extreme, which SNMP International denied. [*Id.* at ¶¶ 44-45]. Plaintiffs allege that Brocade nonetheless disclosed Plaintiffs' source code, provided under the Brocade license, to Extreme, transferring a portion of Brocade's business that publicly distributed or sold products containing Plaintiffs' copyrighted software in binary form. [*Id.* at ¶ 46]. Extreme then began reproducing and publicly distributing products that contained Plaintiffs' copyrighted software and derivative works. [*Id.* at ¶ 47].

SNMP International also had an October 22, 2001, License Agreement with Extreme (the "License Agreement"). [*Id.* at ¶ 68]. The license allegedly limited Extreme's internal use and binary redistribution rights to the "Licensee's Network Switch project," which was "a single product . . . using a single particular combination of target processor, operating system, and development tools platform." [*Id.* at ¶ 70]. In short, the license only allowed use and redistribution of a single product. [*Id.* at ¶ 75]. Under that license, Extreme allegedly reported royalties on one product for 11 years. [*Id.* at ¶ 71].

During the course of this litigation, Plaintiffs say they discovered that Extreme has allegedly used and redistributed Plaintiffs' software licensed under the License in multiple "product classes," but never reported or paid royalties on any of these product classes. [*Id.* at ¶¶

72-73]. Plaintiffs allege that Extreme's royalty reports were largely false, as they reported units of just one product sold, when in fact Extreme had sold and is still selling "scores" of other products that allegedly contain Plaintiffs' software, provided to Extreme under the License Agreement. Plaintiffs allege that they purchased some of Extreme's products in 2022 and located their own software in the products, including Plaintiffs' copyright notice embedded in the products' code. [*Id.* at ¶ 91]. Plaintiffs further allege Extreme induced SNMP International to provide software updates for one licensed product, and then used those updates in multiple unlicensed products. [*Id.* at 151].

The Complaint alleges that Extreme breached the License Agreement in a number of ways, including, *inter alia*, by failing to report and pay royalties and exceeding its use and redistribution rights under the License Agreement. [*Id.* at ¶¶ 74-75]. Plaintiffs allege Extreme's use and redistribution beyond the scope of the License Agreement also constitute copyright infringement. [*Id.* at ¶ 76].

SNMP International sent Extreme a notice of breach of the License Agreement on September 19, 2022. [*Id.* at ¶ 80]. According to the Complaint, Extreme did not cure the breach. [*Id.* at ¶ 82]. SNMP International terminated Extreme's internal use and redistribution rights under the License Agreement and demanded that Extreme return or provide written certification of the destruction of all copies of the Program Source. [*Id.* at ¶ 84]. Extreme did not do so, which Plaintiffs contend is a further breach of the License Agreement.

Plaintiffs originally filed this action on October 26, 2020, asserting various claims against Broadcom, Inc., Brocade Communications Systems, LLC, and Extreme Networks, Inc. An Amended Complaint [Doc. 244] was filed on March 2, 2023. Plaintiffs reached a settlement with Broadcom and Brocade in mediation [Doc. 237] and an Agreed Order of Dismissal [Doc. 268] was

entered. The Amended Complaint [Doc. 244] (the "Complaint"), asserts three causes of action against Extreme: Count 3, Copyright Infringement; Count 5, Breach of the License Agreement; and Count 6, Fraud. [Doc. 244 at 26-32]. Plaintiffs' fraud claim is predicated on, *inter alia*, Extreme's allegedly false reporting of the products sold pursuant to the License Agreement.

In its Motion to Dismiss [Doc. 275], Extreme seeks the following: (1) dismissal of any copyright infringement damages that are predicated on acts that occurred more than three years before Plaintiffs filed suit; (2) dismissal of any claims for breach of Section 16 of the License Agreement; (3) dismissal of any claims seeking damages at the [-.- %][2] rate, compounded monthly, as set forth in § 24 of the License Agreement; and (4) dismissal of the fraud claim.

## II.   STANDARD OF REVIEW

On a motion to dismiss, the Court "must accept as true 'well pleaded facts' set forth in the complaint." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999) (citation omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Generally, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "The [plaintiff's] factual allegations, assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). "Mere labels and conclusions are not enough; the allegations must contain 'factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.*

---

[2] To avoid the necessity of filing a redacted and unredacted version of this Memorandum Opinion, the Court omits the interest rate provided by the License Agreement. The exact number is not relevant to the Court's resolution of the instant motion. It is included in the License Agreement, filed under seal, at Doc. 246-2 at 13.

4

at 575 (quoting *Ashcroft*, 556 U.S. at 678). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678, and the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

## III.   ANALYSIS

The Court will address the issues raised in a slightly different order than the parties, discussing (A) the timeliness of the copyright claims, (B) the "monthly penalty" provision of § 24 of the License Agreement, (C) alleged breach of Source confidentiality provisions, and finally, (D) Plaintiff's fraud claim.

### A.  Copyright Claims

Extreme contends that the Court should dismiss all copyright claims based on acts that occurred more than 3 years prior to the lawsuit, i.e. October 26, 2017. According to Extreme, the Supreme Court of the United States has limited the recovery available to copyright plaintiffs to retrospective relief only three years back from the time of suit. [Doc. 275-1 at 13]; *see Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014). Plaintiffs contend that *Petrella*'s holding is inapplicable to this case, so the Sixth Circuit's normal discovery rule applies, making their claims timely.

