UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:20-CV-451-CEA-DCP |
| EXTREME NETWORKS, INC. | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

The parties appeared before the Court on November 1, 2023, for an informal discovery dispute conference pursuant to this Court's Order [Doc. 218]. Attorneys Olivia Weber and John Wood appeared on behalf of Plaintiffs. Attorneys John Neukom, Saurabh Prabhakar, and Charles Lee appeared on behalf of Defendant Extreme Networks, Inc. ("Extreme"). Attorney Alison Plessman appeared on behalf former parties, Broadcom Inc., and Brocade Communications Systems, LLC (collectively, "Brocade"). Following the November 1 hearing, the Court directed the parties to file supplemental briefing [*See* Doc. 330]. For the reasons stated below, the Court finds that Brocade did not waive the attorney-client privilege over the emails referenced below, that Brocade and Extreme shared a common interest arrangement, and that Extreme did not waive its privilege when it cited three emails in response to an interrogatory. With respect to the Extreme-Avaya communications, the Court requires supplemental briefing as noted below.

## I. BACKGROUND

The parties do not dispute the facts relating to their discovery issues. In February 2017, Extreme and Brocade executed a confidentiality agreement leading up to Extreme's acquisition of Brocade [Extreme's Brief Re Common Interest Communications and SNMPR's Issue Nos. 2 and 3 p. 2 (citation omitted) (hereinafter, "Extreme's Sept. 1 Position Statement")]. According to the Declaration of Daren Dulac ("Dulac Declaration"), the Senior Director of Corporate Development and Business Development, these parties "entered into a mutual confidentiality agreement on February 14, 2017[,]" wherein they "agreed to maintain confidential information exchanged between them in furtherance of effectuating that transaction" [Dulac Declaration ¶ 3]. On March 29, 2017, Extreme and Brocade entered into an Asset Purchase Agreement ("APA"), the goal of which "was for Extreme to acquire the Brocade Business along with any contracts and licenses necessary to operate that business" [*Id*. ¶ 4]. Dulac states:

> The parties agreed to use reasonable best efforts to take all appropriate actions and do all things necessary and proper to consummate the transaction contemplated by the APA. That would involve, for example, ensuring that all appropriate licenses were transferred or assigned to Extreme. The parties again agreed to maintain confidential information exchanged between them in furtherance of effectuating that transaction and agreed that February 2014 confidentiality agreement between the parties remained in effect.

[*Id*.].

Later in 2017, Jennifer Snipes ("Ms. Snipes"), the associate general counsel for Extreme, and Larry Fitterer ("Mr. Fitterer"), Brocade's in-house attorney, jointly requested that Plaintiffs assign the 2001 License between SNMP Research International, Inc, and Brocade Communications Systems, Inc. dated March 10, 2001, as amended, ("Agreement") to Extreme [Extreme's Sept. 1 Position Statement, Ex. B]. On September 22, 2017, Mr. Wood, Plaintiffs'

counsel, responded to the email that the Agreement was not assignable, but he needed to know more about Extreme and Brocade's transaction [*Id*.]. After several email exchanges with Attorney Wood, on September 26, 2017, Mr. Fitterer sought legal advice from Jim Parsons ("Mr. Parsons"), Brocade's in-house intellectual property counsel, relating to Attorney Wood's interpretation of the Agreement [Extreme's Sept. 1 Position Statement p. 2]. On October 11, 2017, Mr. Fitterer shared Mr. Parson's advice with Ms. Snipes and Linda Chan [Extreme's Sept. 1 Position Statement, Ex. B].[1]

Plaintiffs filed their lawsuit on October 26, 2020 [Doc. 1]. On December 2020, Plaintiffs served a Request for Production of Documents ("RFP") [Plaintiffs' Position Statement Re Issues Raised in August 24, 2023 Email p. 2 (hereinafter, "Plaintiffs' Sept. 1 Position Statement")]. In response to the RFPs, Brocade served a privilege log, but it did not include the emails referenced above [*Id*.]. When Extreme provided its privilege log on July 8, 2022, it asserted "legal advice of counsel regarding contract negotiations" over the above emails [Plaintiffs' Sept. 1 Position Statement, Ex. B].[2] On March 22, 2023, Plaintiffs responded:

> Extreme has redacted portions of communications between employees of Brocade and Extreme under the claim of attorney-client privilege. Communications exchanged between Brocade and Extreme are not protected by the attorney-client privilege . . . [and] Extreme has no standing to assert the attorney-client privilege on behalf of Brocade, and to the extent the communications may have been privileged . . . any privilege was waived when the communications were shared with Extreme.

---

[1] According to the Declaration of Peter Lam ("Lam Declaration"), Vice President and Deputy General Counsel of Intellectual Property at Extreme, "Linda Chan was a temporary contract attorney in Extreme's legal department from September 2017 to November 2017" [Lam Declaration ¶¶ 1, 5].

[2] The document numbers are 507–512, 530, 689, 696, 777, 819, 820, and 839 [Plaintiffs' Sept. 1 Position Statement, Appendix B]. At this point, there were thirteen emails in dispute.

[Plaintiffs' Sept. 1 Position Statement p. 2].  On March 28, 2023, United States District Judge Charles Atchley entered an order dismissing the claims against Brocade in light of the Plaintiffs and Brocade's settlement agreement [Doc. 268].

On August 16, 2023, Brocade sent Plaintiffs an email, claiming privilege on the email chain dated September 26, 2017, "that is part of 11 of the 13 email chains at issue" [Plaintiffs' Sept. 1 Position Statement p. 2].[3]  Specifically, Brocade claimed privilege on the "email dated September 26, 2017[,] between two former Brocade attorneys ([Mr.] Fitterer and [Mr.] Parsons)[,]" which was, according to Brocade, "sent to facilitate the rendition of confidential legal advice and analysis relating to a license agreement"  [Former Parties Broadcom Inc. and Brocade Communication Systems LLC's Submission Regarding Documents Listed on the Privilege Log of Defendant Extreme p. 2 (citation omitted) (hereinafter, "Brocade's Sept. 1 Position Statement)].  In addition, Brocade claimed privilege on the "email dated September 26, 2017[,] sent by [Mr.] Parsons to Larry Fitterer and a former Brocade employee (Maggie Mingione)," which, according to Brocade, "contain[s] confidential legal advice and analysis regarding the same license agreement" [*Id.* (citing the Blum Declaration ¶ 2)].

