```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE EASTERN DISTRICT OF TENNESSEE
 2                     AT KNOXVILLE, TENNESSEE
   _____
 3                                )
   SNMP RESEARCH, INC. and SNMP    )
 4 RESEARCH INTERNATIONAL, INC.,   )
                                   )
 5              Plaintiffs,        )
                                   )
 6 vs.                             ) Case No. 3:20-cv-451
                                   )
 7 EXTREME NETWORKS, INC.,         )
                                   )
 8              Defendant.         )
   _____ )
 9
               ELECTRONICALLY-RECORDED MOTION HEARING
10              BEFORE THE HONORABLE DEBRA C. POPLIN

11                  Monday, February 26, 2024
                    10:30 a.m. to 5:14 p.m.
12
   APPEARANCES:
13
                 ON BEHALF OF THE PLAINTIFF:
14
                 JOHN L. WOOD, ESQ.
15               CHERYL G. RICE, ESQ.
                 EGERTON, MC AFEE, ARMISTEAD & DAVIS, PC
16               P.O. Box 2047
                 Knoxville, TN 37901-2047
17
                 OLIVIA WEBER, ESQ.
18               IRELL & MANELLA, LLP
                 1800 Avenue of the Stars
19               Suite 900
                 Los Angeles, CA 90067
20

21

22
   TRANSCRIBED BY:
23
   Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
   Knoxville, Tennessee 37901
25 (865) 244-0454
```

1    **APPEARANCES:** (Continued)

2              **ON BEHALF OF THE DEFENDANT:**

3          SAURABH PRABHAKAR, ESQ.
           DEBEVOISE & PLIMPTON, LLP
4          650 California Street
           San Francisco, CA 94108
5                    and
           CHARLES B. LEE, ESQ.
6          MILLER & MARTIN, PLLC (Chattanooga)
           832 Georgia Avenue
7          1200 Volunteer Building
           Chattanooga, TN 37402

8                  *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              THE COURTROOM DEPUTY:  All rise.

2              This court is now in session with the Honorable

3    Debra C. Poplin, United States Magistrate Judge,

4    presiding.

5              Please come to order and be seated.

6              We are here for a scheduled motion hearing in

7    Case No. 3:20-cv-451, SNMP Research, Incorporated versus

8    Extreme Networks, Incorporated.

9              Here on behalf of the plaintiffs are John Wood,

10   Olivia Weber and Cheryl Rice.

11             Are the plaintiffs ready to proceed?

12             MR. WOOD:  Yes.

13             THE COURT:  Good morning.

14             THE COURTROOM DEPUTY:  And here on behalf of

15   the defendants are Saurabh Prabhakar and Charles Lee.

16             Are the defendants ready to proceed?

17             MR. LEE:  Yes, we are.

18             THE COURT:  All right.  Good morning to you

19   all, and thank you for agreeing to come a little bit

20   earlier.  Once I saw everything we had to go through, it

21   may benefit us all to have a little bit of extra time

22   and hopefully we can get finished a little earlier in

23   the afternoon.

24             I will -- we will take a few brief breaks and

25   an abbreviated lunch break, and we'll just kind of set
```

that as we go along and see where we are in handling all of the issues.

Okay. If we could start with -- I'm going to -- I'm going to reference this as the first issue. This is Extreme's claim that plaintiffs' document production is insufficient with the first topic being the RFP Nos. 50 through 55 and 58, and these are relating to the plaintiffs' prior copyright litigations against Nortel and Avaya.

So, let's see. Mr. Prabhakar, do you want to address this?

MR. PRABHAKAR: Yes, Your Honor. Thank you.

THE COURT: And I'm not ignoring you. I just need to get logged on. If you'll give me just a second.

MR. PRABHAKAR: I could use the --

THE COURT: And you can get your materials settled.

MR. PRABHAKAR: I could use the extra time myself.

THE COURT: All right. Thank you.

MR. PRABHAKAR: Of course, Your Honor.

THE COURT: All right. So, I've read through all of the materials, and I guess the first question I want to ask, and this is actually for Mr. Wood before he starts, does SNMP Research admit that the litigations

1  involve the same copyrighted software?

2        MR. WOOD:  Yes, Your Honor, the registrations

3  are the same.  The license agreements are different.

4        THE COURT:  I'm sorry?

5        MR. WOOD:  The copyright registrations are the

6  same copyright registrations.  The license agreements at

7  issue are different.

8        THE COURT:  Okay.  Mr. Prabhakar, thank you.  I

9  just wanted to first ask that question.

10        Okay.  And I see that you have pulled the

11  public filings from the litigations.

12        MR. PRABHAKAR:  Yes, Your Honor.

13        THE COURT:  Okay.  And it appears that you were

14  wanting just certain things produced from those

15  litigations now; correct?

16        MR. PRABHAKAR:  Correct, Your Honor.

17        THE COURT:  Okay.  I guess one question I have

18  for you:  Does Extreme want the non-parties' material or

19  just plaintiffs' material that was produced in those

20  cases?

21        MR. PRABHAKAR:  We do want non-party materials

22  as well, Your Honor, at this time.

23        And to add some color to that, why we want

24  those materials is, is that arguments about the

25  copyright registrations at issue, whether it's the

1    validity of the copyrights, whether it's the scope of

2    the copyrights, whether it's the value of the

3    copyrights, the apportionment, we would like to know

4    what other parties have said about that, in addition to

5    what the party plaintiffs themselves have said about

6    that in the prior litigations.

7          THE COURT:  Okay.  And what deposition

8    transcripts are you seeking?  Are these 30(b)(6) on

9    parties?

10         MR. PRABHAKAR:  So, Your Honor, for plaintiffs,

11   in this case, we want all the deposition transcripts

12   because it's likely that a lot of -- or most of the

13   plaintiffs' employees who were deposed in the prior

14   litigation would likely get deposed through this

15   litigation as well.  There may be some plaintiffs'

16   employee who may no longer be available.  Their

17   transcripts would also be helpful because we can no

18   longer depose them.

19         So, for plaintiffs, we're certainly looking for

20   all fact witness testimony and also expert deposition

21   transcripts because it's likely that some of the experts

22   in those cases would be experts in this case, and we

23   wanted to make sure that we get to take a look at their

24   opinions in prior cases and test them for consistency

25   and the arguments that they have made previously.

1          THE COURT:  Okay.  So, that's one group.

2    That's plaintiffs.

3          MR. PRABHAKAR:  Yes.

4          THE COURT:  Anything else?

5          MR. PRABHAKAR:  Your Honor, given that we have

6    very little visibility into what non-parties have

7    produced in this case, at this stage, if I may, we would

8    like to see all those materials.  But we're willing to

9    be reasonable in terms of burden.  If there are certain

10   transcripts that are more problematic than the others,

11   we're certainly willing to be -- you know, consider that

12   on a case-by-case basis.

13          But, right now, based on the public filings, we

14   have very little visibility into what the expert said or

15   what was the topic, and, as we noted, we did not receive

16   a list of documents from plaintiffs.  Although they

17   offered when we had a phone call with Ms. Arnold that

18   they would provide that to us, we didn't receive that.

19   We haven't received it to date.

20          So, in absence of that, it's hard for me to say

21   that this is something that we're willing to give up.

22   But certainly if burden and expediency, in terms of

23   getting these things expedited, is an issue, we're

24   willing to look at it on a case-by-case basis.

25          THE COURT:  And you say that in terms of other

1    materials besides plaintiffs, you would be willing to be

2    reasonable, but what -- what specifically are you -- are

3    you wanting to see?

4         MR. PRABHAKAR:  At this point in time, Your

5    Honor, our requests are fairly specific.  So, for

6    example, we're looking for deposition transcripts from

7    the other side's witnesses.

8         Now, if plaintiffs represent that, look, this

9    witness talked about something which had nothing to do

10   with the copyrights, nothing to do with the technology

11   in this case and it has a bunch of irrelevant

12   information to this litigation, certainly we wouldn't

13   want to -- to waste either the plaintiffs' time or the

14   Court's time asking for those documents.

15        THE COURT:  Okay.  Is there anything else you

16   wish to add to this before I talk to plaintiffs?  I have

17   some more questions for them.

18        MR. PRABHAKAR:  Sure, Your Honor.  I would like

19   to note the written discovery responses, although

20   plaintiffs have indicated that they don't have them

21   anymore, we want to see if we can get them from the

22   third parties or if plaintiffs can request them from the

23   third parties and produce that stuff.

24        THE COURT:  That's one of the questions that I

25   have for them, yes.

1          MR. PRABHAKAR:  Sure, Your Honor.

2          THE COURT:  Anything else?

3          MR. PRABHAKAR:  Nothing more, Your Honor.  I'm

4     happy to concede the podium to my opposing counsel.

5          THE COURT:  Okay.  Thank you.

6          So, Mr. Wood, that was one of the questions I

7     had for you.  In terms of the discovery responses, I

8     noted that you said you did not have them and I wanted

9     to better understand that.

10          MR. WOOD:  So, when we finished those cases, we

11     were -- we had to -- we got rid of most of the

12     materials.  I went back and -- in preparation for this

13     filing, I went back and looked to see what I could find

14     that we had in our possession, and I did not find the

15     written discovery responses.  So, we weren't -- the case

16     was over.  It was completely resolved.

17          We do have transcripts.  We do have expert

18     reports.  We do have, I believe, all the under-seal

19     filings.  And, so, that's -- when I made the list of how

20     many -- so, I wanted to give some idea of burden.  So,

21     here are all the documents we have to go through, but

22     I -- and if Your Honor orders us to produce those,

23     I'll -- I'll look again and see what I can find, but I

24     have not been able to locate those.

25          THE COURT:  Is that just part of your normal

```
1  file management that you would have certain things from
2  the litigation and not others?
3          MR. WOOD:  We -- we got rid of most of the
4  stuff we had from the litigation, and it just happened
5  that the transcripts, the filings were all in our online
6  file management system.  But I'm not seeing the
7  written -- written discovery responses.  That doesn't
8  mean -- we may be able to find them, but I'm -- I
9  have -- I mean, I looked pretty thoroughly, and we
10 haven't found them yet.  So --
11         THE COURT:  Okay.  But the -- but what you do
12 have is filed electronically?
13         MR. WOOD:  Yes.
14         THE COURT:  Okay.  And I wanted to just
15 understand a little bit better your position because
16 it's couched in terms of proportionality, but it seemed
17 more like a relevancy argument as you had referenced a
18 question of how Avaya/Nortel's financial information
19 would be relevant.  So, I wanted to better understand
20 your position.
21         MR. WOOD:  Yes, Your Honor.  If I could, I
22 think there is two -- two main issues here.  One, all
23 the production of those documents were all governed by
24 protective orders in those cases.  And it's our
25 understanding that any dispute regarding the production
```

1  of those documents needs to be resolved by the Court in

2  Delaware.  And, so, we don't even believe this is

3  properly heard here.  They can obviously disagree.

4          And I would note that the protective order that

5  Extreme presented is not the correct protective order,

6  and we've -- so, there is a -- in bankruptcy court,

7  there is a main docket, and then the SNMP Research case

8  was an adversary proceeding that has its own docket and

9  its own protective order.  And we've -- we've submitted

10 that protective order.  The two protective orders are

11 Exhibit C and D to my declaration, but I think that may

12 be why there is a little bit of discrepancy between what

13 the protective order requires.  So -- and I have copies

14 of them here if Your Honor doesn't have them, but they

15 were in our -- they were in our submission.  And I'll be

16 glad to talk through those specific provisions.

17          THE COURT:  I can -- I can pull those up.

18          MR. WOOD:  Okay.  And the protective orders are

19 very -- very similar.  So, it's on the Exhibit C

20 submitted with my declaration, and it starts on page 21

21 of that.  It's section E.  So that would be section E.

22 And this is for the -- this is for Avaya, and there is a

23 very similar provision in the Nortel agreement.

24          THE COURT:  Just give me one second.  I have

25 Exhibit C pulled up.

1          MR. WOOD:  You do?  Okay.  So, if you go to

2   page 21 of that document, and it starts in section E, at

3   the -- at the bottom of the page, I point out there is

4   also a very similar provision as to the protective order

5   in this case.  It says, "This Court retains jurisdiction

6   over any documents produced under the protective order

7   in this case."

8          So, if you see it says, "United States District

9   Court for the District of Delaware is responsible for

10  the interpretation and enforcement of this protective

11  order.  After termination of litigations, the provisions

12  of this protective order shall continue to be binding,

13  except with respect to those documents and information

14  that become a matter of public record.  This Court

15  retains and shall have continuing jurisdiction over the

16  parties and recipients of the protected information for

17  enforcement of the provision of this protective order

18  following termination of the litigations.  All disputes

19  concerning protected information produced under the

20  protection of this protective order shall be resolved by

21  the United States District Court for the District of

22  Delaware."

23          And, to us, this seems to be a dispute about

24  the production of information under this protective

25  order, and since Extreme has raised it as a dispute,

1  it's right- -- it should be rightly before the

2  district -- district court for the District of Delaware.

3          THE COURT:  But as to plaintiffs' material,

4  this order doesn't restrict plaintiff from producing its

5  own material.

6          MR. WOOD:  Correct, Your Honor.  And maybe it

7  would help if I explained a little bit about the -- the

8  materials at issue just in general, or we can finish

9  with this.

10          Exhibit D, which is the Nortel protective

11  order, has a very similar provision on page 36.

12          THE COURT:  But are you saying -- I just want

13  to understand your position.  Do you -- are you saying

14  that this order would prevent SNMP from producing its

15  own witness, depositions and such?

16          MR. WOOD:  To the extent that the other

17  side -- yeah, to the extent the other -- those

18  depositions or materials reference the other side's

19  protective materials.  So, often what happens in a

20  dep -- what happens in a deposition is:  A witness,

21  especially the expert witnesses that are percipient

22  witnesses, too, are questioned about confidential

23  information from the other side.  And then the other

24  side requests that the deposition or that part of the

25  deposition be marked confidential.

1          THE COURT:  Uh-huh.

2          MR. WOOD:  So that's what it would restrict us

3     from doing.  So, no, it would not restrict us from

4     producing anything that is our own confidential

5     information.  That would be -- this -- this order

6     doesn't do it.

7          Our problem -- our problem is:  There are a lot

8     of parties and there was a lot of confidential

9     information.  So in the -- and just briefly, what

10    happened in the -- in the Nortel case was:  Nortel went

11    bankrupt, and it was a huge SNMP customer.  I think

12    almost every Nortel product are SNMP Research software.

13    And it was licensed, but Nortel began selling off parts

14    of its business and just began transferring SNMP

15    Research software to other companies without -- in many

16    cases, without SNMP Research's permission.

17         So, SNMP Research was trying to get a handle on

18    this because its software was going everywhere and it

19    didn't want to lose control of its software.  And, so,

20    it's contacting the parties.  Some parties worked with

21    SNMP.  Some, like Avaya, did not and said, we're -- we

22    got it.  We're not going to -- we're not going to

23    cooperate with you.  And, so, SNMP had no choice,

24    really, but to file litigation in order to protect its

25    intellectual property.  But in the course of that, you

1  had all these different parties that had gotten the

2  software, and so they're -- at different times, they're

3  appearing in the litigation.

4          Nortel is also a very complex entity and had

5  many, many entities, and Nortel Canada -- Nortel Canada

6  and Nortel U.S. were the two most significant entities.

7  This case that they're referring to is against Nortel

8  U.S.  Nortel Canada's a completely separate entity.

9  They produced source code in this case.  They marked it

10 source code.  The witnesses talk about that source code.

11 We have experts that write reports on that source code.

12 But it's Nortel -- it was Nortel Canada's highly

13 confidential source code materials.

14          And, so, we don't think we can just expose

15 that, you know, or even the witnesses talking about that

16 when another party has said that's confidential under

17 this protective order in this case.

18          And, so, that's -- that's our issue.  And

19 that's what causes some of the burden is that we would

20 have to go through all of these materials and determine

21 who's asserting confidentiality over what, who produced

22 what.  And I -- I was involved.  I certainly don't

23 remember exactly what happened.  I just know there were

24 a lot of parties and there was source code involved, and

25 we had a -- we had a lot of depositions and we had a lot

1   of experts.  It was a -- it was a complicated case.  And

2   there were, like I said, a lot of different moving

3   parts.  So, that's our -- that's why there is a burden.

4           Now, the other -- so, in considering

5   proportionality, we think our burden is high.  And we

6   offered to resolve this and not have this become an

7   issue, and we think we have to go before the district

8   court in Delaware.  We offered to try and work this out

9   if Extreme would agree to negotiate on the materials it

10  actually gets.

11          And that's when we offered to provide a list on

12  a call with Ms. Arnold, and on that call, Extreme

13  rejected that offer and said, "We want everything that

14  you have.  There is really no negotiation, and you

15  either give us all of it or" -- they're really saying

16  all or nothing.  And we think all of it, there is stuff

17  that isn't relevant, and the burden for going through

18  all of it is pretty high.

19          So, the fact that they didn't take our offer,

20  we're now here.  But we think this is actually the wrong

21  venue for -- you know, the wrong court for this action

22  because of the protective orders in these other two

23  cases.

24          THE COURT:  So, you referred to -- you offered

25  to prepare a list, but it also sounded like you may have

already prepared one; is -- have you prepared a list of
everything?

MR. WOOD:  I've not prepared a list.  I've
looked at the total number of documents.  We haven't
prepared a list with the description of what each one
is.  We haven't gone to that trouble.  But that -- that
was our offer before.

THE COURT:  Uh-huh.

MR. WOOD:  Extreme said, "No, we want to go to
court.  We want everything."  And I said, well, then, we
don't -- one, we don't think this is the proper court,
and we brought that up with them before, that
they're -- these documents are governed by protective
orders in another case.  And in their argument -- I
mean, they're trying to argue that that's, I guess, not
correct.  But, at least in the Nortel case, I think they
have the wrong protective order.

THE COURT:  Okay.  And then briefly describe to
me what the process is, what you feel it is under these
protective orders if you have something on a list and
Extreme says, "I need this deposition."

MR. WOOD:  So, I think we -- we have to give
notice to the party, and they have an opportunity to
object, the producing party does, whoever that may --
whoever that may be, they would have an opportunity to

1  object.

2          And, so, our offer was:  We would -- and this

3  was a couple of months ago since we knew it would take a

4  while.  If we could narrow down the list of materials,

5  we would -- we would go ahead and start that process and

6  try and work through it.  But they weren't -- they

7  weren't interested in that process, and, so, here we

8  are.

9          THE COURT:  Okay.  Thank you.

10         MR. WOOD:  Okay.  Mr. Prabhakar.

11         MR. PRABHAKAR:  Your Honor, a couple of things

12  that I want to respond to, and, first of all, to the

13  extent that we have the wrong protective order, I

14  apologize.  We weren't trying to mislead the Court with

15  anything.

16         But I can tell you two things.  I wrote to

17  plaintiffs -- or Extreme wrote to plaintiffs in mid

18  August asking two questions; have you given notice to

19  the parties whose materials have been requested?  Second

20  question asked is:  Are you willing to produce the

21  protective orders so that we can assess?

22         We met and conferred on this at least three

23  times, and each time I asked plaintiffs' counsel that,

24  "Will you provide us the protective order so that we can

25  assess your position?"  Because plaintiffs' original

1  position was we need to reach an agreement with the

2  other side on the specific materials requested.

3       So, to the extent that we have the wrong

4  protective order and we didn't get the right protective

5  order until this motion was filed, it's not because of

6  our lack of trying.

7       Now, let's parse, if I may, Your Honor, the

8  protective order very briefly.  So, the first thing is:

9  This protective order, which plaintiffs are relying on

10 and which for the purposes, as they have said, the Avaya

11 protective order and the Nortel protective order are the

12 same, it says, the moment the request is -- for

13 protected material is requested in discovery, notice

14 shall be given immediately.  It shall be promptly given

15 by overnight delivery, fax or e-mail within three

16 business days of such demand to the producing party.

17      Your Honor, this is not the first time these

18 materials have been requested in this case.  You may

19 remember back in December of 2022, Brocade and Broadcom

20 had requested these materials.  But they're no longer in

21 the case, so I'm not going to speak for them.  We

22 requested this material way back in March.  So, almost

23 coming up to a year.  There is still no notice;

24 although, this PO requires notice within three days.

25 So, we don't understand if plaintiffs are relying on

1  this PO why the notice has not gone out.

2      And I want to briefly address the notice issue

3  also, Your Honor, because the burden that plaintiffs are

4  citing, in terms of providing notice, it's not that

5  plaintiffs haven't reached out to Nortel's counsel.

6  Plaintiffs actually contacted Nortel's counsel for

7  permission to produce the settlement agreement that they

8  had with Nortel, in which they got a bunch of money from

9  Nortel, to be produced in this case.  Nortel's counsel

10  said, no problem; produce it.

11      So when they wanted a document that's helpful

12  to them produced in this case, they had no problem

13  reaching out to Nortel's counsel.  They haven't in this

14  case because these are documents that they don't want

15  produced.

16      Now, let's look at the issue about Delaware

17  courts having jurisdiction.  The Court is responsible

18  for the interpretation and enforcement of this

19  agreement.  There is no enforcement of this PO.  We're

20  not trying to enforce the PO in this litigation.  In

21  fact, the position plaintiffs are taking is setting a

22  precedent that no district court in the United States

23  can order production of materials from another fellow

24  district court in the United States unless the parties

25  go to the original court and sort out the meaning of the

1   protective order.

2          But I don't understand what's the dispute about

3   the interpretation of the protective order that this

4   Court isn't competent enough to resolve.  These are

5   already similar protective orders.  There is no dispute

6   about the notice.  The timing is clear.  The party to

7   whom the notice has to be given, that's clear.  So,

8   there is really no dispute about the interpretation of

9   the protective order.

10         Now, I want to point out one more thing.  The

11  burden of opposing the enforcement of the demand shall

12  fall solely upon the producing party.  The producing

13  party in this case, Your Honor, would be Avaya, would be

14  Nortel.

15         Plaintiffs' articulation of burden at this

16  point is hypothetical.  They haven't contacted Nortel

17  for these materials; although, they contacted for the

18  settlement agreement.  They have not contacted Avaya for

19  the production of these materials.  For all we know, had

20  plaintiffs done that a year ago, asked for the

21  protective order governing this litigation and the

22  Nortel litigation, we would have had their position by

23  now, and then we would be assessing burden not in a

24  hypothetical but in reality.

25         Right now, the entire statement of burden which

plaintiffs for the first time in detail provided in

Mr. Wood's declaration, which we didn't see an hour

before or maybe a couple of hours before the filing of

our joint statement; although, the Court had ordered

parties to exchange their positions.

So, the articulation of burden that plaintiffs

have in this case is entirely hypothetical, and it would

have benefited this Court, once the dispute was in front

of it, that plaintiffs would have helped the Court help

defendants obtain clarity.

I want to quickly also address the point about

Extreme not willing to compromise. So, if I remember

the meet and confer, or, actually, the call that

Ms. Arnold -- correct me because it's been several

months -- that was the first time we got an offer to

produce a list of documents. But that was only an offer

to provide a list of documents. There was virtually no

commitment from plaintiffs that they would actually

produce documents from that list that we would request.

So, it's not like Extreme was being

unreasonable, that we want everything; although, in

the -- in the abstract, not seeing the list,

everything -- and, you know, this is consistent with

every side. Every side thinks that whatever they are

requesting is relevant; therefore, without seeing in the

1   concrete, it's difficult to give up.  And we were not

2   doing anything inconsistent with that that in the

3   abstract we can't give up rights to any relevant

4   materials.

5        Now, plaintiffs' counsel mentioned facts about

6   a confidential sourcebook of Nortel.  This would be one

7   example of materials that we do not want.  We have no

8   interest in what could Nortel have had besides the SNMP

9   Research software.  We're not interested in that.  It's

10   likely not relevant to our case, so we don't want that.

11        To the extent the source code is an issue, I

12   can tell you we don't want production of source code.

13   And I don't think any of our requests call for

14   production of that source code.  Arguably, we may not

15   even want their expert's report on how Nortel's source

16   code infringes their copyright.

17        To the extent that there is a dispute that how

18   the copyright infringement read works on Nortel, Avaya

19   versus Extreme, that may be relevant.  But, Your Honor,

20   if that source code is an issue that's preventing the

21   production of everything else, Extreme is willing to be

22   reasonable.  We certainly don't want any source code

23   from Nortel, from Avaya.  We don't want it.

24        The issue becomes do we want expert reports

25   related to Nortel's source code.  Perhaps.  But, again,

1    we're willing to be reasonable if that becomes an issue

2    with production.

3              So, we are willing to take a position

4    that -- and I want to quickly add one more thing to the

5    source code so that I'm clear that we're not giving up

6    too much.

7              If there are expert reports that address the

8    source code in the abstract, or, for example, contain a

9    snippet of Nortel's source code which doesn't give us

10   any insight into what Nortel was generally doing, I

11   think that shouldn't be a problem either for Nortel or

12   for plaintiffs to produce to us because, really, there

13   is nothing that we can glean from an out-of-context

14   source code in an expert report.  Likewise, if there is

15   a stray mention to source code or a few files of source

16   code, we're certainly not -- you know, that's certainly

17   not going to cause competitive harm to Nortel.

18             And, finally, if there is quantifiable data in

19   the sense that Nortel's total source code was a million

20   lines, plaintiffs' source code was 20,000 lines, for

21   example, that doesn't reveal anything about the

22   substance of Nortel's source code, and that's also the

23   kind of report that we wouldn't want to give up.

24             But I -- I can confirm with you, Your Honor,

25   that the source code itself is not something that we are

1  requesting, and if that helps unlock this issue, then

2  we're happy to -- happy to -- you know, concede on that

3  because we can totally see that that may not be relevant

4  to our case.

5      Very briefly I want to address the question

6  about written discovery responses.  I know Mr. Wood.  I

7  take his word he doesn't have it.  But these cases were

8  filed in Delaware.  And just like here, you need local

9  counsel in Delaware to -- to present your case in front

10  of the Court.  I would request that if Mr. Wood cannot

11  find the discovery responses in his e-mails or his

12  colleagues' files, he may please request his local

13  counsel in Delaware for those documents.

14      And I'm a hundred percent with Mr. Wood that a

15  bankruptcy court's docket is really, really hard to

16  navigate.  I probably spent a day-and-a-half trying to

17  just download the docket entries.  But they have it.

18  They were in that case.  They could have made our life

19  so much easier.  It took me one-and-a-half days to find

20  what turns out to be the wrong protective order.  It

21  would have taken Mr. Wood five minutes to send me that

22  protective order and we would have figured out whether

23  there is a dispute or not.

24      So, Your Honor, to summarize my argument, first

25  of all, the PO only requires notice, requires prompt

1    notice, which has not been given.

2        The objection to production has to come from

3    the producing party, which is Avaya or Nortel.  And

4    there is no dispute that we can see so far about the

5    interpretation of this order.

6        We have -- plaintiffs want us to go to

7    Delaware.  We are not a party to this case.  I don't

8    even know what standing we would have to file a dispute

9    in Delaware.  And courts in the United States order

10   production of confidential material from other

11   jurisdictions all the time because there is a protective

12   order in this case that affords the highest level of

13   protection.

14       If plaintiffs want, we're willing to agree that

15   every single document produced in prior litigations can

16   be produced attorneys' eyes only and Extreme's

17   witnesses, Extreme's in-house counsel would have no

18   access to that material whatsoever.  Although, it's

19   interesting because part of the Avaya business which was

20   at issue in that litigation is now part of Extreme, and

21   plaintiffs' counsel have asked two Extreme 30(b)(6)

22   deponents questions about Avaya products, about Nortel

23   products.

24       The Nortel/Avaya contracts are listed,

25   identified by Bates number in plaintiffs' interrogatory

response about damages.  That's just to reemphasize the point about the relevance and importance of these documents.

Thank you, Your Honor.  I said more than I said I would, but I just wanted to bring up these points.

THE COURT:  Thank you.  All right.  Mr. Wood.

MR. WOOD:  Thank you.

THE COURT:  Does the concession on the source code help, in his words, unlock the issue any?

MR. WOOD:  Well, I will say that's the first that we've heard of that concession after months and months of discussing this and having a call.  I think that that could help.  In the way it was framed, it could actually make it more difficult; so, we don't want the source code but we do want a snippet.  They talk about it in general but not -- so somebody has got to go through and figure out what's a snippet and what's general, and that's the -- I mean, that -- that's the burden that we'd have is going through that and trying to make that determination, and I don't know that they're going to agree with us.  So --

THE COURT:  What about if it's all produced under attorneys' eyes only?

MR. WOOD:  I think we still have the same problem.  We would be violating this protective order in

1   the -- in the Delaware court.

2           THE COURT:  Well, what if you gave notice to

3   Nortel and Avaya and the request being that it's

4   produced under attorneys' eyes only?

5           MR. WOOD:  So, that was our -- that was our

6   proposal before was that we make a list of all -- of

7   everything.  We work together to narrow that down to

8   something reasonable, and then we would give notice and

9   see if we could get permission to produce all that.  And

10  then if one of those parties does bring up a dispute,

11  then we -- and says no, then we'd have to deal with it

12  at that time.

13          What I know from --

14          THE COURT:  Can I ask you a question, though.

15  In putting this list together, because that's -- and in

16  trying to understand the burden, will the list that you

17  can put together be detailed enough for -- because I

18  hear Mr. Prabhakar saying, well, we've had very little

19  visibility into what these are.  Can you put a list

20  together that's sufficiently detailed where he can go

21  through and say, well, I definitely don't need that;

22  that's not relevant; this, you know, may be; this will

23  warrant discussion?

24          MR. WOOD:  Maybe.  If -- so, for example, we

25  have a source code expert that reviewed Nortel U.S. and

1  Nortel Canada's source code, and I think maybe even some
2  other parties' source code, but I know Nortel U.S. and
3  Nortel Canada.  I remember that for sure.  And, so, we
4  could say this is expert X, Y, Z; this is, in general,
5  what they did.

6          Now, if their response is, okay, we don't care
7  about source code; we don't want that expert report,
8  then that resolves that problem, and we don't have to
9  review it and figure out exactly whose source code is in
10 there and who to give notice to.

11         But if what they're going to say is, we don't
12 want any specific source code but we want all the
13 general statements, not the specific; we want the
14 snippets, not the -- then I don't -- I don't know how we
15 do what he proposed.  So, if we can do it at a high
16 level, then, yes.

17         I mean, we have kind of the same issue about
18 financials.  There was a lot of financial -- you know,
19 there were several financial experts in these cases.
20 They reviewed the other parties' financials.  Those were
21 obviously marked confidential, highly confidential.  We
22 have the same issue.  We don't think their financials
23 are really that relevant to this case.  I don't know if
24 those parties would be okay with Extreme seeing them or
25 not.  They may not.  So, that's the issue we have.

1          I did want to correct one thing.  You know, it

2  was, I guess, said that we did get permission from

3  Nortel's counsel.  So, Brocade hired Nortel U.S.'s

4  counsel.  It's a Mr. David Harrington at Cleary

5  Gottlieb, who was the counsel for Nortel U.S., and he

6  did say you can -- we don't object to producing

7  anything.  But he doesn't represent Nortel Canada.  He

8  produced a significant amount of stuff.  He doesn't

9  represent Genband.  He doesn't represent Avaya.

10          It's interesting that Extreme acquired some of

11  Avaya's materials.  They could have asked Avaya about

12  this.  They're in a better position to ask Avaya than we

13  are, and they -- we haven't heard anything about that.

14          So, I don't know that it's going to be easy to

15  get permission.  We want to reduce it.  And I know when

16  we go ask someone for permission, like if we ask Avaya,

17  if Mr. Hamilton was their counsel, then he's the one

18  that's at issue on these privileged e-mails.  And I've

19  dealt with him before and I know his first question will

20  be, tell me exactly what you're producing.

21          THE COURT:  Sure.

22          MR. WOOD:  And, so, that then becomes our

23  burden is:  We've got to go through everything and say,

24  these are all -- this is all the Avaya confidential

25  material that you produced that Extreme now wants to

see, and it -- you know, it could take us a fair bit of
time to go through everything and figure that out.

THE COURT:  Okay.  And what about the discovery
responses; have you checked to see if they're held by
local Delaware counsel?

MR. WOOD:  I have not.  And, so, I've only
looked at our records.  So, if -- you know, if that's
something Your Honor orders us to do, then we can look
at that.

And, I mean, my memory is the written discovery
was extensive.  I think we'd have -- could have similar
issues there, depending on what the requests were and,
you know, how those were -- how those were marked,
especially if they're wanting our discovery issued to
other parties.

THE COURT:  Uh-huh.

MR. WOOD:  I don't know.  I just -- I'd have to
look at them and see what -- see what they are.  So I
could make a call, but I know that there was a lot of
written discovery in the case.

THE COURT:  Okay.

MR. WOOD:  So --

THE COURT:  All right.  Well, it sounds like to
get a handle on this, we need to understand what the
scope of the universe is, and, so, we're going to need

1    to have the list.

2         So, Mr. Wood, I am going to ask the plaintiffs

3    to put that list together of what -- and as detailed as

4    you can be as to what's included and then allow Extreme

5    time to look at that and -- within the categories that

6    they have requested and to see what they feel they may

7    want so that then the appropriate process of making the

8    call and seeking approvals and can better describe

9    what's being requested to the disclosing parties so all

10   of that can occur because I feel like here today,

11   it's -- it is difficult to assess the full burden

12   without knowing the scope of the universe we're dealing

13   with.  So, we've got to get started somewhere.

14        MR. WOOD:  Okay.

15        THE COURT:  So, the list will be the starting

16   point.  And, Mr. Prabhakar, if you can look at that, try

17   to narrow what you need within -- what you think you

18   need based on the descriptions, try to eliminate things,

19   if you can, and then maybe be more specific.  If it

20   starts getting into the source codes, because I

21   understand their position, that is going to be

22   difficult.  Well, if it was spoken about in general

23   terms versus a specific code, you may or may not want it

24   because he will have to describe that to the disclosing

25   party exactly what's -- what has been requested, and

