# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH INC. & SNMP RESEARCH INTERNATIONAL INC., | ) ) ) | Case No. 3:20-cv-451 |
| *Plaintiffs*, | ) ) | Judge Atchley |
| v. | ) ) | Magistrate Judge Poplin |
| EXTREME NETWORKS INC., | ) ) | |
| *Defendant*. | ) ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the Motion to Refer Questions to the Register of Copyrights [Doc. 293], filed by Defendant Extreme Networks, Inc. Plaintiffs SNMP Research, Inc. ("SNMP Research"), and SNMP Research International, Inc. ("SNMP International") responded in opposition, Extreme replied, and the matter is ripe for review. For reasons that follow, the Motion [Doc. 293] will be **DENIED**.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

A basic understanding of relevant terminology is necessary to frame the parties' dispute. Computer programs are initially written in "source code," a symbolic language that humans can read, often using words and common mathematical symbols. 4 Nimmer on Copyright § 13.03, n. 271 (2022); [Doc. 295 at 10, n.3]; *see also Lexmark Intern., Inc. v. Static Control Components*, 387 F.3d 522, 533 (6th Cir. 2004) (explaining that a computer program's "object code" or binary code/ binary form is a computer-readable "series of zeros and ones," while the source code is "the spelled-out program commands that humans can read"). "The source code is then translated, through a mechanical process known as compilation or assembly, into 'object code,' which is a concatenation of 1s and 0s readable by a computer." *Id.* Object code is not readable to a layperson

and "it is virtually impossible to develop a working understanding of a program by examining only its object code." *Id.* So, "most commercial programs are sold only in object code form, and can be run only 'as is' by the ordinary user." *Id.* "For registration purposes, the claim is in the <u>computer program</u> rather than in any particular representation of the program." Compendium II, § 321.03.

The facts relevant to the Motion to Refer [Doc. 293] are few. Plaintiffs allege that Dr. Jeffrey Case was instrumental in creating the Simple Network Management Protocol, a way for connected devices to communicate by sending and responding to messages. [Doc. 244 at ¶ 2].[1] Plaintiff SNMP Research has registered copyrights for the software at issue in this case (the "Works"), all registered in 2011. [*Id.* at ¶ 33]. Dr. Case personally filled out each of the copyright applications for SNMP Research and submitted the deposit copies of the source code to the Copyright Office. [Doc. 296-1 at ¶ 2]. Prior to registering the software, Plaintiffs had licensed it to various entities. When he filled out the applications, Dr. Case selected "unpublished," because he "did not think that SNMP Research had 'published' the software to the general public just by having licensed (that included restrictions) the software to various entities." [*Id.* at ¶ 8].

According to Extreme, discovery in this case indicates that by January 2011, SNMP Research had entered into license agreements with at least 675 unique entities, prior to registering the first work at issue in this case. [Doc. 293-2 at ¶ 12]. Extreme contends that SNMP's customers in turn redistributed thousands of copies of SNMP's binary/object code to customers. These contentions are based on (i) Extreme's October 22, 2001, license agreement with Plaintiffs (the "License Agreement"), and (ii) the "binary royalties" SNMP Research received from 2000 to 2004.

---

[1] For clarity, citation is made to the CM/ECF-stamped document and page number, rather than any internal pagination of the document. Where possible, the Court has included more specific references, such as to the numbered paragraphs of the Complaint.

2

Plaintiffs do not dispute that they licensed the subject work to hundreds of licensees prior to registration. They do not dispute that their License Agreement with Extreme is typical of agreements with other licensees or that their program had been distributed to potentially thousands of users, in binary form and under restriction.

The License Agreement grants both internal use rights and binary redistribution rights. As to internal use, the Agreement provides:

> SNMP grants Licensee an irrevocable (except as provided herein), non-exclusive, non-transferable, and worldwide license to use, execute, reproduce, display, perform, prepare Derivative Works based upon, and distribute **internally**, copies of the Licensed Modules **in either Source or Software forms**, for Licensee's Network Switch project using the Red Hat Linux operating system and the MIPS hardware platform, provided that Licensee shall not distribute or transfer them to any person or persons outside Licensee's organization without prior written permission from SNMP.

[Doc 246-2 at 3].

