IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

------------------------------------------------------------ x
:
SNMP RESEARCH, INC. and SNMP : Case No. 3:20-cv-00451-CEA-DCP
RESEARCH INTERNATIONAL, INC., :
:
Plaintiffs, :
:
v. :
:
BROADCOM INC., BROCADE :
COMMUNICATIONS SYSTEMS LLC, and :
EXTREME NETWORKS, INC., :
:
Defendants. :
------------------------------------------------------------ x

## DEFENDANT EXTREME NETWORKS, INC.'S OPPOSITION
## TO PLAINTIFFS' MOTION TO CHALLENGE
## EXTREME'S CONFIDENTIALITY DESIGNATIONS

Extreme Networks, Inc. ("Extreme") respectfully submits this brief in opposition to the motion to challenge Extreme's confidentiality designations (Dkt. 365) filed by Plaintiffs SNMP Research, Inc. and SNMP Research International, Inc. (together, "Plaintiffs"). Plaintiffs' challenge to the "OUTSIDE COUNSEL EYES ONLY" ("OCEO") confidentiality designations applied by Extreme rests entirely on their supposition that because they do not directly compete with Plaintiffs, Extreme's confidential and sensitive internal financial information does not merit OCEO protection. Plaintiffs are wrong on the facts and the law, and their motion should be denied.

## FACTS

As Plaintiffs acknowledge in their supporting brief (Dkt. 366, "Brief" or "Br."), Extreme and Plaintiffs agreed—first in 2021 and a second time in 2023—to implement a multi-tiered protective order that would allow designating certain confidential information as OCEO, ensuring that such information could not be disclosed to the parties themselves (nor their

1

principals and employees) and instead could only be reviewed by the parties' outside counsel and retained consultants and experts. (*See* Br. at 2-3 (summarizing and quoting from the governing protective order, Dkt. 335 ("Protective Order").)[1] Under the Protective Order, OCEO protection is reserved for:

> material that the Designating Party believes in good faith constitutes or discloses non-public, highly sensitive proprietary technical or commercial information and/or trade secrets (including but not limited to non-public financial information, pricing, product development and design, bid and proposal information, customer lists and contact information, information regarding subcontractors, teammates and vendors, forward looking forecasts, projections, strategies, plans, or information related to a Party's non-Party customers or clients, but not including source code) the disclosure of which, even under the terms applicable to HIGHLY CONFIDENTIAL Information would create a substantial risk of serious injury to the Designating Party or third parties or significant competitive advantage to the Receiving Party.

(Protective Order at ¶ 6.)

At all relevant times, Extreme and Plaintiffs have "serve[d] completely different markets," with Extreme "provid[ing] hardware solutions to end-users" and Plaintiffs "develop[ing] and provid[ing] software for use in networking products." (Br. at 7.) Plaintiffs now contend that they and Extreme therefore are not and have never been direct competitors. (*See id.* at 7-8.) The parties agreed to multiple protective orders with an OCEO tier nonetheless. (*See id.* at 2-3.)

Over the course of the fact discovery period, Extreme had made five productions of financial information with OCEO designation without a dispute. During this time period, Plaintiffs also produced their financial documents, like balance sheets, income statements, and customer ledgers, with OCEO designations. Until now, the parties' designation of financial

---

[1] The changes to the Protective Order in 2023 were limited to the format in which source code printouts would be produced and used in this litigation.

information as OCEO has been a non-issue.

Relevant here, Extreme has produced financial information across sixteen documents (what Plaintiffs term the "Financial Documents," which are the subject of Plaintiffs' motion) pertaining to its sales of various accused and related products. With the exception of one document containing only pre-2018 information and two documents containing information that predates 2018 (but runs through 2023), the Financial Documents reflect information that dates from 2018 or forward, with eleven of the Financial Documents reflecting information from 2023 or 2024. The Financial Documents contain selling prices, list prices, standard costs, gross profit margins, and customer-level sales information, including the quantities ordered and discounts extended to each customer, on a per-product basis. (*See* Br. at 4-5.)

