```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF TENNESSEE
 2                    AT KNOXVILLE, TENNESSEE
   _____
 3                                )
   SNMP RESEARCH, INC. and SNMP   )
 4 RESEARCH INTERNATIONAL, INC.,  )
                                  )
 5              Plaintiffs,        )
                                  )
 6 vs.                            ) Case No. 3:20-cv-451
                                  )
 7 EXTREME NETWORKS, INC.,         )
                                  )
 8              Defendant.         )
   _____ )
 9
                        MOTION HEARING
10       BEFORE THE HONORABLE DEBRA C. POPLIN

11             Thursday, February 11, 2024
                10:33 a.m. to 12:30 p.m.
12
   APPEARANCES:
13
              ON BEHALF OF THE PLAINTIFF:
14
              JOHN L. WOOD, ESQ.
15            EGERTON, MC AFEE, ARMISTEAD & DAVIS, PC
              P.O. Box 2047
16            Knoxville, TN 37901-2047

17

18

19

20

21

22
   REPORTED BY:
23
   Teresa S. Grandchamp, RMR, CRR
24 P.O. Box 1362
   Knoxville, Tennessee 37901
25 (865) 244-0454
```

1    **APPEARANCES:** (Continued)

2              **ON BEHALF OF THE DEFENDANT:**

3              SAURABH PRABHAKAR, ESQ.
               DEBEVOISE & PLIMPTON, LLP
4              650 California Street
               San Francisco, CA 94108
5                        and
               CHARLES B. LEE, ESQ.
6              MILLER & MARTIN, PLLC (Chattanooga)
               832 Georgia Avenue
7              1200 Volunteer Building
               Chattanooga, TN 37402

8                       *  *  *  *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURTROOM DEPUTY:  All rise.

2          This court is again in session with the

3    Honorable Debra C. Poplin, United States Magistrate

4    Judge, presiding.

5          Please come to order and be seated.

6          We are here for a scheduled motion hearing in

7    Case No. 3:20-cv-451, SNMP Research, Inc. versus Extreme

8    Networks, Inc.

9          Here on behalf of the plaintiff is John Wood.

10          Is the plaintiff ready to proceed?

11          MR. WOOD:  Yes.

12          THE COURTROOM DEPUTY:  Here on behalf of the

13    defendant are Saurabh Prabhakar and Charles Lee.

14          Is the defendant ready to proceed?

15          MR. PRABHAKAR:  Yes.

16          THE COURT:  All right.  Good morning to you

17    all.

18          So, it appears that we have several disputes

19    for plaintiff, as well as for the defendants.  So I'm

20    just going to go in that order, and we will address the

21    plaintiffs' discovery disputes first.

22          So, let me start, Mr. Wood, with the first one.

23    It appears the parties resolved discovery dispute number

24    one.  I just wanted a confirmation.

25          MR. WOOD:  Your Honor, so, Extreme has produced

1  some source code. We don't -- from our examination, we

2  don't believe they've produced all the new source code,

3  and this was -- primarily Extreme is now contending that

4  they removed SNMP Research software from the source

5  code.

6           So, it appears they have produced one version,

7  I guess. So we can verify that. Our expert has now

8  looked at it. We've filed a report last week. He's

9  shown that our source code is still in those products,

10 and, so, we're going to need to see all the versions of

11 the source code because it's still being used in their

12 products.

13          THE COURT: Okay.

14          MR. WOOD: So, I guess I would say it's

15 partially resolved.

16          THE COURT: Okay. So, have you had discussions

17 since your expert has looked at that with Extreme as to

18 what additional information --

19          MR. WOOD: We have not --

20          THE COURT: -- you are seeking?

21          MR. WOOD: We have not yet.

22          THE COURT: Mr. Prabhakar, what would be your

23 response to that, I mean, hearing that they may need

24 some additional information since receiving the updated

25 information?

                    MR. PRABHAKAR:  So, Your Honor, I have to admit

two things:  One, you know, we've produced source code

long ago, so this is the first time I've heard that

something may be missing or they need something else.

          But, as a matter of principle, I don't

understand what different versions are they talking

about because the products are different from the

software.  There are many products, but there is one or

two flavors of software.

          So if it's about versions of software, whatever

they need, I mean, we produced thousands, and we'll

produce whatever else there is.  I don't think there is

a whole lot, so it should be easy enough to produce

that.

                    THE COURT:  Okay.  So it sounds like it would

be most efficient for you all to have a discussion,

hopefully immediately after this hearing, and clarify

what needs further information produced.  So, I think

that -- I don't think I will be able to resolve that

until you all have a discussion.  Hopefully you won't

reach an impasse.  So, if you can, after the hearing,

just follow-up on that and see if you can get that one

resolved; okay?

                    MR. WOOD:  Yes, Your Honor.

                    MR. PRABHAKAR:  We're ready, hopefully, Your

1   Honor.  This is not one we'll have to bother you with.

2          THE COURT:  Okay.  Thank you.

3          All right.  The next dispute is the reopening

4   of Extreme's 30(b)(6) witness on the financial

5   documents.

6          So, I've read the position statements, and I

7   guess I'll turn to you, Mr. Wood.  You're saying there

8   are new columns, there is new information you want an

9   explanation on, it may take an hour.  But I do want you

10:36AM  10   to respond to defendant's position, which is that there

11   are two columns; one is not even populated and the other

12   appears to be a customer purchase order number, if

13   that's what it means.

14          MR. WOOD:  Yes, Your Honor.  I guess our

15   position is:  We'd like to ask the witness about that.

16   So, for -- what we thought we were going to get was just

17   an update to the existing document.  They produced a new

18   document with a couple of new columns.  Since all of our

19   damages are based on those documents, we wanted to

10:37AM  20   confirm them again.

21          THE COURT:  Let me ask you this:  Are all the

22   other columns, except for these two, substantively the

23   same?

24          MR. WOOD:  Yes.

25          THE COURT:  Okay.  So it's just these two

1  columns?

2          MR. WOOD:  Right.  That's my understanding.

3          THE COURT:  And do you agree that one is not

4  populated?

5          MR. WOOD:  I am not -- I have not personally

6  verified that.

7          THE COURT:  Okay.

8          MR. WOOD:  If they say it's not populated, then

9  it's not.  We would still like to know, well, why did

10 they include an unpopulated column.

11         THE COURT:  Okay.

12         MR. WOOD:  What was the -- what was the

13 purpose?  Should it be populated; is there information

14 there?

15         There may be an easy solution to this.  So,

16 they have -- as a result of our last hearing, they have

17 agreed to put up a witness on Topic 18, which is a

18 financial topic, Anthony Hutchins, and he actually

19 helped prepare -- he worked on a lot of these

20 spreadsheets, and I think if Extreme is willing, then it

21 seems like it would be -- we could just question him.

22         THE COURT:  And what was his name again?

23         MR. WOOD:  Anthony Hutchins.  And right now he

24 is scheduled, I believe -- they have agreed to put him

25 up for May 7th.  We've asked to move that earlier, but

10:37AM (line 10)
10:38AM (line 20)

1 they have agreed to put up a witness for financial

2 topics.

3       And Mr. Hutchins works with Kaylee Freeman who

4 was the original witness. So we would be fine if we

5 could just ask him a few of these questions. We're

6 going to have to show him the spreadsheets anyway, so it

7 just seems like this probably -- now that they have

8 agreed to put up a new witness, probably should be a

9 nonissue.

10:38AM 10       THE COURT: Okay. Mr. Prabhakar.

11       MR. PRABHAKAR: So, Your Honor, two very quick

12 responses. If the concern is that these two new columns

13 which don't seem to contain any relevant information

14 have been added to the documents and the concern is that

15 that's somehow affecting the expert reports, which we

16 don't understand why they should, one option is that we

17 can produce these documents again without the two

18 columns if that fixes the concern with somehow that we

19 intend to use these two columns to dispute the expert

10:39AM 20 reports. That's one option, if that helps.

21       The second thing -- I think it's totally

22 fine -- I mean, we would have obviously no objection if

23 they wanted to put these documents in front of

24 Mr. Hutchins. I think the only concern is that they're

25 asking for an additional hour. I think depositions in

1    this case, particularly 30(b)(6) depositions, we reached

2    an agreement on what the time limit is, but now we have

3    multiple requests to add additional hours.

4            So, if it's only two columns and if they really

5    just want information about those two columns, if within

6    the time that they already have with the remaining

7    witnesses they want to ask, we have -- obviously

8    we'll -- we'll have the witness prepared to talk about

9    why the two additional columns are there, and it's most

10   likely going to be that some reporting software got

11   updated and they got added.

12           THE COURT:  Okay.  Thank you.

13           So, Mr. Wood, do you think it would take the

14   estimated hour just to ask Mr. Hutchins about these two

15   columns?

16           MR. WOOD:  No, Your Honor.  If we're already

17   deposing him on other issues that are related to these

18   spreadsheets, I think we can withdraw our request for

19   additional time if they will agree that we can ask him

20   questions about the spreadsheets.

21           MR. PRABHAKAR:  Oh, I would -- they can ask

22   whatever questions they want, Your Honor.  These

23   spreadsheets are within the scope.  So we would have no

24   objection.

25           THE COURT:  Okay.  All right.  So we'll

consider that one resolved and the questions about these

two columns will be posed to Mr. Hutchins. Okay.

Okay. Dispute number three. It appears that

this was resolved in that Extreme was going to respond

on March 29th. So, has that been done?

MR. WOOD: Your Honor, we never received an

update. We never received an update on March 29th to

those interrogatories.

THE COURT: Okay. So, what's the status,

10:41AM Mr. Prabhakar, and this would be responses to

Interrogatory 1 and 5 with responses by March 29th?

MR. PRABHAKAR: Your Honor, I'll have to check

with my team because my expectation is these should have

been done. If they have not been done, we'll produce

them in a couple days. I'll be back -- we can certainly

have -- if they have not been updated, and I will look

into it, but we can have them updated by early next

week, Monday or Tuesday, no problem.

THE COURT: Okay.

10:42AM MR. PRABHAKAR: But -- I mean, the intent was

to update them, but I'll have to look into them as to

why they didn't get updated.

THE COURT: Okay. So it appears this can be

resolved. He'll check the status of it. If they have

not been provided, which sounds like you haven't

1  received them, then they will be provided to plaintiff

2  by end of day Tuesday.

3          MR. PRABHAKAR:  That's right.

4          THE COURT:  Okay.  Dispute number four.  This

5  also looks -- it appeared that there was just maybe a

6  date needed for the supplementation.  What's the status

7  of this?  And this is the response to Interrogatory 7, 8

8  and 11.

9          MR. WOOD:  So, Your Honor, we did receive a

10 supplement on March 29th to 7, 8 and 11.  We do not

11 believe those responses still completely answer the

12 questions, and --

13         THE COURT:  Have you had a discussion as to why

14 you do not feel that they are complete with Extreme?

15         MR. WOOD:  We have not.

16         THE COURT:  Okay.

17         MR. WOOD:  So --

18         THE COURT:  And what about No. 7?

19         MR. WOOD:  Well, that's -- yeah, for 7, 8 and

20 11, I was lumping those altogether.

