UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) No. 3:20-CV-451-CEA-DCP ) |
| EXTREME NETWORKS, INC. | ) ) |
| Defendant. | ) ) |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is the Supplemental Brief Regarding Avaya Acquisition and Privilege [Doc. 359], filed by Defendant Extreme Networks, Inc. ("Extreme"). Plaintiffs SNMP Research, Inc. ("SNMPR") and SNMP Research International, Inc. ("SNMPRI") (collectively, "Plaintiffs") responded in opposition to the supplemental brief [Doc. 374], and Extreme filed a reply [Doc. 377]. For the reasons explained below, the Court **FINDS** that Avaya Inc.'s attorney-client privilege, with respect to the networking business, transferred to Extreme, and that Extreme properly withheld the communications at issue.

I.     **FACTUAL BACKGROUND**

The instant dispute relates to Extreme's assertion of the attorney-client privilege with respect to communications to and from Avaya, Inc. ("Avaya"). In the Fall 2023, the parties reported that they had reached an impasse on several issues, including Extreme's privilege assertions. During the parties briefing on Extreme's privilege assertions, on September 12, 2023, Extreme clawed back documents that included communications between it and Avaya [Doc. 355

1

at 5 (citation omitted)]. And nine days later, Extreme asserted privilege on approximately 100 documents between it and Avaya [*Id*. (citation omitted)]. Extreme claimed these communications were protected by the attorney-client privilege because it acquired Avaya [*Id*. at 6].

Prior to filing for bankruptcy, Avaya had three business segments: (1) Unified Communications, (2) Contact Center and Private Cloud Solutions, and (3) Networking [Doc. 334 p. 19 (citations omitted)]. Extreme asserts that "Avaya had planned to split the company by selling the Networking business and the Contact Center and Private Cloud Solutions business separately, and creating a new Avaya from its remaining Unified Communications business" [*Id*. (citations omitted)]. According to Daren Dulac ("Dulac"), Extreme's Senior Director of Corporate Development and Business Development, in June 2016, Extreme reached out to one of Avaya's creditors to express interest in acquiring the networking business [Doc. 334-26 ¶ 3]. In response, the creditor sent Extreme a slide deck entitled "Avaya Networking July 2016" [*Id*. ¶ 4 (citation omitted)]. Dulac states, "Extreme was interested in acquiring Avaya's networking business in its entirety. Extreme had no intention to enter into any kind of ongoing collaboration or joint venture or partnership related to the networking business with the remainder of Avaya's business" [*Id*. ¶ 6]. Dulac submits that "[o]n March 7, 2017, Extreme and Avaya entered into an agreement for Extreme's acquisition of Avaya's networking business" and that "Extreme closed its acquisition of Avaya's networking business in July 2017" [*Id*. ¶¶ 7, 8]. Dulac explains, "After closing, employees of Avaya's networking business became employees of Extreme, Avaya's networking products became Extreme's products, customers of Avaya's networking business became customers of Extreme, and Extreme's customer support team started supporting those customers" [*Id*. ¶ 8].

2

## II. PROCEDURAL BACKGROUND

On November 1, 2023, the parties appeared before the Court over Extreme's privilege assertions.[1] Relevant here, as it relates to the Avaya communications, Plaintiffs argued:

> [T]hrough a bankruptcy sale in 2017, Avaya sold some of its assets to Extreme. In about 100 documents, Plaintiffs submitted that there is only one attorney-client communication, which is a communication between Avaya and its in-house counsel, Richard Hamilton, III. Plaintiffs claimed that Avaya's disclosure of this communication to Extreme, even as part of an asset sale, waives that privilege. Plaintiffs also challenged Extreme's argument that a transfer of control of Avaya warrants transferring the attorney-client privilege. Asserting that the facts do not support that Extreme has control over Avaya, Plaintiff noted that Extreme only "purchased a division of the Avaya assets." Plaintiffs concluded that Extreme had not met its burden in showing that the attorney-client privileged had been transferred to it.
>
> With respect to the remaining emails between Avaya and Extreme, Plaintiffs argued that "all of them are between Extreme employees and Avaya and Luxoft employees." Plaintiffs argued that the "privilege only extends to agents of lawyers who are employed to provide legal advice." Citing to the asset purchase agreement between Avaya and Extreme, Plaintiffs stated that by its express terms, "this particular sale did not obligate either party to waive privilege."

