# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | § § § | |
| | § | Case No. 3:20-cv-00451-CEA-DCP |
| Plaintiffs, | § § | |
| v. | § § | |
| BROADCOM INC.; BROCADE COMMUNICATIONS SYSTEMS LLC; AND EXTREME NETWORKS, INC., | § § § § | |
| Defendants. | § § | |

## EXTREME NETWORKS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE OPINIONS OF MAHDI ESLAMIMEHR

# TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     LEGAL STANDARD....................................................................................................3

III.    ARGUMENT ................................................................................................................4

        A.      Dr. Eslamimehr Is Qualified to Opine on the Capabilities of Wired
                Switches, and His Opinions Are Both Relevant and Helpful in Evaluating
                Dr. Dhar's Survey Opinions. ..................................................................................4

        B.      Dr. Eslamimehr's Critique of Mr. Bradner's SNMP Testing Is Reliable
                and Grounded in His Expertise. ..............................................................................9

        C.      Dr. Eslamimehr's Critique of Mr. Bradner's Attribution Percentages Is
                Both Reliable and Helpful to the Factfinder in Assessing Mr. Bradner's
                Opinions. ...............................................................................................................15

IV.     CONCLUSION............................................................................................................21

# **TABLE OF AUTHORITIES**

## **CASES**

*3A Composites USA, Inc. v. United Indus., Inc.*,
   No. 14-cv-5147, 2015 WL 11121362 (W.D. Ark. Nov. 10, 2015) .......................................... 12

*Bimbo Bakeries USA, Inc. v. Sycamore*,
   No. 13-cv-749, 2017 WL 1377991 (D. Utah Mar. 2, 2017)...................................................... 8

*Branche v. Zimmer*,
   No. 06-cv-234, 2009 WL 8750012 (E.D. Tenn. Mar. 9, 2009).......................................... 12, 19

*Clark v. Chrysler Corp.*,
   310 F.3d 461 (6th Cir. 2002) ................................................................................................ 12

*Counts v. Gen. Motors, LLC*,
   606 F. Supp. 3d 547 (E.D. Mich. 2022) ............................................................................ 6, 8

*E.E.O.C. v. Tepro, Inc.*,
   133 F. Supp. 3d 1034 (E.D. Tenn. 2015) ............................................................................. 12

*First Tenn. Bank Nat'l Ass'n v. Barreto*,
   268 F.3d 319 (6th Cir. 2001) ................................................................................................ 20

*Gibson Brands, Inc. v. Armadillo Distrib. Enters., Inc.*,
   No. 19-cv-358, 2021 WL 231752 (E.D. Tex. Jan. 22, 2021) ................................................. 5

*Huntzinger v. Coyle*,
   No. 17-cv-184, 2022 WL 95280 (E.D. Ky. Jan. 10, 2022) ................................................... 11

*Kudos Inc. v. Kudoboard LLC*,
   No. 20-cv-5415258, 2021 WL 5415258 (N.D. Cal. Nov. 20, 2021).......................................5

*Lackey v. Robert Bosch Tool Corp.*,
   No. 16-cv-29, 2017 WL 129891 (E.D. Ky. Jan. 12, 2017) ................................................... 21

*Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*,
   441 F. Supp. 3d 745 (S.D. Iowa 2019) ................................................................................ 13

*Mayer v. Louisville Ladder*,
   No. 22-cv-237, 2024 WL 3106900 (W.D. Ky. June 24, 2024) .............................................. 12

*Modern Holdings, LLC v. Corning, Inc.*,
   No. 13-cv-405, 2022 WL 710174 (E.D. Ky. Mar. 9, 2022) .................................................. 21

*Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,
   No. 09-cv-61490, 2011 WL 2295269 (S.D. Fla. June 8, 2011) ............................................ 13

*Rover Pipeline, LLC v. 1.23 Acres of Land*,
No. 17-cv-10365, 2018 WL 3322995 (E.D. Mich. July 6, 2018) ............................................. 12

*Schechner v. Whirlpool Corp.*,
No. 16-cv-12409, 2019 WL 978934 (E.D. Mich. Feb. 28, 2019) ........................................... 4, 5

*Sci. Components Corp. v. Sirenza Microdevices*,
No. 03-cv-1851, 2008 WL 4911440 (E.D.N.Y. Nov. 13, 2008)........................................ 12, 13

*SL EC, LLC v. Ashley Energy, LLC*,
No. 18-cv-1377, 2021 WL 5112943 (E.D. Mo. Nov. 2, 2021) ......................................... 13, 19

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
474 F.3d 288 (6th Cir. 2007) .............................................................................................. 3, 20

*United States v. Cunningham*,
679 F.3d 355 (6th Cir. 2012) ................................................................................................... 11

*Univ. Pitt. v. Townsend*,
No. 04-cv-291, 2007 WL 1002317 (E.D. Tenn. Mar. 30, 2007)............................................. 20

**RULES**

Fed. R. Evid. 702 ............................................................................................................................ 3

Pursuant to Local Rule 7.1, Defendant Extreme Networks, Inc. ("Extreme") submits this memorandum of law in opposition to Plaintiffs SNMP Research, Inc. and SNMP Research International, Inc.'s (the latter, "International, Inc.") Motion to Exclude the Testimony of Mahdi Eslamimehr. *See* Dkt. 457. As established below, Plaintiffs' motion should be denied.

