UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:20-CV-451-CEA-DCP |
| EXTREME NETWORKS, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Defendant's Motion to Exclude Opinions of Mark J. Chandler [Doc. 451]. Plaintiffs have responded in opposition [Doc. 569], and Defendant has filed a reply [Doc. 575]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **GRANTS** Defendant's motion [**Doc. 451**].

## I. BACKGROUND

According to the allegations in the Amended Complaint for Breach of Contract, Copyright, Infringement, and Fraud ("Amended Complaint") [Doc. 244], in 1988, Dr. Jeffrey Case ("Dr. Case") and Ken Key ("Mr. Key") started a company that developed a software-based management system [*Id*. ¶ 1]. "One of the foundational technologies of modern computer networks is the Simple Network Management Protocol (herein, 'SNMP') from which Plaintiffs take their names" [*Id*. ¶ 2].[1] SNMP allows "connected devices to communicate by sending and

---

[1]     Plaintiff SNMP Research, Inc. ("SNMP Research") "is primarily a research and development company that creates, licenses, and supports products based on SNMP" [Doc. 244 ¶

responding to messages" [*Id.*]. "For example, a network-connected laser printer can communicate with a network-connected computer using SNMP to pass messages regarding the printer's status (e.g., needs paper, paper jam)" [*Id.*]. Plaintiffs allege that their "technology is an implementation of SNMP" and that their "primary asset is their intellectual property embedded in their software, including copyright protection" [*Id.* ¶¶ 4, 6].

Plaintiffs state that on March 10, 2001, they "licensed some of their copyrighted software to . . . Brocade Communications Systems LLC ("Brocade")" [*Id.* ¶ 7].[2] According to the Amended Complaint:

> The License Agreement set[s] clear mandates on, among other things, which software was licensed, how it could be used internally by Brocade, and how it could be reproduced or transferred externally. It contained express limitations with respect to use of the human-readable "source code" that makes up the licensed software. Among other things, the License Agreement expressly forbade Brocade from transferring or disclosing "Source" materials, which were defined to include source code and related matter.

[*Id.* ¶ 8]. Plaintiffs claim that "Brocade breached the License Agreement by, among other things, disclosing Plaintiffs' source code to [Defendant]" [*Id.* ¶ 9]. Plaintiffs aver that Defendant continues to "engag[e] in unauthorized reproduction and public distribution of products containing Plaintiffs' copyrighted software, including but not limited to the creation of new Extreme products" [*Id.* ¶ 16].

A few months after Plaintiffs entered into a License Agreement with Brocade, on October 22, 2001, Plaintiff SNMPRI and Defendant entered into a License Agreement ("2001 Extreme

---

30]. Plaintiff SNMP Research International, Inc. ("Plaintiff SNMPRI") "is primarily responsible for sales, marketing, and sublicensing software under license from SNMP Research" [*Id.* ¶ 31].

[2]    Plaintiffs originally named Brocade and its ultimate parent, Broadcom Inc., to the lawsuit [*See* Doc. 244]. These parties settled the claims between them and were dismissed [Docs. 266, 268].

License") [*Id*. ¶ 68]. Plaintiffs submit that Defendant breached that agreement as follows:

> a) failing to report and pay royalties; b) using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 Extreme License; c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 Extreme License; d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the 2001 Extreme License; e) failing to provide information that Extreme was required to provide under the 2001 Extreme License; f) failing to maintain SNMP Research's copyright notice in the software; g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP International; and h) failing to return or provide certification of the destruction of Program Source provided under the 2001 Extreme License.

[*Id*. ¶ 68 (footnote omitted)].

Based on the above, Plaintiffs allege copyright infringement, 17 U.S.C. § 501 [*id*. ¶¶ 117–25; breach of the 2001 Extreme License Agreement [*id*. ¶¶ 137–43]; and fraud [*id*. at ¶¶ 144–55].

