UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

SNMP RESEARCH, INC. and SNMP          )
RESEARCH INTERNATIONAL, INC.,         )
                                      )
            Plaintiffs,               )
                                      )
v.                                    )          No. 3:20-CV-451-CEA-DCP
                                      )
EXTREME NETWORKS, INC.,               )
                                      )
            Defendant.                )

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court,

and Standing Order 13-02.

Now before the Court is Defendant's Motion to Exclude the Combined Opinions of Ravi

Dhar, Scott Bradner, and Michael J. Wallace [Doc. 454]. Plaintiffs responded in opposition to the

motion [Doc. 571], and Defendant filed a reply [Doc. 576]. The motion is ripe for adjudication.

*See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **DENIES** Defendant's

motion [**Doc. 454**].

## I.      BACKGROUND

According to the allegations in the Amended Complaint for Breach of Contract, Copyright,

Infringement, and Fraud ("Amended Complaint") [Doc. 244], in 1988, Dr. Jeffrey Case

("Dr. Case") and Ken Key ("Mr. Key") started a company that developed a software-based

management system [*Id*. ¶ 1]. "One of the foundational technologies of modern computer

networks is the Simple Network Management Protocol (herein, 'SNMP') from which Plaintiffs

1

take their names" [*Id.* ¶ 2].[1]  SNMP allows "connected devices to communicate by sending and responding to messages" [*Id.*].  "For example, a network-connected laser printer can communicate with a network-connected computer using SNMP to pass messages regarding the printer's status (e.g., needs paper, paper jam)" [*Id.*].  Plaintiffs allege that their "technology is an implementation of SNMP" and that their "primary asset is their intellectual property embedded in their software, including copyright protection" [*Id.* ¶¶ 4, 6].

Plaintiffs state that on March 10, 2001, they "licensed some of their copyrighted software to . . . Brocade Communications Systems LLC ("Brocade")" [*Id.* ¶ 7].[2]  According to the Amended Complaint:

> The License Agreement set[s] clear mandates on, among other things, which software was licensed, how it could be used internally by Brocade, and how it could be reproduced or transferred externally. It contained express limitations with respect to use of the human-readable "source code" that makes up the licensed software. Among other things, the License Agreement expressly forbade Brocade from transferring or disclosing "Source" materials, which were defined to include source code and related matter.

[*Id.* ¶ 8].  Plaintiffs claim that "Brocade breached the License Agreement by, among other things, disclosing Plaintiffs' source code to [Defendant]" [*Id.* ¶ 9].  Plaintiffs aver that Defendant continues to "engag[e] in unauthorized reproduction and public distribution of products containing Plaintiffs' copyrighted software, including but not limited to the creation of new Extreme products" [*Id.* ¶ 16].

---

[1]  Plaintiff SNMP Research, Inc. ("SNMP Research") "is primarily a research and development company that creates, licenses, and supports products based on SNMP" [Doc. 244 ¶ 30].  Plaintiff SNMP Research International, Inc. ("Plaintiff SNMPRI") "is primarily responsible for sales, marketing, and sublicensing software under license from SNMP Research" [*Id.* ¶ 31].

[2]  Plaintiffs originally named Brocade and its ultimate parent, Broadcom Inc., to the lawsuit [*See* Doc. 244].  These parties settled the claims between them, and they were dismissed [Docs. 266, 268].

2

A few months after Plaintiffs entered into a License Agreement with Brocade, on October 22, 2001, Plaintiff SNMPRI and Defendant entered into a License Agreement ("2001 Extreme License") [*Id.* ¶ 68]. Plaintiffs submit that Defendant breached that agreement as follows:

> a) failing to report and pay royalties; b) using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 Extreme License; c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 Extreme License; d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the 2001 Extreme License; e) failing to provide information that Extreme was required to provide under the 2001 Extreme License; f) failing to maintain SNMP Research's copyright notice in the software; g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP International; and h) failing to return or provide certification of the destruction of Program Source provided under the 2001 Extreme License.

[*Id.* ¶ 68 (footnote omitted)].

Based on the above, Plaintiffs allege copyright infringement, 17 U.S.C. § 501 [*id.* ¶¶ 117–25; breach of the 2001 Extreme License Agreement [*id.* ¶¶ 137–43]; and fraud [*id.* ¶¶ 144–55].

Defendant states that in order to "understand[] the facts of this case, it is important to distinguish between the public domain SNMP standard and the software that helps implement that standard" [Doc. 536 p. 8 (emphasis omitted)]. According to Defendant, "No entity owns the SNMP standard, nor is there one single way that the standard is incorporated into network devices; rather, entities that seek to enable the SNMP standard in their products do so through specific implementation of the standard, of which many options exist" [*Id.* (citations and emphasis omitted)]. Defendant describes the following:

> Several different components are necessary for the network device to be managed using the SNMP standard . . .. First, the device must have installed on it a piece of software called an "SNMP Agent." That software is customized by manufactures for each device. Second, the device must also have installed on it files called

3

"management information bases" or "MIBs." MIBs describe the information about the network device that can be retrieved and managed via the SNMP standard. MIBs are also customized by network device manufacturers for each kind of device. Plaintiffs' software, called "EMANATE" and "EMANTE/Lite," acts as a "tool kit[]" to help manufacturers create SNMP Agents and MIB files on their devices. EMANTE does not provide SNMP Agents and MIBs that are able to be used out of the box on a particular network device. Instead, a manufacturer of a network device, like [Defendant], uses EMANATE to help them build their own SNMP Agents and MIBs. This can require significant amounts of effort by the manufacturer. The third component is an "SNMP Manager," sometimes called "a network management station" ("NMS"), which must be present to retrieve and manage MIB information from the SNMP Agents installed on network devices on a network. Plaintiffs' software does not contribute to the NMS; rather, manufacturers like [Defendant] must provide it on their own.

Plaintiffs allege that, for a number of years, [Defendant] used Plaintiffs' software, without authorization, to create SNMP Agents and MIBs in its switches.

[Doc. 536 pp. 8–9 (citations omitted)].

The subject of the instant motion is how Plaintiffs' calculated damages under the Copyright Act. Under the Copyright Act, the plaintiff is entitled to actual damages and disgorgement of the defendant's profits. 17 U.S.C. § 504(b). With respect to disgorgement, the plaintiff must only prove the defendant's gross revenue. *Id*. The burden then shifts to the defendant to show any "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id*. Plaintiffs state that they have "offered their own apportionment analysis to both satisfy their burden and to counter [Defendant's] apportionment" [Doc. 571 p. 11].

Relevant to the instant motion are Plaintiffs' experts, Dr. Ravi Dhar ("Dr. Dhar"), Scott Bradner ("Mr. Bradner"), and Mike Wallace ("Mr. Wallace"). In summary, Plaintiffs state that Dr. Dhar "conducted a survey of consumers who use the types of products at issue (i.e., enterprise wired switches)" [*Id*. at 10]. They contend that "[t]he survey respondents identified which of the products' capabilities are important to them and assigned them relative weights" [*Id*.]. Mr. Bradner

4

"then determined which of the capabilities were attributable to SNMP and to what extent" [*Id.*]. And finally, Mr. Wallace applied that result to Defendant's gross revenues and profits [*Id.*]. Defendant challenges these three opinions [*See* Doc. 454].

### A. Dr. Dhar

Dr. Dhar is "the George Rogers Clark Professor of Management and Marketing at the Yale School of Management [Doc. 537-1 ¶ 1]. He is also "the Director of the Yale Center of Customer Insights at the School of Management" [*Id.*]. Dr. Dhar explains that his "academic work focuses on consumer behavior, consumer psychology, branding, marketing management, marketing strategy, and survey design, methodology, and evaluation" [*Id.*]. "In [his] work as a marketing professor and a consultant," he has "conducted, supervised, and/or evaluated more than 1,000 surveys relating to different aspects of consumer behavior" and has published over 90 articles on such topics [*Id.* ¶¶ 4, 6].

Plaintiffs retained Dr. Dhar "to determine the importance of the Allegedly Infringing Monitoring Capabilities in consumers' decision to purchase wired switching products" [*Id.* ¶ 10]. Relying on Plaintiffs' expert, Mr. Bradner, Dr. Dhar defines the "Allegedly Infringing Monitoring Capabilities" as follows:

a. Switch can be monitored from a single pane of glass.

b. Switch can send alerts.

c. Switch can be monitored in real time.

d. Switch can be monitored using software from third-party vendors.

e. Switch can be monitored in a multi-vendor network with single NMS (Network Management System).

f. Switch provides granular view of devices, ports, applications, and users.

5

[*Id.* ¶ 9 (citation and footnote omitted)].

Dr. Dhar states that his opinion relates "to the issue of elements of profit attributable to factors other than the copyrighted work" [*Id.*]. He summarizes his opinions as follows:

> 13.    To complete my assignment, I, assisted by staff working under my direction, designed and conducted an online survey of individuals who, in the last five years, have been involved in the decision to purchase a wired LAN switch that was intended to be used in their employer's network. The survey was designed to provide an estimate of the importance of the Allegedly Infringing Monitoring Capabilities to the purchase decision of wired LAN switch buyers. The design, execution, and analysis of the survey follow accepted scientific standards of my profession, including a review of multiple sources of information about wired LAN switches to identify 55 capabilities of wired LAN switches for inclusion in my survey.

