UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:20-CV-451-CEA-DCP |
| EXTREME NETWORKS, INC., | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Plaintiffs' Motion to Exclude the Testimony of Quentin Mimms [Doc. 459]. Defendant has responded in opposition [Doc. 556], and Plaintiffs have filed a reply [Doc. 582]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **GRANTS IN PART AND DENIES** Plaintiffs' motion [**Doc. 459**].

## I.    BACKGROUND

According to the allegations in the Amended Complaint for Breach of Contract, Copyright, Infringement, and Fraud ("Amended Complaint") [Doc. 244], in 1988, Dr. Jeffrey Case ("Dr. Case") and Ken Key ("Mr. Key") started a company that developed a software-based management system [*Id*. ¶ 1]. "One of the foundational technologies of modern computer networks is the Simple Network Management Protocol (herein, 'SNMP') from which Plaintiffs take their names" [*Id*. ¶ 2].[1]  SNMP allows "connected devices to communicate by sending and

---

[1]    Plaintiff SNMP Research, Inc. ("SNMP Research") "is primarily a research and development company that creates, licenses, and supports products based on SNMP" [Doc. 244 ¶

responding to messages" [*Id.*]. "For example, a network-connected laser printer can communicate with a network-connected computer using SNMP to pass messages regarding the printer's status (e.g., needs paper, paper jam)" [*Id.*]. Plaintiffs allege that their "technology is an implementation of SNMP" and that their "primary asset is their intellectual property embedded in their software, including copyright protection" [*Id.* ¶¶ 4, 6].

Plaintiffs state that on March 10, 2001, they "licensed some of their copyrighted software to . . . Brocade Communications Systems LLC ("Brocade")" [*Id.* ¶ 7].[2] According to the Amended Complaint:

> The License Agreement set[s] clear mandates on, among other things, which software was licensed, how it could be used internally by Brocade, and how it could be reproduced or transferred externally. It contained express limitations with respect to use of the human-readable "source code" that makes up the licensed software. Among other things, the License Agreement expressly forbade Brocade from transferring or disclosing "Source" materials, which were defined to include source code and related matter.

[*Id.* ¶ 8]. Plaintiffs claim that "Brocade breached the License Agreement by, among other things, disclosing Plaintiffs' source code to [Defendant]" [*Id.* ¶ 9]. Plaintiffs aver that Defendant continues to "engag[e] in unauthorized reproduction and public distribution of products containing Plaintiffs' copyrighted software, including but not limited to the creation of new Extreme products" [*Id.* ¶ 16].

A few months after Plaintiffs entered into a License Agreement with Brocade, on October 22, 2001, Plaintiff SNMPRI and Defendant entered into a License Agreement ("2001 Extreme

---

30]. Plaintiff SNMP Research International, Inc. ("Plaintiff SNMPRI") "is primarily responsible for sales, marketing, and sublicensing software under license from SNMP Research" [*Id.* ¶ 31].

[2]    Plaintiffs originally named Brocade and its ultimate parent, Broadcom Inc., to the lawsuit [*See* Doc. 244]. These parties settled the claims between them and were dismissed [Docs. 266, 268].

License") [*Id*. ¶ 68]. Plaintiffs submit that Defendant breached that agreement as follows:

> a) failing to report and pay royalties; b) using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 Extreme License; c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 Extreme License; d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the 2001 Extreme License; e) failing to provide information that Extreme was required to provide under the 2001 Extreme License; f) failing to maintain SNMP Research's copyright notice in the software; g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP International; and h) failing to return or provide certification of the destruction of Program Source provided under the 2001 Extreme License.

[*Id*. ¶ 68 (footnote omitted)].

Based on the above, Plaintiffs allege copyright infringement, 17 U.S.C. § 501 [*id*. ¶¶ 117–25; breach of the 2001 Extreme License Agreement [*id*. ¶¶ 137–43]; and fraud [*id*. ¶¶ 144–55].

Relevant to the instant matter, "[t]he 2001 [Extreme] License provided [Defendant] with two different payment options: 1) a Per-Copy Royalty Option, and 2) a Paid-up Royalty Option (which the parties sometimes refer to as a 'royalty buyout')" [Doc. 551 p. 8 (citation omitted)]. The parties do not dispute "that [Defendant] elected the Per-Copy Royalty option, which required [it] to pay a royalty for each unit that [it] sold containing any of the licensed software, with those royalties due quarterly" [*Id*. (citation omitted)].

Also relevant to the instant matter is that Defendant retained Quentin L. Mimms ("Mr. Mimms") to evaluate Plaintiffs' alleged damages for the breach of the 2001 Extreme License and its alleged infringement of Plaintiffs' copyright [Doc. 475-27 ¶ 1 SEALED]. He summarizes his opinions as follows:

3

> A. Under the breach of contract claim, SNMP Research's damages should be no more than $4.4 million in lost profits (i.e., unpaid royalties).
>
> B. Under the copyright infringement claim, assuming SNMP Research can demonstrate a reasonable relationship between the alleged infringement and [Defendant's] revenues, [Defendant's] profits for the accused products that are subject to profit disgorgement are no more than $202,069 for the EXOS products and no more than $2,308 for the Data Center products.

[Doc. 475-27 p. 6 SEALED; *see also* Doc. 551 p. 7].

Starting with his opinion on the breach of contract claim, Mr. Mimms states that Plaintiffs contend that the 2001 Extreme License covered only a single product—that is, the Black Diamond 10808 10-Slot Chassis product [Doc. 475-27 ¶ 50 SEALED; Doc. 556 p. 8]. Mr. Mimms submits that he is not aware of any evidence that Defendant "underreported sales of or failed to pay appropriate royalties for its sale of the Black Diamond 10808 10-Slot Chassis product" [Doc. 475-27 ¶ 50 (footnote omitted) SEALED; *see also* Doc. 556 p. 8]. He therefore calculates damages as $0 [Doc. 475-27 ¶ 50 SEALED; Doc. 556 p. 8].

Mr. Mimms, however, calculates damages for the alleged breach of contract based on Plaintiffs' position that the "[2001 Extreme License] required [Defendant] to report and pay royalties on products other than the Black Diamond 10808 10-Slot Chassis product," and that Defendant breached the 2001 Agreement in other ways (e.g., using and distributing Plaintiffs' software beyond the scope of the 2001 License Agreement), [Doc. 475-27 ¶¶ 51, 54 SEALED; *see also* Doc. 556 p. 8]. Mr. Mimms concludes that the appropriate remedy "would put a plaintiff in the same position it would have been in but for a defendant's breach (the premise of the 'but-for world approach' to calculating contractual damages)" [Doc. 475-27 ¶¶ 51–52, 56 SEALED; *see also* Doc. 556 p. 8]. He acknowledges that for the 2001 Extreme License, Defendant "elected the

4

Per-Copy Royalty Option" [Doc. 551 p. 8; *see also* Doc. 475-27 ¶ 63 SEALED]. In order to calculate damages, however, Mr. Mimms utilized the Paid-Up Royalty Option (or buyout) to arrive at his damages for the alleged breach of contract [Doc. 475-27 ¶¶ 69–70 SEALED; Doc. 551 p. 10].

