# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. & SNMP RESEARCH INTERNATIONAL, INC., | ) ) ) | Case No. 3:20-cv-451 |
| *Plaintiffs*, | ) ) | Judge Atchley |
| v. | ) ) | Magistrate Judge Poplin |
| EXTREME NETWORKS, INC., | ) ) | |
| *Defendant*. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are the Motion for Partial Summary Judgment [Doc. 463] of Plaintiffs SNMP Research, Inc. ("SNMP Research"), and SNMP Research International, Inc. ("SNMPR International"), and the Motion for Summary Judgment [Doc. 468] of Defendant Extreme Networks, Inc. ("Extreme"). For reasons that follow, both Motions [Doc. 463 & 468] will be **GRANTED IN PART** and **DENIED IN PART**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs develop software that implements the Simple Network Management Protocol ("SNMP") standard. [Doc. 244 at ¶¶ 30–31].[1] The SNMP standard is a way for connected devices to communicate by sending and responding to messages. [*Id.* at ¶ 2]. It allows, for example, a network-connected printer to communicate with a network-connected computer to advise of a paper jam in the printer. [*Id.*]. Defendant Extreme designs and manufactures wired and wireless network infrastructure equipment. [Doc. 538 at 10].

---

[1] For clarity, record citations are to the CM/ECF-stamped document and page number, rather than any internal pagination.

In 2001, Extreme and SNMPR International entered into a License Agreement (the "2001 License" or the "License") [Doc. 491-2]. The 2001 License grants to Extreme certain rights to use Plaintiffs' software for Extreme's "Network Switch project." [Doc. 491-2 at 3]. It also grants certain redistribution rights. [*Id.*]. The parties agree that the License authorizes Extreme to use and distribute Plaintiffs' software in a single network switch product, namely, the BlackDiamond 10808 10-Slot chassis product. [*See* Doc. 538 at 11; Doc. 549 at 7]. There is no dispute that Extreme reported and paid royalties on the BlackDiamond product. In 2011, SNMP Research registered copyrights in the software that SNMPR International licensed to Extreme. [Doc. 489 at ¶ 29].

In 2017, Extreme acquired part of Brocade Communications Systems, LLC's business. [Doc. 489 at ¶ 67]. Brocade also had a license for some of Plaintiffs' software. [*Id.*]. Brocade sought SNMPR International's consent to transfer portions of the software and/or assign a license for the software to Extreme. [*Id.*]. The parties dispute the details of their communications, but Brocade's rights/license was not assigned to Extreme.

Plaintiffs filed this action on October 26, 2020, asserting various claims against Broadcom, Inc., Brocade Communications Systems, LLC, and Extreme Networks, Inc. [Doc. 1]. Against Extreme, the original complaint asserted only a copyright infringement claim. [*Id.* at 16].

In an Amended Complaint [Doc. 244] filed March 2, 2023, Plaintiffs allege that during this litigation, they discovered Extreme had used and redistributed Plaintiffs' software in scores of products other than the BlackDiamond. They allege Extreme falsely reported and paid royalties only on the BlackDiamond product when Extreme had in fact sold numerous other products containing Plaintiffs' software, provided to Extreme under the 2001 License.

The Amended Complaint [Doc. 244] (the "Complaint"), asserts three causes of action against Extreme: Count 3, Copyright Infringement; Count 5, Breach of the License Agreement; and Count 6, Fraud. [Doc. 244 at 26-32]. As to Count 5, Plaintiffs allege that Extreme breached the 2001 License by:

a) Failing to report and pay royalties;

b) Using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 License;

c) Using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 License;

d) Failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the 2001 License;

e) Failing to provide information as required by the 2001 License;

f) Failing to maintain SNMP Research's copyright notice in the software;

g) Failing to give required notice in supporting documentation that copying and distribution is by permission of SNMPR International; and

h) Failing to return or provide certification of the destruction of the Program Source provided under the 2001 License.

[Doc. 244 at ¶ 140]. Plaintiffs' fraud claim is predicated on Extreme's allegedly false royalty reporting of the products sold pursuant to the License Agreement and communications about the royalty reporting.

Extreme now moves for summary judgment as to all of Plaintiffs' claims. Plaintiffs seek summary judgment as to their copyright and breach of contract claims, as well as several of Extreme's affirmative defenses.

3

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party asserting the presence or absence of genuine issues of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56 (c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## III.     EXTREME'S MOTION FOR SUMMARY JUDGMENT

Extreme moves for summary judgment as to all of Plaintiffs' claims. As to the breach of contract claim, Extreme argues (i) all eight subclaims are time-barred; (ii) subclaims (b) through (f) are preempted by the Copyright Act; and (iii) the record is insufficient to demonstrate a breach as to subclaims (a), (c), (d), (f), (g) and (h). As to the fraud claim, Extreme contends that Plaintiffs cannot show a representation of past or present fact that was false when made. On the copyright claim, Extreme argues that Plaintiffs knowingly submitted inaccurate information in their copyright registration applications, necessitating a referral to the Copyright Office. Specifically,

4

Extreme says Plaintiffs' applications covered more than one "work" and that Plaintiffs submitted deficient source code deposits with their applications.

### a. Breach of Contract

#### i. Statute of Limitations – All Subclaims

##### 1. Positions of the Parties

Extreme contends Plaintiffs' breach of contract claims are entirely time-barred by the applicable statute of limitations. [Doc. 538 at 19–20]. According to Extreme, software license agreements constitute transactions involving the sale of goods and are thus governed by the UCC. [*Id.*]. Tennessee's UCC provides for a four-year statute of limitations for an "action for breach of any contract for sale." T.C.A. § 47-2-725. Because Plaintiffs allege that Extreme breached the License Agreement in 2005, Extreme says they had to bring their claims no later than 2009. [Doc. 538 at 19–20]. But Plaintiffs did not file the Complaint until October 2020 and did not assert a breach of contract claim against Extreme until amending in March 2023. According to Extreme, this renders the entire breach of contract claim untimely.

Plaintiffs respond that Tennessee's UCC does not apply to the 2001 License because a license for intellectual property is not a sale of goods. [Doc. 567 at 18]. The provision Extreme seeks to enforce applies only to a "sale," which is defined as a passing of title from seller to buyer. T.C.A. § 47-2-106(1). According to Plaintiff, no title was transferred here. Rather, the License Agreement granted to Extreme a nonexclusive license to use copyrighted software in a single product, but title remained with SNMPR International. [Doc. 567 at 18]. The Agreement also included a variety of use and transfer restrictions. Plaintiffs thus argue that even if software can sometimes be a "good," this License was not a <u>sale</u> of goods. [*Id.*]. Like Extreme, Plaintiffs cite a

number of cases to support their position that a software license is not a contract for the sale of goods to which the UCC applies.

In reply, Extreme reiterates that the "consensus" position of the courts is that software license agreements constitute sales of goods under the UCC, citing additional caselaw.

2.   Analysis

In relevant part, Tennessee's UCC provides:

(1) An action for breach of any contract for sale must be commenced within four (4) years after the cause of action has accrued.
. . .
(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.

T.C.A. § 47-2-725. This chapter of Tennessee's UCC only "applies to transactions in goods." T.C.A. § 47-2-102. "Goods" are "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." T.C.A. § 47-2-105(1). A "sale" "consists in the passing of title from the seller to the buyer for a price." T.C.A. § 47-2-106(1).

While Extreme is correct that Tennessee's UCC applies to "transactions in goods," the remedies provision it seeks to enforce applies more narrowly to "any contract for sale." T.C.A. § 47-2-725(1). Neither party cites a case that squarely addresses whether a software license agreement can constitute a "contract for sale" under Tennessee law. Nor has the Court found such a case in its own extensive research. Indeed, the Court has not found a single case applying the statute of limitations in T.C.A. § 47-2-725 to a license agreement.[2] *Highland Rim Constructors v. Atlantic Software Corporation* does not answer the question because it involved "the sale of a

---

[2] In *Knox County ex rel. Schumpert v. Perceptics Corp.*, No. 03A01-9803-CH-00089, 1998 WL 668721 (Tenn. Ct. App. 1998), the at-issue contract appears to have involved both hardware and a license for software. The defendant argued the UCC applied because most of the assets to be transferred were goods (computer hardware and software), whereas the services were incidental. The court applied the common law doctrine of *nullum tempus occurit regi*, which prevents an action brought by the State from being dismissed due to expiration of the normally-applicable statutory period of limitations. It therefore found that the UCC did not apply and did not reach the issue of whether the contract was one for goods or services.

6

computer system" as well as a software license agreement. No. 01-A-01-9104CV00147, 1992 WL 184872 (Tenn. Ct. App. Aug. 5, 1992) (UCC governed acceptance/rejection of computer "system purchase and software license agreement").

In the absence of controlling caselaw, the parties both cite to numerous cases discussing whether and when the UCC applies to software license agreements. And both parties contend theirs is the consensus position.

Courts, it seems, disagree on where the consensus lies.[3] As one district court observed: "For every court that finds that the weight of authority favors application of common law and not the UCC with regarding to software licenses, another finds that courts nationally have consistently classified the sale of a software package as a sale of a good for UCC purposes." *SAS Institute, Inc. v. World Programming Ltd.*, No. 5:10-25-FL, 2016 WL 3435196, at *10 (E.D.N.C. June 17, 2016) (citation and punctuation omitted). After reviewing the parties' cited authority and many other cases, it appears to the Court that end-user license agreements for consumer software packages are generally treated as sales of goods under the UCC. Beyond this limited proposition, there does not appear to be a clear consensus on the application of the UCC to software licenses.

In the absence of controlling authority or a clear majority position, the Court sees no reason to depart from the straightforward language of the statute. The remedies provision Extreme seeks to enforce plainly applies to "any contract for sale." T.C.A. § 47-2-725. It is undisputed that the 2001 License did not effect any transfer of title. The UCC defines a "sale" to include a transfer of title. Accordingly, T.C.A. § 47-2-725 has no application.

---

[3] *Contrast Irwin Seating Co. v. Int'l Bus. Machines Corp.*, No. 1:04CV568, 2005 WL 1475390, at *7 (W.D. Mich. June 22, 2005) ("Courts have generally held or recognized by implication that Article 2 of the Uniform Commercial Code . . . applies to contracts involving computer software licenses, even though the agreement may include obligations to provide other services such as installation, training and maintenance."), *with Attachment Corp. v. Health Net, Inc.*, No. C09-1161 MJP, 2010 WL 4365833, at *2 (W.D. Wash. 2010) ("The weight of authority favors application of common law and not the UCC with regard to software licenses.").

7

Several cases are particularly persuasive on this point. In *Digital Ally, Inc. v. Z3 Technology, LLC*, the court considered whether the repudiation and damages provisions of Nebraska's UCC applied to the transaction. No. 09-2292-KGS, 2010 WL 3974674 (D. Kan. Sept. 30, 2010). "Although Article 2 of the Nebraska UCC states it applies to 'transactions in goods,' the provisions relating to repudiation and damages are more narrowly defined." *Id.* at *9. The repudiation provisions applied to a "contract," which was statutorily defined as a contract for the present or future "sale of goods." *Id.* The contract at issue was clearly a license, with no passing of title. The court reasoned that "[a] pure license agreement, like the one at issue, does not involve transfer of title, and so is not a sale for Article 2 purposes." *Id.* at *9 (quoting *Berthold Types Ltd. v. Adobe Sys., Inc.*, 101 F. Supp. 2d 697, 698 (N.D. Ill. 2000) (cleaned up)). Based on the plain language of the contract and the statute, the court held that the repudiation and damages provisions of the UCC did not apply. *Id.*

Similarly, in *SAS Institute, Inc. v. World Programming Limited*, the defendant argued that the plaintiff was a "seller of goods" as defined in the UCC, and so could not recover any consequential damages arising from the breach of a software license. 2016 WL 3435196 (E.D.N.C. June 17, 2016). The court explained that "[w]hile defendant is correct that Article Two of the UCC 'applies to transactions in goods,' those provisions that prevent recovery of consequential damages apply to <u>sales</u> of goods." *Id.* at *10; *see also Hagen v. BeneTek, Inc.*, 714 F. Supp. 3d 1075 (E.D. Wis. 2024) (contract that conveyed right to use custom software did not transfer title and so was neither a sale of "goods," nor a "sale" at all); *Berthold*, 101 F. Supp. 2d at 698 (UCC did not apply to computer program transaction "because it involves only granting a license and not a sale of goods"). Reviewing the contract, the court noted that it was called a "license agreement," that title to the software did not pass to the defendant, the agreement referred to a "license grant," and the

plaintiff expressly retained all other rights to the software. *Id.* Like the 2001 License, the agreement had restrictions on transfer and assignment. *Id.*

Extreme's cited cases do not compel a different result. None are binding and many are not factually analogous. The only case construing Tennessee law involved a "system purchase and software license agreement" pursuant to which the plaintiff bought a computer system. *Highland Rim*, 1992 WL 184872. The court held that the sale of an integrated computer system was a transaction in goods and the training provided was an incidental service. *Id. Highland Rim* involved the purchase of actual computers, which are unquestionably goods, so it is not factually analogous.

Extreme relies heavily on *Axios, Inc., v. ThinkWare, Inc.*, but the Court finds it unpersuasive for several reasons. Case No. 1:15-cv-379, 2015 WL 5029227 (S.D. Ohio Aug. 26, 2015). *Axios* involved an end-user license agreement ("EULA") for human resources software. Perceiving a "consensus" position that software licenses constitute transactions for the sale of goods under the UCC, the court applied the UCC. *Id.* While most courts treat a EULA for a consumer software package as a sale of goods under the UCC, the Court respectfully disagrees that there is any broader consensus.

Second, the *Axios* holding relied on Ohio caselaw stating that computer software is a tangible, movable item, rather than an intangible idea. Construing state tax laws, Tennessee courts have reached a contrary conclusion. *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976) (holding "the sale of computer software does not constitute the sale of tangible personal property for the purposes of" the State Sales and Use Tax statute).

In the Court's view, there is a distinction between an end-user license agreement for the use of an integrated / ready to use software package and the License at issue here. The 2001 License

9

Agreement authorized the use of a software program, including its source code, in the development of another product for distribution. The licensed software is not an "off the rack" product that can be used for a distinct purpose upon purchase or license. Instead, Extreme explains, the at-issue EMANATE software "helps manufacturers create SNMP Agents and MIB files on their devices." [Doc. 538 at 9]. It "does not provide SNMP Agents and MIBS that can be used out of the box," but instead is used by network device manufacturers to build their own SNMP Agents and MIBs. [*Id.*].

On the spectrum between a EULA for a consumer software package and a transaction for pure intellectual property, the License Agreement is closer to an intellectual property transaction than the license in *Axios*. *See Kelly v. Waters Corp.*, Civ. No. 17-12193-LTS, 2023 WL 2404040, *9–10 (Feb. 9, 2023) (recognizing that while licensing of a single copy of software may be a transaction in goods, "[i]ntellectual property rights generally are not goods");[4] *Rottner v. AVG Techs. USA, Inc.*, 943 F. Supp.2d 222, 230–231 (D. Mass. 2013) (sale of "generally available standardized software" is "more like the sale of a tangible good," while "intellectual property . . . is definitively not a 'good' under the UCC").

