UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| SNMP RESEARCH, INC. and SNMP RESEARCH INTERNATIONAL, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 3:20-CV-451-CEA-DCP |
| EXTREME NETWORKS, INC., | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and Standing Order 13-02.

Now before the Court is Plaintiffs' Motion to Exclude the Testimony of Mahdi Eslamimehr [Doc. 457]. Defendant has responded in opposition [Doc. 557], and Plaintiffs have filed a reply [Doc. 584]. The motion is ripe for adjudication. *See* E.D. Tenn. L.R. 7.1(a). For the reasons explained below, the Court **GRANTS IN PART AND DENIES** Plaintiffs' motion [**Doc. 457**].

## I.    BACKGROUND

According to the allegations in the Amended Complaint for Breach of Contract, Copyright, Infringement, and Fraud ("Amended Complaint") [Doc. 244], in 1988, Dr. Jeffrey Case ("Dr. Case") and Ken Key ("Mr. Key") started a company that developed a software-based management system [*Id*. ¶ 1]. "One of the foundational technologies of modern computer networks is the Simple Network Management Protocol (herein, 'SNMP') from which Plaintiffs take their names" [*Id*. ¶ 2].[1] SNMP allows "connected devices to communicate by sending and

---

[1]    Plaintiff SNMP Research, Inc. ("SNMP Research") "is primarily a research and development company that creates, licenses, and supports products based on SNMP" [Doc. 244 ¶

responding to messages" [*Id.*].  "For example, a network-connected laser printer can communicate with a network-connected computer using SNMP to pass messages regarding the printer's status (e.g., needs paper, paper jam)" [*Id.*].  Plaintiffs allege that their "technology is an implementation of SNMP" and that their "primary asset is their intellectual property embedded in their software, including copyright protection" [*Id.* ¶¶ 4, 6].

Plaintiffs state that on March 10, 2001, they "licensed some of their copyrighted software to . . . Brocade Communications Systems LLC ("Brocade")" [*Id.* ¶ 7].[2]  According to the Amended Complaint:

> The License Agreement set[s] clear mandates on, among other things, which software was licensed, how it could be used internally by Brocade, and how it could be reproduced or transferred externally. It contained express limitations with respect to use of the human-readable "source code" that makes up the licensed software. Among other things, the License Agreement expressly forbade Brocade from transferring or disclosing "Source" materials, which were defined to include source code and related matter.

[*Id.* ¶ 8].  Plaintiffs claim that "Brocade breached the License Agreement by, among other things, disclosing Plaintiffs' source code to [Defendant]" [*Id.* ¶ 9].  Plaintiffs aver that Defendant continues to "engag[e] in unauthorized reproduction and public distribution of products containing Plaintiffs' copyrighted software, including but not limited to the creation of new Extreme products" [*Id.* ¶ 16].

A few months after Plaintiffs entered into a License Agreement with Brocade, on October 22, 2001, Plaintiff SNMPRI and Defendant entered into a License Agreement ("2001 Extreme

---

30].  Plaintiff SNMP Research International, Inc. ("Plaintiff SNMPRI") "is primarily responsible for sales, marketing, and sublicensing software under license from SNMP Research" [*Id.* ¶ 31].

[2]      Plaintiffs originally named Brocade and its ultimate parent, Broadcom Inc., to the lawsuit [*See* Doc. 244].  These parties settled the claims between them and were dismissed [Docs. 266, 268].

License") [*Id*. ¶ 68]. Plaintiffs submit that Defendant breached that agreement as follows:

> a) failing to report and pay royalties; b) using and redistributing Plaintiffs' software beyond the scope of the use and redistribution rights granted by the 2001 Extreme License; c) using and redistributing Plaintiffs' software after Extreme's right to do so was terminated under the 2001 Extreme License; d) failing to satisfy its obligations with respect to use, copying, transference, protection, and security of the Program Source provided to Extreme under the 2001 Extreme License; e) failing to provide information that Extreme was required to provide under the 2001 Extreme License; f) failing to maintain SNMP Research's copyright notice in the software; g) failing to give required notice in supporting documentation that copying and distribution is by permission of SNMP International; and h) failing to return or provide certification of the destruction of Program Source provided under the 2001 Extreme License.

[*Id*. ¶ 68 (footnote omitted)].

Based on the above, Plaintiffs allege copyright infringement, 17 U.S.C. § 501 [*id*. ¶¶ 117–25; breach of the 2001 Extreme License Agreement [*id*. ¶¶ 137–43]; and fraud [*id*. at ¶¶ 144–55].

Under the Copyright Act, the plaintiff is entitled to actual damages and disgorgement of the defendant's profits. 17 U.S.C. § 504(b). With respect to disgorgement, the plaintiff must only prove the defendant's gross revenue. *Id*. The burden then shifts to the defendant to show any "deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id*. In support of Plaintiffs' damages claim, they provided various expert reports, including that of Dr. Ravi Dhar ("Dr. Dhar"), a survey expert, and Scott Bradner ("Mr. Bradner"), a technical expert, in order to "offer their own apportionment analysis to both satisfy their burden and to counter [Defendant's] apportionment" [Doc. 571 p. 11]. In summary, Plaintiffs state that Dr. Dhar "conducted a survey of consumers who use the types of products at issue (i.e., enterprise wired switches)" [*Id*. at 10]. They contend that "[t]he survey respondents identified which of the

products' capabilities are important to them and assigned them relative weights" [*Id.*]. Then, Mr. Bradner "determined which of the capabilities were attributable to SNMP and to what extent" [*Id.*].

In response, and relevant to the instant matter, Defendant hired a technical rebuttal expert, Maldi Eslamimehr, who is a software engineer with a Ph.D. in computer science ("Dr. Eslamimehr"), to "offer[] critiques of both the list of capabilities at the core of Dr. Dhar's survey and the methodology used and conclusions reached by Mr. Bradner in assessing the 'SNMP attribution' of certain capabilities" [Doc. 557 p. 6]. In addition, Dr. Eslamimehr "[critiqued] Mr. Bradner's 'SNMP attribution' percentages and [proposed] percentages that better represent the various features required for the difference capabilities at issue" [*Id.* at 7].

Just as Defendant sought to exclude the opinions of Dr. Dhar and Mr. Bradner,[3] Plaintiffs seek to exclude Dr. Eslamimehr's rebuttal opinions. Plaintiffs argue that Dr. Eslamimehr should be prohibited from testifying because: (1) he is not qualified as a survey expert to critique Dr. Dhar's work and his critique is otherwise baseless [Doc. 553 p. 6]; (2) his opinions as to "Mr. Bradner's selection of network management stations ("NMS(es)") and tested products" are conclusory and unfounded [*id.* at 9]; and (3) his valuation opinions are unsupported by adequate methodology, evidence, or qualifications [*id.* at 11].