A civil action for copyright infringement must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). "A cause of action accrues when a plaintiff knows of the infringement or is chargeable with such knowledge." *Bridgeport Music, Inc. v. Rhyme Syndicate Music*, 376 F.3d 615, 621 (6th Cir. 2004). "[E]ach act of infringement is a distinct harm" so "the statute of limitations bars infringement claims that accrued more than three years before the suit was filed, but does not preclude infringement claims that accrued within the statutory period." *Id.*;

5

*see Petrella*, 572 U.S. at 670 ("Under [the separate-accrual] rule, when a defendant commits successive violations, the statute of limitations runs separately from each violation.").

Extreme contends that the Supreme Court's decision in *Petrella* changed the chronological scope of relief available to copyright plaintiffs. In *Petrella*, the Court considered whether the equitable defense of laches could bar relief on an otherwise timely copyright infringement claim. 572 U.S. at 667. The Court observed that the three-year limitations period barred "relief of any kind for conduct occurring prior to the three-year limitations period." *Id.* As to conduct occurring within the three-year limitations period, the Court held that laches could not be invoked "to preclude adjudication of a claim for damages brought within the three-year window." *Id.*

The *Petrella* Court repeatedly referenced the "occurrence" of infringement as initiating the limitations period. Yet it acknowledged that while it had not passed on the question, "nine Courts of Appeals have adopted, as an alternative to the incident of injury rule, a 'discovery rule,' which starts the limitations period when the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim." *Id.* at 671, n. 4 (quoting *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433 (3d Cir. 2009)). *Petrella* did not further address the discovery rule, as the case did not involve a statute of limitations challenge.

Perhaps unsurprisingly, the Courts of Appeals have split on how to apply the reasoning of *Petrella* to statute of limitations challenges to copyright claims. Extreme contends that the United States Court of Appeals for the Second Circuit has the right approach: "Despite not passing on the propriety of the discovery rule in *Petrella*, the Supreme Court explicitly delimited damages to the three years prior to the commencement of a copyright infringement action." *Sohm v. Scholastic, Inc.*, 959 F.3d 39, 51 (2d Cir. 2020) (granting in part and denying in part cross-motions for summary judgment). In *Sohm*, the Second Circuit first affirmed the continuing viability of the

discovery rule post-*Petrella*, explaining that "an infringement claim does not 'accrue' until the copyright holder discovers, or with due diligence should have discovered, the infringement." *Id.* at 50 (quoting *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014)). Yet the court held that regardless of whether the injury or discovery rule applies, an infringement is actionable within three years, and only three years, of its occurrence, and the infringer is insulated from liability for earlier infringements of the same work. *Id.* at 51. The Second Circuit stated: "[W]e must apply the discover[y] rule to determine when a copyright infringement claim accrues, but a three-year lookback period from the time a suit is filed to determine the extent of the relief of available." *Id.* at 52. In other words, the accrual of an infringement claim and the damages available are different questions.

Plaintiffs maintain that *Petrella* did not silently overrule the precedent of nine circuits, rendering the discovery rule obsolete. According to Plaintiff, the United States Court of Appeals for the Ninth Circuit laid out the correct framework in *Starz Entertainment, LLC, v. MGM Domestic Television Distribution, LLC*, 39 F.4th 1236, 1238 (9th Cir. 2022). There, the Ninth Circuit explained that *Petrella* "was solely concerned with laches – a doctrine addressing concerns about delay when plaintiffs know of their claims, but sleep on their legal rights – it could not have intended its language to address the situation where a copyright holder does not know about the infringing act to which the discovery rule, not the incident of injury rule, applies." *Id.* at 1242. Because the Supreme Court acknowledged that "incident of injury" was not the only accrual rule that federal courts apply, the Ninth Circuit concluded that *Petrella* "said nothing else about the discovery rule's continued viability." *Id.*

The court then rejected the Second Circuit's determination that *Petrella* "imposed a damages bar separate from the statute of limitations." *Id.* The court held: "[T]he discovery rule for

7

accrual allows copyright holders to recover damages for all infringing acts that occurred before they knew or reasonably should have known of the infringing incidents and [] the three-year limitations period runs from the date the claim accrued, *i.e.*, from the date when the copyright holder knew or should have known of the infringement." *Id.* at 1244. The court explained that "[t]here is no reason for a discovery rule if damages for infringing acts of which the copyright owner reasonably becomes aware years later are unavailable." *Id.*; *see also Martinelli v. Hearst Newspapers, LLC*, 65 F.4th 231, 239-240 (5th Cir. 2023) ("*Petrella*'s general statements about statutes of limitation . . . leave room for caselaw holding that the discovery rule applies to § 507(b).").