In response to Brocade's assertion, Plaintiffs inquired as to why these documents were not listed on Brocade's privilege log [Plaintiffs' Sept. 1 Position Statement p. 2].  Brocade explained:

> The privileged emails in question were not identified on Broadcom's privilege log because they were not in Broadcom's possession at the time of its document collection or review in this case.  In connection with this submission, Broadcom has performed a search for the September 26, 2017 emails, but they have not been located (alone or as part of an email chain).  This is likely because the Brocade employees who sent or received the emails—Jim

---

[3]      Brocade claimed privilege on the following document documents: 507–512, 530, 577, 819, 820, and 839 [Declaration of Philip Brum ¶ 2 (hereinafter, "Brum Declaration")].  Philip Blum is the Deputy General Counsel for Brocade [*Id.* ¶ 1].

Parsons, Larry Fitterer, and Maggie Mingione—all left the company several years ago (*i.e.*, well before this litigation commenced).

[Brocade's Sept. 1 Position Statement p. 3 (citing the Brum Declaration ¶ 6)].

On August 24, 2023, Plaintiffs sent an email alerting Chambers to the parties' dispute regarding the emails referenced above. During the briefing on these issues, the parties encountered additional disputes. Specifically, on September 7, 2023, Extreme asserted the common interest privilege on eight documents that were mainly between it and Brocade and that it had already produced—three of which were referenced in an interrogatory [Plaintiffs' Position Statement Re Extreme's New Privilege Assertions p. 2 (hereinafter, "Plaintiffs' October 5 Position Statement")]. On September 12, 2023, Extreme clawed back eight additional documents that included communications between Extreme and Brocade and Extreme and Avaya, Inc. ("Avaya") [*Id.*]. And nine days later, Extreme asserted privilege on over 101 more documents—100 of which are between Extreme and Avaya and one between Extreme and Brocade [*Id.*].

## II.    PROCEDURAL HISTORY

The parties appeared for a hearing on November 1, 2023 [*See* Doc. 333]. The parties clarified that there are a total of twenty-two emails between Brocade and Extreme that Extreme claims are privileged [*Id.* at 37]. During the hearing, Plaintiffs acknowledged that the email dated September 26, 2017, between two Brocade employees was protected by the attorney-client privilege [*Id.* at 36–37]. Plaintiffs argued, however, that Brocade had waived any attorney-client privilege protection with respect to the email on September 26, 2017, because it did not produce a privilege log asserting this protection [*Id.* at 38–40]. In addition, Plaintiffs argued that Extreme had "not carried its burden to demonstrate that a common-interest privilege exists" [*Id.* at 40]. Plaintiffs asserted "that a mere commercial interest is insufficient to give rise to the common-interest privilege" [*Id.* at 41–42]. Instead, Plaintiffs argued, Extreme must show that it has a

5

common legal interest with Brocade [*Id*. at 42]. Noting their sophistication, Plaintiffs stated that Extreme and Brocade could have drafted "a common-interest agreement to reflect joint legal analysis of the common legal purpose[,]" but they did not [*Id*. at 44].

In addition, Plaintiffs pointed out that Extreme had referenced three documents (ending in 693, 891, and 860) in response to an interrogatory [*Id*. at 53–54]. According to Plaintiffs, Extreme selectively disclosed those documents, which were about "the scope of the SNMP license and whether it's assignable" [*Id*. at 55].

Plaintiffs also challenged Extreme's assertion of the attorney-client privilege with respect to its communications with Avaya [*Id*. at 47]. Plaintiffs stated that through a bankruptcy sale in 2017, Avaya sold some of its assets to Extreme [*Id*.]. In about 100 documents, Plaintiffs submitted that there is only one attorney-client communication, which is a communication between Avaya and its in-house counsel, Richard Hamilton, III [*Id*. at 47–48]. Plaintiffs claimed that Avaya's disclosure of this communication to Extreme, even as part of an asset sale, waives that privilege [*Id*. at 48]. Plaintiffs also challenged Extreme's argument that a transfer of control of Avaya warrants transferring the attorney-client privilege [*Id*.]. Asserting that the facts do not support that Extreme has control over Avaya, Plaintiff noted that Extreme only "purchased a division of the Avaya assets" [*Id*. at 48–49]. Plaintiffs concluded that Extreme had not met its burden in showing that the attorney-client privileged had been transferred to it [*Id*. at 51].

With respect to the remaining emails between Avaya and Extreme, Plaintiffs argued that "all of them are between Extreme employees and Avaya and Luxoft employees" [*Id*. at 51]. Plaintiffs argued that the "privilege only extends to agents of lawyers who are employed to provide legal advice" [*Id*. at 52]. Citing to the asset purchase agreement between Avaya and Extreme,

Plaintiffs stated that by its express terms, "this particular sale did not obligate either party to waive privilege" [*Id*. at 52–53].

Extreme responded that Brocade did not waive the privilege over the September 26, 2017 emails between its attorneys, noting that it accepts Brocade's representation that it did not have the documents [*Id*. at 60]. Extreme further argued that, regardless, it had the documents and produced them in redacted form [*Id*.]. Extreme asserted that Brocade had no obligation to produce a privilege log because Extreme produced one [*Id*.]. According to Extreme, "We produced. We redacted it. We then noted these items on our privilege log." [*Id*.]. At the time of logging, Extreme argued that it was not required to claim the common-interest privilege [*Id*. at 60–61]. Further, Extreme claimed that the subject emails between Brocade and Extreme are protected, noting that the emails relate to "[intellectual property] rights, licensee rights, contract rights in which Brocade and Extreme, attorneys for the same explicitly on the email chain, are wanting one result" [*Id*. at 63–64].

With respect to the dispute over the Avaya communications, Extreme asserted that it boiled down to whether it "purchase[d] enough of the business or the division from Avaya such that they became the transferee or the inheritor or the acquirer of the attorney/client privilege" [*Id*. at 66]. In other words, Extreme noted, the question is whether it bought control of Avaya [*Id*. at 67].

Brocade asserted that it had settled its claims with Plaintiffs and that the parties agreed to a broad release [*Id*. at 73]. In light of the release, Brocade argued that it should not be obligated to litigate discovery disputes [*Id*. at 73–74]. Brocade also asserted that it has no legal duty to review Extreme's document production for redacted documents and to log the privilege, arguing it has no legal duty to log documents that it did not possess [*Id*. at 75–76].

After hearing from the parties, the Court requested supplemental briefing to address three topics: (1) Whether Extreme, by responding to the interrogatory responses, intentionally waived the privilege pursuant to Rule 502(a), (2) Whether there was a transfer of privilege from Avaya and Extreme, and (3) Extreme's claim of privilege with respect to Avaya's employee communications.