```
1   then maybe there can be the discussions of a higher
2   level of protection, if they would be willing to do
3   that, to eliminate some of the work that may entail
4   going through everything.  We don't know.  And, so, we
5   need know what we're dealing with first.
6           And, Mr. Wood, I will ask if you could check
7   your files just one more time and also make a call to
8   your local counsel just to see if they might have it
9   readily available.  That wouldn't cause an
10  additional -- any additional burden in checking --
11          MR. WOOD:  Okay.
12          THE COURT:  -- to make a phone call.
13          MR. WOOD:  All right.
14          THE COURT:  All right.
15          MR. PRABHAKAR:  Your Honor, briefly.  I'm not
16  going to make an argument, but I'm going to make a few
17  requests to this.  Can the plaintiffs at least give
18  notice that their materials have been requested and just
19  attach our discovery requests so that the other side
20  is in -- at a very high level knows what is requested?
21  And if they say yes, then we don't even have to go
22  through the exercise of cataloging everything.
23          And the second thing is:  We would really like
24  to get to the depositions of plaintiffs' employees.  So,
25  if Your Honor could give them a slightly expedited
```

1  schedule to put together that list, given that this
2  request has now been pending for over a year, we would
3  very much appreciate it.

4          THE COURT:  Well, they're a party to the order.
5  So, I'm going to leave it to their discretion whether
6  they feel like they immediately need to put them on
7  notice.  I'm asking them to put the list together
8  because I'm trying to find the scope that's relevant in
9  this case.  So, I'm not going to order them to do that
10 and I'm going to leave that to them.  They have whatever
11 they feel their obligations are under the order.

12          In terms of plaintiffs' employee depositions,
13 if that is less problematic, if you can separate that
14 from the list of other things and that's -- and that's
15 easier, that would at least get things started.  Can you
16 do that?

17          MR. WOOD:  So, we -- we'll put together the
18 full list.  Even on the employee depositions, I'm not
19 sure if they're talking about confidential information
20 from other parties.  We'd have to go through the entire
21 deposition.  So, I think -- well, I think we start with
22 the list, as Your Honor has asked.  Could -- I would
23 request, could we have two weeks to put the list
24 together?

25          THE COURT:  I think -- I think that's

reasonable given the amount of material that's been
described to me.

MR. WOOD:  Okay.  Thank you, Your Honor.

THE COURT:  Okay.  Now, the second topic -- we
can move to that -- is Extreme's request for documents
about SNMP's licensing negotiations with specific
parties, and this pertains to RFP No. 57, and I see that
plaintiffs have produced license negotiations with 28
licensees and negotiations, specific negotiations, with
five.  Is that correct?

MR. PRABHAKAR:  That is correct, Your Honor.

THE COURT:  Okay.  All right.

MR. PRABHAKAR:  And, actually, with those five,
the ask for 28 actually goes down to 26.

THE COURT:  Okay.  Okay.  And, Mr. -- whenever
you're ready, Mr. Prabhakar.  I mean, my first question,
I want to understand specifically what type of
information is Extreme looking for in these licensing
negotiations.

MR. PRABHAKAR:  So, Your Honor, the type of
information that we're looking for is whether there was
any negotiation about what the terms of the license
means; if there were technical terms at issue, do they
inform the scope of the license and do they bear on the
facts that are relevant in this case; were there

1   negotiations about the royalty rates, because it's
2   likely -- a lot of these licenses have been listed in
3   plaintiffs' interrogatory responses as relevant to
4   damages.  So, to the extent that the parties bargained
5   about royalty rates, we would like to know where
6   plaintiff started from, where they ended up.  At a very
7   high level, these are the kinds of information.

8       Another piece of information that's highly
9   relevant to our case is whether there were requests for
10  the addition of other products, whether there was a
11  request for assignment of the license to another party,
12  and what were plaintiffs' demands in those situations
13  because we have a similar pattern here where -- or fact
14  pattern here where we had requested transfer of a
15  license, or Brocade had requested transfer of a license.
16  And, so, we would like to know that, what has been
17  plaintiffs' practice in that regard in the past and
18  whether there is relevant information that we can use in
19  our claims and defenses in this case.  So that's at a
20  very high level what we're asking for, Your Honor.

21      THE COURT:  In the five that they have
22  produced, did you find all this information?

23      MR. PRABHAKAR:  Some of it, Your Honor; not all
24  of it.  And we haven't gone through it cover to cover.
25  But, yes, certainly some of the negotiations about

amending the license, adding products, some of it is
there.  But we haven't seen all of it.  But we only have
five, out of which three are now related to entities
like Extreme.

So, for example, we have Brocade's.  We have
Enterasys' license.  And that's actually quite telling
because Enterasys' license transferred to Extreme.  And
it was a fairly smooth process.  It happened long after
the acquisition closed.  So that's kind of telling and
important for this case.  Except to the extent that
there are others, that's certainly going to be relevant.

The challenge, Your Honor, is -- is the issue
that we are worried about, which is selective disclosure
of negotiations.  So, for example, they have produced
negotiations with Cisco which had a high dollar
settlement with plaintiffs.  So, the concern, really,
here is that are plaintiffs picking and choosing
negotiations that are helpful to them and potentially
withholding negotiations that are not helpful to them?
So, selective disclosure is one of the problems that we
have.

So, in addition to the relevant information
we've required, we're worried that we're only getting
information that plaintiffs are asking for, not the
requests -- not the information that Extreme is

1    requesting.

2            THE COURT:  Okay.  Thank you.

3            All right.  Mr. Wood, if I could start by

4    asking you:  How did you decide to produce the five that

5    you did?

6            MR. WOOD:  Yes, Your Honor.  So, for -- let's

7    start with Cisco.  We produced the Cisco negotiations

8    because they specifically asked for the Cisco

9    negotiations.

10           In request No. 56 -- here it is -- you see it's

11   all documents and communications related to the master

12   software license agreement dated June 23rd, 2008,

13   between Cisco and SNMP Research International, including

14   any exhibits, those related to negotiations that led to

15   this agreement, claims and assertions by you.

16           So, we didn't just pick this out of the list;

17   they asked for it.

18           THE COURT:  Okay.

19           MR. WOOD:  The parties have also asked for all

20   documents and communications with Brocade, Extreme and

21   Enterasys, which are parties related to -- I mean,

22   Brocade was in the litigation.  The transfer of their

23   license to Extreme is at issue.  So that seemed

24   relevant.  There was a specific request for that.

25           Extreme obviously wanted all of the -- all of

the documents we had related to the Extreme license
agreement.  So we produced that.  The Enterasys license
was transferred to Extreme.  So that's something they're
in possession of.  So, these were things they
specifically asked for specifically at issue in this
case.

The problem with RFP No. 57, and if you -- it's
just a list.  And we have asked Extreme, "How did you
come up with this list?"  And they -- all we have
gotten, and this is all that's in their paper, is that
these are similarly-situated entities.  That's the
extent.

Well, we've produced all of our license
agreements.  So, if there is something in the license
agreement, they should be able to show for each of these
entities, they have a license agreement with us, with
SNMP, and be able to show by the terms of the license
agreement that they're similarly situated.  They haven't
done that.  They haven't even attempted to do that.

All -- it's a very conclusory argument.  They
just say, "We" -- "We have determined they're similarly
situated.  We're not going to tell you how."  And I
think if you look at the case they cited, the *High Point
SARL* case, it -- for the proposition that you produce
license negotiations with similarly-situated entities.