The License Agreement also grants Extreme "Binary Redistribution Rights":

> SNMP grants Licensee an irrevocable (except as provided herein), non-exclusive, non-transferable, **royalty-bearing**, and worldwide license to use, execute, reproduce, display, perform, prepare Derivative Works based upon, and distribute internally **and externally**, copies of the Licensed Modules and Derivative Works thereof **in Software form**, for Licensee's Network Switch project using the Red Hat Linux operating system and the MIPS hardware platform.

[*Id.*] (emphasis added). The licensee's redistribution rights specifically included the right to sublicense software to the licensee's customers "in association with the acquisition of Licensee's hardware, software, or services so long as the Licensee's sublicensing terms and conditions are at least as restrictive as those of this License Agreement." [*Id.*]. The License Agreement does not grant any right to distribute the Licensed Modules to third parties in source form. [*Id.* at 4].

3

## II. STANDARD ON MOTION TO REFER

"As a prerequisite to bringing a copyright infringement suit, a copyright holder must register its works." *HealtheState, LLC v. United States*, 160 Fed. Cl. 91 (Fed. Cl. 2022). A certificate of registration satisfies this prerequisite, regardless of whether it contains any inaccurate information, unless two conditions are met:

> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and
>
> (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1). Section 411(b)(2) provides that "[i]n any case in which inaccurate information described in paragraph (1) is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(2). "In other words, before finding that knowingly inaccurate information would have caused the Register of Copyrights to refuse registration, a court must ask the Register whether that would have been the case." *Palmer/kane LLC v. Gareth Stevens Publishing*, 2016 WL 6238612, *1 (S.D.N.Y. Oct. 24, 2016). "[R]eferral under Section 411(b) is required only if both subsections . . . are met." *Lieb v. Korangy Publishing, Inc.*, 2022 WL 1124850, *12 (E.D.N.Y. Apr. 14, 2022).

By its terms, the statute requires referral upon mere allegations of knowingly inaccurate information. Some courts have held that "[t]he movant's burden to *prove* its factual allegations does not arise until the merits stage of the proceeding, where the court can more appropriately make the findings necessary to determine § 411(b)'s scienter requirement." *HealtheState*, 160 Fed. Cl. at 95. But as many courts have recognized, granting referral based on allegations alone "creates a serious potential for abuse by introducing a mechanism by which infringers can throw up

4

roadblocks to merited infringement lawsuits, simply by 'alleging' technical violations of the underlying copyright registrations." *Schenck v. Orosz*, 105 F. Supp. 3d 812, 818 (M.D. Tenn. 2015). Because of this concern, "[e]ven courts that hew closely to the plain language interpretation of § 411(b)(2) review the movant's request to determine whether it has provided some basis for its allegation and presented a proper question for referral to the Register." *HealtheState*, 160 Fed. Cl. at 95-96; *see also Palmer/kane*, 2016 WL 6238612 at *2 ("[C]ourts generally agree that they may first require the party seeking invalidation to establish as a factual matter that the applicant included inaccurate information on the registration application with knowledge that it was inaccurate."); *Brunson v. Cook*, 2023 WL 2668498, *4 (M.D. Tenn. March 28, 2023) (same).

The United States Court of Appeals for the Sixth Circuit has not spoken to the issue. Other courts have near-unanimously found that a court may require some factual basis before referral under § 411(b)(2). *See DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013) (holding that instead of immediate referral, "courts can demand that the party seeking invalidation first establish . . . that (1) the registration application included inaccurate information; and (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office"); *Energy Intelligence Group, Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 278 (5th Cir. 2020) (district court did not err in following "persuasive" interpretation of *DeliverMed* court). And as the United States District Court for the Middle District of Tennessee has noted, the Sixth Circuit has long held that a clerical error in a certificate of registration, unaccompanied by fraud, does not invalidate a copyright. *Schenck*, 105 F. Supp. 3d at 819; *see Advisers, Inc. v. Wiesen-Hart, Inc.*, 238 F.2d 706, 708 (6th Cir. 1956). Reading § 411(b)(2) to require referral upon any allegation of inaccuracy, including a clerical error, would result in referral

of matters that would not impact the case unless the court also finds fraud. *Schenck*, 105 F. Supp. 3d at 819.

The Court is admittedly hesitant to read any evidentiary standard into a statute that requires mere allegations. Yet Extreme concedes "that a bare allegation is insufficient." [Doc. 301 at 8]. Based on this concession, related Sixth Circuit precedent, and the overwhelming weight of authority, the Court finds that the movant must show some factual basis for its allegations of knowing inaccuracy to mandate a referral to the Register of Copyrights.