As the accompanying declaration of Extreme employee Antony Hutchins ("Hutchins Decl.") explains, Extreme maintains the information reflected in the Financial Documents in the strictest confidence. Although Extreme, as a public company, is required to and does disclose certain financial information in regular filings with the U.S. Securities and Exchange Commission, Extreme never discloses financial information in such granular detail as that reflected in the Financial Documents. (Hutchins Decl. at ¶ 11.) That is because that information is sensitive and highly susceptible to exploitation by third parties. For example, Extreme's suppliers, distributors, and other commercial partners can use information regarding its margins to guide their negotiations with Extreme, cognizant of how much Extreme can "give" while maintaining a profit. Its customers can do the same. And Extreme's direct competitors can use access to Extreme's customers' identities and the pricing they receive to target those customers and undercut Extreme, winning Extreme's business for themselves. (*See* Hutchins Decl. at ¶¶ 12-14.)

3

Extreme is accordingly careful to protect the information reflected in the Financial Documents. Its measures to preserve confidentiality include maintaining the information on a need-to-know basis within the company, requiring employees and other parties that do have access to the information to enter into confidentiality and non-disclosure agreements prohibiting its disclosure or use for purposes other than those expressly permitted, and implementing computer security protocols like password protections and access logs to prevent unauthorized access or use. (*See* Hutchins Decl. at ¶¶ 9-10.)

Extreme explained the highly sensitive nature of Extreme's financials to Plaintiffs when they first demanded that Extreme "downgrade" the designation of the information reflected in the Financial Documents in October 2023. (*See* Declaration of Saurabh Prabhakar ("Prabhakar Decl.") at. ¶ 4; Br. at 4.) The Court instructed Plaintiffs during an October 27, 2023 discovery hearing to file a motion challenging the designations to put the dispute before the Court. (*See id.* at ¶ 8.) Plaintiffs waited five months to do so, filing the instant motion on March 20, 2024.

**ARGUMENT**

### I. The Financial Documents Constitute OCEO Information Under the Terms of the Protective Order.

Plaintiffs cannot meaningfully dispute that the Financial Documents contain information that merits OCEO designation under the plain terms of the Protective Order. The Protective Order specifically lists "non-public financial information" and "information related to a Party's non-Party customers," like that set forth in the Financial Documents, as the first and last examples of "non-public, highly-sensitive proprietary technical or commercial information and/or trade secrets" meriting the OCEO designation. (*See* Protective Order at ¶ 6.) Consistent with this, courts within the Sixth Circuit routinely accept and maintain OCEO (also known as "AEO" or "Attorneys Eyes Only") designations for financial information like that reflected in the

4

Financial Documents.  *See, e.g., AWP, Inc. v. Safe Zone Servs., LLC*, No. 3:19-CV-00734-CRS-CHL, 2021 U.S. Dist. LEXIS 119969, at *8 (W.D. Ky. June 25, 2021) (maintaining AEO designation for gross profit figures); *Specialty Auto Parts United States v. Holley Performance Prods.*, No. 1:17-CV-00147-JRW-LLK, 2020 U.S. Dist. LEXIS 68885, at *9-27 (W.D. Ky. Apr. 20, 2020) (AEO category justified for sales, cost, margins, pricing, and customer documents, among others); *Momentive Specialty Chems., Inc. v. Alexander*, No. 2:13-cv-275, 2013 U.S. Dist. LEXIS 73138, at *10 (S.D. Ohio May 23, 2013) (maintaining AEO designation for document reflecting sales information).  It was presumably in reliance on that understanding of the Protective Order that Plaintiffs designated their own financial information, including their customer ledger containing the same types of information as those reflected in the Financial Documents, as OCEO themselves.  (*See* Prabhakar Decl. at ¶ 6.)[2]

In tacit recognition that the Financial Documents fall within the Protective Order's "OCEO" tier, Plaintiffs stake their case on the burden allocation in de-designation challenges, arguing that Extreme cannot explain how disclosure of the Financial Documents would "create a substantial risk of serious injury to the Designating Party or third parties or significant competitive advantage to the Receiving Party."  (Br at 6.)   In so doing, Plaintiffs cite *Home Federal Bank* for the proposition that "[w]hen this type of designation is challenged, **the party seeking an AEO [designation] must identify with sufficient particularity the harm it will suffer**."  (Br. at 6 (purporting to quote *Home Fed. Bank of Tenn. v. Home Fed. Bank Corp.*, 2020 WL 12863501, at *4 (E.D. Tenn. Mar. 12, 2020)).  That bolded language appears nowhere in the