21         THE COURT:  Okay.  I just heard 8 and 11 you

22 felt were incomplete responses, but you included No. 7?

23         MR. WOOD:  Yes.

24         THE COURT:  Okay.

25         MR. WOOD:  Parts of 7 are complete and parts

1  are not.  So, I think that, you know, they have said

2  they will supplement and, I believe, provide complete

3  answers.  So if we could just -- I think we just need to

4  have a schedule in order to do that, and we'll be glad

5  to meet and confer with them on that.

6          THE COURT:  Okay.  I've asked you to try to

7  meet and confer after the hearing --

8          MR. WOOD:  Yes.

9          THE COURT:  -- on another issue.  Will your

10 schedules permit for you today to include this as well?

11         MR. WOOD:  I can.

12         MR. PRABHAKAR:  Of course, Your Honor.  I'm

13 happy to hear what Mr. Wood has to say.

14         THE COURT:  Okay.  It will be hard for me to

15 address it --

16         MR. WOOD:  Yes.

17         THE COURT:  -- unless you all have had a

18 meeting and address it amongst yourselves first.  So --

19         MR. WOOD:  Okay.

20         THE COURT:  Okay.  Try to meet and confer on

21 that today.  And I would like to have a status report by

22 next Wednesday on these issues that you will be meeting

23 on.

24         MR. WOOD:  Okay.

25         THE COURT:  And make it a joint report, please.

1          MR. WOOD:  Okay.

2          THE COURT:  All right.  So, let's see, those

3    are the four discovery disputes I had for plaintiff.  So

4    now we can move to Extreme's.

5          The first dispute is plaintiffs' response to

6    RFP No. 30, and this is dealing with the different

7    version labels.  I guess I want to better understand why

8    Extreme needs these.

9          MR. PRABHAKAR:  Sure, Your Honor.

10:46AM  10          Your Honor, this case is all about source code

11    on each side.  We've produced source code; they have

12    produced source code.  This is a fairly narrow request.

13    But to set the table, let me quickly walk through what

14    do we mean by versions that we're requesting and what we

15    have and what we don't have.

16          So, this is a page from the Plaintiffs' Amended

17    Complaint, and these are their copyright registrations

18    (indicating).  Each registration corresponds to specific

19    versions of source code.  So, there is Version 15, 15.2,

10:46AM  20    3, 4, so on and so forth.  So, these are the versions

21    that are explicitly in the case.

22          Now, there is law on the copyright side that

23    says when you're registering versions, in certain

24    circumstances, if the code is published, you need to

25    provide the delta or the published version, and which is

1   what puts versions that came before 15 at issue.

2         So, the request for versions is basically, we

3   have their source code.  We have source code, some of

4   which was shipped to Extreme, but we don't know and

5   there is no representation that source code corresponds

6   to specific copyright registrations because the code has

7   been updated and issues may have been fixed.

8         So there is no -- as of -- the format in which

9   the code has been produced to us on the source code

10:47AM 10   computer, there is no correspondence between what has

11   been produced and these specific versions.  So our

12   request to plaintiffs was that please produce these

13   versions and the previous version and we'll be done with

14   this.

15         Plaintiffs' response was twofold; that they

16   provided several versions of code produced to Extreme.

17   I just explained that's not the versions that correspond

18   to the registrations.  Because the scope of the

19   registrations has to be clear, we need source code

10:48AM 20   corresponding to each one of these versions.

21         Now, plaintiffs' response is that they have

22   produced their entire repository, and that is correct,

23   but a repository is a meld of versions produced since

24   1994.  So, just by the registrations, we're at Version

25   17, and I think 17 was registered in 2011.  We are 13

1    years or so later.  So there might be additional

2    versions that might have been added to the code.

3         So, the bottom line is:  There are lot of

4    versions in that repository.  And we are not the

5    custodians of that code, so we don't know how plaintiffs

6    versioned them, how to extract them, particularly the

7    versions that are associated with the copyright

8    registrations.

9         So we've just requested plaintiffs to just

10:49AM  10   produce -- they already have the repository.  They just

11   have to run a command or a few commands, extract these

12   versions that correspond to these versions.

13        And for the other versions, we had asked

14   plaintiffs, like, look, we don't know how you version

15   your software.  Everybody does it differently.  Extreme

16   has three different softwares at issue in this case.

17   Each one of them within the company's versioned

18   differently.

19        And to set the context for why we can't do it

10:49AM  20   ourselves is:  I'm going to show you questions that were

21   asked of Extreme's witness related to the repository.

22   So, this is -- this is an issue that plaintiffs are

23   familiar with.  So they asked our witness that instead

24   of extracting 800 different versions, could you not have

25   just produced the different repositories and have SNMP

extract the code and that would have accomplished the same thing.

And this is not attorney argument, Your Honor, this is a technical witness answering this question. Assuming SNMP Research knew how to access the correct tag of the repository, they could have done it. And the only way SNMP Research would know a correct tag that Extreme uses is if Extreme tells them what the tag is.

So, this was basically our request. We thought it was a fairly straightforward, noncontroversial request. So -- but the plaintiffs are standing on the fact that they have produced the repository and they need to do no more.

There was a concern that we didn't make an explicit discovery request for these documents. Your Honor, I mean, this is just document production that's, like, easily resolved between the parties rather than making a request and then framing it in more legal terms. But to resolve that, we even served that request. The time for responding to that request has passed. We still don't have a document that lists out all the tags in the repository that we could use to get access to these versions.

So, to frame my request for the Court, we ask that plaintiffs be ordered to produce from their

repository, or whatever other source that they have,
source code corresponding to the versions associated
with each copyright registration. And if it's too
burdensome for them to extract the other versions in the
repository, just provide us with a document or documents
that -- excuse me -- identify all the tags, all the
versions associated with the code in the repository, and
we'll work with our expert to get that information
extracted in a reliable fashion.

So, it's -- that's the scope of Extreme's
request, Your Honor.

THE COURT: Okay. Thank you.

Mr. Wood, what's your response as to how to get
this information that correlates to the versions?

MR. WOOD: So, first, Your Honor, I think we've
skipped a step. If you look at RFP 30, which we
responded to long ago, it says, "To the extent not
already provided, all source code that you contend is
covered by the copyright registrations listed in Table 1
of the Amended Complaint."

For the Table 1 of the Amended Complaint, we
have provided the -- all of that source code.

THE COURT: And that's what's being referred to
as the repository?

MR. WOOD: No, Your Honor.

1          THE COURT:  Okay.  So, clarify that then.

2          MR. WOOD:  So, we -- so, that's -- so, the

3    repository, as Mr. Prabhakar said, is all of the source

4    code.  It goes back to '94.  So it will be lots of

5    versions of the code.  And -- but then you -- if you

6    look at that chart, one of them may be 15, Version 15.2

7    of the software that was registered.

8          Well, SNMP Research provided that version that

9    was extracted from the repository to Extreme and did

10:54AM 10   that for every single one of the versions.  We also

11   provided a lot of other versions that happened

12   in-between.  So you may have Version 15.2, and then

13   there may be three changes, you know, 15.2.1, and then

14   there may be 15.2.2.

15          So there is a lot of little versions that

16   happened between the big versions, and -- but we

17   put -- this RFP asked for the source code that is

18   covered by the copyright registration.  That's exactly

19   what we provided.  And it's right out of the repository.

10:54AM 20   That's what we gave them.

21          Now, what -- so, if all they're asking for is

22   the source code -- if all they're asking for is a

23   response to this RFP, we've completely done that.

24          What they have said to this is, no, you need to

25   give us every other version there is that's in your

repository as well. You need to extract all of them and let us see what every single one is. Like, well, this RFP doesn't ask for that. We've done exactly what you've asked. And we gave you the repositories. If you want to look at some other versions or look at old -- they have everything we have.

But we think we've completely responded to this RFP. If they want to ask about other versions or old versions, I think they need to serve another RFP, which they have now done because I think they realized this one doesn't do -- this one doesn't ask for other versions.

THE COURT: So what's the status of the response to their new request?

MR. WOOD: We have responded -- we have responded to that, and I think we're still in the -- we haven't heard back from them on our response.

THE COURT: Okay. So this new request more explicitly addresses what we're talking about today?

MR. WOOD: I think it does. Mr. -- I don't want to speak for Mr. -- it's Extreme's request. So, I think that it more explicitly addresses what they're trying to do.

To me, they have -- we have responded to this question. They want additional information. Instead of

1    asking for a new request, they tried to fit it under

2    this one.

3              THE COURT:  Well, now there is a new request.

4              MR. WOOD:  And now there is a new request.  So

5    they have finally issued a new request, which we've just

6    responded to recently, and we haven't heard back from

7    them on our response.  So, we're still in the 14-day

8    response period.

9              THE COURT:  Okay.  So, Mr. Prabhakar, is it

10:56AM   10  that this issue -- it sounds like it may be moot if you

11   have issued a new request that more explicitly addresses

12   what you just explained to me you're seeking.

13             MR. PRABHAKAR:  May I, Your Honor --

14             THE COURT:  Oh, yes.

15             MR. PRABHAKAR:  -- just briefly explain?

16             THE COURT:  And I don't mean to cut you off,

17   Mr. Wood.  I'll let you further respond.  I want to get

18   this clarified because I don't want to spend a lot of

19   time on this if you're already responding to another

10:57AM   20  request that more directly addresses the matter.

21             MR. WOOD:  We think we've fully responded to

22   this request as written.

23             THE COURT:  Okay.

24             MR. WOOD:  We think they have everything they

25   need.  I think there is discussions for us to have on do

1  they really need us to extract every single version, as

2  they say.  We don't think they do.  They have the source

3  code that we've filed with the Copyright Office, which

4  is the basis of our claim.

5          THE COURT:  Okay.

6          MR. WOOD:  So --

7          MR. PRABHAKAR:  So, Your Honor, I'll try to be

8  brief, but I do want to emphasize the fact that this is

9  a dispute about intellectual property.  It's a dispute

10 about property rights.  And as with any other property

11 rights disputes, whether it's real property,

12 intellectual property, patents, whatever, it is

13 extremely important that the scope of the property right

14 is clear.

15         Now, I don't know what Mr. Wood is referring to

16 that we have produced the registration that we've

17 provided to the Copyright Office because that's only

18 50 pages, and that's certainly not the full extent of

19 their source code.

20         So, I do not see, based on the manifest files

21 and based on what my expert has looked at, the versions

22 corresponding to the registrations in the source code.

23 And I don't think --

24         THE COURT:  Well, let me stop you there because

25 you put that chart up, and you said that was the

versions that were part of the Complaint.  And, so, what

I hear Mr. Wood saying, they have provided the source

code that corresponds to all of that and that he's

reading your request to be beyond that, and that now

you've served a new request, that would cover that.

So, to the extent there has -- do you agree

that they have responded to the initial request and

provided the source code for those versions that you

showed the Court?

10:58AM

MR. PRABHAKAR:  No, Your Honor.  We disagree

with that representation, and I'll explain why.