[Doc. 355 at 6–7 (citations omitted)].[2]

Extreme responded that the dispute boiled down to whether it "purchase[d] enough of the business or the division from Avaya such that they became the transferee or the inheritor or the acquirer of the attorney/client privilege" [*Id*. at 7 (citation omitted)]. In other words, Extreme noted, the question is whether it bought control of Avaya [*Id*. (citation omitted)].

---

[1] The Court also addressed Extreme's privilege assertions over its communications with Brocade Communications Systems LLC.

[2] The reference to "Luxoft" is to Luxoft Global Operations GmbH [*See* Doc. 334 p. 26].

During the hearing, the Court ordered the parties to file supplemental briefs addressing "[w]hether there was a transfer of privilege from Avaya and Extreme, and . . . Extreme's claim of privilege with respect to Avaya's employee communications" [*Id*.].

Extreme filed its brief on November 15, 2023 [Doc. 334], and Plaintiffs filed their brief on December 15, 2023 [Doc. 347]. According to Extreme:

> [T]hese communications involved (1) pre-acquisition internal communications within Avaya's networking business for the purpose of gathering information requested by Avaya's in-house counsel to render and implement legal advice (related to Avaya's litigation and settlement with SNMPR) and (2) post-acquisition communications between Extreme and its agents for gathering the same information requested pre-acquisition by in-house counsel[.]

[Doc. 334 pp. 6–7]. With respect to pre-acquisition communications, Extreme asserted that when it acquired a part of Avaya's business, Avaya's attorney-client privilege transferred to Extreme [*Id.* at 18]. The post-acquisition communications, Extreme contended, were protected by Extreme's attorney-client privilege [*Id.* at 25]. Extreme explained that "[t]he post-acquisition communications continued the pre-acquisition privileged communications that were initiated by Richard Hamilton III, Avaya's in-house counsel" [*Id.*].

On February 23, 2024, the Court entered a Memorandum and Order, stating:

> [E]ven if the Court were to find that Extreme acquired Avaya's networking business, the undersigned does not have sufficient information from the parties as to whether this means that Extreme only holds the privilege with respect to Avaya's networking business, as opposed to Avaya as a whole. And if Extreme only holds the privilege with respect to Avaya's networking business, the Court does not have sufficient information (and in fact, has contrary information) regarding whether the subject documents are within the scope of that business.

[Doc. 355 p. 26]. The Court therefore ordered additional briefing on two issues: (1) to the extent the Court finds that Extreme acquired Avaya's networking business, does Extreme hold the

4

privilege only with respect to Avaya's networking business, and (2) do the communications at issue relate to Avaya's networking business.

### III. POSITIONS OF THE PARTIES

Extreme states that "[t]he answer to both questions is yes" [Doc. 359 p. 2]. It does not claim to hold the attorney-client privilege over "communications relating to other businesses or divisions of Avaya" [*Id*.]. According to Extreme, "[m]ultiple courts have recognized that a party that acquires a division of or a business within a company also acquires privilege over communications related to that division or business, though not necessarily over other parts of the company" [*Id*. at 3 (citation omitted)].

In addition, Extreme claims that "[a]ll of the communication at issue—four email chains comprising 100 individual documents—relate to and were part of Avaya's networking business" [*Id*. at 4]. In support of its argument, Extreme largely relies on the Declaration of Michael J. Fitzgerald [Doc. 359-5]. According to Extreme, Plaintiffs' argument "that the communications could not have involved the networking business because the settlement agreement between SNMPR and Avaya was not among the contracts transferred to Extreme in the acquisition . . . is irrelevant to this dispute" [Doc. 359 pp. 6–7].