## I.      INTRODUCTION

In support of their claim for copyright infringement and the disgorgement damages they seek, Plaintiffs intend to have Scott Bradner, a technical expert, and Ravi Dhar, a survey expert, offer opinions on which capabilities of wired switches are attributable to the SNMP standard and how important those capabilities are to consumers of wired switches.[1] For his part, Dr. Dhar created a list of 55 different "capabilities" of wired switches and surveyed consumers on the relative value they place on those capabilities. Dkt. 456-1 ("Dhar Rep.") ¶ 13. Mr. Bradner's report serves two separate functions: first, Mr. Bradner tested a selection of Extreme switches to demonstrate how they use the SNMP standard, Dkt. 456-2 ("Bradner Rep.") ¶¶ 163–276; separately, he provided an assessment of "whether and to what extent" the capabilities of wired switches from Dr. Dhar's survey are "attributable to" the SNMP standard, *id.* ¶ 277. As discussed in Extreme's Motion to Exclude the Combined Opinions of Ravi Dhar, Scott Bradner, and Michael

---

[1] In understanding the facts of this case, it is important to distinguish between the public domain SNMP ***standard*** and the ***software*** that helps implement that standard. The SNMP standard is a technology that enables a networked device like a wired LAN switch to be managed remotely from another computer—for instance, by allowing printer to communicate its status to a computer connected to the same network. Am. Compl. ¶ 2, Dkt. 244. No entity owns the SNMP standard; rather, entities that seek to enable the SNMP standard in their products do so through specific implementations of the standard, of which many options exist. Dkt. 455-2 ("Reid Tr.") at 26:22–27:10; Dkt. 456-4 ("Greenspun Rep.") ¶¶ 65, 102 n.32. Plaintiffs' software is a tool that helps implement the SNMP standard. Am. Compl. ¶ 4. As discussed in more detail below, Mr. Bradner's opinions center on the function and role of the SNMP *standard*. *See infra* at Section III.B. Dr. Dhar, who purports to build on Mr. Bradner's work, refers instead to the "At-Issue Software" and claims that his survey measures the importance of the "Allegedly Infringing Monitoring Capabilities." Dhar Rep. ¶¶ 9, 14.

J. Wallace, *see* Dkt. 456 ("Omnibus Br."), both Mr. Bradner's and Dr. Dhar's reports contain significant methodological flaws and false assumptions about the capabilities of wired switches and the role the SNMP standard plays therein. To explain some of these issues from a technical perspective, Extreme retained Mahdi Eslamimehr, a software engineer with a Ph.D. in computer science and extensive experience with the kinds of network management systems at issue in this case. Dkt. 456-15 ("Eslamimehr Rep.") ¶¶ 4–9. As a rebuttal expert, Dr. Eslamimehr offered critiques of both the list of capabilities at the core of Dr. Dhar's survey and the methodology used and conclusions reached by Mr. Bradner in assessing the "SNMP attribution" of certain capabilities.

Plaintiffs now seek to exclude Dr. Eslamimehr's testimony in its entirety under Rule 702. Yet each of Plaintiffs' three arguments misunderstands the substance of Dr. Eslamimehr's critiques, the standard of Rule 702, or both, and all should be dismissed. First, Plaintiffs claim that Dr. Eslamimehr is not qualified to critique Dr. Dhar's work because Dr. Eslamimehr is not a survey expert and his opinions are unreliable. But this gets matters exactly backwards. Dr. Eslamimehr does not purport to analyze Dr. Dhar's work from a survey-design perspective; rather, his critique is that the supposedly distinct technical "capabilities" that Dr. Dhar identified for use in his survey are in fact overlapping—a critique that Dr. Eslamimehr is well-qualified to give. If anything, Plaintiffs' critique of Dr. Eslamimehr only serves to highlight *Dr. Dhar's* lack of qualifications to identify distinct technical capabilities of networking switches. Next, Plaintiffs challenge Dr. Eslamimehr's opinion that Mr. Bradner's tests of Extreme's switches and related software did not reflect real-world conditions, claiming that this opinion is "conclusory" and not based on "product testing." In doing so, Plaintiffs ignore Dr. Eslamimehr's substantial and well-established experience with both network management systems generally and the specific software at issue

2

here; they also impose a testing requirement that is not supported by Rule 702, particularly for a rebuttal expert whose role is to highlight the shortcomings or omissions of another expert's work. Finally, Plaintiffs argue that the Court should reject as "unsupported" Dr. Eslamimehr's critique of Mr. Bradner's "SNMP attribution" percentages and proposal of percentages that better represent the various features required for the different capabilities at issue. Here, too, Plaintiffs downplay Dr. Eslamimehr's credentials and expertise; they also miss the point of Dr. Eslamimehr's proposed percentages, which is to rebut Mr. Bradner's report by "highlight[ing] the directional error in" his analysis and offering a more realistic estimation of the role the SNMP standard plays. Eslamimehr Rep. ¶ 31.

Because Plaintiffs cannot show that Dr. Eslamimehr's opinions are unreliable, irrelevant, or unhelpful, their motion to exclude his testimony should be denied.

## II. LEGAL STANDARD

Federal Rule of Evidence 702 provides that qualified experts may offer testimony "in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court's role as a "gatekeeper" in assessing the relevance and reliability of expert testimony under Rule 702 "is context-specific and must be tied to the facts of a particular case." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 295 (6th Cir. 2007) (quotation marks omitted).

## III.    ARGUMENT

### A.    Dr. Eslamimehr Is Qualified to Opine on the Capabilities of Wired Switches, and His Opinions Are Both Relevant and Helpful in Evaluating Dr. Dhar's Survey Opinions.

In his opening report, Dr. Dhar identified different "capabilities" of wired switches and designed a survey to measure the relative value that wired switch consumers place on six separate capabilities that he claims are attributable to Plaintiffs' software. Dhar Rep. ¶¶ 9, 13–14. Dr. Eslamimehr begins his rebuttal report by explaining that those six "capabilities" are, in fact, overlapping—that is, they are not "mutually exclusive," but are instead "intricately linked" and "consolidat[ed]" with each other. Eslamimehr Rep. ¶¶ 14–15. Plaintiffs argue that Dr. Eslamimehr's opinions on the capabilities of wired switches must be excluded because Dr. Eslamimehr is not a survey expert. *See* Dkt. 475 ("Pls.' Br.") at 3. But Dr. Eslamimehr's critique of Dr. Dhar's survey is not made "from a consumer survey design perspective," *Schechner v. Whirlpool Corp.*, No. 16-cv-12409, 2019 WL 978934, at \*12 (E.D. Mich. Feb. 28, 2019), as, for example, is the rebuttal report of Extreme's survey expert Phil Johnson, *see generally* Dkt. 456-16 ("Johnson Rep."). Rather, Dr. Eslamimehr's report draws on his technical background and training to assess what the six capabilities at issue actually do in a wired switch and how they relate to each other. These capabilities, such as "multi-vendor network monitoring" and "[a]lert [s]ending," are highly technical, and understanding the role(s) they play requires knowledge of how wired switches work at the level of hardware and software, *see* Eslamimehr Rep. ¶ 14 (explaining in detail how various features of wired switches work together to perform different functions); it does not require any expertise in survey design or administration. Dr. Eslamimehr's decades of experience as a software engineer and computer scientist make him well-qualified to opine on these topics.