Relevant to the instant matter, Plaintiffs retained Mark Chandler ("Mr. Chandler") to issue an opinion about "agreements and negotiations related to the licensing, development and commercial use of software, copyrights, and other intellectual property" [Doc. 535-3 ¶ 15]. He is the managing director with Upstream Partners, Inc. [*Id*. ¶ 1]. According to Mr. Chandler, he "specializ[es] in the valuation and licensing of intellectual property ("IP") assets, including copyrights, trademarks, patents, and trade secrets" [*Id*.]. He also "specializ[es] in empirical analysis related to disputes pertaining to IP assets" [*Id*.]. Plaintiffs state that "Mr. Chandler provided two overarching opinions that address the 'two different types, general categories of agreements that [Plaintiffs have] entered into'" [Doc. 569 p. 8 (citation omitted)]. The first opinion relates to willing licensees and how SNMPRI has a price list that generally governs the relationship

with willing licensees [Doc. 535-3 ¶ 62]. Defendant does not challenge this opinion [*See* Doc. 451].

Instead, Defendant challenges the second category—Plaintiffs' settlement licensing agreements. According to Mr. Chandler, the settlement licenses are "relevant because they demonstrate [Plaintiffs'] licensing practices under conditions that are similar to their current dispute with [Defendant]" [Doc. 561-1 p. 5]. Mr. Chandler states:

> Over the years, there have been several instances where SNMPRI became aware that a customer was using SNMP Research's software without permission in products that the customer had not been paying royalties on, and these disputes were ultimately resolved by settlement agreements.

[Doc. 535-3 ¶ 52]. He then describes the settlement agreements Plaintiffs reached with Cisco Systems, Avaya, Inc., and Broadcom and Brocade [*Id*. ¶¶ 53–61; *see also* Doc. 491-4 ¶¶ 53–61 SEALED]. He opines that these settlement agreements are relevant [Doc. 535-3 ¶ 73]. Mr. Chandler states:

> In my over 25 years of experience in negotiating license and other agreements, reasonable parties negotiating terms in circumstances such as SNMP Research's agreements with Cisco, Avaya, and [Brocade/Broadcom] discussed immediately above and further below, often consider factors including the expense and risk of litigation, the time and energy required to prepare for and participate in a trial, the particular claims and defenses at issue, and the licensee's cash flow position and its ability to pay, which impact the amount of the payment. Consistent with these agreements, parties in SNMP Research's circumstances often are willing to provide favorable deal terms (for example, settle/license for amounts that are a fraction of what the party might obtain if they prevailed at trial) in order to avoid the burdens of trial and ongoing risks of asserting or continuing litigation.

[*Id*.].

Mr. Chandler states that while Plaintiff SNMPRI has entered into royalty payment terms according to a standard approach using a price list [*see id*. ¶ 74], it has also "entered into

4

agreements to resolve disputes with customers whom SNMP Research alleged were using SNMP Research's software without permission and/or without paying appropriate royalties" [*Id*. ¶ 75]. He then details Plaintiffs' settlement agreements with third parties and provides his opinion on why the settlement terms were reached [Doc. 491-4 ¶¶ 76–78, 81–82 SEALED]. According to Mr. Chandler, the previous settlement amounts create a damages floor [*Id*. ¶ 82 SEALED; *see also* Doc. 534 p. 8; Doc. 569 p. 14]. He provides:

> In my experience in negotiating agreements, it is a common-sense principle, as well as a good and customary business practice, to assess the financial condition of ones' counterparty, and its ability to actually fulfill its commitment to make a required payment, and thus to consider whether their financial position is weak or strong. This is essential in deciding on and structuring payment terms, and in taking potential steps to mitigate any risks associated with a counterparty in poor financial condition.
>
> However, the circumstances do not always enable mitigation steps, for example in settling a dispute with a financially distressed counterpart. Under such circumstances[,] it is often both practical and wise to make financial concessions in order to get a deal done rather than pursue expensive litigation. []Indeed, it is my understanding that Avaya filed for bankruptcy protection just a little over half a year after the date of the Avaya settlement agreement and license.

[*Id*. ¶¶ 79–80 (footnote omitted)].

Defendant objects to Mr. Chandler's opinions about Plaintiffs' previous settlement agreements with third parties [Doc. 451]. It argues that according to Mr. Chandler, "[B]ecause Plaintiffs sued other companies and settled with them for certain money amounts, [he] believes those settlements are suggestive of how Plaintiffs' dispute with [Defendant] should be resolved in litigation" [Doc. 534 p. 8]. Defendant therefore moves to exclude Mr. Chandler's opinions about the previous settlements on three primary bases [*Id*. at 9–18]. First, Defendant argues that Mr. Chandler renders a legal conclusion when he states that the previous settlements are "relevant" [*Id*.