> 14.    Based on the results of my survey I find that, when making the decision to purchase a wired LAN switch, respondents allocated a combined average of 6.8 out of 100 points to the Allegedly Infringing Monitoring Capabilities. This number provides an estimate of the importance of the Allegedly Infringing Monitoring Capabilities to the purchase decision of wired LAN switch buyers.

> 15.    I also reviewed various [Defendant] marketing and internal documents, industry publications, and deposition testimony from [Defendant's] executives and found that the importance of the Allegedly Infringing Monitoring Capabilities found in my survey is corroborated by these documents in that management capabilities in general, and monitoring capabilities specifically, are important purchase factors for network switching products. My review also indicates that the importance of management and monitoring capabilities of network switches has been emphasized in [Defendant's] documents and industry publications for several years in the past.

[*Id.* ¶¶ 13–15].

In order to reach his conclusions, as noted above, Dr. Dhar conducted a survey, the details of which are contained in Part V of his report [*Id.* ¶¶ 16–66]. He explains that "[i]n designing and

6

implementing the survey, and in analyzing the survey data, [he] was assisted by Cornerstone Research, an economic and financial consulting firm that has extensive experience in analyzing consumer behavior, survey data, and technology markets" [*Id*. ¶ 17]. In addition, GBK Collective "assisted in implementing the survey and managing the data collection" [*Id*. (footnote omitted)].

With respect to his methodology, Dr. Dhar stated that he used a double-blind study (i.e., "[b]oth the interviewer and the respondent are blind to the sponsor of the survey and its purpose"); respondents were instructed not to guess; "[w]hen appropriate, . . . response options were presented in a randomized or rotated order[;]" he used quality control questions; and he designed the questions "to limit any decision fatigue placed on survey respondents" [*Id*. ¶¶ 19–23 (citations omitted and first alteration in original)].

Dr. Dhar submits that "[i]n order for the survey results to be meaningful," he chose "individuals living in the United States who have been involved in a decision to purchase a wired LAN switch that was intended to be used in their employer's network in the last five years" [*Id*. ¶ 25]. Dr. Dhar conducted the survey online using survey panels that are "maintained by Dynata and Prodege," which he states "are well-established digital data collection firms" [*Id*. ¶ 26 (footnote omitted)]. He also identified certain screening criteria in order for respondents to participate in the survey [*Id*. ¶¶ 27–35].

With respect to the questionnaire portion of the survey, Dr. Dhar states:

> I designed the survey to quantitatively assess the importance of the Allegedly Infringing Monitoring Capabilities. Surveys that directly ask survey respondents to rate the importance of a product attribute find that many survey respondents indicate importance for many attributes, making it difficult to capture how consumers discriminate among attributes in their importance. Furthermore, direct or indirect elicitation of the importance of a product attribute can increase its stated importance due to focalism (for example, survey respondents may put more weight on a feature simply because their attention was drawn to it in a survey). Therefore, I sought to elicit answers in a

7

> non-leading and unbiased manner about the relative importance of
> 55 capabilities of wired LAN switches.

[*Id.* ¶ 36].

Dr. Dhar sets forth his process for selecting the capabilities of wired LAN switches that are relevant to the purchase decision [*Id.* ¶¶ 37–41]. He reviewed the following: (1) "customer-facing and internal marketing materials from [Defendant] and [Defendant's] SEC filings," (2) "reports from third-party industry analysts," (3) deposition testimony from [Defendant's] executives, Hardik Ajmera ("Mr. Ajmera"), Vice President of Product Management," and "Robert Reason, Marketing Director ([who] focused on [Defendant's] switching products[,]" (4) "[Defendant's] product 'data sheets,' which are sales documents highlighting the capabilities and features of specific product lines or product series," (5) "various materials [Defendant] created for external audiences, such as marketing presentations, press releases, annual reports, and its website" (6) "[Defendant's] marketing documents, such as documents outlining brand messaging guidelines, product presentations, sales presentations, and a presentation describing the results from a survey of [Defendant's] software users," and (7) "reports from third-party industry analyst[,] Gartner Research—which according to [Defendant], is a reliable reference for technical expertise and recommendations for buyers of wired LAN switches" [*Id.* ¶ 37 (footnotes omitted)].

Dr. Dhar states, "For each document reviewed, the capabilities of wired LAN switches that appeared in the documents were recorded" [*Id.* ¶ 38]. He submits, "In order to make the list of capabilities understandable and manageable for survey respondents, capabilities that were described differently across marketing materials, but which provide similar benefits to purchasers, were grouped together" [*Id.*]. "Mr. Bradner[] provided guidance for the interpretation of technical terms and the list of capabilities in the survey design" [*Id.*]. In addition, "Mr. Bradner reviewed the phrasing of the capabilities of wired LAN switches identified and did not identify any errors

8

or inaccuracies in the combination of related capabilities or in the list of the capabilities of wired LAN switches used in the survey" [*Id*. (footnote omitted)].

Next, Dr. Dhar "grouped the capabilities identified into categories of related capabilities" [*Id*. ¶ 39]. He specified as follows:

> [T]he capabilities were grouped into the following seven categories: Basic Functionality, Operating Cost and Support, Performance and Availability, Management, Manufacturer Characteristics and Portfolio Architecture, Security, and Scalability. This categorization corresponds approximately to the "key components" of wired LAN switches listed on Gartners 2021 report titled "Critical Capabilities for Enterprise Wired and Wireless LAN Infrastructure."

[*Id*. (footnote omitted)]. He relied on testimony from Mr. Ajmera regarding the important components of wired LAN switches" [*Id*. (footnote omitted)]. In addition, Dr. Dhar states that Mr. Bradner reviewed the list of capabilities that Dr. Dhar identified and did not identify any "(1) . . . potentially important capabilities missing from the list of capabilities, (2) . . . capabilities in the list that did not pertain to wired LAN switches, and (3) . . . errors or inaccuracies in the grouping of these capabilities into categories" [*Id*. ¶ 40 (citation omitted)]. He thereafter sets forth the categories and the capabilities within each category [*Id*. ¶ 41].

Dr. Dhar began his main questionnaire with the following:

> Assume that you are currently involved in the decision to purchase a new wired LAN switch. Assume that you are purchasing the wired LAN switch for the same purpose as the most recent wired LAN switch purchase decision you were involved in.
>
> You will now be shown capabilities of a wired LAN switch that is available for purchase. You will be asked to assess the importance of each capability for your purchase decision.

[*Id*. ¶ 42]. He details the first set of questions as follows:

> The first set of questions (QM1a-QM1g) asked respondents a filter question to indicate whether each of the 55 capabilities presented to them has some importance or has no importance when making the decision to purchase a wired LAN switch. The capabilities were

9

presented to respondents grouped by the capability categories I identified (Basic Functionality, Operating Cost and Support, Performance and Availability, Management, Manufacturer Characteristics and Portfolio Architecture, Security, Scalability), with each category including between four and twelve capabilities. The order in which the seven categories were presented, and the order of the capabilities within each category were randomized across respondents. To ensure that respondents took time to read and answer all questions carefully, respondents were not able to continue to the next question until 15 seconds passed.

In questions QM1a-QM1g, respondents had a choice of the following three options:

- **<u>Has some importance</u>** means the capability has **at least some importance** when purchasing a wired LAN switch.
- **<u>Has no importance</u>** means the capability has **no importance at all** when purchasing a wired LAN switch.
- **<u>Don't know / unsure</u>** means you are unable to say whether or not the capability has importance when purchasing a wired LAN switch.

[*Id*. ¶¶ 42–43 (footnotes omitted)]. Dr. Dhar explains that the first set of questions "were used to determine which capabilities were of at least some importance to the respondents when making their decision to purchase a wired LAN switch" [*Id*. ¶ 45]. With respect to the second question, Dr. Dhar states that it "asked respondents to allocate 100 points across the seven categories to indicate how important each category of capabilities is relevant to the other categories when making the decision to purchase a wired LAN switch" [*Id*. ¶ 46]. Dr. Dhar submits that "[t]his type of question . . . often referred to as a 'point allocation' or 'constant sum' question . . . is commonly used in market research" [*Id*. (footnote omitted)]. According to Dr. Dhar, "A benefit of such an exercise in respect to the questions [he is] addressing with this survey is that it forces the respondent to consider tradeoffs between the capabilities in the survey" [*Id*. (citation omitted)]. Given that this task was "effortful," Dr. Dhar explains that he provided detailed instructions on how to answer the questions, and he discusses the steps contained in the survey [*Id*. ¶¶ 47–48]. "To guarantee that respondents had the ability to allocate points to any capabilities they considered

10

important in their purchase decision," Dr. Dhar "included an additional category labeled '[a]ny other **capabilities** not listed . . . that would be important to your purchase decision'" [*Id*. at ¶¶ 49–50 (citation omitted)].