Turning to his opinions relating to any damages for copyright infringement, Mr. Mimms notes that under 17 U.S.C. § 504(b), "[T]he infringer is required to prove his or her deductible expenses and the elements of the profit attributable to factors other than the copyrighted work" [Doc. 475-27 ¶ 72 SEALED; *see also* Doc. 556 p. 10]. In order to determine expenses, Mr. Mimms "evaluated [Defendant's] standard unburdened cost and standard cost" [Doc. 475-27 ¶ 86 SEALED; *see also* Doc. 556 p. 10]. Mr. Mimms states that Defendant also "incurs additional expenses to sell the accused products" [Doc. 475-27 ¶ 88 SEALED; *see also* Doc. 556 p. 10]. He explains, "[Defendant] conducts research and development to develop the products, performs sales and marketing activities required to sell the products, and incurs general and administrative expenses to support operations resulting in sales of accused products" [Doc. 475-27 ¶ 88 SEALED; *see also* Doc. 556 p. 10]. To support his statement, he relies on Defendant's public filings and states:

> There is reason to expect that R&D efforts are of particular importance to the sales of the accused products. I understand that the products are sophisticated pieces of technology, combining software and hardware, that were introduced and sold over the course of two decades. The products and technologies appear to require continuous R&D to bring both new and improved versions of the products. Indeed, just on the software side, I understand that between 2001 and the present date, Extreme has produced and released to its customers 55 major and minor revisions of the EXOS network operating system. Likewise, I understand that between 2018 and the present date, Extreme has released 17 major and minor versions of the network operating systems for the data center products it purchased from Brocade. It is reasonable to expect that R&D was necessary to produce products of this nature (in

5

comparison to, for example, cable ties or some other simple or white-labeled product).

[Doc. 475-27 ¶¶ 92–93 SEALED; *see also* Doc. 556 pp. 10–11].

With respect to marketing expenses, Mr. Mimms submits, "Again, as with R&D, it is logical to expect that these sales and marketing efforts are expended in connection with the accused products, (i.e., sales and marketing efforts are not devoted entirely or primarily to products other than accused products)" [Doc. 475-27 ¶ 97 SEALED; *see also* Doc. 556 p. 11]. He notes that "[Defendant] witnesses have testified about marketing of wired switches that include the accused products" [Doc. 475-27 ¶ 97 SEALED (footnote omitted); *see also* Doc. 556 p. 11]. "Mr. Mimms also compares [Defendant's] annual revenues to its annual costs in each category and the percentage of revenue assigned to that cost, observing that, in each case, the expenses generally varied with revenue, suggesting that these so-called overheads costs behave more like variable costs, which, he explains, is 'logical' given the 'long-term period at issue'" [Doc. 556 p. 11 (citing Doc. 475-27 tbls. 14–17, ¶¶ 93–94, 99–101, 103–04 SEALED)]. He acknowledges that "[Defendant] does not calculate R&D, selling and marketing, and general and administrative costs on a per-unit basis but annually reports them at the enterprise level" [Doc. 475-27 ¶ 108 SEALED; *see also* Doc. 556 p. 11]. He explains, "To determine the portion of these expenses that can be reasonably attributed to the accused products, [he] . . . used the relationship of these expense[s] as a weighted average percent of revenue . . . and applied these percentages to total accused product revenue to estimate the amount of each expense" [Doc. 475-27 ¶ 108 SEALED; *see also* Doc. 556 p. 11]. "Deducting those proportionate costs from gross revenues leaves [a certain operating margin]" [Doc. 556 pp. 11–12 (citing Doc. 475-27 ¶ 112 SEALED)].

Next, Mr. Mimms turns to apportionment, wherein he determines "the portion of profits not attributable to the copyrighted material[,]" which he states "must be calculated to determine

6

the award of infringer's profits" [Doc. 475-27 ¶ 113 SEALED; *see also* Doc. 556 p. 12]. He

submits that if "[Plaintiff] SNMPR is determined to be entitled to some portion of [Defendant's]

profits[,]" he has "engaged in an apportionment of damages" [Doc. 475-27 ¶ 115 SEALED; *see*

*also* Doc. 556 p. 12]. He notes, however, that "[t]here is no one specific economic method to

determine apportionment" [Doc. 475-27 ¶ 116 SEALED; *see also* Doc. 556 p. 12]. He thereafter

"set[s] forth several potential approaches and points of reference" [Doc. 475-27 ¶ 116 SEALED;

*see also* Doc. 556 p. *12*]. As Defendant explains:

> In certain of these approaches, Mr. Mimms considers various
> measures of the value of Plaintiffs' software and then determines the
> portion of [Defendant's] profits that are attributable to that value.
> For one such approach, Mr. Mimms relies on the "design around"
> costs incurred by [Defendant] in the real world to remove Plaintiffs'
> software at issue and substitute in an existing open-source SNMP
> Agent, as those costs are "a barometer of a value." For another
> approach, Mr. Mimms uses [Defendant's] technical expert's
> estimation of the cost of "writing an SNMP Agent like that provided
> by SNMP Research from scratch."

[Doc. 556 p. 12 (quoting Doc. 475-27 ¶ 116 SEALED and footnote omitted)].

Plaintiffs now challenge Mr. Mimms's opinions pursuant to Federal Rule of Evidence 702

and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993).

## II.     STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or

evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137,

147 (1999) (quoting *Daubert*, 509 U.S. at 589). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if the proponent demonstrates to the court that
> it is more likely than not that:

7

<blockquote>
(a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)      the testimony is based on sufficient facts or data;

(c)      the testimony is the product of reliable principles and methods; and

(d)      the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.
</blockquote>

Fed. R. Evid. 702.[3] The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (quoting *Daubert*, 509 U.S. at 593–94), *aff'd by* 89 F. App'x 927 (6th Cir. 2003). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

---

[3]      Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

## III.   ANALYSIS

Plaintiffs assert two primary challenges to Mr. Mimms's opinions. First, they argue that Mr. Mimms relies on counter-factual hypotheticals that are neither relevant, nor reliable [Doc. 551 pp. 9–13]. Second, Plaintiffs contend that Mr. Mimms's disgorgement methodology and opinions are not legally correct [*Id*. at 13–20]. The Court will address these in turn.

### A.   Alleged Counter-Factual Hypotheticals

In both his opening and rebuttal reports, Plaintiffs accuse Mr. Mimms of relying on a counter-factual hypothetical [Doc. 551 p. 9].[4] That is, according to Plaintiffs:

> [W]hat would the damages be, if contrary to fact, [Defendant] never incurred any Per-Unit Royalties for any of the 379 accused [Defendant] products . . . because, hypothetically, just before [it] began selling each of the 379 accused products, [Defendant] would have purchased a fully-paid up licensed for that product's entire product class/family at the [dollar] buyout price that was offered to [Defendant] for a single product in 2001?

[*Id*. at 9–10]. Plaintiffs assert that these are not "the facts of this case" [*Id*. at 10]. They argue, "Rather in this case, it is undisputed that [Defendant] elected to pay Per-Unit Royalties and never

---

[4]   Plaintiffs state that in Mr. Mimms's rebuttal report, "he relied on the same core assumptions, counter-factual hypotheticals, and opinions he rendered in his Opening Report" [Doc. 551 p. 7 (citation omitted)].