*Irwin Seating Company v. International Business Machines Corporation* is distinguishable because the license agreement at issue was for a "fully integrated, operable system," which included both hardware and software. No. 1:04CV568, 2005 WL 1475390, at *7 (W.D. Mich. June 22, 2005). Similarly, *RRX Industries, Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546–47 (9th Cir. 1985) involved a "computer software system," and the court never referred to the transaction as a license. It only considered whether the contract was for the "sale" of goods or services.

---

[4] On a motion to dismiss, the *Kelly* court was unable to determine whether an asset purchase agreement to sell, assign, and transfer all intangible assets relating to two software programs, including source code and documentation, was governed by the UCC statute of limitations. *Kelly*, 2023 WL 2404040 at *9–10.

Next, several of Extreme's cases are inapposite because the parties agreed that the UCC applied or never raised the issue. *See Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 98 (3d Cir. 1991) ("All three parties agree that the terminals and the program are 'goods' within the meaning of" the UCC); *Tingley Systems, Inc. v. HealthLink, Inc.*, 509 F. Supp. 2d 1209 (M.D. Fla. 2007) (noting the parties "ha[d] not . . . discussed application of Florida's Uniform Commercial Code . . . which governs contracts for the sale of goods"); *Taylor Inv. Corp. v. Weil*, 169 F. Supp. 2d 1046 (D. Minn. 2001) (parties agreed license agreement was governed by the UCC); *CECG, Inc. v. Magic Software Ents., Inc.*, 51 F. App'x 359 (3d Cir. 2002) (applying UCC to determine whether terms of purchase order modified license agreement without discussing applicability of UCC to software or license agreement).

Finally, the Court addresses the Sixth Circuit's footnote in *Comshare, Inc. v. United States*, 27 F.3d 1142, 1145 (6th Cir. 1994). In *Comshare*, the issue was whether master source code tapes and discs constituted "tangible" property, "the purchase of which entitled the company to investment tax credits and accelerated depreciation deductions calculated on the basis of the full investment." *Id.* at 1142. Looking to the "corresponding category" in the UCC, the Sixth Circuit observed: "Courts and academic commentators have been moving toward the position that computer software is a 'good' covered by the sales provisions of the Code, and not simply an intellectual property right which is not covered." *Id.* at 1145 n.2.

*Comshare* interpreted federal tax law, so its mention of the UCC is dicta. More critically, *Comshare's* determination that master source code tapes and discs constitute tangible property for federal tax purposes is potentially at odds with how the Supreme Court of Tennessee has approached that question under state law. In *Commerce Union Bank v. Tidwell*, 538 S.W.2d 405 (Tenn. 1976), the Court explained "that while intellectual processes may be embodied in tangible

11

and physical material, such as punch cards and magnetic tapes, the logic or intelligence of the program is an intangible property right; it is this intangible property right which is acquired when computer software is purchased or leased." *Id.* at 407.

There is, moreover, ample authority for the position that the UCC does not apply to intellectual property, including software.[5] In *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1359 n.2 (Fed. Cir. 2005), the Federal Circuit rejected the argument that the UCC applied to the license of a board game for distribution as a contract for the sale of goods. The court held: "This is manifestly incorrect, since a license for intellectual property, including a license for a patent, is not a sale of goods." *Id.* Similarly, in *Eureka Water Co. v. Nestle Waters North America, Inc.,* 690 F.3d 1139 (10th Cir. 2012), the court ruled that a license for a trademark is not a "good" under the UCC. *Id.* at 1147. Relying on Oklahoma law, the court explained that "[i]ntellectual property is not a movable thing . . . rather, it is a type of intangible property." *Id.* And "[a]lthough one can express

---

[5] *See Novamedix Ltd. v. NDM Acquisition Corp.*, 116 F.3d 1177, 1182 (Fed. Cir. 1999) ("Many commercial transactions are not governed by Article 2 of the UCC: sale of land or securities, assignment of a contract right, or granting a license under a patent or copyright, to name just a few."); *Sys. Unlimited, Inc. v. Cisco Sys., Inc.*, 228 F. App'x 854, 859 (11th Cir. 2007) (unpublished) (sale of intellectual property, including any software, was "not a transaction in goods" and "the UCC only appl[ies] to contracts that deal predominately with 'transactions in goods'"); *Honeywell, Inc. v. Minolta Camera Co., LTD*, No. CIV.A.87-4847, 1991 WL 841033 (D.N.J. July 19, 1991) (contract for confidential design information and developmental automatic focus components that did not specify what form the intellectual property would take predominately "govern[ed] technology rather than goods" and thus UCC did not apply); *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427 (2d Cir. 1995) (where "the sale of a non-exclusive license for copyrighted material was the core of the contract" the contract was not for the sale of "goods" but general intangibles / personal property); *Kelly v. Waters Corp.*, Civil No. 17-12193-LTS, 2023 WL 2404010 (D. Mass. Feb. 9, 2023) (observing that while a license of "a single copy of software" is generally a transaction in goods, "[i]ntellectual property rights generally are not goods, as they are not movable things"); *Rottner v. AVG Techs. USA, Inc.*, 943 F. Supp.2d 222, 230–231 (D. Mass. 2013) (sale of "generally available standardized software" is "more like the sale of a tangible good," while "intellectual property . . . is definitively not a 'good' under the UCC"); *Attachment Corp. v. Health Net, Inc.*, No. C09-1161 MJP, 2010 WL 4365833, at *2 (W.D. Wash. 2010) ("The weight of authority favors application of common law and not the UCC with regard to software licenses."); *see also Beaton v. SpeedyPC Software*, 666 F. Supp. 3d 724 (N.D. Ill. 2023) (construing Canada's commercial code, software license was not a "good" because it was an intangible item, "incapable of being physically moved or transferred"); *Raak Techs., Inc. v. Marx CryptoTech, LP*, Civ. No. 1:15-cv-4019, 2016 WL 9451440 (N.D. Ga. May 2, 2016) (because intellectual property license is not a "transaction in goods," common law statute of limitations applied to software license agreements); *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425 (S.D.N.Y. 1996) (because the "predominant feature" of license agreement for use of software "was a transfer of intellectual property rights," common law statute of limitations applied rather than the UCC).

the content of intellectual property in a movable medium . . . the intellectual property remains intangible." *Id.* So the grant of a trademark license was not a transaction in goods under the UCC. *Id.* These cases illustrate the limited applicability of the UCC where intellectual property is concerned.

The remedies provision that Extreme seeks to enforce applies to contracts for "sale," which by definition requires transfer of title. No transfer of title occurred here. To the extent there is a majority position on the application of the UCC to software license agreements, it is insufficiently clear to override the plain language of Tennessee's statute. Extreme has the burden of proof, both as the moving party and as the party seeking application of the UCC. It has not met this burden, so the motion for summary judgment will be **DENIED** as the statute of limitations argument. Extreme's argument is premised on the contention that the UCC applies, so the Court need not consider Plaintiffs' contentions regarding fraudulent concealment or the discovery rule.

### ii. Failure of Proof as to Subclaims (a), (c), (d), (f), (g) & (h)

#### 1. Subclaims (a) and (c)

Extreme argues that Plaintiffs cannot prevail on subclaim (a), failing to report and pay royalties, or subclaim (c), using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the License. According to Extreme, it was not obligated to pay royalties on unauthorized use of the software, and so its rights under the License were not terminated for nonpayment of royalties. The Court agrees that the License Agreement imposes no obligation to pay royalties on unauthorized use of the software.[6]

There is no dispute that Extreme was obligated under the "Per-Copy Royalty Option," as to which the License provides:

---

[6] As the Court will explain, the License does require payment in certain circumstances for unauthorized use or distribution of the Program Source.

> Licensee shall pay a royalty in the amount given in Attachment C for each royalty-bearing copy distributed under the rights granted herein, which contains all, some, or part of the Licensed Modules.

[Doc. 491-2 at 12]. "Licensed Modules" are defined by reference to Attachment A. [*Id.* at 2]. Attachment A states: "Licensed Modules are portions of the Program which are licensed under the terms of this License Agreement for Licensee's Network Switch project . . .." [*Id.* at 15].

The License therefore obligated Extreme to pay royalties for "royalty-bearing" copies "distributed under the rights granted" by the License, which contained "all, some, or part" of the portions of the Program licensed under the Agreement for Extreme's Network Switch project. Because the License limits royalty payments to copies "distributed under the rights granted" by the License, the royalty obligation does not apply to unauthorized use. The parties agree that the "rights granted" by the License were solely for the BlackDiamond product. So Extreme's royalty obligations were likewise solely for the BlackDiamond product.

Plaintiffs offer no contractual explanation for their interpretation of the License. They emphasize the phrase "all, some, or part of the Licensed Modules." But their interpretation ignores the immediately preceding phrase "distributed under the rights granted herein." They do not explain why the License should not be applied according to its terms, nor do they explain how an obligation to pay royalties could extend beyond "the rights granted" by the License. And while the License does require payment for certain unauthorized use, that is a separate question than whether it requires royalty payments for unauthorized use.

As to subclaim (c), Plaintiffs contend that Extreme continued to use and redistribute Plaintiffs' software after its right to do so was terminated. Plaintiffs point to § 24 of the License as the basis for termination: "If the license fee and royalties are not paid in a timely fashion . . . the internal use and redistribution rights . . . shall be terminated." [Doc. 491-2 at 12; *see* Doc. 567 at

14

11]. There is no contention that Extreme failed to pay royalties on the BlackDiamond product. Since it did not owe royalties on any other products, its rights under the License were not terminated under this provision. Accordingly, subclaims (a) and (c) of Plaintiffs' breach of contract claim will be **DISMISSED**.

### 2. Subclaim (d)

Plaintiffs assert that Extreme breached the License by failing to satisfy its obligations with respect to use, copying, transference, and security of the Program Source. This allegation arises out § 8 of License Agreement:

> The Licensee agrees that it will take appropriate action with its employees and consultants, by agreement or otherwise, to satisfy its obligations under this License Agreement with respect to use, copying, transference, protection, and security of the Program Source, and any other materials provided to the Licensee by SNMP as a result of this License Agreement.

[Doc. 491-2 at 7]. According to Extreme, there is no allegation that it distributed Plaintiffs' source code, so the only possible argument is that Extreme breached § 8 by either (i) using Plaintiffs' source code in non-BlackDiamond products or (ii) giving employees and consultants access to source code while installing it on non-BlackDiamond products. [Doc. 577 at 16].

In seeking summary judgment, Extreme does not raise a fact dispute as to whether it used and copied the Program Source. Rather, it argues that if such use and copying occurred, it would not violate § 8 of the License as a matter of law. First, Extreme implies it did not "use" Plaintiffs' source code in non-BlackDiamond products because source code was not installed on these products. [*Id.* at 17]. Instead, "source code was converted into non-human-readable object code and then installed" on non-BlackDiamond products. [*Id.*]. The suggestion that this does not constitute "use" is nonsensical. Converting and installing source code is "use" of source code in any ordinary meaning of the word.

15

Second, Extreme could only "use" the Program Source through its employees or consultants. Plaintiffs have never contended that § 8 restricts "sharing" the Program Source with employees and consultants in accordance with the License. What Plaintiffs contend, and what the License actually says, is that Extreme was obligated to "take appropriate action" with its employees to make sure that it satisfied its obligations under the License "with respect to use, copying, transference, protection, and security of the Program Source." Extreme asserts this obligation would arise only if its employees failed to keep the Program Source confidential, if its use "threatened the confidentiality of the software." [Doc. 538 at 15; Doc. 577 at 17]. But it does not point to any language in the License that restricts § 8 to instances of external disclosure or distribution.

If Extreme used the Program Source in a manner inconsistent with the License Agreement, it could have done so only by directing the actions of "its employees and consultants." A reasonable jury could conclude that such use violated Extreme's obligation to take "appropriate action" to satisfy its obligations "with respect to use, copying, transference, protection, and security of the Program Source" and other materials provided under the License. There is a genuine issue of material fact, so Extreme is not entitled to summary judgment on subclaim (d).

### 3.  Subclaim (f)

Extreme contends that Plaintiffs have not adduced evidence to substantiate subclaim (f): that Extreme breached the License by failing to maintain SNMP Research's copyright notice in the software. As explained below, the Court concludes that subclaim (f) is preempted.

Even were this not the case, the Court would find that Extreme is entitled to dismissal of subclaim (f). Extreme carried its burden on summary judgment by demonstrating the absence of supporting evidence, and Plaintiffs have responded with no more than a scintilla of contrary

16

evidence. Plaintiffs cite three pieces of purported evidence, but make no effort to explain their significance. First, Plaintiffs cite a June 30, 2023, email internal to Extreme Networks that states: "Remove Copyright of SNMP Research and add it in Extreme Networks format for any new file added." [Doc. 476-22 at 2]. With no context or explanation, this does little to substantiate Plaintiffs' claim.

Second, Plaintiffs cite the report of their expert, Steve Waldbusser, which he clarifies in a subsequent declaration: "As part of my work in this case I reviewed Extreme source code from some of its most recent products, including the latest releases of EXOS and SLX. I found that at least some of these products still contain some SNMP Research source code in certain files but that the SNMP Research copyright notices were not present in those files." [Doc. 565 at ¶ 7]. Extreme counters that products Waldbusser identified were released after this action was brought and include products that are not part of Plaintiffs' breach of contract claim. [Doc. 567 at 13].

Indeed, Plaintiffs confirm in their own summary judgment briefing that "the SLX/VDX products . . . are part of Plaintiffs' copyright infringement claim . . . [b]ut they are *not* part of Plaintiffs' breach of contract claim, because they do not involve Extreme's obligations under the 2001 License." [Doc. 580 at 11]. Waldbusser's declaration does not say whether the source code he found in "certain files" without copyright notices came from the EXOS or SLX product line, both of which he reviewed. While the Court draws inferences in favor of the non-moving party, it cannot make a logical leap to fill a void in the evidentiary record. If the "certain files" to which Waldbusser refers were found in the SLX product line, they are, by Plaintiffs' own admission, irrelevant to the breach of contract claim.

Similarly, Dr. Case asserts he found "[a]t least one" Extreme product that "had indicia of SNMPR software," but no copyright notice. [Doc. 563 at ¶ 19]. He does not say that SNMPR's

source code was found in that product. In a case involving analysis of "hundreds of thousands of lines of Plaintiffs' copyrighted code," [Doc. 580 at 19], undetailed implications are simply insufficient to survive summary judgment. And Plaintiffs do not explain how these pieces of evidence add up to substantiate their claim. Plaintiffs have failed to come forward with more than a scintilla of evidence to support subclaim (f), and Extreme is therefore entitled to judgment on this subclaim even if it were not preempted.