## II.    STANDARD OF REVIEW

"Federal Rule of Evidence 702 obligates judges to ensure that any scientific testimony or evidence admitted is relevant and reliable." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993)).

---

[3]    Plaintiffs also submitted the report of Mike Wallace ("Mr. Wallace"), who applied the results from Mr. Bradner to Defendant's gross revenues and profits [*See* Doc. 571 p. 10]. Defendant challenged the opinions of Dr. Dhar, Mr. Bradner, and Mr. Wallace [*see* Doc. 454], and the Court entered a Memorandum and Order adjudicating the motion on May 28, 2025 [Doc. 598].

4

Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

(a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    the testimony is based on sufficient facts or data;

(c)    the testimony is the product of reliable principles and methods; and

(d)    the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[4]  The Supreme Court of the United States stated in *Daubert* that a district court, when evaluating evidence proffered under Rule 702, must act as a gatekeeper, ensuring "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at 589.

"Although *Daubert* centered around the admissibility of scientific expert opinions, the trial court's gatekeeping function applies to all expert testimony, including that based upon specialized or technical, as opposed to scientific, knowledge." *Rose v. Sevier Cnty.*, No. 3:08-CV-25, 2012 WL 6140991, at *4 (E.D. Tenn. Dec. 11, 2012) (citing *Kumho Tire Co.*, 526 U.S. at 138–39). "[A] party must show, by a 'preponderance of proof,' that the witness will testify in a manner that will ultimately assist the trier of fact in understanding and resolving the factual issues involved in the

---

[4]    Rule 702 was amended on December 1, 2023, but the changes to the rule are not substantive. *Nash-Perry v. City of Bakersfield*, No. 118CV01512, 2023 WL 8261305, at *13 (E.D. Cal. Nov. 29, 2023). Rather, "[t]he amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000--requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard." Fed. R. Evid. 702 advisory committee's note to 2023 amendments.

5

case." *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 970–71 (M.D. Tenn. 2002) (quoting *Daubert*, 509 U.S. at 593–94), *aff'd by* 89 F. App'x 927 (6th Cir. 2003). The party offering the expert has the burden of proving admissibility. *Daubert*, 509 U.S. at 592 n.10.

"District courts generally have 'considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'" *Madej v. Maiden*, 951 F.3d 364, 374 (6th Cir. 2020) (quoting *Kumho Tire*, 526 U.S. at 152). Decisions by the district court are thus reviewed for an abuse of discretion. *See id.* (citing *Kumho Tire*, 526 U.S. at 142). "This deferential standard makes sense because *Daubert* establishes a 'flexible' test that considers many indicia of reliability[,]" and relevance will depend "on the particular science and the particular scientist before the court." *Id.* (citing *Kumho Tire*, 526 U.S. at 150).

## III. ANALYSIS

As noted above, Plaintiffs move to exclude Dr. Eslamimehr's rebuttal opinions critiquing Dr. Dhar's survey analysis, Mr. Bradner's selection of NMSes and tested products, and Mr. Bradner's attribution percentages.

The Court will address these in turn.

### A. Dr. Eslamimehr's Critique of Dr. Dhar's Survey Analysis

Plaintiffs argue that Dr. Eslamimehr is not qualified to render rebuttal opinions about Dr. Dhar's survey, which "asked respondents to evaluate the relative importance of 55 distinct capabilities of wired LAN switches[,] including six capabilities relating to Plaintiffs' copyrighted code," because "he is not 'qualified by knowledge, skill, experience, training, or education' in the field of survey analysis or methodology" [Doc. 553 pp. 6–7 (citations omitted)].

6

Dr. Eslamimehr critiques Dr. Dhar's opinion, stating that the six categories of wired switch capabilities identified by Dr. Dhar as "allegedly infringing" are "overlapping categories" [Doc. 537-18 ¶¶ 13–14]. Dr. Eslamimehr states:

> 15. The features outlined—monitoring from a single pane of glass, monitoring in a multivendor network, real-time monitoring, third party software capability, alert functionality, and granular visibility—are often highlighted in marketing materials as distinct capabilities to showcase the versatility and comprehensiveness of network management systems. However, in practice, these are not isolated features but are intricately linked and often embedded within the broader functionality of a "single pane of glass" capability. This term itself is a marketing expression designed to convey the ease and efficiency with which network administrators can oversee and control entire networks—spanning multiple vendors and technologies—from a unified interface. This consolidation enhances usability and operational efficiency, allowing seamless integration of real-time data feeds, alerts, and detailed analytics into a single dashboard. Essentially, the single pane of glass serves as a central hub that encapsulates all these capabilities, simplifying network management while providing a comprehensive view and control over the network's various elements.

[*Id.* ¶ 15].

Plaintiffs assert that "Dr. Eslamimehr has no expertise in conducting or analyzing surveys of this type. And his conclusion—that some categories in Dr Dhar's survey are 'overlapping'—is both irrelevant and unsupported by any valid evidence or methodology" [Doc. 553 p. 5]. Plaintiffs contrast Dr. Dhar's background in the specific field of marketing surveys, having "conducted, supervised, and/or evaluated more than 1,000 surveys relating to different aspects of consumer behavior," to Dr. Eslamimehr's claim of having "some experience 'surveying' the technical features of software products, but [] ultimately admit[ing], 'I'm not an expert in . . . polling information from people'" [*Id.* at 7 (quoting Doc. 547-18 p. 34)]. They further argue that Dr. Eslamimehr's "overlapping categories" opinions are "unreliable and entirely subjective" [*Id.*]. In

this regard, Plaintiffs note that Dr. Eslamimehr does not define the term "overlapping" in his report, nor does he "explain how to objectively evaluate such a condition . . . or cite any industry standard or similar objective source to anchor his determination" [*Id.* at 7–8]. They point out that Dr. Eslamimehr's conclusions are simply "[b]ased on [his] education and years of experience in the field," absent any identified methodology [*Id.* at 8 (citing Doc. 537-18 ¶ 14 and Doc. 547-18 p. 31)]. And lastly, Plaintiffs maintain that Dr. Eslamimehr's "overlapping categories" opinions are "irrelevant to this case and unhelpful . . . to the trier of fact" because he admitted the six features are "often highlighted in marketing material as distinct capabilities" and that he fails to explain how the "'overlapping' nature of these categories should affect Dr. Dhar's survey in any way" [*Id.* (citation omitted)].