The Court finds the Ninth Circuit's reasoning and approach highly persuasive: "The Supreme Court did not create a damages bar separate from the statute of limitations in *Petrella*," *Id.* at 1245, nor did it invalidate the discovery rule in copyright actions. Rather, it seems that the Court's discussion of occurrences of infringement referred to the general rule of claim accrual, while acknowledging that most courts apply the discovery rule in copyright infringement actions. Read from this perspective, the Court's analysis is a straightforward application of the text of the Copyright Act, barring a civil infringement action "unless it is commenced within three years after the claim **accrued**." 17 U.S.C. § 507(b). Moreover, when the Supreme Court "neither expressly nor implicitly overrules [a] prior Sixth Circuit decision," the district court must be "extremely carefully in concluding that circuit precedent is no longer good law." *United States v. Wehunt*, 230 F. Supp. 3d 838, 846 (E.D. Tenn. 2017) (citation omitted, cleaned up). "[S]ub silentio overruling of a Court of Appeals decision by a Supreme Court case resting on different facts is a rare occurrence," requiring "strong, objective evidence that the higher court would repudiate its holding if given a chance to do so." *Id.* (citation omitted, cleaned up).

The Supreme Court has recently taken up the question posed by this circuit split: "Whether, under the discovery accrual rule applied by the circuit courts and the Copyright Act's statute of limitations for civil actions, 17 U.S.C. § 507(b), a copyright plaintiff can recover damages for acts that allegedly occurred more than three years before the filing of a lawsuit." *Warner Chappell Music v. Nealy*, No. 22-1078, 2023 WL 6319656 (Sept. 29, 2023). Should the Supreme Court's decision in *Warner Chappell Music* materially alter the statute of limitations analysis for copyright claims, the Court will presumably provide guidance to the lower courts on how to apply its holding. In that instance, this Court will entertain a timely and narrowly-tailored motion to alter or amend this Memorandum Opinion and Order.[3]

### B. Monthly Penalty Provision

Extreme moves to dismiss claims based on the License Agreement's monthly penalty provision, arguing the interest rate is usurious and unenforceable as against public policy. Because Extreme's motion ignores the clear language of the contract and seeks dismissal of a remedy provision, not a claim for relief, it will be denied.

Section 24 of the License Agreement provides:

> In addition to all other remedies, all payments received later than 30 days after the invoice date will be "subject to a monthly penalty of [redacted] percent of the amount due, compounded monthly, **or the maximum allowed by law, whichever is less**.

[Doc. 246-2 at 13; Doc. 281 at 25] (emphasis added). Extreme contends that the maximum applicable rate provided for by Tennessee law at the time of the agreement was 9.93% per year, so the monthly rate is usurious and constitutes a penalty unenforceable as against public policy.

---

[3] Any motion to alter or amend that attempts to relitigate issues already decided in this Memorandum Opinion and Order will be stricken.

9

[Doc. 275-1 at 22]. As Plaintiffs point out, the clause cannot be unawlful because the monthly compound interest can never exceed the maximum amount allowed by law. [Doc. 281 at 24].

First, Plaintiffs argue that Extreme is "seek[ing] advance opinions on how to calculate portions of amounts owed in the event breach is found to have occurred." [Doc. 281 at 24]. Extreme says this is wrong – it is merely asking "the Court to rule, as a matter of law, that a contractual rate of [redacted]%, compounded monthly, cannot legally constitute the basis for a claim of damages." [Doc. 289 at 25]. There is no daylight between these statements. The contractual interest rate for calculating damages is not the "basis" of a breach of contract claim. The type of relief available is not an element of a breach of contract claim at all.

While the Sixth Circuit does not appear to have spoken directly to this issue, numerous courts have held that a Rule 12 motion is directed at claims, not the relief available should the plaintiff prevail on those claims. As the Seventh Circuit explained, "the demand is not itself a part of the plaintiff's claim . . . and so failure to specify relief to which the plaintiff was entitled would not warrant dismissal under rule 12(b)(6)." *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002); 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1255 (2d ed. 1990) ("The sufficiency of a pleading is tested by the Rule 8(a)(2) statement of the claim for relief and the demand for judgment is not considered part of the claim for that purpose."). By its language, Rule 12(b)(6) authorizes dismissal for "failure to state a *claim* upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Moratorium Now! v. Detroit 300 Conservancy*, 2015 WL 11005026, at *2 (E.D. Mich. July 22, 2015) (holding that a "plaintiff's demand for relief is irrelevant" to a Rule 12(b)(6) inquiry "because the demand is not itself a part of plaintiff's claim" (cleaned up)).

Indeed, even "an incomplete demand for relief does not warrant dismissal of a properly stated claim." *Jones v. Butler*, 663 F. App'x 468, 470 (7th Cir. 2016). Under Rule 54(c), all

judgments other than default judgments must "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c).

In *Bontkowski*, the Seventh Circuit thus held that even if the plaintiff were seeking relief to which he was not legally entitled, "this would not justify dismissal of the suit." *Id.* Numerous cases have followed *Bontkowski*, finding a request to limit damages premature at the pleadings stage. *DTE Elec. Co. v. Toshiba Am. Energy Sys. Corp.*, 2023 WL 1453128, at *4 (E.D. Mich. Feb. 1, 2023) ("[T]he Court agrees . . . that Defendants' request for it to limit damages is premature at this stage."); *Jarvis v. Oakland-Macomb Obstetrics & Gynecology, P.C.*, 2022 WL 1177165, at *12 (E.D. Mich. April 20, 2022) ("Rules 12(b)(6) and 12(f) are not appropriate means for challenging the remedies plaintiff seeks."); *Zimmerman v. 3M Co.*, 542 F. Supp. 3d 673, 684 (W.D. Mich. 2021) ("Dismissal would be warranted only where the plaintiff wants the improper relief sought in the complaint or nothing at all." (cleaned up)); *Clarke v. Amazon.com Servs., LLC*, 2023 WL 7003220, at *5 (E.D. Ky. Oct. 24, 2023) ("Rule 12(b)(6) is tailored to test the sufficiency of the claims in a complaint, not the types of relief sought."). Only where "a plaintiff *exclusively* seeks an unobtainable remedy" is "dismissal of the entire claim under Rule 12(b)(6) . . . appropriate because the claim – whatever it may be – is not one for which 'relief can be granted.'" *Clarke*, 2023 WL 7003220, at *5.