Extreme filed its brief on November 15, 2023 [Doc. 334], and Plaintiffs filed their brief on December 15, 2023 [Doc. 347].

## III.    STANDARD OF REVIEW

Extreme has asserted two privileges: (1) attorney-client privilege, and (2) the common interest privilege.  In *Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir.1998), *cert. denied by* 525 U.S. 820 (1998), the Sixth Circuit Court of Appeals set forth the elements of the attorney-client privilege as follows:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

Courts narrowly construe the attorney-client privilege, "because it 'reduces the amount of information discoverable during the course of a lawsuit.'" *Carhartt, Inc. v. Innovative Textiles, Inc.*, 333 F.R.D. 113, 116 (E.D. Mich. 2019) (citing *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)).  "The person asserting the privilege has the burden of establishing its existence." *In re Columbia/HCA Healthcare Corp.*, 192 F.R.D. 575, 577 (M.D. Tenn. 2000) (citation omitted), *aff'd sub nom. by In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289 (6th Cir. 2002).  Disclosure to a third party generally waives the attorney-client privilege. *Id*. (citation omitted).

8

The common interest privilege is not a standalone privilege, but instead operates to extend the attorney-client privilege. *In re Com. Money Ctr., Inc., Equip. Lease Litig.*, 248 F.R.D. 532, 536 (N.D. Ohio 2008). "[T]he common interest doctrine provides that 'attorneys facing a common litigation opponent may exchange privileged communications and attorney work product . . . without waiving either privilege.'" *Id.* (quoting *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 106 F.R.D. 187, 191 (N.D. Ill. 1985)). The party asserting the privilege "must prove an agreement among its members to share information arising out of a common legal interest in litigation." *John B. v. Goetz*, 879 F. Supp. 2d 787, 898 (M.D. Tenn. 2010) (citation omitted).

## IV.    ANALYSIS

The parties do not dispute that the emails dated September 26, 2017, between the Brocade attorneys are protected by the attorney-client privilege. Plaintiffs assert, however, that Brocade waived this privilege by failing to produce them on its privilege log. In addition, Plaintiffs argue that to the extent the attorney-client privilege has not been waived, Extreme has not met its burden in showing that it shares a common interest with Brocade. Further, Plaintiffs claims that Extreme waived any privilege by referencing the Bates numbers of three emails in response to an interrogatory.

The Court will address these issues in the order listed and then will review the background of the Extreme-Avaya communications matter, which will require further briefing by the parties and will be addressed by separate order at a later date.

### A.    Whether Brocade Waived the Privilege?

Plaintiffs contend that the "core underlying email is a September 26, 2017 email chain between two Brocade employees (Larry Fitter and Jim Parsons)" [Plaintiffs' Sept. 1 Position Statement p. 3]. Because Brocade did not include the September 26 email chain in its privilege

log, Plaintiffs assert that it waived the attorney-client privilege. Plaintiffs also assert that Brocade's privilege log was untimely. Plaintiffs claim that Brocade's explanation (i.e., it did not have the documents) does not support its claim because Extreme produced the September 26, 2017, email in redacted form on July 8, 2022, and Brocade should have logged it at that time. In addition, Plaintiffs assert that Brocade has produced other documents in which Mr. Fitterer is the custodian—both before and after September 26, 2017. At the time of the September 26 email, Plaintiffs contends that Brocade anticipated litigation, thus triggering its duty to preserve discovery.

A party asserting the attorney-client privilege must comply with Rule 26(b)(5)(A) of the Federal Rules of Civil Procedure. Rule 26(b)(5)(A) states:

> When a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material, the party must: (i) expressly make the claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed--and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim.

Fed. R. Civ. P. 26(b)(5)(A). "As a general rule, when a party fails to assert a privilege on its privilege log, the privilege is waived." *First Horizon Nat'l Corp. v. Houston Cas. Co.*, No. 2:15-CV-2235-SHL-DKV, 2016 WL 5867268, at *8 (W.D. Tenn. Oct. 5, 2016) (citing *Graff v. Haverhill N. Coke Co.*, No. 1:09-CV-670, 2012 WL 5495514, at *8 (S.D. Ohio Nov. 13, 2012)).

Brocade claims that it did not possess the September 26 email chain, and while Plaintiffs question this claim [*see* Plaintiffs' Position Sept. 1 Position Statement pp. 3–4], the Court declines to find that Brocade waived the privilege log under these circumstances. As Extreme explained at the hearing, "We produced it. We redacted it. We then noted these items on [our] privilege log" [Doc. 333 p. 60]. Given that the emails were on a privilege log, albeit the privilege log of Extreme,

who also claims privilege in the email chain, the Court declines to find waiver under these circumstances. *See generally ContiTech USA, Inc. v. McLaughlin Freight Servs., Inc.*, No. 320CV00075SMRSBJ, 2021 WL 6618846, at *3 (S.D. Iowa Nov. 24, 2021) ("Any member of a common-interest arrangement may invoke the privilege against third persons, even if the communication in question was not originally made by or addressed to the objecting member.").

## B.    Whether Brocade and Extreme Share a Common Interest?

The parties disagree on whether Brocade and Extreme share a common interest. Plaintiffs assert that Brocade and Extreme share a common business interest, which is not the same as a common legal interest. According to Plaintiffs, in order for Extreme to establish a common interest, it must show that the "privileged information was disclosed due to actual or anticipated litigation [and] was made for the purpose of furthering a common interest in the actual or anticipated litigation" [Plaintiffs' Sept. 1 Position Statement p. 4 (quoting *Adkisson v. Jacobs Eng'g*, No. 3:15-CV-505-TAV, 2021 WL 149841, at *9 (E.D. Tenn. Jan. 15, 2021))]. Plaintiffs contend that Extreme has not met its burden.

Extreme states that "the seller (Brocade) shared with the purchaser (Extreme) privileged communications with Brocade's intellectual property counsel regarding the interpretation and assignability of the 2001 Agreement as a part of the parties' joint effort to finalize the Brocade Business acquisition" [Extreme's Sept. 1 Position Statement p. 3]. Extreme denies that anticipating litigation is a requirement to assert the common interest privilege.

According to Dulac's Declaration:

> 3.    During the Brocade Business transaction, Extreme, Brocade, and Broadcom (Brocade's parent) entered into a mutual confidentiality agreement on February 14, 2017. Broadcom was a party to the agreement because in November 2016, Broadcom had announced its acquisition of Brocade. Together Brocade and Broadcom had agreed to divest the

11

Brocade Business to Extreme. Under the agreement, the parties agreed that they had a commonality of interest in effectuating the transfer of the Brocade Business to Extreme. The parties agreed to maintain confidential information exchanged between them in furtherance of effectuating that transaction.