```
 1              Well, in that case, one, they had to show that
 2    they were similarly situated.  I don't think Extreme has
 3    done that here.  But it's -- it's informative that what
 4    the Court determined was -- in that case, I think High
 5    Point SARL, it was a patent infringement lawsuit, and
 6    the issue was should you produce all of your licensing
 7    negotiations with other patent infringers.  And the
 8    Court ruled, well, those are obviously similarly
 9    situated because that's exactly what's happening here.
10    You know, you're claiming someone has infringed; we want
11    to know how you negotiated with our infringers.
12              And, so, the only party in this list, according
13    to the -- that analysis that's similarly situated is
14    Cisco.  And we produced -- it's also -- you know, I
15    appreciate counsel saying that he -- they could -- Cisco
16    could come off the list on 57.
17              So, what we produced are the negotiations for
18    this specific license agreement, the June 23rd, 2008,
19    license agreement, which was the license agreement SNMP
20    entered into with Cisco in order to resolve their
21    infringement.  And that's why it was such a high-dollar
22    license agreement because Cisco had been a customer for
23    years.
24              We haven't produced all the negotiations with
25    Cisco previously.  Cisco had licensed lots of stuff.
```

1   There is -- and Extreme has that license.  They have the
2   previous license agreement.  All they asked for was the
3   one that dealt with the infringement and resolving the
4   infringement.

5          THE COURT:  Okay.

6          MR. WOOD:  And, so --

7          THE COURT:  So, none of these on this list are
8   infringers?

9          MR. WOOD:  Not that we know of at this time,
10  correct.  So, we have -- we do not -- we have had no
11  negotiations with any of these -- these parties other
12  than -- I guess I should say:  Radware was one of the
13  parties that got software from Nortel.  They were not
14  previously an SNMP Research customer.  And there was a
15  settlement agreement.  So, Radware did enter into an
16  agreement with SNMP Research to license the software.
17  It's a -- it's a zero-dollar license agreement.

18          So -- and then I don't know if their intent in
19  listing Avaya Holdings Corp. as a -- which is not the
20  Avaya that we had the lawsuit with -- was -- was the
21  same thing.

22          Since we're going through these, Sienna and
23  Ericsson were also recipients of Nortel software.

24          THE COURT:  What were those two?

25          MR. WOOD:  Sienna and Ericsson.  But those

 1    were -- those -- those were resolved.

 2         But I would say, you know, Extreme

 3    hasn't -- I'm making their case for them, I think;

 4    right?  They haven't put any effort into trying to show

 5    that any of these entities are similarly situated.  They

 6    have the Sienna agreement.  They have the Ericsson

 7    agreement.  They can say these are -- these are similar

 8    or not.  And they haven't even attempted to do any of

 9    that or have discussions with us about why some of these

10    are and some of them aren't.

11         THE COURT:  Okay.  Thank you.

12         MR. WOOD:  Thank you.

13         THE COURT:  I bet you know what I'm going to

14    ask.

15         MR. PRABHAKAR:  I'm not going to guess, Your

16    Honor.

17         THE COURT:  Can you -- after reviewing the

18    agreements, can you talk with me about similar

19    situations that you're trying --

20         MR. PRABHAKAR:  Sure, Your Honor.

21         THE COURT:  -- to identify.

22         MR. PRABHAKAR:  So, I think the -- just to

23    briefly address the *High Point* case, it talks about

24    parties that are similarly situated, which doesn't

25    necessarily mean infringer versus non-infringer.

1            So, for example, every party that we have

2    requested negotiations from are providers of network

3    equipment like Extreme.  And, actually, before I even

4    walk down that list, I'll tell Your Honor our concern in

5    providing a really fulsome explanation of how each and

6    every entity got on that list because, as you know,

7    there are 700 different parties that have agreements

8    with plaintiffs and we requested only 28.  So, in some

9    sense, the selection of the list itself reveals work

10   product information.  So, if we dive into more details

11   about how each specific entity got on that list, that's

12   actually going to attorney mental impressions of how we

13   got there.

14           But I take the Court's concern about you want

15   to know a little bit more how, and I'm happy to provide

16   that information of a very high level.

17           So, I said, first of all, all of them are

18   network equipment providers.  Many of them in the list

19   are direct competitors of Extreme; Juniper, Cisco, HP,

20   Sienna, ExGen.  And you just heard --

21           THE COURT:  How many -- how many are direct

22   competitors out of this list?

23           MR. PRABHAKAR:  So, Your Honor, I would have to

24   confirm with our client, like, how they viewed direct

25   competitors.  But I know for certain that Juniper,

1   Cisco, HP, and Sienna are direct competitors.  And Avaya

2   Holding.  At one point in time -- we bought the

3   networking business from Avaya, but at one point in

4   time, Avaya and Brocade were competitors of Extreme.

5   And these are licenses negotiated prior to the

6   acquisition.  So, a lot of them, at least from a direct

7   competition point of view, are related to Extreme.  And

8   Broadcom and Avaya were actually accused of

9   infringement.

10          We have, I understand, Broadcom's negotiations,

11  but Avaya Holding Corp. had a later license, but it also

12  got equipment from Nortel which, in the past, was a

13  competitor of Extreme.

14          Radware, as we understand -- and, Your Honor,

15  this is where my limits of my knowledge about my

16  client's business may be showing.  But, really, given

17  the span of this case, a lot of these entities may

18  either be past or present competitors of Extreme.

19          But, in general, we picked companies which were

20  in the same space, maybe the same size as Extreme and

21  had similar royalty rates as Extreme without, like,

22  going into a lot of work product information, Your

23  Honor.

24          And to -- to remind Your Honor, the bar is

25  relevance, and I think just the fact that each one of

these companies is a licensee of SNMP Research shows
that these negotiations are relevant.

And we have narrowly tailored our request.  We
haven't asked SNMPR to produce negotiations with all 750
licensees.  That would be ridiculous.  That would be
overbroad and Your Honor wouldn't like it.

But essentially what plaintiffs are accusing us
of is:  You put one RFP for Cisco and you produced it,
but you put 26 names here, or 28 names here, so we
aren't going to produce it.  I could break these up into
28 requests.  And that's the selective disclosure
problem, Your Honor.

We requested Cisco.  You gave it to us because
potentially it looked good for you.  We have used your
burden of responding by collecting 28 and putting it in
one request and you ignored it.

Would it be different -- would it be a lot
different if you just would have served 28 requests or
26 requests or 28 requests directed to each entity?
It's form over substance, and that's the selective
disclosure that I'm talking about, Your Honor.

THE COURT:  Okay.  All right.  So he's
explained they picked companies, perhaps, of the same
size and similar royalty rates, and he's given some
examples of the type of information we're looking at

         from the licensing negotiations.  So why would that be

         problematic?

                  MR. WOOD:  So, I'm -- one, I -- we don't think

         all of that is correct.  I actually -- my -- Dr. Case,

         our client, has now joined the hearing, and there is two

         of these entities he's never even heard of, and it

         doesn't appear SNMP even has a license agreement with

         them.  So, it's really not clear to us how they came up

         with this list.

                  THE COURT:  I thought -- I just want to make

         sure I'm understanding something.  I thought you said

         you gave them all of these license agreements.

                  MR. WOOD:  We gave them all of our license

         agreements.

                  THE COURT:  Now you're saying you're

         not -- okay.  You gave them all of your licensing

         agreements.  You're not sure if all of these companies

         are licensees?

                  MR. WOOD:  Right, because they won't tell us

         how they came up with the list.  So, Mr. Prabhakar has

         said more in this hearing than he has on multiple meet

         and confers.  Every time this comes up, we say, "How did

         you come up with the list?  What do you really want?"

                  So, the reason we produced Cisco is not -- it's

         because they asked us a specific request, and it was

clear what they wanted and why it was relevant.  They

haven't -- they haven't done any of that here.  I mean,

for example, Verizon is a cell phone company.  I'm not

sure how Verizon -- VMware produces a virtual machine

which seems completely different.

THE COURT:  Okay.  He described them as

providers of networking equipment.

MR. WOOD:  I think they would have to show that

our license was -- I don't know that the SNMP license

with Verizon is for networking equipment.  I'd have to

go look.  I guess my point is:  There is questions --

THE COURT:  Let me ask this so maybe we can try

to cut this down a little bit:  Would you be able to

look at this list together and pick out, say, three that

are networking equipment providers of a similar size,

similar royalty, and you say, these are like the three

most burdensome negotiations, and produce that?

MR. WOOD:  For a -- you mean pick out three

that we've produced that we can both agree --

THE COURT:  Uh-huh.

MR. WOOD:  -- based on burden and --

THE COURT:  Yes.

MR. WOOD:  We actually offered something just

like that.  You know, we think doing just a few makes a

lot of sense.  We'd be happy to do that.  We think some

1  of these aren't even relevant.  And we couldn't even

2  engage in a discussion because Mr. Prabhakar said they

3  were worried about telling us why they put certain

4  entities on the list.  But I think we have to have that

5  discussion.

6          THE COURT:  That's why I'm not going to ask him

7  to go into any more detail, but using the general

8  criteria that I've been given this morning, I mean, can

9  you all do that?  Look at the list --

10         MR. WOOD:  Yes.

11         THE COURT:  -- pick out the three that kind of

12 fit the categories that they're looking for?

13         MR. WOOD:  Yes, I think we would be -- we'd be

14 happy to pick out three, and that would certainly be

15 more reasonable than doing all 28.  So --

16         THE COURT:  Would -- and, Mr. Prabhakar, do you

17 want to address that?  Because I'm hearing now a concern

18 that they may not even be licensees of them.  So, based

19 on what I have before me, this would seem like a

20 reasonable compromise for today.

21         MR. PRABHAKAR:  Your Honor, I am not going to

22 annoy you by asking for more; although, every requesting

23 party asks for more.  We'll put together a list of three

24 to begin with and see how it works out.

25         THE COURT:  Okay.

1    MR. WOOD:  Thank you, Your Honor.

2    THE COURT:  All right.  Does anyone need a

3  break before we move to topic 3?

4    MR. PRABHAKAR:  I'm sorry, Your Honor?

5    THE COURT:  I was just asking if anyone needs a

6  break before we move to topic 3.

7    MR. PRABHAKAR:  I'm going to keep topic 3

8  really brief.  So --

9    THE COURT:  Okay.  We'll go ahead with that.

10    MR. PRABHAKAR:  -- unless somebody wants to --

11    THE COURT:  All right.  So, this is Extreme's

12  claim that SNMPR refuses to produce the competition

13  documents, RFP Nos. 156, 158 and 161.  And, as I

14  understand, the plaintiffs have produced the

15  non-privileged documents responsive to this request.  Is

16  that right?  Is that correct?

17    MR. WOOD:  Yes, Your Honor.

18    THE COURT:  Okay.  So, I guess a question I

19  have for you, Mr. Prabhakar:  Now that they have

20  produced the non-privileged documents, I mean, what else

21  is there that you're looking for?

22    MR. PRABHAKAR:  So, actually, Your Honor, I'm

23  not aware of any privileged documents being withheld

24  because I haven't seen an updated priv log since these

25  documents have been produced.  But we'll take them at

1  their presentation.

2         And obviously we don't ask for privileged

3  information, but when we reviewed plaintiffs'

4  production, we found, for the timeframe that was

5  requested, very few documents that relate to

6  competitors.

7         So, at this point in time, Your Honor, the only

8  request we have for the Court is two requests:  One,

9  plaintiffs' RFP response still have objections to it.

10 So that prevents us from understanding what's being

11 produced, what's not being produced.

12        Even in their brief, they had informed the

13 Court that they have conducted a reasonably-diligent

14 search but not an unduly burdensome search.  And we just

15 want details because we haven't got those that what do

16 they consider or can they describe their

17 reasonably-diligent search so that we're comforted that,

18 okay, it's diligent; we don't want anything more.  And

19 what do they consider an unduly burdensome search?

20 Because, for example, searching by the name of the

21 competitor in their e-mails or documents wouldn't be

22 unduly burdensome to us but it may be to plaintiffs.

23        So, we just want to understand what was done in

24 response to our request because they kept saying that

25 they don't understand the requests; they're not going to

1  produce, and then suddenly when this issue came before

2  the Court, they said, well, actually, we produced

3  documents.  So we just want the details of the search

4  and what they haven't searched and we'll just be

5  satisfied with that.

6          THE COURT:  Well, let me ask this:  Extreme

7  says it produced its documents.

8          MR. PRABHAKAR:  Yes, Your Honor.

9          THE COURT:  So, can you describe what Extreme

10 did?  Describe Extreme's search.

11         MR. PRABHAKAR:  Sure, Your Honor.  So, one of

12 the named entities on this list was Net-SNMP, and in

13 many of our products, we had replaced plaintiffs'

14 software with the Net-SNMP.  So we basically ran a

15 search for Net-SNMP on all our engineering custodians,

16 and whatever documents, e-mails, all popped up, we

17 produced all of that.  We haven't filtered any of that.

18         THE COURT:  Okay.  All right.

19         MR. WOOD:  Your Honor, so, as we said in our

20 paper, we believe we have produced all the documents we

21 can find after a reasonably-diligent search.

22         THE COURT:  Can you describe the search so that

23 there is an understanding of how it was conducted.

24         MR. WOOD:  Yes, Your Honor.  So, what we

25 discovered was that over the course of SNMP's history,

1  they had kept competitive information in two places.  It

2  was an online file that we discovered, online directory,

3  and there was a paper file where they would file things

4  away.  And, so, it appeared as things came in that they

5  thought were relevant, competitive information, they put

6  those in one of two places, as far as we can tell, and

7  we produced both of those.

8          We think it's unduly burdensome to search, you

9  know, 25, 30 years of e-mails and try to determine if

10  any mention of any -- any entity was somehow what

11  they -- what they want as competitive information when

12  SNMP is in -- that's their business.  It's in their

13  space.  They're going to get questions from customers;

14  they're going to get other things, and to try to filter

15  through all that, we think would be unduly burdensome.

16  And, so, we've produced what SNMP through the years

17  thought was relevant competitive information, and --

18          THE COURT:  So everything in the online

19  directory and everything in the paper files?

20          MR. WOOD:  Yes.

21          THE COURT:  Okay.  Thank you.

22          MR. WOOD:  Thank you.

23          THE COURT:  Mr. Prabhakar, so, you've heard his

24  explanation that they have looked to see what SNMP

25  considered competitive information.  They kept it in

1  those two places and given you everything. And, so,

2  what else would you be looking for? He's described what

3  he considered unduly burdensome by doing any, you know,

4  further search beyond these two files.

5          MR. PRABHAKAR: Your Honor, I do think that an

6  e-mail search for the competitors is appropriate because

7  this goes to the heart of the damages issues in this

8  case.

9          Now, what I hear counsel telling us is that

10 they may have received questions from their customers

11 saying, why shouldn't I move to Net-SNMP; it's free. We

12 would like to know, to assess the key issue in this

13 case, the value of plaintiffs' copyrighted software, how

14 did SNMP Research respond to them.

15         So, while we're satisfied that they have looked

16 at their online files, but that information in the

17 online files came from somebody's e-mails.

18         So, did everybody put that information there,

19 not put that there? Because right now over a period of

20 SNMP's existence over 20 years, we have located about

21 100 e-mails and documents related to their main

22 competitor, Net-SNMP, and we haven't seen any documents

23 for some of the other competitors.

24         So, given the importance of this issue in this

25 case, Your Honor, because it's -- it's relevance versus

burden, relevance here is really, really high to our

damages case. It goes to the heart of the apportionment

issue. We think a little more, if Your Honor is willing

to allow us, would be helpful.

THE COURT: Well, it appears that they have

requested Extreme to provide some search terms to assist

it since it's years of e-mails. So, what is Extreme's

position on that?

MR. PRABHAKAR: So, Your Honor, the -- the

slight challenge there is: We can provide some obvious

terms, which is Net-SNMP, now that we know it's a

competitor, but Extreme's a networking company. We

don't make -- we don't write SNMP Research software.

Like, Extreme would be the best judge of who its

competitors are. Just like that, plaintiffs would be

the best judge and would have the best information of

companies that they consider their competitors.

That was our hesitation in providing search

terms because if I only know of two competitors, then I

have artificially limited the relevant information that

I could get because plaintiffs could have had a list of

six competitors. So that was the hesitation, Your

Honor. It wasn't that we were trying to be difficult,

but because we thought plaintiffs have the best

information. And if they would have given us, say, a

1　list of what they consider competitors, we would have

2　crafted search terms.  And we are still willing to craft

3　search terms if they are willing to entertain that.

4　　　　　THE COURT:  Well, let's go back -- before you

5　sit down -- back to the process that Extreme utilized to

6　do its production.  So, what all did you include in your

7　search terms?

8　　　　　MR. PRABHAKAR:  Net-SNMP, Your Honor.  The

9　broadest possible search we could find, we actually

10　included.

11　　　　　THE COURT:  So, that's it?

12　　　　　MR. PRABHAKAR:  Yeah, just a single keyword

13　search.  We couldn't go broader than that.  We didn't

14　limit it any more.  And we ran it on our engineering

15　custodians who would have had access to those documents.

16　　　　　So, if they're willing to identify, for

17　example, the principal of the company who would

18　likely -- you know, he's a pioneer in this case.  He

19　would have the best information about competitors.  He

20　would get questions about competitors.  If they would

21　just search his e-mails for what they think are

22　competitors, I think we'll be satisfied, Your Honor.

23　　　　　THE COURT:  Okay.  Mr. Wood.  Is there an

24　agreed-upon list of search terms that could be

25　developed?

1          MR. WOOD:  I think so.  We were surprised that

2     Extreme did not want to discuss search terms with us.

3     They just kept saying, "Give us everything, but we're

4     not going to even work with you on search terms."

5          THE COURT:  It sounds like part of the process

6     would be identifying the competitors, which Extreme is

7     saying that they did their search with just the name of

8     their known competitors.  So that sounds like that would

9     be part of the process.

10         MR. WOOD:  Uh-huh.  And I think we would

11    disagree that even just random e-mails, it may mention a

12    competitor's name are somehow relevant.  I think, one,

13    if we're going to go down the road of searching, one

14    thing we could do is maybe filter out support e-mails or

15    certain types of e-mails --

16         THE COURT:  Uh-huh.

17         MR. WOOD:  -- that probably aren't going to

18    have anything -- any discussion of value.

19         THE COURT:  Uh-huh.

20         MR. WOOD:  It would just be a technical -- more

21    of a technical discussion.

22         THE COURT:  And it sounds like there could be

23    limitation on whose e-mail is searched as well.  So, I

24    think I would like the parties to meet and confer on

25    this and develop a list of appropriate search terms.

1          MR. WOOD:  Okay.  Thank you, Your Honor.

2          THE COURT:  Thank you.

3          All right.  We're coming upon the noon hour.

4    Do you all want to take a short lunch break, or do you

5    want to continue working through some items?

6          MR. PRABHAKAR:  It's up to Your Honor, frankly.

7          MR. WOOD:  Yes, up to you, Your Honor.

8          THE COURT:  All right.  Well, let's go ahead

9    and finish topic 4 then, and then I, myself, have

10   segregated topic No. 5 into a separate issue.  So we'll

11   end after topic 4 and take a short lunch break.

12         All right.  So, this is Extreme's claim that

13   plaintiff refuses to produce license agreement related

14   to software that predates the formation of SNMPR

15   International.  So these are the pre-1994 agreements.

16         MR. PRABHAKAR:  Correct, Your Honor.

17         THE COURT:  All right.

18         MR. PRABHAKAR:  And we only request these

19   agreements because I know -- and Your Honor knows

20   because you've ordered the production of license

21   agreements that they have produced a lot, but these are

22   really key because these are license agreements before

23   the formation of the licensing entity.

24         THE COURT:  Uh-huh.

25         MR. PRABHAKAR:  And it goes to a key defense

1    that Extreme has, which is Extreme's position is that

2    part or all of the code that is contained or that is

3    within the scope of SNMP Research's copyright

4    registration was published, and because it was published

5    before it was registered, some code or maybe all the

6    code is not entitled to copyright protection.

7            Now, there may be reasonable dispute about

8    whether our legal theory at this stage is right or

9    wrong, but that's not what we have to resolve at the

10   discovery stage.

11           We understand there are few licenses pre-1994.

12   We understand that the plaintiff, by its own website in

13   1988, had ten customers.  So we're talking about a

14   six-year period.  And we understand in the context of

15   other topics that plaintiffs' licenses are separated --

16   hard copy files are separated by licensee.  Electronic

17   files are easy to search.  So this shouldn't be very

18   burdensome.

19           Now --

20           THE COURT:  Let me ask you this, though:  Why

21   do you need the actual agreement if all the terms from

22   that agreement are incorporated in everything they have

23   given you?

24           MR. PRABHAKAR:  Because we don't know, Your

25   Honor, if they were.  Because, as you can imagine, a

1    company starts in 1988.  It's a start-up.  Dr. Case,

2    like, built it up from scratch.  It is possible that the

3    earlier agreements had different terms, different

4    confidentiality terms, different distribution terms, and

5    as the company gained more experience, more customers,

6    learned more about the business, would have improved

7    upon its licensing terms.  It would have maybe addressed

8    some confidentiality issues that were not addressed in

9    the prior agreements.

10             So, that's the -- there may be information that

11   is valuable to our defense there, Your Honor.  That's

12   what we're trying to assess, how did the

13   confidentialities, one of the terms it morphed as the

14   company got more mature and became a more sophisticated

15   licensing entity than what it was in the beginning.

16             THE COURT:  Okay.

17             MR. PRABHAKAR:  And the only distinction that

18   plaintiffs try to draw is the difference between an

19   active licensee versus an inactive licensee.

20             But for our purposes, Your Honor, let's

21   say -- in a hypothetical situation, we talk about why

22   active and inactive doesn't really matter.  Let's say

23   I'm a provider of technology and I have -- I supply

24   confidential information or confidential products to my

25   client, and in the beginning, I didn't have a stringent

confidentiality restriction in my agreement or in my

dealings with that client.  I became more mature.  I

developed stronger protection.  But that company is no

longer my client and now I'm providing the same

confidential information to another company.  But

because I had already provided it, for example, in a

nonconfidential manner with an earlier client, the fact

that that party is not a client anymore doesn't change

the fact that my information is already out there in a

nonconfidential manner.

So that's why the active and inactive

distinction for the purposes of our key defense doesn't

really make much of a difference to the relevance of the

documents because the fact that these licenses

transferred to something else and had potentially

different terms still doesn't change the fact that at

some stage, they were governed by a different agreement

with different terms, and those terms are relevant to

our defense; otherwise, we wouldn't be asking for those.

THE COURT:  Okay.

MR. WOOD:  Your Honor, so --

THE COURT:  Am I understanding it correctly

that you are representing that the licenses you have

produced include the pre-1994 terms?

MR. WOOD:  So, in 1994, when SNMP Research

1   International was formed, any active license was

2   transferred to SNMP Research International and

3   continued.  And, so, those -- those are SNMP Research

4   International licenses, and we've produced all of those

5   as Your Honor ordered us, I think, a little over a year

6   ago.

7            THE COURT:  Uh-huh.

8            MR. WOOD:  So I don't remember the exact

9   number, but close to a thousand licenses.  So we've

10  produced a lot of licenses.  And we -- it goes back

11  30 years.  So, we've produced 30 years' worth of

12  licensing agreements.

13           What wouldn't have been produced and what

14  they're asking us to find -- so, I think that there

15  would be some duplication because we've already produced

16  some.  If someone was an SNMP Research, Inc. customer

17  and then was no longer a customer in 1994, that

18  agreement -- that agreement was inactive in 1994, then

19  it would not have been transferred because they weren't

20  a customer anymore.  There was no reason to transfer it.

21           So, that's -- so, I think they -- they do have

22  a lot, and I think they could have -- there has been

23  no -- no effort, no showing that any of these agreements

24  that actually transferred, you know, show any of these

25  terms that they think they need to get to.

1          We also -- Mr. Prabhakar keeps saying this
2     relates to the publication issue.  We don't -- we don't
3     dis- -- we don't agree with their issue.  We -- we
4     certainly understand they -- they have that issue, and
5     they do have, I think, the right to get discovery, but
6     they have 30 years' worth of licenses.  I mean, they
7     have everything.  I don't know why they need more, why
8     they need to go back even further.

9          It's almost like saying, well, if -- their
10    stance is:  Well, if you published it before you
11    registered it, then your registration is invalid.  Well,
12    they have licenses back to 1994.  Our registration was
13    filed in 2011, 2012.  So, they already have -- I think
14    if -- you know, to work up that issue, they have
15    everything they need.  They don't need these other ones.

16         And, so, we're just -- we thought we were
17    producing what was relevant.  We thought even going back
18    30 years was probably too much.  We tried -- we did, you
19    know, something less.  They wanted more.  We did that.
20    Now they want even more.  So -- which we think we
21    shouldn't have to do that.

22         THE COURT:  Okay.

23         MR. WOOD:  Thank you.

24         THE COURT:  Mr. Prabhakar, what would not be
25    duplicative in your request?

1          MR. PRABHAKAR:  Licenses that didn't transfer,

2     Your Honor --

3          THE COURT:  Uh-huh.

4          MR. PRABHAKAR:  -- or licenses that transferred

5     but originally had different terms, confidentiality

6     terms in particular, those would be what we want.  And

7     we haven't -- I mean, we've talked about burden in the

8     abstract, but they haven't provided us how many

9     licensees were inactive that didn't transfer which would

10    help us narrow our request.

11         Because we keep going back to, Your Honor, the

12    requesting party always wants more, but it's always

13    helpful to get information back to help reach a

14    resolution without wasting the Court's time, and we just

15    don't have that information.  But from what we had, we

16    don't believe the burden should be too high.

17         THE COURT:  Mr. Wood, how -- how many would we

18    be looking at if they fall in the category of not being

19    duplicative, those that did not transfer?

20         MR. WOOD:  I'm not completely sure.  I haven't

21    done the analysis to find all these agreements.  You

22    know, it's probably a few hundred files.  I don't know

23    how many licenses that would be.  And, like I said, some

24    of those have probably already been actually

25    transferred, and, so, they're showing up, you know, in

1  two different places.  So, we have -- we'd have to go
2  through all of it.  We'd have to go through all of it to
3  figure it out.

4          I think it's also worth pointing out, there
5  is -- you know, they said they needed the
6  confidentiality terms.  This is not a trade secret case.
7  This is a copyright case.  So I'm not sure that that is
8  even completely relevant.  But --

9          THE COURT:  I guess my thoughts would be:
10 Could there be just a sampling produced that would fall,
11 you know, within this non-duplicative category?  That
12 way they can see the terms and just see if they evolved
13 into those that were transferred just through the
14 sampling.

15         MR. WOOD:  I mean, we could try and find a
16 couple of -- you know, a few pre-1994 licenses and
17 produce those, if that's what Your Honor's suggesting.

18         THE COURT:  I -- I think that sounds like it
19 would satisfy what Extreme's looking for because you're
20 looking for the evolution of those terms.  So, if you
21 have, let's say, three pre-1994 --

22         MR. PRABHAKAR:  I do not want to bargain with
23 you, Your Honor, but if we could just get a list, we can
24 maybe try to narrow from there because we've already
25 narrowed to inactive licenses which didn't transfer.