The parties devote significant energy to arguing about what constitutes a "knowing" inaccuracy. Despite voluminous briefing, the answer is fairly clear. In *Unicolors, Inc. v. H&M Hennes & Mauritz*, 595 U.S. 178, 182 (2022), the Supreme Court of the United States held that "[l]ack of knowledge of either fact or law can excuse an inaccuracy in a copyright registration." The Court explained that "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Id.* at 187. Rather, courts can look to circumstantial evidence, "including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and such other matters," to determine whether the applicant "was actually aware of, or willfully blind to, legally inaccurate information." *Id.* at 187-188. As Plaintiffs acknowledge, "willful blindness may support a finding of actual knowledge." *Id.* at 187.

Willful blindness has "two basic requirements": (1) a subjective belief that there is a high probability that a fact exists, and (2) the party takes deliberate actions to avoid learning of that fact. *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-770 (2011). The Supreme Court reasoned that these requirements "give willful blindness an appropriately limited scope that surpasses recklessness and negligence." *Id.* Under this formulation, a person is willfully blind

6

when they take "deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id*. "By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing . . . and a negligent defendant is one who should have known of a similar risk but, in fact, did not." *Id*. In *Global-Tech Appliances*, the Supreme Court found that the Federal Circuit's willful blindness standard was incorrect, because it permitted a finding of knowledge when there was merely a "known risk" that the induced acts were infringing and required only deliberate indifference to that risk. So the Federal Circuit's test did "not require active efforts . . . to avoid knowing about the infringing nature of the activities." *Id*.

According to Plaintiffs, § 411(b)'s safe harbor provision codified the fraud on the Copyright Office doctrine. Following remand of *Unicolors*, the United States Court of Appeals for the Ninth Circuit agreed: "[T]he clear implication of the Supreme Court's holding in this case is that a proper construction of the safe-harbor provision's broad protection of copyright registrants leads to the conclusion that the PRO-IP Act was intended to codify the fraud on the Copyright Office doctrine." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 52 F. 4th 1054, 1066 (9th Cir. 2022). The Ninth Circuit therefore held that "a registration is invalid under § 411(b) if the registrant perpetrated fraud on the Copyright Office by knowingly misrepresenting material facts." *Id.* at 1067.

While Plaintiffs urge that Extreme must therefore make a showing of fraud or intent to defraud to obtain referral, they concede that willful blindness to the law or facts constitutes a "knowing" inaccuracy. As the Ninth Circuit explained, after *Unicolors* "we now know § 411(b) requires mistakes of law and of fact," so "there is no daylight between a court's determination that a party had knowledge of the legal and factual inaccuracies and a finding that the party committed

fraud on the Copyright Office." *Id.* at 1066. There is perhaps a distinction, but it is without a difference. Finally, it is not clear to the Court that the parties actually disagree on this issue. Plaintiffs call it "fraud," but they concede willful blindness will suffice. The Court sees no reason to complicate the issue. Knowledge of the law or facts includes actual knowledge and willful blindness, and the Supreme Court has outlined the types of circumstantial evidence that are relevant to this determination.

## III.   ANALYSIS

To obtain a referral under § 411(b)(2), then, Extreme must show that legally or factually inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate. Based on the overwhelming weight of authority, Extreme's allegations must have some factual basis. Before referring the materiality question to the Register of Copyrights, "a court must first establish whether the registrant had the proper 'knowledge' of the inaccuracy under § 411(b)(1)(A)." *Unicolors*, 52 F. 4th at 1064 (9th Cir. 2022).

Here, Extreme contends that when SNMP Research applied for copyright registration in 2011, it incorrectly identified the Works as unpublished. [Doc. 293-1 at 5]. Extreme says the Works were, in fact, published, because they had already been licensed to hundreds of licensees, who in turn had distributed the software to thousands of customers. Plaintiffs argue that the registrant believed the Works were unpublished and that, at the time of the application, the law was not clear as to whether licensing source code and software under restrictions / with confidentiality requirements could constitute publication. They do not dispute the number of estimated licensees and customers that the Works may have reached, either in source or binary form. But Plaintiffs show that the licenses contained meaningful restrictions and that the binary redistribution rights were likewise limited as to the end user / customer. The unsettled state of the

8

law and the express restrictions in the licenses "at least arguably render the works unpublished." [Doc. 296 at 24]. So, they contend, Dr. Case was not willfully blind to the asserted inaccuracy.