---

[2] Although Plaintiffs claimed that they would downward-designate their financial documents when they were confronted with this issue in the course of this dispute, they have never actually done so.  (*See* Prabhakar Decl. at ¶¶ 9-10.)  To the contrary; on March 5, 2024, Plaintiffs produced their updated customer ledger with an OCEO designation.  (*See id.*)

5

opinion. *See id.* But the opinion where the language actually originates (*Stout v. Remetronix, Inc.*) is instructive.[3] In that case, the Court explained in setting forth the "sufficient particularity" standard that "[c]ourts often examine the following factors in evaluating the need to protect sensitive business information and/or trade secrets from disclosure: (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." 298 F.R.D. 531, 535 (S.D. Ohio 2014) (citation omitted).

As the attached declaration of Antony Hutchins demonstrates, each factor weighs in favor of an OCEO designation here. The sales and cost information reflected in the Financial Documents is internal to Extreme and not disclosed outside of the business. (*See* Hutchins Decl. at ¶ 8.) Within Extreme, the information at issue is disseminated on a need-to-know basis only, and Extreme implements measures like requiring entrance into confidentiality and non-disclosure agreements by employees and advisors and password protections and other computer security restrictions to ensure that the information remains protected. (*See id.* at ¶ 9.) Further, as Mr. Hutchins explains, the information is extremely valuable to Extreme and would be valuable to its competitors by allowing them to target Extreme's customers and to use its pricing and margin

---

[3] Plaintiffs may have intended to quote from this Court's opinion in *Knox Trailers v. Clark*, No. 3:20-CV-137-TRM-DCP, 2021 U.S. Dist. LEXIS 126779 (E.D. Tenn. Jan. 11, 2021), which quotes *Stout* and does contain this language. But *Knox Trailers*, like *Home Federal Bank, see infra* at n.7, is highly distinguishable. The party opposing downward-designation in that case had simply cited to its complaint instead of offering "specific demonstrations of fact" such as an affidavit, and had not offered any evidence at all on the six *Stout* factors. *See* 2021 U.S. Dist. LEXIS 126779, at *12-13. It is therefore of no help to Plaintiffs.

6

information to undercut Extreme and win those customers. (*See id.* at ¶¶ 13-14.) That information could also be exploited by Extreme's suppliers, partners, and customers in their negotiations with Extreme, as those parties could use margin information to calculate Extreme's true "best and final" offer. Mr. Hutchins additionally explains that Extreme maintains a finance department dedicated to maintaining and analyzing this sort of information. (*See id.* at ¶ 8.) Finally, Mr. Hutchins establishes that this information cannot be easily (or at all) acquired or duplicated by others; the information regarding its finances that Extreme does publicly disclose in, e.g., its SEC filings is not nearly detailed enough to permit a third party to derive the per-customer and per-product sales and cost information contained in the Financial Documents. (*See id.* at ¶ 15.) Thus, this test weighs in favor of maintaining the OCEO designation. *See Stout*, 298 F.R.D. at 535-36 (AEO designation justified based on affidavit setting forth that information was protected and could be used to harm designating party).

**II.     A Risk of Substantial Harm Exists Notwithstanding that Plaintiffs Supposedly Do Not Directly Compete with Extreme.**

Plaintiffs appear to believe that an OCEO designation is only proper to prevent disclosure to competitors, arguing that "[s]imply put, the Financial Documents do not meet the Protective Order's standard for OCEO designation because Extreme and SNMP are not competitors." (Br. at 7.) This is not a credible position (as Plaintiffs' frequent usage of the OCEO designation themselves suggests). As an initial matter, the conclusion that Extreme and SNMP are not competitors is not as clear-cut as Plaintiffs suppose. Courts regularly look beyond the parties' current activities in assessing the potential for competitive harm and need not credit a party's self-serving statement that it has no interest in using AEO information for its own benefit. In *Mahavisno v. Compendia Bioscience, Inc.*, for example, the plaintiff (an individual who had accused the defendant companies of breach of contract and copyright infringement) had sought