THE COURT:  Okay.

MR. PRABHAKAR:  So -- and it gets into a little

bit of the weeds of copyright law because the request is

all source code that you contend is covered by copyright

registrations.

Now, they started registering Version 15.  Now,

if they represent -- and if plaintiffs represent --

THE COURT:  Let me stop you right there.  So,

10:59AM

just to make sure I stay on the same page, it says

"covered by copyright registrations listed in Table 1."

MR. PRABHAKAR:  Yes, Your Honor.  And Table 1

was the one that I just showed you.

THE COURT:  Yes.

MR. PRABHAKAR:  So -- but the question is

1    source code covered by those registrations.

2            Now, I showed you Version 15.  So, if we just

3    go by -- in tiers, there are 14 versions that preceded.

4    Plaintiffs have not taken the position that the first 14

5    versions are not covered by the registration.  So,

6    arguably, they should produce Version 1 through 14

7    because their contention is that all prior versions are

8    also covered by the registration.

9            THE COURT:  Okay.  But does -- that gets to

11:00AM 10   this new request.  Does that new request

11   cover -- because that's what I'm hearing Mr. Wood

12   explain.

13           MR. PRABHAKAR:  Yes.  And, Your Honor, because

14   this issue is so central to the case, we issued the new

15   request so that plaintiffs do not have an argument that

16   we didn't understand the scope of this request.

17           Our belief is that the request for prior

18   versions is covered by 30.  But to leave no doubt, we

19   served the new request.

11:00AM 20           And I will assure Your Honor that what I said

21   just moments ago for at least the versions that are not

22   explicitly mentioned in Table 1, Extreme is willing to

23   compromise and reduce the burden if they would just give

24   us a document with the version tags, and which is what

25   months ago, I had asked Mr. Wood in a meet and confer,

1  that why don't you just give us the tags and we'll have
2  our expert figure out how to get it out.
3      So, I'm not even asking them anymore to extract
4  all the versions for us.  Just give us the information
5  so that to the extent the versions are in the
6  repository, we can extract them ourselves.
7      THE COURT:  But he said that they have
8  responded and they're within the time period for you to
9  get back with him.  Is it sufficient what they're
10 producing now?

11     MR. PRABHAKAR:  Well, they haven't produced
12 anything, Your Honor, documents-wise.  What Mr. Wood is
13 saying that he has responded is that he has responded to
14 the RFPs in the sense that he's served a written
15 response to this stuff.  There is not a single document
16 that had been produced the day the response came in.

17     THE COURT:  Okay.

18     MR. PRABHAKAR:  We have -- and, by the way, to
19 the point that, you know, we haven't raised an issue, we
20 actually sent an e-mail last week asking for a meet and
21 confer on their -- all their responses, not just the
22 ones related to the versions issue, and we have not
23 heard back yet on that specific request, and I think the
24 seven-day period under Your Honor's new order runs out
25 on this Friday.

1          So -- but I'm trying to simplify the issue

2   that, for us, we need explicit versions extracted for

3   the versions that are listed in Table 1.  For everything

4   else, we are fine with them just producing a document

5   which identifies all the versions and we will figure out

6   what do we need out of those and how to extract them

7   because our expert reports under the current deadline

8   are due in a couple of weeks, April 30th.

9          We -- even if we engage in the meet and confer

11:02AM 10  process, Your Honor, that clock for us is ticking, and

11  that's why we had raised this issue long ago.  But at

12  least we need the specific versions for code that's in

13  the versions identified in Table 1.

14          THE COURT:  Okay.  So, Mr. Wood, can you

15  respond to his position?

16          MR. WOOD:  Yes.  What I heard him say is, we

17  need the specific code for those versions identified in

18  Table 1, and that's exactly what we gave them.  What

19  they're asking for is additional versions.

11:03AM 20          THE COURT:  Yeah, the ones leading up to those,

21  the --

22          MR. WOOD:  Yeah.

23          THE COURT:  -- prior versions is what he said.

24          MR. WOOD:  And maybe all the ones in-between.

25  And they have some of those.  We gave them everything

1    that was shipped to Extreme.

2            I think we're -- what we're -- we're having a

3    debate over an RFP that's not even before you is our

4    view.  He's -- they're trying to argue the new RFP that

5    they wanted.  We're trying to somehow shoehorn that new

6    RFP into this one.

7            THE COURT:  Well, he's -- I understand that

8    it's saying that it's included within this.  But now

9    he's issued the new one to sort of clarify things.  So,

11:04AM  10  I'm wondering -- I mean, can you all discuss this and

11   resolve it?

12           MR. WOOD:  So let me --

13           THE COURT:  I had misunderstood and thought you

14   had responded with documents, and that doesn't seem to

15   be the case.

16           MR. WOOD:  No.

17           THE COURT:  So, is --

18           MR. WOOD:  I think the way they have asked, the

19   RFP is still overly burdensome because they want every

11:04AM  20  single version.  We don't see why that's --

21           THE COURT:  Well, he said he was -- he was

22   willing to narrow it.

23           MR. WOOD:  We haven't had that discussion.  And

24   to his point, we actually had a meet and confer

25   yesterday with Extreme's counsel.  We offered to go

1    through these RFPs.  They did not want to do that.

2         So they have sent us an e-mail.  We have

3    responded.  On the meet and confer yesterday, we offered

4    to go through these RFPs and Extreme counsel didn't want

5    to do that.  So I just want to correct the statement

6    that we haven't responded or haven't been willing to

7    engage because we are.  That's on the new ones.

8         But that -- so, the issue of what's actually

9    registered, what's registered is a particular source

10   code file, lots of files.  And if there is a copy of

11   that file in an old version or a new version, that

12   should also be registered as well.

13        Extreme has taken the position in this

14   litigation early on that -- so, for example, we

15   registered Version -- all the source code that was in

16   Version 16.2, and what we shipped to Extreme, I think,

17   was 16.4 or 6.  So some version in-between.  And they

18   said, well, since you didn't register that version, then

19   you can't pursue your copyright claim.  We said, no,

20   it's the code.  It's not the label.  It's the code that

21   we registered, and the code in that one is almost

22   exactly the same as 16.2, and what wasn't registered

23   there was registered in the next one, so you don't need

24   all of that.

25        And they're kind of back to the same argument,

1    which is, oh, you didn't -- they're trying to say it's

2    the version that's registered and not the actual source

3    code that's in that version tree.

4          And the way copyright law works is, I mean, if

5    you register a book, even if there is a new edition of

6    that book, what you registered in the first edition

7    is -- to the extent it's the same in the second edition,

8    it's still registered.  You still have a copyright.  You

9    don't have to register every single version.

11:06AM 10    So we've given them all of the code that's

11   registered and it's represented in that table.  To the

12   extent they're copies, it's also registered.  But they

13   don't need all those versions is our position.

14          And that's the discussion we need to have on

15   this new RFP.  What do you -- what do you really need?

16   If you want to just look at it to see how it's changed,

17   we can help them do that in the repository.  I think

18   they probably already can.

19          I will say the testimony he put up was about

11:07AM 20   Extreme's repository, not about SNMP's repository.  So,

21   does that answer that question?

22          THE COURT:  Uh-huh.  It just sounds like it

23   would be helpful to have the conversation so that

24   they're not spinning wheels if they have some direction

25   on how to work through it to extract maybe what they

        1    need.

        2            MR. WOOD:  Okay.  And we'll be glad to have

        3    that meet and confer with them to get exactly what they

        4    need if this will -- you know, to resolve the new RFP.

        5    But we really think we've fully responded to the

        6    existing one that's before you.

        7            THE COURT:  Okay.

        8            MR. WOOD:  Thank you.

        9            MR. PRABHAKAR:  Your Honor, only because this

11:07AM 10    is important for us, I'm going to take a few more

       11    minutes of your time.

       12            I don't think there is any dispute based on the

       13    language of RFP 30 that the source code that plaintiffs

       14    contend is covered by these registrations is within the

       15    scope of 30.  And source code corresponding to these

       16    versions in a directory that says Version 15, 15.2 is

       17    not present on the source code computer.

       18            So, if Mr. Wood's contention is that we've

       19    produced the registration that we submitted to the

11:08AM 20    Copyright Office, which it's a little unclear to me,

       21    even today, what is he contending is produced on the

       22    source code computer.  But what our contention is, there

       23    are no directories in the repository today corresponding

       24    to Version 15, 15.2, 15.3 and every version that's

       25    listed out here.

1          And since that's the scope of at least the

2   registration that's at issue, we can have an argument in

3   the expert reports about deltas or these versions,

4   whether they are covered, not covered, all of that.  We

5   can have that argument in the expert reports.  That's a

6   different fight.  But having directories which represent

7   that this is source code for Version 15 that was

8   registered under Registration No. 1-706-718 is not

9   present.  If Mr. Wood can tell us right now that if

11:09AM  10   that's on the source code computer, not sitting in some

11   PDF file, I think we don't have to take any more of your

12   time.

13          THE COURT:  Okay.  Because, Mr. Wood, what I

14   understood you to say is that it's there, but what I'm

15   hearing him say, they can't find -- it's not a direct

16   corresponding file where they can find it.

17          MR. WOOD:  Your Honor, it's --

18          THE COURT:  So can you help with that?

19          MR. WOOD:  Unless it was somehow removed, it's

11:09AM  20   there.  So when we set up the source code computers two

21   years ago, I actually went to California.  I supervised

22   setting them up and getting the source code on there.

23   And this was part of -- these source code trees were

24   part of what we put on there.

25          If somehow they're missing, they can't find

1   them, we've met and conferred on this issue multiple

2   times.  This is the first time I've heard they're

3   missing source code for the actual registration trees.

4        I would have been glad -- because I agree, if

5   we didn't produce the source code for the registration

6   trees, that's exactly what's responsive to these RFPs.

7   And we kept saying we did it, and they said, well, we

8   need all the other versions.  We said, this doesn't ask

9   for all the other versions, and we don't even -- we

11:10AM 10   think that's burdensome to go get every single version.

11        Anyway, we had that argument over and over and

12   over again.  I never heard that they didn't have the

13   source code for the actual registration trees until just

14   now.  So, if that's --

15        THE COURT:  Well, that sounds like there is

16   something amiss.  You said you provided it.  They're

17   representing that they can't find how it -- in a

18   directory or anything to correlate to those listed.  So

19   it sounds like --

11:11AM 20        MR. WOOD:  So we can work that out.

21        THE COURT:  -- the parties need to get together

22   and discuss this and figure out what the issue is.

23        MR. WOOD:  So if that's the only issue now in

24   RFP 30, we can work that out.  Either we'll point it to

25   them, if it somehow got deleted in the last two years,

1    we'll put it back on there, but --

2            THE COURT:  And then have the discussions on

3    the outstanding request as well since it seems to go

4    beyond just the ones listed in the Complaint to see if

5    you can resolve that as well.

6            MR. WOOD:  Yes.

7            THE COURT:  Okay.

8            MR. LEE:  Judge, just -- if I may, just from a

9    timing standpoint, we're running out of time to get this

11:11AM  10    done.  I mean, we're happy to meet and confer.  We will

11    meet and confer.  But, like, I --

12            THE COURT:  You have to on this issue.  There

13    is nothing I can do until we know what the problem is.