Plaintiffs agree that Extreme can only claim privilege with respect to Avaya's networking business, and not its business as a whole [Doc. 374 p. 2]. But it argues that "Extreme has not carried its burden to prove that the four email threads at issue actually relate to the networking business that Extreme purchased from Avaya, rather than to Avaya's settlement with Plaintiffs that was expressly excluded from Extreme's acquisition of Avaya" [*Id*.]. They assert that "Extreme's own brief makes clear, all of the clawed-back communications ultimately concern Mr. Hamilton's efforts to render legal advice related to a settlement and license between Avaya Inc. and Plaintiffs"

5

[*Id*. at 3 (emphasis omitted)]. According to Plaintiffs, "the sale agreement governing Extreme's purchase of the networking division from Avaya Inc. expressly excluded from the sale the settlement and license between Avaya Inc. and Plaintiffs" [*Id*. at 4 (emphasis and footnote omitted)]. Plaintiffs assert therefore "[a]ny 'privilege' with respect to Mr. Hamilton's rendering of legal advice would have necessarily involved Avaya, Inc., and such privilege thus did not transfer to Extreme when it purchased the networking division" [*Id*.]. Plaintiffs assert that the Declaration of Michael Fitzgerald does not support Extreme's argument [*Id*. at 4–5]. They also point out that Extreme has claimed privilege over an email that "was half a year after Extreme bought Avaya's networking division [*Id*. at 5 (emphasis omitted)]. Plaintiffs state that "[t]he four email chains at issue should be produced in unredacted form" [*Id*. at 6].

In its reply brief, Extreme notes that the dispute has narrowed to whether the communications at issue relate to Avaya's networking business [Doc. 377 p. 2]. Extreme maintains that the communications involve Avaya's networking business, and therefore, are protected [*Id*.]. It asserts that "the settlement agreement Avaya entered with SNMPR affected Avaya's networking products, and the communications at issue discuss how the transfer of Avaya's networking products to Extreme was affected by the settlement agreement" [*Id*. at 2–3 (citation omitted)]. Extreme states that "the communications at issue were not about the settlement agreement itself" [*Id*. at 3]. Further, Extreme states that "existing caselaw clearly establishes that transfer of a company's liability is not a prerequisite for transfer of the authority to assert privilege over that company's communications" [*Id*. at 4 (citations omitted)]. With respect to the emails Plaintiffs pointed out that were sent half a year after the acquisition, Extreme states that it "has already explained that Avaya (and Luxoft) acted as Extreme's agents facilitating the provision of legal advice during this period" [*Id*. at n.1]. Extreme states, "The Court should, therefore, find that when

Extreme acquired Avaya's networking business, it acquired the authority to assert privilege over communications regarding that business, and consequently, that the communications at issue are protected by Extreme's attorney-client privilege" [*Id*. at 5].

IV. ANALYSIS

In *Reed v. Baxter*, 134 F.3d 351, 355–56 (6th Cir.1998), *cert. denied by* 525 U.S. 820 (1998), the Sixth Circuit Court of Appeals set forth the elements of the attorney-client privilege as follows:

> (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection is waived.

Courts narrowly construe the attorney-client privilege, "because it 'reduces the amount of information discoverable during the course of a lawsuit.'" *Carhartt, Inc. v. Innovative Textiles, Inc.*, 333 F.R.D. 113, 116 (E.D. Mich. 2019) (citing *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)). "In the corporate context, the attorney-client privilege may extend to communications between employees that convey legal advice given by an attorney to the corporation." *Ajose v. Interline Brands, Inc.*, No. 3:14-CV-1707, 2016 WL 6893866, at *8 (M.D. Tenn. Nov. 23, 2016) (citing *Broessel v. Triad Guar. Ins. Corp.*, 238 F.R.D. 215, 219 (W.D. Ky. 2006)); *see, e.g., McCall v. Procter & Gamble Co.*, No. 1:17-CV-406, 2019 WL 3997375, at *4 (S.D. Ohio Aug. 22, 2019) ("In the corporate context, the attorney-client privilege extends to communications, between non-attorney employees, made to obtain or relay legal advice."). "The person asserting the privilege has the burden of establishing its existence." *In re Columbia/HCA Healthcare Corp.*, 192 F.R.D. 575, 577 (M.D. Tenn. 2000) (citation omitted), *aff'd sub nom. by In re Columbia/HCA Healthcare*

7

*Corp. Billing Pracs. Litig.*, 293 F.3d 289 (6th Cir. 2002). Disclosure to a third party generally waives the attorney-client privilege. *Id*. (citation omitted).