Other courts both in this Circuit and around the country have rejected similar attempts to

4

exclude non-survey experts who draw on their expertise to highlight inaccurate or misleading survey designs. In *Schechner v. Whirlpool Corp.*, 2019 WL 978934, for example, the defendant presented a rebuttal expert, Dr. Ugone, with expertise in economics to offer a critique of the plaintiff's survey expert. The court explained that "[t]o the extent Dr. Ugone attacked the design or administration of [the] survey, he did not do so from a consumer survey design perspective. Instead, he questioned the economic validity of [the] survey," including, for example, its omission of features that are relevant to consumer purchasing decisions and its failure to "account fully for supply-side factors." *Id.* at *12. Because Dr. Ugone was qualified to offer these "economic critiques" of the survey setup, the court denied the plaintiff's *Daubert* motion. *Id.* Similarly, in *Gibson Brands, Inc. v. Armadillo Distrib. Enters., Inc.*, No. 19-cv-358, 2021 WL 231752 (E.D. Tex. Jan. 22, 2021), the court denied the plaintiff's *Daubert* motion of a rebuttal expert with "no experience with consumer surveys" because, while the expert "may [have been] unqualified to testify on methodology or statistical analysis, [he] did not do that"; rather, his opinion concerned whether the photographs used in the survey presented by the plaintiff's expert reflected the relevant details of the guitar shapes at issue. *Id.* at *2. Because his background in the music industry qualified him to "discuss the brand recognition of [the] guitars" and because he did not attempt to opine on the survey methodology, the court found that his opinions were sufficiently reliable. *Id.* ("He did not testify about n-values or z-scores; he testified about F holes and humbuckers."); *see also, e.g.*, *Kudos Inc. v. Kudoboard LLC*, No. 20-cv-5415258, 2021 WL 5415258, at *13 (N.D. Cal. Nov. 20, 2021) (allowing testimony of non-linguist offered to rebut opinions of linguistics expert because the non-linguist did "not draw on the field of linguistics to derive his rebuttal opinions").

Indeed, Plaintiffs themselves appear to recognize that a technical expert's opinion on

Dr. Dhar's list of capabilities may be both helpful and relevant. As Dr. Dhar explained, while he derived his capabilities from a review of marketing materials, third-party reports, SEC filings, and deposition testimony, Dhar Rep. ¶ 37, he is "not a technical expert" and does not have any personal knowledge of how switches operate, Dkt. 456-8 ("Dhar Tr.") at 66:11–67:08, 77:22–78:03, 98:24–99:09. According to Dr. Dhar, Plaintiffs therefore asked Mr. Bradner, their technical expert, to review the list to determine whether any capabilities were missing, whether any capabilities do not pertain to wired switches, and whether Dr. Dhar grouped the capabilities into larger categories accurately, Dhar Rep. ¶ 40. Importantly, Mr. Bradner offered "no opinion" on whether any of the capabilities are overlapping or whether the list was complete. Dkt. 456-14 ("Bradner Tr.") at 153:19–155:09. If Plaintiffs believe that Dr. Dhar can rely on a technical expert like Mr. Bradner to validate his list of technical capabilities, they cannot now challenge Extreme's reliance on a technical expert like Dr. Eslamimehr to invalidate or critique that list.

Moving from their claim that Dr. Eslamimehr is not qualified to opine on the capabilities of wired switches, Plaintiffs next argue that his opinions are not reliable because he "does not define 'overlapping.'" Pls.' Br. at 3. Plaintiffs have provided no explanation and cited no authority in support of their position that an expert's opinions must be *excluded* as unreliable under Rule 702 because the expert does not formally define a commonly used word. *See, e.g.*, Overlap, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/overlap (defining "overlap" and "overlapping" as "to occupy the same area in part" and/or "to have something in common"). Plaintiffs' expert Mr. Bradner, for instance, never defined "attributable," despite that word being central to his evaluation of the role the SNMP standard plays in wired switches—and, in turn, to Plaintiffs' damages calculations. *See* Bradner Rep. ¶ 277; *see also Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 569 (E.D. Mich. 2022) ("Nothing in Rule 702 prohibits an expert from using

a term's ordinary meaning."). Moreover, to the extent it was not already clear from its plain meaning, Dr. Eslamimehr has repeatedly demonstrated what "overlapping" means in the context of his critique of Dr. Dhar's survey: that the six "Allegedly Infringing Monitoring Capabilities"[2] Dr. Dhar lists separately are in fact interrelated and are not mutually exclusive, as the survey would suggest. *See, e.g.*, Eslamimehr Rep. ¶ 14 (contrasting "overlapping" with "mutually exclusive"); *id.* (explaining that multiple capabilities are overlapping because they are "integrated" into a "single interface" that performs all of the capabilities at once); *id.* (explaining that the "multi-vendor network monitoring" capability overlaps with the "single pane of glass monitoring" capability because achieving the former requires the latter); Supp. Decl. of Sy Damle ("Damle Decl.") Ex. 1 ("Eslamimehr Tr.") at 185:22–186:12 (explaining that "overlapping" means that "they share the same capabilities or sub-capabilities or functionalities").[3] Dr. Eslamimehr merely used a commonly understood word according to its commonly accepted meaning, which he defined multiple times in his report and deposition. This does not render his opinion unreliable.