9–10].  Second, it contends that Mr. Chandler's opinions about the settlement agreements do not fit the facts of the case [*Id*. at 10–12].  According to Defendant, "the fact that other parties paid to settle claims (or supposedly 'underpaid' to settle claims) brought by Plaintiffs in other disputes, some occurring nearly two decades ago, simply has no connection to any of the liability issues here, like the existence and nature of any breach of the 2001 License, whether [Defendant] engaged in fraud in its submission of royalty reports, or the existence of any copyright infringement" [*Id*. at 10].  In addition, Defendant asserts, "The previous settlements also have no role in determining damages in this case" given that both parties' experts relied on licensing rates [*Id*. at 10–11].

Third, Defendant submits that Mr. Chandler's settlement-related opinions are not reliable or helpful [*Id*. at 12–18].  It argues that Mr. Chandler's settlement-valuation opinions are not based on a reliable methodology because he acknowledged that he did not conduct a detailed analysis [*Id*. at 14–15].  In addition, Defendant states that Mr. Chandler's settlement-valuation opinions are not useful to the factfinder because they describe Plaintiffs' "subjective beliefs or their motivations in accepting settlement payments" and "he is . . . displacing fact witness testimony and offering interpretations of facts that the jury can completely understand on its own" [*Id*. at 15].

Plaintiffs respond that Defendant has relied on Plaintiffs' licensing history during the course of this litigation [Doc. 569 p. 6].  They point to Defendant's expert witness on damages, Quentin Mimms ("Mr. Mimms"), and argue that he relies on Plaintiffs' previous settlements [*Id*. at 7 (citation omitted)].  Plaintiffs submit that "Mr. Mimms cites to the same settlement licenses that [Defendant] seeks to preclude Mr. Chandler from testifying about" [*Id*. (citation omitted)].  Plaintiffs therefore state that Defendant's argument about relevancy fails because its expert relied on the same information [*Id*. at 10–11].  In addition, they assert that Mr. Chandler's opinion regarding the settlement licenses is relevant as part of their licensing practices [*Id*. at 11].  They

accuse Defendant of "seeking to offer a one-sided and erroneous narrative around those agreements" [*Id*. at 12]. Plaintiffs submit that throughout the litigation, Defendant has sought to use the settlement licenses [*Id*.]. They also state that "there is copious authority permitting the use of settlement licenses and otherwise purportedly 'non-comparable' license agreements to establish an IP licensor's standard practices and customs" [*Id*. (citations omitted)]. Further, Plaintiffs assert that Defendant's arguments that Mr. Chandler's opinions are not reliable attack opinions that Mr. Chandler does not offer—that is, valuation opinions [*Id*. at 14]. Plaintiffs deny Mr. Chandler offers valuation opinions and contend that Mr. Chandler opines "that the settlement amounts 'reflect in essence a floor that SNMP Research has been willing to accept in the past as partial compensation'" [*Id*. (internal quotation marks and citations omitted)]. Plaintiffs state that this is relevant to Defendant's claim "that somehow because the settlements payments by [various entities] are less than the total disgorgement sought in this case, that somehow undercuts Plaintiffs' position on damages" [*Id*. at 14–15]. Plaintiffs submit that "Mr. Chandler uses his expertise as a licensing professional to place the settlement licenses in the context of Plaintiffs' licensing practices as to alleged infringers[,]" which they state "is plainly proper expert testimony" [*Id*. at 15]. With each settlement license, Plaintiffs contend that Mr. Chandler "discuss[es] the licensing principles that would bear on a transaction with such a potential licensee" [*Id*.]. Any shortcomings, Plaintiffs assert, are for cross examination [*Id*. at 17]. Plaintiffs maintain that Mr. Chandler does not offer a valuation opinion [*Id*.].

Finally, with respect to Defendant's arguments that Mr. Chandler's testimony is not helpful, Plaintiffs respond that "Mr. Chandler does not purport to opine on intent or states of mind, and expressly disclaimed doing so at his deposition" [*Id*. at 18 (citation omitted)]. And they deny that Mr. Chandler's testimony is "cumulative of fact witness testimony[,]" arguing that "Mr.

7

Chandler instead uses his review and analysis of the lengthy and complicated settlement licenses to form a basis to opine on Plaintiffs' licensing practices" [*Id*. at 19 (citations omitted)].