Dr. Dhar states:

> Finally, in the final question (QB1) of the survey, respondents were asked to assess the relative importance of capabilities within the Management category (i.e., the category that includes the Allegedly Infringing Monitoring Capabilities). Specifically, in QM2 respondents were given the following instructions:
>
> > Finally, we are going to ask you about some of the categories of capabilities that would play a part in your decision to purchase a wired LAN switch.
> >
> > You will see only the capabilities that you previously said have some importance to you when purchasing a wired LAN switch.
> >
> > Below is a list of capabilities related to **Management** that you previously indicated have some importance to you when purchasing a wired LAN switch.
> >
> > Please allocate 100 points across the **[INSERT NUMBER OF CAPABILITIES FOR WHICH RESPONDENT SELECTED "HAS SOME IMPORTANCE" IN QM1d {BOLD NUMBER}] Management** capabilities you selected in order to indicate how important each one is relative to the others when you are making the decision to purchase a wired LAN switch. Please consider only **Management** capabilities when answering this question.
> >
> > Allocate the 100 points so as to give more important capabilities a greater number of points and less important capabilities a smaller number of points. Make sure the total adds up to 100 points.
> >
> > **Do not use decimal points** or other punctuations. **You can allocate the same number of points** to more than one capability. **You may enter zero points** for a capability to which you would allocate less than 1 point.

[*Id*. ¶ 51 (footnote omitted)].

11

Dr. Dhar asserts that "[r]espondents were then shown the Management capabilities they previously indicated have 'some importance' when making the decision to purchase a wired LAN switch" [*Id*. ¶ 52].  Respondents entered the number of points they wanted to allocate to each capability [*Id*.].  "As with QM2," Dr. Dhar submits that "a running total of the points assigned was provided on the screen to assist respondents in allocating the full 100 points across different capabilities" [*Id*.].  He explains:

> The scores provided by survey respondents in QM2 and QB1 accurately indicate the order of importance of each capability for that particular respondent because they use a constant sum.  In addition, since the sum of the points allocated must equal 100, survey respondents are required to make point allocations in comparison to the other aspects, not independently.  This makes it even clearer that a feature or aspect with a score of 20, for example, must be more important to that respondent than a feature or aspect with a score of 10.

[*Id*. ¶ 53 (citation omitted)].

Dr. Dhar provides that "[f]ollowing best practices of survey design," he "conducted a pretest of the survey consisting of 20 interviews with individuals who were asked to take the survey and answer questions about the survey" [*Id*. ¶ 54].  He identifies three objectives with respect to the pretest "(1) to ensure the respondents understood and could respond reliably to the survey questions, (2) to ensure that each capability in the survey was clear and understandable, and (3) to ensure that there were no important omissions from the list of capabilities of wired LAN switches that would be considered when making a wired LAN switch purchase decision" [*Id*. ¶ 55].

Turning back to the actual survey, Dr. Dhar then explains the results thereof [*Id*. ¶¶ 62–66].  He submits:

> Multiplying the points allocated to the Management category in QM2 (as a percentage) and the points allocated to each of the Allegedly Infringing Monitoring Capabilities in QB1 gives an estimate of the importance of each Allegedly Infringing Monitoring Capability.

12

To calculate the average importance of a feature, I first calculated the importance of that feature for each respondent by multiplying the points allocated to each Allegedly Infringing Monitoring Capability in QB1 by the points (as a percentage) the respondent allocated to the Management category in QM2. For each respondent, points allocated to "[s]witch can send alerts" were multiplied by 0.5 to reflect that, according to Mr. Bradner, 50 percent of this capability is attributable to the At-Issue Software. I consider the feature as having zero importance to the respondent if the respondent did not mark the feature as "Has of some importance." Then, I add up the importance that each respondent allocated to that feature and divide the sum by the sample size of respondents to derive the average importance of the feature

Summing the estimated importance for each Allegedly Infringing Monitoring Capability, and accounting for Mr. Bradner's assessment that 50 percent of the "[s]witch can send alerts" capability is attributable to the At-Issue Software, provides an estimate for the combined importance of the Allegedly Infringing Monitoring Capabilities. Exhibit 5 shows that the average estimated importance of the Allegedly Infringing Monitoring Capabilities across survey respondents is 6.8 points out of the 100 points that respondents were asked to allocate, and that the 95 percent confidence interval around this estimate is 6.5 to 7.1 points.

[*Id*. ¶ 66 & n.70 (footnote omitted and alterations in original)].

**B.    Mr. Bradner**

By way of background, Plaintiffs explain that "computer protocol is a set of predefined rules governing the exchange of information between two devices, which operates essentially as a language" [Doc. 571 p. 16 (citation omitted)]. They state that "SNMP is described in a set of standard documents and includes predefined messages, i.e., commands and responses, for inter-device communication that can be used for network management purposes" [*Id*. at 16–17 (citations omitted)]. "For example," Plaintiffs state that "the SNMP 'GetRequest' command, sent to retrieve information from a network device, will cause the sending of a SNMP 'Response' message containing the information requested" [*Id*. at 17 (citation omitted)]. According to Plaintiffs, "The Protocol is implemented through software that can send, receive, and process messages confirming

13

to the SNMP standards" [*Id.* (citation omitted)]. Plaintiffs submit that "[i]f a device does not have software that understands SNMP, then the device cannot send SNMP messages" [*Id.* (citation omitted)]. They conclude, "[I]f a wired switch is able to send and receive SNMP messages (i.e., speak the SNMP language), then the switch must have software that can implement SNMP" [*Id.* (citation omitted)].

Plaintiffs retained Mr. Bradner "to opine on technical matters . . . in relation to the [SNMP] and the products at issue in this case (which are Ethernet switches and switches/routers)" [Doc. 537-2 ¶ 2]. "[H]e "opin[es] on the extent to which certain capabilities in [Defendant's] products are attributable to SNMP, including capabilities identified in a survey conducted by Dr. Ravi Dhar" [*Id.*]. He concludes:

> I am aware that Dr. Ravi Dhar conducted a survey to determine which capabilities are important purchase factors for users of wired based switches. I reviewed the list of capabilities used in the survey and (i) agree that these capabilities describe the capabilities of a wired switch, (ii) did not identify any important capabilities missing from the list of capabilities, and (iii) did not identify any error or inaccuracies in the list of capabilities. I also agree that management is [a] term that includes configuration and monitoring capabilities, as shown in Dr. Dhar's survey. Based on my experience, education, training, knowledge, and the experiments I conducted, I was asked to determine whether and to what extent (based on an estimated percentage from 0–100%) certain categories are attributable to SNMP, including for the capabilities identified in the management category of Dr. Dhar's survey. Based upon my review of documents in this case and a conversation with Mr. Waldbusser, it is my understanding that each of the accused products I examined achieves SNMP through SNMP Research's software.

[*Id.* ¶ 277 (citation and footnote omitted)].

In order to determine which of the surveyed capabilities were attributable to Plaintiffs' software, he reviewed the technical documentation [*Id.* ¶¶ 25–113], and he tested the products that Defendant produced during discovery [*Id.* ¶¶ 114–47]. He discussed the Allegedly Infringing Monitoring Capabilities and whether Plaintiffs' software benefited customers [*Id.* ¶¶ 278–306].

14

For example, he identified that "[t]he capability to offer policy-based management and configuration (including zero-touch provisioning) is a function of programming in the operating system in the switch" [*Id.* ¶ 278]. Because SNMP is not involved with this function, he opined that SNMP attribution was 0% for this capability" [*Id.* ¶ 279]. With respect to the switch being monitored from a single pane of glass, Mr. Bradner found that it required SNMP, and therefore, he opined that SNMP attribution was 100% for this capability [*Id.* ¶¶ 280–82]. Further, Mr. Bradner provided a 50% SNMP attribution to the switch being able to send alerts [*Id.* ¶¶ 286–87]. He explained, "Syslog can also provide a version of this benefit if the switch and the NMS both support syslog. Since the decision on which alert protocol to use is a decision made by individual network operators[,]" he attributed half, 50%, to SNMP" [*Id.* ¶ 286]. Mr. Bradner noted that 50% "is conservative because it is [his] experience that Syslog Protocol messages, if an organization uses the Syslog Protocol, are sent to a central logging facility, generally to be looked at during a post mortem after an event or they are sent to a log parser such as Splunk" [*Id.* (citation omitted)].

Plaintiffs state that "[he] identified six surveyed capabilities . . . that depend upon the SNMP software embedded in [Defendant's] products" [Doc. 571 p. 18 (citing Doc. 537-2 ¶¶ 265–306 and footnote omitted)]. In addition, Plaintiffs state, "For the other six capabilities identified in the Management category, Mr. Bradner attributed 0% to SNMP" [*Id.* at 19 (citing Doc. 537-2 ¶¶ 279, 285, 294, 296, 300, 304)].

### C. Mr. Wallace

"Mr. Wallace is a founder and [chief executive officer] of a financial forensics firm and has almost four decades of experience analyzing company accounting and financial records" [*Id.* at 10 (citing Doc. 475-23 ¶¶ 1–8 SEALED)]. According to Plaintiffs, he "calculated [Defendant's] gross revenues from sales of its 'Platforms' (i.e., the physical wired switches that actually contain

the infringing software')" [*Id.*]. Plaintiffs state his results relating to the gross revenues are consistent with Defendant's expert, Quentin Mimms [*Id.* (citation omitted)].