9

elected or paid for a Paid-Up License even a single time, let alone for 379 separate products or 36 product classes" [*Id*. (emphasis omitted)]. Plaintiffs state that such is "true for the 'single product' in which [Defendant] actually had the right to include Plaintiffs' software (i.e., the BlackDiamond 10808 product)" [*Id*.]. In addition, Plaintiffs submit that "it is also true for every other product in which [Defendant] improperly put Plaintiffs' software and then sold" [*Id*.]. According to Plaintiffs, "It is even true for products that [Defendant] sold after this litigation was filed" [*Id*. (emphasis omitted)]. They note, for example, after the litigation was filed, Defendant "sold enough product units containing Plaintiffs' copyrighted software in at least thirteen separate [Defendant] product classes [and] incur[red] . . . Per-Unit Royalties for each of those product classes" [*Id*. at 10–11]. Plaintiffs argue, "These undisputed facts underscore that Mr. Mimms'[s] self-serving opinion that [Defendant] would have timely elected and paid for a Paid-Up Royalty [O]ption on all accused products before any Per-Copy Royalties were incurred is simply made up and is flatly contradicted by the actual facts of this case" [*Id*. at 11 (citation omitted)].

Defendant responds that Mr. Mimms's opinion is well founded [Doc. 556 p. 12]. It argues that "[i]n calculating breach of contract damages, Mr. Mimms applied the 'axiomatic' principle that for breach of contract claims, the plaintiff is entitled to 'damages sufficient to place the nonbreaching party in as good a position as the party would have been had the contract been performed'" [*Id*. at 12–13 (citation omitted)]. Defendant contends that Mr. Mimms constructed a hypothetical, also known as a "but-for," and he "assessed the amounts that Plaintiffs would have collected in the hypothetical world where Plaintiffs and [Defendant] expanded their licensing relationship to encompass every at-issue product (i.e., entered into amendments of the existing license agreement, in keeping with Plaintiffs' regular practice with its licenses) and Extreme timely paid the associated royalties" [*Id*.]. "[This] construction of a but-for scenario," Defendant argues,

is necessary here because the parties "agreed that the 2001 [Extreme] License limited to a single unaccused product, and thus damages can be assessed only by assuming a 'counter-factual' to determine the amount of royalties [Defendant] would have paid on accused products" [*Id.* at 13 (emphasis omitted)]. Defendant also accuses Plaintiff's expert of using a counter-factual hypothetical [*Id.*].

In addition, Defendant states that "Plaintiffs take particular issue with Mr. Mimms's assumption that [Defendant] would have opted for fully-paid up royalties[,]" and they "complain[] that 'it is undisputed that [Defendant] elected to pay Per-Unit Royalties and never elected or paid for a Paid-Up License even a single time, let alone for 379 separate products of 36 product classes'" [Doc. 556 p. 14 (quoting Doc. 551 p. 10 and emphasis omitted)].[5] But Defendant counters, it "has only one license with Plaintiffs covering one product" [*Id.*]. Plaintiffs' complaints, Defendant argues, are for cross examination and not for exclusion [*Id.* (citations omitted)]. It submits that Mr. Mimms has evidence to support his assumptions [*Id.* at 15–16].

Plaintiffs filed a reply, maintaining that Mr. Mimms's opinions should be excluded [Doc. 582 pp. 7–11]. They acknowledge that "[D]efendant is correct that the parties agree that [it] only had the right under the 2001 [Extreme] License to use and distribute the licensed software in a single product" [*Id.* at 7]. But Plaintiffs claim that "[Defendant] is very much mistaken in suggesting that the 2001 License does not apply to [Defendant's] use of the licensed software in other [Defendant] products" [*Id.*]. Pointing to the language in the 2001Extreme License, Plaintiffs assert that the terms therein provided for the "event of unauthorized use or distribution of the Program source" [*Id.* at 8 (emphasis omitted)]. According to Plaintiffs, "[T]here is no dispute that

---

[5]    The Court notes that Defendant made redactions to this sentence, but this sentence is not redacted in Plaintiffs' brief [*See* Doc. 551 p. 10].

[Defendant] expressly chose the default Per-Copy Royalty option under the 2001 [Extreme] License, where in addition to an upfront fee, [Defendant] would pay ongoing royalties on a quarterly basis, with those royalties being a set dollar amount for each [Defendant] unit sold containing 'all, some, or part' of the licensed software" [*Id.* (citation omitted)].  They argue that contrary to Defendant's assertion, the 2001 Extreme License obligated Defendant to pay royalties for the unauthorized use and distribution of the Program Source [*Id.*].  Plaintiffs contend that "Mr. Mimms was told by [defense] counsel to assume the damages provisions agreed to by the parties in the contract . . . do not apply in this case" [*Id.* at 9].  Plaintiffs therefore assert that "he performed his counter-factual hypothetical damages analysis without regard to those terms" [*Id.*].

Generally, an expert's reliance on assumptions "go to the weight, not the admissibility, of the testimony." *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). The United States Court of Appeals for the Sixth Circuit has stated, "Where an expert bases [his] opinion on assumed facts, 'mere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility.'" *Davis v. Sig Sauer, Inc.*, 126 F.4th 1213, 1224 (6th Cir. 2025) (quoting *In re Scrap Metal*, 527 F.3d 517, 530 (6th Cir. 2008)) (ellipses in original).  "[I]t is up to opposing counsel to inquire into the expert's factual basis." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) (citation omitted).

Even so, an expert cannot rely on facts that contradict the evidence in a case because such "undermine[s] the admissibility of his testimony." *Endless River Techs., LLC v. TransUnion, LLC*, No. 23-3087, 2025 WL 233659, at *7 (6th Cir. Jan. 17, 2025) (citations omitted); *see also Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) ("Expert testimony, however, is inadmissible when the facts upon which the expert bases his testimony contradict the evidence."

(citations omitted)).  The Sixth Circuit has explained, "It is true that expert testimony should be excluded if it relies on facts that no jury could accept, or relies on the rejection of facts that any jury would be required to accept."  *Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 527 (6th Cir. 2014).

Plaintiffs contend that Mr. Mimms's use of Paid-Up Royalty Option (royalty buyout) is not relevant or reliable because it contradicts the evidence in this case.  At this time, the Court disagrees.  Plaintiffs' position is based on their interpretation of the 2001 Extreme License Agreement, which they maintain  requires royalties for Defendant's unauthorized use and distribution of the Program Source.  But this is a major point of contention in the summary judgment filings [*see e.g.*, Doc. 570 p. 10] that are currently pending before the District Judge.[6]

Further, Mr. Mimms explains why he utilized the Paid-Up Royalty Option (royalty buyout) as opposed to the Per-Copy Royalty Option.  He acknowledges that the parties in 2001 agreed to the Per-Copy Royalty Option for one product [Doc. 475-27 ¶¶ 50, 61, 63 SEALED; Doc. 556 p. 8].  He adds that given the royalties Defendant paid on the one product, it made economic sense to choose that option [Doc. 475-27 ¶ 63 SEALED].  He states, however, that had Defendant projected the units it would sell for the other accused products, it would have been more beneficial to have chosen the royalty buyout [*Id*.].  And this was an option provided in Plaintiffs' license agreements.  *Goldman v. Healthcare Mgmt. Sys.*, 559 F. Supp. 2d 853, 868–69 (W.D. Mich. 2008) (declining to exclude the expert's opinion on the amounts the plaintiff would have charged under contract because "Defendants are free to offer evidence to contest that amount or subject [the expert] to cross-examination on the issue"); *Morris v. Tyson Chicken, Inc.*, No. 4:15-CV-00077,

---

[6]     To the extent any rulings on the summary judgment filings affect the Court's analysis herein, the undersigned may entertain any appropriate motions.