### 4. Subclaim (g)

Extreme argues that Plaintiffs have no evidence to support their claim that it breached the License by failing to give required notice in supporting documentation that copying and distribution is by permission of SNMPR International. [Doc. 538 at 15]. Plaintiffs respond with seemingly unconnected claims: that in discovery, they reviewed Extreme's documentation and stated that it lacked the required notice, that summary judgment does not require them to prove a negative, and that Extreme's release notes and user guide do not contain the notice. [Doc. 567 at 13].

On a motion for summary judgment, a moving party can carry its burden by demonstrating an absence of evidence to support the nonmoving party's case. The nonmoving party cannot then "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586; FED. R. CIV. P. 56). Plaintiffs make no effort to explain why the pieces of information they cite are connected to their claim or create a genuine issue of material fact as to their claim. "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (*quoting Citizens Awareness Network, Inc. v. United States Nuclear Regulatory Comm'n*,

18

59 F.3d 284, 293–94 (1st Cir. 1995)). Accordingly, Extreme is entitled to summary judgment as to subclaim (g).

### 5. Subclaim (h)

Subclaim (h) alleges that Extreme breached the License by failing to return or provide certification of the destruction of the Program Source provided under the License. This subclaim arises out of Section § 16, captioned "Default," which lists certain remedies SNMPR International has for different breaches of the License. One of those remedies is the right to terminate Extreme's internal use and redistribution rights and "require the Licensee to return or provide written certification of the destruction of all copies of the Program Source . . . and all derivative works of the Program Source in all forms". [Doc. 491-2]. The License grants that remedy if Extreme "fails to observe, keep, or perform" either (i) "any Source confidentiality provisions of this License Agreement," or (ii) "any confidentiality, proprietary, intellectual, payment, or other financial provisions" of the License. [*Id.*].

Extreme contends it did not breach any of the confidentiality, payment, or financial provisions listed in § 16, so this requirement does not apply and Extreme had no duty to return or destroy Plaintiffs' software. Plaintiffs respond that (i) Extreme failed to pay for its "use" of the Program Source, violating the payment and financial provisions of the License, and (ii) there is a triable issue as to whether Extreme breached its "Source confidentiality" obligations by using source material beyond its authorization.[7] [Doc. 567 at 14].

---

[7] In their motion to dismiss briefing, the parties disputed the construction of § 8 and § 16 of the License. Section 16 provides certain remedies "[i]f the Licensee fails to observe, keep, or perform any Source confidentiality provisions" of the License. [Doc. 491-2 at 9; *see* Doc. 275-1 & Doc. 281]. Subsection 16(b) provides that "[i]n the event of unauthorized use or distribution of the Program Source," certain monetary recovery is available. [Doc. 491-2 at 9]. In its motion to dismiss, Extreme contended § 16(b) gives rise to a right to recover only if the unauthorized use or distribution also violates the Source confidentiality provisions. [Doc. 275-1 at 20-21]. According to Extreme, the Source confidentiality provisions are located only in the first paragraph of § 8. Plaintiffs agreed that § 8 contained the Source confidentiality provisions, but argued all of § 8 pertains to Source confidentiality. According to Plaintiffs, unauthorized use or distribution necessarily violates Source confidentiality. The Court did not resolve this

Extreme's argument as to subclaim (h) hinges on its interpretation of § 8, which the Court has rejected. Contrary to Extreme's claim, § 8 does not concern "only the *distribution* of 'Program Source,' *i.e.* source code." [Doc. 577 at 16] (emphasis added). Section 8 also implicates Extreme's obligations with respect to "use, copying, transference, protection, and security of the Program Source." [Doc. 491-2 at pg. 7, § 8]. As Extreme raises no other argument for judgment as to subclaim (h), it is not entitled to judgment in its favor. The parties have not renewed their dispute as to what constitutes a "Source confidentiality" provision, so the Court has no occasion to revisit this issue.

### iii. Preemption – Subclaims (b) to (f)

Section 301 of the Copyright Act provides, in relevant part:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the matter of copyright as specified in sections 102 and 103 . . . whether published or unpublished, are governed exclusively by this title.

17 U.S.C. § 301(a). A state common law or statutory claim is preempted if (1) the work is within the scope of the subject matter of copyright, and (2) the rights granted under state law are equivalent to any exclusive rights within the scope of federal copyright. *Wrench, LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001). There is no dispute that the software is within the scope of the subject matter of copyright, so preemption turns on the second prong – the equivalency requirement.

The equivalency analysis asks "whether the state common law or statutory action at issue asserts rights that are the same as those protected under § 106 of the Copyright Act." *Id.* at 455. The Sixth Circuit explains:

---

interpretative dispute, holding only that Extreme, as the moving party, had not demonstrated that the relevant contract language had one unambiguous meaning. [Doc. 350 at 22].

20

> Equivalency exists if the right defined by state law may be abridged by an act which in and of itself would infringe one of the exclusive rights. Conversely, if an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or display in order to constitute a state-created cause of action, there is no preemption, provided that the extra element changes the nature of the action so that it is qualitatively different from a copyright infringement claim.

*Id.* at 456. In some instances, the state law claim itself provides the "extra element" necessary to avoid preemption. *Stromback v. New Line Cinema*, 384 F.3d 283, 304 (6th Cir. 2004). In other instances, the court must "review the facts as pled by the plaintiff in order to determine whether the acts giving rise to the state law claim are merely acts of copyright infringement." *Id.* So while "a promise in a breach of contract claim may suffice as an extra element, . . . this determination must be based upon a review of the plaintiff's allegations." *Id.* at 305.

In *Wrench*, the court examined the plaintiffs' breach of contract allegations to determine whether the promise was to pay for the use of the work, or merely a promise to refrain from reproducing, performing, distributing, or displaying the work. *Wrench*, 256 F.3d at 457-58. The court found that the gist of plaintiff's implied-in-fact contract claim was a "breach of an actual promise to pay" for plaintiff's creative work. *Id.* at 456. The court held that it was not "the use of the work alone but the failure to pay for it that violates the contract and gives rise to the right to recover damages." *Id.* So, the state law right was not abridged by "an act which in and of itself would infringe one of the exclusive rights granted by § 106, since the right to be paid for the use of the work is not one of those rights." *Id.* The Sixth Circuit explained that the "extra element is the promise to pay," which changed the nature of the action such that it was "qualitatively different from a copyright infringement claim." *Id.*

With this legal framework in mind, the Court turns to the breach of contract subclaims that Extreme asserts are preempted – subclaims (b), (c), (d), (e), and (f). Initially, it is not clear that a "subclaim by subclaim" approach is required, as Extreme suggests. Contracts are ordinarily

viewed as a whole and this Court has taken that approach in analyzing preemption. *See ChampionX, LLC v. Resonance Sys., Inc.*, 726 F. Supp. 3d 786, 829 (E.D. Tenn. 2024) ("Viewing the License Agreement as a whole, the Court concludes that plaintiff's breach of contract claim involves more than a mere promise to refrain from copying or displaying the work, and therefore, is not preempted by the Copyright Act."). On the other hand, the Sixth Circuit has instructed that determining whether an "extra element" exists "must be based upon a review of the plaintiff's allegations." *Stromback*, 384 F.3d at 305.

The Court need not determine exactly what degree of specificity is required to analyze preemption. Extreme is entitled to judgment as to subclaim (c), and Plaintiffs did not respond to Extreme's preemption arguments as to subclaims (e) and (f). That leaves subclaims (b) and (d), both of which are supported by the extra element of an obligation to pay for unauthorized use of the Program Source. Viewed together or individually, subclaims (b) and (d) are not preempted because they both implicate an obligation to pay for unauthorized use and are thus qualitatively different from a copyright claim.

1. Subclaims (b) and (d)

First, Extreme asserts that the Copyright Act preempts subclaim (b), for using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 License. According to Extreme, this claim is based entirely on Extreme's alleged use and redistribution of Plaintiffs' software in non-BlackDiamond products and is thus identical to Plaintiffs' copyright claim. Plaintiffs respond that the License Agreement includes both a promise to pay royalties and a promise to pay for unauthorized use and distribution. Extreme dismisses this response, noting that it did not move for summary judgment as to the royalties subclaim on preemption grounds, so the promise to pay royalties is irrelevant. Extreme does not address

22

Plaintiffs' invocation of a promise to pay for unauthorized use. Because the License Agreement creates an obligation to pay for certain unauthorized use and redistribution, Plaintiffs' claim that Extreme exceeded the scope of the License is not preempted.

Section 16(b) of the License Agreement gives SNMP Research the right to recover for unauthorized use or distribution of the Program Source. [Doc. 491-2 at 9].[8] Plaintiffs contend this is a promise to pay that renders the unauthorized use and redistribution claim qualitatively different from a copyright infringement claim. The Court agrees.

The License gives Plaintiffs a right they do not have under copyright law – "the right to be paid for the use of the work." *Wrench*, 256 F.3d at 456. The promise to pay for unauthorized use of the Program Source provides the "extra element" that renders the breach of contract claim qualitatively different from a copyright infringement claim. It is more than "a promise to refrain from reproducing, performing, distributing, or displaying" the work. *See Wrench*, 256 F.3d at 457; *Forest Park Pictures v. Universal Television Network, Inc.*, 683 F. 3d 424, 432–33 (2d Cir. 2012) ("A claim for breach of a contract including a promise to pay is qualitatively different from a suit to vindicate a right included in the Copyright Act and is not subject to preemption."); *McDermott v. Advanstar Comms., Inc.*, Case No.: 1:98-CV-515, 2006 WL 8454319 (N.D. Ohio March 31, 2006) (claim that licensee agreed to pay for re-use of work and failed to do so was not preempted); *Attachmate Corp. v. Health Net, Inc.*, No. C09-1161, 2010 WL 519051 (W.D. Wa. Feb. 4, 2010) (no preemption where licensor had agreed in contract to acquire licenses for unauthorized copies of software and pay reasonable value of material disclosed); *Envoy Techs., Inc., v. Northrop Grumman Co.*, Civil Action No. 19-13976, 2020 WL 2079376 (D.N.J. April 30, 2020)

---

[8] Again, the full interpretation of § 16 and its relationship to § 8 is not before the Court. But even if Extreme is correct that § 16(b) applies only when unauthorized use or distribution violates the License's Source confidentiality provisions, that would only limit when the right to payment arises under the License, not eliminate it.

23

(unpublished) (breach of contract claim not preempted where contract set pre-determined usage fee for continued use of software after termination of agreement).

Extreme offers no meaningful response to this contention. It does not distinguish *Wrench* or explain how this binding Sixth Circuit authority would not apply. It does not argue that the payment provision is distinguishable from that in *Wrench*, or suggest that, for whatever reason, it does not constitute an "extra element." Extreme wholly fails to address the License's provision of a right to recover for unauthorized use of the Program Source.[9]

To the extent Extreme relies on *Ritchie v. Williams*, *Ritchie* only held there was no meaningful "extra element" that "remove[d] the reformulated claims from the policy of national uniformity established by the preemption provisions" of the Copyright Act. *Id.* at 287–88. But based on *Wrench*, the extra element that was missing in *Ritchie* is present here. And as others have recognized, the *Ritchie* court did not explain its analysis, casting fairly pointed doubt on the efficacy of the "extra element" test. *Id.* at 287 n.3.

Rather than confront this precedent, Extreme urges that the core of Plaintiffs' unauthorized use and redistribution allegations is simply a copyright infringement claim. [Doc. 538 at 17]. That Plaintiffs' contract rights overlap with those of copyright law does not require preemption. *See Shuptrine*, 535 F. Supp. 2d at 897 ("[T]he test is not whether an element overlaps but whether there is an extra element that changes the nature of the action so it is qualitatively different."). Nor does the possibility of double recovery require preemption, since the Court retains the ability to both instruct the jury and reduce any duplicative damages award. *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1327–28 (Fed. Cir. 2003) ("entirely appropriate" for jury to award separate damages

---

[9] Extreme does not argue, for example, that a penalty for unauthorized use is different from an affirmative promise to pay for unauthorized use. Nor does it contend that § 16's reference to Source confidentiality breaches limits the right to payment for unauthorized use such that the provision does not apply to the facts before the Court. In this section of the briefing, Extreme entirely fails to address the right to payment for unauthorized use.

24

for breach of contract and copyright that arose from the same copying, as judge appropriately adjusted the award to avoid double recovery).

The contractual restrictions on Extreme's use and redistribution also support the conclusion that subclaim (b) is qualitatively different from a copyright infringement claim. "[M]ost courts to examine this issue have found that the Copyright Act does not preempt contractual constraints on copyrighted articles." *Id.* at 1324 (no preemption of claim for breach of license agreement that prohibited reverse engineering); *accord Laatz v. Zazzle, Inc.*, 682 F. Supp. 3d 791, 809 (N.D. Ca. 2023) (no preemption where license had restrictions on use of software and breach of contract claim concerned unauthorized use of software's end product).

In *Recursion Software, Inc v. Interactive Intelligence, Inc.*, for example, the license agreement allowed the licensee to distribute "binaries" derived from the subject Voyager software, but with limitations. 435 F. Supp. 2d 756, 766 (N.D. Tex. 2006). Broadly, it prohibited the binaries from being packaged with or embedded in (i) hardware, and (ii) software that is marketed and sold. *Id.* Plaintiff alleged that defendant violated the license agreement by embedding the binaries into its program, which was marketed and sold. Defendant argued this breach of contract claim was preempted. *Id.*

The court disagreed. Conducting an equivalency analysis, the court observed that "[t]he license agreement . . . actually allows [defendant] to do things which would, in the absence of the agreement, constitute copyright infringement." *Id.* at 766. "Thus, a licensee's distribution of Voyager (or elements of it), would, under certain circumstances, be allowable under the license agreement, whereas *any* distribution of the software 'by sale or other transfer of ownership, or by rental, lease, or lending' would violate the Copyright Act." *Id.* Defendant's embedding of the Voyager program into software that was sold, "not the naked distribution of it," was the act that

infringed plaintiff's "private contract rights." *Id.* "The scope of a licensee's permissible distribution of Voyager is determined by reference to the contract itself, not copyright law." *Id.* Accordingly, the court found that plaintiff's state law breach of contract claim was not equivalent to the exclusive rights of copyright and therefore was not preempted. *Id.* The license agreement "involve[d] rights and obligations that render [plaintiff's] breach of contract claim qualitatively different in kind from a copyright infringement claim." *Id.* at 768. Similarly, "[t]he scope of [Extreme's] permissible distribution" of the software "is determined by reference to the contract itself, not copyright law." *See id.*

As a practical matter, it makes sense that a software license agreement would provide a contractual right to recover for unauthorized use in addition to the protections of copyright law. As others have explained, copyright law provides rights against the world, whereas contract law provides rights against other parties to the contract. A licensor who provides source code to a licensee for a limited purpose might well worry that its copyrighted material will be used in an unauthorized manner, and seek protection against such use. It is far easier to use something you already have – Extreme actually had Plaintiffs' source code, and the general public did not. Thus the License provides an additional right to payment for unauthorized use by the licensee, one that copyright law does not provide as to the general public. The practical reality of the parties' relationship further demonstrates how the right to payment makes Plaintiffs' breach of contract claim qualitatively different from a copyright claim.