Defendant responds that in Dr. Dhar's opening report, he identified different wired-switch capabilities and "designed a survey to measure the relative value that wired switch consumers place on six separate capabilities that he claims are attributable to Plaintiffs' software" [Doc. 557 p. 8 (citations omitted)]. It submits that Dr. Eslamimehr's critique of Dr. Dhar's survey is not focused on the consumer survey design, and thus, does not "require any expertise in survey design or administration" [*Id.* (citation omitted)]. Instead, Defendant argues, Dr. Eslamimehr's assessment is based on how the six capabilities function in a wired switch, and because it is highly technical, his "decades of experience as a software engineer and computer scientist make him well-qualified to opine on these topics" [*Id.*]. Defendant adds that Plaintiffs asked their own technical expert, Mr. Bradner, to review Dr. Dhar's list and determine whether he "grouped the capabilities into larger categories accurately," and asserts that while Mr. Bradner did not opine on whether any of the capabilities were overlapping, their reliance on such a technical expert to validate Dr. Dhar's list diminishes their argument as to Dr. Eslamimehr's technical expertise to critique the list [*Id.*].

With respect to the Plaintiffs' argument that Dr. Eslamimehr's opinions are unreliable because he "does not define 'overlapping,'" Defendant responds that it is a commonly used and understood word and that "to the extent it was not already clear from its plain meaning, Dr. Eslamimehr has repeatedly demonstrated what 'overlapping' means in the context of his critique of Dr. Dhar's survey" [*Id.* at 11 (citing examples)]. Finally, as to Plaintiffs' assertion that Dr. Eslamimehr's opinions are unhelpful because the six "capabilities at issue are not 'overlapping from a marketing perspective,'" Defendant counters that "[t]his argument plainly mischaracterizes Dr. Dhar's survey" [*Id.* at 12 (citation omitted)]. Defendant asserts that the aim of Dr. Dhar's survey "was to determine the relative value that consumers place on different capabilities, particularly those purportedly enabled by Plaintiffs' software," and not "to determine which capabilities of wired switches are most important from a marketing perspective" [*Id.* (emphasis omitted)]. Defendant maintains that the way in which "the capabilities may be described in marketing materials has no bearing on this issue" and that Dr. Eslamimehr's assessment that the capabilities are interrelated rather than distinct will assist the factfinder in determining the proper weight to give Dr. Dhar's survey [*Id.*].

Plaintiffs filed a reply, reiterating that "Dr. Eslamimehr is critiquing the survey's design" and that as such, he is not qualified to rebut Dr. Dhar because he is not "an expert in consumer survey design" [Doc. 584 p. 6 (emphasis omitted)]. They contend that unlike Mr. Bradner's technical expertise, which was used by Dr. Dhar to validate his methodology, Dr. Eslamimehr's "technical" testimony is not being used "to support a qualified survey expert's opinion" but rather to criticize "[Dr.] Dhar's survey design through a back door, using attorney argument" [*Id.* at 7]. In addition, Plaintiffs contend that "[w]hether or not 'overlapping wired LAN switch capabilities' is a 'commonly' understood concept or has any effect on the survey itself . . . Dr. Eslamimehr

9

never describes any methodology or procedure for how he gets to his conclusion that the capabilities are, in fact, 'overlapping'" and only cites to "[his] education and years of experience in the field" as support for his opinion that these are overlapping categories [*Id.* at 8]. Finally, Plaintiffs assert that Dr. Eslamimehr's "overlapping categories" opinion makes no connection as to how his critique would ultimately impact Dr. Dhar's survey, and thus, is unhelpful to the trier fact [*Id.* at 9].

### 1. Dr. Eslamimehr's Qualifications

Turning first to Dr. Eslamimehr's qualifications, he has a Master of Science in Computer Science from Linköping University, Sweden, and a Doctor of Philosophy in Computer Science from the University of California, Los Angeles [Doc. 537-18 ¶ 4]. He is a graduate of Harvard Business School in Strategy Execution and holds a Master of Business Administration from the London School of Economics and Political Science [*Id.*]. He states that he has "conducted years of research and software analysis . . . and that his research articles have been widely discussed and cited . . . by scientists in top conferences and journals" [*Id.*]. He has worked as a software engineer for more than 20 years, "including roles and responsibilities associated with software design, development, analysis, testing, and operations for a wide range of companies and international organizations" [*Id.* ¶ 5]. Dr. Eslamimehr critiqued the report of Plaintiff's marketing survey expert, Dr. Dhar, basing his rebuttal opinion on his education and years of experience. Plaintiffs do not challenge Dr. Eslamimehr's qualifications generally as to matters of computer science, network management, and software programming, but they do dispute whether he has relevant expertise to opine on matters concerning the specific field of marketing surveys.

The Court observes that "*Daubert* requires that the expert possess expertise assessed in the context of the 'nature of the issue, the expert's particular expertise, and the subject of his [or her]

testimony.'" *Innovation Ventures, LLC v. NVE, Inc.*, 90 F. Supp. 3d 703, 719–20 (E.D. Mich. 2015) (quoting *Kumho Tire Co.*, 526 U.S. at 150). In evaluating a proffered expert's qualifications, "[t]he trial court ha[s] to decide whether this particular expert ha[s] sufficient specialized knowledge to assist the jurors 'in deciding the particular issues in the case.'" *Kumho*, 526 U.S. at 156 (citation omitted)).

Here, Dr. Eslamimehr opines that the six purportedly infringing capabilities identified in Dr. Dhar's survey are "overlapping categories" [Doc. 537-18 ¶ 14]. Defendant maintains that this critique of the wired switch capabilities does not require any expertise in survey design but rather involves "knowledge of how wired switches work at the level of hardware and software" [Doc. 557 p. 8]. The Court agrees. Dr. Eslamimehr details the function of each of the six capabilities and then explains how "in practice, these are not isolated features but are intricately linked" [Doc. 537-18 ¶¶ 14-15]. Dr. Eslamimehr's opinion in this regard stems from his specialized knowledge and training with respect to these capabilities and their respective functions, and he focuses on the data in the survey, not the survey itself.[5] While Plaintiffs rely on *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) for the general proposition that an expert must be "qualified by knowledge, skill, experience, training, or education," they do not point this Court to any legal authority in which a rebuttal expert with technical expertise in the matter being surveyed was not permitted to opine on a potential flaw in the data embedded within a survey that was well within the expert's field of specialized knowledge. And as Defendant notes, "Dr. Eslamimehr's critiques