The Court agrees that "[t]he pleading stage is not the appropriate time for the Court to make rulings on the amount or type of damages or other relief which may be available in the event [Plaintiffs] prevail on any of their claims." *Nutrimost Drs., LLC, v. Sterling*, 2018 WL 1570624, at *9 (E.D. Mich. Mar. 30, 2018). Indeed, even if Plaintiffs had never sought to recover the monthly penalty in § 24, Rule 54(c) appears to require that relief to be included in the judgment if the evidence ultimately showed that they were entitled to such relief.

11

More obviously, Extreme's position completely ignores the language of the contract, which ensures that the applicable interest rate can never be higher than the maximum allowed by law. In its opening brief, Extreme attempts to hide the ball, omitting "or the maximum allowed by law, whichever is less" in all but two references to this provision. [Doc. 275-1 at 15].[4] Extreme never reckons with this critical phrase. Its reply brief also sidesteps the issue, focusing on how the monthly rate provided in the contract is usurious and/or an unenforceable penalty. Extreme does not dispute that a contract may set an interest rate at the maximum amount allowed by law. [Doc. 289 at 24]. Yet it wholly fails to explain how an interest rate that is expressly limited to the maximum amount allowed by law could be usurious or an unenforceable penalty. Plaintiffs cannot "choose," as Extreme suggests, to enforce a lower interest rate; the contract sets the interest rate and unambiguously caps it at the maximum amount allowed by law. Extreme's argument on this issue borders on frivolous.

The elements of a breach of contract action are generally (1) the existence of an enforceable contract; (2) nonperformance/breach of the contract, and (3) damages caused by the breach. *See, e.g., Thornton v. Dutch Naturals Processing, LLC*, 629 F. Supp. 3d 777, 787 (M.D. Tenn. 2022) (elements of breach of contract claim under Tennessee law). Extreme does not argue that Plaintiffs have failed to state a breach of contract claim upon which relief could be granted. By its plain language, Rule 12(b)(6) authorizes the dismissal of claims, not remedies. It is not a vehicle for limiting a defendant's potential damages exposure. Extreme's Motion to Dismiss [Doc. 275] will be **DENIED** as to the monthly penalty provision.

## C. Source Confidentiality Provisions

Extreme next contends that Plaintiffs have not plausibly alleged a breach of the License

---

[4] The full sentence is only provided 12 pages earlier, in the summary of SNMP's amended complaint, and in the final paragraph of Extreme's argument on this issue. [Doc. 275-1 at 10, 26].

Agreement that would allow them to recover "all revenues" that Extreme received over the course of over twenty years for the sales of its network switching products. [Doc. 275-1 at 17]. The parties appear to agree that this remedy is only available if there is a breach of the "Source confidentiality provisions" of the License Agreement. [Doc. 275-1 at 17; Doc. 281 at 20]. Extreme contends that Plaintiffs have not alleged such a breach, and therefore seeks dismissal of "this subset of the breach of contract claim." [Doc. 275-1 at 18, n.4].

Plaintiffs respond that asking the Court to interpret "isolated provisions of a contract, none of which completely resolve a claim for relief, is not a proper function of a Rule 12(b)(6) motion." [Doc. 281 at 18]. They further contend that Extreme's interpretation of the License Agreement is substantively wrong because Extreme's Source confidentiality obligations included ensuring that its own use of the Program Source did not exceed the scope of the license. The Court finds that the parties' dispute is not appropriate for resolution at the pleadings stage for distinct but related reasons.

### 1. **Procedural Propriety of Extreme's Motion**

First, the Court questions the propriety of dismissing what even Extreme describes as a "subset" of the breach of contract claim. Extreme's motion asks the Court to "dismiss" Plaintiffs' claim for "any amount received" because Plaintiffs have not alleged a breach of § 16. [Doc. 289 at 17]. Initially, § 16(b) of the License Agreement is a default provision, delineating the remedies available for breach of other obligations in the Agreement. [Doc. 275-1 at 17]. The alleged breach would be of § 8.[5] As the Court has explained, Rule 12(b)(6) is not an appropriate vehicle for limiting damages. The gravamen of Extreme's argument on this issue is that, should Plaintiffs

---

[5] Extreme's motion and reply repeatedly reference a "breach" of § 16, the "Default" section of the Agreement. [See, e.g., Doc. 289 at 19, Doc. 275-1 at 17]. It is nonetheless clear that Plaintiffs assert a breach of § 8 that gives rise to the remedies set forth in § 16.

13

prevail, they are not entitled to the remedy in § 16(b). Still, Extreme does argue that Plaintiffs do not allege a breach of the Source confidentiality provisions and the parties agree this is a requirement for recovery of "any amount received" under § 16(b).