4. On March 29, 2017, Extreme agreed to acquire the Brocade Business from Broadcom and entered into an Asset Purchase Agreement ("APA") with Broadcom. The goal of the APA was for Extreme to acquire the Brocade Business along with any contracts and licenses necessary to operate that business. The parties agreed to use reasonable best efforts to take all appropriate actions and do all things necessary and proper to consummate the transaction contemplated by the APA. That would involve, for example, ensuring that all appropriate licenses were transferred or assigned to Extreme. The parties agreed to maintain confidential information exchanged between them in furtherance of effectuating that transaction and agreed that February 2017 confidentiality agreement between the parties remained in effect.

5. Once the APA was signed on March 29, 2017, Extreme, Brocade, Broadcom began to work together to consummate the transaction so that the Brocade Business would become a part of Extreme. For example, the parties negotiated and executed a Transition Services Agreement before the close of the transaction, under which they agreed to work together on certain operations of the Brocade Business (e.g., human resources, engineering, finance, and real estate) for up to twelve months following the close of the transaction.

6. On October 3, 2017, Extreme and Brocade signed another APA with similar terms as the March 2017 APA. I understand that this was done because Broadcom's acquisition of Brocade had not closed; thus, to timely complete the Extreme transaction, Broadcom gave Brocade its consent to execute the new APA with similar terms as the March 2017 APA with Extreme. Under the new APA, the transaction was scheduled to close on October 30, 2017. On and after that date, the Brocade Business became part of Extreme and the employees of Brocade Business became Extreme employees.

[Dulac Declaration ¶¶ 3–6].[4]

As summarized above, later in 2017, Ms. Snipes, Extreme's counsel, and Mr. Fitterer, Brocade's counsel, requested that SNMP Research International, Inc. assign its Agreement with Brocade Communications Systems, Inc. to Extreme [Plaintiffs' Sep. 1 Position Statement, Ex. C]. Mr. Wood responded to that request stating that the Agreement was not assignable but requested more information on the Brocade-Extreme transaction [*Id*.]. Mr. Fitter then sought legal advice from Mr. Parsons, Brocade's counsel, and then Mr. Fitter shared that advice with counsel for Extreme [*Id*.].

As explained in *Elvis Presley Enterprises, Inc. v. City of Memphis*, No. 2:18-CV-02718, 2020 WL 4015476, at *7 (W.D. Tenn. July 16, 2020):

> The common interest privilege may be claimed in three instances: (1) when a single attorney represents multiple clients (*i.e.*, joint client privilege); (2) when parties share a common defense, typically in the criminal context (*i.e.*, joint defense privilege); or (3) when two or more clients share a common legal or commercial interest and share legal advice with respect to that common interest (*i.e.*, common interest arrangement).

*Id*. (citation and footnote omitted). Extreme relies on the third instance—common interest arrangement [*See* Extreme's Sept. 1 Position Statement pp. 3–4]. There are three elements to establishing the common interest arrangement: (1) the communications were made by separate parties in the course of a matter of common interest; (2) the communications were designed to further that effort; and (3) the underlying privilege exists and has not been waived." *Elvis Presley Enters., Inc.*, 2020 WL 4015476, at *8; *see Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342, 347–48 (N.D. Ohio 1999) ("In theory, the common interest doctrine encourages parties working with a common purpose to benefit from the guidance of counsel, and thus avoid pitfalls that

---

[4]     As part of its Position Statement, Extreme submitted several APAs and the parties' confidentiality agreement [Extreme's Position Statement Ex. C, D, and E].

otherwise might impair their progress toward their shared objective."). "A mere commercial interest is not enough." *Harper v. Everson*, No. 3:15-CV-00575-JHM, 2016 WL 8201785, at *7 (W.D. Ky. June 27, 2016).

Plaintiffs assert the Brocade and Extreme did not anticipate litigation at the time of their communications. However, "[t]he weight of authority holds that litigation need not be actual or imminent for communications to be within the common interest doctrine." *Dura Glob., Techs., Inc. v. Magna Donnelly Corp.*, No. CIV.A. 07CV10945-DT, 2008 WL 2217682, at *3 (E.D. Mich. May 27, 2008) (citation omitted), *objections overruled*, No. 07-10945, 2008 WL 2695668 (E.D. Mich. July 2, 2008); *see also United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007) ("The weight of authority favors our conclusion that litigation need not be actual or imminent for communications to be within the common interest doctrine. At least five of our sister circuits have recognized that the threat of litigation is not a prerequisite to the common interest doctrine." (collecting cases)).[5]

Even so, "a joint business strategy which happens to include as one of its elements a concern about litigation" is not protected. *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 220 (W.D. Ky. 2006) (quoting *Bank Brussels Lambert v. Credit Lyonnais,* 160 F.R.D. 437, 447 (S.D. N.Y. 1995)); *see also DS Waters of Am., Inc. v. Fontis Water, Inc.*, No. 1:11-CV-2635-MHS, 2012 WL 13009015, at *4 (N.D. Ga. May 1, 2012) ("The key consideration is that 'the nature of the interest be identical, not similar, and be legal, not solely commercial.'" (quoting *Cheeves v.*

---

[5]    Plaintiffs cite by *Adkisson v. Jacobs Eng'g Grp., Inc.*, No. 3:13-CV-505-TAV-HBG, 2021 WL 149841, at *9 (E.D. Tenn. Jan. 15, 2021) in support of their position that litigation must be anticipated. But the court in *Adkisson* applied Tennessee law, and one of the elements in establishing the common interest privilege is "that the disclosure was made for the purpose of furthering a common interest in the actual or anticipated litigation[.]" *Id.* (quoting *Smedley v. Lambert*, No. 3:12-cv-003, 2013 WL 1333320, at *2–3 (M.D. Tenn. Mar. 29, 2013)).

*Southern Clays, Inc.*, 128 F.R.D. 128, 130 (M.D. Ga. 1989)). In other words, "the common interest must be legal in nature." *Maxtena, Inc. v. Marks*, No. CIV.A. DKC 11-0945, 2013 WL 1316386, at *7 (D. Md. Mar. 26, 2013) (quoting *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B,* 230 F.R.D. 398, 416 (D. Md. 2005)). "What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal." *Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp.*, No. 19CIV9193PGGSLC, 2023 WL 315072, at *8 (S.D. N.Y. Jan. 19, 2023) (quoting *In re F.T.C.*, No. M18-304 (RJW), 2001 WL 396522, at *3 (S.D. N.Y. Apr. 19, 2001)).