```
 1   And I hate to give up, but I don't want to annoy Your
 2   Honor.  I'm really trying to work with you here.  But
 3   this is -- this is important to us.  That's why we're
 4   asking for it.
 5        THE COURT:  Mr. Wood, can you put a list
 6   together?
 7        MR. WOOD:  We can do a list.  I don't know how
 8   that's going to help them without seeing the terms.  I
 9   guess I would propose:  Let's produce, you know, one
10   from the '80s, one from '91 and one from '93, or
11   something like that, so they can see the -- if that's
12   what they want to see is the evolution.
13        THE COURT:  Well, I guess if there could be a
14   list and the name and the date and then let Extreme,
15   say, pick five.
16        MR. WOOD:  Okay.
17        THE COURT:  And for -- and they can make their
18   selection whether it's on different time periods or some
19   other basis.  But that should be able to give some
20   indication of the evolution that they're looking for.
21        MR. WOOD:  Okay.
22        THE COURT:  All right.
23        MR. WOOD:  Thank you.
24        THE COURT:  All right.  Let's go ahead and take
25   our lunch break.  It's a little after noon anyway, and
```

1    we'll just plan to be back here at 1:00.  Okay?

2              MR. LEE:  Thank you, Your Honor.

3              MR. WOOD:  Thank you, Your Honor.

4              THE COURTROOM DEPUTY:  All rise.  This

5    honorable court stands in recess.

6              (A lunch recess was taken.)

7              THE COURTROOM DEPUTY:  All rise.  This

8    honorable court is again in session.  Please come to

9    order and be seated.

10             THE COURT:  All right.  I hope everyone had a

11   nice quick lunch.

12             And I, as I stated earlier, have deemed this

13   the second issue, even though it was discussed in part

14   under the first topic, but this is Extreme's claim that

15   SNMPR refuses to respond to Interrogatories 9 through 17

16   and the improper assertion of discreet subparts in

17   Interrogatories 6, 7 and 8.

18             If I could turn to you, sir.  I just need to

19   get logged in.  Okay.

20             MR. PRABHAKAR:  Your Honor, nearly 11 months

21   ago, we served 11 interrogatories on plaintiffs.  We

22   received answers to less than three.  For all the

23   interrogatories, plaintiffs asserted discreet subpart

24   objections and counted the subparts in a way that meant

25   that they did not have to answer key contention

interrogatories beyond the first two-and-a-half.

Courts in the circuit use the related question test which asks, "Are the subparts factually or logically related?"

Extreme served sub-interrogatories that we believe passed the related question test. We asked plaintiffs to withdraw the subparts objections and respond to the interrogatory fully.

We asked for legal authority in support of their subpart objections, and we got a case from them which was inapplicable under the standards followed by courts in the Sixth Circuit.

Plaintiff cited to *Taylor* from Middle District of Tennessee, a 2008 case. Sorry. We cited *Taylor*, a Middle District, Tennessee case, which sets the related question test. *Taylor*, as recently as 2021, has been cited by cases -- by courts in Tennessee.

Plaintiffs rely on a 2002 opinion from *Medtronic* which uses a discreet information or discreet question standard that courts in the Sixth Circuit, particularly *Taylor*, have expressly rejected.

There is, in fact, guidance in the Advisory Committee notes that puts a question on the discreet information test. The Advisory Committee note says, "Seek information about discreet subjects, not

1   questions," which is consistent with the related

2   questions test.

3           To put a finer point on this, Your Honor, these

4   are all contention interrogatories that go to the heart

5   of the issue.  By imposing improper subpart objections

6   for over a year, plaintiffs have evaded their obligation

7   to provide us fulsome contentions related to their

8   claims, related to their source code.

9           We think each of these objections of subparts

10  are improper, and our count of interrogatories is

11  correct to 17, and they should now remove their subpart

12  objection and answer each of these interrogatories, the

13  ones that have not been answered.

14          THE COURT:  What I do have a question about is

15  No. 17.

16          MR. PRABHAKAR:  Yes, Your Honor.

17          THE COURT:  It states -- it includes a

18  statement, "as well as other methods of managing network

19  devices."  So, I'm just wondering if that being included

20  makes that a discreet subject.

21          MR. PRABHAKAR:  Give me just one second.

22          THE COURT:  Certainly, uh-huh.

23          MR. PRABHAKAR:  Your Honor, it does not, for

24  the simple reason that -- let's look at the language

25  before "including," which is what the related question

1  test looks at.  "Identify and describe all alternatives
2  or competitors to the software material at issue."  It
3  says, "Alternative implementations of SNMP protocol
4  which is a method of managing network devices."  So, in
5  some sense, there is no difference between other methods
6  of managing network devices because SNMP is a method for
7  managing network devices.

8          So, we still think it's within the same broader
9  question, that what are the alternatives to the software
10  material at issue, and we ask for alternative
11  implementations of SNMP, which is a method of managing
12  network devices.

13          THE COURT:  Thank you.

14          MR. PRABHAKAR:  Thank you, Your Honor.

15          MS. WEBER:  Good afternoon, Your Honor.  Olivia
16  Weber on behalf of plaintiffs SNMP.  I'll be handling
17  the subpart issue, and I have three points to make.

18          First of all, we had offered -- plaintiffs had
19  offered a reasonable compromise back in the spring,
20  almost a year ago, that should have mooted this entire
21  subpart counting issue as to the second set of
22  interrogatories from Extreme.  We said if Extreme wanted
23  to serve more interrogatories to account for what we
24  believed were multiple subparts that we would consider
25  that, and we were willing to give them more, as long as

the compromise went both ways.  And Extreme's recitation

of the compromise in its position statement does not

acknowledge that.  So I wanted to make it clear in that

we made this offer to Extreme multiple times over the

past 11 months and that the offer still stands.

On the merits, the relevant question is whether

the subpart is discreet.  That's the language of Rule

33.  And Mr. Prabhakar stated that one test is the

related question test.  There are also courts, many

courts, that apply the independent question test, which

asks -- and this is from *Medtronic* which is a Western

District of Tennessee case -- can the subsequent subpart

stand alone?  Is it independent of the first question?

Discreet or separate questions should not be counted as

separate interrogatories.

And then we cited the *Superior Communications

v. Earhugger* case, which ruled that interrogatories

requesting all facts in support of a contention and then

identifications of persons and identification of

documents are three discreet topics.

And that's our main problem with the second set

of interrogatories that Extreme has served, and I can

give an example.  I'm sure -- it sounds like you're well

familiar.  You've asked questions about the numbers.  So

please stop me if it's getting duplicative.  But

Interrogatory No. 6 says, "Identify and describe all
facts relating to your contention that Extreme has
breached any license."  And then, so, we interpret all
of these subparts as asking questions about all facts in
support of the contention.  That's Roman Numeral II,
III, IV.

        And then they ask for all individuals involved
in or with knowledge of the alleged breach.  That's
identification of all persons.  And we were careful in
our interrogatories to separate out requests about
identification of facts from identification of
individuals.

        And then No. IV, they ask about any documents
relied upon in your response by Bates number,
essentially asking us to do a Rule 33(d) response.

        And let me also go to -- or I should -- before
I move on to another one.  So, this has multiple
discreet subparts for not only the reasons that I just
mentioned, the three reasons, facts, persons and
documents, but they're asking for our contention that
Extreme has breached any license.  And in this case, we
have made two contentions about breach, breach of the
2001 license agreement and breach of the Enterasys
license.

        And so as you can see from our responses, it

took nearly a dozen pages to set forth the facts in
support of the contention of the 2001 Extreme license
and then all of the facts in support of the breach
regarding the Enterasys license.

And if you'll go to -- I'll put it up on the
screen.

THE COURT: Your contention is that these are
separate subparts based on the independent question
test. What would be your position if the Court was
employing the related questions test; would you agree
that all of these are related questions?

MS. WEBER: I think that they're related, but I
also think there would need to be some common sense way
to interpret the related question test. I think it goes
a bit beyond that here because under the related
question test, what Extreme is essentially asking this
Court to do is, if they have -- if Extreme were to have
a broad question upfront, which I think they do, all
facts relating to your contention about breach, then
they can ask any subpart related to that.

Similarly, they could say, identify and
describe all facts in support of your claims, which is
very similar to what they have done here. And then they
could ask about claim 1; they could ask about claim 2;
they could ask about defense 1, defense 2, defense 3,

1    and I think the logic doesn't hold up.  And they're

2    certainly related, but I think in a very broad umbrella

3    sense.

4         And we've been very diligent to separate out

5    our requests even if they're related.  You have requests

6    that go to facts, requests that go to documents and

7    requests that go to individuals, and we've held

8    ourselves to that standard.

9         I think this next one gives an example of some

10   of the mischief that's being caused.  Interrogatory No.

11   7 says, "Identify and describe all facts relating to

12   your discovery of the facts that you believe give rise

13   to your claims."  So they're wrapping in all of our

14   claims here.  And then they say -- Roman numeral I is

15   the copyright claim, No. II is the fraud claim and No.

16   III is alleged breach of any license.

17        Then they ask for all of the facts that go to

18   the day of the discovery, the circumstance, and then

19   they ask for identification of all the individuals and

20   all the documents.  I think that's far too expansive of

21   an approach.  And I'll give -- this brings me to my

22   third point, and it concerns -- this is an issue that

23   came up last week, and, so, I won't delve into it too

24   deeply unless you would like me to, but it's with

25   respect to Extreme Network's responses to SNMPRI's third

 1    set of interrogatories that their claims have multiple

 2    discreet subparts.  And I'll just give one example to

 3    show the contrast.

 4           So, this is our -- sorry.  This is SNMP

 5    Research International, and we say, "For each product

 6    that Extreme has identified as an accused product that

 7    contains the SNMP Research software, identify which

 8    license agreement Extreme believes gives it the right to

 9    use SNMP Research software in those products."

10           And they -- their responses say this is full of

11    discreet subparts pertaining to multiple different

12    licenses and multiple different claims.  And, here, this

13    is really parallel to the Interrogatory No. 1 that Your

14    Honor has enforced two times over the past couple of

15    years where Interrogatory 1 says, and I'll paraphrase,

16    identify every Extreme product that uses SNMP Research

17    software, and they identified that.

18           In turn, now we're saying, for each and every

19    one of those products, identify the license agreement

20    that you believe gives you authorization to use SNMP

21    Research software in those products.

22           So, I think if you look at the contrast between

23    the interrogatories that Extreme has served and we have

24    served, it would be -- Extreme has really pushed the

25    boundaries of how expansive their interrogatories are,

1  and they really should only be asked -- if they're

2  asking for a contention rog, that's fine.  Contention

3  rogs are appropriate, and we are willing to and have

4  listed all of the facts in support of our contention.

5  And we will continue to supplement as we get more

6  discovery, but they shouldn't also be able to ask under

7  the independent question test, or even the related

8  question test, now also identify all individuals with

9  knowledge and all relevant documents.

10          THE COURT:  Okay.

11          MS. WEBER:  Does Your Honor have any questions?

12          THE COURT:  When you started, you stated that

13  you had proposed that they be able to rewrite them and

14  put them in separate, but that was only under the

15  provision that you would then be allowed to serve more

16  interrogatories; is that right?

17          MS. WEBER:  If they needed more.  So, our

18  compromised proposal included or set forth that they

19  still had 20 interrogatories remaining, and our

20  compromise was that not only were those -- could they be

21  served by SNMP -- or excuse me.  Not only could they be

22  served on SNMPR, they could also be served on SNMPRI.

23  So Extreme could distribute the 20, however many it

24  wanted, and if it needed more, because of the way we've

25  interpreted the multiple subparts, we'd be willing to

1  negotiate a reasonable additional number of
2  interrogatories.  And if, say, they got five more or ten
3  more, then we would get the same amount of additional
4  interrogatories.

5      And that falls in line with our -- the
6  plaintiffs' initial proposal in the Rule 26(f) report
7  where we initially proposed 75 interrogatories per side
8  and now we're at 50 per side.  And we've gone with Rule
9  33.  Rule 33 is numerical limits.  So we would be
10 willing to negotiate more as long as it went both ways.

11     THE COURT:  What other courts besides the
12 Middle District of Tennessee has employed the
13 independent question test?

14     MS. WEBER:  Well, there is multiple -- there is
15 at least the *Earhugger* case that we've cited from the
16 Central District of California.  And I can give you a
17 few more case cites.  They come from -- I'll have to sit
18 down and check for it, but I believe it's the D.C.
19 Circuit.  And there is one other that's escaping me, but
20 there are other courts that have done it.  I should say
21 D.C. District Court.  I'm sorry.

22     THE COURT:  Do you recall if there was anything
23 specific about the cases before them?

24     MS. WEBER:  What I do recall is that it was the
25 similar holding to *Earhugger*, which those courts said

1    that you could not -- it violated the separate

2    questions -- the independent question test to ask an

3    interrogatory that sought all facts, identification of

4    persons and identification of documents.

5          THE COURT: Okay. Thank you.

6          MS. WEBER: Thank you.

7          MR. PRABHAKAR: Your Honor, a couple of

8    responses. I'm not sure where to start, but the first

9    point that I want to make is: Plaintiffs' counsel

10    described Rog 7 as mischief. I don't think we intend

11    any mischief. We understand Sixth Circuit to follow the

12    related questions test, and we crafted interrogatories

13    which, in good faith, followed the related question

14    test. There is certainly no mischief intended because,

15    as you can see, we were only through Rog 17 out of the

16    25 allowed. So, if we intended mischief, we would have

17    been all the way up to 25, and now we're like

18    scrambling, oh, wait, we need to ask these three

19    separate questions so we need to cram them in. So,

20    there is certainly no mischief intended, and I can

21    assure Your Honor of that.

22          Now, as you've seen this morning, Your Honor,

23    Extreme has no problem compromising if it keeps disputes

24    out of this court. But this is a fairly fundamental

25    disagreement about what law applies to counting

1  subparts.

2        Compromise implies that we did something wrong,
3  we think we did something improper under the law, and,
4  therefore, now, to avoid wasting the Court's time, we
5  somehow entered into a deal.  But given that we had a
6  good-faith basis that these rogs were proper, we think
7  until we got the Court's guidance, we do not think a
8  compromise is proper.

9        And I think not to go towards motives, but
10 plaintiffs' counsel briefly alluded to the 75
11 interrogatories.  What it sounds to me is that this is a
12 way to force us into agreeing to more interrogatories.
13 They have already got 50 interrogatories.

14        Your Honor is very familiar with the scope of
15 discovery in this case earlier with respect to document
16 production.  You're seeing it in the context of 30(b)(6)
17 depositions, and you're now seeing it in the context of
18 recipient witness depositions.  So, we think, Your
19 Honor, getting to the compromise is putting the cart
20 before the horse.

21        Let me briefly indulge the Court on the
22 substantive issue.  This is the opinion from *Taylor*.  It
23 says, "Courts in the Sixth Circuit utilize the related
24 questions test."  Couldn't have been said more clearer.
25 *Robinson* -- this is a 2008 opinion, Your Honor.

 1          *Robinson*, which is a 2021 opinion from not the

 2   Middle District of Tennessee but the Western District of

 3   Tennessee, that cites to *Taylor*, and we cite to that in

 4   our brief.

 5          So, we have 2008 through 2021, courts not only

 6   relying on *Taylor*, but *Taylor's* express statement about

 7   the test that courts in the Sixth Circuit follow.

 8          Plaintiffs cite to *Earhugger*, and I don't want

 9   to keep putting up cases because, Your Honor, they have

10   already been cited in our brief, but *Synopsis* from

11   California -- I mean, I'm not even going to -- I'm from

12   California, so I don't want to say anything about the

13   Central District of California not applying here, but a

14   California district court has expressly said *Earhugger*

15   is unpersuasive.

16          So the two cases that plaintiffs rely on, first

17   to say that we're causing mischief, second to say that

18   we're not compromising, are bad law in this circuit.

19          Now, if we look at *Synopsis*, Your Honor,

20   *Synopsis* has a line which, if we relied on, would make

21   it impossible for plaintiffs to serve any

22   interrogatories because what *Synopsis* holds is an

23   interrogatory that asks questions about multiple

24   products at issue in a case is a discreet subpart.

25          Now, my -- plaintiffs' counsel showed you

1 Extreme's interrogatory response, and if I may ask for
2 our response briefly to show the Court, what you would
3 see -- what you would see, Your Honor, what we have said
4 is not a blanket objection.  What we have said is that
5 if plaintiffs' theory of subparts is correct, then this
6 interrogatory has discreet subparts.

7     So, if Your Honor says today that it's the
8 related questions test and an interrogatory that touches
9 upon multiple claims -- an interrogatory that refers to
10 multiple claims, each of which is a discreet subpart,
11 then our objections stand.

12     But if they don't, if the Court tells us today
13 that, no, if it's the related question, no matter
14 whether it covers multiple licenses or covers multiple
15 claims, it's -- if it satisfies the related questions
16 test, it's not a discreet subpart, our objections would
17 not stand and we will promptly withdraw them.

18     But if plaintiffs are going to take a position
19 on their interrogatories -- and, Your Honor, they say
20 that expressly in their brief that -- and they say that
21 in their objections to the interrogatories that you have
22 that this is discreet subparts because it relates to
23 different claims and different licenses.  Their
24 interrogatory about our products covers two discreet
25 claims, two expressly-stated claims and one alleged.

There is the copyright infringement claim against

Brocade products, there is the breach of contract claim

against Extreme, and then there is the Enterasys

products against which there is no claim.

So, if their position is that different claims

and different licenses are different discreet subparts,

then I think our objections are proper.

Now, let me go back to what plaintiffs' counsel

said about mixing up documents, persons and facts. I

have not seen a single case that says you cannot mix a

narrative response and a 33(d) response. We have done

that in our responses. Plaintiffs have done that in

their responses. So, to the extent that it asks for

identification of facts as well as documents, that

doesn't necessarily make it a discreet subpart.

Then there is the practical problem. If the

contention seeks to know the identity of people that

have knowledge about that so that we can serve

deposition notices under plaintiffs' construction of the

discreet question test, or they may call it an

independent question test, I would have to serve two

interrogatories; identify all the facts relevant to your

breach of contract claim. I would have to serve another

interrogatory saying, identify all the documents which

may be the documents they cite ultimately in the facts.

1  And then I'll have to serve a third interrogatory asking

2  for identification of persons who had knowledge about

3  the breach of contract case.

4         Setting aside that not only is this not

5  required by the federal rules, it creates excessive

6  burden on the court because, Your Honor, all three

7  pieces of information are related to the contention and

8  we need those pieces of information.

9         So, if the standard is that I have to serve

10  three interrogatories to get to this question, we would

11  be back in this court with repeated requests for more

12  interrogatories.  So, not only is it not the federal law

13  in this circuit, it just imposes additional burden on

14  the Court and it's impractical.

15         Our contention response necessarily involves

16  facts, involves documents, involves people.  So we do

17  not think any of our interrogatories have discreet

18  subparts.  And, therefore, under the proper test in this

19  district, the subpart objections that plaintiffs have

20  imposed are improper, and the question of compromise

21  does not arise unless plaintiffs wanted to force us into

22  a compromise to get more interrogatories.

23         MS. WEBER:  I will be brief.  First, there are

24  courts in the Sixth Circuit that do apply the related

25  questions test.  There are also courts in the Sixth

1   Circuit that apply the independent question test.  And
2   we cited at least one to Your Honor.  *Taylor*, the case
3   that Extreme is relying on, is not controlling
4   authority.  But, regardless, I -- I think the holding in
5   that case, ultimate holding as applied to the facts,
6   makes sense.

7           The interrogatory that was approved asked for
8   identification of the persons and to give their name,
9   address, phone number, and place of employment, and I
10  think that's -- that is essentially an identification of
11  a person and how to contact them, and I think that all
12  makes sense here.  So even what *Taylor* did makes sense.

13          The two other cases that I wanted to cite to
14  Your Honor that make the point that interrogatories
15  requesting identification of all facts, persons and
16  documents are improper, I believe one case is
17  *Kendall* -- I can't read my own writing.  I'll give you
18  the case number.  174 F.R.D. 684.  That's District of
19  Nevada.  And then *Banks v. Office of the Senate.*  That's
20  222 F.R.D. 7.  That's the District Court of -- in D.C.

21          Going briefly to Interrogatory No. 7 that
22  SNMPRI recently served, I will say that the reason we
23  served this interrogatory is because during the meet and
24  confer process over the 30(b)(6) notice, one of the
25  topics that was in dispute was whether we could ask

questions about the scope of the Enterasys license and

Extreme's knowledge and belief about how expansive that

license was and what it covered and what -- that was in

November.  And Mr. Prabhakar's response was, well, you

haven't even served an interrogatory asking us about the

Enterasys license and what is -- what products are

licensed under that.

So we served this interrogatory two days later,

and we still don't have a substantive answer.  They

haven't taken a position.  Fact depositions are ongoing.

Expert reports are currently due in a month, and we

still don't know Extreme's fact positions on what

products that use SNMP Research software are covered by

what license, if any.

Those -- this interrogatory is not asking

about, state all facts in support of your contention in

support of this claim and in support of the second

claim.  It's just like Interrogatory No. 1 that Your

Honor already enforced, which is, identify each product

containing SNMP Research software, and here, it's just

identify -- for each product containing SNMP Research

software, identify the applicable license.  It's very

simple.  And it's not a different claim just because

Extreme may say that one product is purportedly licensed

by one license and one prod- -- a different product is

purportedly licensed by another.

My final point is that using 33(d) to respond to an interrogatory request is very different than being forced to identify all relevant documents in support of the party's answer to the interrogatories.

So, yes, we have used Rule -- we have relied upon Rule 33(d) where appropriate. But I think that's normal and parties do it all the time. It's one thing to do that and it's another to be forced to identify all relevant documents.

Unless Your Honor has any questions --

THE COURT: I don't.

MS. WEBER: -- I will sit down. Thank you.

THE COURT: Okay. With respect to this issue -- do you have something you want to add?

MR. PRABHAKAR: Just one very --

THE COURT: Okay.

MR. PRABHAKAR: -- brief point, Your Honor, and it's not argument. Plaintiffs make a point that they want contention interrogatories answered. We wholeheartedly agree with them. We also want our contention interrogatories answered. We're a month away from expert reports. We have no response to any of our main contention interrogatories. So, to the extent it's about answering contention interrogatories, we're all

1  for it, as long as plaintiffs do the same.

2          THE COURT:  All right.  Well, perhaps you all

3  can have some discussions on the one that was raised

4  that's not before me today.  So, I'm not ruling on that.

5          So, what is before me today, I feel the

6  appropriate related test to apply is the related

7  questions.  So now I've gone through these and I'm going

8  to tell you how I've counted them.

9          So, with regard to No. 6, that appears to be

10 one interrogatory.  No. 7 appears to be three because

11 it's asking about copyright infringement, fraud and

12 separately breach of any license.  So I'm counting that

13 as three.

14         No. 8, one.  No. 9 counts as one.  No. 10, one.

15 No. 11, that will count as two.  No. 12 counts as one.

16 No. 13 counts as one.  14 counts as one.  15 counts as

17 one.  16 counts as one.  And with the question that I

18 asked earlier regarding No. 17, that will also count as

19 one.

20         So, it appears, based on the current count,

21 that answers must be provided to all of these because it

22 would still be under the limit.

23         Okay.  We have the second issue regarding the

24 number of interrogatories served on SNMPRI, and there is

25 a question about the withdrawal of the interrogatories

1    in terms of the count.  So, is that still at issue?  You

2    said you had been preparing responses, but they were not

3    served, and, so, I have questions about that if it's

4    still at issue.

5         MS. WEBER:  So that was part of our compromise

6    proposal is that they would not count towards any of the

7    interrogatories and they could withdraw them in their

8    entirety.  And, so, if Your Honor is inclined to rule

9    that they have -- that they can withdraw them and it

10   doesn't count, we would be okay with that.  But we note

11   that the rule does count interrogatories by the number

12   served, and, so, we are going with the plain language of

13   Rule 33.

14        With that said, it was part of our compromise

15   offer that they would not have to count the second

16   set -- sorry.  I'll be more specific.  Extreme would not

17   have to count the second set of interrogatories that it

18   had served on SNMPRI.  And, so, those were 17 in total.

19        THE COURT:  Okay.  So what's your current

20   position?  I mean, the Court's ruled the related

21   questions test.  So, all the compromise is off the

22   table.  So what's your position now on these?

23        MS. WEBER:  It -- we're -- we're happy to

24   compromise and say that it doesn't count.

25        THE COURT:  Okay.  Anything that needs to be

1  addressed with that?

2          MR. PRABHAKAR:  No, Your Honor, I appreciate

3  the plaintiffs' offer.  But if I may, does the Court

4  have any recommendation on how much time plaintiffs have

5  to respond to the interrogatories now that many of them

6  are within the count?

7          THE COURT:  Okay.  Do you -- how much time do

8  you think you would need?

9          MS. WEBER:  Your Honor, we would need 30 days

10  to respond.

11          THE COURT:  Okay.  Any issues with 30 days?

12          MR. PRABHAKAR:  Your Honor, you know what I'm

13  going to say is:  30 days takes us to the end of March.

14  Some of these contention interrogatories may involve

15  facts that we may want to ask their 30(b)(6) witnesses.

16  So, that pushes our 30(b)(6) depositions pretty much

17  towards the end of March.  But I'll take whatever

18  indulgence Your Honor will provide me on this issue.

19          MS. WEBER:  May I add something?

20          THE COURT:  Yes, you may.

21          MS. WEBER:  If Extreme wants to notice 30(b)(6)

22  depositions for March, we're happy to do our best to try

23  to get substantive, fulsome responses done in three

24  weeks.

25          MR. PRABHAKAR:  Three -- Your Honor, it's up to

1    the Court.  I can't call the ball here.

2              THE COURT:  I was going to set it at three

3    weeks.  I was thinking 21 days.  So, that's the same.

4              MS. WEBER:  Okay.  Thank you.

5              THE COURT:  Three weeks.

6              So, that takes us to the third issue, which is

7    the scope of the plaintiffs' Rule 30(b)(6) topics.

8              MR. PRABHAKAR:  Your Honor, would you like us

9    to address this first since technically it's our motion

10   for a protective order?  But whatever you prefer.

11             THE COURT:  Let me hear just a little bit about

12   the topics, and then I'll certainly allow you sufficient

13   time to address your motion for the protective order.

14             MR. PRABHAKAR:  Of course, Your Honor.  I just

15   wanted a clarification.

16             THE COURT:  Thank you.

17             MS. RICE:  Good afternoon.

18             THE COURT:  Good afternoon.

19             MS. RICE:  Your Honor, we have 18 topics that

20   are still in dispute.

21             THE COURT:  Uh-huh.

22             MS. RICE:  And I believe we've both submitted

23   submission statements on the various topics.  I can

24   address the merits of those different topics if you

25   would like.  I assume that's why you have me here.