### A. Dr. Case's Affidavit and Circumstances of Registration

Dr. Case's affidavit states that he personally filled out the copyright applications for SNMP Research and submitted deposit copies of the source code to the Copyright Office. [Doc. 296-1 at ¶¶ 2-3]. He avers that he did not write anything on the application that he knew, believed, or suspected to be incorrect. [*Id.* at ¶ 5]. This does not end the inquiry, as the Court "need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Unicolors*, 595 U.S. at 187. The Court thus turns to the circumstantial evidence, "including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and such other matters," to determine whether the applicant "was actually aware of, or willfully blind to, legally inaccurate information." *Id.* at 187-188.

Plaintiffs show that each copy of the SNMP Research source code provided to the Copyright Office for deposit included language regarding licensing:

> **This software is furnished under a license** and may be used and copied only in accordance with the terms of such license and with the inclusion of the above copyright notice. This software or any other copies thereof may not be provided or otherwise made available to any other person. . . . **This software is an unpublished work subject to a confidentiality agreement** and is protected by copyright and trade secret law. Unauthorized copying, redistribution or other use of this work is prohibited. The above notice of copyright on this source code product does not indicate any actual or intended publication of such source code.

[Doc. 298-1 at ¶ 6].

Extreme responds that this representation in the deposits is irrelevant to whether the work was published, citing Compendium II, § 905.02. A "note" to this section provides:

> The fact that the copies bear a statement indicating that their distribution has been restricted or limited in some way will generally not constitute a sufficient basis for questioning whether or not publication occurred.

Compendium II, § 905.02.[2] The Court agrees that Plaintiffs' representation about publication status is not determinative of whether the Works were published. But Plaintiffs offer this as evidence of Dr. Case's state of mind, to show that he acted consistently with the belief that licensing did not mean the work was published. [Doc. 296 at 18-19]. His disclosure of the license language in the source code deposit suggests he was not attempting to conceal the prior licensing of the work.

Plaintiffs also argue that neither Extreme nor the Copyright Office raised any questions regarding the publication status of the Works. This argument has little relevance to whether Dr. Case included a knowing inaccuracy in the application materials. First, Extreme was under no obligation to correct potential inaccuracies in Plaintiffs' filings. As to the Copyright Office, "[t]he Office will ordinarily not attempt to decide whether or not publication has occurred but will generally leave this decision to the applicant." Compendium II, § 904(1). Nor does the Office "attempt to make factual investigations to determine whether or not publication has occurred." *Id.* at § 904(2). At the same time, when the "appearance of the copy or phonorecord deposited seems clearly inconsistent" with the applicant's statement about publication, "the Office will correspond with the applicant." § 904(6). Plaintiffs aver that did not happen here.

Finally, Extreme contends that Plaintiff SNMP International had previously co-authored six works, all of which were registered as published. [Doc. 293-1 at 23-24]. According to Extreme, this shows that Plaintiffs knew what they were doing when they applied for copyright registrations for the Works as "unpublished." Plaintiffs' response clarifies that SNMP International was not the

---

[2] There is no dispute that Compendium II, Compendium of Copyright Office Practices, is the operative Compendium. It is available at https://www.copyright.gov/history/comp/compendium-two.pdf (last accessed March 14, 2024).

registrant and that Dr. Case was not even aware that these works had been registered until this litigation. [Doc. 296 at 19-20].

### B. Statutory Definition and Compendium II Guidance

Next, the Court turns to the clarity and complexity of the relevant rule. The Copyright Act defines publication:

> "Publication" is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not itself constitute publication.