7

to remove the defendants' AEO designations over source code so that he could "determine if copyright infringement occurred." No. 13-12207, 2015 U.S. Dist. LEXIS 5957, at *32 (E.D. Mich. Jan. 20, 2015). The Court maintained the original designations, rejecting his argument that he "was not a competitor" of the defendants and "ha[d] no interest in using the source code for his own benefit." *Id*. at 33-34. In so doing, the Court noted the defendants' argument that the plaintiff "ha[d] represented himself as a software innovator capable of creating derivative works based on preexisting software," and stated that while it "decline[d] to delve into the issue of whether Plaintiff is or is not likely to 'steal' Defendants' source code, the fact of the matter is that allowing Plaintiff to view it would make its exploitation a possibility." *Id.* at 37; *see also, e.g.*, *Stout*, 298 F.R.D. at 536 (AEO designation justified where individuals seeking to remove designations were "themselves not direct competitors" but were employed by direct competitors); *see also, e.g.*, *3 Sigma Corp. v. NuCoat, Inc.*, No. 3:10-cv-085, 2011 U.S. Dist. LEXIS 102697, at *3 (S.D. Ohio Sep. 12, 2011) (AEO designation justified where individual seeking to review designated information was "not presently in direct competition with Defendants nor employed by any firm in direct competition" but was "in the business of consulting with respect to this industry," and therefore could leverage such information in "offering his services to one or more direct competitors" of the defendants in the future).

That is the case here as well. Although Plaintiffs have not specified the personnel to whom they hope to disclose the Financial Documents, the size of the companies at issue and the outsized role that Dr. Case takes in them makes it extremely likely that Dr. Case is one of those individuals.[4] And, Plaintiffs themselves allege that Dr. Case was "instrumental" in developing

---

[4] This conclusion is bolstered by Plaintiffs' assertion that the OCEO designations are "inhibiting Plaintiffs' owner's [i.e., Dr. Case's] ability to participate . . . ." (Br. at 6.)

8

*and commercializing* Plaintiffs' technology. (Dkt. 244 at ¶ 1; *see also id*. at ¶ 3 ("[w]ith the help of Dr. Case, SNMP has become ubiquitous"); *see id*. at ¶ 32 ("Dr. Case owns and runs both [Plaintiffs]").) Thus, the "exploitation" of Extreme's information through future endeavors by Dr. Case is a "possibility" that justifies maintaining AEO protection.

Notably, Plaintiffs do not even claim (via sworn declaration from Dr. Case or even just attorney argument) that Plaintiffs do not now and would not in the future seek to use the Financial Documents for their own or Dr. Case's personal advantage. This omission is noteworthy given that Plaintiffs have violated the use restrictions in the Protective Order and those imposed by law several times in this litigation alone, such as when they included information transmitted by Extreme subject to Rule 408 in a filing before this Court, and when they disclosed information that had been designated as OCEO by Extreme's former co-defendants in a deposition to a witness not authorized to view it. (*See* Prabhakar Decl. at ¶¶ 11-15.) Although the Protective Order required Plaintiffs to inform the designating parties of this breach, and although Extreme reminded Plaintiffs of this obligation after the violation occurred, Plaintiffs have not, to Extreme's knowledge, complied. (*See id.* at. ¶¶ 16-17.) Extreme thus has a credible concern that the sensitive and valuable information within the Financial Documents may be misused by Plaintiffs or Dr. Case to their benefit in the future.

Even assuming *arguendo* that Plaintiffs and Extreme are not competitors, however, Plaintiffs are wrong on the law. As their own authority acknowledges, an OCEO designation is justified where "especially sensitive information is at issue *or* the information is to be provided to a competitor." *Home Fed. Bank of Tenn. v. Home Fed. Bank Corp.*, No. 3:18-CV-379-JRG-DCP, 2020 U.S. Dist. LEXIS 261444, at *11 (E.D. Tenn. Mar. 12, 2020) (emphasis added). As such, harms other than competitive harm may justify application of the standard, and Plaintiffs'

9

own authority—originating from this Court—holds that AEO protections may be justified other than in cases involving direct competitors. *See Diamond Resorts U.S. Collection Dev., LLC v. Wesley Fin. Grp.*, LLC, No. 3:20-CV-251-DCLC-DCP, 2021 U.S. Dist. LEXIS 258052, at *22 (E.D. Tenn. July 20, 2021) (rejecting movant's "rigid" argument that because parties were not competitors, "[d]efendants are not at risk to suffer any sort of competitive harm, the only harm protectable by an AEO designation" and permitting AEO confidentiality order despite fact parties were not competitors).