14            MR. LEE:  Well, we've got to find a way to

15    fast-track this and then have a backstop to it because

16    we've got our expert reports due.

17            THE COURT:  Uh-huh.  I want a status report by

18    next Wednesday on this.  So, you all have to work in

19    your meet and confer between now and give yourselves

11:12AM  20    time to do that joint report due Wednesday.

21            MR. PRABHAKAR:  Okay.

22            THE COURT:  All right.  The second dispute is

23    responses to 90, 128 and 129.  I've reviewed the

24    position statements.  Is the issue just the

25    identification of the custodians?

1          MR. PRABHAKAR:  Yes, Your Honor, that's about
2    it.
3          THE COURT:  Can this not be easily resolved,
4    Mr. Wood?
5          MR. WOOD:  Are you saying that the only issue
6    is the --
7          THE COURT:  To identify the custodians.
8          MR. WOOD:  Yes, that's -- we don't have
9    any -- we don't have any problem doing that.  We've
11:13AM  10  actually -- we made a proposal to them on what we would
11   run, which was actually across all the custodians that
12   we have for e-mails.  So there is no -- it's all the
13   e-mails we've collected for all the SNMP Research
14   employees and agreed to some of the searches and thought
15   some were overly burdensome.
16          We've made that proposal on March 31st.  We
17   have not heard back from them.  We have run the searches
18   that we thought were reasonable.  We have already
19   produced the documents.  And, so --
11:13AM  20         THE COURT:  So, with the documents,
21   Mr. Prabhakar, do you -- truly, do you just need the
22   identification of the custodians now?
23          MR. PRABHAKAR:  I think so, Your Honor, because
24   the documents have just been produced late on April 9th,
25   and I was on a plane all day yesterday, so I haven't put

1    my eyes on them.

2            I think we're fine with the search terms they

3    ran.  We're not -- we understand the ones that they're

4    claiming are overly burdensome.  Some of them relate to

5    the Brocade products where we don't have this -- the

6    same relevance as we have for the Extreme products.  So

7    it's really just about identification of the custodian

8    and that's about it.

9            THE COURT:  Any problem doing that before next

11:14AM 10  Wednesday?

11           MR. WOOD:  No, Your Honor.

12           THE COURT:  All right.  Dispute number three.

13   This is plaintiffs' responses to RFPs 29 and 152, and

14   this is dealing with the marketing materials.

15           MR. PRABHAKAR:  So, Your Honor, we've discussed

16   this with plaintiffs multiple times, and I think I

17   understand what they have responded in their position

18   statement.  I just am having difficulty reconciling

19   that, their statement that they don't have marketing

11:15AM 20  personnel, they don't produce advertising or marketing

21   collateral other than the website.

22           So if I understand plaintiffs' statement, all

23   of their marketing and advertising is done by their

24   website, and somehow that is not borne out by some of

25   the documents that have been produced in this case.

1　And --

2　　　　　THE COURT:  Can you point to those?

3　　　　　MR. PRABHAKAR:  Yes, Your Honor.  I was just

4　getting there next.

5　　　　　THE COURT:  Okay.

6　　　　　MR. PRABHAKAR:  So, this is one of the

7　documents that's been produced in this case

8　(indicating).  It very clearly says "Marketing Plan."

9　And I have not seen a marketing plan, at least for the

11:15AM  10　specific product that's at issue here.

11　　　　　But even then, in this marketing plan, there

12　are express references to other marketing collateral

13　which I have also not found.  It says very clearly that

14　there is updating sales and marketing materials.  It's

15　not saying the website.  It talks about a mailer to

16　customers and talks about marcom material.  It talks

17　about trade shows, all of which relate to marketing and

18　advertisements.

19　　　　　I will show you another document that

11:16AM  20　plaintiffs have produced in this case which expressly

21　refers to work that they were doing for advertisements

22　(indicating).  And this is Mr. Butterworth submitting a

23　report internally which refers to ad work to bring ideas

24　together.  It talks about Wind Forum 2001, which appears

25　to be a trade show.  Talks about -- you know, references

companies that does marketing, talks about contracts for ads.

Here is another report from Mr. Butterworth (indicating). It talks about press work. We've asked for press releases. Talks about a press list.

So, I'm not sure what to make of plaintiffs' assertion that the sole source of marketing and advertising is the website. And given that they have marketing plans -- and there is just -- more than one. Here is another one for marketing (indicating). And at the bottom of this, it again talks about preparing for marcom materials, which I understand may be marketing communications material in February 2002 in preparation for a 2002 trade show.

So, there is a little bit of disconnect. And certainly this statement in plaintiffs' response is inaccurate in the sense that they're saying that all of our marketing and advertising is done via the website because we're seeing some of these e-mails and documents that actually refer to marketing materials, advertisements.

It actually even references specific personnel who are doing marketing and advertising. I didn't put up all the documents because I don't want to take up the Court's time unless I have to, but that representation

1   in their response doesn't seem accurate and certainly

2   all of that material is missing from their production.

3           THE COURT:  Thank you.

4           Mr. Wood, how do you reconcile this?

5           MR. WOOD:  So, Your Honor, those documents went

6   by pretty quick, but I think --

7           THE COURT:  Some of them were dated back in

8   2001.  So, I have a question:  Is marketing just by

9   website as of a certain date?

11:19AM 10          MR. WOOD:  My understanding -- obviously

11  Dr. Case knows this better than I do because I wasn't

12  involved back then.  But as of 9/11, SNMP Research

13  stopped going to trade shows, and I think these were

14  referencing trade shows and other things.  We did

15  produce --

16          THE COURT:  Do you have any of that old trade

17  show material?

18          MR. WOOD:  There is a -- they have a directory

19  that had product documents, like design documents.  I

11:19AM 20  think that's probably where these came from.  We

21  produced everything in that directory.  And we've also

22  produced the website.  And then I have talked to my

23  client, are there any other advertisements; is there

24  anything else?  We just don't do that.

25          THE COURT:  Do you have marketing personnel?

1          MR. WOOD:  No.

2          THE COURT:  Ever?

3          MR. WOOD:  Maybe to the extent -- I think

Mr. Butterworth was a salesperson back then, but he may

have done -- maybe he did some marketing.  But I know

since I've been involved with SNMP Research, which is

2009, there have been no marketing personnel.

8          So maybe there are some old documents.  I also

find it interesting that we've met and conferred on this

10    issue, I think, twice, and Mr. Prabhakar didn't share

11    any of that information with us in the meet and confer.

12    He waited until he got in front of you; whereas, we

13    would have -- could have gone back and looked for

14    something in 2001.  I'm not sure exactly how that's

15    exactly relevant, but -- given some guidance; otherwise,

16    we're just looking across hundreds of thousands of

17    documents, and since they don't have marketing

18    personnel, I don't know of advertisements that they do.

19    They're not advertising in magazines.  They're not going

20    to trade shows.

21          THE COURT:  What do your salespeople do in

22    trying to bring on new prospective customers?  I mean,

23    how do they communicate with them?

24          MR. WOOD:  They are mostly -- it's almost all

25    inbound as opposed to outbound.  In other words, people

1   are just calling that they need -- there is so many

2   customers and then they need a new product or they need

3   something else.  And --

4           THE COURT:  Do they then send an e-mail

5   communication in response to receiving a phone call; is

6   that what you're saying?

7           MR. WOOD:  So, someone -- it's usually an

8   existing customer, or someone has heard about us and do

9   research because they have been around so long in the

10  industry and that customer will contact SNMP Research.

11  We're not -- I'm not aware of outbound marketing

12  solicitations.

13          THE COURT:  It would just be in response to a

14  call.

15          MR. WOOD:  Right.

16          THE COURT:  Okay.

17          MR. WOOD:  So, my comment to Mr. -- in the meet

18  and confer was, I can't guarantee you over the course of

19  25 years there hasn't been a solicitation to a customer,

20  but I don't know how to ferret that out from all these

21  communications to all these different customers.

22          But I know there is no marketing person, you

23  know, that's actively doing that and sending these out,

24  which is what you would normally do is go look.  You

25  know, okay, let's see the e-mails they sent because

1   that's what they're doing, once a quarter they're

2   sending out a newsletter, or something like that.

3          So, I mean, we can go back and look, you know,

4   in the 2001 time frame and see if we can find some of

5   those other documents.  Like I said, we did produce --

6   I'd like to see these particular ones.  Hopefully they

7   will share them with us so we can see exactly where they

8   came from.  I suspect they came from this product

9   materials directory that -- and we produced everything

11:23AM   10   in there.

11          THE COURT:  Okay.

12          MR. WOOD:  And most of it was design -- like,

13   okay, we're coming out with a new release, here is

14   our -- what we're going to do with it kind of thing.

15          THE COURT:  Okay.

16          MR. WOOD:  So --

17          THE COURT:  Mr. Prabhakar, can you tell me if

18   that information did come from the product materials

19   directory that they produced?

11:23AM   20          MR. PRABHAKAR:  I have no means of knowing that

21   information, Your Honor.

22          THE COURT:  Okay.

23          MR. PRABHAKAR:  I mean, I just get them in a

24   production format.

25          THE COURT:  Well, it sounds like it would be

most efficient for you to sit down and show those

examples to Mr. Wood and let them --

MR. PRABHAKAR: Right.

THE COURT: -- see what they have. He says

they don't do trade shows since 9/11, and now he's

explained, like, what their salespeople do in response

to an inquiry. So it sounds like a more thorough

discussion about the marketing and sales would be

helpful. And then you have the specific -- and you said

11:23AM you had more examples. I know you just gave a sample.

MR. PRABHAKAR: I can show you one more just to

address this concern that how do we look for

solicitation e-mails and all.

This is another example of a daily report from

2006, actually (indicating). Again, I -- I do not want

to offend anybody by doubting the representation that

they don't do trade shows. But at least this daily

report has a column that says Trade Shows and Marketing

or Website as recent as 2006. And the reports that we

11:24AM just saw about trade shows actually postdated 9/11. But

I don't want to offend anybody by saying that I don't

believe you.

THE COURT: Well, it may be that he -- with

this information, he can ask more tailored questions --

MR. PRABHAKAR: Yes.

THE COURT:  -- to get the information.

MR. PRABHAKAR:  Right.  But there does seem to be a specific mechanism by which customers reach out to them and then they respond.  There is, like, web queries, info prospects.

As Your Honor knows, sometimes companies have a website through which you can send in a query which triggers the marketing people to respond.  So, clearly there is a directed way.  I'm sure there is an e-mail address to which those queries go.

THE COURT:  Okay.

MR. PRABHAKAR:  And that's what we've been asking for.  And I didn't mean to say that we didn't share this information because, you know, that's kind of in opposite order.  We met and conferred, raised the issue with the Court, and then in response, Mr. Wood said certain things; we don't do marketing; we don't have marketing personnel.  In a small company, sales and marketing are often melded.  You don't want to have too many silos.  But, really, it's not the label of the personnel that's important, it's the function.