In determining whether Extreme acquired Avaya's attorney-client privilege, the Court must determine whether these parties were involved in an asset sale or an acquisition. *Lynx Servs. Ltd. v. Horstman*, No. 3:14CV01967, 2016 WL 4565895, at *2–3 (N.D. Ohio Sept. 1, 2016). If the transaction was an asset sale, Extreme does not acquire the privilege. *Id*. at *2 ("A mere transfer of assets, which, in contrast, does not involve a transfer of control or management, does not effect a transfer of the privilege." (citation omitted)); *see also Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F. Supp. 2d 995, 1002 (N.D. Ill. 2008) ("The cases agree that a mere transfer of some assets without more does not transfer the attorney-client relationship." (collecting cases)). If the transaction was an acquisition, Extreme does acquire the privilege. *See Lynx Servs. Ltd.*, 2016 WL 4565895, at *2 ("[A] merger or acquisition involves the transfer of control or management and, generally along with it, a transfer of the privilege." (citation omitted)).

The analysis relating to a transfer of privilege "generally turn[s] on the particular facts and circumstances of the transfers and relationship between the predecessor and successor organization." *Parus Holdings, Inc.*, 585 F. Supp. 2d at 1002. Courts should examine "the practical consequences rather than the formalities of the particular transaction." *Id*. (quoting *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004)). As explained in *Soverain Software LLC*:

> If the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management, the authority to assert or waive the attorney-client privilege will follow as well.

340 F. Supp. 2d at 763.

Extreme did not purchase the entirety of Avaya's business, which it acknowledges. The question therefore before the undersigned is whether Extreme's acquisition of only a division of Avaya's business is sufficient to transfer the privilege. *Soverain Software LLC*, 340 F. Supp. 2d at 763 (explaining that the "bright-line rule does not apply equally to the myriad of ways control of a corporation or a portion of a corporation can change hands"). And courts recognize that the attorney-client privilege can pass "even though only a portion of the assets were transferred." *USI Ins. Servs., LLC v. Ryan*, No. 1:14-CV-151, 2014 WL 3054278, at *5 (N.D. Ind. July 7, 2014) (collecting cases).

The Court finds *UTStarcom, Inc. v. Starent Networks, Corp.*, No. CIV.A. 07-CV-2582, 2009 WL 4908579, at *1 (N.D. Ill. Feb. 20, 2009) helpful. In that case, the court determined that the attorney-client privilege transferred to the plaintiff, even though it bought only a division, CommWorks, of a company. *Id*. at *5. The court initially noted that there were several facts indicating that the plaintiff merely acquired selected assets rather than a business in its entirety, which would support the conclusion that the privilege was not transferred. *Id*. at *4. For instance, CommWorks was "not a separate legal entity[,]" it "did not operate autonomously" with respect to finances, and it "shared significant functions" with the larger company. *Id*. The court went on to find that, despite those facts, there were "several more controlling facts [to] support the conclusion that [the plaintiff] purchased and continued to operate a distinct business unit." *Id*. For instance, CommWorks was a distinct segment of the larger corporation, many of the employees were now the plaintiff's employees, the majority of high-level employees stayed on with the plaintiff, and "CommWorks had its own officers, operating management, [g]eneral [c]ounsel, and the like." *Id*. at *5. In addition, the court noted that the plaintiff "continued the operations in the same . . . location, and provided the same products and services to the existing customer base." *Id*.

The plaintiff also acquired "marketing materials, customer files, intellectual property and product plans and specifications[,]" it received "[a]ll transferable licenses and permits," it was assigned all "CommWorks' customer contracts and warrant obligations," and the plaintiff purchased CommWorks' intangible assets, most notably its goodwill." *Id*.