Finally, Plaintiffs argue that Dr. Eslamimehr's opinions are "unhelpful" because the

---

[2] Plaintiffs also argue that it is "[n]oteabl[e]" that Dr. Eslamimehr did not opine on whether the 49 other capabilities in Dr. Dhar's survey are overlapping. Pls.' Br. at 4. Plaintiffs do not explain why they believe this is notable, perhaps because it is not. The six capabilities Dr. Eslamimehr discusses are the six that Dr. Dhar identified as the "Allegedly Infringing Monitoring Capabilities" attributable to Plaintiffs' software, Dhar Rep. ¶ 9; Eslamimehr Rep. ¶ 14—and thus the basis of Plaintiffs' claimed disgorgement damages, *see* Dkt. 456-3 ("Wallace Rep.") ¶¶ 117–21. The 49 additional capabilities play no significant role in Dr. Dhar's, Mr. Wallace's, or Mr. Bradner's apportionment-related opinions, other than in their omission.

[3] Plaintiffs incorrectly claim that Dr. Eslamimehr "conceded at deposition that [the capabilities] are all distinct. Pls.' Br. at 2–3. In the portion of his deposition Plaintiffs cite, Dr. Eslamimehr stated, consistent with his report, that the six capabilities are not "identical" but are "overlapping." Eslamimehr Tr. at 198:06–19 ("[N]o, they're not identical. . . . Can you monitor switch without sending alert? No. But it's overlapping. You send alert to be monitored. You monitor by checking alert. So [it's] very similar."). In his report, he also observed that the six capabilities are "often highlighted in marketing materials as distinct capabilities" but, Plaintiffs' characterization notwithstanding, he never adopted that opinion himself; to the contrary, he explained why, "in practice, these are not isolated features but are intricately linked." Eslamimehr Rep. ¶ 15.

capabilities at issue are not "overlapping from a marketing perspective," and Dr. Dhar's survey is a "marketing survey." Pls.' Br. at 4. This argument plainly mischaracterizes Dr. Dhar's survey. In Dr. Dhar's own explanation, he was retained to "determine the importance of the Allegedly Infringing Monitoring Capabilities in consumers' decision to purchase wired switching products." Dhar Rep. ¶ 10. His list of capabilities is therefore meant to reflect "capabilities that buyers of wired LAN switches might consider important." *Id.* ¶ 37. While Dr. Dhar reviewed marketing materials to come up with this list, the aim of his survey was not, as Plaintiffs suggest, to determine which capabilities of wired switches are most important from a marketing perspective; rather, it was to determine the relative value that *consumers* place on different capabilities, particularly those purportedly enabled by Plaintiffs' software. How the capabilities may be described in marketing materials has no bearing on this issue.

Dr. Eslamimehr's assessment that the six "Allegedly Infringing" capabilities are not distinct but are, in fact, interrelated will help the factfinder assess the proper weight to give Dr. Dhar's consumer survey results. Contrary to Plaintiffs' suggestion, a rebuttal expert like Dr. Eslamimehr is under no obligation to explain both why another expert's work is unreliable and how that unreliable work might be made reliable, *see, e.g.*, *Bimbo Bakeries USA, Inc. v. Sycamore*, No. 13-cv-749, 2017 WL 1377991, at *7 (D. Utah Mar. 2, 2017) (allowing rebuttal expert's critique of a survey expert, over opposing party's complaint that the rebuttal expert left it "uncertain whether changes [in the survey] would have changed the results," because "[r]ebuttal experts need not produce extrinsic evidence to be able to testify to perceived surveying flaws"); *Counts*, 606 F. Supp. 3d at 588 ("Doctor Neuendorf may offer her rebuttal opinions highlighting the flaws in and limitations of Dr. Shankar's work, which are crucial to the jury's ability to assess the weight of Dr. Shankar's opinions."). Here, however, the implications of Dr. Eslamimehr's

critique are clear.  If Dr. Dhar separated into six distinct "capabilities" features of a switch that are actually "intricately linked and often embedded within the broader functionality of [the] 'single pane of glass' capability," Eslamimehr Rep. ¶ 15, his survey may not reflect how consumers think about what they expect from wired switches and may not accurately measure the relative importance they place on the different capabilities.  Assuming that the capabilities are indeed overlapping and practically inextricable from each other, Dr. Dhar's survey design would tend to overvalue the importance of Plaintiffs' software, by prompting respondents to spread the limited "points" they were asked to assign to capabilities that they consider important in purchasing a switch over six separately listed capabilities that should have been consolidated into a single capability.  While Dr. Eslamimehr, whom Plaintiffs emphasize is not a survey expert, did not extend his critique to Dr. Dhar's survey results, he was not required to.  His opinions are both helpful and relevant in that they allow the factfinder to assess the reliability of Dr. Dhar's survey evidence.

### B.  Dr. Eslamimehr's Critique of Mr. Bradner's SNMP Testing Is Reliable and Grounded in His Expertise.

Following his critique of Dr. Dhar's description of the capabilities of wired switches, Dr. Eslamimehr's rebuttal report next addresses the report of Mr. Bradner, Plaintiffs' technical expert.  Mr. Bradner dedicates much of his report to describing various tests he ran in a laboratory that contained eleven Extreme wired switches and five network management stations ("NMSes") manufactured by Extreme and two third-party vendors, WhatsUp Gold and SolarWinds.[4]  Bradner

---

[4] NMSes, which are one of the components necessary for a network device to be managed using the SNMP standard, do not themselves incorporate the standard.  Rather, an NMS is software run on a computer that retrieves and manages information from devices that incorporate SNMP.  *See* Bradner Rep. ¶¶ 107–09.  Extreme manufactures its own NMS software to use with its switches, but consumers can also use NMSes created by third-party manufacturers.  *Id.* ¶ 130.

9

Rep. ¶¶ 114, 130–42. From his testing, Mr. Bradner concluded that the Extreme switches he tested use the SNMP standard, and the NMSes he tested "assumed" that the devices they were used to manage were supported by the SNMP standard (though his report does not speak to whether either the switches or the NMSes rely on Plaintiffs' software in particular). *Id.* ¶¶ 265–76. After reviewing Mr. Bradner's testing, Dr. Eslamimehr opined that "[t]esting the SNMP capabilities and the overall dependability of Extreme Networks switches requires a well-rounded, comprehensive testing environment that reflects real-world network configurations and challenges." Eslamimehr Rep. ¶ 18. In Dr. Eslamimehr's opinion, Mr. Bradner's decision to test using only eleven wired switches and five NMSes—two of which were old Extreme models and one of which did not appear to be an NMS at all, *see id.* ¶ 17—"skewed Mr. Bradner's results," such that they did "not adequately represent" how the switches and NMSes would actually operate, *id.* ¶ 18.