Defendant filed a reply, asserting that "the royalty rates at which Plaintiffs have licensed their purportedly copyrighted software in ordinary-course commercial transactions in the past have little do with the lump-sum settlement amounts they have negotiated to conclude past litigations" [Doc. 575 p. 5]. It denies that it opened the door to Mr. Chandler's opinions and claims that "it intends to move in limine for *exclusion* of any settlement-agreement evidence" [*Id*. at 5–6]. Defendant also denies that its expert, Mr. Mimms, "factor[ed] the amounts of such settlements into his 'licensing history apportionment approach'" [*Id*. at 6 (citation omitted)]. It acknowledges that "the rates at which copyrighted material was licensed may be relevant even where that license is part of a settlement agreement[,]" but here, "neither damages expert . . . found any such settlement-related licenses relevant" [*Id*. at 8 (citations omitted)]. Defendant states that Plaintiffs have failed to show that Mr. Chandler's settlement-related opinions fit the case and argue that allowing such evidence "would work significant prejudice to the defendant by permitting a plaintiff to suggest to a jury that its present claims have merit because others have chosen to settle claims brought by Plaintiffs in the past" [*Id*. at 8–9; 10–16 (citation omitted)].

In addition, Defendant contends that "Mr. Chandler does not even purport to analyze Plaintiffs' previous settlements for the purpose of extracting licensing rates that might inform the value of its copyrighted software" [*Id*. at 9 (footnote omitted)]. Defendant argues that "Mr. Chandler simply has not done the work to connect his opinions to the terms of these 'settlement licenses' so as to demonstrate that those licenses actually bear on Plaintiffs' 'standard practices and customs' as 'IP licensor[s],' nor their 'general licensing practices' or 'usual licensing approach'" [*Id*. at 10 (citations omitted)]. "[While] Mr. Chandler uses the settlement license to

8

explain Plaintiffs' licensing practices," Defendant asserts that "neither Plaintiffs nor Mr. Chandler can explain how Plaintiffs' litigation-based 'licensing practices' are relevant to any issue in the case" [*Id*. at 11–12 (citations omitted)]. And Defendant states that Mr. Chandler did not account for the differences in the settlement licenses, which show that his "opinions are . . . far removed from Plaintiffs' 'licensing history'" [*Id*. at 12].

Further, Defendant argues that although Plaintiffs deny Mr. Chandler offers a valuation opinion, he references settlement amounts and refers to them as "'understated' relative to their 'potential value'" [*Id*. at 13 (citation omitted)]. It maintains that Mr. Chandler did not apply a reliable methodology [*Id*. at 14]. Defendant states, "Rather than place individual settlement 'licenses' within a larger 'context' of Plaintiffs' own licensing 'practices,' Mr. Chandler . . . instead merely addresses each license individually and describes elements of each settlement negotiation that would suggest . . . that the settlement values are 'understated'" [*Id*. at 15–16]. Defendant notes, "Nothing about these descriptions allows the factfinder to glean anything about Plaintiffs' 'licensing practices[]'" [*Id*. at 15].

Finally, Defendant asserts that even if Mr. Chandler's opinions about settlement-related licenses were admissible, it contends that they are not helpful [*Id*. at 16]. Defendant maintains that Mr. Chandler's opinions constitute state-of-the-mind testimony and that he "merely parrots fact witness testimony and adds a veneer of expertise without underlying substantiation" [*Id*. at 17].

## II.     STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Rule 702 provides:

9

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3]  The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge."  *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (quoting

---

[3]     Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023).  Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

*Daubert*, 509 U.S. at 593–94), *aff'd by* 89 F. App'x 927 (6th Cir. 2003). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

## III.    ANALYSIS

Defendant moves to exclude Part III, section E and Part IV of Mr. Chandler's report—both of which relate to Plaintiffs' settlement history. While it articulates three bases to exclude Mr. Chandler's opinions, the primary issue is whether Mr. Chandler's opinions about Plaintiffs' settlement history fit the facts of this case such that they will be helpful to the jury. Under the circumstances of this case, the Court finds that they will not.