Mr. Wallace, however, also performed an apportionment analysis [Doc. 536 p. 28 (citing Doc. 475-23 ¶ 101 SEALED)]. In order to arrive at his apportionment calculation, Mr. Wallace relied on Dr. Dhar's survey results, which "allocated a combined 6.8 points out of 100 (or 6.8%) to reflect the importance of the Infringing Capabilities on wired switch purchases" [Doc. 571 p. 19 (citation omitted)]. "Mr. Wallace applied the 6.8% 'apportionment factor' to [Defendant's] gross profits from sales of the accused products and related accessories/services . . ., and determined that [a sum certain] of [Defendant's] profits (as of December 2023) are attributable to the infringement" [*Id.* (citing Doc. 475-23 ¶¶ 119–121 SEALED)].

## II.   STANDARD OF REVIEW

Defendant now moves to exclude under Rule 702 of the Federal Rules of Evidence, Part V of Dr. Dhar's expert report, Part VIII of Mr. Bradner's expert report, and paragraphs 117 through 121 of Mr. Wallace's expert report [Doc. 454].

"[Rule] 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)   the testimony is based on sufficient facts or data;

> (c)   the testimony is the product of reliable principles and methods; and
>
> (d)   the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[3] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (quoting *Daubert*, 509 U.S. at 593–94), *aff'd by* 89 F. App'x 927 (6th Cir. 2003). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142).

---

[3] Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

17

"This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

## III. ANALYSIS

As noted above, pursuant to the Copyright Act, the plaintiff "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The statute also provides, "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id*. The statute therefore has two steps. "First, the copyright owner must present proof of 'the infringer's gross revenue' that is 'reasonably related' to the infringement." *Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, No. 2:18-CV-735, 2022 WL 3699403, at *2 (S.D. Ohio Aug. 25, 2022) (quoting *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 635 (6th Cir. 2020)), *aff'd*, 93 F.4th 985 (6th Cir. 2024). Second, "[t]he burden then shifts to the infringer to show (1) deductible expenses, and (2) the elements of revenue attributable to factors other than the copyrighted work." *Id*. (citing *Balsley v. LFP, Inc.*, 691 F.3d 747, 768–69 (6th Cir. 2012)).

Here, "Plaintiffs offered their own apportionment analysis both to satisfy their burden and to counter [Defendant's] apportionment [Doc. 571 p. 11]. Defendant raises four primary challenges to Plaintiffs' experts. First, it asserts that Dr. Dhar provided no reliable methodology for his list of capabilities of wired LAN Switches [Doc. 536 pp. 14–19]. Second, Defendant states that Mr. Bradner's SNMP attribution for the management capabilities that were identified by Dr. Dhar is unhelpful to determining apportionment and is based on conclusory reasoning [*Id*. at 19–

18

23].  Third, Defendant asserts that Dr. Dhar misrepresents the subject of Mr. Bradner's report and perpetuates the errors of Mr. Bradner's findings [*Id*. at 23–29].  Finally, because Mr. Wallace relies on these opinions for his apportionment percentage, Defendant contends that it too should be excluded [*Id*. at 28–29].

The Court will address these in turn.

### A.    Dr. Dhar's Methodology

Defendant asserts that Dr. Dhar arrived at a list of capabilities and then "grouped together" those with "similar benefits," ultimately concluding that there were 55 capabilities [*Id*. at 14].  It argues, "Dr. Dhar's report provides no further insight into his methodology in defining the capabilities at the core of his survey, leaving unanswered a number of significant questions about how and why he landed on the 55 capabilities he did" [*Id*.].  Defendant states that, for example, "Dr. Dhar often chose to group together more than one feature under a single 'capability[,]'" such as grouping "heat generation," "operating temperature," and "noise levels" under "Physical operating environment" [*Id*. (citing Doc. 537-1 ¶ 41)].  Defendant submits that "[o]ther of Dr. Dhar's capabilities appear to describe the same features" [*id.* at 15] and that his "list . . . also omits features listed in the materials on which he relied" [*id*. at 16].  It argues, "[T]he issue is not whether Dr. Dhar's list of capabilities is incorrect . . .; rather, the fundamental problem with Dr. Dhar's report is that he does not adequately explain his methodology at this key step of his survey design, leaving the factfinder with a list of 55 capabilities that appears arbitrary" [*Id*. at 16–17].  Given that, Defendant contends that Dr. Dhar's opinion is not "based on sufficient facts or data" [*Id*. at 17 (citations omitted)].  Defendant states that Dr. Dhar's opinion may be "permissible if he was an expert on wired switches, such that the Court could rely on his technical qualifications or knowledge of the industry" [*Id*.].  But Defendant asserts, he is not [*Id*.].  And although Dr. Dhar states he relied on Mr. Bradner, Defendant contends that during his deposition, Mr. Bradner stated,

19

"that he 'didn't try to assess [whether the list is complete]'" and does not have an opinion in that regard [*Id*. at 17–18 (citation omitted)].

Furthermore, Defendant argues that "Dr. Dhar's presentation of 55 capabilities, some of which are overlapping or contain multiple different features, render the survey results themselves potentially unreliable" [*Id*. at 18]. It asserts that its expert, "Dr. Eslamimehr[,] explains how a number of separate capabilities that Dr. Dhar attributes to Plaintiffs' software, including 'single pane of glass monitoring' and 'real-time monitoring' are inextricable from each other, such that one would not be offered without the other" [*Id*. (citations omitted)]. Therefore, Defendant states, "A survey respondent who valued both capabilities may have assigned equal value to both, may have assigned value to one but not the other knowing that, in effect, they are talking about a single feature, or may have assigned value to one but not the other not knowing that they are interdependent" [*Id*. (emphasis omitted)]. "Similarly," Defendant submits that "a respondent faced with 'Ability to upgrade and expand ports (e.g., increase uplink speed, utilize expansion modules)' and 'Switch has high speed uplink ports[]' as two separate capabilities may have randomly picked one of the two to show that she values switches with highspeed uplink ports or may have spread her points across the two to convey the same message" [*Id*. at 18–19]. Defendant argues, "[T]he seemingly arbitrary list of 55 capabilities—the product of the methodological choices that Dr. Dhar made but did not explain—may well have affected the results of his survey" [*Id*. at 19].

Plaintiffs respond that "Professor Dhar thoroughly explained the methodology he used for capability selection" [Doc. 571 p. 20 (citation omitted)]. They state that while "[Defendant] criticizes the grouping of just two capabilities (out of fifty-five), that is attorney argument, not evidence" [*Id*. at 21]. With respect to Defendant's allegation that Dr. Dhar omitted features, Plaintiffs assert that "the only missing 'feature' [Defendant] ever identifies is 'price'" [*Id*. at 22 (citation omitted)]. They argue that price is not a capability of a switch [*Id*.]. In addition, Plaintiffs

20

state the "survey respondents were able to assign points to any capability(ies) they believed were missing" [*Id*. at 23 (citation omitted)]. Plaintiffs contend that "none of [Defendant's] criticisms go to the reliability of [Dr.] Dhar's overall opinion and survey" [*Id*. (emphasis omitted)]. Finally, Plaintiffs point to Defendant's argument that the alleged flaws "may" have affected the survey results and claim that this shows "the absence of evidence that the results would be any different under [Defendant's] proposed alterations" [*Id*.].

Defendant replies that "Dr. Dhar's survey and its list of '55 capabilities of wired LAN switches' forms the unstable foundation on which Plaintiffs' house of cards is built" [Doc. 576 p. 8 (citation omitted)]. It argues that Dr. Dhar "has no experience in or experience with the market for wired switches" and that he does not provide sufficient detail to explain his methodology [*Id*.]. While Plaintiffs argue that Defendant's criticisms go to the weight of the opinion, Defendant states that it "does not simply criticize Dr. Dhar's survey" but instead, "it identifies fundamental flaws meriting its exclusion under Rule 702" [*Id*. at 9 (citation omitted)]. According to Defendant, "Survey experts do not have *carte blanche* to make methodological choices with impunity or according to their own *ipse dixit*, and courts regularly exclude their opinions where . . . they are not 'the product of reliable principles and methods'" [*Id*. (citation omitted)]. Defendant submits that "Plaintiffs' responses do nothing to undermine" Defendant's examples that demonstrated the foundational problems [*Id*. at 11]. It concludes that its decision "to take a conservative approach to assessing how the myriad issues with Dr. Dhar's list of capabilities affected his survey results does not alter or undermine any of the arguments raised in [Defendant's] opening brief" [*Id*. at 14].

Rule 702 requires that expert testimony be "based on sufficient facts or data[.]" Fed. R. Evid. 702(b). In determining whether the expert's method is reliable, the court must consider whether it is "supported by appropriate validation—i.e., 'good grounds,' based on what is known."

21

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Daubert*, 509 U.S. at 590). "The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *Id*.