13

2020 WL 6331092, at *4 (W.D. Ky. Oct. 28, 2020) ("[The d]efendants['] criticisms of [the expert] for his use of a but-for test and whether he should have used an alternative method go to the weight of [the expert's] opinions and not their admissibility."); *Universal Surveillance Corp. v. Checkpoint Sys., Inc.*, No. 5:11-CV-1755, 2015 WL 6082122, at *19 (N.D. Ohio Sept. 30, 2015) (finding that the damages expert offered "reasoned explanations for the assumptions that he made" and "viable arguments to support his data set choices," and that criticisms of the but-for world went to weight, not admissibility).

The cases that Plaintiffs rely on are distinguishable from the instant matter. For instance, in *Washington*, 105 F. Supp. 3d at 293, the court excluded the plaintiffs' expert opinion because he made unfounded assumptions. *Id*. at 323–24. In that case, the plaintiffs sued the defendant for breach of contract relating to a licensing agreement. *Id*. at 297. The license agreement expired on a date certain, but it allowed the defendant the right to renew for an additional three years. *Id*. at 299. The defendant terminated its arrangements with the plaintiffs, including those under the license agreement, prior to the expiration of the license agreement. *Id*. at 302. The plaintiffs' expert, however, calculated damages for the renewal term on the assumption that the license agreement would have been renewed by defendant, even though "the option to renew was plainly [defendant's] and [defendant's] alone." *Id*. at 323.

The court acknowledged that generally an expert's assumptions are not a basis for exclusion, but it found that "there comes a point at which expert testimony is rightly seen as based on speculation, conjecture, or an assumption so unrealistic as to warrant exclusion through the court's role as gatekeeper." *Id*. at 324 (citations omitted). The court concluded, "In the absence of *any* evidence undergirding [the expert's] assumptions on this point, the calculations stemming from it must be excluded." *Id*.

14

Similarly, in *Ho Myung Moolsan, Co. v. Manitou Min. Water, Inc.*, No. 07 CIV.07483, 2010 WL 4892646, at *1 (S.D.N.Y. Dec. 2, 2010), *aff'd,* 501 F. App'x 85 (2d Cir. 2012), a breach of contract case, the plaintiff's expert opined on damages based on the assumption that the parties would have renewed the contract for five years. *Id*. at *7. In excluding that testimony, the court found that the expert "had no evidence whatsoever that the contract would be so renewed." *Id*.

Mr. Mimms does not offer any opinions on damages had the parties renewed the 2001 Extreme License. Instead, he looked to the terms of the 2001 Extreme License, which provided two methods for payment, and offered an opinion on damages had Defendant chosen the Paid-up Royalty Option (royalty buyout). And he explains why he used this calculation as opposed to the Per-Copy Royalty Option—that is, it made economic sense to choose that option [Doc. 475-27 ¶ 63 SEALED]. In addition, he relies on testimony from Defendant's Senior Director of Engineering about Defendant's regular practices when it relates to third-party software suppliers [Doc. 556 p. 16 (citing Doc. 475-27 ¶ 125 SEALED)]. *See cf. Washington*, 105 F. Supp. 3d at 323–24 (excluding the plaintiff's expert from opining on the defendant's future intentions).[7]

---

[7]     Plaintiffs other cases are also inapposite from this matter. *See Branta, LLC v. Newfield Prod. Co.*, 310 F. Supp. 3d 1166, 1194 (D. Colo. 2018) (finding the plaintiff's expert's assumption that the defendant "would have bid on at least part of the assets" was not reliable because it "ignore[d] the weight of the evidence to the contrary"); *Bank of Am., N.A. v. Bear Stearns Asset Mgmt.*, 969 F. Supp. 2d 339, 358 (S.D.N.Y. 2013) (excluding the expert's assumption that was provided by counsel because "there [were] *no* facts in the record that could lead a reasonable juror to conclude that such a counterfactual scenario would have occurred").

Further, in *Endless River Techs., LLC*, the plaintiff's expert arrived at a damages opinion by relying on a profit projection instead of looking at the online marketplace's actual performance. *Endless River Techs., LLC*, 2025 WL 233659, at *8. The court noted that there was a "stark gap between the profit projections' estimates and the [online marketplace's] real-world earnings." *Id*. (citation omitted).

And in *Silicon Knights*, the court excluded the plaintiff's expert's opinion about a hypothetical negotiation because it was "factually unsupported[.]" *Silicon Knights, Inc. v. Epic Games, Inc.*, No. 5:07-CV-275, 2011 WL 6748518, at *16 (E.D.N.C. Dec. 22, 2011). The court

15

The Court therefore finds Plaintiffs' objections on this basis not well taken. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 529–30 ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation.").

## B.    Mr. Mimms's Disgorgement Methodology

Plaintiffs assert two primary challenges to Mr. Mimms's disgorgement methodology. First, they argue that he uses a generalized deductible cost methodology that has been rejected by the Sixth Circuit [Doc. 551 pp. 15–19]. In addition, Plaintiffs state that "Mr. Mimms also improperly understates [Defendant's] ill-gotten gains" [*Id.* at 19]. The Court will address each of these in turn.

### 1.    Mr. Mimms's Cost Deduction Opinions

Plaintiffs argue, "The Sixth Circuit has already rejected generalized deductible cost methodologies like Mr. Mimms'[s] 'weighted averages' approach" [Doc. 551 p. 15]. Because Mr. Mimms relies on average costs, Plaintiffs assert that his methodology "directly contravenes the burden-shifting framework established by the Copyright Act and ignores the fact that infringers save money when they choose to infringe rather than follow the law" [*Id.*]. They contend, "Simply put, Mr. Mimms'[s] weighted average ratio over a 24-year period is not tied to the infringing products/sales, as it must be to be admissible" [*Id.* at 18]. Calling his opinions *ipse dixit*, Plaintiffs state that they should be excluded [*Id.* at 18–19].

Defendant responds that Plaintiffs' challenge goes to the weight of Mr. Mimms's opinions and not to their admissibility [Doc. 556 p. 17]. According to Defendant, "Plaintiffs do not cite a

also noted that the expert's opinion about the renegotiation was contrary to the defendant's licensing history. *Id.*

single case holding that it is appropriate to exclude an expert's opinion because of a supposed failure to tie deductible costs to revenues" [*Id.* (footnote omitted)]. Defendant submits that "[i]n the portion of his opinion that Plaintiffs challenge, Mr. Mimms addressed overhead expenses by (1) identifying the categories of overhead that contributed to the sales of the accused products, and (2) allocating a portion of those overhead expenses—marketing, research and development, and general administrative expenses—as deductible costs based on the ratio of revenue to expense on the enterprise level" [*Id.* at 18 (citation omitted)]. It contends that "Plaintiffs disregard [Mr. Mimms's analysis] and instead advocate for a standard not required by the caselaw: that Mr. Mimms must identify specific R&D expenses on a project-by-project or even product-by-product basis" [*Id.* at 19].