Subclaim (d) is not preempted for the same reason. Subclaim (d) derives directly from § 8 of the License Agreement, alleging that Extreme failed to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source. The License Agreement gives SNMPR International the right to recover for unauthorized use and distribution of the

Program Source. So to the extent Plaintiffs can show that Extreme breached § 8 by unauthorized use or distribution of the Program Source, and that § 16(b) applies to that breach, Plaintiffs' subclaim (d) also has the extra element of a right to payment.

The License gives SNMP Research a right to recover payment for unauthorized use or distribution of the Program Source. Neither party addresses the scope of that right or whether it is limited by other provisions of § 16, so that question is not before the Court. For present purposes, it is enough that the License Agreement includes a right to recover for unauthorized use or distribution of the Program Source. That right to payment provides an extra element that makes subclaims (b) and (d) qualitatively different than a copyright infringement claim and thus not preempted. The License's confidentiality obligations and restrictions on use of the software and Program Source further demonstrate that these subclaims arise out of the contract, not copyright law.

2. Subclaims (e) and (f)

Plaintiffs assert that Extreme violated the License by failing to inform Plaintiffs of unauthorized copying and distribution (subclaim (e)), and failing to maintain Plaintiffs' copyright notice in the software (subclaim (f)). Extreme argues both claims are preempted. Plaintiffs do not mention either subclaim or the related contractual obligations in their preemption analysis. They do not set out any position as to why subclaims (e) and (f), specifically, are not preempted.

This omission may be due to the parties' different approaches to preemption. Extreme urges a subclaim by subclaim analysis, while Plaintiffs appear to view the contract and alleged breaches as a whole. Regardless, the Court cannot ignore the absence of any responsive argument as to the preemption of subclaims (e) and (f). Moreover, the Court has already held that Extreme is entitled to judgment as to subclaim (f).

27

"It is well understood . . . that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded." *Cunningham v. Tenn. Cancer Specialists, PLLC*, 957 F. Supp. 2d 899, 921 (E.D. Tenn. 2013) (quoting *Rouse v. Caruso*, No. 06-cv-10961-DT, 2011 WL 918327, at *18 (E.D. Mich. Feb. 18, 2011)) (granting summary judgment); *Knox Trailers, Inc. v. Clark*, 2022 WL 4372350, *7 (E.D. Tenn. Sept. 21, 2022) ("[W]hen a party fails to respond to an argument, that argument is generally deemed to be unopposed and the proposition conceded." (quoting *AK Behav. Health Sys., Inc.*, 382 F. Supp. 3d 772, 774 (M.D. Tenn. 2019)). In the absence of responsive argument, the Court concludes that Plaintiffs have waived any argument that subclaims (e) and (f) are not preempted and Extreme is entitled to judgment on these subclaims.

### b. Fraud Claim

Under Tennessee law, a fraud claim requires a plaintiff to show: "(1) that the defendant made a representation of a present or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that the defendant either knew that the representation was false or did not believe it to be true or that the defendant made the representation recklessly without knowing whether it was true or false; (5) that the plaintiff did not know that the representation was false when made and was justified in relying on the truth of the representation; and (6) that the plaintiff sustained damages as a result of the representation." *InterMed Res. TN, LLC v. Green Earth Techs., LLC*, No. 20-cv-01112, 2022 WL 4486402, at *3 (M.D. Tenn. 2022). Extreme shows that Plaintiffs cannot prove the first and second elements of their fraud claim, requiring summary judgment for Extreme.

The basis for Plaintiffs' fraud claim is (i) the submission of royalty reports that only disclosed sales of the BlackDiamond product, and (ii) two communications regarding royalty

payments and reports. [Doc. 567 at 24–25]. Extreme's royalty payments and reports for the BlackDiamond product are not at issue in this lawsuit and the Court has already ruled that Extreme had no duty to pay royalties on any other product. So the royalty reports do not constitute materially false statements. Nearly all of Plaintiffs' caselaw pertains to inaccurate royalty reporting, so it is inapplicable here.

Similarly, the communications Plaintiffs reference all relate to royalties and/or the single product licensed under the License Agreement. In a November 2015 email, SNMP Research employee Patti Sams emailed Extreme employee Fiona Nolan about Extreme's report of zero sales of new units on its reports. [Doc. 489-4 at 2]. Sams inquired: "Is it possible some royalties have missed being reported or has this product reached the end of its life?" Nolan responded that "[t]he product went End of Sale in 2011" and provided two charts showing end of sale and shipment reports for the BlackDiamond product. [*Id.*]. Plaintiffs also point to a similar email exchange in 2013 in which Extreme responded to a royalty report request: "We don't have any consumption for the last 3 quarters." [Doc. 564-6].

Neither of these communications include a false statement. In the absence of any obligation to report royalties for any product other than the BlackDiamond, no reasonable jury could find that Extreme's royalty reports or communications regarding those royalty reports were false. For the same reason, Extreme's disclosures on this score were not "partial" or "fragmentary" disclosures. There is no dispute that Extreme reported all royalties for the BlackDiamond product and that its communications were accurate as to that single product. So no affirmative duty to disclose arose out of these communications.

Nor does this issue present a jury question. While the veracity of a statement is often a question of fact best left to the jury, here it turns on the legal determination that royalties were not

29

owed on products outside the License Agreement. Extreme is entitled to summary judgment on Plaintiffs' fraud claim, which will be **DISMISSED**.

### c. Copyright Claims

"As a prerequisite to bringing a copyright infringement suit, a copyright holder must register its works." *HealtheState, LLC v. United States*, 160 Fed. Cl. 91 (Fed. Cl. 2022). A certificate of registration satisfies this prerequisite, "regardless of whether the certificate contains any inaccurate information," unless two conditions are met:

> (A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and

> (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1). If the certificate of registration contains inaccurate information as described in (b)(1), the Court must "request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." § 411(b)(2).

According to Extreme, Plaintiffs' registrations are inaccurate because (1) each registration covered more than one work, and (2) the deposit copy submitted with each registration was insufficient and/or did not reflect revisions in accordance with the Copyright Office's binding rules. [Doc. 577 at 24]. Extreme argues that Dr. Case knew of the relevant requirements, failed to comply with them, and thus submitted registration applications that knowingly included inaccurate information. [*Id.*]. According to Extreme, these knowing inaccuracies require referral to the Register of Copyrights. [*Id.*].

Plaintiffs first argue that Extreme cannot show any "knowing" inaccuracy, citing the extensive communications between Dr. Case and the Copyright Office in which he sought to

comply with all applicable registration requirements. [Doc. 567 at 29–30]. Plaintiffs also challenge the supposed defects identified by Extreme. As to the "multiple works" theory, Plaintiffs show that registrations may include multiple programs as a single work and that the existence of multiple software components was obvious on the face of the application, which indicated "multiple software 'Applications' and 'Libraries' in addition to 'NETMON.'" [*Id.* at 31].

Similarly, Plaintiffs contend that Extreme is largely incorrect about the purported deficiencies in the source code deposits, both as to how many pages of source code were submitted and as to the identification of revisions. Regardless, Plaintiffs argue the number of pages of source code would have been apparent to the Copyright Office at the time of submission. According to Plaintiffs, these deficiencies, to the extent they are legitimate, did not cause the Copyright Office to refuse registration and cannot be realistically considered misrepresentations.

Extreme fails to demonstrate that the applications improperly sought registration of more than one work and cites no caselaw regarding this requirement. As to the source code deposits, the Court finds that the failure to meet the page minimum was a deficiency, not an inaccuracy, so § 411(b)(2) has no application. Finally, Extreme cites no caselaw to support its position that the absence of revised material in otherwise valid deposit copies necessitates referral. There is no dispute that source code deposits were "bona fide" copies; Extreme simply contends that Dr. Case redacted the wrong portions of the source code in submitting his deposit. Moreover, neither of the deposit copy issues relate to an inaccuracy reflected in the certificates of registration, as the text of § 411(b) suggests is required for referral. At most, Extreme has shown that there were technical deficiencies in the application materials.

### i.  More than One Work

Extreme contends that each of Plaintiffs' copyright applications improperly sought

registration of a single work called "NETMON, Associated Applications, and Libraries," when in fact each registration covered a broad range of distinct products. The Copyright Act provides for registration of "the work" or "a work." *See* 17 U.S.C.A. §§ 408, 409. Circular 61 indicates that "[e]ach separately published version of a computer program that contains new, copyrightable authorship *must be registered separately* with a new application fee." [Doc. 539-39 at 4]. Extreme's argument assumes that because Plaintiffs' registrations covered multiple "products," they necessarily also cover multiple "works." According to Extreme, the registrations therefore violate the requirement that each registration cover a single "work," and are knowingly inaccurate.

Extreme fails to support this argument with relevant legal authority. Other than Circular 61, Extreme only cites the Third Compendium, which did not exist when Dr. Case prepared the applications.[10] Circular 61 does not define a "work," and Extreme makes no effort to show that the registrations as filed were improper in view of the Circular's guidance. Extreme does not demonstrate (or even say) that each of Plaintiffs' registrations contained more than one "separately published version of a computer program that contains new, copyrightable authorship." [*See* Doc. 539-39 at 4]. It baldly equates multiple "products" with multiple "works," without defining either term. Without argument or legal authority, Extreme asks the Court to simply accept that because the registrations covered multiple "products," they must also cover multiple distinct "works."

Extreme cannot carry its initial burden on summary judgment with so minimal a showing. Nonetheless, Plaintiffs respond that at least one circuit court has rejected a similar argument. In *Fonar Corp. v. Domenick*, 105 F.3d 99, 105 (2d Cir. 1997), defendant argued the plaintiff should have submitted source code deposits for each of the 78 subprograms that made up its software. *Id.*

---

[10] "As a general rule, a registration covers one individual work, and an applicant should prepare a separate application, filing fee, and deposit for each work that is submitted for registration." U.S. Copyright Office Compendium, Compendium of U.S. Copyright Office Practices, § 511 (3d Ed. 2021) (hereinafter, "Compendium III").

at 105. The district court held that the copyright registration was not entitled to a presumption of validity in part because of this inadequacy, and ultimately invalidated the registrations. On appeal, the Second Circuit reversed, observing that the Copyright Office had apparently found the "technical filing requirements" for a certificate of registration to be satisfied. *Id.* The court reasoned that "[a] single computer program with an overarching purpose . . . will necessarily be composed of various modules, subroutines, and sub-subroutines, which through their intra-program interactions accomplish the ultimate function or purpose of the program." *Id.* In light of this reality, the "Copyright Office may well conclude . . . that the various modules and subprograms of the maintenance software may all be registered as a single work." *Id.*

*Fonar* is not directly on point and pre-dates the PRO-IP Act framework for evaluating inaccuracy in registration materials. But any distinctions between *Fonar* and the instant case are of little consequence since Extreme cites no contrary authority. It is not Plaintiffs' burden to demonstrate that their "multiple software 'Applications' and 'Libraries'" are comparable to the "various modules, subroutines, and sub-subroutines" discussed in *Fonar*. Extreme certainly never explains this purported factual distinction, instead faulting Plaintiffs for failing to use the same language in describing their own software components.

In the absence of any legal authority equating a "work" with a "product," Extreme unsuccessfully attempts to wring a concession out of the record. Extreme claims, for example, that "Plaintiffs do not dispute that every registration application they submitted covered 'between a dozen and 100' works," citing the deposition of Dr. Case. [Doc. 577 at 26]. Extreme says that in his deposition, "Dr. Case revealed, for the first time, that the applications covered more than one work." [*Id.* at 27]. But Dr. Case did not testify that the registrations cover more than one "work." He said the registrations cover more than one "product" or "software product." [Doc. 539-15 at 6-

7]. Indeed, Dr. Case testified that "the whole **work** is called NETMON, Associated Applications, and Libraries," and explained that the "licensed modules" in the parties' agreement are "subsets of the larger work." [*Id.* at 4 (emphasis added)]. He explained that EMANATE is "part of the work," [*id.*] and confirmed that "[d]epending on how you count," there are "between a dozen and 100 software **products** covered by [the] copyright registration." [*Id.* at 7] (emphasis added).

Similarly, Extreme says Plaintiffs "concede" that these "were 'distinct products' that could be purchased separately. Pls. Br. at 24 (citation omitted)." [Doc. 577 at 28]. It is no wonder the citation is omitted, as the quoted material comes from Extreme's expert, Mr. Greenspun: "I reviewed the table of contents . . . submitted as part of the deposit . . . and have confirmed that, as Dr. Case testified, it covers multiple distinct products." [Doc. 489-13 at ¶ 5]. Greenspun was apparently instructed that "a 'work' can be deemed a distinct work if it is sold separately from other works." [*Id.* at ¶ 2]. Extreme does not recite Greenspun's opinions or the caselaw on which he relied, so the Court sees no occasion to address it here.[11]

Extreme fails to show that a "product" is the same as a "work." Extreme has not shown the registrations actually cover more than one "work," so it cannot show that the applications were improper, much less knowingly inaccurate. It does not explain how the registrations ran afoul of Circular 61 or the Third Compendium, which became effective in 2021, years after Dr. Case prepared the applications. Extreme is not entitled to referral of this issue to the Register of Copyrights.

### ii. Sufficiency of Deposit Copies

Extreme contends that Plaintiffs submitted too few pages of source code as their deposit

---

[11] The reason for this omission may be that both cases referenced in Greenspun's supplemental declaration [Doc. 489-13 at ¶ 2, n.2] relate to calculating statutory damages for copyright infringement, not the validity of a registration. *See Sullivan v. Flora, Inc.*, 936 F.3d 562, 566, 568–69 (7th Cir. 2019); *Capitani v. World of Miniature Bears, Inc.*, 552 F. Supp. 3d 781, 798 (M.D. Tenn. 2021).

34

copies and that the pages submitted do not appropriately reflect revisions from prior versions of the software. Because neither of these purported deficiencies amount to a "knowing inaccuracy," Extreme is not entitled to a referral to the Register of Copyrights on this issue.

Copyright regulations require the deposit for a computer program to include "one copy of identifying portions of the program, reproduced in a form visually perceptible without the aid of a machine or device, either in paper or in microform." 37 C.F.R. § 202.20(c)(2)(vii)(A). "Identifying portions" of a computer program generally means "[t]he first and last 25 pages of the source code if reproduced on paper," along with a page containing the copyright notice. 37 C.F.R. § 202.20(c)(2)(vii)(A)(1).