---

[5]     Indeed, Dr. Dhar states in his expert report that "Mr. Bradner[] provided guidance for the interpretation of technical terms and the list of capabilities in the survey design" [Doc. 537-1 ¶ 38]. Plaintiffs contend that unlike Mr. Bradner's technical expertise, which was used by Dr. Dhar to validate his methodology, Dr. Eslamimehr's "technical" testimony is not being used "to support a qualified survey expert's opinion" but rather to criticize "[Dr.] Dhar's survey design" [Doc. 524 p. 7]. Under the circumstances, the Court sees no difference between using an expert to validate the method and using an expert to criticize the method.

of Dr. Dhar's survey is not made 'from a consumer survey design perspective'" [Doc. 557 p. 8 (citing *Schechner v. Whirlpool Corp.*, No. 16-cv-12409, 2019 WL 978934, at \*12 (E.D. Mich. Feb. 28, 2019)]. Dr. Eslamimehr's role as a rebuttal witness does not require him to perform or offer a competing survey analysis, but rather requires that he possess the necessary expertise to identify a purported flaw in the opposing expert's opinion. In this instance, his limited opinions concerning "overlapping categories" of certain features are well within his specialized field of knowledge and experience. *See Gibson Brands, Inc. v. Armadillio Distribution Enters., Inc.*, No. 4:19-CV-00358, 2021 WL 231752, at \*2 (E.D. Tex. Jan. 22, 2021) ("While [the expert] may be unqualified to testify on methodology or statistical analysis, [the expert] did not do that. Instead, [the expert] testified that the Survey used photographs, which, in his opinion, contain recognizable details beyond the guitar silhouette.").[6] The Court finds Plaintiffs' arguments not well taken.

---

[6] Plaintiffs' attempts to distinguish *Schechner* and *Gibson* are not persuasive [*See* Doc. 524 p. 7]. In *Schechner*, the plaintiff argued that the defendant's expert, an economist, could not testify about survey-taking and market simulation." *Schechner*, 2019 WL 978934, at \*12. The court disagreed, finding that the defendant's expert was providing "economic criticism" to the plaintiff's expert's methodology. *Id.* And because the defendant's expert raised economic concerns, his "lack of direct experience in conducting customer surveys" went "to the weight of his opinions and not their admissibility." *Id.* That is the case here. Plaintiffs contend that in another case, a court excluded an expert in *Schechner* because his testimony "crossed th[e] line" [Doc. 524 p. 7 (citing *Mannacio v. LG Elecs. U.S.A., Inc*., No. CV 16-1220, 2020 WL 4676285, at \*1 (D. Minn. Aug. 12, 2020)]. Dr. Eslamimehr's testimony does not cross the line. And further, the court in *Mannacio* allowed the expert to criticize a study "for not considering individual factors leading to the purchase of a television" because "[s]uch a critique of the calculation of damages falls easily in the wheelhouse of an economist specializing in damages calculation." *Mannacio,* 2020 WL 4676285, at \*8.

Plaintiffs argue that the expert in *Gibson* "testified about 'consumer recognition' of guitar brands based on 'decades of the music industry' and thus was indisputably qualified to discuss consumer decision-making" [Doc. 524 pp. 7–8 (citation omitted)]. In *Gibson*, the court found that the defendant's expert was not testifying about consumer surveys, but instead, he was testifying about the data the plaintiff's expert relied on. *Gibson Brands, Inc.*, 2021 WL 231752, at \*2. Because he was an expert in "brand recognition," his opinion was admissible. *Id.* Here, because Dr. Eslamimehr has specialized knowledge with respect to the subject capabilities and features, such allows him to testify about the data in Dr. Dhar's survey.

## 2.    Dr. Eslamimehr's Critique of Dr. Dhar's Survey

Plaintiffs further assert that Dr. Eslamimehr's "overlapping categories" opinions, serving to critique Dr. Dhar's survey, are baseless. As noted above, Plaintiffs specifically argue that Dr. Eslamimehr does not define the term "overlapping" nor does he "explain how to objectively evaluate such a condition . . . or cite any industry standard or similar objective source to anchor his determination" [Doc. 553 pp. 7–8]; his conclusions are based only on his education and experience [*id.* at 8]; and these opinions have no relevance to this case as he fails to explain how the "'overlapping' categories impact the results or reliability of Dr. Dhar's survey analysis" [*id.* at 8–9].

As an initial matter, the Court notes that while the role of a rebuttal expert is different from that of an affirmative expert, "rebuttal experts must [still] meet *Daubert's* threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Focus Products Group Int'l, LLC v Kartri Sales Co., Inc.*, 647 F. Supp. 3d 145, 246 (S.D.N.Y. Dec. 22, 2022) (alteration in original) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016)); *see also In re E. I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 348 F. Supp. 3d 680, 695 (S.D. Ohio 2016) (noting that defense rebuttal experts must meet the same *Daubert* admissibility standard that applies to an expert who testifies in support of the party who has the burden of proof).

The Court begins with dispensing of Plaintiffs' argument that Dr. Eslamimehr's "overlapping categories" opinions are "unreliable and entirely subjective" because he fails to define, explain, or provide an industry standard for the term "overlapping" and his conclusions are based only on his "education and years of experience in the field" [Doc. 553 p. 8 (citations omitted)]. First, other than stating that the term, is undefined, Plaintiffs do not sufficiently explain

how the use of the term "overlapping" is substantially unsound. As Defendant notes, the term has common meaning, and there is no suggestion that it will be prejudicial or confuse the trier of fact. *Sadler v. Advanced Bionics, LLC*, 2013 WL 1340359, at *4 (W.D. Ky. Apr. 1, 2013) ("When a term has a common meaning, an expert's use of that term will not "necessarily [ ] be prejudicial or [ ] confuse the jury."). "Nothing in Rule 702 prohibits an expert from using a term's ordinary meaning." *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 569 (E.D. Mich. 2022).