There is support for the proposition that "[i]t is not the Court's role on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) to issue piecemeal dismissals of parts of claims." *Morris v. Medtronic, Inc.*, 2023 WL 2387497, *1 (E.D. Mo. March 7, 2923); *Driscoll Firm v. Fed. City L. Grp.*, 2023 WL 2375218, at * 8 (N.D. Ill. Mar. 6, 2023) ("Dismissal of a claim pursuant to Rule 12(b)(6) is an all-or-nothing proposition; we cannot rule on parts of a claim like we can on summary judgment."). Extreme does not contend that the Complaint fails to state a claim for breach of contract, only that it does not adequately allege a breach of the Source confidentiality provisions. As a practical matter, courts at times grant Rule 12(b)(6) motions where it is clear on the face of the pleadings that the plaintiff has not alleged facts sufficient to support a particular theory of liability or a breach of one provision of a contract. The Court is not persuaded that this is an appropriate use of Rule 12(b)(6). However, the Court need not resolve the motion on procedure alone, because the parties' substantive arguments confirm that the issue is not appropriate for resolution at the pleadings stage.

### 2. **Interpretation of the License Agreement**

#### a. Contract Provisions & Positions of the Parties

The first and fourth paragraphs of § 8 of the License Agreement are at issue:

8. Confidentiality and Non-Disclosure

. . . Licensee shall keep the Program Source received from SNMP, and the Sources of any Derivative Works, whether designated confidential or not, in the strictest confidence and will exercise the highest degree of care to safeguard the confidentiality of the Program Source and the Sources of any Derivative Works.

14

. . .[6]

The Licensee agrees that it will take appropriate action with its employees and consultants, by agreement or otherwise, to satisfy its obligations under this License Agreement with respect to use, copying, transference, protection, and security of the Program Source, and any other materials provided to the Licensee by SNMP as a result of this License Agreement.

[Doc. 246-2 at 6-7]. Extreme contends that its "Source confidentiality" obligations are contained only in the first paragraph, while Plaintiffs contend that both paragraphs constitute Source confidentiality provisions.

This dispute is significant because the License Agreement provides specific remedies for violation of Source confidentiality provisions. Section 16 of the License Agreement provides, in pertinent part:

16. Default

**If Licensee fails to observe, keep, or perform any Source confidentiality provisions** of this License Agreement required to be observed, kept, or performed by the Licensee and does not correct such condition within five days after receiving written notice thereof from SNMP Research, SNMP Research shall have the right to exercise any one or more of the following remedies:

. . .

(b) **In the event of unauthorized use or distribution of the Program Source,** SNMP Research shall have the right in addition to its other remedies, to recover from the Licensee an amount not less than the sum that Licensor would have charged the person or persons obtaining the benefit of such unauthorized use of the Program Source, **plus any amount received by the Licensee on account of such unauthorized use** . . .

[Doc. 246-2 at 9; Doc. 275-1 at 18] (emphasis added). The next paragraph of § 16 sets out remedies for breaches of the License Agreement "other than breach of Source confidentiality." [*Id.*].

---

[6] The Agreement then provides that Licensee's obligation to maintain confidentiality survives the termination of the Agreement and lists situations where the confidentiality obligation does not apply, e.g., public disclosure that is not caused by the Licensee's fault or breach. [*Id.*].

15

The parties agree that recovery of "any amount received" under § 16(b) requires a breach of the Source confidentiality provisions of the Agreement and unauthorized use or distribution of the Program Source. But Plaintiffs contend that unauthorized use or distribution necessarily constitutes a breach of Source confidentiality obligations, while Extreme argues that any unauthorized use or distribution of Program Source must actually violate Source confidentiality provisions. They also disagree on what constitutes a "Source confidentiality provision," a term that is not defined in the Agreement.

Extreme contends that its Source confidentiality obligations are laid out only in the first paragraph of § 8, requiring it to "keep the Program Source received from SNMP . . . in the strictest confidence" and "exercise the highest degree of care to safeguard the confidentiality of the Program Source and the Sources of any Derivative Works." [Doc. 275-1 at 18-19]. According to Extreme, Plaintiffs allege that Extreme distributes products containing Plaintiffs' copyrighted *software*, not the source code itself. [*Id.* at 19]. Because the Complaint does not allege disclosure of the Program Source, it does not allege a breach of Source confidentiality provisions.

Plaintiffs argue that the second quoted section of § 8 is also a Source confidentiality provision, requiring Extreme to "take appropriate action with its employees and consultants . . . to satisfy its obligations under this License Agreement with respect to use . . . of the Program Source." [Doc. 246-2 at 7]. Extreme's Source confidentiality obligations therefore "include not using – including through Extreme's own employees and consultants – the Program Source beyond the license's permitted scope." [Doc. 281 at 20]. Plaintiffs contend that Extreme violated this obligation by, *inter alia*, internally using Plaintiffs' software, including the Program Source, beyond the scope of the License Agreement. [*Id.*]. This entitles Plaintiffs to recover, in addition to other remedies, "any amount received by Licensee on account of such unauthorized use," as

16

provided in § 16(b) of the Agreement. This argument mirrors the allegations of the Complaint. [Doc. 244 at ¶¶ 77-79].