Based on the facts of this case, the Court finds that Extreme has satisfied its burden in showing that it and Brocade shared a common interest toward a legal goal. The Court agrees with Plaintiffs that Extreme's and Brocade's commercial transaction does not establish a common interest arrangement. *See Bank Brussels Lambert*, 160 F.R.D. at 447–48 (finding that while the parties who shared the communications had a common concern about the threat of shareholder litigation, this was not sufficient to establish a common interest arrangement because there was no evidence that they had formulated a joint legal strategy). As Mr. Dulac states in his declaration, however, that during the transaction, "[t]he parties agreed to use reasonable best efforts to take all appropriate actions and do all things necessary and proper to consummate the transaction contemplated by the APA. That would involve, for example, ensuring that all appropriate licenses were transferred or assigned to Extreme" [Dulac Declaration ¶ 4]. The common legal strategy was to transfer appropriate licenses to Extreme—the subject of the withheld emails. After Mr. Wood noted that the Agreement was not assignable, Mr. Fitter sought legal advice from Mr. Parsons, and then Mr. Fritter shared that advice with Extreme's counsel. *Maxtena, Inc.*, 2013 WL 1316386, at *8 ("Here, by contrast [to *Bank Brussels Lambert*], the involvement of both the State's and [the

plaintiff's] counsel in the second group of emails constitutes evidence of a coordinated legal strategy to minimize the possibility of future litigation."); *cf. Bank Brussels Lambert*, 160 F.R.D. at 448 ("Nor is there any suggestion that counsel from that firm coordinated its legal efforts with attorneys for any other [of the plaintiffs]"); *Libbey Glass, Inc.*, 197 F.R.D. at 348 ("Because, in this instance, only one participant used the services of counsel, the policy of gaining prior legal advice was only partially fulfilled."). Notably, Extreme and Brocade also entered into a confidentiality agreement prior to sharing the legal advice. *Cf. Libbey Glass, Inc.*, 197 F.R.D. at 348 (noting that the defendant or the third-parties took no steps "to ensure that the privileged communications, though shared, would remain confidential").

And while there does appear to be some overlap between Brocade and Extreme's business transaction and their legal interest, "such an overlap does not 'negate the effect of the legal interest in establishing a community of interest.'" *Dura Glob., Techs., Inc.*, 2008 WL 2217682, at *3 (E.D. Mich. May 27, 2008) (quoting *In re Regents of Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (citation omitted), *objections overruled by* No. 07-10945, 2008 WL 2695668 (E.D. Mich. July 2, 2008)); *see Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, No. 13 CIV. 8997 JPO GWG, 2015 WL 3450045, at *3 (S.D. N.Y. May 28, 2015) (explaining that the "distinction between a common legal, as opposed to commercial, interest is somewhat murky") (quoting *In re Subpoena Duces Tecum Served on N.Y. Marine & Gen. Ins.* Co., No. M8-85 MHD, 1997 WL 599399, at *4 (S.D. N.Y. Sept. 26, 1997)). Under these facts, the Court finds that Extreme has satisfied its burden to establish a common interest arrangement with Brocade.[6]

---

[6] Plaintiffs assert that Extreme also waived the common interest arrangement privilege for failing to identify it on the privilege log [Plaintiffs' Sept. 1 Position Statement p. 5]. The Court declines to find that Extreme waived the privilege by not specifically asserting it in its privilege log. *DC Comics v. Pac. Pictures Corp.*, No. CV1003633ODWRZX, 2012 WL 12878651, at *1 (C.D. Cal. Feb. 15, 2012) (finding that the defendants did not waive their common interest privilege by failing to assert it on the log given that they invoked the attorney-client privilege);

## C.     Did Extreme Waive the Privilege by Selective Disclosure?

The parties' dispute relates to Extreme's response to Plaintiffs' Interrogatory No. 8. Before addressing the parties' arguments, some background is necessary. Specifically, Interrogatory No. 8 states:

> Identify all internal Communications in which there was any discussion or Communication whatsoever concerning: (1) whether Extreme had a right to use SNMP Research Software in Extreme Products, including but not limited to any particular Extreme Product; and (2) payment obligations of Extreme for the use of SNMP Research Software.

[Doc. 334-4 p. 3]. According to Extreme, in July 2023, it agreed to supplement its response to Interrogatory No. 8 "to identify (1) communications that Extreme had produced by Bates Number and (ii) privileged communications by reference to the corresponding privilege log entries" [Doc. 334 pp. 8–9]. Counsel for Extreme, Attorney Prabhakar, details the process involved in supplementing the response:

> 3.      Counsel for Extreme worked to supplement its response to Interrogatory No. 8 between mid-July 2023 and August 8, 2023, the date when Extreme served its supplemental response to Interrogatory No. 8. Preparation of Extreme's supplemental response involved two workflows. The first workflow identified documents that were called for in Interrogatory No. 8. This work included reviewing both non-privileged and privileged documents. By mid-July 2023, Extreme had produced around 84,928 documents comprising around 1,281,828 pages. Therefore, our team had to work through an enormous volume of documents to identify communications related to the subject matter of Interrogatory No. 8.

> 4.      To provide a timely supplement and to reduce the burden of reviewing a large volume of documents, attorneys and paralegals working under my direction used search terms to narrow the volume of documents that had to be reviewed and

---

*Zurich Am. Ins. Co. v. Keating Bldg. Corp.*, No. CV 04-1490 (JBS), 2006 WL 8457156, at *5 (D. N.J. Dec. 29, 2006) ("The failure to assert "common interest" on the log does not waive the privilege.").

to locate communications called for in Interrogatory No. 8. Once the team had identified a narrower set of documents from the search terms, between two to three hundred documents, they reviewed the documents to determine that the documents contained internal communications about the subject matter of Interrogatory No. 8. The team's review focused on the subject matter of the interrogatory—not to assess privilege. The team was not focused on assessing privilege because Extreme's supplemental response had to identify both privileged and non-privileged communications, and therefore, the team expected to see privilege communications in the set it was reviewing.

5. During this workflow, Extreme's counsel was unaware that Extreme had produced potentially privileged communications with former-party Brocade Communications, LLC ("Brocade") or any other non-party. During the time Extreme's counsel was preparing its response to Interrogatory No. 8, I participated in several meet and confers with SNMPR's counsel on Extreme's assertion of privilege and common interest protection over certain communications with Brocade. During the meet and confers, SNMPR's counsel never claimed that Extreme had waived privilege by producing potentially privileged communications with Brocade. For this additional reason, I had no reason to alert the team to look for inadvertently produced privileged documents.