```
 1              THE COURT:  And I would like to divide these by
 2   topics.
 3              MS. RICE:  Okay.
 4              THE COURT:  So, for instance, I would like to
 5   address No. 2 and 3.  So, that's the Brocade license --
 6              MS. RICE:  Uh-huh.
 7              THE COURT:  -- and the 2001 Extreme license.
 8   So I'd like to address those first.
 9              MS. RICE:  Great.  I was kind of planning to
10   take them and group them similarly, Your Honor.  So I'm
11   glad to.
12              So, the Brocade -- topics 2 and 3.  Topic 2
13   relates to Extreme's knowledge about the Brocade
14   license, and topic 3 relates to Extreme's 2001 license,
15   and the topics include the interpretation of the license
16   by Extreme, the facts underlying the performance and the
17   alleged breach, their negotiation history, the notices
18   of breach, and the terminations of the license.
19              As the Court knows the history of this case, it
20   arose from the former defendant Brocade's unauthorized
21   transfer of plaintiffs' copyrighted software to Extreme
22   during an asset sale.  Brocade attained that software
23   pursuant to the license which prohibited Brocade from
24   disclosing the source code to Extreme, but Brocade
25   disclosed it anyway.
```

1    Separately, Extreme had entered into two

2    licenses with SNMPRI, the 2001 Extreme license and the

3    1999 Enterasys license, which we can address in a

4    moment.

5    We understand -- discovered during this case

6    that Extreme was not just improperly using the code that

7    it obtained from Brocade, it was also improperly using

8    plaintiffs' code from the license agreement.  And we

9    believe topics 2 and 3, again, concerning the Brocade

10   license and the 2001 Extreme license, are plainly

11   relevant to our claims of copyright infringement, our

12   claims of the breach of the 2001 license, and then the

13   fraud claims.

14   And I would point out to the Court that, for

15   example, Extreme had admitted in its response to

16   requests for admissions that it would be relying on the

17   Brocade license for defense of this action.  So even

18   though Brocade is no longer in the case, we do believe

19   the Brocade license is still relevant and appropriate

20   for discovery under 30(b)(6).

21   THE COURT:  Let me ask this:  How would Extreme

22   know that negotiation history for the Brocade license?

23   MS. RICE:  Only to the extent that it was

24   involved in working with Brocade on the transfer and

25   understanding through its requests for transfer.

1          Both parties worked with the plaintiff or

2     attempted to work with the plaintiff for a transfer, and

3     there were negotiations between all the parties about

4     that transfer.  So, we believe, based on that and based

5     on e-mails that have been exchanged in the case, that

6     there was quite a bit of investigation done on the part

7     of Brocade and on the part of Extreme as to what the

8     license covered and so forth.

9          THE COURT:  Okay.  So the negotiation history

10    would just be limited to the transfer?

11         MS. RICE:  Well, it's to whatever they would

12    have obtained from Brocade as a part of the transfer, as

13    a part of the negotiations between the three parties

14    relating to the transfer and the claims that -- the

15    questions that SNMP was asking at the time that the

16    transfer was requested.

17         THE COURT:  Okay.

18         MS. RICE:  Anything else?  Okay.

19         THE COURT:  Okay.  If we can, I'd like to get

20    Extreme's position on these two topics --

21         MS. RICE:  Okay.

22         THE COURT:  -- before we move on to the others.

23    Thank you.

24         MR. PRABHAKAR:  Your Honor asked plaintiffs a

25    question that went to the heart of lack of reasonable

1  particularity of this topic.  Your Honor asked about the

2  negotiation history for the Brocade license.  The only

3  answer plaintiffs came back with was the transfer of the

4  license because, to provide a little bit of background,

5  the Brocade license was entered first in 2001.  It was

6  amended five times through 2015, two of which were 2015;

7  the other two -- the second and -- the first and second

8  amendments were long before 2015.  Extreme did not

9  acquire Brocade's data center business until 2017.

10  So -- which brings us to the question of negotiations

11  related to transfer.

12       So, Your Honor, this is -- to make the

13  presentation easy for the Court, I had marked up the

14  different topics in the 30(b)(6) notice.  The ones that

15  are highlighted red are the topics in dispute and the

16  ones that are not highlighted are the topics that

17  Extreme not only has agreed to produce a witness on, has

18  already produced a witness on.

19       So let's look into the question of transfer.

20  Topic No. 8, requests for licenses or assignments,

21  transfers, amendments of these licenses from SNMP

22  Research.  And I'll ignore the language about including

23  because that basically captures the point.

24       This is not a red topic.  Extreme's 30(b)(6)

25  dep witness was designated on this topic.  So, to the

extent the only negotiation history that's relevant to the Brocade topic, that has already been covered by another topic.

Both sides cite a case called Greenway Restaurants of America -- and I may be -- maybe I have the wrong case name, but one of the problems with reasonable particularity of the case cites is lack of a limit in timeframe. And that is exactly the problem, one of the problems with topic 2.

At its broadest scope, it seeks deposition testimony about the Brocade license agreement, which means everything about that license throughout the existence of that license. 24 years as of today. Or if we go back and be a little conservative, since the license SNMP Research claims didn't transfer, 17 years, out of which Extreme did not have any interest in Brocade's data center business for at least 16, if not all 17 of them.

But that's not the only issue with topic No. 2, 3, and, actually, topic 5 as well. Not only on the factual side these topics are not reasonably particular, it seeks testimony that can only be called legal analysis.

As we all know, contract interpretation is a question of law. There is plenty of authority out there

1  that says asking a 30(b)(6) question -- 30(b)(6) witness

2  for legal analysis is improper.  Facts we're totally

3  okay with.  There is no dispute that SNMP Research is

4  entitled to facts about the license.

5          So, let's take, for example, what would be

6  factual information.  What products were sold containing

7  SNMP Research software which had the operating system

8  that Extreme got from Brocade?  What products were sold

9  with SNMP Research software using the EXOS operating

10  system that Extreme developed?  Totally factual

11  information.  Plaintiffs are entitled to it.  Plaintiffs

12  have got that information from the four 30(b)(6)

13  depositions that have happened.

14          Products covered under a particular license

15  agreement with SNMPR are plaintiffs' legal question.  It

16  involves contract interpretation, which we cannot

17  prepare a fact witness to do, setting aside the problems

18  with particularity.

19          So the case that I mentioned, Your Honor, was

20  *Green v. Platinum Restaurants*, and that holds that the

21  timeframe limitation -- without a timeframe limitation,

22  a topic is not reasonably particular, and the Court in

23  that case set a timeframe limitation.

24          Now, I want to go back very briefly, Your

25  Honor, because that's going to come up again and again

1   in all the topics that are before you.

2           We were before the Court on December 21st when

3   Your Honor directed Extreme to put up a witness on

4   finance, put up a witness on marketing by mid June.  We

5   did that.  You asked us to produce the other two

6   witnesses shortly thereafter.

7           Within a month of producing our first witness

8   on finance on an MLK holiday, within a month, Extreme

9   put up all four witnesses that testified about 21 of the

10  40 topics in plaintiffs' deposition notice.  These 21

11  topics covered an entire gamut of facts relevant to this

12  case; Extreme's financial information, revenues,

13  profits, sales, royalty reporting information, royalty

14  payment information, marketing and product features,

15  products containing plaintiffs' code, Extreme's source

16  code repository, Extreme's request for licenses, removal

17  of plaintiffs' offer from Extreme products.  And I can

18  go on and on and describe all of the 21 topics.

19          The point that we want to make, Your Honor, is:

20  To the extent topics 2 and 3 have a factual nonlegal

21  component to it, which is reasonably particular, Extreme

22  has already provided fact testimony on these topics.

23          The residual part of not just topics 2 and 3,

24  but the Enterasys topic, No. 5, they have all this

25  information.  Whatever is factual and properly allowable