17 U.S.C. § 101. The statutory definition does not mention licensing as a mode of distribution.

Compendium II recites the statutory definition of publication. Compendium II, § 902. It explains the definition is in two parts, "one relating to direct distribution to the public and the other relating to the offering to a group for certain purposes." § 907. Works are published via distribution when they are distributed to the public by sale or other transfer of ownership, or by rental, lease, or lending. Compendium II, § 905. For distribution to constitute publication, it must be "to the public," rather than more limited. *Id.* at § 905.02. "Generally, members of the public are persons who are under no implied or express restriction with respect to disclosure of the work's contents." *Id.*

As to "offering to distribute" as publication, Compendium II again tracks the statutory language: "The offering by the copyright owner, or under his or her authority, to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication." Compendium II, § 906. On its face, the statutory language does not require that this "further distribution" also be to the public. This is in contrast to the statutory definition of publication by distribution "<u>to the public</u> by sale or other transfer of

ownership, or by rental, lease, or lending." 17 U.S.C. § 101. Yet the other two purposes of offering to distribute that effect publication are both public – public performance and public display. *See Unicolors, Inc.*, 52 F.4th at 1068 ("The principle of *noscitur a sociis* – 'it is known by its associates' or 'birds of a feather flock together' – instructs that words in statutes are given more precise content by neighboring words.").

Compendium II does not expressly state that offering to distribute for purposes of further distribution means "further distribution to the public." Yet the common theme of the examples in the Compendium is that there is an intermediary between the copyright owner and the public. For example, offering to distribute a new line of greeting cards to retail outlets constitutes publication, as does offering a cartoon to a number of syndicators for purposes of further distribution. Compendium II, § 906. In these examples, the end result of "offering to distribute" is that the work becomes (or may become) publicly available.

Reading the statutory definition of "publication" as a whole and reviewing Compendium II's guidance on the topic of distribution could reasonably lead an applicant to conclude that publication is accomplished by (i) distribution to the public or (ii) offering to distribute to a group of persons for further distribution to the public. Under this construction, then, both direct and indirect distribution contemplate distribution to "persons who are under no implied or express restriction with respect to disclosure of the work's contents." Compendium II, § 905.

This leads to the question of whether licensing software can constitute distribution, and if so, under what circumstances. Under the statutory definition, publication is distribution to the public by "sale or other transfer of ownership, or by rental, lease, or lending." 17 U.S.C. § 101. Despite discussing licensing elsewhere in the Compendium, the chapter on Publication does not mention it. Compendium II likewise defines and/or discusses source code, object code, and

12

software. Yet the section on publication does not give any examples of how such materials are published.

### C. Complexity of the Law – Licensing as Publication

At the time Dr. Case submitted the registration applications for the Works, the law regarding licensing as distribution/publication was unclear. Contrary to Extreme's contention, the Sixth Circuit did not hold in *Daimler-Chrysler Servs. North America., LLC v. Summit National, Inc.*, 289 F. App'x 916 (6th Cir. 2008), "that 'licensing' software constituted publication within the meaning of the Copyright Act." [Doc. 301 at 22].

Rather, *Daimler-Chrysler* addressed the closely-related issue of whether the software system in question had been publicly distributed. Under the Copyright Act in effect at the time of registration (1983), notice of copyright was required for a "publicly distributed" work to be protected. *Id.* at 922-23. The software had been distributed without notice, but the licensor argued that notice was not required because the software was not publicly distributed. *Id.* at 923.

The Act does not define "publicly distributed," so the Sixth Circuit looked to the definition of "publication" in § 101. *Id.* The court explained an exception to this definition for "limited publication": "Limited publication occurs where a work is distributed (1) to a definitely selected group of people; *and* (2) for a limited purpose, without the right of further reproduction, distribution or sale." *Id.* The court explained that the "definite, very selective group" prong "is not satisfied where a plaintiff distributes a work to the general public, or even to a targeted market sector." *Id.* (internal citations omitted).

The court held that the requirements of limited distribution were not met. The software was "aggressively marketed through mass mailings, solicitations, and advertisements in trade journals." *Id.* While the marketing was somewhat targeted, software customers "included a variety

of banks, financial institutions, utilities, and other corporations willing to pay for it." In total, it appears 70 customers utilized the software.

Several things are worth noting about *Daimler-Chrysler*. First, the court gave no special attention to the licensing of the software, apparently assuming that licensing could constitute "sale or other transfer of ownership, or . . . rental, lease, or lending." Instead of discussing licensing, the *Daimler-Chrysler* court focused on how aggressively the software was marketed and the ultimate number and variety of customers that paid for the software in determining that the software was not provided to a definite, very selective group. Another of Extreme's cited cases is similar. In *McClaren v. Chicos FAS, Inc.*, 2010 WL 4615772, at *2 (S.D.N.Y. Nov. 9, 2010), the plaintiff had licensed her mannequin designs to a manufacturer so it could make mannequins to sell to retailers. The court held that by licensing an illustration to a company so that it could produce and sell products based on the drawing, the author published the drawing within the meaning of the Copyright Act. The case says nothing else about licensing as publication or the restrictions in the license agreement.