The potential for harm is present here. Mr Hutchins's declaration explains, with "sufficient particularity," the harm that Extreme would suffer if the Financial Documents were downgraded notwithstanding that the parties are not direct competitors. First, although Plaintiffs and Extreme do not sell the same products to the same customers, Plaintiffs *do* provide products to Extreme's direct competitors.[5] Thus, access to Extreme's financial information—customer names, sales and cost information from which margins may be gleaned—would facilitate Plaintiffs' ability to service those direct competitors (by, for example, guiding Plaintiffs on how to set their licensing fees to reduce the direct competitors' marginal costs), and in turn enable those direct competitors to target and win business from Extreme's customers through lower prices. (*See* Hutchins Decl. at ¶ 15.) Plaintiffs therefore are, while not direct competitors, "uniquely intertwined" with Extreme and the market in which it competes, and positioned to cause harm to Extreme's business if the Financial Documents are disclosed to them. *Id.* Plaintiffs could also exploit the information to their own advantage; if in the future, for example, Extreme were interested in licensing additional intellectual property from Plaintiffs, it must now

---

[5] *See* Prabhakar Decl. at ¶ 6. Plaintiffs could also be acquired by Extreme's direct competitors in the future.

10

negotiate with a party privy to its margins and how much licensing revenue it can stand to pay while still scraping a profit. Finally, Plaintiffs could also harm Extreme's relationships with its customers by, e.g., disclosing margin information to them. *See, e.g., AWP, Inc.*, 2021 U.S. Dist. LEXIS 119969, at *11 (maintaining AEO designation over profits information from which margins could be calculated, noting that defendants could "disclose [the margins] to Plaintiff's customers to harm their relationship," notwithstanding that protective order "prohibit[ed] this intentional malfeasance").

By the same token, the use restrictions in the Protective Order are little obstacle to Plaintiffs' exploitation of Extreme's confidential information to harm third parties; Extreme's customers also risk injury if an AEO designation is not maintained. (*See* Protective Order at ¶ 6 (OCEO designation appropriate where disclosure of information would "create a substantive risk of serious injury to . . . third parties").) Extreme's concern for misuse of the Financial Documents to target its customers is heightened by the fact that Plaintiffs selectively challenge the designation of only those financial documents that contain customer identities and purchasing histories, and exclude other financial documents that provide information about Extreme's business but do not contain customer identities. The exclusion of those documents that are equally or perhaps more relevant to Plaintiffs' litigation strategy suggests that Plaintiffs' claim that downward-designation is necessary so that Dr. Case may participate in direction of litigation strategy is a pretext for obtaining information about Extreme's customers. (*See* Br. at 6-7; Prabhakar Decl. at ¶ 5.)

### III. Plaintiffs Fail to Show that the Financial Documents Reflect Information that Is Stale or Already Public.

Plaintiffs' attempt to minimize the harm that Extreme would suffer from disclosure because "much of this data is historical" is unavailing. (Br. at 10.) This bald statement is

11

incompatible with the descriptions of the Financial Documents Plaintiffs themselves set forth; out of sixteen documents, Plaintiffs identify only one as predating 2018 and another four as predating 2023. (Br. at 4-5.) In other words, eleven out of the sixteen documents at issue run through 2023 or even the first quarter of 2024, essentially as current as information can get for a public company. *Cf. Home Fed. Bank of Tenn.*, 2020 U.S. Dist. LEXIS 261444, at *25-34 (AEO designation not justified for information that ranged from seventeen years to one year old, with the vast majority of information at least five years old).[6] Notably, the only opinion citing Plaintiffs' unpublished authority relied on it to *maintain* a confidentiality designation over financial information that was five years old or newer. *See Nanjing CIC Int'l Co. v. Schwartz*, No. 20-CV-7031EAW, 2023 U.S. Dist. LEXIS 189070, at *19 (W.D.N.Y. Oct. 20, 2023) (citing *Home Federal Bank*); *compare to, e.g., United States ex rel. Daugherty v. Bostwick Labs.*, No. 1:08-cv-354, 2013 U.S. Dist. LEXIS 89683, at *19 (S.D. Ohio June 24, 2013) (maintaining AEO designation for financial information two years old or newer); *Worldwide Distrib., LLLP v. Everlotus Indus. Corp*, No. 1:16 MC 67, 2017 U.S. Dist. LEXIS 19160, at *7 (N.D. Ohio Feb. 9, 2017) (ordering that pricing information between three and one year old, while not "current," be produced subject to AEO protective order). Moreover, Plaintiffs have designated numerous