THE COURT:  Uh-huh.

MR. PRABHAKAR:  And I think to the extent solicitation e-mails are a problem to search, I think this document offers -- I mean -- and I don't know why

1  we would have to identify that because SNMP knows best

2  about how they get contacted.

3       And all of this information is relevant for

4  damages, including the 2001 time frame, because that's

5  how we understand what the value of the business was in

6  2001.  It's relevant throughout because how extensively

7  plaintiffs reach out or contact prospective customers is

8  also relevant to the publication of their copyrighted

9  material because there is case law that says that if

10  you're soliciting business extensively for your

11  software, that can constitute publication of that

12  software, which is why -- another additional reason

13  besides damages why this information is relevant, Your

14  Honor.

15       THE COURT:  Okay.  All right.

16       Mr. Wood.

17       MR. WOOD:  Just one other thing.  Dr. Case

18  corrected me.  He said they were at a trade show during

19  9/11 -- probably Interop in Atlanta -- and they already

20  had some booked for the next year.  So they did attend

21  some trade shows in --

22       THE COURT:  That extended beyond.

23       MR. WOOD:  Yeah, they did attend some trade

24  shows the next year.  Maybe there was a small one.  I

25  think that -- anyway, we'll be glad to talk to them and

look at this information.

THE COURT: The reference, I believe, was to 2006, and it had trade show or website on there. So --

MR. WOOD: Yeah, which -- and if, you know, this -- I hadn't looked at that document until he just showed it. But it looks like -- that looks like a template. So -- and I know that SNMP Research personnel have daily reports that they file, and I think that's what that was, and that was a template, are you doing anything in this area. So, I didn't see anything underneath it. It says that just because it had the word "trade show."

THE COURT: Well, it sounds like you all need to discuss this further as well, so add this to your list for the report next Wednesday.

All right. Dispute number four. This addresses plaintiffs' responses to Interrogatories No. 6 and 7, and there is an issue whether this one was timely.

So, Mr. Prabhakar, I'd like for you to address that when you're stating your position on it, too.

MR. PRABHAKAR: Sure, Your Honor. So, in terms of timeliness, I can represent to you, Your Honor, we've actually sent out letters to plaintiffs about their rog responses way back in August of last year. None of

these requests that we're discussing here today are of

recent vintage.  We've been trying to get these

materials since last fall, and plaintiffs have

represented before that that their document production

and discovery is substantially complete.

But these requests have been served in 2023.

And these are deficiencies that we have informed them

about during meet and confers over the years.  We had a

specific meet and confer, and there is so much material

to discuss, Your Honor, there are so many discovery

issues that we're chasing right now that in an hour-long

meet and confer, certain things get discussed in detail,

certain things get discussed superficially, and I

believe this is one of those that got discussed

superficially.

But the deficiencies are -- at least to us,

seem apparent on the face, and we identified some of

them.  But, like, plaintiffs' response talked about Rog

7 but didn't particularly talk about Rog 6.

So, here is a statement in their response to

Rog 6 about facts related to the license.  And keep in

mind that our request calls for all facts related to

their contention that Extreme has breached a license.

So it's in some sense asking for everything that the

plaintiffs are going to rely on in this case.

1        And I'm showing you a later response

2   (indicating). This is not even the response that we had

3   when the issue was raised because Your Honor had ordered

4   plaintiffs to supplement removing the subpart objections

5   and this is post that.

6        There is an assertion about licensee's network

7   switch project. I don't see any citation. Where is

8   this statement coming from? What's the document that

9   they rely on?

11:30AM  10        This response repeatedly talks about multiple

11   products. You'll see this repeated in this response

12   several times that Extreme copied their software in

13   multiple classes of products totaling scores of

14   products.

15        They talk about it on the next page. This

16   response basically says the same thing over and over

17   again without actually giving us the answer that we

18   want.

19        If there are scores of products, I don't see an

11:31AM  20   identification in this response. They talk about an

21   authorized combination of target processing, operating

22   systems that were authorized under the license, and

23   their contention is that there are certain products that

24   don't fall under that classification. I don't see an

25   identification of those products.

1        And I have looked in the discovery that we have

2  produced, and I'm pretty certain that they have all the

3  information to respond to this interrogatory based on

4  our document production.  I don't see that.

5        There was an assertion in their response that

6  we failed to maintain their copyright notice in the

7  software, and their response, to date, served in

8  March 2024, is that Extreme has not produced source code

9  and install images.

11:32AM 10        I was here in front of you, Your Honor, in

11  November, and I told you that the install images have

12  been produced.  I don't think we've heard before today

13  that somehow the source code production is deficient.

14  And yet as of March 2024, this is how plaintiffs'

15  response reads on Rog 6.

16        And I can move on to Rog 7 if Your Honor wants.

17        THE COURT:  Yes, please.

18        MR. PRABHAKAR:  I think Rog 7, particularly as

19  it relates to Enterasys, we just don't have any facts

11:32AM 20  related to either Enterasys' copyright

21  infringement/breach of contract.

22        Your Honor may remember last time there was a

23  discussion about Extreme's e-mail, which we presented

24  that certain products are under the Enterasys license

25  which Extreme said was a mistake.  We presented to you,

1  Your Honor, that we're not going to rely on the

2  Enterasys license form the EXOS products, and yet there

3  is nothing in the rog response other than that e-mail,

4  which now Extreme has responded to on the record, that

5  the earlier e-mail was sent by mistake.  We're not

6  relying on that.  We need to get updated contentions as

7  it relates to the Enterasys products.

8       If we committed fraud related to the Enterasys

9  products, we're entitled to know.  If we breached the

11:33AM  10  contract, we're entitled to know.  If there is copyright

11  infringement by Enterasys, we're entitled to know.  But

12  we don't have those facts.

13       And their response still is that we haven't

14  completed the production of the full scope of

15  information and I don't know what information is lacking

16  to respond to this interrogatory.  And if there is

17  information that's missing, when was that dispute

18  brought in front of the Court?  And if it wasn't brought

19  in front of the Court, then, really, is something

11:34AM  20  missing, or this response needs to be updated because

21  we're less than a week away from taking a couple of

22  depositions and I just don't have basic facts to ask the

23  witness, why do you contend this line of product

24  breached the license or did something.

25       And these are interrogatories, Your Honor, that

```
 1   have been outstanding since last year.  I think they
 2   were -- if I remember correctly, they were served in
 3   March of 2023.  We're now a year after and we're still
 4   chasing deficiencies.
 5            THE COURT:  Thank you.
 6            Mr. Wood, I saw some indication in your
 7   position statement that you were willing to supplement.
 8   So, can you address that?
 9            MR. WOOD:  Yes, Your Honor.  We do think a
10   lot -- we never did meet and confer on these, but that's
11   really beside the point because we're going to
12   supplement anyway.
13            So, now that we have finished our expert
14   reports, our initial expert reports last week, those
15   expert reports have a list of products.  I think our
16   experts have done work on some of these other items,
17   too.  And, so, in -- it's in our interest to put that in
18   these interrogatory responses, so we're going to do so.
19            We didn't -- we actually gave In- -- I think
20   Interrogatory No. 6 was a ten-and-a-half-page response.
21   We gave a pretty fulsome response.  But now that we've
22   had the expert reports, we're going to supplement.  So I
23   think that it's a nonissue.
24            THE COURT:  And it will address the questions
25   of what line of products breached whatever?
```

11:35AM (line 10)
11:35AM (line 20)

1          MR. WOOD:  Yes, yes.

2          THE COURT:  Okay.

3          MR. WOOD:  And that's our -- our experts have

4  identified those products, and, so, we'll put those in

5  the interrogatory answers.

6          The one thing we right now don't intend to

7  respond to because we don't think it's a part of the

8  question is their 7-1, how the reported facts related to

9  fraud relate to the legal elements of fraud.  We don't

11:36AM  10  think the interrogatory asked for a legal analysis, it

11  just asked for the facts.  And this -- that doesn't seem

12  to be responsive to Interrogatory 7.

13          So that -- the others are just simply facts.

14  Like, what are the products; what's your fact

15  for -- that they removed the copyright notice.  And, so,

16  we'll -- you know, things like that.

17          This is, take your facts, which I think we've

18  already given them, and apply them to the legal

19  elements.  One, the interrogatory doesn't ask that, and

11:37AM  20  it doesn't necessarily seem like an appropriate use of

21  an interrogatory.  So we weren't intending to supplement

22  and satisfy number one, 7-1.

23          THE COURT:  Okay.  All right.  Thank you.

24          Mr. Prabhakar, does that resolve this, given

25  that he said that they will supplement with the

information that's been compiled by their expert that
would be specific to these questions except for 7-1?

MR. PRABHAKAR:  I understand their position on
7, Your Honor, at least related to the legal elements of
fraud.  All we ask at this time is a date certain for
when the response would be provided.

THE COURT:  And I was going to ask that.  When
do you intend to supplement?

MR. WOOD:  If we could do that in two weeks, if
that's sufficient.

THE COURT:  Can you do it by next Friday?

MR. WOOD:  Yes.

THE COURT:  Okay.  Next Friday.

All right.  The next dispute, number five, this
addresses plaintiffs' response to RFP No. 7.  It looks
like plaintiffs are stating that they have produced all
of the responsive documents.  So, Mr. Prabhakar, can you
address your position on that?

MR. PRABHAKAR:  Yes, Your Honor.  And to give
the Court some comfort, this is the last one because I
think we're done on 10.  So we don't have to discuss the
next one, at least from our perspective.

THE COURT:  Okay.

MR. PRABHAKAR:  So, the plaintiffs produced 11
documents which were related to third-party

1   contributors, and they were really just related to two

2   third-party contributors, and we find that a

3   little -- we're not quite sure if that truly is the full

4   extent of third-party contributors for a couple of

5   reasons.

6           So, in their license agreement with Extreme,

7   under Patents, Copyrights and Trademarks, they discuss

8   third-party contributors.  Because, as you can

9   understand, Your Honor, for copyright registrations, you

11:39AM 10  can only register or claim registration or claim

11  copyrighted material that you have created, not what

12  third parties have created.  That's why the third-party

13  contributors identification for this kind of a case is

14  important.

15          And it says there are programs with notices

16  shown in Attachment B to the license.  And it expressly

17  mentions here a MOSY MIB compiler and ISODE package

18  (indicating).  I don't know how to exactly pronounce

19  that, but let's just call it ISODE.

11:40AM 20          Attachment B talks not just about ISODE, It

21  talks about a bunch of contributors; the MITRE

22  Corporation, Northrop, NYSER.Net, Marshall T. Rose.  We

23  haven't seen any communications or documents related to

24  these.

25          The next page talks about DES.  We haven't seen

1    anything about DES.  We have seen e-mails, a couple of

2    e-mails, about ISODE data security.

3         ISODE seems to be something that they use as a

4    third-party product or code.  It's also on their website

5    in the glossary.  It's a little -- we'll try to zoom in

6    so that it's easy on the eyes.

7         Their own website refers to ISODE.  I have seen

8    nothing in the production relating to communications

9    with ISODE.