Based on the facts of this case, the Court finds that Extreme has established that it acquired Avaya's networking business such that the attorney-client privilege transfers. Similar to *UTStarcom, Inc.*, there are facts to support a conclusion that Extreme merely acquired assets. For example, the networking business was not a separate legal entity. And other than there were three divisions of Avaya prior to the bankruptcy, Extreme does not provide much detail about how Avaya operated, and specifically, how the networking business operated before the sale.

But the Court finds that Extreme has set forth facts that it purchased and continued to operate the networking business. *Id*. ("The 'practical consequence' test requires a macro view of the transaction."). Here, Extreme purchased Avaya's (1) existing customers and customer records [Doc. 334-29 p. 8], (2) leases, equipment, and intellectual property, [*id*. at 9, 20–25, (3) existing permits, goodwill, and business accounts [*id*. at 9, 12–16, 27]; (4) existing and ongoing contracts [*id*. 16, 25–27]; and (5) the majority of Avaya's employees [*Id*. pp. 25–41; *see also* Doc. 334-26]. In addition, after Avaya's bankruptcy, it emerged as Avaya Holdings Corp., [*see* Doc. 334-12 p. 2], and the documents it filed with the Securities Exchange Commission reflect, "The Networking business was sold to Extreme in July 2017" [*Id*. at 7; *see also* Doc. 334-12 p. 17 ("On July 14, 2017, [Avaya] sold its Networking business to Extreme. Prior to the sale, [Avaya] had three separate operating segments. After the sale, [Avaya] has two operating segments, Products & Solutions and Services")]. While Extreme and Avaya's agreement was titled, "Asset Purchase Agreement" [*see* Doc. 334 p. 21 (citation omitted)], "[w]hen analyzing an agreement to determine

what rights it confers, labels and titles do not control." *Luraco Health & Beauty, LLC v. Tran*, No. 4:19-CV-51, 2020 WL 2747233, at *5 (E.D. Tex. May 27, 2020).

The Court therefore finds Extreme has satisfied its burden in showing that Avaya's attorney-client privilege, with respect to its networking business, was transferred to it. *United States v. Adams*, No. 017CR00064, 2018 WL 1255003, at *3 (D. Minn. Mar. 12, 2018) (finding the transfer of privilege because "[t]he language of the [asset purchase agreements] themselves specifies that Scio acquired all of Apollo's intellectual property rights, website, equipment, machinery, and inventory, as well as numerous other tangible and intangible assets."), *report and recommendation adopted by* No. CR 17-64, 2018 WL 2392009 (D. Minn. May 25, 2018); *see also Parus Holdings, Inc.*, 585 F. Supp. 2d at 1003 (finding the privilege transferred because the plaintiff "acquired the entire division of Vail responsible for developing and marketing the System. Such acquisition was not limited to obtaining rights to the System, but also included taking on employees and managers from the division"). And as the parties acknowledge, Extreme only acquired the privilege with respect to the networking business, and not Avaya as a whole [Doc. 359 p. 2; Doc. 374 p. 2]; *see also Parus Holdings, Inc.*, 585 F. Supp. 2d at 1003 (finding that the plaintiff held the attorney-client privilege over communications related to the division of the business that it acquired).

The parties, dispute, however, whether the communications relate to Avaya's networking business.[3] In support of its argument, Extreme filed the Declaration of Michael J. Fitzgerald [Doc. 359-5]. He was an employee of Avaya from December 2009 to July 2017, and "was a [p]roduct [m]anager in Avaya's networking business with responsibilities for networking products, including

---

[3] The four email chains are identified in Extreme's September 26, 2023 Supplemental Privilege Log as 1331, 1334, 1336, and 1388 [Doc. 359 p. 5 (citing Doc. 334-16 pp. 3)].

11

Avaya's router portfolio" [*Id.* ¶ 2]. "In July 2017, [he] became an employee of Extreme after [it] acquired Avaya's networking business" [*Id.* ¶ 3]. While he was an employee of Avaya, he "had several interactions with Richard Hamilton III, an in-house attorney in Avaya's legal team" [*Id.* ¶ 4]. According to Mr. Fitzgerald, "[a]ll [his] interactions with Mr. Hamilton were related to legal issues about Avaya's networking business" [*Id.*]. Mr. Fitzgerald states, "Mr. Hamilton was responsible for providing legal advice related to the transfer of Avaya networking products inventory and software to Extreme due to the acquisition" [*Id.*].