Plaintiffs' primary argument regarding the admissibility of this section of Dr. Eslamimehr's report is that Dr. Eslamimehr does not "support his conclusions" and "did not attempt any product testing." Pls.' Br. at 5–7. Plaintiffs are incorrect that Dr. Eslamimehr does not have support for his opinion that Mr. Bradner's tests did not represent real-world conditions. As he explained in his report and in response to repeated questioning during his deposition, Dr. Eslamimehr has a Ph.D. in computer science; he has worked as a software engineer for over two decades; he has extensive experience with "network protocols, network management systems and solutions, network applications, [and] network operations;" and he has "designed and developed [NMSes]," is familiar with all five of the NMSes Mr. Bradner tested, and has worked with the SNMP standard in particular. Eslamimehr Rep. ¶¶ 4–9; *see also* Eslamimehr Tr. at 44:23–46:01 ("I have years of experience building software solution around SNMP using SNMP. . . . I am very experienced in working, using SNMP."); *id.* at 50:14–15 (discussing his "executive role in building

NMS"); *id.* at 72:25–76:18 (explaining his work developing and building NMSes and how that work gave him "hands-on experience working with SNMP"); *id.* at 98:07–16 (explaining that he worked on "SNMP remodeling" at one of his prior jobs); *id.* at 103:23–104:21 ("I was responsible in coding of the functionality of the tool in connection with SNMP."); *id.* at 108:10–109:01 ("I have years of working with SNMP, hands-on working with SNMP, running teams of engineers working with SNMP, building software using SNMP."); *id.* at 131:13–133:13 ("I have many years of experience in – with SNMP. I have many years of experience working with different NMSes."); *id.* at 135:14–22 (explaining that he has worked with WhatsUpGold's and SolarWinds' NMSes and examined the source code of the Extreme NMSes).

Informed by his extensive background in the field of network management and his experiences with NMS and SNMP software specifically, Dr. Eslamimehr reviewed Mr. Bradner's testing setup, *see* Eslamimehr Rep. ¶¶ 17–18 & Ex. B (listing materials considered), and opined that, because Mr. Bradner relied "on only a small set of switches" and "a limited number of NMS[es]," including some that were out of date, Mr. Bradner did not "adequately represent the diverse scenarios in which these switches would operate," *id.* ¶¶ 17–18; *see also* Eslamimehr Tr. at 144:10–145:08 (explaining that real-world environments can include thousands of switches and that, based on his "years of experience with working with this environment," "11 switches with 5 NMSes [] is not representative of any real world"). Far from being "conclusory" or unsupported, Dr. Eslamimehr's methodology of drawing on his experience working with NMSes and switches to opine on *why* Mr. Bradner's tests are unreliable is well-within the bounds of Rule 702. *See, e.g.*, *United States v. Cunningham*, 679 F.3d 355, 378–79 (6th Cir. 2012) (explaining that "the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience"); *Huntzinger v. Coyle*, No. 17-cv-184, 2022 WL 95280, at *3–4 (E.D. Ky. Jan. 10, 2022) (admitting

testimony of a use-of-force expert based on the expert's review of the materials in the case and application of his experience to those materials); *Mayer v. Louisville Ladder*, No. 22-cv-237, 2024 WL 3106900, at *7 (W.D. Ky. June 24, 2024) (admitting testimony of an expert who performed no testing but instead visually inspected a ladder and opined, based on his inspection, that its failure "was the result of insufficient strength in the ladder rail").

Plaintiffs' complaint that Dr. Eslamimehr did not perform his own testing or opine on "an appropriate number" of switches and/or NMSes is also baseless. Rule 702 imposes no requirement that "an expert to come in and actually perform tests in any given situation." *Mayer*, 2024 WL 3106900, at *7 (quoting *Clark v. Chrysler Corp.*, 310 F.3d 461, 467 (6th Cir. 2002)). It is particularly inappropriate to require a *rebuttal* expert like Dr. Eslamimehr to conduct testing or provide alternative approaches, as the "archetypal" function of rebuttal testimony is to "identif[y] a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise." *Sci. Components Corp. v. Sirenza Microdevices*, No. 03-cv-1851, 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008); *see also Branche v. Zimmer*, No. 06-cv-234, 2009 WL 8750012, at *8 (E.D. Tenn. Mar. 9, 2009) (same). Accordingly, courts regularly admit the opinions of rebuttal experts whose opinions critique or shed light on the deficiencies of another expert's report, even when the rebuttal expert does not "offer[] any alternative methodology or conclusions of her own." *3A Composites USA, Inc. v. United Indus., Inc.*, No. 14-cv-5147, 2015 WL 11121362, at *2 (W.D. Ark. Nov. 10, 2015); *see also, e.g.*, *E.E.O.C. v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("The Court agrees with Tepro that Griffin is not required to conduct independent statistical analysis in his role as a rebuttal expert. Instead, Griffin's rebuttal may properly respond to the scope of Tonowski's original expert opinion and reports."); *Rover Pipeline, LLC v. 1.23 Acres of Land*, No. 17-cv-10365, 2018 WL 3322995, at *14–15 (E.D. Mich. July 6,

2018) (noting that "[i]t is well-settled that rebuttal experts are not required to independently assess the fact[s] in issue" and that critiquing portions of an expert report is to "act[] as [a] quintessential rebuttal expert[]"); *Mahaska Bottling Co., Inc. v. PepsiCo, Inc.*, 441 F. Supp. 3d 745, 759 (S.D. Iowa 2019) (noting that courts "regularly permit expert witness testimony even if the expert primarily critiques the opposing expert's approach without offering an alternative approach" and stating that the opposing party's critiques "go to the weight the jury chooses to afford [the expert's] testimony"); *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*, No. 09-cv-61490, 2011 WL 2295269, at *5 (S.D. Fla. June 8, 2011) ("A rebuttal expert can testify as to the flaws that she believed are inherent in another expert's report that implicitly assumes or ignores certain facts."); *SL EC, LLC v. Ashley Energy, LLC*, No. 18-cv-1377, 2021 WL 5112943, at *3 (E.D. Mo. Nov. 2, 2021) ("It is entirely appropriate and helpful to the jury for a rebuttal expert to identify factors which the opposing party's expert failed to consider."). That is exactly what Dr. Eslamimehr did. Drawing on his experience to point out flaws in Mr. Bradner's methodology that "cast doubt on [his] conclusions," Dr. Eslamimehr acted as an "archetypal" rebuttal expert. *Sci. Components Corp.*, 2008 WL 4911440, at *2. He did not need to have performed testing or offered alternatives for his opinions to be both reliable and helpful to the factfinder in assessing the weight to afford Mr. Bradner's testimony.