The Court observes that "[t]he case law does not contain a bright-line precluding production of license agreements arising in the settlement context." *Island Intell. Prop. LLC v. Deutsche Bank AG*, No. 09 CIV. 2675, 2012 WL 526722, at *11 (S.D.N.Y. Feb. 14, 2012) (denying the defendants' motion in limine to exclude the settlement license agreement). Even so, "there must be a 'fit' between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful." *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993) (citation omitted). Under Rule 702, the expert's testimony

11

must "assist the trier of fact to understand the evidence or to determine a fact in issue." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting Fed. R. Evid. 702).

Plaintiffs claim that Mr. Chandler did not provide a valuation of the settlement licenses, but instead he opines on their standard practices and customs, which renders his testimony relevant [Doc. 569 pp. 12, 13]. With respect to Plaintiffs' previous settlement agreements, Mr. Chandler states that they are "relevant because they demonstrate [Plaintiffs'] licensing practices under conditions that are similar to [Plaintiffs'] current dispute with [Defendant]" [Doc. 535-4 p. 17; *see also* Doc. 569 p. 9 ("Mr. Chandler opines that SNMPR's settlements with companies who used SNMPR's software without permission are also relevant to an analysis of Plaintiffs' licensing practices")]. But Plaintiffs have not sufficiently explained why Mr. Chandler's analysis of previous settlement agreements are related to Defendant's liability for breach of contract, copyright infringement, or fraud.

Nor have they explained how Mr. Chandler's opinions are relevant to their damages. Plaintiffs have sued Defendant for breach of contract and copyright infringement, among other claims. The 2001 Extreme License provides:

> In the event of unauthorized use or distribution of the Program Source, SNMP Research shall have the right in addition to its other remedies to recovery from Licensee an amount not less than the sum that Licensor would have charged the person or persons obtaining the benefit of such unauthorized use of the Program Source, plus any amount received by Licensee on account of such unauthorized use.

[Doc. 535-1 p. 9]. Under copyright law, a plaintiff is "entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages." 17 U.S.C. § 504(b). Defendant has retained an expert, Mr. Mimms, to opine that Plaintiffs would

have charged the licensing rates in the 2001 Extreme License [Doc. 534 p. 10 (citation omitted)]. Plaintiffs have retained an expert, Michael Wallace ("Mr. Wallace"), who opines that Plaintiffs would have charged the rates in the 2004 pricing list, relying on Mr. Chandler's first opinion [*Id.* at 10–11 (citation omitted)]. But no one relies on Mr. Chandler's opinions about Plaintiffs' settlement licenses to make any conclusions about damages or otherwise. Under the circumstances, Plaintiffs do not sufficiently explain why Mr. Chandler's analysis of their previous settlement agreements will assist the jury to understand the evidence or to determine a fact in issue.

To be sure, Plaintiffs argue that "this information is clearly highly probative, which is why both Mr. Chandler and [Defendant's] damages expert, Mr. Mimms, discuss it in their respective reports" [Doc. 569 p. 11 (citations omitted)]. But the Court has reviewed Mr. Mimm's opening report, and he simply mentions the settlement history, without amounts, in the background section [Doc. 475-27 ¶ 9 SEALED]. In his rebuttal opinion, he references the settlement agreements and the amounts [*see* Doc. 452-6 SEALED ¶ 67], but Defendant acknowledges that it does not intend to reference any of these settlement agreements at trial [Doc. 534 pp. 9–10; Doc. 575 p. 4]. And Mr. Mimms does not factor the settlement amounts into his "licensing history apportionment approach" [Doc. 475-27 ¶¶ 116–33].

Plaintiffs also state that "[s]ince the early days of this case, [Defendant] has sought to use [the license agreement between SNMP Research and Brocade] as a comparable agreement in hopes of setting a cap on Plaintiffs' damages" [Doc. 569 p. 12 (citation omitted)]. Plaintiffs cite Defendant's response to an interrogatory about the license agreement between SNMP Research and Brocade and state that Defendant has also argued that the "license gave rise to an 'implied license'" [*Id.* (citation omitted)]. Defendant's interrogatory response, however, refers to the 2001 license agreement between Plaintiffs and Brocade, not the settlement agreement [Doc. 489-11 pp.

24–25 SEALED], and "[Defendant] has agreed to drop its implied license defense" [Doc. 575 p. 7 (citation omitted)]. Plaintiffs also point to a sealed motion to compel mediation, but Defendant's statements were in reference to the parties' possible mediation [*See* Doc. 165-1 pp. 5–6]. This does not mean that Mr. Chandler's analysis of the settlement agreements is helpful to understand the evidence or a fact in issue.