Defendant challenges Dr. Dhar's survey. "Because almost all surveys are subject to some sort of criticism, courts generally hold that flaws in survey methodology go to the evidentiary weight of the survey rather than its admissibility." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 452 F. Supp. 2d 772, 778 (W.D. Mich. 2006) (collecting cases), *aff'd*, 502 F.3d 504 (6th Cir. 2007). Even so, "[t]here are limits[,]" and courts "should not respond reflexively to every criticism by saying it merely 'goes to the weight' of the survey rather than to its admissibility." *Id*. (quoting *Simon Property Group L.P. v. mySimon, Inc.*, 104 F. Supp. 2d 1033, 1039 (S.D. Ind. 2000)).

Defendant raises two primary challenges to Dr. Dhar's opinion. First, Defendant argues that Dr. Dhar did not sufficiently explain how he arrived at his list of 55 capabilities [Doc. 536 pp. 14–18]. Second, Defendant submits that because he overlapped some capabilities or grouped others with different features, the results of the survey are not reliable [*Id*. at 18–19]. The Court disagrees.

Starting in paragraph 37, Dr. Dhar sets forth how he selected the capabilities of wired LAN switches [Doc. 537-1 ¶ 37]. As outlined above, he reviewed (1) "customer-facing and internal marketing materials from [Defendant] and [Defendant's] SEC filings," (2) "reports from third-party industry analysts," (3) deposition testimony from Defendant's executives, Mr. Ajmera and Mr. Reason, (4) "[Defendant's] product 'data sheets,' which are sales documents highlighting the capabilities and features of specific product lines or product series," (5) "various materials [Defendant] created for external audiences, such as marketing presentations, press releases, annual reports, and its website," (6) "[Defendant's] marketing documents, such as documents outlining

22

brand messaging guidelines, product presentations, sales presentations, and a presentation describing the results from a survey of [Defendant's] software users," and (7) reports from third-party industry analyst Gartner Research—which according to [Defendant], is a reliable reference for technical expertise and recommendations for buyers of wired LAN switches" [*Id.* (footnotes omitted)]. *See Biscotti Inc. v. Microsoft Corp.*, No. 213CV01015, 2017 WL 2536962, at *1, *3 (E.D. Tex. May 18, 2017) ("The Court finds that Dr. Dhar provided a principled basis for the features selected here[,]" which was "based on [his] assessment of third-party reviews of the console, [the defendant's] internal and external documents, and other materials.").

But Defendant contends that Dr. Dhar's methodology leaves questions about why he grouped more than one feature for a single capability [Doc. 536 p. 13]. Dr. Dhar, however, explains why he grouped more than one feature into a single capability [Doc. 537-1 ¶ 38]. He states that for each document that he reviewed, he recorded the capabilities of the wired LAN switches [*Id.*]. "In order to make the list of capabilities understandable and manageable for survey respondents, capabilities that were described differently across marketing materials, but which provide similar benefits to purchasers, were grouped together" [*Id.*]. For example, he explains:

> [A] data sheet for the X440-G2 Series states that "X440-G2 base models come equipped with 4 upgradeable 1Gb ports . . . These 1 Gb ports can be upgraded to 10Gb Ethernet via a simple software license. This gives administrators the option to increase switch uplink speeds without replacing the entire switch," while a data sheet for the X460-G2 Series states that the "X460-G2 series switches have two slots, VIM and Timing, to support optional modules that support 10 Gigabit Ethernet, 40 Gigabit Ethernet, stacking and timing modules. The VIM slot supports a two-port SPF+ 10 Gigabit Ethernet module, a two-port 10GBase-T Gigabit Ethernet module, a two-port SummitStack module, or a two-port QSFP+ 40 Gigabit Ethernet module." Both of these descriptions refer to the possibility of changing or upgrading ports on the switch, and therefore, they were combined under a capability labeled "ability to upgrade and expand ports (e.g., increase uplink speed, utilize expansion modules)."

23

[*Id.* (citation omitted)].  In addition, Dr. Dhar states "that Mr. Bradner reviewed the phrasing of the capabilities of wired LAN switches identified" and that he "did not identify any errors or inaccuracies in the combination of related capabilities or in the list of the capabilities of wired LAN switches used in the survey" [*Id.* (citation omitted)].  During his deposition, Mr. Bradner confirmed that Mr. Dahr's list of capabilities: (1) described the capabilities of wired switches, (2) was not missing any important capabilities, and (3) contained no errors or inaccuracies [Doc. 537-17 p. 10].  Defendant points to Mr. Bradner's deposition, stating that he did not review "whether Dr. Dhar's grouping of features together was appropriate or whether different capabilities were overlapping or redundant" [Doc. 536 p. 18].  Mr. Bradner acknowledged that he did not assess whether the list of capabilities was complete or whether the categories overlapped [Doc. 537-17 p. 11].  But the Court finds Defendant's challenge on this point goes to the weight of the evidence and not to its admissibility.  *Earl v. Boeing Co.*, No. 4:19-CV-507, 2021 WL 3140545, at *7 (E.D. Tex. July 26, 2021) ("[T]he concern [the d]efendants express regarding the quantity of features included in the survey and the identity of those selected features goes to the weight of [the expert's testimony, not its admissibility."); *Apple, Inc. v. Samsung Elecs. Co.*, No. 12-CV-00630-LHK, 2014 WL 794328, at *16 n.10 (N.D. Cal. Feb. 25, 2014) ("[The defendant's] contention that the particular distraction features that [the expert] chose to test (and the features he chose *not* to test) render the survey unreliable is not persuasive.  [The expert] selected the distraction features to be surveyed based on features highlighted in Samsung's own manuals.  Whether [the expert] chose the correct distraction features, or whether he should have instead relied on other distraction features, goes to weight, not admissibility.").

Defendant argues that "Dr. Dhar's list of capabilities also omits features listed in the materials on which he relied" [Doc. 536 p. 16].  As Plaintiffs point out, however, Defendant only identifies price, and Defendant's expert opined that price is not a capability but an attribute [Doc.

24

571 p. 22 (citing Doc. 561-5 p. 15)]. And further to Plaintiffs' point, if price could be construed as a capability, Dr. Dhar's survey allowed respondents to assign points to any capabilities they believed were missing [Doc. 537-1 ¶ 49].[4] [5]

The cases that Defendant relies on do not require the Court to reach a different result. In its opening brief, it cites *Kentucky v. Marathon Petroleum Co. LP*, 464 F. Supp. 3d 880 (W.D. Ky. 2020). That case was an antitrust suit, which required the plaintiff to "define the relevant market within which the alleged anticompetitive effects of the defendant's actions occur." *Id*. at 889 (citation omitted). The expert limited the geographic market to Kentucky. *Id*. at 890. The court excluded his opinion, explaining that he "did not explain his methodology for defining the relevant market." *Id*. The court reasoned that the expert did not employ the hypothetical-monopolist test,

---

[4] The parties also dispute several of Dr. Dhar's groupings. For example, Defendant asserts that he grouped "heat generation," "operating temperature," and "noise levels" under "Physical operating environment" [Doc. 536 p. 14 (citation omitted)]. Defendant argues that many of the documents Dr. Dhar reviewed treated these features separately, and it is not clear that customers would think about these features together [*Id*. at 14–15]. Plaintiffs counter that "none of [Defendant's] experts said [customers would think about the features together] in any of their reports" [Doc. 571 p. 21 (footnote omitted)]. But regardless, Plaintiffs state that "the evidence [Defendant] cites contradicts its argument" [*Id*. at 22; *see also* Doc. 567-1 p. 22 SEALED]. Similarly, Defendant asserts that two capabilities "describe a feature that is very similar, if not identical" [Doc. 536 p. 14]. Plaintiffs respond that none of the experts opined on this, but regardless, Defendant is not correct [Doc. 571 p. 22]. These are issues that the jury can weigh and decide.

[5] Plaintiffs note that "courts are especially reluctant to exclude a survey when the party attacking it did not conduct its own survey" [Doc. 571 pp. 9–10 (citing *Whirlpool Props. v. LG Elecs.*, No. 1:03 CV 414, 2006 WL 62846, at *3 (W.D. Mich. Jan. 10, 2006) ("[T]he absence of competing survey evidence from [expert] showing divergent survey results significantly undermines the efficacy of plaintiffs' arguments that defendants' evidence is so unreliable it must be excluded."); *Combe Inc. v. Dr. Aug. Wolff*, 851 F. App'x 357, 361-63 (4th Cir. 2021) (finding "criticism of the survey's design" to be "unpersuasive" where defendant "had not introduced any empirical evidence to support" any "alleged flaws"); *In re Univ. S. Cal. Tuition*, 695 F. Supp. 3d 1128, 1153 (C.D. Cal. 2023) (citing numerous cases rejecting criticisms by parties who did not conduct their own surveys); 5 Intellectual Property Counseling & Litigation § 76.06 ("[W]here attacks on the opponent's survey criticize the universe surveyed or methodology employed, a court may look askance at the critique in the absence of a counter-survey proving … a different result.")).

which is usually the methodology that experts utilize, nor did he explain "why he chose to limit the market to terminals in Kentucky." *Id.* Here, Dr. Dhar does explain why he grouped capabilities together—he reviewed numerous sources and determined that certain capabilities related to the same function. Moreover, the Court finds Defendant's citation to *Balimunkwe v. Bank of Am.*, No. 1:14-CV-327, 2015 WL 5167632, at *1 (S.D. Ohio Sept. 3, 2015), *report and recommendation adopted sub nom. Balimunkwe v. Bank of Am., N.A.*, No. 1:14-CV-327, 2015 WL 5836975 (S.D. Ohio Oct. 2, 2015) unhelpful given that the decision related to a handwriting expert. In that case, the court excluded the witnesses for many reasons—one of which was his "report d[id] not adequately explain the methodology he applied to compare the known signatures with the questioned signatures." *Id.* at *14. The court concluded that the expert's phrases in his report were "so vague as to be virtually meaningless." *Id.* Such is not the case here.[6]

---

[6] Defendant adds a few additional cases in its reply brief, but these too are not helpful to the issues in this case. For example, in *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 325 F. Supp. 2d 841 (M.D. Tenn. 2004), the court excluded the expert's surveys that related to the issue of likelihood of confusion because "proof of actual confusion, that is the core of [the expert's] challenged surveys report, does not 'fit' the issue before the [c]ourt and is irrelevant to an award of damages or lost profits." *Id.* at 850.