Plaintiffs filed a reply, stating that "none of the purported support that [Defendant] cites is tied to the accused products other than, at most, in an abstract, theoretical sense" [Doc. 582 p. 12]. According to Plaintiffs, "For an infringer such as [Defendant] to calculate company-wide ratios and then ask the finder of fact to accept that those ratios hold true for accused products is exactly the type of generalized approach not permitted by copyright case law" [*Id.* at 13]. Plaintiffs argue that "the case law requires much more specificity . . . from [Defendant] in order to carry [its] burden of showing, in the disgorgement context, that costs associated with the accused products— not costs associated with [Defendant's] many other products, including for example failed products and expensive products of the future that are currently in development—are properly deductible in the context of copyright disgorgement" [*Id.*]. They state that "another reason that Mr. Mimms'[s] generalized approach is improper here is that included in his company-wide analysis are many [Defendant] products that allegedly lost money" [*Id.* at 14]. Plaintiffs assert, "As a matter of law, an infringer cannot require the copyright owner to subsidized the infringer's losses on non-

accused products, which is exactly what [Defendant] is arguing should happen here" [*Id.* (citations)]. They maintain that "under established precedent, including binding precedent from the Sixth Circuit, Mr. Mimms'[s] 'weighted averages' approach is improper as a matter of law" [*Id.* at 15 (citations omitted)].

Pursuant to the Copyright Act, the plaintiff "is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). The statute continues, "In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.* The statute therefore has two steps. "First, the copyright owner must present proof of 'the infringer's gross revenue' that is 'reasonably related' to the infringement." *Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, No. 2:18-CV-735, 2022 WL 3699403, at *2 (S.D. Ohio Aug. 25, 2022) (quoting *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 635 (6th Cir. 2020)), *aff'd*, 93 F.4th 985 (6th Cir. 2024). Second, "[t]he burden then shifts to the infringer to show (1) deductible expenses, and (2) the elements of revenue attributable to factors other than the copyrighted work." *Id.* (citing *Balsley v. LFP, Inc.*, 691 F.3d 747, 768–69 (6th Cir. 2012)). Deductible expenses must be shown with "specificity." *Id.* (quoting *Singletary Constr., LLC v. Reda Home Builders, Inc.*, 815 F. App'x 892, 899–900 (6th Cir. 2020)).

Plaintiffs contend that Mr. Mimms "cannot provide any specificity with respect to [Defendant's] actual costs relating to the infringing products" [Doc. 551 p. 17]. Mr. Mimms acknowledges that Defendant has costs on a per-unit basis [Doc. 475-27 ¶¶ 86–88 SEALED; Doc. 556 p. 10], in addition to costs that are not tracked on a per-unit basis—overhead costs [Doc. 475-

18

27 ¶¶ 107–12 SEALED; Doc. 556 p. 10].  For the overhead costs, he identifies the categories: (1) research and development costs ("R&D"), (2) sales and marketing costs, and (3) general and administrative costs [Doc. 475-27 ¶ 88 SEALED; Doc. 556 p. 10].  With respect to R&D costs, Mr. Mimms reviewed Defendant's annual reports that noted "the nexus between its R&D efforts and the magnitude of its sales revenue" [Doc. 475-27 ¶ 89 SEALED (footnote omitted); Doc. 556 p. 19].  In addition, Mr. Mimms states that that "[t]here is reason to expect R&D efforts are of particular importance to the sales of the accused products" because "the products are sophisticated pieces of technology" and Defendant developed "new and improved versions of the products" over the years [Doc. 475-27 ¶ 92 SEALED; Doc. 556 p. 10].  He then "analyzes the rates of R&D spending and revenue over two decades to confirm the existence of a relationship between them" [Doc. 475-27 ¶¶ 93–94 SEALED; Doc. 556 p. 19].  He performs a similar analysis with sales and marketing and general and administrative costs [Doc. 475-27 ¶¶ 95–103 SEALED; Doc. 556 p. 19 n.6].  He concludes

> Extreme does not calculate R&D, selling and marketing, and general and administrative costs on a per-unit basis but annually reports them at the enterprise level.  To determine the portion of these expenses that can be reasonably attributed to the accused products, I have used the relationship of these expense as a weighted average percent of revenue calculated in the tables above, and applied these percentages to total accused product revenue to estimate the amount of each expense.  This ratio of revenue to expense on the enterprise level serves as the best available indicator of the ratio of revenue to expense on a per-unit level.

[Doc. 475-27 ¶ 108 SEALED; Doc. 556 p. 11].  He further notes that he understands from his review of case law that the full absorption approach is an acceptable method [Doc. 475-27 ¶ 109 SEALED].  He explains:

> [T]he full absorption approach "allows deduction of a portion of any overhead expense related to the infringement, even if the expense did not vary as a result of the infringing good or service, if the infringer both: (1) demonstrates that the expense contributed to

production of the infringing product, and (2) provides the court with fair and reasonable method for calculating the amount of the expense category that should be deducted."

[*Id.* (citation omitted and alteration in original)].

The Court finds Mr. Mimms's analysis passes muster under Rule 702 and *Daubert*. Both parties rely on *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505 (9th Cir. 1985) in support of their position. In that case, the plaintiffs sued defendants for copyright infringement due to their "use of five songs from [the] plaintiffs' dramatico-musical play *Kismet*[,]" which the defendants incorporated into their production, *Hallelujah Hollywood*. *Id.* at 509. After a bench trial, the court awarded the plaintiffs "a share of defendants' profits." *Id.* On appeal, the plaintiffs argued that "the district court erred in allowing deductions for overhead expenses . . . because [the] defendants failed to show that each item of claimed overhead assisted in the production of the infringement." *Id.* at 515. The Ninth Circuit described the defendants' method as follows:

The evidence defendants introduced a trial segregated overhead expenses into general categories, such as general and administrative costs, sales, and advertising, and engineering and maintenance." Defendants then allocated a portion of these costs to the production of *Hallelujah Hollywood* based on a ratio of the revenues from that production as compared to MGM Grand's total revenues. The district court adopted this approach.

*Id.* at 516 (footnote omitted). The court agreed with "the district court's acceptance of the defendants' method of allocation, based on gross revenues." *Id.* It reasoned that "a theoretically perfect allocation is impossible," and therefore courts "require only a 'reasonably acceptable formula.'" *Id.* (quoting *Sammons v. Colonial Press*, 126 F.2d 341, 349 (1st Cir. 1942)). The court therefore stated, "We find, as did the district court, that defendants' method of allocation is reasonably acceptable." *Id.*

20

The court disagreed, however, with the district court "to the extent it concluded the defendants adequately showed that the claimed overhead expenses actually contributed to the production of *Hallelujah Hollywood*." *Id.* Acknowledging that "an infringer [does not have to] prove his overhead expenses and their relationship to the infringing production in minute detail[,]" the court found that "[n]onethless, the defendant bears the burden of explaining, at least in general terms, how claimed overhead actually contributed to the production of the infringing work." *Id.* (citations omitted). The court concluded:

> We do not doubt that some of defendants' claimed overhead contributed to the production of *Hallelujah Hollywood.* The difficulty we have, however, is that defendants offered no evidence of what costs were included in general categories such as "general and administrative expenses," nor did they offer any evidence concerning how these costs contributed to the production of *Hallelujah Hollywood.* The defendants contend their burden was met when they introduced evidence of their total overhead costs allocated on a reasonable basis. The district court apparently agreed with this approach. That is not the law of this circuit.

*Id.*

Here, Mr. Mimms employed a similar methodology—one that the Ninth Circuit found to be acceptable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d at 531 ("We cannot say that the district court abused its discretion in admitting [the expert's] testimony when the record shows that he performed his analysis according to a reliable method . . . and reliably applied that method to the facts of this case."); *see also Satija v. Permanent Gen. Assur. Corp. of Ohio*, No. 1:13-CV-00082, 2014 WL 1664557, at *4 (N.D. Ohio Apr. 25, 2014) ("Third, Plaintiff's challenge to the method by which [the expert] allocates the profits attributable to the use of the [the infringing product] should be made to the jury. [The expert] implicitly assumes that every dollar spent in costs contributes equally to the profit received. The jury may or may not agree with that approach, but it is a principled means of allocating profit and is reliably applied to the facts of the case.").