For a revised computer program, the copyright notice page plus "the first and last 25 pages of source code will suffice" if "the revisions occur throughout the entire program." *Id.* "[I]f the revisions do not occur in the first and last 25 pages, the deposit should consist of the page containing the copyright notice and any 50 pages of source code representative of the revised material." *Id.*[12]

As an initial matter, the Court seriously questions whether § 411(b) applies to errors in copyright registration materials absent an inaccuracy in the certificate of registration. The statute provides:

> (b)(1) A certificate of registration satisfies the requirements of this section and section 412, **regardless of whether the certificate contains any inaccurate information**, unless—
>
> (A) **the inaccurate information** was included on the application for copyright registration with knowledge that it was inaccurate; and
>
> (B) the inaccuracy of **the information**, if known, would have caused the Register of Copyrights to refuse registration.

---

[12] Different rules apply if the program contains trade secret material, which Plaintiffs do not allege here. 37 C.F.R. § 202.20(c)(2)(vii)((A)(2).

17 U.S.C. § 411(b)(1) (emphasis added). "Words in a statute are to be given the meaning that proper grammar and usage would assign them." A. Scalia & B. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 140 (2012). "The" is a definite article; it is "a function word . . . indicating that a following noun or noun equivalent is definite or has been previously specified by context." *Nielsen v. Preap*, 586 U.S. 392, 393 (2019) (quoting MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1294 (11th ed. 2005)).

Grammatically, "[t]he inaccurate information" in subsection (A) and "the information" in subsection (B) refer to the preceding phrase: "any inaccurate information" that "the certificate contains." The inaccurate information that requires referral, then, is not just any inaccurate information "on the application for copyright registration." It is the previously-specified "inaccurate information" that "the certificate contains." *See Nielsen*, 586 U.S. at 393 ("Congress's use of the definite article in 'when the alien is released' indicates that the scope of the word 'alien' 'has been previously specified in context.'").

Thus, "[t]he important point for our purposes is that a certificate of registration is valid <u>even though it contains inaccurate information</u>, as long as the copyright holder lacked 'knowledge that it was inaccurate.'" *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 182 (2022) (emphasis added) (analyzing argument that "registration certificate was inaccurate"). As to the source code deposits, Extreme does not assert that the "certificate contains any inaccurate information." It does not appear to the Court that Extreme can obtain referral under § 411(b) based on deficiencies in the deposit copies that did not impact the accuracy of the registration certificate. On this basis alone, Extreme's motion for referral as to the source code deposits can be denied. However, neither party addresses whether § 411(b) applies in the absence of an error in the certificate of registration, so the Court will consider the parties' other arguments.

1. Page Count of Source Code Deposits

a. Extreme's Position

NETMON Version 15

Extreme contends the deposit includes at most 47 pages of source code. According to Extreme, the deposit includes 25 pages of source code; 22 pages "of what appear to be script files"; a blank page; and an image of a flowchart. [Doc. 538 at 29]. Extreme contends that script files are not source code, and even if they were, that would be at most 47 pages. [*Id.*].

Extreme cites Waldbusser's testimony here, but he only confirms that a GIF is not source code and states that documentation describing a program "is generally not considered computer source code . . . amongst programmers." [Doc. 541-2 at 3-4].

NETMON Versions 15.2, 15.3, and 15.4

Next, Extreme says that deposits for NETMON Version 15.2, 15.3, and 15.4 each include at most 47 pages of source code. According to Extreme, the deposit copies for these versions "are identical to the deposits for NETMON Version[] 15," save the date of the copyright notice and the image of a different flowchart. [*Id.*]. They include, in other words, the same 25 pages of source code, 22 pages of script files, a blank page, and a page containing a flow chart.

According to Extreme, this means that SNMP Research again submitted no more than 47 pages of source code and also failed to provide "50 pages of source code representative of the revised material," as required by copyright regulations for revised computer programs.

NETMON Versions 16, 16.2, 17, and 17.2

Extreme says Version 16 includes 25 pages of "makefiles"; 7 pages of documentation files in ".man" format; 10 pages of documentation in ".txt" format, and one image file. [Doc. 538 at 30].

37

Relying on the definition provided in the Third Compendium, Greenspun states his understanding that materials related to a computer program—such as makefiles, SHA5 hashes, and documentation—are not "source code." [Doc. 491-3 at ¶¶ 169–70].[13] In his report, Greenspun opined that "[t]he deposit for version 16 contains no source code at all, but only makefile and some documentation." [Doc. 491-3 at ¶ 218]. Greenspun explains that a makefile is not a computer program, and "cannot be compiled into object code." [*Id.*].

Extreme concedes that according to Mr. Waldbusser, makefiles are, in fact, source code. [Doc. 538 at 30]; [Doc. 478-2 at ¶ 223 (stating that "makefiles are source code")]. Extreme nonetheless urges the Court to disregard this opinion because it is "unconnected to the meaning of that term as used by the Copyright Office." [*Id.*]. Even if makefiles constitute source code, there are only 25 pages of them, not the 50 required by the regulations.

As to NETMON Version 16.2, it likewise includes 25 pages of makefiles, and the remaining files are identical to the deposit for Version 16, except for the date of the copyright notice. [Doc. 538 at 30-31].

As to Versions 17 and 17.2, Extreme shows that they include identical deposits: 25 pages of "README" documentation files; 10 pages of ".man" files, 12 pages of documentation in ".txt" format, and two pages with images of flowcharts. [*Id*. at 31]. For the same reasons articulated as to Version 16, Extreme contends this deposit was insufficient to comply with the copyright regulations. As to Versions 16, 16.2, 17, and 17.2, Extreme does not contend that the deposits fail to include pages representative of revised materials.[14]

---

[13] The Third Compendium, inapplicable here because it did not exist at the time of the applications, defines "source code" as "a set of statements and instructions written by a human being using a particular programming language . . .. Typically . . . they are not comprehensible to a computer" so "the source code must be converted into object code." Compendium III, § 1509.1(F).

[14] *See* Doc. 577 at 29 (arguing that Plaintiffs do not dispute that Versions 15, 15.2, 15.3, and 15.4 are revised programs required to reflect revisions).

38

b. Plaintiffs' Position

In addition to disputing that any of the purported errors in the registration applications were knowingly inaccurate, Plaintiffs dispute Extreme's specific challenges to the deposit copies. Plaintiffs note that Dr. Greenspun altered his opinion as to what constitutes source code for deposit purposes in his deposition testimony. [Doc. 567 at 32].[15] Specifically, he testified that he now understood that the Copyright Office does not require source code to be something that is compiled. [Doc. 489-9 at 22]. Circular 61, for example, explains that for programs written in "scripted languages, the script is considered the equivalent of source code." [Doc. 539-39 at 4]. Greenspun maintained that "[i]t still has to be in a programming language," but could include "scripting languages." [Doc. 489-9 at 22].[16] He also testified that while he did not consider makefiles to be source code, the tool he used to analyze lines of code – CLOC – does indeed count makefile lines as source code. [*Id.* at 54].

c. Analysis – Source Code Page Count

Absent a knowing inaccuracy, Plaintiffs' registration certificates are valid even if they include inaccurate information. The Court first considers whether the deposit copies contain inaccurate information, and then turns to whether any such inaccuracies were knowing.

There is some uncertainty as to how much source code each deposit contained. While Extreme relies on Greenspun's report, he testified as to a change of opinion that Extreme wholly

---

[15] This fact is not acknowledged at all in Extreme's briefing, which continues to rely on Greenspun's report despite his testimony that he modified his opinion on this issue. Extreme's lack of candor regarding the opinions of its own expert does not advance its case.

[16] Elsewhere in his deposition, Greenspun testified he found "a lot of the text files in this code base are source code." [Doc. 489-9 at 51]. "I found a lot of code in files that were - - that had .txt extensions." [*Id.*]. While Greenspun does not say where he found code in the .txt extensions, this testimony undercuts Extreme's unexplained suggestion that .txt files do not count towards a source code page minimum. Indeed, Greenspun's CLOC analysis ultimately included source code from text files. [*Id.* at 53].

39

ignores, explaining that "scripting languages" could be source code. The tool he used in his own analysis counts makefile lines as source code. And he repeatedly testified that ".txt" files can contain source code.

Indeed, the record reflects that what constitutes "source code" depends on the context and who you ask. Asked if HTML can be referred to as source code, Greenspun responded that "it depends on the context." [Doc. 489-9 at 55]. He repeatedly testified that he unexpectedly located source code in text files and that .txt files were counted as code by the CLOC tool he used in his own analysis. [*Id.* at 54]. Waldbusser likewise testified that "[s]ometimes files have a mix of things inside of them that would be considered source code statements," and that there were "different contexts that might be considered source code," even if he did not, as a programmer, personally consider them to be source code. [Doc. 541-2 at 2]. He testified that documentation describing a program is "generally not considered source code . . . amongst programmers." [*Id.* at 4].

Deposits for Versions 15, 15.2. 15.3, and 15.4 each contained 25 pages of source code and 22 pages of script files. Extreme's expert testified that scripting languages could be considered source code under the Copyright Office's definition. So these versions contained at least 47 pages of source code.

As to Versions 16, 16.2, 17, and 17.2, Greenspun's original opinion was that makefiles do not count as source code because they cannot be compiled into object code. In his deposition, he clarified that he came to understand that the Copyright Office does not require source code to be something that is compiled. [Doc. 489-9 at 22]. Waldbusser says makefiles are source code, and based on his deposition, Greenspun no longer appears to dispute this. So based on the testimony of Extreme's expert, at least 25 pages of these deposits could reasonably be considered source code.

Versions 16, 16.2, 17, and 17.2 also apparently include 7 pages of documentation in ".man" format. No one explains what a ".man" file is or why it is not source code. Greenspun seems to have considered it documentation rather than source code, though neither his report nor the deposition excerpts say why. [Doc. 491-3 at ¶ 218 (opining that Version 16, which includes ".man" files, consists of only a makefile and documentation)]. These versions also include 10 pages of documentation in ".txt" format. Other than Greenspun's assertion that Version 16 contains no source code, we have no explanation for why these 10 pages do not count. Greenspun repeatedly testified that he located many text files that contained source code, so the mere fact that they are text files is not enough to exclude them. Based on the record, a jury could find that Versions 16, 16.2, 17, and 17.2 each contain at least 25 pages of source code from the makefiles, and possibly more.

With this baseline the Court considers whether the failure to satisfy the 50-page minimum for source code deposits constitutes a "knowing inaccuracy." It does not. There is a material difference between an inaccuracy and a technical deficiency. Take an example: the Court orders the parties to file a brief of at least 10 pages, with citations to the record. If a party files a 6-page brief, the filing would be deficient – it does not comply with the Court's order. If the party instead files a brief with false statements about the evidentiary record, that filing would inaccurate. In the first instance, the deficiency would be readily apparent to the Court. In the second, the Court would have to examine the party's record citations to discover the inaccuracy.

The absence of, e.g., 3 pages of source code does not render a 47-page source code deposit "inaccurate," only deficient. The purpose of § 411(b)(2) is not to police enforcement of the Copyright Office's technical and administrative requirements. "The deposit requirements are designed to aid the Copyright Office in its record-keeping duties." *KnowledgePlex, Inc. v.*

41

*Placebase, Inc.*, No. C 08- 4267 JF, 2008 WL 5245284, *9 (N.D. Ca. Dec. 17, 2008) (plaintiff's failure to provide first twenty-five pages of relevant source code did not render deposit copy defective). Here, the Court can safely presume the Office would not have refused registration due to the insufficient number of source code pages because it did not, despite the deficiency appearing on the face of the deposit. *See Freeplay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, Case No. 3:17-cv-42, 2019 WL 4647305, *9–10 (copyright office "indirectly answered" questions sought to be referred by granting registrations and accepting supplemental registrations with knowledge of purported defects). It does not take background information or technical expertise to discern that a blank page is not source code.

At least one court in this Circuit has reached a similar conclusion on comparable facts. In *Libertas Technologies, L.L.C. v. Cherryhill Management, Inc.*, the defendants sought referral under § 411(B)(2). No. 1:10-cv-935, 2012 WL 6085264 (S.D. Ohio Dec. 6, 2012). They argued that "the application failed to comport with various regulatory and other requirements because of defects that were visible on the face of the deposited work, such as the presence of black diagonal lines that obstructed the copyrighted material and allegedly rendered it illegible." *Id.* at 11. The court held that § 411(b)(1)(B) "clearly is not satisfied" for such information because "the Register of Copyrights would have observed the 'defects' but nonetheless did not refuse registration." *Id.* Defendants also claimed misrepresentations in the date the work was created, the authors of the work, and whether the work was created by copying segments of code from other works. But they "failed to cite any authority to show that such matters satisfy the statutory definition of 'inaccurate information.'" *Id.*

Similarly, the "inaccuracies" Extreme alleges as to the number of pages of source code in each deposit are not inaccuracies at all. They are just deficiencies that the Copyright Office is

perfectly capable of identifying and requesting correction of, as it deems necessary. Moreover, as to several of the applications, the Office explicitly told Dr. Case: "The copy contains the required source code to register the computer program." [Doc. 544-20 at 8-9]. The page count of the source code deposits does not, standing alone, constitute an inaccuracy under § 411(b)(2).

Extreme's cited authority is largely inapplicable on this issue, involving either the validity of the deposit copy, an incorrect date of publication, or both. *See Torres-Negron v. J & N Records, LLC*, 504 F.3d 151 (1st Cir. 2007) (reconstruction created from memory, without access to original work, is not a valid copy for registration purposes); *SellPoolSuppliesOnline.com v. Ugly Pools Arizona, Inc.*, 804 F. App'x 668 (9th Cir. 2020) (plaintiff's false representation that deposit copy depicted website as it appeared on publication date rendered certificate invalid where it in fact was a later version of the website); Resp. of Reg. of Copyrights to Req. Pursuant to 17 U.S.C. § 411(b)(2) at 1, *LADS Network Solutions v. Agilis Sys., LLC*, No. 19-cv-00011, Dkt. 137 (E.D. Mo. Aug. 3, 2011) (had Office known that deposit included source code created after publication date in application, it would not have registered work but would "have attempted to resolve variance" by giving applicant option to correct/supplement); Resp. of Reg. of Copyrights to Req. Pursuant to 17 U.S.C. § 411(b)(2) at 1, *HEALTHeSTATE, LLC v. United States*, 1:18-cv-34C, Dkt. 187 (Fed. Cl. June 28, 2022) (Office would have refused registration had it known publication date was incorrect, works contained copyrightable material from undisclosed prior published versions, and/or included material added after publication date).

Each of these cases speaks to an actual inaccuracy in the registration materials of which the Copyright Office could not have known, not an overlooked filing error. Unlike the page count of a deposit, whether an application includes a "bona fide" copy of the work and an accurate publication date are not "minor" matters – they go to the heart of entitlement to copyright

protection. They are also (usually) uniquely within the knowledge of the applicant. The Copyright Office is not tasked with confirming an applicant's representations about, e.g., the date of creation or publication, and generally could not do so anyway. In short, "[t]his Court need not engage in the type of guesswork § 411(b) was intended to prevent." *Freeplay*, 2019 WL 4647305 at *10. Despite significant independent review, the Court has been unable to locate any case granting referral to the Register on grounds as hyper-technical as those urged by Extreme.