Further, the fact that Dr. Eslamimehr's opinions are based solely on his expertise is of no consequence under these circumstances. Dr. Eslamimehr explained how the various categories of capabilities overlapped in the context of his critique of Dr. Dhar's survey rather than functioning as isolated features [Doc. 537-18 ¶¶ 14-15]. As previously discussed, Dr. Eslamimehr has the requisite expertise to opine in this regard, and this sufficiently establishes the reliability of his opinions, even absent formal methodology. *See Kumho*, 526 U.S. at 152 ("The objective of [*Daubert's* gatekeeping] requirement is . . . to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."); *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) ("In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." (quoting Fed. R. Evid. 702 advisory committee's note (2000)); *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 364–65 (S.D.N.Y. 2014) ("'Technical . . . or other specialized knowledge,' may be relevant and reliable, and therefore admissible under *Daubert*, even if the field of knowledge, be it marketing or plumbing, does not readily lend itself to a formal or quantitative methodology." (internal citation omitted)); *Harris v. BMW of N. Am., LLC*, No. 4:19-CV-00016, 2020 WL 7318087, at *4 (E.D. Tex. Dec. 11, 2020) ("Because [the expert] utilized a reliable methodology in reaching his

conclusion—namely, coupling his experience and knowledge with a review of various internal documents—the Court declines to exclude this opinion.").

Turning to Plaintiffs' final argument concerning Dr. Eslamimehr's critique of Dr. Dhar's survey,—that his opinions have no relevance to this case as he fails to explain how the "'overlapping' categories impact the results or reliability of Dr. Dhar's survey analysis" [Doc. 553 pp. 8–9]—the Court finds this challenge is not a basis to strike Dr. Eslamimehr's opinions but rather is properly addressed through cross examination. Plaintiffs assert that without evidence the "overlapping" categories have some impact on the survey results, "Dr. Eslamimehr's opinions do not 'fit' this case" [*Id.* at 8]. However, "[Defendants' rebuttal expert] need not develop alternative, affirmative opinions in order to rebut the evidence presented by Plaintiffs—that is not Defendants' burden." *Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1215 (E.D. Wash. 2015). In other words, "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." *Medidata Sols., Inc. v. Veeva Sys., Inc.*, No. 17 CIV. 589, 2022 WL 576089, at *2 (S.D.N.Y. Feb. 25, 2022) (quoting *In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020)); *see also TERA II, LLC v. Rice Drilling D, LLC*, No. 2:19-CV-2221, 2024 WL 621002, at *14 (S.D. Ohio Feb. 14, 2024) ("Contrary to [the] [p]laintiffs' assertions, Mr. Watson and Ms. Adair, as [the d]efendants' rebuttal witnesses, are not required to suggest alternate theories of damages or conduct independent damages calculations; instead, they are entitled to criticize Mr. Herzing's damages calculations." (citations omitted)); *CDA of America Inc. v. Midland Life Ins. Co.*, No. 01-cv-837, 2006 WL 5349266, at *6 (S.D. Ohio Mar. 27, 2006) (collecting cases where

the court allowed the defendant's expert to testify as to the weaknesses in plaintiff's theory of damages without offering his own theory).

Contrary to Plaintiffs' assertions, Dr. Eslamimehr, as a rebuttal witness, is entitled to criticize the purported flaw in the data used in the survey, based on his area of expertise, without having to suggest or conduct an independent analysis to demonstrate the impact the flaw may have on the survey results. The impact, if any, of the inaccuracy on the survey will bear on the weight of the evidence. *See Navarro v. Procter & Gamble Co.*, No. 1:17-CV-406, 2021 WL 868586, at *6 (S.D. Ohio Mar. 8, 2021) (noting imperfections or inaccuracies in underlying data go to the weight of the expert's calculations, not the reliability).

## B. Dr. Eslamimehr's Critique of Mr. Bradner's Selection of NMSes and Tested Products

Next, Plaintiffs assert that Dr. Eslamimehr's opinions concerning "Mr. Bradner's selection of [NMSes] and tested products" are conclusory and unfounded [Doc. 553 p. 9 (citation omitted)]. They further argue that Dr. Eslamimehr's opinions should be excluded because they contradict the parties' stipulation regarding representative products and because Dr. Eslamimehr failed to disclose that he reviewed Defendant's source code in preparing his report [*Id.* at 9–10].

Dr. Eslamimehr states:

> 17.    The NMS solutions that Mr. Bradner used were two old Extreme NMS solutions, Extreme Management Center and NetSight, and a non-cloud version of Extreme's current NMS, ExtremeCloudIQ Site-Engine. Other than these, Mr. Bradner used WhatsUp Gold, an open source NMS, and SolarWinds basic "Server and Application Monitor," not its NMS. (footnote omitted).
>
> 18.    Testing the SNMP capabilities and the overall dependability of Extreme Networks switches requires a well-rounded, comprehensive testing environment that reflects real-world network configurations and challenges. Relying on only a small set of switches. (such as 11) and a limited number of

16

NMS skewed Mr. Bradner's results and as explained below they do not adequately represent the diverse scenarios in which these switches would operate and the full extent of capabilities that would be required to network management [*sic*].

[Doc. 537-18 ¶¶ 17–18 (footnote omitted)]. While Plaintiffs maintain that Dr. Eslamimehr fails to support his brief opinions in this regard, Defendants responds that he is relying on his experience, which is sufficient. Considering his qualifications as outlined above, the Court finds that his opinion satisfies the reliability threshold of *Daubert* and Rule 702. Unlike the cases cited by Plaintiffs, this is not *ipse dixit* of the expert [Doc 553 p. 10 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)] nor is there "too great an analytical gap between the facts of the case and the proffered opinion to permit [his] testimony to go to the jury" [Doc. 584 p 10 (citing *Neal v. Fort*, No. 3:15-cv-425, 2017 WL 455499, *4 (M.D. Tenn. Jan. 20, 2017)]. Here, Dr. Eslamimehr explains his experience with design and development of NMSes, including his familiarity with all five of the NMSes tested by Mr. Bradner, and his work with the SNMP standard [*See* Doc. 537-18 ¶¶ 4–9 and Doc. 559-1 pp. 9–26]. *See ChampionX, LLC v. Resonance Sys., Inc.*, No. 3:21-CV-288, 2024 WL 4535974, at *5 (E.D. Tenn. Oct. 21, 2024) (finding the expert's reliance on his experience was permissible and not "conclusory *ipse dixit*" ( collecting cases)); *Grover v. BMW of N. Am., LLC*, No. 1:19-CV-12, 2022 WL 205249, at *7 (N.D. Ohio Jan. 24, 2022) ("Although somewhat conclusory, [the expert's] application of his knowledge and experience to his examination of documents . . . utilizes a reliable methodology sufficient to satisfy the Court's gatekeeping function." (citation omitted)); *see also SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 384 (4th Cir. 2017) (affirming the district court's decision to allow a professor of computer science to "rel[y] on his experience to inform his testimony, rather than any particular

scientific method"). Plaintiffs' disagreement with the conclusions reached by Dr. Eslamimehr is a matter for cross examination.