Extreme responds that the fourth paragraph of § 8 has nothing to do with source code confidentiality, so it cannot be a "Source confidentiality provision." [Doc. 289 at 21]. Extreme argues that § 16(b) predicates recovery of "any amounts received" not on a violation of § 8 generally ("Confidentiality and Non-Disclosure"), but specifically on a violation of the Source confidentiality provisions. If "Source confidentiality provisions" have the same meaning as the entirety of § 8, the term has no independent meaning. Extreme points out that § 8 includes provisions that have no obvious connection to Source confidentiality, including obligations regarding the use and copying of "any other materials provided to the Licensee." [*Id.* at 22].

Further, in their ordinary usage, "confidentiality" and "use" are two different issues, and use does not necessarily impact confidentiality. [*Id.* at 20]. According to Extreme, use/distribution of source code only destroys confidentiality if it results in disclosure. [*Id.*]. And Plaintiffs do not allege that Extreme's use or distribution resulted in disclosure of the source code. [*Id.*].

Relatedly, Extreme contends that "unauthorized use" of the Program Source cannot automatically be a violation of Source confidentiality provisions, because then a Source confidentiality violation could occur with no consideration of "whether the confidentiality of the source code was actually violated." [*Id.* at 22]. Extreme also says that if Plaintiffs were correct, there would be no need to separate § 16 into two parts – one related to Source confidentiality and the second to other breaches.

Plaintiffs argue that their construction does not create surplusage. [Doc. 281 at 21]. There are multiple ways to violate the Agreement's Source confidentiality provisions. Unauthorized use or distribution is just one of those ways. According to Plaintiffs, it makes sense that an additional

17

monetary right – proceeds of unauthorized use or distribution – would be tied to a particular type of Source confidentiality breach, i.e., unauthorized use or distribution of Program Source. Under this interpretation, "unauthorized use or distribution" of Program Source automatically constitutes a breach of Source confidentiality provisions because it is a subset of that broader category of violations.

b. **Analysis of Source Confidentiality Provision**

The Sixth Circuit has explained that "[i]f a court finds that the contract's language has one unambiguous meaning . . . the court may properly grant a motion to dismiss a breach-of-contract claim." *Wilkerson v. American Family Ins. Co.*, 997 F.3d 666, 672 (6th Cir. 2021) (affirming dismissal where defendant's interpretation of the contract was "the only reasonable one"). "Where a dispute is based on the interpretation of a contract, and the contract's terms are clear, there is no issue of fact to be determined and thus dismissal on 12(b)(6) grounds <u>might</u> be appropriate." *Electronic Merchant Sys. LLC v. Gaal*, 58 F.4th 877, 882 (6th Cir. 2023) (cleaned up) (emphasis added).

Despite this authorization, many courts take a conservative approach, declining to resolve contract interpretation disputes at the pleadings stage. *See Miranda v. Xavier University*, 594 F. Supp. 3d 961, 971 (S.D. Ohio 2022) ("Generally, interpretation of contracts – especially ambiguous ones – is a question of fact inappropriate for resolution on a motion to dismiss."); *In re Nat'l Century Fin. Ents., Inc., Inv. Litigation*, 2006 WL 2849784, *7 (S.D. Ohio Oct. 3, 2006) ("The Court, though, will not resolve a conflict in contract interpretation on a motion to dismiss."); *see also Ajuba Int'l, LLC v. Saharia*, 871 F. Supp. 2d 671, 689 (E.D. Mich. 2012) ("In reviewing a Rule 12(b)(6) motion to dismiss, the Court may resolve issues of contract interpretation when the contract is properly before the Court, but must resolve all ambiguities in the contract in

18

Plaintiffs' favor."); *W. Refining Yorktown, Inc. v. BP Corp. N. Am. Inc.*, 618 F. Supp. 2d 513, 526-27 (E.D. Va. 2009) (denying Rule 12(b)(6) motion where parties advanced reasonable interpretations of ambiguous contract provisions and extrinsic evidence was required to resolve the ambiguity).

At minimum, the contract must be unambiguous for the Court to interpret it at the pleadings stage. So Extreme has to show that the relevant provisions of the License Agreement are unambiguous, i.e., that the issue can be resolved as a matter of law. It must also carry its burden of demonstrating that Plaintiffs' allegations are insufficient to state a claim for breach of contract. *See Ross v. Kirkpatrick*, 2021 WL 533753, *8 (M.D. Tenn. Feb. 21, 2021) (denying motion to dismiss where Defendant failed to show (i) that the contract was unambiguous such that it could be interpreted as a matter of law and (ii) that plaintiff had not plausibly alleged a breach of contract).

Extreme has not demonstrated that the relevant contract language has one unambiguous meaning and that Plaintiffs have failed to plausibly allege a breach of Source confidentiality provisions of the License Agreement. Both parties offer plausible interpretations of what constitutes a breach of the Source confidentiality provisions, a term that is not defined by the contract. Though the parties agree that these obligations are in § 8 of the Agreement, they do not agree on what those obligations are. While Extreme is correct that § 8 addresses "Confidentiality and Non-Disclosure," not just "Source confidentiality,"[7] the paragraph Plaintiffs rely on is hardly off topic – it requires Extreme to take appropriate action with its employees to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source. This provision arguably complements the first paragraph of § 8, which requires Extreme

---

[7] It is worth noting that the Agreement also provides that the section captions "are for convenience only" and "not to be construed to define or limit any of the terms therein." [Doc. 246-2 at 10].

to keep the Program Source confidential in the first place. On the other hand, if all of § 8 relates to Source confidentiality, § 16(b) would seem to impose penalties for "Source confidentiality" violations that have no clear connection to Source confidentiality. Nonetheless, the Court cannot say, as a matter of law, that this second provision is not a "Source confidentiality provision."