6. When the first workflow concluded, Extreme's counsel identified 106 communications that related to the subject matter of Interrogatory No. 8.

7. The second workflow involved placing communications that had to be identified in Extreme's response into two buckets: non-privileged and privileged communications. The second workflow was based entirely on document identifiers, such as Bates numbers and internal document identifiers. This workflow did not require reviewing the content of the 106 documents as that was done in the first workflow. Communications in the non-privileged bucket were readily classified because they had been produced with a Bates number stamp. Classifying entirely withheld communications into the privileged bucket required additional work. Documents that were entirely withheld on the basis of privilege did not have associated Bates numbers—they had internal control numbers. The team had

18

to review Extreme's prior privilege logs and associated work-product that mapped internal control numbers to privilege log entry numbers. By the end of the second workflow, Extreme had a list of 33 Bates numbers for non-privileged communications and 77 privilege log entry numbers for privileged communications.

8.     By August 8, 2023, Extreme had inserted the two lists in an interrogatory response and served it on SNMPR—all without any additional privilege screening.

[Doc. 334-1 ¶¶ 3–8].

In briefing the parties' dispute regarding the common interest arrangement, Plaintiffs generally referenced that "Extreme and Broadcom have selectively disclosed numerous communications between them, including their counsel" [Plaintiffs' Sept. 1. Position Statement p. 5 (citation omitted)]. Extreme investigated the issue, and "identified eight privileged documents that had been inadvertently produced" [Doc. 334-1 ¶ 9]. In reviewing the interrogatory response, Extreme "found three of those eight documents were wrongly identified in the non-privileged bucket in Extreme's response to Interrogatory No. 8" [*Id.*]. After Extreme's discovery, it "prepared a supplemental response to Interrogatory No. 8 that deleted the Bates number associated with those documents from the bucket of non-privileged communications" [*Id.* ¶ 9]. Extreme clawed back the documents on September 7, 2023, and served its supplemental response to Interrogatory No. 8 [*Id.* ¶ 10].

On September 7, 2023, Plaintiffs also submitted their Reply Re Issues Raised in August 24, 2023 Email ("Plaintiffs' Sept. 7 Position Statement"). In that document, they asserted that "Extreme cannot withhold some emails dealing with the assignment issue as 'privileged' and disclose others" [*Id.* at 2 (citations omitted). Plaintiffs argued that in Extreme's Sept. 1 Position Statement, Extreme noted that it produced communications wherein Extreme's counsel asked Brocade's counsel for help to respond to Mr. Wood's questions [*Id.* (citation omitted)]. Plaintiffs

also point to a letter dated August 1, 2019, to Katy Motiey, Extreme's general counsel, from Simone Yew, Broadcom, Inc.'s associate general counsel, that references Brocade and Extreme's efforts to have the Agreement partially assigned to Extreme and that SNMPR declined [*Id.* (citing Ex. 4)]. Plaintiffs stated that they were going to offer more examples, but Extreme clawed back additional documents [*Id.*]. In addition, Plaintiffs mentioned that Extreme identified several documents in response to an interrogatory [*Id.*].

Extreme asserts that Plaintiffs' argument that it waived any privilege because it clawed back documents violates the Protective Order [Extreme's Oct. 12 Position Statement p. 2]. Extreme claimed that it inadvertently produced certain documents that it has clawed back and that it did not waive its privilege by selective disclosure [*Id.*].

At the hearing, the Court requested supplemental briefing to address whether Extreme, by responding to the interrogatory responses, intentionally waived the privilege pursuant to Rule 502(a). The undersigned will therefore focus the analysis on this limited issue.[7] In light of the parties' arguments in their informal position statements regarding selective disclosure, the Court framed the issue as one of intentional disclosure under Rule 502(a). In Extreme's supplemental brief, however, it claims that the disclosure was inadvertent. Therefore, the Court will first

---

[7] Citing to various examples in their supplemental brief, Plaintiffs argue that Extreme has selectively disclosed emails [Doc. 347 pp. 14–21]. But this is the first time Plaintiffs have cited to these examples. Plaintiffs urge the Court to conduct an in-camera review [*see* Doc. 347 p. 21], but the Court declines to do so at this stage given that Extreme has not responded to Plaintiffs' argument. Plaintiffs also cite to Exhibit 4 as another example [*See* Plaintiffs' Sept. 7 Position Statement, Ex. 4]. Extreme responds that Exhibit 4 is not protected by any privilege and therefore it is not "an intentional disclosure . . . because the communication was not privileged in the first place" [Doc. 334 p. 14 n.3]. The Court does not have sufficient information or argument to address these issues. The Court, however, grants the parties leave to file appropriate motions. But the Court reminds the parties that pursuant to their Protective Order, "The Designating Party and the Receiving Party shall meet and confer in accordance with applicable law or Court rules regarding any such motion to compel" [Doc. 93 ¶ 51].

determine whether Extreme's citing to three privileged documents in response to Interrogatory No. 8 was intentional or inadvertent.

Rule 502 of the Federal Rules of Evidence governs the "disclosure of a communication or information covered by the attorney-client privilege." Fed. R. Evid. 502. "Under the Rule's structure, a disclosure is inadvertent or it is intentional." *First Tech. Cap., Inc. v. JPMorgan Chase Bank, N.A.*, No. 5:12-CV-289-KSF-REW, 2013 WL 7800409, at *2 (E.D. Ky. Dec. 10, 2013). As the undersigned explained in *Wolpert v. Branch Banking Tr. & Co.*, No. 3:19-CV-138-TRM-DCP, 2023 WL 2731083, at *6 (E.D. Tenn. Mar. 30, 2023), "[t]he Court construes 'inadvertent' to mean 'mistaken, or unintentional, production of privileged material.'" (quoting *First Tech. Cap., Inc.*, 2013 WL 7800409, at *2). At first blush, responding to an interrogatory appears to be intentional, as opposed to producing multiple documents and a few happen to be inadvertently produced. However, in light of Attorney Prabhakar's declaration [Doc. 334-1], the Court finds that Extreme inadvertently cited the three emails in response to Interrogatory No. 8.