```
 1    under the law, plaintiffs have it.  Everything else is
 2    either not reasonably particular or calls for a legal
 3    conclusion which is practically impossible to prepare a
 4    fact witness on.
 5            THE COURT:  Okay.  So you are saying that you
 6    have already produced witnesses that have given factual
 7    testimony to topics 2, 3 and 5?
 8            MR. PRABHAKAR:  Correct, Your Honor.
 9            THE COURT:  Okay.
10            MR. PRABHAKAR:  And there has been over 20,
11    like around 24 hours of 30(b)(6) testimony.  So it's not
12    a small volume to get all the facts that are relevant to
13    these topics.
14            THE COURT:  Okay.  Thank you.
15            MS. RICE:  So, Your Honor, just to follow
16    up --
17            THE COURT:  If you could first address his
18    contention that they have already produced witnesses
19    that have testified to the factual information sought in
20    topics 2, 3 and 5.
21            MS. RICE:  Yes, I can.  In part, although I
22    didn't attend those deps and I haven't fully reviewed
23    the transcripts, I can tell you that we have run into
24    some problems in that context, and I will tell
25    you -- and I'm showing you here a portion of
```

1    Ms. Freeman's deposition.  You can see -- is that coming

2    up?  Here we go.

3         The question by Ms. Weber at line 6, "Was there

4    a contract that governed Extreme's royalty payment to

5    SNMP Research?"  And the objection was, "Out of scope."

6    But Ms. Freeman answered, "I do not know."

7         We're getting to the heart of some of these

8    questions also in Mr. DeBacker's deposition, Your Honor.

9    I have a portion of that here, too.  And this is kind

10   of --

11        THE COURT:  I'm sorry; whose deposition is

12   this?

13        MS. RICE:  This is Mr. DeBacker --

14        THE COURT:  Okay.

15        MS. RICE:  -- which was taken on February 14th.

16        And this goes back to what I said a moment ago

17   about we see e-mails in the discovery that -- where the

18   defendants are -- and Extreme were discussing the

19   licenses, the software covered by the licenses.  Could

20   the license be transferred?  Do they owe royalties?  Do

21   they have to buy a new license?  These were all business

22   discussions that were ongoing.  If there was privileged

23   information, obviously there is a privilege objection

24   that can be made.

25        But you can see here in the transcript of the

expert, Mr. DeBacker was asked by Mr. Wood at line 18,
"Did you review any of the e-mails about the license
agreement exchanged between SNMP Research and Extreme in
this time period?"  And the witness says, "None of
these, no."

            Oh, I'm sorry.  Is it not legible there?

            THE COURT:  It just wasn't pulled up enough.  I
can see it now.

            MS. RICE:  Okay.  Great.  There we go.

            So we're running into problems at depositions
in getting the testimony we need as relate to the --

            THE COURT:  Would you agree that some of the
information has been provided?

            MS. RICE:  I don't know that I can.

            THE COURT:  I've been given two examples where
they don't know, but he's represented -- or Extreme's
representing that they have covered these topics through
other witnesses.  So --

            MS. RICE:  Well, I probably would need to defer
to counsel or confer with my counsel briefly who
actually attended the deposition and let them speak more
specifically to that.  But we had many questions that
were answered with out-of-scope objections and witnesses
who were not prepared.

            In fact, the witness that was there -- I

 1    believe that was Mr. DeBacker who was there to talk

 2    about the transfer.  Under one of his topics was

 3    presented the communications that related to requesting

 4    the transfer, and he had not ever reviewed those

 5    particular communications in preparation for the topic.

 6    So --

 7              THE COURT:  Okay.

 8              MS. RICE:  -- I can only say that without

 9    deferring to someone else.

10              But the best I can answer you is saying that

11    we've had a lot of trouble in answering a lot of

12    questions.  In fact, the defendant has agreed to open

13    Mr. DeBacker's deposition on several topics by agreement

14    on which he was not prepared on February 14th.

15              THE COURT:  Okay.

16              MS. RICE:  We have not yet made that type of

17    request for Ms. Freeman, but we anticipate that we may.

18              THE COURT:  Okay.

19              MS. RICE:  So, in general, in getting back to

20    the argument that Mr. Prabhakar made, as to legal

21    conclusions, there is always the privilege objection to

22    be raised.  But it is Extreme that indicated in response

23    to its request for admissions that it was going to rely

24    upon the Brocade license as a defense.

25              It also has indicated, if we're moving to No.

5, with regard to the Enterasys license, we've had the changing story in this case about whether the products that Extreme has been manufacturing and selling with the plaintiffs' software contained in it were licensed by the Enterasys license or not.  So, certainly those topics are relevant.

And if their position is that they're not going to put forth any fact testimony on that, then this will be a very easy prep.  Beyond that, we do not believe that the topic is, you know, not defined with reasonable particularity, and the timing issue has never been raised to us before today.

Certainly Extreme is limited by its own experience with the various licenses.  But in regards to the Brocade license, which obviously was transferred much later, we -- again, we do have the e-mails where there is lots of discussion going on between the parties about what the license entails, what was it supposed to entail, can it be transferred, etcetera, and we believe that it would be relevant to -- the negotiations would be relevant to the relate -- the extent to which Extreme is relying upon the negotiation history in order to interpret the license itself.

So, you know, I don't know what of that they obtained from Brocade, but they may have obtained that,

1    and, in our mind, that's fair game.

2          Do you have any other questions on 2 or 3?  I

3    really didn't touch on 5, but I think it's very similar

4    for the reasons previously stated.  If there is a

5    specific question there, I'm happy to address it.

6          THE COURT:  I'm going to have another question

7    for Mr. Prabhakar because it's going to get into topic

8    6 --

9          MS. RICE:  Okay.

10         THE COURT:  -- which is the Enterasys license.

11         MS. RICE:  Thank you, Your Honor.

12         MR. PRABHAKAR:  Quick responses, Your Honor.

13         THE COURT:  Okay.

14         MR. PRABHAKAR:  As to the fact that the

15   witnesses didn't answer some questions, I'm sure the

16   Court hears this about every deposition that happens on

17   30(b)(6), that a witness didn't know some answers.

18         The fact is:  We sent a list of disputes to the

19   Court.  We showed you Ms. Freeman's transcript.  The

20   Court asked for all pending discovery disputes between

21   the parties.  Ms. Freeman's deposition happened mid

22   January.  In the list of topics that were sent to the

23   Court, her lack of preparedness on the 30(b)(6) notice

24   is not one of them.

25         Second thing which segues to this point, if an

1  Extreme witness was unprepared on a topic that we agreed

2  to produce him on, the solution or the remedy is to come

3  before the Court, make a showing of lack of

4  preparedness.  The remedy is not to ask for a

5  non-particular topic that calls for legal conclusions to

6  now be opened up because a witness's lack of

7  preparedness, if any, does not make a non-particular

8  topic particular.

9        Second point plaintiffs make is about e-mails.

10  Now, there are business e-mails.  Sure, there are

11  e-mails sent from Extreme Network's account.  There is

12  no denying it.  But a lot of those e-mails are written

13  by people who are in engineering.  How can Extreme, the

14  corporation, take a position on what an individual

15  intended in an e-mail?  And the e-mails that plaintiffs

16  are talking about are e-mails from an engineer named

17  Kevin Frick, e-mails from a procurement person named

18  Fiona Nolan.  And if Your Honor has seen the request for

19  additional depositions, Mr. Frick, Ms. Nolan are on that

20  list.

21        We have scheduled Mr. Frick's deposition for

22  this Friday.  If they want to ask Mr. Frick what he

23  meant in an e-mail, it is fair game.  They're entitled

24  to it and they get to ask it.  But Extreme, the

25  corporation, how do we take a position as a company when

an e-mail is written by an individual?  And e-mails
written after the fact, because if I remember correctly,
Mr. Frick's e-mails are about the EXOS license in the
2015 or '16 timeframe, or 2014 timeframe.  I may be
missing a few years here or there.  But they're within
the 2014, 2015 timeframe.  Extreme's license was
negotiated in 2001.  How does Mr. Frick's e-mail 13,
14 years after the fact inform the negotiation of the
license?

Because we can agree, and plaintiffs say in
their position statement, they are not asking for legal
testimony; they're asking for facts.  How is an e-mail
Mr. Frick sent relevant to the negotiation of a license
that was negotiated before 2001?

So the e-mails do present a particular problem
in the sense that we do not know as a company what was
in a subject's mind when they wrote it.  That's what
30(b)(1) depositions are for.  As I said previously,
facts related to Extreme's products, royalty payments
have been covered.

They showed you a snippet of Ms. Freeman's
transcript.  Ms. Freeman's deposition lasted seven
hours.  We finished at 9 o'clock.  If they did not get
the testimony they wanted in seven hours, it cannot
necessarily be Ms. Freeman's fault.

 1          And we're not saying it's anybody's fault.  The

 2     proper remedy there -- and I'm not enlightening that

 3     wrath upon me.  The proper remedy there is to claim

 4     Ms. Freeman was unprepared, and before this hearing,

 5     plaintiffs have not made that showing.

 6          So, we think, Your Honor, the factual portions

 7     of 2, 3 and 5 have been covered by existing 30(b)(6)

 8     witnesses.

 9          You heard about contention interrogatories.

10     There is no contention against the breach of Enterasys'

11     license.  There are no facts stated for the breach of

12     Enterasys' license.  They have had Enterasys' code since

13     May of 2023.  They have our identification of products

14     that came from Enterasys and had SNMP Research software.

15          I think around or before May of 2023, they have

16     had the install images for Enterasys' switches, which

17     you remember last time we came in November, we discussed

18     that.  Since November 2023.  And they have physical

19     Enterasys switches live and working with Enterasys'

20     software on them since October of 2023.  We are now at

21     the end of February.  There is no update to contentions

22     against Enterasys for breach of license.  And even that

23     wouldn't matter because there is no amendment of the

24     Complaint to add a breach of contract claim against

25     Enterasys.

1    How is topic No. 5 then relevant when

2    voluminous document discovery, source code inspection,

3    physical machines being allowed to inspect, in fact,

4    being shipped to Knoxville, if there is still no claim?

5    How can we justify under Rule 26 that this topic is

6    burden- -- is not burdensome and disproportionate to the

7    needs of the case?

8         Depositions are a different problem, Your

9    Honor.  This is not about attorneys working hard to come

10   up with a rog response or quarreling on resources of the

11   client producing hundreds of documents.  This is

12   interrupting a person from his job.  Which we're glad to

13   do on topics that are proper.  It takes hours and hours

14   to prepare them.  It takes a whole day off from work for

15   them to testify.  All of that time they could be working

16   on Extreme business.

17        So, we have agreed to a very broad scope of

18   document interrogatory discovery, Your Honor.  With

19   witnesses, even the standard is not just relevance, but

20   reasonable particularity and burden.

21        Without a claim against Enterasys, how do you

22   justify a burden of producing a witness on this topic

23   when witnesses have already testified about Enterasys'

24   licenses?  And I'm happy to provide deposition cites if

25   Your Honor likes, but that's our position on Enterasys,

1    Your Honor.  And you heard my position at length on

2    Brocade and Extreme.

3         THE COURT:  Is Extreme going to invoke the

4    Enterasys license?

5         MR. PRABHAKAR:  So, Your Honor, the

6    communication that plaintiff cited -- in fact, we cited

7    that in our brief.  We noted expressly that we referred

8    to the Enterasys license in error.  The correct license

9    is the 2001 Extreme license.

10        Now, if they claim that letter to be the hook

11   for a fact witness, plaintiffs know that that letter was

12   written by counsel, my boss, Mr. Neukom.  How do we

13   provide a fact witness about that letter particularly

14   when we immediately weeks after that said that was in

15   error?

16        Now, they said that we responded to an RFA;

17   that we would rely on a Brocade license as a defense.

18   That could mean a lot of things.  But that is not

19   sufficient.  We could use the Brocade license with an

20   expert.  But that doesn't mean that the legal

21   interpretation of the Brocade license or how we use

22   that, given that the RFA doesn't specify or ask us what

23   part of the case would you use it on, would it be fact,

24   would it be expert, and then using that small admission

25   which was served, like, long before we got to this stage

1    in discovery as a hook for depositions is -- is, quite

2    frankly, tenuous because that means that we could use

3    the Brocade license with an expert and we still don't

4    have fact testimony.

5            But that RFA is not the hook for topic No. 2.

6    Maybe that's a hook for one of the topics that we agreed

7    to produce a witness on, but certainly not No. 2.

8            THE COURT:  So, as to topic No. 6, you're

9    saying that's irrelevant because you're not going to

10   invoke the Enterasys license?

11           MR. PRABHAKAR:  So, topic No. 6, Your Honor, I

12   think our position is that -- let me actually show you.

13           So, topic 6, analysis and communications

14   relating to which products are encompassed by the

15   license.  Legal question.  Topic No. 7, your analyses

16   and communications, internal or external, relating to

17   products that contain or might contain SNMP Research

18   software.  Topic No. 7 is not red.

19           Extreme's designee on topic No. 7,

20   Mr. Fitzgerald provided 20 pages' worth of testimony

21   lasting 37 minutes talking about Enterasys' products and

22   the search he conducted for finding those products.

23   There is nothing left which is factual on topic 6 that

24   plaintiffs are entitled to at this point because they

25   already got that through topic 7 because that's not

    1    limited by license; that's just limited by products that

    2    contain the software.

    3            THE COURT:  Thank you.

    4            MS. RICE:  So, just to respond briefly, Your

    5    Honor, we have over 20 years of use of our client's

    6    product with no payment, and their defense is the 2001

    7    Extreme license.

    8            Extreme has produced Enterasys' products that

    9    contain SNMP Research software in it, and their defense

   10    to any infringement would be the Enterasys license.  So

   11    we do need to explore.  If they are not going to have

   12    any factual testimony and they're going to rely on

   13    experts, then this becomes very simple.  But they have

   14    not been willing to say that to us.

   15            With regards to e-mails, we do not have any

   16    e-mails from the defendant regarding the negotiations of

   17    the 2001 Extreme license, and we have a right to explore

   18    Extreme's position and its view because this is their

   19    defense.  This goes to the heart of their defense.

   20            And to tell us that we can only explore this

   21    through percipient witnesses rather than a corporate

   22    representation of their understanding and position with

   23    regards to these issues is inappropriate in our view.

   24            I did want to touch just briefly on

   25    Ms. Freeman.  First of all, yes, the deposition did

1   happen over the holiday in January.  We are still

2   reviewing that transcript.  It was a very long

3   deposition, in part, because Extreme requested to start

4   late; in part, because we had lengthy disputes during

5   the deposition about speaking objections.  Ultimately

6   towards the end of the day we reached a compromise on

7   speaking objections and things have gone smoothly in

8   subsequent depositions.  And, then, also, Extreme's

9   counsel prepared for over an hour for redirect.  So it

10  was a long day, but it wasn't all on us and it wasn't

11  all substance.

12          So, we believe that 2 and 3 and 5 and 6 are all

13  highly relevant to our case, highly relevant to the

14  defendant's defenses and its position in this case, and

15  we believe we're entitled to the corporate position on

16  these topics.

17          THE COURT:  Thank you.

18          All right.  If we can go to topics 10 and 11.

19  And, Mr. Prabhakar, I saw a notation that these claims

20  will be covered by experts.  It may make it easier if

21  that's the case.  Are you going to be relying on experts

22  for topics 10 and 11?

23          MR. PRABHAKAR:  Give me one second, Your Honor.

24          THE COURT:  Certainly.

25          MR. PRABHAKAR:  So, again, I'll go back to

divvying up this topic into factual and expert opinion
and then show why the factual part is not reasonably
particular, and whatever is left after that is --

THE COURT: So you're saying it needs to be
answered with both factual and expert opinion, not just
solely expert opinion?

MR. PRABHAKAR: There may be a factual
component to it. We have not figured out what that
could be for two reasons. First of all, it says all
agreements you believe are comparable to the Brocade
license. So a factual question would be all agreements
because comparability, which I'll get to, is going to
require expert analysis. And, as stated, comparability
is vague. And I'll explain why, too, in a moment.

Does "all agreements" refer to all agreements
that Extreme knows of? Does it refer to all agreements
produced in this case? Does it refer to all agreements
that exist out in the market? We don't know.

Plaintiffs claim in their position papers that
it is only limited to topics, but it is only limited to
agreements that Extreme considers comparable, and that
should potentially be a smaller or some well-defined
universe that Extreme knows of.

Assuming that is true, any attorney who is
deposing a witness who testifies, I think license A is

1    comparable to the Brocade license or the Extreme

2    license, my next follow-up question would be, Why is it

3    not compared to license Y?  And that is testimony that

4    they're entitled to because that's what goes to the

5    heart of it; what are the grounds for comparability?

6         Therefore, even saying that this topic is

7    limited to agreements that Extreme believes are

8    comparable, setting aside the fact that comparability is

9    not defined in a factual sense, that's the problem with

10   reasonable particularity.

11        Another practical issue is:  Let's say this is

12   limited to licenses SNMP Research produced in this case.

13   Many of those licenses nobody in Extreme has factual

14   knowledge of because they're SNMP Research's or SNMPRI'S

15   licenses.  Many of them are marked highly confidential.

16   Many of them are marked attorneys' eyes only.

17        Even if I could prepare a witness by showing

18   them a license so they can go to the deposition and

19   testify about all agreements they have seen, I can't

20   show them all of them.

21        So, practically speaking, it is impossible to

22   prepare a witness and impart them encyclopedic knowledge

23   about over a thousand licenses which plaintiffs' counsel

24   emphasized in the discovery disputes that they have

25   produced.

1            Which takes us to the issue of comparability.

2    Factually speaking, from a layperson witness, what is

3    the meaning of comparability?  Is it economically

4    comparable; the royalty rates are the same?  Is it

5    technically comparable because it relates to the same

6    operating system, relates to the same CPU architecture?

7    Or is it comparable in terms of the scope of the

8    license; it covers one product; it covers ten products?

9    Reading topics 10 and 11, we cannot determine that.

10           SNMP Research says in its position statement

11   that Extreme should know what this term means because

12   they used it in its briefing to the Court.  Fair point.

13   It was briefed in the context of a discovery dispute.

14           As hopefully a knowledgeable attorney, I may

15   know what comparability means from a legal sense.  I

16   can't impart that legal knowledge to a fact witness.

17   But even then, the first sentence of the first page,

18   plaintiffs' cite in that discovery order or brief reads,

19   "Damages experts, courts and juries consider comparable

20   licenses in determining a reasonable licensing fee or

21   license fee."  That's the expert part of it.

22           So, I want to be clear, Your Honor, that to the

23   extent that there is any factual component to topics 10

24   and 11, it is impossible to prepare a witness.  To the

25   extent it requires a comparability analysis, that comes

1   through expert testimony.

2          And my co-counsel, Mr. Lee, just warned me that

3   you didn't answer Your Honor's question about the

4   Enterasys license.  I don't want to play a game of not

5   answering your question directly that will you provide

6   factual testimony on comparability.  I think on the

7   Enterasys license, I want to answer more expressly that

8   in the follow-up letter, we stated we're not relying on

9   the Enterasys license; it's the Extreme license that

10  covers these products.  So, I do not want Your Honor to

11  think I was being evasive.

12          THE COURT:  Thank you.

13          MR. PRABHAKAR:  Here, based on such

14  poorly-written topics, I think it is unfair to ask

15  Extreme -- and I don't mean any disrespect, Your

16  Honor -- just reading these topics, Extreme should not

17  be put in this spot that it receives overly-broad topics

18  which then forces it, without having taken any

19  deposition of the plaintiffs, without knowing anything

20  about the completeness of their license production, to

21  say, yes, we don't have fact testimony to offer.

22          I do want to answer Your Honor's question

23  directly.  I just don't think that these topics -- and

24  not just 10 and 11.  There are other topics that relate

25  to expert testimony which puts us in the same bind.