Second, the aggressive advertising and marketing of the software was clearly significant to the *Daimler-Chrysler* court. Here, the only evidence of Plaintiffs' advertising and marketing efforts is a dollar amount spent on advertising for a 4-year period. The Court has no context to determine whether this dollar amount suggests "aggressive" marketing, there is no evidence that the advertising was solely for the Works in question, and there is no evidence of the nature of the advertising. That said, the *Daimler-Chrysler* court also clearly considered the number and variety of licensees in determining that publication was general rather than limited. That consideration is significant here because of the number of Plaintiffs' licensees.

14

Finally, *Daimler-Chrysler* is an unpublished case that technically addressed a different legal issue – whether the work had been "publicly distributed" under a prior version of the Copyright Act. Perhaps unsurprisingly, then, this Court could not locate a single case that cites *Daimler-Chrysler* for the proposition that licensing software constitutes publication. This does not mean the case can be disregarded – it clearly discussed publication and this Court does not ignore the Sixth Circuit's discussion of the law, even when unpublished. But the opinion does not say anything about why, when, or how licensing constitutes publication. It simply decides that, under the facts presented, general publication occurred via license. That it lacks precedential value and construes a different statutory term heightens the Court's concern that the case does not give clear guidance on whether and when licensing software constitutes distribution/publication.

As Plaintiffs point out, other courts have reached a contrary conclusion in the context of both direct and indirect distribution. Considering a 2005 registration application, the United States District Court for the Southern District of New York observed that "it is apparent that whether the Work had been published by virtue of its licensing to Elsevier was an unsettled legal question at the time [the applicant] sought to register the animations." *Archie MD, Inc. v. Elsevier, Inc.*, 261 F. Supp. 3d 512, 520 (S.D.N.Y. 2017). Plaintiff Archie alleged that defendant Elsevier infringed its copyright in hundreds of 3-D medical animations, which it had licensed to Elsevier. The license agreement gave Elsevier a worldwide license to use, reproduce, publish, transmit, and distribute the work, in any medium or format, in whole or in part. *Id.* at 517. This description suggests that redistribution rights were less restrictive than those present here.

Pursuant to 17 U.S.C. § 411(b)(2), the *Archie* court referred a question to the Register of Copyrights: whether the fact that Archie had previously licensed its animations to Elsevier before applying to register them would have caused the Register to refuse registration. *Id.* at 514-515.

The Register's June 2017 response stated that if the Office had been aware that the work was published prior to registration, it would have refused registration. The Register explained, however, that "there remained questions as to whether the licensing of the animations effected a publication of the Work." *Id.* at 515.

*Archie MD* suggests that even the Register of Copyrights was not certain if licensing constituted publication in 2005. After extensive analysis of the law, the court determined that the law was unsettled at the time of registration. *Id.* at 520. The court therefore held that there was "no dispute that [the applicant] did not state that the animations in the collection were unpublished 'with knowledge that that information was inaccurate.'" *Id.* (quoting 17 U.S.C. § 411(b)(1)(A)).[3]

In *PRC Realty Systems, Inc. v. National Association of Realtors, Inc.*, 766 F. Supp. 453, 461 (E.D. Va. 1991), the plaintiff developed a collection of computer software programs that could store, search, and manipulate multiple listing information about real estate for sale. It provided users with the ability to search and extract data based on various criteria, e.g. location of the property. Users were the Boards of Realtors and members of the National Association of Realtors ("NAR"). The purported copyright holder granted NAR a five-year exclusive license to use and sublicense the work. Users of the program could get the information from the program by viewing it on a screen or printing it from that screen.

The court found that the publication status of the work did not pose a "substantial question":

> The work was not made available to the general public without restriction. The only "giving away" occurred under tightly restricted terms, e.g. confidentiality and

---

[3] The court in *Archie MD* apparently thought the exclusivity of the license immaterial, reasoning that "whether [licensee] alone had a right to reproduce and sell copies of the Work or whether others did as well is immaterial to whether copies of the Work were in fact distributed." *Archie MD*, 261 F. Supp. 3d at 516. This reasoning suggests that if distribution under a restrictive license does not constitute publication, distribution under multiple restrictive licenses would not change that outcome.