---

[6] *Home Federal Bank* is also distinguishable on numerous other fronts. Contrary to Plaintiffs' claim that the information at issue in that case was "similar" to that in the Financial Documents (Br. at 10), the AEO-designated information in that case did not comprise "hard" financials like margin information, nor did it include specific customer names or identifying information. *See* 2020 U.S. Dist. LEXIS 261444, at *17 (noting no indication that list of customers was included among at-issue information, undermining designating party's claim that information would allow movant to target its customers, and summarizing movant's request to downward-designate information like dimensions of safety deposit boxes, budgets, old marketing plans, employee surveys, and loan policies). The Court moreover based its decision on the fact that much of the information was public or derived from public information (*see id.* at **27, 28) and on the fact that the designating party's supporting affidavits were entirely conclusory and non-specific. *See id.*, *passim.* None of that is the case here.

12

Case 3:20-cv-00451-CEA-DCP   Document 380   Filed 04/03/24   Page 12 of 16   PageID #: 17104

documents with historical information as OCEO, such as license agreements from the mid-1990s with licensees that no longer pay royalties (based on a review of Plaintiffs' latest customer ledgers), a financial valuation report from mid-2000s, and emails and term sheets about an unconsummated acquisition from mid-2000s. Plaintiffs' designation of their own historical documents as OCEO shows that the fact that a document reflects historical information does not disqualify it from OCEO designation.

Similarly, Plaintiffs' claim that Extreme's status as a public company supports their argument (Br. at 10-11) should be disregarded as the afterthought it is. Although Extreme is required to, and does, regularly disclose certain financial information (*id*.), Plaintiffs do not and cannot contend that such information includes the information reflected in the Financial Documents. (*See* Hutchins Decl. at ¶ 11.) (If it did, Plaintiffs could simply consult Extreme's public SEC filings, mooting this dispute.) If anything, Plaintiffs' status as a public company militates against de-designating the Financial Documents; as Mr. Hutchins attests, the information in the Financial Documents constitutes material non-public information that can be used to guide investment decisions. (*See id.* at ¶¶ 15-16.) Disclosure of this information to individuals like Dr. Case would therefore facilitate trading in violation of the federal securities laws.

### IV. Plaintiffs Do Not Show that They Sustain Any Harm Whatsoever from Maintenance of the OCEO Designations.

Plaintiffs also utterly fail to demonstrate that maintenance of the OCEO designations imposes any difficulties whatsoever on them, let alone difficulties that outweigh the harm faced by Extreme. *See Diamond Resorts U.S. Collection Dev., LLC*, 2021 U.S. Dist. LEXIS 258052, at *18 (court must "balance the difficulties imposed upon [a party] against the need to protect information from abuse by competitors" (citation omitted)). Plaintiffs assert that the designation

13

of the Financial Documents "is inhibiting Plaintiffs' owner's ability to participate in the preparation of this case for trial and evaluate its [*sic*] claims" (Br. at 6-7) and that "Plaintiffs are being prohibited from fairly understanding and evaluating their case and from fully participating in preparation of the case for trial with their counsel." (*Id.* at 2.) But Plaintiffs do not articulate any theory of how Dr. Case's inability to identify Extreme's specific customers or to personally scrutinize its revenue and cost information impedes his ability to litigate, let alone substantiate those assertions with specific details or any evidentiary showing. *Cf. Mahavisno*, 2015 U.S. Dist. LEXIS 5957, at \*37 (declining to allow plaintiff to review AEO source code where plaintiff had not explained why review was "necessary to prosecute his breach of contract claim"); *Nolan LLC v. TDC Int'l Corp.*, No. 06-14907, 2009 U.S. Dist. LEXIS 146453, at \*7 (E.D. Mich. June 5, 2009) (maintaining AEO designation where counsel had not explained why client needed to personally review information to assist in prosecution of case).