11:40AM  10    And another reason why we are not a hundred

11    percent sure what's going on with identifying

12    third-party communications or documents, Your Honor, is

13    Interrogatory 15 that they just responded to which

14    expressly asks for identification of third-party code

15    and the source of the third-party code, and this is

16    their response (indicating).  It refers to the source

17    code repository produced by SNMP Research in this

18    litigation.

19         So there seems to be something going on with

11:41AM  20    respect to their lack of identification of who are the

21    third-party contributors, whether in the form of

22    documents, whether in the form of interrogatories, and

23    that's why we're not sure if the assertion that 11

24    documents relating to third-party contributors when I

25    just showed you at least five or six, ISODE and then the

1    list mentioned below.

2         We looked at one of the expert reports which

3    talks about code that came from Marshall Rose.  That's

4    part of their product.

5         So, we're just -- like this reluctance to share

6    information about third-party contributors, which is

7    pretty key to our case, and certainly it matters on the

8    scope of their copyrights.  So we're not sure if we are

9    getting the information that we need from them, either

11:42AM 10   by the way of interrogatory responses because you just

11   heard Mr. Wood say that the source code repository is

12   all the code that they have been developing over the

13   last 20, 30 years.  And the rog response says, go look

14   in the source code repository, when they should already

15   know this information and how voluminous it is.

16        But this rog response, I won't harp on this

17   because this is probably coming to you in a dispute this

18   week.  But there is certainly something missing on third

19   parties.  I don't know if -- why the lack of candor in

11:43AM 20   terms of identifying third parties or identifying

21   communications with third parties.  But we don't think

22   11 documents relating to two third parties completes the

23   response to our RFP.

24        THE COURT:  Okay.

25        MR. WOOD:  Your Honor, in response to RFP 7, we

searched for any e-mails that are to or from any of
these third-party entities.  The SNM- --

THE COURT:  The names that he showed?

MR. WOOD:  Yes.  And I think maybe
even -- maybe even more.  But, I mean, there is no lack
of candor.  He has a list of who they are.  So it's not
like SNMP Research is trying to hide it.  They have the
source code.  They can search for the copyrights from
all those entities and see who they are.

So we searched for anything having to do with
the code and produced those documents.  There is
just -- we went through thousands of documents.  There
is hardly anything.

When you have open source software, there is no
negotiation.  So, open source software, they put the
software out on the internet and you go get it and you
use it.  You don't --

THE COURT:  And all of these were open source?

MR. WOOD:  I don't know.  I'd have to check
with my client to be sure.  I believe -- I believe
that's the case.  I'm not sure about the Marshall Rose
one.  But all the university ones and things like that,
they're different tools and pieces of source code that
would have been downloaded and used in the product.

But you don't -- there is no negotiation

1    process like there is with one of SNMP Research's

2    clients where they contact you, here is the license, you

3    pay us money, we send you an agreement.  There is back

4    and forth and there is negotiation.  You just -- they

5    have it out there; you go get it and you use it.  So,

6    sometimes you have to ask them a question, but that's

7    pretty rare.  You usually just use it.

8              So, I mean, there is no --

9              THE COURT:  So, you're representing that the

11:45AM  10   search has been done for the communications with all of

11   the listed third-party contributors that he's at least

12   shown the Court today?

13             MR. WOOD:  Right.  We searched the list.  We'll

14   be glad to share exactly what we searched with them.  If

15   they think we left someone out, we can search that

16   person.  But I wouldn't have expected to find a lot of

17   documents because of just the way open source works.

18   And we didn't.  I was actually surprised we found any.

19   But we did -- we did find some.  There was some

11:46AM  20   communication sometimes with an author about some

21   things.

22             There is also -- there is one contractor who

23   contributed to the SNMP Research software, and we have

24   produced all of those documents.  There is -- there are

25   a lot more communications related to that contractor.

1  But we did produce all of those.

2          THE COURT:  Okay.  So you produced those, and

3  you can check and confirm whether the ones shown today

4  were all open source or not and you can share with

5  Extreme the search that you performed?

6          MR. WOOD:  Yes.

7          THE COURT:  Okay.

8          MR. WOOD:  Okay.

9          THE COURT:  Mr. Prabhakar, it sounds like he's

11:46AM 10  at least explained and responded.  And, so, I ask that

11  you have those discussions.  Let him share the search

12  with you, with the additional details he'll look into

13  about whether or not they were open source.  He says he

14  did with the third-party contractor provide that

15  information.  So, if you can make sure you have that.

16  Otherwise, it sounds like it's responded to.  But you

17  can put that in your status report that you all have had

18  the discussion and checked all of that so the Court can

19  be assured that that is complete.

11:47AM 20          MR. PRABHAKAR:  Yes, Your Honor.

21          THE COURT:  Okay.  And you said RFP No. 10,

22  which is the sixth discovery dispute, has been resolved?

23          MR. PRABHAKAR:  Yeah, we're not asking for

24  anything else.

25          THE COURT:  Okay.  All right.  So that brings

1   us to our last matter, and this is for the deposition,

2   Extreme's Rule 30(b)(6) deposition. And I've looked at

3   Extreme's proposed dates. Did the one deposition occur

4   yesterday that was on the schedule?

5          MR. PRABHAKAR: Yes, Your Honor.

6          THE COURT: Okay. So that's complete. So the

7   next dates we have are Fitzgerald for April the 23rd,

8   and then Hutchins, which we've discussed, the 7th.

9          Mr. Wood, I understand you have been waiting,

11:48AM  10   and your position is you would like it to occur earlier,

11   but the schedule seems appropriate with everything that

12   needs to be done.

13          So is there anything else you wish to add for

14   why it would need to occur any earlier than what's set

15   forth?

16          MR. WOOD: Yes, Your Honor. So, a couple of

17   items on scheduling. So, the deposition did occur

18   yesterday, but on the -- on the 9th, the day before the

19   deposition, so, two days ago, the day before the

11:49AM  20   deposition occurred, we were informed that Mr. Ajmera

21   would not be discussing Topic 25 and --

22          THE COURT: So he was designated for 17 and 25,

23   and the day before you were told it would just be one

24   topic?

25          MR. WOOD: Yes. And part of our problem with

1   this, and we don't know why we didn't find out until the

2   day before when this was, you know, agreed upon much

3   earlier, but also Mr. DeBacker on February 14th, in the

4   December 29th, 2023 status report to the Court was

5   scheduled for Topic 25 on February 14th, and

6   Mr. DeBacker was not prepared during his deposition to

7   discuss Topic 25.  And, so, Extreme said, we'll get

8   somebody else to do that.

9           And, so, we've now prepared -- we've had two

11:50AM   10   different people prepared to take a deposition on Topic

11   25, and we either showed up at the deposition and found

12   out he wasn't prepared to talk about it, or the night

13   before when we were already -- the deposition yesterday

14   took place in Boston.  So someone had to travel to

15   Boston and we were already there.

16           THE COURT:  Can you remind me what Topic 25 is?

17           MR. WOOD:  So, this is their steps to collect

18   documents and how their, you know, e-mail systems work.

19   Like, it's all about their documents and how they

11:50AM   20   gathered things and that type of thing.

21           THE COURT:  Okay.

22           MR. WOOD:  The -- we are also -- so, Topic 25

23   has not been rescheduled, and we really need some sort

24   of mechanism so we don't run into this problem where we

25   just -- we show up and we've prepared and then we've got

1 to prepare again and then we've got to travel again.

2 And, so, we don't know if that's going to be

3 another date. Is that going to be Mr. Fitzgerald? Is

4 it going to be Mr. Hutchins?

5 We also have not scheduled Topic 9. So, there

6 is two parts to Topic 9. One is the questions about

7 their written discovery, and that is -- that's been

8 briefed. That's been fully briefed and is now before

9 Your Honor.

11:51AM 10 The other part of Topic 9, which is related to

11 25, has to do with their collection of documents

12 specifically for discovery. And we haven't -- they have

13 agreed to put someone up for that part of Topic 9.

14 Mr. DeBacker also was supposed to be up for that topic

15 and was not prepared to discuss it. But we have

16 not -- we have not gotten that scheduled either.

17 And, so, I mean, we can wait until the 7th for

18 Mr. Hutchins. We're just -- we're trying to get through

19 these, and we didn't under- -- you know, there was no

11:52AM 20 discussion about why did he need to be a month out; why

21 couldn't we do it earlier?

22 But probably the bigger deal is just

23 getting -- making sure we get through all the -- all the

24 topics. And then when they put up a witness and say

25 they're putting up a witness for a topic that they

1   actually -- actually follow through because we're having

2   to retake these depositions.

3        And part of the motion on Topic 9 is we would

4   like some extra time, if Your Honor sees fit to reopen

5   Topic 9, because we did spend time trying to question

6   the witness on that, and we think we should get a little

7   extra time there.  But I think that's probably more

8   appropriately handled in response to that -- to that

9   motion.  But it's related to all this -- to all this

11:53AM  10   scheduling.  So --

11        THE COURT:  All right.  Mr. Prabhakar, if you

12   could address Topic 25 and what the plan is for that.

13        MR. PRABHAKAR:  Yes, Your Honor.  Let me

14   address it in a couple of parts.  So, Mr. DeBacker was

15   prepared on Topic 25, and we thought he provided

16   testimony as best he could.  The problem with Topic 25,

17   Your Honor, is:  It's about efforts to collect documents

18   responsive to discovery requests or to preserve

19   documents related to this litigation.

11:53AM  20        As you can understand, in a case of this size,

21   the bulk of that work is done by the lawyers in

22   communication with the company's personnel, and all of

23   that stuff is privileged.  So -- or even if not all of

24   that, at least our communications with them about

25   document collection and information that they provide us

1  is privileged.  It's a hard topic in a case of this

2  complexity.

3      Mr. DeBacker was prepared as best he could.

4  Mr. DeBacker was in a peculiar personal situation where

5  he was coming back from his wife's surgery and just

6  didn't have the amount of time that he could fully

7  prepare on 25.  And there were certain questions asked

8  during the deposition which suggested that Extreme may

9  have, you know, destroyed documents or done something of

11:54AM 10  that sort, and which is what really got us worried about

11  where plaintiffs are going with 25 because we are a

12  hundred percent sure none of that has happened.

13      So, we -- we recognized the gravity of this

14  topic, and, therefore, we tried to prepare Mr. Ajmera.

15  And, again, this is not -- like, IT is not Mr. Ajmera's

16  forte.  We tried to prepare him, and we were not

17  confident that he would be able to provide testimony

18  which would not end up in front of Your Honor that

19  somehow he was unprepared.  It's a hard topic.

11:55AM 20      Topic 9 was another reason why we had to pull

21  him back because we were not able to understand how 9 is

22  different from 25.  And we recognize that we had not

23  designated him on 9.  And we wanted to understand from

24  plaintiffs, how are 9 and 25 different so that next

25  person who is designated can be designated on both and

1    then we can call these topics done.