On July 7, 2017, Mr. Fitzgerald sent Matthew Roman, who would become his supervisor at Extreme, "a memorandum related to Avaya's products, software, and litigations related to certain networking products" [*Id.* ¶ 5; *see also* Doc. 359-6 p. 2]. Mr. Fitzgerald references the litigation between Plaintiff SNMPR and Avaya and identifies the "[n]etworking products" that were affected [Doc. 359–6 p. 7]. He states that "Extreme . . . will not get distribution rights for any of the software images which contain SNMPR software" [*Id.*]. He concludes that "Extreme cannot own or distribute" any of the products he listed and that "Avaya legal (Richard Hamilton) is verifying this inventory is not coming to Extreme" [*Id.*].

Mr. Fitzgerald further explains the unredacted, four email chains as follows:

> 6. I have reviewed an unredacted copy of an email chain bearing Bates number EXTREME-01079442 to EXTREME-01079447.[4] I am copied on this email chain along with Mr. Hamilton. The email chain is about issues surrounding the transfer of certain Avaya networking products and software source code for those products to Extreme.
>
> 7. I have reviewed an unredacted copy of an email chain bearing Bates number EXTREME-01076396 to

---

[4] This email chain is identified on Extreme's Supplement Privilege Log as 1331 [Doc. 334-16 p. 3].

12

EXTREME-01076404.[5] I was added to this email chain on July 12, 2017[,] by Mr. Hamilton. The email chain is about issues related to source code for Avaya's BOSS software. The BOSS software is a network operating system and was used on Avaya's networking products. The BOSS software and Avaya's networking products that used it were transferred to Extreme after it acquired Avaya's networking business.

8. I have reviewed an unredacted copy of an email chain bearing Bates number EXTREME-01076335 to EXTREME-01076345.[6] I was added to this email chain on July 12, 2017[,] by Mr. Hamilton. The email chain is about issues related to source code for Avaya's BOSS and VOSS software. BOSS and VOSS are network operating systems and were used in several Avaya networking products. The BOSS and VOSS software and Avaya's networking products that used them were transferred to Extreme after it acquired Avaya's networking business. Extreme currently uses the VOSS network operating system in its networking products.

9. I have reviewed an unredacted copy of an email chain bearing Bates number EXTREME-01077082 to EXTREME 01077091.[7] I was added to this email chain on July 12, 2017[,] by Mr. Hamilton. The email chain is about issues is related to source code for Avaya's BOSS software and ERS and WLAN products. The BOSS software is a networking operating system and was used in Avaya's networking products, including the ERS series ethernet routing switches. The BOSS software and Avaya's networking products that used it were transferred to Extreme after it acquired Avaya's networking business. Extreme currently sells ERS products containing the BOSS software.

[Doc. 359-5 ¶¶ 6–9].

---

[5] This email chain is identified on Extreme's Supplemental Privilege Log as 1334 [Doc. 334-16 p. 3].

[6] This email chain is identified on Extreme's Supplemental Privilege Log as 1336 [Doc. 334-16 p. 3].

[7] This email chain is identified on Extreme's Supplemental Privilege Log as 1338 [Doc. 334-16 p. 3].

Considering Mr. Fitzgerald's explanation that the withheld emails involved the networking business, the Court finds that Extreme has satisfied its burden in showing that the emails are protected by the attorney-client privilege. Plaintiffs assert that Extreme cannot meet its burden because "all of the clawed-back communications ultimately concern Mr. Hamilton's efforts to render legal advice related to a settlement and license between Avaya Inc. and Plaintiffs" [Doc. 374 p. 3 (emphasis omitted)]. But in Mr. Fitzgerald's July 7 memorandum, he provides a list of products that Extreme cannot own or distribute given the litigation between Avaya and SNMPR [Doc. 359-6 p. 7]. And Mr. Hamilton was to verify that the products were "not coming to Extreme" [*Id*.]. Contrary to Plaintiffs' arguments, "the communications were not about the legal considerations in settling the dispute with SNMPR, the terms of the settlement agreement, or what products should be covered as part of the settlement" [Doc. 377 p. 3]. Instead, "the communications were about how the products of the networking division were affected by the settlement" [*Id*. at 4].