Plaintiffs offer two additional, non-substantive arguments regarding this section of Dr. Eslamimehr's report. Both are meritless. *First*, Plaintiffs claim that Extreme has stipulated that "it would not claim that other products [beyond those Mr. Bradner used in his tests] would yield a different result in testing"—which, in Plaintiffs' view, is contradicted by Dr. Eslamimehr's critique. Pls.' Br. at 5. Plaintiffs are mischaracterizing the stipulation they cite. After providing a list of Extreme's wired switches that contained Plaintiffs' software, Extreme produced for

inspection representative samples of six of those products and stipulated that it would not argue that those samples are "not representative of what *Extreme's customers received* in aspects that are relevant to this litigation."  Dkt. 327 at 3 (emphasis added).  Dr. Eslamimehr's report never states that the individual switches Mr. Bradner used to test are not representative of the switches customers received, nor does he claim that Mr. Bradner used the wrong switches.  Rather, Dr. Eslamimehr's opinion is that the *number* of switches and the number and type of *NMSes* Mr. Bradner used do not reflect the "diverse scenarios" and "the full extent of capabilities that would be required [for] network management" in the real world.  Eslamimehr Rep. ¶ 18.  Nothing about this is inconsistent with Extreme's stipulation.

*Second*, Plaintiffs argue that Dr. Eslamimehr's opinion should be excluded because he did not disclose that he reviewed Extreme's source code in preparing his report.  As an initial matter, Plaintiffs are incorrect that Dr. Eslamimehr did not disclose his review of Extreme's source code: in his list of materials considered, he identifies "Materials Considered by Dr. Greenspun's Opening Expert Report," *id.* Ex. B.  Dr. Greenspun's list of materials considered, in turn, clearly includes "[s]ource code produced by Extreme Networks, Inc. in this case."  Greenspun Rep. Ex. B.  More importantly, however, Dr. Eslamimehr did not need to review Extreme's source code to opine that Mr. Bradner's testing conditions were not reflective of real-world uses of switches and NMSes.  As explained above, Dr. Eslamimehr offered this opinion based on his substantial experience working with networking technology, NMSes, and the SNMP standard.  Nowhere does he claim that his opinions relied on or drew on his knowledge of Extreme's source code specifically, nor have Plaintiffs offered any explanation of why they believe his opinion must be excluded because he did not include "source code analysis."  Pls.' Br. at 6.  Plaintiffs' attempts to impose

requirements out of step with the opinions Dr. Eslamimehr actually offered and with his role as a rebuttal expert to Mr. Bradner must be rejected.

### C. Dr. Eslamimehr's Critique of Mr. Bradner's Attribution Percentages Is Both Reliable and Helpful to the Factfinder in Assessing Mr. Bradner's Opinions.

In the final section of his report, Dr. Eslamimehr addresses Part VIII of Mr. Bradner's report. Mr. Bradner's opinions in Part VIII are discussed in more detail in Extreme's separate *Daubert* motion, *see* Omnibus Br. at 6, 15–19. In short, Mr. Bradner considered twelve "capabilities" of wired switches that Dr. Dhar grouped into the larger "Management" category and provided an estimation of "whether and to what extent (based on an estimated percentage from 0-100%) certain [capabilities] are attributable to *SNMP*"—the publicly available standard, as opposed to Plaintiffs' software. Bradner Rep. ¶ 277 (emphasis added). Mr. Bradner assigned an "SNMP attribution" of either 0%, 50%, or 100% for each capability, depending on whether the SNMP standard is "required" or a "prerequisite" for that capability, ultimately determining that six of the capabilities (the same six discussed in Section III.A above) had an "SNMP attribution" of either 50% or 100%. *Id.* ¶¶ 277–306. In response, Dr. Eslamimehr offered several critiques of Mr. Bradner's methodology and the unexplained assumptions on which he relied. Though Plaintiffs seek to exclude these critiques, Plaintiffs have failed to meet their burden under Rule 702.

Plaintiffs first take issue with Dr. Eslamimehr's opinion that, under Mr. Bradner's approach, "the value of [Plaintiffs'] implementation [of the SNMP standard] is 0% because any value associated is entirely tied to the function of SNMP, not any alleged creativity in implementation." Eslamimehr Rep. ¶ 24. Plaintiffs argue that this opinion is "conclusory" and that it misstates the law on copyright apportionment. Pls.' Br. at 8. Plaintiffs appear to misunderstand the opinion Dr. Eslamimehr is expressing. As Dr. Eslamimehr explained, he

understood that "Mr. Bradner's analysis is relevant to assessing the portion of Extreme's profits that could be awarded to Plaintiffs," Eslamimehr Rep. ¶ 27—which is exactly how his analysis was used in Dr. Dhar's survey results and then Mr. Wallace's apportionment calculations, *see* Omnibus Br. at 7–9. Yet Mr. Bradner's opinions do not discuss Plaintiffs' software at all, instead measuring the extent to which different capabilities are attributable to the *SNMP standard*. If, as Mr. Bradner claims, certain capabilities are 100% attributable to the SNMP standard in general, then the specific attribution value of Plaintiffs' software—or of any other tool used to implement that standard—would appear to be 0%. *See* Eslamimehr Rep. ¶ 29 ("Mr. Bradner's analysis failed from the outset because it failed to assess the value of the copyrighted work but instead assessed the value of the SNMP standard."). Dr. Eslamimehr reiterated this point during his deposition, explaining that his statement "built up on the opposing expert that if everything is SNMP, everything is built on SNMP, then, consequently, the value of SNMPR [software] would be zero." Eslamimehr Tr. at 237:14–17; *see also id.* at 157:21–25 ("This is based on Mr. Bradner saying that everything is about SNMP, and he didn't mention anything about SNMP Research. I was not asked to like look at the level of creativity between SNMP Research software and SNMP."). Rather than being conclusory or based on any particular interpretation of the law on apportionment, Dr. Eslamimehr's statement is instead an assessment of the internal logic of Mr. Bradner's own opinions and how they "fit" with Plaintiffs' assessment of the relative value of their software. This is an appropriate topic for a rebuttal expert.