Plaintiffs assert that "there is copious authority permitting the use of settlement licenses and otherwise purportedly 'non-comparable' license agreements to establish an IP licensor's standard practices and customs" [Doc. 569 p. 12]. These cases are distinguishable from the instant matter. For instance, in *Ultravision Techs., LLC v. GoVision LLC*, No. 218CV00100, 2021 WL 2110778 (E.D. Tex. May 25, 2021), the defendant's expert opined on a reasonable royalty rate by relying on a settlement license that covered patents comparable to the products that the defendant allegedly infringed on. *Id*. at *2. The defendant argued that in arriving at the royalty rate, the expert also relied on a settlement license that was not comparable to the patents at issue. *Id*. The court found that the expert did not rely on the non-comparable license agreement to arrive at a reasonable royalty rate but only considered it to show the plaintiff's "licensing practices as a whole[,]" which the court found, without discussion, to be "relative and probative." *Id*. at *4.

In another case, *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848, 2021 WL 1222622 (N.D. Cal. Feb. 11, 2021), the plaintiff, the alleged infringer, argued that the defendant's expert "improperly relie[d] on several previous licenses involving [the plaintiff] with large lump sum payments up to $1.5 billion that are non-comparable to this case." *Id*. at 33. The court noted that the expert "classified the licenses as noncomparable" *Id*. And it agreed with the defendant that its expert used the licenses "to shed light on [the plaintiff's] general licensing practices, including its purported willingness to make 'significant lump sum payments where it recognizes

infringement risks' and 'enter in a license agreement even when it determines that it is not practicing the patents being licensed'" *Id*. (citation omitted). But here, Mr. Chandler simply summarizes Plaintiffs' own settlement agreements with third parties, and he does not draw any conclusions on Plaintiffs' general licensing practices and how that is relevant to the current dispute with Defendant. In other words, he does not "connect his opinions to the terms of these settlement licenses so as to demonstrate that those licenses actually bear on Plaintiffs' standard practices and customs as IP licensor[s], nor their general licensing practices or usual licensing approach" [Doc. 575 p. 10 (alteration in original and internal citations omitted)]. To the extent the jury finds Defendant liable, pursuant to the damages experts' opinions, the issue is whether the 2001 Extreme License rates apply or the 2004 price list applies. Unlike the experts in *Ultravision or Intel Corp.*, "neither [parties'] damage expert found any such settlement-related licenses relevant" [Doc. 575 p. 8 (citations omitted)].

Plaintiffs also rely on *Comcast Cable Commc'ns, LLC v. Sprint Commc'ns Co.*, *LP*, 218 F. Supp. 3d 375 (E.D. Pa. 2016). But in that case, the expert relied on the plaintiff's previous "licensing agreements to support his expert opinion that [the plaintiff] has a preference for lump-sum payments." *Id*. at 388. The court allowed the expert to do so, reasoning that "a damages expert may consider the usual licensing approach of a party to the hypothetical negotiation in reaching his or her conclusion." *Id*. Mr. Chandler's "opinion sheds no light on Plaintiffs' licensing history" and its relevance to Plaintiffs' claimed damages. [Doc. 575 p. 11].

Instead, Mr. Chandler merely summarizes three previous settlement agreements and states that the values are "understated" and "reflect in essence a 'floor'" that Plaintiffs would accept [Doc. 535-3 ¶ 82 SEALED; *see also* Doc. 569 p. 14]. Plaintiffs do not explain how these settlement licenses are relevant to the issues in this case, especially when no damages expert refers to them,