In *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-CV-10578, 2016 WL 5956325, (E.D. Mich. Oct. 14, 2016), the court excluded the expert, who performed a conjoint analysis, in an "attempt to determine the value that consumers place[d] on the individual accused patent features." *Id.* at *2 (footnote omitted). The court found that the expert's "results express[ed] nothing about the value of the four patented features relative to other important features of the accused devices." *Id.* at *6; *see also id.* at *16 (finding that the other expert "ma[de] no attempt to quantify the value of the four patented features, which are but a few of the numerous features that drive consumer demand for the accused devices, relative to those other features").

And in *Innovation Ventures, LLC v. N2G Distrib., Inc.*, No. 08-CV-10983, 2011 WL 6010206 (E.D. Mich. Nov. 30, 2011), a trademark mark and trade dress infringement case, the court excluded the plaintiff's expert witness's study, largely because he did not provide the survey participants with the defendant's product, explaining the "survey could have and should have used actual product bottles rather than front product photos in the survey." *Id.* at *3.

26

Based on the above, the Court declines to exclude Dr. Dhar's opinions that are set forth in Part V of his expert report.

## B. Mr. Bradner's SNMP Attribution Opinions

Defendant states, "Taking Dr. Dhar's list of capabilities, Mr. Bradner, . . . then determined 'whether and to what extent (based on an estimated percentage from 0–100%) certain categories are attributable to SNMP, including for the capabilities identified in the management category of Dr. Dhar's survey" [Doc. 536 p. 19 (citation and emphasis omitted)]. Defendant contends that Mr. Bradner evaluated "SNMP, not any particular implementation thereof" [*Id.* (citation omitted)]. According to Defendant, "The purpose of Mr. Bradner's calculations was to allow Dr. Dhar to assign proper weight to each 'Allegedly Infringing Monitoring Capability' he presented respondents in his survey, thus providing 'an estimate of the importance of the Allegedly Infringing Monitoring Capabilities to the purchase decision of wired LAN switch buyers'" [*Id.* (citations omitted)]. Defendant submits, "This estimated importance would then provide Mr. Wallace with a figure for his apportionment analysis" [*Id.* at 20]. It explains that "the goal of apportionment is to assess the relative contribution of infringing and noninfringing factors to the profits obtained by the defendant" [*Id.*]. But Defendant contends that "Mr. Bradner's analysis failed to provide relevant information for that task for two separate reasons, making it both unhelpful to the factfinder and unreliable under Rule 702" [*Id.*].

"First," Defendant states, "Mr. Bradner concedes that he did not do any analysis of the contribution of Plaintiffs' software—as opposed to the other software and technology that enable the SNMP standard—to any of the capabilities he was assessing" [*Id.*]. "[Because] it is undisputed that Plaintiffs' software does not, on its own, enable the SNMP standard in networking switches[,]" Defendant argues that "Plaintiffs do not and cannot claim copyright in the other elements necessary to enable the SNMP standard, including the efforts of [Defendant] engineers" [*Id.* (citation

27

omitted)].   Defendant therefore concludes, "Mr. Bradner's failure to distinguish between the contributions of the specific copyrighted work and the contributions of [Defendant's] engineers and other elements in enabling the SNMP standard on [Defendant's] switches renders his opinions wholly useless to the exercise of apportionment of value to Plaintiffs' software" [*Id.* (citation omitted)].

The second issue, Defendant asserts, is that "[f]or each of the six capabilities that Mr. Bradner attributes to the SNMP standard, he derives the percentage of attribution purely based on the *necessity* of SNMP to the capability—whether the SNMP standard is a 'but for' requirement for that particular capability" [*Id.* at 21].   But Defendant contends that this constitutes a "fundamental error by Mr. Bradner [because] the SNMP standard is not all that is required for *any* of the capabilities he discusses—and therefore cannot be responsible for 100% of the benefit of those capabilities" [*Id.*].   According to Defendant, "Mr. Bradner himself has admitted that there are many components that are necessary for the operation of a switch and for SNMP implementation on the switch, such as a switch's CPU or ports [*Id.* at 21–22 (citation omitted)]. Defendant states that "Mr. Bradner fails to consider the contribution of these other components or how they would affect the extent a capability can be attributed to the SNMP standard, and he does not explain why they were omitted in his report [*Id.* at 22 (citation omitted)].   It submits that "Mr. Bradner's reasoning nowhere assesses the relative contribution of the SNMP standard to enable a particular capability, as compared to all the other elements of a switch that may also be required to enable that capability" [*Id.*].   Defendant continues, "Nor does Mr. Bradner offer any insight into why he believed it was appropriate to assign 100% attribution to the SNMP standard for any capability in which it plays some role" [*Id.* (citations omitted)].   Defendant asserts, "Taking Mr. Bradner's flawed reasoning to its logical conclusion, if any component is necessary to achieve a capability, then that capability can be 100% attributed to that component" [*Id.* at 22 (citation

28

omitted)]. Defendant argues that such opinions are not the products of reliable principles and methods and that they are also unhelpful and irrelevant [*Id.* at 23].

Plaintiffs respond, "There is no dispute that SNMPR provides a complete and operational SNMP agent that fully implements the SNMP protocol" [Doc. 571 p. 25]. According to Plaintiffs, "The customer only has to integrate the SNMPR Agent into their specific product, and SNMPR provides a toolkit that automates most of that work" [*Id.* (citation omitted)]. They state that "a key benefit of SNMPR's software is that the customer does not have to create its own implementation of the SNMP standard, and the process of integrating the SNMPR Agent into a product's code base is extremely simple and easy" [*Id.* (citations omitted)]. Plaintiffs claim that "[Defendant] is free to argue to the jury that [it] should get credit for some work it did while illegally copying SNMPR's source[,]" but they state "that is not a basis to exclude either Mr. Bradner's opinion or [Dr.] Dhar's survey" [*Id.*].

Further, Plaintiffs assert that Defendant's argument "that Mr. Bradner only assessed 'the extent to which the SNMP standard contributed to various capabilities of network switches' as opposed to the value of SNMPR's software . . . is wrong" [*Id.* (citation and emphasis omitted)]. According to Plaintiffs, "Mr. Bradner assessed the contribution of SNMPR's software implementation of the SNMP standard" [*Id.* at 26]. In addition, Plaintiffs state that "[Defendant] only discusses a single Infringing Capability . . . [b]ut the Infringing Capabilities are capabilities of the switches themselves; a graphical interface is not part of the switch" [*Id.* (citation and emphasis omitted)]. Plaintiffs conclude that "even if any of [Defendant's] criticisms of Mr. Bradner's Attribution Percentages were correct, they are for cross-examination, not exclusion" [*Id.* at 27].

Defendant replies that "there is a lack of fit between the analysis that Mr. Bradner was engaged in and the legal requirements for apportionment" [Doc. 576 p. 15]. It argues that

29

"Plaintiffs failed to counter [Defendant's] argument that, for each of the six capabilities that Mr. Brander attributes to the SNMP standard, he derives the percentage of attribution (in five out of six cases, 100%) based purely on whether the standard is necessary to the capability, rather than assessing the relative contribution of the SNMP standard compared to other factors" [*Id*.]. It adds, "None of Plaintiffs' responses address[]the core contention brought by [Defendant]: that Mr. Bradner has no basis to claim that 100% of a given capability should be attributed to the SNMP standard where it is undisputed that multiple other features are also necessary to enable that capability" [*Id*. (citation and emphasis omitted)]. With respect to switches, Defendant states that Plaintiffs' position makes no sense, and they "do not explain why Mr. Bradner could not or should not have considered components and functionalities that exist outside the switch when calculating attribution percentages—especially when those components are necessary for the capability he is considering and which he is claiming is 100% attributable to Plaintiffs' software" [*Id*. at 16]. It contends that it "also identif[ied] components and functionalities of the switch itself that are necessary for all six infringing capabilities . . . [b]ut Plaintiffs do not offer any reasoning as to why a component cannot be necessary for more than one capability—and more, importantly, here, they cannot explain why a port or CPU being necessary for an additional capability means that the port or CPU should be discounted entirely in Mr. Brander's apportionment percentages for the allegedly Infringing Capabilities, with all value of the capabilities instead going to the SNMP standard" [*Id*. at 16–17]. According to Defendant:

> More broadly, Plaintiffs' focus on the non-exhaustive handful of examples that [Defendant] provides of components and functionalities that should have been considered in Mr. Bradner's calculation exercise ignores the more fundamental issue raised in [Defendant's] brief: Mr. Bradner's methodology of considering only the SNMP standard's necessity to the six Allegedly Infringing Monitoring Capabilities before attributing those capabilities 100% to the standard, rather than taking into account the relative

30

> contribution of the SNMP standard to the infringing capabilities, is
> unexplained, unreliable, and misleading.