21

And unlike the expert in *Frank Music Corp.*, Mr. Mimms explained what costs were included in these general categories. For instance, he explains that R&D includes, "personnel expenses, consultant fees, and prototype expenses, related to the design, development, testing and enhancement of products" [Doc. 475-27 ¶ 93 SEALED]. In addition, sales and marketing include Defendant's distributors, resellers, and field sales organization [*Id.* ¶ 95 SEALED]. He adds that "[Defendant] also participates in events such as industry tradeshows, technology seminars, technical conferences, and sales and training" [*Id.* ¶ 96 SEALED]. With respect to general and administrative expenses, Mr. Mimms states that they include "salaries and related expenses of executive, finance and administrative personnel, professional fees[,] and other general corporate expenses" [*Id.* ¶ 102 SEALED (footnote omitted)].

Further, Mr. Mimms explains that he reviewed public statements in Defendant's regulatory filings that describe the nexus between these expenses and sales revenue in general and then he analyzes the rates of such costs and revenue over two decades to show the relationship between them [*See* Doc. 556 p. 19]. And for sales and marketing, he notes that "[Defendant's] witnesses have testified about marketing of wired switches that include the accused products" [Doc. 475-27 ¶ 97 SEALED; Doc. 556 p. 11].

In *Premier Dealer Servs., Inc.*, 2022 WL 3699403, the court credited an expert's opinion who employed a similar methodology. *Id.* at *1. In that case, the plaintiff filed suit for copyright infringement with respect to its certificates for the Lifetime Powertrain Loyalty Program ("LPLP"). *Id.* The defendant did "not track expenses separately for each program it administer[ed] and consequently was unable to present an exact figure of LPLP expenses." *Id.* at *4. Its expert, however, was able to "estimate[] the LPLP expenses for the purposes of th[e] lawsuit." *Id.* In order to arrive at his opinions, the expert determined the defendant's total expenses through a

certain timeframe and worked with the defendant's chief financial officer "to identify expense categories that were related to LPLP." *Id*. The court noted that, "Although [the defendant] does not track expenses separately for each program, it tracks categories of expenses . . . across all programs and operations." *Id*. The expert then determined the sum of those expenses. *Id*. Next, the expert determined the revenue of the LPLP and calculated its percentage portion of the [defendant's] total revenue, and he then arrived at the percentage of expenses that was "potentially attributable to the LPLP." *Id*.

The plaintiff challenged this method, arguing that the defendant could not claim general overhead expenses in its deductible expenses. *Id*. at *5. The court explained:

> [The defendant's] proposed method, the full absorption approach, "allows deduction of a portion of any overhead expense related to the infringement, even if the expense did not vary as a result of the infringing good or service, if the infringer both: (1) demonstrates that the expense contributed to production of the infringing product, and (2) provides the court with fair and reasonable method for calculating the amount of the expense category that should be deducted." The Second and Ninth Circuits adopted this approach in copyright cases.

*Id*. (citations omitted). In applying the absorption method to the facts of the case, the court noted that "because 3.3% of [the defendant's] revenue comes from the LPLP, it is reasonable to estimate that 3.3% of [the defendant's] expenses come from the LPLP." *Id*. In other words, the court stated, "The general idea is the more revenue a program generates, the more expensive it is to operate." *Id*. The court concluded that the absorption approach was "logical," noting that "[f]or example, although building rent did not increase with the addition of the LPLP, it is a necessary cost of administering the LPLP[,]" and "[i]t [was] an expense that contributes to the production of the LPLP and should be considered a deductible expense." *Id*. at *6.

Similarly, Mr. Mimms used the absorption approach in his analysis and explained why he arrived at his deductions [Doc. 475-27 ¶ 109 SEALED]. *See Multiple Energy Techs., LLC v. Under Armour, Inc.*, No. 2:20-CV-664, 2025 WL 82328, at *6 (W.D. Pa. Jan. 13, 2025) (rejecting the plaintiff's argument that the expert's use of the absorption method "fails to show that the costs and profits excluded from the disgorgement analysis are not attributable to the infringing products, noting, that such "criticisms . . . go to the weight of his testimony rather than admissibility, and are more appropriately addressed through cross-examination of [the expert] about his decision to use the full absorption method (including his decision to include certain categories of expenses) (collecting cases and footnote omitted)). While his analysis is not provided in minute detail, such is not required, and he provided enough detail about how the overhead expenses contributed to the expenses of the accused products. *See Frank Music Corp.*, 772 F.2d at 516.[8]

Based on the above, the Court finds that Plaintiffs' challenges go to the weight of Mr. Mimms's opinions and not to their admissibility. *See Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 770 F. Supp. 1014, 1024 (E.D. Pa. 1991) ("Which direct and indirect expenses should be deducted is a factual determination to be made by the special master consistently with this opinion." (citing *Sheldon v. Metro–Goldwyn Pictures Corp.*, 309 U.S. 390, 409 (1940)

---

[8]    Plaintiffs rely on *Johnson v. Jones*, 149 F.3d 494 (6th Cir. 1998), stating that "Mr. Mimms'[s] reliance on average costs improperly understates [the defendant's] profit and overstates its costs for the accused products" [Doc. 551 p. 15]. In *Johnson*, the Sixth Circuit addressed whether the defendant had met its burden to show the expenses to deduct from the gross revenue on the infringing profit. *Id.* at 506. The court found that the defendant "provided no evidence of his deductible expenses." *Id.* Instead, "he testified to what his average margin of profit had been for the 40 to 50 jobs he had undertaken in 1994." *Id.* The court did not conduct a *Daubert* analysis, but further, Mr. Mimms explained his opinions on why Defendant's overhead expenses should be considered in determining profits on the accused products. The Court therefore finds this case inapposite to the facts here.

24

("deductions allowed in the computation of the net profits . . . involve questions of fact"))) (alterations in *Allen-Myland*).

## 2. Mr. Mimms's Apportionment Opinions

Plaintiffs also challenge Mr. Mimms's apportionment opinions [Doc. 551 pp. 19–20]. They assert as follows:

> Mr. Mimms . . . improperly understates [Defendant's] ill-gotten gains by (1) apportioning hypothetical profits [Defendant] would have earned if it had written "new code to replace SNMP Research source code from scratch" or "implemented a design-around project" by determining the costs it would have incurred and then multiplying those figures by [Defendant's] operating margin per dollar of cost, and (2) asserting that "[Defendant's] customers only care that the SNMP standard is implemented, not the particular implementation that was used."

[*Id.* at 19 (quoting Doc. 475-27 ¶¶ 136–41, 114 SEALED)]. Plaintiffs argue that his "analysis is flatly contrary to copyright disgorgement law" [*Id.*].