### 2. Representative Revisions

#### a. Positions of the Parties

Next, the issue of representative revisions in Versions 15, 15.2, 15.3, and 15.4. As to Version 15, Extreme somewhat overstates Greenspun's report as stating "none of those files changed as compared to the earlier version." [Doc. 538 at 29]. Greenspun opines that "[t]he deposited 48 pages of code printout . . . do not relate to the new requirements of SNMPv3," which Greenspun characterizes as "[t]he significant change" between the versions. [Doc. 491-3 at ¶ 213]. He states that the deposit pages "do not relate to the software licensed by Extreme and included in its switches and routers." [*Id.*]. Finally, he states: "[T]he the first page of the deposit for version 15 (which can also be referred to as version 15.1) is a printout of /xnetmon/include/Bar.h and all of the lines of code printed were present in the Rel_14_2_1_1 version that I examined on the source code computer." [*Id.* at ¶ 214]. So Greenspun has opined that the deposit does not "relate to" the most significant change between the versions and that the lines of code on the first page of the deposit were present in the prior version. Greenspun's opinion is more nuanced and limited than Extreme's contention that none of the files changed as compared to the earlier version.

Greenspun's opinion is clearer as to Versions 15.2, 15.3, and 15.4. He opines that the deposit for Version 15.2 "contains all of the same files as the deposit for 15.1," with the exception

of an image. [Doc. 491-3 at ¶ 215]. "[A]ll of these files are identical to the ones deposited for 15.1," except the copyright date. [*Id.*]. He states that "there is not even a hint as to the revisions that might have occurred in version 15.2 relative to previous versions." [*Id.*]. Similarly, he says that the deposit for 15.3 is the same as for 15.2, and the deposit for 15.4 is the same as for 15.3, except with updated copyright dates. [*Id.* at ¶¶ 216-17].

Plaintiffs do not actually argue that their source code deposits contained source code representative of the revised material in any amount. Instead, they contend that all changes between the versions were marked with a unique identifier. Dr. Case explains that he did not just submit the first and last 25 pages of source code. He also submitted a 75-200 page table of contents / file directory. For each source code file included in the copyright registration, the table of contents identifies the file's path and name, and the unique identifier, or "hash," computed from the file's contents. [Doc. 489 at ¶ 33]. "The table of contents provides the path for a particular subdirectory, and then for source code files in that subdirectory, it shows the file name, the unique SHA1 signature, and the starting page within the very large PDF file where the source code listing for each file begins." [*Id.*]. Dr. Case took the entire source code  and documentation for each program and then redacted all but the first and last 25 pages of the PDF, but preserved the table of contents. [*Id.* at ¶¶ 33-34]. The deposit thereby "identif[ies] all the files being registered by name, file path, and SHA1 signature." [*Id.* at ¶ 34]. Dr. Case understood the SHA1 signature as allowing SNMP Research to clearly demonstrate what files were included in the copyright registration "by producing the original file, computing its SHA1 signature, and then showing that its SHA1 signature matches the corresponding SHA1 signature for that file in the SHA1 value in the table of contents accompanying the applicable registration with the Copyright Office." [*Id.* at ¶ 35].

Greenspun testified about his review of the registration materials and confirmed that each of the submitted PDFs also included a file listing with hash values for each file name and path. [Doc. 489-9 at 41]. He confirmed that the listing of source code files that was provided with the registration was "a lot more" than what was provided for the source code deposit. [*Id.*]. He confirmed that if you have the hash number in the registration materials and you have the source code file that is listed, you can determine with a high degree of confidence whether a particular file matches the file used to generate the hash, i.e., the source code for the registered program. [Doc. 489-9 at 44].

b. Analysis – Representative Revisions

The record reflects that the deposit copies for Versions 15, 15.2, 15.3, and 15.4 did not comply with the Copyright Office's regulations because the pages submitted were not representative of revised material. Plaintiffs do not dispute that the source code deposit itself did not reflect revised material. The question becomes whether the failure to deposit representative revisions constitutes an "inaccuracy" and if so, whether that inaccuracy was "knowing," under the framework articulated in *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 142 S. Ct. 941 (2022).

Extreme cites no caselaw to suggest such a deficiency constitutes a "knowing inaccuracy" under § 411(b). On one hand, the absence of representative revisions is not something that would have been apparent on the face of the deposit copy. Unlike a too-short deposit, the Copyright Office would not necessarily know that the submission did not contain source code representative of the revisions. In this respect, the error is somewhat analogous to an incorrect publication date or submission of a reconstruction.

On the other hand, there is no dispute that the source code deposit for each registration was in fact from the software version Plaintiffs sought to register. The error, as Extreme argues, is not

46

that the material is inaccurate, but that the wrong excerpt was submitted. Dr. Case submitted the first and last pages of the source code, but it turns out very few revisions were represented in the deposit. The regulations therefore required him to instead submit 50 pages of source code representative of the revised materials. He did, however, ensure that any changes from the prior versions were identifiable. And Extreme does not dispute that the "hashes" identify which files changed. Its objection to the hashes is that they do not show *how* the files changed, only whether they changed. But the regulation does not require a redline of revisions, or that the revised material even be distinguishable from the original/prior version. In view of the comprehensive identification of all changed files, the Court finds that the absence of representative revised material was a technical error rather than an inaccuracy.

But even if the error constituted an inaccuracy in the deposit, the Court would find it was not a knowing one. In deciding whether an applicant was actually aware of, or willfully blind to, legally inaccurate information, the Court considers circumstantial evidence, "including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and such other matters." *Unicolors*, 595 U.S. at 187-188. Extreme does not contend the legal error was significant. It could not credibly do so, given that Dr. Case simply submitted the wrong portion of the right source code. To the contrary, Extreme correctly concedes that these issues "may seem relatively minor individually." [Doc. 538 at 31]. Yet Extreme urges that the Office "regularly refuses registration based on similar registration issues, no matter how minor." [*Id.*]. That may be so, but the Court's review under *Unicolors* considers the significance of the legal error. That the error here was minor weighs against Extreme's position that it was a knowing error.

The complexity of the rule, however, weighs slightly in Extreme's favor. The regulation is not complex. It is, however, vague. There is no guidance on what "representative of the revised material" means. Circular 61 essentially just recites the language of the regulation, so it adds little. A non-lawyer, even one with some copyright experience, could reasonably believe that a file directory with hashes for each change complied with the requirement that revisions be represented in the deposit. That is particularly true where the Office told Dr. Case that the copy contained the required source code. [Doc. 544-20 at 2, 9].

Finally, the applicant's familiarity with copyright law. Dr. Case certainly had more experience with copyright law than most non-lawyers, but there is no evidence he was an expert in copyright applications. He corresponded with the Copyright Office at some length to iron out what he characterized as errors in his applications and submitted corrections and updates for all or some of the applications. [Docs. 544-20, 539-33 & 544-21]. In relation to Versions 15.2 and 15.3, at least, the Copyright Office stated: "The copy contains the required source code to register the computer program." [Doc. 544-20 at 9]. As to Version 15, the Copyright Office apparently noted the lack of artwork in the first and last 25 pages of source code that Case submitted. [Doc. 544-20 at 2]. Dr. Case thus "changed the ordering of the pages" so that at least one example would appear. [*Id.*; Doc. 544-21 at 9-10].

Bad faith or fraudulent intent are not required for an error to constitute a "knowing inaccuracy." But evidence of good faith and diligence surely cut against a finding of willful blindness. Dr. Case's documented attempts to correct deficient filings undermine Extreme's suggestion that he was willfully blind to the requirements for registration. There is no credibility dispute to resolve and no evidence to weigh that prevents the Court from reaching this conclusion. The record demonstrates that Dr. Case made numerous changes to his applications in an attempt

to comply with the instructions of the Registration Specialists and the filing requirements of the Copyright Office. For at least two of the subject versions, he was explicitly told by the Registration Specialist that his deposit contained the required source code to register the computer program. In short, the deposit copy errors Extreme identifies do not rise to the level of "knowing inaccuracy."

Extreme points to technical deficiencies, not knowing inaccuracies. Under any standard of review, it has therefore failed to show that referral is required.[17]

## IV.     PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

### a.  Copyright Claims

A claim for copyright infringement requires a plaintiff to prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Serv. Co., Inc.*, 499 U.S. 340, 361 (1991).

The first prong "tests the originality and non-functionality of the work . . . both of which are presumptively established by the copyright registration." *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 387 F. 3d 522, 534 (6th Cir. 2004) (*abrogated on other grounds by eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)). The parties agree that prong one is presumptively established by a valid copyright registration, though that presumption is rebuttable. [Doc. 498 at 21; Doc. 549 at 12]; 17 U.S.C. § 410(c). "Registration of a valid copyright . . . is prima facie evidence that the work is entitled to protection." *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 628 (6th Cir. 2020).

---

[17] In so holding, the Court notes that Extreme does not suggest that a different standard of review applies to its request for referral than the summary judgment standard applicable to the remainder of its motion. In other words, Extreme does not contend that an unsupported allegation of knowing inaccuracy requires referral, a position the Court has previously rejected. [Doc. 362]. For avoidance of doubt, the Court would find that Extreme is not entitled to referral under any standard, because it has not alleged that Plaintiffs' copyright registrations contain a knowing inaccuracy or supported such an allegation with citation to the record.

49

The second element "tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)." *Lexmark*, 387 F. 3d at 534. "Both prongs of the infringement test . . . consider 'copyrightability,' which at its heart turns on the principle that copyright protection extends to expression, not to ideas." *Id.* at 538.

"Originality has a low threshold, requiring only that the author 'independently created' a work with 'some minimal degree of creativity.'" *Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, 93 F. 4th 985, 989 (6th Cir. 2024) (quoting *Feist*, 499 U.S. at 345). "Authors fulfill originality's requirements by making non-obvious choices from among more than a few options." *Id.* (cleaned up, citation omitted). "Most works will satisfy this low standard of creativity, no matter how humdrum the subject matter." *Id.*

The low threshold for originality nonetheless has three "qualifications," two relevant here: merger and scenes a faire. Both doctrines grow out of the foundational principle that copyright protection attaches "only to the expression of the idea – not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217 (1954).

First, merger "arises when there is only a single way to express a given set of facts." *Premier*, 93 F. 4th at 990. "[W]here there are only limited ways to express an idea, courts consider the idea and expression to 'merge,' and the expression of the idea becomes unprotected." *Weisblat v. John Carroll University*, 748 F. Supp. 3d 517, 531 (N.D. Ohio 2024); *Lexmark*, 387 F.3d at 535 ("Where the expression is essential to the statement of the idea, . . . or where there is only one way or very few ways of expressing the idea . . . the idea and expression are said to have merged." (quotation and citation omitted)). Put differently, "if the unprotected elements are intertwined with any copyrightable elements, [then] the unprotected elements are stronger, and the expression will

50

not be protected." *Id.* (quoting *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F. 4th 659, 673 (6th Cir. 2024)).

"'Scenes a faire' – settings, in other words, that must be done," arise "when the expectations of an industry or subject matter require an author to express facts in a certain way, rendering only a few choices 'feasible in that setting' even if alternatives theoretically remain." *Id.* (quoting *Lexmark*, 387 F.3d at 538). The doctrine applies "when external factors constrain the choice of expressive vehicle." *Lexmark*, 387 F.3d at 535. "In the computer-software context, the doctrine means that the elements of a program dictated by practical realities – *e.g.*, by hardware standards and mechanical specifications, software standards and compatibility requirements, computer manufacturer design standards, target industry practices, and standard computer programming practices – may not obtain protection." *Id.*

Scenes a faire and merger may be at issue in either prong of the infringement test, since both relate to copyrightability. *Lexmark*, 387 F.3d at 538 (while idea-expression dichotomy and accompanying doctrines typically arise as to second prong, both prongs consider copyrightability); *see also Premier*, 93 F.4th at 992 ("The concepts underlying scenes a faire and merger . . . sometimes bear on the threshold originality of the copyright."); *Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 (5th Cir. 1992) (noting that the Fifth Circuit "has applied the merger doctrine to the question of copyrightability," not solely to the question of infringement).

### i. Positions of the Parties

SNMP Research holds registrations from the Copyright Office in all eight subject Works.[18] Plaintiffs show that the registration certificates "constitute prima facie evidence of the validity of

---

[18] The Works are identified as follows: TXu 1-706-718, TXu 1-722-248, TXu 1-772-250, TXu 1-738-956, TXu 1-707-158, TXu 1-738-954, TXu 1-707-157, and TXu 1-738-958. [Doc. 489 ¶ 41].

the copyright and of the facts stated in the certificate." [Doc. 549 at 12 (quoting *Freeplay*, 2019 WL 4647305 at *3)]. Plaintiffs argue that the Works were independently created and easily exhibit "some minimal degree of creativity." *See Premier*, 93 F.4th at 989.

Plaintiffs rely on their technical expert, Mr. Waldbusser, who "conducted an analysis of SNMPR's registered code in Extreme's products to confirm that this code possessed at least a minimal degree of creativity." [Doc. 545 at ¶ 15]. Recall that Plaintiffs' software implements a software standard: the Simple Network Management Protocol ("SNMP"). As Waldbusser explained, "[s]tandards such as SNMP define an external format and external behavior so that software written by different authors can share information without miscommunication or error." [Doc. 478-2 at ¶ 14]. Waldbusser opines that his analysis "revealed numerous examples of creative choices made by SNMPR's programmers in authoring this code," and cites to specific examples in his opening and rebuttal reports. [Doc. 545 at ¶ 15]. He explained that while the SNMP standard specifies some of the behavior of SNMP software, it leaves the implementation details to the discretion of the software developer. [Doc. 478-2 at ¶ 21].

Plaintiffs' opening brief challenges the contrary opinions of Extreme's expert, Dr. Greenspun. [Doc. 549 at 14].[19] Asked to confirm that the subject software has at least a minimal degree of creativity, Greenspun testified: "That wasn't part of my analysis, so I really can't say. I'd have to . . . go back and start from scratch and look at it all again." [Doc. 489-9 at 8]. Plaintiffs maintain that Greenspun's approach was wrong from the start because he sought to "disprove creativity by pointing to a few isolated elements of the software" that he believed were unprotectable, such as scenes a faire. [Doc. 549 at 14]. Plaintiffs argue that "[t]he relevant question

---

[19] Plaintiffs separately move to exclude certain of Greenspun's opinions [Doc. 461], but as the Court will explain, that does not prevent a ruling on their summary judgment motion.

is not whether the work contains unprotectable elements, but rather whether the work *as a whole* contains some minimal amount of creativity." [*Id.*].