With regard to Plaintiffs' argument that Dr. Eslamimehr's opinions are baseless because he did not perform his own testing, the Court has discussed above that it is not necessary for a rebuttal expert, who is tasked with critiquing deficiencies and identifying flaws of another's expert's report, to conduct testing or provide alternative approaches. *See EEOC v. Tepro, Inc.*, 133 F. Supp. 3d 1034, 1047 (E.D. Tenn. 2015) ("The Court agrees with [the defendant] that [its expert] is not required to conduct independent statistical analysis in his role as a rebuttal expert. Instead, [the expert's] rebuttal may properly respond to the scope of [the plaintiff's] original expert opinion and reports."); *Rover Pipeline, LLC v. 1.23 Acres of Land, More or Less, Permanent Easement*, No. 17-CV-10365, 2018 WL 3322995, at *15 (E.D. Mich. July 6, 2018) ("It is well-settled that rebuttal experts are not required to independently assess the fact in issue." (citations omitted)). Thus, the Court finds Plaintiffs' argument is not grounds for exclusion.

Lastly, in their challenge to Dr. Eslamimehr's critique of Mr. Bradner's selection of NMSes and tested products, Plaintiffs assert that his rebuttal opinions should be excluded because they are contrary to the parties' joint stipulation [*see* Doc. 327], which guided Mr. Bradner's selections [Doc. 553 p. 9], and because Dr. Eslamimehr failed "to timely disclose any [] alleged code analysis," which he claimed to have considered in preparing his opinions [*Id.* at 11 (citation omitted)]. Defendant counters that these arguments are meritless [Doc. 557 p. 17], and as to these points, the Court agrees.

First, with respect to the joint stipulation, Defendant asserts that Plaintiffs mischaracterize the stipulation, which was derived after it provided "a list of Extreme's wired switches that contained Plaintiffs' software" and "produced for inspection representative samples of six of those

products and stipulated that it would not argue that those samples are 'not representative of what *Extreme's customers received* in aspects that are relevant to this litigation'" [Doc. 557 at 18 (citing Doc. 327 at 3]. Defendant maintains that Dr. Eslamimehr's report neither states that "the individual switches Mr. Bradner used to test are not representative of the switches customers received" nor that that the wrong switches were used. Rather, Dr. Eslamimehr's report focuses on "the *number* of switches and the number and type of *NMSes*" used by Mr. Bradner, which Dr. Eslamimehr states does not reflect "the full extent of capabilities that would be required [for] network management" [*Id.* (citing Doc. 537-18 ¶18]. Given that, the Court does not find that Dr. Eslamimehr's report is inconsistent with the parties' stipulation.

Second, as to disclosure of source code review, Defendant represents that Dr. Eslamimehr did disclose his review of [its] source code in noting his consideration of Dr. Greenspun's list of materials, which includes "[s]ource code produced by Extreme Networks, Inc, in this case" [Doc. 557 p. 18 (citation omitted)]. Defendant goes on to note, however, that it was not necessary for Dr. Eslamimehr to review its source code to opine about Mr. Bradner's testing conditions [*Id.*]. Indeed, "Dr. Eslamimehr offered this opinion based on his substantial experience working with networking technology, NMSes, and the SNMP standard" [*Id.*]. He did not claim to have "relied on or drew on his knowledge of [Defendant's] source code" [*Id.*]. The Court therefore finds Plaintiffs' arguments not well taken.

### C. Dr. Eslamimehr's Critique of Mr. Bradner's Attribution Percentages

Plaintiffs state that Dr. Eslamimehr's critique of Mr. Bradner's three valuation opinions are unsupported by adequate methodology, evidence, or qualifications, and are unhelpful [Doc. 553 p. 11]. Defendant maintains that Dr. Eslamimehr's "critiques of Mr. Bradner's methodology

19

and the unexplained assumptions on which he relied" are both "reliable and helpful to the

factfinder in assessing Mr. Bradner's opinions" [Doc. 557 p. 19].

Relevant to Plaintiffs' challenges, Dr. Eslamimehr states:

> 24. More fundamentally, the assessments in Part VIII of Mr. Bradner's report on which Dr. Dhar relied were flawed. Having considered Mr. Bradner's estimates, it is my opinion that his opinions in several respects attribute too much value to SNMP. As an initial matter, if implemented correctly, the value of SNMPR's implementation is 0% because any value associated is entirely tied to the function of SNMP, not any alleged creativity in implementation.

> 25. There are several reasons why Mr. Bradner's assessment was flawed. While Mr. Bradner said he was developing an assessment of the "extent" to which certain capabilities are "attributable" to SNMP, he, in fact, was engaged in a fundamentally different exercise. For each of the "Allegedly Infringing Capabilities," he asked essentially, "Is SNMP necessary to enable this capability"? And if the answer was yes, he concluded that SNMP contributed 100% to the enablement of that capability. He reached that conclusion with respect to five different capabilities: "Switch can be monitored from a single pane of glass"; "Switch can be monitored in real time"; "Switch can be monitored using software from third parties"; "Switch can be monitored in a multi-vendor network with single NMS"; "Switch provides granular view of devices, ports, applications, and users." In one instance ("Switch can send alerts") Mr. Bradner attributed 50% to SNMP because there was one other method of providing that capability (Syslog Protocol).

> 26. The first problem with this approach is that it is based on a factually flawed premise---that SNMP was necessary (or, in one case, one of two alternatives) to enable the relevant capability. I disagree with Mr. Bradner about that premise, and I summarize this analysis in the table below and provide more alternatives for each capability.

| Capability | Alternatives to SNMP | Extreme['] s network management software? |
|---|---|---|
| Switch can be monitored from a single pane of glass | REST NetConf | Yes |
| Switch can send alerts | REST NetConf Syslog | Yes |
| Switch can be monitored in real time | REST NetConf | Yes |
| Switch can be monitored using software from third parties | REST NetConf | Yes |
| Switch can be monitored in a multi-vendor network with single NMS | REST NetConf | No |
| Switch provides granular view of devices, ports, applications, and users | REST NetConf | Yes |

. . .

31.    To correct Mr. Bradner's report, and assist Extreme's rebuttal survey expert Mr. Philip Johnson in redoing Dr. Dhar's calculations in Exhibit 5 of his opening report, I have engaged in an exercise, based on my years of experience, education, training, and knowledge, to perform a proper analysis whether and to what extent certain capabilities are attributable to SNMP, based on an estimated percentage from 0–100%. Again, this exercise is fundamentally flawed because it does not measure the value of the SNMP software. But I am doing this to highlight the directional error in [Mr.] Bradner's analysis and assist Mr. Johnson in a similar directional correction of Mr. Dhar's apportionment percentage.