Second, Extreme fails to establish that "unauthorized use" of Program Source is not one type of Source confidentiality violation. Nothing about the structure of § 16 forecloses this possibility. The subsections are not, for example, structured as a list of conditions, requiring Source confidentiality "and" unauthorized use, which might suggest grammatically that they are distinct but can overlap. And Plaintiffs' construction of unauthorized use and distribution of the Program Source only renders the Source confidentiality provision superfluous if you assume that unauthorized use and distribution can occur without a Source confidentiality breach. If Source confidentiality fully encompasses unauthorized use and distribution of Program Source, there is no surplusage, only a specific remedy for one type of Source confidentiality breach. At the same time, § 16 is about Source confidentiality violations, so it makes little sense for § 16(b) to apply in the absence of an actual Source confidentiality violation.

It is similarly unclear why § 16's remedies for breaches other than Source confidentiality are rendered superfluous by Plaintiffs' construction. The second half of § 16 provides remedies for breaches of confidentiality, proprietary, intellectual, payment, and financial provisions of the Agreement other than a breach of Source confidentiality. Notably, this section does not mention unauthorized use or distribution of Program Source, despite mirroring the Source confidentiality breach provisions in most other respects. It tracks much of the language of the Source confidentiality breach section, omitting (i) the right to seek injunctive relief for actual or threatened breach and (ii) additional monetary remedies for unauthorized use or distribution of the Program

Source. If unauthorized use and distribution of the Program Source could occur <u>without</u> a Source confidentiality breach, one might expect the second half of § 16 to more closely mirror the first. That is, to provide additional remedies where unauthorized use and distribution occur in the absence of a Source confidentiality breach.

In short, Defendants have not shown that there is only one reasonable interpretation of the contract. The contract does not define "Source confidentiality provisions," and indeed uses the term only twice, both in the default section. So the parties' arguments turn on the interaction between different provisions in the contract, relying at times on their working knowledge of the relevant technology and how that technology is used and distributed. Extreme argues, for example, that its customers receive networking equipment that runs Extreme's software in binary form, so customers do not receive source code from anyone. [Doc. 289 at 20-21]. Examples like this are helpful to the Court's understanding of the issues, but they are not based on allegations in the Complaint. They hint, instead, at fact-finding.

Finally, to the extent Extreme contends that Plaintiffs have failed to state a claim for breach of the Source confidentiality provisions even under their own interpretation of the contract, the Court disagrees. The Complaint alleges that "Extreme used and copied the Program Source for products that do not conform with the authorized combination of target processor, operating system, and development tools platform allowed under the 2001 Extreme License." [Doc. 244 at ¶ 75]. It alleges that Extreme's confidentiality obligations included taking appropriate action with employees and consultants to comply with its obligations regarding use, copying, etc., of the Program Source. [*Id.* at ¶ 77]. Finally, it alleges Extreme breached this duty by "using (which includes distributing internally within Extreme and to Extreme's contractors) and copying the Program Source outside the authorized use and copying permitted" by the License Agreement. [*Id.*

at ¶ 78]. Particularly where the details of Extreme's alleged use would by uniquely within its knowledge, these allegations are sufficient to state a claim for breach of the Source confidentiality provisions under Plaintiffs' proposed interpretation.

At this stage, the Court cannot say that there is "one unambiguous meaning" to the contract. The parties operate in a highly specialized industry and offer dramatically different interpretations of the contract. *See Allied Erecting and Dismantling Co., Inc. v. U.S. Steel Corp.*, 2013 WL 5442276, *3 (N.D. Ohio 2013) ("[B]ecause of the complexity of the case and the intertwined nature of the relevant contracts, and because of the wide divergence in the parties' own interpretations of these contracts, the Court prefers to exercise caution, rather than inadvertently engaging in unwarranted and improper fact findings at the motion to dismiss stage."). The Court makes no finding as to whether § 16 or § 8 are ambiguous. The Court's holding is simply that Defendant has not shown that (i) the relevant contract language has one unambiguous meaning and (ii) Plaintiffs have failed to state a claim for breach of Source confidentiality provisions.

### D. Economic Loss Doctrine

After briefing on the motion to dismiss, the Tennessee Supreme Court issued a decision in *Commercial Painting Co., Inc. v. Weitz Company, LLC*, 676 S.W.3d 527 (Tenn. 2023): "We hold the economic loss doctrine only applies in products liability cases and should not be extended to other claims." *Id.* at 529. Extreme moved to dismiss Plaintiff's fraud claim based on the economic loss doctrine. *Commercial Painting* makes clear that "the economic loss doctrine should only apply in products liability cases." *Id.* at 540.

In its supplemental briefing, Extreme nonetheless argues that *Commercial Painting* "did not address . . . whether the economic loss doctrine applies to tort claims arising from goods contracts." [Doc. 329]. It most certainly did. The Court said, multiple times, that the economic loss

doctrine applies **only** in products liability cases and "extension of the economic loss doctrine beyond products liability cases is not needed." 676 S.W.3d at 529, 542. Extreme contends that despite this clear language, "read properly" the decision "assumes that the economic loss doctrine **does** apply to goods contracts." [Doc. 329 at 4].