As detailed above, the process of preparing Extreme's supplemental response to Interrogatory No. 8 required working through 84,928 previously produced documents totaling over 1.2 million pages, with a legal team using search terms to narrow the volume of documents containing internal communications about the subject matter of Interrogatory No. 8 [*Id*. at ¶¶ 3–4]. The purpose of the first step was to review content, not privilege, and at this time, Extreme's counsel was not aware that it had previously produced privileged documents [*Id*. ¶¶ 4–5]. After reviewing the documents for content, the next part of the workflow involved placing communications into one of two buckets: non-privileged or privileged [*Id*. ¶ 7]. Because the team had already reviewed for content, this part of the review was based only on document identifiers— the non-privileged documents already had Bates numbers, and the withheld communications

21

already had internal control numbers [*Id.*]. Ultimately, Extreme compiled a list of 33 Bates numbers for non-privileged communications and 77 privilege log entries for privileged communications, which it then inserted into the interrogatory response without conducting an additional privilege screening [*Id.* ¶¶ 7–8]. Based on this explanation, the Court finds that Extreme took reasonable steps to properly identify documents responsive to the Interrogatory No. 8 from a previous voluminous production, and although it inadvertently cited to privileged documents, it took prompt steps to claw back the documents once it investigated and realized the disclosure. Therefore, the Court finds that Extreme's production was inadvertent, and in any event, under the circumstances, the reference to the documents in the interrogatory response by Bates number was not an independent disclosure of the actual documents. *See Synopsys, Inc. v. Siemens Indus. Software Inc.*, 2023 U.S. Dist. LEXIS 169557, *4 (N.D. Cal. Sept. 22, 2023) (finding that the plaintiff "did not waive its privilege when it referenced a previously produced document by bates number" in response to an interrogatory).[8]

Generally, if a party inadvertently discloses a privileged communication, Rule 502(b) applies. *See* Fed. R. Evid. 502(b). But Rule 502(e) states, "An agreement on the effect of the disclosure in a federal proceeding is binding only on the parties to the agreement, unless it is incorporated into a court order." Fed. R. Evid. 502(e). "[T]he United States Court of Appeals for the Sixth Circuit has yet to address how clawback agreements and Rule 502(b) interlace." *LifeBio, Inc. v. Eva Garland Consulting, LLC*, No. 2:21-CV-722, 2023 WL 3258586, at *5 (S.D. Ohio May 4, 2023). Regardless, under the Protective Order or Rule 502(b), the Court finds that Extreme has not waived the privilege.

---

[8]     In *Synopsys*, the court noted that the defendant did not carry its burden, although it was plaintiff who claimed the privilege. *Synopsys, Inc.*, 2023 U.S. Dist. LEXIS 169557, at *4. But here, Extreme filed Attorney Prabhakar's declaration explaining how the disclosure occurred [Doc. 334-1].

Pursuant to the Protective Order,

> The production or disclosure of any information (including documents) in this action that a Designating Party later claims should not have been produced due to a privilege or protection from discovery, including but not limited to any attorney-client privilege, work product privilege, joint defense privilege, or settlement privilege, shall not be deemed to waive any such privilege or protection, nor shall it prejudice any claim that the disclosed or related information is privileged or protected from discovery.

> * * *

> No one shall use the fact or circumstances of production of the information in this action to argue that any privilege or protection has been waived.

[Doc. 93 ¶ 51]. It appears that under the terms of the parties' Protective Order, they agreed to blanket protection. Further, Rule 502(b) provides as follows:

> **(b) Inadvertent Disclosure.** When made in a federal proceeding or to a federal office or agency, the disclosure does not operate as a waiver in a federal or state proceeding if:

> **(1)** the disclosure is inadvertent;

> **(2)** the holder of the privilege or protection took reasonable steps to prevent disclosure; and

> **(3)** the holder promptly took reasonable steps to rectify the error, including (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(b). While Attorney Prabhakar does not explain the privilege review process with respect to how Extreme initially produced the privileged documents, he does explain how Extreme came to cite the three privileged documents in response to an interrogatory [*See* Doc. 334-1 ¶¶ 3–8]. In addition, Extreme explains:

> Extreme's claw back does not even come close to the level of complete recklessness. The three documents at issue are a tiny fraction (0.001 %) of the 35,000 documents Extreme produced in May 2022. They are also a small fraction (3.1 %) of the 106

23

> documents identified in Extreme's interrogatory response. Extreme's use of search terms to prepare its response to Interrogatory No. 8 was not reckless given the volume of documents (around 85,000) that had to be reviewed.

[Doc. 334 p. 17]. *Merenda v. Detroit Med. Ctr.*, No. CIV.A.06-15601, 2009 WL 454670, at *5 (E.D. Mich. Feb. 24, 2009) ("[W]hen the production is large and the number of inadvertent disclosures is small, such facts militate against a finding of waiver." (citation omitted), *objections overruled sub nom. Cason-Merenda v. Detroit Med. Ctr.*, No. 06-15601, 2010 WL 3905936 (E.D. Mich. Sept. 30, 2010)); *see also In re Grand Jury Investigation,* 142 F.R.D. 276, 280–81 (M.D. N.C. Mar. 1992) (finding that eighteen disclosed documents out of 22,000 pages of discovery was insufficient to weigh in favor of waiver.). And further, when Plaintiffs referenced a selective disclosure in their position statement, Extreme clawed it back within a week [*See* Doc. 334 p. 18]. *United States v. Rigas*, 281 F. Supp. 2d 733, 741 (S.D. N.Y. 2003) ("Inadvertent disclosure has been held to be remedied when the privilege was asserted immediately upon discovery of the disclosure and a prompt request is made for the return of the privileged documents."); *cf. Clarke v. J.P. Morgan Chase & Co.,* No. 08–CV–02400, 2009 WL 970940, at *6 (S.D. N.Y. Apr. 10, 2009) (holding two-month delay in asserting privilege, including failure to assert privilege at a deposition, weighed in favor of finding waiver and describing cases in which waiver was found after delay ranging from six days to one month). The Court therefore finds Extreme's argument well taken.

### D. Extreme-Avaya Emails

While the parties were briefing the common interest privilege as to Extreme and Brocade, "Extreme clawed back four email chains" that "total[ed] 100 documents reflecting communications between a third party, Avaya, Inc. and Extreme" [Doc. 347 p. 23 (citation omitted)]. According to Extreme:

24

> [T]hese communications involved (1) pre-acquisition internal communications within Avaya's networking business for the purpose of gathering information requested by Avaya's in-house counsel to render and implement legal advice (related to Avaya's litigation and settlement with SNMPR) and (2) post-acquisition communications between Extreme and its agents for gathering the same information requested pre-acquisition by in-house counsel.