```
 1              We should not be forced to take that position
 2    unless there was a topic that was reasonably particular,
 3    which Your Honor finds reasonably particular and Extreme
 4    says, this is all expert.  Then it would be a fair
 5    question to ask Extreme to take a position or shut up.
 6    But this, these two, 9 and 10, are not those topics.  15
 7    and 17, which we will get to shortly, are also not those
 8    topics.
 9              So, I apologize, Your Honor, that I'm not
10    answering your question directly.  But I just think it's
11    unfair that in response to these topics, I should be
12    asked -- or Extreme should be asked to answer that
13    question.
14              THE COURT:  Is your position going to be the
15    same with topics 15 and 17 because -- that they're not
16    reasonably particular for a fact witness?
17              MR. PRABHAKAR:  No, Your Honor.
18              THE COURT:  Okay.
19              MR. PRABHAKAR:  And I'll explain why.
20              THE COURT:  Okay.
21              MR. PRABHAKAR:  So, let's start with -- so,
22    generally speaking, topics 15 and 17 -- I apologize --
23    relate to apportionment, profits attributable to factors
24    other than the copyrighted work.  It cites to the
25    statute.  The value of SNMP Research software.
```

1          Let's start with 15.  Let's read the first
2     sentence.  "All revenues, costs and profits from the
3     sale of the products identified in Extreme's responses
4     to SNMP Research in its Interrogatories Nos. 1, 2 and
5     9."
6          This is the factual portion of this topic.  The
7     complete basis has reasonable particularity problems
8     that I'll get to and expert problems, but let's parse
9     the first sentence.
10         And I have to go two pages back because that's
11    how long topic 14 is.  So, let's read it.  "Revenues,
12    costs and profits from the sale of the products
13    identified in Extreme's responses to SNMP Research,
14    Inc.'s Interrogatories Nos. 1, 2 and 9."
15         On the next page, the factual portion of these
16    two topics is identical.  Topic 14 I present was not
17    flagged right because Ms. Freeman testified on this
18    topic.  So, the factual portion of 15, they already
19    have -- plaintiffs already have testimony about.
20         THE COURT:  Was she able to answer completely?
21         MR. PRABHAKAR:  Your Honor, our position is,
22    yes, she was.  And certainly plaintiffs haven't, in the
23    list of disputes, raised Ms. Freeman's deposition that
24    has happened over 45, maybe 30 days.  I'm not trying to
25    exaggerate.  Just being bad with math.

1          So, that leaves us to the second part.  And, in

2    fact, I want to note one thing from plaintiffs' position

3    papers, that they actually said that they do not want

4    expert analysis on this.  They want three facts from 15

5    and 17; competitive intelligence, the importance of

6    certain features, and Extreme's profits from certain

7    products.  We just covered C.  And I just showed you

8    that 14 and 15 are virtually identical.

9          That leaves us to complete basis.  It's

10   Extreme's position that complete basis is not reasonably

11   particular.  And let's look at the definition of

12   "complete basis" to show what's wrong with it.

13         Complete basis means identity and comprehensive

14   description of factual basis, including the identity of

15   all persons with knowledge of factual basis, identity of

16   all evidence, including documents, by production number,

17   oral statements, and witnesses that relate to it.

18         There are two problems with this definition

19   which are incorporated in 15 and 17.  It is impossible,

20   given the timeframe at issue in this case, given the

21   number of products at issue in this case, given the size

22   of the operating system in this case, millions of

23   clients, to prepare a witness with all factual basis,

24   all evidence.  I don't even know how I would make a

25   witness memorize production numbers or oral statements.

1    But then comes the second part of it.  Because

2  of the unique nature of 30(b)(6) testimony, SNMP,

3  plaintiffs would argue if there is a complete basis that

4  a 30(b)(6) witness did not provide, Extreme should be

5  precluded from using that at trial.  But a complete

6  basis on apportionment, on the value of the software,

7  profits attributable to other features of the products

8  may actually come from third parties.

9    We've asked for the Avaya/Nortel documents.  It

10  may actually come from plaintiffs.  How can I prepare an

11  Extreme witness to provide a complete basis when the

12  complete basis resides outside of Extreme?

13    And which will bring us to the next logical

14  question.  So what about facts that Extreme does know

15  of?  I pointed you to what plaintiffs wrote in their

16  statement about they need three things; competitive

17  intelligence, importance of certain features, and

18  profits, which we just covered.

19    So let's talk about competitive intelligence

20  and importance of certain features.  Topic No. 13, which

21  is not red, we designated Mr. Ajmera as our 30(b)(6) on

22  it.

23    Let's look at topic C, subpart (c).  And, Your

24  Honor, this is the breadth of this topic, yet to advance

25  30(b)(6) depositions, we agreed to produce a witness on

1  this.  But C reads which features character six customer
2  needs are emphasized were targeted in any marketing.  E
3  reads information about competing products, competitive
4  intelligence that they asked for.  F and G read talking
5  points, messaging Extreme sales and marketing staff used
6  to communicate with customers, information about
7  clarity, points of clarity and difference.

8          I can go on on this topic, Your Honor, but C,
9  E, F, and G relate to the three things plaintiff put in
10  their position statement that they need from topics 15
11  and 17, which Extreme admits are factual information
12  they're entitled to, and they got it from the deposition
13  of Extreme's marketing witness, Mr. Ajmera, who is also
14  not on the name of witnesses I've prepared.  His
15  deposition is closed.

16          So the facts that are relevant to 15 and 17 are
17  now in possession of plaintiffs through Extreme's
18  30(b)(6) witnesses.

19          The left-door application of those facts to
20  come up with an apportionment number or to value SNMP
21  Research software in our products, that I can answer
22  definitively is expert testimony, and not only Extreme's
23  experts, but plaintiffs' experts would provide opinion
24  on that.

25          So, once again, 15, 17, the factual component,

 1    plaintiffs already have the testimony.  Complete basis,

 2    not reasonably particular.  Profits attributable, value

 3    of the software, expert opinion.  There is nothing else

 4    that Extreme can provide on these two topics.

 5              THE COURT:  Thank you.

 6              MS. RICE:  So, first I'll touch on 10 and 11,

 7    Your Honor.  They complain about all agreements being

 8    too broad was never -- or unspecific was never raised

 9    during the meet and confers.  But we have told Extreme

10    repeatedly and it's in our position statement that we're

11    just looking for the agreements that Extreme wants to

12    rely upon, the ones that it believes are comparable.

13              And, so, that is a descriptor Extreme has used,

14    and if they're not going to have any factual testimony

15    regarding that, then it may be a moot issue.  But if

16    they do intend to have factual testimony regarding it,

17    we just would like the opportunity to explore whatever

18    it is they're going to rely on that they believe is

19    comparable.

20              With regards to 15 and 17, and maybe to some

21    extent -- I think this was largely 15 and 17.  And I

22    could be mistaken.  It may have been also raised with

23    regards to 10 and 11.  This argument of duplicative

24    topics, that also was never raised during our

25    conferrals, Your Honor.

So, with regard to 15, 15 is related to the --
those revenues, profits and costs -- revenues, costs and
profits from the sale of products. So it is about the
same financial dollars in 14. But 15 is different
because it is specifically relating to what portions of
those revenues, costs and profits is attributable to
factors other than the copyrighted work. So we're
trying to parse out in 14, you know, what is your profit
on these -- on these products and how do you track it?
What is your sales? What is your revenue? What is your
cost, your margin, etcetera?

And then in 15, it's a totally different topic
which is about what portion of that relates to the
copyrighted work and what portion of that is their
position does not relate to or is not attributable to
the copyrighted work?

Your Honor, we do not have any testimony on
profits attributable from the 30(b)(6) witnesses taken
thus far, or on value, which is, I believe, topic 17.

And as you heard Mr. Prabhakar say when we were
discussing some other discovery earlier today, the
importance of competitive information and the
importance -- their desire to know what SNMP thinks are
the value of its product. Well, SNMP, the plaintiffs,
also want to understand what is it that Extreme thinks

is valuable about SNMP's products.  Why is it, for

example, that their engineers left our client's

networking solution in their products for so many years

rather than subbing it out for a free version or what

have you?

So value is not only about monetary value or an

expert calculation of value; it's also about importance,

and it's a topic that they have recognized before you

today is very critical to the case, and for both

parties.

As to the complete basis, Your Honor, we

understood in our conferrals that by removing the words

"legal basis," we had resolved the complete basis

objection.  Again, we've told them this is not a memory

test, but we are entitled to their position and what we

expect to hear from them at trial.  So, we do believe

it's -- they're reasonably capable of preparing a

witness as to the topics and the facts they're going to

rely upon at trial.

And then No. 17 does not use the term "complete

basis."  So, I think that we're only dealing with that

with regard to 15.

You were also directed to topic 13 as being

duplicative.  But, again, as relates to 17, we believe

those are two very different topics; one being how do

 1    they market the topic and to whom, etcetera, and what

 2    they may say about their product to their customers, but

 3    that may be very different or have overlap with but be

 4    somewhat different than what they internally believe are

 5    the value of our client's software within their product.

 6           So, we believe these topics are relevant; that

 7    they have not yet been covered by depositions that have

 8    been given to date, and to the extent that there is

 9    going to be factual testimony, we would like the

10    opportunity to question Extreme about this.

11           THE COURT:  Thank you.

12           Do you all need a moment?  We can take a short

13    break before we move to topic 18.

14           MR. PRABHAKAR:  I'll take probably less than a

15    minute, Your Honor, if I may.

16           THE COURT:  Okay.

17           MR. PRABHAKAR:  Counsel said we didn't inform

18    them in meet and confers about overlap between the

19    topics.  We did.

20           Now, I don't have an audio recording of the

21    meet and confers, but this is the written record that we

22    cited.  Topic 17, the factual information relevant to

23    this topic overlaps with topic 13.  I said the exact

24    same thing to you just now.  So, we did discuss this in

25    meet and confers, and this is at least one written

1   record of it, Your Honor.   Thank you.

2           THE COURT:   Okay.   All right.   Are you ready

3   for -- to address topic 18?

4           MR. PRABHAKAR:   Your Honor, one brief second.

5           Your Honor, this was topic 18 as served,

6   "Seeking company-level financial information from 2001

7   to the present."   23 years.   "Without limitation, the

8   identity of the process of preparing periodic financial

9   statements, balance sheets, income statements, cash

10  flow, profits, standards, and methods used by Extreme's

11  accounting system."   I don't want to read the whole

12  thing, but this is how it started.

13          I mentioned the *Green* case, Your Honor, which

14  says some temporal limitation is necessary for

15  reasonable particularity.

16          I do not know how to prepare a witness to talk

17  about complete-level financials for 23 years with where

18  we started on this topic.   And then in a purported

19  narrowing of this topic, I can't even fit the entire

20  e-mail on the document camera, but I can represent to

21  you that this has at least eight bullet points, main

22  bullet points, and ten sub items underneath it.

23          So, I don't know if this was the narrowing that

24  plaintiffs had in mind.   We view it as an expansion.

25  And they didn't claim that even this narrowing was

complete.  They should not be deemed exclusive, and we

must send a few additional categories prior to the

deposition.

So we have a serious problem, first, of

overbreadth, lack of a timeframe, and our inability to

prepare a witness to have encyclopedic memory about

23 years of company-level financials.

The other problem, Your Honor, is a vast

majority of this information is irrelevant.  The

company-level financials cover information or covers

products that are not at all in dispute in this case.

The products in dispute in this case are wired products.

These are products where you actually take a physical

cable, plug it in a switch.  As we all know, the world's

going wireless.  You don't have to connect cables to

anything on our phones and our laptops.  Extreme has a

vast majority of wireless products.

The company-level financials have all of that

information as well.  Not only is it irrelevant, how do

we prepare a witness in this litigation which has

nothing to do with wireless access points to understand

and learn about the financials related to products that

are not at issue?

Now, this topic also called for our SEC

statements.  Those were out of scope, but that did not

1    stop plaintiffs from questioning Extreme's finance

2    witness about Extreme's 10-K statements.

3            She answered to the best of her knowledge.  She

4    was certainly not designated on that.  And plaintiffs

5    knew topic 18 is in dispute, and yet they burned

6    valuable time with the witness knowing that Your Honor

7    is going to hear this dispute asking those out-of-scope

8    questions.

9            Extreme had an impossible choice that we either

10   prevent that line of questioning, lest they shoehorn it

11   into a topic that we agreed to then prepare the witness

12   on and then risk being brought in front of this Court

13   saying the witness was unprepared.

14           But knowing that 10-Ks were a topic in dispute

15   did not prevent plaintiffs from asking questions about

16   it.  They got some testimony, whatever the witness deals

17   with in her personal capacity.  But this topic, as

18   written and as redefined, is not reasonably particular,

19   isn't relevant, for the most part, and, therefore, we do

20   not think that we can prepare a witness or we should be

21   required to prepare a witness to the scope of this

22   topic, particularly when they already have seven hours

23   of financial testimony from a 30(b)(6) witness.

24           THE COURT:  Thank you.  Okay.  Ms. Rice, on

25   these particular documents, would a document request be

1  appropriate?

2       MS. RICE:  Well, we have -- for 18 in

3  particular?

4       THE COURT:  Yes.

5       MS. RICE:  We have certain documents, and we

6  have been able to question a witness on some of the

7  financial documents.  But that witness also testified

8  that the way that Extreme keeps its internal numbers

9  differs from the 10-K.  And we believe we need to

10  understand how their 10-K -- or their audited

11  financials, etcetera.  And, so, we need to -- for our

12  experts to be able to understand how it differs so that

13  we can know which one is right or wrong in certain

14  cases.

15       Obviously there is probably many things on

16  their financials that aren't necessarily relevant, but

17  overall, we need to have an understanding of how the

18  10-Ks fit together with the information that we've

19  already been provided and --

20       THE COURT:  Well, based on what you've

21  already -- what you've already been provided, can you

22  narrow the -- this topic as it currently stands?

23       MS. RICE:  Well, let me -- let me check with my

24  counsel for a moment.

25       THE COURT:  Sure.

1      MS. RICE:  Yeah, unfortunately, I don't think
2  we can do that, Your Honor.  I think what we have tried
3  to do, though, is, by the e-mail that Mr. Prabhakar
4  shared with the Court a moment ago -- I believe it's in
5  the papers -- we tried to give them some guidelines of
6  what we -- of how to prepare a witness because they said
7  they didn't have enough specificity.  And, so --

8      THE COURT:  That was the same thing as you had
9  attached as Exhibit E --

10      MS. RICE:  Yes.

11      THE COURT:  -- correct, to the joint statement?

12      MS. RICE:  Correct, correct.  So, we tried to
13  give them some -- they asked for specificity on how
14  would they prepare a witness.  So we tried to provide
15  some more detail.  But, then again, Extreme complains
16  that this is too specific, or, you know, also we may not
17  want to be fully limited to this e-mail.

18      Extreme has identified financial information as
19  recorded in its SEC filings in its sworn response to one
20  of our key financial interrogatories, Your Honor.  And,
21  so, we do believe we should be able to inquire about
22  those SEC filings since they have relied upon them in
23  their own discovery responses.

24      And, again, we have told them it's not a memory
25  test.  But we try to give some guidelines of the areas

we're looking at through conferrals and through the

e-mail and everything.

THE COURT:  Okay.  I'd like to go on and cover

in a group the topics 19, 20, 27 through 20- -- through

30.

I want to ask:  Mr. Prabhakar, now that Extreme

has responded to the Complaint, does it change anything?

I'll ask this of both parties, but --

MR. PRABHAKAR:  I think, Your Honor, what it

changes is:  At least now there is an understanding of

what the affirmative defenses are in response to 19.

There are 15 of them.

In Exhibit C that we cited to our brief, and

we -- we agree that that's not binding authority, but

it's guidance from other district judges who have seen

issues with 30(b)(6) topics, and all affirmative -- all

facts or complete basis for affirmative defense was

topic No. 1 on that list of topics that are considered

problematic.

There are 15 defenses that range from copyright

issues, problems with the registration, equitable

defenses, and then licensing defenses.

It is not reasonably particular as stated, as

catchall, to just assert this topic in a case that

plaintiffs have repeatedly characterized as complex and

1   which Extreme in the context of burdensome discovery has

2   described as complex.

3          If the case, as plaintiffs claim, is complex,

4   how is 19 -- how can they explain 19 to be reasonably

5   particular as one topic for one witness to testify about

6   15 affirmative defenses?

7          So, while now we know what the universe of

8   defenses is, even with that universe, preparing a

9   witness on this topic is problematic.  That is not to

10  say that facts related to some of these defenses have

11  not been obtained by 30(b)(6) testimony.

12         But it's -- I completely understand, Your

13  Honor, because if I was on the other side, I would say,

14  well, how do I know which fact relates to which

15  affirmative defense?  That's a very fair point.  If

16  somebody would have told me, I would have made the same

17  point.

18         The answer to that is a contention

19  interrogatory.  This is one of those topics, Your Honor,

20  where I think it is proper, both in terms of timing and

21  for the Court to manage discovery in this case to say,

22  this is a topic better suited for a contention

23  interrogatory rather than a 30(b)(6) topic now that the

24  answer has been entered in this case.  And the *Adkison*

25  case from this Court notes in context of contention

topics that it may be more efficient and manageable to

provide that answer through contention interrogatories.

So, that's at least our position, Your Honor, on 19.

Would you like me to address the remaining

group of contention topics?

THE COURT:  Uh-huh.  Certainly.

MR. PRABHAKAR:  Thank you, Your Honor.  Not

only on 19, but 20, 27 to 30, all ask for legal

contentions.  There are multiple cases that have held

that 30(b)(6) topics are not designed to discover

contentions or legal theories.

Those cases are good law for three reasons.

Legal contentions are prepared by lawyers who have the

unique knowledge to apply the facts to the case.  It is

impossible to prepare a witness to first learn all the

facts.  And as we discussed in the context of an earlier

topic, all the facts, because of the complete basis

issue with these topics, some of the facts may be -- may

not be in the first instance with -- be with Extreme.

So, there is the first challenge about providing the

witness all of the facts and then a lawyer trying to

teach how the facts apply to the law.

Now, if that's not ringing alarm bells of work

product, it is at least ringing alarm bells of the

witness's ability to comprehend information that we, as

attorneys, learned from three years in law school and then learned our -- you know, then spent our lifetimes trying to perfect. There is a reason why the law says exploring legal contentions and theories is improper for 30(b)(6) topics.

So that leads to the factual information related to topic 20 which talks about unenforceability. But I think more prominently for 27, 28, 29, and 30, which is copyright infringement; why did we breach the license, commit fraud, basis for why SNMP Research should have known that Extreme was using SNMP Research software.

A lot of the facts that Extreme knows as a corporation which I described earlier which apply to these contentions have been developed using the existing 30(b)(6) witnesses. And that's where the complete basis is a trap because, in some sense, we are limited to factual information that plaintiffs' attorneys elicit. So, if they didn't elicit some factual information that was relevant to this in a deposition, that should not be used to preclude Extreme from presenting that complete basis. That's another reason why a contention interrogatory for this is proper.

Topic 30, we have answered at great length an interrogatory which talks about why SNMP Research should

1  have known that Extreme was using SNMP Research

2  software.  They have that answer.  In fact, plaintiffs

3  used that answer to that interrogatory with one of our

4  witnesses who was offered as a designee on document

5  collection.

6         For why we didn't commit fraud, again, facts,

7  e-mails have been put in front of Extreme's 30(b)(6)

8  deponents, and they have answered to the best of their

9  ability why we didn't breach the 2001 Extreme license.

10        Setting aside the legal aspect of breach, the

11 factual aspects.  What are the products?  What's inside

12 them?  What's the software?  Has the software been

13 replaced?  When has it been replaced?  There are

14 documents that talk about what operating system each

15 product runs on.  What's the hardware?  Because all of

16 that is part of the license.

17        All those facts, either through 30(b)(6)

18 deposition testimony or document testimony or contention

19 interrogatory responses, are in possession of

20 plaintiffs.  To now reinvent the wheel after having

21 taken 24 hours of 30(b)(6) testimony, I think, is not

22 only duplicative, but, as stated on these topics, is

23 improper.

24        Anything else?

25        THE COURT:  Thank you.

1          MS. RICE:  I think I can be very short here,

2    Your Honor.  With regard to topics 19, 20 and 27 through

3    30, we're asking -- I think you asked Mr. Prabhakar

4    first, now that we have the answer and we have the

5    affirmative defenses, does that change anything and for

6    us to just set out what the waterfront is, and, for us,

7    we have told Extreme that what we're looking for is the

8    factual basis for their contentions.

9          So, some of their -- one of their affirmative

10   defenses is failure to state a claim.  I don't think

11   we're going to be asking about that in a 30(b)(6)

12   deposition.  But certainly some of the other defenses,

13   the validity of the copyright or the validity of the

14   registration, to the extent there are factual positions

15   that Extreme has that relate to that defense, we believe

16   we're entitled to discover that.  So, for all of these

17   topics, Your Honor, we are simply asking for the facts

18   that Extreme intends to rely upon.

19          There was reference to asking interrogatories,

20   and in some cases there have been some interrogatories

21   asked, and in the depositions that have occurred to

22   date, when we have tried to ask about the rogs, those

23   were objected to as out of the scope.

24          So we haven't been able to really test that in

25   deposition.  But for these, not only is there case law

1   in this district that says that a party may seek the

2   factual basis of another party's claims or defenses by

3   Rule 30(b)(6) deposition.  But, also, with regard to

4   these claim topics, such as 29 and 30, Your Honor, this

5   is a fraud case, and even if there are written responses

6   that address -- or e-mails or what have you that address

7   some of the facts that the defendant is relying upon,

8   the plaintiff should be entitled to test those facts in

9   deposition in a fraud situation.

10        So, we believe that these are proper topics,

11   and we would ask the Court to allow us to proceed with

12   them.

13        Anything else?

14        THE COURT:  Thank you.  As we get to --

15   actually, Ms. Rice, if you're going to address 32, I did

16   want to ask you a question first.

17        MS. RICE:  Sure.

18        THE COURT:  Oh.  Just at first blush, this did

19   seem very broad, and, so, I just -- I want to try to

20   understand exactly what plaintiffs really need --

21        MS. RICE:  Okay.

22        THE COURT:  -- in relation to this.

23        MS. RICE:  Well, what we were trying to

24   understand with topic 32 is what has the defendant done

25   with plaintiffs' code.  This impacts our copyright claim

given that every act of reproduction or preparation of a
derivative work or distribution is alleged to be
infringement and the breach of contract claim because
obviously the contract, we allege, would limit to use to
certain circumstances.

So we provided some detailed categories here.
This is really just as a guide, again, to help Extreme
prepare its witness, not as a limitation on the topic.
Obviously the topic is already limited to code
containing our client's software, and during the
meet-and-confer calls we had, Extreme continued that if
this topic was going to require testimony about the
specific content of the code, it was improper.

And we confirmed that we were not trying to
address the content of the code; what we're really
trying to figure out here is what is -- what are
Extreme's customs and practices corporately for handling
its highly confidential source code, including the code
that our client -- of our client that it has in its
possession, and that we believe that it has version
histories and commit logs which show who accessed the
code, why they accessed the code, when they accessed the
code, and what they did with the code.  So we think that
they have a roadmap for preparing a witness on the
factual aspects of this that should not be really

1  burdensome by using their commit logs and their

2  versioning history.

3          THE COURT:  Okay.

4          MS. RICE:  Anything else I can answer about

5  that?

6          THE COURT:  I don't think so.

7          MS. RICE:  Okay.  Thank you.

8          THE COURT:  That's fine.  Thank you.

9          Sorry, Mr. Prabhakar.  I took that out of turn

10 because I wanted to go ahead and ask while she was --

11         MR. PRABHAKAR:  Not at all, Your Honor.  You

12 can take in whatever order you want them to.

13         A couple points.  The first main point, which

14 is this notion that all these subparts to a topic are a

15 guide to preparation.  They may, in the expectation of

16 getting a witness, be a guide.  But not only do they add

17 to the breadth of the topic, because topic 32 reads,

18 "this includes, without limitation," and this is almost

19 established law that a topic that says "without

20 limitation" is not reasonably particular.

21         But let's parse this topic a little finer.  If

22 we ignore the part that includes "without limitation,"

23 source -- "possession, custody of every copy, including,

24 without limitation, every identical copy of source code

25 containing SNMP Research software."  This is not a

question about SNMP Research software code in Extreme's products; it's about source code that contains plaintiffs' software.

To say that plaintiffs' software code is a drop in the bucket if the bucket presents Extreme's operating system code is not an exaggeration.

So, we have plaintiffs' software code as a portion of millions of millions of lines of code that Extreme's operating system has because, keep in mind, these are networking products.  They comply if we're just talking about standards.  They comply with at least 100 of them because that's how the networking business is.  Because if there aren't any standards, these different equipments cannot talk to each other.  Then, on top of that, there is Extreme's IT to make doing switching better, faster, independent of the source code.

So, the topic doesn't limit this to whatever plaintiff just described about derivative works from SNMP Research software, code comments, what happened with it; it is asking about all the source code, and there are at least a thousand versions that we have produced spanning 23 years.

These sub-bullets are not guides for preparation.  There is no way we can impart all this

wisdom into one witness.  And plaintiffs' counsel said,
wait, there are check-in logs in source code that shows
who checks it out.  What did they do with it?  This is
23 years of source code development.  How do we get a
witness, given that there is no narrowing even to the
source code check-in logs to plaintiffs' source code,
which is really the source code that is at issue in this
case, without that limitation?  How do we have our
witness pouring over 23 years and a thousand different
releases of the software to prepare for this topic?  And
even if it is for plaintiffs' software, how do we
prepare them to cram up everything?

        And this is a memorization exercise.  Because
what a check-in log represents, Your Honor, is a
developer would modify the code, and the check-in
process is, like, he's developing this on his local
computer, and then once he thinks that it's ready to go
into the product that's shipped to the customers or to
the QA team, he would check that in and now it's part of
the prod's code.

        Engineers, software engineers, do this every
day.  That's their day-to-day job.  The check-in comment
would typically contain the name of the developer, the
date of the check-in, and if the developer was a good
one, would explain what his change was.  There are

1  hundreds of developers of Extreme's software code.  I
2  have not looked at the check-in log, but if I have to
3  prepare a witness for this topic, I would be really
4  concerned that how much volume of information am I going
5  to show the witness?  When was the source code first
6  copied, created, obtained?  How does the witness
7  memorize this for a thousand versions of source code?

8          So, as stated, even with this notion that
9  plaintiffs have that somehow the subparts impart more
10  reasonable particularity, even though they're using the
11  "including, without limitation" language, we disagree.
12  They actually make our life much harder because if we
13  miss one subpart because it's too burdensome and we
14  agree to produce a witness, we run the risk of being
15  accused that you were unprepared on this entire topic
16  because after five subparts, the witness didn't know
17  about subpart 2.

18          So, Your Honor's first reaction was right.
19  This topic is overbroad as stated.  And the source code
20  that's at issue is being examined by expert witnesses.
21  They can testify to everything; if not everything, most
22  of the source code issues that are called for by this
23  topic.

24          To the extent there is factual information that
25  plaintiffs need, they could have fashioned a narrower