16

restrictions on sublicensure to a competitor, and on release of source codes. This is not publication.

*Id.* at 461. While Plaintiffs' licenses did grant the right to sublicense to the licensees' customers "in association with the acquisition" of the licensees' products, it required the terms and conditions of the sublicense to be "at least as restrictive as those of this License Agreement." [Doc 246-2 at 3].

Similarly, in *Hubco Data Products v. Management Assistance, Inc.*, 1983 WL 1130 (D. Idaho Feb. 3, 1983), the issue was whether MAI had publicly distributed its operating system without affixing copyright notices, and thus lost whatever copyright protection it might have had. Like the court in *Daimler-Chrysler*, the court looked to the definition of "publication" in 17 U.S.C. § 101. The court found that distribution of an operating system with the object code recorded on it constituted a limited, rather than general, publication. In *Hubco*, the work was licensed pursuant to a "very restrictive" licensing agreement, where the "computer owner was restricted in the use he could make of the operating system." *Id.* at *6. The court thus found that the work was distributed for a limited purpose. Second, the court found that MAI had a reasonable probability of successfully proving that copies of the work were only distributed to a "definitely selected group." *Id.* The basis for this determination was that the operating systems were only offered to owners of MAI computers. *Id.* The court found that this did not constitute general distribution to the public.[4]

Plaintiffs contend that, like the licenses in *Hubco* and *PRC Realty*, the license agreements at issue contained numerous restrictions on disclosure, and limited internal use rights to a particular operating system and platform. [Doc. 296 at 23]. Similarly, the licensee's binary redistribution

---

[4] Extreme says the *Hubco* opinion "turned on the fact that the operating system was offered by the copyright owner simply as a component to the larger computer sold by the copyright owner." [Doc. 293-1 at 19]. The Court sees little in *Hubco* to support this contention.

rights permitted external distribution of the Work and Derivative Works in <u>software</u> form, "for the Licensee's Network Switch project using the Red Hat Linux operating system and the MIPS hardware platform." [Doc. 246-2 at 3]. It permitted sublicensure of the software, but only on terms at least as restrictive as those of the License Agreement. It prohibited distribution to third parties in source form.

Extreme seeks to distinguish *Hubco*, *PRC Realty*, and similar authorities by contending those licenses had significantly more restrictive terms than the License Agreement here. [Doc. 293-1 at 18]. It points to *Unix System Laboratories, Inc. v. Berkeley Software Design, Inc.*, 1993 WL 414724, at *13 (D.N.J. Mar. 3, 1993), in which the court held that publication of source code was not "limited" where it was distributed to thousands of licensees. *Id.* at *14. Without a meaningful screening process, the distribution of source code was not to a "select group." *Id.* at *13. Extreme contends that courts had "universally" held prior to 2011 that licenses permitting wide distribution were not sufficiently restrictive to avoid publication. [Doc. 301 at 22]. The accuracy of this statement depends, of course, on how you define "wide distribution."

Moreover, this argument misses the critical point – the question is not whether a court could parse the distinctions drawn in the caselaw to determine that the Works were published in 2011. The question is whether the law was so clear in 2011 that Dr. Case cannot credibly or reasonable claim to have been ignorant of it. Dr. Case surely knew that the license agreements contained restrictions on internal use of the source code and restrictions on binary redistribution rights. A review of 2011 caselaw would not have clarified precisely how restrictive a license must be to avoid general publication. *See Unix System Labs.*, 1993 WL 414724 at * 14 ("[T]he traditional scope of the limited publication doctrine is narrow. But courts have shown a tendency

to expand the scope of this doctrine when applying it to computer products.").[5] Dr. Case cannot have been willfully blind to the law if the law did not exist at the time or was unsettled. *See ReportHost LLC v. Spectora Inc.*, 2023 WL 2782285, *3 (D. Col. March 29, 2023) (complexity of determining what constitutes publication of mixed-use software weighed against finding that applicant acted with actual knowledge or willful blindness).

Finally, the Court is not persuaded that the sheer number of licensees made it obvious that the Works had been published. Extreme urges that the "clarity of the law on distribution—combined with SNMPR's knowledge that its software was widely distributed—is sufficient to establish that SNMPR had the requisite knowledge (*i.e.* willful blindness) to justify referral." [Doc. 301 at 15].[6] There is no question that the Works reached numerous licensees and customers. But as the Court has explained, the law regarding licensing as publication was not clear in 2011. If, *arguendo*, licensing does not constitute publication, the number of licensees would not change the publication status of a work. Compendium II indicates that members of the public are those "under no implied or express restriction with respect to disclosure of the work's contents." It does not appear to discuss the situation presented here – distribution to a large group of persons who *are* under restrictions with respect to disclosure of the work.