Plaintiffs' claims of harm ring particularly hollow when one considers what other information and avenues of analyzing it are available to Plaintiffs. The OCEO designation, of course, does not impede Plaintiffs' expert witnesses from reviewing and analyzing the designated information in the course of forming their opinions, nor impede Plaintiffs' attorneys from formulating their strategies in reliance on the information. *See Mahavisno*, 2015 U.S. Dist. LEXIS 5957, at \*37-38 (plaintiff had not demonstrated de-designation of source code was justified where plaintiff had retained experts to review source code and was not himself qualified as an expert witness who could opine on source code review). Nor is Dr. Case particularly qualified to analyze the information at issue (let alone uniquely qualified), such that Plaintiffs' case is hindered by his inability to personally review the information. *Compare to, e.g., Encompass Pet Grp., LLC v. Allstar Prods. Grp., LLC*, No. 21-12884, 2023 U.S. Dist. LEXIS

14

7024, at *15 (E.D. Mich. Jan. 13, 2023) (AEO designation not justified where designating party had argued that "the value of the documents would elude the attorneys on the case but that the parties' principals would understand their value" and thereby "ask[ed] the Court to prohibit review of the documents by the only members of the [movant's] litigation team who would fully understand their relevance," disproportionately hindering movant's ability to prosecute). To the extent Dr. Case would like to review portions of expert reports reflecting aggregated financial information, Extreme is willing to engage in that discussion at the appropriate time.

Plaintiffs' conduct in connection with this very motion further undermines their claims. As they recount, the Court "permitted" them to file their motion last October. (Br. at 4.) That they waited nearly six months to do so—all the while litigating furiously—does not bespeak any great necessity for Dr. Case to personally review of Extreme's financial information. Nor have Plaintiffs offered any explanation of necessity during the parties' meet-and-confer discussions. (*See* Prabhakar Decl. at. ¶ 5.) Put simply, Dr. Case's curiosity about Extreme's internal financials—or desire to exploit that information for his or his companies' own ends—does not justify stripping the Financial Documents of protection.

## CONCLUSION

For the foregoing reasons, Extreme respectfully submits that Plaintiffs' motion to challenge Extreme's confidentiality designations should be denied.

DATED: April 3, 2024

Charles B. Lee, BPR# 011570
Jessica Malloy-Thorpe, BPR# 035234
Jordan B. Scott, BPR# 037795
MILLER & MARTIN, PLLC
832 Georgia Avenue
1200 Volunteer Building
Chattanooga, Tennessee 37402
Tel: (423) 756-6600
Fax: (423) 785-8293
clee@millermartin.com
jessica.malloy-thorpe@millermartin.com
jordan.scott@millermartin.com

Respectfully Submitted,

*/s/ John M. Neukom*

John M. Neukom (*admitted pro hac vice*)
Abraham A. Tabaie (*admitted pro hac vice*)
Barbara N. Barath (*admitted pro hac vice*)
Saurabh Prabhakar (*admitted pro hac vice*)
Alicia J. Ginsberg (*admitted pro hac vice*)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, California 94108
jneukom@debevoise.com
atabaie@debevoise.com
bnbarath@debevoise.com
sprabhakar@debevoise.com
ajginsberg@debevoise.com
(415) 738-5700

Leslie A. Demers (*admitted pro hac vice*)
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
leslie.demers@skadden.com
(212) 735-3000

Sy Damle (*admitted pro hac vice*)
LATHAN & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
sy.damle@lw.com
(202) 637-2200

Michael Powell (*admitted pro hac vice*)
David Lamb (*admitted pro hac vice*)
GISH, PLLC
41 Madison Avenue, Floor 31
New York, New York 10010
michael@gishpllc.com
david.lamb@gishpllc.com
(212) 518-2866

*Attorneys for Extreme Networks, Inc.*