2         So that's why we had to pull Mr. Ajmera off at

3    the last minute because we did not want to have three

4    tries on the same topic.  I understand that it could

5    have been frustrating for plaintiffs.  But I think it

6    would have been more frustrating for them had they

7    actually asked the questions, burned the time and then

8    realized he was not prepared.  So --

9         THE COURT:  So, have you had the discussions on

11:56AM  10   the scope of those topics so that you can find the

11   appropriate person to designate?

12        MR. PRABHAKAR:  The interplay between 9 and 25,

13   we sent an e-mail to plaintiffs the day we pulled

14   Mr. Ajmera back on this topic.

15        THE COURT:  On the 9th.

16        MR. PRABHAKAR:  On 9.  Can you explain to us --

17   the way we understand it, 9 and 25 seem to be, you know,

18   the same scope, at least the agreed-upon part of 9,

19   which was not in dispute before Your Honor.  And if

11:56AM  20   plaintiffs tell us, okay, they're the same scope,

21   they're good, the next witness we can prepare for it.

22        And it's most likely going to be Mr. Fitzgerald

23   and it's not going to be Mr. Hutchins.  But, again, some

24   of this kind of gets resolved as we get into the depo

25   prep mode and see if the witness can gather enough

1  information within the company to be prepared about

2  this.

3            So we expect 9 and 25 to be addressed together,

4  most likely with Mr. Fitzgerald.  But, really, the

5  expectation here was that we did not want to put up

6  another witness that plaintiffs then would say was

7  unprepared.

8            And I don't know if, like, the delta is like --

9  it seems like now plaintiffs are over-prepared in terms

10 of having done their work twice.  But, really, I

11 think --

12           THE COURT:  I think it's more in terms of

13 scheduling.

14           MR. PRABHAKAR:  Yes, Your Honor.

15           THE COURT:  If there is going to be a person

16 outside of Fitzgerald or Hutchins, where is that going

17 to be worked in?

18           MR. PRABHAKAR:  I don't expect this to be a

19 person outside of Mr. Fitzgerald or Mr. Hutchins, Your

20 Honor, because, frankly, this is a topic that it's

21 virtually hard to find any single person in Extreme who

22 actually, as a part of their job, knows everything that

23 was done in the context of discovery.  Because there are

24 repositories that engineering knows about, there are

25 repositories that marketing knows about, that finance

knows about.  There is not a single IT person that knows

about all of them.  And then there are efforts to

collect documents, a large part which tends to be

privileged.  But we also wanted to be forthcoming in

terms of what we did because we didn't want any, you

know, blemish on our document collection and production

efforts.

So, it's a hard topic to prepare a witness on,

and -- but we will not push this beyond Mr. Fitzgerald

or Mr. Hutchins.  And I'm almost more than 50 percent

sure it's going to be Mr. Fitzgerald because his

function at least sits in the organization at a place

where he has insights into multiple teams and he's more

likely than not to be able to get this information.

So it was done out of an abundance of caution

that we didn't want to waste plaintiffs' time again, but

not meant to, like, surprise them in any way.

THE COURT:  Okay.  All right.  Well, with that,

Mr. Wood, it sounds like topics No. 9, the second

subpart, and 25 will not -- will likely be

Mr. Fitzgerald.  So that would fit in to the schedule

that's proposed.  So the Court's inclined to go with

this schedule at this point.

MR. WOOD:  Okay.  Could we update the Court on

Extreme's agreement for 9 and 25 with Mr. Fitzgerald and

1    when those dates --

2              THE COURT:  Yes.  Have you responded to his

3    e-mail of the 9th asking for clarification on 9 and 25?

4              MR. WOOD:  I believe we did.

5              MR. PRABHAKAR:  I don't see that, Your Honor,

6    but I think if Mr. Wood can represent right now that 9

7    and 25 are coterminous, I think that will just

8    short-circuit us going back and forth on this.

9              MR. WOOD:  Yeah, I think we said they overlap,

11:59AM 10   and we were fine to have one witness cover both.  It

11   wasn't a problem.  So that's what we said on the 9th.

12             THE COURT:  Okay.  Well, let's just then go

13   with this schedule and with the anticipation that it

14   will be Mr. Fitzgerald on the remaining part of 9 and

15   for 25.

16             Okay.  So, that's all I had on the list today.

17   You all have a lot to do.  So, is there anything else we

18   need to take up at this time, Mr. Prabhakar?

19             MR. PRABHAKAR:  Couple of things, Your Honor.

20             THE COURT:  Okay.  That's fine.

21             MR. PRABHAKAR:  Hopefully it will not take a

22   lot of time.

23             Just based on the meet and confers that we're

24   having and we're supposed to have, we anticipate there

25   might be additional disputes.  I think what Your Honor

1  did last time in February with setting this date --

2          THE COURT:  Let's be more positive.

3          MR. PRABHAKAR:  I wish, Your Honor.  But we

4  already have two disputes that are at an impasse.

5          But I think what Your Honor did in February,

6  which was proactively set a date that the parties could

7  then work together, we would appreciate if we could have

8  a tentative date set for the next hearing.  And if it

9  turns out that, you know, both parties for a change get

12:00PM  10  along and have everything, we can inform the Court and

11  then we could make it that date.  But I thought what we

12  did last time was very, very helpful for both parties,

13  in terms of teeing up the issues before the Court.

14          THE COURT:  Mr. Wood.

15          MR. WOOD:  So an important issue for us is the

16  reopening of Topic 9 --

17          THE COURT:  9, uh-huh.

18          MR. WOOD:  -- which we think Mr. DeBacker

19  certainly was not prepared on the written discovery.

12:01PM  20  And Extreme's arguing the scope didn't cover that.  And

21  that's been briefed before you, but our -- what we're

22  trying to do is:  We want to question a 30(b)(6) witness

23  on the facts in their interrogatory responses.  And, so,

24  right now we're being prohibited from doing that because

25  that's an open issue.  And if we go forward with

 1  Mr. Fitzgerald, he's covering all the rest of these
 2  topics.  It -- it's going to be -- it's going to cause
 3  us a problem because we'll want to ask him about the
 4  facts.  They will say that's out of scope because it's a
 5  fact in an interrogatory.  And then they're going to
 6  say, well, but yet it was already covered, which is
 7  really their argument, even though he wasn't up for
 8  that; he wasn't up for the facts in the interrogatories.
 9          So, if we are going to have a hearing and Your
10  Honor thinks a hearing is necessary to resolve the
11  briefing on Topic 9, we would like to do it sooner
12  rather than later so that maybe we could get that
13  resolved before Mr. Fitzgerald's deposition.
14          THE COURT:  Okay.
15          MR. PRABHAKAR:  Your Honor, I don't want to
16  comment on Topic 9 which has been fully briefed before
17  the Court.  I don't want to argue that motion.
18          THE COURT:  You said you have another issue,
19  though.
20          MR. PRABHAKAR:  Yes, I do.  And it's -- as Your
21  Honor probably has figured out, it's my favorite issue,
22  which is the prior litigation materials.
23          THE COURT:  Uh-huh.
24          MR. PRABHAKAR:  And we are going to meet and
25  confer with plaintiffs.  What I'm hoping is for us to

1  get some guidance from the Court so that this is not an

2  open-ended process.  These are really critical

3  documents.

4        We have consent from Avaya.  I have talked to

5  counsel for Nortel.  He is waiting to get the

6  notification for production of the documents.  And he

7  has represented to me that once they get the

8  notification, Nortel would promptly respond, noting that

9  they are not going to intervene or prevent the

12:03PM  10  production of these documents.  But where we are stuck

11  right now is, they haven't received notice for the

12  production of these documents.

13        The prior litigation materials, even though

14  they seem numerous, right now, we think the scope of our

15  request has collapsed into two unique categories or

16  three unique categories; expert reports, deposition

17  transcripts of plaintiffs' fact witnesses, and

18  deposition transcripts of the expert reports that are

19  requested.  So we could actually put the deposition

12:04PM  20  transcripts for experts in the same bucket as expert

21  materials.  And then the third material is sealed court

22  filings.

23        Based on the lists --

24        THE COURT:  I'm sorry; what was the last one?

25        MR. PRABHAKAR:  Oh, sealed court filings, Your

1    Honor.

2           THE COURT:  Okay.

3           MR. PRABHAKAR:  So, the problem right now is

4    information asymmetry, both for the Court and for us,

5    because Your Honor ordered plaintiffs to produce the

6    list, which, I think, would have been a really helpful

7    exercise in getting this to resolution.  But we sent the

8    list to the Court.  I'm happy to put it up again.  But

9    the list just does not have the information,

12:04PM 10    substantively, at least, on the Avaya side to help us

11    make a decision on what is not relevant.

12           So, what we are hoping, Your Honor, and this is

13    just a proposal to see if we can get this issue

14    resolved, is that based on the lists that the Court

15    ordered plaintiffs to produce and then we identified

16    what was wrong with those lists and plaintiffs had a

17    second chance to supplement those lists.  So I think

18    that the universe of lists should be considered done.

19    And now we have identified materials to the plaintiffs

12:05PM 20    based on the contents of these lists that we think are

21    relevant to this case and are important for us to have.

22           In the meet and confer process, Your Honor,

23    what we would like is that plaintiffs now tell us which

24    expert reports or which of their fact witness

25    transcripts are irrelevant.  Once we have that

1    information, we may agree with part of that, we may

2    disagree with part of that, and we will provide them our

3    reasons.  And then whatever is in dispute either the

4    Court hears why plaintiffs think it's irrelevant, why we

5    think it is relevant.

6           But then once that process is done, hopefully

7    we come up with a list that both sides agree that, okay,

8    we'll drop these expert reports; they seem totally

9    unimportant, you know, irrelevant.  But at least we have

12:06PM 10    a firm date when the Court can weigh in on specific

11    documents or specific expert reports or transcripts and

12    not have us meet and confer document by document

13    because, really, it's the expert reports.  If the expert

14    report is relevant, all the associated exhibits are

15    relevant and the expert's transcripts are relevant.  If

16    the expert report is irrelevant, it's not like we're

17    going to ask, this exhibit seems interesting, let's have

18    that.

19           So, we're just hoping to put together an order

12:07PM 20    process so that plaintiffs don't think we're wasting

21    their time meeting and conferring.  We don't feel that

22    plaintiffs are trying to run out the clock on giving

23    notice, and we can just, like, litigate this case fairly

24    and without us -- you know, the parties getting into

25    each other's motives and just focusing on the substance.

1        So, that's my request, Your Honor. But if the

2    Court has any other directions, I'm happy to take that

3    as well. But that's what I thought would be a fair way

4    to get this issue resolved and off your plate,

5    hopefully, or in your plate in a narrowly-focused manner

6    because right now the lists just don't do justice in

7    terms of us being able to make an assessment of what we

8    should drop.

9        THE COURT: Okay. Mr. Wood.

12:07PM  10        MR. WOOD: So, Your Honor, last Friday, as we

11    told the Court, we started producing documents we

12    have from the Avaya materials, and we've produced some

13    expert reports, and whatever we -- if we produced an

14    expert report, we also produced their deposition

15    transcript and we produced the exhibits. So we weren't

16    picking and choosing. And we did the whole -- the whole

17    set.