Plaintiffs also argue:

> [T]wo of the one hundred clawed-back Avaya emails that Plaintiffs can read . . . also support the conclusion that Mr. Hamilton was rendering legal advice on behalf of Avaya Inc. Both email chains begin with a January 5, 2018 email from Dan Regan, an Avaya employee, to Sunil Ramu, and Extreme employee. This email was a half a year after Extreme bought Avaya's networking division. Moreover, Mr. Regan contacted Extreme regarding 'Possible SNMPRI content in Bangalore,' expressing concern about files that had been flagged for 'containing the SNMP Research Copyright.' These emails plainly reflect communications initiated by Avaya half a year after the sale to Extreme, which related to Avaya's apparent concerns about its settlement and license with Plaintiffs (which were excluded from the sale to Extreme).

[Doc. 374 p. 5 (citation omitted)]. The unredacted portion of these email strings, however, shows that the content relates to the networking business [*See* Doc. 347-24]. For example, Sunil Ramu,

14

an Extreme employee states, "The GA release files belong to Data Networking (DN) and have been moved to Extreme. Sandesh Singh is managing the transfer of the data from Avaya to Extreme" [*Id*. at 6]. The Court acknowledges that these communications were post-acquisition. But on July 14, 2017, Extreme and Avaya entered into a Transition Services and Limited Agency Agreement, wherein Avaya agreed to provide certain services to Extreme that included, among others, infrastructure software and data transfer [Doc. 334-15 pp. 8, 11–12]. *See Oro BRC4, LLC v. Silvertree Apartments, Inc.*, No. 2:19-CV-04907, 2023 WL 2785743, at *5 (S.D. Ohio Feb. 10, 2023) ("[T]he privilege can also extend to agents of the client."); *U.S. ex. rel. Fry v. The Health All. of Greater Cincinnati*, No. 1:03-CV-167, 2009 WL 5033940, at *4 (S.D. Ohio Dec. 11, 2009) ("As long as the independent contractor has a role similar to that of an employee (such as an independent contractor physician who serves as the chief of cardiology), communications between the contractor and attorneys for the purpose of seeking legal advice are privileged."); *see Dialysis Clinic, Inc. v. Medley*, 567 S.W.3d 314, 324 (Tenn. 2019) (explaining that under Tennessee law and consistent with other jurisdictions, courts should extend the attorney-client privilege to a third-party non-employee who "is the functional equivalent of an entity's employee whose communications with the entity's attorneys are protected by the attorney-client privilege").[8] As Extreme represents, these employees "communicated with each other to provide information requested by Attorney Hamilton to facilitate the rendering of legal advice by him and also to implement legal advice conveyed to them" [Doc. 334 p. 27; *see* also Doc. 334-10, Doc. 334-16].[9]

---

[8] Extreme also notes that several of the emails included Luxoft employees. Avaya and Luxoft originally had a contract of services but the contract was transferred to Extreme when it purchased Avaya's networking business [*See* Doc. 334-14]. "The Luxoft team . . . operated as an extension to Extreme's research and development (R&D) organization for Extreme's Stackable portfolio" [Doc. 334-8 p. 3].

[9] Extreme explains that "[o]n eleven privilege log entries, Attorney Hamilton is not listed as a sender or recipient of the emails chains" [Doc. 334 p. 27 n.8]. It explains that it "produced two

## VI. CONCLUSION

For the reasons explained above, the Court finds that Extreme has met its burden in showing that Avaya's attorney-client privilege, with respect to the networking business, transferred to Extreme and that Extreme properly withheld the documents at issue.

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

such emails with non-privileged portions unredacted and redacted portions showing Attorney Hamilton involved in earlier emails in the chain" [*Id*. (citation omitted)]. "For the remaining emails, the log entries state that the email chain originated with the request for legal advice from Attorney Hamilton, reflecting that he was involved in earlier emails in the chain" [*Id*. (citations omitted)].