Next, Plaintiffs argue for the exclusion of a portion of Dr. Eslamimehr's report in which he identifies "alternatives to SNMP"—technologies called REST, NetConf, and, in one instance, Syslog—that can enable the same capabilities for which Mr. Bradner claimed the SNMP standard is "necessary." *See* Eslamimehr Rep. ¶ 26. Here, too, Plaintiffs' argument is that Dr. Eslamimehr's

16

opinions are "conclusory" because he does not describe what REST and NetConf are or cite "objective evidence" about them. Pls.' Br. at 8–9. As for NetConf, as with Syslog (whose inclusion in Dr. Eslamimehr's report Plaintiffs do not take issue with), Mr. Bradner himself describes this technology and states that it can "be used for monitoring a network." Bradner Rep. ¶¶ 95–98.[5] And for both REST and NetConf, Dr. Eslamimehr does explain "what they do" and provides context for the role they play in switches, explaining, for example, that they are "vendor-neutral configuration languages" that "enable[] the switch to be configured and managed uniformly across different vendors' equipment within the same network." Eslamimehr Rep. ¶ 50; *see also id.* ¶¶ 46 (similar), 50 (describing RESTful as an "Advanced Application Programming Interface" that "allow[s] for flexible and custom integration with various third-party management tools"), 54 (similar). Moreover, the fact that Dr. Eslamimehr does not provide the "analysis" or third-party citations that Plaintiffs apparently expect does not render his opinion unreliable. As discussed above, Dr. Eslamimehr relied on his extensive experience with switches and network management technology to critique what he sees as shortcomings in Mr. Bradner's report, in this case opining that Mr. Bradner failed to consider alternatives to the SNMP standard. At trial, Plaintiffs are free to interrogate what those alternatives are and whether they can truly replace the SNMP standard. But they cannot show that Dr. Eslamimehr's discussion of alternatives that Mr. Bradner failed to consider is unreliable or unhelpful under Rule 702.

Finally, Plaintiffs address the primary critique offered in this section of Dr. Eslamimehr's report: that Mr. Bradner, in attributing 100% or even 50% of different capabilities to the SNMP

---

[5] Mr. Bradner also alleges that "both Cisco and Juniper describe [using NetConf to monitor their networks]" but that he has "not found that to be common at this time." Bradner Rep. ¶ 97. Mr. Bradner does not cite to "any technical documents, industry-standard sources, or other objective evidence," Pls.' Br. at 9, to support this opinion, presumably because he, like Dr. Eslamimehr, is relying on his industry experience and expertise.

standard whenever the standard is necessary for a capability, "treated the SNMP standard as the only feature that is required to enable each capability" and failed to account for other components that are also required. Eslamimehr Rep. ¶¶ 25, 29–30. To correct Mr. Bradner's omission of these other components, Dr. Eslamimehr listed them for each of the six capabilities, concluding that, if one accounts for all of the different features required, the relative contribution of the SNMP standard is between 7.6% and 9.1%. *See id.* ¶¶ 31–57.

Plaintiffs raise multiple arguments in an attempt to discredit Dr. Eslamimehr's analysis, none of which has any merit. First, Plaintiffs argue that Dr. Eslamimehr "did not perform any testing" and "fails to cite even a single piece of outside supporting evidence." Pls.' Br. at 9–10. Putting to the side that Mr. Bradner did not cite a single piece of outside evidence that supports his conclusion that *100%* of a capability for which the SNMP standard plays *a* role should be attributed to the standard, nor did he tie this conclusion to the "testing" he performed, Plaintiffs misunderstand the opinion that Dr. Eslamimehr is offering. As discussed above, Dr. Eslamimehr is a rebuttal expert, and his opinions are focused on explaining why Mr. Bradner's analysis is inaccurate or incomplete. To formulate these opinions, Dr. Eslamimehr considered the same switch and NMS technology Mr. Bradner considered and, drawing on his many years of working with this technology, explained what Mr. Bradner missed. *See* Eslamimehr Rep. ¶ 31 ("To correct Mr. Bradner's report, . . . I have engaged in an exercise, based on my years of experience, education, training, and knowledge, to perform a proper analysis whether and to what extent certain capabilities are attributable to SNMP, based on an estimated percentage from 0-100%."). Dr. Eslamimehr did so with the express purpose of "highlight[ing] the directional error in [Mr.] Bradner's analysis," *id.*, and by his own admission the attribution percentages he offers to highlight this error likely *overestimate* the relative role played by the SNMP standard, *see, e.g.*, *id.* ¶ 37. It

is entirely proper under Rule 702 for Dr. Eslamimehr to draw on his expertise to both explain *that* Mr. Bradner's attribution percentages are unreliable and illustrate *why* they are unreliable. No "testing" is required for him to do so. *See supra* Section III.B.