and two out of three settlement licenses contain notable distinctions that Mr. Chandler did not take into account [*See* Doc. 575 p. 12; Doc. 513 p. 12 SEALED].  Further, his opinions "do[] not reflect meaningful engagement with the facts underlying each settlement" [Doc. 575 p. 9].  He identifies the amounts of the settlement agreements and then recites certain language from the settlement agreements [Doc. 535-3 ¶¶ 73–82].  He then concludes the settlement values represent a floor of what Plaintiffs would be willing to take for infringement [*Id*. ¶ 82; *see also* Doc. 491-4 ¶ 82 SEALED], which is a partial valuation opinion.  But there is no indication that he "attempted to ascertain how much, if any, of the same copyrighted software was at issue in each case . . ., nor that he analyzed the degree of use each defendant had supposedly partaken in" [Doc. 575 pp. 12–13].  And one settlement is over fifteen years old [*Id*. at 9].  While it is true that "[u]se of past licenses and negotiations to inform the hypothetical negotiation does not 'require[] identity of circumstances[,]'" they must be "'sufficiently comparable' for evidentiary purposes and differences in circumstances must be soundly accounted for."  *Elbit Sys. Land & C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292, 1299 (Fed. Cir. 2019) (quoting *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014)).  The only reference that Mr. Chandler provides in this regard is that in one of the settlements, the claims "were generally similar in nature to SNMP Research's claims against [Defendant] in this case" [Doc. 535-3 ¶ 76; Doc. 491-4 ¶ 76 SEALED].  During his deposition, he stated that he ████████████████████████████████████ ████████████████████████████████████████████████████████████ [Doc. 509-6 p. 60 SEALED].  It does not appear that he took any of those differences into account.  *See Oracle Am., Inc. v. Google Inc.*, 847 F. Supp. 2d 1178, 1187 (N.D. Cal. 2012) (excluding the damages expert's testimony about past licenses because the expert did very "little to describe these licenses" and the "jury could adequately evaluate the probative value of the agreements"); *see also*

16

*cf. Zak v. Facebook, Inc.*, No. 415CV13437, 2021 WL 4481588, at *4 (E.D. Mich. Sept. 30, 2021) (allowing the expert to testify about prior settlements because he "acknowledged the limitations inherent to using settlement agreements as part of the hypothetical negotiation exercise[,] acknowledged the relevant Federal Circuit precedent on how and when settlement agreements may be used in the hypothetical negotiation context[,]" and he "analyzed the specific factual and procedural backdrop against which the Company Two settlement was reached and accorded it weight based on that analysis"); *Parkervision, Inc. v. Qualcomm Inc.*, No. 3:11-CV-719-ORLTEM, 2013 WL 12152672, at *6 (M.D. Fla. Oct. 11, 2013) (excluding the defendant expert's reliance on a license agreement between the defendant and a third party because it was entered into "*six* years after the hypothetical negotiation") (citation omitted)).[4]

In summary, in showing a reasonable fee, "[d]ifferent kinds of evidence may be relevant, as long as it is viewed for what it says about the work-specific value. For example, past arms-length licensing practices by the copyright owner or the infringer for similar uses and 'benchmark' licenses by others in the industry may be useful." *Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) (citations omitted). Mr. Chandler generally discusses the circumstances of Plaintiffs' previous settlements and his opinions on why Plaintiffs and the third parties arrived at the settlement amount. But he "does not even purport to analyze Plaintiffs' previous settlements

---

[4]      Some courts have excluded expert testimony relying on non-comparable settlement agreements under Rule 403. *See Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-CV-10578, 2016 WL 4727476, at *8 (E.D. Mich. Sept. 12, 2016) ("Substantial trial time would be involved in placing these agreements before the jury, explaining their context and limited relevance, and trying to convey a convoluted theory of how they might reflect the value of the patents in suit. Any limited relevance that the Compromise and Settlement or the Engagement Agreement might have is substantially outweighed by the waste of time, risk of confusion and danger of prejudice it would engender."); *see also Fenner Invs., Ltd. v. Hewlett-Packard Co.*, No. CIVA6:08-CV-273, 2010 WL 1727916, at *2 (E.D. Tex. Apr. 28, 2010) ("District courts routinely exclude settlement licenses because the potential prejudice and jury confusion substantially outweigh whatever probative value they may have." (collecting cases and footnote omitted)).

for the purposes of extracting licensing rates that might inform the value of its copyrighted software" [Doc. 575 p. 9 (emphasis and footnote omitted)]. Nor does he connect his summary of Plaintiffs' three previous settlements to any standard practices and customs.

Based on the above, the Court finds that Plaintiffs have not sufficiently shown how Mr. Chandler's opinions about these settlement licenses will assist the jury to understand any evidence in this case or facts at issue.[5]

## IV. CONCLUSION

For the reasons set forth above, the Court **GRANTS** Defendant's Motion to Exclude Opinions of Mark J. Chandler [**Doc. 451**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

[5]     In light of this finding, the Court need not address the parties' remaining arguments.

18