[*Id*. at 17 (emphasis omitted)].

Further, Defendant asserts that "Mr. Bradner's attribution percentages are based on a flawed and unsupported assumptions that no additional labor or effort by [Defendant] is required to implement SNMP functionality on a switch and that nothing besides the SNMP standard is necessary for the six capabilities he identifies" [*Id*. at 18].

As noted above, under the Copyright Act, a copyright owner is entitled to actual damages and profits. 17 U.S.C. § 504(b). With respect to profits, the copyright owner must only show the infringer's gross revenue, "and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id*. "'[A]ttributable to' means apportionment." *Balsley v. LFP, Inc.*, 691 F.3d 747, 769 (6th Cir. 2012). "Where there is a commingling of gains, he must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him." *Sheldon v. Metro-Goldwyn Pictures Corp.*, 309 U.S. 390, 406 (1940).[7] The Seventh Circuit has explained, "Today, *Sheldon*'s legacy is a two-part test for entitlement to apportionment of profits: the infringer must show (1) 'that all the profits are not due to the use of the copyrighted material,' and (2) that 'the evidence is sufficient to provide a fair basis of division.'" *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 477 (7th Cir. 2024) (quoting *Sheldon*, 309 U.S. at 402), *reh'g and reh'g in banc dismissed*, No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), and *cert. denied*, 145 S. Ct. 1182 (2025). One court has explained that when the plaintiff offers a

---

[7]     The First Circuit has stated, "The commingling referred to in *Sheldon* was the commingling of infringing and non-infringing profits -- not infringing and non-infringing elements of the offending work -- and refers to the defendant's burden to apportion such profits." *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 111 F.4th 125, 138 (1st Cir. 2024).

31

rebuttal to the apportionment opinion, the plaintiff "does not bear the burden of establishing apportionment but rather has the much lower burden of demonstrating how the [d]efendants' expert's apportionment analysis is incorrect." *Furnituredealer.net, Inc v. Amazon.com, Inc*, No. CV 18-232, 2022 WL 891462, at *22 (D. Minn. Mar. 25, 2022).

Here, Plaintiffs relied on experts to perform an apportionment analysis in order to rebut Defendant's apportionment analysis. As noted above, Mr. Bradner "was asked to determine whether and to what extent (based on an estimated percentage from 0–100%) certain categories are attributable to SNMP, including for the capabilities identified in the management category of Dr. Dhar's survey" [Doc. 537-2 ¶ 277]. "Based on [his] review of documents in this case and a conversation with Mr. Waldbusser," Mr. Bradner states that "it is [his] understanding that each of the accused products [he] he examined achieves SNMP through SNMP Research's software" [*Id.* citation and footnote omitted)]. Mr. Bradner analyzed many capabilities and opined that SNMP attributed 100% to the following capabilities: (1) switch can be monitored from a single pane glass, (2) switch can be monitored in real time, (3) switch can be monitored using software from third parties, (4) switch can be monitored in a multi-vendor network with single NMS, and (5) switch provides granular view of devices, ports, applications, and users [*Id.* ¶¶ 280–282, 288–90, 291– 92, 297–98, 305–06]. He explains that SNMP is required for these capabilities [*Id.*]. With respect to the capability, switch can send alerts, he provides that SNMP attributes only 50% [*Id.* ¶ 287]. He submits, "Syslog can also provide a version of this benefit if the switch and NMS both support syslog" [*Id.* ¶ 286]. Given that "the decision on which alert protocol to use is a decision made by individual network operators, [he has] attributed half to SNMP" [*Id.*]. He calls his attribution percentage "conservative" because "Syslog Protocol messages . . . are sent to a central logging facility . . . [and] not normally processed at an NMS" [Id.]. SNMP trap messages, however, "would not be centralized and thus would be processed by the NMS" [*Id.*]. Or in other words, as he

explained during his deposition, "Syslog is not generally used." [Doc. 537–17 p. 14]. With respect to the remaining capabilities, Mr. Bradner opines that the SNMP attribution is 0% because SNMP is not involved in providing functions, not directly involved, or the function is not dependent on SNMP [Doc. 537-2 ¶¶ 278–88, 283–85, 293–94, 295–96, 299–300, and 301–04].

Defendant contends there are two primary issues with Dr. Bradner's opinions in this regard: (1) he did not analyze the contribution of Plaintiffs' software (as opposed to the other software and technology) to enabling any of the capabilities he assessed, and (2) for five capabilities he attributed to the SNMP standard at 100%, he did not explain the appropriateness of the full 100% assignment even though the SNMP standard is not all that is required for any capability. Starting with the former argument, both parties rely on the expert report of Steve Waldbusser, Plaintiffs' expert who analyzed the source code and technical evidence [Doc. 475–20 ¶ 1 SEALED]. Mr. Waldbusser states that Plaintiffs' software "is designed to make the job of a software developer as easy as possible" and that "[a] software developer who uses SNMP Research's product can create an SNMP Agent without having to understand technical details of SNMPv1, SNMPv2c, and SNMPv3" [Id. ¶ 38 SEALED; see also Doc. 571 p. 25]. Later, Mr. Waldbusser explained: "SNMP Research provides a fully working agent that implements the SNMP protocol. The customer does have to integrate the SNMP Research source code into its product, but SNMP Research provides a toolkit that allows the customer to easily integrate the SNMP Research" [Doc. 565 ¶ 8 (citations omitted)]. Mr. Bradner confirmed in his rebuttal report that Plaintiffs' software makes "the process of integrating the SNMPR Agent into a product code base . . . easy" [Doc. 571 p. 25 (citing Doc. 509-11 ¶ 42 SEALED)]. Defendant contends that "Plaintiffs do not dispute that integrating Plaintiffs' software requires the labor of [Defendant] engineers" and that because Mr. Bradner did not account for its contribution, his opinion is unreliable and does not fit the facts of the case [Doc. 576 pp. 18, 19]. The Court disagrees that this objection serves as a basis for exclusion. While the

33

parties do not appear to genuinely dispute that Defendant contributed by having to integrate the source code in its system, ███████████████████████████████████

███████████████ [Doc. 509-11 ¶ 41 SEALED]. He relies on David Spakes, one of Plaintiffs' engineers, who testified about the level of effort by the manufacturer [Doc. 561-4 p. 5]. Specifically, he testified that the manufacturer's "work is reduced to just basically filing in some blanks. We—we refer to it as a cookbook approaching to programming" [*Id*.]. It appears to the Court that there are factual issues as to whether Defendant's effort should be accounted for given the purported ease of Plaintiffs' software [*see* Doc. 509-11 ¶ 42], and that is more appropriate for the jury to weigh and consider. *See Jackson v. Parker-Hannifin Corp.*, 645 F. Supp. 3d 577, 599 (S.D. Miss. 2022) (explaining that "factual disputes . . . are better suited for jury determination than a *Daubert* motion").

Next, Defendant argues that Mr. Bradner erred by claiming that 100% of any given capability should be attributed to Plaintiffs because multiple other features were necessary to enable that capability. The Court finds this dispute, however, is a classic battle of the experts. Defendant relies on its expert Dr. Mahdi Eslamimehr ("Dr. Eslamimehr") [Doc. 537-18]. Dr. Eslamimehr states that he disagrees with Mr. Bradner's 100% attribution opinion with respect to the capability, "Switch can be monitored from a single pane of glass," because there other "critical features and functionalities beyond just SNMP" [*Id*. ¶¶ 33–34]. In its brief, Defendant states that some of the other functionalities include graphical interface and configuration management software [Doc. 536 p. 21]. Mr. Bradner testifies about the user interface design, stating, "Well, that's completely irrelevant to managing a switch from a single pane of glass. The pane of glass is the user interface, not the switch. So the user interface design on the switch is completely irrelevant." [Doc. 507-8 p. 7]. With respect to configuration management, Mr. Bradner testified, "The statement is about monitoring a switch, not configuring a switch. So [Dr. Eslamimehr]