Defendant responds that Plaintiffs "misapply the law in arguing that two of Mr. Mimms's apportionment opinions must be summarily rejected simply because they include in their analysis calculations related to the cost of alternatives to the software at issue" [Doc. 556 p. 21]. It asserts that the cases Plaintiffs rely on "condemned simply replacing apportionment with a calculation of costs associated with non-infringing alternatives" [*Id.* at 22]. According to Defendant, they do "not suggest that non-infringing alternatives could not be considered as part of an apportionment analysis at all" [*Id.*]. Here, Defendant submits, "Mr. Mimms does not offer an opinion that disgorgement in this case should be equivalent to the cost of implementing a hypothetical alternative" [*Id.* at 23]. Defendant argues, "[T]here is nothing hypothetical about the implementation of a design-around; in the real world, [Defendant] actually did replace the software at issue with an available, open-source alternative" [*Id.* at 24 (citation omitted)]. Defendant states

25

that Plaintiffs "completely misstate[] Mr. Mimms['s] analysis" [*Id.*]. And it contends that "Mr. Mimms's analysis is supported by numerous other cases" [*Id.* at 25].

With respect to "Mr. Mimms's statement that '[Defendant] customers only care that the SNMP standard is implemented, not the particular implementation that was used[,]'" Defendant asserts that it "bears no relation to alternatives[,]" and it is a "restatement of the opinion of Dr. Philip Greenspun" [*Id.* at 26].

Plaintiffs reply that Defendant "errantly analogizes to patent licensing and lost profits cases (i.e., an infringement plaintiff's projection of profits it may have lost) for the argument that evidence of non-infringing substitutes—such as the cost of a license, the cost of a design-around, etc.—is relevant and admissible to show the 'value' of the infringed intellectual property and thus what an alleged infringer should be ordered to disgorge" [Doc. 582 p. 15 (citation omitted)]. According to Plaintiffs, "A threshold defect with [Defendant's] position is that it ignores that this is not a patent licensing case nor a lost profits case, but rather a copyright disgorgement case" [*Id.*]. Plaintiffs contend that "[i]n the context of copyright disgorgement, courts have routinely held that defendants cannot avoid or lessen disgorgement by pointing to other works that the defendant could have used or licensed in place of the infringed work" [*Id.*]. They submit that Defendant's argument that "Mr. Mimms is only using non-infringing substitutes to 'value' the intellectual property[,]" is a "distinction without a difference" [*Id.* at 16]. Plaintiffs explain, "At the end of the day, Mr. Mimms[] then uses that purported 'value' derived from non-infringing substitutes to reduce disgorgement down to the 'value' he calculates" [*Id.*].

In addition, Plaintiffs argue that Defendant is "wrong about the facts" because it "continues to include portions of Plaintiffs' software in some of [Defendant's] products even to [the] present" [*Id.* at 17 (citation omitted)]. Plaintiffs also state that it is irrelevant if Defendant "had multiple

options to replace Plaintiffs' software because that is not unusual" [*Id.*]. They submit that "the Copyright Act's framework for disgorgement looks at what actually happened vis-à-vis the defendant and its profits from infringement, not what might have happened if the infringer had not infringed but instead had designed-around, gotten a license, or switched to another computer program" [*Id.* at 17–18 (emphasis omitted)]. According to Plaintiffs, "what [Defendant] could have made if it had not infringed is not only irrelevant to determining how much it did make because of its infringement, it would defeat the entire purpose of the statutory disgorgement remedy" [*Id.* at 19 (citation omitted). Plaintiffs contends that Mr. Mimms's apportionment opinion cannot "be fixed through cross-examination" [*Id.* at 20].

As noted above, with respect to damages under the Copyright Act, "The copyright owner is entitled to recover the actual damages by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b). With respect to disgorgement, after the plaintiff establishes the gross revenue, the burden is on the defendant to show (1) the deductible expenses, and (2) "the elements of profit attributable to factors other than the copyrighted work." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561, 2016 WL 2342365, at *4 (N.D. Cal. May 3, 2016) (quoting 17 U.S.C. ¶ 504(b)).

The disgorgement remedy seeks "to prevent the infringer from unfairly benefiting from a wrongful act." *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561, 2016 WL 1743154, at *3 (N.D. Cal. May 2, 2016) (citation omitted). In other words, "[t]he availability of this remedy 'discourages infringement and encourages the would-be infringer to transact with the copyright owner rather than "steal" the copyrighted work.'" *Id.* (quoting *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 931 (7th Cir. 2003)). Even so, there must be "some reasonable

27

approximation of apportionment of infringer's profits[,]" in order to "avoid . . . 'giving the plaintiffs everything[.]'" *Id.* (citation omitted).

In the instant matter, Plaintiffs challenge Mr. Mimms's opinions in paragraphs 136–41 and 114. Defendant describes Mr. Mimms's opinions as follows: (1) he "[c]onsider[ed] different ways to measure the value of Plaintiffs' software" [*see* Doc. 475-27 ¶¶ 117–29, 136, 138–40]; (2) he "[c]alculate[d] the relationship between cost and operating profit" [*see id.* ¶¶ 131–32]; and (3) he "[e]stimate[d] the profit attributable to alleged copyright infringement based on the measured value of software and the calculated operating profits" [*see id.* ¶¶ 131–33, 136–37, 140–41] [Doc. 556 p. 24]. Defendant further explains, "With regard to the first step in its analysis, Mr. Mimms considers three different ways to measure the value of Plaintiffs' software: (a) the royalty fees that [Defendant] would have paid to license the software" [*see* Doc. 475-27 ¶¶ 127–29]; "(b) the cost of recreating the software" [*see id.* ¶¶ 136]; and "(c) the cost [Defendant] paid in the real world to replace for the software" [*see id.* ¶¶ 138–40] [*See* Doc. 556 p. 24]. Defendant states Mr. Mimms then uses these values "in steps two and three to calculate [its] profits attributable to the alleged infringement in light of the measured value of Plaintiffs' software" [*Id.*].

The Court will start with *Oracle Am., Inc.*, given that both parties reference it in their briefs. In that case, the court held that the defendant's expert "may not offer any disgorgement analysis based on non-infringing alternatives." *Oracle Am., Inc.*, 2016 WL 1743154, at *1. Specifically, the defendant's expert evaluated the defendant's "counterfactual substitution of a non-infringing alternative to the [copyrighted works] at issue." *Id.* The court concluded that it was "[n]ot acceptable" to "allow[] the existence of non-infringing alternatives to reduce recovery of wrongful profits. This is a distinct remedy for the purpose of *disgorgement*. Non-infringing alternatives have nothing to do with this." *Id.* at *3. It reasoned that "apportionment only requires a reasonable

approximation," but "any reasonable approximation must be based on a methodology that is tied to the goal of estimating the profits that [the defendant] actually earned due to its use of the allegedly infringing elements[.]"  *Id*.  The court continued that "'[a]pportionment' based on non-infringing alternatives would allow an infringer to reduce his disgorgement to nothing more than the cost of a license, a fundamental contradiction to what Section 504(b) has in mind."  *Id*.

The court further noted that "[t]he idea behind Section 504(b) is to hand over to the copyright owner the actual profits by the infringer using his copyrighted work."  *Id*. at *4.  It continued, "If a copyright infringer could avoid disgorgement by claiming he could have substituted some non-infringing alternative, the infringer would rarely be discouraged from infringing and the purpose of the disgorgement remedy would be eviscerated."  *Id*.