Greenspun testified that "there might be some dusty corner of the EMANATE agent that doesn't run afoul of merger or scenes a faire," but as to the "day-to-day core of it," he believed it was not entitled to copyright protection. [Doc. 489-9 at 68]. His analysis did not purport to be an "exhaustive review of merger or scenes a faire for the entirety of the SNMP agent source code," which he suggested would have been immensely time-consuming. [*Id.*]. Rather, he opined that any implementation of the SNMP standard was going to be tightly constrained by that standard. [*Id.*]. Greenspun conceded, however, that the SNMP Research code included capabilities that were not part of the SNMP standard, for example, the postmosy program. [*Id.* at 18].

Finally, Plaintiffs show that Waldbusser's comparison between the subject software and a third-party implementation of the SNMP standard disproves Greenspun's assertion that the protocol dictated the expression of Plaintiffs' code. [Doc. 549 at 15]. Waldbusser compared SNMP Research's code with a product named Net-SNMP, an open-source SNMP implementation made by a third party. [Doc. 545 at ¶ 16]. He found "that the releases have a nearly total absence of similarities," sharing only "22 short snippets in common" out of the more than 325,000 lines of code that he analyzed. [*Id.*]. According to Plaintiffs, if Greenspun were right that implementing the SNMP standard eliminated the chance of creativity, one would expect the source code for these two implementations of the standard to be similar, rather than almost completely dissimilar.

All this, in Plaintiffs' framework, goes to the first element – ownership of a valid copyright. The second element of Plaintiffs' prima facie case is "copying of constituent elements of the work that are original." *Feist*, 499 U.S. at 361. Plaintiffs show there is no dispute that Extreme copied thousands of SNMP Research's copyrighted files into its product code bases. [Doc. 549 at 16].

Waldbusser's analysis "confirmed that Extreme copied literally thousands of SNMPR's files with SNMPR's copyright notice into Extreme's product code base, and that most of the source code in these files was copied verbatim into Extreme's products without any modification by Extreme." [Doc. 545 at ¶ 12]. Waldbusser found that "for source code files copied into products, the vast majority of the source code lines (more than 90% and in some products as high as 96%) remained exactly identical to lines from SNMPR's registered source code, down to individual details of phrasing, punctuation, structure, organization, and commentary provided by SNMPR's programmers." [*Id.*]. Waldbusser also located SNMP Research's "postmosy" code in Extreme products, copied with only "slight changes." [*Id.*].

Extreme's expert Greenspun confirmed in his deposition that direct copying is easy to prove using a "diff" command, as Waldbusser did. [Doc. 489-9 at 19]. He testified that using a diff command, it was generally straightforward to see which lines of code were copied. [*Id.*]. For a "normal full-sized commercial program, . . . if lines are identical, it's probably because one was copied from the other." [*Id.*]. Greenspun was asked if he disputed Waldbusser's analysis regarding Extreme's use of SNMP Research source code in Extreme products, and testified that he had "never heard of anybody disputing that," was not aware that it was in dispute, and did not do his own analysis of copying. [*Id.* at 20].

Extreme responds that "[m]aterial questions exist as to whether Plaintiffs' software is original and, if Extreme copied Plaintiffs' software, whether Extreme copied protectable or unprotectable elements." [Doc. 498 at 21]. Extreme disputes Plaintiffs' suggestion that as long as a work has some original components, the entire work is protected. [*Id.*]. To the contrary, "[t]he mere fact that a work is copyrighted does not mean that every element of the work may be

protected." *Feist*, 499 U.S. at 348. Instead, "copyright protection may extend only to those components of a work that are original to the author." *Id.*

Extreme asserts that both merger and scenes a faire are exceptions to originality that prevent resolution of originality on summary judgment. Extreme shows that the SNMP standard is a freely available internet standard that enables communication between a device running SNMP software designed to manage other devices ("managers") and the managed devices themselves ("agents"). [Doc. 498 at 23]. As Waldbusser explains, the SNMP standard "defines the format required for messages between managers and agents as well as the behavior required by the managers and agents." [Doc. 475-20 at ¶ 69]. According to Waldbusser, however, the standard "does not dictate how those various requirements must be met." [*Id.*]. The standard simply "specifies enough to ensure that SNMP software written by different developers can successfully communicate even if the developers use completely different strategies for implementing the standard." [*Id.*].

Greenspun testified as to his opinion that SNMP Research's software that implements the SNMP standard is dictated by that standard. [Doc. 489-9 at 9]. He testified that for "these programs that implement standards . . . the idea is coming from somewhere else, and any departure from that idea is going to be a mistake." [*Id.* at 8]. According to Greenspun, "that does limit the number of ways to express the idea." [*Id.*].

Greenspun testified that a programmer implementing a standard in a software program could still generate "minor differences" such as variable names. [Doc. 489-9 at 10]. But he believed that renaming variables "isn't creative," and programmers would consider it to be the same code. [*Id.*]. He agreed there were "probably" other ways that a programmer could express creativity in implementing the SNMP standard, but said he simply had not seen any in Waldbusser's reports.

[*Id.* at 11]. Greenspun also agreed that if two programmers separately set out to implement the SNMP standard, the source code would look different. [*Id.*]. Function names would likely be different, as well as abbreviations and variable names. [*Id.*]. Greenspun testified that it was unlikely that two programmers could make different decisions about how software components would communicate with each other internally. [*Id.*]. He opined that there was "a pretty limited scope for creativity there." [*Id.*]. In sum, Greenspun concluded that even with minor differences in naming, etc., "ultimately, it's going to kind of amount to the same thing . . . given the constraints of the standard." [*Id.* at 12]. He also testified that there was "quite a bit" of third-party code in Plaintiffs' software. [Doc. 489-9 at 10].

### ii. Greenspun's Opinions

Before analyzing the parties' contentions, the Court notes that the pendency of Plaintiffs' motion to exclude certain of Dr. Greenspun's opinions does not prevent resolution of the dispositive motions. Neither party suggests otherwise. In relevant part, Plaintiffs move to exclude Greenspun's opinions regarding copyright registration requirements and copyrightability. [Doc. 552]. They argue he cannot opine as to either because he is not a lawyer or an expert in copyright law, applied the wrong legal principles, and did not conduct a creativity analysis of the entirety of Plaintiffs' source code. [*Id.* at 7-14].

Relative to copyrightability, Plaintiffs' argument relates primarily to Greenspun's legal conclusions. Permitting expert testimony that misstates or misapplies the law risks confusing or misinforming the jury. That is not an issue on summary judgment. The Court is not concerned with his legal conclusions, which can be easily separated from his technical observations (many of which Plaintiffs cite in support of their own arguments). Moreover, Extreme does not rely on Greenspun's conclusion that Plaintiffs' software is not copyrightable, but on his technical analysis.

56

Considering Greenspun's technical (as opposed to legal) opinions does not change the outcome of either dispositive motion. *See Cook v. Erie Ins. Co.*, 478 F. Supp. 3d 658, 664 (S.D. Ohio 2020) ("[T]he Sixth Circuit has clarified that although expert opinion may embrace the ultimate issues to be decided by the jury, the expert is not permitted to draw a legal conclusion and is only permitted to state an opinion that suggests the answer to the ultimate issue or that give[s] the jury all the information from which it can draw inferences as to the ultimate issue." (citation and punctuation omitted)). The *Daubert* motion will be resolved in due course.

### iii.   Analysis – Copyright Claims

Plaintiffs are entitled to summary judgment as to the prima facie elements of their copyright claim. Plaintiffs present valid copyright registrations and point to specific examples of the creativity of their software, with supporting expert opinion. As to copying, they provide overwhelming and largely undisputed evidence that Extreme copied their source code. Extreme responds that Plaintiffs' copyright protection is limited by the doctrines of scenes a faire and merger. Extreme relies on Greenspun's opinion that any implementation of the SNMP standards will be tightly constrained by the standard itself. Yet Greenspun does not opine as to whether the software exhibits minimal creativity. He acknowledged that the SNMP standard does not entirely dictate its implementation, and conceded that Plaintiffs' software had capabilities that do not appear in the standard. Extreme fails to identify any specific portion of Plaintiffs' software that it contends is unoriginal, relying on general reference to the SNMP standard. It provides no hint as to which purportedly unprotectable elements should be filtered out due to merger or scenes a faire. Nor does it make any effort to rebut Plaintiffs' showing that specific elements of the software were original and were copied by Extreme.

First, any conflict between the parties' experts does not preclude summary judgment. Greenspun maintains that the SNMP standard tightly constrains and largely dictates any implementation of that standard. Waldbusser disagrees, opining that the implementation is left to the programmer.

The Court need not (and cannot) resolve that dispute in order to find in Plaintiffs' favor. Greenspun conceded that Plaintiffs' software had capabilities not found in the standard, including the postmosy program. [Doc. 489-9 at 18]. He also agreed that the "getMany" and "getOne" functionalities would be "very tiny increments on top of the standard." [*Id.*]. Moreover, he explained that while the SNMP standard "dictates much or most of what's significant," it does not dictate "every last little thing." [Doc. 489-9 at 10]. So Greenspun's opinions do not create a genuine issue of fact as to whether the software exhibits a minimal degree of creativity.

Greenspun also did not analyze whether the software had at least a minimal degree of creativity. [Doc. 489-9 at 8]. Instead, he "investigated the extent to which Plaintiff's software was boxed in by the SNMP standard and the operating system environment in which it had to run, both of which limit the scope for expression of a software developer." [Doc. 491-3 at ¶ 174]. So he does not purport to opine as to whether the work exhibited minimal creativity, only the extent to which the SNMP standard dictated Plaintiffs' implementation.

Waldbusser, on the other hand, did conduct an exhaustive creativity analysis and identified specific examples that he believed showed creativity. Plaintiffs point to three. [Doc. 580 at 21-22]. First, the "postmosy" code. Greenspun agreed the code is not part of the SNMP standard. [Doc. 489-9 at 18]. And Waldbusser identified it in Extreme products with only "slight changes." [Doc. 545 at ¶ 12].

58

Second, Plaintiffs show that creativity is seen in code functions such as "MakeOID" and "CloneOctetString." [Doc. 580 at 21]. Waldbusser explained that these source code lines show that "quite a lot of expressive freedom is available": the symbols could be given different names, other algorithms could have been used to get the same results, the functions could be redesigned. [Doc. 475-20 at ¶ 141-142; Doc. 580 at 21]. Waldbusser offers this analysis in relation to one of the "exact matches" he identified between Plaintiffs' registered code and source code in an Extreme product. [Doc. 475-20 at ¶¶ 139-140].

Third, Plaintiffs point to the "placing of a single integer called RequestID." [Doc. 475-20 at ¶ 94]. In comparing Plaintiffs' code to the third-party SNMP implementation, Waldbusser noted: "Even drilling down to a tiny task . . . the two implementations are completely different." [*Id.*]. These lines, too, were located in Extreme's products. [*See id.*; Doc. 475-22 at 3].

Extreme offers no evidence to dispute the creativity or originality of any of these software elements. Greenspun opines that the "much of what I've seen as purportedly creative differences" in Waldbusser's reports are "as minimal as you can possibly get" from a programming perspective. [Doc. 494-4 at 31-32]. Yet minimal creativity is all that is required to establish that a work is original. Greenspun's opinion that there are limited ways to implement the SNMP standards is insufficient to create a fact issue as to the specific instances of creativity Plaintiffs identify. This is particularly true given that he conceded the postmosy code is not dictated by the standard and that there were other elements, however minimal, "on top of" the standard. There is thus no genuine issue of material fact as to whether Plaintiffs' works reflect "some minimal degree of creativity." *Premier*, 93 F. 4th at 989 (quoting *Feist*, 499 U.S. at 345).

Extreme nonetheless urges that the doctrines of merger and scenes a faire present triable disputes. These doctrines "filter out non-protectable expression." *Weisblat*, 748 F. Supp. 3d at 531-

32. With the merger doctrine, "any remaining protected expression must be more than *de minimis*—that is, it must be 'more than a small insignificant portion of the plaintiff's work.'" *Id.* (quoting *Neal Publ'ns v. F. & W Publ'ns, Inc.*, 307 F. Supp. 2d 928, 931 (N.D. Ohio 2004)). Similarly, scenes a faire cannot be registered by themselves. Yet "works containing scenes a faire qualify for copyright registration 'provided that the work as a whole contains a sufficient amount of original expression.'" *Premier*, 93 F.4th at 992 (quoting Compendium III § 313.4(l)). Extreme's reliance on these doctrines fails for two related reasons.

First, Extreme never identifies what elements of the works are unprotectable under either doctrine. Neither doctrine is a complete bar to copyrightability if there is a sufficient amount of original expression remaining after unprotectable elements are disregarded. Certainly, "copyright protection may extend only to those components of a work that are original to the author." *Feist*, 499 U.S. at 348. But Extreme does not identify what specific portions of the software are supposedly unprotectable.[20] Assuming, *arguendo*, that merger and scenes a faire apply, Extreme fails to show that the remaining original expression is "*de minimis*" or in an insufficient amount. *See Weisblat*, 748 F. Supp. 3d at 531–32; *Premier*, 93 F.4th at 992.

At most, Extreme contends that "much of an implementation of the SNMP standard is non-copyrightable," and "many aspects of [Plaintiffs] source code were dictated by the SNMP standard." [Doc. 498 at 24]. It is not clear that Extreme even seriously contends Plaintiffs' software is wholly lacking in creativity / original expression, only that merger and scenes a faire create a fact issue as to the extent of copyright protection. Extreme insists that the merger doctrine requires the court to "undertake a line-by-line analysis to determine whether specific lines in the code are

---

[20] The only thing that Extreme explicitly states is unprotectable is the SNMP standard itself. [Doc. 498 at 23]. Yet Plaintiffs do not purport to enforce a copyright in the SNMP standard, but rather their implementation of that standard. [Doc. 580 at 20].

the only and essential means of accomplishing a given task." [Doc. 498 at 22 (citation omitted, cleaned up)]. Yet it provides the Court with no tools whatsoever to do that. Extreme cannot obtain a trial on originality simply by suggesting that merger and scenes a faire apply, without providing any of the information necessary for the Court to apply them. *Cf. RJ Control*, 100 F.4th at 674 ("vague references to general portions of the code are insufficient" to establish which portions of code are protectable).

In response to a properly supported motion for summary judgment, the non-moving party is required to "set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Plaintiffs present significant and specific evidence of originality and Extreme cannot create a material dispute simply by claiming merger and scenes a faire destroy the originality of some unspecified portion of the software.

There is likewise no dispute that Extreme copied Plaintiffs' software and that this copying included original elements. Whether copying occurred is generally a factual matter. *See Lexmark*, 387 F.3d at 534. Here, it is undisputed. Plaintiffs carried their burden on summary judgment by presenting evidence that Extreme copied thousands of SNMP Research's copyrighted files into its product code base, even down to SNMP Research's copyright notice. [Doc. 545 at ¶ 12]. Waldbusser's analysis revealed that for source code files copied into products, the vast majority were precisely identical to lines from SNMP Research's registered source code. [*Id.*]. As explained above, Waldbusser specifically identified original elements of SNMP Research's code in Extreme products, including the "postmosy" code, copied with only slight changes. [*Id.*; Doc. 475-20 at ¶¶ 139-140; Doc. 475-22 at 3].

Extreme makes no effort to refute Plaintiffs' proof that Extreme copied their source code into its products. Greenspun does not dispute this either; he was not aware it was even an issue in

61

this litigation. Perhaps it was not. Construing the facts in the light most favorable to Extreme as the non-moving party, it is undisputed that Extreme copied protectable elements of Plaintiffs' software. Accordingly, Plaintiffs are entitled to summary judgment as to the prima facie elements of their copyright claim.

Finally, the Court is unpersuaded by Extreme's argument that summary adjudication as to the elements of Plaintiffs' copyright claim would be premature due to the pendency of several affirmative defenses. The Court will not defer ruling on issues properly before it simply because others remain for trial. Extreme cites no authority suggesting this is required. *See Stokes v. Brinor, Inc.*, 683 F. Supp. 3d 713 (N.D. Ohio) (on cross-motions, granting summary judgment as to liability for direct copyright infringement but denying defendant's motion for summary judgment as to its statute of limitations defense).

### b. Breach of Contract

Plaintiffs move for summary judgment on their breach of contract claim on the basis that Extreme breached the License Agreement by exceeding the scope of its use and distribution rights under the 2001 License and failing to pay royalties owed. [Doc. 549 at 10]. As the Court previously explained, the License Agreement only obligated Extreme to pay royalties on the BlackDiamond product, so Extreme is entitled to summary judgment as to the royalties aspect of Plaintiffs' breach of contract claim. Plaintiffs' motion will therefore be **DENIED** in this regard.

As to exceeding the scope of use and distribution rights under the License, Extreme's sole argument is that the claim is preempted. The Court has now ruled that, to the extent supported by an obligation to pay for unauthorized use, the unauthorized use and redistribution claim is not preempted. However, Plaintiffs do not affirmatively show that Extreme's use of the software constitutes a breach of § 16(b) of the License. So this claim remains for trial.

### c. Extreme's Affirmative Defenses

Extreme's Amended Answer [Doc. 381] asserts sixteen affirmative defenses. Plaintiffs move for summary judgment as to Extreme's 1st to 10th, 12th, 13th, and 16th affirmative defenses. [Doc. 549 at 17]. Extreme withdrew its 1st, 7th, 9th, 12th, and 13th defenses, and part of its 8th affirmative defense. [Doc. 498 at 10 n.3]. That leaves affirmative defenses 2 to 6, 8(a), 8(c), 10, and 16 for resolution.

Plaintiffs did not move for summary judgment as to Extreme's 11th defense (statute of limitations – copyright infringement), 14th defense (statute of limitations – state law claims), or 15th defense (failure to mitigate damages).

<u>Second, Third, and Fourth Affirmative Defenses: Non-Infringement, Copyright Protection Unavailable, Invalid Copyrights</u>

Extreme appears to acknowledge that its copyright-related defenses rise or fall on the Court's determinations of Plaintiffs' copyright claim, and thus does not present any additional argument. The Court has found that Plaintiffs are entitled to summary judgment as to the prima facie elements of their copyright claim. Accordingly, Plaintiffs are entitled to summary judgment as Extreme's Second Affirmative Defense (non-infringement), Third Affirmative Defense (copyright protection unavailable), and Fourth Affirmative Defense (invalid copyrights). These defenses are **DISMISSED**.

<u>Fifth Affirmative Defense: Invalid Copyright Registrations</u>

The Court has explained that Extreme is not entitled to a referral to the Register of Copyrights based on a knowing inaccuracy in Plaintiffs' registrations. SNMP has presented evidence that the purported errors in its registration materials were not inaccuracies, much less knowing inaccuracies. Extreme simply has not shown there was an inaccuracy in the registration materials. First, as to the "multiple works" theory, Extreme has not shown that a registration

63

covering multiple products cannot be registered as a single work. Second, there is no allegation that any deficiency in the deposit copy resulted in an inaccuracy in the certificate of registration. And the deficiencies identified are just that – deficiencies, not inaccuracies. There is no dispute that the source code deposits accurately reflected the source code for each registered version of the software. Similarly, only minimal revisions were reflected in the source code deposits, but they were accompanied by a file directory with unique signatures for every single file that changed from the previous version. None of the cases cited by Extreme are remotely analogous – all involved actual inaccuracies, not technical deficiencies.

Plaintiffs have carried their burden on summary judgment by demonstrating the absence of evidence to support Extreme's invalid copyright registration affirmative defense. Conflating inaccuracies with deficiencies, Extreme responds with inapposite caselaw and an inability to point to a single genuine inaccuracy in the registration materials, much less the certificates of registration. For these reasons, and as set forth more fully in § III(c) above, Plaintiffs' motion for summary judgment on Extreme's Fifth Affirmative Defense is **GRANTED**.

Sixth Affirmative Defense: Copyright Misuse

Copyright misuse is an equitable defense that the Court may determine on the merits as a matter of law. *FreePlay Music, LLC v. Dave Arbogast Buick-GMC, Inc.*, Case No. 3:17-cv-42, 2019 WL 4647305 (S.D. Ohio Sept. 24, 2019). "To establish copyright misuse, a defendant must establish either (1) that the plaintiff violated the antitrust laws or (2) that the plaintiff illegally extended its monopoly beyond the scope of the copyright or violated public policies underlying copyright laws." *Id.* at * 13.

The sole basis for Extreme's copyright misuse defense is that Plaintiffs refused to agree to a transfer of a fully-paid license from Brocade to Extreme. [Doc. 498 at 27]. Extreme contends

that it sought to continue selling the same products Brocade had been selling, which were at that point part of Extreme's business. [*Id.*]. According to Extreme, Plaintiffs repeatedly refused to provide consent for the transfer, even after requesting and receiving a detailed breakdown of exactly which products Extreme sought a license assignment for.

According to Plaintiffs, Brocade's license agreement required it to obtain consent for an assignment. [*See* Doc. 246-1 (agreement to keep Program Source received in the "strictest confidence")]. Extreme does not dispute that Plaintiffs' consent was required.

The record reflects that in September 2017, Brocade sought SNMPR International's consent to the assignment of the Brocade License Agreement to Extreme, in connection with Extreme's anticipated acquisition of Brocade's Data Center business. [Doc. 544-15 at 1–8]. SNMPR International's counsel responded that the agreement was not assignable and requested more information about the transaction and the software involved. [*Id.* at 10–11]. Extreme's representative did not provide that information, but instead requested the assignment form be provided for review. [*Id.*]. Plaintiffs' counsel again requested information. [*Id.*]. According to Dr. Case, neither Extreme nor Brocade responded to Plaintiffs' request for information about the transaction. [Doc. 489 at ¶ 67].

In October, representatives for the parties discussed a service request from Extreme and SNMP Research agreed to provide technical support provided that it was not construed as a license for the subject software. [Doc. 544-16]. It is not clear whether Extreme or Brocade had provided Plaintiffs with the information they requested at this point.

Regardless, Plaintiffs did not consent and Extreme again requested assignment in April 2018. [Doc. 544-18 at 9]. The emails show that Extreme identified the Brocade product list with SNMP Research software. [*Id.* at 8]. Plaintiffs apparently agreed to transfer a royalty buyout for

no charge, but only as to specific products and with Extreme's agreement to pay a yearly service agreement. [*Id.* at 7]. Extreme did not respond to counsel's June 1, 2018, email, or to a follow-up email on June 27th. [*Id.* at 5-7]. Plaintiffs' counsel emailed yet again on July 24th, asking whether Extreme still intended to obtain a license for the software it obtained from Brocade, after which communications resumed. [*Id.*]. After Plaintiffs' counsel indicated that the agreement was ready to be executed, Extreme's representative relayed that Brocade wanted the assignment to be partial. [*Id.* at 2]. According to Dr. Case, the purpose of a partial assignment was to allow both Brocade and Extreme to use the subject software. [Doc. 489 at ¶ 70].

It's not clear what happened next, but in February 2020, counsel for Extreme reached out to counsel for Plaintiffs about license renewals for SNMP software. [Doc. 544-17 at 3]. Plaintiffs' counsel responded: "If you are referring to the SNMP software that Extreme received from Brocade then it is my understanding that Extreme is using SNMP software it received from Brocade without a license." [*Id.* at 2]. Counsel explains that someone was going to send Plaintiffs information about which Extreme products use SNMP software without a license so they could work on getting a license in place. [*Id.*]. Counsel for Plaintiffs indicates in the email that "Brocade would not agree to transfer the license . . . to Extreme so a new license is required." [*Id.*]. Extreme's counsel acknowledged that "Extreme needs to license SNMP software to cover the Brocade license." [*Id.*].

Nothing about this chain of events suggests that Plaintiffs "illegally extended [their] monopoly beyond the scope of the copyright or violated public policies underlying copyright laws." *FreePlay*, 2019 WL 4647305 at *13. There is no evidence that Plaintiffs are "copyright trolls," employing "abusive litigation tactics to extract settlements." *Id.* at * 14 ("Standing alone, initiating multiple copyright infringement actions and attempting to negotiate settlements does not

66

indicate copyright misuse or copyright trolling."). To the contrary, the record suggests Plaintiffs actively attempted to work with Brocade and Extreme to reach an agreement on assignment and/or license amendment. Plaintiffs are entitled to summary judgment as to Extreme's affirmative defense of copyright misuse.

Eighth Affirmative Defense: Laches and Estoppel

Plaintiffs contend that both laches and estoppel are equitable defenses that Extreme is barred from pursuing due to its unclean hands. [Doc. 549 at 22]. Plaintiffs point to the following as evidence: (1) Extreme's purportedly false royalty reports and false statements regarding those reports; (2) Extreme's repeated refusal to identify products containing Plaintiffs' software, despite a Court order to do so; and (3) Extreme use of Plaintiffs' software when it knew that it had no license to use the software in any product other than the BlackDiamond product.

The Court has held that Extreme's royalty reports and emails about those reports were not false, so this cannot support Plaintiffs' unclean hands argument. Second, it is not clear to the Court that a parties' conduct during the course of discovery can support an unclean hands argument. Plaintiffs cite no authority for such a proposition. Finally, Extreme's use of Plaintiffs' software in products other than the BlackDiamond product goes to the heart of the claims in this case. As triable issues remain, the Court cannot say that Extreme's conduct bars it from asserting equitable defenses.

On the merits, Extreme points out that Plaintiffs present no argument as to laches. Plaintiffs do not dispute this contention in their reply. In the absence of supporting argument, Plaintiffs cannot obtain summary judgment as to Extreme's laches defense, which remains for trial.

As to estoppel, Courts have articulated its elements in various ways. Extreme proposes the following elements for estoppel in a copyright case: "(1) plaintiff knew about defendant's

infringing conduct; (2) plaintiff must intend that his conduct be acted on or must act in a way that the party asserting the estoppel had a right to believe it was so intended; (3) defendant must be ignorant of the true facts; and (4) defendant must rely on plaintiff's conduct to its detriment." *Clever Factory, Inc. v. Kingsbridge Intern., Inc.*, 2013 WL 5375258 at *5 (M.D. Tenn. Sept. 24, 2013) (quoting *Quinn v. City of Detroit*, 23 F. Supp.2d 741, 752-53 (E.D. Mich. 1998)).

Extreme does not even attempt to show that it was ignorant of the true facts, an essential element of its estoppel defense according to its own articulation of the law. So it cannot prevail on this defense even if all of its other contentions are accepted. Plaintiffs are entitled to summary judgment as to Extreme's affirmative defense of estoppel.

Tenth Affirmative Defense: Unclean Hands

The doctrine of unclean hands "allows the court to deny relief where the party applying for the relief is 'guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue." *FreePlay*, 2019 WL 4647305 at *12 (quoting *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995)). Extreme argues Plaintiffs acted in bad faith by blocking Extreme and Brocade's attempts to transfer the Brocade License to Extreme. [Doc. 498 at 28]. Extreme further accuses Plaintiffs of delay in bringing suit "or even attempting negotiations with Extreme and Brocade." [*Id.*].

The record thoroughly undermines Extreme's narrative on this point. The communications provided to the Court are the only evidence supporting this defense, other than Dr. Case's declaration. They show that Plaintiffs' counsel worked with Extreme to negotiate an assignment. Plaintiffs assert (and the correspondence suggests) that Brocade declined to execute the license assignment, an assertion Extreme does not dispute.

68

Extreme cites no authority for the proposition that a delay in bringing suit, assuming there was one, constitutes bad faith. And the record shows that Plaintiffs' counsel repeatedly emphasized the need for a license: "If Extreme is using or distributing SNMP Research software it obtained from Brocade then it is doing so without a license." [Doc. 544-18 at 8; *id.* at 5 ("[I]t is important to my client that Extreme not use the software without a license.")]. Extreme fails to create a genuine dispute as to its equitable defense of unclean hands and Plaintiffs are therefore entitled to summary judgment as to this defense.

<u>Sixteenth Affirmative Defense: Preemption</u>

For its Sixteenth Affirmative Defense, Extreme asserts that Plaintiffs' state law claims are preempted by the Copyright Act. As explained in § III(a)(iii) above, subclaims (e) and (f) are preempted. Subclaims (b) and (d) are not.

## V. CONCLUSION

Accordingly, the Motion for Summary Judgment [Doc. 468] of Defendant Extreme Networks, Inc., is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Extreme's Motion [Doc. 468] is **GRANTED** as to breach of contract subclaims (a), (c), (e), (f), and (g), which are **DISMISSED**;

- Extreme's Motion [Doc. 468] is **GRANTED** as to the fraud claim, which is **DISMISSED**;

- Extreme's Motion [Doc. 468] is **DENIED** as to the remaining contract subclaims and the copyright claim;

- Extreme's Motion [Doc. 468] is **DENIED** as to the request for referral to the Register of Copyrights.

69

The Motion for Partial Summary Judgment [Doc. 463] of Plaintiffs SNMP Research, Inc., and SNMP Research International, Inc., is **GRANTED IN PART** and **DENIED IN PART** as follows:

- Plaintiffs' Motion [Doc. 463] is **GRANTED** as to the prima facie elements of their copyright claim;

- Plaintiffs' Motion [Doc. 463] is **DENIED** as to the breach of contract claim;

- Plaintiffs' Motion [Doc. 463] is **GRANTED** as to Extreme's affirmative defenses 1, 7, 8(b) (acquiescence), 8(d) (waiver), 9, and 12-13 which were withdrawn and are therefore **DISMISSED**;

- Plaintiffs' Motion [Doc. 463] is **GRANTED** as to Extreme's affirmative defenses 2-6 and 10, which are **DISMISSED**;

- As to Extreme's 8th affirmative defense, Plaintiffs' Motion [Doc. 463] is **GRANTED** as to estoppel, which defense is **DISMISSED**, and **DENIED** as to laches;

- As to Extreme's 16th affirmative defense, Plaintiffs' Motion [Doc. 463] is **GRANTED** as to subclaims (b) and (d), and **DENIED** as to subclaims (e) and (f).

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**