[Doc. 537-18 ¶¶ 24–26, 31].  The Court will address each of Plaintiffs' challenges in succession.

21

### 1. Dr. Eslamimehr's "0%" Valuation

First, Plaintiffs assert that "Dr. Eslamimehr offers the conclusory opinion that the value attributable to Plaintiffs' SNMP agent is '0%' on the theory that 'any value . . . is entirely tied to the function of SNMP, not any alleged creativity in implementation'" [Doc. 553 p. 12 (citing 537-18 ¶ 24)]. They state that Dr. Eslamimehr admittedly did not "look at the level of creativity between [SNMPR] software and SNMP" [*id.* (citing Doc. 547-18 pp. 22–23)], and even if he had done so, his opinion misstates a legal premise in copyright law [*id.*]. Plaintiffs maintain that the proper damages apportionment in a copyright case is "between the infringing and the noninfringing features of the defendant's work" rather than "between the creative and derived features of the plaintiff's work" [*Id.* (citing *Bucklew v. Hawkins*, 329 F.3d 923, 932 (7th Cir. 2003))]. Defendant counters that Plaintiffs' challenge misunderstands the opinion being expressed by Dr. Eslamimehr [Doc. 557 p. 19]. It states that "Dr. Eslamimehr's statement is [] an assessment of the internal logic of Mr. Bradner's own opinions and how they 'fit' with Plaintiffs' assessment of the relative value of their software" [*Id.* at 20].

In his calculation, "Mr. Bradner assigned an 'SNMP attribution' of either 0%, 50%, or 100% for each capability, depending on whether the SNMP standard is 'required' or a 'prerequisite' for that the capability, ultimately determining that six of the capabilities . . . had an 'SNMP attribution' of either 50% or 100%" [*Id.* at 19 (citation omitted)]. Dr. Eslamimehr criticizes this analysis stating that "it failed to assess the value of the copyrighted work but instead assessed the value of the SNMP standard" and opines that "if everything is SNMP, everything is built on SNMP, then consequently, the value of SNMPR [software] would be zero" [*Id.* at 20 (alteration in original and citations omitted)]. Defendant states that this is an appropriate topic for

a rebuttal expert, but Plaintiffs maintain that Dr. Eslamimehr is "attempting to apportion between the creative and derived features of Plaintiff[]s['] software, an approach expressly forbidden by copyright law" [Doc. 584 p. 13]. Plaintiffs add he is testifying as to the value the creativity of Plaintiffs' software without analyzing it [*Id.*].

"Rebuttal experts can properly 'respond[ ] to the content of [the original] expert witness' report and opinions.'" *Tepro, Inc.*, 133 F. Supp. 3d at 1047 (quoting *Express Energy Servs. Operating, L.P. v. Hall Drilling, LLC*, No. 2:14-cv-204, 2015 WL 3743795, at *3 (E.D. Ohio June 15, 2015)). And here, as a rebuttal expert, Dr. Eslamimehr can properly opine as to potential flaws in Mr. Bradner's initial report, and specifically, that Mr. Bradner "attribute[ed] too much value to SNMP" [Doc. 537-18 ¶ 24]. But Dr. Eslamimehr further states, "[I]f implemented correctly, the value of SNMPR's implementation is 0% because any value associated is entirely tied to the function of SNMP, not any alleged creativity in implementation" [*Id.*]. During his deposition, he acknowledged that he "was not asked to look into [the] level of creativity of SNMP software compared to the actual SNMP" [Doc. 547-18 p. 22]. Given that he did not look at the level of creativity, he cannot offer opinions about that area. And one court has noted, "The apportionment that the law permits is not between the creative and the derived features of the plaintiff's work, but between the infringing and the noninfringing features of the defendant's work." *Bucklew*, 329 F.3d at 932.

During his deposition, Dr. Eslamimehr states that the sentence in paragraph 24 has nothing to do with creativity but instead "is based on Mr. Bradner saying that everything is about SNMP, and he didn't mention anything about SNMP Research" [Doc. 547-18 p. 22]. While such is proper rebuttal testimony, the Court finds that Dr. Eslamimehr goes beyond critiquing Mr. Bradner by

referencing creativity in his expert report. The Court therefore excludes that sentence in paragraph 24 of his report.

### 2. Dr. Eslamimehr's "Alternatives to SNMP"

With respect to the above chart prepared by Dr. Eslamimehr, identifying alternatives to SNMP for each of the six purported infringing capabilities, Plaintiffs take no issue with Syslog but dispute "two other [] alternatives to SNMP in his chart; a pair of technologies known as 'REST' and 'NETConf' [Doc. 553 p. 12]. They assert that Dr. Eslamimehr's opinions as to whether these are viable alternatives to SNMP are conclusory, lacking citation to "any technical documents, industry-standard sources, or other objective evidence" [*Id.* at 12–13]. Defendant responds that Dr. Eslamimehr explains what both REST and NetConf do and "provides context for the role they play in switches, explaining, for example, that they are 'vendor-neutral configuration languages' that 'enable[] the switch to be configured and managed uniformly across different vendors' equipment within the same network" [Doc. 557 p. 21 (citing Doc. 537-18 ¶ 50 (other citations omitted)]. It further states that his opinion is based on his "extensive experience with switches and network management technology" and the lack of analysis or citations to third-party authority does not render his opinion unreliable [*Id.*]. The Court agrees. Dr. Eslamimehr's experience and knowledge is sufficient to meet the *Daubert* threshold of admissibility, and Plaintiffs' criticisms of Dr. Eslamimehr's discussion of alternatives that were not considered by Mr. Bradner are more appropriately the subject of cross examination.

### 3. Dr. Eslamimehr's "Corrected" Attribution Percentages

Finally, Plaintiffs argue that "Dr. Eslamimehr criticizes Mr. Bradner for attribut[ing] too much value to SNMP and purports to present a 'correct[ed]' valuation" [Doc. 553 p. 13 (citing 537-18 ¶¶ 24, 31(internal quotations omitted)]. They state that Dr. Eslamimehr performed no

"testing or other analysis to support his valuation" and merely "identif[ied] 10 to 12 additional factors that contribute to each [of the six 'infringing' capabilities], resulting in final valuation percentages between 7.6 percent and 9.1 percent" [*Id.* (citing Doc. 537-18 ¶¶ 33–57 and Doc. 547-18 p. 41]. They also state that Dr. Eslamimehr has no expertise on the topic of SNMP [*Id.* at 14].

Defendant responds reiterating that as a rebuttal expert "focused on explaining why Mr. Bradner's analysis is inaccurate or incomplete," Dr. Eslamimehr is not required to perform testing for the "express purpose of highlighting the directional error in Mr. Bradner's analysis" [Doc. 557 p. 22 (cleaned up)]. It asserts that "Dr. Eslamimehr considered the same switch and NMS technology Mr. Bradner considered and, drawing on his many years of working with this technology, explained what Mr. Bradner missed" [*Id.* citing Doc. 537-18 ¶ 31]. With respect to the attribution percentages offered by Dr. Eslamimehr, Defendant states that "[he] does not claim that his percentages are the true or correct ones[,] . . . acknowledg[ing] that they are 'conservative' and that the assumptions he relies on would tend to overvalue the role of the SNMP standard" [*Id.* at 23]. It maintains that Dr. Eslamimehr's "directional analysis" "show[s] what Mr. Bradner overlooked in assigning the entire value of a capability that relies on the SNMP standard to that standard and demonstrate[s] how significantly his oversight would affect the 100% attribution percentages he offered" [*Id.*]. In short, Defendant argues that Dr. Eslamimehr "draw[s] on his expertise to both explain that Mr. Bradner's attribution percentages are unreliable and illustrate why they unreliable" [*Id.* at 23 (emphasis omitted)].

In their reply, Plaintiffs restate that "Dr. Eslamimehr is not qualified by 'experience' to offer these 'corrected' attribution percentages, because he is not an expert on the subject of SNMP" [Doc. 584 p. 17]. They also note that while Defendant states Dr. Eslamimehr's analysis "merely

25

highlights 'directional error' in Mr. Bradner's analysis," it "neglects to mention that it affirmatively uses the exact numbers provided by Dr. Eslamimehr to derive Mr. Johnson's attribution analysis and damages valuation" [*Id.* at 16 (emphasis omitted and citing Doc. 456-16 ¶ 72 SEALED)]. Thus, Plaintiffs argue this is more than "highlighting 'directional error'" as Defendant seeks to use these "unsupported percentages to place grossly reduced damages estimates in front of the jury" [*Id.*].

Starting with Plaintiffs' challenge that Dr. Eslamimehr is not qualified to testify about SNMP, the Court finds it not well taken, largely for the same reasons as described above. Dr. Eslamimehr has a Master of Science in Computer Science and has "worked as a software engineer for more than 20 years" [Doc. 537–18 ¶¶ 4–5]. During his deposition testimony, he explained his experience with SNMP [Doc. 547-18 p. 10]. In light of his educational and professional background, the Court finds him qualified to testify about SNMP. *See Bradley v. Ameristep, Inc.*, 800 F.3d 205, 209 (6th Cir. 2015) ("[Courts] take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement." (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)).

Plaintiffs also state that Dr. Eslamimehr claims to have identified 10 to 12 additional factors that contribute to each [capability]" and that he did not provide a sufficient basis for that opinion [Doc. 553 pp. 13–14]. In his report, Dr. Eslamimehr discusses the additional factors [*see* Doc. 537-38 ¶ 38(a)–(j)], and opines that "[e]ach of these features is crucial for the robust alerting capabilities of modern network switches. While SNMP provides a standard method for monitoring and event notification within network devices, the complete functionality of sending alerts is much more complex and requires a holistic approach encompassing multiple technologies and standards" [*Id.* ¶ 39]. Plaintiffs argue that for this testimony, Dr. Eslamimehr claims to have relied on source

26

code but that he never disclosed it. The Court addressed this issue above. They also argue that Dr. Eslamimehr failed to use a reliable methodology [Doc. 553 p. 15]. But in reviewing the capabilities, Dr. Eslamimehr relied on his specialized knowledge within this area. The Court finds such testimony is appropriate rebuttal testimony, and that it appears this is merely a "classic battle of the experts' and it [is] up to the jury to evaluate what weight and credibility each expert opinion deserves." *Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005) (quoting *Cadmus v. Aetna Casualty and Surety Co.*, No. 95-5721, 1996 WL 652769 (6th Cir. Nov. 7, 1996)).

But Dr. Eslamimehr also opines, "In considering all of those features together with SNMP, and assuming that each of those features, together with SNMP, contribute equally to altering capabilities of modern network switches, the relative contribution of SNMP is 9.1%" [Doc. 537-18 ¶ 40]. During his deposition, however, he acknowledged that he could have identified additional features [Doc. 547-18 p. 43]. In addition, he stated that he did not analyze whether "SNMP has [a] lower value than any of the other dozens of features" [*Id*. at 41]. He submitted, "I need a . . . thorough analysis to provide like exact comparison for SNMP compared to any of those features" [*Id*.]. Defendant argues that "Dr. Eslamimehr does not claim that his percentages are the true or the correct ones; in fact, he expressly acknowledges that they are 'conservative' and that the assumptions he relies on would tend to overvalue the role of the SNMP standard" [Doc. 557 p. 23 (citation omitted)]. But Dr. Eslamimehr's alleged overvaluing the role of the SNMP standard does not make his opinion reliable. And while attacks on an expert's data are generally for cross examination, *see Victorino v. FCA US LLC*, No. 16CV1617, 2018 WL 2767300, at *3 (S.D. Cal. June 7, 2018) (finding that the "[d]efendant's challenge to the data or input underlying [the expert's] formula calculations is subject to cross-examination at trial, and not exclusion"), this does not necessarily mean "that a significant error in application will never go to the admissibility,

as opposed to the weight, of the evidence." *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[A]ny step that renders the analysis unreliable . . . renders the expert's testimony inadmissible." (ellipses in original) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)). Because Dr. Eslamimehr acknowledges he did not analyze whether SNMP has a lower value and he admitted there were more features he did not identify, [*see, e.g.*, Doc. 537-18 ¶¶ 40–41], his opinion that each feature contributed a certain percentage creates "too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co.*, 522 U.S. at 146.[7] The Court therefore excludes these opinions.

## IV.    CONCLUSION

For the reasons set forth above, the Court **GRANTS IN PART AND DENIES IN PART** [**Doc. 457**].

**IT IS SO ORDERED.**

ENTER:

Debra C. Poplin
United States Magistrate Judge

---

[7]     Defendant characterizes Dr. Eslamimehr's opinion as "'directional analysis'" to help the jury assess Mr. Bradner's opinions [Doc. 557 p. 23]. But Defendant has not sufficiently explained how Dr. Eslamimehr's opinion can be helpful when it acknowledges that he "does not claim that his percentages are the true or correct ones" [*Id.*].

28