There is no serious basis for Extreme's argument. The Supreme Court of the State of Tennessee is more than capable of issuing a narrow ruling when it chooses. In *Commercial Painting*, it instead stated a broader rule, limiting the applicability of the economic loss doctrine to products liability cases. The Court will not undercut this unambiguous holding. Counsel for Extreme is cautioned that while zealous advocacy is encouraged, arguments that have no colorable basis in law or fact may subject counsel to sanctions. *See King v. Whitmer*, 71 F. 4th 511, 528 (6th Cir. 2023) ("A legal contention is frivolous if it is 'obviously without merit' under existing law and unsupported by a good-faith argument to change or extend the law.").

### E. Motion to Strike

As Extreme acknowledges, its sole argument for dismissal of the fraud claim is that the claim is barred by the economic loss doctrine. It did not challenge the sufficiency of the fraud allegations. [Doc. 308 at 1]. In response, Plaintiffs urged the Court to wait for the Tennessee Supreme Court to decide *Commercial Painting* before ruling on this issue. In the alternative, Plaintiffs argued that dismissal was inappropriate based on current Tennessee law. Plaintiffs referenced punitive damages almost as an aside. They argued that Tennessee law allows recovery of punitive damages in connection with a breach of contract claim if the breaching party's conduct was intentional, fraudulent, malicious, or reckless. [Doc. 281 at 30]. So, Plaintiffs argued, they are entitled to punitive damages even if their fraud claim is dismissed. [*Id.*]. Extreme's reply brief argued that Plaintiffs are not entitled to punitive damages as to their breach of contract claim

because the factual allegations of the Complaint do not plausibly allege that Extreme acted intentionally, fraudulently, malicious, or recklessly. [Doc. 289 at 32].

Plaintiffs move to strike this section of Extreme's reply or, in the alternative, for leave to file a sur-reply. [Doc. 305]. According to Plaintiffs, Extreme's reply brief argues, for the first time, that Plaintiffs have not adequately alleged facts to support entitlement to punitive damages. [*Id.* at 1-2]. Extreme responds that it did, in fact, challenge punitive damages – the fraud claim is the only claim for which Plaintiffs requested or could request punitive damages, so there was no need to challenge the sufficiency of the punitive damages allegation because the fraud claim is barred by the economic loss doctrine. [Doc. 308]. Plaintiffs disagree and suggest they should be granted leave to amend if the Court decides that they have not adequately alleged punitive damages as to their breach of contract and/or fraud claims.

This issue is not properly before the Court. Extreme did not challenge the sufficiency of the punitive damages allegations in its motion to dismiss. Rather, it challenged the fraud claim as legally barred, so any challenge to punitive damages was only by implication. Similarly, Plaintiffs' argument that they are entitled to punitive damages on the breach of contract claim was not responsive to Extreme's motion or relevant to the viability of the fraud claim. Extreme's contention that Plaintiffs are not entitled to punitive damages is technically responsive to Plaintiffs' argument, but both arguments are beyond the scope of the original motion to dismiss. Ordinarily, arguments raised for the first time in reply briefs are waived. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008). In short, both parties raise issues that are not relevant or logically connected to the resolution of the original motion to dismiss.

Before filing a motion to dismiss, parties are required to confer and determine whether an amendment could cure purported deficiencies in the pleadings. This prevents unnecessary motion

practice and, at least ideally, streamlines the presentation of issues to the Court. Expanding the scope of a motion to dismiss after the fact prevents the parties from resolving issues by agreement or amendment. This is but one of the many reasons that issues cannot be raised for the first time on reply. For example, Extreme contends that Plaintiffs' Complaint only seeks punitive damages as to the fraud claim. While the Court will not speak to the sufficiency or scope of Plaintiffs' punitive damages request, this is the type of technical deficiency that conferral and amendment are designed to address. And as the Court has explained, a Rule 12 motion is generally not the appropriate method for challenging damages requests.[8]

If Extreme wished to challenge the sufficiency of Plaintiffs' punitive damages request, it needed to do so in its original motion and brief. Yet Plaintiffs' reference to punitive damages was also unrelated to the arguments Extreme made in its motion. And none of the parties' arguments on this issue pertain to the Court's resolution of the fraud claim. Accordingly, the Court will not consider either parties' arguments regarding punitive damages. Plaintiffs' Motion to Strike [Doc. 305] will be **DENIED AS MOOT**.

## IV.    CONCLUSION

Accordingly, the Motion to Dismiss the Amended Complaint [Doc. 275] of Extreme Networks, Inc., is **DENIED** and the Motion to Strike [Doc. 305] of Plaintiffs SNMP Research, Inc. and SNMP Research International, Inc. is **DENIED AS MOOT**.

**SO ORDERED**.

*/s/ Charles E. Atchley, Jr.*
CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE

---

[8] The Court acknowledges that Extreme is correct that courts often rule on the sufficiency of punitive damages allegations on Rule 12 motions. This is perhaps because punitive damages are uniquely treated more like "claims" than other forms of relief and require specific allegations. Regardless, the issue has not been properly presented to the Court.

25