[Doc. 334 pp. 6–7]. With respect to pre-acquisition communications, Extreme asserts that when it acquired a part of Avaya's business, Avaya's attorney-client privilege transferred to Extreme [*Id*. at 18]. The post-acquisition communications, Extreme contends, are protected by Extreme's attorney-client privilege [*Id*. at 25]. Extreme explains that "[t]he post-acquisition communications continued the pre-acquisition privileged communications that were initiated by Richard Hamilton III, Avaya's in-house counsel" [*Id*.].

Some background as to this issue is also necessary. Prior to filing for bankruptcy, Avaya had three business segments: (1) Unified Communications, (2) Contact and Private Cloud Solutions, and (3) Networking [Doc. 334 p. 19 (citations omitted)]. Extreme asserts that "Avaya had planned to split the company by selling the Networking business and the Contact Center and Private Cloud Solutions business separately, and creating a new Avaya from its remaining Unified Communications business" [Doc. 334 p. 19 (citations omitted)]. According to Mr. Dulac, in June 2016, Extreme reached out to one of Avaya's creditors to express interest in acquiring the Networking business [Doc. 334-26 ¶ 3]. In response, the creditor sent Extreme a slide deck entitled "Avaya Networking July 2016" [*Id*. ¶ 4 (citation omitted)]. Dulac states, "Extreme was interested in acquiring Avaya's [N]etworking business in its entirety. Extreme had no intention to enter into any kind of ongoing collaboration or joint venture or partnership related to the [N]etworking business with the remainder of Avaya's business" [*Id*. ¶ 6]. Dulac submits that "[o]n March 7, 2017, Extreme and Avaya entered into an agreement for Extreme's acquisition of Avaya's

networking business" and that "Extreme closed its acquisition of Avaya's [N]etworking business in July 2017" [*Id.* ¶¶ 7, 8]. Dulac explains:

> After closing, employees of Avaya's networking business became employees of Extreme, Avaya's networking products became Extreme's products, customers of Avaya's networking business became customers of Extreme, and Extreme's customer support team started supporting these customers.

[*Id.* ¶ 8].

As noted above, Extreme divides its argument into two sections: (1) pre-acquisition communications, and (2) post-acquisition communications. With respect to the pre-acquisition communications, at the hearing, Extreme asserted that the dispute boiled down to whether it "purchase[d] enough of the business or the division from Avaya such that [it] became the transferee or the inheritor or the acquirer of the attorney/client privilege" [Doc. 334 at 66]. In other words, Extreme noted, the question is whether it bought control of Avaya [*Id.* at 67]. But even if the Court were to find that Extreme acquired Avaya's networking business, the undersigned does not have sufficient information from the parties as to whether this means that Extreme only holds the privilege with respect to Avaya's networking business, as opposed to Avaya as a whole. And if Extreme only holds the privilege with respect to Avaya's networking business, the Court does not have sufficient information (and in fact, has contrary information) regarding whether the subject documents are within the scope of that business.

For instance, Extreme states that prior to the acquisition, on July 12, 2017, an Avaya employee, Daniel Regan, sought legal advice from Attorney Hamilton.[9] According to Extreme, "On July 14, Attorney Hamilton requested Michael Fitzgerald, an Avaya employee at that time, to

---

[9] Extreme identifies this entry as #1334 on its privilege log [Doc. 334-10 p. 5]. But this entry is dated July 21, 2021, which is after Extreme purchased Avaya's networking business. In addition, this entry shows that Daniel Regan sent an email to an employee of Luxoft, Florin Dragan, although there are numerous individuals copied, including Attorney Hamilton.

provide information necessary to render legal advice related to settlement of litigation between SNMPR and Avaya involving Avaya's networking business" [Doc. 334 p. 26]. Extreme further states that "[o]n July 18, employees of Luxoft Global Operations GmbH ("Luxoft"), who were involved in the development of the Avaya software, also provided information requested by Attorney Hamilton" [*Id*. (citation omitted)]. And Luxoft too was Extreme's agent "by virtue of assignment of Avaya's Master Services agreement ("MSA") with Luxoft to Extreme" [*Id*. at 27]. Extreme contends, "In each of the claw back emails related to Avaya's networking business, Extreme, Avaya, and Luxoft employees communicated with each other to provide information requested by Attorney Hamilton to facilitate the rendering of legal advice by him and also to implement any legal advice conveyed to them" [*Id*.].

Plaintiffs contend that "Extreme has only identified a single attorney involved in the four clawed-back email chains at issue: Richard Hamilton III" [Doc. 347 p. 24]. According to Plaintiffs, "Attorney Hamilton was the legal director for Avaya, Inc., and he rendered legal advice on behalf of Avaya, Inc., not the networking business" [*Id*.]. Plaintiffs contend that Daniel Regan originally "sought advice from Mr. Hamilton related to the settlement of a litigation between Plaintiffs and Avaya" [*Id*.]. According to Plaintiffs, "the asset purchase agreement governing Extreme's purchase of Avaya's networking business makes clear that the settlement agreement between Plaintiff and Avaya Inc., was excluded from the sale of the networking business" [*Id* (citations omitted)]. Therefore, Plaintiffs conclude that "any purported 'privilege' with respect to Mr. Hamilton's rendering of legal advice about the litigation/settlement between Avaya Inc. and Plaintiffs would have necessarily been on behalf of Avaya Inc., not Avaya's networking division that was part of the sale to Extreme" [*Id*.]. Citing to an email chain dated January 5, 2018, that Extreme clawed back, Plaintiffs assert this was sent a year after the acquisition and was from Dan

Regan, an Avaya employee, to Sunil Ramu, an Extreme employee" [*Id*. at 25 (citations omitted)].
Plaintiffs state that the subject of these emails was concern relating to files that contained "SNMP
Research Copyright[,]" which according to Plaintiffs, relate to the settlement agreement between
them and Avaya Inc. [*Id*.].

To the extent the Court finds that Extreme acquired Avaya's networking business, in light
of the above arguments, the Court does not have sufficient information to determine whether the
privilege extends only to communications relating to the networking business, and if so, whether
the communications at issue actually relate to the networking business. The Court will therefore
order supplemental briefing.

## V.  CONCLUSION

For the reasons stated above, the Court finds that Brocade did not waive the attorney-client
privilege over the subject emails, that Brocade and Extreme shared a common interest
arrangement, and that Extreme did not waive its privilege when it cited three emails in response to
an interrogatory. With respect to the Extreme-Avaya communications, the Court will require
supplemental briefing, which the undersigned will more fully explain at the hearing on February
26, 2024.

**IT IS SO ORDERED.**

ENTER:

*Debra C. Poplin*
Debra C. Poplin
United States Magistrate Judge