```
 1   topic which would call for that information, but they
 2   did not.  And now that we have taken multiple 30(b)(6)
 3   depositions and we have already designated a witness who
 4   talked about source code repositories, now is not the
 5   time to go back and try to fix a problem which we
 6   flagged to plaintiffs in the first place during the meet
 7   and confers.  And plaintiffs' counsel said, we want to
 8   know everything that you did with plaintiffs' source
 9   code.  That's just the definition of not reasonably
10   particular, and that's why topic 32 is improper, Your
11   Honor.
12            THE COURT:  Okay.
13            MS. RICE:  So, Your Honor, Exhibit A to the
14   position statement has the correct version.  What
15   Mr. Prabhakar showed you is not quite correct.
16   We -- and I'll put it up here.
17            We did remove the "without limitation" language
18   that he was referencing.  So, if that helps clarify that
19   piece of this topic.
20            This is a complex case, Your Honor, and what we
21   heard earlier today was that on license agreement,
22   30 years' worth of plaintiffs' license agreement wasn't
23   enough; that the defendant needed to see 38 years of
24   license agreements.  But the defendant has had
25   plaintiffs' code for 21 or 23 years now in its custody
```

1    and who it's allowed to have possession of and how it

2    has used our code, our client's code, is equally

3    relevant, Your Honor.

4        With regard to the comment about the repository

5    expert -- or the designee on repositories -- excuse

6    me -- we still need to understand what the names of the

7    repositories are where the code is held.

8        This is really about corporate practice, Your

9    Honor.  Most of the versions of defendant's source code

10   that contains the plaintiffs' software should be treated

11   relatively similarly, we would expect, and, so, this may

12   not be, in our view, as burdensome as it's being made

13   out to be.

14       Also I wanted to point out to the Court -- I'm

15   sorry.  I lost my note.  Thank you.  Excuse me.  I'm

16   sorry.  That -- sorry.  I'm sorry.  I've completely lost

17   my thought and I can't find that comment.

18       So, I guess I would just say that we believe

19   this is not as monumental a task as the defendant is

20   making it out to be.  It's certainly -- the case spans a

21   number of years, and the handling and use of our

22   client's code is relevant.

23       And, so, we would ask that the defendant be

24   ordered to prepare a witness to testify to what's

25   reasonably appropriate for a witness to be able to know

1  under these circumstances based on the documents

2  that -- and information and witnesses that employees

3  that Extreme has available to it.

4          THE COURT:  Okay.  Ms. Rice, before you sit

5  down --

6          MS. RICE:  Uh-huh.

7          THE COURT:  -- do you have your materials to

8  address topic 37?

9          MS. RICE:  I do, yes.

10          THE COURT:  So, I do want to ask your position

11  on the relevancy of the --

12          MS. RICE:  Sure.

13          THE COURT:  -- management information base.

14          MS. RICE:  I'm glad you asked that.  So,

15  management-based information documents are -- they're

16  basically documents that define what can be queried in

17  the network and generally what kind of variables or

18  parameters can be monitored using SNMP.

19          So, there are manage -- they're referred to as

20  MIBs, management information-based objects, MIBs, in

21  each release of the EXOS software that contain SNMP

22  Research software.

23          So, these MIBs are relevant to showing how

24  Extreme's products utilized SNMP, and the number of MIBs

25  in the EXOS product appears to have changed over time

and grown over time, and we would like to explore how
the use of MIBs has changed and grown over time. That
would help us understand how extensively over time
Extreme's products have used our client's software and
in what respects.

THE COURT: Okay. Thank you. Can you address
that question?

MR. PRABHAKAR: Yes, Your Honor. I first want
to address the omission in 32. It was an error in the
document. I did not intend to mislead the Court. So,
to the extent that I was arguing that none of it is
limiting, I stand corrected.

THE COURT: Okay.

MR. PRABHAKAR: But it was entirely
unintentional. That's how I made an error in creating
this document, but that was inadvertent.

MIBS, or management information-based objects,
there is not a single claim in this case that refers to
MIBs. There is no copyright registration about MIBs.
There is not a person identified on plaintiffs' initial
disclosures about MIBs. There is no interrogatory
response that refers to MIBs. To the extent a witness
is necessary on MIBs, we don't understand the relevance
to this case at this point in time.

THE COURT: Well, can you respond to what

Ms. Rice just stated; that it would -- that they have

changed and grown over time and then that would show how

Extreme used the plaintiffs' software?

MR. PRABHAKAR: Your Honor, I -- fair point.

But that's not what the topic asked. Because if the ask

would have been how MIBs have changed over a period of

time, the delta is a much narrower topic than, tell me

everything about MIBs.

And that's not what we had discussed during

meet and confers. All we had heard during meet and

confers is MIBs is part of the software and, therefore,

we are entitled to it.

But if we use that logic, we just don't know

where to draw the line. This is the exhibit plaintiffs

attached. There is a MIB that talks to the agent.

There is an -- also a management station that talks to

the agent. Does that mean management stations are not

at issue in this case?

We have an SNMP agent in our products. Does

this figure show that now suddenly deposition testimony

on management stations is allowed, even though

management stations are not part of any claim in this

case?

Your Honor, 30(b) -- we are -- and I hate to

sound like a broken record because this really is a

1    burden issue for us.  We are 24 hours of deposition

2    testimony in.  At this point in time, we should be

3    focusing -- plaintiffs should have been focusing -- they

4    served a 40-topic notice -- should have been focusing on

5    exactly what they needed for this case.  It seems

6    like -- not just on topic 37, but on 32 -- that they had

7    a narrower ask.

8              I'm not saying that the ask as stated on the

9    record was reasonably particular.  I hesitate to take

10   that position.  But it appears to me that they had in

11   their mind a specific scope which would have been

12   manageable.  But that's not what they wrote initially.

13             When we met for six hours during meet and

14   confers and discussed narrowing of these topics, the

15   only narrowing that they provided for topic 32 was

16   removing the legally-problematic "including, without

17   limitation" language.

18             If they knew what they wanted after or during

19   the meet and confers, they would have said, yes,

20   Extreme, you have a valid point.  This is really not the

21   full scope of what we want.  We want to really know

22   where our -- to the extent we have three repositories,

23   but let's use that for the sake of argument.  You have

24   one repository for EXOS products; you have one

25   repository for Brocade products, and you have one

repository for Enterasys products.  Produce a witness
knowledgeable about -- and I'm not trying to craft a
topic on the fly -- the repository; do not ask for each
and every version of the source code.

So, that's what the meet and confer process,
which has been written in the federal rules, is for.
Because we agree.  Sometimes it's not possible to craft
a topic which both parties would see eye to eye on.

And, as I said, just like the requestor wants a
lot, the producer wants a little.  The meet and confer
process was meant to narrow topics so that they can
be -- witnesses can be designated.

We are satisfied that we will not be -- Extreme
is not being accused of not putting up an unprepared
witness.  Plaintiffs are satisfied that they got the
information that they were looking for.  But neither 32,
nor 37 reflect the narrowing that plaintiffs are
supposedly offering today.  And we could have easily, if
these topics were reasonably particular, redesignated a
witness on engineering topics.

We designated two of them.  There is no reason
why, going back, we could not have included this
specific change in MIBs as part of their deposition
prep.  There is no reason why.  And, actually, on source
code repositories, there is actually a topic that goes

1  to that that we prepared a witness on.  31.  Your source

2  code for operating system contained in the

3  products -- it's not in red -- how is it maintained,

4  developed, inserted into the products?

5       That sounded incredibly similar to how

6  plaintiffs just described topic 32.  There is a witness

7  who was designated on that.  If 32, to the extent that

8  it's not overlapping with 31, was narrowly stated in the

9  first instance, one witness could have covered 31 and

10  32.

11       Now plaintiffs, after six hours of meet and

12  confer, articulate a new topic for 32, which is not

13  reflected in the original topic.  It is extremely

14  burdensome on Extreme to now redo the wheel when this

15  could have been done right in the first instance.

16       THE COURT:  Thank you.

17       MS. RICE:  I will just briefly say with regards

18  to topic 32 where we had the meet and confer, we talked

19  about all of the things that were mentioned a moment

20  ago, commit logs, where the copies are stored.  All

21  those different things were discovered or discussed in

22  the meet and confer process.

23       With regard to topic 27 -- or 37 -- excuse

24  me -- the topic specifically says the development of

25  MIBs.  It does not say, tell us everything about MIBs in

the software.  So, we understand that to mean what I

explained to Your Honor.

        And during the meet and confer, we actually

explained why we believe that topic was relevant and

said the fact that the -- that you're using MIBs, that

Extreme is using MIBs, shows that it's using SNMP, and

how and to what extent.  And we were told at that time

that counsel would take that back to the team, that that

did not seem to be something that would be difficult to

present a witness on and they just had the issue to find

the right person.

        So, we do not understand what the problem with

this -- we think it's narrowly defined and they should

be able to produce the witness on it.

        THE COURT:  Thank you.  All right.  And the

last topic which is No. 40.

        MR. PRABHAKAR:  Give me one second, Your Honor.

        So, Your Honor, the issue with topic 40 is that

the topic, as stated, requests one person to find out

persons knowledgeable about 39 of the topics.  That is,

by definition, not reasonably particular.

        But I understand what plaintiffs offered as a

compromise, and that kind of goes into this whole

narrative that we discussed during the meet and confer.

We explained this to you in the meet and confer.  None

1  of that is reflected in the narrowing of the topics that

2  plaintiffs offered.

3       But on 40, I can put -- at least try to put

4  Your Honor to ease for two reasons.  One, plaintiffs

5  actually have asked each of our witnesses about who is

6  the person who knows about this; who is the person who

7  knows about this.  The most knowledge regarding that

8  subject is slightly problematic because most knowledge

9  may be in the eye of the beholder.  I don't think

10 Extreme has a position, has one favorite child over the

11 other, like, who is the most knowledgeable engineer.

12      So, to the extent that the question, if we set

13 aside the "most" part, plaintiffs have asked, I think in

14 virtually every deposition or all depositions, who is

15 knowledgeable about certain topics, and they have

16 received that information.

17      We also have served responses to two.  It's 15

18 and 17.  And we have identified dozens of people by

19 interrogatory number where the interrogatory number is

20 essentially a proxy for that subject matter of people

21 who are knowledgeable on that topic.

22      And I know, Your Honor, this has been a long

23 day, so I don't want to go back and go find that

24 interrogatory response.  But if Your Honor would like, I

25 can show that to demonstrate how many people we have

1   identified in written discovery through interrogatories.

2   And then plaintiffs also had the opportunity to ask

3   about knowledgeable people in the depositions.  They

4   have asked that.  The witnesses have provided answers,

5   whatever they knew.  But other than that, we don't know

6   what's left to explore on this topic that's not already

7   been explored.

8           THE COURT:  Are the -- in the depositions, are

9   they asking most knowledgeable or just knowledgeable?

10          MR. PRABHAKAR:  Your Honor, I don't have all

11  those questions memorized.

12          THE COURT:  You said the word "most" was

13  problematic.

14          MR. PRABHAKAR:  Right.

15          THE COURT:  That's why I was asking.

16          MR. PRABHAKAR:  Yeah, and I think it may have

17  been a variation of, like, who is knowledgeable on this

18  topic.  I don't want to exclude the possibility, but --

19  that they didn't ask most knowledgeable, but I do know

20  that they have asked at least who's knowledgeable on

21  their areas, and whatever the witness knew as related to

22  their topic, they have provided that testimony.

23          And I'm happy to pull that from the

24  transcripts, but I just don't know where it's --

25          THE COURT:  Okay.  Thank you.

1    MS. RICE:  I feel like I almost heard an

2  agreement on that one.  Maybe I'm wrong.  But I feel

3  like what I heard was they're going to prepare and have

4  been preparing a witness to talk about who the person or

5  persons are that have the greatest knowledge on the

6  various topics.

7    THE COURT:  I think what he said is:  They have

8  prepared responses to 15 and 17, and then the witnesses

9  were being asked at the deposition and they're

10  responding to the best of their ability.

11    MS. RICE:  And that's what we're understanding.

12  So, I'm not sure if this topic is really in dispute.

13  But all we're trying to determine is who are the people;

14  person or people.  It doesn't have to be one person.

15  But they have identified quite a few, a number of people

16  with knowledge in their initial disclosures and their

17  interrogatory responses, and we're trying to figure out

18  who really has -- who are the true knowledge holders so

19  that if we need to go for a percipient witness

20  deposition, who we get.  And it sounds like we're

21  getting that.  So, as long as that continues, we should

22  be fine with that.

23    MR. PRABHAKAR:  Your Honor --

24    THE COURT:  Go ahead.

25    MR. PRABHAKAR:  -- I want -- I want to quickly

respond that we're not agreeing that we're now going to
prepare a witness who is going to testify about persons
knowledgeable about 1 through 39.  Our position is we've
already done that.  Just so that there is no lack of
clarity to plaintiffs.  This topic, we consider it
exhaustive.

THE COURT:  Okay.  All right.  I want to take a
recess.  I'm going to say it will be ten minutes, but it
may be a little bit longer.  We'll check and make sure
everyone is in the courtroom before we start again, but
I'll try to limit it to ten minutes.

THE COURTROOM DEPUTY:  All rise.  This
honorable court stands in recess.

(A brief recess was taken.)

THE COURT:  Okay.  I want to go through the
topics with you and what my rulings are going to be.

So, starting with topic 2, the Court wants this
limited to the transfer action and what Extreme obtained
from Brocade.  So, with that limitation, the topic can
stand.

Topic No. 3 can stand as stricken with
plaintiffs' proposal and, of course, these are limited
to the facts that would be questioned.

Topics Nos. 5 and 6, based on Extreme's
representation here today that the reference to

1   Enterasys was mistaken, topics 5 and 6 do not seem
2   relevant at this time.  But that will be subject to
3   reconsideration if things change.

4          Topics 10 and 11 will be stricken.  Comparable
5   is not defined, so these do not seem reasonably
6   particular.

7          For topics 15 and 17, the Court feels these
8   could be combined such that it captures what was
9   explained here today, in terms of what is sought.  So,
10  for products that contain the subject software, the
11  plaintiffs are seeking the value of the product and then
12  broken down into apportionments of the valuable -- the
13  value that's attributable to the software versus the
14  portion that's attributable to other elements.

15         Topic 18 is too broad and the plaintiffs are
16  invited to rewrite it.

17         For topics 19, 20 and 27 through 30, those are
18  okay, provided they're limited to the factual basis and
19  subject to the rewrite of No. 20 that plaintiffs have
20  offered.

21         And topics 32 and 37 are overbroad.
22  Plaintiffs, again, are invited to rewrite those
23  as -- based on discussions here today.

24         And topic 40 appears appropriate with the
25  clarification -- it sounds like deponents have been

asked who they talked to and who was knowledgeable about

the subject.  So, with that limitation, topic 40 appears

okay.  So, those are the rulings on the 30(b)(6) topics.

So, with that, given the limitation on the

scope now, I would like to ask the parties to discuss

the fourth issue before we delve into it because this is

going into how many hours would be needed.  And so now

that the scope is more defined, I would like you all to

talk about that to see if that can be resolved without

the Court's intervention.

And I'd like to go through the other matters

and then give you all a few minutes to kind of discuss

that and see if there is room for you all to come to an

agreement on that.  And, if not, I'll take it up at the

end.

MR. PRABHAKAR:  Your Honor, may I briefly ask

clarification on two topics?

THE COURT:  Yes.  Let me turn back.  Yes.

MR. PRABHAKAR:  What's the ruling on topic 3?

THE COURT:  That it's okay as it stands with

the stricken language that plaintiffs proposed.

MR. PRABHAKAR:  And for 40, you said the topic

is okay?

THE COURT:  Yes, it stands given -- given that

they have been -- the deponents have been asked -- what

1    I understood -- with whom did they speak and their

2    knowledge and who is knowledgeable about the subject.

3    So, limited to those questions, it seems appropriate.

4              MR. PRABHAKAR:  So, this is only -- so, now

5    when we designate a witness, do we designate on 40, or

6    just whoever is designated on the topics that the Court

7    has allowed, they provide that information?

8              THE COURT:  It -- it's -- so, as I understand,

9    you're preparing responses that would name people that

10   have knowledge.  So, with this, it would be the person

11   who is being deposed and these are the questions that

12   can be asked.

13             MR. PRABHAKAR:  Understood, Your Honor.  Thank

14   you.

15             THE COURT:  Okay.  So, then, I'll let you all

16   further discuss the timing limitation in a moment.

17             For the fifth issue, that's the plaintiffs'

18   request for an extension of its expert disclosure

19   deadline, the parties need to finish taking the Rule

20   30(b)(6), and then if there are any timing issues, you

21   need to meet and confer and file either a joint or

22   opposed motion, and the Court will take that up by

23   formal motion.

24             Similarly, with the sixth issue as to fact

25   witnesses, the parties need to take their depositions.

1    If you need additional beyond the ten, then you'll need
2    to file an appropriate motion with the Court.
3            If we can turn to your bullet point list.  So,
4    with two exceptions, I'm going to give you specific
5    instructions for your position statements, and these are
6    the two exceptions:  For -- let's see -- plaintiffs'
7    issue No. 6, the reopening of the Rule 30(b)(6)
8    deposition, you'll need to file a motion on that issue.
9            And for defendant's issue No. 5, the improper
10   withholding of certain documents on the basis of
11   privilege, you'll need to file a motion on that.
12           With regard to all the other remaining bullet
13   points, what I'll be asking you to do is to file a
14   one-page position statement, and the only attachments I
15   want to see are the discovery requests and the response;
16   nothing else.  No e-mails or anything else.
17           I want the party making the request to file
18   statements by March 15th, and then responses will be due
19   March 22nd.  And then I want to set a hearing to go
20   through all of these and get those resolved.  And I want
21   you to look at your calendars for April 2nd and 3rd.
22           MR. WOOD:  Your Honor, I just wanted to mention
23   I think our expert report deadline is April 2nd.
24           THE COURT:  Okay.
25           MR. WOOD:  So that day might be a pretty busy

1    day for us if the -- if we're moving the date.  I guess

2    we may be filing a motion.  I think Your Honor said you

3    want us to finish the 30(b)(6) depositions first.

4              THE COURT:  Uh-huh.

5              MR. WOOD:  And then meet and confer and then

6    come back to you about the opening report deadline?

7              THE COURT:  Yes.

8              MR. WOOD:  So, I don't know if it could be

9    possible to get a deadline for finishing the 30(b)(6)

10   or -- because our expert reports are due in a month.

11             THE COURT:  Uh-huh.

12             MR. WOOD:  If we're not able to get them

13   finished but we can't ask for an extension -- the reason

14   for asking for the extension is because we can't get

15   them finished.  I mean, that's part of the reason for

16   the extension.  And, so, if we're not able to get them

17   finished but yet we can't ask for the extension --

18             THE COURT:  Well, if you're to the point where

19   you know for certain that you cannot, just -- I guess

20   the point being, you need to go ahead -- you need to

21   file a motion.

22             MR. WOOD:  Okay.

23             THE COURT:  I'm not going to take that up on an

24   informal discovery dispute basis.

25             MR. WOOD:  Okay.

1          THE COURT:  So --

2          MR. WOOD:  Okay.  All right.  Thank you, Your

3     Honor.

4          MR. PRABHAKAR:  Your Honor, just to confirm,

5     the 3rd is okay for Extreme.

6          THE COURT:  Are plaintiffs available on the 3rd

7     to take up the bullet point list?  I would like to start

8     at 10:30 again.

9          MR. WOOD:  We're available on the 3rd, Your

10    Honor.

11         THE COURT:  Then lastly, before you all meet to

12    discuss the timing of depositions issue, the parties

13    would have had an opportunity to see the Court's

14    Memorandum and Order, and I need some additional

15    briefing on the Extreme and Avaya Communications.  So I

16    wanted to go over that briefing schedule with you.  So I

17    would like to receive Extreme's brief on March the 11th,

18    and plaintiffs' response on March 25th, and defendant's

19    reply on April 1st.

20         All right.  So, I'm going to -- I'll just take

21    a recess and let you all have a little bit of time to

22    see if you can make any headway on the number of hours

23    for the 30(b)(6).  And you can just let Ms. Stone know

24    when you're ready and I'll come back out.  Thank you.

25         MS. RICE:  Thank you, Your Honor.

1          MR. LEE:  Judge, I'm taking notes as fast as I
2     can.  Will an order be submitted on this?
3          THE COURT:  On the fourth issue?
4          MR. LEE:  With respect to the 30(b)(6) topics.
5          MS. RICE:  The full day's worth.
6          THE COURT:  I'm sorry; I can't hear the
7     question.
8          MR. LEE:  I'm sorry.  We were taking notes
9     furiously; I think both sides.
10         THE COURT:  Yes.
11         MR. LEE:  With respect to the 30(b)(6) topics
12    narrowed, which ones are good and which ones are bad --
13         THE COURT:  Yes.
14         MR. LEE:  -- will an order be issued with
15    respect to that?  I just didn't know.
16         THE COURT:  We can do a short order so that you
17    have that.
18         MR. LEE:  Okay.  Thank you.
19         THE COURT:  Okay.
20         THE COURTROOM DEPUTY:  All rise.  This
21    honorable court is in recess.
22         (A brief recess was taken.)
23         THE COURT:  (Beginning of audio recording:) --
24    discussions.  Whoever would like to address --
25         MR. PRABHAKAR:  I just have one point of

clarification on one topic which might make things a
little simpler timing-wise.

       THE COURT:  Okay.

       MR. PRABHAKAR:  And I apologize for sitting,
Your Honor.  So, Your Honor, you combined 15 and 17?

       THE COURT:  Yes.

       MR. PRABHAKAR:  In terms of putting up a
witness, it becomes a little tricky.

       THE COURT:  Okay.

       MR. PRABHAKAR:  Because 15 has financial
components to it, which means that we have to have,
like, one witness on a -- separate on 15.  Nobody else
who is non-finance can have that knowledge.  17, which
is about value, is not necessarily quantifiable but
could be subjective value.

       THE COURT:  Okay.

       MR. PRABHAKAR:  So, I don't think I can put up
a finance witness who can also talk about the subjective
value, and I can't put up a technical witness or a
marketing witness who can then go over the financial.
So is there a way to -- given that 15, they have all the
profit calculations and everything, we can just talk
about the subjective value, which I understand Your
Honor's concern that they don't have that testimony.  I
understand that concern.  It's legitimate.  So, if we

1  could just have 17, it might break the logjam on perhaps

2  the number of hours.

3      THE COURT:  Okay.

4      MR. PRABHAKAR:  That's at least Extreme's

5  proposal.  But it's just a proposal, and I don't want to

6  say anything which suggests that we don't agree with

7  your ruling.

8      THE COURT:  So, essentially it's to break them

9  apart again, the questions?

10      MR. PRABHAKAR:  Correct.

11      THE COURT:  Because you'll need a financial

12  person for 15 and a marketing person for 17?

13      MR. PRABHAKAR:  Marketing or engineering or

14  someone like that.

15      THE COURT:  Or engineering.

16      MR. PRABHAKAR:  Right.  And they're not

17  interchangeable in the sense that I can't put up one

18  person to do 15 and 17 is my guess.

19      THE COURT:  Okay.  And that will assist in your

20  estimation for the deposition time as well?

21      MR. PRABHAKAR:  Yes, Your Honor.

22      THE COURT:  Okay.  All right.  Given his

23  explanation, I'm inclined to do that.

24      MR. WOOD:  We're completely fine with that,

25  Your Honor.

1          THE COURT:  Okay.  All right.  So, I will

2    reverse my ruling on that and we will now treat 15 and

3    17 separately again.  And, so, do you need further

4    discussions?

5          MR. PRABHAKAR:  I think in terms of this

6    ruling, we can -- okay.  I should probably just take

7    five minutes with counsel just so that we can see if we

8    can hammer this out.  Not to take the time up anymore.

9          MR. WOOD:  Maybe two minutes.

10          MR. PRABHAKAR:  Yeah, maybe two minutes.

11          THE COURT:  That will be fine.

12          (End of audio recording file.)

13          (Which were all the digitally-recorded

14           proceedings had and herein transcribed.)

15                    * * * * * * *

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4              I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    digitally-recorded proceedings; that the foregoing pages

7    were transcribed to the best of my ability to hear and

8    understand the recorded file under my personal

9    supervision and constitute a true and accurate record of

10   the digitally-recorded proceedings.

11             I further certify that I am not an attorney or

12   counsel of any of the parties, nor an employee or

13   relative of any attorney or counsel connected with the

14   action, nor financially interested in the action.

15             Transcript completed and signed on Monday,

16   March 4, 2024.

17

18

19

20

22             _____
                 TERESA S. GRANDCHAMP, RMR, CRR
23               Official Court Reporter

24

25