---

[5] These circumstances make this case markedly different than those presented in, *e.g.*, *Lieb v. Korangy Publishing, Inc.*, 2022 WL 1124850 (E.D.N.Y. Apr. 14, 2022). There, the question was simply whether a lightly-revised version of an article that had been posted online a week earlier had been previously published.

[6] Extreme goes to great lengths to emphasize the number of licensees and customers that the Works likely reached, resorting to unsupported hyperbole on several occasions. Extreme suggests, for example, that the licenses "allowed the software to be used on virtually every relevant processor, system, and platform on the market for switching and routing," that the licensees included "the dominant players" in the industry, and so forth. Suffice to say these unsubstantiated claims do little to advance Extreme's argument.

After careful review of the caselaw presented by the parties, the Court finds that the complexity of the law in 2011 weighs heavily against a finding that Dr. Case included a knowing inaccuracy in the registration applications when he identified the Works as unpublished.

We now know that "[s]oftware is published when copies are distributed by purchase or license." Compendium III 612.2. And "[a] program is considered published even if the copies contained object code rather than source code and even if the source code has not been disclosed to the public." Compendium III, § 721.9(E). This guidance, of course, was not available to Dr. Case in 2011. Its later inclusion suggests the Office believed clarification was necessary. The key language in Compendium II "simply restated the statute using different wording" and thus "did not provide meaningful guidance to registrants" on the issue of licensing of software as publication. *Unicolors*, 52 F.4th at 1069. It provided no guidance regarding licensing as publication and no guidance specific to publication of source code or software.

Nor could Dr. Case have readily determined these principles from a review of existing caselaw in 2011. Willful blindness to a legal inaccuracy requires far more than the failure to properly construe and distinguish nuanced legal precedent. While *Daimler-Chrysler* suggests licensing *can* constitute publication, it does not explain why or under what circumstances. The caselaw regarding limited vs. general distribution of software was anything but clear-cut. Though distribution was undoubtedly broad here, the license agreements at issue had meaningful restrictions on the disclosure of source code and binary redistribution rights. Finally, though not a significant factor, Dr. Case acted consistently with his averred belief that the Works were unpublished. Each source code deposit stated that the software was furnished under license, was unpublished, and was subject to a confidentiality agreement.

On the record before the Court, Extreme has not demonstrated a knowing inaccuracy sufficient to justify referral pursuant to 17 U.S.C. § 411(b)(2). Recall that willful blindness is more than negligence or even recklessness. *See Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769-770 (2011). Even deliberate indifference to a known risk is not willful blindness. *Id.* Dr. Case cannot "almost be said to have actually known the critical facts." *Id.* And "[b]efore making . . . a request" to the Register of Copyrights, "a court must first establish whether the registrant had the proper 'knowledge' of the inaccuracy under § 411(b)(1)(A)." *Unicolors*, 52 F. 4th at 1064 (9th Cir. 2022).[7] Based on the circumstances of registration and the complexity of the law at the time, Extreme has not shown that Dr. Case's identification of the Works as "unpublished" was a knowing inaccuracy.

## IV. CONCLUSION

Accordingly, the Motion to Refer Questions to the Register of Copyrights [Doc. 293], filed by Defendant Extreme Networks, Inc., is **DENIED**.

**SO ORDERED**.

>                   */s/ Charles E. Atchley, Jr.*
>                   CHARLES E. ATCHLEY, JR.
>                   UNITED STATES DISTRICT JUDGE

---

[7] *See also DeliverMed Holdings*, 734 F.3d at 625 ("[C]ourts can demand that the party seeking invalidation first establish that the other preconditions to invalidity are satisfied before obtaining the Register's advice on materiality."); *Lieb*, 2022 WL 1124850 ("[R]eferral under Section 411(b) is required only if both subsections . . . are met. Thus, it must be shown that inaccurate information was included on the registration 'with knowledge that it was inaccurate' (Subsection A) and that the alleged inaccuracy, if known 'would have caused the Register of Copyrights to refuse registration (Subsection B).").