18        And then we also -- two days ago, we did

19    another production and produced the individual

12:08PM  20    transcripts, deposition transcripts and all the exhibits

21    for those transcripts. So -- and these are out of the

22    set that they have requested.

23        We have been trying to have a conversation with

24    them about what's relevant and what's not, and we think

25    a lot of the experts probably aren't relevant.

THE COURT: And the Court had asked the parties
to meet and confer on this.

MR. WOOD: Yes. And, so, when we -- their
response to us has simply been we want everything we
asked for. So if they're now saying we really want to
have a discussion on relevance, we would -- we would
welcome that. We would be glad to sit down and go
through.

We're going to -- we've also now received a
response from Nortel Canada, and they have agreed that
we can produce documents, the documents that they
submitted to the litigation, which I think should clear
up a lot of the Nortel issues. We haven't started that
process yet. We just got that this -- just a couple of
days ago. So -- but, yes, we'd be glad to sit down and
go through it with them because we don't -- we think a
lot of the things they're asking for aren't relevant.

I think we do have an issue. Last time
Mr. Prabhakar said they're not interested in source
code, and it would -- the source code reports are pretty
big in all these, and, so, to look at them and review
them is a burden. And if they don't need that, and I
think what he said is, well, I didn't really -- I was
saying that if there wasn't permission. But our
understanding of that, that wasn't really necessary. So

1  we -- that would be a big help for us if we can leave

2  that -- those source code reports out for someone else's

3  source code.  So -- I mean, it was SNMP Research source

4  code in someone else's product is what they're related

5  to.

6           So, we're happy to sit down and go through the

7  remaining stuff and produce, but we've already -- we've

8  already started the process.  We just haven't gotten any

9  agreement.  So we've just picked what we thought was

10 relevant and then we'll have to discuss the rest.

11          THE COURT:  Okay.  Well, it sounds like there

12 does need to be some more discussions on this to try to

13 narrow whatever issues there may be with regard to this

14 production.  So continue that and have that discussion;

15 the relevancy as well.

16          MR. WOOD:  Okay.

17          MR. PRABHAKAR:  Yes, Your Honor.  And, really,

18 the question, Your Honor, is the information asymmetry.

19 So, if it was clear from the list what the report

20 relates to, it would have made life much easier in terms

21 of dropping our demands.

22          On the source code side, Your Honor, I don't

23 want to rehash what I said at the last hearing because

24 the transcript speaks for itself, but I have talked to

25 Avaya's in-house counsel, I have talked to Nortel's

outside counsel, and both of them have told me about source code that those expert reports, the majority of the source code in those expert reports was SNMP Research's source code that also relates to the registered copyrights because it's the same copyrights that were at issue in both cases.

And I can -- based on the source code expert report that even we have received, it bears out that their source code expert has been focused on SNMP Research source code in our products. There isn't free-ranging discussion of source code of our products that has nothing to do with SNMP Research or that Extreme independently developed.

So, if it's their source code, then that's really relevant to this litigation because it's the same registration. So I wanted to give Your Honor some comfort that it's not that I'm changing my position in a way that I'm asking for something that I had given up before because the last time the concern was that we're not asking for production of third-party source code. But, in this case, it even looks like the third parties are not concerned about production of their source code since it's so dated, particularly the Nortel stuff.

THE COURT: So how -- but you have -- but Mr. Wood is getting that. I'm trying to figure out the

avenue for getting this information.  Are you asking
Mr. Wood to get it?

MR. PRABHAKAR:  He is the only person who has
it, Your Honor, at this point in time because we just
have a list, and the list which we sent to the Court
just reads like -- you know, for example, I'll just put
it up so that --

THE COURT:  I understand.  But you said you've
talked with their counsel.  They're okay with that?

MR. PRABHAKAR:  Yeah.  And I told them -- and,
in fact, Avaya's counsel sent an e-mail to them saying
everything that was in their list, including source
code, we're okay with that.

THE COURT:  Okay.  Is there any problem then
from your standpoint, Mr. Wood, if their counsel has
said it's fine?

MR. WOOD:  No, we can produce it.  I think it
still just goes back to the relevance and burden
question.

THE COURT:  How much of a burden is it if you
already have it?

MR. WOOD:  Well, they're still going through
it.  I mean, to produce -- it was probably -- each
production that we made in the Avaya stuff was a day to
go through the documents.  We did find some privileged

materials in there because they were our files that we

had.  So there were some other things in there.  So, I

mean, we have to go through the documents.  It's not

like we just have it and we just give it to them.  I

mean, we need to go through it and actually do the

production process.

So -- and the source code reports are pretty

big and they have a lot of extra files.  So they would

be some of the more burdensome ones to produce.  And if

they're not important to the litigation, I think

Mr. Prabhakar last time was willing to say, I don't need

that; I just want the other stuff.  So, if that's the

least important, then we would not do it because of the

burden because we've got a lot of other things to do.

MR. PRABHAKAR:  We're fine with production in

PDF format instead of going through the whole process

where they would convert it to an image or whatever.

Produce them in PDF if that reduces the burden because

of the size of the document.

MR. WOOD:  It's not the physical production

process; it's the reviewing of the documents, making

sure we've looked at it and we know what's in there,

there is not something else in there, there is not some

attorney notes or something like that.

THE COURT:  And you said you found some

1  privileged material in looking through some?

2          MR. WOOD:  Yes.

3          MR. PRABHAKAR:  I mean, if -- that may be

4  related to the way they have organized their documents.

5  But I don't understand how a report that's been

6  submitted in a case would have privileged information

7  unless --

8          MR. WOOD:  Well, because it was in our files.

9          THE COURT:  Don't talk over each other.  We

12:15PM 10  have a court reporter.

11          So, I would have the same questions because I

12  don't have the full understanding of that.  So you all

13  need to discuss this further.  Share your conversations

14  that you've had with counsel with Mr. Wood and let

15  Mr. Wood explain to you, like, what he would have to go

16  through.  You can have the relevancy discussions and

17  then see where you get --

18          MR. PRABHAKAR:  Yes, Your Honor.

19          THE COURT:  -- with that.

12:16PM 20          MR. LEE:  Your Honor, on the relevancy

21  discussions, I mean, I've participated in already one

22  meet and confer on this, and the problem -- and

23  Mr. Prabhakar is very smart, smarter than I am, about

24  the asymmetrical aspect of the information that's

25  available.  And what I mean -- or what I understand that

to be is:  We get on a meet-and-confer call and we go

through this list, and they say, explain to us how this

is relevant, and we're looking at this list.  I can't

tell what it is.  It's very hard for us to explain the

relevance because we're looking in the dark here.  And

that's why we're asking, look, you guys are looking at

this; tell us what you think is clearly irrelevant here

and why and then we will narrow down the universe in

which we can do this.  But this back and forth, you tell

12:17PM  me why it's relevant; I can't; you tell me why you think

it's irrelevant, we're just talking loops around each

other.

        THE COURT:  And, well, what I heard today

Mr. Wood say is you haven't had that discussion yet.

        MR. PRABHAKAR:  Actually, Your Honor, we did,

and I think it's in the report that we submitted to the

Court where we just asked them, why don't you tell us

what you're producing and then that limits the universe

of what we have to discuss, and they wouldn't give us

12:17PM  that list.

        They have produced some documents, but I don't

know if the production's complete, so that it would be

helpful to actually meet and confer about stuff that

they think they don't want to produce because of burden

or irrelevance.  And that's the information that's been

1 lacking from our end because we identified what we

2 thought was relevant based on the list that was provided

3 based on some additional research that we did in those

4 dockets.

5           So, really, I think we've kind of done our

6 diligence.  But I understand we need to discuss with

7 Mr. Wood.  But what Mr. Lee said was really that we

8 can't set forth any more on relevance than we already

9 have, and we need information from them and we need

12:18PM 10 cooperation from them so that if we ask them, okay,

11 which ones are you now producing and the next time

12 you're producing any so we don't waste time discussing

13 that.

14           THE COURT:  Can you all meet in person on that

15 and go through the sheet?

16           MR. WOOD:  Yes, we'll be glad to talk to them

17 about what we think is relevant and not relevant, Your

18 Honor, and then --

19           THE COURT:  Okay.  And I think you all need to

12:18PM 20 do that in person and not over the phone.

21           MR. WOOD:  Okay.

22           THE COURT:  Okay.  Let me take just a

23 five-minute recess and make sure there is not anything

24 else I need to address with the parties.  So, I'll be

25 right back.  We'll stand in a brief recess.

```
 1            THE COURTROOM DEPUTY:  All rise.  This
 2  honorable court stands in recess.

 3            (A brief recess was taken.)

 4            THE COURTROOM DEPUTY:  Please be seated.  This
 5  court is again in session.  Please come to order.

 6            THE COURT:  So, the only thing that I wanted to
 7  advise the parties with, I guess, a potential discovery
 8  dispute that may be forthcoming that Mr. Prabhakar
 9  mentioned, include that, the status of your discussions
10  on that in that report that the Court is to receive next
11  Wednesday.  I'll look at that.  And then if it's
12  necessary to get the parties together, I'll
13  have -- we'll reach out to you at that time to schedule
14  a date for that.  Because Mr. Prabhakar was asking for a
15  date, but given some stuff I have on my calendar, I'll
16  just -- I'll need to reach out to you just to schedule
17  that once I know what I'm dealing with or need to
18  address.

19            MR. PRABHAKAR:  Yes, Your Honor.  And I
20  appreciate Your Honor's -- the willingness to indulge my
21  requests a lot, but I also know from both your calendar
22  and Mr. Lee how much you have on your plate.  I just
23  want you to know I know that and I acknowledge that.  So
24  I'm very grateful for what we get from you.
25            THE COURT:  And I'm happy to try to resolve
```

1  these.  So I'll see what we're dealing with next week

2  and where we're at.

3        Okay.  So, thank you all for coming in today.

4  I hope you all have some fruitful discussions this

5  afternoon so you can start getting your case ready to be

6  tried.  All right.  Thank you.

7        MR. WOOD:  Thank you, Your Honor.

8        MR. PRABHAKAR:  Thank you, Your Honor.

9        THE COURTROOM DEPUTY:  All rise.  This

12:30PM  10  honorable court is adjourned.

11             (Which were all the proceedings had and

12              herein transcribed.)

13                  *  *  *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C-E-R-T-I-F-I-C-A-T-E

2    STATE OF TENNESSEE

3    COUNTY OF KNOX

4           I, Teresa S. Grandchamp, RMR, CRR, do hereby

5    certify that I reported in machine shorthand the above

6    proceedings; that the foregoing pages were transcribed

7    under my personal supervision and constitute a true and

8    accurate record of the proceedings.

9           I further certify that I am not an attorney or

10   counsel of any of the parties, nor an employee or

11   relative of any attorney or counsel connected with the

12   action, nor financially interested in the action.

13          Transcript completed and signed on Monday,

14   April 14, 2024.

15

16

17

18

20          _____
             TERESA S. GRANDCHAMP, RMR, CRR
21           Official Court Reporter

22

23

24

25
```