Relatedly, Plaintiffs claim that Dr. Eslamimehr's opinions are unreliable because he did not explain how he identified the additional features that contribute to the capabilities at issue or why he assigned them equal value as the SNMP standard. Pls.' Br. at 11–12. Again, Plaintiffs miss the point. As Dr. Eslamimehr explained, he discussed the additional features necessary for each capability "[t]o correct Mr. Bradner's report" and "highlight the directional error in" his analysis. Eslamimehr Rep. ¶ 31. In service of this goal, Dr. Eslamimehr listed only the "most important" features for enabling a given capability (while acknowledging that others likely also play a role), "assum[ed] that each of" the features he listed "contribute[s] equally to [that] capability," and offered his own attribution percentages based on that assumption—finding, for example, that where eleven features are necessary, "the relative contribution of [the] SNMP [standard] is 9.1%." *See, e.g.*, *id.* ¶¶ 34–37. Dr. Eslamimehr does not claim that his percentages are the true or correct ones; in fact, he expressly acknowledges that they are "conservative" and that the assumptions he relies on would tend to *overvalue* the role of the SNMP standard. *Id.* ¶ 37. The purpose of Dr. Eslamimehr's exercise, instead, was to show what Mr. Bradner overlooked in assigning the *entire* value of a capability that relies on the SNMP standard to that standard and to demonstrate how significantly his oversights would affect the 100% attribution percentages he offered. Dr. Eslamimehr's "directional" analysis is therefore reliable and helpful to the factfinder in assessing Mr. Bradner's opinions; that Dr. Eslamimehr relied on certain assumptions, which he clearly explained, to make his points does not alter that conclusion. *Cf. SL EC*, 2021 WL 5112943, at *3 ("It is entirely appropriate and helpful to the jury for a rebuttal expert to identify factors

which the opposing party's expert failed to consider."); *Branche*, 2009 WL 8750012, at *8 (noting that "rebuttal evidence identifies a flawed premise in an expert report that casts doubt on both that report's conclusions and its author's expertise" (citation and quotation marks omitted)).

Finally, Plaintiffs argue that Dr. Eslamimehr "is clearly not an expert on the topic of SNMP" because his CV does not list SNMP, he has not published papers specifically about SNMP, he has not developed his own SNMP agent, and he has no patents relating to SNMP.[6]  Pls.' Br. at 10.  In making this argument, Plaintiffs ignore Dr. Eslamimehr's Ph.D. in computer science, his two decades of working as a software engineer, his experience with "network protocols, network management systems and solutions, network applications, [and] network operations," and his work "design[ing] and develop[ing] [NMSes]."  Eslamimehr Rep. ¶¶ 4–9.  They also ignore Dr. Eslamimehr's repeated testimony that he has "years of working with SNMP, hands-on working with SNMP, running teams of engineers working with SNMP, building software using SNMP." Eslamimehr Tr. at 108:17–109:02; *see also supra* Section III.B.  Plaintiffs' insistence that an expert who opines on the role the SNMP standard plays in network monitoring must list SNMP on his CV or have an SNMP-related patent is not only out of step with the reality that a computer scientist who develops network management solutions and designs NMSes regularly works with the SNMP standard; it is also out of step with the law in this Circuit, which cautions against taking an "unduly narrow approach" to defining the topics on which an expert is qualified to opine.  *First Tenn. Bank Nat'l Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001); *Surles*, 474 F.3d at 295 (holding that an expert with general knowledge of threat assessment was qualified despite lack of specialized expertise in the "very specialized area of commercial bus line threat assessment"); *Univ. Pitt. v.*

---

[6] Plaintiffs' expectation that Dr. Eslamimehr would have patents regarding the SNMP standard is surprising, considering software generally falls under the scope of copyright, not patent—as this copyright case regarding an SNMP tool illustrates.

*Townsend*, No. 04-cv-291, 2007 WL 1002317, at *12 (E.D. Tenn. Mar. 30, 2007) ("Where a witness is qualified in a general relevant field, the witness's lack of familiarity with specific aspects of the specialized field at issue merely goes to the weight and credibility of the testimony, not its admissibility."); *Lackey v. Robert Bosch Tool Corp.*, No. 16-cv-29, 2017 WL 129891, at *5 (E.D. Ky. Jan. 12, 2017) (rejecting the defendant's argument that an expert on safety warning design was not qualified to testify on safety warnings "specific to table saws" because "that defines far too narrowly the expertise necessary"); *Modern Holdings, LLC v. Corning, Inc.*, No. 13-cv-405, 2022 WL 710174, at *24 (E.D. Ky. Mar. 9, 2022) (finding that an expert with general expertise in "air quality compliance" who worked "on multiple projects involving electrostatic precipitators" was qualified to testify on electrostatic precipitators, despite not having specific expertise or training on that topic). Dr. Eslamimehr is well-qualified under Rule 702 to offer his opinions on the role of the SNMP standard, and his critiques of Mr. Bradner's report are both methodologically sound and helpful to the factfinder.

## IV.     CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude the testimony of Dr. Eslamimehr.

Dated: February 7, 2025                    /s/ Sy Damle

Charles B. Lee, BPR# 011570            Sy Damle (*admitted pro hac vice*)
Jessica Malloy-Thorpe, BPR# 035234     LATHAM & WATKINS LLP
MILLER & MARTIN, PLLC                  555 Eleventh Street, NW, Suite 1000
832 Georgia Avenue                     Washington, DC 20004
1200 Volunteer Building                sy.damle@lw.com
Chattanooga, TN 37402                  (202) 637-2200
Tel: (423) 756-6600
Fax: (423) 785-8293                    P. Anthony Sammi (*admitted pro hac vice*)
clee@millermartin.com                  Rachel R. Blitzer (*admitted pro hac vice*)
jessica.malloy-thorpe@millermartin.com LATHAM & WATKINS LLP
                                       1271 Avenue of the Americas
Leslie A. Demers (*admitted pro hac    New York, NY 10020
vice*)                                 tony.sammi@lw.com
SKADDEN, ARPS, SLATE,                  rachel.blitzer@lw.com
MEAGHER & FLOM LLP                     (212) 906-1200
One Manhattan West
New York, NY 10001                     Michael Powell (*admitted pro hac vice*)
leslie.demers@skadden.com              David Lamb (*admitted pro hac vice*)
(212) 735-3000                         GISH PLLC
                                       41 Madison Avenue, Floor 31
                                       New York, NY 10010
                                       (212) 518-2000

                                       *Attorneys for Extreme Networks, Inc.*

22

## CERTIFICATE OF SERVICE

   I hereby certify that on February 7th, 2025 a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail, facsimile, or hand delivery.  Parties may access this filing through the Court's electronic filing system.

*/s/ Sy Damle*
Sy Damle

23