34

bringing up configuration management is completely irrelevant" [*Id*. at 8]. Mr. Bradner discusses during his deposition why he disagrees with the features that Dr. Eslamimehr opined contributed to the capability, "switch can be monitored from a single pane of glass" [*Id*. at 7–8]. Defendant also notes that the NMS is a capability, but as Plaintiffs point out, Dr. Philip Greenspun noted in his expert report that the NMS is different from an SNMP agent, and he describes the NMS as "software that communicates with switches and displays to network technicians, in other words, not software that runs on switches" [Doc. 571 p. 26 (quoting Doc. 547-8 ¶¶ 228–29 and emphasis omitted)]. Defendant also states that CPUs and ports are necessary. During Mr. Bradner's deposition when asked about CPUs, he testified, "You're talking about entirely different categories. That doesn't make any sense" [Doc. 507-8 p. 10]. He was then asked, "Can the switch be monitored if it doesn't have a CPU?" [*Id*.]. Mr. Bradner responded, "A switch probably can't work if it doesn't have a CPU" [*Id*.]. And when asked if a switch can be monitored whether it does or does not have ports, Mr. Bradner responded, "Then it's not a switch" [*Id*.]. Plaintiffs note, however, that these "capabilities are already included in the Basic Functionality" [Doc. 571 p. 27 (citation omitted)]. In summary, Defendant points out several features that Mr. Bradner should have considered that would have affected his apportionment analysis. Plaintiffs disagree and argue that the features Defendant discusses are not capabilities or are accounted for elsewhere. The Court finds that these disputes are for the jury to weigh and consider. *See Mojo Mobility, Inc. v. Samsung Elecs. Co.*, No. 2:22-CV-00398, 2024 WL 3512225, at *2 (E.D. Tex. July 23, 2024) (explaining that factual disputes regarding the conclusions of the expert's report are not a basis to exclude and "are within the purview of the jury"); *see also Huddleston v. Springfield Health Servs., LLC*, No. 3:22-CV-00718, 2025 WL 57709, at *2 (M.D. Tenn. Jan. 8, 2025) ("Indeed, rejection of expert testimony is the exception rather than the rule—the gatekeeping function established by

*Daubert* was never intended to serve as a replacement for the adversary system." (quoting *Daniels v. Erie Ins. Grp.*, 291 F. Supp. 3d 835, 840 (M.D. Tenn. 2017)).

### C.    Dr. Dhar's Incorporation of Mr. Bradner's Work

Defendant states that "Dr. Dhar tak[es] Mr. Bradner's attribution percentages and incorporat[es] them into his survey findings to provide 'an estimate of the importance of the Allegedly Infringing Monitoring Capabilities to the purchase decision of wired LAN switch buyers'" [Doc. 536 p. 23 (citation omitted)].  It argues that Dr. Dhar's results are "fundamentally unreliable" for two reasons [*Id*. at 23–24].  First, Defendant states, that "Dr. Dhar, following Mr. Bradner's lead, improperly conflates the SNMP standard—a software protocol that is not owned by any one entity and for which multiple open-source versions exist—and Plaintiffs' software which is a tool kit that enables manufacturers to build software agents that comply with the SNMP standard" [*Id*. at 24].  Defendant asserts, "In his survey, . . . Dr. Dhar took Mr. Bradner's conclusions about the capabilities of wired switches attributable to the SNMP *standard* and converted them, with no discussion or analysis, to capabilities attributable to Plaintiffs' *software*, listing the six capabilities as the 'Allegedly Infringing Monitoring Capabilities'" [*Id*. (citations omitted)].  It claims, "Dr. Dhar then used the relative value the survey respondents—who were individuals 'involved in the decision to purchase' any wired LAN switch, not just [Defendant's] and not just those that use Plaintiffs' software—assigned to these capabilities to opine on the overall importance of the 'Allegedly Infringing Monitoring Capabilities" [*Id*. at 25 (citations omitted)].  Because Dr. Dhar's survey actually measures "the importance that consumers of wired switches place on capabilities enabled by the SNMP standard—not by Plaintiffs' software specifically[,]" Defendant argues that it is unreliable because it "overvalue[s] the role of Plaintiffs' software for those six capabilities" [*Id*. at (emphasis and foot omitted)].

"Second," Defendant asserts that "even putting aside the unexplained and misleading conflation of the SNMP standard with Plaintiffs' software, Dr. Dhar's ultimate finding—that 6.8 points out of 100 should be allocated to 'the Allegedly Infringing Monitoring Capabilities'—is dependent on the calculations in Part VIII of Mr. Bradner's report" [*Id*. at 27]. Defendant argues his reliance "perpetuates [the] fundamental flaw" [*Id*. at 28].[8]

Plaintiff responds that even if Defendant's first argument were correct, it "would not be a basis to exclude" [Doc. 571 p. 28 (citation omitted). In addition, Plaintiffs characterize Defendant's argument as "semantics[,]" noting that "[w]hen [Defendant's] accused products perform the SNMP standard, they do so because they contain SNMPR's software" [*Id*. (citation and emphasis omitted)]. According to Plaintiffs:

> It does not matter under copyright law that Extreme *could* have copied some other software or *could* have created its own software, or that there is some other software out there that *could* have done the same thing. What matters for disgorgement is which software [Defendant] actually used, and it is undisputed that it was [Plaintiffs'] software; indeed, the Motion itself admits it.

[*Id*. at 28–29 (citation and emphasis omitted)]. They argue that "[c]ourts prohibit copyright infringers from attempting to avoid disgorgement by pointing to the presence of alleged 'non-infringing substitutes'" [*Id*. at 29 (citation omitted)]. "[W]hile [Defendant] avoids the phrase 'non-infringing substitutes' in its brief," Plaintiffs assert "that is exactly what [Defendant] is arguing when it contends that [Dr.] Dhar supposedly erred by not measuring the difference in value that customers placed on SNMPR's software as compared to some other software implementation of the SNMP standard" [*Id*. (citations and emphasis omitted)]. With respect to Defendant's second argument, Plaintiff argues that it is just a repeat of Dr. Bradner's work [*Id*. at 30].

---

[8]     Given its finding above, the Court need not address this issue.

Defendant maintains in its reply that "the issue is that Dr. Dhar, with no explanation or analysis, converts Mr. Bradner's assessment of the extent to which the SNMP standard enables a given capability of a switch, to the amount that the capability should be attributed to Plaintiffs' software, to his ultimate conclusion on the 'importance of the Allegedly Infringing Monitoring Capabilities in consumers' decision to purchase wired switching products'" [Doc. 576 p. 20]. Defendant argues that Dr. Dhar did not explain "why these leaps were justified or of why a survey that relied on (1) respondents who had not necessarily purchased or used a switch with Plaintiffs' software and (2) an expert who explicitly stated that he was not opining on Plaintiffs' software could be used to measure the value of Plaintiffs' software" [*Id*.]. Further, Defendant states that Plaintiffs' argument about "noninfringing alternatives" misunderstands the point [*Id*. at 22]. It submits that "the example of alternatives to Plaintiffs' software merely demonstrate that there is in fact a real difference between the SNMP standard and Plaintiffs' software such that Mr. Bradner's SNMP-specific opinions cannot automatically and without explanation be converted into opinions about Plaintiffs' software and that it was incumbent on Dr. Dhar (not Plaintiffs' lawyers) to explain why he made the leap from one to the other" [*Id*. (citation omitted)]. It maintains that Dr. Dhar's survey is unreliable [*Id*. at 23].

The Court finds Defendant's arguments are not a basis for exclusion. *See Mojo Mobility Inc. v. Samsung Elecs.*, 2024 WL 3512225, at *2 (finding defendant's argument that the apportionment "survey improperly captures consumer value attributable to the Qi standard," rather than the invention, merely "identified factual disputes regarding the conclusions of the report," and thus "exclusion would be improper"). As Plaintiffs note, "The survey is relevant to showing the value placed on the software given that the software performs the standard" [Doc. 571 p. 28 (citing *Mojo Mobility Inc.*, 2024 WL 3512225, at *2; *ImprimisRx, LLC v. OSRX, Inc.*, No. 21-cv-1305, 2023 WL 7390842, at *6 (S.D. Cal. Nov. 8, 2023) ("The importance to a consumer of

38

hypothetical advertising claims is connected to the importance of similar and specific advertising claims."); *Apple*, 2012 WL 2571332, at *11 (expert's opinions admissible where surveys "solicit[ed] data on the impact of design on consumer choice more generally," and applied the "research more specifically to the asserted intellectual property rights and accused products at issue")).[9] And second, as Plaintiffs also point out, Mr. Bradner noted in his report, "Based upon my review of documents in this case and a conversation with Mr. Waldbusser, it is my understanding that each of the accused products I examined achieves SNMP through [Plaintiffs'] software" [Doc. 537-2 ¶ 277]. The Court therefore finds Defendant's objection not well taken.[10]

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's Motion to Exclude the Combined Opinions of Ravi Dhar, Scott Bradner, and Michael J. Wallace [**Doc. 454**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

[9] To the extent Defendant criticizes Dr. Dhar's survey [*see* Doc. 536 p. 25 n.6], the Court notes that it is a "rare case where the surveyed population is so off target that the survey becomes unreliable." *Navarro v. Procter & Gamble Co.*, 501 F. Supp. 3d 482, 500 (S.D. Ohio 2020). This is not that rare case.

[10] Given these findings, the Court need not address Defendant's argument relating to Mr. Wallace's opinions.