Turning to the expert's opinion, the court stated, "With his non-infringing alternative analyses, [the expert] did not perform a reasonable approximation of [the defendant's] apportioned profits"  *Id*.  "Instead," the court noted, "he approximated the costs avoided by the infringement."  *Id*.  The court concluded:

> [The expert's] failure to award [the plaintiff] any of the profits attributable to synergies with its copyrighted works is fatal to the admissibility of that portion of his testimony.  Thus, [the plaintiff's] non-infringing alternative analyses invite an approximation that is contrary to the law.  Accordingly, for disgorgement, [the defendant] may not offer his testimony on non-infringing alternatives for the purpose of apportionment of infringer's profits.

*Id*.

Defendant claims that Mr. Mimms measures the value of Plaintiffs' software by evaluating the cost of recreating the software and the cost Defendant paid in the real world to replace the software [Doc. 556 p. 24].  But as Plaintiffs note, "At the end of the day, Mr. Mimms[] then uses that purported 'value' derived from non-infringing substitutes to reduce disgorgement down to the

'value' he calculates'" [Doc. 582 p. 16]. The Court finds this is contrary to § 504(b). *See Goldman v. Healthcare Mgmt. Sys., Inc.*, 559 F. Supp. 2d 853, 875–76 (W.D. Mich. 2008) ("The ability to avoid damages by rewriting a computer program, or a song, or reproducing a painting, should not be considered because it would not implicate the *originality* of the expression being protected. Those concerns are considered in patent cases precisely because the alternatives question the *novelty* of the patent; if there are alternatives, or could be alternatives in the marketplace, the idea is not novel.").[9]

In other words, "The statute requires subtracting actual expenses and actual profits due to non-infringement. There is nothing in the text that lets parties construct and subtract hypothetical profits they might have earned had they never infringed." *Thomson Reuters Enter. Ctr. Gmbh v. Ross Intel. Inc.*, No. 1:20-CV-613, 2024 WL 3639193, at *2 (D. Del. Aug. 2, 2024) (citations omitted);[10] *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 775 F. Supp. 544, 571 (E.D.N.Y.

---

[9] The parties dispute whether this case is relevant because there is some ambiguity as to whether the court's discussion pertained to actual damages or disgorgement [Doc. 556 p. 23; Doc. 582 p. 19 n.2]. While the court uses the phrase, "actual damages," it also discusses the burden shifting framework on disgorgement claims. *See Goldman*, 559 F. Supp. 2d at 873. But regardless, the premise still holds true that "what [Defendant] could have made if it had not infringed is not only irrelevant to determining how much it did make because of its infringement, it would defeat the entire purpose of the statutory disgorgement remedy" [Doc. 582 p. 19].

Further, Defendant points out that one court noted, "I do not agree with *Goldman's* holding insofar as it applies to a computer program, which is the category of alleged copyrighted material at issue in this case." *AMO Dev., LLC v. Alcon Vision, LLC*, No. CV 20-842, 2023 WL 22104, at *1 (D. Del. Jan. 3, 2023). But in that case, it is clear that the court focused on "[c]omputer code occup[ying] a unique space in intellectual property"—functioning both "like an invention" and "a work of authorship"—and allowed such evidence in the context of actual damages and not disgorgement. *Id.* ("borrow[ing] from patent law's remedial scheme" for lost profits claim and citing *Oracle* for the proposition that defendants "may 'offer evidence of non-infringing alternatives to meet [the plaintiff's] claim for the profits it would have received absent infringement under Section 504(b)' of the Copyright Act" (citation omitted)).

[10] Defendant distinguishes *Thomson Reuters Enter. Ctr. Gmbh*, 2024 WL 3639193, stating that the "case relates to deducting expenses, not apportionment of profits" [Doc. 556 p. 23 n. 9].

30

1991) (explaining that the "basic flaw" of the non-infringing substitutes approach to disgorgement is that it "works from a premise of a hypothetical, infringement-free world" and "ignores the statutory purpose of the profits factor of damages, which is to deprive the infringer of any extra benefits it receives that are attributable to the forbidden conduct"), *aff'd in part, vacated in part*, 982 F.2d 693 (2d Cir. 1992); *Cisco Sys. Inc. v. Arista Networks, Inc.*, No. 14-CV-05344, 2016 WL 11752975, at *12 (N.D. Cal. Nov. 16, 2016) ("With respect to [the expert's] opinion on non-infringing alternatives, the [c]ourt agrees that non-infringing alternatives should neither be used to rebut causal nexus nor profits rightly attributed to the copyrighted work."); [11] *cf. Moonbug Ent. Ltd. v. BabyBus (Fujian) Network Tech. Co.*, No. 21-CV-06536, 2023 WL 4108838, at *7 (N.D. Cal. June 21, 2023) (noting that in this case, there was "no legal impropriety in considering a non-infringing alternative[,]" recognizing "[w]hile this court has indeed excluded expert opinions for the consideration of 'non-infringing alternatives,'" the court found that the expert had actually considered an alternative that existed and the expert was simply correcting the opposing expert's "apportionment of infringing and non-infringing views"). [12]

---

But as noted by Plaintiffs, "That distinction is wholly irrelevant . . . because an analysis of what the infringer could have done had it not infringed has no place in the Copyright Act's framework for determining disgorgement of the defendant's profits" [Doc. 582 p. 18 n. 1].

[11]     The court in *Cisco Sys. Inc.*, declined to exclude the expert because she did not opine that the plaintiff "would lose the right to disgorgement if there is a non-infringing alternative." *Cisco Sys. Inc.*, 2016 WL 11752975, at *12.  Instead, the court explained that the expert "merely noted that there is little to no evidence showing that [the defendant's] customers requested [the plaintiff's] copyrighted [works]." *Id*. Mr. Mimms's opinions go further than the expert challenged in *Cisco Sys. Inc.*

[12]     Defendant cites to several decisions that purportedly supports its position [Doc. 556 pp. 25–26].  In *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 637 (6th Cir. 2020), the court never addressed "the propriety of expert testimony on non-infringing alternatives" [Doc. 582 p. 21 (citation omitted)].  In *Bonner v. Dawson*, 404 F.3d 290, 292 (4th Cir. 2005), "[t]he court did not allude to . . . non-infringing substitutes evidence" [Doc. 582 p. 21 n. 3.].  And in *Premier Dealer*, 2022 WL 1604739, at *4, "[t]he court did not discuss or approve testimony on the cost of, e.g.,

Based on the above, the Court finds Plaintiffs' argument well taken and excludes Mr. Mimms's apportionment opinions [*See* Doc. 475-27 ¶¶ 136–141 SEALED].[13]

## IV. CONCLUSION

For the reasons stated above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' Motion to Exclude the Testimony of Quentin Mimms [**Doc. 459**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

redesigning the form or using a different method to collect the relevant information" [Doc. 582 p. 21 n. 3]. The Court therefore finds these cases inapposite.

[13]     At this time, the Court declines to exclude paragraph 14 in Mr. Mimms's report. Defendant argues that "this statement bears no relation to alternatives" and that "[i]t is a restatement of the opinion of Dr. Philip Greenspun, [Defendant's] technical expert" [Doc. 556 p. 26 (citations omitted)]. It further submits, "that Mr. Mimms uses [this statement] to 'consider whether the accused elements [] in fact had any causal link to the proffered revenue'—the exact analysis instructed by *Oracle* [*Id*. (citation omitted and second alteration in original)]. Plaintiffs did not sufficiently respond to this argument, and therefore, the Court declines to exclude this statement. *AK v. Behav. Health Sys., Inc.*, 382 F. Supp. 3d 772, 774 (M.D. Tenn. 2019) (stating that pursuant to case law, "when a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded").